UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TUNC URAZ,

Petitioner,

v.

FREDEANE ARTIS,

Respondent.

CASE NO. 4:25-cv-10608

HON. SHALINA D. KUMAR

MAG. JUDGE DAVID R. GRAND

**ANSWER IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS**

# TABLE OF CONTENTS

Introduction ........ 1

Statements in Compliance with Habeas Rule 5(b) ........ 4

A. Statute of Limitations ........ 4

B. Exhaustion ........ 4

C. Procedural Default ........ 4

D. Non-retroactivity Doctrine ........ 4

Statement of the Case ........ 5

A. Trial Facts ........ 5

1. Uraz's aggravated stalking of EM ........ 5

2. Uraz's solicitation of murder of EM ........ 11

B. Procedural History ........ 24

Standard of Review Pursuant to AEDPA ........ 27

Argument ........ 34

I. [Claims IV and V] Uraz's challenge to the trial court's admission of his prior bad acts is not cognizable on federal habeas review. In any event, the state appellate court reasonably denied Uraz's claims regarding joinder and the admission of the other-acts evidence. ........ 34

A. Portions of Uraz's challenges to the trial court's rulings are not cognizable on federal habeas review. ........ 36

B. Clearly established federal law regarding joinder ........ 38

C. The state appellate court's decision ........ 39

D. Analysis ........ 44

II. [Claim VII] Uraz's claim that the state courts erred by denying his motion to dismiss based on entrapment is not cognizable on federal habeas review, and in any event, the state appellate court reasonably denied his claim........................51

A. Uraz's entrapment claim is not cognizable on federal habeas review. ...........................................................51

B. Even if Uraz's entrapment claim was cognizable, he is not entitled to relief. ......................................................52

III. [Claim VI] Uraz's claim that his Sixth Amendment right to counsel was violated by the admission of his communications with jail inmates and an undercover police officer is procedurally defaulted, and lacks merit in any event. .................56

A. Uraz has procedurally defaulted this claim..........................56

B. Even if this Court excuses or otherwise bypasses the procedural default, Uraz still is not entitled to relief because the state appellate court reasonably concluded his Sixth Amendment right to counsel had not yet attached with respect to his aggravated stalking and solicitation of murder charges. .............................................61

1. Clearly established federal law regarding Sixth Amendment right to counsel .......................................61

2. The state appellate court's decision .............................62

3. Analysis ........................................................................64

IV. [Claim II] Uraz's claim that he was denied an impartial jury based on Juror #2's "dual identity" is procedurally defaulted and lacks merit in any event. ....................................................67

A. Uraz has procedurally defaulted this claim..........................68

B. Clearly established federal law regarding the right to an impartial jury, voir dire, and a juror's non-disclosure ..............................................................................70

C. Analysis ........ 73

V. [Claim III] The state appellate court reasonably denied Uraz's claim regarding Juror #1's bias........ 74

A. Clearly established federal law regarding juror bias and the no-impeachment rule........ 75

B. The state appellate court's decision ........ 77

C. Analysis ........ 79

VI. [Claim I] The state appellate court reasonably concluded Uraz was not denied the effective assistance of trial counsel....... 81

A. Clearly established federal law regarding ineffective assistance of counsel: the *Strickland* standard ........ 82

B. Analysis ........ 85

1. Trial counsel's mental state and handling of Uraz's case........ 85

2. Trial counsel's failure to challenge Uraz's statements while incarcerated as violative of his Sixth Amendment right to counsel. ........ 94

3. Trial counsel's failure to investigate and present evidence of Uraz's diminished mental state........ 95

4. Trial counsel's failure to investigate and call other witnesses. ........ 97

Conclusion........ 102

Relief ........ 107

Certificate of Service ........ 108

## INTRODUCTION

Petitioner, Tunc Uraz, stalked his ex-girlfriend, EM, and solicited two jail inmates and an undercover police officer to murder her after she ended a romantic relationship with him. A jury found Uraz guilty of aggravated stalking[1] and three counts of solicitation of murder.

As a result of his Ingham County jury-based convictions of three counts of solicitation to commit murder, Mich. Comp. Laws § 750.157b(2), the State now holds Uraz in custody in the Michigan Department of Corrections. Uraz is currently serving a sentence of 200 to 360 months' imprisonment for the solicitation of murder conviction.

Uraz commenced this action under 28 U.S.C. § 2254 by filing a petition with this Court. The State understands the petition to be raising the following claims:

I. Petitioner was denied his constitutional right to the effective assistance of counsel where trial counsel failed to request a continuance or withdraw as counsel when he was nearing a mental breakdown which impacted his ability to reasonably represent his client throughout the proceedings, as evidenced by counsel's

---

[1] Uraz was sentenced to 36 to 90 months' imprisonment for the aggravated stalking conviction, a sentence he has fully served. Because Uraz is only "in custody" for purposes of his solicitation of murder convictions, his request for habeas relief is limited to those convictions.

(1) overall handling of the case, (2) failure to object to the admission of Uraz's incriminating statements while incarcerated as violative of Uraz's Sixth Amendment right to counsel, (3) failure to present evidence of Uraz's diminished mental state, and (4) failure to investigate or call certain witnesses in Uraz's defense.

II. Petitioner was denied his constitutional right to an impartial jury when juror #2 concealed his use of a dual identity and where his dishonesty would have provided a valid basis to challenge for cause.

III. Petitioner was denied his constitutional right to a fair trial by an impartial and unbiased jury where juror #1 a juror expressed bias against petitioner's ethnic origin.

IV. Petitioner was denied his constitutional right to a fair trial by the court's decision denying his motion for severance where the sheer number of prior bad acts, as well as unrelated and unfounded allegations admitted into evidence, resulted in an unfair prejudicial tactical advantage in violation of United State Supreme Court precedent.

V. Petitioner was denied his constitutional right to a fair trial by the introduction of unduly prejudicial evidence concerning prior bad acts.

VI. Petitioner was denied his constitutional right when the trial court admitted into evidence a video tape and transcribed conversation that was obtained in violation of Petitioner's right to counsel.

VII. The trial court erred when it denied petitioner's motion to dismiss based on entrapment of a crime that was manufactured by law enforcement and their agents/informants and where the Michigan courts further based their denial upon an unreasonable

application of facts and law, contrary to United States and Michigan Supreme Court precedent.

Should the Court interpret the petition to be raising different claims, the State requests an opportunity to file a supplemental pleading. To the extent that Uraz failed to raise any other claims that he raised in the state courts, those claims are now abandoned. *See Sommer v. Davis*, 317 F.3d 686, 691 (6th Cir. 2003) (holding that an issue is abandoned if a party does not present any argument respecting the issue in his brief). Thus, habeas review of abandoned claims is barred.

The State now answers the petition and requests that it be denied.

## STATEMENTS IN COMPLIANCE WITH HABEAS RULE 5(b)

With respect to the bars that preclude habeas review, the State asserts the following in conformance with Habeas Rule 5(b):

### A. Statute of Limitations

The State is not arguing that any of Uraz's habeas claims are barred by the statute of limitations.

### B. Exhaustion

The State asserts that Uraz has not exhausted Claim II from his habeas petition in the state courts, although this technically results in a procedural default as more fully discussed below.

### C. Procedural Default

The State asserts that Uraz has procedurally defaulted Claim VI as more fully discussed below.

### D. Non-retroactivity Doctrine

The State is not arguing that consideration of any of Uraz's claims is barred by the non-retroactivity doctrine.

## STATEMENT OF THE CASE

### A. Trial Facts

Uraz and EM were in a dating relationship from the end of 2012 or beginning of 2013 until June 2015.[2] (11/3/2017 Jury Tr. at 10.) They met when Uraz worked at the Michigan State University (MSU) cafeteria and EM was a student. (*Id*. at 9.) During their relationship, Uraz and EM communicated in English, and Uraz taught a culinary arts management class in English. (*Id*. at 10–11.)

#### 1. Uraz's aggravated stalking of EM

When EM ended the relationship, Uraz was not happy. (*Id*. at 11.) After the relationship ended, Uraz still tried to communicate with EM and work on their issues. (*Id*. at 11–12.) EM asked Uraz to leave her alone, but he refused. (*Id*. at 12.) In July of 2015, EM moved from one unit in her apartment complex to another unit, and Uraz helped her move. (*Id*. at 12–15.) Uraz did not have a key to EM's apartment. (*Id*. at 14–15.)

---

[2] This statement of facts is adapted from the prosecution's September 12, 2022 supplemental brief on appeal filed in the Michigan Court of Appeals following an evidentiary hearing.

During the evening on August 24, 2015, someone keyed EM's car and peeled the registration tag off of it. (*Id*. at 15–17.) On September 29, 2015, Uraz confronted EM while she was grocery shopping and asked EM about a man that she was dating. (*Id*. at 18–19.) EM asked Uraz to leave her alone and left the store. (*Id*. at 19.) Uraz left at the same time as EM. (*Id*.) During this time, Uraz was still trying to communicate with EM by text message. (*Id*. at 20.)

On December 31, 2015, Uraz confronted EM while she was celebrating New Year's Eve at Dave and Busters with her then-boyfriend, Stan White, and their friends Noelle VanSlembrouck and Zeb Baldwin. (*Id*. at 20.) Uraz tried to make EM come outside to talk to him. (*Id*.) When she refused, he began slandering her, calling her a slut, and trying to talk to White. (*Id*. at 20.) EM felt scared and unsafe. (*Id*. at 21.) Management had to escort Uraz out of the restaurant. (*Id*. at 22.) That evening, when EM and White left Dave and Busters, the tires on White's vehicle were slashed. (11/02/2017 Jury Tr. at 178–79.)

EM obtained a Personal Protection Order (PPO) and served Uraz on January 21, 2016. (11/03/2017 Jury Tr. at 21.) On February 13, 2016, Uraz texted EM and called her a "Ho." (*Id*. at 24.) On March 26,

2016, Uraz confronted EM in the parking lot of Best Buy in Okemos. (*Id*. at 25.) As EM was pulling into the parking lot, she noticed Uraz's vehicle behind her. (*Id*. at 25.) Uraz pulled up next to EM, rolled down his window, and tried to talk to her. (*Id*. at 25.) EM took pictures of Uraz using her phone, stayed inside her car, and called the police. (*Id*. at 26–27.) Uraz only left the parking lot when police arrived. (11/02/2017 Jury Tr. at 131.) EM was upset, crying, and distraught. (*Id*. at 132.)

On April 8, 2016, EM was in Petoskey at her mother's home. (11/03/2017 Jury Tr. at 27.) Uraz called EM from his mother's phone. His mother's name appeared on EM's mother's caller ID, and EM did not answer the call. (*Id*. at 28.) EM did not inform Uraz that she was going to Petoskey. (*Id*. at 28.)

Also in April 2016, Uraz attempted to obtain a gun and ammunition. (11/06/2017 Jury Tr. at 91–93.) Uraz approached his co-worker at MSU, Patrick Burnett; asked Burnett if Burnett "trust[ed]" him; and then asked Burnett to obtain gun and ammunition for him, stating, he could not do it the "legal way." (*Id*. at 92–94.) Uraz stated that he really needed it and appeared to be serious. (*Id*. at 94–96.)

Uraz made the same request of Burnett the next day. (*Id.* at 97.) Burnett knew it was not a joke and reported the conversation to his supervisor. (*Id.* at 97–99.) Uraz was terminated from his employment at MSU for making this request. (*Id.* at 99.)

In May 2016, EM stayed at White's house. (11/03/2017 Jury Tr. at 29.) During the night, Uraz egged EM's vehicle and slashed the tires on White's vehicle again. (*Id.*; 11/02/2017 Jury Tr. at 181–84.) Uraz also texted White, although he did not identify himself in the text messages. (11/02/2017 Jury Tr. at 179–185.) Uraz asked to meet White to work out their differences. (*Id.* at 185.) White responded by calling the sender by Uraz's name, confronting him about damaging White's and EM's vehicles, and declining to meet with him. (*Id.* at 185–89.) The sender did not express confusion and responded in a manner that made it clear he was Uraz. (*Id.*) After this, EM ended her relationship with White because she did not want to put him in continued danger. (11/03/2017 Jury Tr. at 30–31.)

Also in May 2016, EM placed a security camera in her bedroom because she was concerned that Uraz had entered her apartment without her knowledge or consent. (*Id.* at 31.) EM was correct. On

May 25, 2016, Uraz was caught on camera looking around inside EM's room. (*Id*. at 32–33.) Uraz appeared to be looking in an area where EM had placed tickets for an upcoming Drake concert. (*Id*. at 34.) A bra, underwear, and a pair of shoes also went missing from EM's bedroom. (*Id*. at 31.)

On July 17, 2016, Carmen Elias, EM's roommate and EM saw Uraz parked outside of EM's bedroom. (*Id*. at 35-36; 11/02/2017 Jury Tr. at 146–48.) Elias went to the parking lot, and Uraz drove away. Uraz then texted Elias and stated that he was in Turkey. (11/02/2017 Jury Tr. 147–48.) A few weeks later, Elias found the lug nuts on her tires had been loosened while it was parked outside her apartment. (*Id*. at 155.)

On July 13, 2016, EM obtained another PPO. (11/03/2017 Jury Tr. at 36.) On August 15, 2016, Uraz began trying to access and change the password on EM's Facebook account. (*Id*. at 37.) Uraz also created an Instagram account in EM's name. (*Id*. at 37–38. ) He used pictures from EM's actual Facebook account posted them on the fake Instagram account without EM's consent. (*Id*. at 38–42.) Through search warrants for the IP addresses associated with the activity, the activity

was linked to the apartment complex where Uraz and Uraz's associate, Burak Atamar, lived. (*Id*. at 83, 102–10.) On August 16, 2016, EM attended the Drake concert; she had tickets that Uraz appeared to look at when he broke into her bedroom in May of 2016. (*Id*. at 48.) When she returned to her vehicle, her tires were again slashed. (*Id*. at 48–50.)

Uraz was charged with home invasion second degree and aggravated stalking in file 16-0534-FH and placed in the Ingham County Jail. Uraz called EM two times from the Ingham County jail. Uraz had prerecorded a message that said, "I hope you're happy." (*Id*. at 46–48.) Uraz also wrote a letter and gave it to his former attorney, Chris Bergstrom, to give to the prosecutor for EM. (*Id*. at 72–74.) Uraz pleaded guilty to aggravated stalking on August 23, 2016, for his stalking conduct from before that date. (*Id*. at 68–69.) He admitted his conduct was designed to scare or intimidate EM. (*Id*.)

In late August 2016 Uraz created a fake email account using EM's name. (*Id*. at 44–46.) He sent EM a copy of the same letter he had provided to Bergstrom. (*Id*. at 44–46, 72–7.) This was a violation of the PPO and no contact order. On August 27 and 31, 2016, EM received notifications regarding changes to her Facebook password. (*Id*. at 42.)

This activity was again linked to the apartment complex where Uraz lived. (*Id*. at 83, 102–10.) Uraz's GPS tether also showed that he was present at the physical location associated with the IP address on August 27, 2016, and August 31, 2016, when the activity occurred. (11/02/2017 Jury Tr. at 115–19.) Uraz was later charged with aggravated stalking in file 16-1064-FH for his stalking conduct between the dates of August 23, 2016, and September 26, 2016.

### 2. Uraz's solicitation of murder of EM

While incarcerated at the Ingham County Jail for the stalking activity from June 2015 to early-mid August 2016 (16-0534-FH), Uraz began soliciting other inmates to murder EM.

The first person Uraz solicited was inmate Charles Allen. Uraz and Allen were housed together for a period of time in a medical unit. (11/07/2017 Jury Tr. at 26–27.) They became friendly and Uraz began to talk to Allen about EM. (*Id*. at 8–10.) Uraz told Allen that he was in jail for stalking EM. (*Id*. at 10–11.) Uraz told Allen that he wanted to get back at EM, and stated "this bitch got to pay." (*Id*. at 12–13.) Uraz then made numerous, specific solicitations of Allen. Uraz asked Allen to beat EM with a baseball bat, that he wanted her "fucked up," and

that he wanted pictures of it. (*Id.* at 14–16.) Uraz then asked Allen to kill EM. (*Id.* at 16–22.) He specified that he wanted her beaten beyond recognition with a bat and that he wanted it to be recorded so that he could masturbate to it. (*Id.* at 20–21.) Uraz also requested EM's identification. (*Id.*) Uraz specified that he wanted EM's body to be dumped where no one would find her. (*Id.* at 16.) Uraz agreed to pay Allen $2,500 in exchange for killing EM. (*Id.* at 16–18.) Uraz told Allen where EM lived, what type of car she drove, and warned him that she has a camera in her house. (*Id.* at 18–20.) Uraz also requested a gun so that he could go after the guy EM "cheated" with. (*Id.* at 21–22.) Allen went along with the conversations, but he had no intention of doing anything Uraz asked. (*Id.* at 22.)

Allen notified a jail deputy about what Uraz had requested. (*Id.* at 24–25.) Allen was interviewed by Lansing Police Detective Matt Krumbach. (*Id.* at 135–36.) During the interview, Allen asked if he could get out of jail. (*Id.* at 27–28.) Detective Krumback told Allen no but stated he could tell Allen's probation officer that Allen was helpful. (*Id.* at 27–28.) Allen stated that no one took advantage of Uraz or hurt him while he was in jail. (*Id.* at 39, 68.) Allen cooperated with law

enforcement for the sake of EM's life, and because it was the right thing to do. (*Id*. at 28, 69–70.)

The second person Uraz solicited to murder EM was Reginald Close. Close's nickname was "Rough." (11/03/2017 Jury Tr. at 131.) Uraz, Allen, and Close were assigned to the medical unit at the same time, and that is where Uraz and Close met. (*Id*. at 132–35.) Uraz began talking to Close about EM within 48 hours of meeting him. (*Id*. at 136–38.) Uraz told Close that EM ruined his life, lied to him, and cheated on him. (*Id*. at 138.) He also told Close that he had stalked her, entered her house, and that it was her fault that he was in jail. (*Id*.) Uraz further stated that he was going to get rid of her and that he had lost his job at MSU because he tried to get a gun from a coworker in order to kill EM. (*Id*. at 138–39.) Uraz also admitted to Close that he slashed EM's tires while she was at a Drake concert and that he was able to access her phone through her iCloud. (*Id*. at 140–41.)

Uraz asked Close if he knew anyone who could have EM killed and make it look like a robbery. (*Id*. at 143.) By the time this conversation took place, Allen had been moved to another location in the jail. (*Id*. at 143–44.) Uraz asked Close if he could help by killing

EM. (*Id*. at 145.) Close notified his lawyer after he realized that Uraz was serious about killing EM. (*Id*. at 145.) Close agreed to help Uraz kill EM. (*Id*. at 145–46.) Uraz provided EM's and White's addresses, EM's Facebook information, a map to EM's apartment, EM's and White's car information, and EM's job information. (*Id*. at 152–56.) Uraz agreed to pay $1,000 for EM's murder. (*Id*. at 147.) Uraz made arrangements for his associate, Atamar, to place some money in Close's jail account. (*Id*. at 157.)

Lansing Police Detective Andrew Hogan interviewed Close. (11/06/2017 Jury Tr. 106.) Close did not receive anything in exchange for his statement or testimony, and he was provided with immunity for agreeing to help Uraz kill EM. (11/03/2017 Jury Tr. at 146, 160–61.) Detectives Hogan and Krumbach checked Close's jail account and verified that Atamar made a deposit of $133.59 on October 13, 2016. (11/06/2017 Jury Tr. at 108–110; 11/07/2017 Jury Tr. at 132–33, 137–42.) Detective Hogan verified that Uraz never complained of threats, assaults, or promises from other inmates. (11/06/2017 Jury Tr. at 110–11.)

The third person Uraz solicited to murder EM was undercover officer, FM, who pretended to be a "hit man." (*Id*. at 117.) FM was provided with basic information regarding Uraz's previous solicitations and was pretending that he was Close's friend from Detroit. (*Id*. at 117–19.) FM called Uraz for the first time on October 18, 2016, using a video chat option for jail calls, but the call was not successful. (*Id*. at 121.) FM called again on October 24, 2016. Uraz answered, and the entire call was recorded, which was played for the jury at trial. (*Id*. at 121, 126–27.) FM told Uraz that "Rough" had told him that Uraz needed someone to "take out the trash." (*Id*. at 123.) Throughout the call, FM referred to EM as the "trash," however, he made it clear that this was code for EM, the person Uraz wanted to have killed. They discussed whether Uraz wanted FM to "beat" the trash, whether he should "spill" the trash all over the house, whether he should beat the trash with a bat, whether he would want the scene to be cleaned up afterward, what color hair the trash had. (*Id*. at 123–27.) Uraz stated that he wanted it done quickly, throw it out clean. (*Id*.) They discussed the address where the trash would be, and Uraz stated that Rough would have that information because he had written it all down. (*Id*. at

124–25.) Uraz stated that he was certain that he wanted it done. They discussed how completion would be verified, and that Uraz would pay FM $2,000 for the first "bag" and $500 for any others. (*Id*. at 141–42.) Uraz specified that he wanted the "trash" taken care of before November 2, which was his sentencing date.

Uraz was subsequently charged with three counts of solicitation of murder as to EM. Uraz was represented by trial counsel, Jacob Perrone. The trial court granted the prosecution's request to join the solicitation charges and the aggravating stalking charge and denied Perrone's move to sever them. (02/28/2017 Mt Hr'g at 3–21.) Perrone also filed a motion to allow Uraz to assert the defense of entrapment, but it was ultimately denied. (10/20/2017 Mt Hr'g 8–105.) Perrone further responded and argued against the prosecutor's motion to admit Uraz's prior acts of stalking under MRE 404(b). (10/11/2017 Mt Hr'g 3–22.)

At trial, Perrone's defense included arguing that the jury should keep an open mind, that Uraz was presumed innocent, that Uraz does not have to prove anything, and that the prosecutor must prove beyond a reasonable doubt that Uraz is guilty. (11/02/2017 Jury Tr. at 114–20;

11/09/2017, Jury Tr. at 135.) Perrone also argued that the evidence against Uraz was manufactured, that Allen and Close took advantage of Uraz, and that they provided testimony against Uraz to benefit their own situations. (11/02/2017 Jury Tr. at 121–27; 11/09/2017 Jury Tr. at 138–39.) Perrone further argued that the evidence that was admitted pursuant to MRE 404(b) was not a part of the charged conduct in the case. (11/09/2017 Jury Tr. at 137–38, 145.) The jury convicted Uraz of three counts of solicitation to commit murder and one count of aggravated stalking. (11/09/2017 Jury Tr. at 186.)

On December 12, 2017, Perrone informed the trial court that he has bipolar disorder, which he takes medication for. (12/12/2017 Hr'g at 5–7.) Perrone clarified, however, that he did not have an active episode during the trial and that his diagnosis did not impact his representation of Uraz. (*Id.*)

On December 13, 2017, a hearing was held regarding the information Perrone provided. The trial court informed Uraz that Perrone had an illness "after the completion of the trial, but before the time of sentencing." (12/13/2017 Hr'g at 3.) The trial court appointed another attorney, Duane Silverthorn to represent Uraz; however, Uraz

requested that Perrone continue representing him along with Silverthorn, stating it was what he wanted. (*Id.* at 4.) Uraz's sentencing was adjourned from December 20, 2017 to January 24, 2018, so that Silverthorn could prepare. (*Id.* at 5–6.)

Uraz was sentenced to 200 to 360 months' imprisonment for each count of solicitation of murder, and 36 to 90 months' imprisonment for aggravated stalking, with credit for 443 days. (01/24/2018 Sent. at 37.) Perrone did not appear on Uraz's behalf. (*Id.* at 1–2.)

Uraz appealed his convictions. His appeal included a motion to remand for a *Ginther*[3] hearing, claiming Perrone had a mental breakdown during trial and provided ineffective assistance of counsel by: (1) failing to impeach Allen and Close with prior theft convictions, (2) giving an inadequate closing argument, (3) sending a particular email to Uraz's sister during the trial, and (4) creating delays between questions while cross-examining a witness. On March 6, 2020, the Michigan Court of Appeals remanded the case to the trial court to hold a *Ginther* hearing on Uraz's ineffective-assistance claim regarding Perrone's mental health and his performance during trial. The *Ginther*

[3] *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973).

hearing was delayed due to the COVID-19 pandemic and the necessity of holding the *Ginther* hearing with Uraz's in-person presence.

At the *Ginther* hearing, Uraz testified on his own behalf and called seven witnesses: (1) Perrone; (2) Perrone's second chair attorney, Eric Schroeder; (3) Perrone's trial assistant, Nicholas Fernandez; (4) the second chair trial prosecutor, Charles Koop; (5) Uraz's attorney at sentencing, Silverthorn; (6) an employee from Perrone's office, Andrew Vuckovich; and (7) first chair trial prosecutor, Jonathan Roth.

Perrone testified that he did not have a mental health diagnosis before Uraz's trial and that he did not experience symptoms during trial. (10/04/2021 Hr'g at 14.) Perrone also testified he did not have any issues with his mental health on any day of Uraz's trial. (*Id*. at 22, 23, 24, 26, 29, 34–35.) Rather, he had an issue with his mental health about a week after trial, which led to Perrone being diagnosed with bipolar disorder. (*Id*. at 35.) The next time Perrone saw Uraz, Perrone informed Uraz of his mental health diagnosis; Uraz nonetheless asked Perrone to continue to represent him. (*Id*. at 36–37.) Perrone testified that if he did in fact have a mental breakdown or bipolar episode in court, it would have been obvious to everyone: he would have been

unintelligible, and those present would have been calling for help for him. (*Id*. at 37–38.) Perrone also explained he did not have any general mental decline during the trial. (*Id*. at 38.)

Schroder testified that he did not observe Perrone have any issues with his mental health during trial. (*Id*. at 42–51.) Schroeder understood his ethical obligations under Michigan Rules of Professional Conduct 1.1 and 8.3 and explained that he did not see anything regarding Perrone's representation that gave him pause based on his ethical obligations. (*Id*. at 46–47.) As to Uraz's specific claims, Schroeder testified that Perrone did not have a mental breakdown during trial and that "to his knowledge" Perrone did not have a mental decline during trial. (*Id*. at 49–50.)

Fernandez testified that he did not see any "downturn" in Perrone's behavior during trial; however, Fernandez did recall an outburst that was directed at either the prosecutor or a detective. (*Id*. at 52.) Koop also agreed with the other witnesses that Perrone did not have a mental breakdown during trial. (*Id*. at 55.) Similarly,

Vuckovich did not recall issues or changes in Perrone's behavior during the relevant timeframe.[4] (*Id.* at 63–64.)

Roth also did not observe Perrone have a mental breakdown during Uraz's trial. (04/13/2022 Hr'g at 5–7.) Roth's testimony was unique among the other witnesses because he and Perrone attended law school together and the two had known each other for 10 to 12 years before Uraz's trial. (*Id.*) Roth did not notice anything different about Perrone during the trial, and he did not observe Perrone have a mental breakdown or mental decline on any of Uraz's trial dates. (04/13/2022 Hr'g at 6–7, 11, 12, 14, 17, 20.)

The trial court denied Uraz's motion for a new trial. (08/08/2022 Ingham Cir. Ct. Order at 1–17.)

The Michigan Court of Appeals also accurately summarized the facts adduced at trial as follows:

> Defendant and the victim, EM, were in a romantic relationship for approximately 2½ years. Defendant was displeased when EM terminated their relationship. He began harassing her and eventually pleaded guilty—in a separate case from those involved in this appeal—to aggravated stalking. Defendant's prior harassing behavior

[4] Vuckovich characterized Perrone as a "jerk" and an "asshole," but did not relate those characterizations to Perrone's mental health. (*Id.* at 64.)

consisted of many acts, such as invading EM's home, confronting her unexpectedly at an out-of-town restaurant, and damaging her car. The prosecution presented evidence that, while housed in the Ingham County Jail, defendant solicited two fellow inmates and an undercover police officer to murder EM. Accordingly, defendant was charged with three counts of solicitation to murder. He was also charged with aggravated stalking for certain telephone and computer activities that took place in late August of 2016, after the earlier acts encompassed by the prior stalking conviction. Defendant was convicted as charged.

After the trial was completed but before sentencing, defendant's trial counsel suffered from a mental health episode and was hospitalized. He received a diagnosis and treatment. The trial court appointed new counsel to represent defendant at sentencing. In the brief on appeal, defendant alleged that he received ineffective assistance of counsel at trial because trial counsel's mental breakdown began during trial as evidenced by the deficient questioning of witnesses. We granted defendant's motion for a *Ginther* hearing and remanded the matter to the trial court.

On remand, the court heard testimony from the prosecutors, defendant's trial counsel and junior members of his team, and defendant. The trial court concluded that defendant failed to show that trial counsel acted unreasonably by failing to introduce evidence of theft-related convictions of the two inmates that defendant approached to kill EM. It noted that trial counsel sought to undermine the testimony of the inmates by noting their incarceration and motive to obtain a benefit from the disclosure, the failure to introduce MRE 609 evidence may have been a matter of trial strategy to prevent a distraction from the motive theory, and the evidence may be considered cumulative. The trial court also rejected the contention that trial counsel engaged in a lengthy delay when questioning the witnesses and that his closing argument rambled on for hours, noting that defendant failed to cite to the record and merely announced

> his position without offering authority in support. Furthermore, at the *Ginther* hearing, trial counsel explained that any delay between questions was caused by his consultation with defendant. Ultimately, the trial court concluded that there was no evidence that trial counsel suffered from a mental breakdown during the trial. Defendant opined that the breakdown occurred much earlier because of his experience with the mental conditions of family members, but the trial court noted that defendant did not offer expert, only self-serving, opinion. And the attorneys familiar with trial counsel testified that his actions and behavior at the trial were consistent with his normal demeanor. Defendant relied on an e-mail communication that trial counsel sent to defendant's family members. The trial court found that the e-mail did not demonstrate a mental breakdown but was merely overly optimistic and contained exaggerations. Finally, the trial court determined that even if it assumed that trial counsel acted unreasonably, defendant failed to demonstrate prejudice, particularly in light of the overwhelming evidence of his guilt. Thus, the trial court denied relief premised on ineffective assistance of counsel.

*People v. Uraz*, Nos. 343695; 343696, 2023 WL 325528, at *1 (Mich. Ct. App. Jan. 19, 2023). This recitation of the facts is entitled to the presumption of correctness under § 2254(e)(1), and Uraz has not demonstrated through clear and convincing evidence that this summary is incorrect.

The presumption of correctness extends to factual findings made by state appellate courts on the basis of their review of trial court records. *Treesh v. Bagley*, 612 F.3d 424, 430 n.1 (6th Cir. 2010);

*Brumley v. Wingard*, 269 F.3d 629, 637 (6th Cir. 2001) (citing *Sumner v. Mata*, 449 U.S. 539, 546–47 (1981)).

The State opposes any factual assertions made by Uraz that are not directly supported by—or consistent with—the state court record, because Uraz has failed to overcome the presumption of factual correctness under 28 U.S.C. § 2254(e)(1) or meet the requirements of 28 U.S.C. § 2254(e)(2).

### B. Procedural History

Uraz was convicted of aggravated stalking and three counts of solicitation of murder. The trial court sentenced him to 200 to 360 months' imprisonment for the solicitation of murder convictions.

Following his conviction and sentence, Uraz filed a claim of appeal in the Michigan Court of Appeals, which raised Claims I, III, and IV through VII from his habeas petition across both his brief from appellate counsel and his *pro se* Standard 4 brief. Following the remand and *Ginther* hearing discussed above, the Michigan Court of Appeals affirmed Uraz's conviction in an unpublished opinion. *Uraz*, 2023 WL 325528, at *1–19.

Uraz subsequently filed an application for leave to appeal in the Michigan Supreme Court, which raised, in pertinent part, the same claims as in the Michigan Court of Appeals relevant to his habeas petition (i.e., Claims I, III, and IV through VII).

Before the Michigan Supreme Court decided Uraz's application, however, Uraz filed in the trial court a motion for an evidentiary hearing and new trial that raised, in pertinent part, Claim II from his habeas petition. Uraz filed a motion in the Michigan Supreme Court to stay his application and requested an abeyance pending the trial court's resolution of his motion.

The trial court ultimately denied Uraz's motion. (08/17/2023 Ingham Cir. Ct. Order at 1–3.) The Michigan Supreme Court denied Uraz's motion to stay and to hold his application in abeyance and also denied his application because it was not persuaded that the questions presented should be reviewed by the Court. *People v. Uraz*, 1 N.W.3d 247 (Mich. 2024) (unpublished table decision). It later denied his motion for reconsideration. *People v. Uraz*, 5 N.W.3d 11 (Mich. 2024) (unpublished table decision).

Uraz did not appeal to the United States Supreme Court or seek collateral review before the trial court. Rather, he filed the instant petition for habeas relief.

## STANDARD OF REVIEW PURSUANT TO AEDPA

Review of Uraz's habeas petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). AEDPA prevents a federal court from granting habeas corpus relief based on any claim "adjudicated on the merits" in state court, unless the petitioner can establish that the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under the "contrary to" clause of § 2254(d)(1), the petitioner must establish that "the state court arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law or . . . decide[d] a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Metrish v. Lancaster*, 569 U.S. 351, 357 n.2 (2013) (internal quotation marks and citation omitted).

Under the "unreasonable application" clause of § 2254(d)(1), the petitioner must establish that, after "identif[ying] the correct governing legal principle from the Supreme Court's decisions, [the state court] unreasonably applie[d] that principle to the facts of [his] case." *Hill v. Curtin*, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (alteration omitted). "[T]he state court's decision must have been more than incorrect or erroneous[;]" rather, it must have been "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 520–521 (2003)). "[E]ven 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014).

In other words, the state court's determinations of law and fact must be "so lacking in justification" or "so obviously wrong" as to give rise to error "beyond any possibility for fairminded disagreement." *See Dunn v. Madison*, 583 U.S. 10, 14 (2017) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)) and *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (per curiam).

If this rule is to mean anything, a federal court must carefully consider all the reasons and evidence supporting the state court's decision. *Mays v. Hines*¸ 592 U.S. 385, 391 (2021). "After all, there is no way to hold that a decision was lacking in justification without identifying—let alone rebutting—all of the justifications [for a state court decision]. Any other approach would allow a federal court to essentially evaluate the merits de novo by omitting inconvenient details from its analysis." *Id.* at 391−392 (cleaned up). All that is required to avoid federal habeas relief is "ample room for reasonable disagreement" about the prisoner's claim. *Kayer*, 592 U.S. at 113.

As the Supreme Court has stated, "[i]n our dual-sovereign system, federal courts must afford unwavering respect to the centrality of the trial of a criminal case in state court. That is the moment at which society's resources have been concentrated in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens. [Federal court] intervention is also an affront to the State and its citizens who returned a verdict of guilt after considering the evidence before them. Federal courts, years later, lack the competence

and authority to relitigate a State's criminal case." *Shinn v. Ramirez*, 596 U.S. 366, 390 (2022) (cleaned up).

Moreover, not just any Supreme Court decision will do under § 2254(d)(1). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta," of the Supreme Court's decisions. *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (internal quotations and citations omitted). Where no Supreme Court case has confronted "the specific question presented" by the habeas petitioner, "the state court's decision [cannot] be contrary to any holding from this Court." *Woods v. Donald*, 575 U.S. at 317 (internal quotation marks and citation omitted). Moreover, the Supreme Court decision must have been on the books at "the time the state court render[ed] its decision." *Greene v. Fisher*, 565 U.S. 34, 38 (2011) (internal quotation marks and emphasis omitted); *see also Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) ("State-court decisions are measured against [the Supreme] Court's precedents as of the time the state court renders its decision.") (internal quotation marks omitted); *see also Shoop v. Hill*, 139 S. Ct. 504, 505 (2019) ("the Court of Appeals relied repeatedly and extensively on our decision in *Moore v. Texas*, 581

U.S. ___ (2017), which was not handed down until long after the state court decisions" and was thus "plainly improper.")

"It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Richter*, 562 U.S. at 101 (internal quotation marks and citation omitted). As the Supreme Court has repeatedly pointed out, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.' " *Kernan v. Cuero*, 583 U.S. 1, 8 (2017) (per curiam) (quoting *Glebe v. Frost*, 574 U.S. 21, 23 (2014)) (per curiam). Likewise, neither do "state-court decisions, treatises, or law review articles" constitute clearly established Federal law as determined by the Supreme Court. *Cuero*, 583 U.S. at 8.

Moreover, federal court of appeals precedent cannot "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 63 (2013) (per curiam) (citation omitted); *see also Lopez v. Smith*, 574 U.S. 1, 6 (2014) (providing that absent a decision by the Supreme Court addressing "the specific

question presented by [a] case" a federal court cannot reject a state court's assessment of claim).

Under § 2254(d)(2), the "unreasonable determination" subsection, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Wood v. Allen*, 558 U.S. 290, 293 (2010). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (internal quotation marks and citation omitted).

The Supreme Court has also instructed habeas courts to apply a rebuttable presumption that a "federal claim was adjudicated on the merits" even "[w]hen a state court rejects a federal claim without expressly addressing that claim." *Johnson v. Williams*, 568 U.S. 289, 301 (2013). *See also Kernan v. Hinojosa*, 578 U.S. 412, 416 (2016) (per curiam) ("Containing no statement to the contrary, the Supreme Court of California's summary denial of Hinojosa's petition was therefore on the merits.").

Finally, Uraz's burden is made even heavier by the fact that a federal court is "limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181.

# ARGUMENT

## I. [Claims IV and V] Uraz's challenge to the trial court's admission of his prior bad acts is not cognizable on federal habeas review. In any event, the state appellate court reasonably denied Uraz's claims regarding joinder and the admission of the other-acts evidence.

The prosecutor successfully sought the admission of seventeen prior acts of Uraz regarding his prior stalking of EM, which formed the basis of his prior aggravated stalking conviction (16-0534-FH). Those acts were as follows:

1. Uraz's damage to EM's vehicle, August 24 or 25, 2015;
2. Uraz's in-person and text message harassment of EM and White, December 31, 2015 to January 1, 2016;
3. EM securing a PPO against Uraz until July 22, 2016, and Uraz receiving notice of that PPO, January 20 to January 21, 2016;
4. Uraz's Facebook message to White stating, "Meet me anytime anywhere if you have the courage," January 30, 2016;
5. Uraz's message to ME calling her a "Ho," February 13, 2016;
6. Uraz's confrontation of EM at Best Buy, March 26, 2016;
7. Uraz's two attempts to illegally purchase a gun and ammunition from Burnett, April 5 to 7, 2016;
8. Uraz's phone calls to EM at her mother's house, April 8, 2016;

9. Uraz's damage to EM's vehicle parked in White's driveway, early May 2016;

10. Uraz's damage to White's vehicle and messages to White asking to meet and discussing prior incidents of vandalism and harassment, May 20 to May 27, 2016;

11. Uraz's messages to EM asking to meet and "make amends," May 17 to May 25, 2016;

12. Uraz's home invasion at EM's apartment, May 25, 2016;

13. Uraz's appearance in the parking lot at EM's apartment, and Uraz's false text message to EM's roommate stating he was in Turkey, July 17, 2016;

14. EM's PPO against Uraz extended another year, and Uraz receiving notice of that extension, July 22 and July 27, 2016;

15. Uraz slashing the tires to EM's vehicle parked outside her residence, August 15 to August 16, 2016;

16. Uraz sending a letter to EM's mother asking her mother to write him back, September 2016;

17. EM's PPO against Uraz extended until July 22, 2022, and Uraz receiving notice of that extension, July 22 and July 27, 2017.

(10/03/2017 People's Mt. to Admit Other Acts Evid. at 6–10; 10/11/2017 Hr'g at 18–23; 10/31/2017 Jury Tr. at 15–16.) Also, as discussed, the trial court denied Uraz's motion to sever the aggravated stalking charge (16-1064-FH) and the three solicitation of murder charges (16-1065-FH). (02/28/2017 Hr'g at 17–19.)

Uraz argues that his right to a fair trial was violated in two ways. First, Uraz argues the trial court should have severed the aggravated stalking charge and the three solicitation of murder charges. (ECF No. 1, PageID.74–79.) Second, he argues the admission of his prior stalking conduct against EM referenced above at the joint trial unfairly prejudiced him and should have been excluded. (*Id*. at 80–86.) Although Uraz presents these as two separate grounds for habeas relief, the claims share common facts, and the Michigan Court of Appeals addressed them together because Uraz "intertwine[d] his severance argument with his argument addressing other-acts evidence." *Uraz*, 2023 WL 325525, at *3. Ultimately, Uraz's evidentiary challenges are not cognizable on federal habeas review, and regardless, the Michigan Court of Appeals reasonably denied Uraz's claims.

### A. Portions of Uraz's challenges to the trial court's rulings are not cognizable on federal habeas review.

Uraz's challenge to the trial court's evidentiary rulings regarding the "bad acts" evidence is not cognizable on federal habeas review. Evidentiary claims are solely state-law issues not cognizable on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). As to the

admission of other acts evidence, the Supreme Court has declined to hold that similar "other acts" evidence is so extremely unfair that its admission violates fundamental conceptions of justice. *Dowling v. United States*, 493 U.S. 342, 352–53 (1990); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) ("There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence."). Also, to the extent Uraz argues the trial court's joinder decision violated Michigan's joinder rule, Mich. Ct. R. 6.120(B), that too is not cognizable on federal habeas review. *See Davis v. Coyle*, 475 F.3d 761, 777 (6th Cir. 2007) ("In considering whether the denial of severance amounted to an error warranting relief in a habeas proceeding, the issue before us is not whether the failure to sever counts for separate trials was a violation of a state rule of procedure, but whether the failure to sever denied the petitioner due process of law under the Fourteenth Amendment.") (citing *Corbett v. Bordenkircher*, 615 F.2d 722, 724 (6th Cir. 1980)).

"Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice

so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)); *see also Bugh*, 329 F.3d at 512 (an evidentiary ruling "may violate due process and thus warrant habeas relief" when the ruling "is so egregious that it results in a denial of fundamental fairness"). As explained below, Uraz cannot make that showing.

**B. Clearly established federal law regarding joinder**

"Improper joinder does not, in itself, violate the Constitution." *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986). To obtain federal habeas relief on a misjoinder claim involving state law, a petitioner "must show that misjoinder of the counts 'result[ed] in prejudice so great as to deny [him] his . . . right to a fair trial." *Davis v. Coyle*, 475 F.3d 761, 777 (6th Cir. 2007) (alteration in original) (quoting *Lane*, 474 U.S. at 446 n.8). To demonstrate substantial prejudice, the petitioner must show "actual prejudice, not merely the potential for prejudice." *Id.* In other words, Uraz must show that misjoinder "had substantial or injurious effect or influence in determining the jury's verdict." *Lane*, 474 U.S. at 449 (quotation marks and citation omitted).

### C. The state appellate court's decision

As to joinder, the Michigan Court of Appeals first cited the state rule regarding joinder, Mich. Ct. R. 6.120, and explained the following principles governing joinder under Michigan law:

> When a logical relationship exists between joined counts as well as overlapping proofs, joinder is appropriate. The admission of evidence in other trials is also a consideration when examining whether joinder is appropriate because the joinder of other crimes cannot prejudice defendant. A temporal requirement is not delineated in MCR 6.120, and the acts need not be committed at the same time, but nonetheless must be connected acts or acts constituting a single scheme or plan. An error in the decision to join cases is not grounds for disturbing the judgment unless refusal to take such action appears to be inconsistent with substantial justice. Moreover, an error in the joinder of cases does not affect the outcome of the proceedings when evidence of each charged offense could have been introduced under MRE 404(b).

*Id.* (citations omitted). The court went on to apply these principles to the facts of the case, explaining:

> The stalking charge was based on conduct that occurred between August 23, 2016, and September 26, 2016. It was during this timeframe that defendant telephoned EM and engaged in certain computer-related activities such as hacking into EM's online accounts. These incidents were part of defendant's continued harassment of EM, which culminated in his solicitation of her murder. The various acts undertaken by defendant and charged by the prosecutor in the two lower court cases at issue here were indeed a "series of connected acts[.]" MCR 6.120(B)(1)(b).

> One stalking charge and three solicitation charges were submitted to the jury, and these offenses were related. MCR 6.120(B)(1). The evidence pertaining to each charge was not particularly complex, and defendant has not established that considerations under MCR 6.120(B)(2) warranted severance. Defendant's contention that the charges resulted in jury confusion is not supported by the record evidence. When there is a lack of evidence of jury confusion and the offenses are related as defined in the court rule, a challenge to the joinder of claims is without merit.

*Id.* at 2–3 (alterations in original; some citations omitted). Next, the court explained how Uraz's severance argument was "intertwine[d]" with his other-acts evidence argument, and how the prior acts were properly admitted under Mich. R. Evid. 404(b), stating:

> Defendant essentially intertwines his severance argument with his argument addressing other-acts evidence, asserting that the other-acts evidence admitted in support of the stalking charge unfairly prejudiced the solicitation case. Defendant does not submit that the prior incidents were irrelevant and inadmissible as propensity evidence under MRE 404. And indeed, the other incidents were relevant and were admissible for non-propensity reasons, such as to show intent and motive with regard to all four counts that defendant faced. See MRE 404(b)(1). That defendant had harassed EM in the past made it more likely that he willfully hacked into her online accounts and contacted her for purposes of harassment. EM documented defendant's property damage and unwanted contact, obtained a personal protection order (PPO) against him, and reported his violations of the PPO to the police. EM's report of defendant's harassment and its consequences made it more likely that he had a motive to have her killed.

*Id*. at 3 (some citations omitted). Finally, the court addressed and rejected Uraz's argument that the admission of the other-acts evidence and the trial court's joinder decision denied him a fair trial, along with his other arguments seeking relief under these claims, stating:

> Defendant submits that the extensive admission of acts of stalking diverted the jury from a rational consideration of the evidence addressing the weaker charges of solicitation to commit murder and did not satisfy the balancing test of MRE 403. Thus, defendant contends that his constitutional right to a fair trial was violated. We disagree.
>
> The " '[i]mproper joinder of offenses does not, in itself, violate the Constitution. Rather misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial.' " *Williams*, 483 Mich. at 245, 769 N.W.2d 605, quoting *US v Lane*, 474 U.S. 438, 446 n 8, 106 S Ct 725, 88 L Ed 2d 814 (1986). Relying upon intermediate federal court caselaw, defendant explains that prejudice is demonstrated when "the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict." *Sandoval v Calderon*, 241 F.3d 765, 772 (CA 9, 2000). The *Sandoval* Court concluded that prejudice arises when the joinder allowed otherwise inadmissible evidence of other crimes to be introduced in a trial, or when a strong evidentiary case is joined with a weaker one. *Id*. As analyzed below, however, the prior acts of stalking were admissible to set forth the foundation and motivation to solicit individuals to kill EM because defendant blamed her for the adverse events in his life. And, contrary to defendant's assertion, the aggravated stalking charge did not serve to buttress the substantially weaker charges of solicitation to commit murder.

* * *

In the present case, defendant's prior instances of stalking were highly, not marginally, probative. That is, they showed both that defendant had engaged in aggravated stalking while performing certain acts between August 23, 2016, and September 26, 2016, and showed that defendant was escalating a series of actions to the point that he was motivated to solicit EM's murder.

The presentation of the full background of defendant's stalking history allowed the jury to determine whether defendant was merely a scorned partner having emotional difficulty with the end of the relationship or whether defendant actually wanted to kill EM. The history of defendant's acts against her and her new boyfriend placed the charged acts into context. It was not an abuse of discretion for the trial court to give the jury a full picture of the dealings between defendant and EM and to conclude that the probative value of this full picture was not substantially outweighed by the danger of unfair prejudice. MRE 403.

In his supplemental brief, defendant contends that it was not proven that defendant was the person who damaged EM's vehicle and the vehicle of her new boyfriend and that, therefore, evidence of the prior acts of vehicle damage should have been excluded. But this was an entirely reasonable inference from the sequence of events, viewed as a whole. There was substantial evidence that defendant actually perpetrated the acts in question. Additionally, defendant contends that certain text or online messages as listed in the prosecutor's motion to admit other-acts evidence were not proven to have come from defendant. But the description of item 10 adequately shows in context that the messages emanated from defendant. And as for item 5, EM explicitly testified that the text in question came from defendant. With regard to item 2, defendant inaccurately represents that the court admitted a message mentioned in that item. The court admitted a statement about the out-of-town restaurant incident but did not, contrary to defendant's

implication on appeal, admit a Facebook message sent on the afternoon of December 31, 2015. Thus, the trial court properly reviewed the other-acts evidence for factual support, and its rulings were not inconsistent or irrational.

Defendant makes a separate argument in his supplemental brief about an incident during which defendant attempted to obtain a gun from a coworker at Michigan State University (MSU). He asserts that the court admitted evidence of this incident based on defendant's testimony during a pretrial entrapment hearing and that this amounted to a violation of the qualified privilege a defendant is allowed when testifying at an entrapment hearing. See *People v D'Angelo*, 401 Mich. 167, 178, 257 N.W.2d 655 (1977) ("Any testimony the defendant gives at the entrapment hearing, including his possible admission of the crime charged or some aspect of it, will not be admissible against him in the case in chief for substantive purposes as an admission[.]"). The *D'Angelo* holding, however, was not violated because defendant's testimony from the entrapment hearing was not, in fact, admitted against him at trial. The MSU incident was brought out through the coworker's testimony. Also, it is simply not apparent from the record that the trial court relied on defendant's testimony at the entrapment hearing when admitting the evidence about the MSU incident, the facts of which were admitted through other witnesses.

Because a logical relationship existed between the stalking and the solicitation to commit murder offenses as well as overlapping proofs, joinder was appropriate. Defendant failed to establish error with regard to the joinder of the cases or with regard to the admission of the other-acts evidence. Furthermore, defendant did not demonstrate that the joinder of offenses rendered his trial substantially unfair such that he suffered prejudice. To the contrary, the trial court instructed the jury regarding the limitations of the other-acts evidence as well as the need to consider each of

> the charges separately. Therefore, defendant was not deprived of a fair trial. *Sandoval*, 241 F 3d at 772.

*Id*. at 3–5 (some citations omitted; footnote omitted).

### D. Analysis

The Michigan Court of Appeals decision was neither contrary to, nor an unreasonable application or determination of, clearly established Federal law or the facts of case.

First, the court of appeals reasonably concluded the other-acts evidence was properly admitted. The prosecutor offered that evidence to prove Uraz's motive and intent to stalk and kill EM because she broke up with him, and he believed that she was responsible for ruining his life. Uraz's second aggravated stalking charge (16-1064-FH) was also a continuation—and escalation—of his prior stalking behavior that resulted in his first aggravated stalking conviction (16-0534-FH). It was important for the jury to have the full context of Uraz's stalking behavior to properly evaluate his conduct. The other-acts evidence was also important for the jury to understand the reason, motivations, and intent behind Uraz's solicitation of EM's murder (16-1065-FH). These are all permissible, nonpropensity purposes under Mich. R. Evid. 404(b).

Further, the other-acts evidence was relevant to the charges at issue and its probative value was not outweighed by the danger of unfair prejudice. *See* Mich. R. Evid. 401; Mich. R. Evid. 403. Uraz's previous acts of stalking EM were highly relevant to whether he continued to engage in the same type of conduct he had done the last two years, which he admitted was intended to intimidate or frighten her. Similarly, Uraz's prolonged and escalated stalking of EM was relevant to why he would want to kill her. From Uraz's perspective, EM cheated on him, caused him to lose his job, and ruined his life. So Uraz believed EM deserved to die a violent death simply because she did not want to have a relationship with him. His attempts to illegally obtain a gun and ammunition, which occurred in the midst of Uraz repeatedly stalking EM in the Spring 2016, were also relevant to his later attempts to have EM killed. Put simply, Uraz's prior stalking behavior and his attempts to obtain a gun illegally (i.e., the other-acts evidence) prefaced his later stalking conduct at issue and culminated into his attempts to have her killed. Without that evidence, the jury would have heard, with no context whatsoever, about two instances of stalking conduct followed by three attempts to solicit EM murder. This would have been an

inaccurate portrayal of EM and Uraz's relationship, and the jury would not have been able to understand Uraz's motive, intent, and plan in stalking EM and soliciting her murder. Therefore, the other-acts evidence was highly relevant to the aggravated stalking and solicitation of murder charges. And while that relevant evidence was prejudicial to Uraz, it was not *unfairly* prejudicial.

Finally, the trial court issued a limiting instruction that was carefully crafted to prevent the jury from considering the other-acts evidence for an improper propensity purpose. (11/09/2017 Jury Tr. at 175–76.) Jurors are presumed to follow the court's instructions, *Penry v. Johnson*, 532 U.S. 782, 799 (2001), and the trial court's limiting instruction helped curb any prejudice stemming from the other-acts evidence.

Ultimately, because the other-acts evidence was properly admitted under Michigan law and the jury was given a proper limiting instruction on that evidence, Uraz cannot show its admission denied him due process. *Seymour*, 224 F.3d at 552; *Bugh*, 329 F.3d at 512.

Second, the court of appeals reasonably concluded that the joinder of Uraz's aggravated stalking charge and solicitation of murder charges

did not deny him a fair trial. Uraz began stalking EM after she ended their relationship in June 2015. He continued stalking her for approximately two years until his stalking behavior culminated in three attempts to have EM killed because he wanted her to pay for ruining his life. Because Uraz's conduct involved the same victim and constituted a series of connected acts or a series of acts constituting part of a single scheme or plan, it was reasonable to join his aggravated stalking and solicitation of murder charges together. *See Lane*, 474 U.S. at 449 (joinder of offenses "conserve[s] state funds, diminish[s] inconvenience to witnesses and public authorities, and avoid[s] delays in bringing those accused of crime to trial.").

Uraz's challenge to the joinder decision stems from his earlier argument regarding the other-acts evidence. He contends that trying the cases all together, with the inclusion of the other acts-evidence, "bolster[ed his] 'bad character' in violation of due process." (ECF No. 1, PageID.78.) Uraz is correct that the "introduction of evidence of other crimes that would otherwise be inadmissible" can be a source of potential prejudice and the basis for a misjoinder due-process violation. *Davis*, 475 F.3d at 777. That is, "[b]y allowing joinder of offenses, the

possibility exists that a jury may use the evidence of one of the charged crimes to infer a general criminal disposition by the defendant; the jury also may confuse or cumulate the evidence of the various crimes charges." *Id.* at 778. But, again, "[t]he prejudice that [Uraz] must demonstrate, however, in order to justify a grant of a writ of habeas corpus is *actual* prejudice, not merely the *potential* for prejudice." *Id.*

Here, as discussed, Uraz's prior aggravated stalking behavior from June 2015 to August 2016 (16-0534-FH) was admissible as to *both* the second aggravated stalking charge from August 2016 to September 2016 (16-1064-FH) and the solicitation of murder charges (16-1065-FH). Also, his August 2016 to September 2016 stalking behavior would have been admissible in a trial on the solicitation of murder charges, and vice versa. Otherwise, the jury would not have had the full scope of Uraz's stalking behavior and would not have proper context as to why Uraz solicited EM's murder. Because the same evidence have been admissible against Uraz at his hypothetical separate trials, he was not prejudiced by the joinder decision. See *LaMar v. Houk*, 798 F.3d 405, 428 (6th Cir. 2015) (petitioner failed to establish prejudice from purported misjoinder of separate murder charges because evidence from

one case "would have been admissible to prove the course-of-conduct" in the other case); *United States v. Jacobs*, 244 F. 3d 503, 507 (6th Cir. 2001) ("[E]ven if the charges were tried separately, evidence from each crime would have been admissible in the trial of the other because of the common scheme or plan.") (citing Fed. R. Evid. 404(b)); *Krist v. Foltz*, 804 F.2d 944, 947–48 (6th Cir. 1986) (although joinder of two robbery counts may have been improper, similarity in details of the two robberies and their closeness in time would have made evidence of one crime admissible at the separate trial of the other; therefore, the petitioner suffered no prejudice from his counsel's failure to move for severance of the charges).

In addition, the trial court gave the jury specific cautionary instructions regarding the multiple charges at issue and the prosecution's burden of proving each element *for each charge* beyond a reasonable doubt. (11/09/2017 Jury Tr. at 165–66, 172–75, 180–81.) A jury is "presumed capable of considering each count separately" and any prejudice arising from trial of joined offenses may be cured by limiting instructions. *United States v. Cope*, 312 F.3d 757, 781 (6th Cir. 2002). "Error based on misjoinder is almost always harmless where . . . the

trial court issues a careful limiting instruction to the jury on the issue of possible prejudice resulting from the joinder." *United States v. Cody*, 498 F. 3d 582, 587 (6th Cir. 2007). Given jurors are presumed to follow the court's instructions, *Penry*, 532 U.S. at 799, the trial court's instructions here cured any possible prejudice from the joinder of the separate charges into one trial. *See Jacobs*, 244 F.3d at 507 (no abuse of discretion in joining multiple cases together where district court "gave specific cautionary instructions to minimize the possible prejudice, instructing the jury to consider separately the evidence relating to each charge and cautioning the jury not to let their decision on one charge influence their decision in any other charge").

Accordingly, Uraz is not entitled to habeas relief on these claims.

## II. [Claim VII] Uraz's claim that the state courts erred by denying his motion to dismiss based on entrapment is not cognizable on federal habeas review, and in any event, the state appellate court reasonably denied his claim.

Uraz also argues that he was entrapped to solicit EM's murder, that the trial court erred by denying his motion to dismiss "based on entrapment of a crime that was manufactured by law enforcement and their [sic] agents/informants," and that the Michigan appellate courts erred by upholding that decision. (ECF No. 1, PageID.93–101.) Uraz's entrapment claim is not cognizable on federal habeas review and lacks merit in any event.

### A. Uraz's entrapment claim is not cognizable on federal habeas review.

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle*, 502 U.S. at 68. "[T]he Supreme Court has not yet recognized a constitutionally required entrapment defense." *Sosa v. Jones*, 389 F.3d 644, 646 (6th Cir. 2004), *cert. denied* 546 U.S. 883 (2005); *see also Hampton v. United States*, 425 U.S. 484, 488–91 (1976) (plurality opinion); *United States v. Russell*, 411 U.S. 423, 430–32 (1973) (declining to adopt the defendant's proposal of a due-process

defense to entrapment). Therefore, habeas relief cannot lie where the purported error does not violate clearly established federal law. 28 U.S.C. § 2254(a); *see also Noble v. Harrison*, 491 F. Supp. 2d 950, 961 n. 7 (C.D. Cal. 2007) (entrapment does not raise a cognizable federal constitutional claim).

**B. Even if Uraz's entrapment claim was cognizable, he is not entitled to relief.**

"Under the current entrapment test in Michigan, a defendant is considered entrapped if either (1) the police engaged in impermissible conduct that would induce a law-abiding person to commit a crime in similar circumstances or (2) the police engaged in conduct so reprehensible that it cannot be tolerated." *People v. Johnson*, 647 N.W.2d 480, 485 (Mich. 2002). The criminal defendant bears the burden of establishing entrapment by a preponderance of the evidence. *People v. D'Angelo*, 257 N.W.2d 655, 662 (Mich. 1977). "[W]here law enforcement officials present nothing more than an opportunity to commit the crime, entrapment does not exist." *Johnson*, 647 N.W.2d at 485.

The Michigan Court of Appeals denied Uraz's entrapment claim, explaining, in pertinent part:

> First, there is no evidence of particularly reprehensible conduct by the police in connection with FM's video call. A police detective testified that Close, who was not associated with the police, provided information about solicitation to commit murder, the police investigated the details Close provided, and only then was FM used as an undercover officer. The police were simply attempting to ascertain whether defendant was, indeed, willing to have EM killed. In other words, "[T]he police did nothing more than provide defendant with an opportunity to commit a crime. Such conduct was not reprehensible and does not establish entrapment."
>
> * * *
>
> There was no evidence here of any appeals to sympathy or of any favors, inducements, pressure, or threats by the police. In addition, there was no escalation of culpability by the police because defendant had already solicited Close to murder EM before FM's call. As in *Johnson*, "[t]he undercover activity at issue in this case did nothing more than present defendant with an opportunity to commit" a crime that the defendant had already committed. *Id*. at 503. The *Johnson* Court indicated that in such a situation, "no escalation occurred." *Id*. Defendant contends that the trial court relied too heavily on defendant's predisposition to commit the crime, but *Johnson* indicates that the fact of a defendant's having committed the same crime earlier is a relevant consideration regarding whether the police induced an escalation of criminality. While a few of the factors cited in *Johnson* could be viewed in defendant's favor—such as the targeted investigation—the majority of the factors favor the prosecution, and the trial court did not clearly err by finding that dismissal on the basis of entrapment was not appropriate with regard to the evidence gathered by FM.[5]

> Defendant also contends that the trial court did not properly follow an objective test, focused "on the investigative and evidence-gathering procedures used by the governmental agents," but instead used a subjective test, "which focuses on the defendant's predisposition or motivation to commit a new crime." See *People v Juillet*, 439 Mich. 34, 53, 475 N.W.2d 786 (1991) (opinion of Brickley, J.). Furthermore, "[u]nder a proper approach, factors of both the subjective and objective tests can be considered and utilized to determine if entrapment occurred." *Id.* Contrary to defendant's assertion, the trial court's ruling did in fact rely quite heavily on objective police conduct. This case is in accordance with Johnson, and no error requiring reversal is apparent.[6]
>
> ---
>
> [5] Defendant argued below that all three solicitation charges should be dismissed because of entrapment and is continuing to argue as much on appeal. But entrapment is based on police conduct, and the evidence clearly showed that the solicitation information from Close and another jail inmate did not arise from police involvement.
>
> [6] Given the clear evidence that no entrapment occurred, defendant's argument about whether a defendant can claim entrapment and also assert innocence in a pretrial proceeding need not be reached.

*Uraz*, 2023 WL 325528, at *6 (alterations in original; some citations omitted). This decision was entirely reasonable. Uraz had already solicited Allen and Close to murder EM before FM initiated the video call. Neither inmate had spoken to Uraz at the direction of police, police never asked them to gather information, and they did not have proffered agreements regarding their statements or testimony

regarding Uraz's solicitations. (10/20/2017 Hr'g at 93–94.) Because Allen and Close were not acting as police agents, Uraz's discussion of their involvement with respect to his entrapment argument is irrelevant. And given Uraz freely solicited each of them to murder EM, Uraz was not a law-abiding citizen who FM induced to commit a crime. *Johnson*, 647 N.W.2d at 485. Nor was FM's conduct "so reprehensible" that it that it cannot be judicially tolerated. *Id.*; *D'Angelo*, 257 N.W.2d at 658 ("The purpose of the entrapment doctrine is to deter unlawful government activities and to preclude the implication of judicial approval of impermissible government conduct."). At best, FM presented Uraz an opportunity to commit his crimes, which does not constitute entrapment. *Johnson*, 647 N.W.2d at 485.

Accordingly, Uraz is not entitled to habeas relief on this claim.

## III. [Claim VI] Uraz's claim that his Sixth Amendment right to counsel was violated by the admission of his communications with jail inmates and an undercover police officer is procedurally defaulted, and lacks merit in any event.

Next, Uraz argues the admissions of his incriminating statements to Allen, Close, and FM violated his Sixth Amendment right to counsel. (ECF No. 1, PageID.87–92.) Uraz has procedurally defaulted this claim by failing to raise it below. In any event, the Michigan Court of Appeals reasonably concluded his Sixth Amendment right to counsel had not yet attached at the time he made the statements, and thus, no violation occurred.

### A. Uraz has procedurally defaulted this claim

To the extent a petitioner deprives the state court of the opportunity to review his claims by failing to follow reasonable state-court procedures, review of the claims is barred. Procedural default results where three elements are satisfied: "(1) the petitioner failed to comply with a state procedural rule that is applicable to the petitioner's claim; (2) the state courts actually enforced the procedural rule in the petitioner's case; and (3) the procedural forfeiture is an 'adequate and independent' state ground foreclosing review of a federal constitutional

claim." *Willis v. Smith*, 351 F.3d 741, 744 (6th Cir. 2003). In this case, Uraz's claim of regarding the deprivation of his Sixth Amendment right to counsel is procedurally defaulted because he failed to raise the issue at trial.

Uraz failed to comply with a state procedural rule that requiring a defendant to make a timely, specified objection at trial. *See People v. Anderson*, 989 N.W.2d. 832, 839 (Mich. Ct. App. 2022) ("For an issue to be preserved for appellate review, it must be raised, addressed, and decided by the lower court. . . . To preserve for review by this Court a constitutional-error claim that implicates a defendant's due-process rights, the issue must be raised in the trial court."). This determination is made by looking at the last state court to issue a reasoned decision on the claim. *Amos v. Renico*, 683 F.3d 720, 726 (6th Cir. 2012). Here, that was the Michigan Court of Appeals, enforced the procedural rule by finding Uraz's claim unpreserved, reviewing the claim for plain error affecting his substantial rights, and denying relief under such review. *Uraz*, 2023 WL 325528, at *13. This reason for denying relief constitutes a procedural default.

A State prisoner who fails to comply with a State's procedural rule waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 748–50 (1991); *Sutton v. Carpenter*, 745 F.3d 787, 789–90 (6th Cir. 2014).

Notably, a state court does not waive a procedural default by looking beyond the default to determine if there are circumstances warranting review on the merits. *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000) (citing *Paprocki v. Foltz*, 869 F.2d 281, 284–285 (6th Cir. 1989)). For example, plain error review does not constitute a waiver of state procedural default rules. *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012). Nor does a State court fail to sufficiently rely upon a procedural default by otherwise ruling on the merits in the alternative. *See Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir. 2001).

To establish cause, a petitioner must establish that some external impediment frustrated his ability to comply with the state's procedural rule. *See, e.g.*, *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Haliym v.*

*Mitchell*, 492 F.3d 680, 690–91 (6th Cir. 2007). A petitioner must present a substantial reason to excuse the default. *Hall v. Vasbinder*, 563 F.3d 222, 236 (6th Cir. 2009); *see also Amadeo v. Zant*, 486 U.S. 214, 222–23 (1988) (reviewing a claim that a document was concealed by officials). One recognized reason includes attorney error rising to the level of ineffective assistance of counsel. *Edwards v. Carpenter*, 529 U.S. 446, 451–52 (2000); *McCleskey v. Zant*, 499 U.S. 467, 493–494 (1991). This procedural default is not excused by the ineffective assistance of trial counsel claim as explained hereafter.

The narrow exception for fundamental miscarriages of justice is reserved for the extraordinary case in which the alleged constitutional error probably resulted in the conviction of one who is actually innocent of the underlying offense. *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Carrier*, 477 U.S. at 496. A claim of actual innocence "requires [the] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

To show that his case is the "extraordinary" one warranting application of this exception, Uraz must demonstrate "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U.S. at 321, 327. Uraz has not presented any new, reliable evidence in support of a claim of actual innocence. Therefore, a miscarriage of justice will not occur as a result of the Court's failure to consider the substantive merits of Uraz's claim.

Unexcused procedural defaults can—and should—be the reason a habeas court declines to grant a prisoner relief. The Sixth Circuit has noted that "[c]omity and federalism demand nothing less." *Benton v. Brewer*, 942 F.3d 305, 307 (6th Cir. 2019). Moreover, the Sixth Circuit has stressed the importance of considering a state's assertion of a procedural default defense. *Sheffield v. Burt*, 731 F. App'x 438, 441 (6th Cir. 2018) ("[W]here a straightforward analysis of settled state procedural default law is possible, federal courts cannot justify bypassing the procedural default issue."). Indeed, the Sixth Circuit continues to enforce procedural defaults, including when the district court skips over the default entirely. *See Theriot v. Vashaw*, 982 F.3d 999, 1002 (6th Cir. 2020); *McKinney v. Horton*, 826 F. App'x 468, 478

(6th Cir. 2020); *Strong v. Nagy*, 825 F. App'x 239, 241 (6th Cir. 2020); *Williams v. Burt*, 949 F.3d 966, 970–971 (6th Cir. 2020); and *Stalling v. Burt*, 772 F. App'x 296, 297 (6th Cir. 2019).

Uraz's Claim VI is procedurally defaulted, and habeas relief is barred. *See Davila v. Davis*, 582 U.S. 521, 527 (2017).

### B. Even if this Court excuses or otherwise bypasses the procedural default, Uraz still is not entitled to relief because the state appellate court reasonably concluded his Sixth Amendment right to counsel had not yet attached with respect to his aggravated stalking and solicitation of murder charges.

#### 1. Clearly established federal law regarding Sixth Amendment right to counsel

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence." U.S. Const. Amend VI. This right ensures fair prosecution of a criminal proceeding. *Maine v. Moulton*, 474 U.S. 159, 169 (1985). It also differs from a person's right to have counsel present during a custodial interrogation, which works "to protect the Fifth Amendment privilege against self-incrimination rather than to vindicate the Sixth Amendment right to counsel." *Gouveia*, 467 U.S. at 188 n.5 (citations omitted); *see also McNeil v. Wisconsin*, 501 U.S. 171,

176–80 (1991) (detailing the difference between the Sixth Amendment's right to counsel after adversarial proceedings have begun and the prophylactic right to counsel under the Fifth Amendment aimed at counteracting the pressures of a custodial interrogation).

Critically, the Sixth Amendment right to counsel does not attach until formal adversarial proceedings are initiated against the criminal defendant, including a formal charge, preliminary hearing, indictment, information, or arraignment. *United States v Gouveia*, 467 U.S. 180, 187–88 (1984); *Brewer v. Williams*, 430 U.S. 387, 398 (1977). The Sixth Amendment right to counsel is also "offense specific." *McNeil*, 501 U.S. at 175. "It cannot be invoked once for all future prosecutions," *id.*, or once for all "factually related" offenses. *Texas v. Cobb*, 532 U.S. 162, 168–69 (2001).

### 2. The state appellate court's decision

The Michigan Court of Appeals rejected Uraz's claim that the admissions of his statements to Allen, Close, and FM violated his Sixth Amendment right to counsel, explaining:

> Defendant's primary authority for his argument is *Massiah v United States*, 377 U.S. 201 (1964). In that case, the Court ruled that the defendant had been denied Sixth

Amendment protections “when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of counsel” that the defendant had already retained. *Id*. at 202, 206. In *Brewer v Williams*, 430 U.S. 387, 401 (1977), the Court stated that the “clear rule of *Massiah* is that once adversary [sic] proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him.” The Court referred to the commencement of adversarial proceedings as a formal charge, preliminary hearing, indictment, information, or arraignment. *Id*. at 398.

We reject defendant’s reliance on *Brewer* and *Massiah* for the proposition that he was entitled to counsel during the video call with FM in light of *Texas v Cobb*, 532 U.S. 162 (2001). The defendant in that case was indicted for burglary and obtained an attorney to represent him for that charge. *Id*. at 165. The police questioned the defendant about people who had disappeared from the burgled home, and the defendant confessed to murdering them during the burglary. *Id*. at 165–166. The defendant argued that “his right to counsel had attached when” an attorney was appointed for the burglary case and that the police “were therefore required to secure [the attorney’s] permission before proceeding with the interrogation” about the missing people. *Id*. at 166. A lower court agreed with this argument, concluding that the murders were factually intertwined with the burglary. *Id*. at 167. The Supreme Court disagreed, ruling that the Sixth Amendment right to counsel is “ ‘offense specific.’ ” *Id*. at 165.

It is not in dispute that defendant was in jail and represented by an attorney when the October 24, 2016 call with FM occurred. At that time, he had representation for purposes of a prior stalking charge. The warrant for solicitation to murder is dated November 10, 2016, and the bindover occurred on December 13, 2016. The warrant for

> the current stalking charge—i.e., the charge at issue at trial and at issue in this appeal—is dated October 26, 2016, and the bindover occurred on December 14, 2016. Even if the prior stalking offense had a "relationship" with the instant offenses, under the rule of *Cobb*, no Sixth Amendment violation occurred during the call with FM because the right to counsel is offense-specific, and at the time of the video call, adversarial proceedings had not commenced in the current cases.
>
> Defendant contends that his statements to Allen and Close were obtained in violation of his Sixth Amendment right to counsel because they were essentially acting as agents of the police. But this is simply not accurate. There was no evidence that the police directed Allen or Close to obtain information. Instead, the two witnesses obtained the information and chose to share it with the police. Defendant cites *State v Marshall*, 882 N.W.2d 68 (Iowa, 2016), in support of his argument, but in that case the court agreed that the government is not prohibited from using evidence it obtains through luck or happenstance, see *id*. at 83, which is essentially what occurred here. There is no evidence of a "proffer agreement or any kind of meaningful relationship between" Allen and the police or between Close and the police in connection with defendant's cases. *Id*. at 101.14

*Uraz*, 2023 WL 325528, at *13 (footnotes omitted).

### 3. Analysis

The Michigan Court of Appeals decision was neither contrary to, nor an unreasonable application or determination of, clearly established Federal law or the facts of case. Even though this claim is procedurally defaulted, the Michigan Court of Appeals' ruling that Uraz has not

established plain error is entitled to AEDPA deference. Federal constitutional claims reviewed for plain error by a state court *are* claims adjudicated on the merits and are entitled to review under AEDPA standards. *See Stewart v Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2017); *see also Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009).

The court of appeals correctly cited and reasonably applied the Supreme Court's precedent involving a defendant's Sixth Amendment right to counsel and its "offense specific" nature. The Supreme Court's decision in *McNeil* is factually analogous. There, the petitioner was being held on armed robbery charges when police questioned him about a murder and burglary in a completely different town. *McNeil*, 501 U.S. at 173–76. The petitioner made incriminating statements in the absence of counsel that were later used to convict him of the murder and burglary. *Id*. Because the petitioner had not been charged with murder and burglary at the time he made the incriminating statements, however, the Supreme Court held that no Sixth Amendment violation occurred. *Id*. at 176 ("Because petitioner provided the statements at issue here before his Sixth Amendment right to counsel with respect to the [murder and burglary] offenses had

been (or even could have been) invoked, that right poses no bar to the admission of the statements in this case.").

Here, Uraz was incarcerated for the prior aggravated stalking conviction (16-0534-FH) at the time he made the incriminating statements to Allen, Close, and FM. Uraz does not dispute that he made those statements *before* he was charged the solicitation of murder charges; indeed, his statements to the three men formed the basis of those charges. Because Uraz's statements related to *uncharged* offenses, for which his Sixth Amendment right to counsel had not yet attached, the admission of his statements at his subsequent trial was not improper. *See id.*; *Illinois v. Perkins*, 496 U.S. 292, 299 (1990) (the Sixth Amendment offers no protections from undercover agents until *after* charges are filed on the subject of the interrogation).

Accordingly, Uraz is not entitled to habeas relief on this claim.

## IV. [Claim II] Uraz's claim that he was denied an impartial jury based on Juror #2's "dual identity" is procedurally defaulted and lacks merit in any event.

According to his petition, Uraz hired a private investigator in May 2023 to investigate jurors from his trial. (ECF No. 1, PageID.66–67.) Among those investigated was Juror #2, who Uraz claims has a history of using a "dual identity" for fraudulent purposes. (*Id.* at 66–69.) Uraz argues Juror #2's concealment of that dual identity deprived Uraz of an impartial jury because Uraz could have challenged Juror #2 for cause based on his dishonesty. (*Id.*) Uraz also claims he is entitled to an evidentiary hearing under *Remmer v. United States*, 347 U.S. 227 (1954).

Uraz is not entitled to habeas relief. Uraz failed to present this claim to each level of the state appellate system, and because he cannot go back and exhaust this claim in a motion for relief from judgment, it is procedurally defaulted. But even if this Court looks beyond the procedural default, Uraz's claim is plainly meritless and does not warrant habeas relief or an evidentiary hearing.

**A. Uraz has procedurally defaulted this claim.**

Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). To fulfill the exhaustion requirement, the prisoner must have fairly presented the federal claims to *all* levels of the state appellate system. *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995); *see also* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.").

Here, Uraz first raised this issue regarding Juror #2's "dual identity" in a June 30, 2023 motion he filed in the trial court seeking a new trial or evidentiary hearing, which the trial court denied in an August 17, 2023 order. (08/17/2023 Ingham Cir. Ct. Order at 1–3.) Notably, Uraz raised this issue *after* the Michigan Court of Appeals denied his claim of appeal on January 19, 2023, *after* he filed his application for leave to appeal in the Michigan Supreme Court in April 2023, but *before* the Michigan Supreme Court denied his application on

January 30, 2024. Although Uraz moved to supplement his application in the Michigan Supreme Court (and to stay and abey his application pending the trial court's decision on this issue), it does not appear Uraz's supplemental brief raised this issue regarding Juror #2. But even if he did, review in the Michigan Supreme Court is merely discretionary, *see* Mich. Ct. R. 7.303(B), and presenting a claim to only the Michigan Supreme Court on discretionary review is insufficient to exhaust it. *Castille v. Peoples*, 489 U.S. 346, 351 (1989). So while Uraz raised this claim regarding Juror #2 during the pendency of his direct appeal, he never appealed the trial court's denial of that claim to the Michigan Court of Appeals. Thus, he did not present his claim to *all* levels of the state appellate system. *Duncan*, 513 U.S. at 365–66.

If the prisoner fails to present his claims to the state courts, but has no remaining state-court remedy, the claims are considered exhausted, but procedurally defaulted. *See Gray v. Netherland*, 518 U.S. 152, 161–62 (1996); *Landrum v. Mitchell*, 625 F.3d 905, 918 (6th Cir. 2010). While Uraz has not yet filed a motion for relief from judgment, he did raise his claim regarding Juror #2 on direct appeal—albiet, only to the state trial court. Accordingly, he may not raise this

claim in a motion for relief from judgment. *See* Mich. Ct. R. 6.508(D)(2) (prohibiting the court from granting relief from judgment where the defendant "alleges grounds for relief which were decided against the defendant in a prior appeal"); Mich. Ct. R. 6.508(D)(3)(a) (requiring the defendant seeking relief from judgment to show "good cause for failure to raise such grounds on appeal"). Nor has Uraz advanced a legitimate, credible claim that there is a significant possibility he is actually innocent of the crimes so as to bypass the requirements of Mich. Ct. R. 6.508(D)(2) and (D)(3)(a).

As a result, Uraz's claim that Juror #2's conduct deprived him of his due process right to an impartial jury is procedurally defaulted.

Alternatively, this Court may deny the claim on its merits for the reasons stated below.

### B. Clearly established federal law regarding the right to an impartial jury, voir dire, and a juror's non-disclosure

The Sixth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant the right to be tried by an impartial and unbiased jury. *Morgan v. Illinois*, 504 U.S. 719, 726–28 (1992). "[P]art of the guarantee of a defendant's right to an impartial

jury is an adequate voir dire to identify unqualified jurors." *Id.* at 729. Voir dire provides a mechanism for securing such a jury, "exposing possible biases, both known and unknown, on the part of potential jurors." *McDonough Power Equip., Inc., v. Greenwood*, 464 U.S. 548, 554 (1984); *see also Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) ("Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled."). However, "[t]he adequacy of voir dire is not easily the subject of appellate review." *Morgan*, 504 U.S. at 730. On federal habeas review, the question "is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed[?]" *Patton v. Yount*, 467 U.S. 1025, 1036 (1984). Put differently, this Court must ask "whether there is fair support in the record for the state courts' conclusion that the jurors [ ] would be impartial." *Id.* at 1038.

The Supreme Court has articulated a test for determining whether a juror's non-disclosure during voir dire necessitates a new trial, which the Sixth Circuit has summarized as follows:

> [I]n *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984), the Supreme Court devised a test for determining whether a juror's non-disclosure during voir dire necessitates a new trial. To obtain a new trial, a party "must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556. "The motives for concealing information," the court explained, "may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id.* Thus, *McDonough* teaches that the deliberate concealment of information on voir dire does not automatically give rise to a presumption of bias.

*Williams v Bagley*, 380 F.3d 932, 945–46 (6th Cir. 2004). "If a juror is found to have deliberately concealed material information, bias *may* be inferred. If, however, information is *not* concealed deliberately, the movant must show *actual bias*." *Id.* at 946 (quoting *Zerka v. Green*, 49 F.3d 1181, 1186 (6th Cir.1995) (emphasis in original)). If the defendant presents a substantiated claim of juror bias or partiality, he may be afforded a *Remmer* hearing to have an opportunity to prove actual bias. See *Smith v. Phillips*, 455 U.S. 209, 215 (1982) (citing *Remmer*, 347 U.S. 227).

### C. Analysis

In denying Uraz's claim, the trial court stated:

> Defendant claims that, in his trial, Juror #2 committed perjury by using a married last name rather than his birth last name and that this discrepancy denied Defendant a fair trial. As stated in Defendant's Motion, the standard for juror misrepresentation in voir dire is "it is proper and appropriate to grant a new trial when affidavits or testimony are presented confirming that matters have been falsely denied or concealed on voir dire, if these matters would establish the juror's incompetency or disqualification or would lead the parties to challenge him or her and if the affidavits are not proffered to show misconduct of a juror or jury for the purpose of impeaching their verdict. *People v Graham*, 84 Mich App 663, 666–667 (1978). The allegation that Juror #2 used a married last name is insufficient to demonstrate incompetency or disqualification.

(08/17/2023 Ingham Cir. Ct. Order at 1–2.) In essence, the state trial court found that Juror #2's oscillating use of two different last names was not material information that affected his partiality, and thus, did not affect his qualifications as a juror or warrant further inquiry. *McDonough Power Equip.*, 464 U.S. at 556. Indeed, Juror #2's voir dire gave no indication that he was bias or otherwise unfit to serve on the jury. (10/31/2017 Jury Tr. at 127–28, 130–31, 141.) There is also no indication Juror #2 acted deliberately in concealing his identity from the court or parties. *Williams*, 380 F.3d at 945–46.

Uraz is not entitled to habeas relief or a *Remmer* hearing.

### V. [Claim III] The state appellate court reasonably denied Uraz's claim regarding Juror #1's bias.

At the end of the second day of trial, Juror #1 asked the trial court whether Uraz was Turkish and indicated he may be biased against Uraz. (11/03/2017 Jury Tr. at 4.) The trial court believed Juror #1 was trying to avoid serving on the jury, decided Juror #1 would be struck before deliberation, and explained it did not strike him immediately because it could cause other jurors to seek dismissal. (*Id*. at 4–6.) In rendering its decision, the court noted its instruction to the jurors that they were not allowed to discuss the case amongst themselves until deliberation. (*Id*. at 6.) Ultimately, Juror #1 was one of two jurors struck before deliberation. (11/09/2017 Jury Tr. at 181–82.)

Uraz argues his right to an impartial jury was violated where Juror #1 expressed bias towards Uraz's ethnic origin. (ECF No. 1, PageID.70–73.) Although Juror #1 did not deliberate, Uraz argues the trial court should have inquired into Juror #1's bias and whether any of the jurors who actually deliberated had been exposed or improperly influenced by it. (*Id*.) Put simply, there is no record evidence to show Juror #1 communicated his bias to any of the other jurors, and the state trial court appropriately addressed the issue by relying on its

instructions to the jury that it may not discuss the case prior to deliberation. The state appellate court's rejection of Uraz's argument was reasonable, and he is not entitled to habeas relief.

### A. Clearly established federal law regarding juror bias and the no-impeachment rule

The Sixth Amendment "right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). However, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith*, 455 U.S. 217. Rather, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.*

As discussed, a *Remmer* hearing may be appropriate where the defendant presents a substantiated claim of juror partiality. *Smith*, 455 U.S. at 215 (citing *Remmer*, 347 U.S. 227). The requirements of *Remmer* coincide with the no-impeachment rule provided in both the federal and Michigan rules of evidence, which generally prohibits the

impeachment of a jury verdict, subject to certain exceptions. *See* Fed. R. Evid. 606(b); Mich. R. Evid. 606(b). As the Sixth Circuit has explained:

> Rule 606(b) provides that "[d]uring an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1). The rule contains several important exceptions, including when a juror's testimony relates to whether "extraneous prejudicial information was improperly brought to the jury's attention" or whether "an outside influence was improperly brought to bear on any juror." *Id*. 606(b)(2)(A)–(B). Subject to the express exceptions in section (b)(2), however, Rule 606(b) "prohibit[s] the use of any evidence of juror deliberations" to impeach a jury verdict. *Warger v. Shauers*, 574 U.S. 40, 48 (2014). Michigan has a similar no-impeachment rule. *See* Mich. R. Evid. 606(b); see also *People v. Budzyn*, 566 N.W.2d 229, 236 (Mich. 1997) ("[O]ral testimony or affidavits may only be received on extraneous or outside errors, such as undue influence by outside parties.").
>
> The no-impeachment rule is grounded in "[s]ubstantial policy considerations," such as encouraging "full and frank discussion in the jury room," ensuring the finality of verdicts, and, overall, preserving the integrity of the jury system. *See Tanner v. United States*, 483 U.S. 107, 119–21 (1987). Accordingly, the Supreme Court has noted that the no-impeachment rule "harmonize[s] with," rather than detracts from, the holding of *Remmer*, which also is based on the principle that "the integrity of jury proceedings must not be jeopardized by unauthorized invasions." *Id*. at 120 (quoting *Remmer*, 347 U.S. at 229).

*Smith v. Nagy*, 962 F.3d 192, 200 (6th Cir. 2020).

A *Remmer* hearing "delving into allegations of juror misconduct is required only where 'extrinsic influence or relationships have tainted the deliberations.' " *Garcia v. Andrews*, 488 F.3d 370, 375 (6th Cir. 2007) (quoting *Tanner*, 483 U.S. at 120). Notably, the Supreme Court has recognized that "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 225 (2017).

**B. The state appellate court's decision**

The Michigan Court of Appeals explained that a jury's verdict may be challenged based on juror misconduct, including bias arising from a defendant's ethnicity, but that the criminal defendant "bears the burden of showing that the jury was exposed to an extraneous influence and that this influence created a substantial and real possibility of affecting the verdict." *Uraz*, 2023 WL 325528, at *14 (citing *People v*

*Fletcher*, 679 N.W.2d 127, 134–35 (Mich. Ct. App. 2004)). The court then held that Uraz failed to make that showing because Juror #1 did not deliberate and the jury was instructed not to discuss the case before deliberation, stating:

> Defendant, however, failed to show that the jury was exposed to an extraneous influence. While one juror expressed bias, there is nothing in the record to show that he communicated this bias to any other juror. The court specifically addressed the concern about possible communication among jurors by stating that the jurors were not allowed to discuss the case among themselves until deliberations started. And indeed, the jurors were given this preliminary instruction. Jurors are presumed to follow their instructions. An appellant has the burden of providing this Court with a record to verify the factual basis of an argument upon which reversal is allegedly warranted. Defendant has not done so and merely speculates that some sort of error occurred that might have come out during further questioning of the biased juror.

*Id*. (citations omitted). The court of appeals also rejected Uraz's argument that he was unable to show Juror #1's bias affected the jury's verdict because the trial court did not hold an evidentiary hearing, explaining:

> In support of his appellate argument, defendant relies on *People v Jackson*, 292 Mich App 583, 593, 808 N.W.2d 541 (2011). In *Jackson*, the trial court questioned an "overwhelmed" juror, who was dismissed, about what she might have said to other jurors, and it found that she had said nothing of import to them. While the trial court, like in

> *Jackson*, could have questioned the biased juror in the present case, it elected to forgo such questioning and rely on the jurors' instruction that they were not to discuss the case until deliberations started. This was not an unreasonable approach, and defendant has not shown that the deliberating jurors were exposed to an extraneous influence. *Fletcher*, 260 Mich App at 540, 679 N.W.2d 127. Defendant contends that he is unable to show such an exposure *because* the trial court did not hold a hearing, but (1) the trial court did not abuse its discretion by handling the matter in the way it did and (2) defendant did not move for a new trial and attempt to impeach the jury verdict with additional evidence of actual juror misconduct. See, e.g., *id*. at 538–540, 679 N.W.2d 127 (stating that impeachment of a verdict, such as by way of juror affidavits, can be appropriate due to improper influences unrelated to the trial proceedings). Defendant, on the basis of the existing record, has set forth no ground for reversal.
>
> *Uraz*, 2023 WL 325528, at *14.

### C. Analysis

The Michigan Court of Appeals decision was neither contrary to, nor an unreasonable application or determination of, clearly established Federal law or the facts of case. Although Juror #1 expressed a bias against Uraz's Turkish descent, the trial court excused Juror #1 before deliberations began. (11/09/2017 Jury Tr. at 181–82.) The court also instructed the jurors *not* to discuss the case until deliberation started. (*Id*.; 11/02/2017 Jury Tr. at 94.) Given jurors are presumed to follow their instructions, *Penry*, 532 U.S. at 799, Uraz fails to show that any

other juror was exposed to Juror #1's bias or that the bias had impacted the jury's verdict. That Juror #1 did not participate in deliberations, and that there is no evidence another juror was exposed to that bias, makes this case distinguishable from *Peña-Rodriguez*. *See Peña-Rodriguez*, 580 U.S. 225–26 ("Not every offhand comment indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow further judicial inquiry. For the inquiry to proceed, there must be a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality *of the jury's deliberations and resulting verdict*. To qualify, the statement must tend to show that racial animus was a significant motivating factor *in the juror's vote to convict*.") (emphasis added).

Accordingly, Uraz is not entitled to habeas relief or a *Remmer* hearing.

## VI. [Claim I] The state appellate court reasonably concluded Uraz was not denied the effective assistance of trial counsel.

Finally, Uraz argues Perrone had a mental breakdown during trial and provided ineffective assistance, as evidenced by Perrone's (1) overall handling and presentation of the case, including (a) delays in his cross-examination of a prosecutor witness, (b) sending a particular email to Uraz's sister during the trial, (c) not impeaching Allen and Close with their prior theft convictions, and (d) presenting an inadequate closing argument; (2) failure to contest the admission of Uraz's incriminating statements to Allen, Close, and FM as violative of Uraz's Sixth Amendment right to counsel; (3) failure to consult an expert or present evidence of Uraz's own mental state to under the specific intent necessary to commit solicitation of murder; and (4) failure to investigate, interview, or call material witness to Uraz's defense. (ECF No. 1, PageID.43–65.) Uraz argues that but for Perrone's mental breakdown and deficient performance, the result of his trial would have been different. He is incorrect.

### A. Clearly established federal law regarding ineffective assistance of counsel: the *Strickland* standard

Claims of ineffective assistance of counsel are governed by the law set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). Under *Strickland*, a petitioner must establish *both* that his counsel's performance was deficient *and* that he was prejudiced by his counsel's deficient performance. *Id*. at 687–88. If a petitioner cannot satisfy one prong, the other need not be considered. *Id*. at 697. There must also be a "cause-and-effect relationship between the deficient performance and any prejudice suffered by the defendant." *Williams v. Burt*, 949 F.3d 966, 975 (6th Cir. 2020) (citing *Strickland*, 466 U.S. at 687).

Regarding the performance prong, the petitioner must demonstrate that counsel's performance was so unreasonable under prevailing professional norms that "counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Judicial scrutiny of counsel's performance is "highly deferential," and a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. In other words,

petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Id.*

Regarding the prejudice prong, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* That "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Pinholster*, 563 U.S. at 189 (quoting *Richter*, 562 U.S. at 112).

Where the state court has addressed an ineffective assistance of counsel claim on its merits, a state prisoner seeking habeas relief in federal court "must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance." *Bell v. Cone*, 535 U.S. 685, 698–99 (2002); *Durr v. Mitchell*, 487 F.3d 423, 435 (6th Cir. 2007). The question on habeas review "is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*,

550 U.S. 465, 473 (2007)); accord *Richter*, 562 U.S. at 101 ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable."). "[R]eliance on 'the harsh light of hindsight' to cast doubt on a trial that took place" years ago "is precisely what *Strickland* and AEDPA seek to prevent." *Richter*, 562 U.S. at 89.

Ultimately, the "standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id*. at 105. "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Id.* Indeed, because the *Strickland* standard is more general, "a State court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Mirzayance*, 556 U.S. at 120. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), and even "under de novo review, the standard for judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105. "If this standard is difficult to meet, that is because it was meant to be." *Id*. at 102.

### B. Analysis

#### 1. Trial counsel's mental state and handling of Uraz's case.

First, Uraz claims Perrone suffered a mental health episode that impacted his performance during Uraz's trial. (ECF No. 1, PageID.43–49.) In addressing Uraz's claim, the Michigan Court of Appeals first summarized the testimony presented at the *Ginther* hearing regarding Perrone's mental health, the observations of the attorneys present during Uraz's trial, and some of the defense's strategy:

> On remand, the court conducted an evidentiary hearing to address trial counsel's mental health to determine whether it deprived defendant of the effective assistance of counsel. Trial counsel testified that he was not sleeping well during and after the trial. He took a trip after defendant's trial was complete, but was required to return home early to address a family matter. After his return, trial counsel was hospitalized and treated for a mental health issue.[7] The prosecutors and second chair defense counsel did not notice or report that trial counsel suffered from a mental health issue during the trial. One of the prosecuting attorneys attended law school with trial counsel and had known him for many years. He did not observe any issues that arose during the trial. Although the jail inmates solicited to commit murder had theft-related convictions, trial counsel did not elicit this information, but focused on their motivation to lie. One of the prosecutors opined that deficient performance by trial counsel did not occur in failing to elicit this impeachment evidence. He cited to the limited attention span of the jury and the lack of import of a "shoplifting" conviction, the knowledge that the jail inmates

> were incarcerated at the time of the solicitation, and the inmate's motivation to benefit from being cooperative with the authorities.
>
> ---
>
> [7] In his pro se supplemental brief filed after remand, defendant purportedly cites to the mental health records of trial counsel. There is no indication that those records were admitted at the *Ginther* hearing. It is unclear how defendant obtained the records and whether it was in compliance with the laws protecting the privacy of individual health information. We limit our evaluation of the mental health issue to the testimony elicited at the hearing. As a general rule, "[a]ppeals to the Court of Appeals are heard on the original record," MCR 7.210(A), and the parties may not expand the record on appeal, *People v Nix*, 301 Mich App 195, 203, 836 N.W.2d 224 (2013).

*Uraz*, 2023 WL 325528, at *7 (alterations in original). The court of appeals also noted Uraz's testimony explaining his exposure to individuals with mental illness and his opinion that Perrone suffered from the effects before and during trial. *Id*. at 8. Yet the trial court found Uraz's testimony "self-serving," and explained that Uraz never raised an issue with Perrone's performance and that Uraz was even willing to have Perrone continue representing Uraz after the disclosure of the mental health issue. (08/08/2022 Ingham Cir. Ct. Order at 14–15.) *Id*.

After summarizing the testimony and the trial court's findings, the court of appeals concluded Perrone's mental health issues did not

arise during trial and that Perrone's performance was not constitutionally deficient, explaining

> Defendant alleges that trial counsel was ineffective for failing to seek a continuance when he began to suffer from mental health issues during the trial as evidenced by his failure to effectively cross-examine witnesses, especially those convicted of theft-related offenses.[8] The trial court, however, did not find that a mental health issue arose during the trial, and we cannot conclude that this finding was clearly erroneous. Further, the trial court did not find that trial counsel's questioning of witnesses was ineffective. Rather, it concluded that, in light of the nearly 30 witnesses that trial counsel interviewed, it was a matter of trial strategy to focus on the motivation of the jail inmates to lie to obtain favorable treatment. And, the record reveals that defendant was provided a different attorney when the illness manifested after trial and before sentencing and that defendant acquiesced to this substitution. Defendant points to an e-mail that trial counsel sent to defendant's sister, contending that it demonstrates that trial counsel was acting erratically. Although this e-mail was overly positive and exaggerated the potential success of the criminal trial and possible civil claims, it simply does not reflect that trial counsel was somehow incapacitated during material portions of his representation of defendant or that his representation of defendant fell below an objective standard of reasonableness.
>
> ---
>
> [8] Defendant contends that trial counsel was ineffective for failing to cross-examine Allen and Close with certain prior convictions, producing Internet Criminal History Access Tool (ICHAT) information purportedly reflecting a 2011 misdemeanor larceny conviction property valued over $200, but less than $1,000, MCL 750.356(4)(a), for Allen and a 2003 felony conviction for third-degree home invasion, MCL 750.110a(4), for Close. The attached ICHAT records

reflect that they were obtained after defendant's conviction, but before his sentencing and they were not part of the lower court record.

Assuming arguendo that we could take judicial notice of such convictions, decisions whether and how to cross-examine witnesses are matters of trial strategy. Even so, counsel's failure to develop defenses by adequately impeaching witnesses may establish ineffective assistance.

As to Allen, this Court has held that a misdemeanor larceny conviction does not contain an element of dishonesty and is not admissible for impeachment under MRE 609(a)(1). As to Close, the record does not reflect that that third-degree home invasion necessarily contained an element of theft, as required by MRE 609(a)(2), or an element of dishonesty or false statement, as required under MRE 609(a)(1).

---

In further support of his claim of ineffective assistance at trial, defendant relies on cross-examination when trial counsel allegedly took a long pause between questions. This contention is premised on a comment by the prosecutor that three minutes was occurring between the questioning. But trial counsel testified that he took time between questions to confer with defendant. Furthermore, the defense counsel acting as second-chair testified that the lapse of time argued by the prosecutor was an exaggeration. The trial court also did not find that trial counsel rambled in his closing argument. Thus, the evidence does not reflect that trial counsel's representation of defendant fell below an objective standard of reasonableness. The court remarked that counsel acted in an acceptable manner in defending such a serious case. Defendant has established no basis for a reversal in connection with trial counsel's illness.

*Id.* at 8–9 (some citations omitted). The court of appeals went on to reject Uraz's broad challenges to Perrone's performance, including

Perrone's "meaningless" cross-examination of witnesses and his "rambling and inadequate" closing argument, explaining:

> Defendant states that trial counsel's "cross examinations were meaningless." Yet, defendant provides no examples of how the cross-examination of witnesses was inadequate. An appellant may not simply make an assertion and leave it up to this Court to discover the basis for his claims. At any rate, trial counsel's cross-examination of key witnesses was reasonable. Defendant also argues that "a review of defense counsel's examination of the defense witnesses . . . supports the conclusion that defense counsel was unable to properly represent [defendant]." Once again, defendant provides no examples of how the cross-examination of these witnesses was inadequate. One defense witness seemed to have little pertinent information to offer, although trial counsel did elicit from him that defendant was "kind and caring." As for the second defense witness, trial counsel insinuated through his questioning that inmates Charles Allen and Reginald Close may have been conspiring to set defendant up.
>
> Defendant also contends that trial counsel's closing argument was "rambling and inadequate." Once again, defendant does not indicate how the argument was inadequate and thus his briefing is deficient. At any rate, trial counsel raised the issue of the credibility of jail informants, discussed the vague language used in the video call between defendant and FM, argued that the police manufactured the solicitation charges to escalate the stalking situation, and submitted that the police investigation into internet-protocol addresses was inadequate. The closing argument was not deficient.
>
> Defendant also contends that trial counsel acted improperly during jury voir dire. In support of this argument, defendant cites to the entire voir dire transcript and once again offers no specific examples. An appellant

> may not leave it up to this Court to unravel his arguments for him. Defendant has established no basis for relief on appeal in conjunction with his claims of ineffective assistance of counsel.

*Id.* at 11–12 (citations omitted). The Michigan Court of Appeals decision was entirely reasonable and was neither contrary to, nor an unreasonable application of determination of, clearly established Federal law or the facts of the case.

As for Perrone's illness, the credible testimony from the *Ginther* hearing established that Perrone's mental breakdown occurred *after* the trial, that he did not suffer any symptoms during Uraz's trial, and that he did not have any general mental decline that impacted his performance before or during trial. (10/04/2021 Hr'g at 14, 22–38, 46–50, 52, 63–64; 04/13/2022 Hr'g at 6–7, 11–14, 17, 20.) The state courts reasonably rejected Uraz's self-serving testimony that Perrone suffered an episode before and during trial, particularly since Uraz still wanted Perrone to continue his representation after the disclosure.

As for Perrone's delays during his cross-examination of witnesses, there was evidence that the delays were not as long as suggested, and in any event, the delays appeared to be tactical in that they diluted the importance of the witnesses' testimony. (10/04/2021 Hr'g at 28, 50;

04/13/2022 Hr'g at 16–17.) "Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *Dell v. Straub*, 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002).

Regarding Perrone's email to Uraz's sister, Perrone expressed his belief that he would obtain a not-guilty verdict in Uraz's trial and stated he would file a lawsuit against the prosecutor in federal court seeking $10,000,000 in damages. Perrone explained that his email may have been "a little bit expansive," but he "was trying to keep their moral up." (10/04/2021 Hr'g at 40). Though some of the statements contained in the email are odd and display a sense of arrogance, the email does not demonstrate that Perrone's representation of Uraz and his performance during trial was constitutionally deficient.

As to Allen's and Close's prior convictions, because they were not impeachable offenses under Michigan law, the Michigan Court of Appeals reasonably concluded that Perrone's failure to impeach them on those grounds was not constitutionally deficient. *Tackett v. Trierweiler*, 956 F.3d 358, 375 (6th Cir. 2020) ("The failure to raise a meritless claim does not constitute ineffective assistance of counsel.").

Also, as discussed, cross-examination and impeachment of witnesses fall within the purview of trial strategy. *Dell*, 194 F. Supp. 2d at 651. As *Dell* put it:

> Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel. Where trial counsel conducts a thorough and meaningful cross-examination of a witness, counsel's failure to employ a trial strategy that, in hindsight, might have been more effective does not constitute unreasonable performance for purposes of an ineffective assistance of counsel claim. Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available.

*Id*. (citations omitted). The jury already knew Allen and Close were incarcerated, and Perrone chose to attack their credibility through other means, including their involved in other inmates' cases, their discussion of Uraz's case between themselves, their goal of helping themselves at Uraz's expense, and their belief that someone could easily take advantage of Uraz. (11/03/2017 Jury Tr. at 131; 11/06/2016 Jury Tr. at 6–13, 31, 39, 47, 49, 51.) Perrone confirmed his belief that these were solid methods to impeach Allen and Close, which is entitled to deference. (10/04/2017 Hr'g at 11.) *Id*.

Finally, contrary to Uraz's claim, Perrone's presentation of the case and closing argument was not inadequate or constitutionally deficient. Perrone focused on the prosecutor's burden of proving Uraz guilty beyond a reasonable doubt, advanced his defense that the evidence against Uraz was manufactured, and emphasized to the jury that Uraz's prior conduct was not part of the charged conduct. (11/02/2017 Jury Tr. at 114–27; 11/09/2017 Jury Tr. at 135–145.) Perrone testified his closing argument was consistent with the strategy that Uraz agreed to. (10/04/2021 Hr'g at 33–34.) *See Wiley v. Sowders*, 669 F.2d 386, 389 (6th Cir. 1982) (A petitioner "can hardly complain that his counsel was ineffective if he freely and knowingly consented to the trial strategy.").

Ultimately, the Michigan Court of Appeals reasonably denied Uraz's claim that Perrone suffered a mental illness during trial that affected his representation of Uraz and that Perrone's handling of the case was constitutionally deficient. *Richter*, 562 U.S. at 101; *Strickland*, 466 U.S. at 687, 689. Further, even if Uraz could show Perrone's performance was ineffective in those areas, Uraz cannot establish prejudice given the other, overwhelming evidence of his

guilt—including the testimony from EM, White, and others who observed Uraz's stalking behavior first-hand; the testimony of Allen, Close, and FM describing Uraz's solicitation of EM's murder; and the video of Uraz soliciting FM to murder EM. Accordingly, Uraz cannot show, even if Perrone's performance was constitutionally deficient, there is a reasonable probability his trial would have been different. *Strickland*, 466 U.S. at 694.

**2. Trial counsel's failure to challenge Uraz's statements while incarcerated as violative of his Sixth Amendment right to counsel.**

Uraz also argues Perrone should have challenged the admission of his statements to Allen, Close, and FM while incarcerated as violative of his Sixth Amendment right to counsel. (ECF No. 1, PageID.49–52.) As explained above, however, Uraz's right to counsel had not yet attached for the solicitation of murder charges. Thus, as the Michigan Court of Appeals recognized, there was no Sixth Amendment violation, and counsel was not ineffective for failing to raise that claim in the trial court. *Uraz*, 2023 WL 325528, at *13 n.14; *see also Tackett*, 956 F.3d at 375.

**3. Trial counsel's failure to investigate and present evidence of Uraz's diminished mental state.**

Next, Uraz argues Perrone was ineffective for failing to pursue a defense based on Uraz's diminished mental state or that Perrone should have at least requested a continuance to conduct a proper forensic evaluation. (ECF No. 1, PageID.52–55.) In rejecting Uraz's claim, the Michigan Court of Appeals noted that a diminished capacity defense is not available in Michigan and that Perrone "was not ineffective for failing to pursue a non-exist defense." *Uraz*, 2023 WL 325528, at *10 (citing *People v. Carpenter*, 627 N.W.2d 276 (2001)). This was reasonable. *See Tackett*, 956 F.3d at 375.

Further, the Michigan Court of Appeals explained that while Uraz cited the relevant statute governing an insanity defense, Mich. Comp. Laws § 768.20a, Perrone reasonably decided to pursue other defenses, stating:

> In this case, weeks before trial, defense counsel filed a motion to dismiss for entrapment, alleging that defendant had been in a vulnerable mental state, "off his medications, . . . going through alcohol and sever[e] prescription pain killer[ ] and benzo withdrawals, ... [and being] mentally ill." The record also reflects that the trial court had earlier ordered that defendant could have a psychiatrist or psychologist visit at the jail.

> From the existing record, it appears that the decision not to pursue an insanity defense was a matter of strategy. And it is not evident that trial counsel made a poor strategic decision by emphasizing the alleged unreliability of the key prosecution witnesses as opposed to pursuing an insanity defense and admitting that defendant had committed the charged crimes. See *People v LaVearn*, 448 Mich. 207, 216, 528 N.W.2d 721 (1995) (defense counsel's decision regarding the defense to be pursued is a matter of trial strategy.). Recognizing that defendant made some reference below to depression and post-traumatic stress disorder, we conclude that defendant has not overcome the presumption of sound trial strategy, concerning trial counsel's attempt to obtain a not-guilty verdict by challenging the credibility of the prosecution witnesses. Simply put, counsel could have reasonably decided that his chances of persuading the jury that defendant did not comprehend the wrongfulness of his actions—thrice soliciting EM's murder and stalking EM for two years in the face of PPOs—stood less chance of success than persuading the jury that the government's witnesses lacked credibility.

*Uraz*, 2023 WL 325528, at *10 (some citations omitted). This too was a reasonable decision. Following the denial of his entrapment defense, Uraz knew of, and consented to, the trial strategy and defense of attacking the credibility of the prosecutor's witnesses and arguing the prosecutor failed to satisfy its burden of proof. (10/04/2021 Hr'g at 33–34.) Uraz cannot now claim that Perrone's decision not to pursue an entirely different strategy/defense was constitutionally deficient. *Wiley*, 669 F.2d at 389. Also, Perrone's decision not to present an insanity

defense admitting to the charged conduct was reasonable given it would have been inconsistent with the defense at trial that the prosecutor's witnesses were not credible. See *Poindexter v. Mitchell*, 454 F.3d 564, 573–75 (6th Cir. 2006) (counsel was not deficient for failing to pursue of "heat of passion" defense where such a defense was inconsistent with petitioner's claim that he was not involved in the crime); *Jackson v. Shanks*, 143 F.3d 1313, 1326 (10th Cir. 1998) ("Trial counsel's decision not to present inconsistent defense theories does not constitute ineffective assistance."). That counsel's strategy was ultimately unsuccessful does not mean that counsel was ineffective. See *Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002) ("an ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken").

#### 4. Trial counsel's failure to investigate and call other witnesses.

Uraz further argues Perrone's investigation and failure to call certain witnesses was inadequate and constitutionally deficient. (ECF No. 1, PageID.55–62.) The Michigan Court of Appeals rejected Uraz's claim, stating:

Defendant contends that trial counsel should have investigated and called various witnesses for the defense. Defendant provides a list of thirteen witnesses whom he believes should have been called at trial. Defendant does not ask for a remand to explore their potential testimony further, but instead argues that reversal is warranted because of trial counsel's failure to call them. A defendant has the burden of establishing the factual predicate for a claim of ineffective assistance of counsel. In other words, the defendant must prove his claim. See also MCR 7.212(C)(7) (stating that facts pertinent to an appellant's argument must be supported by references to the lower court record). Defendant's list of names does not prove his claim of ineffective assistance of counsel. In fact, defendant himself says that "[t]he above named witnesses were all *potentially relevant* to defense theory and facts." (Emphasis added.) The mere potential for relevance does not demonstrate that trial counsel acted below an objective standard of reasonableness by failing to call the potential witnesses. The decision regarding whether to call a witness is presumed to be trial strategy, and in light of the existing record, defendant has not overcome this presumption or established that the failure to call the witnesses affected the outcome of the proceedings.

Indeed, when discussing witnesses below, trial counsel mentioned some of the potential witnesses defendant lists, but did not indicate what testimony they would provide. The exception is Kathy Edmonds; trial counsel stated that Edmonds would be able to testify that defendant had actual trash at his house around the time that defendant and FM had their conversation at the jail, during which they used coded language about "taking out trash."[11] But even if we were to conclude that trial counsel's offer of proof about Edmonds—in the absence of an affidavit from Edmonds herself—is sufficient to prove that Edmonds would have testified in this manner, it is not apparent that the failure to call Edmonds fell below an objective standard of

reasonableness or affected the outcome of the case. While the beginning of the conversation between FM and defendant might lead to the conclusion that the two were speaking about actual trash, by the end it is abundantly clear that actual trash at defendant's home was not the subject of the conversation. No reasonable jury, even if it heard from Edmonds that defendant had actual trash at his house, would have concluded that the conversation between defendant and FM was about actual trash.

---

[11] The defense insinuation was that when FM agreed to take out trash for defendant, this was not a "coded message" referring to EM's murder but resulted from defendant's desire to have actual trash cleared from his home.

*Uraz*, 2023 WL 325528, at *11 (some citations omitted). The Michigan Court of Appeals reasonably denied Uraz's claim. First, the court reasonably concluded that Uraz failed to establish the factual predicate of his claim by not providing an offer of proof of the witnesses' testimony and how the testimony was relevant to his case. A habeas petitioner is not entitled to relief on an ineffective-assistance-of-counsel claim unless he can establish the factual predicate on which the claim is based. *See Vinson v. McLemore,* 226 F. App'x 582, 584 (6th Cir. 2007) ("The key problem with Vinson's claim is that he has not established the factual predicate for bringing it.").

Further, decisions regarding what evidence to present and which witnesses to call at trial are matters of trial strategy left to the sound

discretion of trial counsel. *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002); *Yancey v. Haas*, 742 F. App'x 980, 984 (6th Cir. 2018); *see also Robinson v. Lafler*, 643 F. Supp. 2d 934, 939 (W.D. Mich. 2009) (citing *Strickland*, 466 U.S. at 689). None of the witnesses that Uraz names were particularly relevant such that Perrone should have called them, nor would their testimony have made a different result reasonably probable. For example, Edmonds's purported testimony that Uraz literally had trash to get rid of would not have changed the context of Uraz's and FM's conversation, wherein they discussed hair color, the type of vehicle, and whether Uraz wanted to the trash "beaten with a bat" or "spread all over." (11/06/2017 Jury Tr. at 123–27.) Uraz also stated he gave the details to Close, whom Uraz had already solicited to murder EM. (*Id.*) Thus, the context of Uraz and FB's conversation and their meaning of "trash" was clear, and Edmonds's purported testimony would not have been persuasive.[5] Nor would the purported testimony of other people Uraz lists—including inmates and people who interacted with Allen and Close, character witnesses, and others who may have

[5] Given Uraz was fluent in English, his claim that the language barrier was a key factor in his misunderstanding of the "trash" references is also unpersuasive. (11/3/2017 Jury Tr. at 10–11.)

had some tenuous connection to the case—have made a different result reasonably probable. *Strickland*, 466 U.S. at 694.

In sum, the Michigan Court of Appeals reasonably concluded Uraz was not denied the effective assistance of trial counsel. Accordingly, he is not entitled to habeas relief on this claim.

## CONCLUSION

Uraz procedurally defaulted Claims II and VI. He has not shown cause and prejudice to excuse the default. In addition, he has not shown failure to review the claims would result in a fundamental miscarriage of justice. Accordingly, as detailed above, habeas review of Claims II and VI should be barred.

In any event state courts' rejection of Uraz's claims did not result in decisions that were contrary to federal law, unreasonable applications of federal law, or unreasonable determinations of the facts. Uraz was entitled to a fair trial, but "not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986); *see also United States v. Hasting*, 461 U.S. 499, 508–509 (1983) ("[T]here can be no such thing as an error-free, perfect trial" and the Constitution "does not guarantee such a trial.") The state-court decisions in this case were not "so lacking in justification" that they resulted in "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. The formidable threshold for granting habeas relief has not been met because fairminded jurists could disagree on the correctness of the state court's decision.

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Consequently, habeas relief should be denied.

Additionally, the State opposes any requests for bond, oral argument, or any other relief, including a certificate of appealability. And the State asserts that Uraz is not entitled to habeas relief because he has not established that the alleged errors had a substantial and injurious effect on the verdict in this matter. *See Brecht*, 507 U.S. at 622.

The State also contends that Uraz has not demonstrated entitlement to discovery. Unlike typical civil litigants, "[h]abeas petitioners have no right to automatic discovery." *Johnson v. Mitchell*, 585 F.3d 923, 934 (6th Cir. 2009) (quoting *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001)). Rule 6(a) permits district courts to authorize discovery in habeas corpus proceedings under the Federal Rules of Civil Procedure only "for good cause." R. Governing 2254 Cases in the U.S. Dist. Cts. 6(a). "Rule 6 embodies the principle that a court must provide discovery in a habeas proceeding only 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.' "

*Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004) (quoting *Bracy v. Gramley*, 520 U.S. 899, 908–909 (1997)). "Rule 6 does not 'sanction fishing expeditions based on a petitioner's conclusory allegations.' " *Williams*, 380 F.3d at 974 (quoting *Rector v. Johnson*, 120 F.3d 551, 562 (5th Cir. 1997)); Habeas Rule 6(a). "Conclusory allegations are not enough to warrant discovery under Rule 6; the petitioner must set forth specific allegations of fact." *Williams*, 380 F.3d at 974 (internal quotation marks and citation omitted). Uraz has not met this burden.

If this Court denies the petition, the State asserts that Uraz is also not entitled to a certificate of appealability (COA) so as to proceed further. In order to obtain a COA, a petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the prisoner is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483–484 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) ("Under the controlling standard, a petitioner must sho[w] that reasonable jurists could debate whether (or,

for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.") (internal quotation marks and citations omitted).

When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Slack*, 529 U.S. at 483–484, *see also Dufresne v. Palmer*, 876 F.3d 248, 254 (6th Cir. 2017) ("To meet *Slack*'s standard, it is not enough for a petitioner to allege claims that are arguably *constitutional*; those claims must also be arguably *valid* or *meritorious*.")

Likewise, when a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claims, a COA should issue, and an appeal of the district court's order may be taken, if the petitioner shows that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find

it debatable whether the district court was correct in its procedural ruling. *Slack*, 529 U.S. at 484.

When a plain procedural bar is present, and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petition should be allowed to proceed further. In such a circumstance, no appeal would be warranted. *Id.*, *see also Dufresne*, 876 F.3d at 254.

"At the end of the day, 'the gate keeping function of certificates of appealability [is to] separate the constitutional claims that merit the close attention of . . . this court from those claims that have little or no viability.' " *Dufresne*, 876 F.3d at 254 (quoting *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001)). Here, this Court should deny Uraz a COA on all of his claims. The claims simply "have little or no viability."

## RELIEF

For the reasons stated above, this Court should deny the petition. The Court should also deny Uraz any requested discovery, evidentiary hearings, bond, oral argument, and any other relief he seeks in this action, including a certificate of appealability.

Respectfully submitted,

Dana Nessel
Attorney General

s/Nicholas Johnson

Assistant Attorney General
Criminal Appellate and Parole Appeals Division
P.O. Box 30217
Lansing, MI 48909
(517) 335-7650
JohnsonN42@michigan.gov
P82810

Dated: September 8, 2025
Uraz, Tunc/ 2025-0429319-A/ USDC Answer

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2025, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

HONORABLE SHALINA D. KUMAR
MAGISTRATE JUDGE DAVID R. GRAND

and I hereby certify that Ashley Greer has mailed by United States Postal Service the papers to the following non-ECF participant:

TUNC URAZ, #114653
THUMB CORRECTIONAL FACILITY
3225 JOHN CONLEY DRIVE
LAPEER, MI 48446

Respectfully submitted,

Dana Nessel
Attorney General

s/Nicholas Johnson

Assistant Attorney General
Criminal Appellate and Parole Appeals Division
P.O. Box 30217
Lansing, MI 48909
(517) 335-7650
JohnsonN42@michigan.gov
P82810