STATE OF MICHIGAN

IN THE 55TH DISTRICT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

16-1065-FC
CC

File No. 16-2960 FY

v

TUNC URAZ,

Defendant.

_____/

PRELIMINARY EXAMINATION – VOLUME I

BEFORE THE HONORABLE THOMAS P. BOYD, DISTRICT JUDGE

Mason, Michigan – Thursday, December 1, 2016

APPEARANCES:

| | |
|---|---|
| For the People | MR. CHAS T. KOOP II  (P58112)<br>Assistant Prosecutor<br>303 West Kalamazoo Street<br>Lansing, Michigan  48933<br>(517) 483-6108 |
| For the Defendant | MR. MICHAEL J. NICHOLS (P59391)<br>3452 East Lake Lansing Road<br>East Lansing, Michigan 48823<br>(517) 432-9000 |
| TRANSCRIBED BY: | Ms. Elaine D. Stocking CER 0703<br>CERTIFIED ELECTRONIC RECORDER<br>(517) 676-8414 |

1

TABLE OF CONTENTS

WITNESSES:   PEOPLE

CHARLES MARICE ALLEN

     Direct examination by Mr. Koop            16

REGINALD GARFIELD CLOSE, JR.

WITNESSES: DEFENDANT

None

EXHIBITS:

|  | marked | received |
|---|---|---|
| PX 1 - 3 page handwritten document | 3 | |
| PX 2 - DVD - Close interview | 3 | |
| PX 3 - inmate request form - Allen | 3 | |

2

Mason, Michigan

Thursday, December 1, 2016 - at 10:42 a.m.

(PX 1, 2, and 3 marked before commencement of the proceedings)

THE COURT:  16-2960 FY.  People of the State of Michigan versus Tunc Uraz.  Mr. Uraz is before the Court with Attorney Mike Nichols.  Mr. Uraz, good morning.  Mr. Nichols, good morning.

MR. NICHOLS:  Good morning, your Honor.

THE COURT:  People of the State of Michigan are represented by Assistant Prosecuting Attorney Chas Koop.  Mr. Koop, good morning.

MR. KOOP:  Good morning, your Honor.

THE COURT:  Good morning, Officer.  Assuming opposite seats, probably there's a motion in there somewhere.  Mr. Nichols.

MR. NICHOLS:  I was asked to simply switch tables for purposes of security and concern and otherwise, so --

THE COURT:  Somebody's making a motion.  Must be Mr. Koop --

MR. KOOP:  No, I'm making that motion, your Honor.

THE COURT:  Any objection, Mr. Nichols?

MR. NICHOLS:  No.

THE COURT:  The parties will switch seats as

3

they've apparently agreed upon.  No problem.  Preliminary matters, Mr. Koop.

MR. KOOP:  Thank you, your Honor.  The People have filed with the Court a petition seeking or requesting that the Court grant immunity to witnesses Reginald Close and Charles Allen.

THE COURT:  I've read your petition.  Is there anything in addition in support of the petition you'd like to add?

MR. KOOP:  No, your Honor.

THE COURT:  Mr. Nichols, any comment on this petition?

MR. NICHOLS:  I demand a copy certainly before I cross-examine each witness.

THE COURT:  Anything else?

MR. NICHOLS:  I've not reviewed it yet, so, no, I don't have any --

THE COURT:  Say again?

MR. NICHOLS:  -- I have not seen the petition.  I have no comment.

THE COURT:  Oh.  Would you like to read it?

MR. NICHOLS:  Please.

MR. KOOP:  I do have one other preliminary matter, but I'll let Mr. Nichols read that first.

THE COURT:  Take your time, Mr. Nichols.  Have a

4

seat, Mr. Koop.

(Pause)

MR. NICHOLS: May I approach, your Honor?

THE COURT: Of course. All right As it relates to the People's petition for immunity pursuant to MCL 780.701, Mr. Nichols has read the petition. Do you have comments, Mr. Nichols?

MR. NICHOLS: Your Honor, I do. There may be some dispute and some inaccuracy as it relates to the dates of cohabitation within the Ingham County Jail amongst the three players here; my client, the accused, Mr. Uraz; and the two witnesses who are being given immunity. I've been advised by the prosecutor that they're trying to obtain jail records to sort out what dates are what. I don't know if that makes the petition under the statute fatal at all, but I just wanted to make that comment since the Court gave me the opportunity.

THE COURT: Okay.

MR. KOOP: The dates I included, your Honor, are based on what I had taken from recorded statements by the two witnesses as to their recollection of the timing of events. I don't doubt that they aren't -- they don't have time down to the exact date, and so it's based on what these witnesses said, at least represented.

THE COURT: Okay. In that regard, Mr. Nichols, I

5

should have given you the verified statement in support of the petition as well, which I did not. So if you would approach.

MR. NICHOLS: I will. Thank you.

THE COURT: The statute calls for the People to provide a verified statement of facts. The verification required under the statute is the People's best efforts to state the facts upon which their request is made. I believe that's what Mr. Koop has done in this petition. I have not done any research to determine the effect, if any, of an inaccurate date, but I do believe that the burden on the People is to state the facts as accurately as they can And, Mr. Koop, that's what you're verifying you've done today?

MR. KOOP: That's correct, your Honor.

THE COURT: Mr. Nichols, take your time.

MR. NICHOLS: Thank you.

(Pause)

MR. NICHOLS: I've reviewed it. Approach?

THE COURT: Thank you. Mr. Nichols now having had an opportunity to review the verified statement in support of the petition of use immunity, anything you wanted to add?

MR. NICHOLS: Nothing else.

THE COURT: Mr. Koop, as it relates to Mr.

6

Nichols' comments, anything you want to state further in support of your petition?

MR. KOOP:  No, your Honor, thank you.

THE COURT:  All right.  Based on the review of the petition filed by the People as well as the verified statement in support of that petition, I'm going to find the statutory grounds met and order immunity for Mr. Reginald Close, Jr., and Mr. Charles Allen as it relates to any activity which may be determined or alleged to be criminal which is discussed in paragraph 7 of the petition. All right.  I need to do two things.  First, I'm going to give Mr. Nichols a copy of the package and then create copies of the orders for the witnesses.  It'll just take about two seconds.

MR. KOOP:  Thank you, your Honor.

(At 10:53 a.m., recess)

(At 10:54 a.m., proceedings reconvened; all parties present)

THE COURT: All right. We're returning to 16-2960 FY.  People of the State of Michigan versus Tunc Uraz.  Mr. Uraz, Mr. Nichols, Mr. Koop, all still in the room.  I've provided to counsel a copy of a package which is -- gives the petition, affidavit, and order executed by the Court as it relates to immunity.  Mr. Nichols, additional preliminary matters?

7

MR. NICHOLS: Your Honor, I filed a motion to object or exclude any opinion testimony. It would be from a witness who we may not hear from today. It would be the detective who acted as an undercover. I talked with Mr. Koop about it yesterday. I don't think he intends to offer any sort of opinion about what certain slang terms or other terms actually meant to conclude what he believed Mr. Uraz's state of mind was, but I wanted to place that on the record that I filed that motion and I don't think it's going to be an issue.

THE COURT: Okay. Mr. Koop, you know, I did read that message and I think I understood what Mr. Nichols is trying to say, but what he's trying to -- I think what he's telling me now is that he's not pushing that point today, although we may revisit it later?

MR. NICHOLS: Agreed.

THE COURT: Mr. Koop, okay with you?

MR. KOOP: That's correct, your Honor.

THE COURT: All right. Other preliminary matters, Mr. Nichols.

MR. NICHOLS: One that's a little more important for purposes of today -- and that is the potential for down the road -- an exception to the confrontational clause. The prosecutor is proceeding today for the obvious reason of wanting to lock in to inmates who may or may not be

available, if this matter goes to trial, at the trial, and if they testify today and the accused has the opportunity to cross-examine the witness, then that may help bootstrap the exception to the confrontation clause under *Crawford versus Washington*.  I want to put on the record, your Honor -- I'm not asking the Court to rule -- but I just want to put on the record that just this morning I obtained what I think are the criminal histories for Mr. Allen and Mr. Close --

THE COURT:  What do you mean you think?  They are the history or not, right?

MR. NICHOLS:  Well, you would -- their names are fairly common.  I got their dates of birth coming to me from the prosecutor's office.  Mr. Koop made that representation to me in an email.  He gave me what he thought were the convictions subject to MRE 609 impeachment, but I want to make that decision for myself, and I also just have this immunity petition with the background facts and the verified statements, and I just want to say on the record -- and especially when a preliminary examination is much different than a trial -- I don't believe that cross-examination here today would be the same as the opportunity for cross-examine like at a deposition for purposes of the confrontation clause, especially when just moments ago I've got a pretty

important document which is an immunity petition with the verified facts as well as criminal histories that I think -- but I'm not positive because I don't know their dates of birth yet -- are their criminal histories for the witnesses involved.

THE COURT:  Okay.  But let me just understand that.  So Mr. Koop gave you criminal histories for these two gentlemen?

MR. NICHOLS:  No, he gave me a summary of what he thinks are the qualifying 609 impeachment convictions. That was in an email last night and -- and he was trying to be as cooperative as he felt necessary.  But I want to make that decision for myself.  I want to get their criminal histories, and I believe that my client -- I've got an obligation to get them for my client.  And I just printed them off this morning because I just got them this morning. I don't want to be facetious, but I mean they're not entirely short.  They're complicated enough I want to go through them and, you know, when I cross-examine them.  I'm not going to be entirely confident I've got everything I need in terms of material for a full and fair cross-examination for purposes of the confrontation clause.

THE COURT:  You know, Mr. Nichols, it makes perfect sense, and don't take this the wrong way because I know you're trying to approach this in a serious manner,

10

but we can do this in a couple weeks.  I'm not in a hurry. I mean, if you want to take time to do the things that you've just suggested, I don't have to do this today.

MR. NICHOLS:  Well, I think I should, but I should also talk to Mr. Uraz as well, if you can -- if the Court would indulge me for a minute or two.

THE COURT:  Of course.

MR. NICHOLS:  Okay.

MR. KOOP:  And then if I could respond to that when he's --

THE COURT:  Sure.  Let's have him talk to Mr. Uraz for a minute.

(Pause)

MR. NICHOLS:  Your Honor, as it relates to witnesses Allen and Close, I've consulted with Mr. Uraz, and in light of the importance of, you know, having everything I think I need for the cross-examination of those two witnesses, because they're the critical witnesses in this case as I see it so far, I would like a week.  I don't need two, but, yes, I would ask for an opportunity, even if we start, for a continuance before I cross-examine those two witnesses, Close and Allen.

THE COURT:  Mr. Koop.

MR. KOOP:  Thank you, your Honor.  First, the -- in regards to the criminal histories, I have reviewed the

11

criminal histories of Charles Allen and Reginald Close, and it's my understanding that based on the laws regarding LEIN my office says we don't just turn over the entire criminal history but do inform the defense counsel of qualifying convictions which I did provide to Mr. Nichols.  I don't have an objection to the adjournment especially as framed by Mr. Nichols where if we start the testimony of at least Mr. Allen to then allow -- to adjourn and then allow Mr. Nichols time to do whatever investigation he needs to do, but my preference is to at least start the examination today, obtain the testimony of Mr. Allen, and then at the Court's discretion address any adjournment that's necessary.

THE COURT:  All right.  That's what we'll do.  Other preliminary matters, Mr. Nichols?

MR. NICHOLS:  No.

THE COURT:  Mr. Koop, preliminary matters?

MR. KOOP:  Nothing further, your Honor.

THE COURT:  All right.  Mr. Koop, call your first witness.

MR. KOOP:  People would call Charles Allen to the stand.

THE COURT:  Good morning, Mr. Allen.

MR. ALLEN:  Morning.

THE COURT:  Before you're seated, please raise

12

your right hand.  Do you swear or affirm the testimony you'll provide in this matter will be the truth?

MR. ALLEN:  I do.

THE COURT:  Be seated.  State your full name.

THE WITNESS:  Charles Marice Allen.

THE COURT:  Spell each name, please.

THE WITNESS:  C-h-a-r-l-e-s.  M-a-r-i-c-e.  A-l-l-e-n.

THE COURT:  Thank you.  Mr. Koop, questions for Mr. Allen.

MR. KOOP:  I believe we need to address the --

THE COURT:  Oh, I apologize.

MR. KOOP:  Thank you.

THE COURT:  Would you hand that to Mr. Allen?  Mr. Allen, what you've just been handed is an order from the Court granting you immunity in this matter.  The immunity extends to the alleged conduct which is explained starting on the fourth page of that document.  If you'd turn to the fourth page, you see "B" and it says "Charles Allen"?

THE WITNESS:  Uh-huh.

THE COURT:  There are nine paragraphs there.  Mr. Allen --

THE WITNESS:  Yes, sir.

THE COURT:  -- sorry.  How far have you gone in

13

school?

THE WITNESS:  How far?  I graduated.

THE COURT:  Where?  Where from?

THE WITNESS:  From the Thumb Correctional Facility.

THE COURT:  All right.  You got your degree at the Thumb?

THE WITNESS:  Yes, sir.

THE COURT:  All right. When you were there, did anybody ever tell you you had trouble reading or understanding the English language?

THE WITNESS:  No.

THE COURT:  Ever in your K through 12 education have anybody tell you that?

THE WITNESS:  No.

THE COURT:  Ever have any special work with a reading tutor or reading class?

THE WITNESS: Yes.

THE COURT:  All right.  When was that?

THE WITNESS:  In middle school.

THE COURT:  Okay.  And in high school, no problems with reading?

THE WITNESS:  No, not really.

THE COURT:  All right.  Go ahead and read those paragraphs.  If you have any difficulty at all, let me

14

know.

THE WITNESS:  All right.  Beginning --

THE COURT:  You don't have to read them out loud.
Just read them to yourself.

THE WITNESS:  All right.

THE COURT:  If you have any difficulty, let me
know, and I'll read them to you.

THE WITNESS:  Okay.

(Pause)

THE COURT:  All set, Mr. Allen?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  So, Mr. Allen, essentially
this grant of immunity says they're going to ask you
questions about the things alleged in those nine
paragraphs, and if you give testimony that might implicate
yourself in a crime that you're not going to be held
responsible for that, for that testimony.  Do you
understand that?

THE WITNESS:  Yes, sir.

THE COURT:  You have a right to have a lawyer.

THE WITNESS:  Okay.

THE COURT:  If you can't afford a lawyer or don't
have a lawyer, the Court will appoint a lawyer for you.  Do
you understand?

THE WITNESS:  Yes.

15

THE COURT:  All right.  Do you want me to appoint a lawyer for you before you testify?

THE WITNESS:  No.

THE COURT:  You're ready to proceed.

THE WITNESS:  Yes, sir.

THE COURT:  If you change your mind, you let me know, okay?

THE WITNESS:  All right.

THE COURT:  Mr. Koop, questions -- first of all, are you satisfied with the Court's treatment of the order?

MR. KOOP:  Yes, your Honor.

THE COURT:  Mr. Nichols?

MR. NICHOLS:  Satisfied.

THE COURT:  Mr. Koop, questions for Mr. Allen.

MR. KOOP:  Thank you.

CHARLES MARICE ALLEN

(At 11:10 a.m., called by Mr. Koop and sworn by the Court, testified as follows)

DIRECT EXAMINATION

BY MR. KOOP:

Q    Good morning, sir.

A    Morning.

Q    My name is Chas Koop, I'm an assistant prosecutor in Ingham county.  I'm going to ask you some questions here today.  If you don't understand anything I ask, you just let me

16

know, okay?

A    Okay.

Q    Sir, where are you currently incarcerated?

A    Ingham County Jail.

Q    And how long have you -- since when have you been incarcerated at the Ingham County Jail?

A    I've been here since August 3rd.

Q    Do you know anyone by the name of Tunc Uraz?

A    I do.

Q    Do you call him Tunc or some other name?

A    Tony.

Q    Tony?

A    Yeah.

Q    How do you know this person?

A    I met him here in the Ingham County Jail.

Q    If you saw him -- the person you know as Tony again, would you be able to recognize him?

A    I would.

Q    Do you see him in court today, sir?

A    I do.

Q    Would you identify him and state something he's wearing?

A    He's wearing a jumpsuit like me.

        MR. KOOP:   I'd ask the record to reflect he's identified the defendant.

        THE COURT:   Mr. Nichols.

17

MR. NICHOLS:  No comment.

THE COURT:  The witness has identified the defendant.  You may proceed, Mr. Koop.

MR. KOOP:  Thank you.

BY MR. KOOP:

Q    Mr. Allen, do you recall when you first met Mr. Uraz?

A    I believe it was somewhere in the beginning or middle of September.

Q    Okay.  You're not absolutely certain on a date?

A    No.  Did not really keep track.

Q    And where did you meet him?

A    On Ingham County Jail, post 5, E block.

Q    Okay.  And what is the E block?  Is it a room? dorm?

A    It's a dorm.

Q    It's a dorm?  Were you in the same cell, or how was that situated?

A    We were in the same dorm, but different rooms.

Q    How is it that you came to meet Tony?

A    I was out on rotation.  He had just came in.  He looked like he was a little lost, you know, so I tried to help him out, and that's my initial meeting with him.

Q    Okay.  By help him out, what do you mean by that?

A    Like I just help him get like acclimated to being in jail, like, you know, let him know what time mealtimes were, rotation times, where the shower was, how we cooked our

18

food.   Just, you know, jail stuff.

Q   Showed him the ropes.

A   Yeah.

Q   Okay.   And how often would you see Mr. Uraz?

A   Once or twice a day usually.   When I was on my rotation and I'd go to the shower or the store, I'd walk past his room and we'd have a conversation, or when he came out, he'd come down and talk to us, talk to me.

Q   Okay.   And when you say have a conversation, where would these conversations take place?

A   In the dorm in the Ingham County Jail.

Q   Was there anyone else present for these conversation?

A   Not to my knowledge.   I mean, I was locked inside the room when he was out, and when I was out, he was in his room, but usually most the time people -- other people in the dorm were sleeping.

Q   Okay.   So how would you communicate if you were each in separate dorms or separate rooms?

A   We'd like tie a string to a piece of soap, pass notes.

Q   Did you have any verbal conversations with him?

A   Yeah.

Q   When did those take place?

A   On my rotations or on his rotations.

Q   Okay.   Do you ever discuss -- or did he ever say to you why he was in jail?

19

A    Yes.

Q    What was the reason he gave?

A    He said he was in here for aggravated stalking and home invasion or something like that.

Q    Okay.  Does a person by the name of Erika Melke mean anything to you?

A    That's the victim in this case.

Q    In whose case?

A    In his case.

Q    His being Tony or the defendant?

A    Tony.  Yeah.

Q    And is Erika Melke somebody you personally know?

A    No.

Q    How do you know the name Erika Melke?

A    From Tunc.  Tony.

Q    He told you?

A    Yeah.

Q    When did the defendant first bring this Melke person's name up?

A    Just, you know, conversations.  We all talk about, like, our girlfriends or ex-girlfriends, and she just popped up in conversation.

Q    In what way was he talking about Ms. Melke?

A    In the beginning he was just, you know, kind of sad, and then eventually, you know, it got into like how mad he was

20

and what he would do to her and just escalated from there.

Q   When you say how mad he was, what are you basing --

A   He blamed her for his incarceration, and I guess his anger escalated off of that, too, what he came to be.

Q   When you say anger, what made you believe he was angry?

A   By the things he would say and the way his face would be, just would be.

Q   Okay.  Did he ever say -- make any statements about his relationship with Melke, meaning friends, lovers, something else?

A   I guess it sort of changed a few times from being a student to his girlfriend to his ex-girlfriend, you know.

Q   So it was a personal relationship then --

A   Yes.

Q   Okay.  How frequently would you say the defendant would speak to you about Ms. Melke?

A   Any chance he got.

Q   Were you aware if he talked to anyone else about Ms. Melke?

A   So-so.

Q   What do you mean by that?

A   I mean, there was a point to where, like, where we were housed in another area of the jail and we got separated, and I could tell he was pretty -- he was pretty serious about getting that situation taken care of, so I would not doubt that he looked to someone else when he couldn't get

21

to me.

Q   Okay.  Well, let's back that up a little bit.  You never -- did you ever actually hear him talk with any other inmates about Ms. Melke?  Were you ever present for any conversation like that?

A   No.

Q   Did he ever -- did the defendant ever relay to you that, you know, he talks about Ms. Melke to another inmate?

A   No.

Q   Now, you just stated -- talking about taking care of that situation.  What do you mean by that?

A   After a while, you know, from conversations after we got to know each other a little bit better, he started to open up to me about like personal things, you know, and eventually, I don't know, he took me for a more ignorant individual and he wanted me to assault or do more damage to Erika.

Q   Okay.  What do you mean by do more damage?

A   Like kill.

Q   You said "like kill."  Did he actually --

A   Kill.

Q   He wanted to have her killed.

A   Yeah.  Yeah.

Q   Did he ask you -- what specifically did he ask you about that, about having her killed?

A   What do you mean?

22

Q   Well, did he actually say the words he wanted to have her murdered?

A   Yeah.

Q   What did he say, if you recall?

A   He said that he wanted her beat with a baseball bat beyond recognition.

Q   Did he state anything else?

A   Like what?

Q   Well, what about having her killed?  Did he make any specific statements about that?

A   He said --

        MR. NICHOLS:  Objection.  Form of the question.  Witness has answered.

        MR. KOOP:  I don't think he has.

        THE COURT:  Objection's overruled.  Go ahead, Mr. Koop.

BY MR. KOOP:

Q   As it relates to having Ms. Melke killed, did he ever ask you if you would personally have her killed?

A   Yes.

Q   And what was that conversation?  How did that come about?

A   We were talking one day, I can't recall the date, but he asked me -- well, he told me he would pay me to kill her.  He said that he wanted it videotaped and he wanted it sent to him with a picture of her driver's license so he knew

23

for a fact that it was her, and he would pay me $2,500.00. He said he didn't care what happened to her car, he said take her car, do whatever with it, it didn't matter.  He just didn't want to deal with that bitch.  That's what he said --

Q  Those are his words --

A  -- his words.

Q  Okay.  Did he ever -- to further this request to have her killed, did he ever give you any specific information about Ms. Melke?

A  He gave me her make and model of her car, her address, what her patio looked like, where the cameras were in her house.

Q  Do you recall what sort of -- the description of the car he gave?

A  Green Toyota RAV4.

Q  Did he give her -- ever give you anything about where she lives?

A  3925 College Towne, apartment 202.

Q  Was there any discussion -- did the defendant ever talk about prior attempts to have Ms. Melke killed?

A  No, not to my knowledge.

Q  Did he ever solicit you or ask for you to obtain a weapon for him?

A  Yeah.  He wanted a gun.  He said he wanted a gun for the boyfriends or lovers of Ms. Melke.  He felt like they

24

damaged his relationship in certain ways.  He said he knew where they lived.  He wanted a gun for himself and his roommate.

Q   Did he ever state why he wanted this gun?

A   Just to deal with like the boyfriends, the ex-lovers.

Q   What do you mean by deal with?

A   Kill them.

Q   Did he ever provide names of those ex-boyfriends?

A   No.

Q   You stated that the defendant offered to pay you $2,500.00 to kill Ms. Melke?

A   Uh-huh.

Q   Okay.  What did you do in response to him offering that money to you?

A   What do you mean?

Q   Meaning, did you say, "Okay, I'll kill her"?

A   I told him, "Yeah, we'll deal with it."

Q   That you'll deal with it?

A   "Yeah, we'll deal with it."  Yeah.

Q   Okay.  And after the defendant made this offer for $2,500.00, did you two ever discuss how you would effectuate this plan?  How you would take care of Ms. Melke?

A   What did you say?  Effectuate?

Q   How would -- did you ever discuss specific plans on how you

25

would carry out killing Ms. Melke?

A    Yeah, he wanted me to either go to her house or her work after she got out of work, you know, kill her wherever I went, take her in her car, dump her body off somewhere where she wouldn't be found. He said that he'd give me half up front and half after I showed proof.

Q    Did you ever talk about a time line when this was to happen?

A    Time line?

Q    Meaning -- I mean, you're in jail. How were you supposed to kill her in jail?

A    Like when I got out of jail.

Q    Did the defendant ever give you any money or anything of value while in jail for your assistance in --

A    He'd give me like noodles, coffee, but I think that was just to -- like not to say anything about the whole situation. I think that was more of that.

Q    Okay. Were there any actual attempts to put money in your account?

A    He wasn't able to because I wasn't really getting like a lot of visits and I can't use the phone, so there would have been no way for that to happen.

Q    He wasn't able to, but were there any -- any attempts made by someone else through the defendant to put money into your account?

26

A   Not to my knowledge.

Q   Do you recall being interviewed by Detective Krumbach in this matter?

A   I do.

Q   And where did that interview occur?

A   Here in the county jail.

Q   And was that sometime in October?

A   Yes.  I believe so.

Q   Do you recall making a statement to him that a friend of the defendant tried to put money on your account but was unable to?

A   Right.

Q   Do you recall -- let me retract that.  So a friend of the defendant tried to put money on your account at some point?

A   That's what I was told.  He told me that someone tried to put money in my account, but they weren't able to.  But I don't know if they were able to or if they did --

Q   The defendant told you someone tried to put money --

A   Yeah.

Q   And what was the purpose or why was this person trying to put money on your account?

A   I'm guessing for the killing --

        MR. NICHOLS:  Objection.  I object --

        THE COURT:  One second.  Mr. Nichols.

        MR. NICHOLS:  Speculation.  Can't guess.  It's

got to be with some foundation.

MR. KOOP:  I'll reframe the question, your Honor.

THE COURT:  The question's withdrawn.  Mr. Koop, you may proceed.

BY MR. KOOP:

Q    Did you and Mr. Uraz ever have specific conversations about defendant having another person put money on your account?

A    He told me that he was going to pay me to kill Erika Melke. He also told me that he was going to have money put in my account.  He told me that someone tried to put money in my account, but they weren't able to.  I don't know if someone tried to put money in my account or if they were able to or not, but it was for to kill her.  That's the only thing it could be for, because why else would someone put money in my account.

Q    Okay.  So you didn't ask -- did you ask the defendant to put money on your account because you wanted to buy food?

A    No, I can get money from my mom and from my girlfriend.

Q    Okay.  Now, you previously testified about the defendant wanting to or soliciting you to obtain a gun for him.

A    Yes.

Q    When you're speaking about obtaining this gun, did the defendant actually use the word gun?

A    In private yes.  In -- around people, he would use the word "toy."

28

Q    Why the word "toy"?

A    To keep the conversation discreet.

Q    Discreet?

A    Yeah.  People listening.  Because, you know, in jail, a lot of people are in your business.

Q    What do you mean by the business?

A    Like people always in your conversation.  People are listening to what's going on.  I mean, it's jail.

Q    Were you ever present for the defendant -- let me strike that.  In jail, are there such things as video visits?

A    Yes.

Q    What's a video visit?

A    It's basically a visitation for friends or family because you don't have like face-to-face visits or contact visits, so our visits like from our family or friends are through a video screen, kind of like FaceTime.

Q    Okay.  Did you ever personally see the defendant have any conversations or use this video chat or FaceTime?

A    Yeah.

Q    Okay.  And do you recall who he was talking to?  Did you know?

A    His roommates or people he knew or there was -- what do you call that, one of the doctors that -- OBGYN, a gynecologist or something.

Q    Okay.  And that's a pretty specific thing.  Did the

29

Q   defendant tell you who these people were?

A   Yeah.

Q   Okay.  Said one was a roommate?

A   One was a roommate.

Q   One was a OBGYN or --

A   Or a gynecologist, one of those type of doctors.

Q   Was there anybody else?

A   There was two guys who worked at a pizza shop.

Q   In these conversations, was the defendant speaking English?

A   No, they were talking in Turkish.

Q   Okay.  Mr. Allen, do you speak Turkish?

A   No.

Q   So you could not understand these conversations they were having?

A   No.

Q   Okay.  Did the defendant ever discuss with you what he did for a living prior to being in jail?

A   He's a teacher.

Q   Where at?

A   MSU and LCC.

Q   Did he say any specifics about his employment at MSU?

A   He worked at Brody Hall.

Q   Was there any conversation of whether the defendant still worked there, at MSU?

A   He didn't.  He said he did not.

30

Q    Did he say why he did not work there any longer?

A    He did not.

          MR. KOOP:   Just one moment, your Honor.

BY MR. KOOP:

Q    Did the defendant ever then tell you about soliciting or talking with someone on the video chat for the purpose of murdering Erika Melke?

A    Could you repeat that?

Q    Yeah, that was a bit confusing.  I apologize.  The video visits, the video chats --

A    Uh-huh.

Q    -- were you ever aware of the defendant talking with anyone over that means of communication about murdering Erika Melke?

A    He told me that he did, but I don't know if he did.

Q    You didn't personally see it.

A    I seen -- when he'd be on visits, I'd see him on the visits.  He said -- because I told him like, you know, jail are watching these visits, you know, they're always monitoring and recording.  He was like, "Well, that's all right, I speak in Turkish to my buddy so they won't be able to know what I'm saying."

Q    Okay.  Did he ever talk about speaking with anyone from Detroit?

A    Yeah.

31

Q    What was that conversation?

A    There was a visit from a guy from Detroit.  About four or five times that visit happened.  And he was pretty spooked about it.  I mean, usually you only get a certain amount of visits, and the guy came and he asked, he's like, yeah, (inaudible) said you needed some trash taken out --

MR. NICHOLS:  I object, unless there's a foundation that this witness actually heard this conversation between the visitor and Mr. Uraz and only what Mr. Uraz said would be admissible.  The rest would be hearsay.

THE COURT:  Mr. Koop.

MR. KOOP:  Well, then, I guess -- I think the answer can stand up to this point, and then I'll --

THE WITNESS:  That's what -- he said that, that's what the guy said --

THE COURT:  Hang on a second, Mr. Allen.  Hang on one second.

MR. KOOP:  The answer can stand as to what the defendant told him.  I agree that he cannot parrot anything that was said by the other person on the line.

THE COURT:  Mr. Allen, so is it your testimony that you heard Mr. Uraz say what you're about to tell us?

THE WITNESS:  Yes.

THE COURT:  And you heard him say it to this

32

other person?

THE WITNESS:  No, he said -- he told me.

THE COURT:  After the fact.

THE WITNESS:  After the visit was over.

THE COURT:  Based on that, I guess I'd like to have the question re-asked, please.

BY MR. KOOP:

Q    Did the defendant ever tell you he spoke with this C.J. from Detroit about having Erika Melke murdered?

A    Yes.

Q    All right.

THE COURT:  To the extent that Mr. Nichols' motion requires a ruling, I'm going to overrule it as it relates to the question as it was restated.

MR. KOOP:  Thank you, your Honor.  One moment, your Honor.

BY MR. KOOP:

Q    Mr. Allen, you've previously testified that the defendant wanted some sort of proof that Ms. Melke had been murdered, is that correct?

A    Right.

Q    Did the defendant give any sort of reason why he wanted that proof?

A    To make sure it's the right person.

Q    Did he state anything else about obtaining a picture of Ms.

33

Melke?

A    He said that -- well, he wanted the video, he told me that he wanted the video so he could jack off to it.

Q    Okay.  Video of her dead?

A    Being -- yeah, being -- the whole process of how it happened, what happened to her, and then the end of it. You know, so the whole thing.

Q    Previous testimony about the defendant wanting you to beat Ms. Melke with a baseball bat --

A    Uh-huh.

Q    -- was that to harm her or what was the purpose of that?

A    The purpose was to kill her.  The purpose was to, you know, do damage.

Q    Okay.  Did he ever specify besides this baseball bat how he wanted her to be murdered?  If you can recall?

A    He just wanted her dead.  I don't really think he cared how, but that is the way he mentioned.

Q    In all of your conversations with the defendant, those occurred within the Ingham County Jail?

A    Yes.

Q    And that occurred between the time you were incarcerated on or about August 3rd, is that correct?

A    Yes.

Q    Do you recall when you last spoke with the defendant in jail?

A    Do I recall when?

Q    Yes.  Approximately.

A    Some time before Thanksgiving.

Q    Mr. Allen, at any point when the defendant had solicited you for these various crimes, did you alert jail authorities?

A    I did.

Q    How did you alert them?

A    The first time I wrote a kite.  I never heard nothing back. A month passed.  So then I wrote another one, and then I would say 20 -- 20 days to a month passed, and then I got a response.

Q    Okay.  Do you recall approximately when you got that response?

A    October, I guess I would say.  October, November.  I'm not really sure.

            MR. KOOP:  May I approach the witness, your Honor?

            THE COURT:  For what purpose?

            MR. KOOP:  To -- well, I'll lay a better foundation.  Thank you.

BY MR. KOOP:

Q    The kite you wrote to some authority in the jail, what is the process of writing a kite?

A    You -- depending on who the kite is addressed to, there's a

35

kiosk, an electronic kiosk for certain kites, like housing issues, commissary, stuff like that, but personal kites that are -- that should addressed to like a higher authority are on paper and given to the post deputy, and the post deputy gets that kite to wherever it needs to go.

Q And in this situation, the kite you wrote to jail authorities, was it handwritten or on the kiosk?

A I handwrote it.

Q Okay. And do you recall the exact date you wrote that kite?

A No.

Q On those kites, is there a spot for you to put a date in?

A Yes.

Q Would you have done that in this instance?

A I may have or I may not have.

Q If you saw a copy of that kite, would it refresh your memory?

A Yes.

MR. KOOP: May I approach the witness, your Honor?

THE COURT: You may.

BY MR. KOOP:

Q Mr. Allen, I want to show you a copy. I want you to read it and don't say it, just read it over, and see if that refreshes your memory, okay?

36

A    Read it to myself?

Q    Correct.

A    Yeah.

Q    Okay.  You've had the chance to read what I handed you over?

A    Yes, sir.

Q    You recognize what it is I handed you?

A    I do.

Q    What was it that you just read?

A    My kite.

Q    Okay.  And that's the kite you filled out and --

A    Yes.

Q    -- does that help refresh your memory as to when you sent that kite?

A    It does.

Q    When did you send that kite?

A    October 24th.

Q    Okay.  You stated you had sent multiple -- more than one kite.

A    I did.

Q    This kite dated October 24th, 2016, was this the first, second or --

A    That's the second one.

Q    Okay.  And this second one, that's the one you got a response on?

37

A     Yes, I didn't get a response on the first one.

Q     How soon after sending this October 24th kite did you get a response?  If you can recall?

A     A few weeks.

        MR. KOOP:  I have nothing further, your Honor. Thank you.

        THE COURT:  Mr. Nichols, how do you want to proceed?

        MR. NICHOLS:  Move for a continuance on my cross on this witness.

        THE COURT:  Mr. Koop, what's your pleasure?  Do you want to call other witnesses?  Continue testimony today?

        MR. KOOP:  Well, your Honor, I believe as it relates to the next witness, Mr. Close, we have to address the issue of representation for him.  And based on that, we can proceed if he doesn't want counsel, or if the Court appoints counsel -- so I'm done with this witness.  Mr. Close would be the only other witness I would call today. I, too, would ask for a continuance, so --

        THE COURT:  Mr. Allen, what's your out date?

        THE WITNESS:  January 23rd.

        THE COURT:  Twenty-third?

        THE WITNESS:  Yes.

        THE COURT:  Okay.  All right.  Mr. Nichols, do

                                38

you have your calendar?

MR. NICHOLS:  I do.  I'd like to approach briefly.

(Side bar conference - off record)

THE COURT:  All right.  While we're not adjourning for the day today, we will have a continuance scheduled for the afternoon of December 13th.  Tuesday, December 13th, at 3:00 in the afternoon.  That's when we'll next see you.  Okay, Mr. Allen?

THE WITNESS:  Okay.

THE COURT:  All right.  Mr. Allen, you can step down.  The officers are going to bring you back.  Sorry. Mr. Koop --

MR. KOOP:  Your Honor, if we might just advise Mr. Allen that if for any reason he's let out before the 13th, he's advised to notify or give a good address so we can insure that he is here on the 13th.

THE COURT:  Mr. Allen, you're on probation here, aren't you?

THE WITNESS:  No.

THE COURT:  No?

THE WITNESS:  I'm not on probation or any paperwork.

THE COURT:  Okay.  So that means that if you leave -- if you leave the jail before December 13th, come

on over here and see us so we can make sure you have written notice to come back to the hearing, okay?

THE WITNESS:  Definitely.

THE COURT:  All right.  You know, don't talk to anybody about your testimony.

THE WITNESS:  Definitely not.

THE COURT:  All right.  Have a good day.

THE WITNESS: You, too.

(At 11:47 a.m., witness excused)

THE COURT:  Mr. Koop, do you want to call your next witness?

MR. KOOP:  Next, the People call Reginald Close to the stand.

THE COURT:  Thank you.  Sir, you're headed right for this red chair here.  Before you're seated, would -- sorry -- would you please raise your right hand?  Do you swear or affirm the testimony you'll provide in this matter will be the truth?

MR. CLOSE:  Yes.

THE COURT:  All right.  Go ahead and have a seat, sir.  Please state your full name.

THE WITNESS:  Reginald Garfield Close, Jr.

THE COURT:  Would you spell each name, please.

THE WITNESS:  R-e-g-i-n-a-l-d.  Garfield, G-a-r-f-i-e-l-d.  Close, C-l-o-s-e.  Junior.

40

THE COURT:  Thank you, Mr. Close.  Mr. Koop, questions for Mr. Close.

MR. KOOP:  I believe I've already addressed the immunity --

THE COURT:  Oh, sorry about that.  Thanks for reminding me, Mr. Koop.  Mr. Close, I want to explain what I've just handed to you.

THE WITNESS:  Uh-huh.

THE COURT:  The front is an order that bears my signature.  That's an order granting immunity for you testifying.  Immunity means that they can't charge you with crimes based on what you tell me today.  Do you understand that?

THE WITNESS:  Uh-huh.

THE COURT:  That's a yes, sir?  Is that a yes, sir?

THE WITNESS:  Yes, sir.

THE COURT:  All right.  I'm going to direct your attention to the third page there.  In the middle of that page you'll see capital "A" and then it says "Reginald Close, Jr."

THE WITNESS:  Uh-huh.  Sorry about that.  Yes.

THE COURT:  That's okay.

THE WITNESS:  I was reading it.

THE COURT:  That's okay.  I'm going to direct

41

your attention to that section and the eight paragraphs that follow that.  There are eight numbered paragraphs. Before you do that, I just want to ask you a couple questions.

THE WITNESS:  Okay.

THE COURT:  How far have you gone in school?

THE WITNESS:  Got a GED.

THE COURT:  All right.  Where did you get your GED?

THE WITNESS:  Michigan Department of Corrections.

THE COURT:  Okay.  And where were you in school before you went to DOC?

THE WITNESS:  New Horizon Academy.

THE COURT:  All right.  And before that?

THE WITNESS:  Allen Middle School.

THE COURT:  All right.  So let's talk of middle school.  When you were in middle school, did anyone ever tell you you had trouble reading --

THE WITNESS:  No.

THE COURT:  -- or understanding the English language?

THE WITNESS:  No.

THE COURT:  All right.  Did you ever have any special work with a reading tutor or reading class?

THE WITNESS:  No.

42

THE COURT: All right. And you don't believe you have any difficulty reading?

THE WITNESS: No.

THE COURT: All right. I'm going to ask you to read those paragraphs, and when you're done -- just read them to yourself. When you're done, why don't you look up to me, okay?

(Pause)

THE WITNESS: I'm ready.

MR. KOOP: Your Honor, I believe Mr. Close has finished reading it.

THE COURT: Thanks, Mr. Koop. All right. Mr. Close, based on the statements in those eight numbered paragraphs, they're going to ask you questions about the material. The order granting immunity means that you can't be prosecuted for anything you may have done wrong in that exchange. Do you understand that?

THE WITNESS: Okay.

THE COURT: All right. Therefore you have rights --

THE WITNESS: Yes, sir.

THE COURT: You have rights. You have the right to an attorney --

THE WITNESS: Uh-huh.

THE COURT: -- to be here with you before you

43

testify.

THE WITNESS:  Uh-huh.

THE COURT:  And if you can't afford an attorney or you'd like me to appoint an attorney for you, I'll do that for you today.  Would you like me to appoint an attorney for you before you testify?

THE WITNESS:  I actually -- I actually had an attorney who was working on this, but I was going to plead the Fifth on this, whatever questions were asked today.  I had actually talked to him about a week ago, so --

THE COURT:  Okay.  Who's that attorney?

THE WITNESS:  Alex Rusek.

THE COURT:  All right.  So you spoke with Mr. Rusek about the possibility of going forward?

THE WITNESS:  I had told -- he had told me that they would probably subpoena me to come to court --

THE COURT:  Okay.  All right.

THE WITNESS:  -- told me that I had the right to plead the Fifth if I didn't want to testify or anything.

THE COURT:  All right.  And that's your intention today?

THE WITNESS:  Yes.

THE COURT:  Okay.  Your ability to plead the Fifth --

THE WITNESS:  Uh-huh.

44

THE COURT: -- so when we say that, we mean that the United States Constitution, Fifth Amendment, gives you the right to -- protects you from compelled self-incrimination, meaning we can't force you to say things that might hurt you.

THE WITNESS: Right.

THE COURT: Right?

THE WITNESS: Right.

THE COURT: That immunity letter takes away the "hurts you" part --

THE WITNESS: Right.

THE COURT: -- because it says it's not going to hurt you to testify --

THE WITNESS: Right.

THE COURT: So you have a limited ability to refuse to answer the questions once I've issued that order.

THE WITNESS: Okay.

THE COURT: Would you like -- so my point is to a certain extent I'm not going to let you plead the Fifth.

THE WITNESS: Okay.

THE COURT: Would you like to talk to a lawyer about that before you proceed?

THE WITNESS: I mean, if you could just explain it to me, what you mean limited ability --

THE COURT: Yeah, I'm not really allowed to give

45

you legal advice.  I can tell you -- I can tell you what the law says --

THE WITNESS:  No, what I'm saying when you said limited ability, that's what I was trying to figure out what you meant by that.

THE COURT:  Okay.  If the question has to do with the subject matter contained in those eight paragraphs --

THE WITNESS:  Okay.

THE COURT:  -- you're not going to be able to refuse to testify.

THE WITNESS:  Okay.

THE COURT:  Because you've been granted immunity, in which case -- you know, again, compelled self-incrimination means we can't force you to tell us something that's going to hurt you.  Well, the "hurt you" is gone because they can't prosecute you from that.

THE WITNESS:  Okay.

THE COURT:  You know, we can have an attorney sit next to you question by question if you want.  I mean, it's not something you have to do on your own.

THE WITNESS:  Right.  You sound like this -- like the first eight paragraphs like I have to answer on those.

THE COURT:  Those are the paragraphs that have to do with the statements the prosecution intends to elicit from your testimony.

THE WITNESS:  All right.  Okay.  I mean, I can answer.

THE COURT:  Okay.  Do you want me to appoint an attorney for you?

THE WITNESS:  No, I'm okay.

THE COURT:  All right.  You've obviously just sworn an oath to tell me the truth, right?

THE WITNESS:  Yeah.

THE COURT:  And you're going to do that.

THE WITNESS:  Yeah.

THE COURT:  Okay.  Mr. Koop.

MR. KOOP:  May I make an observation, your Honor?

THE COURT:  You may.

MR. KOOP:  Mr. Close has stated that as it relates specifically to his testifying today, he has spoken with an attorney.  He was given advice by that attorney on how to proceed, mainly plead the Fifth.  That advice is incorrect or is not a course of action the defendant can take.  I mean, he's been given immunity, so he's advised him incorrectly.  I think he should perhaps be given the opportunity to speak with that counsel again to best further advise him on the best practice to proceed.

THE COURT:  Mr. Nichols.

MR. NICHOLS:  Well, I agree other than the attorney as sometimes happens didn't have the full

47

understanding that a petition for immunity was in the offing.  Obviously that advice for -- I would hope all of us as attorneys would change if a person's granted immunity.  We would have to explain to them how that works. I'm not Mr. Close's lawyer.  Neither is Mr. Koop and neither is the Court, although I think the Court gave a very thorough explanation of immunity.  Beyond that, I have no further comment.

THE COURT:  Mr. Close, what's your out date?

THE WITNESS:  I don't have one as of right now.

THE COURT:  You're on a DOC hold then?

THE WITNESS:  Yes.  I'm actually waiting to go to trial on the case.

THE COURT:  Ah.  Sorry.  Not adjudicated matter.

THE WITNESS:  Yes.

THE COURT:  What's the trial date?

THE WITNESS:  I don't actually have one yet.

THE COURT:  Any insight, Mr. Koop?

MR. KOOP:  I believe -- I don't think it's any time in the next two weeks.

THE COURT:  Okay.  We're talking about coming back in two weeks, so what I'd like to do based on the conversation we've just had today is to send a message to Mr. Rusek to ask him to spend some time with you and try to answer all the questions you have.  And then --

48

THE WITNESS:  I mean, I understand what you said. Like I fully understand --

THE COURT:  I don't -- I don't doubt that, Mr. Close.

THE WITNESS:  Oh, okay.

THE COURT:  I'm sorry.  I didn't mean to suggest that you didn't understand --

THE WITNESS:  Okay.

THE COURT:  All I'm saying is that -- and what Mr. Koop is saying -- is that you had time to talk to a lawyer and think about it.

THE WITNESS:  Yeah, he told me about the immunity also.

THE COURT:  Okay.  I think Mr. Nichols was doing his best to save Mr. Rusek on that one, but --

THE WITNESS:  Oh.  Okay.

THE COURT:  -- but I think that what we're suggesting is we're coming back anyway.

THE WITNESS:  Okay.

THE COURT:  And it doesn't sound like, you know, you are going to be unavailable on that day, so we might as well put it off a couple weeks and give you an opportunity to talk to Mr. Rusek again, have any questions you want answered, and if you want Mr. Rusek sitting next to you when you testify, or another lawyer, we'll do everything we

49

can to make that happened.  Okay?

THE WITNESS:  Okay.

THE COURT:  All right.  Thanks, Mr. Close.  We're all set.  We'll see you in a couple weeks, Mr. Close.

(At 11:59 a.m., witness excused)

THE COURT:  Mr. Koop.

MR. KOOP:  Thank you, your Honor.  Your Honor, at this time, the People would request a continuance of this matter.  The next witness we would call in order would be Officer Frank Mobley.  He is on vacation until this evening.  So we are obviously unable to call him at this time.  So we'd ask for a continuance for that matter.

THE COURT:  Mr. Nichols.

MR. NICHOLS:  My position remains the same as earlier.  I obviously need to do some further prep for my cross of the two jailhouse witnesses.

THE COURT:  Okay.  So we're set for 3:00 on December 13th, and I think everyone should expect to be here until we're done, however long that takes.  Anything additional, Mr. Koop?

MR. KOOP:  Not from the People, your Honor -- I guess as it relates to Mr. Rusek, I will inform Mr. Rusek of what transpired here today, but is the Court appointing or how does the Court want to address the resolution of counsel for Mr. Close?

THE COURT: Well, actually I certainly had intended to ask you to inform him, or one of you or both of you to inform him about what happened. I'm going to expect Mr. Rusek to have his conversation with Mr. Close without having to be appointed on this matter, since he's already endeavored to do so. However, if there comes a time where it's going to make sense either at Mr. Close's request or from our general observation that Mr. Rusek be with -- here with him, then the Court would appoint him for that purpose.

MR. KOOP: When I had spoke with Mr. Rusek yesterday, I told him I would call him after today's hearing. After I speak with Mr. Rusek today, I'll apprise all the parties of what Mr. Rusek intends to do and informs me, and we can proceed as necessary.

THE COURT: Okay. And the only thing I would add, as unhelpful as it might be, I'm not going to adjourn that date for Mr. Rusek to personally appear. If Mr. Rusek can't personally appear, we'll get somebody else.

MR. KOOP: That does help. Thank you, your Honor.

THE COURT: All right. Mr. Nichols.

MR. NICHOLS: Your Honor, I have by way of discovery some concerns. It's always frustrating. The first two pages of the incident report, I've got four

51

witnesses whose contact information is completely blacked out. And I can understand why the first witness, Ms. Melke, might have her contact information blacked out. I'm certainly not going to harass her. But we also just had what we can presuppose is her address or at the time her address. I would just ask for information to contact the salient witnesses so that I can conduct witness interviews or have a private investigator do the same. That's my first request.

THE COURT: Okay. Well, as it relates to these witnesses, we're talking about Ms. Melke and two other human beings who are identified as?

MR. NICHOLS: Close and Allen and then --

THE COURT: We certainly know where they are.

MR. NICHOLS: And I'm certainly less concerned, but there's a Stanley White who from what I'm seen so far is not that big of a deal, but, you know, being able to talk to everybody is always something that I believe is due diligence. At least making the effort.

THE COURT: Sure. I don't -- I tell you what, I'm going to ask a question and if you don't believe it's proper to respond to it at this time in this format, that's fine, Mr. Koop, just let me know, but why is Ms. Melke a witness? What does she know that's going to help the case -- the judge in this case?

52

MR. KOOP:  That would go to 404(b) acts.  I'm not calling her in the solicitation of murder.  I don't believe she's necessary as to the elements of solicitation of murder for bindover or even conviction.

THE COURT:  And if Mr. Nichols wanted to interview with her, could you provide him with the contact information for that purpose?

MR. KOOP:  Yes, your Honor.  You know, our -- my office practice is always to make them available.  I don't know if -- I will confer how best to get that information to Mr. Nichols.  We may need for -- protect the record, file a protective order not to disclose it to anybody else, but I see no reason why we cannot produce that to him.

THE COURT:  All right.  I mean, Mr. Nichols makes a fine point that we think one of the witnesses just listed her address on the record, but, sure, I'm sure Mr. Nichols will be able to do whatever you need to do to make those assurances.

MR. KOOP:  Sure.

THE COURT:  All right?  Mr. Nichols, next issue?

MR. NICHOLS:  Thank you.  It sounds like in talking off the record with Mr. Koop, he's trying to get the jail records.  The dates are obviously important, but I just heard testimony about a second -- or a first kite from Mr. Allen that may have been in a kiosk.  If it was in a

kiosk, I presume it still exists. I obviously want to get whatever data was either in a kiosk or on a handwritten kite, if it was a handwritten kite and it still exists. It sounds like that would be the first kite. I would like to get my hands on that for discovery purposes.

THE COURT: All right. Mr. Koop, I'm guessing this is something you don't have.

MR. KOOP: It's not something I have and that's the first time I've heard of it. I can certainly follow up to see if that exists. It just says regarding discovery the defendant has this file, and he also has a pending aggravated stalking in 54A. I've instructed my discovery unit to basically provide all the reports from the aggravated stalking to Mr. Nichols in this case as well, because I think there is that overlap of 404(b). I don't know what I'll use, but I'd rather provide everything to him than me select what I think it relevant. So --

THE COURT: Okay. I take from that you're going to endeavor to determine if there's a first kite and where it is?

MR. KOOP: Correct.

THE COURT: And, of course, if you find it, you're going to give it to Mr. Nichols.

MR. KOOP: Correct.

THE COURT: All right. Mr. Nichols.

54

MR. NICHOLS: Thank you. And then finally, your Honor, what I brought up the other day as it relates to contact for Mr. Uraz, he did have the consulate appear and meet with him. I believe it was Tuesday. So obviously we appreciate that, but he still has -- and I don't know if it's because of what happened during the communication with the consulate, but he really wants to communicate with his sister and son. At some point it crosses over into punishment to deprive a person the ability to talk with somebody that close to him when even if he were sentenced on this charge, convicted on the nose, be able to have contact with the people in prison. So I'm asking for some modification to allow -- and even if it's one per week -- to contact his sister who has custody of his son, so that he can have a visit with either or both of those individuals.

THE COURT: Okay. But we're in a little different position than we were when we talked about this the last time. Now I've got a witness who's testified on the record that Mr. Uraz has told him that he used the visitation to continue solicit harm to Ms. Melke. So before that, there was a continuation perhaps -- I don't know if that word has a negative connotation, I don't mean it that way, but there was an implication or reference from the People that that was the case. Now I've got sworn

testimony that that was what the visitation was used for. I mean, I think we're in a different situation, and I don't, at least at this point, intend to change that order.

MR. NICHOLS:  Can I make an offer of proof?

THE COURT:  Sure.

MR. NICHOLS:  That was an undercover who approached Mr. Uraz by way of a video conference visit that the undercover set up, and I think once the undercover, Mr. Mobley, testifies, it was -- and this was part of my motion -- there were code words used.  It's very -- maybe somewhat, maybe a lot, maybe somewhere in between -- ambiguous as to what exactly these two were talking about, and, more importantly, the quality of the audio and video communication during the course of their entire exchange, which was no more than a few, if not maybe several minutes. It wasn't very long is what I'm saying.  But I don't know that that characterization is full and complete.  The Court heard simply the direct exam testimony from a witness who is testifying based on an exception to the hearsay rule, but hearsay from Mr. Uraz, your Honor.

THE COURT:  Uh-huh.

MR. NICHOLS:  So I'd want to make that offer of proof, and perhaps if Mr. Koop has a different version of it, he can -- he can relay it on the record.

THE COURT:  I don't -- I don't have any reason to

56

doubt what you said, but the testimony from Mr. Allen is not about the content of the conversation. It's about Mr. Uraz's understanding of that conversation.

MR. NICHOLS: And -- and that point, let me extrapolate it out just a little bit. If the undercover goes and says, hey, I heard this -- I heard you wanted to have this happen. Mr. Uraz didn't solicit that, and the Court hasn't heard exactly what was said to Mr. Uraz initiated by the undercover, what Mr. Uraz understood or could have understood based on the context of the conversation. And -- but even if initiated by another person there was some discussion about it, I think there are still safeguards that can be put in place. I mean, if somebody is in close enough distance to observe and -- and keep the contact limited so that he can at least talk to his son, I mean, I don't think Mr. Uraz is going to tell his son -- how old's your son? I don't think he's going to tell his 11-year-old son go harm Ms. Melke. I mean, I just don't think that's a -- I understand where the Court is coming from, but I think the Court could still fashion an ability for the man to have contact with his 11-year-old son and not frustrate the concerns the Court has about avoiding any additional situations with Ms. Melke.

THE COURT: Thank you. Mr. Koop, on the issue with the 11-year-old child.

57

MR. KOOP:  Well, your Honor, I'm certainly sympathetic that the defendant wishes to speak with his 11-year-old child; however, as the Court previously noted, we now have testimony about specific allegations of the crime of solicitation of murder.  I think the protection of society outweighs any consideration to be given to the defendant in order to speak with his child.  We have no guarantees that the defendant won't communicate anything about this case in terms of to his sister.  And simply at this point we've only heard testimony of one witness.  I don't think anything has substantially changed since the last time this motion had been brought that would warrant a modification of that order, and I ask the Court to deny it at this time.  I think two weeks further without speaking with his child is not unreasonable given the severity of the crimes in this case.  I ask the Court to deny that motion.  Thank you.

THE COURT:  All right.  Well, I guess with two exceptions, first, I don't need much of a change of circumstances to change my mind as it relates to the bond.  And second is maybe a lot more than two weeks, depending on how things go.  But based on the testimony today, there's just no way I could in good conscience allow an increased scope of communication.  So I'm going to deny that request.  Mr. Nichols, anything additional?

58

MR. NICHOLS:  I think I covered it.

THE COURT:  Mr. Koop?

MR. KOOP:  Nothing further, your Honor.  Thank you.

THE COURT:  Okay.  See everybody in two weeks.

MR. KOOP:  Thank you, your Honor.

(At 12:11 p.m., recessed to next session)

STATE OF MICHIGAN)

COUNTY OF INGHAM )

I certify that this transcript, consisting of 59 pages, is a complete, true, and correct transcript of the first session of the preliminary examination proceedings and testimony taken in this case on Thursday, December 1, 2016.

Date: December 7, 2016

Elaine D. Stocking CER 0703
55th District Court
700 Buhl Avenue
Mason, Michigan 48854
(517) 676-8414