STATE OF MICHIGAN

IN THE 55TH DISTRICT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

File No. 16-2960 FY

16-1065-FC

CC

v

TUNC URAZ,

                    Defendant.
_____/

PRELIMINARY EXAMINATION - VOLUME II OF II

BEFORE THE HONORABLE THOMAS P. BOYD, DISTRICT JUDGE

Mason, Michigan - Tuesday, December 13, 2016

APPEARANCES:

For the People             MR. CHAS T. KOOP II   (P58112)
                           Assistant Prosecutor
                           303 West Kalamazoo Street
                           Lansing, Michigan  48933
                           (517) 483-6108

For the Defendant          MR. MICHAEL J. NICHOLS (P59391)
                           3452 East Lake Lansing Road
                           East Lansing, Michigan 48823
                           (517) 432-9000

TRANSCRIBED BY:            Ms. Elaine D. Stocking CER 0703
                           CERTIFIED ELECTRONIC RECORDER
                           (517) 676-8414

TABLE OF CONTENTS

WITNESSES:  PEOPLE

CHARLES MARICE ALLEN

    Cross-examination by Mr. Nichols      64
    Redirect examination by Mr. Koop     111

REGINALD GARFIELD CLOSE, JR.

    Direct examination by Mr. Koop      115
    Voir dire re: PX 1      128
    Continued direct examination by Mr. Koop     128
    Cross-examination by Mr. Nichols     139
    Redirect examination by Mr. Koop     166

FRANK MOBLEY

    Direct examination by Mr. Koop      170
    Voir dire re: PX 2      173
    Continued direct examination by Mr. Koop     178
    Voir dire re: PX 2      179
    Cross-examination by Mr. Nichols     181
    Redirect examination by Mr. Koop     187
    Recross-examination by Mr. Nichols     189

WITNESSES: DEFENDANT

None

EXHIBITS:
                       received

PX 2 - DVD Secura video call, marked 1st session   181

Motion to bind over to circuit court by Mr. Koop   191
Argument by Mr. Nichols     192
Ruling of the Court     204

FORM AZ-13   PENGAD · 1-800-631-6989 · www.pengad.com

61

Mason, Michigan

Tuesday, December 13, 2016 - at 4:13 p.m.

THE COURT:  This is 16-2960 FY.  People of the State of Michigan versus Tunc Uraz.  Mr. Uraz is back before the Court with Mr. Nichols.  Thanks for your patience, gentlemen, this afternoon.  It's one of those things.  Mr. Uraz, good afternoon.  Mr. Nichols, good afternoon.

MR. NICHOLS:  Good afternoon, your Honor.

THE COURT:  People of the State of Michigan are represented by Assistant Prosecuting Attorney Chas Koop.  Mr. Koop, good afternoon.

MR. KOOP:  Good morning, your Honor.

THE COURT:  Deputy, good afternoon.

MR. KRUMBACH:  Afternoon.

THE COURT:  Are we ready to return to the hearing?

MR. KOOP:  Yes, your Honor.

THE COURT:  Preliminary matters?

MR. KOOP:  The only preliminary matter I have is I'm on call, so if my phone rings after five I might just have to quickly answer to tell them I'm unavailable.

THE COURT:  On call for the office?

MR. KOOP:  Correct.

THE COURT:  Yeah, we can work it out.  We've got

62

computers.  Whatever you need to do.

MR. KOOP:  Thank you.

THE COURT:  Mr. Nichols.

MR. NICHOLS:  I'm always on call.

THE COURT:  Let's call the next witness.

MR. KOOP:  We need to recall Charles Allen, your Honor.

THE COURT:  All right.  So did somebody tell the court officer that already?

MR. KOOP:  I believe.

THE COURT:  Could you guys approach for a second?

(Side bar conference - off record)

THE COURT:  Officer -- Officer Beeson, could I talk to you real quick?  How are you doing, Mr. Allen?  Just have a seat in the wooden chair for a second for me, okay?  Right there.  Thank you.

(Side bar conference - off record)

THE COURT:  All right, Mr. Allen, come on up.  Raise your right hand, please.  Do you swear or affirm the testimony you'll provide in this matter will be the truth?

MR. ALLEN:  I do.

THE COURT:  All right.  Have a seat.  I know it's a continuation, but since it's a different day, we do the oath again.

THE WITNESS:  Okay.

THE COURT:  I don't know why, but they last one day.  I don't even know why that is, but that is what it is, okay?

THE WITNESS:  Okay.

THE COURT:  All right.  Just go ahead and state your name for the record again.

THE WITNESS:  Charles Allen.

THE COURT:  This is a continuation of Mr. Allen's testimony when we were last together on December 1st.  There was some material, the immunity agreement and other things, that Mr. Nichols didn't have in advance.  As a result, the Court offered, he accepted, the invitation we bring Mr. Allen back over today for the cross-examination.  To confirm on the record, Mr. Koop and Mr. Nichols and I just had a conversation at bench which confirmed that Mr. Koop has in fact concluded his direct examination of Mr. Allen, tendering the witness to Mr. Nichols, and that's where we are now.  Mr. Nichols, your questions for Mr. Allen.

CHARLES MARICE ALLEN

(At 4:19 p.m., called by Mr. Koop and sworn by the Court, testified as follows)

CROSS-EXAMINATION

BY MR. NICHOLS:

Q    Mr. Allen, one of the things that Judge Boyd just said was

64

that you started your testimony a couple weeks ago on December 1st. Do you remember that?

A Yeah.

Q And you took a -- you took an oath on December 1st, correct --

A I did. I did.

Q You testified under oath, right?

A Yes.

Q Okay. And you were asked a number of questions by Mr. Koop.

A Right.

Q Do you recall that?

A I do.

Q And you testified truthfully?

A I did.

Q You testified -- and this is page 24 of the first session of the transcript, you testified in response to a question from Mr. Koop as follows at line 16. Question from Mr. Koop.

"Did he give her -- ever give you anything about where she lives?"

You were asked that question?

A I was.

Q And you said:

"Answer: 3925 College Towne, apartment 202."

65

A    Right.

Q    You adopt that testimony as truthful?

A    What do you mean?

Q    Do you adopt that testimony?  Was that what you said?

A    Yes.

Q    And was that your truthful testimony?

A    Yes.

Q    I want to talk to you about the circumstances of meeting my client, Mr. Uraz, okay?

A    Uh-huh.  Yes.

Q    Remember, you have to say at least a yes or no.

A    Yes.

Q    Okay.  Now, I managed to do a little background on you, and you've been in jail a lot.  You wouldn't disagree with that, correct?

A    No.

MR. KOOP:  I'm going to object to the foundation for that, your Honor.

THE COURT:  You had another objection.  I could see it on your lips.

MR. KOOP:  Whether it's proper character.  Just coming out and saying he's been in jail a lot, I'm going to guess -- I don't know where that's going, but I'm going to object to foundation.

THE COURT:  Objection is to foundation.

66

MR. NICHOLS: I said foundationally I'm going to ask you some questions about the circumstances of meeting Mr. Uraz. I can ask a bunch of different small questions to lay a foundation, but I think the foundation is fine. It's not --

THE COURT: Well, the question is -- the question he's objecting to is the one where you asked, you've been in jail a lot. That's the objection.

MR. NICHOLS: And the objection is that there's not enough foundation?

THE COURT: That was the objection.

MR. NICHOLS: Okay. I don't -- I don't think that's objectionable. I mean, I think he could --

THE COURT: I agree. Objection's overruled.

THE WITNESS: Yes.

THE COURT: He answered.

BY MR. NICHOLS:

Q    How many times?

A    I don't see why it matters. Why does that matter?

THE COURT: Mr. Allen, makes perfect sense --

THE WITNESS: Right. I mean, I can -- I --

THE COURT: -- no, hang -- Mr. Allen, hang on. It makes perfect sense, but you don't get to make objections.

THE WITNESS: All right.

THE COURT:  That objection would be to relevancy, but you don't get to make objections.  So do your best to answer the question and let everybody else sort out the rest, okay?

THE WITNESS:  Maybe 30.

BY MR. NICHOLS:

Q    You testified back on December 1st that when you first met Mr. Uraz he looked lost, correct?

A    Correct.

Q    The first time you met him was at the Ingham County Jail. Would that also be correct?

A    Correct.

Q    You testified that you don't really keep track of time very well.  Is that correct?

A    I choose not to.

Q    You choose not to.  Is that a coping mechanism for doing a lot of different jail stints?

A    No.  I just choose not to.

Q    In general, that's your rule of life is you just don't keep track of time?

A    Time is irrelevant.  It's going to pass regardless.

Q    Time is irrelevant.  It's going to pass regardless.  Right?

A    That's right, sir.

Q    Okay.  Do you have any idea how long into your current jail sentence it was that you met Mr. Uraz?

68

A    Probably near the end.

Q    The end of your current sentence at the Ingham County Jail?

A    Yes.

Q    When's your out date?  January twenty-something?

A    Yeah.

Q    Okay.  How about -- do you think it was August?

A    No.

Q    Do you think it was September?

A    I think it was in the beginning of September.

Q    Do you remember what post you were on, sir?

A    I was on post 5, F dorm.  E or F dorm.

Q    What dorm was Mr. Uraz in at that time?

A    The same dorm as I.

Q    F or E?

A    Yes.

Q    One or the other?

A    Our dorm that I was in doesn't have an A, so it confuses me sometimes.  I forget that there isn't an A dorm.  It starts at B dorm.

Q    There would have been other inmates in that dorm.

A    Correct.

Q    Those other inmates were whom?

A    Who?

Q    Yeah.  What were their names, if you know.

A    There was Alvarado, Muhammad --

69

Q    Muhammad's last name is important to me.  Fateen?  Do you
know his last name?

A    That is his last name.

Q    Okay.  All right.  Who else?

A    Pierce.

Q    John Pierce?

A    Yes.

Q    Okay.  Mr. Uraz, obviously.

A    Yes.  Uraz.  Johann.

Q    Big guy, right?

A    Yeah.

Q    Guy named King?

A    Yes, King.

Q    Guy named Virgil?

A    Yeah.  Henry.

Q    How about Reginald Close?

A    No.

Q    You know who Reginald Close is though, don't you?

A    I do.

Q    Now, this lasted for a few weeks, and I know you don't keep
track of time, but would you agree a few weeks is a fair
characterization of time that this core group of people was
in the same dorm?

A    The people that I just named?

Q    Yes.

70

A    Yes.

Q    Did there come a point in time that you and some of the others of this group were moved to what's called a medical floor?

A    Yes.

Q    That was a few weeks after this -- your first meeting with Mr. Uraz.

A    Yes.

Q    On the medical floor was who?

A    It was Pierce, Muhammad, and there was Uraz, Close, and me. And then I was moved the next morning.

MR. NICHOLS:  I think Mr. Close -- they were about to bring in.  Do you want me to continue?

THE COURT:  Please.

MR. NICHOLS:  Okay.

BY MR. NICHOLS:

Q    You, Mr. Uraz, John Pierce, Muhammad Fateen, Reginald Close on the medical dorm.

A    Yeah, but we weren't together.  Only me -- well, myself, Close, and Uraz were in the same dorm, and then I was moved the next morning into a dorm with Fateen Muhammad.

Q    You mean Muhammad Fateen?

A    No, I mean, Fateen Muhammad.

Q    Okay.  Now, you had testified about some specific statements that Mr. Uraz made to you, okay?

71

A    Correct.

Q    Was that all on one day, on one occasion?

A    No.

Q    It was over the course of several days?

A    It was over the course of a few months.

Q    Okay.  Now, when you're all on the medical ward -- there's a reason for that, right?

A    It's because the jail became overcrowded and they didn't have room, so they moved us for a few days until they made more space and they moved us to another floor.  Because they were taking our privileges away that we -- we were basically being punished in a way that we shouldn't have been, so we were moved until they figure out how to deal with us, and then we were moved back down to a dorm to where we were free.  We went from being 23-hour lockdown to being free, to be able to watch TV.  We weren't able to use the phones.

Q    That's -- that's an important question I want to follow up on.  You're in the medical dorm on 23-hour lockdown, right?

A    Correct.

Q    Not allowed to use the phones, correct?

A    Correct.

Q    That's one of the punishments is the phone privileges are taken away.

A    Right.

72

Q    They were taken away from you, they were taken away from

Uraz, from all these other individuals we're talking about.

A    Right.

Q    You testified that you were in a dorm with Fateen Muhammad,

right?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    You and Fateen Muhammad did not get along well.

A    We have arguments.  I couldn't say we didn't get along

well, but we're guys, we're locked up, you know.  Things

happen.  But I wouldn't say we didn't get along.

Q    Okay.  Were you moved because of, shall we say, the fact

that you didn't get along?

A    No.  I was moved because Fateen had a bad day and started a

-- I guess -- in a -- threw a fit and the deputies on post

felt that I should have been moved because of his fit, but

it wasn't really directed towards me.  It was more of him

being locked up for as long as he has been.

Q    So then you're moved back --

A    Right.

Q    -- after you were separated from Fateen.

A    Correct.

Q    You moved back within a day, is that correct?

A    No.

73

Q    How long?

A    I was -- I was over there -- I had been asking, you know, we had been, you know, we had apologized through the glass back and forth, you know, I had been trying to get moved back into the dorm that I was in with him, but it was -- I was waiting for people down in classification to assess the situation.  Eventually I was moved back down there and we've been in the same cell, I don't know -- or in the same post for, I don't know, the last month or so.

Q    Okay.  I appreciate, you know, on all the way to the present day, but I'm focusing on the September time that we're talking about, okay?

A    Uh-huh.

Q    You're separated from Fateen for how long?  A week?  Two weeks?

A    About a month.

Q    About a month.  And then you're moved back into post 5, is that correct?

A    I never left 5.

Q    Okay.  But you're moved back into a dorm with Allen, Close, Fateen, and Mr. Uraz, correct?

A    No.

Q    No?

A    Close was not in that dorm.  Close was moved to P-C when we came back down from medical.

74

Q Okay. You, Fateen Muhammad, Tony Uraz, right?

A Correct.

Q Okay. And then later it's you, Pierce, and Muhammad after Uraz is separated from you, right?

A Correct.

Q Is there ever a time, now that we've kind of gone through the time line here, that you lived in the same dorm or cell with Mr. Uraz?

A Say that again?

Q Okay. Let's start this way. Same cell. Were you ever in the same cell with Mr. Uraz?

A Like living in the same cell?

Q Same cell.

A Once.

Q For how long?

A A day. That was on -- that was on medical floor.

Q Okay. And who else was in that cell?

A Close.

Q You, Reginald Close, and Mr. Uraz.

A Correct.

Q Okay. For 23-hours lockdown, right?

A We were in a cell where we didn't come out or -- but we had TV, shower.

Q Okay. No phone.

A No phone.

Q    No visits.

A    Not for us, no.

Q    Is this the point in time that you observed Mr. Uraz to get emotional over this woman?

A    No.

Q    Is this the point in time that Mr. Uraz made the statements that you testified on December 1st that he made about wanting harm to befall this woman?

A    No.

Q    When was that point in time?  When was the first time he said something to you, whether it was beating her with a baseball bat or any of these other details that you testified to on December 1st?

A    A few weeks after he came in.

Q    He came in August 31st.  Would you agree with that?

A    I say September, but whatever you have is what it is.

Q    Okay.  And was that the point in time when the other individuals living in the same dorm were the ones you originally listed, and what I mean, Muhammad, Johann, Tony, you, Virgil, Alvarado, King, and Close?

A    No, Close wasn't in the same dorm.

Q    Okay.  When did Close move into that dorm, if at all?

A    He never did.

Q    Okay.  When would Close have been living in the same dorm, to your knowledge, as Mr. Uraz?  Was that --

76

A   When we were on medical floor.  They were bunkies.

Q   Okay.  When you went to medical.  So you're all in the same dorm and this is when you realized Mr. Uraz doesn't seem like he's fitting in, he looks lost, right?  Do you remember that?

A   You could tell he wasn't -- had been to jail before.

Q   Who initiated the initial greeting between you and Mr --

A   I was on rotation when he came in.

Q   I need to finish my question.  Okay.  Did you say, hi, I'm Mr. Allen, how are you --

A   Yeah.

Q   I mean, how did that happen?

A   I didn't tell him my name.  I said, hi, how are you doing, you know.  Welcome to jail.  You know, he was clean shaven, he had a smile on his face, but he kind of looked like, you know, like it was a fake smile, you know.  I could tell how -- you know, discombobulated he may have been, you know.  So I tried to make him feel comfortable.

Q   He seemed like he was out of sorts?

A   Yes.  Well, sort of.

Q   You wanted to make him feel at home.

A   Not at home.  Comfortable.  You know, people get behind them cell block doors and lose their mind.  They do anything, you know.

Q   You figured you'd help him cope.

77

A   I figured I'd help him get comfortable.

Q   Get comfortable.  How does it come about that your relationship develops into one where he starts laying stuff on you like what you've testified to a couple weeks ago?

A   I would talk to other people at night, because I don't sleep.  Well, I don't sleep during the night.  So at nighttime I'll be up talking to people and I would tell, you know, like some stories about my girlfriend, about my life, about stuff like that.  And then, like, sometimes he'll stop, like, man, I really liked your story, you know, I can kind of relate.  And eventually it went from him relating to my stories to him telling me about his own stories.

Q   Kind of relate.  Relate in what way?

A   About how our girlfriends left us, or how our girlfriends mistreated us, or how we couldn't trust them.

Q   Okay.  How your girlfriend did you wrong?

A   My girlfriend didn't do me wrong.  I did her wrong.

Q   She left you?

A   I left her.

Q   You left her.  So you figured this is a way to make people feel, as you put it, comfortable is to tell them stories.

A   No, I just felt like telling stories because I was bored.

Q   You testified on December 1st about passing notes back and forth.

78

A    Correct.

Q    Did you pass any notes back and forth with Mr. Uraz?

A    One.  I believe one.  I don't remember what it said, but I know it went through Pierce to him because Pierce was the only way to get there.  I don't remember what it said, if I -- if I did, but I kind of recall passing a note.

Q    That's because you guys were separated by a cell or something?

A    Separated by cells, yeah.

Q    You don't remember what the note said.

A    I don't.

Q    Why would you send a note to Mr. Uraz?

A    We were all talking.  Like we'd have a C.O. sometimes that would tell --

Q    A what?

A    We'd have a deputy that would tell us not to talk, don't be loud, don't get out of the doors, don't be yelling back and forth, so we'd write notes.

Q    You'd just pass a note to Mr. Uraz.

A    Yes.

Q    Did the note offer to help him feel more comfortable in any way?  Something like that?

A    No.

Q    No?  Not at all?

A    No.

79

Q    Did he write a note back?

A    I don't recall.

Q    You didn't save this note.

A    No.

Q    Do you know if Mr. Uraz saved the note?

A    No.

Q    At what point did he make a statement to you regarding wanting to harm his ex-girlfriend?

A    He was out on rotation, and he was talking to --

Q    Now, you said he was on rotation.  Is this when -- we're in the period of time that you've testified about that you've got about seven people living on post 5 in dorm F.  About that time?

A    Yeah.

Q    So that window of time and your contact with him.

A    Right.

Q    Okay.  You're on rotation.  What time of day is it?

A    I don't know.  I don't keep track of the time.

Q    All right.  Okay.  Go on.

A    I remember he came out of rotation and I think he was talking to Pierce, and Pierce's door is like kitty-corner from my door and Muhammad's door was next to mine, so he's standing in the middle of three cells, you know, right outside three different cells.

Q    "He" meaning him, Mr. Uraz?

80

A   Yes.  Mr. Uraz was standing outside of three different cells in the corner, you know, so we're all talking, and he brings up the fact, he says -- first thing I remember he said was -- well, he was --

Q   Let's make sure we're clear.  We've got three witnesses here, right?

A   Correct.

Q   Pierce, you, and who else?

A   Muhammad.

Q   Muhammad.  Fateen Muhammad --

A   Fateen Muhammad --

Q   Okay.  Go ahead.

A   He said -- he kept on talking about how -- how he was being punished and how his punishment didn't fit the crime, and then he said, "This bitch got to pay."  And then like right then, I'm sitting there like, okay, I'm thinking in my mind, like what does he mean.  So like over the course of a couple days, I started pressing for questions like "what do you mean by this bitch got to pay?"  And then eventually --

Q   Okay.  I'm going to stop you right there.  Over the course of the next couple of days, after this talk after rotation, right?  This is important.

A   Uh-huh.

Q   You are pressing him.  What do you mean by this bitch got --

81

A    I said information, not pressing him, pressing for information.

Q    Pressing for information.

A    Yeah.  I was curious --

Q    Either way --

A    -- I was curious.

Q    You're curious.  Okay.

A    Do you know what I'm saying?

Q    Why are you curious?

A    Because a person that -- with that type of mental state shouldn't be in the post that we're on, because, you know, people get hurt that way.  You say the wrong thing out loud around the wrong people and things happened.

Q    Now, this is a guy who you initially wanted to make feel more comfortable.

A    Right.

Q    This is kind of your way.  You want people to feel more comfortable in a place they may not be accustomed to.

A    Not people, just people who I know aren't really acclimated for that type of situation.  Jail.

Q    Okay.  You're pressing for information now because you don't think somebody like this should be living in the dorm with you.

A    Yeah, there's places where those type of people go.

Q    Okay.  Like medical.

82

A   I don't know where they go.

Q   It's for the good of the dorm, right?  You want to make sure that everybody's okay and where they should be.

A   Not everybody.  Just like that person in general.  Like if -- if I came to you and I started talking about hurting somebody else, what would be your response?

Q   I get to ask the questions, but I appreciate the hypothetical.  So he says to you, "bitch got to pay."  Over the course of the next couple days, you're pressing for information for the reason that you don't know that he should be living in the dorm, right?

A   Correct.

Q   So do you say to him, hey, you know, you say stuff like that and that might get you in some trouble, that might get you moved to where you don't get any privileges.  Something like that?  Is that how you address it with him?

A   I wouldn't say go to a place with no privilege.  I would just say a place where, you know, other people who you don't know could get a hold of that type of information and take it upon themselves to do whatever they feel.

Q   Do whatever they feel like.  What, act upon it?

A   Right.  You know, if it --

Q   That's important.  When you say to him, if you say something like that, somebody might take it the wrong way and act upon it?

83

A    Uh-huh.

Q    Yes?

A    Specify "act upon it."

Q    Like when he says "bitch got to pay" --

A    Right.

Q    -- what I took your statement to mean is act on it as make the bitch pay.

A    Correct.

Q    That's what you meant.  That's what you meant.

A    Correct.

Q    Okay.  All right.  So you approach -- is it like the next day?  Two days later?

A    I couldn't say.  I know it was over the course of a few days.

Q    You don't keep track of time, right?

A    Correct.

Q    Okay.  You bring it up with him and you say somebody might take what you said and act upon it.  That's how you get into the topic?

A    To him?

Q    Yes.

A    Did I say that to him?

Q    Yes.

A    No.

Q    What did you say?

A    I asked him --

Q    Because this is a guy who's not acclimated to jail and you want to make him feel comfortable, right?

MR. KOOP:  Objection, your Honor.  He's asked that multiple times now.  I think it's asked and answered.

MR. NICHOLS:  Well, I want to -- I want to --

THE COURT:  I'm not -- Mr. Nichols, I'm not sure it's really a question as opposed to prefacing additional questions, but your point is well taken.  Let's just move on, Mr. Nichols.

BY MR. NICHOLS:

Q    What was your -- describe your demeanor and your approach to Mr. Uraz when you want to counsel him about saying something that might be imprudent.

A    What?

Q    The wrong thing to say.  Not a smart thing to say.

A    Repeat your question.

Q    Sure.  What was your demeanor when you approached Mr. Uraz within the next day or a couple of days --

A    I asked --

Q    -- just to say to him, you may not want to say stuff like that.

A    I told him that multiple times, like to keep, you know, that to himself, because people were -- eventually, not at that time, but eventually I told him like, man, you can't

say certain things like that out loud. People listen, you know. You talking about people's addresses, stuff like that, you know, people find out where that stuff goes. But --

Q You mean the address you testified to, 3925 College Towne --

A College Manor, College Towne, wherever it is.

Q Okay. Go on.

A I asked him -- you know, after a while, you know, he started opening up and telling me about his relationship, about, you know, stuff that was going on with his girl and him, or his ex-girl and him.

Q Okay. Now, the first conversation you had after his initial statement "bitch got to pay," where were you when you approached him to counsel him.

A I was in my room.

Q You were in your room.

A Right. We were talking through my door.

Q Through the door?

A Yeah.

Q That strikes me as a place where other people could overhear your conversation. Is that true --

A No. No. I mean, if people are listening, but if you're close enough to the door, you can talk without people listening.

Q   So are your rooms or cells right next to each other?

A   Yeah.

Q   Who is in your cell at this point in time?

A   Nobody.

Q   You're -- single cell.

A   Yeah.

Q   Okay.  Who's in his?  Mr. Uraz?

A   Nobody.

Q   Okay.  All right.  So you make the statement to him about that's not a smart thing to say.  Does he respond?

A   I never said that to him till later on, after, you know, we were out walking around and we were all free of our -- in a new dorm.

Q   Mr. Allen, I thought what you said to me was a couple of days later or so, you went up to him to counsel him about what he said --

A   Oh, yeah, I went to his door and I was talking to him in his door, you know.  He was telling me, you know, things, and like I made it clear to him like you got to be careful what you say out loud around certain people.  You know, like I literally said that.  I'm like, dude, you got to be careful what you say around people.  You never know who's listening.

Q   To me that's just -- you're sending a signal to him, nobody takes that stuff seriously and I'm not going to do anything

87

about what you said, the specific statement, "bitch got to pay." Is that what you were trying to convey to him?

A    What?

Q    You were trying to convey to him nobody took that seriously, I certainly didn't take it seriously, but be careful about saying that kind of thing.

A    No. I just told him that it's not smart to say things out loud like that because you never know who's listening and who will do what with what information you give out.

THE COURT: Explain that to us, Mr. Allen.

THE WITNESS: Like if I was to say "bitch got to pay," you know, somebody next to me could jump up and be like, yo, you know, he could be sitting in the door, ear hustling, trying to figure out what all the conversation going on about. You know what I mean? And, you know, if I say the wrong thing, the next day, that person might be in my ear, like, yo, what's up with that, man? You trying to do something about that? You know what I'm saying? So I told him, you got to be careful what you say around certain people because that information can go a long way.

THE COURT: What's the downside risk? You're saying he's got to be careful. Careful of what?

THE WITNESS: Careful of like if you -- if you're talking about killing somebody, you know, there could be a person that will actually kill somebody instead of taking

88

information to the person needs to be taken to. You know what I'm saying? Like I basically -- when he told me that, I basically quieted down, because I didn't want that information to actually get taken care of. So in my mind, I automatically was like, okay, what type of stuff is this guy talking about doing to this girl. If he's really trying to get this girl killed, I need to figure out some way to get this information into the right hands.

BY MR. NICHOLS:

Q     Okay. You said two things there in your answer to the Judge's question. Ear hustling.

A     Correct.

Q     Does that mean take something that you overhear when you're actively listening in on a conversation and take it to the C.O.'s to get yourself some sort consideration, like a better sentence or better plea deal, better privileges.

A     I mean, people do that.

Q     Okay. You told him, you should be careful because people will do that, ear hustling, right?

A     Correct.

Q     Okay. On October 31st of 2016, you sat down with this detective right here, Detective Krumbach. Do you remember that?

A     Yeah.

Q     Do you remember the first thing you said to him?

89

A    Yeah.

Q    The first thing you said to him was can you get me out of here on a tether or something?

A    Correct.

Q    Okay.

A    I have a child on the way.

Q    In other words, get me out of here on a tether.  I'm about to give you some really good information.

A    But I also told him --

Q    Can you get me out of here on a tether because I'm about to give you some really good information, right?

A    Correct.

Q    That's what you meant.

A    Correct.

Q    Isn't that -- isn't that ear hustling?

A    No.  That's called doing the right thing.

Q    Okay.  The other thing you said, what do you -- something about people take that and do something with it.

A    No, no, no, no, no, no.  See, I --

Q    Let me ask you a question, okay?

MR. KOOP:  Well, your Honor, he did ask a question.

THE COURT:  Question's been asked.  He's trying to answer it.

MR. NICHOLS:  Yeah, and he said something that

90

was nonresponsive.  He said --

THE COURT:  He didn't get a chance to say anything yet.

BY MR. NICHOLS:

Q    Okay.  Go ahead.  What were you going to say?

A    When I sat down with the detective, I did ask that question --

Q    I'm not asking you about the detective --

A    Okay, but you didn't let me answer.  You kept talking.

Q    No.  I asked you a specific question about the first thing you said and what you were doing and to agree whether or not it was ear hustling.

A    I didn't care if I got a deal.

Q    Well, I appreciate that, but we've covered the first thing you said and what that constituted.  You said it was doing the right thing.  I'm moving on to a different topic.  This lawyer can ask you about that, okay?

A    Yeah.

Q    All right.  So the other part of your prior answer to the Judge's question about people might actually act upon it, right?

A    Correct.

Q    Right?  So you didn't -- you told Mr. Uraz, you know, people might act upon that.  That's what you meant.

A    I said that you got to be careful what you say to people

because people might take the information and actually act upon it.  I didn't say they would act upon it, but if it gets to the wrong person, things happen.

Q   And that's -- and that's based on how you interpreted that first thing that Mr. Uraz had said to you, "bitch got to pay."

A   It was the way he said it.

Q   Okay.  Fair characterization, your statement to him was based on how you interpreted what he said.

A   Correct.

Q   All right.  That's really important.  That's why I'm drilling on that, okay?  Not just trying to pick on you.

A   It's cool, man.

Q   Okay.  So at that point, is that where you testify he offered you $2,500.00 in that conversation?

A   No.

Q   Okay.  How did that conversation end?

A   Huh?

Q   What was the result of that conversation you just told us about where either you're in his room or he's in your room, I'm not really clear.

A   He -- there's nobody in anybody's room.  When you're on rotation, there's one person in the day room, one person in their rooms.

Q   I'm not talking about the rotation.  I'm talking about --

92

you said after that statement following, he comes out of rotation, makes the statement in front of a bunch of guys, and then within a couple of days, you have a personal conversation with him and you're cell to cell, room to room.

A   Door to door.

Q   Door to door.

A   Or face to door.

Q   Okay.  How did that conversation end?

A   Maybe I got in the shower, maybe I put in the store.  I don't know.

Q   Did you write a kite at that point in time?

A   No.

Q   Did you ask to talk to a corrections officer or a guard?

A   No.

Q   You didn't report at that point in time, hey, there's a guy in here who's trying to get his ex-girlfriend killed?

A   At that time I didn't know how serious he was about it. The conversation really hadn't spiked until the money was offered.  And I was like, okay, this is actually real.

Q   Okay.  So when you're door to door, just to be clear, you are on post 5, dorm F.

A   Yes.

Q   Okay.  After that conversation that ended with you not taking it seriously, when was -- when was the next time you

93

had contact with Mr. Uraz?

A    First of all, I never said I didn't take it seriously.  It just wasn't serious at that moment.  Second of all, the next time we were actually out, I think we were --

Q    And what I mean is whether anybody else was around or just the two of you.  Any contact.

A    I mean, we talked every day.  When I was on -- well, when one of us was up or one of us was sleeping, we would talk when we were both up.  Sometimes at night, but it wasn't nothing related to that, but I really couldn't say.  I really -- I don't recall.

Q    Okay.  Now, I'm going to narrow it down.  When was the next time you had a conversation with Mr. Uraz that had anything to do with his ex-girlfriend, whether there was anybody else present or not?

A    When we were in 5B dorm.

Q    That's not medical, is it?

A    No.

Q    Okay.  At this point in time, who is living in B dorm?

A    Myself, Uraz, Muhammad, Close.  I believe that's it.

Q    All right.  And this core group, how long was this core group together?

A    Maybe a week or two.

Q    Okay.

A    I forgot actually.  I think I -- I think I didn't hear -- I

FORM AZ-13   PENGAD • 1-800-631-6989 • www.pengad.com

think when you asked me before, I think I told you that Close wasn't in there, but he was.  I just remembered that.

Q   All right.  So what I was asking you about is when did he make a statement that had anything to do, anything at all, with his ex-girlfriend?

A   I think it was around the afternoon.  A couple people were sleeping.  It was just me and him out in the dorm.  TV was on and we were just sitting at the back of the dorm and we started talking about that.  I'm like, you know, what he wanted done again.

Q   Now, who initiated that?

A   You know, this conversation trails off, you know.  There's thousands of conversations that go on at one time.  So I really don't recall.

Q   You don't recall who initiated it?

A   No.  We were sitting out, watching TV.  We were talking.  I don't really -- no, I don't recall.

Q   A thousand conversations.

A   Yeah.  Just life.  Jail.  Court.  Kids.  You know, TV.

Q   All right.  So among the categories of conversation topics, up pops his ex-girlfriend, right?

A   Yes.

Q   You don't remember who initiated it, if it was you or if it was him?

A   It may have been me.

95

Q   What makes you say that?

A   I don't know.  It just -- it may have been me.  It may have been him.  I don't recall.

Q   Okay.  Was there a concern that the two of you discussed about whether or not this conversation was recorded?

A   Yeah.

Q   Do you know that it was recorded?

A   Yeah.  I mean, I would imagine so.  Everything in every dorm is recorded.

Q   Okay.  So that's kind of why you're not sure if it was you who initiated it or if it was Mr. Uraz.

A   No.  No, I just don't recall.

Q   Okay.  So if you -- you said you may have initiated it.  What do you think you said?

A   What day is it?

Q   This is the day you told me about where it's you and Mr. Uraz, I think you're in the dorm alone, back in the corner, and you're talking about a thousand subjects, kids, life, court, TV.

A   Right.

Q   Okay.

A   And --

Q   How does it come up?

A   It just comes up.  I -- we're talking.  That's what happens when you talk to people.  Conversation happens.  Topics pop

up. You know if we -- I don't know.

Q You don't know. Well, what do you remember about his ex-girlfriend and who said what?

A Said what about what?

Q Mr. Uraz. Ex-girlfriend. Statements. What do you remember?

A Mr. Uraz' ex-girlfriend's statements?

Q Did anybody, either you or him, initiate a conversation about his ex-girlfriend?

A Yeah.

Q Okay. Who?

MR. KOOP: Objection, your Honor. Asked and answered. He doesn't remember.

THE COURT: The objection is cumulative. Mr. Nichols?

MR. NICHOLS: I'm trying to find out because he keeps saying I may have initiated conversation, he may have, but it happened. I don't know what was said. I'm trying to figure out if we can get something out of what was said.

THE COURT: I know, but this last question was who started it, which is the same question you keep asking, and he said he really doesn't remember, popped up in conversation.

MR. NICHOLS: Okay.

97

THE COURT:  So Mr. Nichols' question is what was said as it relates to the girlfriend in that conversation when the two of you are watching TV in the dorm.

THE WITNESS:  The conversation is the same conversation that was had.  Like it's the same conversation every time we talk.  It's about what happened, what he wanted done, you know --

THE COURT:  Be specific.  That conversation in the dorm watching TV.

BY MR. NICHOLS:

Q    And who said what, please.

A    The conversation, the same, the repeated conversation is Erika, what happened with Erika and Uraz, how he wanted to get her killed, how he was going to pay for it, how he was going to get the proof, how he wanted everything to be made sure like there was no trace back, you know, about her boyfriends, where they lived, what he was going to do with them, you know, where she lived at, what kind of couch she had on her balcony, what color her car was, where she worked at.  It was the same conversation, just trying -- he trying to perfect it down to the last detail.  So the same conversation that we had over and over again on different occasions.

Q    Well, hold on.  You said the same conversation we had over and over again.  What I want to make clear is we've got --

he makes a statement in front of a group of guys, "bitch got to pay" --

A    That's way before.

Q    I'm sorry?

A    That's way before this, where we're at now.

Q    Okay. And then you counsel him within a couple of days, "not a smart thing to say." And then I asked you the next time there's any conversation about his ex-girlfriend, and you told me about this conversation in the dorm. That's your testimony.

A    Right.

Q    Right? Okay. And you said -- you ended that answer with the same conversation over and over again, but from your testimony I'm taking it that this is the first time he goes into another conversation about his ex-girlfriend. Is that correct or not?

A    What did you just say?

Q    Is this the -- is this conversation in the dorm the first time after the "bitch gotta pay" statement --

A    This -- that's the extended version. You know what I'm saying? That is when more details arose, you know. This was when this conversation --

Q    So this is all one big conversation?

A    What?

Q    I'm trying to figure out if -- where he goes from "bitch

99

gotta pay" in front of a group of guys --

A    Right, you can jump it back and forth.

Q    -- and you say -- and you say --

THE COURT:  Hang on, Mr. Nichols.  Mr. Allen, you told us at some point Mr. Uraz said, "The bitch gotta pay."

THE WITNESS:  Correct.

THE COURT:  Some time later, you're having this private conversation in the --

THE WITNESS:  Dorm.

THE COURT:  What Mr. Nichols is saying is that his question that got us to that point was when was the next time you talked about this.  So was that the next time you talked about it, when you were alone when the TV was on?

THE WITNESS:  To that extent.

THE COURT:  Okay.  And then you concluded that answer with, well, we had that conversation lots of times.

THE WITNESS:  After.

THE COURT:  Okay.  So that was the next time that it got really to that extent?

THE WITNESS:  Correct.

THE COURT:  And then when you said lots of times, you mean after that?

THE WITNESS:  After that.

THE COURT:  Mr. Nichols.

100

BY MR. NICHOLS:

Q    All right.  Beyond what you've testified to about the specific statements that he made, anything else that you haven't already covered?  I'm talking about in the dorm.

A    Anything what I haven't covered?

Q    Have you covered everything?

MR. KOOP:  I'm going to object to vague.  I don't know what we're talking about in terms of time frame.

MR. NICHOLS:  I don't think it's vague --

THE COURT:  The question -- the objection is vague.

MR. NICHOLS:  I don't think it's vague.  I focused him to in the dorm, was there anything else that Mr. Uraz said that he didn't already testify to.  In the dorm.

THE COURT:  In that instance?

MR. NICHOLS:  Yes.

THE COURT:  I think he can answer that question. Do you understand the question, Mr. Allen?

THE WITNESS:  No.

THE COURT:  So during that conversation watching television --

THE WITNESS:  Correct.

THE COURT:  The conversation going back and forth, is there anything else that Mr. Uraz said about

101

Erika during that initial lengthy in-depth conversation?

THE WITNESS:  Not that I can recall at this time.

BY MR. NICHOLS:

Q    Now, this was a week after the -- one of the "bitch gotta pay" statement?  Two weeks?  Or something else?

A    (Breathes out noisily)

THE COURT:  I'm not sure we can transcribe that, Mr. Allen.

THE WITNESS:  Oh, I'm sorry.  I'd have to say a couple -- couple weeks.  Two months.  Maybe two months.  Couple weeks.  I'm not sure.

BY MR. NICHOLS:

Q    Could be early October?

A    Yeah.  Yeah, it could be.

Q    Early October?

A    What?

Q    Early October?

A    Yeah, it could be.

Q    Okay.  Could be.  Did you then go do a kite?

A    Yeah.

Q    How did you do the kite?

A    I wrote it with my hand.

Q    Okay.

A    On paper.

Q    We've got your kite that was previously marked.

102

A     The first one or the second one?

Q     Well, we're going to find out.

            MR. NICHOLS:  May I approach the witness?

            THE COURT:  You may.

BY MR. NICHOLS:

Q     I'm handing you what's been marked for identification purposes as People's proposed exhibit number 3, Mr. Allen. What is that?

A     That is a kite.

Q     Is that the kite that you just testified to or a kite?

A     What?

Q     Is that the kite that you wrote after this conversation in the door?

A     No.  There's one before this.

Q     Okay.  You said you wrote that out in hand.

A     Correct.

Q     Has anyone shown you the -- so we'll say kite number 1. Has anyone shown you kite number 1?

A     I haven't seen it.

Q     So if there were two kites, do you recall how much time passed between the first kite that you wrote out and the second kite that you wrote out?

A     Maybe two and a half, three weeks maybe.  I remember the officer I gave it to.  I remember it was nights.

Q     The first kite?

103

A    Yes,

Q    Okay.   When you say nights, do you mean at night?

A    It was -- it was night.   Yes.

Q    Okay.   Who was the officer?

A    Calkins.

Q    As in Tryon Calkins?

A    I don't know.

Q    Shorter, Caucasian --

A    Glasses.

Q    Glasses.   What post was --

A    Five.

Q    Five.

A    'Cause I asked that -- I actually asked Calkins who this kite -- the kite with that information, where it would go and how to get it to there.   He told me I fill out the kite and I give it to him.

Q    Okay.   How much time between this conversation that you described in the dorm with the TV and the kite to Officer Calkins that you wrote out?

A    A few days after, you know, the conversations.   After -- it took awhile to get kite paper, too.   Because they don't really give out kite paper.

Q    A few days after conversations, is that what you said?

A    Yes.

Q    What conversations?

104

A    The conversations with Uraz.

Q    So we've got the conversation in the dorm that we've just covered. Was there another conversation between the dorm conversation and the kite?

A    I mean, there was just, you know, what's the word I'm looking for? There was determination, you know. He was very -- like, it was set in stone, like, it was something that was going to be done whether I did it, whoever did it, it was something that he wanted to make sure got done, so after I got my --

MR. NICHOLS: Your Honor, I'm going to move to strike this as nonresponsive. What I asked him was when was the next conversation. And he went on to talk about describing Mr. Uraz's state of mind in a way that had nothing to do with my question.

THE COURT: Well, I -- I mean, I think the reason he's answering is because -- well, I mean, we can of course ask Mr. Allen, but it sounds like he was saying that Mr. Uraz brought it up often because he was determined.

MR. NICHOLS: Okay.

BY MR. NICHOLS:

Q    Did he bring it up the next day?

A    Probably.

Q    Where?

A    The same place we are every day. In the dorm.

105

Q   Who was there?

A   I don't know.

Q   Well, that's important.  Who --

A   What do you mean?  At the time?  I don't know.  I said he probably brought it up.  I didn't say there was people around.  I didn't say that I know what he said.  I said he probably did.  It's something that was always on his mind.  So he tended to talk about it.

Q   Okay.  What was on his mind and what he specifically said to express to you an intent?  That's what I'm trying to parse out here, okay?  So he probably said something the next day, but you don't have an independent recollection of what he said?

A   No.

Q   Okay.  How about the day after that?

A   Same answer.  I don't know, but more than likely he probably said something.  It may not have been extreme, may not have been serious, but he probably said something.  He may not have.

Q   Okay.  Because you went on to say that you took him to be very determined about it because he talked about the subject matter, but you don't remember two days after this conversation in the dorm whether he brought it up or not.  Your answer is "probably," is that correct?

A   Correct.

106

Q   Do you remember what you said in that first kite?

A   Sort of.

Q   What do you remember?

A   I remember that I was attempting to notify someone that there was a person on my post with intent to harm someone on the outside.

Q   Anything else?

A   No.

Q   Just that general message?

A   (No verbal response)

Q   Yes?  You have to say it --

A   Yes.

Q   As we've talked about this time line, Mr. Allen, would you agree that one of the common people who is in the dorm with you and Mr. Uraz would be Fateen Muhammad?

A   Yes, but there's a few other --

Q   Others, sure.

A   Right.

Q   But he's one of them.

A   Correct.

Q   John Pierce is another.

A   Correct.

Q   Reginald Close is a third.

A   Correct.

Q   Have you ever talked to Reginald Close about the subject

107

matter of Mr. Uraz wanting to harm his ex-girlfriend?

A    No.

Q    Not one conversation?

A    Not that I can recall.

Q    Now, you testified on December 1st about Mr. Uraz attempting through a third party to put money in your account.  Do you recall that testimony?

A    Uh-huh.

Q    Is that a yes?

A    I was told that.  Yes.

Q    And that you were told that by Mr. Uraz.

A    Correct.

Q    Is that because you were telling him you were going to report him for what he had said about his ex-girlfriend?

A    No.

Q    You know the term "extortion"?

A    Yes.

Q    You weren't extorting him?

A    No.

Q    You never once said --

A    No.

Q    I need to finish the question.

A    Okay.

Q    You never once said, even when you said, hey, you need to be careful about what you're saying, you never once said,

108

I'll protect you and make sure it doesn't get out to anybody.

A    No.

Q    When was -- out of these conversations that you just testified to here, when was the first time he offered you cash for harming his ex-girlfriend?

A    I don't recall.  It was somewhere in B dorm, when we were moved back down from medical floor.

Q    But which conversation was it?  Was it -- it wasn't the first one because he just said "bitch gotta pay."  Was it the second one when you guys were in the dorm watching TV?

A    I could say that.  It was around that time period.

Q    Around that time period or that conversation?

A    It was when a price was put, a price solidly put.

Q    You put the price?

A    No.

Q    He made the offer.

A    Correct.

Q    And you're in jail.

A    Yeah.

Q    Did you say to him, I'm in jail, I can't do that.

A    No.

Q    Did you express to him that you could carry out what he told you he wanted done?

A    Sort of.  He asked for a gun right after -- after like --

109

you know, through conversation, like, okay, if I couldn't do that, he wanted to figure a way to do it himself.

Q   You testified on December 1st when you were asked -- and this is page 23, line 1.

"Well, did he actually say the words he wanted to have her murdered?

Answer:  Yeah.

Question:  What did he say, if you recall?

Answer:  He said that he wanted her beat with a baseball bat beyond recognition."

You were asked those questions?

A   Yes.

Q   And you gave those responses.

A   I did.

Q   That's your truthful testimony?

A   Yes.

Q   Did you at any point tell him that you could use the money that he was offering to marry your girlfriend in the jail?

A   No.

Q   You made a statement about something specific that you claim Mr. Uraz told you that he wanted to do, and that was have his ex-girlfriend's death videotaped so he could masturbate to it.  Do you remember that testimony?

A   Yes.

Q   Have you ever watched a movie where somebody made that

110

statement?

A    No.

Q    Is that something that you put into this version of your events?

MR. KOOP:  Objection, argumentative.

MR. NICHOLS:  I don't think it's argumentative. It's a question.

MR. KOOP:  Well, I think it's meant to harass the witness.

THE COURT:  Objection's overruled.  Questions don't have to be nice.  He wants to know if you made that up.

THE WITNESS:  No.

MR. NICHOLS:  All right.  Nothing further.

THE COURT:  Mr. Koop, redirect.  What do you need, Mr. Allen?

THE WITNESS:  Huh?

THE COURT:  What do you need?

THE WITNESS:  Nothing.

THE COURT:  All right.

REDIRECT EXAMINATION

BY MR. KOOP:

Q    Good afternoon, Mr. Allen.  Mr. Allen, you testified here on cross-examination today that you had conversations with the defendant about where she worked, meaning where Erika

111

Melke worked.

A    Correct.

Q    Did you ever have conversations of what she did for a job?

A    I just know she worked at the urgent care.

Q    Worked at an urgent care? And you know that through talking to Mr. Uraz?

A    Correct.

        MR. KOOP: May I approach the witness, your Honor?

        THE COURT: Sure.

        MR. KOOP: I'm showing the witness People's proposed exhibit 3.

BY MR. KOOP:

Q    Mr. Allen, that is a kite you wrote, correct?

A    Correct.

Q    Now, this initial -- actually -- this initial -- there's a guy on my post that's asked me to kill --

        MR. NICHOLS: I'm going to object, your Honor. This exhibit is not in evidence. He can lay the foundation just by asking him -- I mean, I started it. He can just say is that a fair and accurate representation of the kite you wrote.

        THE COURT: The objection is that you're introducing evidence not properly before the Court.

        MR. KOOP: Your Honor, what I'm trying to

112

establish is a time line.  I'll rephrase it.

THE COURT:  Objection is sustained.  Testimony is -- statement by Mr. Koop as it relates to the exhibit is stricken.

BY MR. KOOP:

Q    Mr. Allen, are there two different people's handwriting on there?

A    There is.

Q    Do you know who else's handwriting's on that exhibit?

A    I believe that that handwriting is Casey Haapapuro.

Q    Is that a corrections officer?

A    It is a detect -- or a deputy.

Q    Okay.  And you stated that you wrote two kites.

A    Yes.

Q    In addition to this kite?

A    That's the second one.

Q    This is the second one.  So there was an additional one that we don't have.

A    Right.

MR. KOOP:  Okay.  People have nothing further, your Honor.

THE COURT:  Mr. Allen, we're all set.  They're going to take you back.

THE WITNESS:  All right.

THE COURT:  Have a good day.

113

THE WITNESS:  All right.

(At 5:14 p.m., witness excused)

THE COURT:  Mr. Allen's all set.

MR. KOOP:  Judge, you expressed your intention of finishing this today?

THE COURT:  Sure.  That would be my hope.

MR. KOOP:  Okay.  I was just making sure of the time line still because I still have a detective in the hallway, and if you weren't going to do that, I'd ask that he be dismissed, but if we're plugging forth, we'll plug forth.

THE COURT:  That's the plan.  Good afternoon, Mr. Close.  Right up here.  Before you're seated, please raise your right hand.  Do you swear or affirm the testimony you'll provide in this matter will be the truth?

MR. CLOSE:  Yes.

THE COURT:  All right.  Please be seated.  State your full name.

THE WITNESS:  Reginald Garfield Close.

THE COURT:  All right.  Mr. Close, do you remember the last time we talked --

THE WITNESS:  Yes.

THE COURT:  -- we talked about whether or not you wanted to have an attorney with you?

THE WITNESS:  Yes.

114

THE COURT:  Have you had a chance to talk to your attorney since that time?

THE WITNESS:  Yes.

THE COURT:  Okay.  The deputy has asked you before they brought you in if you wanted to talk to another attorney today, and the message I got back was no, that you're ready to go.

THE WITNESS:  Yes, sir.

THE COURT:  All right.  That's correct?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  And you understand then that they're going to ask you questions, you're going to answer them.

THE WITNESS:  Yes, sir.

THE COURT:  All right.  Any trouble, you look up and ask me a question, okay?

THE WITNESS:  Okay.

THE COURT:  All right.  Mr. Koop, questions for Mr. Close.

MR. KOOP:  Thank you.

REGINALD GARFIELD CLOSE, JR.

(At 5:16 p.m., called by Mr. Koop and sworn by the Court, testified as follows)

DIRECT EXAMINATION

BY MR. KOOP:

FORM AZ-13   PENGAD • 1-800-631-6989 • www.pengad.com

Q    Good afternoon, sir.

A    Uh-huh.

Q    Mr. Close, I'm going to ask you some questions.  If at any point you don't understand something or I mumble like that, just let me know --

A    Okay

Q    -- and I'll clarify for you, okay?  Mr. Close, do you remember when you -- you're currently incarcerated in Ingham county, is that correct?

A    Yes, sir.

Q    When did you begin being housed at the Ingham County Jail?

A    July 1st, I believe.  July 1st.

Q    Okay.  And have you remained in jail since that July 1st date?

A    Yes.

Q    Sir, do you know anyone by the name of Tunc Uraz?

A    Yes.

Q    Do you call him Tunc or some other name?

A    Tunc or Tone.

Q    Tone?

A    Tone, yeah.

Q    How do you know this person?

A    From jail.  From Ingham county.

Q    Did you know this person outside of jail?

A    No.

116

Q    So it's only through your stay at jail that you know this person?

A    Yes.

Q    If you saw this person again that you know as Tunc Uraz, would you be able to recognize him?

A    Yes.

Q    Do you see that person in court today?

A    Yes.

Q    Could you identify him and state something he's wearing, sir?

A    With the striped uniform like I got on.

MR. KOOP:  Ask that he identified -- the record reflect he's identified the defendant.

THE COURT:  Any objection, Mr. Nichols?

MR. NICHOLS:  No comment.

THE COURT:  People -- sorry.  The witness has identified the defendant.  The record shall so reflect.

MR. KOOP:  Thank you, your Honor.

THE COURT:  Mr. Koop, you may proceed.

MR. KOOP:  Thank you.

BY MR. KOOP:

Q    Sir, do you recall when you first met Mr. Uraz?

A    Yes.

Q    When was that?

A    Sometime in September, October.  Somewhere around there.

117

Q     Okay.   Do you know -- are you certain of that date?

A     I'm not certain of the actual day, but around that time.

Q     Okay.   And do you know where in the jail you met Mr. Uraz?

A     We were being housed in medical.

Q     Housed in medical?

A     Uh-huh.

            THE COURT:   Is that a yes, Mr. Close?

            THE WITNESS:   Yes.

BY MR. KOOP:

Q     Approximately how long in medical were you with the defendant?

A     Maybe two weeks in medical.

Q     Okay.   While you're in medical, are you actually in the same cell as him?

A     Yeah.

Q     Are you roommates?   Bunkmates?

A     Roommates.

Q     Okay.   Is there anyone else in that cell with you?

A     For one night, probably like maybe six, eight hours, Charles Allen was in there with --

Q     That was Charles Allen?

A     Yeah.

Q     Do you recall how long you spent on medical with the defendant?

A     Two weeks maybe.

118

Q    About two weeks?

A    Yeah.

Q    Then did you go to some other cell in the jail or place in the jail?

A    Yeah, we went to post 5 together.

Q    Both of you?

A    Yeah.

Q    Both you and the defendant?

A    Yeah.

Q    Okay.  When you went to post 5, were you again in the same cell or where were you?

A    Not in the same cell but in the same dorm.

Q    Okay.  When you're on post 5, did you have -- were you able to have contact with the defendant?

A    Yeah, we were out basically all day around each other.

Q    Okay.  So there was opportunity for you to talk to each other?

A    Yeah.

Q    Okay.  Would you talk -- how often would you talk with the defendant?

A    Daily.

Q    Daily?  Is this both while you're in medical and when you moved to post 5?

A    Yes.

Q    Does a person by the name of Erika Melke mean anything to

119

you?

A    Eric?

Q    Erika Melke.

A    Yeah.

Q    Is that someone you know personally?

A    No.

Q    How do you know the name Erika Melke?

A    Through Tunc.

Q    Is this a person he spoke about?

A    Yes.

Q    Okay.  If you can recall, when did the defendant first bring her up to you?

A    When we were in medical.

Q    And what was he talking about as it relates to Erika Melke?

A    Just how she's his girlfriend and how he ended up with a stalking charge on her and just basically about her being his girlfriend before, and he told me he came to jail for a stalking charge on her.

Q    Did the defendant ever talk about causing any damage to her vehicle?

A    Yes.

Q    What was that conversation?

A    He was saying something about like he had slashed her tires or something before.

Q    Do you recall the -- in what -- when he slashed the tires

120

or where that was?

A    I don't recall where it was.  I remember him saying something about -- something about a concert or something, I believe, that she was supposed to have been going to. The day of the concert.  I don't remember him saying where the car was though.

Q    Okay.  Do you remember what concert he was talking about?

A    Drake, I believe.

Q    Did the defendant ever express any desire about wanting to cause harm to Erika Melke?

A    Yes.

Q    What type of harm?

A    Have her killed.

Q    Was this a one-time conversation?

A    No.

Q    If you can recall, Mr. Close, when was the first time you and the defendant had a conversation about the defendant wanting to cause harm to Erika Melke?

A    Maybe a couple of days after they moved Charles Allen out of the room with us.

Q    Is that back in medical?

A    Yeah.

Q    While you were on medical with Charles Allen and the defendant, did you overhear the defendant talk to Charles Allen about harming his girlfriend?  Or Erika Melke?

A    No, we actually only spent the night in there.  We got there about 11, 12:00.  We were up about maybe a hour, then everybody like went to sleep.  Then the next morning, I believe, they moved Charles Allen out of the room with us.

Q    Okay.  So a couple days -- so the first conversation is while you're on medical --

A    Yeah.

Q    -- about harming Erika Melke, is that correct?

A    Yeah.

Q    Who initiated this conversation?

A    Tunc.

Q    Was anyone else present for this conversation between the two of you?

A    No.

Q    Did the defendant ever talk about past attempts to cause physical harm to Erika Melke?

A    No.  He had told me that he had got fired from his job for trying to get a gun.  Someone had told him on his job -- told on him at his job about trying to obtain a gun from him.  But like he didn't say he was going to necessarily kill her with it.  He insinuated it though.

Q    He insinuated it?

A    Yeah, like --

Q    What do you mean by that?

A    I mean, he was talking like if he could have got a gun,

122

that he probably wouldn't have been going -- all this probably wouldn't have been going on.

Q   Okay.   And you took that to mean he was going to use it on Erika Melke?

A   Yeah.

Q   Is that a yes, sir?

A   Yes, sir.   Sorry about that.

Q   Thank you.   I can hear you, but --

A   Okay.   Yeah.

Q   -- we have a record.   Besides Erika Melke, did the defendant ever discuss any desires or plans to have anyone else harmed?

A   Yeah, just people that was around her that he thought she was having sex with guys, a couple guys, that he thought she was having sex with like while she was with him, and I guess he had gotten in an argument with one of the guys.

Q   Do you remember what the defendant said about that argument?

A   I don't recall exactly what he said about the argument, I just know he said that she was with him, and he ended up arguing with her, and the guy told him to leave, and he said that he told the guy not to put his hands on him, he was going to call the cops, and it was just argument at that time.

Q   Was that an argument in Pontiac?

123

A    I believe so.  He said -- yeah, I believe it was outside of a restaurant in Pontiac.  I believe so.

Q    Do you recall if the defendant ever told you about when that argument took place?

A    I don't remember the date, no.

Q    Okay.  What I mean is not the date that you talked to the defendant, but the day that that argument was --

A    Yeah, that's what I saying --

Q    Okay.

A    -- I don't remember the day he said the argument happened.  I just recall the argument in general.

Q    Okay.  Thank you.  Did the defendant ever ask you to kill Erika Melke?

A    Yes.

Q    How did he ask that?  How did that conversation take place?

A    We were in medical, after they had moved Charles Allen out, and we were sitting there a couple days later, and he was just like -- he just came out with it.  Like he wanted her -- he wanted her dead.  He asked me could I do it or did I know anybody that could kill her.

Q    And what was your response?

A    Yeah, that I did.

Q    I'm sorry?

A    Yes, I did.

Q    Okay.  And that was yes, you did --

124

A    Know someone or -- yeah.

Q    Okay.  When you said you knew someone that could have her killed, was there a price ever discussed?

A    Yeah, it was somewhat a price.  I guess -- yeah, I guess you could say there was a price discussed.  Yeah.

Q    And when you tell him that you know someone that could do this for him --

A    Uh-huh.

Q    -- did you offer to do it for free?

A    No.

Q    What was that conversation?  What did you say to him in response?

A    I just asked him did he seriously like want her killed.  He said yeah.  I told him that I can probably find somebody that I knew in Detroit or whatever to take care of it considering both of us was sitting in jail.  And he asked me to get in touch with him.

Q    Okay.  Why Detroit, Mr. Close?

A    I'm from -- I'm not from Lansing.  I'm from Detroit.

Q    You're from Detroit, sir?

A    Yeah.

Q    Okay.  Was there ever specific conversations between the two of you about the details, the who, what, when?

A    Yeah.  I mean, like he drew a map of where she lived at.  He told me what door she used to go in the house.  What

125

kind of car.  License plate number.  Things like that, like.

MR. KOOP:  May I approach the witness, your Honor?

THE COURT:  You may.

BY MR. KOOP:

Q  I'm showing what's been marked as People's proposed exhibit 1.  Could you just look that over?  Do you recognize what that is I've handed you, sir?

A  Uh-huh.

Q  How is it that you recognize that?

A  That was the map that Tunc had drew and with his handwriting, my handwriting.

Q  And what is it that I've handed you?

A  That's the map and stuff of Erika Melke's drive -- parking lot, the other guys' names or whatever that she's supposedly having sex with or whatever.

Q  And this is written correspondence?

A  Yes.

Q  Who is this written correspondence between?

A  Me and Tunc.

Q  Just the two of you writing on this?

A  Yes.

MR. KOOP:  Move for admission of People's proposed exhibit 1, your Honor.

126

THE COURT:  Mr. Nichols.

MR. NICHOLS:  May I voir dire?

THE COURT:  You may.

VOIR DIRE RE: PX 1

BY MR. NICHOLS:

Q    Mr. Close --

A    Uh-huh.

Q    -- where were you when this proposed exhibit was created?

A    In medical.

Q    Do you recall what day, sir?

A    I don't recall exactly which day, no.

Q    This is a three-page proposed exhibit.  Were all three pages essentially composed at the same time?  Do you understand what I'm asking?

A    Yes.

Q    And the answer is?

A    Yes.

Q    Okay.  Part of this is your handwriting, right?

A    Yes.

Q    And part of this is Mr. Uraz's handwriting.

A    Yes.

Q    And are you testifying to that because you actually saw Mr Uraz write out what he has contributed to this composite exhibit?

A    Yes.

127

MR. NICHOLS:  Okay.  I have no further voir dire and I don't object.

THE COURT:  Exhibit 1 is admitted.

(at 5:33 p.m., PX 1 received by the Court)

MR. KOOP:  May I approach again, your Honor?

THE COURT:  You may.

CONTINUED DIRECT EXAMINATION

BY MR. KOOP:

Q    You have People's exhibit 1 right there in front of you. On that first page, whose handwriting is the top handwriting?

A    That's Tunc's handwriting.

Q    What is he asking in that?

A    He's basically asking -- well, we were talking in the room, and I kind of advised him that there was speakers in the room, so he asked me like did I want to wait for him to get sentenced for it like or would they come and try to do something to him if he's not sentenced yet, if something happened to her and he's still sitting in jail.

Q    Whose "them"?

A    The police.

Q    Okay.  Now, the second page of People's exhibit 1, at the bottom, whose hand -- at the very bottom, whose handwriting is that?

A    That's my handwriting.

128

Q   And that's a "black Charger," is that correct?

A   Uh-huh.

Q   Why did you write down "black Charger"?

A   That was the car he was explaining to me.

Q   Okay.  Whose -- do you recall whose car that was?

A   That was Mike Toves, I believe.

Q   And is Mike Toves also written down there?

A   Yeah.

Q   Why do you have Mike Toves's name written down?

A   Because he was telling me like where the car would be and things like that.

Q   Why is Mike Toves's car -- the name Mike Toves and his car important?

A   He supposed to have a relationship with Erika while Tunc was having a relationship with her.

Q   And what was the purpose of you writing down his name and car, description of the car?

A   He wanted something done to him also.

Q   By something done, did you have a specific conversation?

A   He said he would -- that he would want his car burned up or he would want him hurt, either one.

Q   Him hurt?

A   Yeah.

Q   Okay.  And what about Stan White?  Is his name also written down there?

129

A    Yes.

Q    Okay.   And what is written under Stan White's name?

A    An address.

Q    Okay.   And, again, how did you get that address?

A    Through Tunc.

Q    Okay.   And that -- the same is true for Mike Toves?

A    Yeah.

Q    And what was the purpose of writing down Stan White's address?

A    It was supposed to been a guy -- I think this was the guy he had a argument with at one time at a restaurant or something.   This is the guy supposed to be having a relationship with her, too.

Q    Okay.   Did he, the defendant, ever expressly state what he wanted done to Stan White?

A    He wanted him hurt, too.

Q    Did he, the defendant, ever expressly state what he wanted done to Stan White?

A    He wanted him hurt, too.

Q    Did he ever say he wanted either of those men killed?

A    Yeah.

Q    And do you recall when he said he wanted to have these men killed, was it during this interchange while you're writing back and forth?

A    Yeah.

130

Q This writing back and forth, were you passing notes directly to each other? Were you -- how were you writing these notes back and forth to each other?

A Passing 'em like where you're standing and where I'm sitting, like.

Q Were there also an oral -- talking back and forth?

A At that point, we had kind of stopped talking because like the way he was talking, I was telling him, like, it's, you know, speakers in the room. They could be listening exactly what you're saying, so we had basically started writing -- we was in the same room, like bunk was -- if I'm sitting right here -- if my bunk is right here, his bunk was where you standing.

Q Okay. So we're talking about --

A Two feet in front of each other.

Q Okay. Thank you. Turning now to the third page of People's exhibit 1, is that a map there?

A Yeah.

Q Who drew that map?

A Tunc.

Q Tunc drew that map?

A Uh-huh.

Q That's a yes?

A Yes. Sorry.

Q I appreciate it. And the top of the page, College Towne,

131

apartment and then the address?

A    Yes.

Q    Who wrote that down?

A    Tunc.

Q    Whose address is that supposed to be?

A    Erika's.

Q    Okay.  The -- below that, Erika Melke or Erika Lynn, that's a Facebook?

A    Yeah.

Q    What was that in relation to?

A    He just told me if the guy didn't know how she looked by me explaining it to him, he can probably look her up to see how she looks on Facebook.

Q    Why the importance for -- to know what she looked like?

A    Because he wanted her killed.

Q    Because he wanted her killed, the defendant did?

A    Yeah.  Yeah.

Q    It looks like it's set off a little bit, but does that say "green Toyota"?

A    Rav4.

Q    And whose car is that?

A    Supposed to have been Erika's.

Q    Supposed to be Erika's?

A    Uh-huh.  Yes.

Q    What is underneath that?

132

A    A license plate number.  Said a green Spartan Toyota around the license plate, like a license plate cap or whatever that goes around --

Q    Okay.  License plate CB.  What was that supposed to be?

A    Like that was a partial plate, I guess.  He didn't know the whole thing.

Q    Again, was all this writing in his handwriting?

A    Yes.  That's all his handwriting.

Q    Okay.  And what was the -- I'm sorry, what was the map of?

A    Supposed to be her apartment, where she parks at, where the trash cans were, and how to turn into her apartment and which door, her apartment number or whatever.

Q    Did he ever give any map or anything of where she worked?

A    He just said she works at different urgent cares.  She doesn't work at the same place all the time, so --

Q    He also described where she worked?

A    Yeah.

Q    Thank you.  Now, did you and Mr. Uraz ever come to an agreed-upon price for your role in helping to kill Erika Melke?

A    I had just told Tunc that the guy owed me a favor and I was just saying he'd do -- he'd do it for me as a favor.  Tunc told me he would give me a thousand dollars for getting it done for him.

Q    A thousand dollars to have her killed?

133

A   Yeah.

Q   How were you supposed to get paid if you're in jail?

A   I was -- just told him I was going to have him meet somebody out in the world and give him the money.

Q   "He" being the defendant?

A   Yeah, Tunc.  I was going to have Tunc meet someone and give him the money.

Q   While in jail, did you -- did the defendant ever give you anything of value, money, have money put on your books?

A   Yeah, he was getting a visit -- well, he told me one night before he was getting a visit the next day, and his roommate was going to come out to the jail and he could have him put some money on my books just as a -- you know, to show me that he was serious about getting it done.

Q   When you say getting it done, what do you mean?

A   Getting Erika killed or whatever.

Q   And was it actually to kill Erika?

A   Yeah.

Q   Was a date discussed as to when this killing -- when he wanted this to happen?

A   He was preferring it had happened while he was still in jail.

Q   Okay.  Do you recall a specific date that he wanted?

A   I believe he was supposed to go -- sometime in October, towards the end, he was supposed to go to court.  I don't

134

remember a specific date, which day he was supposed to go, but he wanted it done before then.

Q   And what was the court date that was -- did he say why he wanted it done before his court date?

A   I believe he was -- he was supposed to go home on his court date.  He said he was going to get time served, and I believe he was supposed to go home around that time.

Q   I want to go back a little bit.  The defendant had stated to you that the roommate was going to come and put some money on your account?

A   Uh-huh.

Q   Is that a yes?

A   Yes.  Sorry.

Q   Okay.  It's habit.

A   Yeah.

Q   And did that -- did you ever get any money on your account?

A   Yes.

Q   Okay.  When did that happen?

A   Around mid-October.  Around the second week of October.

Q   Do you recall -- do you know who put that money on your account?

A   I don't know him personally.  I just know him to be his roommate, I believe.

Q   Do you recall how much money was put on your account?

A   I know they took some for like a old charge I had, like a

booking charge, so it ended up being like a hundred and thirty-something dollars left on there after they took some of it.  So I don't know exactly how much.  He told me it was $150.00 though.

Q   And did the defendant specifically state what that money was for?

A   Yeah, he said it was towards, you know, showing that he was serious about getting her killed, because when he had wrote the map and stuff, I told him that I had sent it to the guy or whatever, but I actually didn't send it to the guy, so —

Q   Okay.  So that money that was put on your account was a down payment, if you will?

A   Yes.

Q   Okay.  Did you ever give the defendant a name or number for someone that he could contact about killing Erika Melke?

A   Yeah.

Q   Who was -- do you recall the name or number you gave him?

A   No, because it wasn't a real number.

Q   Okay.  At any point did you -- without telling me any sort of conversation you had -- at any point did you discuss the defendant's solicitation of you for the murder of Erika Melke with any other inmates?

A   Yes.

Q   Who did you speak with?

136

A    Charles Allen.

Q    Do you recall when that was?

A    Towards the end of October.  It was probably going on the third week of October.

Q    At any point do you alert jail authorities to the defendant's plan?

A    No, I sent it through my attorney.  I didn't tell any -- any jail authority.

Q    Do you recall when you contacted your attorney?

A    It was when we was still in medical.

Q    Would that have been in October?

A    Yes.

Q    And then after you contacted your attorney, were you at some point later interviewed by detectives from the Lansing Police Department?

A    Yes.

Q    One of them being right here to my left, is that correct?

A    Yes.

Q    Was your attorney also present for that?

A    Yes.

Q    And before you gave that statement, were there any promises or plea offers extended to you?

A    No.

Q    And the writing on People's exhibit 1, this written communication between you and the defendant, was that

137

before or after you contacted -- before or after you were interviewed by the police?

A    Before.

Q    Before?   And the money that was deposited in your account, was that before or after you were interviewed by police?

A    Before.

Q    After you were interviewed by the police, did you ever -- did you and the defendant ever talk further or continue to discuss plans to have Erika Melke killed?

A    Yes.

Q    At some point are you and the defendant separated from each other?

A    Yes.

Q    Okay.   Do you recall when that was, Mr. Close?

A    I believe it was at the end of October.   Yeah, I went to court, came back from court, and they separated us.

Q    Okay.   After you were separated at the end of October there, have you ever -- have you had any further contact with the defendant?

A    Yes.

Q    Okay.   When was the last time you had contact with him?

A    Sometime in November, I believe.   They moved us right across the hall from each other.

Q    And, I'm sorry, was that the last time you had any contact with him?

138

A    Yeah.

Q    When you're having these discussions with the defendant about having Erika Melke killed or having harm done to the other individuals she was dating, when the defendant spoke about this, what's his tone or demeanor?  How is he acting?

A    I mean, he never acted any different.  He acted the same all the time.

Q    Did you believe he sincerely wanted her killed?

A    Yeah.

Q    Did he ever tell you he was just joking about wanting to have her killed?

A    No.

        MR. KOOP:  I have nothing further, your Honor.  Thank you.

        THE COURT:  Mr. Nichols, questions for Mr. Close.

CROSS-EXAMINATION

BY MR. NICHOLS:

Q    Mr. Close, good evening.

A    Good evening.

Q    I'm not here to trick you --

A    Okay.

Q    -- okay?  If you don't understand a question I ask, just let me know and try not to answer before I finish the question, and I'll try not to start another question until you finish your answer, okay?

139

A    Okay.

Q    Have you ever testified before?

A    No, sir.

Q    Where in Detroit are you from?

A    I'm from the west side of Detroit.  14th.  Carry around the old Tiger stadium.

Q    Yeah.  Okay.  One of the things that I got my hands on was a record.  I got records for some of the players here.  You testified about meeting Tunc Uraz in medical.  Do you remember that?

A    Yes.

Q    Looks like you were moved to medical about September 27th.  Does that sound right?

A    Could be right, yes.

Q    Okay.  Do you remember that Mr. Uraz was moved into medical at the same time that you were?

A    Yes.

Q    There was a reason for that, is that right?

A    Yes.

Q    When you were moved into medical with Mr. Uraz, who else was in there?

A    Charles Allen.

Q    Nobody else?

A    No.

Q    Was there anybody in the same -- now, medical is kind of

140

like -- maybe a little bit like a dorm there.  A couple different cells, is that right?

A   Uh-huh.  Yes.

Q   Who is in what cell?  Do you understand what I'm asking you?

A   Uh-huh.  Yes.

Q   Okay.  Go ahead.

A   Me, Tunc, and Charles was only in the cell for literally like one night.  We got there about 11 something at night --

Q   Uh-huh.

A   -- maybe after twelve, and the next day they moved Charles out of the cell with us, and me and Tunc were in the same cell, and Charles moved next door with another guy.

Q   Okay.  Do you remember who that other guy was?

A   I believe the name is Muhammad.  I don't know his -- they just call him Muhammad.  I don't know if that's his actual name.

Q   Okay.  Fateen, maybe?

A   I believe so.  Probably so --

Q   Okay.  Cool.  And if you don't remember, that's fine.  Just tell me.

A   I know.

Q   Okay.  Now, you made a statement to Detective Krumbach here with your lawyer, Mr. Rusek, around October 27th of this

141

year.  Does that sound like about the right date?

A  I'm not sure if it's the 27th.  I'm not a hundred percent sure.  It could be around -- around that area.  I'm not sure if it's the 27th exactly.

Q  Okay.  Certainly your memory of what was said to you by Mr. Uraz was fresher when you made that statement than it is here today.

A  Somewhat, yeah.  Certain things I don't recall, I guess.

Q  Sure.  Nobody's got a perfect memory, right?

A  Right.

Q  Okay.  At about the time that Tunc Uraz started talking about his ex-girlfriend in the ways that you've described, you guys had been together on medical for a good three weeks.  Would that be correct?

A  No.

Q  How long?

A  Two or three days, maybe.

Q  Do you remember telling Detective Krumbach it was about three, four weeks?

A  I don't remember telling him we were on -- we were on medical three or four weeks when he started talking to me about it, no.

Q  Okay.  It might have been that's how long you were on medical, but you remember as you sit here today under oath that it was within two days?

142

A    Two or three days.

Q    Two or three days.  Now, I gather, especially on medical and from what I understand, you're on lockdown pretty much completely, is that correct?

A    Yes.

Q    You don't get to leave the cell at all?

A    Not unless you have like a visit or you're going to actual medical to see a doctor or going to court or something.

Q    And you weren't there for a medical reason.  You were there because there was something else going on, and you were put into a --

A    We were all on phone restriction basically.

Q    Couldn't call people.

A    Yeah.

Q    Yeah.  Okay.  And I don't need to get into why with you, but that's kind of what the situation was.

A    Yes.

Q    It was like a punishment, is that right?

A    Yes.

Q    Okay.  Now I can imagine, you get to know somebody pretty well in a short amount of time.  Is that kind of what it's like in there?

A    Yeah.

Q    In the room, completely alone with Tunc Uraz for two, three days, and then he starts talking about this ex-girlfriend

143

Q of his, right?

A Yes.

Q You remember he was just pacing up and down one night?

A I mean, that's all we could do is pace in the room. There's nowhere, you know, necessarily to go.

Q But this night was a little bit different.

A Yeah, I can remember him pacing a couple nights, but yeah.

Q And you finally said, "What's up with you?" Is that correct?

A Not that I can recall.

Q Okay. But he was -- he was really worked up about something. Would you agree with that?

A I would agree like it's fairly high tension with everybody being worked up, like we were all in jail, like -- like I seen him not acting any different. Like he was just -- he was more of -- when we were in the room together, he was more of like a night owl person. He would sit up and read and, you know, read -- read until he went to sleep. Like that's usually what he did at night. Like after they turned the television off at 12, he would set up maybe a hour or two and read. Walk back and forth, read, then lay down, whatever.

Q He's from Turkey. Is that your understanding?

A Yes.

Q And there came a point in time that he starts talking about

144

this ex-girlfriend of his, right?

A    Yes.

Q    He was not happy about her, right?

A    Right.

Q    He wasn't happy about where he was, right?

A    Right.

Q    He was in your cell with just the two of you, right?

A    Right.

Q    And he's pacing back and forth, and he finally starts talking about her in a really bad way and blaming her for where he is, right?

A    I mean, he kind of blamed himself too, but not just her, yeah.

Q    Okay.  Now, I got to imagine you guys when you're not reading or watching TV, I mean, you really just have each other to talk to, right?

A    Yeah.

Q    And you got to try to figure out a way to pass that time because that's all you got is time, right?

A    Right.

Q    And sometimes you might just start talking about things on the outside, right?

A    Yes.

Q    You may have said some things to him?

A    Yeah, we had conversations.  Yeah.

145

Q    And he obviously said some things to you.

A    Yeah.

Q    Some of those things may be, you know, not so realistic, right?

A    I mean, you can say some of the stuff, but, I mean, we talk about a lot of stuff, but --

Q    Sure.  The exhibit that we did here, I think it's Prosecutor's 1.

        MR. NICHOLS:  Can I see it?

BY MR. NICHOLS:

Q    This exhibit here that you've identified for us, the three pages --

A    Uh-huh.  Yes.

Q    Okay?  Okay.  Was this, you know, right at that same time that he brought up his ex-girlfriend with you?

A    Maybe a day or two after, somewhere around there.

Q    Okay.  A couple days maybe?

A    Yeah.

Q    This would have had to have been in a common area, right?

A    Yes.

Q    And when I say "this," I mean where he and you wrote these notes back and forth, right?

A    Yes.

Q    Okay.  Because I think your testimony is the reason why you were writing notes to each other is because you were in a

146

common area and you thought you might have been recorded.

A   Well, they -- they tell you, well, you -- in this jail everywhere they have speakers like in the dorms, in the rooms, that they can listen to a conversation, whatever, and then when the conversation kind of went to that, I thought maybe he didn't want to be like talk about it as loud or whatever.

Q   Okay.  And it looks like the first thing on this first page here is a note.

        MR. NICHOLS:  Can I approach the witness to show the note?

        THE COURT:  You may.

BY MR. NICHOLS:

Q   Is that your handwriting or Mr. Uraz's?

A   Mr. Uraz.

Q   Okay.  And it looks like he says "wait for me to get sentenced because they may try to keep me here if something happens to her," is that correct?

A   I believe so.  If I can look at it.  I'm not --

Q   Sure.  I'm going to hand it to you.  Can you put your hand -- I'm sorry.  Yeah.

A   I got it.

Q   Okay.  So these three pages, are these -- according to your recollection, as best as you can remember, is that in chronological?  Page 2, page 3.  I'll flip through it and

147

you can flip through it.

A    I believe so.  The map could have been drawn before the two letters were wrote or whatever.

Q    Okay.  So it might be that the map, which is page 3, may have been prepared --

A    Yeah.

Q    -- first in order --

A    Yeah.

Q    -- in this three-page exhibit.  Okay.  Because what's curious to me is where it says wait for me to get something and sentenced, I mean, that just kind of seems to be out of context.  That would be --

A    Yeah, because he was talking about it like kind of out loud, and I told him he didn't want to be as loud with the speakers in the room.  I told him like we were -- like where we were, they didn't have like a deputy on post.  They would have to come from downstairs, so I'm like there's a camera in the room, there's a speaker in the room that they can listen in, so I was like you probably don't want to be talking out loud.  We were talking before it actually start getting wrote down, and that's like where he start writing before, like we were talking before that actually about the situation.

Q    That's what makes sense to me when I look at that three-page exhibit --

148

A    Yeah.

Q    Okay.  What also makes sense is that there might be some more pages than what we have saved here.  Were there some other pages that you just weren't able to save?

A    No.

Q    Did he ever get in your stuff and try to take some of these pages out of it?

A    No.

Q    At least to your knowledge.

A    Yeah.

Q    No?

A    I mean, I never left out of the room or anything, like, so, man.

Q    Okay.  So when you guys are going back and forth, does he at any point in time say, hey, look, you know, I really -- let's just forget I said that.

A    No.

Q    Never came up?

A    No.

Q    When was the first point in time that you communicated what Mr. Uraz said to you to your lawyer?

A    Maybe a day after he said it.

Q    You were still on medical is what your testimony was --

A    Yeah.

Q    You were on medical for -- looks like from September 27th

149

to October 6th.  Does that sound right?

A It could be about right.

Q Okay.

A I'm not for sure.

Q You went back to 5, dorm 5?

A Five B, yes.

Q Okay.  Did Mr. Uraz move with you or not?

A Yes.

Q Okay.  So it's within -- that's like a week that you talked to Mr. Rusek, your attorney.

A Uh-huh.

Q Yes?

A Yes.

Q Okay.  Now, I've been in this situation with clients, too.  You testified to the prosecutor here that in exchange for your testimony here today and your interview with Mr. Krumbach, you weren't given any sort of plea agreement.

A No.

Q Okay.  You do have a pending case.

A Yes.

Q And that's why Mr. Rusek represents you.

A Yes.

Q And it's a pretty serious case, right?

A Somewhat, yes.

Q Like a home invasion?

150

A     Yes.

Q     First degree?

A     Uh-huh.

Q     Yes?

A     Felony firearm.  Yes.

Q     Okay.  Which is like a two-year flat sentence, right?

A     Yeah.

Q     Okay.  And so really what's going on is you, with the help
of your lawyer, you were hoping that maybe you can get some
consideration on how that case is resolved in exchange for
your cooperation.

A     Well, they told me off of -- soon as like it wasn't going
to be like no promises that I can get anything, like none
of that, so --

Q     Right.

A     -- I mean, like, and I still haven't been offered no type
of deal or anything.

Q     Oh, I understand.  Believe me, I've been in that awful
situation where no promises, but it isn't going to hurt to
cooperate, right?

A     I mean, I wouldn't say that.  I mean, like, the -- I'm
waiting to go to trial now.  Like, I'm -- no deal's been
offered, like nothing.  So --

Q     Okay.

A     I mean, they told me that like it wasn't going to be no --

151

'cause I'm doing this, I can go home tomorrow or nothing like, you know --

Q   Oh, absolutely.

A   Yeah, so it was never no promises of that.

Q   I'm not trying to suggest that a promise was made --

A   Uh-huh.

Q   -- I just want to make sure it's clear on the record that your cooperation here is with the hope of getting a benefit at some point on this open case that you're facing.

A   No.

Q   Not at all?

A   No.

Q   Just doing it because it's the right thing to do?

A   Yeah.

Q   I noticed that when you were being with your lawyer --

A   Uh-huh.

Q   -- you made sure to move so that you couldn't be seen through the doorway in the interview room, is that correct?

A   Yeah.

Q   Okay.  Mr. Close, so Mr. Uraz and you are together for it sounds like the total time period of September 27th through October 6th, is that correct?

A   No.  We were actually on 5B, too, after we moved off of medical.

Q   Okay.  So he does move with you.

152

A    Yes.

Q    Same cell, different cell?

A    Two cells down.

Q    Okay.   These conversations continue?

A    Yes.

Q    Can you describe in detail where these conversations occur?

A    We were in a long dorm --

Q    Did you say, I'm sorry, a long dorm?

A    A long dorm, like it was a little longer than this courtroom, where you walk up and down the dorm and talked, just me and him.   There was only four guys on the dorm: me, him, another guy, and Charles Allen.   Me, Fateen, Charles Allen, and Tunc.

Q    Fateen Muhammad --

A    Uh-huh.

Q    -- is a common, I'll say, thread or person who you and Mr. Uraz and Mr. Allen are housed with throughout a big chunk of the time that you're in --

A    You say a common who?

Q    Common person.

A    Oh.   Yeah.

Q    Okay.   So you and Mr. Uraz would walk alone together up and down this long dorm, is that what you're saying?

A    Uh-huh.   Yes.

Q    Okay.   And he would bring it up with you?

153

A     Excuse me?

Q     He would bring it up with you?  "It" meaning his desire to have harm befall his ex-girlfriend?

A     Yes.

Q     At what point is money brought up?

A     That was brought up in medical.

Q     Okay.  Back when it first came up.

A     Yeah.

Q     The very first conversation?  Sorry, you didn't answer that last.  You kind of nodded your head.  Was that a yes?

A     No.  What was the last question?

Q     In medical is when money came up?

A     Yes.

Q     That very first conversation?

A     No.

Q     Second conversation?

A     I don't exactly know which conversation it was, but it came up within the first few conversation.

Q     You testified on direct conversation (sic) that you initially said you were going to do it as a favor, but then Mr. Uraz said he would put a thousand dollars for you for --

A     No.  I said that I had a friend that owed me a favor.

Q     You had -- I'm --

A     Yeah.

154

Q   -- okay, you had a friend who owed you a favor.

A   Yes.

Q   Okay.   And did you tell Mr. Uraz what the friend was going to do the killing for?

A   He was going to do it for me.

Q   Do it for you.

A   Yes.

Q   Okay.   Because he owes you a favor?

A   Yes.

Q   And Mr. Uraz was going to pay you $1,000.00?

A   Yes.

Q   At some point out on the outside when you were both out.

A   He was going to get out and give the money to someone for me.

Q   To hold for you?

A   Yeah, I guess so.   However.   To hold, spin, whatever.

Q   Who was this person?

A   I want to plead the 5th on that.   Or do I --

MR. KOOP:   Can we approach, your Honor?

THE COURT:   I don't know why -- sure.

(Side bar conference - off record)

THE COURT:   I told Mr. Nichols that at this point in time that question's not proper.   He's going to ask you some other questions.

THE WITNESS:   Okay.

155

THE COURT:  However --

THE WITNESS:  Okay.

THE COURT:  As we briefly discussed last time we were together --

THE WITNESS:  Yeah.

THE COURT:  -- the 5th Amendment protects you from being forced to say something that's going to hurt you.

THE WITNESS:  Right.

THE COURT:  Right?

THE WITNESS:  Yeah.

THE COURT:  In the eyes of the law, right?

THE WITNESS:  Yeah.

THE COURT:  What it says is it protects you against compelled self-incrimination.

THE WITNESS:  Yeah.

THE COURT:  They can't force you to confess or force you to admit you did something wrong.

THE WITNESS:  Okay.

THE COURT:  That's why you have this immunity letter.  The question is who's your friend you're going to have do something bad.

THE WITNESS:  Right.

THE COURT:  That's not asking to say something bad about you.

156

THE WITNESS: Right.

THE COURT: The answer isn't going to incriminate you, it's going to incriminate your friend.

THE WITNESS: Right.

THE COURT: So if the question is properly put to you, which it hasn't been yet in my view --

THE WITNESS: Right.

THE COURT: -- you don't really have any option but to try to answer it.

THE WITNESS: Okay.

THE COURT: Okay?

THE WITNESS: Yeah.

THE COURT: Mr. Nichols.

MR. NICHOLS: Okay.

BY MR. NICHOLS:

Q    So this -- when this piece of the -- I'm going to call it plan is discussed with you and Mr. Uraz, okay? This is early on in the series of conversations about his request of you, okay? What I want to understand is whether or not this person really existed or if you were just making up a detail for him?

A    The person existed, but I wasn't going to actually have him go meet this person. Like when he was explaining this to me, I kind of got like leery and stuff about it, and probably after the second conversation I was going to write

157

my attorney or something and tell 'em anyway, like it was just kind of a iffy situation for me, like, and then I was -- I'm like kind of used to the jail, like they record somebody, they record stuff.  I had just gotten in trouble for them recording me, so I was kind of like I didn't know if it was a situation where I was getting dragged in or something or something I really didn't want nothing to do with and I had went too far in the conversation.

Q   Do you mean your state of mind was concern that you might have been getting bated by Mr. Uraz to saying something to get you in trouble?  Is that what you're saying?

A   Maybe.

Q   That was one of the concerns that you had --

A   Yes.

Q   What did you tell Mr. Uraz about yourself during these initial, you know, we'll say 48, 72 hours that you're in medical together?

A   That -- I told him that I had a case that was -- wasn't strong.  I told him I was waiting to go to trial.  I was sitting there waiting to go to trial.

Q   You told him your case wasn't strong?

A   Strong.

Q   Strong?

A   Right, I didn't have a strong case against me.  He was asking me what was I in here for.  I was telling him

158

basically like I was waiting for all of my information to come back on my case, and I was going to go to trial with it. He asked me did they offer me a plea or anything. He had told me that they offered him like a zeroed or something. I told him they offered me a plea but I didn't accept it. He asked me did I have any kids. I told him that I had kids. Like we just -- basically just had a conversation about probably like three or four other different things. I can't recall right now, but just conversation in general.

Q    A series of things are discussed over a couple of days and all of a sudden -- or was it all of a sudden he says he wants to have this woman killed. Is that how it went down?

A    No, he had brought up him trying to get a gun at his job, and him losing his job. And I asked him like -- you know, because he had told me he was the teacher and stuff like that at LCC and he was working at Michigan State, and I'm like, what would you need a gun for? And I had told him that I was getting accused of having a gun in my case, and he's like, oh, I was trying to get a gun. And I'm like, for what? He, like, somebody at my job told on me about trying to get the gun. I'm like, what did you need a gun for? And he got to telling me, going on about the girl. About how he was planning on if all of this wouldn't have happened, like he was going to try to do something to her,

159

like.

Q Did he want the gun for the girl or did he want the gun for somebody else, if he said?

A I'm sure the way the conversation was going, it was for the girl.

Q He wanted the gun for the girl.

A Yeah.

Q Okay. So he wanted you to get a gun for him?

A No. He tried to get a gun through someone else.

Q Trying to get a gun for this girl, the same girl who you testified he told you he wanted killed.

A Yes.

Q So how does it evolve then into him asking you to help him get her killed?

A He just asked me like how I been involved with, you know, stuff like in the street. When I told him I was from Detroit, I guess Detroit has a reputation of, you know, not too good of everybody coming out of Detroit. He asked me if I knew anybody --

Q I came out of Detroit, if that --

A Well, I mean, you know --

Q Right.

A I don't know. So, but, excuse me, but, yeah, that's -- that's where the conversation went to. He just asked me if I knew anyone or -- he asked me how long would I be in

160

here.  I told him how long.  Said I'm waiting to go to trial.  I got a hold on me for a parole hold, so I got to wait.  I can't bond out.  I told him I would have been bonded out, but I got to wait.

Q  So you explained to him you're going to be there for a while.

A  Until I went to trial --

Q  For a minute.

A  Yeah.

Q  Okay.

A  He just asked me, well, do you know anybody?  I say, yeah, I got a -- I know a couple people.  I got a guy who owe me a favor and --

Q  Okay.  Know anybody for what?

A  That could have Erika killed.

Q  His specific words to you were?

A  That he wanted her dead and he was going to go back home to Turkey.  Wanted her dead because she was ruining his life, and he wanted to bring his son back here to go to school and stuff, and she was ruining his life, so --

Q  Did he give any specific method that he wanted used to accomplish having her dead?

A  He just wanted her --

Q  Because just to make it clear for you --

A  Okay.

161

Q  -- this is important.  What his specific words were that caused you to think what you're thinking on the witness stand, it's critical.

A  Oh, he said he wanted her dead.

Q  Okay.  Were those his words?

A  Yes.

Q  Okay.  Did he say how?

A  He didn't say the means.  He just wanted -- he wanted her killed, like he didn't say if it was a knife, gun, what was used.  He just said he wanted her dead.

Q  Did he say, "I want her dead"?

A  He said he wanted her killed, like he wanted to find somebody that would kill her.

Q  "I want you to help me find somebody to kill Erika"?  Is that what he said?

A  It was basically me, but, you know, we were both sitting in a cell together.  I couldn't actually do it, so --

Q  Well, that's why I asked you.

A  Yeah.

Q  "I want you to help me find somebody to kill Erika."

A  Yeah.

Q  Those were his words?

A  No, not in those words exactly, but, you know, do you know anybody?  Can you have it done?  In those words.

Q  Okay.  Do you know anybody.  Can you have it done.

162

A     Uh-huh.

Q     Correct?

A     Yes.

Q     Okay.  Beyond that, can't remember anything else?

A     Not necessarily, like, I mean, not that comes to mind right off the top.  I mean, it was a couple months back or whatever, so --

Q     And this was his idea.

A     Yes.  I never knew Erika before I met him, so it wouldn't have been my idea to do anything to her.

Q     Well, I didn't ask you that.

A     Oh.

Q     What I'm asking you is a conversation comes up.  He's talking about his ex-girlfriend.  Is he the one who said I want her dead, or did you say, I got somebody who owes me a favor?

A     No, he said he wanted her dead.

Q     Charles Allen.  You were asked by the prosecutor if you had a conversation with him about this topic.  Remember those questions?

A     Uh-huh.

Q     Okay.  When did you talk to Charles Allen about this?

A     When we were on 5B.  I don't remember an exact date.

Q     That was obviously after the three of you with Muhammad were on medical?

163

A   Muhammad was never in the room with us when we were on medical.

Q   Okay.  So what did you and Charles Allen discuss?

A   He came to me and told me that Tunc had asked him to get his girlfriend killed, and I'm like, are you serious?  And he goes to going on and he's calling her address off and he's like saying everything like that I already know but I'm not telling him that I had already had information that he had told me all the same stuff.  But he didn't tell him about the other guys, like Steve and the guy, Mike, and stuff, and --

Q   He didn't?

A   No.  I don't -- I don't -- this isn't what Charles is telling me.  He's not telling me that he wanted anything done to them.  He's just telling me about Erika.

Q   Okay.

A   And he's telling me the address for her and I'm like, oh, really?  Like, I'm like oh.  Like so what you do?  He, like, this probably --

MR. KOOP:  I''m going to object to hearsay at this point, your Honor.

THE COURT:  Hang on one second, Mr. Close.  Mr. Nichols, on the hearsay objection?

MR. NICHOLS:  I don't disagree.  Anything that what Charles Allen stated offered for the truth of the

164

matter asserted would be hearsay.

THE COURT:  The objection is sustained.  Next question.

BY MR. NICHOLS:

Q    How many conversations did you and Mr. Allen have?

A    One -- as far as that went, one conversation.

Q    At this point in time it sounds like you've already talked to your lawyer about setting up a proffer interview.

A    I actually didn't sign a proffer or anything.

Q    I don't mean sign, but setting up.

A    No, I just told him what was going on.  It wasn't about a proffer.  I never brought a proffer up.  He never brought a proffer up or anything.  He just told me that he was going to get in touch with the detective.  Like he never said about a proffer agreement, anything.

Q    Okay.  So it was after you tell your lawyer about what you testified Mr. Uraz told you, correct?

A    Uh-huh.

Q    Yes?

A    Correct --

Q    You have to say -- you have to say yes --

A    You said is what after it though --

Q    Yes.  The conversation with Mr. Allen is after you've talked to your lawyer?

A    Yeah.

Q    Okay.  Did you ever do a kite of any sort?

A    Talking about to jail administration?

Q    Correct.

A    No.

Q    You testified on direct examination that you gave Mr. Uraz a number and it was not a real number, is that correct?

A    Yes.

Q    That's because you had no intention of carrying this through, is that correct?

A    Correct.

Q    How many times total do you believe you talked to Mr. Uraz about his desire to have his ex-girlfriend killed?

A    Numerous.  Maybe 20 times.

Q    Twenty times?

A    Yes.

            MR. NICHOLS:  Okay.  Nothing further.

            THE COURT:  Mr. Koop, redirect?

            MR. KOOP:  Yes, sir.  Briefly.

                    REDIRECT EXAMINATION

BY MR. KOOP:

Q    Mr. Close, the correspondence, the written correspondence in People's exhibit 1 between you and the defendant, did you provide that to detectives during that interview?

A    My attorney did.

Q    Your attorney did?

166

A    Yeah.

Q    Okay.  So all that was before the interview with detectives, is that correct?

A    The?

Q    The written correspondence.

A    Yes.

Q    Okay.  And cross-examination, Mr. Nichols was asking you about the first time Charles Allen brought this up to you, "this" being the defendant soliciting him for murder as well.  Do you recall that conversation occurring before or after you talked to the detective?

A    That was after I talked to him.

Q    After you talked to the detective?

A    Yes.

Q    Mr. Close, isn't it true that after you talked to the detective, you were offered a plea agreement, but you have since rejected that.

A    Yeah, I was offered a plea.  Yeah, I was offered a plea.

Q    Okay.  So -- okay.  Thank you.

          MR. NICHOLS:  Your Honor, if that's the case, I think I'm entitled to the terms of that plea agreement.

          THE COURT:  I have no idea.  I've never researched that question.  Any reason he couldn't have the offer -- the terms of that plea agreement?

          MR. KOOP:  No.

167

THE COURT:  Do you know what it is?

MR. KOOP:  I do.

THE COURT:  All right.  Should we wait until later to do that?  I mean, I don't --  I mean, Mr. Close obviously knows what that is.

THE WITNESS:  Yeah, I know what it is.

THE COURT:  It's his plea agreement.  I don't --

MR. KOOP:  I don't have any issue with it --

THE COURT:  Okay.

BY MR. KOOP:

Q     Okay.  And do you recall an offer as being you would plead guilty to home invasion first degree with a cap of 120 months, in exchange, the People would dismiss the balance of your charges and the habitual offender notice in full, or you plead guilty to home invasion second and felony firearm, no sentencing agreements, and in exchange People would dismiss the balance of charges and the habitual offender notice in full.  Does that sound accurate?

A     Yes.

Q     Okay.  And you discussed that with your attorney?

A     Yes.

Q     And you rejected that offer, correct?

A     Yes.

Q     And then you're proceeding to trial, correct?

A     Yes.

168

Q    And so your testimony today is not in consideration for any plea offer?

A    No.

MR. KOOP:  Okay.  Nothing further -- I have nothing further, your Honor.

THE COURT:  All right.  Mr. Close, thank you. have a good day.

THE WITNESS:  Uh-huh.

(At 6:24 p.m., witness excused)

MR. KOOP:  Last witness for the People is Detective Frank Mobley.  Your Honor, I plan on playing a disk.  Do you want me to just do it through the computer and play it for you after?  Of course, I lay the foundation, but --

THE COURT:  You have a computer disk?

MR. KOOP:  Yes.

THE COURT:  Yeah, I don't have a computer that can do that.  If you want to show me something on yours or --

MR. KOOP:  Okay.  I just haven't done that in this court before, so --

THE COURT:  Yeah.  Good afternoon.  Before you're seated, please raise your right hand.  Do you swear or affirm the testimony you'll provide in this matter will be the truth?

169

MR. MOBLEY:  Yes, sir.

THE COURT:  Please be seated.  State your full name.

THE WITNESS:  My name is Frank Mobley.

THE COURT:  Spell both first and last, please.

THE WITNESS:  Frank, F-r-a-n-k.  Mobley, M-o-b-l-e-y.

THE COURT:  Thank you.  Mr. Koop, questions for Detective Mobley.

FRANK MOBLEY

(At 6:27 p.m., called by Mr. Koop and sworn by the Court, testified as follows)

DIRECT EXAMINATION

BY MR. KOOP:

Q    Good evening, sir.

A    Good evening.

Q    Where are you currently employed?

A    City of Lansing Police Department.

Q    How long have you been employed with the City of Lansing Police Department?

A    Twenty-one years, sir.

Q    What is your current assignment?

A    I'm currently assigned to the special operations section, and I've been there since July 2016.

Q    Were you serving in that capacity on or about October of

this year?

A   Yes, sir.  I was serving in an undercover capacity.

Q   And in that capacity, were you brought in regarding -- in regards to a solicitation of murder?

A   Yes, sir.

Q   And what information -- or, I guess, what steps did you take to investigate this matter further?

A   I'm sorry, the question again?

Q   Sure.  What was your role in this investigation?

A   Lieutenant Backus asked -- to be -- on the -- a hit man.

Q   Okay.  You were to play a hit man?

A   Yes, sir.

Q   Okay.  In order to carry out this role as a hit man, what, if anything, did you do?

A   I had to call the defendant and -- while he was in jail, and have a video conference with him.

Q   Did you in fact have a video conference with him?

A   Yes, I did.

Q   Do you recall when that video conference occurred?

A   I believe it was 10/24 of '16.

Q   This video conference, 10/24 of '16 you said?

A   Yes, sir.

Q   Did you actually make contact with the defendant?

A   Yes, I did.

Q   Okay.  And this person that you spoke with over the Securus

171

video visit, would you recognize that person again?

A   Yes, sir.

Q   And do you see that person in the courtroom today?

A   Yes, sir.

Q   Would you identify him, please, for the record?

A   He's sitting in the striped shirt, the Ingham County Jail uniform.

MR. KOOP:  I'd ask the record to reflect he's identified the defendant.

THE COURT:  Mr. Nichols.

MR. NICHOLS:  No comment.

THE COURT:  The witness has identified the defendant.

BY MR. KOOP:

Q   Now, this video call, how is it initiated?

A   Normally what happens is you get a password.  You have to pay for the actual service, and you can set it up either by your phone or by a tablet or computer of some sort.

Q   Did you actually -- what I mean by this contact, did you call the defendant or did the defendant call you?

A   I called the defendant.  Sorry about that.

Q   Okay.  And that was on or about 10/24/2016?

A   Yes, sir.

Q   Okay.  To your knowledge, is the Securus video visit recorded?

172

A    Yes, sir.

Q    Have you reviewed that recording since?

A    Yes, sir.

Q    Okay.  And you reviewed that prior to today's hearing?

A    Yes, sir.

Q    Okay.  And that recording, is that an accurate representation of the conversation you had with the defendant?

A    That is the entire contact that I had with him on that day, 10/24.

Q    Then you subsequently provided that to -- or this disk that you had, you've reviewed that disk?

A    Yes, sir.

        MR. KOOP:  Okay.  I'd move for the admission of People's exhibit 2.

        THE COURT:  Mr. Nichols.

        MR. NICHOLS:  Voir dire?

        THE COURT:  Please.

                VOIR DIRE RE: PX 2

BY MR. NICHOLS:

Q    You reviewed the proposed exhibit today, Detective?

A    Yes, sir.  That actual disk right there that he has with him?

Q    Yes.

A    I did not actually view that disk.  I made a couple

173

recordings, and I believe that that is one of the recordings.

Q How did you do this? You got the master of what was captured by the Ingham County Jail and then burned a couple of recordings? Is --

A Correct, sir.

Q Okay. Did you look at the recordings after you made the recordings?

A I'm sorry? Can you repeat that?

Q Sure. After you burned the disk, did you look at the burned two disks, the recording that you made, to check the, first of all, quality?

A Okay. You -- let me get this straight.

THE COURT: How many disks did you make?

THE WITNESS: I don't recall. I think two or three.

THE COURT: Did you watch each one from beginning to end?

THE WITNESS: No, I did not.

BY MR. NICHOLS:

Q Okay. Did you watch any of the recordings that you made at all?

A No, I did not.

Q So when you say it's a fair and accurate representation, that's your assumption based on what you observed as you

174

were making the recording?

A   Can you repeat -- I'm not -- I'm not understanding what you're asking me.  You're asking me did I watch the recordings, and I said no, I did not.  And you're asking me now what again?

Q   The source video that you used --

A   Uh-huh.

Q   -- as you were burning the disks, did you ever look at the source video?

A   Yes.

Q   Okay.  Would you agree that the quality is poor?

A   No.

Q   You think the quality is sufficient?

A   Yes, sir.

Q   To fairly and accurately capture every word exchanged --

A   Yes, sir.

Q   Let me finish.  -- every word exchanged between you and Mr. Uraz?

A   I thought it was good.

Q   Okay.

        MR. NICHOLS:  All right.  No further voir dire.

        THE COURT:  And?

        MR. NICHOLS:  I object.  The recording that I have of the one he wants to play is like mine.  There's a whole big chunk that you can't understand what's being

175

said.

THE COURT:  Yeah, he just told me he's never seen it.  So the objection is sustained.

MR. KOOP:  Well --

THE COURT:  We can certainly take a break and you can watch it.  I don't know how much time it is, but --

MR. KOOP:  It's about a 15 minute recording, so -- well, the --

MR. NICHOLS:  Can I make a suggestion?

THE COURT:  Mr. Nichols.

MR. NICHOLS:  If the witness is here and can remember the conversation, he can testify to it.  I mean, it's a statement against interest.

THE COURT:  I'm not telling anybody what they have to do.

MR. KOOP:  Right.  But I'd also like the disk admitted into evidence as defendant's statement.  The --

THE COURT:  It's tough to be a witness, Detective Mobley.  Just -- just chill --

MR. KOOP:  Well, one of the -- I think one of the issues he's talking, yes, there's a chunk in the very beginning that is muffled, and they're both conversating back and forth that you can't hear anything --

THE COURT:  You can't testify about this video.  What do you want to do?

176

MR. KOOP:  I'm sorry?

THE COURT:  You can't testify about this video. How would you like to proceed?

MR. KOOP:  I'd like to proceed by taking a break so Officer Mobley can review the video.

THE COURT:  Let me know when you're ready.

MR. KOOP:  Thank you.

(At 6:34 p.m., recess)

(At 6:56 p.m., proceedings reconvened; all parties present)

THE COURT:  Returning to 16-2960 FY, People of the State of Michigan versus Tunc Uraz.  Mr. Uraz, Mr. Nichols, Mr. Koop, Detective Mobley, all still in their places.  Mr. Koop.

MR. KOOP:  Thank you, your Honor.

(Court - court recorder conferring)

THE COURT:  All right.  Just in case.  16-2960 FY, returning to the People of the State of Michigan versus Tunc Uraz.  Mr. Uraz, Mr. Nichols, Mr. Koop, Detective Mobley, all in their places.  Detective Koop.  Sorry.  Mr. Koop.

MR. KOOP:  Thank you, your Honor.

THE COURT:  Is that a promotion or demotion?

MR. KOOP:  Yes.

THE COURT:  Mr. Koop, questions for Detective

177

Mobley.

MR. KOOP:  Thank you, your Honor.

CONTINUED DIRECT EXAMINATION

BY MR. KOOP:

Q    Detective, you've had the opportunity to view that jail tape now?  Or, excuse me, that Securus video visit now?

A    Yes, sir.

Q    Okay.  And at the beginning of that audio, is there some static or feedback?

A    Yes, sir.

Q    Now that static or feedback, was that present during your original call with the defendant?

A    In the beginning, sir, yes.

Q    Okay.  So that static or feedback that we hear, you were also hearing at the time --

A    Correct.

Q    -- of making the jail call.

A    Yes, sir.

Q    And that disk that you just watched, does that disk encompass the entirety of your call with the defendant?

A    Yes, it is, sir.

Q    And does that fully and accurately depict that conversation you had with the defendant?

A    Yes, sir.

MR. KOOP:  Move for the admission of People's

178

exhibit 1 (sic).

THE COURT:  Two, is that?

MR. KOOP:  Yes.  People's exhibit 2.

THE COURT:  Mr. Nichols.

MR. NICHOLS:  Voir dire?

THE COURT:  Sure.

VOIR DIRE RE: PX 2

BY MR. NICHOLS:

Q    So we all watched it together, and we hear you say several times into the video that you're having a hard time hearing the other person.  Was that a technique by you to get him to restate something, or were you legitimately having a hard time hearing him?

A    Yes, sir.  It was a technique to get him to repeat something.

MR. NICHOLS:  Okay.  No further voir dire.  I still object as to relevance because at no point in time do they discuss anything other than "taking out trash," and this was the subject of my motion that I filed two weeks ago.

THE COURT:  Mr. Koop, on the relevancy objection.

MR. KOOP:  Well, that's Mr. Nichols' opinion as to what they're talking about.  I think given the cumulative evidence in total, it's the People's position that circumstantially it would show that he's in fact

179

indeed trying to solicit the murder of Erika Melke.

THE COURT:  Okay.  So, Mr. Nichols, I did read your motion.  I haven't seen the video.  How is it you think I can rule on the relevancy on your motion without seeing the video?  Do you think it'd be all right if I watched the video and then rule on your objection?

MR. NICHOLS:  I do.

THE COURT:  All right.  Let's go with that.  Was that your intended next step, to show me the video?

MR. KOOP:  Correct.

THE COURT:  All right.  Perfect timing.  Let's do that.

MR. KOOP:  May I approach, your Honor?

THE COURT:  Please.  Mr. Nichols, you're certainly welcome to approach if you like.

MR. NICHOLS:  Thank you.

THE COURT:  Detective Mobley, you may as well if you'd like.

(At 7:00 p.m., proposed PX 2 played)

THE WITNESS:  (During playback) May I speak?  May I speak?

THE COURT:  (No verbal response)

(At 7:13 p.m., playback ends)

THE COURT:  Go back and have your seats, guys.  Mr. Nichols, objection to the admissibility of exhibit 2 is

180

overruled.  Exhibit 2 is admitted.

(at 7:13 p.m., PX 2 received by the Court)

THE COURT:  Mr. Koop, questions for Detective Mobley.

MR. KOOP:  One second.  Nothing further, your Honor.

THE COURT:  Mr. Nichols, questions for Detective Mobley.

CROSS-EXAMINATION

BY MR. NICHOLS:

Q    Detective, who did you talk to before you made that phone call to Mr. Uraz?

A    Lieutenant Backus.

Q    When?

A    I think it was on 10/18.

Q    October 18th, 2016?

A    Yes, sir.

Q    Conversation with Lieutenant Backus, right?

A    Correct.

Q    And after that, you go make a phone call that we just saw. It's been admitted now as exhibit 2, the copy.

A    No, sir.

Q    Okay.  What's incorrect about that statement?

A    I attempted to make a phone call on 10/18, but the video connection was just horrible.  I didn't even -- my WiFi was

181

messed up, so on that date, I was unable to see him that date. So on 10/24, we tried again and the WiFi was -- on my phone was -- and my laptop was right, and that's when I made contact.

Q   Were you in the same location both days?

A   At our office, yes, sir.

Q   Okay. So what we saw in exhibit 2, you were at the -- you were at your office?

A   Yes, sir.

Q   Where's your office?

A   It's a special operations --

         MR. KOOP: I'm going to object to that, your Honor. It's a special operations section, so --

         THE COURT: All right. So at some place that normal people don't know there's a police department?

         THE WITNESS: Correct, sir.

         THE COURT: So what's the objection?

         MR. KOOP: Well, the objection is one of relevancy --

         THE COURT: Relevancy. Mr. Nichols.

         MR. NICHOLS: Well, I think it's relevant because if he's at a place where he has no intention of carrying out the act, he's at the police department, obviously he's at the police department, he's not going to carry out what he's supposedly being solicited for. I think it's

relevant.  Now, he said he was at his office, which I think we can assume was the Lansing Police Department, and he said special operations.

THE COURT:  No, I don't think it is relevant.  Objection sustained.

BY MR. NICHOLS:

Q   You obviously had no intention of carrying out the act of killing his ex-girlfriend.

A   No, sir.

Q   You made this phone call after your conversation with the lieutenant, as you've testified.  There was an obvious reason, correct?

A   Yes, sir.

Q   What was the reason?

A   For the female's safety.  Also because he had -- we had gotten word -- information that he had asked several other people within the jail, so for her safety.

Q   I don't understand the safety part.  What do you mean?

A   He was trying to hire someone to kill her.

Q   That's the information you had.

A   Yes, sir.

Q   So you needed to call him to confirm that?

A   It's my job and duty to work in an undercover capacity, and if he was trying --

THE COURT:  You guys talk at cross purposes.  I

183

mean, you wanted to document the threat --

THE WITNESS:  Yes, sir.  Correct, sir.

THE COURT:  Mr. Nichols.

BY MR. NICHOLS:

Q    You wanted to document the information that had been relayed to you by your lieutenant.

A    Yes, sir.

Q    Okay.  Did he tell you that they needed to confirm it because they didn't have enough solid information?

A    It always helps, I guess.  It's our job to, once again, is to document criminal activity and --

Q    Okay.  Let's just cut -- you wanted to develop more evidence.

A    Yes, sir.

Q    More evidence than what you had.

A    Yes, sir.

Q    Okay.  More evidence than what you had at the time of the conversation with your lieutenant.

A    Yes, sir.

Q    Okay.  Have you any special training in how to pretend to be a hit man?

A    When you say special training, what are you --

Q    Is there a class that you take on that?

A    I've never taken a class to be a hit man.  No, sir.

Q    On how to pretend to be a hit man.

184

A    No, sir.

Q    You were clearly pretending to be a hit man.

A    Yes, sir.

Q    You used the word "take out the trash."

A    Yes, sir.

Q    Why did you use that word?

A    Because we were being video'd, we were being recorded, and I knew that if I would have started the conversation of me asking him did he want me to kill his girlfriend that he was incarcerated for at that time, I knew he wouldn't talk to me.  So, you know, he had another charge going on with her.  I knew that that would have been plain old stupid for me to say do you want me to kill your girlfriend on a recorded line.

Q    Because he never would have spent one more second with you if you'd said, hey, I'm here to see if you really want to kill her.

A    Correct, sir.

Q    Okay.  You never got more specific though than "trash," right?

A    Correct, sir.

Q    And we hear that in the exchange.  You talk about "two" as in "two per bag," right?

A    I'm sorry?

Q    You talk about money.

185

A    Correct.

Q    And you say, "I usually do two," right?

A    Yeah.

Q    "Two per bag."

A    Yes, sir.

Q    "Two" can mean a lot of things.

A    Correct, sir.

Q    Okay.  And then he says, "Is that everything," right?

A    Correct, sir.

Q    And you say, "No, no, no, no, no, no, no, no."  Right?

A    Correct.

Q    You guys never had a meeting of the minds.  Do you know what that means?

A    No, sir.  Can you elaborate?

Q    Here's what I'm going to do.  Here's the price I'm going to charge you, and you're going to agree to pay me.

A    I thought that's what I was asking him in the recording.

Q    What you asked him.  Right?

A    "Two," and then I said "five hundred" for each additional bag.

Q    And he said, "Is that for everything?"

A    It went something like that, yeah.  Yeah, if I remember correctly.

Q    Have you taken any other steps in investigating this case beyond what you've testified to here today?

186

A    I'm sorry, can you -- when you say any other steps, what do you mean?  Like --

Q    Sure.  Well, you obviously did a report of some sort, correct?

A    Correct.

Q    Okay.  And we know you had one phone call or conversation with the lieutenant before trying to initiate a phone call, correct?

A    Correct.

Q    Then you tried a phone call, then you had the phone call that we just saw, admitted now as the exhibit, correct?

A    Correct.

Q    Okay.  Anything other than that?

A    We attempted again on 10/28 to do a video conference call with him again, with the defendant, and at that time he wouldn't answer the phone.  He wouldn't --

Q    He wouldn't talk to you.

A    No.

            MR. NICHOLS:  Okay.  Nothing further.

            THE COURT:  Mr. Koop.

                    REDIRECT EXAMINATION

BY MR. KOOP:

Q    Following that initial video call on the one we just viewed, did you ever actually connect with him again on a video call?

187

A    10/28, we attempted to.

Q    Did he actually pick up?

A    Is it okay if I can look in my report to refresh my memory?

Q    Would that have been something you included in your previous report?

A    Yes, sir.

Q    Okay.  And if you read that, would that help refresh your memory, sir?

A    Yes, sir.

        MR. KOOP:  May I approach the witness, your Honor?

        THE COURT:  You may.

BY MR. KOOP:

Q    Showing you page 11 of 12 of a police report.  I just want you to read that and look up when you've done -- when you're done.

A    Yes, sir.

Q    Does that help refresh your memory?

A    Yes, sir.

Q    And do you recall when the second contact, video visit with the defendant was made?

A    Yes, sir.

Q    What date was that?

A    I misspoke.  I said it was 10/28, but it was 10/27.

Q    And were you actually able to make a connection through

188

that same video visit system with the defendant?

A    Yes.

Q    And what was the -- please describe that visit for us.

A    The defendant advised me that he could not hear me.  After several seconds, he hung up the phone.

Q    So you actually did make a connection with him?

A    Yes, sir.

Q    Okay.  After that connection, were you ever able -- did you ever attempt again to contact the defendant?

A    Yes, sir.

Q    And did he ever pick up again?

A    No, he did not.

        MR. KOOP:  Nothing further, your Honor.  Thank you.

        THE COURT:  Mr. Nichols, Detective Mobley's memory was refreshed during the course of redirect.  Would that change your cross?  Would you like to ask additional questions?

        MR. NICHOLS:  Briefly.

                    RECROSS-EXAMINATION

BY MR. NICHOLS:

Q    Obviously he said something to the effect on that -- I guess it's the third attempt on the 27th that he couldn't hear you.  Is that what your recollection is?

A    Yes, sir.

189

Q     Were you able to record that at all?

A     There was a recording of that.  Everything is recorded.

Q     Okay.  Do you have that?

A     No, I don't.  I don't have it on me right now, but I can get that for you.

Q     Okay.  Would you, please?

A     (No verbal response)

            THE COURT:  That's an affirmative response?

            THE WITNESS:  Yes, sir.

BY MR. NICHOLS:

Q     Affirmative response.  Okay.  Thank you.  Because obviously saying "I can't hear you" can have some different meanings, right?

A     Yes, sir.

            MR. NICHOLS:  Okay.  Thanks.  Nothing further.

            THE COURT:  All right.  Detective, you can step down.

            THE WITNESS:  Thank you, sir.

            MR. KOOP:  May this witness be excused, your Honor?

            THE COURT: Pardon me?

            MR. KOOP:  May this witness be excused?

            THE COURT:  Mr. Nichols, any objection?

            MR. NICHOLS:  No objection.

            THE COURT:  He may.

(At 7:24 p.m., witness excused)

THE COURT: Mr. Koop, your next witness?

MR. NICHOLS: People rest, your Honor.

THE COURT: Mr. Nichols.

MR. NICHOLS: Your Honor, we have no proofs.

THE COURT: Mr. Koop.

MR. KOOP: Thank you, your Honor. Your Honor, at this time, the People seek to have the defendant bound over as charged; however -- well, let me detract that. I'd actually move to separate in count 1 Reginald Close and/or Frank Mobley, making them separate charges, so that count 1 would read homicide solicitation of murder, did solicit another person, Reginald Close, to commit murder. Count 2, as stated, did solicit Charles Allen to commit murder. And count 3, did solicit another person, Frank Mobley, to commit murder, contrary to statute, and the habitual offender second offense, your Honor.

Your Honor, it's my position, the People's position that the elements of this offense for purposes of preliminary examination have been met. We have the testimony of the both -- Charles Allen, Reginald Close, and Officer Frank Mobley. Both Charles Allen and Reginald Close are unequivocal about the defendant's soliciting through words or actions, offer or promise to give money or services or anything of value to another person being

191

Charles Allen and Reginald Close, and that the defendant intended what he said or did would cause the murder to be committed of Erika Melke. In support of that, we have the witnesses, Charles Allen and Reginald Close, detailing how they in fact had money put on their account or attempts to have money put on their account for the express purpose of a good faith down payment to secure the intentional killing of the victim, Erika Melke. Further, in terms of Officer Mobley, there is an express discussion about payment of funds to "take out the trash." The defendant on that recording you can hear state that he can't give that information over the phone, but he routinely confirmed that he wanted this done. There was discussion of prices, and given the totality of the evidence before your Honor, I believe that there is at least as to Frank Mobley circumstantial evidence to prove that the defendant also intended to solicit Frank Mobley for the -- to commit murder. We'd ask the Court to bind over as charged. Well, as I've previously stated, with the separate charges, your Honor. Thank you.

THE COURT: Mr. Nichols.

MR. NICHOLS: I'm trying to understand the charging theory as it's been proposed. Maybe I didn't keep up with it, but are there now three counts as proposed?

THE COURT: That's what he's moving.

192

MR. NICHOLS: Okay. So one is Close and/or Mobley, one is Allen --

THE COURT: No. One is Close, two is Allen, three is Mobley.

MR. NICHOLS: Okay.

THE COURT: Right, Mr. Koop?

MR. KOOP: Correct, your Honor.

MR. NICHOLS: Well, *People versus Fyda*, 288 Mich App 446, is the case that I found that appears to be one of the more recent cases on a solicitation to commit murder. It requires an actual expressed statement with the intention. *People versus Thousand* is the most recent case that I was able to find on impossibility, and I guess I will say this. With Mr. Allen, I don't think it's reasonable that the proofs demonstrate this man, Mr. Uraz, solicited Mr. Allen to commit the crime of murder of Erika Melke, and I would cite for the Court *People versus King*. The Court's charged with considering defenses as well as credibility of witnesses, and this isn't really a close call. And I also understood the proofs to show that Allen is the one who brings up the issue of harming to the extent of killing with Mr. Uraz. And I think taking everything together, that's probably because Allen and Close had had a conversation prior to Allen's conversation with Uraz. Impossibility, your Honor, is the defense that says either

193

factually or legally the crime that requires specific intent can't have been committed; therefore, the person can't be convicted of it. With Detective Mobley, there's no way the detective is going to commit the crime of murder or any crime. He goes in there to --

THE COURT: The crime is consummated without regard to intent to commit.

MR. NICHOLS: In *People versus Thousand*, the Supreme Court said solicitation -- and this was a C.S.C. -- solicitation to entice a minor to engage in sexual contact is impossible where there was an undercover officer. Obviously not the minor. The crime was impossible to commit.

MR. KOOP: What is that case cite, please?

MR. NICHOLS: 465 Mich 149. I also understand the Supreme Court, to put it charitably, in this opinion somewhat muddied up the impossibility doctrine by analyzing it as a mixed question of impossibility factually and legally. But be that as it may, we've got three individuals, none of whom had any intent or ability to carry out the crime. Impossibility, an example would be hunter shoots deer, charged with shooting a deer out of season or without a license. Deer is a stuffed deer. That crime is impossible. It's a stuffed deer.

THE COURT: All right. I suspect you thought

194

that was helpful, but --

MR. NICHOLS:  It's 7:30.

THE COURT:  No.  It's a stuffed deer.  I mean, what does that have to do with anything?

MR. NICHOLS:  Well, it's specifically one of the --

THE COURT:  Ms. Melke's not stuffed.

MR. NICHOLS:  It's specifically one of the law school hypotheticals of impossibility, and I think *Thousand* even talks about it.

THE COURT:  Well, I do understand the reason that lawyers don't tell me about the law prior to the hearing.  But it doesn't make it easy.  So you've given me four case names, two cites.  It'd be nice, you know, that I could look at those and see what it is you're trying to say.  I mean, the statute -- all right, the cite for *Thousand*?

MR. NICHOLS:  465 Mich 149.  It's a 2001 case.

THE COURT:  465, 149.  All right.  Then at 288 Mich App, you said I'll find?

MR. NICHOLS:  *People versus Fyda.*  F-y-d-a.  That's the case that -- one of the more recent cases that I found that set forth the elements for solicitation.

THE COURT:  Page number?  288 Mich App?

MR. NICHOLS:  451.  The court goes into the analysis on --

195

THE COURT:  What's the cite?

MR. NICHOLS:  The star cite's 451.

MR. KOOP:  The full -- the full -- very beginning of the case.

MR. NICHOLS:  288 Mich App 446.  Star cite 451.

THE COURT:  Okay.  You said the names of two other cases.  What were those, and what do you suggest they purport to show?

MR. NICHOLS:  No, I don't think I did.  I think I just talked about *Fyda* and *Thousand*.

THE COURT:  Okay.

MR. KOOP:  If I could respond to those cases, your Honor.

THE COURT:  All right.

MR. KOOP:  People would have the Court point to *People v Vandelinder*, 192 Mich App 447.  In that case -- pinpoint 450 -- in that case, the court held that solicitation of murder is a specific intent crime that requires proof that the defendant intended to commit the murder or that the murder in fact would be committed.  The court goes on to cite that a solicitation to commit murder occurs when, one, the solicitor purposely seeks to have someone killed and, two, tries to engage someone to do the killing.  The court further states: "Solicitation is completed when the solicitation is made.  A contingency in

the plan may affect whether the victim will be murdered, but it does not change the solicitor's intent that the victim be murdered." And then I'd also point to *People v Salazar*, 140 Mich App 137, pinpoint 143. And that case held that a defendant who attempted to incite an undercover police officer to commit murder could not escape conviction merely because the officer would not actually kill someone.

THE COURT: All right. The name of the last case?

MR. KOOP: *People v Salazar*, 140 Mich App 137, pinpoint 143.

THE COURT: Okay. So, Mr. Nichols, *Salazar's* directly on point?

MR. NICHOLS: Let me look.

(At 7:37 p.m., recess)

(At 7:46 p.m., proceedings reconvened)

THE COURT: Returning to 16-2960 FY, People of the State of Michigan versus Tunc Uraz. Mr. Uraz, Mr. Nichols, Mr. Koop are all still here. I guess I want to clarify one of your arguments. Not only does *Salazar* say it doesn't matter that it's not a cop because he would never do it, but *Fyda*, the case you -- the case you cite is an entrapment case where they never even get to the question that clearly the cop isn't going to commit the murder. So that argument is of no moment. What was your

197

argument as it relates to Mr. Allen?

MR. NICHOLS: The record. I mean, first of all, I thought the testimony was that Allen is the one who broached the subject of the actual act, and, frankly, his credibility, to the extent that he carries the elements of the offense, it's just -- it is manifest. It is beyond bad. And I just -- I don't think he's telling the truth.

THE COURT: Well, okay, he -- you know, when we talked about this at the outset of the case, Mr. Allen's a bad guy. He's got a record and, you know, somebody put on the record he's been in jail 30 times. You know, what kind of people do you think you wander around looking to murder other people? I mean, he's a bad guy. So I don't understand how I'm supposed to look at that character and think, well, that's a bad character. Yeah, he's a bad character.

MR. NICHOLS: It's not his character. It's what his testimony was.

THE COURT: Okay. But what his testimony was is that, you know, that sometime in the beginning or the middle of September they met. He was told the victim's name. First he said Mr. Uraz was sad about the falling apart of the relationship. Then he became angry, held her responsible for his incarceration, eventually wanted to assault or, quote, do more damage, close quote; then kill.

Beat with a baseball bat beyond recognition. He -- I mean, at this point I don't have any reason to believe that the address he gave us was wrong. I don't know, of course, nobody's put any contradictory evidence in there. You know, he knew the story. Again, I don't know that it's true but it's consistent with other witnesses that Mr. Uraz had been looking to get a gun so that he could deal with the boyfriends or ex-boyfriends of the intended victim, offered to pay $2,500.00. So, I mean, yes, I understand that at preliminary examination I have the right to take into consideration the trustworthiness, veracity of a witness, but that standard as I understand it is pretty low. I mean, I have to just conclude that no reasonable juror could possibly believe it. How do you think I make that decision, that no reasonable juror could possibly believe Mr. Allen when his testimony is so consistent with Mr. Close's?

MR. NICHOLS: Because the testimony from Mr. Close, which is one piece of the testimony that is contradictory with Mr. Allen, Mr. Allen says never talked to Mr. Close about this.

THE COURT: He did.

MR. NICHOLS: Mr. Close says, yeah, we talked about it and it was --

THE COURT: He did. He did, but to the extent

199

that Mr. Close is our barometer for veracity, he said he did not tell Mr. Allen any of the details of his conversation with Mr. Uraz.  He just listened.  That's Mr. Close's testimony.  So the fact that they're consistent is still powerful.

MR. NICHOLS:  And I don't have a transcript to say one way or the other, whether I can agree with the Court's assessment or not.

THE COURT:  Uh-huh.

MR. NICHOLS:  I don't.  I do want to address *Salazar*.  And I just read it, your Honor --

THE COURT:  Uh-huh.

MR. NICHOLS:  Agree that it does make a point within the case about just because you're an undercover police officer doesn't mean you can't be enticed to commit a crime, but what's I think more appropriate and I think hurts the prosecutor's argument is pinpoint cite 146: "In the instant case, the evidence simply does not support a conclusion that there would be any immediate action to kill either Neil or Kimmel . . . we find no testimony to indicate that anything had gone even beyond the preparatory stage, in other words, obtaining explosives . ."  And the court talked about the fact that the conversation was the officer went and talked to the defendant who simply confirmed and somewhat equivocated, as I read their framing

200

on the record. And, frankly, what you have here is Detective Mobley calling the jail, initiating the phone call, the conversation. They never had a meeting of the minds.

THE COURT: I disagree. I agree with Detective Mobley's appraisal of that. He said two, two for a first bag of trash, 500 for each bag after that.

MR. NICHOLS: I don't think you ever heard Mr. Uraz say okay.

THE COURT: Oh, I think he did. I think on exhibit 2, he does say okay.

MR. NICHOLS: I don't read it the same way.

THE COURT: Right, and not to mention the fact that a meeting of the minds is not a criminal law concept or required under the statute or any of the case law. The question has to be, you know, did he solicit it and was --

MR. NICHOLS: Did Mr. Uraz solicit it.

THE COURT: Yeah, was he -- yeah, did he through words or action offer to promise -- offers -- sorry. Through words or actions, offered, promised, or gave money, that it was intended that he cause the murder to be committed. So what is the meeting of the minds? It's about making an offer and that when he made the offer he intended to have the murder committed.

MR. NICHOLS: I think you have to consider the

201

fact that here the crime is this person talks to another person, says do this. In exchange for that, there has to be consideration. So the meeting of the minds concepts absolutely are -- are at play in the criminal context, because you have to have --

THE COURT: Show me any case that talks about the consummation of a contract in a criminal context.

MR. NICHOLS: Sure, you have to -- you have to have either -- I think the statute says you either have to give somebody something of value whether you're forgiving a debt or you're --

THE COURT: Yeah, you have to offer something of value.

MR. NICHOLS: -- or offering a payment or forgiving a debt.

THE COURT: Okay.

MR. NICHOLS: And taking the totality of that recording that you have, your Honor, I don't think you can find that the elements stand that Mr. Uraz solicited the undercover detective who initiated the phone call with him. And if the Court disagrees --

THE COURT: I mean, but I don't -- I just don't even understand your argument. I mean, you read *Fyda*, right?

MR. NICHOLS: Yes.

202

THE COURT:  And *Fyda*, the case you cited to me, says that not only did the officer negotiate with the guy, he offered to do it for less.

MR. NICHOLS:  My point --

THE COURT:  He said, I'll do it for a thousand dollars, and the defendant *Fyda* said, no, I'm not paying a thousand dollars.  He said, okay, how about seven hundred. And the court says that's not entrapment.  That's not, you know, untoward.

MR. NICHOLS:  My point is not entrapment.  My point is --

THE COURT:  I understand, but your point was originally when we left the room is he's a cop, he couldn't have done it.  And you cited a case for me where it was a cop.  So how is it I'm supposed to go read that case and come back and say, oh, yeah, the Court of Appeals says a cop couldn't have done it.  *Fyda* is a cop.

MR. NICHOLS:  Well, what I'm attempting to do is respond to the *Salazar* argument, which was, hey, just because he's a cop doesn't mean there can't be enticement. *Salazar* may say that, but there still has to be all of the other elements of the offense shown.

THE COURT:  Which are a promise for money with the intent to commit murder.  Right?

MR. NICHOLS:  Right.

203

THE COURT:  Okay.  All right.  Okay.  So the prosecutor's burden is to show by probable cause two things:  First, the defendant, through words or actions, offered, promised, or gave money, services, or anything of value or forgave or promised to forgive a debt or obligation owed to another person; and, second, that when he did that, the defendant intended that what he said or did would cause murder to be committed.  All right.  So as it relates to the motion of the prosecutor, count number 1, which would be Reginald Close, Mr. Close told us today that he met Mr. Uraz in medical where they were together for approximately two weeks.  They moved to post 5 together.  The defendant mentioned Erika Melke.  The defendant admitted that he had, you know, slashed Erika Melke's tires when she was out of town, that he really was very upset.  He wanted Erika killed.  This was in multiple conversations.  The first of those happened while in medical together, according to Mr. Close.  These conversations were initiated by the defendant.  He -- the defendant asked Mr. Close if he would kill her or did he know someone who would do it, and that Mr. Close said that he did.  He thought he could -- he thought he could get that done.  Exhibit 1 from the People is a dialog back and forth with drawings.  The dialog and the document includes names of people to be killed.  It includes information on

204

the lot where Ms. Melke lives, where she parks, where the garbage can was, which door she usually entered.  He offered $1,000.00 to Mr. Close for arranging the murder of Ms. Melke.  He told him he would put money in his account and then someone did put money in his account.  He believes that amount of money was reduced because he owed some money to the jail, but that money was put into the account and certainly he believed it was by the roommate of the defendant, Mr. Uraz.  The writing that was exhibit 1, Mr. Close explained that that was done because they didn't want to be overheard because everything in the jail is recorded. Many subsequent conversations, and Mr. Uraz never took back or told him to forget that conversation.  As it relates to the elements, an offer of money, in this case there was money paid, certainly money offered, a solid amount.  The down payment made.  And there's certainly enough evidence for a reasonable juror to conclude that at the time that this offer was made and the payment was made, that the defendant, Mr. Uraz, intended what he said and what he did to cause murder to be committed.

Count 2 in the People's motion today as it relates to Mr. Charles Allen -- Mr. Allen testified when we were last together, he finished today -- but his direct examination was December 1st when we were last together that he met Mr. Uraz beginning or the middle of September.

205

He said they met on post 5.  He talked today about the fact that they were together in medical with Mr. Close and some other gentlemen.  Again, as I mentioned in context of the pre-ruling discussion, he said at first he was sad about what the victim had done.  He blamed her for his incarceration.  Then he became angry.  Eventually said he wanted to do more damage, wanted to kill her, wanted to, quote, beat her with a baseball bat beyond recognition, close quote.  Then he said he would pay to get this done, and he wanted it on a videotape or pictures of the -- well, videotape with pictures of the victim's identification to prove that that's what he was paying for, to get proof that the murder had been committed.  He provided Mr. Allen with details about her car and about her address.  Mr. Allen sat there on the stand and, you know, rattled off those details for us.  Again, in terms of consistency with the story of Mr. Close, Mr. Allen told us about the fact that Mr. Uraz had tried to get a gun to deal with the boyfriends or ex-boyfriends of Ms. Melke, and then there was an offer to pay $2,500.00 to kill Ms. Melke, and that Mr. Allen told him that, quote, we'll deal with it, close quote.  Mr. Uraz, according to Mr. Allen, offered to pay half up front, half at the time proof was shown.  Now, Mr. Allen reports that someone tried to put money into his account but there was no way to put money into his account.  I don't -- I don't

206

know what to make of that.  I don't know what a jury will make of that.  You know, the evidence from Mr. Allen clearly suggests that there was a promise to pay money and that the intended effect of that promise was the murder of Ms. Melke.

As it relates to count 3 as moved by the People today concerning Mr. Mobley, the undercover officer, Detective Mobley, the video that's presented as exhibit number 2 is the conversation about taking out the trash. You know, it's a hundred percent circumstantial.  The question isn't do you want to kill anybody, the question is, you know, do you still want that trash taken out.  But, I mean, the conversation can't be understood to be about trash.  It can't be understood to be about Mr. Uraz's home which he first says I won't tell you that over this -- over the telephone, and then says I don't even know the -- I don't even know that address, I don't know what you're talking about.  The conversation makes zero sense in any other context than the context of this case.  So as it relates to circumstantial evidence, a reasonable jury -- a reasonable juror certainly could conclude that it is evidence of Mr. Uraz soliciting the murder of Ms. Melke. There is an offer to pay money.  Again, the evidence speaks for itself, but when Detective Mobley tries to nail that down to two for the first bag and 50 -- 500 for each bag

207

after that, you know, there is an affirmative response. You know, I think that there is more -- you know, there -- well, let me rephrase that.  I think there is definitely a reasonable doubt about what that conversation means.  You know, that is not proof beyond a reasonable doubt.  I wish the prosecution good luck as it relates to that individual claim.  However, *People versus Hudson*, 241 Mich App 268, tells us:  "If evidence introduced at preliminary examination conflicts or raises a reasonable doubt about the defendant's guilt, a magistrate must let the factfinder at trial resolve those questions of fact.  This requires binding the defendant over for trial."  So the fact that I think there's more than a reasonable doubt about the solicitation of Detective Mobley does not mean that part stops here.

For all these reasons, I find that there are three counts of alleged conduct that alleges conduct outside the jurisdiction of the district court, offenses not cognizable by the district court.  Therefore this matter is bound over to circuit court for further proceedings on the charges as amended.  Mr. Koop, anything additional?

MR. KOOP:  No, your Honor, thank you.

THE COURT:  Mr. Nichols.

MR. NICHOLS:  Your Honor, I was not arguing

208

entrapment.  I just want my --

THE COURT:  I know you weren't.

MR. NICHOLS:  Okay.  I cited *Fyda* for the elements.

THE COURT:  Yes, but the point is that *Fyda* is about a cop and the fact that the Court of Appeals never even thought to mention impossibility suggests that it wasn't an issue.

MR. NICHOLS:  Right, your Honor.  *Thousand* was the case I raised for impossibility.  And maybe it's the late hour, but I think the Court and I just did not connect.

THE COURT:  Yeah.  I mean, what I'm saying is that -- what I'm saying is that the case is about a cop undercover soliciting, and the court never suggests that that's a problem in any way.  You know, I mean, you take that in combination with *Salazar* and I think it's pretty hard to conclude that the Court of Appeals thinks that a police officer cannot serve in an undercover capacity and that testimony be used to support the conviction for solicitation of murder.

MR. NICHOLS:  Your Honor, I would also ask for the Court to consider allowing a modification of the bond so Mr. Uraz can have some communication with his son.

THE COURT:  Mr. Koop.

209

MR. KOOP:  I haven't listened to the calls personally, but Mr. Krumbach has listened to some of the calls, and when he's speaking with his son, he does speak in English, and he's encouraging the son to -- correct me if I'm wrong, Detective -- that giving the son other information to talk to other people.  So it is not this bonding of a father-son --

THE COURT:  So let me make sure I understand. You said he does speak in English?

MR. KOOP:  Yes.

THE COURT:  Okay.

MR. KOOP:  To the son.

THE COURT:  Okay.  But he's obviously not soliciting murder through the son.

MR. KOOP:  But he is soliciting the son to contact other people for the defendant, and that's a problem as I see it for, you know, reasons we don't know. So it is being represented he just wants to talk to his son, father to son, talk about school, talk about life, but in practice he has been talking to the son to talk to other people.

THE COURT:  Okay.

MR. KOOP:  So that's a --

THE COURT:  But to convey what to other people, Detective?

210

MR. KRUMBACH:  To set up meetings.  Make sure he calls me, make sure he makes contact with people.  Just repeatedly drilling into this boy, don't forget, this person needs to contact me, call me, speak to me.  The young boy is just, okay, Dad.  I have no idea why he's doing that, but in the context of what I've learned so far, it's concerning.

MR. NICHOLS:  I haven't seen or heard any of these recorded phone calls that obviously were before the Court imposed a no contact order.  I mean, it had to be.  I just don't know.  I mean, if it's have this person contact me, that can mean so many different things, and we've just had about a day's worth of testimony on context.  I think we can achieve the purposes of pretrial release conditions or bond conditions without precluding the accused citizen from having any contact with his -- I believe he's twelve - eleven-year-old son.

THE COURT:  Circuit court arraignment is scheduled for the 20th day of December.  The Court acknowledges written receipt of waiver of circuit court arraignment signed both by Mr. Uraz and Mr. Nichols.  Mr. Koop.

MR. KOOP: The other witness, there's some -- there's been some testimony of Burak Atamer, that this is the individual that put money on the account of one of the

211

witnesses that testified.  The detective tried to make contact with him.  He -- that witness has since left the country.  So there is a concern.  I don't know why Burak left the country.  I don't know if he had prior travel plans that just happened to coincide with this case, but he leaves the country after the detective tries to make contact with him on this case.  So there is a similar concern that I don't know if Mr. Uraz's son speaks Turkish at all, but there is a cost involved that's just monitoring these.  If he is speaking Turkish, there's a cost involved in having to translate that.  At this point in the proceedings, given the evidence that's now been presented to the Court, the People would urge the Court to keep the conditions as they currently are in place.

THE COURT:  Yeah, I guess I'm just going to state for the record, people in the United States come from all over the world and speak all kinds of incredible, great languages --

MR. KOOP:  Sure.

THE COURT:  -- and we're just kind of all stuck with that.  So the fact that it might cost this extra money is something I will not consider in any way.  I would, if the case stuck with me, watch the videos and make a determination about what's going on and what this communication with the son is designed for.  But it's not

212

going to stay with me that long.  I mean, as soon as we walk -- that clock turns off this time, it belongs to a circuit court judge, and absent having that experience, I'm not going to change the bond conditions.  We can leave that to the circuit court.  Anything else, Mr. Nichols?

MR. NICHOLS:  No.

THE COURT:  Have a good day.

MR. KOOP:  Thank you, your Honor.

(At 8:13 p.m., proceedings concluded)

STATE OF MICHIGAN)

COUNTY OF INGHAM )

I certify that this transcript, consisting of 154 pages, is a complete, true, and correct transcript of the 2nd session of the preliminary examination proceedings and testimony taken in this case on Tuesday, December 13, 2016.

Date: January 13, 2017

Elaine D. Stocking CER 0703
55th District Court
700 Buhl Avenue
Mason, Michigan 48854
(517) 676-8414

213