STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

                    Plaintiff,

vs.                        CASE NO:  16-1064-FH
                                     16-1065-FC

TUNC URAZ,

                    Defendant.
_____/

        HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
     LANSING, MICHIGAN -- TUESDAY, JANUARY 31, 2017

                    PRETRIAL/BOND MOTION

APPEARANCES:

FOR THE PEOPLE:

WILLIAM O. CRINO, JD
CHAZ T. KOOP, JD
Assistant Prosecuting Attorney
Prosecuting Attorney's Office
313 W. Kalamazoo
Grady Porter Building
Lansing, Michigan 48933


FOR THE DEFENDANT:

JACOB PERRONE, JD
Perrone Law, PC
221 W. Lake Lansing Road, Ste. 200
East Lansing, MI 48823

MICHAEL J. NICHOLS
3452 E. Lake Lansing Road
East Lansing, MI 48823



Reported by:  Teresa J. Abraham, CSR-3445
Phone:  (517)483-6404   e-Mail: tjabraham@msn.com



WITNESSES:

None.

EXHIBITS:

Exhibit #    Description    Received

None.

Lansing, Michigan

January 31, 2017

at about 8:39 a.m.

\*\*\*\*\*\*\*\*\*

MR. KOOP:  People v Tunc Uraz, 16-1064-FH, aggravated stalking case Mr. Perrone is on. 16-1065-FC, solicitation of murder Mr. Nichols is on.  May I approach?

THE COURT:  Yes.

(Counsel hands the Court a form.)

THE COURT:  We have, in the two files, as called by Mr. Koop.  May I have appearances on behalf of Mr. Uraz?

MR. NICHOLS:  Michael J. Nichols on behalf of Mr. Uraz on solicitation to commit murder.

THE COURT:  You are on one file, 1065?

MR. NICHOLS:  Yes.

THE COURT:  Mr. Nichols?  And on file 1064?

MR. PERRONE:  Jacob Perrone on behalf of Mr. Uraz on that file, Your Honor.

THE COURT:  Okay.  You are Tunc Uraz, sir?

THE DEFENDANT:  Yes, sir, Your Honor.

THE COURT:  File 16-1064.  I have been handed a pretrial statement that advises you are charged with aggravated stalking as an habitual

second.  The Prosecution indicates that they will file an amended witness list prior to trial.

Copies of reports have been provided There is no intent to use copies of confession, or intent to use 609 specific crimes.  There may be 404(B), similar acts, where they would try to show that some act that you may have done were consistent with, even though they did not result in being any charges issued.  That's known as 404(B).  They have to file a motion on that.  It's not automatic.  They have to file a motion.  The Court decides whether it's relevant or prejudicial.  Understand?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Physical exhibits are available for inspection.  The Prosecution has made an offer in, I guess it applies to both cases, both 1064 and 1065.  Mr. Koop?

MR. KOOP:  Thank you, Your Honor.  It is a package offer in those files where the Defendant would plead guilty to one count of solicitation of murder in 16-1065-FC.  In exchange, the People would dismiss the count not pled to, in full, as well as dismiss the habitual offender notice in that file in full.

Further, the People would also dismiss, in file number 16-1064-FH, which is the aggravated stalking case.

THE COURT: Okay. Mr. Perrone, in 1064 has requested a jury trial. Any competency or criminal responsibility issues, Mr. Perrone?

MR. PERRONE: Not at this time, Your Honor.

THE COURT: Any special defenses that you are aware of?

MR. PERRONE: No, Your Honor.

THE COURT: And there may be a motion to sever from 16-1065?

MR. PERRONE: Yes, Your Honor.

THE COURT: Turning our attention, then, to 16-1065. Mr. Nichols and Mr. Uraz, I have been handed a pretrial statement that says you are charged with three counts of solicitation of murder. Also, habitual 2nd. The People have indicated they will file an amended witness list. Copies of reports have been provided. No confessions, no intent to use 609, specific crimes.

But there may be similar acts, as I stated, in 16-1064 under 404(B).

Physical exhibits are available. The plea

offer remains the same.  Plead guilty to one count of solicitation of murder in exchange for dismissal of the balance of the information, and dismiss 16-1064.

Mr. Nichols has requested a jury trial.

Any competency or criminal responsibility issues, Mr. Nichols?

MR. NICHOLS:  Not at this time.

THE COURT:  Any special defenses you are aware of?

MR. NICHOLS:  No, I don't believe so.

THE COURT:  Also, a request that there will be a sever of this case 1065 from 1064.

A plea offer, Mr. Nichols, you made a proposed plea offer?

MR. NICHOLS:  One count of solicitation to commit a felony greater than five years.  Dismiss the balance habitual, as well as the companion case that Mr. Perrone has.

THE COURT:  So what's the greater than five years?

MR. NICHOLS:  What's the maximum penalty on that?

THE COURT:  Yeah.  You're asking -- you're saying that's what the sentence should be?

MR. NICHOLS:  No.  There's a specific solicitation to commit felony greater than five years, punishable by a penalty of greater than five years and a solicitation to commit a felony less than that.

THE COURT:  I'm not familiar with the differentiation.  Mr. Koop, have you got any information on that for me?

MR. KOOP:  Understanding what he just said, if it's felony of solicitation punishable five years or more, then the penalty is five years and/or $5,000.  If it's a felony solicited by less than five years, then that becomes a misdemeanor, two years and/or $1,000.

THE COURT:  Okay.  All right.  You're also asking for the severance of the counts in addition to the severance of the filings?

MR. NICHOLS:  That is correct.  I don't know if I put it on the form, Your Honor.  I spoke with staff about getting a hearing the 28th of February at two p.m. --

THE COURT:  Okay.

MR. NICHOLS:  -- should we not have this matter resolved.

THE COURT:  All right.  So I am going to

sign the pretrial statement in both matters. All right. So we will set this for final pretrial on Wednesday, March 1 at 10. That will be on both 1064 and 1065.

MR. NICHOLS: Your Honor, I'm supposed to be in a jury trial in Muskegon on March 1st.

THE COURT: It's not going to go. They tell me you're kind of lengthy. It's going to be March 8th, then, on both files at 10. It's a Wednesday, not a Tuesday.

Mr. Uraz, you need to be made aware, on both files, that it's the Court's policy that I will not accept any pleas to reduced charges after the final pretrial. Although no proposed reduced charges have been offered by the Prosecution at this time.

I also would not participate in any sentence bargaining on either file after March 8th. That could be in one of two ways. Mr. Perrone, Mr. Nichols could ask me what I was likely to sentence you to if you entered a plea to some charge. So you would have some idea what I was thinking in advance known as a Cobb's agreement.

Or the Prosecution can make a

recommendation as to what he felt the sentence should be. That's known as a Killebrew agreement. I would only participate in one or either or both. It's possible you could have both at the same time up through the end of that final pretrial conference on March 8th at 10.

Okay. Any questions?

THE DEFENDANT: No.

THE COURT: All right. You guys have motions?

MR. NICHOLS: Yes.

THE COURT: All right.

MR. NICHOLS: Your Honor, I filed a bond motion and brief. Mr. Koop responded on behalf of the People. Also, there is a report and recommendation from this Court's Pretrial services staff that I reviewed this afternoon.

I would also like to note, Your Honor, present in the courtroom, is Ilker, I-L-K-E-R, Pak, P-A-K, who is the Consulate General for the Turkish Republic in Chicago, as well as a friend of my client's -- a gentleman named of Saad Wahidi(sp). He is a member of the Lansing community.

One additional piece of information. We

are working on an address for Mr. Uraz to bond out to, because 1250 Haslett Road, number 10 is just not going to work as an address for him at this point in time.

We are working on a gentleman who owns a building. It's a multi-unit residential address converted to a multi-unit apartment at 304, South Magnolia. And a gentleman named Dillon. And Mr. Uraz sort of managed this property and put renters in there and kept an eye on it for him. Mr. Wahidi(sp) is going to try to get ahold of Dillon. He knows him, thinks he has his e-mail address to make sure there's an open room right now for Mr. Uraz to bond out to.

Another point I want to make, is everybody among us who have been working with Mr. Uraz noticed that since he has been in jail, has not been able to contact his 12 year old son especially. It seems to really have a negative impact on his mental state. And, I mean, there is a lot of depression that might be episodic. He doesn't have contact with his son, frankly, his sister, or his somewhat of his estranged wife, who is in Turkey.

So I'm asking the Court, if the Court

doesn't see fit to impose a bond, that Mr. Uraz can pose to give him an opportunity to have some degree of contact.  I understand the concerns that have been expressed by the Prosecutor.  I know a little bit about that history.  I get it.  In terms of a solution to protect the concerns that the Prosecutor has of any ability, Mr. Uraz has not only to contact the alleged victim directly or indirectly, to have some contact or do something bad as it relates to, who knows, monitoring the calls.

I saw Mr. Koop made an argument, well, it's expensive for us to translate those calls to make sure nothing was being said in Turkish, that we need to respond to or monitor, asserted a price to translated some transcripts.  If he has even a call a week for 15 minutes, I can't imagine the cost that would be incurred far outweighs the ability of the guy to have contact with his 12 year old son.

THE COURT:  But the issue is, on his other case, we had to put him back in because he violated the bond by continuing to stalk this young lady.  And there he had phone calls before these charges came up even where pretty much the

same argument was made, that he had learned his lesson, he wouldn't be contacting, that's before these alleged charges.

And he then still was using the telephone and was cited for that. I don't think we, you know, gave him any additional time or anything for that. He was cited sort of like an informal show cause when he came back saying, Mr. Uraz, you're still talking to this lady. That's part of it. I don't think we can accept his assertions, I mean, that he is not going to do anything, because all these alleged charges arose well after that timeframe. And I don't know how we can monitor it.

I think I did get a letter from the Consulate talking about a Skype. I don't think the jail is set up for Skype. The main thing is no one would be able to know what he was saying or what he wanted to do if he was going to speak in Turkish.

THE DEFENDANT: I -- I --

THE COURT: That's a concern, based on the number of times. Well, we know for a fact he used the phone on some occasions. These are just allegations that he apparently was attempting to

use a phone soliciting some people for things. We know prior to this he was using the phone because we had recorded conversations. It's -- I don't know how we can do that. I don't know how we could trust what the interpreter was going to say. We would have to have an independent interpreter, somebody would have to pay for it.

MR. NICHOLS: The Court has choices that are between bad and worse. And Mr. Uraz understands his part in that.

One suggestion I'm making is he can only have contact with the sister who cares for the son part-time as well as us.

THE COURT: No way for us to verify that. It's virtually impossible for us to verify that. Suppose someone on the other end says I'm the sister. How are we going to be able to verify?

MR. NICHOLS: You mean the video visits, Your Honor?

THE COURT: I don't think video equipment is available for video visits. Can they do that? Will they do that?

MR. KOOP: One of his charges stems from a video visit.

MR. NICHOLS: It's a video conferencing.

kind of, as I understand it, kind of is like Skype. I'm not that technologically savvy.

THE COURT: I don't know how that could be worked out, because we -- I think the Prosecutor would be entitled to an independent interpreter. Someone has to pay for it.

MR. NICHOLS: I think that's what --

THE COURT: Maybe if Mr. Uraz was going to pay for the independent interpreter, then, you know, we would do something. I think the Prosecution is entitled to have an independent interpreter rather than one of Mr. Uraz' choices.

Yes, Mr. Uraz?

THE DEFENDANT: If I can just speak English? I talk to my son in English anyways. He doesn't interpret Turkish. I only speak to him in English anyways, if that makes a difference. My family speaks English anyways. It doesn't matter

THE COURT: That's a possibility. But you made representations to me before that just didn't turn out to be accurate. I mean, so you get on the video, you start talking in English, then all of a sudden you switch to Turkish. What are we going to do? I guess the person can stop the interview. I'm just saying, you made

representations to me before, they didn't turn out to be accurate, leaving this woman alone. That's what I am going to talk about. You made those to me. You asked me to give you a chance. I did. I worked with you. I put in for you a little while. I let you back out. I tried to work with you. That's the problem I have.

MR. PERRONE: I think Mr. Uraz would be willing, if he switches from English to Turkish, to pay for the Prosecutor to have to be able to have an independent translation, who the Prosecutor chooses to be assured that.

THE COURT: That's an awful lot. I think that -- I don't know if we can rely on Mr. Uraz' representations. That's what I am saying, based on his history.

MR. NICHOLS: I get that. I'm not only concerned for my client's own well-being, but his 12 year old son. These two have not had contact, as I understand it, since the order was imposed, cutting him off from all outside contact, except for Judge Boyd's bond modification. He can talk to his lawyers and he can talk to the Counsulate General, or anybody from the Consulate's office. I see the effect it has on Mr. Uraz, Senior. I

only wonder what effect it has on the 12-year-old. We all understand, I think Mr. Uraz does, too, the Court's in the dilemma that the Court is on. It's his doing. It's his prior representations which he appears to have not practiced what he was preaching. But I really want to find a solution. I know the Court said that somehow makes the Prosecutor whole if they have to pay for an independent translator. If Mr. Uraz is willing to do that, if he can show that he can do that, that's the other part of the concern. You let me down once, shame on you. You let me down twice, shame on me. If he can verify he has those funds, maybe that can alleviate that concern.

THE COURT:  Mr. Perrone?

MR. PERRONE:  Your Honor, at this point I am piggy-backing on Mr. Nichols' motion. He has the capital offense. I can only emphasize Mr. Uraz is 41 years old. He previously worked as an adjunct professor at the community college. The offense of him not following through on his word, it appears he lost his job prior to that. There is some significant situational issues associated with the prior case. Isolation has a way of changing the thought process. It's having

a significant impact at this point in time on Mr. Uraz. Again, communication with his 12-year-old son, at a minimum, I believe. If we can accommodate that, that that would be appropriate.

THE COURT: Mr. Koop?

MR. KOOP: Thank you, Your Honor. I appreciate the desire for the Defendant to want to have contact with his son. But I just don't trust it. He has had bond violations. He has had court orders not to use the telephone. Then we have jail recordings of him a day later for the next month using the telephone. And then when that gets shut down, in that same time period, he is using a video visit to assist people as soliciting murder of the victim of the aggravated stalking. And the person he is soliciting is an unknown person. He doesn't know him.

So to trust the Defendant that he's going to do the right thing here, and only speak in English, or only talk to his son about the son's well-being or how the son is doing, I have zero faith in it. After there has been representations that he hasn't been able to talk with his son or communicate with his son since

back in October, yet at the same time from October through January 1 of 2017 he is sending numerous letters to a female in the East Lansing area. She is not involved in this case at all.

So he has methods and means to communicate with his son via sending a letter. But instead he uses those methods and means to contact a female. So he has means at his disposal. I don't think he has shown anything that encourages or provides comfort that he's going to abide by court orders. He picked up these most recent charges while he was in jail. I think the limiting of his privileges while he is confined is appropriate. And it's not a punishment, but it's in direct response to what the Defendant's done while he has been incarcerated.

For those reasons, I would ask the Court to deny the Defendant's motion to the extent that the Court deems appropriate.

THE COURT: Weren't there allegations that he attempted to contact the victim's relatives or something. Is that the issue in this case? I can't recall.

MR. KOOP: He has sent a letter to the victim's mother while the aggravated stalking case

is pending.

THE COURT: Okay.

MR. KOOP: But that was not part of --

MR. NICHOLS: This one is pending now.

MR. KOOP: I think at the time that he was serving the sentence, was uncompleted. But the mother at the time was not part of the no-contact order.

THE COURT: But it's the mother of the victim?

MR. KOOP: Correct.

THE COURT: All right. Anything else from anybody?

MR. NICHOLS: On behalf of Mr. Uraz, two additional things. The letter is to a female. If I understood the argument, it's not like Mr. Uraz was writing his son saying send these letters to this person, that woman, whomever.

THE COURT: I didn't take it that. I took it to me that he could write letters to his son if he so desired. Apparently he hasn't done so.

MR. NICHOLS: He has. He sent letters to his son. I am emailing messages after I meet with him to the son and the sister. But I'm disconnected from those individuals. I can't be

in loco parentis.  I mean, I think we get to the point, and certainly in our motion in brief, that bond is not supposed to be punishment.  I understand the safety components.  I think there are other ways around it, as we have just discussed.

I also included in my request, if he can't get out, psychologist, Doctor Schau(sp) is to see him at the jail.  He could get in Friday afternoons.  I understand this gentleman has seen other inmates at the jail.  I think having that component of going forward with the bond condition is imperative for the good of the community as well as Mr. Uraz, getting him some treatment based on what I have seen so far.

Beyond that, one small thing.  Mr. Pak from the Consulate General brought some paper back to us.  Obviously neither or nor Mr. Perrone can get to him.  I don't know if he is seeing him here or driving down to the jail.  I don't know if the Court has any control over that.

THE COURT:  You can order him to be seen at the jail.  He's a representative of his government.  I have authority to do that.  I don't have any authority over here, though.  Or that the

representative of Mr. Uraz' government, he can talk to him at the jail. Anything else?

In this matter, it's not a punishment that the Court has taken any action. It's a matter of seeking to protect the victim in this matter. It started off as a straight stalking case. Mr. Uraz was on bond and continued to contact the victim. And now we took some action, but we really didn't take his bond. I think we put him in jail for a little while so we could get a message to leave her alone. He had an aggravated stalking involving the same victim. They have it continued to escalate where he now has been charged for solicitation of murder.

So I think it's really a protection of the victim that the Court is taking the actions that it has. He hasn't been convicted. But I think that on his prior case we bent over backwards to assist him. I need some job hearings. I think he was employed at Michigan State University. We tried to work with him on that. But the victim is actually sort of terrified.

There was some reference, I think, in maybe the preliminary examination transcript, there were other actions that Mr. Uraz had taken

that are not charged conduct, such as following her to a concert, things like that, that he's not charged. But I think it's relevant for the consideration of a bond motion.

So here we have a charge of solicitation of murder, which is a case that the Court is not required, necessarily, to grant bond. I don't necessarily have to go through the normal factors.

But in looking at those factors, he has a prior record on this case. And now he has three solicitation charges. He has always appeared. I will give him credit for that. He has a history of drug or alcohol abuse.

His mental condition, I don't know, they are asking for a psychological evaluation, which I don't have any issue with, primarily, the seriousness of the case in the charges that he has.

Likelihood of conviction, three counts of solicitation for murder pending aggravated stalking case, all involving the same victim. Apparently I believe the employment history, he lost his job, I think, partly as a result of whatever was happening here. And that he doesn't

have any family here.  He previously requested to go to Turkey.  Frankly, I didn't believe he would return from Turkey.  I would not allow him to go to Turkey from the pendency of the other case.

I'm a little concerned in the Consulate's letter saying he could serve his time in Turkey if he wanted to, if he could make a request on that.  I don't know how much cooperation we would really get from the Turkish Embassy if he were allowed to be released and returned to Turkey.

I don't know of any reason for me to believe he would stay here in the United States, based on the seriousness of these charges if they continued to escalate.  Again, it's not punishment, it's the protection of the victim.  Mr. Uraz has demonstrated he could not comply with the terms of, any reasonable terms of the release.  I will deny the motion and continue to hold Mr. Uraz without bond.  I have no objections to the doctor who --

MR. NICHOLS:  Schaer.  S-C-H-A-E-R.

THE COURT:  Doctor Schaer being allowed access to Mr. Uraz for purposes of evaluation and assessment.  I have no objections that we have an order.  What's the representative Consulate?

MR. NICHOLS:  Ilker, Pak, P-A-K.

THE COURT:  I have no objections to an order stating that he's authorized to visit Mr. Uraz at the jail, as a member of the Turkish Consulate in this matter.  And Mr. Uraz being a dual citizen, I believe, in Turkey.  His son is living there in Turkey as well.  Didn't mention anything about whether he wants access to newspapers.

MR. NICHOLS:  I received communication.  I have been trying to figure this out with the jail.  If I understand it correctly, he can get newspapers for some research.  Somebody got him a subscription.  It just didn't get to him.

THE COURT:  All right.

MR. NICHOLS:  But that's okay, Your Honor?

THE COURT:  I'm concerned about that.  I really am.  I can't remember.  When was the last time you were in Turkey to see your son?  It was quite some time ago, wasn't it?

THE DEFENDANT:  It was last year, March.

THE COURT:  March of 2016?

THE DEFENDANT:  Yes.

THE COURT:  All right.  So I will allow one phone call per week, 15 minutes.  Not to exceed 15

minutes, or video, however they work it. That all communication has to be in English. I don't know if your sister speaks English or not. All communication will be in English. If English is not used, the conference is to be terminated immediately. If there is conversations that are in Turkish or some other language, that Mr. Uraz would be responsible for paying the Prosecution to have an independent interpreter, if that should happen.

I don't know. Do you have money to pay for an interpreter, Mr. Uraz?

THE DEFENDANT: Yes, I do.

THE COURT: Mr. Koop?

MR. KOOP: Just to be clear --

MR. NICHOLS: He has funds in a trust account with our office. I mean, if it becomes necessary with proper channels followed, I can disclose what that is.

THE COURT: All right.

MR. KOOP: Just to be clear, to be in English, I don't want this to disintegrate into all of a sudden we are only getting communication in Turkish and now we are at a disadvantage where we have to come back to court. If I understand

the Court's order correctly, they are to be in English. If for whatever reason to they turn into Turkish --

THE COURT: Terminate immediately.

MR. KOOP: -- terminate.

THE COURT: But if there is still some -- I was thinking in terms of, by the time they terminate, there might be something, you would have to have that reviewed.

MR. KOOP: Correct. I just didn't want to -- I wanted to make sure it's understood, if he talks in Turkish, that that would be a violation of the order.

THE COURT: Supposed to be in English only, Mr. Uraz.

THE DEFENDANT: Yes.

THE COURT: Something else, Mr. Nichols?

MR. NICHOLS: Want me to prepare an order?

THE COURT: You will need to prepare an order. All right?

MR. NICHOLS: And it is okay for him to receive newspapers?

THE COURT: Yeah. I don't have any issue with that.

MR. NICHOLS: Okay. Apparently you can get

a Securus tablet at the jail.

THE COURT:  I'm not authorizing any tablets, all right?

MR. NICHOLS:  Thank you, Your Honor.

THE DEFENDANT:  Thank you.

(Proceedings concluded at 3:28 p.m.)

STATE OF MICHIGAN          )
COUNTY OF INGHAM           )

I, TERESA J. ABRAHAM, Certified Shorthand Reporter in and for the County of

Ingham, State of Michigan, Thirtieth Judicial Circuit Court, do hereby certify that the facts stated in the foregoing pages are true and correct, and comprise a complete, true and correct transcript of the proceedings taken in this matter on this the 31st day of January, 2017.

_____
Teresa I. Abraham, CSR-3445

Date:   June 19, 2018