STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff,

vs                                          CASE NO.    16-1064-FH
                                                        16-1065-FC

TONG URAS,

Defendant

_____/

HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
LANSING, MICHIGAN -- TUESDAY, MAY 2, 2017

AMENDED
PRETRIAL

APPEARANCES:

FOR THE PEOPLE:

CHAZ T. KOOP, JD
Assistant Prosecuting Attorney
Prosecuting Attorney's Office
313 W. Kalamazoo
Grady Porter Building
Lansing, Michigan 48933


FOR THE DEFENDANT:

JACOB PERRONE, JD
Perrone Law, PC
221 W. Lake Lansing Road, Ste. 200
East Lansing, MI 48823

ERIC SCHROEDER, JD
GODWIN & ASSOCIATES PC
2970 E. Lake Lansing Rd.
East Lansing, MI 48823-7619


Reported by:  Teresa J. Abraham, CSR-3445
Phone:  (517) 483-6404    e-Mail: tjabraham@msn.com

I N D E X

WITNESSES

HALIME URAZ

Direct Examination by Mr. Perrone
Cross-Examination by Mr. Koop

EXHIBITS

Exhibit #    Description    Received

None.

Lansing, Michigan

May 2, 2017

at about 2:44 a.m.

\*\*\*\*\*\*\*\*

THE COURT:  This is the time set for pretrial on behalf of Mr. Uraz.  Mr. Koop is here, Mr. Perrone.  On file 16-1064-FH and 16-1065-FC. And you are Tunc Uraz, sir?

THE DEFENDANT:  Uraz, yes.

THE COURT:  What are we doing today, Mr. Perrone?

MR. PERRONE:  I have a pretrial order for Your Honor.

THE COURT:  These are final pretrials, right?

MR. PERRONE:  Due to the fact that I was appointed at the last final pretrial —

THE COURT:  And he adjourned to this time. He's not going to kick it to the road.

So this is the final pretrial from me. That's why I adjourned it.  You've been with the case throughout, even though you may not have been with this portion of the case.  But you were here at every proceeding.  Mr. Nichols was here with every discussion.  So I won't be setting it

op for another pretrial.

MR. PERRONE: That's correct, Your Honor. I got the file from Mr. Nichols. It is about a foot tall, as far as reviewing.

THE COURT: I'm not going to give another final pretrial. We can set it for trial today and my final pretrial policy will be in effect.

MR. PERRONE: I have a number of motions that are necessitated based upon my review of the file.

THE COURT: You still can file the motions, but today is the final pretrial. I'm not prohibiting you from filing motions. I won't accept any pleas to reduced charges after today. That's where we stand.

MR. PERRONE: I have spoken with Mr. Oraz and he -- the nature of this being the final pretrial, I have conveyed the plea offer to him, and at this point in time it is his intention to exercise his right to trial.

THE COURT: Okay. For the record, why don't we just have Mr. Koop indicate what the final offer by the Prosecution is.

MR. KOOP: Well, it's a final offer in the solicitation of murder case, 16-1065-FC. The

Defendant would plead guilty to one count of solicitation of murder, with a Killebrew sentence agreement that the Defendant be scored at an A grid cell, C-3, which places him at an 81 to 135 months

In exchange, the People would dismiss the balance of the Information, as well as the -- dismiss file 16-1364-FN, which is the aggravated stalking case. That is the extent of the agreement at trial.

On a conservative estimate, I have him at 135 to 281 months. But it could very well be higher, depending on how the OVs are scored.

THE COURT: So, Mr. Uras, what we have here is there really is no offer of a plea to a reduced charge today. You are charged with several counts of solicitation of murder. So there are no reduced charges. But more importantly to you, there is a Killebrew proposal by the Prosecution that would have your guidelines be 81 to 135 months on the A grid, and a C-3 cell as part of the plea.

Now, without the Killebrew agreement Mr. Koop, would you tell us what his guidelines would be again?

MR. KOOP:  Conservatively, 135 months to 281 months.  But I think it very well could be higher, depending on OVs.

THE COURT:  There is no plea to reduced charges, no reduced charges offered.  That's really not the issue.  The issue is the sentence bargaining.  So I would not participate in any sentence bargaining after today.  So that means you would be at the low end of the guidelines, 135 to 200 some odd months.  Versus if you accept this plea offer, you would have a guideline of 81 to 135.

I've already told Mr. Nichols I would probably be inclined to go to the low end of the guidelines.  Probably will be 81.  I think we had that discussion before.  At least I had that discussion with the attorneys.  That's where we are.

So today is the day, if you're going accept the plea or not.  After today we will go to trial.  I will not participate in any sentence bargaining after today.

THE DEFENDANT:  I understand.  I would like to go trial, Your Honor.

THE COURT:  All right.  I have been handed

this pretrial statement. You're charged with solicitation of murder, three counts as an habitual second. The People will file a witness list prior to trial.

Copies of reports have been provided. No copies of confessions or intent to use 609, similar acts. The Prosecution probably will attempt to introduce similar acts. They have to file a motion to do that, set forth what these acts might be. In this case it could be the prior conviction of stalking and soliciting information, as to whether or not that's relevant or not to this case. I would have to make that decision. You could not do it by themselves. They would have to file the motion, give notice to everybody, and then we would have a hearing. I would make a determination on that. Understand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. Also, they could file 404(B). So that is other acts of a similar nature that may not have resulted in any charge or conviction. So what that means is the Prosecution could, again, after filing a motion, attempt to introduce evidence of other similar acts that gave

rise to this charge, that did not result in any type of charges or conviction on your part.

Again, the Prosecution would have to file a motion, and they would have to have a hearing to determine whether or not I was going to allow that testimony. Understand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. You've heard the Gillabrew agreement, or request of the Prosecution earlier this afternoon; is that correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: The matter is set for jury trial. It's my understanding there's no competency or criminal responsibility issues. I guess Mr. Parrone is still exploring if there are any special defenses, but it doesn't appear if there are. He wants to file a pretrial motion.

How long do we think this trial will take?

MR. KOOP: I would say about a week.

MR. PERRONE: I would say closer to two, from my perspective.

THE COURT: I already told Ms. Hoover that will be the case. I have three capital cases in front of you already. That means we would go to -- it's going to be at least five or six days;

MR. ROOP: I think after all of that, I think Mr. Perrone is a little more accurate.

THE COURT: Let me just make a record. So last on our docket we have two, three, now three capital cases that are all scheduled to last longer than one week. We're now at May 2nd, and we have a CSC trial, a capital offense. We have four capital offenses that are going to trial on June 19th.

We have People v Williams, which is not a capital offense, but it's a case that is much older than this one. The case involving People v Embry is going to trial in July. We have a murder trial with People v Thomas, that's going on the 21st of August. We have the murder trial on Grant Taylor that's expected to take three to four weeks, that's going on September 5th. We have a capital offense of People v Derrick that's scheduled on October 23rd for about a week and a half. Then we are into the holiday season.

This is going to take at least two weeks. We are going to set this Thursday, November 2nd, commencing at 8:30. All motions need to be heard before trial. All right? So we are going to set the matter for trial on November 2nd.

Pretrial is set for November 2nd, Mr. Uras. See you there.

MR. PERRONE: Two things that I did not include in there, that we have a couple issues that he would like to address, the two things I did not include in there. And just to preserve the record adequately, from my perspective, in order to preserve the record, will file a 180-day motion. Also, a speedy trial motion. And also I am going to file a bond motion.

Understand, I'm not going to address the specifics of the cash bond today. But looking to file a motion associated with his bond in the near future to address that aspect, I would like to address the prior order regarding restrictions associated with his phone privileges.

As I understand it, currently, the last order he has -- His level in the Ingham County Jail has decreased since the last time we here, as he has comported his behavior to the expectations of the jail administrators and deputies. He is currently prohibited from speaking Turkish on the phone, and limited to visitation only with his sister and his son. His sister is in the courtroom today, and can attest

to the fact that she is not likely going to be a co-conspirator in any further allegations, if they're made. We are not going to have her here. She is here from Turkey. His brother is also here, who would also like to have the ability to visit. He can attest to, again, his current standing, and the realistic unlikelihood of them being any type of co-conspirators, if they are to speak in Turkish. It is their native language.

His son, he would also like the ability to speak with his son in Turkish. I don't anticipate that there's going to be any issues with his son trying to perpetuate any further issues. I'm hoping that we can potentially clear that order up a little bit.

He also, as I understand it, outside of that order, would qualify for four weekly visits. That would be done via the Securus system, based on what the jail has indicated to myself and also the Turkish Embassy.

As far as the visiting list is concerned, if that's something that Your Honor believes is appropriate to restrict, we would like to ensure that we have allowed for his sister and his brother and any representatives of the Turkish

Embassy to have the ability to have those visits via Securus, either onsite or remotely. And I think if we can take advantage of this opportunity, given that his sister has traveled from Turkey in order for Your Honor to get a better understanding --

THE COURT: Didn't she meet with him today? She had permission for them to meet today?

THE DEFENDANT: Yes, thank you.

MR. PERRONE: That's correct, Your Honor. We are looking into November. From my discussions with Ms. Uraz, his son is experiencing some behavioral issues back home. And --

THE COURT: Didn't he already have authority to talk with his son and his sister?

MR. PERRONE: He did.

THE COURT: Then we already have them in his list.

MR. PERRONE: Sometimes they get into heated family disputes. The call gets cut off because he reverts to his native tongue. And due to the current order continuing a visit that he speaks in Turkish, if Ms. Uraz had the ability to at least address the Court, that could potentially sway your opinion on whether or not that's going

to attempt to perpetuate any further --

THE COURT: Well, the difficulty is, how would we know. We had that discussion when this was put to me before. I tried to reach a reasonable compromise for Mr. Uraz. I think I let him have everything but the laptop, all right, which all these things were elements in the offense, the alleged offense.

So we got the telephone, that's an element. We got the laptop, that's an element. So all those were elements. There is no way we can monitor that.

Let's hear from Mr. Koop.

MR. KOOP: Well, Your Honor, as I recall, the speaking Turkish, that was a stipulation that the Defense proposed he wouldn't do. And he agreed to that. And further agreed that if he -- these were things he presented so he could get privileges back. But now he wants that not to be a condition anymore.

And he further stipulated before that if he spoke in Turkish, he was going to be the one that paid for it. So he was making all these proposals to the Court about him not speaking in Turkish. So I find it, I guess, disingenuous to

say it was a, number one, a prohibition. But, number two -- I'm a little blindsided by this. Now that he doesn't want to speak in English, I would like a more full hearing on it than just shooting from the hip right now.

THE COURT: Mr. Perrone?

MR. PERRONE: In regards to addressing the issue into a full hearing, given the strength associated with Ms. Uraz and her travels, if we could preserve her testimony, at least minimally, so that Your Honor has the ability to gauge whether or not --

THE COURT: We will have to come back. I don't have any problem preserving her testimony. But we will have to come back to that.

MR. PERRONE: Beyond that, just to articulate for the record, as I understand it, there are considerable issues associated with his son in Turkey, where there is potential that his ex-wife is not going to have the ability to retain custody. And that his son may become a ward of the State given the allegations if, on the precipes that were occurring then, had this case occurred in the United States, generally he would have been entitled, and would have a right to have

some involvement in those proceedings. Whereas, since he is in the United States now, and is pretty far away from Turkey, he would not have the same ability. So I would try to facilitate active communication between the Turkish Embassy and --

THE COURT: He already has the ability to communicate with his son. We have not restricted that. If he wants to participate in some type court proceedings in Turkey and pay for it, I don't have any problem with that. I assume that probably would be in Turkish with the authorities there. But I don't have any objections with the Consulate being involved. The Consulate has been actively involved in the case. I don't have any problems adding the brother to the list. But for right now I'm going to stick with the English requirement.

MR. PERRONE: Just to respond briefly to Mr. Uras agreeing that he would not speak the native language, I think this is somewhat of a human nature issue. This is something he was not actively trying to do. But when getting in heated family arguments, again, Human nature sometimes precipitates us reverting --

THE COURT: He might, but I think they cut

him off.  That's what it was.

MR. PERRONE:  Any speaking that he did in the Turkish language was not done intentionally by him.  It was done in the heat of the moment, and --

THE COURT:  No one wrote him up.  Nobody accused him of anything.  Nobody made him lose his privileges.  It's my understanding that the call was cut off at that point.  So the next time he was still able to resume, but he didn't really suffer any consequence from his agreement.

I think we tried, with a bad situation, we tried to work to the best of our ability here. So even though I believe it was on one or two occasions where he spoke Turkish, they cut him off.  But they did not restrict him after that. He still could call, as long as he had spoken English.  There is just no way we can know what he's saying.  And this is the whole nature of this case, using the phone, allegedly, to solicit people.  So there is just no way that we can tell -- we don't have a person or officer on duty to speak Turkish.

MR. PERRONE:  More than understandable, Your Honor.  I wanted the Court to take his time,

And to thank you on behalf of the family for facilitating the visitation today. I think that that goes a long way in their minds as to how the proceedings are being handled, as this is a matter that is being looked at from a number of people in Turkey as to how this system works versus the Turkish system. So I think that that is a --

THE COURT: If they have some court hearing or something, if he wants to pay for it, I'm sure we aren't going to pay for it. If he wants to pay for it, we will allow him to participate.

MR. PERRONE: As far as preserving testimony?

THE COURT: We will do that later. I have other people waiting. We can do it today. But we are going to take these other cases first.

MR. PERRONE: Okay. Thank you, Your Honor.

THE COURT: All right.

THE DEFENDANT: Can I say something?

THE COURT: You can, but you have to check with Mr. Perrone to see if he wants you to say it first.

THE DEFENDANT: In regard to the order, since he is currently restricted, as far as visiting, we are making requests that the order be

added to allow for four weekly visits, instead of the restrictions that are currently in place.

THE COURT: What are the restrictions? I think he is eligible weekly, anyways. I don't know if the restrictions are on the number.

THE DEFENDANT: Once a week.

THE COURT: That's what it is, once a week. That's the jail policy, not mine. Once a week, that's what any resident in jail would get.

THE DEFENDANT: He gets four, Your Honor.

THE COURT: I don't know. I think it's once a week.

MR. PERRONE: My understanding, the one visit is based upon what's included in the order. The jail is acting in accordance with the order instead of their policy that allows for the additional visitation. As long as it's appropriately scheduled.

MR. URAZ: I know everybody gets one, everybody gets three visits when they come to the jail.

THE COURT: Well, if they come to the jail, that's different. The issue is we still have difficulty monitoring. So you would have to speak in English. If they come to the jail -- I mean,

they're here now.  How long are you going to be here?

THE DEFENDANT:  They are leaving tonight

MR. PERRONE:  Leaving tonight?

THE COURT:  I can't get them out there today.  So we got the visit downstairs today.

MR. PERRONE:  I would like to thank the Sheriff's staff, also, to facilitate.

THE COURT:  Right.  We agreed to accommodate you.  We will come back to this and make a record.  We will come back to it.

THE DEFENDANT:  Thank you.

THE COURT:  All right.

MR. PERRONE:  Thank you, Your Honor

THE COURT:  So, on the record, everybody knows the trial date is November 2nd

THE CLERK:  At 8:30.

(Proceedings concluded at 3:07 p.m.)

(Back on the record at 3:25 p.m.)

THE COURT:  All right we are returning to the matter of People versus Uraz.  Two files. 16-1064-PH and 16-1065-FC

Mr. Perrone wanted to call Mr. Uraz' sister for testimony?

MR. PERRONE:  That's correct, Your Honor

The Defense calls Halime Uraz.

THE COURT:  Come over here for me, ma'am.
Raise your right hand and be sworn by the clerk,
please.

THE CLERK:  Do you swear or affirm to tell
the truth, the whole truth, under penalty of
perjury?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Have a seat.  We need you to
spell both your first and last name for the Court
Reporter, please.

THE WITNESS:  Haline Aysem Uraz.  Am I
going to spell it for you?

THE COURT:  Spell it for her, yes.

THE WITNESS:  The first name is H-A-L-I-M-E
and the second name is A-Y-S-E-M.  The last name
is U-R-A-Z.

THE COURT:  Mr. Perrone?

HALIME URAZ,

a Witness duly sworn to testify
under oath as follows:

DIRECT EXAMINATION

BY MR. PERRONE:

Q    Ms. Uraz, where do you currently live?

A    I currently live in Turkey.  We are here for just

two days for this Court.

Q   Are there any issues that are going on with Iunc Uraz' son currently, that you're aware of?

A   Yes.  Actually the government authorities called from the Administrator's Family and Social Services.  And there is a complaint about his wife and son.  They are fighting or yelling at each other all the time.  And the neighbors are complaining about the voices.  And they are also afraid of that, and his wife is applying guidance to his son.  The government is thinking to take back son from the mother.  And they are going to put him to other places to protect his son

Q   How did you become aware of those issues?

A   Actually, the building of the manager called me and warned about this issue.  And later the manager gave my phone number to the Social Services.  And they called me.  And they also asked me to come there and give some expiration(sic).

THE COURT:  Explanation?

THE WITNESS:  Explanation.  Yes.  On the situation.  And that's it.

Actually, I'm not good with his wife, because she doesn't want to see me, or contact

with me.  And I am only dealing with his son's school businesses, and providing some -- helping for their monthly living standards.  I'm providing some money to pay for their invoices and other things.

THE COURT:  Paying their living expenses?

THE WITNESSES:  Yes.

Q  (MR. PERRONE) In regard to the education, are you involved with his schooling, or just with financial resources?

A  Yeah.  I'm also concerned with his school and paying the physician -- school fee, I'm paying. I am sorry

Q  How often are you able to see him outside of the process associated with the State?

A  Actually two weeks.  Every two weeks I try to see his son.

Q  From your perspective, is his mother a -- is Mr. Urez' son's mother a positive role model to him?

A  Actually, I don't think so.  She has some mental problems.  She doesn't go to any doctor or somewhere.  So we didn't prove that she has psychological problems

Q  Has the government spoken with you about the

ability if his son were to become a ward of the State, whether or not you would be able to maintain some form of custody or another family member that you are aware of?

A   Actually, they didn't ask, because they're waiting for the Court decisions, because they are asking some mental reports from his wife.  And according to that, probably they are going to decide whether to take care of his son by myself or the government will take care of his son.

Q   But you're going to participate in those proceedings in an effort to attempt to gain custody of Mr. Uras' son?

A   Yes.

Q   And have you been the primary contact for Mr. Uras in regards to who's associated with his son?

A   Yes.

Q   What is your native language?

A   Turkish.

Q   When did you learn English?

A   In the university.

Q   How long ago?

A   Twenty years ago.

Q   How often, on a daily basis, do you use the English language?

A   Not very, actually.

Q   How would you classify your English for proficiency?

A   Intermediate, actually. But not very fluent in it. I mean, I can understand some of the things. But sometimes I have to specifically express myself. I prefer to speak in my own language, because it's sometimes hard to find the legal word with what's going on regarding his son.

Q   Has that proved to you to be an impediment to communicating with Mr. Uraz?

THE COURT: Impediment means that you are not as good in communicating with him in English as you would be in Turkish.

THE WITNESS: Yes. I prefer speaking in Turkish. It's hard for me to speak in English to him. Sometimes I'm unable to explain everything to him.

Q   (MR. PERRONE) In your communications with Mr. Uraz, has he, in any way, encouraged or requested that you take any actions in order to prevent any witnesses associated with this case from appearing?

A   No.

Q   Has he indicated to you or encouraged you to do

anything as to the individual that is the complaining witness in this case?

THE COURT: That's the person who brought the case is the complaining witness. He is asking if he has asked you to contact her in any way.

THE WITNESS: No

Q  (MR. PERRONE) What is your current job?

A  Actually I am working with as an assistant with the Turkish Cement Manufacturers Association.

THE COURT: Where? Turkish is a little faster than --

THE WITNESS: There is an association regarding the Turkish Cement Manufacturers Association.

Q  (MR. PERRONE) And you don't have any intent in this matter attempting to intervene in these proceedings other than to provide support and communicating with Mr. Uraz as to the current status of his son's issues with the proceedings that are currently going on in Turkey?

THE WITNESS: Um-hum.

THE COURT: You have to say "yes" for the Court Reporter

THE WITNESS: Yes

Q    (MR. PERRONE)  Yes?

THE COURT:  She said it.

THE WITNESS:  Yes.

MR. PERRONE:  I don't have any other further questions.

THE COURT:  Mr. Koop, do you have any questions?

## CROSS-EXAMINATION

BY MR. KOOP:

Q    At the -- Mr. Uraz talked about his prior case where he was convicted of the aggravated stalking?

A    Before?

Q    Correct?

A    Entering the jail?

Q    Correct?

A    Actually, he didn't mention about his relationship before.

Q    Okay.  Has he since talked to you about his relationship?

A    Excuse me?

Q    Has he since talked to you about this relationship?

THE COURT:  He has been in jail.  Has he told you about why he got there?

THE WITNESS:  Actually, no.  I got the

information from the lawyer.

Q    (MR. KOOP) Has he talked to you about this case at all?

A    Yes. We were talking about it, because we are just wondering what's going on. But basically I couldn't have any chance to talk to him because he was restricted for months or six months or something. So I'm getting all the information from his lawyer.

Q    Okay. And in regards to the custody matter, have you also informed the Turkish Courts about Mr. Uraz currently being incarcerated?

THE COURT: That he's in jail. Have you told the Turkish family court that Mr. Uraz is in jail?

THE WITNESS: Yes. They know that. I can ask for paper or something from them, if you would like?

MR. KOOP: Nothing further. Thank you.

THE COURT: How old is Mr. Uraz' son?

THE WITNESS: Eleven.

THE COURT: So is he living at home now or he is living in state custody?

THE WITNESS: Actually, he is living at home right now.

THE COURT:  Under supervision with Family Services?

THE WITNESS:  Yes.

THE COURT:  While they're doing testing on the mother?

THE WITNESS:  Um-hum.

THE COURT:  And then they will make decisions as to whether or not she is going to be able to keep him at that point?

THE WITNESS:  Yes.

THE COURT:  Have they indicated to you that if she is unable to keep him, that he would be considered for placement?

THE WITNESS:  Yes.  They are calling his wife all the time.  She did not ask for all the forms.  And probably they will get the necessary action about that.

THE COURT:  Okay.  All right.  I don't have any other questions.

THE WITNESS:  Thank you.

THE COURT:  Let me talk to the attorneys, please.

(Off the record discussion at the bench.)

THE COURT:  Okay.  We are resuming on Mr. Uraz, 16-1065-FC and 16-1064-FH.

So, Mr. Uraz, I had a conversation with the Attorneys in this matter about this amount of time you're facing if you don't prevail. So I'm just -- you know, I'm just a judge. I try cases. You can go to trial. But sometimes I think parties have to look at the amount of time that they're looking at. That's a lot of time.

You got a son that's 11 years old. So, I mean, if you go to trial, it's not likely you're going to be able to see the son if you don't prevail. Okay? So that's one of the things I was talking about, trying to see if there was some instruction we could come with that you could live with. We haven't been able to do that. So that's where we are. Okay?

THE DEFENDANT: Okay.

THE COURT: So I'm going to set this for a status conference. So we will still keep the trial date that we have. But we're going to set it for a status conference on August 15th at two. So we will come back and see. Maybe the parties can come up with some resolution that will benefit everyone. Give you some opportunity to see your son before he grows up. So under the current proposal, it's not likely. Maybe there's some

that proposal. Maybe you can -- well, I guess I don't want to say it. Okay. Thank you. All right?

MR. PERRONE:  We can talk about it later.

(Proceedings concluded at 3:52 p.m.)

STATE OF MICHIGAN            )

COUNTY OF INGHAM             )


                I, TERESA J. ABRAHAM, Certified

Shorthand Reporter in and for the County of

Ingham, State of Michigan, Thirtieth Judicial

Circuit Court, do hereby certify that the facts

stated in the foregoing pages are true and correct,

and comprise a complete, true and correct

transcript of the proceedings taken in this matter

on this the 2nd day of May, 2017.




Teresa J. Abraham, CSR-3445




Date:   October 19, 2018