STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff,

vs,                                    CASE NO:   16-1064-FH
                                                  16-1065-FC

TUNC ORAZ,

Defendant.
_____/

HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
LANSING, MICHIGAN -- WEDNESDAY, OCTOBER 11, 2017

MOTION TO ADMIT OTHER ACTS EVIDENCE

APPEARANCES:

FOR THE PEOPLE:

WILLIAM O. CRINO, JD
CHAZ T. KOOP, JD
Assistant Prosecuting Attorney
Prosecuting Attorney's Office
313 W. Kalamazoo
Grady Porter Building
Lansing, Michigan 48933


FOR THE DEFENDANT:

JACOB PERRONE, JD
Perrone Law, PC
221 W. Lake Lansing Road, Ste. 200
East Lansing, MI 48823

ERIC SCHROEDER, JD
BODWIN & ASSOCIATES PC
2970 E. Lake Lansing Rd.
East Lansing, MI 48823-7415


Reported by:  Teresa J. Abraham, CSR-3485
Phone:  (517)483-6404   e-Mail: tjabraham@msn.com

I N D E X

WITNESSES:

None.

EXHIBITS:

Exhibit #     Description     Received

None.

Lansing, Michigan

October 11, 2017

at about 10:07 a.m.

**********

MS. SHEPPARD: People versus Tunc Uraz, docket number 16-1064-FH and 16-1065-FC, each with attorney Jacob Perrone.

THE COURT: We have Mr. Koop here. Mr. Koop or you?

MR. ROTH: We are both on this, Your Honor.

THE COURT: You are Tunc Uraz, sir?

THE DEFENDANT: Tunc Uraz. Yes.

THE COURT: Mr. Roth?

MR. ROTH: Thank you. We are here today for the People's motion to admit other acts evidence pursuant to MRE 404B. I received, by email, the Defense's response yesterday. I will address a few of their points. But I also want to highlight some of the issues from our brief.

All of the events that we have noticed up in our 404B notice deal with one continuous course of action. Starting in June of 2015 after the breakup of the victim, the Defendant continued to have unconsented contact with her in escalating ways, which culminated in our FC file

in which he solicited three people to try and kill Ms. Melke.

All of the acts that we have noticed up fall into three categories, plus one additional act. And those three categories, beginning in June of 2015, many of which were in violation of PPO's directed against Ms. Melke, as well as friends and family near her. They were damage to her personal property, appearance at her location, both at home and out, and, finally, unwanted communication, both in traditional letter form as well as electronically.

The additional act that we have noticed up is most pertinent for the solicitation of murder counts. His efforts to purchase a gun from an employee at Michigan State University where the Defendant was working at the time.

We believe all of these actions in our notice are in accordance with the standards set forth by the Michigan Supreme Court in analyzing MRE 404B. There are four things to look at.

First: Is it relevant. Stalking is defined as a continuous course of conduct just as a matter of law. So obviously we are not going to look at an isolated event. So legally and

factually, these things are relevant. The reason that stalking is defined as a course of conduct, is because stalking doesn't happen in a vacuum. It doesn't happen at one time. It happens over a long period of time. It happens in escalating ways.

All of the things we have noticed up are relevant in that they show that whole course of conduct. It's one of the legal elements for the charge of stalking.

Second, we have offered, for proper purpose, one continuous course of conduct as well as to show motive and intent. Any one of these incidents, by itself, leaves intent unknown. Any one of these incidents by itself may appear innocent. But when you add all of them together, it makes clear, through that course of conduct, that these do have an intent that is consistent with the one required by the stalking count. That is if he intended to harass or threaten or stalk her against her will.

The aggregate of all of these incidents is necessary to understand the totality of the circumstances, that these things were done intentionally by the Defendant in reaction to the

breakup.  It's escalated over time, and then culminated in his intentional solicitation of two people who were in the jail with him, as well as what turned out to be an undercover officer outside to solicit the person he had been targeting with his stalking.

The third element is the Vandervliet analysis, is that we are to look at the probative value and exclude the proffered evidence only if the probative value is substantially outweighed by the danger of unfair prejudice.  Not prejudice, but unfair prejudice.

None of the evidence in this case is unfairly prejudicial.  All of the proffered evidence is part of that same course of conduct.  So it is strictly, fairly prejudicial to that element.  None of it is unfairly prejudicial.  None of it has that borderline relevance that we are concerned about.  In our brief we pointed out that in prior case law it has been repeatedly held that evidence of actions, consistent actions targeting a specific victim are highly probative.

So when we look at that standard, that courts have already found that this sort of evidence is highly probative, there's absolutely

no reason, under the third prong, to exclude any of these things.

The fourth and final element of the Vandervliet analysis is to consider a cautionary instruction, a limiting instruction. The People have no objection in this situation. We will speak with Mr. Perrone over the next week or so to put jury instructions together, submit those to the Court. And we certainly stipulate and agree to put a limiting instruction in there.

Finally, I want to talk about few of the points that Mr. Perrone has brought out on his brief. On page four he indicates that none of the evidence is directly connected to the Defendant or to the other acts. So, in other words, he is saying that all of these prior things we have noticed up, the letters, the emails, the damage to the vehicle, we can't prove that that's the Defendant. That's not true.

And he goes on to say that, although later in the brief, because the Defendant has told other people in the jail those things, so he is the one who admits that he did all of those things. So we are not merely putting forth circumstantial evidence, saying that these things

never happened before, and then the breakup, then they happened, so it must be the Defendant.  What we are saying is these things happened under suspicious circumstances, and the Defendant later admitted that he later was, in fact, the person that perpetrated them.

That also speaks to the relevance.  When he solicits these two people in the jail to kill the victim, he tells them this background.  Because even to him all of that background and buildup is relevant to the continuing course of conduct.

Mr. Perrone also mentions that these other acts weren't charged.  He cites absolutely no cases that will make that a relevant argument in this case, because it's not.

As this Court has ruled a number of times, for MRE 404B, whether the prior acts were charged, convicted, or none of the above, is not a pertinent inquiry.

Mr. Perrone argues that all of these acts sort of hinge around incentivize performance.  In this case there was absolutely no incentivization given to either of the cooperating witnesses.  These were people who were in jail for bad crimes

on their own. We offered them nothing. They got nothing. They came forward merely because they were disturbed by the Defendant's conduct.

Finally, Mr. Perrone says very, very broadly that all of these things pose a strong risk of unfair prejudice, that they will evoke sympathy to the jury. And I think in light of the charges, that three of the charges in this case are that the Defendant solicited people to kill Ms. Melke. These other things, keying the car, sending letters, showing up at the bar, they pale in comparison in terms of prejudicial value. There's no chance that a jury is going to hear the charge of solicitation of murder, but not be bothered until they hear that her car was keyed. They are probative, they are relevant, they are not unfairly prejudicial.

And for all those reasons, we ask the Court to grant the People's motion to admit the other acts evidence as detailed in our notice.

I'm happy to answer any questions the Court may have. Thank you.

THE COURT: Stan White was a subsequent friend or significant other of Ms. Melke?

MR. ROTH: That's correct, Your Honor.

THE COURT: So we are talking about the 17 incidents?

MR. ROTH: Yes. We numbered them in our brief. But, as we indicated in the beginning, it's part of one course of conduct with 17 that were detailed to the police. Thank you.

THE COURT: Mr. Perrone?

MR. PERRONE: The evidence, and I can go over them individually, as to the intent of relevance and the level of relevance as contained, the offenses that are alleged are too attenuated or too broad, and they create too large of a risk that a jury is going to transfer to the Defendant's intent associated with the stalking, to the intent associated with the solicitation to murder as a result of being shot due to the allegations. The allegations need to be presented appropriately.

At this point in time, as far as Melke, she had an opportunity to testify that these things happened to her car. But as far as proving that the Defendant did that, that would have to come in through the individual who alleged that it occurred, Mr. Close, who lacks credibility as a result of the circumstances that

he came into contact with my client. We are talking about issues associated with Stan White.

THE COURT: Wouldn't credibility be a jury question, though?

MR. PERRONE: It would be. I just request that, again, Ms. Melke not have an opportunity to say that this happened definitively. If she believes it happened, she can testify that something happened to her car.

THE COURT: Right.

MR. PERRONE: I don't want her running around being able to say that he did it definitively and convey that to a jury.

Now, as far as the issues associated with Mr. White, it appears what we are looking at here, number four, there is a January 30th of 2016. And, number 10, substantial conversations between Mr. White and allegedly Mr. Uraz. Again, as far as any consternation and argumentation between Mr. White and Mr. Uraz, what we have, we have a prior case that's attenuated from any course or common plan or scheme. We have a common plan or scheme associated with talking. We don't have a common plan or scheme associated with the solicitation of murder. All of the

events didn't lead up to solicitation of murder. It's the Defense's position that that was isolated.

Again, as far as the issues associated with arguments between Mr. Uraz and the boyfriend of the alleged victim in this matter, I think that that's too far attenuated to include every 404B acts, not to mention there was the likelihood of confusing a jury as to who is the actual victim in this case, and put them into a position where, based upon the issues associated with Mr. White, that they are using intent on the capital offense.

The prior case cited by the Prosecution, the People versus Ohr, we have a course of conduct. And that was a case that involved a prior attempt to shoot the alleged murder victim in a murder case. There you have consistency, you have relatedness. In this case we have stalking versus solicitation. There is a very large gap between an aggravated stalking charge and a capital solicitation charge.

THE COURT: Wasn't he in the county jail because of the aggravated stalking charge when the solicitation for murder charge came up?

MR. PERRONE: Correct. But are we going to try him for aggravated stalking or try him for solicitation of murder? And as far as the Prosecutor running wild with every issue from the prior aggravated stalking case, I think that that needs to be limited by Your Honor in order to afford Mr. Uraz a fair trial. I think that piling on information regarding the prior case and attenuated arguments with boyfriends is going to distract the jury and not allow them to make a reasoned conclusion as to the facts of this case.

The focus should be on the actual -- what we can do with prior acts is it can be incorporated through the counts. And, again, the prior acts, the fact that he had asked prior inmates prior to asking an officer can be used in order to establish a common plan or scheme.

As far as motive is concerned, we want to avoid the potential of having the jury transfer his intent as to aggravated stalking as to his intent to solicit a murder. We want to be sure that they focus their attention on the relevant element associated with the solicitation charge, and to allow the Prosecution to run wild with all of the allegations that were contained in prior

reports corroborated by jailhouse snitches who could have obtained that information from police reports, it just seems attenuated and speculative in nature. And I think that there has to be a significant point-by-point issue as to whether or not it comes in.

Now, as to prior stalking, I see the Dave and Buster's. If Ms. Melke had an opportunity to see him in person, she could testify as to whether she had seen him in person.

Now, as far as her testifying that all these things happened, and he did those, I would ask that the sequencing be taken into account by the Court to ensure that we don't have a situation where the jury is becoming inflamed and convicting on a capital offense as a result of allegations associated with a five-year aggravated stalking offense.

Again, just to summarize, common plan or scheme, we don't have the same common plan or scheme, we have a buildup. And, again, I think Your Honor has to scrutinize the Prosecution's attempt to include every aspect of these individuals' relationship as evidence that he solicited to have her killed, including her

subsequent relationships.

The prior case law, as far as common plan or scheme, there was a consistency. An attempt to murder was used in a murder case. In this case, if we are going to use aggravated stalking as a basis to try to establish solicitation, it isn't appropriate. They are very different concepts overall, and the Prosecutor should not have the ability to run wild with all of the information associated with the aggravated stalking in an effort to convict on the solicitation charge. Because that would, in effect, cause my client not to be able to have a fair trial.

THE COURT: All right. Thank you. Mr. Roth?

MR. ROTH: Thank you, Your Honor.

So Mr. Perrone focuses on two primary issues in asking this Court to exclude the evidence. And the first of which is that the evidence isn't good enough. He says Ms. Melke can only say what happened. And the only person who can say who did it is Mr. Close. And he said that, as a matter of law, Mr. Close is not good enough. And there simply is absolutely no legal

support for that.

She can talk about the allegation, and he can talk about who did it. And, as the Court pointed out, it is for the jury to decide the credibility of that. I think Mr. Perrone brings that up because his credibility is high. How else would he be able to know about these different incidents, these different property damages and letters and emails, if it weren't true, if the Defendant hadn't told him?

The second way that the Defendant asked the Court to exclude this evidence was by bifurcating the issue of solicitation and stalking. The Court has already ruled on this issue, when there was a motion to sever the stalking and the solicitation cases. And the Court denied that because the Court already found that these are part and parcel. That the stalking is a broad category, a broad umbrella in that the solicitation is one event within that broad category of stalking.

We don't have a stalking trial and a solicitation trial. What we have is one trial, and it is about stalking. And it starts at the very beginning with Ms. Melke and the Defendant

breaking up.  And there is a course of events during which the Defendant begins by trying to get her back.  And when that fails he lashes out.  As the Court pointed out, when he gets locked up for this continued course of conduct, and he realizes if I can't have her, nobody will, he begins soliciting for people to murder her.  These are one continuous course of conduct.

So when Mr. Perrone says there has to be consistency between the other acts and the charged act in this case, they are.  There is a continuous course of conduct beginning with the breakup and culminating with the solicitation all under the umbrella of stalking, which is what this Court already ruled in denying the Defense's motion to sever these two cases.

When Mr. Perrone talks about how attenuated they are, let's keep in mind how close in time they are.  This all happens within about a year and a half span from breakup to incarceration to solicitation.  These are very closely related events both in time and in manner.

So we would ask the Court, again, to grant the People's position as it relates to the other

acts evidence.

THE COURT: In this matter the Court has to look at several things. One is proper purpose evidence, relevance, balancing test, whether or not there was a limiting instruction.

But under 404B, under proper purpose, the Court has to determine whether the evidence would tend to show motive, opportunity, intent, preparation, plan or scheme, knowledge, identity or absence of mistake.

And so it's somewhat complicated by, apparently, that Ms. Melke had a relationship with Mr. White, in that Mr. White became the subject of some contact from the Defendant, purportedly. And I guess the Court has to look at that. And in balancing, as being not necessarily stalking Ms. Melke, I guess it could be considered to be continuing harassment of her because of her relationship with another individual. But it doesn't necessarily go directly to her. The Court's a little concerned about that.

So, looking at these, the majority of them, and the Court's already ruled, so if I recall correctly there is a stalking case, and

then there became an aggravated stalking case, and then there became a solicitation for murder.

So the Court's already ruled, and I stand by that. This seems to be an ongoing scheme or intent with ongoing escalated actions by the Defendant in this matter starting off as a simple stalking case. I shouldn't say simple, but stalking case. Then I believe he had just gotten out of jail, if I recall correctly, when the aggravated stalking came up where he was awaiting sentencing and the aggravated stalking came up. Then, while he is in jail, the allegations of solicitation of murder.

So the Court does feel that it is one common scheme or intent, that the -- most of the proposed evidence, not all of it, shows motive, opportunity, intent, preparation and scheme or plan in doing an act, in absence of mistake or accident.

So going through them individually, I think number one I have is the car incident on August 24th or 25th that her car was vandalized. I think she can testify that her car was vandalized. I don't think she can conclude that it was necessarily the Defendant.

Statement of Stan White that the Defendant showed up at Dave and Buster's while Mr. White was with Ms. Melke. I think since Ms. Melke was there, that that would also be part of number -- the incident on January 20th speaks for itself, it's an order of the Court.

Number four, January 30th, '16. There's no inference or reference that Ms. Melke was involved in that. So I do not think looking at the balancing test, that we should have that admitted as the situation ongoing with Mr. White and Mr. Uraz.

The incident on January 13 are the texts indicating that he was sorry. I think that is -- it will be admissible.

The January 26th, it says 17, but I assume that was 16, showing up at the Best Buy parking lot next to Ms. Melke. I think it's relevant, again, for the reasons stated before.

Number -- April 5th through 7th incident, I don't know if that's really going to be -- that's super prejudicial. And this was some time before the alleged solicitation came up. And the court's just not comfortable saying that that should be able to be used. I think the prejudice

on him attempting to buy guns, since the solicitation took place in the jail, is prejudicial to the Defendant. So I will not allow that testimony of the co-worker.

The April 8th incident. We will allow that, because, again, Ms. Melke, at the time, had gone to Petoskey and apparently the Defendant called the mother's residence while Ms. Melke was in Petoskey and had called her subsequent thereto.

The early May 2016, again, I don't think we have enough to say that that was Uraz in this matter. So we'll not allow Mr. White to testify that his car -- let me go back. Ms. Melke's car was outside Stan White's house. She received multiple calls on her cell phone from a restricted number. That's a close call. It really is. We don't have anything tying Mr. Uraz to that, specifically. I think she can testify that the car was egged while she was at Mr. White's. We'll just leave it with that with being not prejudicial.

May 20 through 27 of 2016, apparently Mr. White's cars were punctured. And the Defendant later admitted to do doing so. I think

that's relevant. Not only was he stalking Ms. Melke, but apparently he was stalking her subsequent -- significant other as part of the overall plan, scheme and intent to harass and cause difficulty for Ms. Melke.

On May 17, we don't know that those texts came from Mr. Uraz. It would have to be something more than believing that they came from him. So I would not allow that.

May 25th, 2016, personal items missing from her apartment. Apparently there's a video showing Mr. Uraz in her bedroom. I would allow that as being relevant. That certainly shows ongoing stalking.

July 17, 2016, observing the Defendant in the vehicle parked outside of her residence would be relevant. The July 22nd PPO extended, speaks for itself.

Apparently on August 15th through 16th, Melke's car tires were punctured. Defendant later admitted to doing that. That goes to what the source admission is would be a credibility question for the jury, as long as we have testimony from someone saying that that's what the Defendant told him. We would allow that.

September 16, 2018. I don't think that's relevant that he contacted her mother and asked that if they could get back together. So I would not allow that.

And the July 22nd, 2017, the PPO was extended, speaks for itself.

So did you get all those?

MR. ROTH: Yes, Your Honor.

MR. PERRONE: Yes, Your Honor.

THE COURT: So that's the Court's ruling in this matter.

MR. ROTH: Thank you, Your Honor.

We are called for trial on October 30th. I have been in communication with Mr. Perrone about that. He was to get me any list of any witnesses from our list that he needed produced by yesterday. He didn't. So I assume there's no witnesses from our list that he requires.

MR. PERRONE: I provided it to him via e-mail this morning.

MR. ROTH: Okay. I was in Court. Maybe that happened.

THE COURT: All right. See everybody on October 30th.

MR. ROTH: Thank you, Your Honor.

MR. PERRONE:   Thank you, Your Honor.

(Proceedings concluded at 10:39 p.m.)

STATE OF MICHIGAN          )

COUNTY OF INGHAM          )

I, TERESA J. ABRAHAM, Certified Shorthand Reporter in and for the County of Ingham, State of Michigan, Thirtieth Judicial Circuit Court, do hereby certify that the facts stated in the foregoing pages are true and correct, and comprise a complete, true and correct transcript of the proceedings taken in this matter on this the 11th day of October, 2017.

Teresa J. Abraham, CSR-3445

Date:   June 6, 2018