STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

THE PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff,

vs.                              CASE NO:   16-1068-FC
                                            16-1069-FH

TUNC URAZ,

Defendant.
_____/

BEFORE HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
    LANSING, MICHIGAN -- FRIDAY, OCTOBER 20, 2017

MOTIONS

APPEARANCES:

FOR THE PEOPLE:

JONATHAN ROTH, JD
CHAZ KOOP, JD
Assistant Prosecuting Attorney
Ingham County Prosecutor's Office
303 W Kalamazoo St Ste 4
Lansing, MI  48933
(517)  483-6210


FOR THE DEFENDANT:

JACOB A. PERRONE, JD
PERRONE LAW, PC
221 W. Lake Lansing
Suite 200
East Lansing, MI 48823

Reported by:  Teresa J. Abraham, CSR-3445
Phone:  (517) 783-0024    e-Mail: tjabraham@msn.com

INDEX

Argument by Mr. Perrone                          96/114
Argument by Mr. Roth                             102
Rebuttal Argument by Mr. Perrone                 106/120
Argument by Mr. Koop                             117

WITNESSES:  PEOPLE'S:

None.

WITNESSES:  DEFENDANTS:

TUNC URAZ

Direct Examination by Mr. Perrone                 9
Voir Dire Exam. by Mr. Roth                       19
Cont'd. Direct Exam by Mr. Perrone                22
Cross-Examination by Mr. Roth                     33
Redirect Exaxmination by Mr. Perrone              75

MATT KRUMBACH

Direct Examination by Mr. Perrone                 78
Cross-Examination by Mr. Roth                     92
Redirect Examination by Mr. Perrone               95

EXHIBITS

Exhibit #            Received

DX-#A                22
DX-#B                22

PX-#M-2              55
PX-#M-21             52
PX-#M-29             42
PX-#M-30             45



STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

THE PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff,

vs.   CASE NO. 16-1065-FC
16-1064-FH

TUNC URAZ,

Defendant.

BEFORE HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
LANSING, MICHIGAN - FRIDAY, OCTOBER 20, 2017

MOTIONS

APPEARANCES:

FOR THE PEOPLE:

JONATHAN ROTH, JD
CHAZ KOOP, JD
Assistant Prosecuting Attorney
Ingham County Prosecutor's Office
303 W Kalamazoo St Ste 4
Lansing, MI 48933
(517) 483-6210

FOR THE DEFENDANT:

JACOB A. PERRONE, JD
PERRONE LAW, PC
221 W. Lake Lansing
Suite 200
East Lansing, MI 48823

Reported by: Teresa J Abraham, CSR-3445
Phone: (517) 483-6404  e-Mail: tjabraham@msn.com

---

INDEX

Argument by Mr. Perrone        98/114
Argument by Mr. Roth           102
Rebuttal Argument by Mr. Perrone   106/120
Argument by Mr. Koop           117

WITNESSES: PEOPLE'S:

None.

WITNESSES: DEFENDANTS:

TUNC URAZ

Direct Examination by Mr. Perrone    8
Voir Dire Exam by Mr. Roth          19
Cont'd Direct Exam by Mr. Perrone   22
Cross-Examination by Mr. Roth       33
Redirect Examination by Mr. Perrone 75

MATT KRUMBACH

Direct Examination by Mr. Perrone    78
Cross-Examination by Mr. Roth        92
Redirect Examination by Mr. Perrone  96

EXHIBITS

Exhibit #    Received

DX-#A        22
DX-#B        22

PX-#M-2      55
PX-#M-51     52
PX-#M-58     42
PX-#M-90     45

---

Lansing, Michigan

October 20, 2017

at or about 10:42 a.m.

*************************

MR. ROTH:  Scheduled for motion is People verse Tunc Uraz, docket number 16-1065-FC and 16-1064-FH.

THE COURT:  We have Mr. Roth here, Mr. Koop here. Mr. Perrone is here. You are Tunc Uraz, sir?

THE DEFENDANT:  Yes, sir.

THE COURT:  I just want to put on the record, I just came from a seminar that I believe these motions were untimely filed. These were motions were not surprises. There's nothing new. They were like eight days before the commencement of the trial. And, Mr. Perrone, why the delay?

MR. PERRONE:  Again, given the timing associated with this motion, all the witnesses that needed to appear, and due to commitment docket restraints, as a result of this being filed, the People's other acts motion was filed and heard last week. Entrapment is a constitutional issue. Likely something that is going to require a trial in order to preserve the

---

necessary facts in order to establish the defense.

THE COURT:  I don't have any issue with that, Mr. Perrone. My issue is you could have done that last month, two months ago, three months ago. I mean, there's nothing new, no new information that prior acts had anything to do with this particular motion. So I just want to put on the record it's an untimely motion. I guess I could be justified in saying I won't hear it. But this is a serious matter for Mr. Uraz, so I'm not going to take that position. But I'm cautioning you in the future, these are motions that are not the result of any N-E-W found information. And the case is over a year old. So I think they could have been filed in accordance with the prior pretrial statement. I even gave you some extra pretrials on this file. All right?

So let's move on.

MR. PERRONE:  Your Honor, if I may, to further, just to preserve the record. This is a case where I was not initially appointed to a capital offense. There is a tremendous amount of information you have to go through in order to —

THE COURT:  Wasn't that six months ago, Mr. Perrone?

MR. PERRONE: Again, with the docket restraints, I acknowledge –

THE COURT: Wasn't that six months ago? My suggestion is we just move on, unless you want to put something else on the record about why it took you so long to file a motion. It's up to you. If you want to make a record, go ahead.

MR. PERRONE: Thank you, Your Honor. We are addressing the entrapment issue. Initially there was a totality of circumstances issue. In this case, Mr. Uraz – it's undisputed that there were two jail informants that were involved in this. There were numerous letters that were alleged to have been written between the parties, the contents of the letters between Mr. Uraz and Mr. Close, with the handwriting, and –

MR. ROTH: I'm sorry. I have to stop counsel at this point. This argument has to be based on record evidence. It's case law in the People's brief, It's case law in Defense counsel's brief. He is citing to fact, not to –

MR. PERRONE: He is entitled to an evidentiary hearing.

THE COURT: Go ahead.

MR. ROTH: He is entitled to an evidentiary hearing, which is what the People appear today to do. We have our witness here. We are ready to proceed.

THE COURT: Okay. Mr. Perrone?

MR. PERRONE: Again, my intention would be to call a witness and put the video on, and let Your Honor make a determination based upon the video and the evidence presented. Very simple issue.

THE COURT: You're entitled to a hearing, so –

MR. PERRONE: In this case we have involvement of two jail informants. That's an undisputed part the record. As far as their involvement with the police, and what involvement the police had, the case law that I looked at said specific instructions were made to informants in these type of situations so that they don't instigate it. But it appears, based upon my review, there is instigation on part of the jail informants here, which is indicative of entrapment.

Where do we go with entrapment? Frankly, I reviewed a number of these cases, and it's so absurd that this mechanism is used in a jail context. You're playing on a particular victim, otherwise entirely susceptible. Mr. Uraz, under 23-hour confinement. He can attest to that. I don't think we can dispute that at this point in time of those two individuals, given ample opportunity to further instigate the offense. I think it's further indicative that there was a second phone call that was made. And that Mr. Uraz did not answer the phone at that point in time.

We have a sequence of events that necessarily the jail informants would have sent the information to the police prior to the conversation between Mr. Mobley and Mr. Uraz, therefore, giving them an opportunity to figure out what happened between the police and the jail informant that were jumping Mr. Uraz' case, and have a history of jumping other individual cases in order to determine whether or not that, along with a conduct of the video, as instigation by Officer Mobley, whether that will encompass entrapment.

And one of the issues with the prior cases is this is a situation where you are dealing with susceptible defendants, and the circumstance where you're incarcerated, you're obviously initially upset. Based upon the evidence that will be presented, there will be a letter showing that there was instigation on the part of the jail informant here. And in a situation where the facts indicate, based upon the totality, that he was in a susceptible state based upon his situation.

When we look at his situation articulated in the motion, he had just lost his job –

MR. ROTH: Your Honor, I'm going to object to this. This has to be cited to record evidence. If he would like to cite to these things, the Defendant can testify –

MR. PERRONE: Mr. Uraz can testify to it.

THE COURT: Let's get on with the hearing. Who is going to go first?

MR. ROTH: The Defense has the burden. So they can –

THE COURT: All right.

MR. PERRONE: We call Mr. Uraz.

THE COURT: Mr. Uraz, would you step up here for us, please? Raise your right hand and be sworn by the Clerk, please.

THE CLERK: Do you swear or affirm that you

9

will tell the truth, the whole truth, under penalty of perjury?

THE DEFENDANT: Yes, I do.

THE COURT: All right. Have a seat there for us, please, and get situated. And then state your name, spelling your first and last name for the Court Reporter, please.

THE WITNESS: My first name is Tunc, last name is Uraz. T-U-N-C, U-R-A-Z.

THE COURT: Thank you. Mr. Perrone?

TUNC URAZ

a witness, having been duly sworn to testify under oath as follows:

DIRECT EXAMINATION

BY MR. PERRONE:

Q You were incarcerated in the Ingham County Jail in 2016. In October and November of 2016, specifically?

A Yes, sir.

Q Prior to that, had you been in jail before?

A I have never been in jail in my life.

Q Where were you working prior to your incarceration?

A Michigan State University for 25 years.

Q When were you terminated?

10

A April of 2016, April 15, to be exact.

Q When did you come to this country?

A October of 1988. October 11, 1988, to be exact. I was born here. My parents went to Michigan State University.

Q Where is your family located?

A Primarily in Turkey right now. I lost both my parents by now. It's just my son, my wife and my sister and my brother.

Q How much family do you have in the United States?

A None.

Q How many years did you work at Michigan State for?

A Twenty years, 21 years full time, four years part-time.

Q When you were initially taken to the jail, when did they take you to the medical unit?

A I was taken to the medical unit September 27 until October 7 of 2016.

Q And did you come into contact with any inmates?

A Yes.

Q While you were in that unit?

A Yes.

Q What type of proximity did you have with those inmates?

A We were in a 12-by-12 room altogether, three

11

people.

Q How long were you in the room for?

A Three of us were in there for 24 hours.

Q What day was that?

A It was September 27 until September 28th. Do you need the exact times?

Q You initially come into contact with Mr. Allen or Mr. Close?

A Mr. Allen was in the same post with me. Post 5, Dorm F, when we were locked up in a solitary confinement for 23 hours for a month almost. I met Mr. Close first time on the medical floor on September 26 until – from September 26 until October 7th. Charles was removed October 7th.

Q Have you ever been diagnosed with any indicative underlying mental illnesses or mental health issues?

A PTSD. I was seeing a therapist. I was depressed, manic depressive, I would say. I had a substance abuse issue.

Q What is your substance abuse issue?

A Alcohol, alcohol and benzodiazepine, Xanax.

Q When did you start using benzos?

A Around 2015, I would say, around June, July.

Q And was there any corresponding events associated

12

with your use?

A Well, obviously break-up with the person. And also big family issues. My wife has a bipolar disorder, and we were having some family –

THE COURT: I'm sorry. Your what?

THE WITNESS: My wife.

THE COURT: Your wife?

THE WITNESS: Yes. Has a bipolar disorder.

THE COURT: You were living with your wife at the time? She is in Turkey?

THE WITNESS: Yes. Well, she was here in 2013. She went back to Turkey in 2016.

THE COURT: All right. So you were married, living with your wife in 2015?

THE WITNESS: Yes.

THE COURT: You were involved in this relationship, also, in 2015?

THE WITNESS: Yes.

THE COURT: And that's when you started taking the benzos?

THE WITNESS: Yes.

THE COURT: And I guess abusing alcohol?

THE WITNESS: Yes.

Q (MR. PERRONE) How long did you use alcohol for?

A I used alcohol on and off for almost 30 years.

13

But not this heavily.

Q  What types of health issues, if you can recall, were happening at the time that you were confined with Allen and Close?

A  Being in jail for the first time in my life. Put into solitary confinement was a surprise the next day. I wasn't expecting that. And it's the loneliness. Your focus changes. There is no human contact. You start hallucinating. I had high blood pressure, hypertension, manic depressive situations. We just go through every single thing that solitary confinement can do to you. Your focus changes. You start thinking over and over and over many times every little detail in your life, what happened then. You start getting frustrated most of the time. I also had experienced – like I would read a book and I would not remember what I read after a while. Then I would read over it again because – the scarcity of items, you beg for a book. I wasn't allowed to buy any commissary for the first month. Of course, no phone calls, whatsoever, you know, taken away.

Q  Did you have your legal documentation associated with your case?

14

A  Not at that time.

Q  Not at that time?

A  Not at that time. No, I had – no, not at that time. No. Not until I got charged.

Q  Did either Close or Allen approach you in regards to helping you with your case?

A  Yes, they did.

Q  How did they tell you that they were going to help you?

MR. ROTH: Objection. Assumes facts not in evidence. I think it is also lack of foundation for that.

THE COURT: Okay.

MR. PERRONE: We have a situation here where it's not in evidence yet as a result of this being the appropriate hearing for the Defendant to testify to it. The Defendant's testimony –

THE COURT: What's going to be in evidence?

MR. ROTH: He says how do they tell you how they were going to help them. He hasn't testified that they made a proposition to begin with. I think did they approach you, what did they say is appropriate.

THE COURT: Well, let's rephrase the question.

15

Q  (MR. PERRONE) Did Close or Allen approach you and talk to you about helping you with your case?

A  Yes, they did.

Q  And how did they propose to help you with your case?

MR. ROTH: I'm going to object to the nature of the question. If we could bifurcate Close to Allen? It's not like they were speaking together on a 3-person conversation, as I understand.

Q  (BY MR. PERRONE) Who initially approached you?

A  Allen approached.

Q  Who?

A  Charles Allen.

Q  Charles Allen approached you to help you with your case?

A  Yes.

Q  Because he is on the same post as you?

A  Yes.

Q  What did he propose to do to help you with your case?

A  He would ask everyone to come to the post what's your case, why are you here for, what did you do?

THE COURT: Slow down. I can't quite make you out.

16

THE WITNESS: I'm sorry. He would ask everybody when they come to the post, why are they here for, what are their charges.

THE COURT: He asked everybody that?

THE WITNESS: Including myself, too. Then he would –

THE COURT: He was curious?

THE WITNESS: Too curious. I didn't know any better that you aren't supposed to talk about your charges in jail.

THE COURT: All right. Thank you.

Q  (MR. PERRONE) Prior to this incarceration, what was the longest period of time that you had spent in jail?

A  I spent one night, March 26. I spent two days, August 23rd to August 25th. And that's it. I was in solitary confinement both times, too.

Q  While you're in solitary confinement, is this when you initially come into contact with Reginald Close?

A  I believe Reginald Close was in my cell on Post 5F Dorm. And when I got there, they removed him before I got there because he, I guess, had a problem with another inmate. And they removed him to the next dorm. And he was put in his

17

room.

Then I came into contact with him on September 26th when we were all moved together, Allen Close and myself in the same room, 12-by-12 room, medical floor. All of a sudden they moved us all one night.

Q  At that point in time, did Close talk to you about your case?

A  Next day, yes, I did.

Q  While you were in the hole or afterwards?

A  While we were all in the same room.

Q  While you were in the medical room for 23 hours lockup?

A  Yes.

Q  Did you subsequently exchange letters with him, with either Close or Allen?

A  Letters?  No letters.

Q  Did Mr. – if I could refresh.  Do you recall any letters?

A  You mean notes?

Q  Notes.  Sorry.

A  You use my second language.  I take this literally.  When you say "letters," I think regular letters.

Q  Notes.

18

A  Notes.  Thank you.  Notes?  Yes, he initiated notes.  It's his handwriting.  Because I say why are we writing down.  He said there is microphones in the room.  We didn't want them to hear us.

MR. PERRONE:  Defendant's Proposed Exhibit.

Q  (MR. PERRONE)  What I am handing you, do you recall what that document is?

A  Yes, I do.

Q  And are these notes between yourself and another inmate?

A  Yes.  These two are.  But this is my own.

Q  The first two are notes between you and who?

A  Close.

Q  And Mr. Close is the individual who initially sent you the notes?

A  Yes.

Q  And those are the notes – or reproductions and copies of the notes that were sent between yourself and Mr. Close while incarcerated at the Ingham County Jail?

A  Yes.

Q  And that is in fact your handwriting on there, also?

A  Yeah.  The bad handwriting is mine, yes.

19

MR. PERRONE:  Okay.  Move for admission.

THE COURT:  Any objections, Mr. Roth?

MR. ROTH:  The only thing that I ask, that I told Mr. Perrone, if we could just get a little clarification from the Defendant.  Are the first two –

THE COURT:  You can have voir dire.

MR. ROTH:  Thank you, Your Honor.

VOIR DIRE EXAMINATION

BY MR. ROTH:

Q  Is the screen on in front of you, sir?

A  Yes.  I don't know.

Q  I just want to ask you generally about these notes.  So this first note, this is between you and Mr. Close, correct?

A  Yes, sir.

Q  This second note is also between you and Mr. Close, correct?

A  Yes, sir.

Q  Do these go together?  In other words, was this one continuous conversation between you two or are these separate times?

A  It was two separate times.  It's – no.  I'm sorry.  One continuous time, but it was two separate pages.

20

Q  Okay.  But one conversation between you two?

A  If you notice, the first page is ripped at the bottom?

Q  This one?

A  Yes.

Q  The third part of the note, is this also part of the same conversation or a separate –

A  No.  This is stolen from me.

Q  Stolen from you?

A  Because this is part of my other documents.

Q  Okay.  So this is not a note passed between you two?

A  No.

MR. ROTH:  Very good.  I have no objection to the admission of what was described as one and two.  To this point I don't think there is any relevance to number three.  As he is saying, this was not given to somebody.

THE COURT:  But he said he wrote it.

MR. ROTH:  He said he wrote it, which would be hearsay.  As I understand it, pages one and two are admitted to show the effect on the listener's – the effect on the Defendant.  If the Defendant is testifying to page three was not given to somebody, then it wouldn't have that

21

relevance. So I have no objection to admitting pages one and two.

THE COURT: But it wouldn't be hearsay because it's his document that he wrote.

MR. ROTH: Right. And so we can put it in because he is our party opponent. Because it's his own party, it wouldn't be applicable.

MR. PERRONE: I'm just showing the Court based on – and just allow the Court an opportunity based upon relevance, if you look at this map, the nature of the drawing on the Map and that could be indicative of the Defendant's mental state at the time of the drawing of the map in association –

THE COURT: I hear you. So this is an evidentiary hearing. So I am going to allow it.

MR. ROTH: That's fine. I ask that it will be separated, A and B.

THE COURT: A should be two pages that were actually authored by Mr. Uraz, and exchanged with other persons. That's a two-page document. And then Exhibit B is a document that is simply authored by Mr. Uraz, but not distributed to anybody. All right.

MR. ROTH: Thank you, Your Honor.

22

(DX#A & B are received into evidence.)

MR. PERRONE: Move for admission.

THE COURT: Do you have a copy?

MR. PERRONE: Yes, Your Honor.

THE COURT: With these caveats the Court will admit Defendant's Exhibits A & B.

MR. PERRONE: After the Court has had an opportunity to look at it, I would like Mr. Uraz to look at it briefly just to –

CONT'D. DIRECT EXAMINATION

BY MR. PERRONE:

Q   And the handwriting on there, if you could read the first sentence?

A   "You don't think it will look better as a robbery"?

Q   Whose handwriting is that?

A   Close.

Q   And how do you take that?

A   I take it as an offering.

Q   How do you respond?

A   First, I was asking him verbally:

What are you talking about?

He said: Sir, don't say anything. There is a microphone here. They listen to us. I didn't know anything. Again, I have

23

never been in jail in my life. Why would they have a microphone on the medical floor?

Q   When were these notes exchanged?

A   It was exchanged September 27 after midnight.

Q   Thank you. Do you recall – did you think that he was serious?

A   It is nothing more than a conversation. I didn't think it was serious at all. It was just a talk. But at the end of the – the reason it tripped you is because I said:

No, I don't want anything.

And that's what frustrated me about the whole thing. I said:

I want to dispose of these papers. And he said, fine. Fine. I trusted the guy.

And that's where we end up.

Q   Based upon those letters, did you initially tell him to try to make it as some form of a robbery or did you tell him a specific scheme or plan?

A   It is nothing more than talk, again, about my case, what happened. Yes, sir. This and that. Then he came up with these ideas, and started offering me stuff.

Q   Why did you write notes regarding it? Whose idea was it to write notes?

24

A   It was Close's idea to write notes.

Q   And after you got out of the whole –

MR. ROTH: Your Honor, I'm going to object to the use the word "whole." The Defendant, in his testimony, continues to refer to it as the medical wing. The only person that says "whole" in this entire thing is Mr. Perrone. It's not term of art, it's not cute, it's not relevant.

MR. PERRONE: Commonly referred to, I apologize, I'll refer as to a medical unit.

THE COURT: I don't remember a medical unit being commonly referred to as a hole. A hole is for disciplinary actions, not medical. Now, he may have been in there for 23 hours. But that's not the hole, based on my 37 years of experience.

So I would have to agree, you said medical hole, you can stress the fact that he's there for 23 hours of a day. But that's not the hole.

Q   (MR. PERRONE) Okay. Were you there for disciplinary reasons?

A   On the medical floor?

Q   Yeah.

A   It's about from 23/1 lockdown I got moved to 24-hour lockdown because each room came with – there was no need to get out the room. I don't

25

know which one is better, but –

THE COURT: I simply think we established that he is there for at least 23 hours, maybe 24, on these days in question. I assume that's the relevance.

Q (MR. PERRONE) And are you, subsequent to the September 27, 2016, does Mr. Close continue to approach you in regards to the –

A Yes, he has.

Q – different issue in the letter?

A Yes, he has.

Q And what does he say to you?

A He said he could help me. He said, you know, you can beat this case. I figured there is nothing to talk to him about. I said, I don't know what you're talking about. Then it was nothing more than a conversation again. I said:

Well, what are you here for. And then it would be a conversation of what was he there for. And it never dawned on me that why would he be locked up 23/1 also. I didn't know the reasons behind why we're all there.

Q Does there come to be some talk between you and him with regards to a price associated with helping you on your retainer case?

26

A No.

Q Does he talk to you about setting up a phone call with somebody on the outside?

A No.

Q How do you end up on the phone call?

A I got called. It is a phone call. It was a video visit.

Q How is that set up?

A It's set up through the jail system. You to have an account. You have to be approved by the jail to be able to set up an account. And you are only allowed to have three visits a week paid, and one free visit per jail room.

Q How are those visits set up?

A It's set up outside from an individual.

Q And what other video visits had you had?

A That week, specifically?

Q Yes.

A It started October 19th.

Q Since you have been incarcerated, who had you gone a video visit with?

A My video visit was my sister, two or three of my friends.

Q Did you expect to receive a phone call in regards to a plan to murder Erika Melke?

27

A No.

Q Did you have any indication who was going to be on the other end of the line when you picked it up?

THE WITNESS: Your Honor, can I explain the system?

THE COURT: Go ahead.

THE WITNESS: The way this works is this –

THE COURT: But the question simply is: Did you know.

THE WITNESS: No, I did not.

THE COURT: Right. That doesn't have much to do with the operation of the system.

THE COURT: Back then you didn't know? You didn't know, right?

THE WITNESS: No. Now I do.

THE COURT: But you didn't know at the time?

THE WITNESS: No. Now the system allows you to see future visits.

THE COURT: All right.

Q (BY MR. PERRONE) You didn't have the ability to see the future visits with a name at that point in time, correct?

A No.

Q At some point in time did Mr. Close approach you

28

in regards to giving him some commissary money?

A Yes. He said that he needed money for his dental work to get the inspection done.

And the other thing that he said he doesn't have any money to put money in his account, so he needs some help. Okay. I can help you with that a little bit here and there.

But then I was extorted. Because he said that he mailed these letters and he wanted more. I said, well, after we disclose of these things, you never agreed to this thing, and that I was extorted.

The other thing that I started explaining –

THE COURT: You said he mailed them to you?

THE WITNESS: To his lawyer.

THE COURT: Okay. But you didn't know at the time you said he mailed them?

THE WITNESS: Um-hum. I thought they were disposed of. I wrote "no" underneath here. These is his handwriting. Bad handwriting, mine.

Q (BY MR. PERRONE) Did he offer you any type of support while being incarcerated?

A Could you specify?

Q Did he offer to provide with you any type of

29

support while you were incarcerated, as far as protection?

A No.

Q Did he say he was going to protect you from the other inmates?

MR. ROTH: Your Honor, I am going to object. The Defendant was answering the question. That is leading.

THE COURT: I'll sustain the objection.

Q (MR. PERRONE) Again, I'll rephrase. Did Mr. Close approach you and offer you anything while you were incarcerated?

A As far as protection?

Q As far as support?

A Other than mental support, talking to each other. That is it. That was just the talking, because I was locked up.

Q Were you afraid of the other inmates potentially doing something against you?

A Afraid from Allen? Yes. He was unstable. And just because Close got removed on the 19th of October.

MR. ROTH: Objection, non-responsive.

THE COURT: It's an evidentiary hearing.

Q (MR. PERRONE) Did Mr. Close approach you after he

30

initially told you that he had taken the notes, the letters, to the police, or to his attorney? Did he approach you after that?

A I think something was happening. Because on the 19th I came here for sentencing and it was postponed for two weeks.

MR. ROTH: I am going to object. Non-responsive. The question was: Did he approach you.

MR. PERRONE: He is explaining his answer.

MR. ROTH: No. He is making narrative about his sentencing.

MR. PERRONE: No. He is explaining –

THE COURT: You have to say either "yes" or "no" first. And then we can see if it's relevant after he offers an explanation. You can say whether he contacted you, yes or no, at first.

THE WITNESS: Could you repeat the question, please?

THE COURT: Mr. Perrone?

Q (BY MR. PERRONE) As far as Mr. Close contacting you in regards to repeated attempts to extort you after the initial attempt when he had told you that he had taken it to his attorney.

A Yes, he has. But I didn't know at that time. He

31

said it with his attorney. I believe it is just a talk.

Q As far as the second call, did you miss a Securus call after you had initially spoken with the individual that proposed to take out the trash?

A He contacted me a second time, October 24th, I believe. And at that time I realize what was happening. The video – and can I say something?

Q Yes.

A After five minutes, I hang up the visit. The deputy on post came up and said:

Why did you hang up on your visit.

I said: Well, I don't want to take the visit.

He said they called the jail wondering why you didn't pick up your visit.

MR. ROTH: Objection. This is narrative. It's not responsive to the question.

THE COURT: He can answer the question why he didn't pick up the phone.

Q (MR. PERRONE) The deputy, did they instigate that you go take the call?

A Yes. Because although you hang up the call, the call is still there. You can always sign up and pick up the call, regardless.

32

Q Do you recall the name of the deputy?

A Coulkins.

Q You don't go pick the phone up, though?

A No.

Q Now, do you have any further communication after October 24th with Close or Allen?

A Close was removed October 19th from our post. Allen was removed October 26th – 29th, to be exact. And he was still in the same post as me after that time.

Q Did you, other than payments you made through the commissary, did you make any other payments to either Close, Allen or anyone else?

A I bought some commissary for Allen, also.

Q And why?

A Because he said that I think you are being extorted by this guy. I want some help, too. So I help helped him, too.

THE COURT: Okay. He was being extorted by someone, Mr. Allen?

THE WITNESS: No. I was being extorted by these two inmates, Your Honor.

Q (MR. PERRONE) Did you see Mr. Close extort anyone else?

A No, I did not.

33

Q  Did anybody tell you this?
A  Yes.
Q  What did they tell you?
        MR. ROTH:  I'm going to object to the hearsay.
        THE COURT:  Sustained.  Outside of his knowledge, even for this area.
Q  (BY MR. PERRONE) Did you make any prior attempts to have Ms. Melke killed?
A  Never. No.
Q  Did you intend for her to be killed?
A  No.
Q  Did you ever believe that she would be killed?
A  No.
        MR. PERRONE:  No further questions.
        THE COURT:  Mr. Roth?
        MR. ROTH:  Thank you, Your Honor.
                CROSS-EXAMINATION
BY MR. ROTH:
Q  Good morning, sir.  My name is Jonathan Roth from the Ingham County Prosecutor's office.  I have a series of questions for you today.  At any point you don't understand any of the questions, or you need me to repeat any of them, please let me know.  All right?

34

A  Yeah.
Q  I want to start by talking about your relationship with Ms. Melke.  When did you start dating her?
A  December – October 2004.
Q  When did the relationship end?
A  June of 2025.
Q  Ms. Melke broke up with you, correct?
A  Yes.
Q  You were very unhappy with that, correct?
A  I was unhappy.
Q  You were very unhappy with her ending the relationship with you; is that correct?
A  I was unhappy.
Q  Sir, please listen to my question.  If it's no –
        THE COURT:  He said he was unhappy.
        MR. ROTH:  But the fact it's specific because of the relationship is important.
Q  (BY MR. ROTH) So if you're saying no, not because of that, just say no.  Was your unhappiness because Ms. Melke broke up with you?
A  Mr. Roth –
Q  Answer the question.
A  Remember, English is my second language.  I am taking literally everything you say.
Q  I understand.

35

A  Yes.  I was unhappy.
Q  Were you unhappy because Ms. Melke broke up with you?
        MR. PERRONE:  Objection.  At this point in time he is badgering the witness.
        THE COURT:  It's a straightforward question, Mr. Uraz.  You were unhappy.  The question was:  Were you unhappy because of the breakup.  It's a yes or no answer.
        THE WITNESS:  Yes.  I was unhappy.
        MR. ROTH:  Thank you.
        THE COURT:  Well, you were unhappy because of the breakup?
        THE WITNESS:  I was unhappy because of many things.
        THE COURT:  Thank you.  It was a contributing factor?
        THE WITNESS:  Sure.
Q  (BY MR. ROTH) Sir, I just want to be clear on something.  You mentioned this a couple of times because English is not your second language.  Do you feel comfortable with these proceedings, that you understand what is going on?
A  I prefer a translator so there's nothing that gets lost in translation.  I would really

36

appreciate it.
Q  All right.  That's something we can work on at some point in time in future hearings.  But at any point in time you can't understand my question, you have to let me know, okay?
A  Yes.
Q  Thank you.  So when Ms. Melke broke up with you, you testified earlier you started making bad decisions about drugs and alcohol, correct?
        MR. PERRONE:  No.  Mischaracterization as to what he testified to.  He said the drugs and alcohol were related to issues with his bipolar wife.
        MR. ROTH:  No.
        THE COURT:  No.  I thought he said at the time of the breakup, and the fact that his wife had left.
        MR. ROTH:  That's correct.
        THE WITNESS:  It started before that.  I was abusing prescription drugs and alcohol before.
Q  (MR. ROTH) All right.  So when you testified on direct that those issues got worse during the breakup, that was wrong?
A  Repeat the question.
Q  All right.  During the breakup your issues with

drugs and alcohol got worse, correct?

MR. PERRONE: I believe he said alcohol.

MR. ROTH: He talked about benzos as well.

THE COURT: He said benzoids(ph) and alcohol –

MR. PERRONE: He said the issues with alcohol increased after using them.

THE COURT: The issues broadened after using benzos?

THE WITNESS: Yes.

Q (MR. ROTH) So, sir, when the breakup happens, your issues with benzos and alcohol get worse, correct?

A Yes.

Q You start using more drugs, correct?

A Prescription drugs, yes.

Q But you are not using them within the prescription, you are abusing them, correct? You are taking more than you should, correct?

A Okay. I am buying them from – these weren't prescribed to me. I was buying them for my friend.

Q I understand. So they were prescription, but just that they were not prescriptions for you?

A Yes.

---

38

Q I understand. And you're also drinking more alcohol around that time, correct?

A Yes.

Q And, in general, because of the drugs and alcohol, you feel less stable than before, correct?

A My decision-making process was impaired.

Q Were impaired, correct?

A Yes.

Q So let's talk about those poor decisions. After Ms. Melke broke-up with you, you started doing things to harass her, correct, to bother her?

A No.

Q All right. Did you send her a number of text messages talking about closure and getting back together?

A I may have. Yes.

Q You may have or you did?

A I don't know.

MR. PERRONE: If he could particularize it as to specific time?

THE WITNESS: Is this before the PPO or after the PPO? What are we talking about here?

Q (MR. ROTH) Let's start about before the PPO. Did you send her a number of text messages asking to get back together, asking for closure?

---

39

A Yes. Both times. I have to move, too.

Q Okay. Sir, just listen to the questions and just answer the questions. Okay? It will make it a lot easier.

A Sure.

Q Did you send her a number of text messages talking about closure and getting back together?

A I don't remember. I may have.

Q And did she tell you she did not want you to continue to contact her, correct?

A She never said that.

Q On August 24th and 25th, 2015, she was driving a green Toyota Rav4, correct?

A I'm sure.

Q You knew her, right?

A Yes.

Q That was her car, right?

A I'm sure.

Q You're sure?

A You want me to say she was driving a green Rav4 Toyota when I knew her? Yes, she was driving a green car.

Q And in August of 2015 you keyed or scratched that vehicle, right?

A No.

---

40

Q She started hanging out with a guy named Stan White, correct?

A Yes.

Q And you knew Stan White, correct? You knew of him?

A Of him, yes.

Q How did you feel about Stan White?

A He raped her October 10th, 2013.

Q How did you feel about Stan White, sir?

A I wasn't happy with the decision she made to see him again.

Q How did you feel about Stan White, sir? Sir, you were angry with Stan White, weren't you?

A I wouldn't say angry. I was not happy.

Q Sir, you hated Stan White, correct?

A You're putting words in my mouth, Mr. Roth.

Q Then say "no."

A No.

Q You're telling me that you believe this man raped this woman that you cared about and that you were not angry with him?

A I was angry with her decision that she made a decision to see him again.

Q And you began contacting Mr. White, correct?

A Yes.

41

Q And you damaged his vehicle, correct?
A No.
Q Do you recall going to Dave and Busters in Auburn Hills on January 1st?
A Yes. But I -- I --
Q Sir, do you recall going there?
A Yes, I do.
Q And you made a big scene there that day, correct?
A No, I didn't.
Q She made it clear she wanted you to leave?
A I did.
Q And restaurant security had to remove you; isn't that correct? Sir, yes or no, did the restaurant security have to make you leave?
A No. I voluntarily left.
Q Sir, did you ever damage Mr. White's car?
A No.
Q Did you ever damage Ms. Meika's car?
A No.
        MR. ROTH: May I approach the witness, Your Honor?
        THE COURT: You may.
Q (BY MR. ROTH) Sir, I'm showing you what's been marked for our hearing as People's Proposed Exhibit Number M-29. If you could take a moment

42

and flip through that for me?
A Okay.
Q Do you recognize this?
A I guess I do.
Q This is a conversation you had with Stan White by text message?
A Yes.
        MR. ROTH: All right. I move for admission of Proposed Exhibit M-29.
        THE COURT: Any objection?
        MR. PERRONE: No objection, Your Honor.
        (PX-#M-29 is received into evidence.)
Q (MR. ROTH) All right. So let's just look at the cover page for now. Mr. White says to you:
        "Is this Tony Uraz"?
        First of all, you go by Tony often, correct?
A It's my nickname.
Q All right.
        "The same person who has vandalized mine and Erika's vehicles multiple times, and has been obsessively stalking Erika for a long time."
        Do you remember receiving that message?
A Yes.
Q And did you say: No, I didn't do any of those

43

things?
A I didn't talk about it. I didn't say that I did it.
Q Did you deny doing those things?
A Yes.
Q Show me where. Where did you deny it, sir?
A I didn't say I did it on there.
Q Oh. Again, he talks about you popping tires, and, again, you don't deny it, correct? Correct?
A Once again?
Q Sure. Again, Mr. White talks about popping the tires on our vehicle, referring to his and Erika's.
A What does popping tires mean?
Q Puncturing the tires.
A I didn't do that.
Q I understand, but you said here you did not deny that, correct?
A I'm trying to get to the subject matter.
Q Again, he says:
        "If you don't have about $1500 to give me and Erika for the damages you caused from vandalizing our vehicles, then we will have nothing to talk about"?
        You remember him saying that?

44

A Sure.
Q And, again, you don't deny it, correct? Correct?
A There is nothing to deny, because I didn't do anything. If I didn't do anything, I did not deny it.
Q Sir, you did not deny it, correct?
A Again, I didn't do anything.
Q In fact, you said:
        "I am not going to discuss these matters by a text," correct?
A Obviously. Yes.
Q You began following Erika around town, correct?
        MR. PERRONE: I'm going to object. If he can testify about incidents, it will make it a lot easier than broad general questions.
        THE COURT: All right. Rephrase.
        MR. ROTH: Okay. Your Honor.
Q (MR. ROTH) I want to talk specifically about March 26, 2018. Did you follow her to the Best Buy in Okemos?
A I ran into her in Best Buy Okemos. I didn't follow her.
Q I am going to show you what's been marked as Proposed Exhibit M-30. This is picture of you at the Best Buy in the parking lot near her, correct?

45

A   Yes.

MR. ROTH:  I move for admission of Proposed Exhibit M-30.

THE COURT:  Any objection?

MR. PERRONE:  No objection.

THE COURT:  Received.

(PX-#M-30 is received into evidence.)

Q   (MR. ROTH)  Sir, at this time, you have a valid PPO against you, correct?

A   Yes.

Q   You were not to be anywhere near her, correct?

A   Yes.

Q   If you were to see her somewhere, you're supposed to turn and leave, correct?

A   Yes.

Q   Instead it's your testimony you just happened to bump into her at that Best Buy, correct?

A   Yes.

Q   You didn't didn't follow her there?

A   No.

Q   And so is this a picture of you turning and leaving that we see in front of us?

A   Yes.

Q   Sir, isn't this a picture of you looking at her and making some sort of gesture with your hand?

46

A   Probably when I do that kind of thing, because — can I tell you about something?

Q   Sir, that wasn't the first time you had either just bumped into her around town, was it?  Was that the first time — you used the phrase "just bumped into her." You know what that means, correct?

A   Coincidental meeting?

Q   Right.

A   Yes.

Q   So is that the first time while you had this PPO that you just bumped into her?

A   She bumped into me.

Q   Was this the first time she bumped into you?

A   Again, one more time, ask me a question.

Q   You said she bumped into you at the Best Buy. Was this the first time at the Best Buy that she happened to bump into you?

A   No. Second time.

Q   Tell me about the first time.

A   First time was February 23rd, 2016 at my doctor's office.

Q   Very good.  I want to talk about April 5th, 2016. Do you remember that day, sir?

A   April 5th?

47

Q   2016.

A   Sure.

Q   Remember a person by the name of Patrick Burnett that you used to work with at MSU?

A   Yes.

Q   You talked to Mr. Burnett about buying a gun, correct?

A   I may have.

Q   No. You may have or you did, sir.

A   I don't remember. It's been two years.

Q   Sir, how often do you try to buy a gun?

A   I don't buy guns.

Q   So this would be memorable. You would remember if this is the first and only time, right?

A   I may have trouble remembering. I don't remember, specifically.

Q   Would looking at a police report where he describes this conversation with you jog your memory? Would that help you remember?

A   Sure.

THE WITNESS:  Your Honor, may I get my white folder — envelope?

THE COURT:  Mr. Perrone, Mr. Urez wants the white envelope.

MR. ROTH:  In the same way witnesses don't

48

get documents up there unless they're specific for refreshing.

THE COURT:  We will allow him to have his envelope. Is that the right one?

THE WITNESS:  Yes. Is that okay?

THE COURT:  Yeah.

Q   (MR. ROTH) Take the ingredients out so that I don't have any problems. Thank you. All right. I'm going to show you the police report from then.

A   Sure.

Q   If you could read that highlighted part silently to yourself, then look up when you're done. Did that refresh your memory, sir?

A   No. Because I never seen this police report in my life.

Q   No. But the stuff that's in there, did that refresh your memory as to what happened that day?

A   I don't remember, to be honest with you.

Q   Sir, isn't it true you asked Mr. Burnett: "Do you trust me"?

A   I don't remember, to be honest with you.

Q   Sir, isn't it true he said: I trust you?

A   Well, we worked together two, three, four years. Hopefully we trust each other.

Q   Isn't it true that you then said I want to get a

49

gun and some bullets; can you do that?

A  It was just a conversation.

Q  Sir, is that a yes, you did say that?

A  I said I don't remember. It's been two years. Because I was drinking and I was using benzos, I don't remember much of the stuff.

Q  Isn't it true you then said:
"I don't want to go about it in the legal way." Correct?

A  No. I don't remember it, again.

Q  Sir, you worked at Michigan State University for how many years?

A  Twenty-one years, full time. Four years –

Q  Hey, pay attention to me. Don't read documents. We are having a conversation here, okay?

A  But this is related to what I –

Q  Listen to me. If you need to refer to something, ask for it, okay?

A  Mr. Roth, I would appreciate you being polite. Because I have been polite with you, sir.

Q  Listen to me, answer the questions. How long had you worked at Michigan State University?

A  Twenty-five years.

Q  You lost your job after this conversation, correct?

50

A  Yes.

Q  And you're telling us you don't recall the conversation?

A  I don't remember the specifics of it.

Q  All right.

THE COURT: So let me ask you. You lost your job because Michigan State investigated and they determined that they thought you were going to buy a gun. That's why they discharged you?

THE WITNESS: Yes.

THE COURT: Move on.

Q  (MR. ROTH) You began contacting Ms. Melke's mother, correct? Let me ask it differently. You called her phone, correct?

A  Can you time specific, please?

Q  April 8, 2016.

A  Yes. She called me.

Q  Sir, listen to me. Did you call her phone?

A  Yes.

Q  Did you also send her a letter?

A  Yes.

Q  Was there a valid PPO against you at that time?

A  Not from her mother.

Q  There was a valid PPO against you at that time?

A  Yes.

51

Q  Protecting Ms. Melke?

A  Yes.

Q  You weren't supposed to contact anybody on her behalf, correct? You weren't supposed to contact the people to try to get to her, correct?

A  Is that what the PPO states? Probably.

Q  Sir, was there a time when you were breaking into Ms. Melke's apartment when she wasn't home?

A  I think those charges were dropped.

Q  Sir, was there a time when you broke into her house, her apartment when she wasn't home?

A  Yes.

Q  What did you do that for, sir?

A  To drop a ring.

Q  Did you take something with you?

A  Take something with me?

Q  Sir, I am going to show you what's been marked as Proposed Exhibit M-21. Is that a picture of you in her home that day?

A  Sure.

Q  And that's January 1, 2016, at least has the date on there.

A  That's the date on there.

Q  That's not correct?

A  That's not the date.

52

MR. ROTH: Your Honor, I move for proposed Exhibit M-21.

MR. PERRONE: No objection.

THE COURT: So admitted.

(PX-#M-21 is received into evidence.)

Q  (MR. ROTH) Sir, did you take something when you went to her home that day?

A  Take from her?

Q  Yes.

A  No.

Q  Take something from her home?

A  I don't know.

Q  Sir, was this the only time you went into her home when she wasn't there?

A  Yes.

Q  There was a valid PPO at that time, correct?

A  I believe so.

Q  And you were not supposed to go to her home, correct?

A  I believe so.

Q  And you went to her home anyway, correct?

A  Yes.

Q  And you did so and stole some underwear from her, correct?

A  No.

53

Q  You stole a bra from her, correct?
A  I don't know.
Q  You don't know? Is that what you said?
A  No.
Q  No, or you don't know?
A  No.
Q  You never took any property from her home that day?
A  No.
Q  But you went to her home knowing it is in violation of a PPO, correct?
A  Yes.
Q  You knew that it was going to scare her, harass her, bother her, correct?
A  No.
Q  You know there was a PPO telling you not to go there, though, correct?
A  Yes.
Q  And you went there anyway, correct? Is that correct, sir?
A  No. Yes.
Q  Did you create an Instagram account in her name?
A  Did I create an Instagram account in her name?
Q  Do you know what Instagram is, sir?
A  I'm not really up to speed right now. Yes,

54

probably.
Q  Yes, you know what Instagram is?
A  Yes.
Q  And did you create an Instagram account in her name?
A  Is Instagram created through the Facebook account or not?
Q  Yes. Yes, it can be related to a Facebook account.
A  All right.
Q  Do you remember doing that, sir, that you created an account in her name, either through Facebook, Instagram or both?
A  Okay. I created an Instagram account through her name. I'm not sure what you're referring to.
Q  The picture on the account was her picture, correct?
A  I have to see the account, I am sorry.
Q  I'm showing you what's been marked People's Proposed Exhibit Number 4. Do you remember this?
A  Okay.
Q  You remember making this?
A  I remember the picture, I guess. I don't remember making—what are you referring to? Making what?

55

Q  Do you remember opening an account and putting this picture on it through Facebook or Instagram?
A  Here is two separate pictures. When you create an account, there is a picture that comes with that account, regardless. Can you show me that picture?
Q  All right. So I'm going to show you what's been marked as M-2 and M-1. These are what you're referring to?
A  No. This is—can I point?
Q  Yeah.
A  Okay. Referring to that round face picture right there, you see that? That says there is no picture there, referring to the picture.
Q  You created this account, correct?
A  I don't remember. Probably.
Q  Probably?
        MR. ROTH:  Your Honor, I would move for admission of Proposed Exhibit M-2?
        THE COURT:  All right. So admitted.
        (PX-#M-2 is received into evidence.)
Q  (BY MR. ROTH) Then you put a picture on that account, correct? You said this is the default picture up here, correct? And then you put another picture on the account, correct?

56

A  I don't remember.
Q  Showing you Proposed Exhibit M-1, is this the picture you put on there?
A  I don't remember.
Q  Sir, let's talk about your actions. You don't seem to remember anything.
A  I was drunk and high on benzos. I don't remember much at that time.
Q  But you created this Facebook account or Instagram account—
A  I may have.
Q  —in her name? And, again, that was a violation of a PPO, correct? Is that correct, sir?
A  Why would that be a violation of the PPO?
Q  You had a PPO telling not to bother her and you made a Facebook or Instagram account in her name, correct?
A  How does that bother her?
        THE COURT:  It's a yes or no.
        THE WITNESS:  No.
Q  (MR. ROTH) At the time you made this, there was a PPO, correct?
A  Okay. Yes.
Q  Protecting Erika Melke from you, correct?
A  Yes.

57

Q I want to show you what has been marked as Proposed Exhibit M-5. There is an e-mail that you sent to her during that time, correct? I say e-mail, but you sent it to her digitally somehow. I guess, is a better way of saying it.
A I gave the same letter to my lawyer.
Q Because you wrote this, correct?
A I wrote the letter. Yes.
Q And you gave one copy to your lawyer to give to Erika, correct?
A Yes.
Q And you actually sent a copy directly to her, correct?
A No. Because that is not my e-mail.
Q You wrote this letter?
A I wrote the letter.
Q And you're saying this isn't an e-mail account from you?
A No.
Q You wrote this letter on August 2016, correct?
A August of 2016, yes.
Q And, again, there was a PPO telling you not to have contact with her, correct?
A That's why I gave it to my lawyer, to show it to Mr. Koop here.

59

A I don't remember, sir.
THE COURT: Let's move on.
Q (BY MR. ROTH) If you don't remember your actions, then you don't know if you would have keyed her car, correct, ever?
A Correct.
Q You can't tell me, then, whether or not you ever threw eggs at her car, correct?
A Correct.
Q You can't tell me whether or not you ever keyed Stan White's car, correct?
A Correct.
Q You can't tell me whether or not you ever punctured Stan White's tires, correct?
A No.
Q When is it that you get sent to jail in August of 2016. Do you recall the date?
A August 23rd through 25th I was sent for two days.
Q All right. For two days only?
A Yes. And I was on tether.
Q I am sorry?
A I was on tether at that time.
Q On tether?
A Yes.
Q Then you get remanded into the jail on the 23rd?

58

Q But you continued to want to contact her, correct?
A No. That's what I gave to my lawyer to show Mr. Koop.
Q You also changed Ms. Meike's Facebook password, correct?
A I don't remember that. No.
Q You may have?
A I said no, I don't remember. I didn't say I may have.
Q Well, if you're telling me you don't remember, then you can't tell me you didn't do it, correct?
A No, I didn't.
Q A minute ago you didn't remember. How are you so sure you don't remember now?
A Because you're playing with words. I have given you the right answers.
Q Sir, did you change the Facebook password for her account?
A No.
Q A minute ago I asked you that, you said you don't remember. Why did your answer change?
A I didn't remember my actions. I was using benzos, drinking heavily.
Q Again, if you don't remember your actions, you may done it, correct?

60

A I was told by my lawyer that it's better to go back, go to jail and start serving my sentence early. August 31st. I came here, however you want it.
Q So August 31st is where you go in?
A Yes.
Q When you get in there initially, you're not in the medical dorm, you're in, is it E or F?
A I was put in general population first, for the first, around 9 PM, and next day 6 PM I was pulled out from there and put in solitary confinement.
Q And what post or dorm was that?
A Which one? First one or second?
Q Let's talk the first one.
A First one was Post Floor Dorm B.
Q All right. And you said in one day you were pulled and put in what you refer to as isolation, correct, solitary?
A Solitary. Post 5, Dorm F.
Q So let's talk about how these are set up. How many dorms in a post?
A Four.
Q And within Dorm F, how many different cells are there?

61

A  Six.
Q  And are they sort of off of a main room?
A  Yes.
Q  And each one of the cells, are they just for one person?
A  Yes.
Q  Was Charles Allen in your dorm at that time?
A  Yes.
Q  Was Reginald Close in your dorm at that time?
A  No.
Q  When you first got there, did Charles Allen sort of make friends with you?
A  Yes.
Q  You two began talking.
A  Yes.
Q  Socializing?
A  Yes.
Q  And while you two were socializing, you talked about your case some, correct?
A  He initiated the conversation, yes.
Q  Sir, it's a yes or no question.
   THE COURT:  Yes or no, Mr. Uroz?
   THE WITNESS:  Yes.
Q  (MR. ROTH)  In talking about your case, did you also talk about Ms. Melke?

62

A  Yes.
Q  You were upset with Ms. Melke at this time, correct?
A  I was frustrated.
Q  You felt that she had put you in jail, correct?
A  I put myself in jail.
Q  You felt she was responsible for it, correct?
A  I brought myself in jail because I was unhappy with my actions?
Q  And when you talked to Charles Allen, you called her a bitch, correct?
A  No.
Q  And in talking with Charles Allen, you told him that you wanted him to beat her up when he got out, correct?
A  No.
Q  You told him that you wanted him to use a baseball bat and beat her up beyond recognition when he got out, correct?
A  No.
Q  You told him you wanted him to kill her when he got out, correct?
A  No.
Q  You told him that you wanted him to get you a gun, correct?

63

A  No.
Q  You told him that you were going to use a gun when you got out to kill the man associated with Erika Melke, correct?
A  No.
Q  How long were you in that dorm before getting moved to medical?
A  August 31st through September 26.
Q  So about 26 days, 27 days?
A  Um-hum.
Q  Is that a yes?
A  Yes.
Q  Then you go to medical, correct?
A  Correct.
Q  Is that where you meet Reginald Close?
A  Yes.
Q  While you're in medical, is Reginald Close your cellmate?
A  Yes.
Q  And Reginald Close, you also become friendly with, correct?
A  He became friendly with me, yes.
Q  And, again, you guys talked about your cases, correct?
A  Yes.

64

Q  And you talked about Ms. Melke with him, correct?
A  No.
Q  You asked Reginald Close to kill Ms. Melke, correct?
A  No.
Q  You asked Reginald Close to get you somebody who could kill Ms. Melke, correct?
A  No.
Q  During this time you were doing frequent video visits with a person by the name of – I'm not going to pronounce it correctly, I apologize – Mr. Atamer?
A  Um-hum.
Q  Yes?
A  Yes.
Q  What's the proper way to pronounce his name?
A  First name or last name?
Q  Last name, Atamer?
A  Atamer.
Q  I apologize.  When you were speaking to him on October 11, 2018, at approximately 9:30 pm, you told him:
   "I gave you a name so you can deposit $150 to the guy's account."  Correct?
A  Yes.

65

Q   You were referring to Reginald Close, correct?
A   Yes.
Q   He told you, you can't deposit in his account. He tried but it can't be done. Correct?
A   Yes.
Q   And you followed up with:
    "Can you come down here tomorrow to make a deposit. Can you do that for me, please? It's very important. The guy here, I need to pay him some way, get my head around." Correct?
A   Yes.
Q   You didn't mention anything about dentist work, correct?
A   Yes. Because I was being extorted.
Q   On that same phone call, you said to him: Are there any news of the woman that got me in trouble. Did you hear anything at all, correct?
A   Yes.
Q   A minute ago you told me that you did not blame Ms. Melke at all, that you felt you put yourself in jail, correct? But in this phone call you refer to her as the woman that got me in trouble, correct?
A   Yes.
Q   Because you blamed her, correct?

66

A   No.
Q   Then you go on to say, because he says: "Huh"?
    And you went on to say:
    "Any news of the woman who got me in trouble? Any news of the woman who's the reason I'm rotting away in this jail"? Correct?
A   This conversation was in Turkish. Whoever translated this conversations, I need to meet this person, I need to hear the origin –
    This is hearsay right now. Because I don't speak English to the guy that speaks Turkish. I speak Turkish, also. So this is the second information you're telling me, which I don't remember. I need to hear the original tapes with the person that can translate.
Q   Are you telling me you did or did not say this?
A   I don't remember what I said. This is in Turkish. Bring the guy who translated. We will face it together and we will go from there.
Q   All right. Next call on October 13, 2016, at 9:31 a.m. do you recall saying to Mr. Atamer:
    "But I'm telling you I was fucked in here for five weeks. I'm locked in here for 23 hours. I read so much – inaudible – I read – if I kill

67

    the woman, this would be at least worth my while."
    Do you recall saying that?
A   I think it sounds like it's in Turkish, but that's okay. No, I didn't say that. Because I said it in Turkish.
Q   All right. Did you say something about killing this woman would make it worth it?
A   No. I said if the punishment fits the crime, then I'm okay with that.
Q   And you were talking about Erika Melke when you said that, correct?
A   No, I did not.
Q   Another phone call on October 18, 2016, at approximately 9 p.m, you told Mr. at Atamer:
    "Don't you worry, I made really good friends in here. Now I have very decent friends."
    Correct? Is that correct, sir?
A   I don't remember. These are – is this from a year ago. They are no phone calls. They are videos. Bring them to me in Turkish. Let me listen to them.
Q   Sir, do you recall saying that?
A   No, I do not.
Q   Sir, did you go on to then say: I am crossing over to the other side, I'm becoming tough,

68

    correct? Do you recall talking to him about becoming tough?
A   As it had to do with the jail, yes.
Q   You went on to say: Toughening up from the good boy to the bad boy. Do you remember saying that?
A   Didn't sound that way in Turkish. No.
Q   Something like that.
A   No, I didn't say that. These are hearsay conversations. So that's why –
Q   Sir, listen to the questions and answer them, okay? Yes or no?
A   No.
Q   You go on to then say: They put me in here, but I'll make them regret it for putting me in here. I'll say that much, okay? Now, I've decided to be the bad man. Do you remember saying that?
A   No.
Q   A conversation on October 20 at approximately 8:30 p.m. Do you recall telling him, referring to Ms. Melke:
    "She knows how to control everyone with her her pussy."
    Do you remember that?
A   No.
Q   You felt Ms. Melke was manipulative, though, that

69

Q ...she controlled people?
A She told me once that she could be. Yes.
Q While you were in custody, did you also testify to a video visit that you received from somebody you did not know, correct?
A That is correct.
Q And he told you that it was somebody who knew Ruff, correct? He said: I know Ruff?
A Who's Ruff.
Q Did you know Reginald Close by the nickname Ruff?
A How did you spell Ruff?
Q R-U-F-F?
A I know somebody R-O-U-H-G(sic).
Q Was that Reginald Close?
A They called him Ruff, which I didn't refer to.
Q You knew a guy in jail by the name of Reginald Close, correct?
A Yes.
Q And people called him Ruff, right?
A I believe so.
Q So when this guy calls you that you don't know, and says that he knows Ruff, you know he is talking about Reginald Close, correct?
A May I see the transcript?
Q At the bottom of the page, isn't it correct that

70

you said to that man:
"You get my name from Ruff?" Correct?
A Yes, I think I did.
Q Just to be clear, this conversation is in English, right?
A Yes.
Q All right. And in that conversation, Ruff started talking about getting rid of some trash, correct? I'm sorry. The person that you were talking to on the other end of the video conference was talking about getting rid of some trash, correct?
A I believe so.
Q And he asked you: Do you want me to beat that trash up with a bat? I mean, when I'm there to take it out? Correct?
A Yes.
Q And then you said: Yes. Yes, please. Clear the house. Correct?
A Yes.
Q I mean, you wouldn't beat up trash with a baseball bat, would you?
A I didn't understand what he was saying. English is my second language. Once again, I was referring to the answers.
Q Sir, when he said: Beat up that trash with a

71

baseball bat, you knew by "trash" he meant a person, correct?
A No.
Q Later on he asks you:
"Do you want me to come back and show you the trash is gone or are we good or are you taking my word, or do you want me to contact somebody else or what? Correct?
A I have to see the transcript. You're relating to something that you're asking me happened years ago.
Q That is fine.
A Can I have a copy so I can hold it in my hand?
Q I am going to hold it for you. Read it right here.
A Do you want to highlight it? Do you want me to come back and show —
Q No. Just read silently to yourself.
A Oh.
Q So he asked you what I just read you, correct? He asked you if you need him to confirm that the trash is gone, correct?
A Okay.
Q And then you asked him to send you a card in there, correct?

72

A Okay.
Q Is that correct, sir?
A To what context? I don't remember what I — when I said that, to be sure.
Q This is what you said in response, correct? You said: Well, you can send me like a card in here. Send a card to me here. I apologize. Correct? Is that correct, sir?
A If it says that.
Q He goes on to ask you: I mean - do you want to look at this while I read it?
A I would appreciate it.
Q He goes on to ask you:
"I mean, you want that trash to hurt? I mean, do you want me to beat that shit up before I — or do you want me to just throw it out, just quick, or do you want me to beat that ass"?
You remember him saying that?
A I don't remember. But I guess it says it there.
Q So when he says all those things, you know he is not talking about trash, correct?
A Actually I thought he is talking about trash, because I had trash at my home at that time that I wanted him to remove.
Q So you thought it made sense to beat that trash up

73

before taking it out?

A   If you look at the conversation, I'm asking questions. I'm not instigating anything.

Q   Sir, you knew he wasn't talking about trash, he was talking about a person, correct?

A   No.

Q   Sir, during this conversation, you were asking this man to kill Erika Melke for you, correct?

A   No.

Q   You were offering him money to kill Erika Melke for you?

A   No.

Q   Those men that we talked about before, Reginald Close and Charles Allen, as best as you were aware, they did not know Erika Melke before you, correct?

A   No. But I think they went through my paperwork.

Q   Sir, I'm not asking you to guess about things. I'm asking you, in your conversations with them, neither one of them knew Erika Melke before, correct?

A   No.

THE COURT:   How much longer do we —

MR. ROTH:   I'm almost done, Your Honor.

Q   (MR. ROTH) I'm showing you page four in that same

74

transcript with the men who called you— he asked you:

"Can you give me address where that trash might be at"? Correct?

A   Um-hum.

Q   Is that a yes?

A   Yes.

Q   And then you replied:

"No. Ruff should have given you the address." Correct?

A   I didn't know what address he is talking about.

Q   Sir, you just told us a minute ago, you thought you had trash removed from your house, correct?

A   Yes.

Q   So you could have given him your own address, correct?

A   Why would I give him my own address so he can steal stuff from my home? He looked suspicious. I didn't want him to get my home address and get my neighbors upset, too.

Q   Do you recall there is a text message that you had sent to Ms. Melke where you called her a "ho," do you remember that. And then you came back and said: This wasn't meant for you?

A   I believe so. Yes.

75

Q   All right.

A   But I didn't use the word "ho." It was supposed to be "who."

MR. ROTH:   Your Honor, I have nothing further of the witness.

THE COURT:   Any redirect, Mr. Perrone?  If you are going to have some, we'll take a break.

MR. PERRONE:   Quickly. Two questions.

REDIRECT EXAMINATION

BY MR. PERRONE:

Q   In the conversations you had with Mr. Atamer, was that at a period of time where your mental faculties were less than what they usually were?

A   Yes.

Q   Was that as a result of —

A   Being locked up 23 hours a day.

Q   How many times did Officer Mobley ask you whether you wanted the trash taken out?

A   Probably more than six, seven times.

MR. PERRONE:   No further questions.

MR. ROTH:   Nothing.

THE COURT:   All right. So we are going to take a break. What else do we have on the motion?

MR. ROTH:   I assume the Defense is not calling any other witnesses?

76

MR. PERRONE:   I'm going to call your witness and play the video of Officer Mobley, if Your Honor has had the opportunity to see that.

MR. ROTH:   We will stipulate to admit the video. If the Court would like to watch it on the break, that's fine as well, so we don't all have to be in the courtroom.

THE COURT:   How long is the video?

MR. ROTH:   Fifteen minutes.

MR. PERRONE:   Yeah.

THE COURT:   We will just watch it in here.

MR. ROTH:   That's fine. One of us will be calling Detective Krumbach. And then we have the two shorter motions that don't require any testimony.

THE COURT:   All right. We'll take a recess, probably about 20 minutes or so.

MR. ROTH:   Thank you, Your Honor.

(Recess taken from 12:11 to 12:34 p.m.)

THE COURT:   Returning on the record on Tario Uraz. Who is next?

MR. ROTH:   I believe Defense and I are going to stipulate to giving the Court a video to watch.

THE COURT:   Set it up. Might as well watch

77

it now.

(Playing video at 12:35 p.m.)

THE COURT: Can we stop it, or is this something else, or is this part of it?

MR. ROTH: This is it. We have a transcript that might make it easier to watch.

MR. PERRONE: We are going to -- if we are going to submit the transcript for the jury, just so we are addressing this issue now; if we have an issue associated with the jury, if we have to use the transcript of the video to try to understand it, we should coordinate that, if the Prosecution is going to offer that.

THE COURT: We can always just play it, the video, and then the issue becomes if the transcript is accurate, than it will be provided with the transcript. Not necessarily at the time the video was playing.

MR. PERRONE: I will be objectionable to any transcript.

MR. ROTH: I'm just trying to address that issue.

THE COURT: We'll note that. But I would think, since like anything else, the deposition, anything else, a transcript can be made available.

78

But I would allow the video to be played first at trial before presenting a transcript.

MR. ROTH: I believe we'll stipulate to call this Defense Exhibit D.

THE COURT: All right. Thank you.

MR. PERRONE: Yes.

(DFS #D being played from 12:37 to 12:50 p.m.)

THE COURT: Additional witnesses, Mr. Perrone?

MR. PERRONE: I will call Detective Krumbach.

THE CLERK: Can you swear or affirm to tell the truth, nothing but the truth, under the penalty of perjury?

THE WITNESS: I do.

MATT KRUMBACH,

A witness sworn to tell the truth, testifies as follows:

DIRECT EXAMINATION.

BY MR. PERRONE:

Q   Detective, if you could spell your name and state what department you work for?

A   Detective Matt Krumbach, K-R-U-M-B-A-C-H, with the City of Lansing.

Q   How long you have you worked for the City of

79

Lansing?

A   Over 21 years.

Q   And you were assigned to investigate a stalking--

A   Yes.

Q   -- complaint? And the Defendant was the individual that you were investigating for stalking?

A   Sir, there were several complaints involving your client that I was investigating. Could you be more specific on dates and which ones?

Q   Were you investigating Mr. Uraz for aggravated stalking in this matter prior to the instant case? Were you investigating him on a prior case?

A   Yes.

Q   So you have been involved with Mr. Uraz on all of the aggravated stalking cases?

A   Not all of them, sir. Some.

Q   That were in Lansing?

A   Some of them.

Q   But you had knowledge of the ones that were alleged to have occurred outside the City of Lansing?

A   Yes.

Q   As part of your investigation?

A   Yes.

80

Q   When were you initially contacted in regards to Mr. Uraz allegedly contacting the inmates to solicit a murder? Do you recall when you were initially contacted?

A   Yes.

Q   When?

A   I believe that that is some time in September of 2016.

Q   And that would have been when you came into contact with Reginald Close?

A   Yes, I did come into contact with Reginald Close.

Q   In your report you state that you received information on October 13 from Alexander Rusek on behalf of Reginald Close, would that be accurate that you received information on October 13, not September?

A   Yes, sir. My apologies. I had so many cases against him, the dates. I received information from Alexander Rusek regarding his client. Yes. It would be October.

Q   What were you told?

A   I am sorry, sir.

Q   What were you told? What information were you given, specifically?

A   I am sorry. What, sir?

81

Q   What were you told by Alexander Rusek? What did he convey to you, specifically?

A   What did he convey to me, specifically?

Q   What did he tell you?

A   I was given information that Alexander Rusek had contacted the Ingham County Prosecutor's office in regards to Mr. Uraz contacting his client to solicit murder.

Q   And what was the first thing that you did after you received that information?

A   I discussed it, the information that I received with the Prosecutor. And then I contacted Mr. Rusek.

Q   And what did Mr. Rusek tell you?

A   I asked him if it would be possible that I would be able to interview his client, Mr. Reginald Close, at the Ingham County Jail.

Q   And was that something that was set up?

A   He said that - yes. He would confer with his client. They agreed to a date and time. I did go down to the Ingham County Jail and conduct that interview, along with Detective Hogan.

Q   What did you tell Mr. Rusek in regards to the context of the interview?

A   What did I tell him?

82

Q   Yes.

A   Can you be more specific?

Q   What did you tell him the meeting was going to be about?

A   Well -

Q   You asked for the meeting. What were you looking to accomplish?

A   Well, I was told that he had information about solicitation of a murder.

Q   Did you tell Mr. Rusek to inform his client not to have any contact with Mr. Uraz?

A   Did I tell him not to?

Q   Did you tell Mr. Uraz to inform his client not to have any further contact or to instigate any calls or communication between Mr. Uraz and Mr. Close?

A   Not that I recall, sir. I think they were separated.

Q   So the conversation that you would have had with Mr. Rusek would have been preliminary prior to the meeting? Was there a meeting?

A   We met Mr. Rusek at the jail. So I had spoke to him on the phone. I set up a date and time to go down to the jail. Mr. Rusek was going to be present while Mr. Close spoke with us. And he was.

83

Q   Do you recall the date that you met with Mr. Close?

A   I would have to - if you're asking for a specific date, it was in October of 2016. There is a lot of dates involved. If you want the specific one, I -

Q   If you want to review your report, would that refresh your recollection?

THE COURT:  Just the date. Give him the date. It's an evidentiary hearing.

Q   (MR. PERRONE) October 17?

A   Sounds about right, sir.

Q   1:30 p.m.?

A   That sounds about right, sir.

Q   And, as part of your investigation, you became aware that Mr. Close was not going to be offered a proffer because he was already proffering on an unrelated incident?

A   Prior to me setting up of this meeting, I had asked the Prosecutor's office if there is any proffer agreement that they would consider, and they told me no.

Q   Is that something that you had discussed with Alexander Rusek, the possibility of a proffer?

A   I told him that there would be no proffer, and he

84

stated he understood that.

Q   When did you tell him that there would be no proffer?

A   I told him that.

Q   At the meeting or when you initially set up the meeting?

A   Probably walking into the meeting that he understood that. And that I reiterated that while it was audio and videotaped.

Q   When you received this information, you ended up returning to work. You took a vacation?

A   I may taken a few days off, once again, yes.

Q   You received the information on - in the late afternoon of October 13th?

A   I have it documented in my report, sir, if you were looking for specific dates in October of 2016.

Q   What did you do after the meeting with Mr. Close? You contact Mr. - did you contact Officer Mobley?

A   No, sir.

Q   Who is all - is this a special operations operation?

A   I'm sorry?

Q   Is this a special op? Who was all involved? Who do you contact to set up the phone call? How is

85

the phone call with Officer Mobley set up on your end, being the investigative detective?

A   Are we jumping from right after the meeting to that?

Q   Yes.

A   There were several things that happened in between, during my investigation, which led me, at one point in time, along with Detective Hogan, who is a detective that I work with, to contact Lieutenant Robin Backus of our VCI unit, and have a meeting in regards to this ongoing investigation.

Q   What several things happened that you investigated?

A   Well, I verified some information that we had learned during our initial interview with Mr. Reginald Close. There was some discussion of money placed on his account. Detective Hogan assisted me in verifying that that money was placed on Mr. Reginald Close's account. There was discussion that Mr. Close had advised me that Mr. Uraz had contact with agencies outside of the Lansing Police Department. We went over and verified that. As part of my job, I went over to Michigan State University with Detective Hogan

86

and verified the information with MSU and verified that reports had been taken, and that Mr. Uraz had been released from his employment. I gathered those reports.

Also, Detective Hogan assisted me in gathering some information in regards to photographs of subjects that placed money on Mr. Reginald Close's account that verified the date and times that he gave us originally during the statement he gave us. There's a lot of things that I do as a detective, sir, before I run over to VCI.

Q   And it's determined that a phone call is going to be set up?

A   At one point in time, yes.

Q   And part of the verification was $160 on the account of Reginald Close?

A   Yes, sir.

Q   Did you speak with deputies at the Ingham County Jail in regards to the operation?

A   Speak to?

Q   Did you speak to deputies at the Ingham County Jail in regards to what you were doing?

A   I'm sorry. I keep interrupting you.

Q   I am sorry. I will try to be more precise. Did

87

you speak with deputies at the Ingham County Jail in regards to the call that was going to be made by Officer Mobley as part of the —

A   No. I did not.

Q   — investigation. Were deputies at the Ingham County Jail aware that there was an investigation, and to solicitation of a murder at their institution?

A   Not — yes.

Q   Do you recall when they were made aware?

A   Yes.

Q   Who made you aware?

A   I had to get permission from the Ingham County Sheriff's Department jail staff to conduct that investigation. I advised them of what I was doing. Normally when I conduct an interview, I do them at the City of Lansing Police Department in audio video rooms. As a general courtesy I let them know exactly what I am doing down there and who I'm speaking with. So, yes.

Q   Do you recall when you contacted them, specifically?

A   Contacted who, sir?

Q   What date that you would have contacted the Sheriff's office?

88

A   Once again, sir, I have documented things in my report. I'm assuming some time in October of 2016, sir.

Q   The initial call was made on October 24th, 2016?

A   If that's what the documentation in my report would say, yes.

Q   Where were you at when the call was being placed?

A   Doing general duties.

Q   Were you overseeing the operation? Did you guys have any audio/visual of the conversation?

A   Nope. No. None.

Q   How long has Officer Mobley on the Lansing Police Department Special Operations Team?

A   Sir, you would have to ask him. I do not know.

Q   Why did it take a week to set up the call?

A   Well, I was conducting my investigation. I was gathering information. I had a meeting with the command officer and VCI to determine — and also with other agencies, to determine how to go forth with this investigation. It takes time.

Q   Did you feel that it is imperative to set the phone call up as quickly as possible?

A   I did not feel that it is imperative. I think that there were some issues in my investigation that were time sensitive. Yes.

89

Q   Did you have any fears of Mr. Close instigating the Defendant?

A   I am sorry, sir?

Q   For him into taking the phone call, did you instruct Mr. Rusek to inform Mr. Close anything in regards to his communications or conduct towards Mr. Uraz following the meeting on October 17?

A   I don't believe so, sir.

Q   So there would have been a week in between the meeting with Close initially, and the phone call where Mr. Close could have had — could have instigated Mr. Uraz while incarcerated in the same jail as him?

A   It's possible, sir. I'm not a City of Lansing officer. So what happened down there in that jail, I know that when I concluded my interview with Mr. Close, I was under the belief that he had been separated at that point in time, I believe. I would have to review from Mr. Uraz.

Q   After the initial phone call is made, is there a second phone call?

A   I believe there is, sir.

Q   What happened with the second phone call?

A   I reviewed that tape, sir. I believe initial contact was made. And then it is terminated.

90

Q   And that call was placed at the behest of your investigation?

A   That is part of the investigation, yes.

Q   Why is the second call necessary?

A   Well, part of this investigation, these telephone calls were handled by the VCI unit, Violent Crime Initiative Unit of our department. So there were some protocols and discussions and talks with the undercover officer, people in that unit in regards to follow-up calls. But it's not in charge of that aspect of it, sir.

Q   And the second call, there were attempts to reconnect. Were you aware that after the second caller got disconnected, that they tried to reinitiate the call?

A   I'm not aware of it, sir. But I'm not disputing that if there is a record of it.

Q   Did you have any discussions with your team in regards to the necessity for the second call?

A   Did I have? My team?

Q   Yes.

A   No. Like I stated to you before, the VCI unit is the unit that handled this call. They had some talk with other agencies that assist with our agencies and gave assistance, to my

91

understanding, as the undercover officers in how to conduct himself in regards to these calls.

Q   What was your investigation into Mr. Close? Did you find anything in his background that led you to believe that he may be lying? Did you scrutinize Close's statements as a result of investigating his background?

A   Yes.

Q   Do you have any contact with any of the deputies after the October 24th call was made at the Ingham County Jail?

A   I have a lot of going back and forth. I have a large case load. Do you mean specifically in regards to this?

Q   Do you have any information in regards to this particular case and/or the investigation after the 24th?

A   Yes. I imagine I may have updated the command staff at some point in time after this investigation. Yeah. I may have spoken to them.

Q   And did you instruct the deputies to try to facilitate the phone call being made?

A   No.

Q   So if the deputies had tried to instigate Mr. Uraz to accept the second call, that would come from

92

them and would not have been something that is requested by your department?

A   No. Not by me.

Q   Well, you were provided with information from Mr. Allen subsequent to that of Mr. Close?

A   Yes, sir.

Q   After the initial phone call was made.

A   I would have to check the dates and times again, sir.

Q   Did Allen's name ever come up with Mr. Close?

A   No.

MR. PERRONE:   No further questions.

THE COURT:   Questions, Mr. Roth?

MR. ROTH:   Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ROTH:

Q   I want to start by talking about some of the terms that were used during your direct testimony. When Mr. Perrone was asking you about talking to Reggie Close the first time, you said that you had told Mr. Rusek there would be no proffer. I want to talk about what that means. When you say there would be no proffer, did that mean that there would be no proffer agreement that would indicate that anything he said would not be used against

93

him?

A My understanding of the proffer agreement is that he would not have any special considerations given to him for speaking with me.

Q And even though he wasn't given that incentive, Reggie Close spoke to you that day?

A Yes.

Q Mr. Perone asked if you had scrutinized the statement he gave to you. Is that what you were talking about before to make sure you were able to corroborate the things that he was telling you were the truth and accurate?

A Yes.

Q Very good. And then after Mr. Close's interview, then the phone call is done, the video call is done with Officer Mobley, correct?

A Yes.

Q After that you are notified that Charles Allen has also been solicited by the Defendant to kill Erika Melke, correct?

A Yes.

Q And that, again, you were made aware through the Prosecutor's office, correct?

A That's correct.

Q At that point did you sit down and interview

94

Mr. Allen as well?

A I did.

Q Again, with Mr. Allen, was there a proffer letter in place?

A There was none.

Q Even though there was not, did he agree to speak with you as well?

A Yes.

Q Did you similarly try to corroborate the things that he was telling you was true?

A Yes.

Q I want to talk about Close's interview. All the things that Close tells you about the Defendant soliciting him for murder, had Close been under the direction of the police at any time in gathering that information?

A No.

Q Now, going forward to Mr. Allen, when Mr. Allen sits down and tells you all the things about how the Defendant had solicited him to kill Erika Melke, at any point before that time, was he under the direction of the police department?

A No.

MR. ROTH: I have nothing else, Your Honor.

THE COURT: Redirect?

95

REDIRECT EXAMINATION

BY MR. PERRONE:

Q Quickly. In regards to you specifically told Mr. Rusek in regards to the proffer that there was not going to be a proffer. You testified to that?

A That's correct.

Q You told him that on October 13th –

A That's the date.

Q – when you initially spoke with him on the phone setting up the meeting?

A I was under the impression that, once again, sir, with the dates, yes, I had told him that there would be no proffer.

Q You told him that when you initially spoke with him on the phone when he called you about a proffer?

THE COURT: He previously testified it was at the time of the meeting.

Q (BY MR. PERRONE) And after the meeting still went on, though?

A Yes.

Q Was it your feeling that Mr. Close was doing this out of the goodness of his heart?

MR. ROTH: Objection. Speculation.

THE COURT: Sustained.

96

MR. PERRONE: No further questions.

THE COURT: Thank you, Detective.

THE WITNESS: Thank you.

THE COURT: Any additional witnesses? Proofs are closed?

MR. ROTH: Nothing else.

MR. PERRONE: Nothing further from the Defense.

THE COURT: Any argument or do you just want me to rule?

MR. ROTH: Brief argument on behalf the People. We are going to ask the Court to incorporate the other record evidence at the preliminary examination. Defense has the burden. I'll let them argue first.

THE COURT: Mr. Perrone?

MR. PERRONE: Yes, Your Honor. What we are looking at here is an entrapment motion. Entrapment motions are generally not overly favored by the courts due to circumstances of trying to facilitate allowing the police to do their job.

The guidelines that we're looking at, we're looking at the totality of the circumstances test. We have to look at the

97

situation of the Defendant, Mr. Uraz, in this case. The record supports that he was incarcerated, did not have any type of, prior to the issues associated with Ms. Melke, did not have any prior issues with the criminal justice system, did not spend much time in jail.

There was knowledge he had been on the medical unit for 23 hours a day with these two individuals. Without him having the same level of understanding of the Court system, and the jail system, he is open to their suggestions associated with trying to help him with his case.

Then we have the meeting with Alexander Rusek on October 13th prior to the meeting on October 17, and Mr. Close is instructed to not have any type of contact with Mr. Uraz.

So, therefore, it leaves him the availability. And although he wasn't going to get anything out of it, we know the meeting went forward. Obviously he is attempting to get something out of it. There was an indication and testimony associated with other proffers that he was making. I think that's indicative of — what happened is we left people in a jail that were trying to commit additional criminal acts in an

98

attempt to extort Mr. Uraz, trying to find a way to help themselves out, find a new way to defend against the charges and the prison time that they were already subject to.

When we look at a person in Mr. Uraz' situation, significant issues and specifically withdrawal, there is case law that says if the police play on the fact of a Defendant's either depressed mental state or alcohol withdrawals, or substance abuse withdrawals, that is indicative of overreaching on their behalf. In this case, given the 23-hour a day lock-down, the information the detectives had associated with Mr. Uraz, they obtained from Mr. Melke(sic), they should have known his situation.

And if you review the phone call, the phone call was very scattered. There wasn't anything very definitive overall. We are talking about trash, we're talking about prices, we are talking about payment up front. He is trying to get payment up front. He's trying to get an address. He's trying to get all of this out of him.

Mr. Uraz has testified that these people suggested it to him, that they initially talked

99

to him about his case, and told him they were going to do these things. If you look at the letters that were written, the suggestions in there are coming from the individuals that speak with the people. The call, in and of itself, the detectives' actions are instigating him to agree to something that he otherwise wouldn't do. This is an escalation issue. Based upon the State's action, the Defendant otherwise hadn't been in any significant trouble.

You know, we have an aggravated stalking charge where we have panty sniffing and stalking, and various visits to Dave and Busters. And the Defendant testified that he left there. It's not really disputed that he left, but that he did leave. And now we have a solicitation of murder. We have an individual who is in jail, who has never been in there before, is trying to find a way out.

Frankly, the entire concept of dealing with cases where people are incarcerated is definitely suggestive, in and of itself, due to the mental state that they're in. And I think these investigations have to be conducted with certain protocols.

100

And in previous cases I've noticed that the police have gone back and attempted to show pictures to be able to establish specific intents, so that the person can see that it happened and acknowledge that, yeah, that that was their actual intent. Right here we have a situation that is very abstract. And we have jail informants that are involved in this, that are instructed not to try to instigate Mr. Uraz. We have Mr. Uraz indicating that they were suggesting to him that he needed to participate in this. The call was initiated by the police. In prior cases the call was not initiated. Not the call, but the issue was not initiated. In this case Mr. Uraz' testimony is this is something that was manufactured by Mr. Close and Mr. Allen.

If you look at the letters, again, you can see the manufacturer. The letters show manufacturing on their behalf. Whether the police were involved in that is a question, obviously. But I don't think that's been established at this point in time, aside from the knowledge that they would have had in regards to Ms. Melke. But the video is indicative of

101

Officer Mobley attempting to instigate, at all possible avenues, to get affirmations from the Defendant, whereas providing a general opportunity by the police is not considered to be entrapment, but instigating it is.

Given all of the facts of this entire investigation, this amounts to entrapment. What is entrapment? Where do we get to it? Entrapment is a very difficult defense to make. But in our society today, it is changing with perspective of police power. And police power is being checked to a certain extent. And entrapment is going to be a viable defense into the future. And it's likely something that Mr. Uraz would have a viable appeal on as a result of these facts.

There is going to be protocols associated with jails because you're running over people by sending in people to make calls, where people are in a very vulnerable, emotional state.

Obviously, as Your Honor knows from his practice very well, people go to jail. And they all want to kill the other person and/or the witness. How many times have I been before Your Honor myself on cases where the individual is

102

incarcerated on a bond violation.

So did Mr. Uraz realistically intend to solicit a murder? This was a fantasy. It was put before him in a vulnerable state. $2,000. The crux of the issue, from my – $800 for each other one. How many do you want, one or two? We don't have anything definitive. We have a lot of suggestions.

The address, I don't know. He ends the conversation with: I don't know.

The instigation on behalf of the People in regards to the call, in association with the behavior of the jail informants and the prior history of the jail informants are indicative of entrapment.

Thank you. Your Honor.

THE COURT: Mr. Roth?

MR. ROTH: Thank you, Your Honor.

So there is a couple points that I think need to be made up front. The first is the case law that we include at the bottom of page six of our brief. The Court of Appeals has held, and this is still good law, it has been good law for a long time. It is well cited law. It is well established in this jurisdiction that a defendant

103

cannot simultaneously deny the commission of the crime and assert the defense of entrapment.

The Defendant was expressly asked today about Reginald Close, about Charles Allen, about Officer Mobley:

"Did you solicit any of these people to kill Erika Melke? And he said no, unequivocally. Given that, he cannot claim that he was entrapped to do those things, because he denies doing them. That, alone, is enough to resolve this motion.

But go beyond that. The Defense rests a larger portion of their claim of entrapment on the idea of the Defendant's state of mind at the time.

A couple things that belie that. The first thing is that when we watch the video, the Defendant isn't not understanding English, he is not out of it, he is not incoherent. He is articulate. He has trouble hearing, as both parties do. But there's nothing indicating that he is in any way in some vulnerable state of mind at that time, that he's being manipulated at that time.

And related to that, the Court has to then consider the Defendant's credibility in court

104

today when he testifies. So not only does that video belie this assertion that he was in some vulnerable state at the time, but when we look at his direct examination, he was able to give very, very specific information when it helps his cause to say we were having that conversation on this specific date after midnight.

But on cross-examination when he is asked about any of the details that may inculpate him, he simply says: I don't know. I was hired by the guy. That obfuscation of answering questions belies his credibility. It indicates that what he's telling the Court today is simply self-serving.

But the most important thing that segues into the elements that we are asked to consider, is that entrapment, by its very nature, is about police action. What we have in this case is Charles Allen, who was not acting as a police agent, he was acting on his own. It would be impossible for this Court, or any Court to find that Charles Allen had entrapped the Defendant because he was not acting as a police officer under the direction of a police officer when he spoke to the Defendant.

105

For the same reason, Reginald Close could not have entrapped the Defendant, because he is not a police officer. He was not acting as an agent of the police. He was not acting under the direction of the police, which only leads us with the solicitation done with Officer Mobley. And that brings us to the second element.

Excuse me. The first element. Did the police engage in impermissible conduct that would induce a law-abiding person to commit a crime in similar circumstances?

So we know that the Defendant is not somebody who would not act this way under other circumstances, because he has already acted that way, he has already solicited Reginald Close to commit a homicide.

So when Officer Mobley calls him to further discuss that plan, we know that the Defendant is new to this idea of soliciting somebody to murder Erica Melka, because he has already done so. He is prohibited from satisfying that first element of our analysis.

So, for those reasons, we ask the Court to deny the motion. Thank you.

THE COURT: Mr. Perrone, anything further?

106

MR. PERRONE: Yeah. Just a brief follow-up.

In regards to the assertion that you have to admit to a crime, entrapment in this case, solicitation of murder is also specific intent. So it's very difficult for this person in circumstances where specific intent is an issue and mental capacity is an issue, as far as whether they admit to a specific intent crime. So as far as an admission, him not admitting that he solicited these people to claim entrapment, it seems that it's a positive.

THE COURT: He is saying he didn't do it, right? He is saying: I'm not guilty of this offense, right?

MR. PERRONE: What he was saying is that they approached him in regards to it.

THE COURT: Let me go back. His position at trial is he didn't do it, correct?

MR. PERRONE: He didn't intend.

THE COURT: Are you trying to make a nuance? You might say: It may have happened, but it wasn't my intent. Is that what you're saying?

MR. PERRONE: One of the issues associated with this, I think, is very imperative. The

107

Prosecutor said that Mr. Uraz didn't admit to anything. He admitted to a lot of things. Mr. Uraz admitted to the actions. He admitted to the conduct. He admitted to the conversation.

THE COURT: Okay.

MR. PERRONE: So if he admitted to conversation, he admitted to everything. As far as him saying that he doesn't feel that he's guilty, I don't think is an adequate ground. There isn't a defendant in America that thinks he is guilty. And it's somewhat positive to our system, because we go to Court and say not guilty. So I can't go to Court and say not guilty and entrapment. That's all I have.

THE COURT: Well, I've heard the evidence that's been presented at the hearing. And you know that there is a two-prong test that we have to look at. One, did the police engage in impermissible conduct that would induce an otherwise law-abiding citizen to commit a crime or did the police engage in conduct so reprehensible that the Court cannot tolerate it. Reprehensible conduct alone without these instigations can constitute entrapment. Burden on the Defendant in this particular matter is a subjective test.

108

So what we have here is the Jones case that clearly says you can't claim innocence and entrapment at the same time. So basically entrapment is I may have done it. I mean, I think you could say I may have done it, but the only reason I did it, I wasn't inclined to do it, that I was entrapped by the police. We don't have that here.

Here we have Mr. Uraz, I guess under technical argument, saying it wasn't my intent. So I guess he is sort of saying, yeah, I did do it, I did make these statements on the video. I don't know if that's the position he wants to take at trial or not. But when I made these statements, it wasn't my intent to follow through. So that's a fact question, I guess, for something down the road.

But in regards to the first prong, what we have is a continuing escalation of activities on behalf of Mr. Uraz to the danger of the victim, Ms. Melka. It started way back. We had incidents where he had sent her texts. He acknowledged that he created a Facebook page. He tried to distinguish that. And that he may not have added her picture to the page. But he did

109

create a Facebook page. He was found inside of her residence after the issuance of a PPO. He acknowledged that was in fact him. He had other multiple violations of the PPO stating that Ms. Melke had run into him, rather than vice-versa. He was photographed at Best Buy doing that.

We have the text messages with her friend that whose vehicle had also been keyed or damaged, or the tires punctured. We have all these things leading up to this situation.

If the Court recalls correctly, Mr. Uraz was awaiting sentencing on a conviction already for stalking. So not only that, we already have a conviction for stalking this very same victim at the time the situation arose.

We also have the situation for today's hearing I allowed – I disallowed under 404B, where Mr. Uraz admitted today that he was attempting to buy a gun from a co-employee at Michigan State University, which was like shortly before this. And that he was discharged from his employment because of the efforts to try to buy this weapon.

So we have conduct on behalf of Mr. Uraz

110

that indicates that he would do this. Frankly, he has continued to escalate. He could not let this particular relationship go. So we have that issue.

The other portion that we have is the police really didn't do anything. Close or Allen were not the agents. They were in the cell. There has been some rhetoric about Mr. Uraz' state of mind, which is self-reported. He said he had been on drugs for some time, but he had been in custody for six to eight weeks. So I don't know what effect the withdrawal may have had on him at that particular time. And that Close and Allen not were not agents of the police. And they took the information about Mr. Uraz discussing solicitation of the victim in this matter to authorities. The authorities got it, they investigated it. And then they had the undercover agent make the call.

Now, I looked at the video. It didn't appear as if Mr. Uraz was induced to do anything to me. He was asked did he still want the trash removed, trash being referred to the victim in this matter. There was a lengthy discussion concerning that.

111

And more telling to the Court was when he was asked, apparently he didn't want to say on the phone where she lived, or what kind of car did she drive. Well today he has testified already that he knew where she lived, and that he was aware that she drove a green Rav4, I believe. But more importantly, he says:

I gave that information to Ruff.

Now, we know that Ruff is Mr. Close. We also know that People's Exhibit B is a document that has her address, her phone number, her car. And he even drew a map as to where her residence was going to be located in the complex. So when you take that, and account that he had already provided, we will assume, some information to Ruff, he says he has, there is some documentation that information of that nature was available, that he had written it down.

And then even in Exhibit A, the note starts at assuming that they already had the discussion. And the note is simply saying: Are you sure you want me - do you want me to make it look like an accident or something like that. So clearly there was a discussion about doing some harm in some fashion to the victim prior to those

112

notes being written.

When we look at the conduct of the officers in this matter, they investigated. There was not a lengthy delay. Once the information got to Detective Krumbach, it was a week before the phone call was made by the victim's Impact unit.

So, looking at the factors that the Supreme Court has said we have to consider, whether there existed appeal to the Defendant's sympathy as a friend, we do not have that here. Whether the Defendant had been known to commit the crime with which he is charged, not necessarily the solicitation, but the aggravated stalking. Yes. He had a long history of that. That's documented on this record. There was no long lapse in between the investigation. Looks like a week or 10 days before the call was made.

Was there any existing inducements that would make the commission of the crime unusually attractive to a hypothetically law-abiding citizen? It appears that Mr. Uraz had sought -- there will be a fact question at trial. The eid of Allen and Close. Close followed up. Mobley contacted him. He continued to talk about the

113

fact that he wanted to have the trash removed. So there were no offers of excessive consideration of other enticements. There were no proffer offers to either Allen or Close that's been testified to. There was no guarantee that the acts were not illegal. There wasn't any governmental pressure, wasn't any sexual favors, there were no threats of arrest. I think important to the Court is the fact that Mr. Uraz knew that November 2nd was his sentencing date. And so he wanted to make sure that whatever was going to happen was going to be resolved by November 2nd. And that came up on several instances both in the video and other discussions that he was going to be sentenced on his conviction on the stalking matter.

It does not appear there existed any governmental procedures that tended to escalate the criminal culpability. The police did not have control over the informant. The phone call was made by an undercover agent. It doesn't appear to be a targeted investigation. It appears that based on Mr. Uraz' escalating history, that, frankly, law enforcement had to take some action in order to ensure protection of

114

the victim.

So, for all those reasons, and I would just state I don't think I needed to go beyond the Jonas case to enumerate the reasons as to why I'm going to deny this motion, because it clearly states the Defendant cannot simultaneously deny the commission of the crime, and assert the defense of entrapment, which is what the Court concludes we have here. But even if that's not sufficient, I've enumerated the reasons why I'm denying the motion. So the motion is denied.

Next motion?

MR. PERRONE: Briefly. Motion as to venue. I provided an attachment. And just to start out with, on page seven there is one amendment. There was not video testimony from Defendant's preliminary examination. There was, however, the information contained in multiple State Journal — In the State Journal and the Towne Courier.

THE COURT: Was there more than one article?

MR. PERRONE: Yes.

THE COURT: I mean, I recall one article, not too many. I don't recall any media appearing at any hearings like we have in a lot of cases.

115

MR. PERRONE: Well, we have an argument to preserve the record, your Honor. It is the inflammatory nature of the article being the basis for the community bias. There are a number of very definitive statements that are made in the article.

If you look in the first paragraph, second paragraph of the article, first column, the bottom of it, we have specific agreements associated with killing. Uraz agreed to pay the Officer $2,000 for killing the woman, and $500 for every additional person. That was fresh. So obviously that was either misinterpreted. That, in and of itself is inflammatory, because it definitively states or concludes that you agreed for $2000 or $500. That's a determination factor that the jury should be left with.

We have statements by the State Journal. And these were taken from the swear-to, where they are attributing statements to Detective Krumbach. And we have a specific inflammatory nature where the accused wanted him to take pictures of the identification, bludgeon the victim to the point of unrecognition, dispose of the body, take a picture of the victim after

116

being bludgeoned. Those are statements that were received from Mr. Close that were allegedly distributed to Mr. Uraz, although that doesn't even comport with the video that we're talking about today when it said that we just want to get it done. That's very inflammatory in nature.

The article having the number 10 police reports involving prior issues, we have addressed that issue on the 404B. There are certain issues that will come, some that won't.

Again, for purposes of community bias, that is inflammatory in nature is what the argument is.

Beyond that, it is something that more than likely is going to play into the second prong, which is the proportionate argument. That is likely going to be something that's going to require voir dire. I just ask that Your Honor allow for adequate voir dire in order to ensure that we don't have any type of inflammatory nature to provide Mr. Uraz with a fair trial. Just to ensure that the people who are put in the jury box have not been influenced and are able to maintain a fair and impartial mentality.

The second aspect is because of the

117

inflammatory nature of the articles, and the statements that were included by Mr. Palmer and the State Journal, we would ask for a media gag order in this so that we don't have any additional inflammatory statements that may prejudice the jury pool in this matter, some instructions associated with the video in the courtroom, as far as what they're able to – what the People was able to put out there. We will leave it up to Your Honor's discretion based upon the affirmations in the motion.

THE COURT: Mr. Koop?

MR. KOOP: Thank you, Your Honor. Regarding the motion to change venue, Your Honor, the gag order, generally. The Defendant has drastically failed to meet the burden in both of these requests.

Regarding the motion to change venue, the proper venue for a criminal action generally is the County in which the crime is committed. However, upon a showing of good cause, the trial court may move the case to be tried in another county based on two circumstances. And the Court has defined the good cause in two situations, being a show of actual bias or community bias.

118

With regards to actual bias, that's found where there was extensively high inflammatory pretrial publicity.

To the extent that the pool is tainted, counsel has attached two articles. I believe they are the same AP article from the facts that were from the swear-to where I don't see, number one, how they're inflammatory. And especially to the extent that a pool has been tainted.

One article, "don't (inaudible) at all, finds good cause." I don't think we could have any murder trial or solicitation murder trial in this county if such an article is enough to show good cause.

As counsel has stated, community bias. Well, that's not something we can find out until the time of the jury trial when the voir dire of that panel is taken. So he has failed to provide any factual support for these claims. He broadly and erroneously asserts of the large coverage of the article. In this case it's nothing but general reporting focused on the facts of this case which almost all of which are going to be admissible at trial anyway.

I think most importantly, despite the

119

Defendant's dramatic and uncorroborated assertion, the media coverage has been sparse at best.

For those reasons, Your Honor, we ask that the Court deny the Defendant's motion to change the venue.

Similarly, for the gag order, there is a significant presumption against prior or First Amendment rights, including intents of media for publishing facts and circumstances pending trial to justify the imposition of a prior restraint. The activity of restraint must pose a clear and present danger of a serious imminent threat to a protected competing interest. Again, the Defendant here has woefully to cite with any source of specificity, any facts and circumstances about this case that would justify the significant remedy of a gag order.

And for these reasons, Your Honor, we ask this Court to deny both the Defendant's motions as to the change of venue and the gag order. Thank you.

THE COURT: Anything else, Mr. Perrone?

MR. PERRONE: Again, most of those cases, we have one article, okay, and the Prosecution is

120

going to say that we only have one article here, but we have the Internet. Most of the cases that are cited in an era where information was not accessible.

The arguments that are made by the Defendant in this case are an inflammatory nature of the statements that were included in the articles. There was not a specific agreement, that is a fact question before the jury. That was included in the article.

So as far as community bias is concerned, the argument that that's an inflammatory nature of the reporting, and with the advent of the Internet, and the accessibility of the information, that kind of changes the difference between one article and a hundred. Because the prior cases where we have a hundred articles at times where the Internet was not at the same level it is today. So we can't make the same comparison that the Prosecutor is making that there is 100.

But this isn't like the 100-article case, because we have the Internet. So I would ask that Your Honor take into account the Internet, the fact that the information is streamed, almost

121

live. And that our jury pool is likely going to have access to information.

Although Your Honor is going to instruct them not to, because of the inundation of the information, I don't want the State Journal to have the opportunity to report things that may skew your jury, Your Honor.

THE COURT: All right. In this matter there's been a request for change of venue. The Court's really sensitive to that. So that's why I asked, I only recall seeing one article. I don't know if there are others if that was at or near the time of the charges in this matter. There has not been any media requests. I don't believe anybody appeared at this pretrial hearing, which we have often in profile cases. So there's the nature of the media, I agree, creates high profile cases. But it doesn't appear that this qualifies as a high-profile case in the opinion the Court. For instance, People versus Grant Taylor was a high-profile case where they had something like three, four times a week. And in that particular case, I did not grant a change of venue.

The case in the County of People versus Ricky Holland, I acknowledge, by his parents was

122

much broader. And the position that the Court took and the position I think is we being in the panel and we look at it. One remedy is to be a little more liberal on challenges for cause, which I indicated in the Grant Taylor case had it not been resolved, I indicated that I'm amenable with that. But we have to come and bring the pool in to see whether or not they're tainted or not.

But of the cases that I have on my docket, my most recent one was involving Mr. Milliman who allegedly ran over a lady and left her in a coma, which had media coverage all the time.

And so in this particular case, the Court feels we can bring in the panel, we can question them and see where we stand. There's nothing that says if we feel we can't get a jury, that we still can't change the venue in the event that occurs.

So on that basis, I guess I will deny the motion for change of venue without prejudice so that we can see how it goes. The Supreme Court is pretty clear on the media, that they are much more liberal than I would be. I mean, I can't exclude anybody from the courtroom, which

123

includes excluding the media. But I don't think in this particular instance I can tell the media that if a representative can come in and observe that they not write about it. I don't think the facts in this case rise to the level of that.

We have to focus on the fact that once the 14 people are impaneled, then that's the 14 we're working with, not the entire community. And these instructions that they receive every day, not to review or hear or discuss the case, including any family members about the testimony, we have not received any media video or streaming requests. We only did streaming one time. I probably wouldn't allow streaming for a trial. But I did allow it for sentencing, I believe, one time. And we take precautions to protect the jury. If there is a video camera by media after they file the official media request and they cannot do any witnesses or victims, they cannot record any witnesses or victim, nor can they record any members of the jury panel.

So for those reasons I will deny the motion to restrict media coverage. I don't even think I have the authority to do that. Okay. Anything else?

124

MR. ROTH: We have one other thing that the People noticed up for today. Before we do that, we prepared an order as to each of the Court's rulings today, as well as the 404B ruling. So we can take care of those real quick and then take up our other issue.

MR. PERRONE: I am going to sign the order for entrapment. I haven't had the opportunity to look at this order in regards to the 404B motion yet. I will take a second to look at it and I will return it.

THE COURT: Are you going to make copies or do you want the Clerk to file these?

MR. ROTH: I can take care of it, Your Honor.

Finally, the People have filed an objection to Defendant's witness list, as well as notice for hearing today. On September 29, 2017, the People served the disclosure demand upon the Defendant asking for a witness list. We then followed up both by email and in person with defense counsel. We were told that one would be forthcoming. It never was, not until this week, October 18, 2017.

There are a couple problems with that

125

witness list. First, it was not served timely. And the Defendant then must move the Court to amend the list, to show good cause why it is late and the relevance of these witnesses.

Why it is late, I know the Court is not going to exclude witnesses for that reason. But the more important thing to me is that there are 32 witnesses on this list. And specifically directing the Court's attention to numbers 12 through 16, 18 and then 19 through 34. None of these people seem to have any relevance to this case. So I would ask the Court, or defense counsel, for an offer of proof as to what relevant information they could probably provide.

Similarly, many of these witnesses do not have contact information associated with them, which is required. I asked for that information as well.

As to number 27, Jacob Tava, I think that's his — I'm not certain how accurate this witness list is to begin with. His actual name is Tava Jacobs, not Jacob Tava. And his location is known. He is in prison for murder.

We also, in Defense counsel's witness list, numbers 12 through 17, they have what's

127

photographs or otherwise that may be offered into evidence, but never received a response. But if there are any documents, any objects that are associated with any of these mystery witnesses, we ask that they be disclosed today.

THE COURT: Mr. Perrone?

MR. PERRONE: I can offer proof as to the witness list in this case.

THE COURT: Let's start by making a record. What's the good cause in delay for submitting the witness list?

MR. PERRONE: Just the nature of the case, and the issues that I had put on in this case, not being involved in it from inception until I got up to this point in time.

As far as the witness list is concerned, I'm getting numerous letters, there are 32 witnesses on this list. This is a court-appointed case for me. I'm trying to do above and beyond what anybody else would do in this similar circumstance. The case has been moved up as far as trial is concerned. It was initially slated for December, But it got moved up to October 30.

THE COURT: It's been moved up three days.

126

called a new request to produce.

THE COURT: A what?

MR. ROTH: I don't think he wrote that correctly. I think what he wants is us to produce these people for him, would be my guess as to what's meant there.

THE COURT: They aren't allegedly res gestae witnesses, are they?

MR. ROTH: Your guess is as good as mine, Your Honor. I have never seen those names before. Fateen Muhammed is in the pod. So, I guess, I at least know who he is, Your Honor. I don't know what his relevance would be.

The other people, I don't know. I don't know why Defense needs us to produce them. Most of them appear to be in jail, prison, in which case Defense counsel can writ him just as well as we can.

Fateen Muhammed, by the way, is listed as living in Lansing. He's also in the Department of Corrections now.

Finally, the People, in their previous disclosure demands asked for any written or recorded statements by any of these witnesses, or any tangible exhibits, whether documents,

128

Right?

MR. ROTH: Yes. It was scheduled for November 2nd.

THE COURT: Moved it up three days.

MR. PERRONE: Again, I got the list. I provided it to him. The witnesses were all very accessible to him. Most of the names I provided. Most of the names that were pertinent were provided at the preliminary examination, and were part of this. Mr. Roth says he hasn't heard or seen any of these names before. He hadn't been involved in this case until recently.

THE COURT: I mean, you are supposed to give a list. The People don't have to investigate folks that aren't going to be called. So you can't rely on the fact that something was mentioned at the preliminary examination, doesn't give a reason you're going to call.

All right. And what are the witnesses?

MR. PERRONE: The witnesses that were incarcerated —

THE COURT: Name then, and tell me what you think their proffered testimony might be.

MR. ROTH: If we could start with number 12?

129

MR. PERRONE: Number 12. John Pierce. He was an inmate with Mr. Uraz and Mr. Allen. Everyone on this list was an inmate at the time.

THE COURT: Why should the People have to produce those witnesses? You can produce them yourself.

MR. PERRONE: As I understand it, the last time I attempted to produce any witnesses, and spend any of my time doing it, the County did not reimburse me for it. I was told that I had to go through the Prosecutor's office.

THE COURT: Now, we are going into a difficult area here.

MR. PERRONE: I submitted a voucher for $800 versus service fees. I did not get paid on it.

THE COURT: Let me get the time to make a record. If I understand you correctly, so there won't be any dispute by the Court of Appeals when they look at this, you're saying on some other case you did not feel you were adequately compensated for that –

MR. PERRONE: I was told here to subpoena witnesses from the Prosecutor's office.

THE COURT: Excuse me. You were not

130

adequately compensated or did not get paid. So you waited until – when did you get the witness list?

MR. ROTH: I believe Wednesday of this week, around 3 or 4 p.m.

THE COURT: Thursday. Nine days before the start of the trial, and, say, the Prosecution should be compelled to produce them. So let's make a record so we can be clear on that, Mr. Perrone. I believe that's what you've telling me, that you do not feel you should have to produce them because you did not get adequate –

MR. PERRONE: I was –

THE COURT: Excuse me – on some other case.

MR. PERRONE: No. What I'm saying is the protocol that I have been told to utilize, if I want to subpoena a witness that I go through the place or the Prosecutor's office.

THE COURT: Don't you think nine days is kind of short?

MR. PERRONE: The statute, 767.40 contemplates 10 days before trial for the Defense to produce a list.

THE COURT: Didn't we have a pretrial

131

order?

MR. ROTH: We did, as well as the Court Rule indicates 28 days.

THE COURT: We had a pretrial order that says – let's get the witness list in. I know that's a long time ago. All right. Let's go down and continue to tell me what the people who may have been in the same pod or what. 12 –

MR. ROTH: I assume 12 through 16.

THE COURT: Do you have any contact information other than the list of names?

MR. PERRONE: I listed their inmate numbers and their facility.

THE COURT: We don't know if they're still there, right?

MR. PERRONE: MDOC says they're there, I looked on ODUS.

THE COURT: If MDOC said they were there, you could have prepared a subpoena, right? Just asking.

MR. ROTH: What would be the relevance of other people in the pod?

THE COURT: I don't know. I guess maybe –

MR. PERRONE: They would be able to see the conversations.

132

THE COURT: Maybe.

MR. PERRONE: And maybe be able to help the State's case.

THE COURT: Have you interviewed them?

MR. PERRONE: No. I have gotten information from them.

THE COURT: How do we know what they're going to say?

MR. PERRONE: I have gotten information from them. I have not personally interviewed –

THE COURT: If you have gotten information, that has to be disclosed to the Prosecution, doesn't it?

MR. ROTH: Yes.

THE COURT: So, in other words, we got two days. If you received information you have to disclose to the Prosecution, and if we're here today on a proffer, and you have that information, you have to tell us what it is.

MR. PERRONE: The information that they witnessed this happened and they saw Close and Allen were instigating.

THE COURT: By doing what?

MR. PERRONE: That they were the ones instigating all the conversations with the

133

Defendant. They were controlling the conversations. They were extorting. They were requiring that $160 be put into the accounts.

THE COURT: I understand. You missed – I know you are a solid attorney, sir. By doing what – what they say what did they here, other than overall statements that we think he instigated or they were instigating. Do you have any written information?

MR. PERRONE: Again, I have some information.

THE COURT: Do you have any written information?

MR. PERRONE: Yes. That would be work product. As far as turning everything over to the Prosecutor, that I do for work product –

THE COURT: These would be witness statements?

MR. PERRONE: Correct. I don't have witness statements.

THE COURT: What's the nature of your product?

MR. PERRONE: The information that I received from my client, which is provided.

THE COURT: You got the information from

134

Mr. Uraz?

MR. PERRONE: Yes, in coordination with preparation for the case.

THE COURT: So you got information from Mr. Uraz, where Mr. Uraz says this is what these people might say. You haven't talked to the people?

MR. PERRONE: I HAVE not directly talked to them, no.

THE COURT: Talked to any of them?

MR. WHITE: I have not talked directly with them, no.

THE COURT: Mr. Roth?

MR. ROTH: The defense counsel was asking to have 1, 2, 3, 4, 5 people written in on the off chance that any of these murderers, abusers or whoever are going to tell the same story that the Defense would like them to tell. There has been no efforts – If these were as important that Mr. Perrone says, why wouldn't they be interviewed?

THE COURT: I have the solution. You can use the video room next week right over here. We will set that up for you. I'll ask the Prosecutor to help get the video writ together. You can

135

interview the witnesses by video.

MR. PERRONE: Perfect.

MR. ROTH: Thank you, Your Honor.

THE COURT: So that you can then have some non-hearsay information about what a witness is going to testify to.

MR. ROTH: Both parties are going to be present for that?

THE COURT: Well, I think he can interview his witnesses without being present, per se. I guess you can set up your own right after that.

MR. ROTH: Thank you, Your Honor.

THE COURT: A little burdensome, yes. Not simultaneously. But at the same time, if we got the writ out.

The Prosecutor, all they can do is make A diligent effort. Corrections doesn't even like people to come in. They can even testify by video at trial, which would probably be better, because we don't know exactly when you're going to get to them. The Corrections cut down their transportation personnel in light of video capabilities here. So all I can say is I think Mr. Perrone should make efforts. Mr. Roth should

136

make efforts. We will see what we get.

MR. ROTH: That's 12 through 16. I ask Mr. Perrone to address the relevance of 18 through 34, minus 32 and 33 can always –

MR. PERRONE: Again, Tim Harris was involved in the investigation. On 18 for Nichols.

MR. ROTH: I'm sorry. He is a private investigator?

MR. PERRONE: Yes.

MR. ROTH: Has he prepared any reports?

MR. PERRONE: Those would have been provided to you. I haven't had any conversations with him besides reports turned over to my office by Mr. Nichols.

MR. ROTH: We have not received any reports –

MR. PERRONE: I don't have anything in my possession as far as reports are produced.

THE COURT: Well, get them another copy of the report, since they say they don't have it.

MR. PERRONE: Ashley Close, the wife of Reginald Close, can testify as to his viability. Most of these names –

MR. ROTH: Most of these names are names that came to me from – stop. What does –

137

THE COURT: How can a spouse testify against her husband?

MR. PERRONE: She can testify to statements that he made to her in regard to what he is doing.

THE COURT: Has anybody talked to her to see what her statement is?

MR. PERRONE: She is not going to -- if I talk to her, she is going to say she doesn't know anything. I would have to be able to interrogate her.

THE COURT: Prosecution doesn't have to produce her.

MR. PERRONE: Those statements would be hearsay. She cannot offer admissible testimony.

THE COURT: That will be true. She can't say what he said, I guess. See how it plays out.

MR. PERRONE: It goes to state of mind. It would be outside the --

THE COURT: He is not the Defendant.

MR. PERRONE: I understand that.

THE COURT: So it will be hearsay. "This is what he told me," would be hearsay.

MR. PERRONE: But it's not going to the truth of the matter asserted. It goes to his intent in setting up Mr. Uraz.

138

MR. ROTH: That's the truth of the matter asserted. But that witness is not going to realistically be produced, I can tell that from this point. So if we move onto 19, Jordan Lawalle?

MR. PERRONE: I will focus on the ones that, frankly, I know about.

MR. ROTH: Hold on. Hold on.

THE COURT: All right. If you don't know about them, you don't have to produce them.

MR. ROTH: I am not as concerned about producing them.

THE COURT: You don't want to be surprised. So 19 -- let's just go in numerical order. Nineteen.

MR. ROTH: Yes, please.

THE COURT: If you don't know anything, just say I don't know.

MR. PERRONE: I will stipulate. All right. Jordan Lawalle is taken off.

MR. ROTH: Thank you.

MR. PERRONE: Chisl Oz was with Mr. Uraz at Dave and Busters on the Dave and Busters incident.

THE COURT: Okay.

MR. PERRONE: Sean Moon was the trustee on

139

the post at the time that the alleged statements were made. Again, Ashley Close, Barbara Leroy.

MR. ROTH: Hold on. Go back to Sean Moon would be the relevance is the same as the one other ones listed, that he may or may not confirm that these things happened?

MR. PERRONE: Yes.

MR. ROTH: Go ahead. So 22 is Ashley Close, 23, Barbara Leroy.

MR. PERRONE: Tim Horan's mother-in-law.

THE COURT: Tim who?

MR. PERRONE: Close's mother-in-law.

MR. ROTH: What in the world could she possibly say?

MR. PERRONE: Again, she is going to be able to attest to the statements that were made.

THE COURT: Well, you think? You don't know, right? Nobody has talked to her, correct?

MR. PERRONE: No.

THE COURT: So you can't really say that she is going to testify to that. But you know maybe she is relevant? Okay.

MR. ROTH: Can we a take a moment and approach?

THE COURT: Yes.

140

(Off the record discussion at the bench.)

THE COURT: Continue down the list.

MR. ROTH: We were on 23. Close's mother-in-law, Barbara Leroy, for relevance?

MR. PERRONE: She was Close's mother-in-law.

THE COURT: She would only testify to statements by Close?

MR. PERRONE: That is information regarding where Ashley Close lives, and where she has been around.

MR. ROTH: Why would that be relevant at trial?

MR. PERRONE: It's probably irrelevant. I am going to talk with Cathy Edmond, a neighbor. She'll be able to testify --

MR. ROTH: Hold on. Twenty-three, Barbara Leroy. You said probably not relevant.

THE COURT: You're going to withdraw?

MR. ROTH: Twenty-three, Barbara Leroy?

MR. PERRONE: Yes.

THE COURT: Next one?

MR. ROTH: Twenty-four, Eric Phreed?

MR. PERRONE: Eric Phreed. Remove him.

MR. ROTH: Thank you.

141

MR. PERRONE: Kathy Edmond, neighbor of Mr. Uraz. She is able to testify he had trash at his house at the time that the conversation was had.

Andrew Nitchman, he had Erika Melke's keys and mail, allegedly.

MR. ROTH: All right. So if that's the allegation, he needs to be appointed an attorney and advised of his rights not to testify. I assume we agree on that?

MR. PERRONE: Again, the Court can utilize its discretion as far as extrinsic evidence is concerned.

THE COURT: But if there is information that says Mr. Uraz created the account. So if this witness is going to come in and say he created the account, he has to be advised of his Fifth Amendment rights against self-incrimination. He has to be appointed an attorney. He has to be explained to him that he could have potential perjury by complaints in this matter based on the fact that we already have Mr. Uraz on the record saying he created the account.

MR. ROTH: So what I am asking is if Mr. Perrone, in the next couple days, decides he

142

is serious about calling Mr. Nitchman, then please let me and the Court and me know so he can have an attorney appointed for him, we can have Mr. Nitchman come in early during the first few days so he can be advised of his rights, so when it's time for him to testify for the defense he is prepared.

THE COURT: Right. So if you are going to use him, we need to know so we can appoint an attorney. We need to have his contact information so he can consult with an attorney.

MR. PERRONE: I can do the rest of these. Jacob Tava –

MR. ROTH: Tava Jacobs.

MR. PERRONE: Tava Jacobs is in MDOC and, again, who will be a witness, privy to the different conversations. Chris Shinbarger is the same thing.

THE COURT: They were at the Ingham County Jail during this time period or just while Mr. Uraz was there, if we know?

MR. PERRONE: While Mr. Uraz was there. They were in the same unit.

THE COURT: All right.

MR. PERRONE: The same post.

143

MR. ROTH: What the Court is asking, during the time of the charged offenses, is what the Court would like to know.

MR. PERRONE: Yes.

MR. ROTH: Right.

THE COURT: Okay.

MR. PERRONE: Again, Noel Van Sienbrouck and Jackie Close are individuals that had their cases jumped.

MR. ROTH: I don't know what that means.

MR. PERRONE: That Mr. Close proffered evidence against them in their cases.

THE COURT: What's the relevance of that in our case?

MR. PERRONE: This guy is going around proffering against everybody's cases. It goes to his credibility.

THE COURT: You already stated that he proffered.

MR. ROTH: Proffering against other people. What Mr. Perrone intends to use these witnesses for would be propensity evidence, which should not be allowed.

MR. PERRONE: It's impeachment evidence of a witness. It wouldn't be propensity.

144

THE COURT: It would be impeachment if he said I proffered.

MR. PERRONE: Because it could be proved that he lied on the proffer. I know the proffers.

THE COURT: You want to prove that he lied on the proffer? I mean, how can we bring in a witness to say, I don't know if they were convicted or whatever happened, that the information that he gave wasn't true?

MR. PERRONE: I would just like to have an adequate opportunity to cross-examine.

MR. ROTH: Hold on. He's on direct exam, first of all, because you want to call him. Let's understand where we're at. Second of all you want to present a statement that he made –

MR. PERRONE: I'm calling him as an adverse witness. You started yelling.

MR. ROTH: Hold on. You want to call these witnesses to say that this is what Reggie Close said about me. Then you want to call him to say that's not true. That's impeachment with extrinsic evidence of a collateral matter, which is expressly not allowed by the Court Rule.

MR. PERRONE: It's necessary to effectively cross-examine Mr. Close as a witness in other

145

cases that could undermine his credibility through impeachment.

MR. ROTH: It is expressly not allowed under the rules of evidence that you can impeach with extrinsic evidence of a collateral matter.

THE COURT: I guess we have to wait and make a record at the time.

MR. PERRONE: I have also reserved my right to amend upon good cause.

I would like to indicate for the record, I have been getting letters from the Defendant with some of these witnesses, and also getting information from the Turkish Embassy, who has been throwing these witnesses at me. So if the People don't feel that trying to address getting information thrown at me as quickly as it has been and trying to turn around as quickly, given all of the parties involved in this case, as Your Honor is well aware, given my client's family members who are involved in the Turkish government. Again, we are listing witnesses, some are potential witnesses, some will not be called. This is a case that has 10 cases inside of it, outside of it, solicitation cases. This is a three, 4-week trial. The Defendant has an

146

opportunity to present witnesses. I will endeavor at my best to try to conserve judicial economy and resources by not putting up needless witnesses.

The Prosecutor's office, I do apologize for the cumbersome nature of the witnesses on my end. I hope they can appreciate it from my side, also. I would ask for them to facilitate in any manner whatever witnesses or to talk to these witnesses to get whatever information they need. I don't intend to produce any information I have that I'm required to, but I don't intend to make the State's case for them.

MR. ROTH: Thirty-one. Shaneta Beasley.

MR. WHITE: Mr. Close's victim. I will remove her from the list. Those were not requested to be produced.

MR. ROTH: Thirty-four, Kazam Shelkh.

MR. WHITE: Kazam Shelkh. This is a name that came to me. I actually sent an e-mail to the Embassy to get additional contact information. They just sent me names. That's one of the reasons I don't know who always these people are. I've got a random email from the Turkish Embassy saying list these people. I inquired of the

147

Turkish Embassy as to what property they had, who they were. They weren't able to tell me. I spoke with my client as to any information that was given to me.

As far as timeliness, everything will be more than timely by the time we show up on October 30. All witnesses will be prepared to testify. We will be prepared to try the case.

In regards to Mr. Shelkh is another -- I am going to remove him. He is the victim of Close's GBH case.

MR. ROTH: So the last thing I want to confirm, then, is that because it sounds to me like the Embassy has provided statements by some of these people. So, again, if there are any written or recorded statements in any form that the Defense counsel has in its possession, under the Court Rule, it must be turned over.

If there is anything that counsel intends to offer as an exhibit, it must be turned over. I ask that be done today.

MR. PERRONE: That's a reasonable request. I will turn over whatever I have. I will inquire with the Embassy as to any documentation that they may have.

148

THE COURT: All right. So, you know, I'm not here next Friday. I don't know if Mr. Crino is going to finish his trial in time. We might not be able to start until Tuesday. So we can still meet on Monday.

MR. ROTH: Absolutely, Your Honor.

THE COURT: So just so we won't have any issues later, all right, as to Mr. Uraz perhaps not saying he was informed of the final offer of the Prosecution in this matter, would you please restate that, please?

MR. ROTH: Thank you, Your Honor. The Defendant can plead guilty as charged to Count I, Count I in docket 16-1094-FH as an habitual second offender, as well as Counts 1, 2 and 3 as a habitual second offender in docket 16-1065-FC. In exchange, the parties would agree, pursuant to People versus Killebrew, his minimum sentence for the capital offenses would not exceed -- excuse me -- 15 years with Department of Corrections. More importantly, we would agree that these sentences be served concurrently.

THE COURT: The guidelines, do you know those off the top of your head?

MR. ROTH: I don't, Your Honor. I

149

apologize. Fifteen is well within the range.

THE COURT: So there won't be any future dispute, you heard the last proposal of the Prosecution, Mr. Perrone?

MR. PERRONE: Yes, Your Honor.

THE COURT: Mr. Uraz?

THE DEFENDANT: Yes, Your Honor.

THE COURT: So now let's turn to this issue of an interpreter. We've had three cases with you, Mr. Uraz. At no point it appeared to me that you had a language barrier to require an interpreter. But now today on the stand you indicated that you wanted to have an interpreter. Is that accurate, sir?

THE DEFENDANT: Yes, Your Honor. May I say something?

THE COURT: Okay.

THE DEFENDANT: They are using the translations that I spoke –

THE COURT: You can utilize an interpreter in any way you wish.

THE DEFENDANT: A Turkish translator. I don't know how qualified they are. I need to be –

THE COURT: I don't have any control over that. All I can do is try to find the approved

150

Turkish interpreter off our list.

THE DEFENDANT: That will be great.

THE COURT: If your Embassy feels they want to provide you an interpreter, then there is a process where I could qualify them as an interpreter, which might be best, which might make you feel more comfortable. Otherwise, we will make our best efforts to get you a Turkish interpreter. But that will be the interpreter. I don't know if it's going to work for your needs or not. Whereas, if the Embassy was in a position to provide you with an interpreter, I can qualify them and they can serve that role.

Yes?

THE DEFENDANT: Due to the fact that I have an accent, and when I say things, sometimes people – I'm worried about the jury not understanding my accent.

THE COURT: So you really want the interpreter just for your testimony?

THE DEFENDANT: Testimony and the wording that I may use. Vocabulary. There are limitations that I have, also.

THE COURT: So let me just clarify so I can understand. The Prosecution goes first. They

151

will present their witnesses. You won't be presenting anything at that time. Okay?

THE DEFENDANT: (Defendant nods.)

THE COURT: All right. Then the defense will put your witnesses on and may be calling you to testify. So is it your position that you really don't need an interpreter for when other people are talking, you're concerned that you might be biased by your accent. So when you testify, if you chose to do so, that's when you would like to have an interpreter?

THE DEFENDANT: Yes. Also, there are some vocabulary that I do not understand.

THE COURT: You want the interpreter throughout, then, since there could be words that you aren't clear about, right?

THE DEFENDANT: Yes.

THE COURT: It's kind of short notice, but we're working on it. As I said, the alternative would be to have a representative from the Embassy that can serve in that capacity. I could qualify them as an interpreter. Try to see if we can't find one.

How long do we think the trial will last, two weeks?

152

MR. ROTH: No, Your Honor. We are going to be done Friday, the first week, or Monday. Most defense witnesses will fall off. We should be resting, depending on if we start on time on Monday or Thursday, and resting on Thursday or Friday.

THE COURT: All right. Anything else, Mr. Perrone?

MR. PERRONE: Nothing further, Your Honor.

MR. ROTH: One thing Mr. Perrone asserts today: My client was not in a mental state to appreciate the wrongfulness of his actions or that he was in such a diminished capacity that he couldn't resist the actions. I will point out that Defendant was not sent to the forensic center for criminal responsibility, nor does Michigan law recognize that that's a valid defense. Neither those things are a permissible argument at trial.

THE COURT: Mr. Perrone, I know diminished capacity is not an argument.

MR. PERRONE: This is specific intent. It's an element that needs to be produced by the state.

THE COURT: Diminished capacity and insanity are different concepts that I think

153

would —

MR. PERRONE: Be prejudicial, if instructed.

THE COURT: Isn't your argument that he did have a diminished capacity either from excess incarceration or his withdrawal?

MR. PERRONE: Diminished capacity isn't a defense, though. It's a factor as specific intent.

MR. ROTH: The law expressly says that's not a permissible argument.

THE COURT: Well, it's a defense. I mean, it's like, all right, we had the same issue that came up with regard to the entrapment defense. You have to say I did it. Okay. And the reason I did it was because I was entrapped. And on any defense you're saying I did it, but this is why. All right? So, yes, I did it, but I wasn't in my right mind. It wasn't — you can't really use diminished capacity. You might argue that he was in jail for 23 hours a day, it affected his judgment, something like that.

MR. PERRONE: That's the argument. Again, I will avoid making any indication as to his mental —

154

THE COURT: All right.

MR. PERRONE: — diminished capacity on being in jail.

THE COURT: I'm not trying to tell you how to try the case. But by taking that tactic you're really saying he did it, but he just didn't have a specific intent to commit the crime, but he did do the act.

MR. PERRONE: Conduct versus intent. The jury will be shown the video to be able to make that determination.

THE COURT: That's a dangerous hill to go down. I want the record to be clear in case there's an appellate review. That's a slippery slope when you say I did it, but I didn't intend to do it, but these are the things that happened.

MR. PERRONE: It's a different aspect of the situation.

THE COURT: I am sorry?

MR. PERRONE: Again, conduct versus intent. We have a Defendant here, based upon him not testifying, he doesn't have to say anything. So the jury is — I'm trying to provide evidence to the jury, what would undermine his specific intent. As far as diminished capacity, it's more

155

of an argument of his circumstances — that — that his will was overborn — I don't think will being overborn is diminished capacity.

THE COURT: To get to diminished capacity, not that.

MR. PERRONE: Specific intent. Specific intent.

THE COURT: Specific intent is saying he intended to do it. To get to diminished capacity, as I indicated I believe he really can't get to it. Even if you were going to get to it, yeah, these events happened, that was not my desire, that's not what I wanted to. So you got a situation where the conduct is sort of like acknowledged, and I didn't intend for this to happen, is like fantasy, or whatever you want to call it, playing around, however you want. It's like saying but it did happen. You can't take the stand and say —

MR. PERRONE: The jury is going to be shown the video, they are going to make the assumption that it happened. At least what happened on the video happened.

THE COURT: But you can't argue simultaneously, what I'm saying, I didn't do it

156

versus I did it.

MR. PERRONE: You can say he took the phone call.

THE COURT: What he said on the phone call is something — he can acknowledge that he did. Whether it is his specific intent, the trash actually be taken out, or that somebody be killed is a fact question for the jury to determine. I don't have an issue with that. When you cross over and say, well, yeah, but it is really because I was held for 23 hours. Yes, I had been on benzoids, and alcohol, I had been withdrawn for a while, I just wasn't in my right mind because I was suffering from depression. That's, I think, a problematic part. Not the fact that he got the call. This is what happened. He can testify it is not my real intent I did have trash there to pick up. Not to say the only reason I picked up the call was because I was confined for 23 hours and I was was withdrawing from drugs and alcohol. We will hash it out.

MR. PERRONE: We will figure it out.

MR. ROTH: To the extent I wasn't clear before, the Defendant rejected that offer. He acknowledged, but rejected it.

157

THE COURT:   Mr. Uraz, you indicated you want to proceed to trial and are rejecting the final offer?

THE DEFENDANT:   Yes, Your Honor.

THE COURT:   Good enough.

MR. ROTH:   Thank you.

(Proceedings concluded at 2:27 p.m.)

158

STATE OF MICHIGAN    )
COUNTY OF INGHAM     )

I, TERESA J. ABRAHAM, Certified Shorthand Reporter in and for the County of Ingham, State of Michigan, Thirtieth Judicial Circuit Court, do hereby certify that the facts stated in the foregoing pages are true and correct, and comprise a complete, true and correct transcript of the proceedings taken in this matter on this the 20th day of October, 2017.



_____
Teresa J. Abraham, CSR-3495

Date:  November 1, 2017