STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff,

vs. CASE NO: 16-1064-FH, 16-1065-FH

TUNC URAZ,

Defendant.

HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
LANSING, MICHIGAN -- TUESDAY, OCTOBER 31, 2017

CRIMINAL JURY TRIAL

APPEARANCES:

FOR THE PEOPLE:

WILLIAM O. CRINO, JD
CHAZ T. KOOP, JD
Assistant Prosecuting Attorney
Prosecuting Attorney's Office
313 W. Kalamazoo
Grady Porter Building
Lansing, Michigan 48933

FOR THE DEFENDANT:

JACOB PERRONE, JD
Perrone Law, PC
221 W. Lake Lansing Road, Ste. 200
East Lansing, MI 48823

ERIC SCHROEDER, JD
BODWIN & ASSOCIATES PC
2970 E. Lake Lansing Rd.
East Lansing, MI 48823-7415

Reported by: Teresa J. Abraham, CSR-3445
Phone: (517)483-6404 e-Mail: tjabraham@msn.com





STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff,

vs. CASE NO: 16-1064-FH
16-1065-FH

TUNC URAZ,

Defendant.

HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
LANSING, MICHIGAN -- TUESDAY, OCTOBER 31, 2017

CRIMINAL JURY TRIAL

APPEARANCES:

FOR THE PEOPLE:

WILLIAM Q. CRINO, JD
CHAZ T. KOOP, JD
Assistant Prosecuting Attorney
Prosecuting Attorney's Office
303 W. Kalamazoo
Grady Porter Building
Lansing, Michigan 48933

FOR THE DEFENDANT:

JACOB PERRONE, JD
Perrone Law, PC
221 W. Lake Lansing Road, Ste. 200
East Lansing, MI 48823

Reported by: Teresa J. Abraham, CSR-3445
Phone: (517)483-6404 e-Mail: tjabraham@msn.com



I N D E X

Jury Selection Commences 52

WITNESSES:

None.

| Exhibit # | Description | Received |
|---|---|---|

None.



Lansing, Michigan
October 31, 2017
at about 8:42 a.m.

*********

THE COURT: We are on the record in two matters that had been consolidated for trial. 16-1064-FH and 16-1065-FC, aggravated stalking -- excuse me, solicitation of homicide. And 16-1064-FH is aggravated stalking.

Appearances, please?

MR. ROTH: Jonathan Roth on behalf the People. Also at counsel table assisting me is Chaz Koop and Matthew Krumbach.

MR. PERRONE: Jacob Perrone, Your Honor. And seated to my right at counsel table is Nicholas Fernandez, who is a Florida attorney, and Eric Schroeder, a Michigan attorney.

MR. FERNANDEZ: Nicholas Fernandez, bar number 160(ph), state of Florida, Your Honor.

MR. SCHROEDER: Eric Schroeder, P-number 71598, state of Michigan?

THE COURT: What's your number, Mr. Roth?

MR. ROTH: 72.

THE COURT: I'm 23. There are still some ones out there.



All right. Let's take up the issue of the interpreter first. There have been a previous request by Mr. Uraz to have an interpreter present. He said he did not feel he needed to have an interpreter always. He is more concerned whether, if he chose to testify, that he wouldn't understand the questions and potential responses.

The record should reflect that Mr. Uraz has had two other cases with the Court. The Court's been with Mr. Uraz for quite some time now. The Court doesn't recall, in its opinion, that Mr. Uraz had any difficulty with English. I don't believe there have been previous requests for interpreters. I can't recall. But I know we haven't appointed any.

Anyway, we did proceed to appoint an interpreter today. Would you state your name for us, ma'am?

INTERPRETER: Good morning, Your Honor. My name is Azar(ph) Sadeghi, last name S-A-D-E-G-H-I.

THE COURT: You had a brief opportunity to meet with Mr. Uraz today. Do you feel you can assist him?

THE INTERPRETER: Well, there is four distinct dialects in Turkish. His dialect is

Turkish Istanbul. My dialect is Turkish Asady(ph). There are some differences. I can try. But it's up to Your Honor.

THE COURT: Also, I received some information about your schedule or scheduling conflicts that you might have?

INTERPRETER: Correct. I am invited to a wedding in Pennsylvania, Judge, Friday night. My intention is to leave Friday, early in the morning, and coming back Sunday, and I won't be available on Friday. On Thursday I have to take my grandson to Ann Arbor at 2:00, in Ann Arbor where we live. I would like to be dismissed at 1:00.

THE COURT: The following week?

INTERPRETER: I will be available any time of the day.

THE COURT: Mr. Perrone, comments or Mr. Uraz's position on the Interpreter?

MR. PERRONE: Mr. Uraz wishes to move forward with the Interpreter. I spoke with her in regards to potentially finding somebody with exactly the same dialect. She informed me she would be the only certified Interpreter in the State of Michigan that has passed the test. There



would be a different group where I could seek out potentially somebody with the same dialect. I spoke with Mr. Uraz in regards to this. He would like to move forward with this Interpreter. She is a certified Interpreter which speaks a dialect close enough that she will suffice.

THE COURT: She will have to have some spot to sit next to Mr. Uraz. I don't know what you're going to do with all your people over there. Somebody is going to have to go back for her to be present.

MR. PERRONE: Yes, Your Honor.

THE COURT: So you need to -- Thursday at one, you aren't going to be here Friday; is that correct?

INTERPRETER: Yes, Your Honor.

THE COURT: Let me get my oath for certified interpreters. Just a minute.

MR. PERRONE: And, further, Mr. Uraz has indicated as far as the Interpreter is concerned, as far as going forward with his testimony, that that would be the only time that he thinks that it would be necessary for her to be of assistance when he is being asked questions, so that they can be interpreted to him. So he understands them.



THE COURT: I guess I'm confused. So he is saying she doesn't need to be here on the other occasions or he wants her?

MR. PERRONE: He is saying she does not need to be here on other occasions besides his testimony, so he has an adequate opportunity to understand the questions being asked him.

THE COURT: Mr. Uraz, would you stand for me, please? Raise your right hand. Do you swear or affirm the testimony you are about to give will be the truth, the whole truth, under the penalty of perjury?

THE DEFENDANT: Yes, sir.

THE COURT: Have a seat. The Interpreter has indicated that she is available on the limited schedule this week, but available next week to assist you if you needed someone to intercede on questions and answers, things of that nature. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And it's my understanding you have made a request for an interpreter. If I recall correctly, initially, it is if you should decide to testify, you wanted to make sure that your position was clearly enunciated to the jury;



is that correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: So the interpreter advises that she is available here on the schedule that she has provided us. But Mr. Perrone has indicated that you feel you don't need an interpreter, except for when you take the stand if you decide to do so; is that correct?

INTERPRETER: Yes, Your Honor.

THE COURT: You're comfortable with that?

INTERPRETER: Yes, Your Honor.

THE COURT: If that is the case, we would have her come back. I guess I would have to give the information to Mr. Perrone, the contact information, or get it. Let me see. You're at 734-665-7295?

INTERPRETER: That's the University Translator, one of the companies I work with.

THE COURT: Okay. And let me see. We don't have your contact information. It sounds like he is indicating he doesn't need you to be here through the entire trial, but would like for you to be here when he testifies. We just don't know what day it would be yet. How would they contact you to let you know?

INTERPRETER: That company needs to know ahead of time. The Court or attorney needs to contact them, and they will contact me.

THE COURT: That's what I was asking. That's the 734-665-7295 number?

INTERPRETER: That's correct.

THE COURT: Two people, Donna Anato Vose? and Lori Finn(ph?).

INTERPRETER: Lori Finn, yes.

THE COURT: Lori Finn is the one?

INTERPRETER: Lori Finn or Donna.

THE COURT: Mr. Uraz, based on your statement, we are going to have the interpreter come back on the day that you anticipated to, if you decide to testify. We don't know which day that is. Mr. Perrone will have to contact you. I will give them that contact information. We will have either Lee Anne call, probably have Lee Anne, call the interpreting service to contact Ms. Sadeghi to come back on the day that you are testifying. And that would be one day next week, probably next Thursday or Friday.

THE DEFENDANT: Yes, Your Honor.

THE COURT: How do you want to handle it?

THE DEFENDANT: Yes.



THE COURT: No one is forcing you.

THE DEF: No, Your Honor.

THE COURT: You are making it on your own voluntary free will?

THE DEFENDANT: Yes, Your Honor.

THE COURT: You are comfortable going ahead with that policy?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Ma'am, we will call you next week.

INTERPRETER: I'll work on my dialect.

THE COURT: All right. Thank you very much. You're free to go. Do you need something?

INTERPRETER: Would Your Honor kindly sign that paper that I were here?

THE COURT: Yes.

INTERPRETER: From 8:30 to whatever time.

THE COURT: Okay, ma'am. I signed it and put our phone number. See you next week.

We had several matters discussed in chambers that we needed to place on the record. The first was these two cases have been consolidated, 16-1064-FH and 16-1065-FH. And the Defense had requested that the information and the elements of those matters be read separately



with clear designation as to each file. The Court indicated that it would do that. Is that your understanding, Mr. Perrone?

MR. PERRONE: Yes.

THE COURT: And Mr. Roth?

MR. ROTH: We have no objection to that.

THE COURT: Then we had several other issues. The first having to do with an assertion of a qualified privilege of Mr. Uraz on two matters. Since we had a hearing on entrapment, Mr. Uraz testified in support of that action. The Court did issue an order of reconsideration, a previous denial of 404B. He had concerns, his efforts to purchase a handgun from an employee at Michigan State University. And the Court based that on Mr. Uraz's testimony that he did attempt to buy the gun. That he was discharged. And it was in close proximity to some of the other 404B matters that the Court did allow in, such as Dave and Buster's, the video from her residence and things like that.

So the Court, based on that -- now, it's my understanding that the Defense asserts that the qualified privilege means that the Court cannot consider that for 404B. And the



Prosecution indicates that that's not accurate. So we'll turn, first, to Mr. Perrone on the qualified privilege argument.

MR. PERRONE: Yes, Your Honor. It's not in dispute that Mr. Uraz has a requested privilege to testify in an entrapment hearing, the nature of the defense. Your Honor made a ruling as a result of the Prosecutor's motion on 404B that it was a speculative act because there wasn't anything else on the record to corroborate it. Using Mr. Uraz's qualified testimony in order to reconsider and change the order to allow the gun in would impede his ability and would impede the opportunity for him to testify freely, and, further, in the future, would not encourage people to testify to entrapment, if it's going to be used against him.

The information is going to be put to the jury as a result of Mr. Uraz's testimony at a qualified hearing. There are -- it should not be allowed to be presented to the jury if it is being verified on a result of qualified testimony.

THE COURT: Mr. Roth?

MR. ROTH: Thank you. Two things. First of all, a qualified privilege is

exactly that. It's qualified. It's not an absolute privilege. There are circumstances in which it is admissible, the most likely which we will experience during this trial. If the Defendant testifies, we can use that transcript to impeach his testimony.

Second of all, our argument is to reconsider the Court's ruling was not strictly based, in fact, not even primarily based on the Defendant's testimony, but, based on the argument that counsel gave, the articulation counsel gave at the hearing about the anticipated defense at trial. When the Court initially denied the 404B request as it related to the gun, the ruling was unfairly prejudicial, not because it was uncorroborated, because there is nothing tying it, increasing probative value. What happened at that hearing. Defendant's counsel articulated the anticipated defense at trial, the things they wanted to put forward, the Defendant never had any desire to have Erika Melke killed.

What happened in jail, simply, for lack of a better phrase, going along with what other inmates suggested to him, one's in custody. So the fact that he tried to buy a lethal weapon



months earlier, months before he was locked up, months before he met Reginald Close, and months before he met Charles Allen, obviously is extremely probative for the fact that the defense is not true. He had this lethal desire well before meeting Allen and Close.

THE COURT: Mr. Perrone?

MR. PERRONE: In regards to the assertion that he purchased a legal weapon, nothing on the record that indicates aside from the subsequent testimony of Close that there is any intent associated with Prosecution, the weapon, that it was directed towards Ms. Melke. There is a PPO valid outstanding at the time that the allegations were made.

Therefore, the assertion by Mr. Uraz that it is acknowledged that he's trying to purchase a gun by other legal means, he wasn't able to purchase a gun by legal means. Nothing to indicate, nothing the Prosecutor can present to indicate that the gun was being purchased for anything associated with Erika Melke. No threats pointed to Mr. Uraz associated with a gun.

The outstanding issues associated with a boyfriend, a logical leap to say he bought a gun



for Erika Melke, the Prosecutor must not be allowed to use, to purchase a firegun itself, outside the testimony of Close, which we anticipate will be incredible. I will leave it to Your Honor's discretion. I think it's going to have too much -- it's going to confuse the jury and unfairly prejudice my client in this matter because of the lack of specificity associated with any common plan or scheme associated with purchasing a gun. All they are proposing, he is going to purchase a gun. It is speculative by its very nature. Presented to the jury unfairly prejudices my client due to the speculative nature of what it's proposed to be offered for.

THE COURT: All right. In this matter the Court did grant the request for reconsideration based on what we've heard. I think the timeline is important, and the fact that Mr. Uraz was prohibited from purchasing a legal gun. He is making efforts to buy something illegal on the black market, so to speak, in connection with his efforts to circumvent the personal protection order that prohibited him from purchasing a firearm. So the Court feels that is relevant.



It's also relevant going to intent down the line. We do have the statement from one of the witnesses, Mr. Close. But not taking that into consideration, it does show potentially that there were efforts to put himself in a position to carry out to the further stalking and/or assault upon the victim in this matter.

In addition, I believe his testimony was a requested privilege, and I think it can be used just like other statements in regards to an evidentiary hearing, motion to suppress, things like that. So, in that regard, the Court will stand by its original reconsideration and we'll allow that testimony to come in.

Okay. The second issue we have concerning the requested privilege is that Mr. Uraz was represented by his prior attorney, Mr. Bergstrom, in this matter. And that Mr. Uraz gave a letter to Mr. Bergstrom to give to an Assistant Prosecutor, Chaz Koop. And the issue is, from the Prosecution's standpoint, that I don't know what's in the letter. But that that letter should be used.

The Defense's position is that it is, it still was attorney/client privilege or limited

privilege. But we had testimony from Mr. Uraz indicating it was his intent that the letter go to the Prosecutor. Mr. Roth?

MR. ROTH: Thank you, Your Honor. As the Court laid out, the letter in question was admitted in a different forum at the hearing last week. At that hearing the Defendant gave a foundation for the letter to be admissible in front of the jury, and to be found outside the attorney/client privilege.

The law in Michigan provides that communication that is intended to be confidential between clients and attorneys are to remain privileged. However, if the intent of that communication does not include confidentiality, in other words, if something said between them that is meant or allowed to go to the outside world, then there is no longer privilege, and it's not a qualified absolution. It's completely not privileged at that point.

In this case we have a letter that the Defendant authored and gave to his attorney in order for his attorney to provide to Mr. Koop, who was at the time the Prosecutor in the case. On page 57 of the transcript of the hearing from,



I believe it was last week, the Defendant said on line 11 -- he wrote the letter on lines 19 and 20. He said:

That's why I gave it to my lawyer to show it to Mr. Koop here. Lines 22 and 23: That's what I gave to my lawyer to show Mr. Koop.

Because Defendant's intent to offer the letter and providing to his attorney was not to remain confidential attorney/client not covered by that privilege, thus, admissible in court.

THE COURT: Mr. Perrone?

MR. PERRONE: Again, we have a logical leap associated with her as far as intentions. Mr. Uraz, based upon his testimony, he said he gave it to his lawyer to show it to Mr. Koop. That could have been done in settlement negotiations.

Again, something that would be given to his attorney in confidence, in determining whether or not it was going to be used, as far as the Prosecutor is concerned, the fact that he gave it to the Prosecutor, that is being used in settlement negotiations, that would be compromised. Therefore, it should not be something that is admissible.



He doesn't give up his privilege as a result of presenting something for his attorney to use in settlement discussions.

Other than that, I'll leave it to the discretion of Your Honor.

THE COURT: Mr. Roth?

MR. ROTH: I think it's worth noting that that case had been already briefed with the word settlement negotiations at that time.

THE COURT: I think in regards to privilege, Mr. Uraz testified. I believe he might have been in custody at the time. He gave a letter to his attorney to give to the Prosecutor. His intent was the letter go to the Prosecutor. Not that he's disclosing confidential information that would have been privilege to his attorney.

We have the secondary issue of what happens when a document is given to the attorney, and the attorney then publishes the document, so to speak, to others. I don't have to get to that in this situation, because Mr. Uraz has testified it was his intent that the document go to the Prosecutor, so that his attorney was just a conduit for that. So I would allow that to be introduced.



MR. ROTH: Thank you, Your Honor.

THE COURT: The next issue that we discussed had to do with witness Close. It's my understanding that at or about the time of Mr. Uraz's preliminary examination on this case, that Mr. Close had a case pending before Judge Draganchuk that was adjourned. And the defense's position is that perhaps that the reason for the adjournment was so that Close would continue his cooperation against Mr. Uraz. It's been indicated that that case subsequently ended in an acquittal for Mr. Close. And so it raises two issues.

First of all, the Court felt that the fact that the adjournment was granted was relevant, and that the Defense could introduce that.

The issue, as to the purpose of the adjournment, there is nothing on the record to show why that adjournment was granted, although it was done by written stipulation. So the Court indicated that the written stipulation was relevant and could be utilized.

The secondary issue is there is an acquittal, and the Defense wished to indicate the reason for the acquittal, which they felt because the witness failed to appear created an inference

that somehow the Prosecution was involved in a conspiracy to have the witness not appear so that the case would not be dismissed.

The Court's position in conference was that the acquittal was relevant. Okay? But there's nothing to establish why the acquittal was entered, and that it couldn't go beyond that and speculate as to why it occurred. So that is Mr. Perrone's request. So, Mr. Perrone?

MR. PERRONE: Yes, Your Honor. In regard to the adjournment, it appears that it is an adjournment that was signed off on via stipulation and order on October 19th. Mr. Close came into contact with law enforcement on October 13th. And this is something that was discussed with the Prosecutor, with law enforcement, prior to October 19th. It would have necessitated his availability for appearance at preliminary examination.

It appears from the register of actions from the Close case, that the transcript was filed at the same point in time as the motion to adjourn the trial. It also appears that the trial had a prior trial date and was a hard set trial date. And that an adjournment was granted. It's Mr. Uraz's position it's more than likely it



is tied in the necessity for him to appear, and provide testimony at the preliminary examination on this matter.

Further, due to, as the Defense understands it, there being other cases that Mr. Close was also involved in with the Prosecutor's office at that point in time, that would further support that he received something of benefit associated with providing information to the Prosecutor's office.

It appears that the trial that was initially scheduled for October 31st, did not actually start until January 9th or 10th of 2017. That would -- that delay, as a result of the adjournment definitely was something that could have resulted in acquittal due to stale evidence.

Now, in this case it's our position that there is a benefit that was received as a result of delay that could have resulted in acquittal. That's what we freely anticipate to present to the jury associated with Mr. Close's trial and the benefits associated with Mr. Uraz's case, specifically. And we reserve the right to further argue at receiving additional information of the other case, that is Mr. Close proffered on



and either provided a statement in written or oral form.

THE COURT: Mr. Roth?

MR. ROTH: Thank you, Your Honor. So speaking only to the adjournment and acquittal issue, it's my understanding the Court's ruling is that evidence of the adjournment and evidence of the acquittal are admissible, but speculative argument or evidence about the reason for either is not. We have no objection to that ruling.

THE COURT: So that is the Court's ruling, that will be the Court's ruling that it's relevant so that evidence of the acquittal, a copy of the stipulation, and the fact that subsequently in January there was an acquittal, will be relevant.

But as to the speculation that that was as a result of some agreement with the Prosecution, absent someone testifying, if that's the case, the Court would not allow you to go behind those things. But those things would be admitted.

The other issue we had, I thought it was a different witness. I didn't know Mr. Close. I think one other primary witness who made a statement against Mr. Uraz while in custody. Apparently there is information that the Defense



has. I don't think Mr. Close was also making statements against other defendants at the same time. Mr. Roth?

MR. ROTH: It was Mr. Close, Your Honor.

THE COURT: It was Mr. Close?

MR. ROTH: Yes, sir.

THE COURT: So that Mr. Close, in addition to making statements against Mr. Uraz, was organizing information on other persons, or other cases as well.

The Court -- the Defense made a request to be provided with the substance of those statements in the other cases. And the Court felt that the substance was relevant.

There is an offer that there be an in-camera review by the Court of those statements. The reason being that the Court was of the opinion that we needed to know the circumstances in which these statements were being made. Say, for instance, the traditional proffer would be someone has information about a case that's pending, or may have been a witness in a case, or may have had some other information versus whether or not Mr. Close was also proffering against other individuals who happen

to be in custody at the same time that Mr. Uraz -- in or about that time the Court indicated it felt it would be relevant totally, to his offering proffers on other cases. So the fact that he was objecting offering proffers on other cases, the Court would allow in.

As to what the content of what these proffers were, the Court indicated if there was some that he was also saying that I talked to someone in custody, and this is what they told me, or gave some lead that the Court felt that would be relevant to Mr. Uraz's case.

The other ones I would reserve judgment until I had an opportunity to review the content. Mr. Roth said he would provide those contents to the Court. Mr. Perrone?

MR. PERRONE: Again, it appears to me that the statement associated with the other cases in and of themselves would have significant similarities associated with a common plan or scheme central to the defense. That Mr. Close manufactured these scenarios in order to better his circumstances given that he was on parole at the time and had significant criminal charges against him that would likely cause him to go to



prison for a significant period of time. I've not had an opportunity to review all of that documentation. I don't know how many other cases he did proffer on, how many other cases he provided a statement on.

As I understand it, the case in John Pierce, specifically, made an indication that there is a letter presented to him from Reginald Close that was going to be used against him at trial. And that that is something that ended up in a plea. I haven't had information associated with that case up to this point in time. I requested that.

And due to trying to avoid issues with not having appropriate evidence of these things similar in nature to the information that is proffered in Mr. Uraz's case, I think that that would be a significant issue underlying Mr. Uraz's defense, and could frankly be a smoking gun in this case.

THE COURT: Mr. Roth?

MR. ROTH: Thank you, Your Honor. I want to clarify the record on a couple of issues. First of all, I have no idea on who Mr. Close is proffered against, otherwise, how many people or



the contents of those proffers.

Secondly, that Mr. Perrone requested them this past Friday. This is Tuesday. I believe he requested them this past Friday by close of business via e-mail. But to bring up to the Court as he did this morning, I have no objection to producing those things for in-camera review. I spoke to Detective Krumbach. We got out of our in chambers discussion, pulled out all proffers, Mr. Close did this during that time period. Once Lansing Police Department assembles them, we will have for the Court for review.

THE COURT: Anything else, Mr. Perrone?

MR. PERRONE: Just a response. This is something that discovery requests were made with the Prosecutor's office, the. Assertion that Mr. Roth has no idea associated with any other cases that Mr. Uraz -- I think Mr. Roth initially consulted from its inception. The fact that he comes into court today, he has no idea associated with any other cases that his prime witness in this case, it seems, to be counter-intuitive overall, he would not know that his prime witness had other cases, and that would potentially be something undermined in this case. There were



requests made. That is an issue. I would like to see them. If there is nothing there, there is nothing there. We would like to make a determination after reviewing them, the assertions.

I didn't do anything. This is the obligation of the Prosecutor, an obligation for them to turn over materials, part and parcel of the investigation that they did in this matter. As far as an assertion that I did not request them appropriately in this matter, I find that, frankly, off base.

THE COURT: The Court is going to stand by my preliminary ruling in this matter. It will be relevant that there be testimony elicited about Mr. Close proffering on other persons at or about the same time. As to whether or not we will allow evidence of the nature of that proffer, the Court will conduct an in-camera review of however many that comes out to be. As I indicated, tentatively, the standard I would use there still would be relevant that he is proffering against other people.

I assume the Defense would show that he's desperately trying to come up with some

information to get a deal for himself. I do think that's relevant, so that the number of proffers will be allowable, no matter what. Okay. But the nature of the proffers, the line the Court will be tentatively looking at is, were they proffers where he purportedly talked to someone while in custody and received information and/or admission from a person versus your more standard proffer where he may have had information about some matters that were unsolved or outside. And that he had information about the People's witnesses, things like that.

So with those caveats, I will allow the defense to talk about the number of proffers he made at or about the same time, and reserve a decision whether or not they can go as to the nature of these problems. That's what I remember. Anything else I left out?

MR. ROTH: I have a number of small issues, Your Honor, that I have spoke to Mr. Perrone about.

First, the People have given issues regarding Mr. Close and Allen as far as their involvement in the Defendant's solicitation of them to kill Erika Melke. We will also do that



on the record when they testify as to the Defendant's witness list. It's my understanding that the Defendant is going to writ John Pierce, Kenneth McDaniels and Motamo Hamedy(sp), from the Department of Corrections to appear. In turn, they will be returned. It's my understanding they will likely be up Monday. We writted for these days. We will have further objections to their testimony, depending on how proofs go until that time.

We have further understanding as to the Defendant's witness list. The Defendant further strikes Timothy Marris, (sp) Jordan Lawol, (sp) Shawn Moon, Chris Lindbergers, Cassan Sheik from their second amended witness list.

As to the balance, the People may have some objections. But, again, based on how the proofs come out this week, we will take it out then.

THE COURT: Mr. Perrone?

MR. PERRONE: In regard to the use immunity, I just request that a copy of the agreement be presented to the jury so they have an opportunity to see what a use agreement is, and understand the nature of it.



THE COURT: Is there a written agreement?

MR. ROTH: There is not, Your Honor.

MR. PERRONE: There is some filings with the Court from the Prosecutor's office indicating that they are giving him use immunity and circumstances under which they are giving him use immunity.

MR. ROTH: That is a District Court filing that expires at the conclusion of the preliminary examination. We will detail the terms of grant of use immunity during their testimony.

THE COURT: Okay. Again, I agreed to strike those witnesses at this point in time. I will strike the remaining witnesses on Monday.

For corrections, we need to make sure that we are really going to get to them. It looks like today we probably won't be able to complete today with 12 preemptories. We're only going till two.

MR. ROTH: We will see.

THE COURT: Then we would come back Thursday. I don't know how the Prosecution's case, if that's the case, I doubt it will get four witnesses on Monday, Mr. Perrone. Any way we can work it out.



MR. ROTH: Certainly won't be before Monday.

THE COURT: Right.

MR. ROTH: We ask to sequester the balance of the witnesses. I'll put on the record that the parties met at our office October 9th, 2017. We'll verify that defense counsel had all discovery at that time. There are no further requests. All intended exhibits are present in the courtroom and marked available to the defense counsel.

I also provided to the Court Reporter, as well as defense counsel, an exhibit log with description numbers for each of the exhibits. It's my understanding the defense does not have any intended exhibits.

THE COURT: Mr. Perrone?

MR. PERRONE: In regards to the exhibit, the transcript of the hearing, at the last hearing, at the evidentiary hearing, the Prosecutor was talking about different statements. And the transcript of Mr. Uraz's statements that were made to Baraa(sp) Amir while he was incarcerated. As far as that exhibit is concerned, I request that entire transcript be

admitted, if the the Prosecutor seeks to admit any portion.

THE COURT: The entire transcript of?

MR. PERRONE: Discussions between the Defendant and Burak Atamer while he is incarcerated.

MR. ROTH: That is not on our exhibit list at this time. Don't have any intention of admitting that document. If we change our minds, that is something we will talk to defense counsel.

MR. PERRONE: Again, I would like to address that issue as far as admitting that. Mr. Atamer is out of the country, potentially has a Fifth Amendment issue in this case from his prospective -- potentially why he left the country. We don't know. I don't have him to be able to produce as a witness. He is unavailable.

THE COURT: But if he had a Fifth Amendment issue, wouldn't that also be in the transcript?

MR. PERRONE: The transcript is what I am seeking to admit.

THE COURT: I understand. If the witness has a Fifth Amendment issue, it still would be information, I assume, contained in the transcript.



MR. PERRONE: Correct. But I cannot call him to have him verify any information associated with the discussions.

THE COURT: Was it under oath?

MR. PERRONE: No. It was just a jail conversation.

THE COURT: Doesn't it have to be under oath to be admitted as a witness who is not present?

MR. ROTH: Correct.

THE COURT: If a witness is not available, a prior under oath statement that can be utilized. Again, a recording of some conversation is not being under oath would fall under the unavailable witness of a caveat.

MR. PERRONE: I don't know if it's necessarily hearsay. I think also a number of hearsay exceptions as far as present-sense exception, given the nature of the allegations associated with the different statements made by Mr. Uraz. It's being offered to provide context, Mr. Uraz's state of mind during all relevant periods of time with the probative nature of the discussions. And the nature of the hearsay again, as far as conversation, that's something I would



like to reserve, given I can't set the foundation through Mr. Atamer due to unavailability.

THE COURT: How would you do that if he's not available?

MR. PERRONE: The fallback trustworthy rule. A recording made and transcribed by the police, made by the jail, transcribed by the police. As I understand it was $1400 to transcribe some of these videos because they were in Turkish.

THE COURT: You will have to get cases on that. I think unavailable statements not made under oath to a person now no longer here --

MR. PERRONE: I can come back to it. May I just use it through Defendant's testimony?

THE COURT: Maybe your assistant can come up with something.

MR. PERRONE: The second issue, just to address, is argument for down the road whether or not ability to bring extrinsic evidence for impeachment purposes. It is the Defendant's position, in general, extrinsic evidence is something admissible for impeachment.

First, the case law exception, extrinsic evidence is allowed for impeachment purposes to



prove bias. The witness is being offered for bias. I don't know who the witnesses are, what they might be testifying to. One other transcript that is mentioned, the transcript of some prior hearing, was that mentioned?

MR. ROTH: The transcript, the hearing from Friday was distributed by Ms. Abraham this morning. I'm certainly not seeking to admit that case in chief. If the Defendant testifies, it may be used for impeachment. That would be if --

MR. PERRONE: I would also like to admit the swear-to in this matter as an exhibit.

THE COURT: The what?

MR. PERRONE: The officer's swear-to.

THE COURT: Well --

MR. PERRONE: Detective Krumbach's swear-to.

THE COURT: I think you would use it for impeachment first. If the officer testifies, you can use it for impeachment. I don't think you can introduce it, as part of your case in chief. You would have to ask him in the normal fashion.

MR. PERRONE: Okay.

THE COURT: Anything else? The Court had previously ordered us to produce some MDOC

witnesses by video, a writ from the defense. Three people I mentioned earlier, John Pierce, Kenneth McDaniels Mateen Muhammed. We did October 26th. The very next day we turned over the DVD of the people's conversation of each of those witnesses to the defense counsel. We are in the process of getting those transcribed. John Pierce's interview finished, and was turned over today. And continued to do so as those transcripts were completed.

THE COURT: Is that accurate, Mr. Perrone?

MR. PERRONE: It is, Your Honor.

THE COURT: Anything else?

MR. ROTH: No, Your Honor.

THE COURT: Mr. Perrone?

MR. PERRONE: Just in regards to the normal issues, depending upon the evidence presented, the defense may seek the duress instruction for jury instruction purposes. I forwarded a copy of this one to Mr. Roth.

MR. ROTH: When was it forwarded to me?

MR. PERRONE: I just sent it to him.

MR. ROTH: When? I don't know what that means, time-wise.

MR. PERRONE: About 15 minutes ago.



MR. ROTH: Okay.

THE COURT: We are premature on that. So certainly we will have an opportunity, ample opportunity to discuss final instructions when we get to that point in the case. We will reserve that.

MR. PERRONE: Due to -- if I could just try to get a definitive scheduled associated with this, the Turkish Embassy. I am also very interested in when the proceedings are going to be held so that I can send them at least an update, initially, so they can tell everybody what needs to be told in Turkey and elsewhere.

THE COURT: We're starting today. This week, next week. I don't know. It's your case. It seems like you would be able to let them know. It's been indicated that it probably will go to next Friday. I'm going to extend that to next Monday, just in case it takes longer. It would go to -- I am going to tell the jury that it's probably -- would not go past the 13th. And you know when your people will be testifying. So I guess you could let the Embassy know. All right. Anything else? All right. We will call for the jury. Probably takes about 15 or 20 minutes.



Also, we are -- we only would go until about 2:00 today. If we don't have the jury, we made arrangements for them to come back on Thursday. We should be finished relatively early on Thursday. We will go to closing statements and start witnesses. Or if we get a jury selected today, not closing statements, opening statements, we will go with opening statements on Thursday.

So I'm not anticipating we will have any witnesses today. Regular schedule will be Thursday. It will be a full day for us, which means 3:30. Break for lunch. Friday, probably do the same. Full day 8:30 to 1:30. Since the interpreter is not going to be here, Monday, last full day for me. 8:30, break for lunch. Next Tuesday, 8:30 to 1:30, in the normal fashion. Next Thursday will be a full day. Then we will see where we are. So that's the anticipated schedule.

MR. ROTH: Thank you, Your Honor.

THE COURT: Anything else?

MR. ROTH: No.

THE COURT: So the jury is on their way up. It will be about 15 minutes.



Recess taken from 10:20-10:56 a.m.)

(Jury present in courtroom at 10:56 a.m.)

THE COURT: All right. Be seated for me, please.

You see that we had to seat so many people here in the jury box. Once we get to that, we will have you step down. We'll call up people. You can take a seat for us, please.

Ladies and gentlemen, I'm Judge Clinton Canady, the third. It's my pleasure and privilege to welcome you to Ingham County Circuit Court.

Now, jury duty may be a new experience for some of you. Jury duty is one of the most serious duties that members of a free society are asked to perform. Our system of self-government could not exist without it. The jury is an important part of this Court.

The right to a jury trial is an ancient tradition and part of our heritage. The law says that both a person who is accused of a crime and the Prosecution have the right to a trial, not by one person, but by a jury of 12 impartial persons. Jurors must be as free as humanly possible from bias, prejudice or sympathy for

either side.

Each side in a trial is entitled to jurors who keep open minds until the time comes to decide the case.

Trial begins with jury selection. the purpose of this process is to obtain information that will help us choose a fair and impartial jury to hear this case.

During jury selection the lawyers and I will ask you questions. This is called the voir dire. The questions are meant to find out if you know anything about the case. Also, we need to find out if you have any opinions or personal experiences that might influence you for or against the Prosecution, the Defendant, or any witnesses.

One or more of these things could cause you to be excused in this particular case, even though you may otherwise be requested to be a juror. The questions may probe deeply into your attitudes, beliefs and experiences. They are not meant to be an unreasonable prying into your life. The law requires that we get this information so that an impartial jury can be chosen.



If you do not hear or understand the question, you should say so. If you do understand it, you should answer it truthfully and completely.

Please do not hesitate to speak freely about anything you believe we should know.

During the jury selection, you may be excused from serving on the jury in one of two ways.

First, I may excuse you for cause. That is, I may decide that there is a valid reason why you cannot or should not serve in this case. The law gives each side the right to excuse a certain number of jurors in this way. If you are excused, you should not feel bad or take it personally.

As I explained before, there simply may be something that causes you to be excused from this particular case.

Because jurors have to answer the voir dire questions under oath, it's necessary that the Clerk administer an oath to all members of the jury panel. So I would ask everyone to please stand at this time and raise their right hand, and the Clerk will administer the oath.



THE CLERK: Do you solemnly swear or affirm that you will truthfully and completely answer all questions about your qualifications to serve as jurors in this case? If so, please say: I do.

(Prospective jury answers in the affirmative.)

THE COURT: Be seated for me, please.

What happens during voir dire, we are going to call 14 people to the box. I and the lawyers will ask questions. Just because you aren't called in the initial 14, don't relax, all right? Because invariably we will have to call some other people up. We are capable of repeating all the questions that we have asked. But if you would remember and concentrate for us, it helps us to be more efficient if you recall something that you might have had a response to some issue.

Okay. We expect this trial will last -- I always give you the worst-case scenario -- so the worst-case scenario would be a week from Monday. That would be Monday, November 13, worst-case scenario. More than likely we will be finished before that. That's the absolute worst-case scenario.

I would like to introduce to you members



of my staff which are important. We have the court reporter, Teresa Abraham. If this matter is going to be reviewed by the next highest Court, which is known as the Michigan Court of Appeals, they do so only on what they've read as the record. They don't take testimony, don't take any evidence. All they do is look to see what I did. So everything has to be answered with a yes or no so the Court Reporter can take it down for us.

My Clerk is Diane Chillers. She is the one that will draw the names to sit. She will administer various oaths. She will come back at the end of the trial to administer oaths and strike two witnesses.

This is a criminal case involving the charge in one file, which is file number 16-1064-FH. There are two separate cases which have been consolidated into one matter. The one file, the first one, is 16-1064. That is a charge of aggravated stalking. File number 16-1065 is three counts of solicitation to commit murder. So three counts, three allegations, that that occurred. I will be explaining those charges more fully later, the charges made

against the Defendant, Mr. Tunc Uraz.

I will ask the Defendant's lawyer, Mr. Perrone, to introduce himself and list any potential witnesses he intends to call in regards to the witnesses.

So a lot of times you will recognize the name. It's not unusual to not recognize the name until somebody comes in. If you are one of the 14 people selected, and you don't recognize the name now, somebody comes in and you are able to say I do know that person, it's not an issue you need to let us know that that occurred. It happens regularly.

I would ask Mr. Perrone to stand and introduce himself and his client at this time.

MR. PERRONE: My name is Jacob Perrone. I'm the Defendant's attorney, Mr. Tunc Uraz. Sitting at my counsel table, are Nick Hernandez, my associate, and my associate Eric Schroeder.

As far as witnesses that we're looking at calling, and if you know any of them, please chime in. We have Reginald Close, Charles Allen, Erika Melke, Carmen Elias, Stan White, Richard Laing, John Pierce, Ken McDaniels, Fateen Muhammed, Tim Horan, Cihat Oz, Ashley Close,



Cathy Edmond, Andrew Nitchman, Noell VanSlembrouck, Jackie Close.

THE COURT: So does anybody know any of those names at this time? Stand up for us please. And who do you know?

UNIDENTIFIED JUROR: Cihat Oz.

THE COURT: How do you know him?

UNIDENTIFIED JUROR: He is part of our agency for substance abuse.

THE COURT: Thank you. Anybody else? Yes?

UNIDENTIFIED JUROR: The name Tim Horan sounds familiar.

THE COURT: From where would you think?

UNIDENTIFIED JUROR: Is he a retired state trooper?

THE COURT: I don't know if he is or not. I don't know. He may be. We will find out.

UNIDENTIFIED JUROR: Okay.

THE COURT: All right. Anybody else? Yes?

UNIDENTIFIED JUROR: Name Stan White from Holt High School.

THE COURT: Okay. All right. Thank you.

UNIDENTIFIED JUROR: Yep.

THE COURT: Anybody else? Okay. The lawyer for the State of Michigan is Assistant



Prosecuting attorney Jonathan Roth. I would ask Mr. Roth to stand and introduce himself and anyone else seated at counsel table, list any potential witnesses he intends to call.

MR. ROTH: Thank you, Your Honor. Good morning, ladies and gentlemen. My name is Johnathon Roth. I am from the Ingham County Prosecutor's office. With me is Assistant Prosecuting Attorney Charles Koop. As well with me is Detective Krumbach from the Lansing Police Department.

During this case you may hear about the Lansing Police Department, Lieutenant Robert Backus, Officer Mandi Brunner, Penni Elton, Detective Hogan, Officer Peter Howard, Detective Eric Janzen, Detective Matthew Krumbach, Officer Ryan Lawrence, Officer Jennianne Maatman, Officer Frank Mobley, Officer Dylan Reost, Officer Antonio Sandoval, Meridian Township Police Department Officer Daniel King, Officer Kristi Lysik, Officer Aaron McConaughy. Other law enforcement members: Officer Ag, Steve Bailey, Bureau of Alcohol, Tobacco and Firearms. Deborah Sandra Douse, Ingham County Sheriff's Department. Deputy Kevin Jewell. Deputy Detective Sergeant



Maureen Kennedy. Michigan State University Police Department.

The following lay witnesses: Charles Allen. Kathyrn Beckett. Christopher Bergstrom. Patrick Burnett. Reginald Close. Carmen Elias. Heather Heitman. Richard Lane. Erika Melke. Jennifer Roberts. Michael Stoves. Stan White and Bernard Brown.

MR. ROTH: Thank you, Your Honor.

THE COURT: Wow. Okay. Anybody know any of those people? We will start over here. Stand up for us, ma'am.

UNIDENTIFIED JUROR: I know Mandi Brunner. I went to high school with her.

THE COURT: I wouldn't ask you how long ago that is. Yes, ma'am. Did you raise your hand?

UNIDENTIFIED JUROR: Kristi Lysik, Sandra Douse and Kevin Jewell.

THE COURT: Thank you. Another hand behind. Yes, ma'am?

UNIDENTIFIED: Officer Krumbach. He is a past client of our agency.

THE COURT: What agency is that?

UNIDENTIFIED JUROR: Real estate.

THE COURT: Hotseat.

UNIDENTIFIED JUROR: I know several of the officers professionally, personally.

THE COURT: You are law enforcement yourself?

UNIDENTIFIED JUROR: I am.

THE COURT: All right. Anybody else?

Okay. Usually the Court's schedule, so that you'll know, I try to reserve time for you to be able to take care of your -- at least look in on your affairs. Let me put it that way. Sometimes you can't take care of them. But you can look in on them. So today we will see how long we will go in order to get a jury selected. But normally on Tuesdays we go 8:30 to 1:30, with two breaks. So that it's really a half day, from our standpoint. And you will be released at about 1:30.

In this trial, on Monday, Thursday and Fridays, we will be going 8:30 to noon, break for lunch. Come back, go to no later than 3:30 on those days. We do not meet on Wednesdays. Wednesdays are Motion Day, which is set aside. You can imagine that the Court has a lot of cases it has to work with. People have interim and intermediate issues that need my assistance, we



will call it. And so that is Wednesdays are set aside for those matters. So on any one session, we normally would not go longer than two hours at any one setting, usually less than that. But the most extreme would be two hours at one time.

So if someone has any health issues, we can try. We generally are able to work with them. If you're diabetic, need snacks, bad back, need to stand up, walking around, we have hearing enhancement equipment. If you have difficulty hearing, let us know that you can't hear. We have individual monitors on the seats so that we can try to work with most situations that anybody may have.

This is a criminal case. As I indicated, it's really two criminal cases. And the paper used to charge the Defendant with a crime is called an information. The Information of this case charges the Defendant, Tunc Uraz, in file number number 1064, reads as follows:

That between August 23rd, 2016 and September 26, 2016, at 4925 Dunckel Road, Apartment 202, City of Lansing, Ingham County, that the Defendant did engage in a willful course of conduct, involving repeated or continued



harassment of Erika Melke, the conduct being such that would cause a reasonable person to feel terrorized, and/or frightened, and/or intimidated, and/or threatened, and/or harassed, and/or molested. Said conduct, actually causing Erika Melke to feel terrorized, and/or frightened, and/or intimidated, and/or threatened, and/or harassed, and/or molested. And at least one of the actions constituting the offense is in violation of a restraining order, and/or a condition of pretrial release, contrary to statute.

In file number 1065-FC the Defendant is charged that between August 31st, 2016 and October 31st, 2016, at 630 North Cedar Street, in the County of Ingham, City of Mason, that the Defendant, in Count 1, homicide, solicitation of murder, did solicit another person, Reginald Close, to commit murder, contrary to statute.

In Count 2, that the Defendant did solicit another person, Charles Allen, to commit murder.

And in Count 3, that the Defendant did solicit another person, Frank Mobley, to commit murder. All three of those matters are contrary to statute.



Now, the Defendant has pled not guilty to these charges. You should clearly understand that the Information I read is not evidence.

An Information is read in every criminal trial so that the Defendant and jury can hear the charges. You must not think it is evidence of his guilt, or that he must be guilty because he has been charged.

A person accused of a crime is presumed to be innocent. This means that you must start with the presumption that the Defendant is innocent. This presumption continues throughout the trial and entitles the Defendant to a verdict of not guilty, unless you are satisfied, beyond a reasonable doubt, that he is guilty.

Every crime is made up of parts called elements. The Prosecutor must prove each element of the crime beyond a reasonable doubt.

The Defendant is not required to prove his innocence or to do anything.

If you find that the Prosecutor has not proven every element, beyond a reasonable doubt, then you must find the Defendant not guilty.

A reasonable doubt is a fair, honest doubt, growing out of the evidence or lack of

evidence. It is not merely an imaginary or possible doubt, but a doubt based on reason and common sense.

A reasonable doubt is just that, a doubt that is reasonable after a careful and considered examination of the facts and circumstances of this case.

So at this time I am going to ask you to step down here for me, please. You might get called and come back. But step down right now so we can fill with 14. As people are called up, you can fill the vacant seat. If you can stand over here it'll be better by the deputy.

I am going to ask the Clerk to call 14 persons for us, please.

THE CLERK: Juror number 1: Karen Marie Delaney. D-E-L-A-N-E-Y. Juror number 2: William Joseph Redmond. R-E-D-M-O-N-D. Juror number 3: Anthony William Maile. M-A-I-L-E. Juror number 4: Hugh Howard Culton. C-U-L-T-O-N. Juror number 5: Christina Ann Coble. C-O-B-L-E. Juror number 6: Diana Sue Perazza. P-E-R-A-Z-Z-A. Juror number 7: Stacie Ann H-E-I-B-E-L. Juror 8: Steven Michael Lott. L-O-T-T. Juror number 9: Marcelle Teressa Bell. B-E-L-L. Juror number 10:



Caleb Ryan Burton. B-U-R-T-O-N. Juror number 11: Michele Rene Kepros. K-E-P-R-O-S. Juror number 12: Eric Donald Larson. L-A-R-S-O-N. Juror number 13: Ericka Autumn Shupta. S-H-U-P-T-A. Juror number 14: Gregory Scott Adams. A-D-A-M-S.

THE COURT: So from this point on, we will only refer to you by number. They put those numbers -- yours are in front. You are 13. They put those numbers up so I could figure it out. You should have seen it before I had numbers up there. I had to pause and say which one are you.

Anyway, this is the first set of questions I am going to ask to you individually. Just basically background information. We used to know your community, not your street address or anything, just the community. Your marital status. Whether you have any children under the age of 18. Your employment. And spouse's or significant other's employment.

So Juror number 1, your community?

JUROR 1: Ingham County.

THE COURT: And your employment?

JUROR 1: Demmer.

THE COURT: Married or single?

JUROR 1: Married.



THE COURT: Children under 18?

JUROR 1: Three. Ages 7, 5 and 3.

THE COURT: Spouse's employment?

JUROR 1: Teacher.

THE COURT: And your level of education?

JUROR 1: Master's degree.

THE COURT: Juror number 2, your community, sir?

JUROR 2: Williamston.

THE COURT: Married or single?

JUROR 2: Married.

THE COURT: Children under 18?

JUROR 2: None.

THE COURT: Grandchildren under 18?

JUROR 2: No.

THE COURT: And your employment?

JUROR 2: Retired.

THE COURT: From?

JUROR 2: Various firms. But the last was first a data corporation.

THE COURT: Spouse's employment?

JUROR 2: Retired.

THE COURT: From?

JUROR 2: Williamston schools.

THE COURT: And your level of education?



JUROR 2: Associate's degree.

THE COURT: Juror number 3, your community?

JUROR 3: Ingham County.

THE COURT: Married or single?

JUROR 3: Married.

THE COURT: Children under 18?

JUROR 3: One. Three months.

THE COURT: Brand new?

JUROR 3: One. Yeah.

THE COURT: Sleeping through the night yet? And your employment?

JUROR 3: Executive chef, owner.

THE COURT: Spouse's employment?

JUROR 3: General manager, owner.

THE COURT: Your level of education?

JUROR 3: Associate's degree.

THE COURT: Juror number 4, your community?

JUROR 4: Okemos.

THE COURT: Married or single?

JUROR 4: Married.

THE COURT: Children under 18?

JUROR 4: No.

THE COURT: Employment?

JUROR 4: Retired pediatrician.

THE COURT: And spouse's employment?





JUROR 4: Psychotherapist.
THE COURT: Is she still working?
JUROR 4: No. We are both retired.
THE COURT: Your level of education?
JUROR 4: Doctorate, medicine.
THE COURT: Juror number 5, your community, ma'am?
JUROR 5: Eaton Rapids.
THE COURT: Married or single?
JUROR 5: Single.
THE COURT: Children under 18?
JUROR 5: No.
THE COURT: Employment?
JUROR 5: Restaurant manager.
THE COURT: Level of education?
JUROR 5: High school.
THE COURT: Juror number 6, your community?
JUROR 6: East Lansing.
THE COURT: Married or single?
JUROR 6: Married.
THE COURT: Children under 18?
JUROR 6: Yes.
THE COURT: Ages?
JUROR 6: Four and eight.
THE COURT: Your employment?



JUROR 6: Work at a salon.
THE COURT: Spouse's employment?
JUROR 6: Kellogg Foundation.
THE COURT: Your level of education?
JUROR 6: Trade school.
THE COURT: Juror number 7, your community?
JUROR 7: Ingham County.
THE COURT: Married or single?
JUROR 7: Single.
THE COURT: Children under 18?
JUROR 7: One, 17.
THE COURT: Your employment?
JUROR 7: Henry Ford Allegiance Health.
THE COURT: Level of education?
JUROR 7: Master's.
THE COURT: Juror number 8, your community?
JUROR 8: Lansing.
THE COURT: Married or single?
JUROR 8: Single.
THE COURT: Children under 18?
JUROR 8: No.
THE COURT: Employed?
JUROR 8: Yes.
THE COURT: Where?
JUROR 8: I am a fitness manager.



THE COURT: Level of education?
JUROR 8: Bachelor's degree.
THE COURT: Juror number 9, your community?
JUROR 9: Ingham.
THE COURT: Married or single?
JUROR 9: Married.
THE COURT: Children under 18?
JUROR 9: No.
THE COURT: Your employment?
JUROR 9: Social worker.
THE COURT: Spouse's employment?
JUROR 9: Retired from University of Phoenix Air Force.
THE COURT: Your level of education?
JUROR 9: Master's.
THE COURT: Juror number 10, your community?
JUROR 10: Meridian.
THE COURT: Married or single?
JUROR 10: Single.
THE COURT: Children under 18?
JUROR 10: No.
THE COURT: Employment?
JUROR 10: Retail.
THE COURT: Your level of education?



JUROR 10: Some college.
THE COURT: Juror number 11, your community?
JUROR 11: East Lansing.
THE COURT: Married or single?
JUROR 11: Married.
THE COURT: Children under 18?
JUROR 11: Yes.
THE COURT: How many?
JUROR 11: Two. Ages 14 and 17.
THE COURT: Your employment?
JUROR 11: Registered nurse.
THE COURT: Spouse's employment?
JUROR 11: He is a physician.
THE COURT: Level of education?
JUROR 11: Bachelor's.
THE COURT: Juror number 12, your community?
JUROR 12: Williamston.
THE COURT: Children under 18?
JUROR 12: Yes.
THE COURT: Ages?
JUROR 12: Year and a half.
THE COURT: Employment?
JUROR 12: Water-well technician.

THE COURT: Level of education?
JUROR 12: High school.
THE COURT: Juror number 13, your community, ma'am?
JUROR 13: East Lansing.
THE COURT: Married or single?
JUROR 13: Married.
THE COURT: Children under 18?
JUROR 13: Three, two years old, six years old and almost 10.
THE COURT: Almost up to digits. Your employment?
JUROR 13: Pediatrics. Speech, language pathologist.
THE COURT: Spouse's employment?
JUROR 13: Teacher.
THE COURT: Your level of education?
JUROR 13: Master's.
THE COURT: Juror number 14, your community?
JUROR 14: Leslie.
THE COURT: Married or single?
JUROR 14: Married.
THE COURT: Children under 18?
JUROR 14: Six and 10.



THE COURT: Your employment?
JUROR 14: Judicial Information Services.
THE COURT: You're at the institute?
JUROR 14: Yeah.
THE COURT: Spouse's employment?
JUROR 14: She is Leslie elementary.
THE COURT: Your level of education?
JUROR 14: Bachelor's.
THE COURT: The next questions I will be asking to you as a group. So if you're going to have a response, I need for you to raise your hand, because I have to identify you by number so that the Court Reporter can get it down. It will be a group question. Anybody know anything about this case? Anybody have personal concerns, commitments or problems that will interfere in light of the schedule I have given?
All right. We have got several jurors. Number 1?
JUROR 1: I have training next week for teacher training.
THE COURT: Juror number 12?
JUROR 12: Dealing with a divorce and child custody right now. Actually we have court next week and CPS stuff going on. So --



THE COURT: Here in Ingham County?
JUROR 12: Eaton County.
THE COURT: Juror number 13?
JUROR 13: I don't get paid. When I get work, I don't have any time off. If it's one day, okay. But several days in a row, we don't have a backup plan for that.
THE COURT: Anybody else? Anybody have prior juror service? Juror number 4, was it criminal or civil?
JUROR 14: It was criminal.
THE COURT: Was the jury able to reach a verdict?
JUROR 14: Yes.
THE COURT: Anybody else have prior jury service?
Anybody ever been a witness in a case or a party to a case? That means like you might have been a victim or been sued, or something like that. Anybody been in that capacity, been a witness to a case? Juror number 4?
JUROR 14: Mal-practice cases, nefarious --
THE COURT: Someone was the defendant or the group was the defendant?
JUROR 14: Yes. Group and often as a



witness, as a witness or an expert.
THE COURT: As a witness, expert witness?
JUROR 14: Yes.
THE COURT: Anybody else? Juror number 7?
JUROR 7: Just for therapy out-patient for health.
THE COURT: Are you a therapist?
JUROR 7: Yes.
THE COURT: You offered some testimony in regard to therapy that you rendered a patient? Anybody else?
All right. Has anybody, themselves, family members or friends, been a victim of a crime? What about anyone being accused of a crime? What about friends in law enforcement, family or friends involved in law enforcement? What about -- okay. There we go. Juror number 4, you first.
JUROR 4: Past patients.
THE COURT: Patients have been involved? Juror number 7?
JUROR 7: Nine and a half years in the Department of Corrections. So all kinds of people.
THE COURT: In the course of your

employment?

JUROR 7: Former employment.

THE COURT: Okay. Juror number 8?

JUROR 8: An uncle in the DeWitt Police Department, along with some close friends in East Lansing Police Department.

THE COURT: I don't think we have anybody from either one of those agencies. Is there anything about that relationship, do you feel, would make you unable to be fair and impartial in this case?

JUROR 8: I guess a little bit. Just because I am a firm believer if you don't put yourself in these kinds of situations, then the police aren't going to have any reason to kind of go at you, I guess.

THE COURT: Well, would you be able to follow my instructions, and if I gave you the process or procedure you had to follow?

JUROR 8: I could try.

THE COURT: Well, that's all we all can do is try. I saw some other hands. Juror number 10?

JUROR 10: A parent in Department of Corrections. A friend, also, in law enforcement.

THE COURT: Are they based here in Lansing



in Corrections or elsewhere? Your parents, that is.

JUROR 10: My parents were Ingham.

THE COURT: Where?

JUROR 10: Ingham. My friend is Eaton County.

THE COURT: You said Ingham?

JUROR 10: Eaton.

THE COURT: Anybody else? Okay. What about criminal defense, or anything like that? Friends, lawyer friends?

Anybody have any bias due to race, gender or national origin for any other reasons?

Anybody a member of a special advocacy group? We got past these general questions.

As jurors, you are the sole triers of the facts. That means that you have to judge who is telling the truth and not telling the truth. And you arrive at a decision, which really means you have to make some judgment, sit in judgment of people, person and circumstances. That is what a juror does. Anybody feel they would be unable to do that?

Can you be fair and impartial? By that I mean it's important that you not form any



conclusions until you hear all the testimony from both sides until you start to decide what occurred. That's what I mean by being fair and impartial.

The Prosecution has the burden of proof. You'll hear a lot about that. It's the Prosecutor's responsibility to prove the case beyond a reasonable doubt. In conjunction with that, the Defendant does not have to do anything.

The Defendant has the right to remain silent. In course of the trial, the Prosecution presents their case. If the Defendant decides to exercise his or her right to remain silent, when you go to deliberate, you can't go back to the jury room and say, well, I wish I had heard from the Defendant. You have to judge the case based on the evidence that's presented to you.

All right. Mr. Roth, each side now has a chance to ask you some follow-up questions. First, the Prosecutor, then Mr. Perrone on behalf of Mr. Uraz.

MR. ROTH: Good morning. Again, ladies and gentlemen, my name is Jonathan Roth. I am from the Ingham County Prosecutor's Office. I have a series of questions for you this morning. They



are meant to help us to get to know each of you a little bit better, to make sure we have a fair group for the People, the defense, the Court. If at any point you have any questions or responses you think we should know about, raise your hand and we will get to you.

So I want to start by following up on a few issues that the Judge asked about. For 4, the only one who's been a juror before; is that correct?

JUROR 4: Yes.

MR. ROTH: All right. About how long was that case?

JUROR 4: About 20 plus years ago.

MR. ROTH: Do you recall what the charge was?

JUROR 4: The charge was embezzlement. It was a State employee.

MR. ROTH: Nothing about that, that would make it uncomfortable for you being a juror again?

JUROR 4: No.

MR. ROTH: No? Very good.

I want to follow-up on some employment issues. Juror 7, you work for Henry Ford Health Alliance; is that correct?

JUROR 7: Allegiance Health.

MR. ROTH: I apologize. What are your responsibilities?

JUROR 7: Out-patient, burial, out-patient therapist.

MR. ROTH: How long have you been doing that in that capacity?

JUROR 7: I was working on my chemical hours and with the State.

MR. ROTH: Is that with the Department of Corrections?

JUROR 7: Yes.

MR. ROTH: How long did you work with the Department of Corrections?

JUROR 7: I was a stay-at-home for 18 and a half years.

MR. ROTH: Juror 14, you work for Michigan Judicial --

JUROR 14: Information Services.

MR. ROTH: What do you do there?

JUROR 14: I'm a programmer analyst.

MR. ROTH: How long have you been doing that?

JUROR 7: Six years.

MR. ROTH: Before that?



JUROR 7: I wasn't working.

MR. ROSS: Juror 10, you indicated some college, or is that in the past?

JUROR 10: Still in college.

MR. ROTH: Where do you go to school?

JUROR 10: LCC right now.

MR. ROTH: What are you studying?

JUROR 10: Game design.

MR. ROTH: Like programming?

JUROR 10: Yeah. Computer. That's what I want to do upon graduation.

MR. ROTH: Anybody close friend who is an attorney?

JUROR 10: My brother-in-law is a real estate attorney. Nothing like what we're doing here.

MR. ROTH: Very good. For the duration of the trial, if you sat as a juror, you wouldn't want to talk to him about the case?

JUROR 10: No.

MR. ROTH: Very good. Juror 14, obviously you work with some lawyers?

JUROR 14: My sister-in-law is an attorney for GM.

MR. ROTH: Unemployment law?



JUROR 14: She has been employed since she was 17.

MR. ROTH: What kind of lawyer is she there?

JUROR 14: She is contractual. She just switched to, I think, property.

MR. ROTH: So nothing like we do here? Would you be okay if you sat as a juror, not talking about this case as long as it goes on?

JUROR 14: Yes.

MR. ROTH: Anybody else?

The Judge asked if you have been witness in a case that we're here about. I want to follow-up on that, be a little more specific. I want to know if anybody has been charged with a crime. Charged with a crime can mean a lot of things. Anybody have a minor shop-lifting, drunk driving? Not needing particularities about that. Has anybody been charged with a crime? Very good.

Has anybody been a victim of a crime, whether it was reported to the police or not?

Anybody have close family or friends who have been victims of crimes or charged with a crime?



Juror 9, you're thinking about it? I don't know if you had considered that. I am going to ask it more round-about. Anything it is that you remember thinking about that would make it uncomfortable being a juror?

JUROR 9: Not that particular issue. No.

MR. ROTH: Anything that you're thinking do you think we need to know about as it related to that? Very good.

Let's talk about law enforcement. The Judge asked if anybody knows people in law enforcement positively or negatively? Anybody have any strong feelings about law enforcement one way or the other? Juror 8?

JUROR 8: I think as long as you respect law enforcement, you're good.

MR. ROTH: The Judge is going to tell you you're going to hear police witnesses, whether they are telling the truth or not, like any other witness.

JUROR 8: I do not.

MR. ROTH: Even though the Judge tells you that, that will be in your mind?

JUROR 8: Eighteen and a half years in the DOC, probably.

MR. ROTH: Juror 10?

JUROR 10: I think there is some unfair racial profiling happening in law enforcement to the – not to me.

MR. ROTH: That's a valid concern. What I want to follow-up on that is essentially the same thing, the Judge is going to tell you that each officer that gets up there, you are to evaluate their testimony the same as every other witness. Just because they are officers doesn't mean they're telling the truth. Given your concerns, do you feel you would do that?

JUROR 10: Yes.

MR. ROTH: Anybody else? Very good. Wou the witness list, based on a list that each of us read, do any of you believe that you know any of the witnesses of the Defendant, the attorneys in this case? Juror 1?

JUROR 1: Officer Bruner.

MR. ROTH: Anything about that, that would make you uncomfortable being a juror?

JUROR 1: No.

MR. ROTH: I don't think she is going to actually testify in this case. If she did, would you evaluate her testimony the same as everybody



else?

JUROR 1: I would evaluate the same.

MR. ROTH: Anybody else raise their hand? Juror 10?

JUROR 10: Frank Mobley. He is my friend's dad.

MR. ROTH: Officer Mobley will testify in this case. Do you believe that if he were to testify, you could evaluate his testimony the same as everyone else?

JUROR 10: Yes.

MR. ROTH: Just because you know his son doesn't mean you would believe him any more, for or against him than anybody else?

JUROR 10: Right.

MR. ROTH: Very good. Anybody else? No? Four?

JUROR 4: There is so many people on that list. I worry that I may have been involved with them through my practice.

MR. ROTH: Sure. As Judge Canady mentioned earlier, if that happens, somebody comes to the courtroom, your sort of light goes off, raise your hand and let us know.

JUROR 4: Okay.



MR. ROTH: Very good. The Judge also asked if anybody knew anything about this case. I want to follow-up on that as well. There has been some media attention. Who, in the jury pool, reads the Lansing State Journal, either online or in print? Who watches local news?

I want everybody to think about the next question. Especially those people sort of engaged in that.

The information charges that the Defendant, Tunc Uraz, stalked Erika Melke in 2016. And that between August and October of 2016, he solicited three people to kill her. Two of them were inmates in the jail. One of them was an undercover police officer. Based on that information, does anybody believe that they read or heard about this case before?

Juror 10, without telling us what it is, does that ring a bell for you?

JUROR 10: Yeah.

MR. ROTH: Do you have a case in your mind, whether it was on news or the State Journal?

JUROR 10: I think other things happen in that particular reason so the police are called.

MR. ROTH: Based on this sounding familiar



to you, have you decided any of the facts of this case?

JUROR 10: No.

MR. ROTH: Okay. So what you hear in court, can you set aside what you heard before and only make a decision based on what you hear in court?

JUROR 10: Yes.

MR. ROTH: Very good. Anybody else saw or heard anything about this case before?

I want to talk about domestic violence a little bit, a sensitive subject. I am not going to pry too deeply into your personal experiences. It is something important that I need to follow-up on. Anybody have strong feelings about domestic violence? What I mean by that, not anybody pro for domestic violence, but personal issues on this jury, either for themselves or close family or friends that they just care deeply on them based on that. Tell me about that a little bit.

JUROR 12: I actually have been the victim of some violence, I guess you could say. Personal things that I don't like.

MR. ROTH: I am not going to ask for the

details.

JUROR 12: Yeah.

MR. ROTH: Obviously, based upon the charges in this case, it involves discord within that relationship. Do you believe that your feelings about domestic violence would impair your ability to be a juror, that you would have some bias for or against because of that?

JUROR 12: It's a possibility.

MR. ROTH: What are your experiences in the past that make you able to say that, Juror 13? You raised your hand a little bit?

JUROR 13: I just worked in the shelter before in grad school and an undergrad. I seen when it was faked in.

MR. ROTH: It's an issue when it has a personal resident with you?

JUROR 13: Yes.

MR. ROTH: Would you like an inside clean slate?

JUROR 13: I think it depends on what I heard.

MR. ROTH: Tell me what you mean by that.

JUROR 13: If it's clear that people were being harmed, obviously I can't look away from



that.

MR. ROTH: Nobody is asking you to look away from it. I think all that we have been talking about is can you set aside whatever you were into before, just approach with clean eyes. Whatever you hear in here is fine. Set aside your experiences or feelings from before?

JUROR 13: I think so.

MR. ROTH: That's fair. Anybody else?

JUROR 4: Both because of my experience and my spouse's career, I'm very prone to knowing here, more than people are aware of, and I have that mindset.

MR. ROTH: Do you believe you would translate that to our specific case?

JUROR 4: I could.

MR. ROTH: If the Judge asked you to set that aside, would you be able to follow that instruction?

JUROR 4: I would try.

MR. ROTH: Absolutely. I appreciate that. Very good. Juror 5, we haven't talked at all. Good morning. How are you today?

JUROR 5: Good.

MR. ROTH: Do you have any feelings on the



subject?

JUROR 5: No.

MR. ROTH: It's not a subject that you feel one way or the other is going to influence you?

JUROR 5: No.

MR. ROTH: Very good. Who else haven't I talked to? Juror 2, good morning, sir.

JUROR 2: Morning.

MR. ROTH: Any thoughts on the subject or something that you bring to the table on?

JUROR 5: I don't think so.

MR. ROTH: Very good. Juror 9, good morning. I am going to fix your number.

You heard the discussion. Any concerns about the topics at all?

JUROR 9: I don't believe in domestic violence. But I know there is pros and cons, there is two sides. So that's my --

MR. ROTH: You're going to come at it, evaluate it, based only on what you heard?

JUROR 9: Yes.

MR. ROTH: Very good. All we can ask, one thing all jurors have to believe is credibility, who you believe, why you believe, how much you believe them.



Juror 11, good morning. I haven't talked to you yet. I will pick on you a bit. Do you have children?

JUROR 11: Sure.

MR. ROTH: How old?

JUROR 11: Four and eight years old.

MR. ROTH: I believe at some point one or more of them have gotten in some trouble with you?

JUROR 11: Sure.

MR. ROTH: When you are deciding who is telling the truth about what happened, what are some of the things you think about when you determine who is telling the truth?

JUROR 11: Who has been there, who has been around, who is the most likely to have done it from past experience, that kind of thing.

MR. ROTH: All right. So now let's transition that with people that you know to now strangers, like witnesses that you are going to hear. What are you going to think about if you are determining whether a witness is telling the truth or not?

JUROR 11: I guess you have to put the whole thing together. I have to listen to, not just rely on one witness. If it's being

collaborated by multiple witnesses, it may sway myself more than if I just hear some random thing coming from one random person.

MR. ROTH: So see how the pieces fit together is very important to you, right?

JUROR 11: Yes.

MR. ROTH: Juror 14, what are some of the things you can tell when someone is telling the truth or not?

JUROR 14: I would have to weigh against the people who are testifying.

MR. ROTH: All right. So in making that analysis, would you look at whether they have any special reason to tell the truth or any special reason to lie, things like that?

JUROR 14: Yeah.

MR. ROTH: If there is some insensitive bias, things like that?

JUROR 14: Yeah.

MR. ROTH: Open up to the larger panel. What are some of the things you interpret.

Juror 6, good morning.

JUROR 6: Morning.

MR. ROTH: What sort of things do you talk about?



JUROR 6: Seeing how I -- I have three kids of my own. You can tell who is lying just by expressions, body lines.

MR. ROTH: Physical appearance is very important to you?

JUROR 6: Yes.

MR. ROTH: Yes?

JUROR 6: Yes.

THE COURT: Can you imagine for a witness they might have some anxiety or nerves coming in to testify that might influence physical appearance?

JUROR 14: Yes.

MR. ROTH: You will take all that into consideration?

JUROR 14: Yes.

MR. ROTH: Very good. In general, is there anybody who feels that, for whatever reason, they are not capable or comfortable of evaluating witness credibility? Very good.

You're going to hear testimony from people, two witnesses who are in jail with the Defendant at the time of the second case. Is there anybody who can't listen to that person's testimony because that witness was in jail for



his own issues?

Juror 7, you're with the Department of Corrections. I am sure you have your concerns about that?

JUROR 7: Yep.

MR. ROTH: I want to ask the question as clearly as I can. If you don't understand, let me know. You're going to hear from other inmates. Does anybody say, because they are inmates, I simply am going to tune them out completely?

Yes, Juror 8? You wouldn't even let me finish. That's a fair stance, or are you going to listen to their stories like anybody else, compare with each other, compare with other evidence, and then make what we talk about sort of a global decision based on how it all fits together?

JUROR 8: I wouldn't necessarily tune them out. Given testimony between police officers, am I going to be biased toward police officers? Absolutely.

MR. ROTH: Okay. Anybody else feel they are going to give a different standard to an inmate than they would to another witness? Juror 7?



JUROR 7: Probably.

MR. ROTH: That's fair. Anybody else? Juror 13?

JUROR 13: Probably I would be bias.

MR. ROTH: The Judge is going to tell you to evaluate their testimony like anybody else, see how it fits together, see how it fits with the other evidence. Do you feel you could do that or again you just think they are going to show up in an inmate's uniform, I am going to tune them out to some extent?

JUROR 13: I don't know. I never done it before. So maybe.

MR. ROTH: All right. Juror 14?

JUROR 14: I am kind of the same way. I never done it before. I'm kind of nervous that I might bias something.

MR. ROTH: Let's talk about what it is going to be, then.

You're going to hear from the People's case a number of witnesses, police witnesses, lay witnesses. Towards the end you're going to hear from two people who are in jail. They are going to come in here, they are going to be in jail or in prison uniforms, probably. So you're going to

have lots of other things to compare them with, to compare them to. If you think about it in your mind, do you feel yourself already saying: I can't take these inmates, I can't take them as being credible witnesses, or would you be able to compare them to all the other pieces that you will have available to you. Is that a yes?

JUROR 14: Yes. Yes, I could give them fair credibility.

MR. ROTH: That's all we ask that you start fresh with them like everything else and compare them and make a decision. Juror 13, do you think you could do that?

JUROR 13: Yes.

MR. ROTH: I appreciate the honesty. Anybody else have concerns about that? Juror 3, any concerns, or you could evaluate them like everybody else?

JUROR 3: Evaluate like everybody else.

MR. ROTH: Juror 2?

JUROR 2: Same.

MR. ROTH: Anybody else have problems with that issue? Anybody watch television shows like Law and Order, CSI, things like that? Judge Judy? So in those shows, they often show scientific



evidence that does not exist in reality. In those shows you'll see DNA, fingerprints, things that are not common, really, certainly not useful in every case. Based on what happens, those shows, being fans of those shows, anybody have expectations about the sort of evidence that they want to or expect to see in a real courtroom trial? Juror 10, you watch any of those shows?

JUROR 10: No, I do not.

MR. ROTH: Very good. Juror 9?

JUROR 9: No.

MR. ROTH: Juror 8?

JUROR 8: I watch a couple, but I don't like it.

MR. ROTH: Who is a big fan? Juror 14, who is your favorite?

JUROR 14: NCI.

MR. ROTH: Very good. You know, in those shows, there are things closer to scientific than to reality.

JUROR 14: That's why I watch it.

MR. ROTH: Very good. You are not coming in the courtroom and expect this to look like that in any way?

JUROR 14: No.



MR. ROTH: Very good. Anybody have concerns, setting aside expectations based on TV and movies and books and come in sitting on a criminal case? Very good.

One of the other things in those shows or movies or books, they don't use the rules of evidence. In real courtrooms, they do. There is rules that limit what we know and are able to show you.

One of the things that come up, police reports. A lot of people on TV movies, experts to review police reports. In reality, you cannot. It will be referred to, referenced, shown to witnesses. As jurors you will not be able to see it. You will be asked to make your decision based only on the evidence presented to you that comes in the form of testimony, exhibits, documents, pictures, things like that.

You are to set aside everything else. Everyone feel they will be able to do that?

Juror 6, you're nodding. You can make your decision based on what is presented to you in Court, not anybody else. Anybody have concerns about that? Very good.

In TV shows they often use the phrase:



Beyond a shadow of a doubt, beyond all doubt. In real life the Judge is going to tell you that burden is beyond a reasonable doubt, based on reason and common sense, not imaginary or possible doubt, but one that arises out of a careful consideration of the evidence.

When you go back as jurors to make your decision, is anybody going to be wanting that TV or movie standard, beyond a shadow of a doubt, beyond all doubt? Juror 5, you're shaking your head?

Anybody have concerns about that, watching TV, the standard beyond a shadow of a doubt? No? Nothing from the jury? Very good.

Juror 11, you have a 17, 18-year-old kid and a 14 as well?

JUROR 11: Yes.

MR. ROTH: When they got in trouble, you had to administer punishment, whatever it was. As jurors we ask you to do an important thing. As parents, you are the judges, the jury, executioner. You decide what went wrong, who did it, what the punishment is going to be. As a juror, we ask you to do something smaller and maybe important. You are not to consider

punishment at all. It is not to be a factor in your decision at all. You are only asked to decide, if the evidence is presented to you, that the elements of a crime have been satisfied. So if you sat as a juror in this case, can you set aside punishment and make your decision?

JUROR 11: Yes.

MR. ROTH: You don't feel it would creep in?

JUROR 11: I don't have no idea what the punishment would be.

MR. ROTH: That's the whole point. Set it aside, pure guess. Anybody feel the idea of punishment would play a role in their decision in deciding this case?

JUROR 11: No. Because I always miss something.

MR. ROTH: Anything that maybe anybody feels we should know about, their ability to be a juror that I haven't asked about, that you think we should know?

All right. Nothing else, Your Honor. Thank you.

THE COURT: Mr. Perrone?

MR. PERRONE: Good morning, ladies and



gentlemen. The first question, who here has common sense? I always like it when people don't raise their hand. You're going to be asked here to apply that common sense and reason. And there is going to be evidence that is presented by the Prosecutor. He has asked a number of questions to you. I would like to kind of circle back. Is everyone here accountable with the presumption of innocence, with presuming an individual is innocent of a crime going into a trial? You are comfortable with maintaining that position, Juror number 9? Is there anybody that you know that if someone were to come to you and tell you that if they had done something wrong, you would initially disbelieve them?

JUROR 9: No.

MR. ROTH: Anyone else know anyone that they, if somebody came to them, told them, family members, friends, grandmother, that they had done something wrong, that you initially would just say no, no way they could have done that wrong? Yes, number 2? What would that be for you?

JUROR 2: People that I know intimately, my wife, for example. If someone told me that my wife had done something wrong, I would not tend to



believe that.

MR. PERRONE: Is that something that you are comfortable, at this point in time, extending to this case, and affording Mr. Uraz the opportunity to presume, initially, and have that skepticism?

JUROR 2: Well, let's put it this way. Because of my relationship with my wife, that I feel that way. For complete strangers I would look at evidence, entirely the evidence.

MR. PERRONE: If the Judge instructs you that you are initially going in without having an opportunity to look at the evidence, presume Mr. Uraz is innocent in the same fashion, would everyone be able to do that? Anybody have a problem applying that standard?

Now, we had some talk about shadow of a doubt. That's where we come back to the common sense, and that they believe that this excuses their common sense in coming to a determination in this case. It is the standard of reasonable doubt. Does anybody here have any idea what reasonable doubt means, outside of what your concept is?

JUROR 11: What is more likely than not?



MR. PERRONE: Would you believe it would be more likely than not?

JUROR 11: More likely than not, yeah.

MR. PERRONE: Would you be comfortable employing a higher standard than that?

JUROR 11: Sure.

MR. PERRONE: I am not talking a shadow of a doubt. What we are looking for, it's not going to be any doubt, but it's going to be, are you accountable in looking at a doubt based upon reason. That is where we come on common sense. If you have something that you believe as to someone's credibility, you don't know their past, that's a doubt. Would you consider that to be a reasonable doubt?

JUROR 11: Maybe.

MR. PERRONE: But would you be able to be fair and impartial in making an assessment?

JUROR 11: Yes.

MR. PERRONE: Thank you. We had some discussions in regard to domestic violence. No one here has had a family member, son, daughter, parents, cousin, that has been affected by domestic violence?

JUROR 13: My sister.

MR. PERRONE: Okay. In that circumstance, is that something that is a bias in making a determination? If domestic violence was an aspect of this case, would you believe that Mr. Uraz was more likely guilty as a result of there being a domestic component?

JUROR 13: No. I would listen to the evidence and figure it out.

MR. PERRONE: Fair and impartial?

JUROR 13: Yes.

MR. PERRONE: Seven, same question. If you can recall testimony, are you going to be able to remain fair and impartial, are you going to think if there is an allegation associated with domestic violence that that is more?

JUROR 7: I am probably not going to be.

MR. PERRONE: In your occupation, you work in behavioral health. Does that have any indication associated with the social issues, police being involved? Does that prohibit you from being fair and impartial?

JUROR 7: Being a therapist?

MR. PERRONE: Yes.

JUROR 7: I don't think so.

MR. PERRONE: And you did -- you had made



statement that you previously worked in Corrections for 18 years?

JUROR 7: Yes.

MR. PERRONE: And you tend to believe testimony of a law enforcement officer over that of an ordinary person?

JUROR 7: (Juror nods.)

MR. PERRONE: Could you put that aside and base your assessment on all of the evidence and remain fair and impartial?

JUROR 7: Probably not.

MR. PERRONE: Okay. Having worked in Corrections for 18 years, what types of things associated with working in Corrections makes it difficult for you to remain impartial?

JUROR 7: Probably 18 and a half years of listening to people lie.

MR. PERRONE: Let me talk about punishment. The Prosecutor went into it. We will discuss it a little bit. You will be informed of the nature of the charges in this case. There will be penalties associated. That is for the Court to make that determination. You are supposed to make your determination on the facts. Is being here comfortable, using the facts and making a



determination -- better stated, if there is -- if the facts do not indicate what we're looking to, what they're looking to, can you guys, putting aside and go forward and looking only at the facts, instead of looking at potentially how this could affect somebody, the punishment here is if he is going to -- are you going to feel bad for the Defendant if the punishment is more serious? Is anybody here going to feel bad for the Defendant if the punishment is more serious but you're still going to be able to maintain that presumption of innocence?

Four? Having had that experience, the Judge's instructions will have a very powerful effect on this whole question of fact, how they are interpreted. And that's going to have a strong effect about how you would approach it. You previously have been on a jury before?

JUROR 4: Yes.

MR. PERRONE: What was the verdict in that case?

MR. ROTH: No.

THE COURT: It's only did the jury reach a verdict.

MR. PERRONE: Did the jury reach a verdict?



JUROR 4: The jury did reach a verdict. Yes.

MR. PERRONE: The issue of race is going to become a topic in this case. The issue that is at the focal point of our nation currently. Does anybody believe that they were biased as it comes to race? No one here thinks they are biased associated with race?

JUROR 5: I do.

MR. PERRONE: Why do you think so?

JUROR 5: I guess I don't know how to answer that question. I just think everyone carries some biases with them. And it might not be always a negative thing. I think that certain people --

MR. PERRONE: Structural, institutional?

JUROR 5: Yeah. Structural. Institutional. There is a history in our country, whether you recognize it or not. You carry those biases with you.

MR. PERRONE: Given those biases, do you think you could put those biases aside as it pertains to making a decision in this case?

JUROR 5: Maybe. I don't know.

MR. PERRONE: Do you think you could

attempt to identify those biases in trying to come to a conclusion in this case?

JUROR 5: (Juror nods.)

MR. PERRONE: Does being here, you believe you can attempt to use that same standard as far as biases are concerned, and try to maintain an open mind?

JUROR 5: (Juror nods.)

MR. PERRONE: Anybody here have any form of substance abuse issues, friends, relatives, kids?

I will go back to 4. I will come to you, number 6. Would that be something that would, if substance abuse topics are here, would that be something to interfere with your ability to maintain impartiality?

JUROR 6: It would just be part of the facts.

MR. PERRONE: Juror number 6, do you hold something associated with substance abuse so close that you would not be able to remain fair and impartial?

JUROR 6: I would.

MR. PERRONE: How many people here have traveled internationally? That's a good thing. I have only been to the Bahamas once. There is



going to be international components associated with this case that you will have to make a decision, be held accountable as to the bias issue. Anybody here biased, as to 14 individuals, as to where we are at in today's society, been thinking they could be fair and impartial if an individual was not born in the United States?

Juror number 8, what do you think about Trump's immigration plan?

JUROR 8: I don't agree with it. There are obviously dangerous people in the world. I think people who came to the US illegally should be in trouble. The people that were born in the US from legal immigrants, I think, should be allowed to stay, people have been here for 10 plus years, so on. To force them to go back to their homes or kicked out of the United States, I think was wrong.

MR. PERRONE: Juror 9?

JUROR 9: I do need to let you know I was not born in the United States. But I am a US citizen.

MR. PERRONE: Are you still able to remain fair and impartial as it results to this? Are you going to require some special treatment?



JUROR 9: Absolutely. Yes.

MR. PERRONE: As far as your status to integrate into the United States, that wouldn't be anything to undermine your impartiality?

JUROR 9: No.

MR. PERRONE: When did you come to the country?

JUROR 9: Years ago, '79.

MR. PERRONE: How old were you when you came to the country?

JUROR 9: Sixteen.

MR. PERRONE: Okay. Did you have a difficult time assimilating?

JUROR 9: A little bit. Sure.

MR. PERRONE: And you, again, are not going to provide any type of benefit associated with status, given your status?

JUROR 9: I don't think so.

MR. PERRONE: Does anybody think a travel ban that's been initiated is something that is needed for our country?

JUROR 4: For me, I think it's primarily race plating. In other words, what comes out of that, more than there are issues, but it's done in a way that I think -- well, that's how I feel



about it.

MR. PERRONE: All right. Well, we are all in agreement that we can set aside the biases and remain fair and impartial in this case as it revolves around immigration status.

I want to talk to you a little bit more about police officer's testimony. You don't believe you can be fair and impartial as it relates to other's testimony versus that of a law person?

JUROR 8: I think if someone is convicted of a crime, that's part of the punishment, they lose their credibility in so many --

MR. PERRONE: What about if someone is charged with a crime?

JUROR 8: That someone is charged with a crime, I am sorry, convicted of crime, they lose their credibility. The crime, I would just think that would depend on the circumstances. If someone put themselves in a situation where it could be seen either way, thinks they're at fault, because at the end of the day don't put yourself in a bad situation, to me that's common sense, with like doing that.

MR. PERRONE: Based on that thought

process, that they put themselves in a bad position if they got charged with a crime, you are not going to be able to remain fair and impartial throughout?

JUROR 8: I might not. It would depend on more of the facts that I heard.

MR. PERRONE: You're not going to be able to maintain presumption of innocence? Are you going to be able to maintain presumption of innocence?

JUROR 8: No.

MR. PERRONE: So you're going to presume --

JUROR 8: Just depends. I would --

MR. PERRONE: Do you think he is guilty?

JUROR 8: From what I've heard he is at least guilty of something.

MR. PERRONE: Anybody here a member of the NRA? Anybody a member of the National Rifle Association? Anybody here a hunter? Anybody here going to be upset that if they have to stay here for three weeks, instead of hunting? Anyone have any specific objection to the second amendment and the right to bear arms?

JUROR 8: I think in today's society, I think law enforcement should be allowed to carry



weapons. Other than that, in hunting, I don't think there is any need for automatic weapons. I think those should be 100 percent illegal. I think there should be more screening going on who own a gun. Unless you are a law enforcement officer, I think carrying a gun in public is not safe.

MR. PERRONE: Does anyone here believe that guns should be outlawed entirely, except for law enforcement? Anybody not agree with the the 2nd Amendment, right to own a gun?

Now, we also had some talk about media. Did anybody here read anything in the paper, or hear anything on the news associated with this case, that you can recall?

JUROR 13: I just remember reading something, but I don't know if it is the specific case.

MR. PERRONE: The only specific case?

JUROR 13: The only thing, my friend was killed right by there. I wanted to tell her, oh, something went shady, went down over there.

MR. PERRONE: Is anyone here affiliated with Michigan State University in any capacity? You first.



JUROR 8: My mom is a retired employee. And my aunt and uncle work there as well.

JUROR 9: You mean currently?

MR. PERRONE: Any type of affiliation with Michigan State University, if that affiliation would not interfere with your ability to remain fair and impartial?

JUROR 9: No.

MR. PERRONE: MSU?

JUROR 11: My husband works for MSU. My son is a freshman at MSU.

MR. PERRONE: What does your husband do there?

JUROR 11: Physician/surgeon with MSU surgery, trauma surgeon.

MR. PERRONE: There is going to be information in this case that revolves around Michigan State University. Anybody can think of a situation with MSU that would interfere with your ability to remain fair and impartial?

Any Wolverine fans? Anybody think an affiliation with the University of Michigan, or a University of Michigan fan, because of the affiliation to Michigan State, that they may not be able to maintain fairness and impartiality?



JUROR 9: I graduated from Michigan State, undergrad and grad school as my --

MR. PERRONE: Anybody have family members from Detroit? I am going to start with Juror number 6.

JUROR 6: I had two brother-in-laws that lived there.

MR. PERRONE: Do you think that they have a different mentality than you?

JUROR 6: For sure.

MR. PERRONE: Do they often brag about it?

JUROR 6: No.

MR. PERRONE: Being from Detroit?

JUROR 6: No.

MR. PERRONE: Okay. What type of a different mentality as a result of being from Detroit?

JUROR 6: Well, they are good kids. First of all, they grew up in a good family. I don't know. It doesn't sway me one way or the other.

MR. PERRONE: It would not --

JUROR 6: No.

MR. PERRONE: -- interfere with your impartiality --

JUROR 6: No.

MR. PERRONE: -- with family members in Detroit? Like cousins, uncles and stuff in Detroit? You had an opportunity to visit Detroit?

JUROR 6: Yeah.

MR. PERRONE: Based upon your viewpoint, is there kind of a different mentality in Detroit?

JUROR 10: Not from what I seen as far as family, local.

MR. PERRONE: Is Detroit often viewed as your city than Lansing?

JUROR 10: Yeah, at times.

MR. PERRONE: People oftentimes will try to use Detroit to show that they're tough because they're from Detroit.

JUROR 10: Possibly some people.

MR. PERRONE: Okay. But those affiliations with Detroit does not interfere with your ability to remain fair and impartial in this case?

JUROR 10: Right.

MR. PERRONE: Not too many people here acknowledge that they watch crime shows, but this is a solicitation of a murder case. There is going to be allegations associated with a hitman. Has anybody here had an opportunity to see a show that involved a murder for hire plot? Start with



Juror 13. Do you think that as a result of watching those, that you're going to be more prone to believe that somebody hired a hitman?

JUROR 13: No.

MR. PERRONE: Anybody else from those shows believe that they would undermine their impartiality as to making a determination in the real facts of this case because this isn't TV?

No further questions. Thank you.

THE COURT: We will take about 15 minutes for people to be able to use the restroom, 20 minutes, report back downstairs, come back up. Only way to do it to make sure you're still here. But you can stop at the restroom along the way. You don't have to necessarily go back. We will be in recess for a restroom break.

(Jury exits courtroom at 12:17 p.m.)

(Back on the record with jury present at 12:45 p.m.)

THE COURT: Be seated. She will come in as soon as she finishes taking roll. Those who were seated, please resume your number.

Be seated. Continuing jury selection in this matter. All parties are present. Challenge for cause, Mr. Roth?

MR. ROTH: Thank you. We have three that



we believe should be excused for cause. Juror number 7 had indicated could not be fair and impartial. Juror 8, the same issue, especially as it related to police. Juror 12 as well as it relates to the issue of domestic violence.

THE COURT: Mr. Perrone, challenges or comments?

MR. PERRONE: Yes, I would agree with Juror 7, 8, as far as for cause, given their lack of ability to maintain impartiality. As far as Juror 12 is concerned, I think that we have an added definitive, showing that he would be a for cause challenge. I would like that looked into a little bit further.

I think the issue of domestic violence, in and of itself, should be more scrutinized as to how it would affect his impartiality before the challenge of cause would be appropriate.

THE COURT: I think as far as Jurors 7 and 8, 7 being based on her history as a former employee of the Department of Corrections, and Juror number 8 on his comments. Juror number 12 indicated he had a bias, I think, partially, perhaps based on personal experience. And so I think whenever that comes up, it's best to have a



clean slate. And so I would also excuse number 12. So 7, 8 and 12 are all free to go.

Now, those who are excused today. You have to continue to call the Hotline today after five. So those who aren't are excused, you don't have to call today at 5. So 12, you have been excused, and Juror number 7. You are free to go. Thank you on behalf of the Citizens of Ingham County.

Any peremptory challenges at this time, or do you want to defer, Mr. Roth?

MR. ROTH: We can excuse one at this time, Your Honor. People excuse Juror number 9.

THE COURT: Nine? Okay. So 12, you're free to go and 7, you're free to go, and 9, you're free to go as well.

JUROR 8: And 8, Your Honor?

THE COURT: Yeah. You're already gone.

Do you have any preemptories you wish to exercise at this time, Mr. Perrone?

MR. PERRONE: Yes. The Defense would use peremptory for Juror number 2.

THE COURT: Number 2? Okay. Juror number 2, you're excused. Call the Hotline after 5 for us, please.

THE CLERK: Juror number 2, Wonnie Goss. G-O-S-S.

THE COURT: We will move Juror 14 to seat 7. Any objections, Mr. Roth?

MR. ROTH: No.

THE COURT: Any objections, Mr. Perrone?

MR. PERRONE: No.

THE COURT: We will put a juror on the end here. We will seat you down here in seat 14, ma'am. Two is sitting in 14.

THE CLERK: Juror number 7, Jacklin Sue Nichols. N-I-C-H-O-L-S.

THE COURT: So, for the record, just show that Juror number 14 is sitting in seat 7 now. So we're going to put number 2, and we will hopefully get it worked out. So that -- call Juror number 2, and they can have a better egress and access.

THE CLERK: Juror number 8, Kelly Marie Bernath. B-E-R-N-A-T-H. Juror number 9, Christina Jean Listermann. L-I-S-T-E-R-M-A-N-N. Juror number 12, Leslie Leigh Ortlieb. O-R-T-L-I-E-B.

THE COURT: Okay. You're in front in 12. So we are going to start with Juror number 2. Your community, ma'am?



JUROR 2: Holt.

THE COURT: Married or single?

JUROR 2: Married.

THE COURT: Any children under 18?

JUROR 2: No.

THE COURT: Your employment?

JUROR 2: I work for night stocking at Kroger's.

THE COURT: Spouse's employment?

JUROR 2: He is disabled.

THE COURT: Your level of education?

JUROR 2: High school grad.

THE COURT: Then we have Juror number 8. Your community, ma'am?

JUROR 8: Lansing.

THE COURT: Married or single?

JUROR 8: Single.

THE COURT: Any children under age 18?

JUROR 8: No, sir.

THE COURT: Employment?

JUROR 8: I'm employed in an administrative position.

THE COURT: And spouse's employment?

JUROR 8: I'm single.

THE COURT: And your level of education?



JUROR 8: I have a bachelor's degree.

THE COURT: All right. And then we have Juror number 9, your community?

JUROR 9: Holt.

THE COURT: Married or single?

JUROR 9: Married.

THE COURT: Children under 18?

JUROR 9: No.

THE COURT: Your employment?

JUROR 9: Pediatrics, speech therapist.

THE COURT: A lot of pediatrics in this group. Spouse's employment?

JUROR 9: Business anaylst.

THE COURT: Your level of education?

JUROR 9: Master's

THE COURT: And then we will go to 12. Your community?

JUROR 12: Haslett.

THE COURT: Married or single?

JUROR 12: Single.

THE COURT: Children under 18?

JUROR 12: None.

THE COURT: Your employment?

JUROR 12: Veterinarian. I am not working right now.



THE COURT: Your level of education?

JUROR 12: Doctorate.

THE COURT: Juror number 14, your community, ma'am?

JUROR 14: Leslie.

THE COURT: Married or single?

JUROR 14: Widow.

THE COURT: Any children under 18?

JUROR 14: No.

THE COURT: Employment or retired?

JUROR 14: Retired.

THE COURT: Retired from?

JUROR 14: I did cleaning, but I collect my husband's benefits.

THE COURT: And your level of education?

JUROR 14: Twelfth grade graduate.

THE COURT: Now, I see you have a, I guess it's a walker. Is this your -- is your balance affected. Anything else?

JUROR 14: I have a brain tumor.

THE COURT: You have brain tumor?

JUROR 14: Yes. If I have a long ways to walk, I have a problem with my leg.

THE COURT: What about -- does the brain tumor affect your thinking or cognitive skills

cause headaches, things like that?

JUROR 14: I have light headaches at times.

THE COURT: Do you have to take medication for those?

JUROR 14: Well, I take Tylenol.

THE COURT: I ask, because the proceeding will take a lot of concentration. And so I don't know how that might affect your condition.

JUROR 14: I might not do too well if I sit a long time not doing nothing. I take naps.

THE COURT: Like automatically?

JUROR 14: I don't know they're coming.

THE COURT: That's what I'm saying. So if there are no objections, I am going to excuse Juror 14, which really I am going to then switch back. So Juror number 14, which really was called as 7.

MR. ROTH: Two.

THE COURT: Help me out, please. You're going to be excused, ma'am. You need some assistance to get back to your walker? The deputy will help you out.

Then we will ask 7 to come back to seat 14. We should be back in order. Two, you should go to 7, according to the Clerk. She is my



backup. Now we're back in order for the record. We will fill seat 2.

THE CLERK: Juror number 2, James David Wolf. W-O-L-F.

THE COURT: Juror number 2, you said you were in law enforcement?

JUROR 2: Yes, sir.

THE COURT: Which department?

JUROR 2: State Police.

THE COURT: So we have State Police involved in this?

JUROR 2: No, Your Honor.

THE COURT: We have a lot of police officers. According to your experience, do you feel you would be biased towards officers' testimony?

JUROR 2: I could be fair, sir.

THE COURT: You could be fair and impartial, set all that aside?

JUROR 2: Yes, sir.

THE COURT: Your community?

JUROR 2: Haslett.

THE COURT: Married or single?

JUROR 2: Married.

THE COURT: Children under 18?



JUROR 2: No, sir.

THE COURT: We know your employment is State Police. Spouse's employment?

JUROR 2: Registered nurse.

THE COURT: Your level of education?

JUROR 2: Bachelor's.

THE COURT: Now, for the new people. You heard the questions we asked earlier. I always ask first if you have anything you would have brought to our attention. If you recall on those prior questions, anything you would've brought to my attention? I will run over them. We are still relatively early. What about prior jury service? Any of the new persons had any prior jury service? Anybody ever been a witness in a case, a party in a case, other than maybe Juror number 2, we know. Juror number 9? Yes, ma'am?

JUROR 9: I was a witness in a witness in a military situation, sir. It was inappropriate sexual advances on the part of a senior leader.

THE COURT: Okay. Juror number 12, yes?

JUROR 12: I was subpoenaed in a case that they ended up settling out of court. It was an individual that got in a car accident. I witnessed it. She was under the influence.



THE COURT: Anybody else? Anything about those people who had been witnesses that feel that that experience would make you unable to be fair and impartial in this case?

JUROR 12: No, sir.

THE COURT: What about -- anybody have friends in law enforcement, other than Juror number 2? And what's the relationship?

JUROR 12: I have several close friends in law enforcement. One used to work for NCIS. And now two for the Kansas Police Department.

THE COURT: Out of state?

JUROR 12: Yes.

THE COURT: Anybody else? Anybody have family or friends involved in criminal defense of any type?

You heard my questions? Bias due to race, gender or national origin? Anybody have any difficulty with setting aside any biases? The role of the jury is to makes decisions. That is, you have to make the -- judge the testimony, how you weigh it. Anyone feel they are unable to do that? Can you all be fair and impartial?

Burden of proof? I have to say this every time. The Prosecutor has the responsibility to

prove the case beyond a reasonable doubt. The Defendant doesn't have to present anything. They can. They don't have to. They have a constitutional right to remain silent. If they chose to exercise that right, that silence can't be used against you. You can't go back and say: I wish I had heard from the Defendant. Anybody have any difficulty with that concept? Mr. Perrone? Mr. Roth?

MR. ROTH: Thank you, Your Honor. In addition to anything the Judge said, anything else anybody wanted to bring to our attention based upon the questioning?

JUROR 9: I have a trip planned. Leaving next week through the weekend.

MR. ROTH: It's the sort of thing you can move? You have to go?

JUROR 9: I could move it.

THE COURT: To our new jurors, as it related to law enforcement, any of the new jurors have strong feelings one way or the other about law enforcement? Juror 12?

JUROR 12: I just have a lot of friends in law enforcement.

MR. ROTH: But you could treat them fairly,



the same all as everybody else? Juror 2, I know you indicated that you worked for the Michigan State Police. What do you do for them?

JUROR 2: I am a uniform officer. I'm an assistant deputy director at this point in my career.

MR. ROTH: At the Lansing post?

JUROR 2: Headquarters.

MR. ROTH: Other than Juror 2, anybody know any of the witnesses listed earlier, based on what we talked about this morning of our new jurors?

Anybody believe that they have heard anything about this case, seen it, read it in the news? Anything like that? No? Very good.

Of our new jurors, anybody have strong feelings about domestic violence one way or the other? Juror 7? I am not going to probe deeply into what it is. Is it sort of the thing, if you're concerned, that if you hear about some tumultuous relationship, that you might be fair, unfair, biased?

JUROR 7: Yeah, I was in a domestic situation myself, so...

MR. ROTH: Not something you could put aside?



JUROR 7: No.

MR. ROTH: Very good. Juror 12, you raised your hand?

JUROR 12: Yeah. One of my close friends, it is to your case, but I have known people that have been through that. I think I can be impartial about it.

MR. ROTH: You can put aside personal feelings, listen to the Judge's instructions? Very good. Anybody else?

We talked about credibility. On behalf of our new jurors, anybody feel accountable evaluating credibility of a witness?

We also talked earlier about inmate witnesses, people who are in custody, who are in jail are going to testify. Of our new jurors, anybody feel that they could not fairly evaluate the credibility of those witnesses? Anybody have concerns about that? Juror 9, you feel accountable evaluating like everybody else?

JUROR 9: Yes.

MR. ROTH: Juror 8, you feel comfortable with that?

JUROR 8: I do.

MR. ROTH: Juror 12?



JUROR 12: Yes.

MR. ROTH: You have to answer out loud.

JUROR 12: Yes. Sorry.

MR. ROTH: Juror 7?

JUROR 7: Um-hum.

MR. ROTH: Is that yes?

JUROR 7: Yes.

MR. ROTH: Very good. And Juror 2?

JUROR 2: Yes.

MR. ROTH: I have nothing else, Your Honor. Thank you.

THE COURT: Mr. Perrone?

MR. PERRONE: Yes, Your Honor.

Juror 2, specifically, do you know what behind the shield means?

JUROR 2: Interpretation?

MR. PERRONE: Would you back up a fellow officer if you knew they were lying?

JUROR 2: Absolutely not.

MR. PERRONE: To protect them?

JUROR 2: Absolutely not.

MR. PERRONE: Did that culture exist in certain law enforcement?

JUROR 2: I have never experienced it in my career.

MR. ROTH: Do you think you would give a police witness more credibility than a lay witness?

JUROR 2: I would judge their testimony the same.

MR. PERRONE: Do you do any field work currently?

JUROR 2: I did field for three years, now in administration.

MR. PERRONE: When you were out on the field, what type of work did you do?

JUROR 2: I have been in several different areas. I have been in organized crime. I have been in narcotics. I have been hired as a hitman.

MR. PERRONE: With that experience, in whatever that investigation was, would that undermine your ability to be impartial here?

JUROR 2: Absolutely not.

MR. PERRONE: So you're saying that your previous involvement in investigation, involving an alleged hitman, would not influence you in any hitman criminal trial?

JUROR 2: No, sir.

MR. PERRONE: You don't think you have an inherent bias?



JUROR 2: No.

MR. PERRONE: You cannot acknowledge that you may have a bias as a result of your affiliation with law enforcement?

MR. ROTH: Your Honor, I guess we are moving onto badgering.

THE COURT: He stated he didn't have one.

MR. PERRONE: I apologize. I'm used to cross-examining police officers. Sorry about that.

As far as the international components associated with this, do you think you could be fair and impartial given that there is an international context? Do you think the international context associated with this would sway your decision either way?

JUROR 2: No. I don't think it will. No.

MR. PERRONE: Do you have any specific viewpoint on guns, as far as gun ownership?

JUROR 2: I own guns. I carry a gun for a living. I think if you're a legal citizen, you should carry a gun. I have no objections carrying one.

MR. PERRONE: Do you know anything about this case? Have you heard anything in the media?



JUROR 2: No, sir.

MR. PERRONE: There isn't anything from a domestic violence standpoint that would undermine your impartiality?

JUROR 2: No, sir.

MR. PERRONE: Juror number 7, coming back to you. The prior issue with domestic violence would not allow you –

THE COURT: We're going to excuse her for cause.

MR. ROTH: Without objection.

MR. PERRONE: Without objection.

THE COURT: Ma'am, we are going to excuse you, based on your personal history. Call the Hotline at 5 for us, please.

MR. PERRONE: Juror number 8, in regards domestic violence, is that a subject that you hold, that would not allow you to obtain an open mind in this case.

JUROR 8: It does not.

MR. PERRONE: Does the international component to this, in someone who is affiliated with the case is a foreigner, would you provide them with less credibility?

JUROR 8: I would provide them with the



same credibility.

MR. PERRONE: You heard me ask earlier in regards to whether or not you could start with the presumption of innocence. Is there anybody that you know, if somebody told you they did something wrong, that you would initially be skeptical, not believe them?

JUROR 8: If I knew their character, somebody else was quite familiar with, came to me with something absurd, I would question it. But if it is something I'm not affiliated with, I have no idea with their character, I would have no predetermined judgment.

MR. PERRONE: You would be able to use your common sense?

JUROR 8: Yes.

MR. PERRONE: Thank you. Juror number 9, you said you had your trip planned?

JUROR 9: Yes.

MR. PERRONE: Is it going to be a considerable issue for you to transition your trip plans? How long had you had the trip planned?

JUROR 9: A couple weeks. It's not major plans. I can change it.

MR. PERRONE: That wouldn't, in any way –

you wouldn't feel a sense that you were missing out on something, that you would use that against the Defendant?

JUROR 9: No.

MR. PERRONE: Is there anything with regard to domestic violence that makes you feel weary to obtain an open mind?

JUROR 9: I would obtain an open mind.

MR. PERRONE: If you have seen anything media related, as far as in general, as far as jurors are concerned, anybody seen anything in the media as far as it pertains to this specific case? Anyone?

Again, anyone been in jail, the new jurors? Charged with a crime? I like this guy. Not me. Big smile.

Anything specific as far as any beliefs associated with gun ownership?

Juror number 12, are you going to be able to maintain impartiality as a result of the significant prior experience that you had as it pertained to something else?

JUROR 12: I believe so. There was in her case, the result, it resulted in a stalking component as well.



MR. PERRONE: You say you believe. So would you -- would your involvement in that case undermine your ability to have an open mind throughout this trial if the Defendant is charged with stalking? Would you initially -- would the prior experience not allow you to maintain an open mind?

JUROR 12: I believe I could keep an open mind. But I was pretty intricately involved in everything that happened. So I can't, with 100 percent, say.

MR. PERRONE: There is definitely a stigma there.

JUROR 12: Yeah.

MR. PERRONE: Could that stigma cause you not to have an open mind?

JUROR 12: Potentially. I don't know the aspects of it, if there were similarities.

MR. PERRONE: If there were similarities, that would be something difficult for you to make a judgment and determination on?

JUROR 12: Yeah. Potentially.

MR. PERRONE: No further questions.

THE COURT: Additional challenge for cause, Mr. Roth?



MR. ROTH: I assume that Mr. Perrone is going to make a challenge as to number 12?

MR. PERRONE: Yes.

MR. ROTH: We have no objection.

THE COURT: All right. Juror number 12, thank you. You are to call the Hotline until five. Thank you very much. Any peremptory challenges, Mr. Perrone?

MR. PERRONE: Yes, Your Honor. I am going to excuse Juror number 2.

THE COURT: Do you have anything else?

MR. ROTH: People thank and excuse Juror 13.

THE COURT: All right. Juror 13, you have been excused. Any other ones you wish to exercise at this time, Mr. Perrone?

MR. PERRONE: Not at this time, Your Honor.

THE CLERK: Juror 2, Ryan Gibbs Petty. P-E-T-T-Y. Juror number 12, Misha Renee Overton. O-V-E-R-T-O-N. And Juror number 13, Clifton Benjamin Schneider. S-C-H-N-E-I-D-E-R. Juror 7: Heather Jeanette Elias.

THE COURT: Juror number 2, your community?

JUROR 2: Holt.

THE COURT: Married or single?



JUROR 2: Married.

THE COURT: Any children under 18?

JUROR 2: Ten, 8 and almost 3.

THE COURT: Your employment?

JUROR 2: I am a sales rep and job manager for a roofing company.

THE COURT: Spouse's employment?

JUROR 2: None.

THE COURT: And your level of education?

JUROR 2: High school.

THE COURT: Juror number 7, your community, ma'am?

JUROR 7: Lansing.

THE COURT: Married or single?

JUROR 7: Single.

THE COURT: Any children under 18?

JUROR 7: No.

THE COURT: Employment?

JUROR 7: I do clerical work at a local law enforcement agency.

THE COURT: Which agency?

JUROR 7: Ingham County Sheriff's office.

THE COURT: And by clerical work?

JUROR 7: Just compiling and collating information, materials. More specifically, I'm a

line operator. I do court-ordered warrants.
THE COURT: Your level of education?
JUROR 7: I have a bachelor's degree.
THE COURT: And Juror 10, your community ma'am?
JUROR 10: Lansing
THE COURT: Married or single?
JUROR 10: Single.
THE COURT: Children under 18?
JUROR 10: One.
THE COURT: Age?
JUROR 10: Four.
THE COURT: And employment?
JUROR 10: Bank of America.
THE COURT: Educational level?
JUROR 10: Some college.
THE COURT: Juror number 13, your community, sir?
JUROR 13: Williamston.
THE COURT: Married or single?
JUROR 13: Married.
THE COURT: Children under 18?
JUROR 13: I have one that's 8. Two that are 6.
THE COURT: Your employment?



JUROR 13: Attorney.
THE COURT: And what kind of law do you practice?
JUROR 13: Civil defense.
THE COURT: Work for the State of Michigan?
JUROR 13: Yes.
THE COURT: Spouse's employment?
JUROR 13: Unemployed. Homemaker.
THE COURT: Your level of education?
JUROR 13: Juris doctorate.
THE COURT: The new jurors, the four of you, you heard my other questions. So we know that. Does anybody have any prior jury service amongst the newcomers here? Anybody have any responses to questions I would have that you would have given me off the top of your head? Juror number 2?
JUROR 2: I am in commission sales. I won't make any money at all through this process, if it's a 3-week process. I need to support my family.
THE COURT: What about law enforcement as far as line operator? Number 2?
JUROR 2: I have friends at church that are three police officers, one state, one local, one



county.
THE COURT: Juror number 7, do you think your responsibilities as a line operator would have interfered with your ability to be fair and impartial in this matter?
JUROR 7: Potentially, maybe not so much that. But relationships I have with co-workers, friends. Also my boyfriend is also a law enforcement officer.
THE COURT: I think this involves things at the Ingham County Jail which would be probably near your worksite. I am going to -- so that relationship is kind of close. I am going to, if there are no objections, excuse Juror number 7 for cause.
MR. ROTH: Without objection.
MR. PERRONE: Without objection, Your Honor.
THE COURT: Thank you, ma'am. Let's fill that seat at this time.
THE CLERK: Juror number 7, Ross Michael Little. L-I-T-T-L-E.
THE COURT: Juror number 7, your community?
JUROR 7: Williamston.
THE COURT: Married or single?



JUROR 7: Single.
THE COURT: Children under 18?
JUROR 7: No.
THE COURT: Employment?
JUROR 7: Special chef.
THE COURT: Specializing in anything?
JUROR 7: Italian food.
THE COURT: Your level of education?
JUROR 7: Bachelor's.
THE COURT: You heard the questions I have been asking this morning and afternoon? Do you have any responses you would give?
JUROR 7: Not off the top of my head.
THE COURT: Prior jury service?
JUROR 7: No prior.
THE COURT: Friends in law enforcement?
JUROR 7: No.
THE COURT: Been a victim of a crime or accused of a crime?
JUROR 7: Yes.
THE COURT: And so you had contact with law enforcement as a result of that?
JUROR 7: Yes.
THE COURT: So do you feel that you could be fair and impartial or something about your

experience that might affect your ability to be fair and impartial?

JUROR 7: I have never had good experience with the law before, really, so, I'm a little bitter.

THE COURT: Well, but does the bitterness extend to the fact that you could not be fair and impartial and weigh the evidence, or would you be tilted one way or the other?

JUROR 7: I feel tilted for sure.

THE COURT: Tilted, based upon your -- on your personal experience?

JUROR 7: Yes.

THE COURT: Any objection if I excuse Juror 7?

JUROR 7: No, Your Honor.

THE COURT: Mr. Perrone?

MR. PERRONE: No objection, Your Honor.

THE COURT: Thank you, sir. Call the Hotline after five.

THE CLERK: Juror number 7, Cynthia Ann Milks. M-I-L-K-S.

THE COURT: Your community, ma'am?

JUROR 7: Stockbridge.

THE COURT: Married or single?



JUROR 7: Married.

THE COURT: Children under 18?

JUROR 7: No.

THE COURT: Your employment?

JUROR 7: Registered nurse.

THE COURT: Spouse's employment?

JUROR 7: Fire and Security, Ford Motor Company.

THE COURT: Your level of education?

JUROR 7: Associate's.

THE COURT: You have heard questions that I have been asked? Any responses for me?

JUROR 7: One big one. I have a daughter that is a victim of domestic abuse. The perpetrator fled the state. I also have a cousin that was shot and killed by her husband. I honestly don't know if I could be impartial.

THE COURT: The same daughter -- the same daughter that is a victim where the husband shot --

JUROR 7: No. She is a cousin that was shot. And my daughter. Two instances.

THE COURT: That's what I was asking. Two instances or one. That's what I really was asking. Both -- all of them involve domestic



violence, though?

JUROR 7: Yes.

THE COURT: Any objections?

MR. ROTH: No, Your Honor.

THE COURT: We always have someone seated at the hotseat. We could call it cold. The cold seat. Any objections? All right.

MR. ROTH: No objection.

THE COURT: Thank you, ma'am. Appreciate it. Call the Hotline after five for us, please.

THE CLERK: Juror number 7, Mary Pride. P-R-I-D-E.

THE COURT: Juror number 7, your community?

JUROR 7: Mason.

THE COURT: Married or single?

JUROR 7: Married.

THE COURT: Employment?

JUROR 7: Retired from the Office on Aging and Office of the State of Michigan.

THE COURT: Spouse's employment?

JUROR 7: Retired from the State of Michigan.

THE COURT: Level of education?

JUROR 7: Bachelor's.

THE COURT: You heard my questions asked



today? Anything off the top of your head that you would have responded to?

JUROR 7: My stepson is a sergeant at the East Lansing Police Department.

THE COURT: You think that relationship, because he is at the police department, would give you a tendency not to be able to be fair and impartial and to listen to all the witnesses in this matter?

JUROR 7: I would still be fair.

THE COURT: You can be fair? Okay. Going back to the other three persons at this particular time. Anybody have bias due to race, gender or national origin, or any other reasons?

You heard me ask about sitting in judgment? That's why the jury has to make decisions. Anybody feel they are unable to do that? Understand that the Prosecutor has the burden of proof? The Defendant doesn't have to prove anything? Nor does the Defendant have to take the stand. The Defendant has an absolute right to remain silent. Anybody have a difficulty with those concepts? Mr. Roth?

MR. ROTH: Thank you, Your Honor. I want to follow up. Juror 5, you said Eaton Rapids; is

that right?

JUROR 5: Yes.

MR. ROTH: Is that in Eaton County?

JUROR 5: Yes. I am right on the border.

MR. ROTH: I want to clarify that to our two other jurors. Good afternoon. Is there anything that you want to bring to our attention beyond what you just discussed with the judge, any of our other jurors? No? Very good.

Juror 12, you indicated some college. Are you currently in college or is that in the past?

JUROR 12: Currently.

MR. ROTH: Where are you in school?

JUROR 12: Davenport.

MR. ROTH: What are you studying there?

JUROR 12: Business management.

MR. ROTH: What do you want to do when you graduate?

JUROR 12: Open my own business.

MR. ROTH: What kind?

JUROR 12: I have a passion for flowers.

MR. ROTH: Very good. We have these surveys that are 50-50 on accuracy. It indicates involved in a criminal suit. Does that ring a bell?



JUROR 12: Yeah.

MR. ROTH: Tell me what that means.

JUROR 12: Involved in a criminal suit.

MR. ROTH: It indicates for your checklist it's checked?

JUROR 12: Yeah. I had an incident with a criminal, yeah, a few years ago.

MR. ROTH: Okay.

JUROR 12: That was caught shoplifting.

MR. ROTH: How long ago?

JUROR 12: Probably like -- it was at a point, five years. It's been longer than five years.

MR. ROTH: Anything about that, that gives you a bias one way or the other?

JUROR 12: No.

MR. ROTH: You have to say out loud.

JUROR 12: No.

MR. ROTH: No strong feelings about law enforcement one way or the other?

JUROR 12: No.

MR. ROTH: All right. A little hesitation. So you don't need to --

JUROR 12: It's not going to affect my judgment. I had encounters with law enforcement



that I am not agreeing I am a real racial person, Black live matters is very strong to me. Knowing all the occurrences going on with police officers, killings of black people, yeah. With that encounter, I do have. But it's not going to affect my judgment.

MR. ROTH: That's the most important thing. What other beliefs, when you meet police officers on the witness stand. You would start with evaluating them?

JUROR 7: Yeah.

MR. ROTH: That's all we can ask of you. Thank you.

So opening back up to anybody have strong feelings about law enforcement one way or the other? Any of our new jurors? Any of you new jurors know any of the witnesses listed? No? For any of our new jurors, anybody believe that they heard anything about this case, read anything about this case in the media? No?

Of our new jurors, does anybody have strong feelings about domestic violence one way or the other? No?

For our new jurors, we had a talk earlier about credibility, evaluating credibility of



witnesses who are in jail, or have been in jail. For all of our new jurors, do you feel accountable evaluating whether or not they are telling the truth or not, or do you feel you could not listen to somebody who was in jail? Juror 12?

JUROR 12: No.

MR. ROTH: Start with Juror 7.

JUROR 7: Yes. I could be impartial.

MR. ROTH: Juror 2?

JUROR 2: I could be impartial, being I was from an older group.

MR. ROTH: Juror 13? Good afternoon, sir.

JUROR 13: Good afternoon.

MR. ROTH: You feel comfortable with that as well?

JUROR 13: Yes.

MR. ROTH: I have nothing else, Your Honor.

THE COURT: Mr. Perrone?

MR. PERRONE: Anyone associated with the international nature of this case that would provide any type of inability to be fair and impartial to any of the new jurors? No one has seen anything on the media or in the paper as it related to this case that can be recalled right

now at least?

The domestic violence aspect, it's often a very difficult issue to talk about. I just want to ensure that we don't have any feelings associated with domestic violence that would otherwise preclude us from being impartial in this matter. No one has anything that would undermine their ability to be open as it related to domestic violence?

Okay. As to the new individual jurors, the Prosecutor spoke about jail, and as far as being fair and impartial. Does the fact these individuals are in jail, is that something you're going to use against them, initially? Anybody use the fact that somebody is in jail against them, initially. As far as their credibility, will you allow their testimony and use your common sense to determine whether or not the statements being made are incredible?

Juror number 2, what is your position on gun rights?

JUROR 2: I have firearms. I obtained them legally. I have them registered and I carry them legally.

MR. PERRONE: Juror number 7, do you hav



any specific viewpoint on gun ownership?

JUROR 7: No.

MR. PERRONE: Do you disagree with gun ownership? Do you think people shouldn't have guns?

JUROR 7: I have mixed feelings. I don't take a stand on that.

MR. PERRONE: What are the case components for guns involved? You feel you would still be able to be fair and impartial?

JUROR 7: Yes.

MR. PERRONE: Given that you have a stepson on the East Lansing Police Department, do you still believe that you could be and fair impartial?

JUROR 7: Yes.

MR. PERRONE: How close is your relationship with your stepson?

JUROR 7: Very.

MR. PERRONE: Do you talk with him about different cases?

JUROR 7: No. He doesn't talk about them.

MR. PERRONE: Do you watch television, Law and Order?

JUROR 7: I do watch Law and Order.



MR. PERRONE: And as far as your stepson is concerned, his position, you would still be able to come in here and afford Mr. Uraz the right to be presumed innocent, and you would walk in with an open mind?

JUROR 7: I would come in with the right to do that.

MR. PERRONE: You believe, even having law enforcement, you think the Defendant still has rights?

JUROR 7: Oh, definitely.

MR. PERRONE: Juror number 12, you said as far as police are concerned, you had a number of negative interactions with them?

JUROR 12: Yes.

MR. PERRONE: How negative were those interactions?

JUROR 12: It is negative to the point where I want to record it, to where I want to make sure if something happens, was I able to see my view as well as not just the police officer's view.

MR. PERRONE: Did you feel you were being discriminated against?

JUROR 12: Yeah.



MR. PERRONE: Do you think that experience is going to undermine your ability here as to a different officer testifying?

JUROR 12: No.

MR. PERRONE: So if different officers were to testify, you would not use your experience with that officer to undermine his credibility? Would you use whatever type statement he makes in your common sense?

JUROR 12: Yes.

MR. PERRONE: You spoke about black lives matter. Do you think police officers are racist in general?

JUROR 12: I mean, yes, to a certain extent. I might even say I am racist. So, yeah. That's why I said if a police officer gets up here and the judgment may be a different case. If the Defendant is black, I would feel some type of way, but he is not black. That might be me speaking out being racist. If the Defendant was black, I would feel some type of way with the officers coming up here, taking a stand on the black lives matter stand. I don't know what occurrence happened.

MR. PERRONE: As to Mr. Uraz, given that

he's not black, would you still be able to afford him the same presumption that he didn't do anything wrong? Would you have a stronger conviction if he was black, the Defendant, rather than white?

JUROR 12: I believe I would.

MR. PERRONE: Are you able to put that aside, try to maintain your impartiality as it relates to Mr. Uraz?

JUROR 12: Yeah. Fairness to both the Defense and the State, right.

MR. PERRONE: Juror number 13, civil defense attorney?

JUROR 13: Yes.

MR. PERRONE: What type of civil defense?

JUROR 1: My primary client is Michigan Department of Corrections. Also the Governor's office. Do some elections work, wherever they send me at.

MR. PERRONE: As part of your job with the Michigan Department of Corrections, do you defend against civil rights lawsuits?

JUROR 13: That's what I do, correct. Yes.

MR. PERRONE: You said you work for the State. Who else do you work for?



JUROR 13: I work for the Michigan Department of Attorney General AG's office.

MR. PERRONE: Did you think your work as a civil defense attorney for MDOC would impede your ability to remain fair and impartial as statements made by jail informants?

JUROR 13: I don't think so. I don't have any involvement in cases that have jail and things like that.

MR. PERRONE: Do you come in contact with inmates?

JUROR 13: Yes.

MR. PERRONE: Does that contact with those inmates undermine your ability to be impartial regarding testimony from an inmate?

JUROR 13: No. They testify for me sometimes, sometimes against. It goes both ways.

MR. PERRONE: So you would be fair and impartial, and base your assessment on the veracity of the statements?

JUROR 13: Yes.

MR. PERRONE: You understand the presumption of innocence?

JUROR 13: I do.

MR. PERRONE: Is there anybody that you



know, that if somebody were to come to you and tell you that they did something wrong, that you would be extremely skeptical?

JUROR 13: As with the prior juror, my wife was a great example.

MR. PERRONE: Is that a courtesy, maintaining an open mind from the very beginning, and scrutinizing the facts, is that a courtesy YOU could extend in this case to Mr. Uraz?

JUROR 13: Yes. It's the courtesy I think anybody on trial deserves. It's part of our constitutional rights.

MR. PERRONE: Do you have any specific perspective on guns and gun rights?

JUROR 13: I have a gun, so...

MR. PERRONE: You haven't heard anything on the media associated with this case?

JUROR 13: I have not. No.

MR. PERRONE: You haven't heard anything from the outside from your affiliation with MDOC?

JUROR 13: No.

MR. PERRONE: And do you believe that you could tell the difference between a truth and a lie?

JUROR 13: I have learned that. No, I



probably can't, most of the time.

MR. PERRONE: Why?

JUROR 13: Because I've had people lie to me, believed what they said. Found out later it was false. So it's hard a lot of times to tell.

MR. PERRONE: Do you think that experience would help if you are assessing credibility in your current -- as a juror, in the jury function?

JUROR 13: I think it would put all like experiences together, would help in that.

MR. PERRONE: I have no further questions.

THE COURT: Okay. Challenges for cause, Mr. Roth?

MR. ROTH: No, Your Honor.

THE COURT: Challenges for cause, Mr. Perrone?

MR. PERRONE: No, Your Honor.

THE COURT: Peremptory, Mr. Roth?

MR. ROTH: Thank you. The People thank and excuse Jurors 12 and 13.

THE COURT: Please call the Hotline after five for us, please. Challenges for cause. Excuse me. Peremptory, Mr. Perrone?

MR. PERRONE: Yes, Your Honor. The Defense is going to excuse Juror 6 and Juror 11.

THE COURT: Call the Hotline after five for us, please.

THE CLERK: Juror number 6, Kathleen Smeak S-M-E-A-K. Juror number 11, Diane Bauer. B-A-U-E-R. Juror number 12, Mary Christina Veldman. V-E-L-D-M-A-N. Juror number 13, Steven Dale Reed. R-E-E-D.

THE COURT: Okay. Juror number 6, your community, ma'am?

JUROR 6: Williamston.

THE COURT: Married or single?

JUROR 6: Married.

THE COURT: Children under 18?

JUROR 6: No.

THE COURT: Employment? Is he employed?

JUROR 6: Realtor.

THE COURT: Spouse's employment?

JUROR 6: He's a broker.

THE COURT: And your level of education?

JUROR 6: Trade school.

THE COURT: And Juror number 11, once you get situated, your community?

JUROR 11: Ingham County, Okemos.

THE COURT: Married or single?

JUROR 11: Married.



THE COURT: Children under 18?

JUROR 11: No.

THE COURT: Employment?

JUROR 11: Vice president Financial For Non-profit and interim CEO.

THE COURT: Spouse's employment?

JUROR 11: He works at MSU as a physics professor chair. Now he is senior consultant in the president's office.

THE COURT: He is now what?

JUROR 11: Senior consultant administration officer in MSU.

THE COURT: Still at MSU?

JUROR 11: Yes.

THE COURT: Your level of education?

JUROR 11: MBA, CPA.

THE COURT: Juror 12, your community?

JUROR 12: Lansing.

THE COURT: Married or single?

JUROR 12: Widow.

THE COURT: Any children under 18?

JUROR 12: No.

THE COURT: Your employment?

JUROR 12: Retired registered nurse and currently working full time nanny.



THE COURT: For your family or independent?

JUROR 12: Five grandchildren.

THE COURT: And your level of education?

JUROR 12: Registered nurse diploma.

THE COURT: And Juror number 13, your community, sir?

JUROR 13: Onondaga Township.

THE COURT: Married or single?

JUROR 13: Married.

THE COURT: Children under 18?

JUROR 13: No.

THE COURT: Employment?

JUROR 13: LCC.

THE COURT: Which department?

JUROR 13: Administrator Department K-12.

THE COURT: K-12? Spouse's employment?

JUROR 13: Farm Bureau Credit Union.

THE COURT: Your level of education?

JUROR 13: Doctorate.

THE COURT: So the four of you, you heard my questions? Any responses off the top of your head for any of those? Prior jury service, perhaps? Friends in law enforcement. Juror number 6?

JUROR 6: My daughter was the victim of a



domestic assault by a roommate, and also my mother.

THE COURT: She was ultimately murdered, you say?

JUROR 6: No. Also my mother.

THE COURT: Also your mother? Do you feel those experiences with your close family members being involved in domestic violence, is there an impact on your ability to be fair and impartial in this case?

JUROR 6: It's very possible.

THE COURT: Very possible? What about anybody else? Juror number 12?

JUROR 12: Both my daughters have been victims of domestic violence. And by association with my daughter I have been, too.

THE COURT: Do you feel that would impact your decision in this case?

JUROR 12: Yes, it would.

THE COURT: All right. So I am going to excuse Jurors 6 and 12, if there are no objections, Mr. Roth?

MR. ROTH: No, Your Honor.

MR. PERRONE: No objection.

THE COURT: Based on personal experience.

Yes, Juror number 11?

JUROR 11: I have a schedule issue. I am supposed to fly to Florida a week from tomorrow for vacation.

THE COURT: Thank you.

JUROR 11: I also have a domestic violence. My sister, who her husband who is a police officer, hit her years ago. He was kicked off the force. This is in California, not in the State of Michigan. She is still married to him. I believe he is still abusive. She doesn't seem to be able to cut the ties.

THE COURT: Looking at those incidents, do you feel would impact your ability to be fair and impartial in this case?

JUROR 11: I think I could be fair and impartial. I am more concerned about the trip that I will be going on.

THE COURT: What's the purpose of the trip?

JUROR 11: My husband is speaking at a conference in West Palm Beach. I'm going with him as a vacation.

THE COURT: Prepaid?

JUROR 11: Paid for it already. Booked the flight. I don't know if he used miles, if he



paid, or how he did it. So...

THE COURT: Okay. Lets fill those two seats for me, please.

THE CLERK: Juror number 6, Kevin Lee Morrison. M-O-R-R-I-S-O-N. And Juror number 12, Megan Rose Coxon. C-O-X-O-N.

THE COURT: Juror number 6, your community?

JUROR 6: Ingham County.

THE COURT: Married or single?

JUROR 6: Married.

THE COURT: Children under 18?

JUROR 6: No.

THE COURT: Employment?

JUROR 6: Lansing Schools.

THE COURT: Spouse's employment?

JUROR 6: She works for GM.

THE COURT: And your level of education?

JUROR 6: Associate's.

THE COURT: Juror number 12, your community, ma'am?

JUROR 12: Mason.

THE COURT: Married or single?

JUROR 12: Married.

THE COURT: Children under 18?

JUROR 12: Two and seven months.



THE COURT: Brand new? Not quite as new as the three months guy. And your employment?

JUROR 12: Dart Container.

THE COURT: Spouse's employment?

JUROR 12: Fed Ex.

THE COURT: And your level of education?

JUROR 12: Associate's.

THE COURT: Okay. So for 6 and 12, you heard the questions. Up to any point you would have any responses you would have off the top of your head involving with domestic --

JUROR 12: I had a DUI about a decade ago. No issues with law enforcement, anything.

THE COURT: Doesn't affect your ability to be fair and impartial?

JUROR 12: It did not.

THE COURT: Friends in law enforcement?

JUROR 12: No.

THE COURT: Prior jury service?

JUROR 12: Haven't got this far.

THE COURT: You haven't gotten to the box? Okay. And you have heard my discussions about necessity of a jury to reach a decision, which means you have to make some judgment. Anybody feel unable to do that?



Back to all four of you. You heard my comments about burden of proof. The Prosecution has to prove the case beyond a reasonable doubt, that the Defendant does not have to prove anything. Has an absolute right to remain silent. Anybody have any difficulty with those concepts? Anyone feel they could be fair and impartial in this matter? All right. Thank you. Mr. Roth?

MR. ROTH: Thank you, Your Honor. So Good afternoon. So for new jurors, any strong feelings about law enforcement one way or the other? Anyone know witnesses, attorneys, parties, anything like that? Anybody here know anything about this case in the media? No? Strong feelings about domestic violence, inmates, jail witnesses? Can you evaluate credibility like all witnesses? Allright. I have nothing else, Your Honor. Thank you.

THE COURT: Mr. Perrone?

MR. PERRONE: Juror 6, what do you do for Lansing Schools?

JUROR 6: I teach.

MR. PERRONE: You teach?

JUROR 6: I teach IT, IT tech.

MR. PERRONE: Database administrator?

JUROR 6: No. I just do software installs, and whatever has to do with software, hardware.

MR. PERRONE: Does any of your prior history, do you have any type of relatives overseas? This is the last time you took a trip abroad?

JUROR 6: I haven't been overseas at all. Canada is it. That was years ago.

THE COURT: Over the lake, huh?

JUROR 6: Over the lake. Yeah.

MR. PERRONE: Have you seen any media associated with this case?

JUROR 6: No.

MR. PERRONE: Any affiliation with MSU?

JUROR 6: No.

MR. PERRONE: In regard to jail, have you ever been in jail?

JUROR 6: No.

MR. PERRONE: Do you have family members that have been in jail?

JUROR 6: My grandson's dad is in jail right now.

MR. PERRONE: What for, if you know?

JUROR 6: I don't think I should talk about



that, necessarily. I take my grandson to visit his dad.

MR. PERRONE: Do you think that that --

JUROR 6: It's not going to have any effect on my decision one way or the other.

MR. PERRONE: And you heard the presumption of innocence?

JUROR 6: Right.

MR. PERRONE: As far as maintaining an open mind from the beginning, is there anybody that you know where you would, if somebody told you that they had done something wrong, initially now?

JUROR 6: No. I have an open mind. There would have to be facts involved.

MR. PERRONE: IT is a fairly specialized area?

JUROR 6: Pretty. Yeah.

MR. PERRONE: Do you do deductive reasoning?

JUROR 6: It's trouble shooting. All troubleshooting.

MR. PERRONE: Juror number 11, is this trip going to --

JUROR 11: Did he state me?

MR. PERRONE: Juror number 12, based on



what we talked about, you're going to be able to maintain an open mind?

JUROR 12: Yeah, yes.

MR. PERRONE: As far as prior issues with the Department, did you feel you were treated unfairly in that circumstance?

JUROR 12: No. They did what they had to do, cooperation on both sides.

MR. PERRONE: What exactly do you do at Dart?

JUROR 12: I'm senior product scheduler. I work in the corporate building.

MR. PERRONE: Do you think that you have any biases in regard to race?

JUROR 12: No.

MR. PERRONE: Anyone have any biases as to being foreign?

JUROR 12: No.

MR. PERRONE: Number 13, you work for an insurance industry?

JUROR 13: LCC.

MR. PERRONE: Your wife works in the insurance industry?

JUROR 13: She works for a credit union at Farm Bureau.



MR. PERRONE: What do you -- where did you do your admissions? Community college?

JUROR 13: Yes.

MR. PERRONE: What do you do with admissions?

JUROR 13: I work with an early college program and high school completion program.

MR. PERRONE: Are you familiar with most of the staff at Lansing Community College?

JUROR 13: Some of them.

MR. ROTH: And you don't know any of the party witnesses that have been named?

JUROR 13: I didn't recognize anyone.

MR. PERRONE: Anything in your history that's domestic violence related that's going to impede your ability to be fair and impartial?

JUROR 13: I don't think so.

MR. ROTH: You don't think so? I'm not going to get into specifics. I just want to know if you think whatever that incident was, if that's going to be the caliber that's going to interfere with your ability to?

JUROR 13: An in-law who was involved in domestic violence, but I believe I can be impartial.

MR. PERRONE: But your view -- that's your viewpoint on gun possession?

JUROR 13: I don't own guns. But I believe people have a right to guns.

MR. PERRONE: No further questions.

THE COURT: Challenge for cause, Mr. Roth?

MR. ROTH: No, Your Honor.

THE COURT: Challenge for cause, Mr. Perrone?

MR. PERRONE: No, Your Honor.

THE COURT: Peremptory, Mr. Perrone?

MR. PERRONE: Juror number 11.

THE COURT: Okay. Peremptory, Mr. Roth?

MR. ROTH: The People are satisfied with the panel.

THE COURT: I told everyone we would be going till 2. We had to wrap up at 2. The jurors haven't had any lunch or anything. We will take number 11, and see where we are.

THE CLERK: Juror number 11, Thomas Hacker. H-A-C-K-E-R.

THE COURT: Your community?

JUROR 11: Delhi Township.

THE COURT: Married or single?

JUROR 11: Married.



THE COURT: Children under 18?

JUROR 11: None.

THE COURT: Your employment?

JUROR 11: Dart Bank.

THE COURT: Do you know Juror number 12?

JUROR 11: No.

THE COURT: And spouse's employment?

JUROR 11: Retired.

THE COURT: From?

MR. ROTH: Jackson National.

THE COURT: And your level of education?

JUROR 11: Bachelor's.

THE COURT: You heard all my questions today? Any answers for me?

JUROR 11: No.

THE COURT: Prior jury service?

JUROR 11: Yes, I did.

THE COURT: Okay. Criminal or civil, if you recall?

JUROR 11: It was civil.

THE COURT: Was the jury able to reach a verdict?

JUROR 11: Yes.

THE COURT: Friends in law enforcement?

JUROR 11: Yes.



THE COURT: What is the nature of the relationship?

JUROR 11: I got to know officers in Ingham County jail, as a best friend, actually.

THE COURT: Okay. And does anything about that relationship impede your ability to be fair and impartial of the facts in this case?

JUROR 11: No.

THE COURT: Some witnesses may be witnesses in Ingham County jail. Do you feel that fact makes you able to be fair and impartial?

JUROR 11: No.

THE COURT: You heard my comments about burden of proof is on the Prosecution. Jurors have to make decisions, which means you have to sit in judgment. The Defendant has a right to remain silent. Any difficulty with any of those concepts?

JUROR 11: No.

THE COURT: Fair and impartial? Bias due to race, prejudice, national origin?

JUROR 11: No.

THE COURT: Mr. Roth?

MR. ROTH: Thank you, Your Honor. Sir, do you have strong feelings about law enforcement one



way or the other?

JUROR 11: No.

MR. ROTH: Do you know any of the witnesses, the attorneys or anything like that?

JUROR 11: No.

MR. ROTH: Haven't heard about this case in the media?

JUROR 11: No.

MR. ROTH: I think the Judge asked no strong feelings about domestic violence?

JUROR 11: Correct.

MR. ROTH: Witnesses who are also inmates, you can evaluate credibility like anybody else?

JUROR 11: I do have a problem with that.

MR. ROTH: Tell me about that.

JUROR 11: I have known inmates in the past. I just feel they're liars. Basically I can't trust them.

MR. ROTH: No matter what else goes on, when that inmate gets up there, it's a turnoff in your mind?

JUROR 11: It is.

MR. ROTH: If the Judge instructs you otherwise, it isn't going to fix that --

JUROR 11: No. I still feel that way.

MR. ROTH: I understand. I appreciate the honesty. Thank you. Nothing else, Your Honor.

THE COURT: I have a tendency to excuse him for cause based upon his comments in light of the potential facts in the case.

MR. ROTH: Yes, Your Honor.

THE COURT: Any objection?

MR. ROTH: No, Your Honor.

THE COURT: Mr. Perrone?

MR. PERRONE: No, Your Honor.

THE COURT: Juror number 11. Thank you very much. One more try here.

THE CLERK: Juror number 11. Jason William Robinson. R-O-B-I-N-S-O-N.

THE COURT: Juror number 11, your community?

JUROR 11: Haslett.

THE COURT: Married or single?

JUROR 11: Single.

THE COURT: Children under 18?

JUROR 11: Two. Ages 13 and 7.

THE COURT: Your employment?

JUROR 11: Substance abuse therapist.

THE COURT: What agency?

JUROR 11: Reality counseling therapist.



THE COURT: Level of education?

JUROR 11: Bachelor's.

THE COURT: You heard my questions? Any answers for me?

JUROR 11: No.

THE COURT: Prior jury service?

JUROR 11: I have prior jury service.

THE COURT: Was the jury able to reach a verdict?

JUROR 11: Yes.

THE COURT: Criminal or civil?

JUROR 11: Criminal.

THE COURT: Friends in law enforcement?

JUROR 11: No.

THE COURT: You heard the concept of presumption of innocence? Right to remain silent? Free of bias, prejudice? Making a decision? Do you have any difficulty with those concepts?

JUROR 11: No, sir.

THE COURT: Mr. Roth?

MR. ROTH: Thank you, Your Honor. You had indicated earlier that you knew one of the defense witnesses, Mr. Roth?

JUROR 11: Yes.

MR. ROTH: He goes to Reality Counseling?



JUROR 11: He was discharged recently.

MR. ROTH: Anything about your relationship with him you would have trouble sitting as a juror if he is a witness?

JUROR 11: No, sir.

MR. ROTH: What do you do at Reality Counseling?

JUROR 11: I'm a therapist.

MR. ROTH: How long have you been doing that?

JUROR 11: I have been there two years. A contractual therapist up in Saginaw several years.

MR. ROTH: Nothing else.

THE COURT: Nothing? Mr. Perrone?

MR. PERRONE: There is going to be a substance abuse component to this case. Given that you are in substance abuse, do you think your viewpoint on somebody who is a substance abuser interferes with your ability to be fair and impartial?

JUROR 11: No.

MR. PERRONE: What is your viewpoint as far as substance abusers?

JUROR 11: Rehabilitation process. I am in recovery for 12 years.



MR. PERRONE: You are a firm believer in rehabilitation?

JUROR 11: Yes.

MR. PERRONE: You have seen quite a few people over the years, I anticipate, in Reality, in very difficult situations. You're able to stand here and say that that's not going to skew your perspective?

JUROR 11: No.

MR. PERRONE: What's your viewpoint on guns?

JUROR 11: I don't even own any. I do believe the people have the right to carry them.

MR. PERRONE: Have you ever been affected by domestic violence?

JUROR 11: No.

MR. PERRONE: Family member?

JUROR 11: No.

MR. PERRONE: Dealings with substance abusers?

JUROR 11: Yes.

MR. PERRONE: Do you feel that you are able to determine when somebody is telling the truth?

JUROR 11: (Witness nods.)

MR. PERRONE: How long have you been a

substance abuse?

JUROR 11: Counselor.

MR. PERRONE: Counselor.

JUROR 11: Thank you. I have been four years.

MR. PERRONE: A considerable amount of experience dealing with that segment of the community?

JUROR 11: Yes.

MR. PERRONE: Anything about nationality, ethnicity, that's going to cause you to be biased in this case?

JUROR 11: No, sir.

MR. PERRONE: What's your viewpoint on Trump's travel ban?

JUROR 11: Like I said, it doesn't really matter to me.

MR. PERRONE: No further questions.

THE COURT: Any challenge for cause for Juror number 11, Mr. Roth?

MR. ROTH: No, Your Honor.

THE COURT: Mr. Perrone?

MR. PERRONE: No, Your Honor.

THE COURT: Peremptory, Mr. Roth?

MR. ROTH: People would thank and excuse



Juror 11.

THE COURT: Juror number 11, you are excused. Thank you. Call the Hotline after 5.

THE CLERK: Juror number 11, Karen Marie Schaefer, S-C-H-A-E-F-E-R.

THE COURT: Your community, ma'am?

JUROR 11: Holt.

THE COURT: Married or single?

JUROR 11: Single.

THE COURT: Children under 18?

JUROR 11: No.

THE COURT: Employed?

JUROR 11: I'm a retired teacher.

THE COURT: And your level of education?

JUROR 11: Master's degree.

THE COURT: You heard all my questions today?

JUROR 11: Yes.

THE COURT: Any information for me?

JUROR 11: I'm trying to think of all of them. The only thing I do have, what I would call more acquaintances that are in different law enforcement capacity. Former colleagues' husbands, Michigan State Police.

THE COURT: Do you feel anything about



those relationships would render you unable to be fair and impartial?

JUROR 11: No. I don't believe so.

THE COURT: Any prior jury service?

JUROR 11: No.

THE COURT: You heard my comments about burden of proof?

JUROR 11: Yes.

THE COURT: Being able to sit in judgment?

JUROR 11: Um-hum.

THE COURT: The defense has a right to remain silent, fair and impartial?

JUROR 11: That's correct. Yes.

THE COURT: No bias due to race, sex or national origin?

JUROR 11: No. I don't believe that.

THE COURT: Mr. Roth?

MR. ROTH: Thank you, Your Honor. All right. Strong feelings about law enforcement one way or the other?

JUROR 11: No, I wouldn't say so.

MR. ROTH: Do you know witnesses or the attorneys?

JUROR 11: No.

MR. ROTH: Have you heard or read anything



about this case in the media?

JUROR 11: I believe I have read something in the State Journal. But nothing that I could say specifically I recall.

MR. ROTH: All right. So nothing that you read has given you any decisions about the facts of the case are?

JUROR 11: No.

MR. ROTH: Whatever they are, you can put them aside?

JUROR 11: Yes.

MR. ROTH: Strong feelings about domestic violence?

JUROR 11: Only as a teacher, having seen children that are dealing with that.

MR. ROTH: Very good. So nothing that would give you any bias one way or the other?

JUROR 11: Probably not.

MR. ROTH: Witnesses who are jail inmates, you could evaluate their credibility like anybody else?

JUROR 11: I believe so.

MR. ROTH: Nothing else, Your Honor.

THE COURT: Mr. Perrone?

MR. PERRONE: Yes, Your Honor.

You said you read something in the paper as to this, but you can't recall?
JUROR 11: Right.
MR. PERRONE: You believe you would be able to go forward without your ability to obtain a fair and impartial outlook?
JUROR 11: I believe I could. I don't remember exactly what all I read.
MR. PERRONE: Domestic violence. You had somebody close to you affected by domestic violence?
JUROR 11: I had a sister-in-law. I don't know if that affects my opinion one way or another. A former marriage of hers before she knew my brother, and students that may be in situations.
MR. PERRONE: You can remain fair and impartial in light of having to deal with that in the past?
JUROR 11: I think I could. I believe I could. Yes.
MR. PERRONE: Do you think that that would -- you say you think, I believe. Maybe it's not anything definitive?
JUROR 11: For me it's just the thought of



when I dealt with the children in that situation, their parents.
MR. PERRONE: That's something you wouldn't be able to put aside?
JUROR 11: Tough having dealt with that.
MR. PERRONE: That would be something you may not be able to put aside in making determinations if it turns out there were children involved?
JUROR 11: That could be a little bit more challenging for me.
MR. PERRONE: If there weren't children involved, would that be like some form of a stigma?
JUROR 11: If there were not?
MR. PERRONE: If there were not children involved.
JUROR 11: Probably not as much for me.
MR. PERRONE: When is the last time that you took a trip internationally?
JUROR 11: 2001.
MR. PERRONE: Would you use Mr. Uraz's national origin against him, or would you be able to maintain a fair and impartial outlook regardless of their national origin?



JUROR 11: I think I could be fair about that. My parents are both immigrants as well.
MR. ROTH: What do you think about Trump's ban?
JUROR 11: I think in a way it's a reflection of the times, what people are feeling about the areas he has banned. I don't personally believe in it, again, because my parents are immigrants. I feel like people should be able to come to our country.
MR. PERRONE: How do you feel about the current social climate in America as it relates to race?
JUROR 11: It's pretty tense right now. I somewhat like that the police -- that people just follow what the policeman asks them to do. There aren't always issues, maybe, but sometimes we hear the side that the police officers have been wrong. I think it's a two-sided coin. And --
MR. PERRONE: But in your viewpoint, you would believe you said that the police officers, people will just do what they said. Obviously there are exceptions to rules?
JUROR 11: Correct.
MR. PERRONE: Do you think it's more often



than not that the police are doing what they're supposed to do and that the other people are doing what they're not supposed to do?
JUROR 11: I probably personally leaned that way. I'm kind of a rule-bound person, if you just follow the rules.
MR. ROTH: Do you realistically think, based on that, you're going to be able to maintain a fair and impartial perspective throughout the proceedings?
JUROR 11: If the person I believe is assumed to be innocent, I will go into the situation feeling that until I hear the facts.
MR. PERRONE: Anybody you know, somebody came to you, told you they had done something wrong, you would initially be skeptical, wouldn't believe them? Anything personal to you that you know?
JUROR 11: Sure. I would say a lot family members. Probably former colleagues. If someone had knew they had done something wrong, I would be shocked.
MR. PERRONE: If I understand your belief that criminals are generally, do anything wrong, you think that's going to create a problem with

maintaining impartiality?

MR. ROTH: Your Honor, I think he already asked this. She said no.

MR. PERRONE: She said she believes so. Just trying to get something --

THE COURT: Well, we are out of time for today. All right?

MR. PERRONE: I would make a challenge for cause, and ask that Juror 11 --

THE COURT: I deny that. She says she felt she could be fair and impartial. You asked her that several different ways. She always said she could be fair and impartial.

That's it for today. I know you didn't have lunch or anything. We are going to have to come back on Thursday morning. Okay? And we are going to have you report downstairs by 8:30. I think you might be the only ones down there. So for the people who are in the gallery, you do not have to call the Hotline, just have to report back at 8:30. I already talked with the jury clerk concerning that, for the folks who are in the boxes currently, we also are having you report at 8:30. Everybody who will be downstairs will come back up.



Yes, juror number 3?

JUROR 3: Now, we don't have to call for today for tomorrow?

THE COURT: Right. The people who are here now do not have to call again.

JUROR 3: So we don't have to be here tomorrow?

THE COURT: You don't have to be here tomorrow. We are off tomorrow.

So I guess I'll ask, is it your intention to use preemptory on Juror 13 so she doesn't have to come back? Is that what you were going to do?

MR. PERRONE: I don't want to yet. I was not going to use that preemptory at this time.

THE COURT: Okay. You have to come back. Yes, sir.

JUROR 14: Once the trial gets going, what days?

THE COURT: All right. I will repeat. For the trials will be Thursday and Friday, 8:30 to lunch. Break for lunch. You are free to go to lunch no later than 3:30. That's Thursday and Friday. Next Monday will be the same, eight to noon. Break for lunch until 3:30. Next Tuesday will be 8:30 to 1:30. No lunch. But two breaks.



And then we should be in the vicinity of closing in those days, Thursday and Friday, the only day that you might go past 3:30 if there are jury deliberations.

JUROR 1: Your Honor, I'm a teacher. Since I haven't been dismissed --

THE COURT: You're still in the box?

JUROR 1: Like I am in?

THE COURT: You're still in, yes.

JUROR 1: Okay.

THE COURT: Yes.

MR. PERRONE: I was going to use my peremptory on her.

THE COURT: On Juror number 1?

MR. PERRONE: Yes.

THE COURT: All right. I guess you got -- he used his preemptory on you, so you're excused. You don't need to come back on Thursday.

All right. Any questions from anybody in the panel or here? Yes, ma'am?

JUROR 11: I have a bad back. I have had back surgery. I have a herniated disk. I've had a part time with the Court. If I listen to the history, I don't think that will --

THE COURT: We would allow you to stand or



get up or walk around. We will allow you, if you need additional breaks, we will give you those breaks if you're selected. We can accommodate that.

JUROR 11: So I have to come?

THE COURT: You have to come.

JUROR 11: Thank you.

THE COURT: Thursday at 8:30.

All right. On behalf of the citizens of Ingham County, we will see you Thursday. Thank you very much.

(Proceedings concluded at 2:13 p.m.)

STATE OF MICHIGAN )
COUNTY OF INGHAM )

I, TERESA J. ABRAHAM, Certified Shorthand Reporter in and for the County of Ingham, State of Michigan, Thirtieth Judicial Circuit Court, do hereby certify that the facts stated in the foregoing pages are true and correct, and comprise a complete, true and correct transcript of the proceedings taken in this matter on this the 31st day of October, 2017.

Teresa J. Abraham, CSR-3445

Date: May 5, 2018