STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

                    Plaintiff,

vs.                           CASE NO:   16-1064-FH
                                         16-1065-FH

TUNC URAZ,

                    Defendant.
_____/

    HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
    LANSING, MICHIGAN -- THURSDAY, NOVEMBER 2, 2017

               CRIMINAL JURY TRIAL

APPEARANCES:

FOR THE PEOPLE:

WILLIAM O. CRINO, JD
CHAZ T. KOOP, JD
Assistant Prosecuting Attorney
Prosecuting Attorney's Office
513 W. Kalamazoo
Grady Porter Building
Lansing, Michigan 48933


FOR THE DEFENDANT:

JACOB PERRONE, JD
Perrone Law, PC
221 W. Lake Lansing Road, Ste. 200
East Lansing, MI 48823

ERIC SCHROEDER, JD
BODWIN & ASSOCIATES PC
2970 E. Lake Lansing Rd.
East Lansing, MI 48823-7415


Reported by:  Teresa J. Abraham, CSR-3445
Phone:  (517) 483-6404   e-Mail: tjabraham@msn.com

2

# I N D E X

Closing Argument by Mr. Koop                      105
Closing Argument by Mr. Perrone                   114

WITNESSES:
DANIEL RING
      Direct Examination by Mr. Roth              128
      Voir Dire Examination by Mr. Perrone        134
      Cont'd. Direct Exam. by Mr. Roth            135
      Cross-Examination by Mr. Perrone            138
      Redirect Examination by Mr. Roth            143
CARMEN ELIAS
      Direct Examination by Mr. Koop              144
      Cross-Examination by Mr. Perrone            150
      Cross-Examination by Mr. Koop               158
NOELL VANSLEMBROUCK
      Direct Examination by Mr. Roth              159
      Cross-Examination by Mr. Perrone            169
STAN WHITE
      Direct Examination by Mr. Roth              174
      Voir Dire Examination by Mr. Perrone        181
      Cont'd. Direct Exam. by Mr. Roth            183
      Voir Dire Examination by Mr. Perrone        192
      Cont'd. Direct Exam. by Mr. Roth            193
      Cross-Examination by Mr. Perrone            195
      Redirect Examination by Mr. Roth            204
      Recross-Examination by Mr. Perrone          205

| Exhibit # | Description | Received |
|---|---|---|
| PX-#1 | photo/Best Buy | 135 |
| PX-#2 | photo/Best Buy | 135 |
| PX-#3 | photo/Best Buy | 135 |
| PX-#4 | text conversation | 182 |
| PX-#5 | photo/vehicle | 193 |
| PX-#6 | photo/vehicle | 193 |



STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff,

vs.                    CASE NO: 16-1064-FH
                       16-1065-FH

TUNC URAZ,

Defendant.

HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
LANSING, MICHIGAN -- THURSDAY, NOVEMBER 2, 2017

CRIMINAL JURY TRIAL

APPEARANCES:

FOR THE PEOPLE:

WILLIAM O. CRINO, JD
CHAZ T. KOOP, JD
Assistant Prosecuting Attorney
Prosecuting Attorney's Office
313 W. Kalamazoo,
Grady Porter Building
Lansing, Michigan 48933

FOR THE DEFENDANT:

JACOB PERRONE, JD
Perrone Law, PC
251 W. Lake Lansing Road, Ste. 200
East Lansing, MI 48823

ERIC SCHROEDER, JD
BODWIN & ASSOCIATES PC
1970 E. Lake Lansing Rd.
East Lansing, MI 48823-7415

Reported by: Teresa J. Abraham, CSR-3445
Phone: (517) 483-6404  e-Mail: tjabraham@msn.com

I N D E X

Closing Argument by Mr. Koop      105
Closing Argument by Mr. Perrone   114

WITNESSES:
DANIEL KING
    Direct Examination by Mr. Roth       128
    Voir Dire Examination by Mr. Perrone 134
    Cont'd. Direct Exam. by Mr. Roth
    Cross-Examination by Mr. Perrone
    Redirect Examination by Mr. Roth     143
CARMEN ELIAS
    Direct Examination by Mr. Koop       144
    Cross-Examination by Mr. Perrone
    Cross-Examination by Mr. Koop        158
NOELL VANSLEMBROUCK
    Direct Examination by Mr. Roth       159
    Cross-Examination by Mr. Perrone     169
STAN WHITE
    Direct Examination by Mr. Roth       174
    Voir Dire Examination by Mr. Perrone 181
    Cont'd. Direct Exam. by Mr. Roth     184
    Voir Dire Examination by Mr. Perrone 192
    Cont'd. Direct Exam. by Mr. Roth
    Cross-Examination by Mr. Perrone     194
    Redirect Examination by Mr. Roth     203
    Recross-Examination by Mr. Perrone   205

Exhibit #   Description       Received
PX-1        photo/Best Buy
PX-2        photo/Best Buy
PX-3        text conversation
PX-4        photo/vehicle
PX-5        photo/vehicle

Lansing, Michigan
November 2, 2017
at about 8:39 a.m.
**********

THE COURT: Back on the record in People v Uraz, docket number 16-1064-FH. Mr. Roth is here. Mr. Perrone is here. You are Tunc Uraz, sir?

THE DEFENDANT: Yes, sir.

THE COURT: It's my understanding that there was some contact with jurors who did not follow instructions. They were supposed to report downstairs, but some persons earlier this morning reported upstairs and had some incidental contact with Mr. Roth. Mr. Roth?

MR. ROTH: Thank you, Your Honor. There was, I would estimate, five, six or so jurors just outside of the courtroom on the third floor this morning as Mr. Koop and myself were entering the courtroom. They asked me what my name was. They asked me what Mr. Perrone's name was. I simply responded that a Court Clerk would come talk to them. That was the extent of the contact. I spoke with Mr. Perrone about it. It doesn't sound like anybody has a real issue about it. I would just ask the Court to remind the jurors that when

they see us in the courthouse they are not to speak to us and we cannot respond to them.

THE COURT: Yes. Ms. Roper went out immediately and sent those to people who, I guess, were confused about where they were to report. everybody else was downstairs, they were directed.

The second issue that we have is I have reviewed the other proffer of Reginald Close which consisted of the actual proffered letter dated August -- the notes of the actual proffer itself that took place on August 24th. And during the course of that, Mr. Close had some notes that apparently were written on tissue paper of some type that had been passed back and forth between he and Mr. Pierce. So the issue then were these relevant.

So, first, talking in terms of the proffer, it does appear that Mr. Pierce was also in custody at the time Mr. Close made his proffer, which would be similar to the situation with Mr. Uraz. So I think the fact that that proffer offered by Reginald Close against another resident of the jail wouldn't be relevant.

So I looked at the actual content of the proffer, the actual the content with the

suspected homicide that had taken place outside of the jail, if I recall correctly.

MR. ROTH: Well, let me be a little clearer on that issue. So there are, as I understand it, and I came in contact with this Tuesday for the first time, Mr. Close proffers on a homicide that is completely unrelated to Mr. Pierce. I don't know the timing of it, but he also, during that proffer interview, separately says: I also have some information about Mr. Pierce, and he hands over the toilet paper that has the note. So the homicide and Mr. Pierce are separate issues.

THE COURT: Right. But I guess, for our purposes, the proffer is there. One had to do with something outside of the jail. The other one had to do with another resident in the jail, which is the same situation we have with Mr. Uraz.

MR. ROTH: Correct.

THE COURT: So that makes that relevant. Okay.

I guess -- and I wasn't able to decipher. It was with great difficulty in reviewing the tissue paper notes. There was no way for me to tell if it was with Mr. Close or from Mr. Pierce, or vice-versa. But there were several of these

notes that referenced that one of the inmates admitted to being an excellent liar, and that they bragged about being able to pass a polygraph test. But I couldn't tell who it was, if it was Close telling that to Pierce or Pierce telling that to Close. But I think that would be relevant if someone is acknowledging that they are an excellent liar. But I don't know how we are going to work that out. I can't tell who wrote it. But we know that either way Mr. Close is involved, either way. Any suggestions?

MR. ROTH: So, as I understand, the Court is not -- the Court is not finding the proffer about the thing that happened outside the jail relevant for our purposes?

THE COURT: Well, it's only relevant that there was a proffer, but not as to its contents. Correct.

MR. ROTH: Correct. And so, you know, pursuant to that ruling, frankly, I think I already, incidentally, without realizing it, turned over those notes to Mr. Perrone late last week not knowing what they were. And so if the Court wants to hand over the notes between Mr. Pierce and Mr. Close, I have no objection to that.

And, as I understand the fact that there was a proffer about an unrelated homicide outside of the jail is relevant, but the actual content of the proffer about the homicide is not and shall not be disclosed. I think that's fine.

THE COURT: There's two proffers. One, on an unrelated matter. But, more importantly, one engaged another resident of the Ingham County Jail.

Yes, Mr. Perrone?

MR. PERRONE: Yes. In regards to the proffer information, I'm making it perfectly clear that we're just articulating that there was a proffer as to another case outside of the jail. And as to that issue here, I think it makes that information relevant as to the issue that happened outside. And it appears that there's a foundational aspect of it to show, as far as the homicide that occurred outside of the jail, depending upon the nature of the proffer, that --

THE COURT: I would say that it's not related to the situation back in 2011.

MR. PERRONE: All right.

THE COURT: So it's not anything that's in close proximity.

The things that we have are this is in close proximity to Mr. Uraz' contact some time in October. This was in August.

So we can say that Mr. Close made two proffers. One, we can use the date I guess in August, but leave out the contents.

The other would be with Mr. Pierce who was in the jail at the time of the exchanging of notes going on, either, I guess, proffering or I guess in the light most favorable to the Defense, trying to solicit an ommission on Mr. Pierce. That would be the inference in the light most favorable to the Defense that that is what Close was doing, which was the allegation that that's what Mr. Close was doing. Okay? So in regards to the proffer, those portions, I would.

The notes, however, I think, all I could say is there was discussion among the people, between Close and Pierce, that one of them felt that they were an excellent liar, and that they felt they could pass a polygraph test. So I would say that's relevant whether, even though we can't identify right now who wrote that, it's still relevant in this matter that someone would profess as a good liar. So I think that would be

admissible, too.

So, I don't

say Mr. Perrone

already?

MR. ROTH

that's —

THE COURT

might have to, at s

original. But I cou

at what time. But

MR. ROTH

me —

THE COURT

MR. ROTH:

copy, but —

THE COURT

one we asked you to

MR. ROTH:

Mr. Perrone on the

already have it, I'll g

THE COURT

of the proffered lette

MR. ROTH:

of that as well

can determ

going to be rele

of the discussion

MR. ROTH: A

Honor.

THE COURT:

have?

MR. ROTH: No t

THE COURT: A

(Off the record discu

(Recess taken from 9:30

THE COURT: Re

People v Uraz. All the pa

The jury roll has been tak

has not returned from Tu

THE COURT: All

comes back in, we'll have t

stricken at the end the sess

that. We have to fill 7. Ok

(Jury present in courtroo

THE COURT: Be s

coming back today. We ha

take care of this morning th

delay. We are going to resu

at this time. I would ask the

admissible, too.

So, I don't know, I guess we can -- you say Mr. Perrone has a copy of those tissue notes already?

MR. ROTH: I can retrieve the copy that's --

THE COURT: They aren't very good. So you might have to, at some time, go look at the original. But I couldn't tell who was sending it at what time. But I could decipher some things.

MR. ROTH: If the Court could return to me --

THE COURT: The good copy?

MR. ROTH: I'm not sure if there's a good copy, but --

THE COURT: Well, I'm going to return the one we asked you to bring down yesterday.

MR. ROTH: Thank you. And I will talk to Mr. Perrone on the break. And if he doesn't already have it, I'll give him a copy.

THE COURT: And then Mr. Perrone has a copy of the proffered letter?

MR. ROTH: No, Your Honor. I can make him a copy of that as well.

THE COURT: He should be entitled to a copy

of the proffered letter, and the date of that.

MR. ROTH: As well as Detective Lewandowsky's supplemental report, which I think addresses the toilet paper.

THE COURT: Yeah. I would just think this one sheet.

MR. ROTH: Yes.

THE COURT: Right. Okay.

MR. ROTH: I'll take care of all of that on the break.

THE COURT: All right. All right. So we're providing you with the proffered letter, the supplemental report indicating when the proffer took place, and how he came in possession of the tissue notes, and how they were passed back and forth in the jail, being relevant because Mr. Close was attempting to proffer, and/or, as I stated, in the light most favorable to the Defense, solicit some type of admission from Mr. Pierce, the allegations that Mr. Uraz is making in his defense would be relevant. And the fact that either one of these gentlemen, one of them says that they're an accomplished liar, and still they could pass the polygraph test, will be relevant. But you'll have to go through there and find that.

Maybe you can determine which one it says. But it's still going to be relevant that that was the nature of the discussions.

MR. ROTH: All right. Thank you, Your Honor.

THE COURT: All right. Anything else you have?

MR. ROTH: Not at this time, Your Honor.

THE COURT: All right.

(Off the record discussion at 9:25 a.m.)

(Recess taken from 9:30 a.m. to 9:41 a.m.)

THE COURT: Resuming on the record in People v Uraz. All the parties are still present. The jury roll has been taken. And Juror number 7 has not returned from Tuesday.

THE COURT: All right. So when the jury comes back in, we'll have to fill -- one was stricken at the end the session. We didn't fill that. We have to fill 7. Okay. Are we ready?

(Jury present in courtroom at 9:43 a.m.)

THE COURT: Be seated. Thank you for coming back today. We had some other matters to take care of this morning that counted for the delay. We are going to resume for jury selection at this time. I would ask the Clerk to call for

seat 1, seat 7.

THE CLERK: Juror number 1, Larry Ronald Nishon. N-I-S-H-O-N. Juror number 7, Timothy Arden Moore. M-O-O-R-E.

THE COURT: Since we have been gone for a couple days, let me start with Juror number 1. Your community, sir?

JUROR 1: Okemos.

THE COURT: Married or single?

JUROR 1: Married.

THE COURT: Children under 18?

JUROR 1: None.

THE COURT: Your employment?

JUROR 1: Retired?

THE COURT: From?

JUROR 1: A podiatrist. I'm a semi-retired physician, and retired from Champion Information Technology at Sparrow.

THE COURT: And spouse's employment?

JUROR 1: Teacher's aid.

THE COURT: And your level of education?

JUROR 1: Doctorate.

THE COURT: And Juror number 7, your community, sir?

JUROR 7: Waverly.

**13**

THE COURT: Married or single?

JUROR 7: Married.

THE COURT: Children under 18?

JUROR 7: None.

THE COURT: Your employment?

JUROR 7: Sales.

THE COURT: Spouse's employment?

JUROR 7: Retired from education.

THE COURT: And your level of education?

JUROR 7: Bachelor's.

THE COURT: So we will resume with the questions. I'll just go through them with you all at one time. And remember everybody still has a chance to come up here.

All right. So either one of 1 or 7 have any personal concerns with the timeframe we provided so far? Length of trial? Prior jury service for either one of you? Ever been a party to a case or a witness in a case, previously?

JUROR 1: Yes.

JUROR 7: Yes.

THE COURT: Both? And Juror number 1, in the course of your profession or something else?

JUROR 1: In the course of my profession as a Defendant. Also been a Plaintiff. Also been an

**14**

expert witness.

THE COURT: Juror number 7?

JUROR 7: My house was broken into.

THE COURT: So you testified you were a witness concerning that incident? Anything about that you feel would make you unable to be fair and impartial in this case?

JUROR 7: No.

THE COURT: What about friends or family in law enforcement or criminal defense? Either one of you had those?

JUROR 7: No.

THE COURT: Any bias due to race?

MR. ROTH: Your Honor, I think Juror 7 may have raised his hand.

THE COURT: Yes.

JUROR 7: I have -- one of my best friends is an FBI agent. I know the retiring chief of police from Lansing Township. I also know many generals who are military police in Afghanistan, things like that.

THE COURT: Do you have a military police background yourself?

JUROR 7: No.

THE COURT: Or background in law

**15**

enforcement?

JUROR 7: No. They are just friends.

THE COURT: Do you think your relationship with them would color your opinion for testimony in this case for law enforcement officials, or could you weigh the evidence and make up your own mind as to credibility?

JUROR 7: I would try. Yes.

THE COURT: You think you could do so?

JUROR 7: I would try, yes.

THE COURT: That's the best we could always do.

Returning to bias due to race, gender or other reasons. Anybody have any biases? Jurors have to make a decision, that's the bottom line. Anyone have any difficulty doing that? You heard about the burden of proof last week? Familiar with that burden of proof? Fair and impartial? The Defendant has the right to remain silent. Any difficulty with that concept?

Mr. Roth?

MR. ROTH: Thank you, Your Honor.

Good morning. I want to follow-up a little bit with you, Juror 1 first. Your position with Sparrow Hospital now. Could you

**16**

tell me a little bit about what day-to-day that means?

JUROR 1: I am a contract person. It's IT with regard to electronic records. I don't know. I am what they call a physician's champion. I'm kind of the bridge between the IT people and the docs. I'm the one who trains all the ITs. I've been involved since I have been a retired podiatrist. I also have a background in engineering. I kind of bridge that gap when they have new projects taking on a hospital or whatever. It's on an individual basis.

MR. ROTH: Juror 7, you indicated that your house was broken into before?

JUROR 7: Yes.

MR. ROTH: They caught the person who did it?

JUROR 7: Yes.

MR. ROTH: And they were prosecuted? First of all, how long ago?

JUROR 7: Yes. Sixteen, 17 years ago.

MR. ROTH: Was that handled by the Ingham County Prosecutor's office?

JUROR 7: Yes.

MR. ROTH: Anything about that experience

17

that gives you bias for or against police, the Prosecutor's office, Defendants, nothing? Very good.

JUROR 7: Sir, can I — can I ask the Judge a question before we go further?

THE COURT: Yes, sir?

JUROR 8: I am requesting to be dismissed. My wife got a cancer diagnosis yesterday. The doctor is requesting someone to be with her tomorrow to go over the treatment options.

MR. ROTH: Without objection.

MR. PERRONE: No objection.

THE COURT: We will excuse you for cause with that. Good luck with that. Okay? Thank you for that information.

THE CLERK: Juror number 13, Joel Martinez, M-A-R-T-I-N-E-Z.

THE COURT: Your community, Juror 13?

JUROR 13: Bunkerhill Township.

THE COURT: Married or single?

JUROR 13: Married.

THE COURT: Children under 18?

JUROR 13: One. Nine.

THE COURT: Your employment?

JUROR 13: City of East Lansing.

18

THE COURT: Spouse's employment?

JUROR 13: They were medical records, billing.

THE COURT: Your level of education?

JUROR 13: Some college.

THE COURT: You have heard all the questions we have asked for the last few days. Any information you have for us?

JUROR 13: I have served on a jury before.

THE COURT: Criminal or civil?

JUROR 13: Criminal.

THE COURT: Was the jury able to reach a verdict?

JUROR 13: Yes.

THE COURT: Do you have any difficulty with the concept of burden of proof or the Defendant has the absolute right to remain silent?

JUROR 13: No.

THE COURT: Mr. Roth?

MR. ROTH: Thank you, Your Honor. All right. Just to keep up, jury duty, how long ago was that?

JUROR 13: It was last summer.

MR. ROTH: It's bad luck. Do you remember what the charge was?

19

JUROR 13: Yes. It is a CSC charge.

MR. ROTH: Do you remember what Court it was in, either this court or Mason?

JUROR 13: It was this court. This judge, actually.

MR. ROTH: It's not the Prosecutor, you don't think?

JUROR 13: No, you were not.

MR. ROTH: Anything about that experience that would make you uncomfortable being a juror?

JUROR 13: No.

MR. ROTH: So for Jurors 1, 13 and 7, I want to talk a little about the topics we covered more expansively on Tuesday. Anything you want to bring to our attention based on those questions, Juror 7? Something else?

JUROR 7: I'm not sure I can do a good job on this jury. My wife's best friend was murdered by her husband, stabbing her over 20 times.

MR. ROTH: Oh. So let me — I appreciate the honesty about that. You know, domestic violence is not an issue where there's two sides of it. Nobody is for domestic violence. The question is not are you against domestic violence. The question is, is it going to affect you in such

20

a way that you won't be fair and impartial? Is that what you're telling us?

JUROR 7: Yes.

MR. ROTH: I appreciate the honesty, sir. So as to Jurors 1 and 13, then, anything else you want to bring to our attention based on the questions from Tuesday? No? Very good.

Any either of you have strong feelings about police officers one way or the other? Either of you know the witnesses listed?

Based on what we talked about, do either of you believe that you have read or heard anything about this case in the media? No? Very good.

Further, to the point we are discussing feelings about domestic violence, you believe it would affect your ability to be fair and impartial?

And, finally, witnesses who are inmates, does that pose an issue for either of you, Juror 1 or Juror 13? No? You could listen to the testimony and evaluate like any of the other witnesses? Yes?

I have nothing else, Your Honor. Thank you.

21

THE COURT: Mr. Perrone?

MR. PERRONE: Let's start with Juror number 7. You don't think that you could put aside the personal issues that you've had?

JUROR 7: No.

MR. PERRONE: You think that you would be partial to the State's case?

JUROR 7: Yes. She was in our wedding, and it's very close to our family.

MR. PERRONE: Okay. You would not be able to maintain an open mind?

JUROR 7: I'm not sure I could.

MR. PERRONE: As to Juror 1, do you have a vehicle that has a light in it that shows you how close you are to -- does it tell you -- do you have a vehicle that tells you how many miles that you have until you run out of gas?

JUROR 1: Yes.

MR. PERRONE: When you get to about 20, 30 miles, it blinks and tells you that you're close to E?

JUROR 1: Yes.

MR. PERRONE: Do you fill up when the light first comes on or do you test it and wait?

JUROR 1: When it first comes on.

22

MR. PERRONE: Why?

JUROR 1: I don't want to run out of gas.

MR. PERRONE: Is there anything that would cause you to believe that you may run out of gas?

JUROR 1: Just my light.

MR. PERRONE: Do you think that the computer -- do you think you have actually 27 miles?

JUROR 1: No.

MR. PERRONE: That would be due to potentially computer error or some other reason?

JUROR 1: I think that they're set so that the light goes off way before what it's saying on the screen.

MR. PERRONE: So you think that you actually have more gas?

JUROR 1: Absolutely.

MR. PERRONE: But you still fill up?

JUROR 1: I still fill up.

MR. PERRONE: You're married. How long have you been married for?

JUROR 1: Thirty-five years.

MR. PERRONE: Has it all been bliss?

JUROR 1: Yeah. Actually it has.

MR. PERRONE: Congratulations.

23

JUROR 1: She's a very good woman.

MR. PERRONE: And she is a teacher's aid?

JUROR 1: Yes.

MR. PERRONE: You seem very involved in helping people?

JUROR 1: Yes.

MR. PERRONE: You volunteer to something you hold close?

JUROR 1: Yes.

MR. PERRONE: I'll stop picking on you.

JUROR 1: There was a joke kind of the other day. If anyone was a Wolverine.

MR. PERRONE: For cause. Have you had any type of family, friends that were involved in domestic violence?

JUROR 1: No.

MR. PERRONE: Juror number 13, you're married?

JUROR 13: Yes.

MR. PERRONE: Everything been the same as Juror 1? More or less --

JUROR 1: For the most part, yes. There has been difficulties, but it's been good.

MR. PERRONE: Spartan or Wolverine?

JUROR 13: Spartan.

24

MR. PERRONE: Your affiliation with the City of East Lansing, is that something that's going to cause you to give more of a preference to the State?

JUROR 13: No. I actually work for a separate department. It's East Lansing and Meridian Township. We are the drinking water plant. So kind of left on our own. I don't really have an affiliation with the City of East Lansing, other than I'm their employee and they sign my paycheck.

MR. PERRONE: You heard the other day when I was talking about potentially somebody in your life that you held close. Do you know anybody where if somebody were to tell you that they had done something wrong, that you would be very skeptical initially, and require --

JUROR 13: Yes.

MR. PERRONE: Who would that person for you be?

JUROR 13: Probably my wife.

MR. PERRONE: Is that a mentality that you can maintain throughout this trial until you feel that the Prosecutor has substantiated his burden and listen to all of the evidence, and keep an

25

open mind until you have an opportunity to hear all of the evidence?

JUROR 13: Yes.

MR. PERRONE: You have to keep an open mind until you hear --

JUROR 13: I think it would just have the initial doubt if someone said they did something wrong, because -- you wouldn't believe them because you did something at that point, but --

MR. PERRONE: You didn't have any affiliations, see anything in the media associated with this?

JUROR 13: No.

MR. PERRONE: If I could just circle back to 10 momentarily. You said that you knew --

THE COURT: Circle back to who?

MR. PERRONE: Number 10.

THE COURT: No. Only the new persons.

MR. PERRONE: No further questions.

THE COURT: All right. Challenge for cause by stipulation?

MR. ROTH: I assume we are going to stipulate to excuse Juror 7? May I inquire of Juror 13 for one second? I asked if I was the Prosecutor on the case. I think it's just as

26

pertinent to ask if Mr. Koop was.

JUROR 13: No, he was not.

THE COURT: Any objection to excusing Juror number 7, Mr. Perrone?

MR. PERRONE: No.

THE COURT: You are excused. Any peremptory at this time, Mr. Roth?

MR. ROTH: People thank and excuse Juror 4.

THE COURT: Mr. Perrone, any peremptory that you have at this time?

THE CLERK: Juror number 4, Carolyn Snow Combs. C-O-M-B-S. Juror number 7, Patricia Eileen Wysong. W-Y-S-O-N-G. Juror number 10, Ricky Lee Smith. S-M-I-T-H.

THE COURT: Juror number 4, your community?

JUROR 4: Okemos.

THE COURT: Married or single?

JUROR 4: Married.

THE COURT: Children under 18?

JUROR 4: One. Fourteen.

THE COURT: Your employment?

JUROR 4: Homemaker and freelance children's writer.

THE COURT: Okay. And spouse's employment?

JUROR 4: At MSU. He's a professor.

27

THE COURT: Which department?

JUROR 4: Chemical engineering.

THE COURT: Your level of education?

JUROR 4: Master's.

THE COURT: Juror number 7, your community, ma'am?

JUROR 7: Holt.

THE COURT: Married or single?

JUROR 7: Single.

THE COURT: Children under 18?

JUROR 7: No.

THE COURT: Employment?

JUROR 7: Retired from financial director of Clinton County Road Commission.

THE COURT: Your level of education?

JUROR 7: Master's.

THE COURT: Juror number 10, your community, sir?

JUROR 10: Lansing, Michigan.

THE COURT: Married or single?

JUROR 10: Single.

THE COURT: Any children under 18?

JUROR 10: No.

THE COURT: Your employment?

JUROR 10: Retired.

28

THE COURT: From?

JUROR 10: State of Michigan.

THE COURT: Which department?

JUROR 10: Department of Management and Budget.

THE COURT: Your level of Education?

JUROR 10: Tenth grade.

THE COURT: So for the new persons, 4, 7 and 10, you heard the questions we have been asking over the last couple of days. Anyone have any responses off the top of your heads for us in those questions? Juror number 7?

JUROR 7: I have been a victim of abuse.

THE COURT: You feel that would affect your ability to be fair and impartial in this case?

JUROR 7: Possibly, if it is in the same vein.

THE COURT: In the same vein? I wouldn't ask what vein it was. But anybody else? Friends in law enforcement for the new persons? Prior jury service?

You heard the comments about burden of proof for the Prosecution? I told you guys you'll get tired of hearing about that. Burden of proof for the Prosecution? That's the

Prosecution's responsibility. The Defendant has an absolute right to remain silent. Anybody have any difficulty with those issues, Mr. Roth?

MR. ROTH: Thank you, Your Honor. Juror 1 let me follow up on that issue. First, I appreciate you bringing it to our attention. If I understand what you're saying, if the type of physical assault was comparable or similar to some way to what you went through that would pose a problem for you?

JUROR 1: Yes.

MR. ROTH: If I tell you that while you're going to hear about domestic discord, and issues of domestic violence, broadly, you will not hear about a physical assault. Will that sort of ease your mind to be – and your ability to be fair and impartial?

JUROR 1: If it made me feel that that person was in fear for their lives, like I was, I would feel sympathy for that person.

MR. ROTH: All right. So I think everyone in that circumstance is going to feel sympathy. I think that's the human answer. I don't think you're surrounded by 13 people who wouldn't feel sympathy. The question is, are you going to feel

unfair sympathy, I guess, is what I need to find out.

JUROR 1: I'm not sure.

MR. ROTH: I appreciate the honesty on that one. Thank you.

So for our new jurors, are there any other issues that you would like to bring to our attention? For our new jurors, do any of you have strong feelings about law enforcement, one way or the other? Do any of you know any of the witnesses that were listed for either side? No?

Based on what we talked about, does anybody feel they heard about or read about this case in the media? No? Strong views about domestic violence that would make them unfair? No?

And any concerns about a witness who was in jail?

Does anyone feel they could be fair and equal in evaluating testimony like all other witnesses? Juror 10, are you concerned about that?

JUROR 10: Yes.

MR. ROTH: Tell me about that.

JUROR 10: I would tend to, I think, decide

with law enforcement rather than a prisoner, yes.

MR. ROTH: So if a prisoner got up there and testified, is it that you simply wouldn't listen to them, or is it that – or would you able to, at the Judge's direction, evaluate their credibility, consider the same thing, or you already have a presumption in your mind that they're not telling the truth?

JUROR 10: Maybe a slight presumption. I would give it a, you know, give them consideration and take in the evidence.

MR. ROTH: Very good. Thank you, Your Honor.

THE COURT: Mr. Perrone?

MR. PERRONE: Juror number 10, in regards to you providing more credibility to a police officer rather than a jail informant, would you provide more credibility to a lay person, a normal person than a jail informant?

JUROR 10: Yes.

MR. PERRONE: Now, as far as that bias or presumption, do you feel that you are willing to maintain an open mind for both sides on the case and make a decision based upon the evidence aside from that bias?

JUROR 10: Sure.

MR. PERRONE: And you're able to acknowledge that you do have that bias in making your final conclusion as it related to the evidence that is presented here?

JUROR 10: One more time.

MR. PERRONE: The conclusion, it's going to be your opinion?

JUROR 10: Yes.

MR. PERRONE: Your opinion is what you're going to stick with, as far as your opinion on the evidence, not your bias?

JUROR 10: Correct.

MR. PERRONE: As to all of the new jurors, you haven't heard anything in the media, haven't read anything in the paper, as it is specific to this case?

JUROR 10: Not that I recall, no.

MR. PERRONE: Any affiliation with Michigan State University. Any affiliation with food services?

JUROR 10: No.

MR. PERRONE: Retired in the State of Michigan?

JUROR 10: Um-hum.

33

MR. PERRONE:  Office of Management and Budget?

JUROR 10:  Um-hum.

MR. PERRONE:  Tenth grade education?

JUROR 10:  Um-hum.

MR. PERRONE:  Congratulations.

JUROR 10:  Absolutely.

MR. PERRONE:  Is there anything as to foreign individuals?  What is your viewpoint on Trump's travel ban?

JUROR 10:  I believe if, you know, if they have evidence that there's someone that's a danger to our society here, or to our country, they should not be allowed, but otherwise they should.

MR. PERRONE:  Very reasonable.  Juror number 7, can you honestly put aside those past experiences and maintain an open mind that we discussed as necessary to serve as a juror?

JUROR 7:  I want to know that I can.

MR. PERRONE:  Juror number 4, would you provide more credibility to the testimony of a lay person than the testimony of the jail informant?

JUROR 4:  I would listen carefully.  Just make sure it's consistent, and all the pieces fit together and weigh the evidence the same.

34

MR. PERRONE:  And you don't have any family members in law enforcement?

JUROR 4:  No, I do not.

MR. PERRONE:  Do you believe you could tell the difference between a truth and a lie?

JUROR 4:  I wouldn't say I'm 100 percent.  I would do my best.

MR. PERRONE:  Can you think of any mechanisms that you would use in deciding the difference between a truth and a lie?

JUROR 4:  Again, looking for consistency within a person, and across different people, that's the main thing.

MR. PERRONE:  So if there is something inconsistent from your perspective, if there is something inconsistent, then that would tend to disfavor?

JUROR 4:  Yes.  True.

MR. PERRONE:  No further questions.

THE COURT:  Challenges for cause, Mr. Roth?

MR. ROTH:  I believe Juror number 7, Your Honor.

THE COURT:  Mr. Perrone?

MR. PERRONE:  No objection.

THE COURT:  Do you agree with that?

35

MR. PERRONE:  Yes, Your Honor.

THE COURT:  Ma'am, thank you very much.  Are they supposed to call the Hotline today again?  You have to call the Hotline.  Thank you.

Any peremptories, Mr. Perrone?

MR. PERRONE:  Defense excuses Juror 11.

THE COURT:  Any others at this time, Mr. Perrone?

MR. PERRONE:  Not at this time, Your Honor.

THE COURT:  Mr. Roth?

MR. ROTH:  The People thank and excuse Juror number 10.

THE CLERK:  Juror number 7, Henry Joseph Legere, L-E-G-E-R-E.  Juror number 10, Carl Rudolph Herring, H-E-R-R-I-N-G.  Juror number 11, Jason Linn Gillespie, G-I-L-L-E-S-P-I-E.

THE COURT:  Juror number 7, your community?

JUROR 7:  Holt, Michigan, Your Honor.

THE COURT:  Married or single?

JUROR 7:  I'm married.  I have three children under the age of 18.  Fourteen and twins who are 11.

THE COURT:  Your employment?

JUROR 7:  I am a retired defense attorney.

THE COURT:  Your level of education?

36

JUROR 7:  I have a doctorate in preventative medicine.

THE COURT:  And spouse's employment?

JUROR 7:  She works for the State of Michigan.

THE COURT:  In which department?

JUROR 7:  She is in the Insurance Bureau.

THE COURT:  Juror number 10, your community, sir?

JUROR 10:  Lansing.

THE COURT:  Married or single?

JUROR 10:  Married.

THE COURT:  Children under 18?

JUROR 10:  No.

THE COURT:  Your employment?

JUROR 10:  Retired.

THE COURT:  From?

JUROR 10:  Department of Corrections.

THE COURT:  Spouse's employment?

JUROR 10:  Lansing School District.

THE COURT:  Your level of education?

JUROR 10:  Doctorate.

THE COURT:  Juror number 11, your community, sir?

JUROR 11:  Ingham.

37

THE COURT: Married or single?

JUROR 11: Married.

THE COURT: Children under 18?

JUROR 11: No.

THE COURT: Employment?

JUROR 11: Cook.

THE COURT: Spouse's employment?

JUROR 11: Auditor for Auto Owners.

THE COURT: Your level of education?

JUROR 11: Bachelor's.

THE COURT: Now, the three new persons, 7, 10 and 11, you heard our questions over the last few days. Any responses to those questions, 7, 10, 11? Prior jury service, anybody?

Juror number 10, was it criminal or civil, if you recall?

JUROR 10: Civil.

THE COURT: Was the jury able to reach a verdict?

JUROR 11: Yes.

THE COURT: Civil or criminal?

JUROR 11: Civil.

THE COURT: Was the jury able to reach a verdict?

JUROR 11: Yes.

38

THE COURT: What about friends, family in law enforcement, criminal defense, besides Juror number 7, anybody else?

You heard my comments about the burden of proof rests with the Prosecution. Any difficulty with that concept? The Defendant has an absolute right to remain silent. You have to make a decision as to the purpose of the jury. You have to be fair and impartial on all affairs and wait until the end of the presentation of the evidence before making any decisions. Okay with that?

Mr. Roth?

MR. ROTH: Thank you, Your Honor.

Good morning. Juror number 7. You and I know each other a bit. We had a number of cases together over the years?

JUROR 7: That is correct.

MR. ROTH: Nothing about that, that gives you bias one way or the other?

JUROR 7: No.

MR. ROTH: Juror number 10, I want to follow up on two issues. What is your doctorate in?

JUROR 10: Clinical psychology.

MR. ROTH: What did you do for the

39

Department of Corrections?

JUROR 10: Psychologist.

MR. ROTH: How long did you do that?

JUROR 10: Seventeen years.

MR. ROTH: Anything about that employment that gives you any bias or concerns one way or the other?

JUROR 10: No.

MR. ROTH: Very good. Based on any other corrections, anything that any of you would like to bring to our attention?

JUROR 10: No.

MR. ROTH: Any strong feelings about law enforcement? Do any of you know any of the witnesses that we listed for either party? No? Strong feelings about domestic violence such that you could not be fair and impartial? Juror number 11?

JUROR 11: Yes. My mother and my father.

MR. ROTH: The question is that, you know, obviously the 13 people sitting around you are against domestic violence as well. The question is, will it affect your ability to be fair and impartial?

JUROR 11: It happened at a young age, for

40

many years. To say I don't -- that I don't have any biases would be a lie.

MR. ROTH: Okay. Very good. I appreciate the honesty.

Do any of you believe that you have heard about or read about this case in the media? No?

You will hear testimony from a witness or more multiple witnesses who were inmates at the time. Do you feel you could fairly evaluate their credibility like every other witness? Yes? Very good.

I have nothing else. Your Honor. Thank you.

THE COURT: Mr. Perrone?

MR. PERRONE: Yes, thank you.

Juror number 10, you worked for the Michigan Department of Corrections?

JUROR 10: I did.

MR. PERRONE: You work in the area of Mental Health?

JUROR 10: Yes.

MR. PERRONE: Did you work in that area in the prison system?

JUROR 10: Yes.

MR. PERRONE: Did you work with inmates?

**41**

JUROR 10: Yes.

MR. PERRONE: Is there anything about your experiences with the inmates through your profession that would cause you to not be able to maintain an open mind as to their testimony?

JUROR 10: No.

MR. PERRONE: You would be able to judge their testimony in the same manner that you would judge a police officer's?

JUROR 10: Yes.

MR. PERRONE: Juror number 7, what your — obviously as a defense attorney you feel you could be impartial regardless of whether or not Mr. Uruz testified?

JUROR 7: That is correct.

MR. PERRONE: So you would be able to maintain that impartiality, although he didn't put anything forward?

JUROR 7: That's his right.

MR. PERRONE: You would not use that against him, that you believe it is intentionally indicative of his guilt?

JUROR 7: No.

MR. PERRONE: Being an attorney, do you think that's a difficult thing to do,

**42**

realistically?

JUROR 7: Not for me.

MR. PERRONE: You think it's difficult for most people?

JUROR 7: I believe so. Yes.

MR. PERRONE: No further questions.

THE COURT: Okay. Challenge for cause, Mr. Roth?

MR. ROTH: Juror 11, Your Honor.

THE COURT: Any objections?

MR. PERRONE: No objections.

THE COURT: Thank you, sir. Call the Hotline after five for us, please. Any peremptory, Mr. Roth, at this time? Mr. Perrone?

MR. PERRONE: Number 8. Juror number 8.

THE COURT: Thank you, ma'am. Call the Hotline after five. Any others at this time, Mr. Perrone?

MR. PERRONE: Not at this time.

THE COURT: Mr. Roth, do you have any at this time?

MR. ROTH: The People thank and excuse Jurors 7 and 10.

THE CLERK: Juror number 7, Dakota Bellen. B-E-L-L-E-N. Juror number 8, Eric Jeffrey Wolfe.

**43**

W-O-L-F-E. Juror number 10, Raymond Carl Johnson. J-O-H-N-S-O-N. Juror number 7, Michelle Beloskur. B-E-L-O-S-K-U-R.

THE COURT: Juror number 7, what community do you live in?

JUROR 7: Holt, Michigan.

THE COURT: Are you married or single?

JUROR 7: Single.

THE COURT: Any children under 18?

JUROR 7: No.

THE COURT: Employment?

JUROR 7: Driver for Two Men and a Truck.

THE COURT: Your level of education?

JUROR 7: High school diploma.

THE COURT: Juror number 8, your community, sir?

JUROR 8: Lansing.

THE COURT: Married or single?

JUROR 8: Single.

THE COURT: Children under 18?

JUROR 8: I help raise three kids that aren't mine.

THE COURT: How old are they?

JUROR 8: Twelve, 10 and eight.

THE COURT: Your employment?

**44**

JUROR 8: Restaurant manager.

THE COURT: Your level of education?

JUROR 8: High school.

THE COURT: Juror number 10, your community, sir?

JUROR 10: Lansing.

THE COURT: Married or single?

JUROR 10: Single.

THE COURT: Children under 18?

JUROR 10: No.

THE COURT: Employment?

JUROR 10: Carpenter.

THE COURT: Your level of education?

JUROR 10: Some college.

THE COURT: Juror number 11, your community?

JUROR 11: Okemos.

THE COURT: Married or single?

JUROR 11: Married.

THE COURT: Children under 18?

JUROR 11: Thirteen, 11 and eight.

THE COURT: Your employment?

JUROR 11: I am an office manager.

THE COURT: Spouse's employment?

JUROR 11: IT.

45

THE COURT: Your level of education?

JUROR 11: Master's.

THE COURT: The new 7, 8 and 10 and 11, you heard all of my questions? Any responses for me, off the top of your head? Prior jury service? Victim of a crime? Police officers, law enforcement, friends, family?

JUROR 11: I have a nephew —

THE COURT: Juror 7, first.

JUROR 7: I know a detective for the Lansing Police Department, and I also have a friend on the force, and I have military background from my friend.

THE COURT: Lansing force or other forces in the area?

JUROR 7: Other forces in the area.

THE COURT: Anything about that, that you think would make you unable to be fair and impartial in this case?

JUROR 7: No, sir.

THE COURT: Juror number 11?

JUROR 11: I have a nephew in the police service, but not local.

THE COURT: Anything about that relationship that you feel would make you unable

46

to be fair and impartial?

JUROR 11: No.

THE COURT: You heard the comments about burden of proof being the Prosecution's responsibilities? The Defendant has the absolute right to remain silent. Any difficulty with those concepts? To be fair, bias, impartial. You have to make a decision. That's why we are here. Mr. Roth?

MR. ROTH: Thank you, Your Honor. Good morning. So for our new jurors, I want to follow-up with Juror 11. You are an office manager. What type of office?

JUROR 11: It's a non-profit.

MR. ROTH: So you have heard all of our questions. Anything for the new jurors you would like to bring to our attention? Let's go through the list. Strong feelings about law enforcement one way or the other for any of our new jurors? Juror 10, your head moves a little bit.

JUROR 10: No. I'm fine.

MR. PERRONE: Okay. Is there any issue there, or —

JUROR 10: No. I remember reading about this in the State Journal.

47

MR. PERRONE: That's our next question. You read about this case in the State Journal. You understand that obviously the standards for what goes in the print are very different for what the standards of what goes on in the courtroom?

JUROR 10: Yes.

MR. PERRONE: Based on what you have read in the newspaper and online, do you believe you decided any of the facts of this case?

JUROR 10: Hard to tell.

MR. PERRONE: So what the Court would ask you to do, what we would ask you to do, both sides come here with a fresh slate, put aside whatever you may have read, because things may be different. Are you able to do that?

JUROR 10: No.

MR. PERRONE: Okay. I appreciate the honesty.

MR. ROTH: So, for the rest of the jurors, do you believe that you know any of the witnesses that either party mentioned?

JUROR 8: I recognize one of the names, Stan White.

MR. ROTH: Stan White? Somebody you're close with, not close with?

48

JUROR 8: No. If it's the same Stan White, just high school, same town.

MR. ROTH: Nothing that would give you bias for or against him?

JUROR 8: No.

MR. ROTH: Anybody else feel that they heard about or read about this case in the media at all?

JUROR 8: No.

MR. ROTH: Strong feelings about domestic violence such that you do not believe that you could be fair and impartial?

JUROR 8: No.

MR. ROTH: Witnesses who are inmates. So for any of our new jurors, any concerns about listening to the testimony of a witness who is also an inmate in the jail at the time? Do you believe you could evaluate his credibility the same as everybody else? Juror 7?

JUROR 7: I think so.

MR. ROTH: Juror 8?

JUROR 8: I believe so.

THE COURT: Juror 11?

JUROR 11: I have no issues.

MR. ROTH: Very good. Nothing else, Your

49

Honor.

THE COURT: Mr. Perrone?

MR. PERRONE: Yes, Your Honor. Thank you. Juror number 10, do you believe everything you read?

JUROR 10: No.

MR. PERRONE: And in regard to your review in this case, you said it would be nearly impossible for you to set that aside. But taking into account that you don't believe everything you read, would you be able to maintain an open mind here in light of the facts that you saw something in the media?

JUROR 10: It would be interesting to hear all the facts, but I can't say definitively that I could be unbiased about it all.

MR. PERRONE: You can't say definitively, but you could try to?

JUROR 10: Yeah.

MR. PERRONE: Do you know anyone affiliated with the case?

JUROR 10: No.

MR. PERRONE: You're from this area?

JUROR 10: Um-hum.

MR. PERRONE: Any affiliation with MSU?

50

JUROR 10: No.

MR. PERRONE: Turn over to Juror 8. You helped raise three kids?

JUROR 8: Yeah.

MR. PERRONE: And they're not your kids?

JUROR 8: No.

MR. PERRONE: Do you find it difficult oftentimes, as far as trying to --

JUROR 8: Yes.

MR. PERRONE: Certain dynamics there, otherwise, but you have to play the intermediary?

JUROR 8: Yeah.

MR. PERRONE: With three kids there's probably three different stories?

JUROR 8: Yeah.

MR. PERRONE: How do you determine which kid is telling the truth?

JUROR 8: Usually let their mom deal with it.

MR. PERRONE: Never been in a position where you had to make that call?

JUROR 8: Yeah. Each kid has their own personality. But, you know, you kind of know.

MR. PERRONE: You look at their personality and the different things that they have done

51

historically?

JUROR 8: Yes.

MR. PERRONE: And also whether or not their story makes sense?

JUROR 8: Yes.

MR. PERRONE: Juror 11, you have a nephew in law enforcement?

JUROR 11: Um-hum.

MR. PERRONE: What is the nature of what he does?

JUROR 11: Street cop.

MR. PERRONE: Do you talk with him about what he does? Does he ever tell you about his cases?

JUROR 11: Not specifically.

MR. PERRONE: Just generally?

JUROR 11: (Juror nods.)

MR. PERRONE: Probably comes to family events for all the holidays?

JUROR 11: Yep.

MR. PERRONE: Have you talked to him about doing jury service? Have you told him you had to do jury service?

JUROR 11: No, I had not had time to talk to anybody.

52

MR. PERRONE: You think you could maintain that same open mind and impartiality that we have been talking about?

JUROR 11: Yes.

MR. PERRONE: When your car is close to E, what do you do?

JUROR 11: That depends on the week. Ideally you go and fill it up.

MR. PERRONE: When that light comes on, do you get a gut feeling, do you get a little bit nervous, anxious?

JUROR 11: Yeah. Sure.

MR. PERRONE: Worried?

JUROR 11: Yeah.

MR. PERRONE: And no friends, family members that have been victims of domestic violence that would cause you --

JUROR 11: No.

MR. PERRONE: No further questions. Thank you.

THE COURT: Challenge for cause, Mr. Roth?

MR. ROTH: Thank you. Given Juror 10's statement about what he has read in the paper, his very honest statement about not being able to reconsider that, I think that would be

53

appropriate.

THE COURT: Mr. Perrone, any objection?

MR. PERRONE: No objection.

THE COURT: Thank you. Juror number 10, call the Hotline, please. Any preemptory at this time?

MR. ROTH: The People are satisfied with the panel.

THE COURT: Mr. Perrone, any preemptory at this time?

MR. PERRONE: Not at this time, Your Honor.

THE COURT: We will fill seat 10.

THE CLERK: Juror number 10, Deena Doris Hayes, H-A-Y-E-S.

JUROR 10: Hello.

THE COURT: Hello. Your community?

JUROR 10: Onondaga.

THE COURT: Married or single?

JUROR 10: Married.

THE COURT: Children under 18?

JUROR 10: One. Twelve.

THE COURT: Employment?

JUROR 10: Pharmacist.

THE COURT: Spouse's employment?

JUROR 10: Corrections officer.

54

THE COURT: Your level of education?

JUROR 10: Bachelor's.

THE COURT: You heard the questions. Any information for us?

JUROR 10: No.

THE COURT: Prior jury service?

JUROR 10: No.

THE COURT: Friends in law enforcement at the — other than, I guess, maybe co-workers of your spouse or something? Beyond that?

JUROR 10: No.

THE COURT: You feel YOU could be fair and impartial and listen to all the evidence?

JUROR 10: Yes.

THE COURT: And you heard me discuss the Prosecution has the burden of proof, the Defendant has an absolute right to remain silent? Any difficulty with those concepts?

JUROR 10: No.

THE COURT: Mr. Roth?

MR. ROTH: Thank you, Your Honor. Good morning.

JUROR 10: Good morning.

MR. ROTH: So, again, our booklets are about half correct. It indicates you have been in

55

a criminal case before. Doesn't ring a bell?

JUROR 10: I am sorry. Yeah.

MR. ROTH: Tell me about that.

JUROR 10: I and my insurance company sued for an auto accident.

MR. ROTH: So that would be the same thing. They have been charged with a crime, anything like that?

JUROR 10: No.

MR. ROTH: Very good. You heard all our questions? Nothing you want to bring to our attention?

JUROR 10: No.

MR. ROTH: Strong feelings about law enforcement one way or the other?

JUROR 10: No.

MR. ROTH: Do you know any of the witnesses who have been listed?

JUROR 10: No.

MR. ROTH: Do you believe you heard about, read about this case in the media?

JUROR 10: No.

MR. ROTH: Strong feelings about domestic violence makes you unfair one way or the other?

JUROR 10: No.

56

MR. ROTH: Witnesses who were in custody in the jail, at the time you're going to hear from a couple at least. Would you treat and examine their testimony the same way you would examine all the other witnesses?

JUROR 10: Yes.

MR. ROTH: Very good. Nothing else.

THE COURT: Mr. Perrone?

MR. PERRONE: Anything about your spouse's occupation that would cause you not to be able to maintain an open mind in this case?

JUROR 10: No.

MR. PERRONE: Does he tell you stories about what happens at work?

JUROR 10: Yes.

MR. PERRONE: Are they often entertaining?

JUROR 10: They are always entertaining.

MR. PERRONE: Would you give more credibility, would you give less credibility to a jail inmate?

JUROR 10: No. I have worked with jail inmates in my profession. I don't know what they're in jail for.

MR. PERRONE: How do you work with them in your profession?

57

JUROR 10: I have had people who were on work release work with me as my employees.

MR. PERRONE: You were willing to facilitate their inclusion in that program?

JUROR 10: Yeah. They're usually pretty reliable if they're on work release, because they don't want to be in jail longer.

MR. PERRONE: You have never been in jail before?

JUROR 10: No.

MR. PERRONE: Ever had a family member in jail?

JUROR 10: Yes.

MR. PERRONE: And how long ago?

JUROR 10: I have no idea. Probably 10 years ago.

MR. PERRONE: Was it a close family member?

JUROR 10: Nephew.

MR. PERRONE: Did it cause you any type of emotional concern for him?

JUROR 10: No.

MR. PERRONE: That would not impede your ability to maintain an open mind here?

JUROR 10: No.

MR. PERRONE: Do you feel it's the

58

Defense's responsibility to present anything to you, if I was not to present any evidence to you? Is that something that you feel would cause you to believe that it's more likely than not that my client is guilty?

JUROR 10: We are being instructed that it's the Prosecution's job to present the evidence and convince us that the Defendant was guilty. So I would to say I am instructed that the burden of proof is on the Prosecution. I mean, I don't know if -- I don't know.

MR. PERRONE: So you'll follow the instructions?

JUROR 10: I will try to follow the instructions.

MR. PERRONE: You will hold the Prosecutor to his burden?

JUROR 10: I will do my best.

MR. PERRONE: All we can ask.

THE COURT: Any challenges for cause, Juror number 10, Mr. Roth?

MR. ROTH: No, Your Honor.

THE COURT: Mr. Perrone?

MR. PERRONE: No, Your Honor.

THE COURT: Eleven?

59

JUROR 11: I feel there's something I need to bring to the Court's attention. I have some health issues. I'm having something looked into. I am going to see a specialist next week.

THE COURT: You have what scheduled?

JUROR 11: Meeting with a specialist. I'm having some pain.

THE COURT: When is it? I'm trying to get --

JUROR 11: Wednesday, next week.

THE COURT: We don't meet on Wednesdays. You're good.

MR. ROTH: Can I inquire on that issue without prying? Wednesday we don't have court. Is the issue, I don't want to know what it is, something that will be distracting to you, for example, today, tomorrow, Monday, Tuesday?

JUROR 11: I'm having some pain and ringing in my ears a little bit. It's not terrible. I'm not sure what's going to happen. It will have to come to pass.

MR. ROTH: As of right now, you believe you're okay?

JUROR 11: Um-hum.

MR. ROTH: If you're ultimately selected to

60

the panel, if it does become an issue, will you raise your hand and let us know?

JUROR 11: Okay.

THE COURT: Yes, Juror number 1?

JUROR 1: There has been many questions about MSU. I feel I need to be forthcoming. I was a consultant to MSU sports medical department for many, many years.

THE COURT: I don't feel we have sport issues here. Thank you. I am a Wolverine myself.

JUROR 1: Go blue.

THE COURT: Peremptory, Mr. Roth?

MR. ROTH: The People are satisfied with the remaining panel.

THE COURT: Mr. Perrone?

MR. PERRONE: The Defense excuses Juror 11.

THE COURT: All right.

THE CLERK: Juror number 11, Yasoda Suvedi S-U-V-E-D-I.

THE COURT: Your community, ma'am?

JUROR 11: Ingham.

THE COURT: Married or single?

JUROR 11: Married.

THE COURT: Children under 18?

JUROR 11: None.

THE COURT: Employment? Are you employed?

JUROR 11: No.

THE COURT: Spouse's employment?

JUROR 11: Yes.

THE COURT: Where?

JUROR 11: My husband is a professor at MSU.

THE COURT: Your level of education?

JUROR 11: High school.

THE COURT: You had mentioned earlier you had a back issue, I think. Can you tell us a little bit about that?

JUROR 11: I had a herniated disk. I had surgery. They fused my L-4, L-3. Now, I'm also in terrible pain. I took Tylenol. That doesn't help. I have a back brace, but I'm doing my best.

THE COURT: Do you take medications from time to time that are stronger than Tylenol?

JUROR 11: Yes.

THE COURT: Do you take prescription medications for pain?

JUROR 11: Yes.

THE COURT: Do the medications sometimes cloud your judgment or affect your mood, I guess, is what I'm asking about.

JUROR 11: Yes.

THE COURT: Did you take any today?

JUROR 11: Today I did not. I cannot drive. That makes me drowsy. So I take it in the evening.

THE COURT: The medications. If you do take them, and it makes you unable to drive, so you made a prudent decision, and didn't take them today, you indicated?

JUROR 11: I take that in the evening.

THE COURT: Okay. And so since you didn't take your medications, how do you feel right now?

JUROR 11: Right now I am in a lot of numbness, tingling, light headaches.

THE COURT: Any questions, Mr. Roth?

MR. ROTH: If the Court is inclined to excuse her for cause, based on what she already said, I have no objection.

THE COURT: I am inclined to do that.

MR. PERRONE: No objection.

THE COURT: Thank you, ma'am.

THE CLERK: Juror number 11, Pamela Ann Castillo, C-A-S-T-I-L-L-O.

THE COURT: Your community, ma'am?

JUROR 11: Ingham.

THE COURT: Married or single?

JUROR 11: Married.

THE COURT: Children under 18?

JUROR 11: No.

THE COURT: Your employment?

JUROR 11: Housewife.

THE COURT: Spouse's employment?

JUROR 11: Works for the City of Lansing.

THE COURT: Which department?

JUROR 11: Building maintenance.

THE COURT: Your level of education?

JUROR 11: High school.

THE COURT: You heard the questions we asked last Tuesday? Do you have any responses for us?

JUROR 11: No.

THE COURT: Prior jury service at all?

JUROR 11: Yes.

THE COURT: Was it criminal or civil?

JUROR 11: Criminal.

THE COURT: Was the jury able to reach a verdict?

JUROR 11: Yes, sir.

THE COURT: Friends or family in law enforcement?

JUROR 11: No.

THE COURT: Been victim of a crime yourself?

JUROR 11: No.

THE COURT: You heard my client about burden of proof being the Prosecutor's responsibility, the Defendant has an absolute right to remain silent? Do you have any difficulty with those concepts?

JUROR 11: No.

THE COURT: Mr. Roth?

MR. ROTH: Thank you, Your Honor.

THE COURT: Good morning.

JUROR 11: Morning.

MR. ROTH: Any strong feelings about law enforcement one way or the other?

JUROR 11: (Juror shakes head.)

MR. ROTH: Do you know any of the witnesses that the parties have listed?

JUROR 11: I didn't.

MR. ROTH: You indicated you were on a jury before. How long ago was that?

JUROR 11: A year and a half.

MR. ROTH: Do you remember what the charge was, what is it?

65

JUROR 11: Attempted murder.

MR. ROTH: Was I the Prosecutor?

JUROR 11: No.

MR. ROTH: Mr. Koop?

JUROR 11: I don't think so.

MR. ROTH: Anything about that experience that would make you uncomfortable being a juror?

JUROR 11: No.

MR. ROTH: Was that in this building or one in Mason?

JUROR 11: In this building, Judge Dragonchuk.

MR. ROTH: Do you believe you have heard anything about this case in the media?

JUROR 11: No.

MR. ROTH: Any strong feelings about domestic violence is such that you could not be fair?

JUROR 11: No.

MR. ROTH: You heard testimony from witnesses, also inmates. Could you examine and decide their testimony like the other witnesses?

JUROR 11: Yes.

MR. ROTH: I have nothing else, Your Honor. Thank you.

66

THE COURT: Mr. Perrone?

MR. PERRONE: In the last jury, did you feel you were adequately instructed?

JUROR 11: Yes.

MR. PERRONE: You feel you are prepared to follow those instructions?

JUROR 11: Yes.

MR. PERRONE: You heard all of us talk today as far as the different principles associated with maintaining an open mind? You're more than willing to do that?

JUROR 11: Um-hum.

THE COURT: You have to say "yes."

JUROR 11: Yes.

MR. PERRONE: No further questions.

THE COURT: Any challenge for cause from Juror number 11, Mr. Roth?

MR. ROTH: No, Your Honor.

THE COURT: Mr. Perrone?

MR. PERRONE: No, Your Honor.

THE COURT: Peremptory, Mr. Roth?

MR. ROTH: The People are still satisfied with the panel, Your Honor.

THE COURT: Mr. Perrone?

MR. PERRONE: Defense allows Juror 7 to

67

leave.

THE COURT: You're excusing Juror 7?

MR. PERRONE: Yes.

THE COURT: Yes, Juror number 3?

JUROR 3: I don't know whether to say this. The severity of this case. I do own a business with my wife. I have a three month old. If I'm not at the restaurant, I have to be with the three month old. I'm a key role in my restaurant. I have a lot of functions coming up this week, as well as next week, many changes, catering. I work about 14 hours a day. I don't have a replacement. So I also feel like being here, I am going to have my mind elsewhere at my place of business.

THE COURT: All right. Thank you.

JUROR 3: Just wanted to be honest.

THE COURT: I don't think it rises to a level for cause. However, we will fill seat number 7.

THE CLERK: Juror number 7, Sherri Sue Barner, B-A-R-N-E-R.

THE COURT: Your community, ma'am?

JUROR 7: Lansing.

THE COURT: Married or single?

JUROR 7: Single.

68

THE COURT: Children under 18?

JUROR 7: No.

THE COURT: Employment?

JUROR 7: Jackson National Life.

THE COURT: Your level of education?

JUROR 7: High school.

THE COURT: You heard all the questions. Any responses for us?

JUROR 7: No. I have retired family members from the Lansing Police.

THE COURT: Okay.

JUROR 7: But I also had an uncle that's been incarcerated a lot.

THE COURT: Anything about those situations that you feel would make you unable to be fair and impartial in this case?

JUROR 7: No.

THE COURT: You could listen to the evidence?

JUROR 7: Sure.

THE COURT: Have you had prior jury service?

JUROR 7: No.

THE COURT: You heard us talk about burden of proof?

69

JUROR 7: Yes.

THE COURT: Are you fine with that?

JUROR 7: Yes.

THE COURT: Mr. Roth?

MR. ROTH: Good morning. Am I correct you are family friends with one of the gentleman at the Defendant's table?

JUROR 7: Yes.

MR. ROTH: Tell me how close of family friends.

JUROR 7: Actually Nick Fernandez, I know. His mom is friends of mine. His brother is real good friends of my youngest son's. My daughter has worked for his extended family's veterinary clinic for 23 years.

MR. ROTH: With him being on the defense team, does that give you any bias for or against them?

JUROR 7: I don't think so.

MR. ROTH: Nothing else. Thank you.

THE COURT: Mr. Perrone?

MR. PERRONE: Yes, Your Honor.

So you say you would be the least well-known person of his family?

JUROR 7: Of his family. Yes. He has

70

several cousins that I know better than him. His dad coached my youngest son.

MR. PERRONE: So you didn't have interaction with him?

JUROR 7: With Nick? No.

MR. PERRONE: You can maintain an open mind as to the Prosecution's side?

JUROR 7: Sure.

MR. PERRONE: Anything about your affiliation with people who are retired LPD, would that potentially undermine your ability?

JUROR 7: No.

MR. PERRONE: Do you think the testimony of a police officer should be given more credibility than a lay person?

JUROR 7: No.

MR. PERRONE: You had an uncle that is incarcerated?

JUROR 7: Um-hum.

THE COURT: To have to say "yes."

JUROR 7: Oh, yes.

MR. PERRONE: Was that for a long period of time?

JUROR 7: Yes.

MR. PERRONE: And anything associated with

71

that, that would interfere with your ability in this case to maintain an open mind?

JUROR 7: No. Because it all started when I say very young. So, no.

MR. PERRONE: No further questions. Thank you.

THE COURT: Challenge for cause, Juror number 7?

MR. ROTH: No, Your Honor.

THE COURT: Mr. Perrone, challenge for cause?

MR. PERRONE: No, Your Honor.

THE COURT: All right. Peremptory challenge?

MR. ROTH: The People thank and excuse Juror 7.

THE COURT: Peremptory challenges, Mr. Perrone?

MR. PERRONE: Pass at this point.

THE COURT: Call the Hotline for us, ma'am.

THE CLERK: Juror number 7, Terry Lee Defeyter, D-E-F-E-Y-T-E-R.

THE COURT: Your community, sir?

JUROR 7: Lansing.

THE COURT: Married or single?

72

JUROR 7: Single. But I have been with the same woman for 25 years.

THE COURT: You're in a long-term relationship?

JUROR 7: Right.

THE COURT: Any children under 18?

JUROR 7: No.

THE COURT: Your employment?

JUROR 7: I work at Royal Scott Golf Course. And my last work was for Michigan State.

THE COURT: What do you do for Michigan State?

JUROR 7: I do the setup for broadway shows and concerts.

MR. PERRONE: And your significant other's employment?

JUROR 7: Housewife.

THE COURT: And your level of education?

JUROR 7: Twelfth.

THE COURT: You heard the questions? Any information for us that we have been asking for over the last couple days?

JUROR 7: My daughter was in a very abusive relationship.

THE COURT: And do you feel that her

73

involvement in that situation would color your judgment in this case?

JUROR 7: Yes.

THE COURT: Do you think it would?

JUROR 7: Yes.

THE COURT: Did you get actively involved, I guess, during that time?

JUROR 7: Yes, I did.

THE COURT: Mr. Roth, any objections?

MR. ROTH: No, Your Honor. Thank you.

THE COURT: Mr. Perrone?

MR. PERRONE: No, Your Honor.

THE COURT: Thank you. You may be excused for cause, Juror 7.

THE CLERK: Juror number 11, Jeffery Allen Pioszak. P-I-O-S-Z-A-K.

THE COURT: Your community, sir?

JUROR 7: Williamston.

THE COURT: Married or single?

JUROR 7: Married.

THE COURT: Children under 18?

JUROR 7: No.

THE COURT: Your employment?

JUROR 7: I'm an auto worker.

THE COURT: Spouse's employment?

74

JUROR 7: She works for the Michigan State Police.

THE COURT: In what capacity?

JUROR 7: She is with the Traffic Crash Division.

THE COURT: Like she is on the road, or --

JUROR 7: She is in the office.

THE COURT: Your level of education?

JUROR 7: High school.

THE COURT: You heard the questions. Any responses for me?

JUROR 7: I have a sister-in-law that's a detective at Meridian Township.

THE COURT: Anything about that, that would render you unable to be fair and impartial?

JUROR 7: No.

THE COURT: Prior jury service?

JUROR 7: Yes.

THE COURT: Criminal or civil?

JUROR 7: Criminal.

THE COURT: Was the jury able to reach a verdict?

JUROR 7: Yes, it was.

THE COURT: You heard the questions about the burden of proof, and the right to remain

75

silent? Any difficulty with those concepts?

JUROR 7: No.

THE COURT: Mr. Roth?

MR. ROTH: Thank you, Your Honor. Good morning, sir.

JUROR 7: Morning.

THE COURT: I want to first ask about your prior jury service. How long ago?

JUROR 7: About 22 years ago.

THE COURT: What was the charge?

JUROR 7: It was child abuse.

MR. ROTH: Anything about that experience that makes you uncomfortable being a juror again?

JUROR 7: No.

MR. ROTH: Very good. Run through our list again. You don't know any of the witnesses listed by either party?

JUROR 7: No.

MR. ROTH: Given the relationships in your family, no strong feelings about law enforcement one way or the other?

JUROR 7: No.

MR. ROTH: Haven't heard anything about our case in the media?

JUROR 7: No.

76

MR. ROTH: Strong feelings about domestic violence that makes you unfair one way or the other?

JUROR 7: No.

MR. ROTH: If you heard testimony from witnesses, also inmates, could you evaluate the testimony the same as other witnesses?

JUROR 7: Sure.

MR. ROTH: Very good. Nothing else.

THE COURT: Mr. Perrone?

MR. WHITE: None for cause.

THE COURT: Questions?

MR. PERRONE: No questions.

THE COURT: Challenge for cause?

MR. ROTH: No, Your Honor.

THE COURT: Peremptory, then, Mr. Roth?

MR. ROTH: The People are satisfied with the panel, Your Honor.

THE COURT: Mr. Perrone?

MR. PERRONE: Defense releases Juror number 3.

THE COURT: All right. Call the Hotline after five for us, sir.

THE CLERK: Juror number 3, Sherry Francis Smith. S-M-I-T-H.

77

THE COURT: Your community, ma'am?

JUROR 3: Lansing.

THE COURT: Married or single?

JUROR 3: Married, but separated.

THE COURT: Children under 18?

JUROR 3: No.

THE COURT: Employment?

JUROR 3: Patient care technician at Sparrow Hospital.

THE COURT: I guess you separated the spouses' employment?

JUROR 3: Um-hum.

THE COURT: He is not employed?

JUROR 3: Um-hum. No, sir.

THE COURT: Don't want to go into that, huh? And your level of education?

JUROR 3: College.

THE COURT: You heard the questions we have been asking? Do you have any responses that you would have given us?

JUROR 3: No, sir.

THE COURT: Any prior jury service?

JUROR 3: No, sir.

THE COURT: Friends in law enforcement?

JUROR 3: No, sir.

78

THE COURT: You heard me talk about burden of proof and Defendant's right to remain silent? Any difficulty with those?

JUROR 7: No, sir.

THE COURT: Mr. Roth?

MR. ROTH: Thank you. Good morning.

JUROR 3: Good morning.

MR. ROTH: Ever been a juror before?

JUROR 3: No.

MR. ROTH: Let's run through the list. Real strong feelings about law enforcement one way or the other?

JUROR 3: No.

MR. ROTH: Know any of the witnesses listed?

JUROR 3: No.

MR. ROTH: Heard about the cases in the media?

JUROR 3: All's I know is the other day.

MR. ROTH: Tell me what you're seeing.

JUROR 3: On the website.

MR. ROTH: Did you read anything that came up?

JUROR 3: No, sir.

MR. ROTH: Nothing about that, that gives

79

you preconceived ideas about what happened in this case?

JUROR 3: No.

MR. ROTH: Any strong feelings about domestic violence that makes you feel unfair in this case?

JUROR 3: No.

MR. ROTH: If you heard testimony from witnesses, also inmates, would you feel you would be able to evaluate the testimony the same as other witnesses?

JUROR 3: Yes.

MR. ROTH: Very good. Nothing else. Thank you.

THE COURT: Mr. Perrone?

MR. PERRONE: Briefly. You heard us talk for a couple days, heard me talk, specifically. If there is anything that you could recall, based on my prior questions? I'm getting a little tired of myself. You will to be able to maintain an open mind and be fair and impartial, and follow instructions?

JUROR 3: Yes.

MR. PERRONE: Thank you.

THE COURT: Any challenges for cause for

80

Juror number 3?

MR. ROTH: No, Your Honor.

THE COURT: Mr. Perrone?

MR. PERRONE: No.

THE COURT: Peremptory, Mr. Roth?

MR. ROTH: The People are satisfied.

THE COURT: Mr. Perrone?

MR. PERRONE: The Defense is satisfied, Your Honor.

THE COURT: All right. For those people who were not called, thank you for very much for coming in for the last two days. Call the Hotline again at five. But not too many people start a new trial on Friday. You're probably pretty safe.

On behalf of the Citizens of Ingham County, thank you very much. Appreciate you coming in, assisting us in this situation.

(Jury exits courtroom at 10:56 a.m.)

THE COURT: Be seated. We have one oath for the jury now that you have been impaneled to be administered by the Clerk, and then we will take a recess, so that Ms. Smith can familiarize you with the jury room and the materials that we have. We will come back with the post-selection instructions, then we will break for lunch, come

81

back for opening statement after lunch today.

So if you would all rise, raise your right hand for me, please.

THE CLERK: Do you solemnly swear or affirm that in this action now before the Court you will justly decide the questions submitted to you, that unless you are discharged by the Court from further deliberations, that you will render a true verdict, and that you will render your verdict only on the evidence introduced and in accordance with the instructions of the Court. If so, please say: I do.

(Jury answers in the affirmative.)

THE COURT: All right. Thank you. So we will be in recess now. And Ms. Smith will familiarize you with the jury room, the materials, and the process of and procedures we will follow from here on out.

(Jury exits courtroom at 10:58 a.m.)

THE COURT: We will be in recess. But I also have a disc of, I guess, the Close interview.

MR. ROTH: I am going to return that to Mr. Roth at this time.

MR. ROTH: Thank you, Your Honor.

THE COURT: We will come back in about 20

82

minutes do the post-instructions.

MR. ROTH: Can we get a copy of those?

THE COURT: Yes.

(On the record at 11:24 a.m.)

THE COURT: Ready for the jury?

MR. ROTH: Mr. Perrone and I discussed this morning, when the Court ruled previously on the venue challenge. There is obviously a second prong that is applied to the specific rule. The first part of the Court Rule -- there is so much media that it's impossible to get an appropriate jury. The second prong is, after having spoken to the jurors, are they are an appropriate jury, and in speaking with Mr. Perrone this morning, at least before we brought them in today, I think the intent was that they are not asking the Court to consider that second prong in light of the very minimal coverage that is talked about by the jurors. But I will defer to him on that.

THE COURT: Mr. Perrone?

MR. PERRONE: Yes. Initially I wasn't of the opinion that that was going to create an issue given the juror that testified that his opinion of the case would be as a result of him reading the article.

83

It's the Defense's position that the inflammatory nature of the article, and the general allegations that were taken straight from the swear-to, do not comport with the facts of this case, and would inflame anyone who read that article. And there are -- it makes it impossible as a result of just the inflammatory nature of that article, based upon what the juror testified to today as his opinion at reading the article, that this would not be an appropriate venue. Anybody who had that ability to read that in circulation, locality, more than likely would have the same type of a feeling as indicated by that juror. Prior to him indicating that, I was not going to renew the motion. But given that he has indicated, based upon his review, it seems to me the inflammatory nature of the article merits the argument.

THE COURT: We have 55 jurors in the pool. One or two may have had some contact with the article. The other one said they may have seen it. They didn't know, they didn't recall anything about it. This particular juror, who is seated in seat 10 at that time said he read the article and he felt, based on his reading of the article, that

84

that would render him unable to be unbiased.

As to how that spread to the entire panel, in light of the fact there were only three of the people in the pool who said they had seen the article, the Court does not find that that's inflammatory. I credit the juror for his honesty. But he was the only one who had read the article, had formed an opinion. There were only two, maybe three other ones who had read the article and said they did not form an opinion. But I don't see how that rises to tainting the entire pool or changing the venue because somebody read the article.

So, based on that, I will stand on my original decision and deny the request.

MR. ROTH: Thank you, Your Honor. I believe we are prepared --

THE COURT: Right.

(Jury present in courtroom at 11:30 a.m.)

THE COURT: Be seated. We are going to provide you, if Ms. Smith hasn't already provided you a copy of these instructions, that you'll have for reference throughout the course of the trial.

But, ladies and gentlemen of the jury, you have been chosen to decide a criminal case made

85

by the State of Michigan against one of your fellow citizens. I will explain some of the legal principles you will need to know and the procedures that you will follow in this trial.

A trial follows this procedure: First, the Prosecutor makes an opening statement where he gives his theories about the case. The Defendant's lawyer does not have to make an opening statement, but he may make an opening statement after the Prosecutor makes his or he may wait until later. These statements are not evidence, they are only meant to help you understand how each side views the case.

To prove the charges, the Prosecutor must prove the following beyond a reasonable doubt. In file number 16-1064-FC, aggravated stalking, the Defendant is charged with aggravated stalking.

To establish this charge, the Prosecutor must prove each of the following elements beyond a reasonable doubt:

First, that the Defendant committed two or more willful, separate and non-continuous acts of contact with Erika Melke.

Second, that the contact would cause a

86

reasonable individual to suffer emotional distress.

Third, that the contact caused Erika Melke to suffer emotional distress.

Fourth, that the contact would cause a reasonable individual to feel terrorized, frightened, intimidated, threatened, harassed or molested.

Fifth, that the contact caused Erika Melke to feel terrorized, frightened, intimidated, threatened, harassed or molested.

Sixth, that the stalking was committed in violation of a court order or restraining order of which the Defendant had actual notice.

In file number 16-1065-FH, Count 1, solicitation to commit murder. The Defendant is charged with solicitation to commit murder. To prove the Defendant's guilt, the Prosecutor must prove each of the following elements beyond a reasonable doubt.

First, that the Defendant, through words or action, offered, promised or gave money, services or anything of value to another person.

Second, that the Defendant intended that what he said or did would cause Reginald Close to

87

kill Erika Melke.

The Prosecution does not have to prove that Reginald Close actually committed, attempted to commit, or intended to commit murder.

In Count 2, the Defendant is charged with solicitation to commit murder. To prove the Defendant's guilt, the Prosecutor must prove each of the following elements beyond a reasonable doubt.

First, that the Defendant, through words or actions, offered, promised or gave money, services or anything of value to another person.

Second, that the Defendant intended that what he said or did would cause Charles Allen to kill Erika Melke.

The Prosecution does not have to prove that Charles Allen actually committed, attempted to commit or intended to commit murder.

Count three, solicitation to commit murder. The Defendant is charged with solicitation to commit murder. To prove the Defendant's guilt, the Prosecutor must prove each of the following elements beyond a reasonable doubt.

First, that the Defendant, through words

88

or actions, offered, promised or gave money, services or anything of value to another person.

Second, that the Defendant intended that what he said or did would cause Frank Mobley to kill Erika Melke.

The Prosecution does not have to prove that Frank Mobley actually committed, intended to commit or intended to commit murder.

After the Prosecution has presented all his evidence, the Defendant's attorney may also offer evidence, but he does not have to do so.

By law, the Defendant does not have to prove his innocence or produce any evidence.

If the Defense does call any witnesses, the Prosecutor has a right to cross-examine them.

The Prosecutor may also call witnesses to contradict the testimony of the Defense witnesses.

After all the evidence has been presented, the Prosecutor and the Defendant's lawyer will make their closing arguments. Like the opening statements, these are not evidence, they are only meant to help you understand the evidence and the way each side sees the case.

You must base your verdict only on the

89

evidence.

You will be given a written copy of these instructions, as I've advised.

Now, my responsibility as the Judge in this trial is to make sure that the trial runs fairly and efficiently, to make decisions about evidence, and to instruct you about the law that applies to the case. You must take the law as I give it to you. Nothing I say is meant to reflect my own opinions about the facts of the case.

As jurors you are the ones who will decide the case. Your responsibilities as jurors is to decide what the facts of the case are. This is your job and no one else's. You must think about all the evidence and all the testimony, and then decide what each piece of evidence means, and how important you think it is. This includes how much you believe what each of the witnesses said.

What you decide about any fact in this case is final.

When it's time for you to decide the case, you're only allowed to consider the evidence that was admitted in the case. Evidence includes only the sworn testimony of witnesses, the exhibits

90

admitted into evidence and anything else I tell you to consider as evidence.

It is your job to decide what the facts of the case are. You must decide which witnesses you believe and how important you think their testimony is.

You do not have to accept or reject everything a witness says. You are free to believe all, none or part of any person's testimony.

In deciding which testimony you believe, you should rely on your own common sense and every-day experience. However, in deciding whether you believe a witness' testimony, you must set aside any bias or prejudice you have, based on the race, gender or national origin of the witness.

There is no fixed set of rules for judging whether you believe a witness. But it may help you to think about these questions:

Was the witness able to see or hear clearly. How long was the witness watching or listening. Was anything else going on that may have distracted the witness. Does the witness

91

seem to have a good memory. How does the witness look and act while testifying. Does the witness seem to be making an honest effort to tell the truth, or does the witness seem to evade the questions or argue with the lawyers. Does the witness' age or maturity affect how you judge his or her testimony. Does the witness have any bias or any personal interest in how this case is decided. Have there been any promises, threats, suggestions or other influences that affect how the witness testified. In general, does the witness have any special reason to tell the truth, or any special reason to lie. All in all, how reasonable does the witness' testimony seem when you think about all the other evidence in the case.

The questions the lawyers ask witnesses are not evidence. Only the answers are evidence.

You should not think that something is true just because one of the lawyers asks questions and assumes or suggests that it is.

I may ask some of the witnesses questions myself. These questions are not meant to reflect my opinion about the evidence. If I do ask questions, my only reason would be to ask about

92

things that may not have been fully explored.

Now, during the trial, you, as jurors, may think of an important question that would help you understand the facts of this case. You are allowed to ask such questions. You should wait to ask questions until after the witness has finished testifying, and both sides have finished their questioning.

But, as a practical matter, what I would do is after the witnesses have finished testifying, I will ask the jury if anyone has questions. You have to write them down on the jury questionnaire forms we've had, because everything has to be recognized if it's going to be reviewed by another court. So write down the question and then we will address it.

Now, if you still have an important question after the witnesses have testified, raise your hand, write the question down, pass it to the Bailiff, who will give it to me. Do not show your question to other jurors. If your question is not asked, it's because I determined, under the law, that the question should not be asked.

Now, my policy is, if I can't ask the

question, most of the time I can tell you the rationale why I cannot. But sometimes I can. But most of the time I will tell you the reason why we could not ask that question. So if we find ourselves in a situation where I can't give you the reason, then do not speculate about why the question was not asked. In other words, you should draw no conclusions or inferences about the facts of the case. Nor should you speculate about what the answer might have been.

Also, in considering the evidence, you should not give greater weight to testimony merely because it was given in answers to questions submitted by the jury.

On the other hand, if you cannot hear what a witness or lawyer says, please raise your hand immediately, and ask to have the question or answer repeated.

During the trial the lawyers may object to certain questions or statements made by the other lawyers or witnesses. I will rule on these objections according to the law. My rulings for or against one side or the other are not meant to reflect my opinions about the facts in the case.

Sometimes the lawyers and I will have discussions out of your hearing. Also, while you're in the jury room I may to take care of other matters that have nothing to do with this case. Pay no attention to these interruptions.

Now, you must not discuss the case with anyone, including your family or friends. You must not even discuss it with other jurors until the time comes for you to decide the case.

When it's time for you to decide the case, I will send you to the jury room for that purpose. Then you should discuss the case amongst yourselves, but only in the jury room and only when all jurors are there. When the trial is over, you may, if you wish, discuss the case with anyone.

If I call for a recess during the trial, I will either send you back to the jury room or allow you to leave the courthouse on your own and go about your business. But you must not discuss the case with anyone or let anyone discuss it with you or in your presence. If someone tries to do that, tell him or her to stop. Explain that as a juror you are not allowed to discuss the case. If he or she continues, leave and report the incident to me as soon as you return to court.

You must not talk to the Defendant, the lawyers, or the witnesses about anything at all, even if it has nothing to do with the case. It's very important that you only get information about the case in court when you are acting as the jury and the Defendant, the lawyers and I are all here.

Now, the only information that you will receive about the case will come to you in the courtroom. You must not consider any information that comes from anywhere else. You must not read newspaper headlines or articles relating to the trial. Also, you must not watch or listen to television radio comments or accounts of the trial while in progress.

Until your jury service is concluded, you are not to discuss the case with others, including other jurors, except as otherwise authorized by the court. Likewise, contacting other jurors via social media, adding other jurors as friends on Facebook, and/or posting information about the trial on social media is strictly prohibited. You are not to read or listen to news reports about the case.

Now, you may also not use a computer, cellular phone or other electronic devices with communication capabilities while in attendance at trial or during deliberations. These devices may be used during breaks or recess, but may not be used to obtain what we refer to as independent juror research. Suppose you hear something here in the courtroom, and you aren't quite clear on it, you want to go home, you want to use your devices to Google something or look up a definition in Wikipedia. Or sometimes people will go home, try to conduct an experiment based on testimony they heard here in trial. So all those things will be outside the courtroom and so all those type of things are prohibited. You can't take information out of the courtroom. Go home and look it up, Google it, or look it up on Wikipedia, or conduct any experiments on information you have heard here in the courtroom. So these devices may be used during the breaks but may not be used at any time to obtain or disclose information about parties, witnesses, attorneys or Court officers, news accounts of the case, or information collected during juror research on any topics raised or testimony

97

offered by any witness or by any exhibit. You must not visit the scene of the occurrences that is the subject of the trial. If it should become necessary that you view or visit the scene, you will be taken as a group under court supervision.

You must not consider as evidence any personal knowledge you have of the scene. You must not do any investigations on your own or conduct any experiments of any kind. This includes using the internet for any purpose regarding this case. If you discover a juror has violated my instructions, you should report it to me. You may also take notes during the trial, if you wish, but, of course, you don't have to. If you do take notes, you should be careful that it does not distract you from paying attention to all the evidence.

When you go to the jury room to decide on your verdict, you may use your notes to help you remember what happened in the courtroom. If you take notes, do not let anyone except others see them during deliberations. You must turn them over to the Bailiff. During recesses your notes will not be examined by anyone.

When jury service concludes, your notes

98

will be collected and destroyed.

You can see we have seen chosen a jury of 14. After you have heard all of the instructions, we will draw lots to decide which two of you will be dismissed.

In order to form a jury of 12, possible penalties should not influence your decision. It's the duty of the judge to fix the penalty within the limits prescribed by law.

Now, I may give you more instructions during the trial. And at the end of trial, give you detailed instructions about the law that applies in this case. You should consider all of my instructions as a connected series taken altogether. They are the law you must follow.

After all the evidence has been presented and the lawyers have given their arguments, I will give you detailed instructions about the rules of law that applies to this case.

You will go to the jury room and decide on your verdict. A verdict must be unanimous. That means that every juror must agree upon it. It must be the individual decision of each juror.

It's important for you to keep an open mind and not make a decision about anything in

99

the case until you go to the jury room to decide the case.

So that concludes the preliminary instructions. We are going to take our lunch time recess now. We are going to ask you to report downstairs at 1:15. And we will get started after that with the opening statements on behalf of the parties today.

I don't know if we'll have any witnesses today or not. We will. Okay. We might have a couple witnesses for you.

Remember, don't discuss the case with anyone on the break. You are free to go back your business. You can go anywhere you want to go. Don't discuss case with anyone, family, friends, read any news accounts. We will be in recess at this time for lunch.

(Jury exits courtroom at 11:46 a.m.)

THE COURT: We will be in recess.

MR. ROTH: Your Honor, can we take up a few housekeeping issues real quick?

THE COURT: All right.

MR. ROTH: I apologize if the Court would rather do it on the other side of lunch. Okay?

THE COURT: Go ahead.

100

MR. ROTH: I spoke to Mr. Perrone this morning. There's a witness on his witness list, Noell VanSlambrouck. We are going to move to add her to our witness list. Obviously since she was already on the Defense witness list, there would be no unfair surprise in doing that. So...

THE COURT: Mr. Perrone, any comments?

MR. PERRONE: She is on my witness list. The People reserve the right.

THE COURT: Okay.

MR. ROTH: I spoke to Mr. Perrone this morning. He has a list for witnesses that are in MDOC scheduled for Monday, the 6th. Given our schedule this morning, we thought that would be good. More and more I think it'd be probably best for a backup. I wouldn't cancel Monday, but secondary Tuesday would be my suggestion there. I see an email this morning. I assume Mr. Perrone, as well, while in court, Leanne Whipple from Pretrial Services; she has been trying to appoint attorneys for several of the witnesses that Mr. Perrone has listed, and asked for attorneys for it. I think she is having great trouble finding people that aren't conflicted out and are available by scheduling.

101

And so I guess my request is that if there are some maybe Mr. Perrone is less serious about, let her know so she can tailor her efforts accordingly.

THE COURT:  All right.

MR. ROTH:  My strong suspicion is that Jackie Close is not somebody that will actually be called. Maybe let her know, that will be helpful.

The last thing, from an administrative standpoint, before any witnesses are called, I want to make sure. That way there is no risk of surprise to the Defense. As the Court read the instructions, the Court Rule allows to move to amend the Information at any time before, during or after trial.

I think for juror ease, I'm going to move to amend the language in Count 1 very slightly. It says list another person: Reginald Close. And in Count 2, list another person: Charles Allen. I am going to make a request to amend it to say Charles Allen or somebody on his behalf or Reginald Close or somebody on his behalf. That way there's no issue for the jury.

THE COURT:  This is in what, 6.5?

MR. ROTH:  Yes, Your Honor.

102

THE COURT:  Mr. Perrone?

MR. PERRONE:  I would disagree with the unilateral change by the Prosecution at this stage that if that's something they anticipated would have been foreseeable a long time ago, I don't think the additional language is necessary. Frankly, I anticipate it will just further confuse the jury. We've already read them instructions. Now we are going to reinstruct them as to something additional and more significant.

THE COURT:  Any additional comments?

MR. ROTH:  The standard is unfair surprise. It's not any of those things. Given no testimony has been presented, there will obviously not be prejudice.

THE COURT:  I am adding the language: Name the individual or someone on their behalf was -- it fits the facts of this case, really, because Mr. Close and the other witnesses were in custody at the time.

So they were going to have to elicit the help of somebody on their behalf, even if they had agreed to do it. So the Court will allow that amendment.

MR. ROTH:  Thank you. Nothing else.

103

THE COURT:  Do you have anything you wish to bring to our attention, Mr. Perrone?

MR. PERRONE:  Just as I'm thinking, for scheduling purposes, for the jury view of the premises, Defense is requesting that the jury have an opportunity to see where these guys were at in the jail.

THE COURT:  Those requests have to be made prior to time of trial, due to the logistics involved. Here in this particular case, it's at the jail. I don't see the benefit of them seeing the scene at the jail.

Also, in this particular case, that causes safety issues for the jurors, because the jail has residents in there, and there would have to be moves, or I don't know how the jail would handle that. But, historically, those requests are made in advance of trial because they have to have a bus. We have to take them out there. Arrangements have to be made for safety.

So I would deny that request at this time.

And the facts of this case I don't think really go towards viewing the jury scene, having the jury view the scene, rather.

All right. Anything else?

104

MR. ROTH:  No, Your Honor. Thank you.

MR. PERRONE:  Nothing further, Your Honor.

(Recess taken at 11:51 a.m.)

(Back on the record w/Jury present 1:40 p.m.)

THE COURT:  Mr. Koop will be present for closing arguments on behalf of the Prosecution. Mr. Koop?

MR. KOOP:  Thank you, Your Honor.

Good afternoon, ladies and gentlemen. The charged offense in the two cases before you mark the culmination of the Defendant's increasingly dangerous fixation with the victim. And while these charges focus on a period of between August 23rd, 2016 through October 30 1st, 2016, the road leading us to where we are today began much before that date. It began almost two years ago.

For you to understand why we're here today, you have to start from the beginning. And this case begins when the relationship between the Defendant and the victim ended. The People believe the evidence presented will reflect the following:

That in June of 2015, the victim, Erika Melko, ended her relationship with the Defendant.

**105**

A short time later, Ms. Melke blocks the Defendant's number. She no longer wants to have any communication from him. Except this simple act triggered the Defendant's obsessive conduct where he would now engage in a continuous, willful, purposeful and unrelenting conduct that would have Erika Melke feeling frightened, threatened, harassed and ultimately endangered her life.

Now, over the next year, the Defendant's actions escalated from annoying to life threatening. At the beginning the Defendant's actions could be labeled as simple. That's merely finding new ways to call her, text her, or e-mail her. And while any one of these acts alone may seem innocent. But when we take these together, they show the Defendant's increasing obsession and his decreasing regard for Erika's safety and welfare. It's because of this escalation that in January 2016, Erika Melke was granted a personal protection order preventing the Defendant from contacting her in any way.

Except the Defendant's actions only escalated further. He began to show up where Erika was, be it the store or home, friend's

**106**

home, restaurants. He began to damage her property, throwing eggs at her car, keying her car, slashing her tires, and doing these same acts to her friend's vehicle.

Then in April 2016, while working at Michigan State University, the Defendant asked his co-worker to purchase a gun for him, telling his co-worker he didn't want to go about getting this gun by legal means.

Then we turn to May of 2016. Around this time Erika began to notice items from her room missing, underwear missing. She suspected the Defendant, but had no evidence. So what she did was buy a trail cam, she put it up in her apartment. One night when Erika returned home from work, she checks the trail camera. What does she see? She sees, plain as day, the Defendant in her bedroom. The Defendant was never given a key to her apartment. He is not allowed in her apartment. And at this time there was still a valid PPO in place that protected Erika and prevented the Defendant from being anywhere near her, especially her bedroom.

So what does Erika do next? She files for an extension of that Personal Protection order.

**107**

But, again, the Defendant continued his escalations. He made clear that the order from the Judge would have no effect on him.

Which brings us to our current charges. In this case there's actually two cases. We have an aggravated stalking file. That's file 16-1064-FH. And we have the solicitation to commit murder, which is 16-1065-FC.

Focusing on the aggravated stalking, beginning at about August of 2016, August 27th of 2016, Erika Melke received an alert on her phone, an alert from Facebook. That alert said someone had accessed her Facebook account, changed the password. This person was not Erika.

She received a similar alert on August 31st. Both of these alerts, she — it provides an IP address of the location that was used to change her Facebook password.

A search warrant was executed by the Lansing Police Department, Detective Matt Krumbach. And this investigation revealed that the IP addresses that Erika had been provided put the address at 1242 Haslett Road here in East Lansing, Michigan.

Detective Krumbach also learned that these

**108**

IP addresses were specific to Apartment C-1 through C-24. And immediately the GPS tether the Defendant now had on his ankle placed him in an apartment located at 1242 Haslett Road at the same time Erika's Facebook accounts were accessed.

Just so happens that the Defendant's good friend, Brock Adater(sp) Atamir(ck) at the time lived at 1242 Haslett Road.

Also, on August 31st, 2016, Erika Melke received an e-mail from an address that was intended to appear that it belonged to her, similar to her name, initials, that sort of thing. The email account was not one she created or used, but the contents of the email clearly showed it was written by the Defendant.

Later on that day, August 31st, 2016, the Defendant was remanded to the custody of the Sheriff and held at Ingham County Jail for his actions related to entering her apartment back in May.

But now, even with the Defendant under custody with the Sheriff, he would not let this stifle his escalating obsession.

Once the Defendant is in jail in the

109

evening hours on August 31st, 2016, Erika received a phone call from the jail. In a prerecorded – in a recorded telephone from the jail, you get the spot for the inmate to state their name. In that spot Erika heard: I hope you're happy.

And it's from the Ingham County Jail that the case of solicitation to commit murder arises out of.

One might think that the Defendant, now in custody, Erika Melke is finally free of any further harassment from the Defendant. She no longer had to be in fear. Except that's not the case. When the Defendant can no longer see or contact her, he solicited two jail inmates and an undercover police officer to kill Erika Melke.

The Defendant first approached Reginald Close to have Erika Melke killed. After Reginald Close reported this to his attorney, Close is then interviewed by the police. Close, in alarming detail, provided a map of Erika's neighbourhood that was drawn by the Defendant, names and addresses of friends and her social media account names, so the person could make sure they're killing the right person.

110

After the interview, police confirmed information that was provided by Close in the interview. They confirmed that the Defendant's friend, Burak Atamer places money on Close's jail account. He placed that money on the account after the Defendant solicited Close to commit murder.

Close was then removed from the jail, the Defendant's area of the jail. After Close was removed from the Defendant, the Defendant turned to somebody else. That's Officer Mobley who was posing as an undercover hitman. Officer Mobley poses as Close's friend, T.J. He contacted the Defendant by a video call. In that video call the terms of the killing of Erika were settled. The Defendant would pay TJ to remove the trash from his apartment, that the Defendant wanted this done before he got home on November 2nd, and that Reginald Close should have given TJ the address and the details.

Ultimately, in the end, the Defendant didn't care how TJ disposed of the trash, he just wanted it done by November 2nd, with Close gone and no further contact with Detective Mobley.

The Defendant turned to another inmate,

111

Charles Allen. Allen was similarly disturbed by Defendant's proposal and also alerted jail deputies. Like Close, Charles Allen cooperated with law enforcement. He provided detailed information that he could only see from the Defendant.

In the end, it is clear that Erika Melke, once a girlfriend, doted on by the Defendant, was now just some trash he wanted taken out, someone he wanted killed. If he couldn't have her, then nobody would.

Now, at the end of this trial the Judge will read to you a series of instructions. As a result of the Defendant's actions, he is charged with four total crimes. Each crime is made up of elements. These elements are a checklist for you to keep in mind on your notepad as this trial progresses. You get to check off each element of the crime. You must find the Defendant guilty of that crime. The Judge is going to instruct you on the elements as well. But I just want to go over them briefly here with you.

First, we have aggravated stalking. So this is in file 16-1064. This is the only count on that file. To prove this, the Defendant is

112

charged with aggravated stalking. To establish this charge, the Prosecutor must prove each of the following elements. The People have to prove all six of these. First, that the Defendant committed two or more willful, separate and non-continuous acts with unconsented contact with Erika Melke.

Second, that the contact would cause a reasonable individual to suffer emotional distress.

Third, that the contact caused Erika Melke to suffer emotional distress.

Fourth, that the contact would cause a reasonable individual to feel terrorized, frightened, intimidated, threatened, harassed, molested.

Fifth, that the contact caused Erika Melke to feel terrorized, frightened, intimidated, threatened, harassed, molested.

Finally, the assault was committed in violation of the Court order or restraining order of which the Defendant had actual notice.

The next crime the Defendant is charged with relates to file 16-1065. These are the solicitation to commit murder charges. He is

113

charged with three counts of this. Instead of reading the same instruction three times, I've condensed them down into this language. And to prove this, the Defendant — the Prosecutor must prove each of the following elements beyond a reasonable doubt:

First, that the Defendant, through his words or actions, offered, promised or gave money, services or anything of value to another person.

And, second, that the Defendant intended that what he said or did would cause the person solicited to kill Erika Melke.

Now, it's important to note that the solicitation of murder, the Prosecutor does not have to prove that the person solicited. Actually committed, attempted to commit or intended to commit murder. He focuses on the Defendant's actions. And with these three counts of solicitation to commit murder, each count stands by itself. And Count 1, as you'll see, is related to Reginald close. Count 2, Charles Allen. And Count 3, Frank Mobley, who is the undercover officer.

Ladies and gentlemen, in the end, we

114

believe that the evidence will be clear that the Defendant's actions were ever-escalating, predatory, criminal, and that these criminal acts jeopardized the life and safety of Erika Melke.

And at the end of this trial we will ask you to find the Defendant guilty of aggravated stalking and three separate counts of solicitation of murder. Thank you.

THE COURT: Thank you, Mr. Koop.

MR. KOOP: Thank you, Your Honor.

THE COURT: Mr. Perrone?

MR. PERRONE: Yes, Your Honor.

Thank you, again, ladies and gentlemen, for the time and efforts that you're going to expend in jury service here. We will try to ensure that we provide you with a full view of all of the facts without holding you for too long. We understand that everybody has to get back to their daily lives.

While you're here, I just ask — I also would like to point to the instructions just to highlight some of the things that I feel are important for anyone. There are some members of the jury that have previous jury service that have an understanding of how the process works.

115

Overall, this is somewhat of a very difficult job for anyone to do. I think you really have to take a step back and understand the nature of the process that you're in. Most people in the jury have never probably been to court before anything substantial, never had any involvement with the criminal justice system outside of probably what they see on TV. Obviously television does not lie, this is reel life.

As far as the jury instructions are concerned, in pointing to the first jury instruction, the Judge has instructed you this is one the most serious duties of any organized society.

If you're familiar with history, they had the Salem Witch trials. In the Salem Witch trials people were accused of being witches, so they were thrown in the water. And if they drowned, then they weren't witches. If they could swim, they were determined to be witches and killed. So one way or the other, it was a source of summary execution.

Our country is fairly newer, when you look at it, at a historical perspective. But in

116

regards to our country, we have certain rights that flow to all citizens of our country, that everyone is entitled to very basic rights. freedom of speech, freedom of press, freedom to speak our minds, freedom not to be subjected to unreasonable government intrusion. These are rights that we. And, as a country, we hold them dearly. They're currently at the forefront our social climate.

There are going to be a lot of issues that brings me to the second point. Jurors must be as free as humanly possible from bias, prejudice or sympathy. As humanly possible. I think it's something you should focus your attention on.

Part of what I will attempt to do, and the Judge is going to attempt to do, is to make sure that your mind is wrapped fully around the nature of the laws that you're trying to interpret. But also to make sure that you do maintain an open mind. It's something that you would have to step back, kind of look outside of yourself, and think about what you're thinking and how you're acting.

There are a lot of biases in our society. That's inevitable. Some people want to sweep it under the rug, say we have equal protection under

117

the law, everybody has equal rights. The function of you, as a jury, is the cornerstone of trying to ensure that we are here to become about as equally possible to equal protection. But we are humans. So inevitably we are going to have inherent biases. We're going to ask you to do your best to attempt to set those aside and make a fair determination based upon the evidence and/or lack thereof.

The second jury instruction I would like to focus on is the principle associated with reasonable doubt. Now, you've heard a little bit in voir dire associated with this, that this isn't any doubt. It's a reasonable doubt. It's a doubt based on reason and common sense. That is, you will be left to your own faculties in determining what reasonable doubt is.

Oftentimes I try to articulate the standard as well as I can probably in favor of the Defense. The Prosecution is going to try to articulate that standard in the manner favorable to the Prosecution.

As I like to often point out instructions, so you have an opportunity to see something besides what I am saying, it is not any doubt.

118

But you're specifically instructed that reasonable doubt is a doubt that is reasonable, that could be a single doubt after a careful considered examination. So as far as it is not any doubt, that is true. But there is a requirement of careful consideration of the evidence which would lead you to believe that if you're able to attach a reason associated with the case, that it causes you concern or doubt. If that reason is based upon your common sense, and you have a feeling that the State has not brought forward the necessary evidence to convict beyond a reasonable doubt, then it's your obligation to find my client not guilty.

If you find that after you reviewed all of the evidence, that it reaches that level, then you'll be required to find my client guilty.

We have multiple offenses here. This is something that you have to look at each offense as to the elements of each offense in order to make that determination.

As we spoke, I think I have hammered on enough, presumption of innocence comes in here with open minds, viewing all the evidence.

At some point in time if you get tired, I

119

think you already heard of that, let me know what's going to come at the end, I may have a trick up my sleeve. I want to make sure we keep an open mind throughout the process.

When we discussed this matter, we do very carefully, each of you, there's an individual on this jury, you each have your own viewpoint. You will have an opportunity to review all the evidence and discuss all of the evidence amongst yourselves. But at the end of the day, each and every one of you is entitled to your opinion. That is your vote. That is your right. This is somewhat of a special experiment also that could change. Someone may give you some type of a reason that changes your opinion. Somebody may be able to reason with you and change your opinion and say, yeah, I didn't look at it in that light. That's the type the openmindedness that I am going to ask you to do.

Further, associated with the standards with reasonable doubt, the instructions associated with the Defendant not having to put any evidence on, I think further indicates the — will assist you in determining what that standard is, as this is a system that is set up to avoid

120

the types of issues that we are faced with in the Salem Witch trials.

You're going to hear a lot of testimony in regards to the relationship between my client and Ms. Melke in this matter. They had a three-year relationship. There is no question that it is a relationship that ended, and my client didn't feel it ended on appropriate terms. And his actions directly after that happened, the State will bring you through all of the different issues associated with his actions, all of the different contacts, the nature of those contacts. It will be their obligation to prove one of the contacts that they're discussing is changing Facebook passwords and putting a dildo on there. You'll hear a lot of different testimony from the State in regards to the contacts that show that a lot of my client's actions were extremely childish. They'll be able to prove a lot of those actions. I cannot refute that.

But when we come to the facts of this case, we talk about culmination from the Prosecutor's side on this, from August 23rd to October 26th. I have a couple dates to go over with you. This is an incident where my client

was incarcerated as a result of the contact that he had with Ms. Melke.

He is incarcerated, initially, and he is required to spend 23 hours a day in a cell with similar inmates who were also required to be in the same type of cell. They aren't allowed to use the phone. They were on restriction as a result of different issues that they had in their individual cases.

There was some talk about Mr. Close. September 27th is the first date that Mr. Close comes into contact with my client. September 27th is also the first date that Mr. Close comes into contact with Mr. Allen, as they are no the same medical post at the Ingham County Jail on restriction.

The evidence will show that Mr. Close has proffered to the Prosecutor's office on other occasions, that he was currently awaiting trial. And you'll be left with a firm conviction that it is his intensions to attempt to gain some form of an advantage. Given his situation, you will see the lengths that he went through in order to do that.

The dates and the times are very

important. I would like to have you focus on those. On September 27 is the first time that Mr. Close comes into contact with my client, Mr. Uraz.

It's anticipated from his testimony, which is more than likely going to be, I can't recall, I can't recollect, that solicitation was made within two days of him coming into contact with Mr. Uraz.

Mr. Uraz solicited him three days between him contacting each other. Mr. Close will testify that when he was initially asked, he just told Mr. Uraz that he had a guy and the guy owed him a favor. So it will get taken care for.

This is allegedly based upon Mr. Close's testimony, happened two or three days after September 27th. This information was not brought to the police until October 13th, when Detective Krumbach, with the Lansing Police Department, is informed by the Ingham County Prosecutor's office that this individual had some information to convey.

As a result of delay, time off, the investigating officer didn't take any action until the 17th and tried to make a determination

as to the efficacy of the information he is being provided with, not to mention that he was already investigating all of the prior incidents, whether being brought to his attention by Mr. Close.

There is a meeting that occurs on October 17th between Mr. Close's attorney and the detective. Subsequent to that meeting he is returned. At this point in time Mr. Close, Mr. Allen, and my client were all removed from the medical post onto a normal general population. And they were all still together at this point in time.

Charles Allen will testify that he didn't hear anything. He was on the post with Mr. Uraz prior to going to the medical post, and that he did not hear anything, was not at all provoked or solicited until after they had gotten out of the medical post.

He will further testify that he did not have any discussions with Mr. Close in regards to this case in coming forward to the police with the murder-for-hire plot. First thing that he said to the police is what can I get out of this. I have a pregnant wife at home. He was assured after he was done talking to the police.

Mr. Allen, that a good word will be put in for him with the Judge. That in and of itself, okay, is the beginning of the investigation.

Mr. Close and Mr. Allen are both returned after their meetings into general population with Mr. Uraz without any form of instruction.

After the meeting on the 17th, Mr. Close is released back. Well, when the Prosecutor made the assertion that he was not returned back, well, Mr. Close was not returned to the same cell as Mr. Uraz, that is inaccurate. The evidence will show that Mr. Close was returned to the same cell after meeting with the police that he had been in previously, and had access to Mr. Uraz.

As far as on instigation, we have an issue of the December 2nd date yet. Here the Prosecutor says you will see a video and that video will show that Mr. Uraz wanted it done by December 2nd. And this is also something you'll see in the notes written between the inmates.

You'll see one of the inmates, Mr. Close, walking along Mr. Uraz and telling him different ways to go about doing this, to take care of the situation.

You will see Mr. Uraz responding in those

125

notes, saying he wanted to wait, he didn't want anything to happen while he was incarcerated, because he felt that that would probably not allow him to get out.

Well, we have more instigation by Close. The note was delivered to the Prosecutor's at the first meeting. The note was something that they had available to them. None of the police had the note available to them. Yet they still allowed Mr. Close to go back into the same cell with Mr. Allen and Mr. Uraz. Surprisingly, subsequent to October 18th, a phone call placed by undercover Officer Mobley, he is unable to get through the jail. This is a call that he will acknowledge in his testimony that he made. It was not set up by Mr. Uraz. It was set up by the investigation officer. The call on the 18th does not go through.

It's not until the 24th that another call goes forward and that he connects with Mr. Uraz. Mr. Uraz was not made aware that somebody would be calling him in regards to this. There is no indication from any of the witnesses that there was any structure, scheme, that he indicated anything about trash bags.

126

You will see from the video, also, that the officer is using investigative techniques. That's what he'll testify to. He is attempting to ensure that he gets what he needs out of this. We have what he testified to as a detective with not a great amount of experience. It's conducting this investigation, an undercover officer who hasn't been involved in any undercover operation. We have multiple days on both ends for both of them. Initially we have a delay between the 13th and the 17th when the information is first received.

Then we have a delay from the 18th to the 24th. This allows Mr. Close an opportunity to work something out so they can attempt to obtain a favorable result on his case.

You'll hear that $160 was placed on Mr. Close's account by my client. You will also hear that my client was putting money and was known by a lot of inmates as being very kind. Unfortunately, it's kind of soft, as a weakness.

How do we get from allegedly sniffing panties and putting dildos on Facebook to soliciting a murder? We manufacture the investigation. We make the investigation in a

127

manner so that we can convict this individual for it. It becomes very manufactured. It will be very evident to you, after watching this trial, being informed by me of the applicable legal standards, that it was Close, Mobley and Allen who solicited my client. My client did not solicit.

The story that they will sell you is going to ring in a fantasy. When you get put on a post in jail with other individuals who are not only in jail, but in trouble for what they did while in jail, just throwing an individual to the wolves. And when you conduct an investigation, and you don't have the foresight to avoid that investigation, causing your main witness to come back in contact without any instruction leads us to where we are at today, leads you to make a determination as to what happened here. There is no equivocation in the video. He asked for addresses. Doesn't give it to him.

I'm not asking for CSI in this case. Just to look at the facts, look at the sequencing, the investigation. And, at the very end, look at the dates and look at them from the investigation standpoint. the necessity for a second call, for

128

a level of proof, and see what happened on that second call. Thank you.

THE COURT:  Thank you. First witness on behalf of the Prosecution?

MR. ROTH:  Thank you, Your Honor. The People call Officer Daniel King.

THE COURT:  Step up here for us, Officer, if you will, please? Right up here. Raise your right hand for me. Do you swear or affirm the testimony you are about to give will be the truth, the whole truth, under penalty of perjury?

THE WITNESS:  Yes, sir, I do.

THE COURT:  Have a seat. State your name and spell your last name for the Court Reporter, please.

THE WITNESS:  My name is Daniel King. Last name is spelled K-I-N-G.

THE COURT:  Thank you. Mr. Roth.

MR. ROTH:  Thank you, Your Honor.

DANIEL KING,

a witness having been duly sworn, testifies as follows:

DIRECT EXAMINATION

BY MR. ROTH:

Q  Good afternoon, sir.

129

A Good afternoon.

Q Where are you employed?

A With the meridian Township Police Department.

Q In what capacity?

A A police officer.

Q Assigned road patrol?

A Yes, sir, that's correct.

Q How long have you been with the Meridian Township Police Department?

A Nearly two years this December.

Q Did you have prior police experience?

A I did.

Q Where was that?

A In Virginia.

Q Thank you. Can you tell me a little bit about what your experiences are as a road patrol officer with the Meridian Township Police Department?

A Standard duties are answering calls for service, enforcing state laws and local ordinances, anything of that nature.

Q Very good. On March 26, 2016, at approximately 5:40 PM, were you dispatched to the Okemos Best Buy store on Grand River?

A Yes, I was.

Q For what purpose?

130

A Dispatch let us know that there was a complaint that they received of a possible protective order violation.

Q Is that often called a PPO?

A That's correct.

Q Personal protection order?

A That's correct.

Q Could you explain to the jury briefly what a personal protection order is?

A A personal protective order, essentially, in laymen's terms, is an order that is issued by a court or a judge, protecting one party from another party, based on any type of given circumstances that the Court finds necessary.

Q So sort of what we see on TV is called a restraining order, something telling somebody to stay away from somebody else?

A Essentially, yes.

Q Very good. Once you receive that dispatch, or that call that day around 5:40 PM, how quickly or approximately did you arrive on scene?

A I don't recall how soon it was. I would imagine it would have been within a half hour.

Q Thank you. What did you observe when you first arrived at the Best Buy?

131

A As I was pulling into the parking lot, I did observe that there was a silver Pontiac Pacifica, I believe, which is what our dispatcher relayed information to us, stating that one of the involved parties was in the vehicle -- in that vehicle in the parking lot.

Q The person that you see in the Pacifica, were they male or female?

A Male.

Q Very good. And then what else do you see or do once you arrive?

A I took note of the male driver in the Pontiac. I observed that he appeared to be heavy-set, had dark hair, and was wearing sunglasses.

Q What was he doing when you arrived and saw him?

A He was just sitting in his vehicle at that point when we pulled in.

Q Did the vehicle leave shortly after you arrived?

A It did.

Q Could you give us an estimate of how quickly after you arrived that vehicle leaves?

A In my best estimate would probably be as soon as we passed the vehicle.

Q Very good. Just to put that in context, were you in a fully marked police vehicle?

132

A Yes, we were that day.

Q And a marked uniform as we see you in today?

A Yes, that's right.

Q Very good. So you arrived, and the male in the Pacifica leaves. What did you do then?

A At that point we made -- I was with a training officer at the time. I made contact with the complainant.

Q Do you recall her name?

A I believe it was Erika Melke.

Q Very good. Where was she when you made contact with her?

A I think she was right outside of her car, in her car. And we began speaking with her.

Q Can you tell me what her demeanor was when you first made contact with her?

A She was extremely upset. She was crying and distraught. It was very obvious.

Q So without telling us what she said that day, was Ms. Melke cooperative with you?

A Yes.

Q Did she provide anything to you?

A Yes.

Q Can you tell us what that was?

A She showed me her cell phone.

133

Q What specifically did she show you on the cell phone?
A She had pictures on her cell phone of Mr. Uraz, who was in his vehicle next to her.
Q At the Best Buy parking lot that day?
A That's correct.
Q So you said she initially shows them to you on her phone. Did she later provide them digitally as well?
A I don't believe so.
Q At some point you come in possession of the actual pictures, correct?
A I don't think I did personally, no.
Q You're right. I said that poorly. At some point the Meridian Township Police Department does?
A I believe so.
MR. ROTH: Very good. May I approach the witness, Your Honor?
THE COURT: You may.
Q (MR. ROTH) Showing you pictures one, two and three, were the pictures she provided to you that day?
A Yes.
Q In the content of these pictures, is that the person that you observed in the parking lot that

134

day in the Chrysler Pacifica?
A Yes.
MR. ROTH: Your Honor, I move for admission of Proposed Exhibits 1, 2 and 3.
THE COURT: Mr. Perrone?
MR. PERRONE: Voir dire, briefly?
THE COURT: All right.
VOIR DIRE EXAMINATION
BY MR. PERRONE:
Q As far as these photos, how did you obtain these from the victim? Did you take them from her phone?
A I don't recall whether or not, if she emailed them to me, or if it was another officer, or how we ended up actually coming in possession of those, of those pictures.
Q And were you able, when you saw the pictures on her phone, to make a direct correlation between the individual that you saw in the Pacifica, and Mr. Uraz seated in the courtroom today?
A It appeared to be.
Q It appeared to be him?
A Yes. I never ended up making contact with him on that date.
Q What what would your level of certainty have been

135

that it was him?
A Percentage-wise?
Q Yes.
A Sixty, 70 percent.
MR. PERRONE: No further questions. No objection.
THE COURT: All right. We'll admit Exhibits 1, 2 and 3.
MR. ROTH: Thank you, Your Honor.
(PX-#1, 2 and 3 received into evidence.)
CONT'D. DIRECT EXAMINATION
BY MR. ROTH:
Q So starting with on the screen in front of you, People's Exhibit 1, did you recognize the background in the picture that she showed you?
A Did I recognize the background?
Q Yeah. What's shown here?
A That's the wooded area, I guess you could say, in the parking lot there, in Best Buy.
Q So now showing you 2, and then 3, we see a vehicle here with a man in it. Is that vehicle shown in Exhibit 1?
A It appeared to be.
Q Thank you. Touch the screen in front of you. You can make a mark. Can you circle it to show to the

136

jury, please? So in the center of the picture; is that correct?
A Yes, that's right.
Q Very good. Showing you 2. It's a little difficult to see on the screen, but you testified to this when Mr. Perrone asked you: When you saw those picture, did you recognize the person that you saw in that vehicle?
A Yes.
Q As whom?
A As Mr. Uraz.
Q When you say Mr. Uraz, at the time you didn't know his name, correct?
A Ms. Melke gave me his information.
Q What I'm saying, you didn't have any personal experience with him before? Are you recognizing him as the person you saw on the way in, or somebody else?
A As the person as I saw on the way in.
Q Very good. Do you see that person in the courtroom today?
A I do.
Q Could you please point him out and identify him for the record?
A Seated right here.(indicating)

137

Q At which table?

A Oh. I'm sorry. He is seated right here (indicating)

MR. ROTH: Your Honor, I ask the record to reflect the identification of the Defendant.

THE COURT: Mr. Perrone?

MR. PERRONE: No objection.

THE COURT: So identified.

MR. ROTH: Thank you,

Q (MR. ROTH) You mentioned earlier that you were at dispatch because this is a violation of the personal protection order. Did you verify that there was, in fact, a PPO in place at the time?

A Yes.

Q Who was the protected party?

A The protected party was Ms. Melke.

Q And who was she protected from in the PPO?

A Mr. Tunc Uraz.

Q The Defendant?

A Yes.

Q And was one of the terms of that PPO that he was not allowed to be in her proximity, in her area?

A I believe so.

Q You indicated already that as soon as you arrived at the parking lot, he left, correct? So you did

138

not make contact with him that day?

A No, I never did.

MR. ROTH: Very good. I have nothing further of this witness, Your Honor.

THE COURT: Mr. Perrone?

CROSS-EXAMINATION

BY MR. PERRONE:

Q So it's your testimony that you believe that it was Mr. Uraz, and that he left because he saw you?

MR. ROSS: Your Honor, I'm going to object. That would be speculation. That isn't what he testified to. He can't say why the Defendant left.

MR. PERRONE: He can about his observation and his belief as an officer.

THE COURT: Well, I think he can testify — what was the question again? Read back the question.

(Portion of record read back by court reporter.)

THE COURT: So I would agree that he can't testify as to why Mr. Uraz may have left. All he can testify to is what happened. So I'll sustain that objection.

Q (MR. PERRONE) Did you attempt to stop Mr. Uraz?

A No.

139

Q Will that be something that you would be able to do as a function of your job in law enforcement?

A Is it something that I would be able to do?

Q You would be able to arrest him for his actions?

A Yes.

Q Okay. And Ms. Melke indicated to you as part of your investigation that Mr. Uraz drove away from her once she started taking pictures?

A Correct.

Q You didn't have any prior interactions with Mr. Uraz?

A No.

Q You saw an individual in the Chrysler Pacifica while you were coming into the Best Buy?

A Correct.

Q Were you alerted on dispatch to be looking for somebody in a Chrysler Pacifica?

A I believe so. Yes.

Q Was there any indication that he had said anything to her?

MR. ROTH: Your Honor, I am going object to hearsay.

THE COURT: That who said anything to her?

MR. PERRONE: Mr. Uraz.

THE COURT: Well, he can indicate if there

140

was some indication. He cannot ask what was said.

MR. ROTH: The only way to know that Ms. Melke testified to that, Ms. Melke is here and will testify.

THE COURT: Well, I think he can say she spoke to me.

THE WITNESS: Yes.

THE COURT: Yes, she spoke to you?

THE WITNESS: Yes.

Q (MR. PERRONE) She spoke to you?

A Yes.

THE COURT: He can't testify as to what.

MR. PERRONE: He said?

THE COURT: She said.

MR. ROTH: Right. That is the objection.

THE COURT: What she told him. He can't testify as to what Ms. Melke told the officers. That would be hearsay.

Q (MR. PERRONE) What did you do to follow-up after seeing them at the Best Buy parking lot?

A After I spoke with Ms. Melke, I submitted a, I guess you could call it, a request for a warrant.

Q Is that the extent of the involvement that you had?

A Yes.

141

Q   In this case, and also in any issues between Ms. Melke and Mr. Uraz --

A   I'm sorry?

Q   -- did you have any other report or any other investigation concerning either Ms. Melke or Mr. Uraz?

A   No.

Q   So this contact at the Best Buy was the sole case that you worked on?

A   Correct.

Q   And you can't recall how long it took you to get on scene?

A   No. Not from the time the call came out.

Q   Would it refresh your recollection if you knew what time?

A   I suppose it could help.

Q   If you would like to take a quick look, just read it to yourself. And then give it back to me. I'll ask you questions.

A   I guess, are you asking me what time we arrived on scene?

Q   Yeah. What time you arrived on scene, how long did it take you to get there?

A   I don't know when the time the call came out, if we were tied up with other calls, or if we were

142

doing something else, or actual travel time it took to get there.

Q   After having the opportunity to review the report, did you arrive at 5:40?

A   Yes.

Q   And did you write the report at 6:41?

A   Yes.

Q   Was that the time that the report was completed?

A   That's the time that the --

Q   You started writing?

A   Yes, the report was created.

Q   How much time did you spend on the scene?

A   It couldn't have been more than half an hour or so.

Q   How long were you on the scene before the silver Pacifica left?

A   I don't know for certain.

Q   Was it toward the beginning of when you arrived, or was it toward the end?

A   My belief was it is when we pulled in, the Pacifica had left.

MR. PERRONE:   No further questions.

THE COURT:   Any redirect?

MR. ROTH:   Just the last thing.

REDIRECT EXAMINATION

143

BY MR. ROTH:

Q   Had left or the process of leaving as you arrived?

A   I can't say for sure.

Q   Let me say it this way. You certainly saw it in the parking lot?

A   Sure.

Q   Shortly thereafter, it's no longer there, it left?

A   Correct.

MR. ROTH:   I have nothing else.

THE COURT:   Jurors have any questions for Officer King? Thank you, Officer. Appreciate you coming in. Next witness?

MR. KOOP:   Next one is Carmen Elias, Your Honor.

THE COURT:   Step up here for us, ma'am, if you would. Raise your right hand for me. Do you swear or affirm the testimony you are about to give will be the truth, the whole truth, under the penalty of perjury?

THE WITNESS:   Yes.

THE COURT:   Have a seat. And then once you get situated, state your name and spell your last name for the court reporter.

THE WITNESS:   My name is Carmen Elias. My last name is E-L-I-A-S.

144

THE COURT:   Thank you, Mr. Koop.

MR. KOOP:   Thank you. Your Honor.

CARMEN ELIAS,

a witness having been duly sworn, testifies as follows:

DIRECT EXAMINATION

BY MR. KOOP:

Q   Good afternoon, Miss. Do you know someone by the name of Erica Melke?

A   Yes.

THE COURT:   Just get closer to the mike for us. There you go. Thank you.

Q   (MR. KOOP) How do you know Erica Melke?

A   She was my roommate and friend.

Q   How long have you known Erica?

A   About five years.

Q   You said your roommate and friend?

A   Yes.

Q   When were you first roommates together?

A   Three years ago.

Q   And at what address were you roommates at?

A   We were in College Town Apartments, 308.

Q   Is that located at 4795 Douckel Road?

A   Yes.

Q   Here in the City of Lansing, Ingham County?

**145**

A   Yes.

Q   Do you recall approximately when you moved into Apartment 306?

A   It was like two summers ago. I think in July.

Q   July of 2015?

A   Yes.

Q   Did you and Erica — how long did you stay in Apartment 306 for?

A   One year.

Q   Where did you move after that?

A   Downstairs in Apartment 202.

Q   So that would have been in July of 2016?

A   Yes.

Q   Ms. Elias, do you know someone by the name Tunc Uraz?

A   Yes.

Q   How do you know this person?

A   He was my manager at Michigan State in the culinary services.

Q   At the culinary services?

A   Yes.

Q   How long was he your manager for?

A   About I think three to four years.

Q   Do you see him in the courtroom today, Miss?

A   Yes.

**146**

Q   Could you identify him and say something that he's wearing, please?

A   He is wearing a black tux or black suit.

MR. KOOP:   I ask the record to reflect she has identified the Defendant.

THE COURT:   Any objections, Mr. Perrone?

MR. PERRONE:   No objection, Your Honor.

THE COURT:   So identified.

Q   (MR. KOOP) Miss, I would like to direct your attention to July 17, 2016. At this point you're living with Erika Melke at 4295 Dunckel, correct?

A   Yes.

Q   Did something happen in the evening hours of July 17 that caused you and Ms. Melke to make a report to the Lansing Police?

A   Yes.

Q   Did the police in fact come and interview you that night?

A   Yes, they did.

Q   What is the reason for the police to be called?

A   We spotted him outside in our parking lot.

Q   Who is "he"?

A   Tunc Uraz.

Q   You say you spotted him outside your apartment. What circumstances did you see him outside of your

**147**

apartment?

A   Erika called me to her room because she had seen a white vehicle outside her window. When we went out there, we seen a white vehicle directly outside her bedroom window.

Q   Did you see who was inside that vehicle?

A   No. Not at the time from the window.

Q   Not at that time?

A   No.

Q   So you're still inside your apartment?

A   Yes.

Q   You say not at that time. What do you do after seeing through the window?

A   We had known that both our cars had been messed with. All our lugnuts were loosened, and her tires and lugnuts were loosened and popped. So we went outside together to see if there was any damage on our car at the moment. We went out, we had seen the car speed past and circle around. There is a QD and Speedway across from our apartment. At that time we had seen a car circle around and come back. As we started walking back in. We turned around. The white car came around again in front of us and we saw Tunc Uraz in the car.

**148**

Q   That's the driver?

A   Yeah. That's when I told Erika to call the cops. They directed us to come back inside the apartment at that point.

Q   Following this instant, when you see the Defendant, did you receive any communication with him?

A   I think a couple days before I got a text saying that he was in Turkey.

Q   A couple days before, a couple days after?

A   A couple days before this incident.

Q   Is it normal for you to see text messages from the Defendant at this time?

A   I had received a couple here and there. I mostly just didn't reply.

Q   Well, in the communications you would have of the Defendant, was it typical for you two to discuss travel plans, especially his plans for traveling overseas?

A   No.

MR. KOOP:   One moment, Your Honor.

Q   (MR. KOOP) Miss, were you aware of the dating relationship between Erica and the Defendant?

A   Yes.

Q   Is that something she talked to you about, her

149

relationship with the Defendant?

A   Yes.

Q   When this relationship between Erica and the Defendant ended, what was her demeanor? How did she respond?

A   I know that she was very upset. She also was really upset because she knew that this is the time that he started messaging different things. She showed me text messages of the negative things he would send to her that would make her more and more upset and escalated. It was just more crying and upset.

Q   She was upset?

A   Yeah.

Q   I wanted to go back a bit. You stated you worked with the Defendant back for about four years at MSU. When you communicated with to the Defendant, did he always speak in English to you?

A   Yes.

Q   These text messages that he sent you, were they in English?

A   Yes.

Q   You said he is your manager?

A   Yes.

Q   Did you have any problem following his directions

150

because of his language?

A   No.

Q   And at work you carried on in a normal conversation if you saw him?

A   Yes.

Q   There was no problem communicating?

A   No.

MR. PERRONE:   Nothing further, Your Honor.

THE COURT:   Mr. Perrone?

CROSS-EXAMINATION

BY MR. PERRONE:

Q   You made a prior report, prior to July 23nd, which was July 26th, in regards to Mr. Uraz appearing near your apartment?

A   Are you asking if I made a —

Q   Yeah. Did you make a report prior to July 26th?

A   I know I filed for a PPO, but I didn't make any police report.

Q   You can't recall if you made any police report or involved in any police reports?

A   I can't recall.

MR. PERRONE:   Am I allowed to refresh her recollection?

THE COURT:   Yes. You can look at this and see if it refreshes your memory, Mrs. Elias. Just

151

read it to yourself right now.

Q   (MR. PERRONE) Do you recall making a report prior to July 26th?

MR. ROTH:   I'm going to object if he is referring to July 26th. I'm wondering where that date is coming from. He testified that it was July 17th that she talked to him.

THE COURT:   The incident was July 17th?

MR. ROTH:   That's correct.

THE COURT:   So this would be subsequent, not before. I think your question was: Did she file a police report.

MR. PERRONE:   Yes.

Q   (MR. PERRONE) Did you file a report on July 17th?

A   Yes. This was the one I discussed earlier with a white vehicle.

Q   You filed a subsequent report on July 26th?

A   I didn't file another report other than the same report I discussed earlier.

Q   Do you believe -- were you contacted by the police after the 17th after you made your initial report?

A   No. I think just the contact for the PPO, whether it was approved or not.

Q   When did you receive the text?

A   I can't recall the exact date. But it had to

152

have been a couple days before the incident occurred, or a week before.

Q   Would it refresh your recollection if you had an opportunity to read the report?

A   I can try.

Q   Does that refresh your recollection?

A   Yeah. I know that it was right before this incident, but I'm not exactly sure what date. It was a year ago, over a year ago. I don't know for sure the date, but...

Q   And in the report that you made on the 26th, that was subsequent to the 17th?

A   Yeah. I honestly don't remember making a report on the 26th. I remember the 17th that night when he came to our apartment.

Q   After reviewing the report, does it refresh your recollection as to making an additional report?

A   No. That happened all the same night. Everything listed in there was that same night.

Q   You worked with Mr. Uraz three to four years at Michigan State?

A   Yes.

Q   He is your manager?

A   Yes.

Q   Did you have any problems with him being your

153

manager?

A   I mean, at the incident with Erika, it became uncomfortable working with him, knowing that he was causing her to be scared and stuffed like that. It was uncomfortable being there and trying to act normal at work.

Q   Did you see him make Erika scared?

A   Yes.

Q   What did he do?

A   He would threaten her through text messages, trying to call her. I would see him multiple times outside of our apartment. I remember her showing me a couple times of the cars. She would see his car outside the window.

Q   Did you know them as they were romantically involved? Did you ever hang out with them as a couple?

A   Not together.

Q   So you knew Ms. Melke and Mr. Uraz separately?

A   Yes, we did. We were at work together. So...

Q   How long did you live with Ms. Melke for?

A   I lived with her for three years now, going on the third year.

Q   Were you living with Ms. Melke at some point in time during her relationship with Mr. Uraz?

154

A   I think when I moved in with her was when the relationship was starting to end.

Q   You didn't have any contact with Mr. Uraz after moving in the apartment as far as seeing them as a couple?

A   I mean, unless it is work-related, not really. Besides, like I said, he did send me a couple random text messages, saying he is in Turkey that one time. And a couple other times trying to apologize to her through me.

Q   He is trying to apologize to her through you?

A   Yes.

Q   What is he saying?

A   Just he is sorry for everything that he has done.

MR. ROTH:   I'm going to object to hearsay as to what the Defendant is saying to this witness.

THE COURT:   Well, Mr. Uraz is here. I'll allow the statement. I'll overrule the objection. You can tell us what he said.

THE WITNESS:   I am not sure, specifically. Just that he's sorry for everything he has done, along those lines.

Q   (MR. PERRONE) Did you see Mr. Uraz threaten to kill Erika Melke?

155

A   No.

Q   Did you get any indication outside of the police that Mr. Uraz was intending to kill Erika Melke?

MR. ROTH:   I'm going to object. We have a lack of foundation. It's hearsay. I think there is even some speculation in there. So...

THE COURT:   That would be hearsay, any information she got from the police. So I will sustain that objection.

Q   (MR. PERRONE) You don't have any personal knowledge on your efforts, on Mr. Uraz's efforts to kill Ms. Melke?

A   Did I fear for my life? Yes.

Q   What caused you to fear for your life?

A   When all my lugnuts on my car happened to be loosened up.

Q   When did that happen?

A   About a couple weeks before we made the police report, which is why we went downstairs to check our vehicle.

Q   Did you see Mr. Uraz remove lugnuts from your car?

A   No.

Q   Did you assume that it was Mr. Uraz?

A   Yes.

Q   Why did you assume it was Mr. Uraz?

156

A   Because Erika's car had been damaged previously in the same way.

Q   Did you have any information that Mr. Uraz had done that?

A   Well, I mean, it happened all at the same time. So...

Q   You can't think of any reason why he would tell you that he's in Turkey?

A   I mean, besides him trying to —

MR. KOOP:   Object to speculation, Your Honor. He is asking this witness do you have any other reasons why he would be in Turkey.

THE COURT:   I thought the question was what did she think about that, not what his speculation was. Speculating-wise, what did she think about it. Wasn't that the question? I'll overrule the question.

THE WITNESS:   Can you repeat the question, please?

Q   (MR. PERRONE) How did you take it when he sent you this message? What did you think was his intention?

MR. KOOP:   I'm going to object.

THE COURT:   Okay.

MR. PERRONE:   That one —

157

THE COURT: I will sustain the objection. All she can say is what did she think when she got the message. She can testify to that, not what his intentions were.

Q (MR. PERRONE) What did you think when you received the message?

A I thought it was odd.

Q Had you spoken with Mr. Uraz on the phone previously?

A No.

Q You would have reported the text once you got it, or once you signed?

A I reported the night the cops came to our home. I felt that it was worth mentioning. At the time I thought it was odd, and then the night of that, because it was so recent. I thought it is worth mentioning.

Q Did you file a report on your vehicle's lugnuts.

A That's when I got a PPO. I used that as an order to get my -- in order to get my PPO.

Q Was there anything else, specifically, that you can recall, as far as Mr. Uraz's actions that caused you, specifically, to feel in danger?

A Well, when the evidence of him in our home was on camera, that made me feel unsafe, and him outside

158

our home when we had seen him previously.

Q But other than those instances, you didn't have a specific reason or specific instance of why he would have ill will toward yourself?

A Just towards myself?

Q Yes.

A No.

MR. PERRONE: No further questions.

THE COURT: Any redirect, Mr. Koop?

MR. KOOP: Briefly.

REDIRECT EXAMINATION

BY MR. KOOP:

Q Miss, did you have any problems with anybody else during this time period?

A No.

Q Did you have a breakup with a boyfriend, anything like that?

A No.

MR. ROTH: Nothing further.

THE COURT: Jurors, any questions for Ms. Elias? Thank you, ma'am. Thank you very much. You may be excused. Stay if you want. You are free to go. Next witness?

MR. ROTH: People call Noell VanSlembrouck.

THE COURT: Raise your right hand before

159

you sit down. Do you swear or affirm the testimony you are about to give will be the truth and the whole truth under penalty of perjury?

THE WITNESS: I swear.

THE COURT: All right. And state your name and spell your last name for the Court Reporter, please.

THE WITNESS: My name is Noell VanSlembrouck. V-A-N-S-L-E-M-B-R-O-U-C-K.

THE COURT: I'm glad I asked you to spell it for me.

THE WITNESS: Good call.

NOELL VANSLEMBROUCK,

a witness having been duly sworn, testifies as follows:

DIRECT EXAMINATION

BY MR. ROTH:

Q Your first name is spelled differently as well. Could you spell that for us?

A Yes. It is Noell. N-O-E-L-L.

THE COURT: Mr. Roth?

MR. ROTH: Thank you, Your Honor.

BY MR. ROTH:

Q Good afternoon. ma'am.

A Good afternoon.

160

Q Do you know a person by the name of Erika Melke?

A I do.

Q How do you know Ms. Melke?

A We are childhood best friends and we lived together in 2011 and 2015.

Q Do you have an idea how many years total you've been friends with Ms. Melke?

A Since kindergarten. So 20.

Q You know her pretty well?

A Very well.

Q During the course of the friendship, did you know her to be dating a person by the name of Punch or Tony?

A Yes.

Q Do you see him in the courtroom today?

A Yes.

Q Could you please point him out and identify him for the record?

A Right there.(witness indicating)

MR. ROTH: Thank you. Your Honor, I ask the record to reflect the identification of the Defendant.

THE COURT: Any objection, Mr. Perrone?

MR. PERRONE: No objection, Your Honor.

THE COURT: So identified.

161

Q (BY MR. ROTH) So, at some point, you know that the Defendant is dating Erika. Does there come a time when you become aware that she is no longer dating him?

A Correct. Yes.

Q Can you recall approximately when that was? Probably May or June of 2015.

Q Is that before or after you guys no longer lived together?

A I moved right out in May. So it was right after.

Q Thank you. Without telling us what she said, after the breakup, when the subject of the Defendant would come up in conversation, what was Erika's demeanor after the breakup?

A I would say more like anxious, scared and upset.

Q Tell me what you mean by anxious.

A I mean, she was always worried about what was happening if things were going to be okay with her car, with her apartment, with her job.

Q Did you ever have any experiences with him after the breakup?

A Yes.

Q Were any positive?

A None of them.

Q I want to talk about a specific one. New Years'

162

Eve, 2016. Where were you that evening?

A New Years' Eve, it was 2015?

Q Fifteen, going on '16. I apologize.

A Right. We were at Dave and Buster's down in Utica of Michigan.

Q Can you tell us what Dave and busters is?

A Dave and Buster's is an arcade place. They have pool, food, all that stuff.

Q Is there a restaurant/bar/arcade all in one?

A Yep.

Q Who were you there with?

A I was there with Erica, my boyfriend Zeb and Stan. Zeb. Z-E-B.

Q Thank you. Erica, you, Zeb, and one more person?

A Stan.

Q Who is Stan to the group?

A Stan was somebody that Erika was seeing at the time.

Q Male or female?

A Male.

Q While you were there with these other three people, did something happen?

A Yes. We were there having a good time. It was after midnight at this point and Tony had walked up.

163

Q When you say "Tony," you are referring to the Defendant, correct?

A Correct.

Q So you say he walked up. Is that in the restaurant or outside?

A That was in the arcade area.

Q But still inside?

A Inside, yes.

Q Had you invited him that evening?

A I had not.

Q Had you told him where you guys would be?

A No. Nobody had.

Q So nobody ever invited him, nobody told him where you guys were?

A We were not expecting to see him.

Q How did you feel when you first saw him that evening?

A I was very weirded out and scared.

Q How did Erika respond?

A Same. We were all like: What is going on here.

Q What did he do once he arrived?

A He went up to Erika and asked — he was like: Let's go outside. We need to talk.

Q How close was he when he was saying this?

A I was really close. We were all right there in

164

like the same little bubble.

Q What happened then?

A She adamantly said "no" over and over. Lots of talking, everybody being like she doesn't want to go outside, she doesn't want to talk to you, what are you doing here. Basically he never left. We had to get a manager to come up.

Q You said you were telling him no, Erica is telling him no, the gentlemen at the table are telling him no. How is the gentleman responding when everybody is telling him no, please leave?

A He is saying, Noell, this doesn't involve you, this doesn't involve you.

Q Was he getting upset?

A Yes. You could tell he was getting angry. He started slandering Erika, calling her demeaning names.

Q I know we are in court, but tell us what words he was using.

A Slut. I don't know verbatim other than that, that he was saying she was a slut, she is going to say what she wants to make you happy and pretty much implying that she was a liar.

Q Who is he saying this to?

A Stan, Erika, all of us.

**165**

Q How long do you think this went on when you guys were telling him: Please leave, please leave?
A I would say probably it felt like at least 10, 15 minutes before a manager came up and realized something was going on.
Q So a manager approaches you guys. Is it fair to say this is a pretty big scene at the restaurant?
A Yeah. You could tell there was something going on. We were all like worked up. Erika is bawling her eyes out at this time. Very upset. Shooken(sic), asking why aren't you leaving.
Q As long as this is going on, how did you feel?
A I was like: What's happening here. Like why is this happening. I was worried something is going to happen to to her when he's outside, that he was going to come in and do something to us. All of those things were running through our heads at that point.
Q You said at some point that restaurant or the arcade security or management approaches. What happens then?
A They were wondering like who is who, why is this happening. And that's when we explained we came here, we've been here for a few hours having a good time. He clearly drove an hour and a half

**166**

out of his way, to come here at midnight, 1 a.m. when they close at two. We are paying customers. We want to stay, and for him to please leave.
Q What happened then?
A Then we went off for a few minutes. Tony was talking with them. Then a few minutes later he came back, because he had talked to the manager into allowing him to apologize. So he came over and he's like: I'm sorry, but. And then went on and said more demeaning things. And clearly he was not apologizing. And that's when the manager took him out.
Q You said a lot of information. I want to back up a little bit. Was it management or security or both?
A I guess management. I don't know if they have actual security there.
Q All right. So management is talking to the Defendant. You said we left. Who is we? Me, Erika, Stan, my boyfriend. We walked over to the arcade games, kept on playing. That's what we were there for.
Q So all four people go away a little bit?
A Um-hum.
Q Is that a yes?

**167**

A Yes.
Q At some point the Defendant is brought back to you guys?
A Yes.
Q First of all, he now has management with him?
A Yes.
Q What's his misdemeanor when he comes back at this time.
A At first it seemed like he wanted to apologize. But that was not what he was doing.
Q How quickly did that change?
A Very quickly. He said I am sorry and then went on to do more stuff. And that's when the management took him and they left.
Q When he said more demeaning things this time, what sort of demeaning things did he say?
A Just the basic demeaning her character saying she is a slut, she's easy, just trying to make Stan not want to be there with her, I'm guessing, was his goal.
Q And then at some point you said management realized what he was doing and they take him away?
A Yes.
Q About how long did you think this went on?
A Not long. Real quick, that part.

**168**

Q Now, when you are testifying today in court, you're smiling. And so that's okay. But what I want to know is, as this is going on, how are you feeling?
A I'm really nervous right now.
Q Okay. What about back then, when all these things are happening, how are you feeling?
A Nervous. Anxious. Scared.
Q When you guys left the arcade or the bar that night, how did you feel?
A Worried.
Q What are you worrying for?
A Worried to go back to my apartment and find him there or worried that anything would be wrong with any other vehicles there.
Q Did you have any other interaction with him that night?
A No.
     MR. ROTH: I have nothing else, Your Honor. Thank you.
     THE COURT: Mr. Perrone?
     CROSS-EXAMINATION
BY MR. PERRONE:
Q What were – did anything happen to your vehicle?
A No.

173

A No.

Q Mr. Uraz, when he initially comes up to you, he is talking to you for 10 or 15 minutes?

A That's what it felt like. I did not have a watch on me.

MR. PERRONE: No further questions.

THE COURT: Any redirect?

MR. ROTH: No, Your Honor. Thank you.

THE COURT: Do the jurors have any questions for Ms. VanSlembrouck? Any questions for her? Thank you, ma'am.

THE WITNESS: Thank you.

THE COURT: Why don't we approach?

(Off the record discussion at the bench.)

MR. ROTH: People call Stan White.

THE COURT: Step up here for us, sir. Right up here. If you would raise your right hand before you sit down. Do you swear or affirm the testimony you are about to give will be the truth, the whole truth, under penalty of perjury?

THE WITNESS: Yes, I do.

THE COURT: Have a seat. State your name and spell your last name for the Court Reporter, please.

THE WITNESS: My full first name is Stan

174

Lee. My last name is White. W-H-I-T-E.

STAN WHITE,

a witness having been duly sworn, testifies as follows:

DIRECT EXAMINATION

BY MR. ROTH:

Q Good afternoon, sir.

A Hello.

Q How are you?

A I am good.

Q Do you know a person by the name of Erika Melke?

A Yes.

Q How did you know Ms. Melke?

A We met in school in x-ray class.

Q What school was that?

A Lansing Community College.

Q Do you recall approximately when that was?

A 2013, I believe.

Q Did you become friends at that time?

A Yes. Like classmates.

Q Have you ever had a romantic or dating relationship with her?

A Yes.

Q Is that currently or in the past?

A The past.

175

Q Could you tell us approximately when that began, approximately.

A It ended like 2015. Like end of 2015.

Q That's when it began?

A I believe so.

Q When did it begin? I am sorry, when did it end?

A About mid-way through 2016, I would say.

Q During the course of your relationship with her, did she ever mention an ex-boyfriend to you? Did she ever mention an ex-boyfriend by the name of Tony to you?

A She mentioned an ex-boyfriend by the time I knew her.

Q Don't tell us what she would say, but when she would speak of a man named Tony, what was her demeanor, her appearance?

A Well, when I started dating her, she was single. But her appearance would be she was -- seemed, I guess, sad because they broke up. So they broke up and she was sad, I guess.

Q As time progresses, you know, now you're beginning a relationship with her, you're dating her. As she speaks of Tony, what is her demeanor now?

A Now she is scared.

Q Did you ever have any contact with this person,

176

Tony?

A I met him.

Q Was that something that you had wanted?

A No.

Q I want to start by talking about an incident on New Years' Eve, 2015, into the early morning hours of January 1 of 2016. Did you come in contact with him at a location of Dave and Buster's?

A Yes.

Q Is that the first time you had met him?

A Yes, it was.

Q Who are you there with?

A I was there with Erika and Noell and Zeb. Noell is her friend. Zeb was Noell's boyfriend.

Q Could you tell us what happened that morning?

A We were just celebrating New Years' Eve, trying to have fun, and enjoy our time. He kind of showed up out of nowhere, unexpectedly. I honestly didn't know who he was at first. She seemed really like scared and like shocked about this guy being there. I had no idea who he was. But he kept trying to get her to talk to him. She didn't want to. She actually ended up crying. So I was just kind of like confused. I had never met the man before. I wasn't sure what

177

was going on at that time. But it was after the ball dropped, I believe. So it was beginning of 2016 at midnight.

Q Do you see that person in the courtroom today?

A Yes.

Q Can you please point him out and identify him for the record?

A Right there. (Witness indicating)

MR. ROTH: Your Honor, I ask would ask that the record reflect the identification of the Defendant.

MR. PERRONE: No objection.

THE COURT: So identified.

Q (MR. ROTH) We heard a lot of details about this incident from Noell. I am not going to ask you a ton about it. But how are you feeling as this is happening?

A How do I feel?

Q As it's going on those early morning hours.

A At Dave and Buster's?

Q Yes.

A Well, I was just shocked that he wouldn't take no for an answer. She kept saying she didn't want to talk to him. But he just kept getting pushy, trying to get her to talk to him. And I just

178

couldn't believe that like he was so like persistent when she was very clear that she didn't want to talk to him.

Q How did that ultimately end that night? How was the situation with him end?

A Well, eventually one of the managers at Dave and Buster's was talking to him. At the end he got -- walked out, he walked outside with the manager, one of the managers there, someone that works there.

Q After the Defendant left, about how much later was it that you and your friend left?

A Well. I mean, the bar closes about two or so. Oh, probably a little bit before two. You know, we had an Uber driver. I would say it was around two.

Q Did you discover something about your vehicle either that day or the next day?

A Yeah. I ended up having a flat tire.

Q Where was your vehicle parked?

A It was parked in the back part of the parking lot, closer to the highway.

Q Is that the parking lot of Dave and Buster's?

A Yeah.

Q So when you leave Dave and Buster's is when you

179

discover a flat tire on your vehicle?

A Yeah. We went back out. I was about to check and get my coat or something like that. And we had a flat tire. That's when I noticed it, after I left.

Q Was this sort of a run-of-the-mill flat tire or was there something uncommon about it?

A When we got it fixed, it had a side puncture.

Q What does a side puncture mean?

A It didn't mean roll over a nail or something like that, which would've been on the bottom. So you could tell it wasn't done by just the road.

Q So it was actually on the side of the tire?

A Side of the tire, yeah.

Q After that time, after that date, did you start to receive unwanted contact from the Defendant?

A Yes.

Q What form did that come in?

A Well, text messages, random numbers. Actually some texts were claiming to be like a girl asking me if I'm dating someone. I was getting random text messages, just weird ones about always if I'm always seeing somebody, or if I'm dating somebody.

Q Talking about random numbers, each time would be a

180

different number, or were they just coming back --

A I had a lot of numbers. I think I blocked like four or something of them on my phone. But they was numbers, kind of untraceable numbers, kind of a throw-away phone type of deal.

Q Had you ever had this problem before you started dating Ms. Melke?

A Oh, no.

MR. ROTH: May I approach the witness, Your Honor?

THE COURT: You may.

Q (MR. ROTH) I'm showing what's been marked Proposed Exhibit 4. If you would take a moment and flip through this for me?

A Yeah.

Q So I see you're nodding as you're going through it. Do you recognize this conversation?

A Yes.

Q Are you one of the parties in this text conversation?

A Yes, I am.

Q Who is the other person that you are talking to?

A I believe it's Tony.

Q Based on the contents of the conversation, you were able to tell it was him?

**181**

A Yes.

MR. ROTH: Very good. Your Honor, I move for admission of Proposed Exhibit 4.

THE COURT: Mr. Perrone?

MR. PERRONE: Voir dire, Your Honor?

THE COURT: All right. Let me ask you, did you start receiving these text messages after the Dave and Buster's incident?

THE WITNESS: Yes.

VOIR DIRE EXAMINATION

BY MR. PERRONE:

Q These text messages would be received in May?

A Yes. I believe that was in 2016, I believe.

Q May of 2016?

A Um-hom.

Q Is this a complete and total — is this the complete copy of the entire conversation?

A Yes.

Q Was there any other text between you and this individual?

A Well, there is actually some that I talked to. But it is someone claiming to be a girl that is asking me if I was seeing anybody. But I actually did get those text messages. Those are the only ones I seem to have a record of between

**182**

me and him.

Q But there were additional messages to this conversation?

A No. No. Not to that conversation. That's all that conversation is.

Q This is the entire conversation?

A Um-hum.

THE COURT: That's a "yes"? You have to say "yes" for the Court reporter.

THE WITNESS: Yes. I apologize.

THE COURT: All right.

MR. PERRONE: No further questions.

THE COURT: All right.

MR. ROTH: I assume that means no objection?

MR. PERRONE: No objection.

THE COURT: So we will admit that as Exhibit 4.

MR. ROTH: Thank you, Your Honor.

(PX-#4 is received into evidence.)

CONT'D. DIRECT EXAMINATION

BY MR. ROTH:

Q So I want to clarify things Mr. Perrone was asking you about. So this conversation occurs in May of 2016, as best you recall, correct?

**183**

A Correct.

Q You talk about preserving this one. This is the one you still have. But there was other smaller conversations where someone was claiming to be a woman asking if you're dating anybody?

A Yes. At that time I wasn't truly sure who it was. I didn't think much about it at the time. So I deleted those texts.

Q We see that you preserved these text messages that we see in Exhibit 4, correct?

A Correct.

Q How did you preserve them?

A Just off of screenshots.

Q Why did you do that?

A Well, just in case for proof some day that the harassment was taking place.

Q I want to ask you about that. You know, when somebody text messages me, I don't feel the need to document it. What was going on in your life at the time in that world such that you felt you needed to start preserving stuff?

A At this point I had three incidences where I had a side puncture, popped tires. There were incidents where Erika's vehicle got egged in my driveway. And this all happened — this was —

**184**

this text was after that.

Q Is it fair to say that things felt like they were escalating, getting a little more serious?

A Yeah. Definitely.

Q How did you feel about that?

A Well, I was a little nervous. I felt like I had to always look over my shoulder everywhere I went. Somehow he got my number. I didn't give him that information. He found out where I lived. I didn't give him that information. So, yeah, I was a little nervous. I got a son and his safety is my top priority. And the fact that he vandalized her car in my driveway made me nervous for me and my family.

Q You talked about him being at your house. Did you ever give him your address?

A No. Never.

Q You see this text conversation? Did you ever give the Defendant your cell phone number?

A No.

Q Do you know how he got your address or cell phone number?

A No. I don't know how.

Q I want you to read this text conversation for us. Starting with these ones on the left. Are these

185

you speaking or the Defendant?(Indicating)

A The Defendant.

Q Start with reading the Defendant for me here.

A "I think it is time for us to meet to solve our differences."

Q Your response?

A "Who is this"?

Q The Defendant.

A "You know me. We met."

Q Your response?

A "Is this Tony Uraz, the same person who has vandalized mine and Erika's vehicles multiple times, and who has been obsessively stalking Erika for a long time?"

Q What's the Defendant's response there?

A "If you want to play games, I am not going to talk to you. And I am sorry for bothering you. I thought we could have a civilized conversation, face to face. Have a good day."

Q How did you respond?

A I said: "Games are when you pop the tires on our vehicles multiple times. You have took it past civilized."

Q How did he respond?

A "Again, I am leaving soon. My son needs me. If

186

you want to meet in person to talk, I am okay with that. If not, sorry for bothering you."

Q And then he texted again without response?

A Yes.

Q What does that say?

A "Well, I tried. Again, have a good life."

Q How did you respond?

A "Maybe you can give me the money for all I had to spend on new tires, then I would be more willing to talk. That's when I lost my desire to be friendly."

Q How did he reply?

A He said: "Let's talk first. We are both adults, and we both have boys. Let's talk and come up with a solution. I'm willing to negotiate."

Q What did he say?

A He said —

Q So let me first say: You did not respond to that, correct?

A Uh-huh.

Q And then he goes on to say: "I am sorry -- uh-huh means no?

A No.

Q And he then says again?

A "I am ready now."

187

Q No response from you. He says?

A "Meet me at Buddie's by you."

Q No response from you. He says?

A "I am there."

Q Tell me what you say. I think on the next page. Read what you say.

A "The fact that you even know where I live bothers me. I don't know how you know where Erika is at all times. You must have hacked into her phone and got my number. Because I didn't give you my number or you're tracking her whereabouts through her phone or car. You crossed the line throwing eggs at her car while it was on my property the other day. Better stay away from my property. Erika lives in constant fear with bad anxiety and looks over her shoulder everywhere she goes because she is afraid you're always watching her."

Q How did he respond?

A He said: "Again, if you would like to meet, I am here to talk. If not, I tried. Sorry for bothering you."

Q No response from you. He then says?

A "Okay. Let me try again, because I want good karma. Where would you like to meet"?

188

Q All right. How did you reply?

A I said: "If you don't have about $1500 to give me and Erika for the damages you caused from vandalizing her vehicle, then we really have nothing to talk about. Plus, I don't trust your intentions for wanting to meet up with me. Tony Uraz, there is nothing to negotiate."

Q How did he reply?

A He said: "I am not going to discuss these matters via text message unless you want to meet face to face. I am sincere with my intentions. I have a son. You have a son. We are both responsible individuals. I am leaving soon. I lost my job, my house, everything. If I wasn't sincere, why would I ask you to meet me"?

Q How did you reply to that?

A I said: "Because you have proven to be unpredictable and capable of anything. You have given me absolutely no reason to trust you. There is nothing to talk about between us. You and Erika were long broke up before I even started hanging out with her. I didn't even know who you were until you unexpectedly showed up that day at Buster's on New Years'. Now, somehow you know where I live and have my phone number.

189

I didn't give you that information."

Q All right. Almost to the end. How does he reply to that?

A "I am sorry for Dave and Buster's incident. I am sure you got what you wanted that night. Your information is on the internet under the White Pages. I knew about you October, I believe that's 2013, is what it's supposed to be, when you had her after class. Thank you for your well wishes."

Q Your response?

A I said: "I was friends with her in class. But that was it. Any time I spent with her in that way, I was under the impression that she was single and not with anybody. I can't believe you have known me all this time. If all you say is true about your situation in life, then I wish you well in your future, but I don't want to meet up. Not after all that was done."

Q Then he finally says?

A "Okay. I tried to make it right. Thank you for your well wishes."

Q How did you feel receiving these text messages from him?

A Well, I was a little unsure of his intentions to

190

meet up. Like, you know, I didn't know what to expect.

Q Were you comfortable with the idea of meeting him?

A No. Not at all, or else I might have met up with him. I was uncomfortable, I was unsure of what might happen. I decided it was not a good idea to meet up with him.

Q You mentioned earlier that your tire was punctured at Dave and Buster's that evening. Was that the only time it happened?

A No. There was a few other times.

Q Tell us, generally, about those.

A Actually, when I went and got copies of the receipt at Dave and Buster's, I didn't get that fixed until January 4th. I think actually it was January. A few weeks after that another one took place. The next one was probably roughly about a month after that or something like that.

Q And, again, anything like that ever happened before you start dating Erika?

A No.

Q You weren't having any problems with anybody else in your life?

A No.

Q Were you present when anything happened to Erika's

191

car?

A Erika's car? Well, when I stayed at Noell's house, she had a flat tire over there. I was in the house with her when it was being punctured outside.

Q I think you mentioned earlier there was an incident where her car was egged. Do you recall that?

A Yes.

Q Where did that happen?

A In my driveway where I live.

Q Approximately when was that?

A Shoot.

Q Just an estimation.

A 2016, springtime, I want to say. I don't think it was that bad outside, weather-wise. Probably springtime, I would say.

Q What happened?

A Well, we actually went to the movies earlier that day. She had turned off her phone before we left, you know, because we thought he might like track us. Her phone was off. Nothing happened to my vehicle in the parking lot. And then once we got over, we stopped by my place, and then she turned on her phone. Or, actually, when we got

192

out of the movies, she turned on her phone. We went home, we went over to hang out downstairs. And then when she was leaving to go home, she found out her car was egged at that point. It was dark out, late.

Q Her car had been parked at your house at that time?

A Yes.

Q Showing you Proposed Exhibits 5 and 6. Is this a — excuse me. Are these fair and accurate depictions of her car with eggs around them?

A Yes.

MR. ROTH: Your Honor, I move for admission of People's Proposed Exhibits 5 and 6.

THE COURT: Any objection, Mr. Perrone?

MR. PERRONE: Voir dire, Your Honor?

VOIR DIRE EXAMINATION

BY MR. PERRONE:

Q When were these pictures taken?

A I guess I would say springtime 2016. Don't know the exact date.

Q Did you take these pictures?

A Actually I think Erika took those pictures. Then I got them from Erika.

Q You got them from Erika?

Q You testified earlier that you had been receiving other messages from other phone numbers in the same time period?

A Yes.

Q That you attributed it also to Mr. Uraz?

A Yes. I believe it was him.

Q You did not preserve those, though?

A No. The first one, I said, was someone stating it was a female asking if I'm seeing anybody. But I will mention with those text messages that it was a statement saying I'm sorry for Dave and Buster's.

Q How many random numbers do you receive text messages from?

A I think around four. Because I was trying to block as many as I could.

MR. PERRONE: No further questions.

THE COURT: So, Mr. White, in one of the text messages, you indicated that a response was: I was sorry for Dave and Buster's?

THE WITNESS: I believe that is in one of those text messages.

THE COURT: Other than Dave and Buster's, had you ever had contact with Mr. Uraz?

THE WITNESS: Not face to face.

---

THE COURT: All right. Any additional juror questions? All right. Okay. Thank you, sir. Step down. You can be excused. That's all the time we have for today, members of the jury. We are going to conclude today's services. We will come back tomorrow and report downstairs at 8:15. We won't go this long tomorrow, I assure you. I ran over a little bit today. I don't want those people to have to come back. Remember, don't discuss the case with anyone, family, friends, children, grandparents. And don't read any newspaper accounts.

On behalf of the citizens of Ingham County, I would like to thank you for your service. We will see you tomorrow morning. Appreciate it. Thank you very much.

(Jury exits courtroom at 3:52 p.m.)

THE COURT: Be seated. I just want to make an observation in reference to Mr. Uraz's request for an interpreter while he is testifying, which in fact we are going to provide. However, I believe the demonstration of the command of the language in Exhibit 4 concerning the text messages shows that Mr. Uraz has an above-average command of the language. He is able to communicate

---

clearly in writing and use some pretty sophisticated language in that regard. So the question is: Does he really need an interpreter or not. We are still going to provide it, but should that become an issue later, I just want the record to be clear on that.

We will be in recess until tomorrow at 8:30.

MR. ROTH: Parties should be present in the courtroom ready to proceed at 8:30?

THE COURT: Our role is having the jury come in 8:15 so that we can go at 8:30.

MR. ROTH: Thank you, Your Honor.

THE COURT: All right.

(Proceedings concluded at 3:54 p.m.)

STATE OF MICHIGAN )
COUNTY OF INGHAM )

I, TERESA J. ABRAHAM, Certified

---

Shorthand Reporter in and for the County of Ingham, State of Michigan, Thirtieth Judicial Circuit Court, do hereby certify that the facts stated in the foregoing pages are true and correct, and comprise a complete, true and correct transcript of the proceedings taken in this matter on this the 2nd day of November, 2017.

Teresa J. Abraham, CSR-3445

Date: May 7, 2018