STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff,

vs.                                CASE NO:   16-1064-FH
                                              16-1065-FH

TUNC URAZ,

Defendant.
_____/

HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
LANSING, MICHIGAN -- FRIDAY, NOVEMBER 3, 2017

CRIMINAL JURY TRIAL

APPEARANCES:

FOR THE PEOPLE:

WILLIAM O. CRINO, JD
CHAZ T. KOOP, JD
Assistant Prosecuting Attorney
Prosecuting Attorney's Office
313 W. Kalamazoo
Grady Porter Building
Lansing, Michigan 48933


FOR THE DEFENDANT:

JACOB PERRONE, JD
Perrone Law, PC
221 W. Lake Lansing Road, Ste. 200
East Lansing, MI 48823

ERIC SCHROEDER, JD
BODWIN & ASSOCIATES PC
2070 E. Lake Lansing Rd.
East Lansing, MI 48823-7415


Reported by:  Terese J. Abraham, CSR-3485
Phone  (517)483-6406    e-Mail: tjabraham@msn.com

I   N   D   E   X

WITNESSES:

ERIKA MELKE

        Direct Examination by Mr. Koop                8
        Voir Dire Examination by Mr. Perrone          16
        Cont'd. Direct Examination by Mr. Koop        17
        Cross-Examination by Mr. Schroeder            56
        Redirect Examination by Mr. Koop              60
CHRIS BERGSTROM

        Direct Examination by Mr. Koop                64
        Voir Dire Examination by Mr. Perrone          73
        Cont'd. Direct Exam. by Mr. Koop              73
        Cross-Examination by Mr. Perrone              75
RICHARD LAING

        Direct Examination by Mr. Koop                80
        Voir Dire Examination by Mr. Perrone          85
        Cont'd. Direct Exam. by Mr. Koop              88
        Cross-Examination by Mr. Perrone              91
        Redirect Examination by Mr. Koop              101
HEATHER HEITMAN

        Direct Examination by Mr. Koop                103
        Voir Dire Examination by Mr. Perrone          105
        Cont'd. Direct Exam. by Mr. Koop              105
        Voir Dire Examination by Mr. Perrone          108
        Cont'd. Direct Exam. by Mr. Koop              108
        Cross-Examination by Mr. Perrone              109
        Redirect Examination by Mr. Koop              110
BERNARD BROWN

        Direct Examination by Mr. Koop                115
        Voir Dire Examination by Mr. Perrone          116
        Cont'd. Direct Exam. by Mr. Koop              119
        Cross-Examination by Mr. Perrone              123
        Redirect Examination by Mr. Koop              126
REGINALD CLOSE

        Direct Examination by Mr. Koop                131
        Voir Dire Examination by Mr. Perrone          149
        Cont'd. Direct Exam by Mr. Koop               150

| Exhibit # | Description | Received |
|---|---|---|
| PX-#7 | car photo | 17 |
| PX-#8 | car photo | 17 |
| PX-#9 | car photo | 17 |
| PX-#10 | car photo | 17 |
| PX-#11 | car photo | 17 |
| PX-#12 | BBQ order | 23 |
| PX-#13 | "ho" text | 24 |
| PX-#14 | trail cam #180 pic | 32 |
| PX-#15 | trail cam #186 pic | 32 |
| PX-#16 | trail cam #187 pic | 32 |
| PX-#17 | trail cam #188 pic | 32 |
| PX-#18 | trail cam #192 pic | 32 |
| PX-#19 | 2nd PPO | 37 |
| PX-#20 | Instragram acct | 39 |
| PX-#21 | Instragram acct | 39 |
| PX-#22 | Instragram acct | 39 |
| PX-#23 | Instragram acct | 39 |
| PX-#24 | Instragram acct | 39 |
| PX-#25 | FB screenshot | 43 |
| PX-#26 | FB screenshot | 43 |
| PX-#27 | email | 45 |
| PX-#28 | email | 45 |
| PX-#29 | jail call screenshot | 48 |
| PX-#30 | PPO | 51 |
| PX-#31 | letter/Bergstrom | 73 |
| PX-#32 | Spartan Net records | 88 |
| PX-#33 | lease agreement/Atamer | 108 |
| PX-#34 | North Pointe Apts. map | 105 |
| PX-#35 | North Pointe Bldg. map | 105 |
| PX-#36 | GPS tether disk | 119 |
| PX-#37 | GPS records | 120 |
| PX-#38 | GPS records | 120 |
| PX-#39 | notes dft/Close | 150 |
| PX-#40 | notes dft/Close | 150 |
| PX-#41 | map of apt | 150 |
| PX-#50 | mom's phone call | 28 |
| PX-#51 | tires pic | 49 |
| PX-#52 | tires pic | 49 |
| PX-#53 | apt complex map | 13 |
| PX-#59 | GPS records | 122 |
| PX-#60 | screenshot IB file | 89 |

*****************************************************************

| DX-#A | PPO statement | 58 |

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff,

vs.                    CASE NO: 16-1064-FH
                              16-1065-FH
TUNC URAZ,

Defendant.
_____/

HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
LANSING, MICHIGAN -- FRIDAY, NOVEMBER 3, 2017

CRIMINAL JURY TRIAL

APPEARANCES:

FOR THE PEOPLE:

WILLIAM O. CRINO, JD
CHAZ T. KOOP, JD
Assistant Prosecuting Attorney
Prosecuting Attorney's Office
313 W. Kalamazoo
Grady Porter Building
Lansing, Michigan 48933

FOR THE DEFENDANT:

JACOB PERRONE, JD
Perrone Law, PC
211 V. Lake Lansing Road, Ste. 200
East Lansing, MI 48823

ERIC SCHROEDER, JD
BODWIN & ASSOCIATES PC
2970 E. Lake Lansing Rd.
East Lansing, MI 48823-7415

Reported by: Teresa J. Abraham, CSR-3445
Phone: (517)483-6484 e-Mail: tjabrahane@msn.com

---

I N D E X

WITNESSES:

ERIKA MELKE
  Direct Examination by Mr. Koop        8
  Voir Dire Examination by Mr. Perrone  46
  Cont'd. Direct Examination by Mr. Koop 47
  Cross-Examination by Mr. Schroeder    50
  Redirect Examination by Mr. Koop      60

CHRIS BERGSTROM
  Direct Examination by Mr. Koop        64
  Voir Dire Examination by Mr. Perrone  73
  Cont'd. Direct Exam. by Mr. Koop      75
  Cross-Examination by Mr. Perrone      75

RICHARD LAING
  Direct Examination by Mr. Koop        80
  Voir Dire Examination by Mr. Perrone  85
  Cont'd. Direct Exam. by Mr. Koop      87
  Cross-Examination by Mr. Perrone      89
  Redirect Examination by Mr. Koop      101

HEATHER HEITMAN
  Direct Examination by Mr. Koop        102
  Voir Dire Examination by Mr. Perrone  105
  Cont'd. Direct Exam. by Mr. Koop      105
  Voir Dire Examination by Mr. Perrone  108
  Cont'd. Direct Exam. by Mr. Koop      108
  Cross-Examination by Mr. Perrone      108
  Redirect Examination by Mr. Koop      110

BERNARD BROWN
  Direct Examination by Mr. Koop        115
  Voir Dire Examination by Mr. Perrone  116
  Cont'd. Direct Exam. by Mr. Koop      116
  Cross-Examination by Mr. Perrone      123
  Redirect Examination by Mr. Koop      128

REGINALD CLOSE
  Direct Examination by Mr. Koop        131
  Voir Dire Examination by Mr. Perrone  139
  Cont'd. Direct Exam by Mr. Koop       139

---



Exhibit #    Description              Received
  car photo
  car photo
  car photo
  car photo
  rear photo
  PPO order
  000 text
  (trail cam) 180 pic
  (trail cam) pic
  (trail cam) pic
  (trail cam) 182 pic
  Inst PPO
  Instagram acct
  Instagram acct
  Instagram acct
  Instagram acct
  Instagram acct
  FB screenshot
  FB screenshot
  email
  email
  (cell) call screenshot
  PPO
  Letter/Bergstrom
  Sparrow Net records
  lease agreement/Atamer
  North Pointe Apts. map
  North Pointe bldg. map
  GPS tether disk
  GPS records
  GPS records
  notes of Close
  notes of Close
  map of apt
  mobile phone call
  tires pic
  tires pic
  complex map
  GPS records
  screenshot of cell
DX-8A    PPO statement                 58

---

Lansing, Michigan
November 3, 2017
at about 8:39 a.m.

*********

THE COURT:  We are on the record in the matter of People v Uraz file number 16-1064 and 16-1065.  We have Mr. Roth here, Mr. Perrone.  You are Mr. Uraz, sir?

THE DEFENDANT:  Yes, sir, Your Honor.

THE COURT:  At the close of yesterday's session, we received a question from Juror number 1 that asked:  Is his region -- to Mr. Uraz's country of origin -- Turkey.  That is the nature of his question.  He communicated to Ms. Smith he might have a bias if the answer to that was yes.  I sent a message to him through Ms. Smith that that would not be a basis for him to be excused.

THE COURT:  Go ahead, Mr. Roth.

MR. ROTH:  I think it would be appropriate.  I hate to delay things further.  But I think it would be appropriate to ask him about that.  Obviously proofs will come out, his country of origin is Turkey.  If the juror is going to say that that gives him a bias for or against the Defendant, that he can't set aside, then I think

he needs to be excused.

THE COURT: I had this come up before. It always raises an issue where someone didn't want to serve, having to do with a person of Hispanic origin. And my solution, and that's what I am going to do in this case, is to simply say that when we come down to strike the people, we are going to strike number one.

MR. ROTH: That's fine, Your Honor.

THE COURT: By doing it that way, we don't have to get into what his thoughts are for or against. It's just a matter of by agreement we know that Juror number 1 would be struck at the conclusion of the proofs. Anything you would like to put on the record, Mr. Perrone?

MR. PERRONE: I think that inquiring as to Juror number one, his bias, would be prudent. Given that Mr. Uraz is actually a United States citizen, would just clear that issue up with him, at this stage, rather than him operating under a biased presumption.

THE COURT: Well, my theory is this: We don't need to ask him that if we are going to strike him.

MR. ROTH: I'm in agreement, Your Honor.

THE COURT: So he is not going to be in the final 12. The jury's not allowed to discuss the case amongst themselves, anyways, until it comes time for deliberation. And then that way —

And the other reason is; If we do it the other way, there are always other people on the jury who, once they start hearing the case, don't want to hear it sometimes, it starts a stampede. So by us indicating that we will strike Juror number 1, we don't have to get into any background. That's how I'm going to handle it.

MR. ROTH: Thank you, Your Honor.

THE COURT: Any other preliminary matters?

MR. PERRONE: Yes. Following up on the Close notes. I had an opportunity to preliminarily review them last night. They are somewhat difficult to read and interpret. Based upon my review of them it doesn't appear that the statement that was made by the individual in the notes, associated with being able to pass a polygraph test, is Reginald Close.

THE COURT: I don't know how we can determine that. I mean, I don't know, other than asking him. There is no identifying marks on the notes. And I think I acknowledged that,

initially, by saying I can't tell what the source of the origin is. But I guess even the mere fact of the conversation is relevant.

MR. PERRONE: Well, the note that is used in this case, in the solicitation case, if you look at that handwriting compared to the handwriting associated by —

THE COURT: Do we have a handwriting expert? I'm not trying to be difficult. I'm just saying, I think you will be able to ask about the statement. You can bring up the statement. You can ask him did he write the statement. So I think that's the way to handle it. You can show him the note and see if that is what he wrote. So I am going to allow you to get to that issue.

MR. PERRONE: Okay. Thank you, Your Honor.

THE COURT: Anything else, preliminarily?

MR. ROTH: No, Your Honor.

THE COURT: We may have to take a break in order to get this transcript done.

[Jury present in courtroom at 10:45 a.m.]

THE COURT: Next witness, Mr. Roth and Mr. Koop?

Step up here for us, Ms. Melke. Raise your right hand, please.

Do you swear or affirm the testimony you are about to give will be the truth under penalty of perjury?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Have a seat. State your name for the Court Reporter for us, please.

THE WITNESS: Erika Melke. M-E-L-K-E.

THE COURT: Mr. Koop?

**ERIKA MELKE**

A witness sworn under oath, testifies as follows:

DIRECT EXAMINATION

BY MR. KOOP:

Q  Good morning, Miss.

A  Hello.

Q  Ms. Melke, how old are you?

A  Twenty-five.

Q  Do you know someone by the name of Tunc Uraz?

A  Yes.

Q  Do you call this person by a different name?

A  Tony.

Q  How did you first meet this person?

A  At the MSU cafeteria.

Q  Is that while you were a student or something else?

**9**

A  Student at first.

Q  At the cafeteria, were you working there, or how did you meet him there?

A  The first year I was a student, and I met him. And the following years I was no longer a student there, and I worked there.

Q  Do you see Mr. Uraz in court today?

A  Yes.

Q  Can you please point to him and say something he is wearing?

A  White shirt with black overcoat suit, with a tie.

MR. KOOP:  I would ask the record to reflect that she has identified the Defendant.

THE COURT:  Any objection, Mr. Perrone?

MR. PERRONE:  No objection, Your Honor.

THE COURT:  So identified.

Q  (MR. KOOP) While you were working at the cafeteria, is the Defendant also working there?

A  Yes.

Q  At some point, do you start a friendship with him?

A  Yes.

Q  Is that friendship turning into a dating relationship?

A  Yes.

Q  Ms. Melke, when did that dating relationship

**10**

begin, approximately?

A  End of 2012, early 2013.

Q  You are no longer in a dating relationship with him, correct?

A  Correct.

Q  When did that relationship end?

A  June of 2015.

Q  So you dated approximately three years?

A  Two and a half to three, yeah.

Q  In your relationship with the Defendant, what language did the two of you speak?

A  English.

Q  That's how you communicated back and forth?

A  Yes. I don't know any other language.

Q  Did the Defendant have any trouble communicating to you?

A  No.

Q  When you spoke to him in English, did he have any problems or difficulties understanding you?

A  No, he didn't.

Q  Based on your long-term relationship with the Defendant, did you know him to have any problems, difficulty reading or writing, speaking English?

A  Some of his speaking was a little not correct English, but otherwise he got the point across.

**11**

Q  You said that the Defendant, you met while at MSU, working at MSU. Besides MSU, where was was he employed? Anywhere else?

A  Yes.

Q  Where?

A  He worked at LCC teaching.

Q  Do you know what course he taught?

A  Management of some sort, culinary.

Q  How long was he teaching that course?

A  He would teach that certain semesters if there was enough students to take it. So since I had met him, he was teaching that course.

Q  To the best of your knowledge, he taught that course in English?

A  Yes, he did.

Q  Would you say that your relationship with the Defendant ended somewhere in June of '15, correct?

A  Yes.

Q  Who ended that relationship?

A  I did.

Q  How did the Defendant respond when you broke up with him?

A  He was not happy about it.

Q  You say not happy. What makes you feel not happy?

A  He did not want the relationship to end. He kept

**12**

trying to communicate with me to resolve the issues. But I did not want to.

Q  You said he kept trying to want to resolve these issues and communicate with you. Was there a time that you tried to put an end to this communication?

A  A few months after.

Q  How did you try to do that?

A  I would ask him to leave me alone and he would not.

Q  I want to direct your attention to the end of July of 2015, okay? Where were you living at that time?

A  I moved to College Towne Apartments.

Q  Is that 4925 Dunckel?

A  Yes.

Q  That's here in Lansing, Ingham County?

A  Yes.

Q  Is that a house or an apartment, Miss?

A  Apartment.

Q  What apartment were you living in, in July of 2015?

A  308.

Q  You say that's called College Towne Apartments?

A  Yes.

13

Q Did you live there by yourself or with someone else? Did you have a roommate?

A Yes, I had a roommate.

Q What is your roommate's name?

A Carmen Elias.

MR. ROTH: May I approach on this, Your Honor?

THE COURT: You may.

Q (BY MR. ROTH) I am handing you what's been marked People's Proposed Exhibit 53. Do you recognize what I handed you, Miss?

A Will you repeat that?

Q Do you recognize what's contained on that?

A Yes. My apartment complex.

Q Does that accurately reflect the layout of the roads around your apartment complex?

A Yes.

MR. KOOP: Move to admit People's Proposed Exhibit 53, Your Honor.

THE COURT: Mr. Perrone?

MR. PERRONE: No objection, Your Honor.

THE COURT: So admitted.

(PX-#53 is received into evidence.)

Q (BY MR. KOOP) You move in, in July of 2015. Was this a year-long lease?

14

A Yes.

Q And where, after the conclusion of the year, where did you move next?

A To Apartment 202 in the same building. Just one floor down.

Q This is that map of your — on the map, can you circle on the screen where your apartment would be, roughly?

A Sorry. That is from what I touched.

Q Try again.

A It's still barely --

Q Just over in the corner here?

A Yeah. To the right.

Q Right here? (Indicating)

A Yes.

Q So Apartment 202 is a floor down?

A Yes. Same building.

Q The relationship with the Defendant had ended some time in June of 2015; is that accurate?

A Yes.

Q You moved in your Apartment 308 in July of 2015. Had the Defendant – had you ever invited the Defendant over to your apartment on Dunckel Road?

A He insisted that he help me move in, in July. After that I did not ever invite him back over.

15

Q And move into Apartment 308?

A Yes. 308.

Q Did you ever give him a key to your apartment?

A Never.

Q Just that one time of moving that you had invited him over?

A Correct.

Q Ms. Metke, around August of 2015, specifically August 24th to August 25th, was there some sort of damage done to your vehicle as it was parked outside of your apartment?

A Yes.

Q What vehicle were you driving at that time?

A A Toyota Rav 4.

Q Do you recall what the damage done to your car was?

A Yeah. There was a key mark to the driver's side. And the Michigan registration tabs were scratched off.

Q Did you report this incident to the police?

A I did.

Q And did the police come out and take photographs?

A I drove to the precinct, actually, and they took pictures there.

MR. KOOP: May I approach the witness, Your

16

Honor?

THE COURT: You may.

Q (BY MR. KOOP) I am showing you, to review those photos.

A Yes.

Q This is from that incident?

A Yep.

Q Within these exhibits, you were able to recognize that as the damage on your car on these dates?

A Yes.

MR. KOOP: Move to admit People's Proposed Exhibits 7 through 11, Your Honor.

MR. PERRONE: Voir dire, Your Honor?

THE COURT: Okay.

VOIR DIRE EXAMINATION

BY MR. PERRONE:

Q Were those pictures taken by police officers?

A Yes, they were.

Q Do you recall the police department that took the report?

A Yes. It was off of Cavanaugh.

MR. PERRONE: No objection, Your Honor.

THE COURT: All right.

THE COURT: What number was that again?

MR. KOOP: Seven through 11, Your Honor.



**17**

THE COURT: Are you going to move for those to be admitted?

MR. KOOP: I do.

THE COURT: I will admit those.

(PX-#7-11 received into evidence.)

CONT'D. DIRECT EXAMINATION

BY MR. KOOP:

Q   So, Ms. Melke, let's review these photos. This is People's Exhibit 7. That's the rest of your vehicle?

A   Yes.

Q   A Toyota Rav 4?

A   Yes.

Q   And then a little closer now. This is People's Exhibit 8. What do we see here on People's Exhibit 8?

A   My license plate with the tag scratched off.

Q   And before August 24th to 25th, 2015, your license plate did not appear like that; is that correct?

A   Correct.

Q   What do we see here in People's Exhibit 9?

A   The driver's side of my vehicle.

Q   And similarly, People's Exhibit 10?

A   And the driver's side key mark.

Q   And then People's Exhibit 11, is that that same

**18**

key mark?

A   Yes.

Q   Just a little zoomed in?

A   Yes.

Q   And that key mark was not -- the damage to your vehicle, meaning the scratch and the license plate, that was not done, that was not like that before the 25th?

A   Correct.

Q   That Toyota that you were driving at the time, do you still have the vehicle today?

A   I do not.

Q   When did you no longer have that vehicle?

A   Just this past summer.

Q   Meaning 2017?

A   Yes.

Q   Did you have the same license plate throughout that time?

A   Yes.

Q   Directing your attention to September 29, 2015, while at the Kroger Grocery Store in Frandor, do you recall an interaction with the Defendant at that time and place?

A   Yes, I do.

Q   Can you tell the jury about that?

**19**

A   I went to the Kroger to pick up a couple things. I was doing my shopping, just walking around, and there appears the Defendant. And he approaches me and tried to talk to me. He asked me questions about some guy I was seeing. And I told him there was nothing to talk about, I have nothing to tell you, and please leave me alone, and he wouldn't. And then he ended up walking out to the parking lot at the same time as me. And I put my stuff in the car and left.

Q   When you see him at the grocery store, is he pushing a cart, is he carrying any groceries?

A   No.

Q   He didn't have a basket in his hand, anything like that?

A   He might have had a basket. I don't recall exactly. But he was not pushing a cart.

Q   How did it make you feel when the Defendant approaches you in the store, asking you about a relationship?

A   I was very surprised to see him there, and a bit scared that he showed up at the same place I did. And I felt it wasn't his business to be asking me those questions as I was no longer in a relationship with him.

**20**

Q   Now, around this time, are you still communicating -- he's still trying to contact you by phone, anything like that?

A   Text messages here and there. Yes.

Q   Now, on September 29, we heard some testimony yesterday about an incident at Dave and Buster's on New Years' Eve 2015 and January 1st, 2016. Do you recall that evening?

A   I do.

Q   Who did you go to Dave and Buster's with?

A   I was there with Noell VanSlembrouck, her boyfriend and Stan White.

Q   Is her boyfriend named Zeb Baldwin?

A   Yes, it is.

Q   Did you see the Defendant that New Years' Eve?

A   I did.

Q   Had you invited him to meet you there, to celebrate?

A   No, I did not.

Q   Did you actually see him inside Dave and Buster's?

A   Yes. He approached us.

Q   What happened once he approached you?

A   He was trying to get me to come outside and talk. And I did not want to. And I kept saying: No. And he was very persistent. He began standering

me and talking with Stan White about me, trying to put me down.

Q Let's get into that a little bit more. You say slander you. What do you mean by slander you? What's he saying?

A Basically calling me names, trying to get Stan to think that I was just going to, you know, be with anyone and give anyone what they want.

Q I know this is difficult, but what did you mean by not giving anyone what they want?

A Basically calling me a slut.

Q When the Defendant is saying these things to you, in front of your friends, approaching out of nowhere, how does it make you feel?

A I was very scared. I wasn't – I did not feel safe. I was upset. It ruined my night. And it just was not appropriate and respectful at all.

Q How long was the Defendant there talking or trying to get you to go outside?

A I'm not sure how long he was there.

Q Does he at some point leave your group of people?

A Yeah. We got management involved, and asked them to help take care of the situation.

Q Did they – how did they take care of the situation?

---

A They pulled him aside, asked him what was going on. And then they ended up escorting him out.

Q Did you have any further contact with him that evening?

A No.

Q Did you have any other issues that night or next morning?

A Stan White's tire was popped. He had parked his vehicle at Dave and Buster's that night.

Q Ms. Melke, after the incident at Dave and Buster's, did you file for a personal protection order against the Defendant?

A Yes, I did.

Q Were you granted that? What are they are called, PPO?

A Yes.

MR. KOOP: May I approach the witness, Your Honor?

THE COURT: You may.

Q (MR. KOOP) I'm handing you what's been marked People's Proposed Exhibit 12. Do you recognize that, Miss?

A Yes.

Q Is that the PPO you were granted?

A Yes, I was.

---

MR. ROTH: Your Honor, at this time I move for the admission of People's Exhibit 12 under MRE 904, which is a certified copy of the personal protection order that was issued on January 20, 2016.

THE COURT: Mr. Perrone?

MR. PERRONE: I just want to make sure it's comprehensive and includes the written portion. I would object on the basis of it not being complete.

THE COURT: I think this is just a certified order. The order speaks for itself. If you want to introduce the petition, you can. So I would admit the exhibit as being a copy of the order.

MR. PERRONE: Thank you, Your Honor.

(PX-#12 is received into evidence.)

Q (MR. KOOP) Ms. Melke, after the PPO was issued, People's Exhibit 12, it's a certificate of service stating that the Defendant had, in fact, received a copy of this PPO dated January 21st, 2016. So after January 21st, 2016, did the Defendant stop all contact with you?

A No.

Q Turning to February 13, 2016, did you make a

---

report to the Lansing Police about a text message that you had received?

A Yes, I did.

Q Do you recall who that text message was from? What was the nature of that text message that you reported?

A When I received it, it said "Ho," H-O. And then another message right after that saying "Sorry, that message was not for you."

Q Who was that message from?

A From the Defendant.

Q Do you recognize what's contained in People's Proposed Exhibit 13?

A Yes.

Q How do you recognize that?

A That was from my phone.

MR. ROTH: Move to admit People's Proposed Exhibit 13. Thirteen, Your Honor.

THE COURT: Any objections?

MR. PERRONE: No objections, Your Honor.

THE COURT: So admitted.

(PX-#13 is received into evidence.)

Q (BY MR. KOOP) This is a screenshot of the text message the Defendant sent you?

A Yes, it is.

25

Q That is him here on the left?

A Yes.

Q Is this a number you knew to be the Defendant's?

A Yes.

Q We heard some testimony yesterday about the incident at the Best Buy parking lot on March 2016. Do you recall speaking with Meridian Township Police at that time and location?

A Yes, I do.

Q Tell us about that, please.

A I left my apartment from College Towne and was driving to Best Buy in Okemos, on Grand River. And I noticed that the vehicle that he has driven before, the silver Pacifica, I noticed that type of vehicle behind me a little ways. And I was instantly paranoid that it could be him. And so I pulled into Best Buy, continued what I was going to do, and pulled in the parking spot. I noticed the silver Pacifica circling around the parking lot and pulled up right next to me. It was him, the Defendant. And he had his window rolled down and was trying to talk to me. I did not roll my window down to listen to what he was trying to say to me. I pulled my camera — my phone out, started taking pictures on my camera

26

of him. Because I, at that time, had a PPO against him, and he was violating that PPO.

Q I want to show you what's been marked as People's Exhibit 1 — Sorry, People's Exhibit 3. Is that one of the photos you took?

A Yes.

Q Is that the Defendant in People's Exhibit 3?

A Yes, it is.

Q People's Exhibit 1, where is that picture taken?

A That is in the Best Buy parking lot.

Q What are you trying to capture here in this picture?

A His vehicle that he was in.

Q Can you circle that for us? And that's the vehicle you previously knew the Defendant to drive?

A One of the vehicles he would drive, yes.

Q What other vehicle did you know him to drive?

A He had a white Mercedes car.

Q Did you pull in the parking lot first?

A Yes.

Q Is the Defendant directly behind you when you pull in?

A I don't think he is directly behind me. Maybe a couple cars back.

27

Q But were you parked at the time that he, the Defendant, drove up to your vehicle?

A Yes. I was parked and I was about to go into the store. Then I saw him started circling around, and I instantly felt threatened. I didn't feel safe to get out of my vehicle.

Q When you took these photos, you were still inside your vehicle?

A Yes.

Q Did you have any communication with him?

A I did not.

Q Did the police arrive shortly thereafter?

A Yes.

Q At the end of March 2016 — I direct your attention to April 8th of 2016, were you visiting your mother in Petoskey at that time?

A Yes, I was.

Q Had you told — this might sound like a silly question. Did you tell the Defendant you were visiting your mother that weekend?

A I did not.

Q While you were at your mother's house, did you receive a call that concerned you?

A There was a call on her phone, and she had the caller ID at the time. And the name that showed

28

up was Tony's mother's like last name on the caller ID. It was a 517 area code.

Q So you recognize the name and number, at least the 517, associated with the Defendant's mother?

A Yes.

Q Did you take a picture of that caller ID?

A Yes.

MR. KOOP: May I approach the witness, Your Honor?

THE COURT: You may.

Q (MR. KOOP) Handing you Proposed Exhibit People's 50, do you recognize that?

A Yes, I do.

Q What is that?

A That is my mother's phone with the caller ID with the number that he was calling from.

MR. KOOP: Move to admit People's Proposed Exhibit 50, Your Honor.

THE COURT: Any objections, Mr. Perrone?

MR. PERRONE: No objection, Your Honor.

(PX-#50 is received into evidence.)

Q (MR. KOOP) This is hard to see from afar. But that's the name right there; is that correct?

A Yes.

Q Did you know her name from a relationship with the

29

Defendant?

A Yes.

Q Is that the only call that you received from the Defendant around that time?

A Yeah.

Q Did you see any contact or message at the same time?

A I don't recall.

Q This trip to Petoskey, is that a preplanned trip or something like that?

A Most likely, yeah.

Q It's not one that you were supposed to take with the Defendant, correct?

A Will you repeat that?

Q It's not a trip you were supposed to take with the Defendant, correct?

A Correct.

Q Yesterday we heard an incident with Stan White in May of 2016 where your car had been egged. Is this a photo of your car here in People's Exhibit 5?

A Yes.

Q And this happened at Stan White's house?

A Yes. I was parked in the driveway.

Q What is the status of your and Stan's relationship

30

or friendship at that time?

A We were in a dating relationship, and we would hang out often. And we had went to the movies prior to that. My phone was off that whole time. And after the movies I went to his house. My phone was then turned on there. And I parked in the driveway there, hung out for like an hour. And when we walked out, there were eggs thrown at my vehicle.

Q Where did Stan White live?

A In Holt.

Q Do you know the specific address, by chance?

A I do not.

Q Are you still dating Stan White today?

A No, I am not.

Q Is there a specific reason why the two of you ended your relationship?

A I felt it wasn't safe for him, with my situation going on. And I didn't feel it was safe, you know, and fair to be with him, with what was going on with me. And he has a kid and a family, you know. I didn't want to put them in danger.

Q You said what was going on with you. What do you mean by that, Ms. Melke?

A With the harassment, vandalism and everything

31

from the Defendant, I just didn't want to put him in that position either.

Q Later in May, specifically May 25th, 2016, where would you have been living at this time?

A Will you repeat the dates?

Q May of 2016.

A I was still at 308 — or wait. Sorry. May of 2016.

Q You're still at that 2925 Dunckel, correct?

A Four-nine.

Q Sorry, four-nine.

A 2016.

Q Around this time period, did you put a camera in your bedroom?

A Yes.

Q Why did you put a camera in your bedroom?

A I noticed some of my things went missing the month previous. And it was underwear, bras, sandals, things like that. And I didn't think it was my roommate doing that. We're not the same size. So I figured that she wouldn't be taking my stuff. So I bought the camera and set it up to see like if anyone else was coming in my room.

Q On/or about May 25th, did you return home and check that camera?

32

A Yes.

Q And upon reviewing those — I guess were there any photos when you reviewed that?

A Yes. I did found photos on there of the Defendant.

MR. KOOP: May I approach the witness, Your Honor?

THE COURT: You may.

Q (MR. KOOP) Handing you what's been marked People's Proposed Exhibit 14 through 18. Could you please review those for me? Do recognize those, Ms. Melke?

A Yes, I do.

Q How do you recognize those?

A That is my bedroom. That is the Defendant in my bedroom when I was not there.

Q Are these the photographs from that trail cam?

A Yes.

MR. ROTH: Move to admit.

MR. PERRONE: No objection, Your Honor.

THE COURT: So admitted.

(PX-#14-18 are received into evidence.)

Q (MR. KOOP) Ms. Melke, did you report this incident to the police?

A Yes, I did.

**33**

Q Would looking at the police report help refresh your memory which apartment you were in at the time?

A I was in Apartment 308.

Q Thank you. Ms. Melke, this is People's Exhibit 14. What are -- what do we see in People's Exhibit 14?

A That is the Defendant entering my room.

Q I want to just review one thing real quick here. At the bottom puts a time of 4:16 a.m., 1-1-2015. This is reported to the police on May 25th, 2016?

A Yes.

Q Do you know the discrepancy of the date there?

A Yes.

Q Can you explain that for us?

A I had taken out the batteries of the trail cam to use in a remote. I didn't have any other batteries at the time. So I took them out of the trail cam and used them on the remote. Then before I went to work the following day, I last minute put the batteries back in the camera, set it up last minute, as I was to get to work. I didn't have time to set the date and time backup. I just turned on the camera, set it up.

Q So it automatically defaulted to January 2015?

**34**

A Yes.

Q People's Exhibit 15, again, what do we see here?

A The Defendant looking around in my room.

Q Do you recall what would have been in this general area over here? (Indicating)

A Yes. So on the door there was my work schedule, as well as concert tickets and other random stuff.

Q What is the tickets for? What concert?

A A Drake concert for August of 2016.

Q And, again, that's the Defendant in your bedroom?

A Yes. Looking at the same area.

Q People's Exhibit 16 and People's Exhibit 17. Again, the Defendant is still in your bedroom, correct?

A Yes.

Q And then 18, is that him leaving your bedroom?

A He was touching the door, yes.

Q Before you left for work, had you checked the camera or were there any pictures of the Defendant on your camera before you left for work?

A Previously there were no pictures of the Defendant on that camera.

Q This is the first time that you saw him on that trail cam, you reported that to the police?

**35**

A Yes.

Q Did you report it that day?

A I found it early morning. And then I called.

Q Okay. And did the police come to your apartment again?

A Yes.

Q He didn't have a key to your apartment?

A Correct.

Q Is that the same bedroom that you had moved into, or he helped you move into?

A Yes.

Q Focusing on July 17, 2016, was there an incident where yourself and Ms. Elias saw the Defendant in a car outside of your apartment?

A Yes.

Q Can you tell us about that?

A Since the incident with him in my apartment, when we weren't there, I have been very paranoid. And I was constantly looking out my bedroom window to see if he was around. I noticed him sitting while I - well, I noticed a suspicious vehicle sitting outside my bedroom window and thought it is very odd. And then they started circling around. So I told my roommate, Carmen, about it, that I was paranoid about it. So we went to go

**36**

to my vehicle to see if anything had been done to it, vandalism-wise. And we ended up seeing the Defendant in that vehicle that was parked right outside my bedroom.

Q When you went outside, was the vehicle still -- was it there when you went outside?

A No. It ended up driving back through the parking lot.

Q About how far away was the vehicle when you were able to see into it?

A About 30, 40 feet.

Q Were you able to identify how many people were in that car?

A Yes.

Q How many people?

A One.

Q Who was that?

A The Defendant.

Q Ms. Melke, did you obtain a second PPO or extend the first one?

A Yes, I did.

Q Was that on July 13, 2016?

A Yes.

MR. KOOP: Your Honor, move to admit People's Proposed Exhibit 19 pursuant to MRE



37

902(4).

MR. PERRONE:  No objection, Your Honor.

THE COURT:  So admitted.

(PX-#19 is received into evidence.)

Q  (MR. KOOP) This is a certified copy of that personal protection order, Ms. Melke. When is that order here set to expire? Right here. Is that 7-22-2017?

A  Yes.

Q  And that was, in fact, served on the Defendant here on page three; is that correct?

A  Yes.

Q  After August of 2000 — excuse me, August 15, 2016, did you have any problems with your Instagram or Facebook?

A  Yeah, I did. My Facebook, he was trying to get hacked into. I would get emails stating that my password was trying to be reset. I was not the one trying to reset it.

Q  Was there an Instagram account created in your name?

A  Yes. I had my own Instagram account. I had noticed there was another Instagram with my name, my full first, middle, and last name on there, which I had never put that on my own Instagram

38

account. So I noticed that and thought it was suspicious.

Q  For the benefit of the jury, can you explain what Instagram is?

A  It's a social media account where you upload pictures.

Q  I want to talk about this Instagram account that you just mentioned.

MR. KOOP:  May I approach the witness, Your Honor?

THE COURT:  Yes.

Q  (BY MR. KOOP) Review briefly People's Exhibit Proposed Exhibit 20 through 24. Do you recognize that, Ms. Melke?

A  Yes, I do.

Q  How do your recognize that?

A  That is the Instagram account that was created, not by me.

Q  And these exhibits are screenshots of that account?

A  Yes.

MR. KOOP:  Move to admit People's Proposed Exhibits 20 through 24.

MR. PERRONE:  No objection, Your Honor.

THE COURT:  So admitted.

39

(PX-#20-24 are received into evidence.)

Q  (BY MR. KOOP) People's exhibit 20, what is this a picture of, Ms. Melke?

A  That is a screenshot of the Instagram account that I never created that account. And I never uploaded those pictures. I had never sent those pictures to the Defendant.

Q  Is your middle name in fact Linn?

A  Yes, it is.

Q  What is this a picture of here? That's probably a little blurry here.

A  The middle picture?

Q  People's Exhibit 22, that same --

A  Yes, that is a picture of my friend and I.

Q  And what friend was that?

A  Mike Topez(sp).

Q  That is a picture you never sent to the Defendant?

A  Correct.

Q  Do you know when approximately that picture was taken?

A  I do not recall the dates. But those pictures were in my Facebook account.

Q  So they were taken — those were pictures that you had on your separate Facebook account; is that correct?

40

A  Yes.

Q  Did you give the Defendant the password of your Facebook?

A  Never.

Q  And then People's Exhibit 21, what do we see?

A  That is a picture of me.

Q  Do you know where that photo came from?

A  That is on my camera, on my phone.

Q  And had you ever uploaded that to your Facebook?

A  No.

Q  Did you send that photo to the Defendant?

A  No.

Q  Now, looking at People's Exhibit 23, what do we see on People's Exhibit 23?

A  That is a picture of Stan and I. That is on my phone.

Q  That's Stan White?

A  Yes.

Q  And that picture, would that be taken before or after you ended your relationship with the Defendant?

A  After.

Q  And you never sent that to him; is that correct?

A  Correct.

Q  On People's Exhibit 24, what is contained on this

41

exhibit, Ms. Melka?

A Those are messages I had attempted to figure out who was creating the account in my name, as I thought it was a suspicious activity. And I tried to figure out who it was. And with the messages that I received back, I came to the conclusion that it was the Defendant.

Q Now, with Instagram, is that something where your friends tried to connect to you, and you can share photos and comments and that sort of thing?

A Yes.

Q Were you made aware of any of your friends or people that you knew starting to what is called following that account?

A Yes.

Q How did you become aware of that?

A I had a friend, they messaged me on Facebook and asked -- they took a screenshot and they asked what in the heck was this, what is going on. And I said that's not my account, don't follow it. And from there I figured that it was the Defendant posting these things in order to get back at me.

Q So this account, this fake account had your friends following it; is that correct?

42

A Yes.

Q Any co-workers or anything like that?

A Yes.

Q How did that make you feel that there's now this fake account of a social media with, I guess, an embarrassing photo on there?

A Yeah. I was humiliated and very upset about it.

Q You also mentioned something happened to your Facebook account, correct?

A Yes.

Q Did that occur on/or about August 27th and August 31st, 2016?

A Yes.

Q How did you become aware of the issue with the Facebook?

A I was receiving several emails that were showing that the password was trying to be changed. I was at work while receiving these emails. I was not the one trying to reset my password.

MR. KOOP: May I approach the witness, Your Honor?

THE COURT: You may.

Q (BY MR. KOOP) Do you recognize what I have shown you as People's Proposed Exhibits 25 and 26?

A Yes, I do.

43

Q How do you recognize these?

A That is a screenshot from my email.

Q In both instances?

A Yes.

MR. KOOP: Move to admit People's Proposed Exhibits 25 and 26, Your Honor.

THE COURT: Mr. Perrone?

MR. PERRONE: No objection, Your Honor.

THE COURT: So admitted.

(PX-#25 and 26 are received into evidence.)

Q (BY MR. KOOP) What do see we see in People's Exhibit -- I move to admit -- sorry. People's Exhibit 26. What do we see in here, Miss?

A The screenshot of the email that I was receiving in regards to changing my Facebook password.

Q That's on August 27, 2016?

A Yes.

Q This came directly from Facebook?

A Yes.

Q Same here with People's Exhibit 26. What do we see here?

A A screenshot of the Facebook password trying to be changed, or it was actually reset again on August 31st.

Q You weren't, at this time, trying to reset your

44

Facebook password?

A Correct.

Q Were you having any other issues with your phone at this time?

A I don't recall. There is a lot that has happened.

Q Just to be clear, you never authorized or desired to have your password changed on these two days, correct?

A Correct. I did not need my password changed.

Q On August 1st, 2016, did you see an email from an account that you were unfamiliar with?

A Yes.

Q And what was that email generally about?

A In regards to past relationships with the Defendant.

Q Showing you what's marked People's Proposed Exhibit 27 and 28, do you recognize these, Miss?

A Yes. That is the email that I received.

Q People's 27, how do you recognize that?

A The screenshot of the email I received to my personal email.

MR. KOOP: Move to admit People's Proposed Exhibit 27 and 28.

MR. PERRONE: No objection, Your Honor.

45

THE COURT: So admitted.

(PX-#27 and 28 are received into evidence.)

Q (BY MR. KOOP) Ms. Melke, what do we see here in People's Exhibit 27?

A The screenshot of the email that I had received from the email account that I was not familiar with.

Q Whose email address is this?

A That is my personal email that I created.

Q And email 620@Gmail.com, that's who sent you that email?

A Yes.

Q Is that a Gmail account that you own?

A No, it is not.

Q Had you ever seen that email, received an email from that account before?

A No. That was the first email that I received from that account.

Q It was sent to you at 3:32 PM?

A Yes.

Q In People's Exhibit 29, is that that same email, just the full context of it?

A Yes, it is.

Q Ms. Melke, at this time, when you received the email, what was going through your mind?

46

A I was shocked that I was again receiving something that had to do with the Defendant. I thought the contact was no longer like — I don't know what I'm saying. Sorry. I was just very shocked to see that email from an unfamiliar person or email account.

Q I want to break this down a little, because the email does not have a name on it, correct, or who it is from?

A Correct. It was not signed or there was no name on it.

Q Looking here, it talks about dating website, and his mother, or this person's mother. What about the email that led you to believe it was from the Defendant?

A Everything in it.

Q Following the receipt of that email, did you have any other communication that day or unwanted communication?

A I had received a phone call from the Ingham County Jail on that phone call.

Q Did you answer it?

A I answered the phone call. It was a number that I wasn't sure of. It had a recording of Ingham County Jail. And in that the timeframe allows

47

someone to say their name. And I heard the Defendant saying: I hope you're happy.

Q This recording. It doesn't say to person so and so is calling? It doesn't say this is Tunc Tiraz calling you, correct?

A Correct.

Q What makes you think it was the Defendant saying I hope you're happy?

A The accent and the voice I was very familiar with.

Q You immediately recognized that to be the Defendant?

A Yes.

Q Did you take a screenshot of that photo?

A Yes, I did.

Q You turned that over to law enforcement?

A Yes.

Q People's Proposed Exhibit 29, do you recognize that, Ms. Melke?

A Yes.

Q How do you recognize that?

A That is the screenshot that I took.

MR. KOOP: Move to admit People's Proposed Exhibit 29.

THE COURT: Any objections?

48

MR. PERRONE: No objection.

THE COURT: So admitted.

(PX-#29 is received into evidence.)

Q (BY MR. KOOP) People's Exhibit 29, this reflects the call you received in the jail?

A Yes.

Q Both at 9:06 and 9:12 PM?

A Yes.

Q These are the calls that you heard the recording of: I hope you're happy?

A Yes. Both times it said that.

Q How did it make you feel when you heard the Defendant now calling you from jail?

A I, again, felt threatened, not safe that he was still contacting me, even though there was a PPO in order.

Q Not just a PPO, but now he's in jail contacting you, correct?

A Right.

Q Let's back up here. Ms. Melke, you mentioned that you had your tires slashed before you went to a Drake concert; is that correct?

A Yes, all four of my tires were.

Q Do you recognize Exhibits 51 and 52?

A Yes. My vehicle with the tires on both sides.

49

MR. KOOP: Move to admit Proposed Exhibits 51 and 52.

MR. PERRONE: No objection.

THE COURT: So admitted.

(PX-#51 and 52 received into evidence.)

Q (BY MR. KOOP) Move to admit People's Exhibit 51, Ms. Melke. What do we see here?

A My vehicle with flat tires.

Q Again, People's Exhibit 52, what do we see here?

A The other side of my vehicle with flat tires.

Q And these flat tires, when did this occur?

A This happened the day of the concert. I believe it was August 16th.

Q Were they deflated or did you have to replace the tires?

A I had to get all new tires. They were not repairable.

Q Were they punctured or slashed or what was that?

A Yes. The sidewall was punctured, which they were unable to repair that.

Q Was this the only time you had damage done to your tires?

A No.

Q Approximately how many other times was there damage done to your tires?

50

A Three to four times, previously, where I had single flat tires that were also not repairable due to a puncture on the sidewall.

Q While you were in your dating relationship with the Defendant, did you have any issues with your vehicle?

A Never.

Q Did you have any issues with someone trying to change your Facebook password?

A Never.

Q And after you ended your relationship with the Defendant, is there anyone else in your life that you were having issues with?

A No, I was not.

MR. KOOP: May I approach, Your Honor?

THE COURT: Yes.

Q (MR. KOOP) I'm showing you what's been marked as People's Proposed Exhibit 30. Do you recognize that, Ms. Melke?

A Yes.

MR. KOOP: At this time I would admit People's Exhibit 30 under MRE 902(4), with a certified record of a personal protection order.

THE COURT: Mr. Perrone?

MR. PERRONE: No objection, Your Honor.

51

THE COURT: So admitted.

(PX-#30 is received into evidence.)

Q (MR. KOOP) This is the People's Proposed Exhibit 30. This is that third amended, or extended personal protection order that you received, Ms. Melke; is that correct?

A Yes, it is.

Q That was issued on 7-18-2017?

A Yes.

Q Previously, these personal protection orders, did you have to renew them every year, or file for an extension every year?

A It was, I believe, six months, the first time. And then it lasted a year. And now it's extended for about five years.

Q Okay. Ms. Melke, after you received the phone call from the Defendant in jail, have you had any further contact with him or received any letters from him?

A No.

Q At August 31st, 2016, has there been any damage to your vehicle?

A No.

Q Have you had any other issues with your Facebook account?

52

A No.

Q Have you found that anyone has reported other Instagram accounts in your name?

A No.

Q Did you have any front flat tires?

A No.

Q Ms. Melke, after you obtained that first PPO, January of 2016, what was your hope? What did you want that to achieve?

A I was hoping he would get the picture to leave me alone. And I thought he would abide by that.

Q That is in January of 2016. In May 2016, when you — this personal protection order was still in place, you had the trail cam and see the Defendant. What are you feeling at that time?

A Very scared for my life. That he could come in at any time and harm me.

Q When you received confirmation that the Defendant was in jail, on August 31st, 2016, did you feel — what were you feeling at that time?

A I was relieved to know that he was no longer out in public. I was hoping that the harassment would stop from there. I felt a little more safe knowing that he wasn't out and about watching me and following me around.



53

Q But then on October, specifically October 18, 2016, is there a time that Detective Krumbach and Detective Hogan from the Lansing Police Department came to your work?

A Yes.

Q Was this a meeting that had been planned well before?

A No. He called me up that day and asked if he could come meet with me right away.

Q That's Detective Krumbach?

A Yes.

Q Where were you when he called?

A I was at my job.

Q Did he tell you on the phone what he needed to talk to you about?

A No.

MR. PERRONE: Object as to hearsay.

THE COURT: I'll sustain that.

MR. KOOP: I didn't ask what he said, I asked if she knew what he was coming to talk to her about. That's fine.

THE COURT: I'll still sustain that.

Q (BY MR. KOOP) And did Detective Krumbach actually show up to your work on October 18th?

A Yes.

54

Q Did he give -- without telling us what he said, did he give you any information about the Defendant at that time?

MR. PERRONE: Objection. Leading and hearsay.

THE COURT: I'm sorry?

MR. PERRONE: He was leading and hearsay. Did he give you any information. That's asking did he give you any statement.

THE COURT: Well, he can ask her did she receive information. I don't think that's hearsay, because it's just what happened. So I'll overrule that objection.

Q (MR. KOOP) In the course of that conversation with Detective Krumbach, were you informed of anything that made you feel like you were no longer safe?

A Before he showed up, I wasn't --

MR. SCHROEDER: Objection, Your Honor.

MR. KOOP: Well, whoa, whoa, whoa. Who's going to be doing the cross-examining here? We have got two attorneys -- may we approach, Your Honor?

(Off-the-record discussion at the bench.)

Q (MR. KOOP) So, Ms. Melke, in that conversation

55

with Detective Krumbach, were you provided some information about what was occurring in the jail?

A When he showed up to my job? Yes.

Q Correct. And how did that, you receiving that information from Detective Krumbach, how did that make you feel?

A I was very scared, paranoid, stressed. I had a breakdown. And I could not finish out with the rest of my shift. And I had to leave work because of that information that I received.

MR. KOOP: One moment, Your Honor. No further questions.

THE COURT: Why don't we take our morning recess, about 15 minutes? Come back with continued cross-examination. We will be in recess.

(Jury exits courtroom at 10:02 a.m.)

THE COURT: We will be back in about 15 minutes. You are free to step down.

(Recess taken from 10:03 a.m. to 10:26 a.m.)

THE COURT: Ms. Melke, we need you to come up to the stand, and be ready for the jury. What's your name?

MR. SCHROEDER: Eric Schroeder, Your Honor. S-C-H-R-O-E-D-E-R.

56

THE COURT: Schroeder? Okay. Be seated. Cross-examination by Mr. Schroeder on behalf the Defense.

CROSS-EXAMINATION

BY MR. SCHROEDER:

Q Good morning, Erika. My name is Eric and I'm -- my name is -- sorry. My first speaking part on this trial, so I am a little nervous. My name is Eric. How are you doing today?

A I'm all right. How are you?

Q Good. Do you spell your name with a C or with a K?

A A K.

Q Okay. I spell my name with a C, so I hope you don't hold that against me going forward. Okay?

A Um-hum.

Q All right. So I want to focus on the -- I understand you have been testifying for about 90 minutes so far. I am going to try to keep mine short so you don't have to be up here for too much longer.

So during the three-year period that you and Tony were dating, did you date continuously throughout that period or any breaks in between?

A It was pretty continuous.

57

Q  And during that time, did you file any -- during the time you were dating, did you file any police reports against Tony?

A  No.

Q  And did Tony appear to be, when he came to his use of technology during that time, did he appear to be tech savvy or more old-fashioned?

A  Pretty tech savvy. He had a friend, too, that would help him with that.

Q  Okay. Now, when you applied for the first PPO, as part of the application, you typed out a statement; is that correct?

A  Yes.

Q  And there was a picture included in that, too. Was there a picture?

A  I don't recall a picture.

MR. SCHROEDER:  Your Honor, can I approach?

THE COURT:  Yes. And what is it that you have? What is it? Identify it for the record what it purports to be.

MR. SCHROEDER:  This purports to be the typed statement that Ms. Melke submitted with her first PPO application.

THE COURT:  All right. Just review it, ma'am. See if that refreshes your memory.

58

THE WITNESS:  Yes. That is the typed PPO.

MR. SCHROEDER:  Okay. Your Honor, at this time I would like to submit the written -- the typed statement as to Defense Exhibit 1.

THE COURT:  You need to mark it as Defendant's Exhibit A. There should be some stickers in the box.

MR. SCHROEDER:  I am marking the statement as Defendant's Exhibit A. I would like to admit the statement at this time.

THE COURT:  Any objection?

MR. ROTH:  Your Honor, I believe this is a hearsay statement that would otherwise not be admissible. But the People will stipulate to Defendant's Exhibit A.

THE COURT:  I believe this is the document that is in support of the order that was previously admitted. So I will admit this as just part of that ongoing documentation as Defendant's Exhibit A.

MR. SCHROEDER:  Okay.

(DX-#A is received into evidence.)

Q  (MR. SCHROEDER) Erika, in that typed statement, did you indicate that you broke up with Tony because he was on an on-line dating website?

59

A  Yes.

Q  During your testimony you described a couple incidents where your car was damaged. In those instances were those cases where the car was damaged overnight, then you discovered the damage the following morning?

A  Yes.

Q  And going to the Dave and Buster's incident, there is not a PPO in place against Tony at that time, correct?

A  Correct.

Q  You also described an incident involving Instagram who is -- were you the one that sent the first message to the person using that account?

A  Yes. Because it was suspicious that there was an account in my name that I had never created. So I was trying to figure out what was going on and who it was.

Q  Okay. Then on the day that Officer Krumbach came to meet with you, was Detective Hogan there as well?

A  Yes.

MR. SCHROEDER:  Can I have that, Your Honor? Erika, I don't believe I have any further questions for you at this time. Thank you.

60

THE COURT:  Okay. Any redirect, Mr. Koop?

REDIRECT EXAMINATION

BY MR. KOOP:

Q  Ms. Melke, I just want to look at Defendant's Exhibit 8 here. Did you have a neighbor -- here on the third paragraph -- neighbor contact you about somebody outside of your apartment?

A  Yes.

Q  That was the day after Dave and Buster's?

A  Yes.

Q  I guess January 1, New Years' day?

A  Yeah.

MR. KOOP:  Nothing further, Your Honor. Thank you.

THE COURT:  Jurors have any questions for Ms. Melke?

(Off-the-record-discussion at the bench.)

THE COURT:  Juror number 9 has a question. But you aren't in a position to answer it, Ms. Melke. The question is:

Does unconsented contact only refer to contact after the initiation of the personal protection order? No. All right?

Any other questions? Thank you, ma'am. Appreciate you coming in. You're all set. Free

61

to go. All right.

THE WITNESS: Thank you.

THE COURT: Next witness?

MR. ROTH: Next witness is Mr. Bergstrom. I would ask if we could excuse the jury for a couple minutes to put some things on the record. Not a full break. It will only take a moment.

THE COURT: All right. A little recess. All rise.

(Jury exits courtroom at 10:37 a.m.)

THE COURT: All right. Be seated. Raise your right hand. Do you swear or affirm the testimony you are about to give will be the truth under penalty of perjury?

THE WITNESS: I do.

THE COURT: Have a seat. State your name, spell your last name for the Court Reporter, please.

THE WITNESS: Chris Bergstrom. B-E-R-G-S-T-R-O-M.

THE COURT: Mr. Roth?

MR. ROTH: Thank you, Your Honor. The reason I asked to excuse the jury, Mr. Bergstrom has brought with him a letter the Defendant provided to him to give to the Prosecution at the

62

time of his prior sentencing. The Court has already ruled that that letter was not privileged because it was intended for outside parties.

Mr. Bergstrom obviously had -- wants to be professionally prudent on that issue. And so I thought it would be best for the Court to order him to turn it over.

THE COURT: Okay. That's fair. What's been indicated to me, at the time of the prior sentencing in this matter, that Mr. Uraz authored a letter that he directed that you pass on either to the Prosecutor to be passed onto the complaining witness or something along those lines. It's my understanding that a request had been made for that letter, and you felt that it was privileged, as an attorney/client privilege.

Mr. Uraz testified at an evidentiary hearing that he had authored the letter, that he had intended it to go to either the Prosecutor or the complaining witness, I don't recall. But he authored the letter. It was simply using you as a transmitter or a conduit to deliver the letter that he had written. Based on that, I did find it wasn't a document that was prepared in

63

relation to your representation. It was not anything that you had requested. You were acting at the behest of Mr. Uraz in passing on this letter that he has authored to give to a third party. That's my understanding of the circumstance. Do you have any major dispute with that?

MR. BERGSTROM: No, I don't, Your Honor. I just thank the Court for qualifying that position.

THE COURT: Okay. So based on the fact, that if we had Mr. Uraz also acknowledging that he had intended the letter to go elsewhere, it was not really directed to you, but was only being given to you because he was unable to give it himself, that it fell outside the attorney/client privilege. And, as such, I said then it would be admissible. So I will order you to do that based on the statement you gave to the Court.

THE WITNESS: I brought the letter with me, Your Honor. I have provided the original to Mr. Roth.

THE COURT: Any comments you have, Mr. Perrone?

MR. PERRONE: No, Your Honor. Again, if we would just limit the scope.

64

THE COURT: I'm ordering Mr. Bergstrom to provide the letter. He has complied with that order at this time.

MR. ROTH: Thank you, Your Honor. With that, I think we are prepared to proceed.

THE COURT: All right.

(Jury present in courtroom at 10:41 a.m.)

THE COURT: Be seated. Mr. Roth?

MR. ROTH: Thank you, Your Honor.

CHRIS BERGSTROM,

A witness, having been duly sworn to testify under oath as follows:

DIRECT EXAMINATION

BY MR. ROTH:

Q Good morning.

A Good morning.

Q You have already been sworn in and put your name on the record outside the presence of the jury; is that correct?

A Yes, sir.

Q All right. So could you state your name for the jury?

A My name is Chris Bergstrom.

Q How are you employed, sir?

A I'm an attorney.

65

Q   As an attorney, within your practice as an attorney, do you practice criminal law?

A   I do.

Q   Specifically criminal defense?

A   Yes.

Q   In that capacity, did you represent a person by the name of Tunc Uraz?

A   I did.

Q   That was in a separate case, not the one we are here for today?

A   Correct.

Q   Do you see him in the courtroom today?

A   I do.

Q   Please point him out and identify him for the record.

A   He is seated next to Mr. Perrone, Mr. Perrone's right.

MR. ROTH:   I ask that the record to reflect identification of the Defendant.

MR. PERRONE:   No objection, Your Honor.

THE COURT:   So identified.

Q   (BY MR. ROTH) Now, I am going to move very careful. I won't ask for any confidential discussions you had during the course of representation. There are a few court hearings

66

that I do want to talk about.

First of all, starting with People's Exhibit 12, this is a personal protection order. You're familiar with these documents?

A   I am.

Q   If you would like, I could give you the paper in front, if that's easier?

A   I think I can follow this. This is fine.

Q   Very good. This is against a person with the Defendant's name, correct?

A   That's correct.

Q   Protecting a person by the name of Erika Melke, correct?

A   Correct.

Q   Could you please read for us the behavior that prohibits the Defendant from engaging in, as it related to Erika Melke?

A   Paragraph 5A, from entering onto property where the petitioner lives.

Paragraph 5C prohibits Mr. Uraz from assaulting, attacking, beating, molesting or wounding Erika Melke.

Then there's 5E. And that prohibits stalking as defined by MCL 750.411h and 750.411i. And that includes, but is not limited to,

67

following the Petitioner, sending mail or other communications to the Petitioner, approaching or confronting the Petitioner in a public place or on the private property. Contacting the Petitioner by telephone, appearing at Petitioner's workplace or residence.

Q   Thank you. Now, in this specific PPO, were you provided with a copy of this previously?

A   Was I provided a copy of that previously?

Q   Yes.

A   Yes, sir.

Q   All right. And did your firm or yourself, did you provide a copy of this to Mr. Uraz?

A   I'm sure we did.

Q   Is that what's acknowledged in the proof of service here at the bottom?

A   Yes.

Q   All right. Ms. Hall is an employee of yours?

A   Lucille Hall is my secretary/paralegal.

Q   Very good. I want to talk about a couple ensuing court hearings starting with August 23rd, 2016. Did you appear in court with the Defendant?

A   I did.

Q   I have the transcript, if you need that to refresh your memory. But is it fair to say, on that day,

68

under oath, that the Defendant admitted to the Court that he had notice of that PPO we just talked about?

MR. PERRONE:   I am going to object as to foundation. He hasn't set the foundation for testimony as to the court order as far as the Defendant's statement.

THE COURT:   He has indicated his office served the PPO on Mr. Uraz. So this question just deals with the fact that did Mr. Uraz know. So I would overrule that objection.

MR. ROTH:   Thank you.

Q   (MR. ROTH) Just to be clear, what I am asking about, there was a court hearing on August 23rd, 2016, correct?

A   There was.

Q   And did you appear, side by side, with the Defendant that day?

A   I did.

Q   And under oath, at that time, did he admit to the Court that he knew about that PPO?

A   I don't recall the exact words. I believe we entered a plea on that occasion to a certain charge, and that the Court would have required him to acknowledge a factual basis for that plea.

69

Q And so, as part of that, under oath, did he admit that he had knowledge of a court order prohibiting him from contacting Ms. Melke?

A He would have had to make that admission.

Q And did he also admit to a pattern of conduct in violation of that order?

A He also would have had to make that admission as well.

Q And he also would have admitted that he knew that his conduct was designed to scare or intimidate Ms. Melke?

A Yes, sir.

Q And that that was his intent?

A Yes, sir.

Q Did you return to court -- was there another hearing on November 2nd, 2016?

A That would have been the sentencing, I believe.

Q And at that time, was there a, what's called a -- was there a report provided to you and your client to review?

A Yes, sir.

Q You reviewed that item with him?

A I did.

Q The one thing I wanted to ask about is that document -- I apologize, Your Honor. One moment.

70

You don't have a copy of that document with you, correct?

A I do not.

Q All right. We're just going to take a pause for a moment. Here it is. I am not going to move for admission of the document, but I do have it if you need it to refresh your memory, okay?

A Fair enough.

Q During that hearing on August 2016, did the Court ask if that document was correct?

A The Court did. It always has.

MR. PERRONE: I am going to object. I would like to approach.

THE COURT: All right.

(Off the record discussion at the bench.)

Q (BY MR. ROTH) So the Court asked, as it always does, if there were any corrections to the report?

A I believe it did.

Q And then you and your client, and again I have the transcript if you would like, affirmed that the report is correct?

A We would have affirmed if the report was correct or we would have made corrections if it was inaccurate.

MR. ROTH: May I approach the witness, Your

71

Honor?

THE COURT: You may.

Q (MR. ROTH) So I'm going to show you page six of that hearing. If you would take a moment and read it to yourself?

A Thank you.

Q All right. So if other than the one administrative issue, the report was correct?

A That's correct.

Q That was affirmed by you and your client, correct?

A It was.

Q I want to talk about one issue in that record. In that report it talks about the Defendant's substance abuse issues, if any, correct?

A I don't remember.

Q But that's typically involved?

A It is.

Q So I'm going to show you that particular report. I want to show you the report. Again, this is not as an exhibit. On the cover page it indicates Substance Abuse History; is that correct?

A It does.

Q What is the only substance that the Defendant reports using?

A That report indicated alcohol.

72

Q From what period to what period?

A 1985 to August 31st, 2016.

Q Then it goes into some depth later on in that issue. Did the Defendant indicate that he had used any illegal narcotics, pills, anything like that, without prescription?

A In that report the Defendant denied using any illegal substances in his lifetime.

Q And all that information comes from the Defendant, correct?

A That's correct.

Q So on that August 31st date, did the Defendant also provide you with a letter?

A He did on August 31st, he provided me with a letter.

Q Showing you what's been marked as Proposed Exhibit 31, is this the letter that he provided for you?

A It is.

Q And did he give you directions of what he wanted you to do with this letter?

A That's correct.

Q What did he ask you to do with this letter?

A I was requested to show that to the Assistant Prosecutor, Mr. Koop.

MR. ROTH: Your Honor, I move for admission



73

of Proposed Exhibit 31.

THE COURT: Mr. Perrone?

MR. PERRONE: If I could voir dire briefly?

VOIR DIRE EXAMINATION

BY MR. PERRONE:

Q You were asked to give it to Mr. Koop by Mr. Uraz?

A I was asked to show it to Mr. Koop.

Q And at the time Mr. Koop was the prosecuting attorney on that case?

A He was.

MR. PERRONE: No objection, Your Honor.

THE COURT: All right. So we will admit Exhibit 31.

(PX-#31 received into evidence.)

CONT'D. DIRECT EXAMINATION

BY MR. ROTH:

Q So looking at this Exhibit 31, who is it addressed to?

A Erika.

Q And who signs that letter?

A Mr. Uraz.

Q So I take it you, at some point, read this letter?

A I have.

Q I want to then show you what's already been admitted as Exhibits 27 and 29, emails that

74

Ms. Melke indicated she received from email address: EMELKE20@Gmail.com, which was not hers. Are these emails the same letter that the Defendant provided to you? I guess I should have corrected what I said. Twenty-eight and 29 are just different printings of the same email?

A Well, if 27 and 28 are the same identical communications?

Q They are. One is a different version. I apologize.

A That's fine. I can't compare that.

Q I will move it.

A If you would start at the top, I will be happy to review it. Thank you.

As far as I can read on the screen, it appears to be verbatim.

Q So it appears that the anonymous email Ms. Melke received matches the one the Defendant directly gave you?

A It appears, it appears to be the same.

Q Very good. So during the course of your representation with the Defendant, or of the Defendant, what language did you communicate with him in?

A English.

75

Q And if he was not sufficiently fluent and communicative in that language, that would have been something you would have determined and advised the the Court about?

A If I felt my client couldn't understand me, I would have taken the appropriate steps to do that, and, if necessary, engaged the services of an interpreter.

Q And this was never an issue with the Defendant, correct?

A That was not a problem.

MR. ROTH: Thank you, Your Honor. I have nothing else.

THE COURT: Mr. Perrone? Mr. Schroeder?

MR. PERRONE: Yes, Your Honor. I will be doing this.

CROSS-EXAMINATION

BY MR. PERRONE:

Q Did you ever have any issues in communicating with Mr. Uraz?

A None that I recall.

Q Nothing even minor as to communication?

A You know, as with any client or anyone, there can always be a minor issue, or I don't understand or maybe my client doesn't understand. But I try to

76

be very sensitive about that.

Q And you testified that November 2nd, 2016 was the culmination of your representation?

A That would be the sentencing.

Q Is that when you stopped representing Mr. Uraz?

A I believe it was. I don't recall if we had any communications after that. I think we did. But I did not represent him subsequent to that date.

Q Did you — did Mr. Uraz grieve you?

A He did.

Q So he filed a complaint against you alleging unprofessional conduct?

A That's correct.

MR. ROTH: I am sorry. Alleging what?

MR. PERRONE: Unprofessional conduct.

Q (MR. PERRONE) And prior to that complaint, there had been a breakdown of the attorney/client relationship?

A The complaint was after November 2nd. I stopped representing him on the 2nd. I had some communications with him and on his behalf.

Q If you can recall how many times that you visited him at the Ingham County Jail between August 31st and November 2nd?

A I can't recall how many times I visited him.

Case 4:25-cv-10608-SDK-DRG   ECF No. 10-17, PageID.1401   Filed 09/08/25   Page 23 of 47

**77**

Q Would it be more than once?

A I remember it may have been. I do remember reviewing the presentence report with Mr. Uraz at the jail.

Q And is your firm fairly diligent in ensuring that clients receive the discovery materials?

A We always try to get the discovery materials to our client.

Q Can you recall if you attempted to give Mr. Uraz the discovery materials while he was incarcerated?

A I don't recall what discovery materials may have been received subsequent to his incarceration. But, generally, if we get materials, we either provide them to the clients or review them with the clients.

Q If a client is incarcerated, would you potentially mail them to the client?

A Sometimes we mail. Generally I -- I can't remember the last time we mailed. Generally I would meet with the client, review the materials. Sometimes I leave the client with a copy of the materials after we take off the paperclips and the staples. But I don't recall any special meeting with Mr. Uraz regarding discovery materials.

**78**

Q You can't recall any meeting with Mr. Uraz between August 31st, 2016, when he was re-incarcerated and his sentencing on November 2nd?

A I do recall meeting with him prior to his sentencing.

Q Would that have been closer to the day of the sentencing?

A Well, if I review the pre-sentence report with him, that would probably be within the week of sentencing. Because typically they are not prepared and ready for review until that timeframe.

Q After -- but prior to when you reviewed the presentence report with him at the Ingham County Jail, do you recall any additional visits that you had with him after he was re-incarcerated?

A I can't recall if I did or didn't. I don't remember. I would have to check my calendar and see, or my computer to see what my notes were.

Q How long have you been an attorney?

A Almost 40 years.

Q Ballpark, how many presentence investigation reports have you reviewed?

A Too many to count.

Q In your experience, how thorough are the

**79**

investigators in the presentence reports?

A It varies. Some aren't as thorough. And --

MR. ROTH: I am going to object. I think this is speculation. I don't think it's relevant. We have evidence of the Defendant's direct statement. It's not a reflection of the investigator at all.

THE COURT: Okay.

MR. ROTH: The Defendant affirmed on the record: That statement is correct. I've never used illegal drugs.

THE COURT: I will sustain the objection.

Q (MR. PERRONE) As part of that form, Mr. Uraz did acknowledge that he had alcohol, he had used alcohol?

A That is reflected on that report, yes.

MR. PERRONE: No further questions.

THE COURT: Any redirect?

REDIRECT EXAMINATION

BY MR. ROTH:

Q Did the Defendant's grievance against you influence your testimony in any way at all?

A No.

MR. ROTH: Nothing else.

THE COURT: Jurors have any questions for

**80**

Mr. Bergstrom?

THE COURT: Thank you. Appreciate you coming in. Next witness?

MR. KOOP: Next witness, Richard Laing.

THE COURT: Step up here for us, sir. Raise your right hand for me. Do you swear or affirm the testimony you are about to give will be the truth, the whole truth under penalty of perjury?

THE WITNESS: I do.

THE COURT: Have a seat. State your name and then spell your last name for the Court Reporter, please.

THE WITNESS: Richard Laing. L-A-I-N-G.

THE COURT: Thank you. Mr. Koop?

MR. KOOP: Thank you, Your Honor.

RICHARD LAING,

a witness sworn to tell the truth as follows:

DIRECT EXAMINATION

BY MR. KOOP:

Q Morning, sir.

A Morning.

Q Mr. Laing, where are you currently employed?

A Spartan Net Company.

Q What do you do at Spartan Net?

81

A   I am a founder, a chief operating officer, and acting vice president.

Q   What is Spartan Net?

A   Spartan Net is an internet service provider who supplies internet service for apartment communities in the greater Lansing and Grand Rapids area.

Q   How long have you been -- you said you were a founder. How long have you been with Spartan Net?

A   Fifteen years, since the very beginning.

Q   In your capacity with Spartan Net, are you familiar with the term or what an IP address is?

A   Yes, sir. I am an executive. But I'm also an operator. So I have been a network engineer. I was that way by trade.

An IP address, meaning internet protocol, is an address, a unique address, that is used to route data traffic across the internet. So the answer is yes.

Q   If you are -- you said it's a unique address. If you were provided with an IP address, what sort of information are you able to attain with an IP address?

A   So the way that we use IP addresses, there is a limited amount of IP addresses throughout the

82

internet, so to speak. So what we will do, we will take a block of IP addresses. We will do something called subnetting. We will subnet those IP addresses, then allocate those to certain segments of the network itself.

So in regards to an apartment community, we would typically take a block of IP addresses. We would allocate those to the segments which are typically done at a -- by the building, or by the community at -- it just depends on the size. So we would like to segment them that way so that, you know, if you have a problem on the network, something like that, it could be done in a smaller segment versus a larger segment.

And, you know, we take these subnets. Then we will do a process called network address translation, which means that you have public IP addresses that are used to route onto the internet. And then you have private IP addresses that are used internal to these network segments.

You take -- you will hand out a very unique address for the private side. And then you will take that address, and you will do something called NAT-ing or network address translation to the larger subnet public facing. That's the way

83

we do that.

Q   Were you contacted by a detective from the Lansing Police Department in regards to inquiry for IP addresses?

A   Yes.

Q   Were you provided specifically with two IP addresses by Detective Krumbach?

A   Yes.

Q   Specifically a 72.44.103 and .166, and 72.44.103.178?

A   Yes.

Q   With the 72.44.103, that was one of the --

A   Yes. That's correct.

Q   And also this IP address here?

A   Yes. Those are my IP addresses that have been assigned to Spartan Net Company.

Q   And with those IP addresses, were you able to determine -- you say they're unique. Were you able to determine the location where those would have originated?

A   Yes. So, again, what we will do is these addresses, we set up the public facing addresses at particular buildings, and then we will use those as the address translations. And we will hand out an internal unique address to every

84

single client, or every single device that wants to connect to the network. And in that I way it will use its internal address to translate into the public facing addresses. These addresses were part of the public facing address pool.

Q   And the records of this inquiry, did you provide those to Detective Krumbach?

A   We did.

Q   Prior to your testifying today, we reviewed a CD of those records, correct?

A   Yes, we did.

Q   And did that CD securely contain and reflect the record you provided to Detective Krumbach?

A   Yes, we did.

MR. KOOP:   May I approach the witness, Your Honor?

THE COURT:   You may.

Q   (MR. KOOP) That was the CD that we reviewed today, correct?

A   Yes, sir.

MR. KOOP:   Move to admit People's Proposed Exhibit 32, Your Honor.

THE COURT:   Mr. Perrone?

MR. PERRONE:   Voir dire?

THE COURT:   All right.

85

VOIR DIRE EXAMINATION

BY MR. PERRONE:

Q   So this is a CD that you prepared?

A   I did not prepare the CD. I prepared the files. More or less had the files prepared for me, what we turn over.

Q   Who prepared the files for you?

A   I have some engineering team that worked directly for me. And together we worked together to pull these files out of the network.

Q   You said "together we worked." What was your role?

A   My role was I took the original inquiry from the detective, and took the addresses. Went to the engineering team, and we spoke together about the addresses. Pulled up where the addresses were actually allocated onto the network and tracked down exactly where they were. And then we pulled the archive file off our network and gave that data together.

Q   And you spoke earlier that the engineering team was the one that produced the files?

A   Yeah. They literally type in the commands onto the network with me standing directly over them. And we produce the files that way.

86

Q   Did you actively participate in producing the files, or did you just instruct the engineering team to produce the files?

A   Well, actively meaning that I stood directly over top of him while I watched him issue the command to pull that data out of the network. I did not type the commands onto the PC to pull that.

Q   Did you tell him which commands to type?

A   No.

MR. KOOP:  I am going to object. It's been asked and answered what his involvement is.

THE COURT:  I'll allow it.

THE WITNESS:  I don't need to tell him what to pull.

Q   (MR. PERRONE) As far as Spartan Net, are you — do you act as the records keeper, or do you have somebody else that has that function associated with your records?

A   I guess records meaning what? Most of our data is network drives. It's very active. The network is, itself, kind of runs itself, and we set up just standard backups and things that kind of happen automatically. So in regards to records keeper, the network typically keeps its own records.

87

Q   But you wouldn't be able to articulate how the search was conducted in order to derive the result that was put on the disk?

A   As far as the search?

Q   Yes.

A   As far as someone inquiring onto the network to pull this data?

Q   As it is specific to these IP addresses.

A   Yes. I can tell exactly how to do that.

Q   But you did not do that in this case?

A   No, I did do that in this case. We — I went to the engineer. We sat there together —

MR. ROTH:  I am going to object, Your Honor, as to relevance. There are very specific foundations to admit a business record. That has been laid by this witness. Anything else is, first of all, beyond the scope of voir dire. Second of all, not relevant to admissibility.

THE COURT:  I think it is beyond the scope of voir dire. If you want to go to it on cross, you can.

MR. PERRONE:  Again, I would just lodge my objection to the individuals that actually created it, and aren't here to testify and set the foundation for its admission.

88

THE COURT:  The testimony is it was created under his direction, by his staff. And that he was present at the time, observing them conducting the search. He has indicated that the search was all electronic. And that it's a matter of simply retrieving the data from the system. And he was present when that was done in his role as an executive of Spartan Net. As such, I will allow the exhibit.

MR. ROTH:  Thank you, Your Honor.

(PX-#32 is received into evidence.)

MR. KOOP:  May I approach the witness, Your Honor?

THE COURT:  You may.

CONT'D. DIRECT EXAMINATION

BY MR. KOOP:

Q   I am handing you what's been marked People's Proposed 60. Do you recognize that?

A   I do.

Q   How do you recognize People's Proposed 60?

A   This is the actual screenshot of the file that we pulled up. This is an archive of the actual configuration of the device that shows the network based on the timeframe that was asked for.

89

Q There is a second page there. Do you recognize the second page?

A I do. Yeah. This is a continuum of the exact file. So, you know, you got to scroll down. So this is the second portion of that. That also shows the subnet of the IP addresses that are in question.

MR. KOOP:  Move to admit People's Proposed Exhibit 60.

THE COURT:  Any objections, Mr. Perrone?

MR. PERRONE:  No objection.

THE COURT:  All right. We will admit Exhibit Number 32.

MR. ROTH:  Sixty.

MR. KOOP:  We admitted 32. This is Exhibit 60. A little out of order.

THE COURT:  Sixty? All right. Missed it. So this is okay. I will admit 60.

(PX-#60 is received into evidence.)

Q (BY MR. KOOP) What is this first page here, Mr. Lyons?

A This is actually the configuration of the device that is located at the network on that particular setting.

Q And on the second page of Exhibit 60, what is

90

being reflected?

A So, as discussed earlier, each network is built into a segment with public facing IP addresses. And what this is showing is that interface VLAN 60 along with VLAN 61 and 62, these are the actual network segments and IP addresses that we have allocated to those particular buildings. So NPT is our three digit acronym for North Pointe Building A, and so on, North Pointe Building B, and then Northe Point Building C.

Q Can you explain the IP addresses there?

A Yes. So, again, they are broken off in two segments. The segments have 100 – they have these these different blocks. And 72.44.103.1 is the first segment of 64 addresses. And then so on. It goes up.

So the next segment is there. And then finally the North Pointe Building C, 72.44.103.129, which would contain the IP addresses in question.

Q So just to be clear, the IP address 72.44.103.166, which of the building blocks would that be lined up with?

A Billing C.

Q Building C? And that's in this block

91

here?(indicating)

A Yes.

Q That's North Pointe Apartments?

A Yes.

Q Same with People's Exhibit 26, 72.44.103.166. Where would that IP address – what building would that relate to?

A Building C.

MR. KOOP:  I have nothing further, Your Honor. Thank you.

THE COURT:  Mr. Perrone?

MR. PERRONE:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PERRONE:

Q How long have you owned Spartan Net for?

A Fifteen years.

Q Where is your main office located?

A It's 3032 East Lake Lansing Road, East Lansing, Michigan.

Q This was – a subpoena was initially sent to Merit Network?

A I would not know that, actually.

Q You were contacted by the police after they had attempted to go through Merit Network?

A I would not know where –

92

MR. KOOP:  I am going to object.

THE WITNESS:  I would not know if they reached out to Merit.

THE COURT:  Yes.

Q (BY MR. PERRONE) Did you ever talk to Kevin Hogan of Merit?

A No, sir.

Q What is the address for the 178 – the IP address ending in 178, where did that track to?

A I apologize?

Q What's the physical address of North Point Apartments?

A I actually don't know the physical address of North Pointe Apartments.

Q Is North Pointe Apartments near where Spartan Net is located?

A It is. I know exactly where North Pointe Apartment is. I just don't know the actual physical address.

Q How far away?

A It may be a mile away down Hagadorn Road, across Saginaw.

Q Did you have any – you had some correspondence with Detective Krumbach via email?

A Yes.

93

Q Do you recall what, specifically, he asked of you? What were you asked to do?

A We were asked to recover any information that we had in regard to the IP addresses. Any record that we had of, you know, any devices that those IP addresses have.

Normally we can actually track it down to an actual MAC address, which is a unique address per device. But because of the timing and the network address translation, we were only able to show where physically that IP address is configured, and to what pool. So that's what he asked me. That's what I shared.

Q What was the issue of timing that prevented you from determining whether or not there was a unique address?

A Well, the addresses are handed out. They have an expiration of how long that device can actually hold that address, which is typically a 24 hour. Or the device that comes up onto the network can release the address, and not be connected to the network any longer. And he had asked, and I can't remember exactly how long it was from the time that the address, based on what he had requested, but we no longer had that information.

94

And we only had exactly where that address was located.

Q So you weren't able to obtain a unique address because of the delay?

A I was unable to track that IP address to an actual MAC address.

MR. PERRONE: May I approach the witness?

Q (MR. PERRONE) If you would take a quick look at that, is that an accurate reproduction of the email correspondence that you sent in response to the subpoena?

A This is my email that I had sent to Detective Krumbach.

Q And that was in regards to your conclusions from the subpoena request?

A That's correct. This is sharing that we --

MR. ROTH: Hold on. I don't want him to read the content just yet, because I am going to have an objection.

Q (MR. PERRONE) Does that accurately reflect the information conveyed to Mr. - to Detective Krumbach?

A This is my initial response to him. Yes.

THE COURT: Your objection?

MR. ROTH: Thank you, Your Honor. MRE 801

95

defines hearsay as a statement other than one made by the declarant while testifying at the trial or hearing.

The statement in that email was not written during this hearing. It was written some other time. This is procedurally improper. Mr. Perrone can ask about the content of it, he can impeach him with it. But if it is offered for the truth of the matter asserted, it is hearsay and inadmissible.

THE COURT: Mr. Perrone?

MR. PERRONE: It's a business record kept in the ordinary course of business as you had previously ruled. Mr. Laing is the individual that can attest to the fact that that email was sent from Spartan Net on behalf of the company. Therefore, the email in regards to the conclusions is not only relevant in this matter, but they are prohibiting it from being introduced.

MR. ROTH: It's not a business record. The underlying files attached are business records. This is an email as a result of a subpoena or search warrant. It is not a normal business --

THE COURT: I believe the testimony is that this is his initial findings, whatever that might

96

be.

MR. ROTH: It's my understanding Mr. Perrone said he is withdrawing it?

MR. PERRONE: I am withdrawing the exhibit, but I would like you to take a look at it.

MR. ROTH: That's fine.

THE COURT: He is withdrawing it? Okay.

Q (MR. PERRONE) Do you recall telling them that both the IP addresses that were used came from the network servicing the North Pointe Apartment in East Lansing?

A Yes.

Q Do you recall telling them it was particularly building C in this community?

A Yes.

Q And do you recall telling them there were units labeled C1 through C24, minus number 13?

A Yes.

Q Please let me know if I can be of further assistance?

A (Witness nods.)

Q Were you able to identify which unit that the IP address came from in Building C?

A I was not able to identify down to the exact unit, no.

97

Q Does Spartan Net hold an easement for that property?

A We do.

Q Is that an exclusive easement?

A It is. Well --

Q If you could kind of explain?

A It's coming into the right-of-way. So it's an easement of right-of-way. So we placed fiberoptics in the community through the right-of-way easement. I can't tell you if there is others in there. But I suspect that possibly AT&T would be in there.

Q So you don't have exclusive rights?

A I have exclusive rights to service the community. It's an arrangement that I have with the owner of the community. And the service is actually sold to every single apartment within the community and the unit in bulk. And the community itself actually buys that service from me in bulk.

Q Do you have a record keeping associated with which units are serviced by Spartan Net?

A We are.

Q Do you service all of the units or are there other providers?

A One hundred percent of the units. There is

98

wiring in the structure that goes from every single unit down to the main or intermediate telecom facility where our networking equipment is connected, and it connects to every single apartment.

Q And this letter -- this email that you wrote was after you preliminarily had reviewed all the information?

A Yes. He had asked for the information. This type of request happens from time to time. It's not the first time that we have gone through this with the local law enforcement. And we immediately act on that because it's a time-sensitive request, just based on the lease expiration of the IP addresses. So we looked it up at the time.

Q Are expired IP addresses recycled?

A They would go back into the pool.

Q They would be reused by someone else?

A Yes. It happens after you have a pool of public, and you have a pool of private. And then you do a function called address translation, which the private address is then translated to the public address, and the public address is what's seen on the internet.

99

Q In your additional investigation, were you able to narrow it down to a sequence of units or a single unit?

A We were able to narrow it down --

MR. ROTH:   Objection. Asked and answered. He already testified there was one through 24, minus 13 in Building C. This has been asked and answered.

THE COURT:   Are there any differences?

MR. PERRONE:   The difference is he said this is preliminary. And I'm asking subsequent --

THE COURT:   I thought he said he never could. But go ahead. I will let you ask him.

Q (BY MR. PERRONE) You were only able to narrow it down from the building in Unit C1 to 24 minus 13?

A That's correct.

Q What's the minus 13?

A There is no unit 13.

Q Why do you know there isn't a unit 13?

A Because we service all the units in the building, and there is no apartment 13.

Q Can you track down the unit, which subscriber has the IP address?

A We are able to track down what address is being used down to what unit in realtime or within 24

100

hours of a request.

Q Do you recall how long it took for you to see this request versus the time that it was requested for?

A I don't recall the exact time. But it was not within 24 hours, that I do know.

Q And you made your initial findings and sent the email on September 30th of 2017?

A Whatever was in the email was the date.

Q Would it refresh your recollection if you had an opportunity to review that again?

A I can, sure. Yeah. It looks like I sent it on Friday, September 30, 2016 at 12:51 PM.

Q Do you recall how long it took you to turn the request around?

A It doesn't take me long to turn it around. Looking up the addresses and the subnets on the network is a very speedy process to recover.

Q On the dates that they were looking for, if you can recall, what was the dates they were looking for those IP addresses on?

A I don't recall the exact dates. Actually, maybe I can recall. It was in the archive file. And my memory serves it was August 17th.

Q What's your average turn-around time?

MR. ROTH:   Objection. Relevance.

101

MR. PERRONE:  I'm trying to determine —

THE COURT:  He already answered it has to be within 24 hours.  He indicated he got it at 24 hours.  He wasn't able to find the information.  That's been asked and answered two or three ways.  So what's the relevance of his turn-around time, since he didn't get the request within 24 hours?

MR. PERRONE:  I'm trying to determine how stale the request was when he received it.

THE COURT:  But it's not relevant.  He says he couldn't do anything if it wasn't within 24 hours.  I'll sustain the objection.

MR. ROTH:  Thank you, Your Honor.

MR. PERRONE:  No further questions.

THE COURT:  Any redirect, Mr. Koop?

MR. KOOP:  Just one question.

REDIRECT EXAMINATION

BY MR. KOOP:

Q  Is North Pointe Apartments a DTN property?

A  It is.

Q  And the IP address that you associated with Building C, that would encompass August 27, 2016 for that IP address?

A  It would.

Q  And same as true for August 31st, 2016, 72 — this

102

IP address?

A  Yes.

Q  Those were both Building C?

A  Yes.

MR. KOOP:  Nothing further.  Thank you.

THE COURT:  Jurors have any questions for Mr. Laing?  All right.  Thank you, sir.  Appreciate you coming in today.  Thank you.  Next witness?

MR. KOOP:  Heather Heitman.

THE COURT:  Step up here for us, ma'am.  You can leave your coat back there, if you would like.

Raise your right hand for me.  Do you swear or affirm the testimony you are about to give will be the truth under penalty of perjury?

THE WITNESS:  Yes, I do.

THE COURT:  Have a seat.  State your name, spelling your last name for the Court Reporter, please.

THE WITNESS:  My name is Heather Heitman.  Last name H-E-I-T-M-A-N.

THE COURT:  Thank you.  Mr. Koop?

MR. KOOP:  Thank you, Your Honor.

HEATHER HEITMAN,

103

a witness called to testify under oath as follows:

DIRECT EXAMINATION

BY MR. KOOP:

Q  Good morning, Miss.  Where are you employed?

A  DTN Management Company.

Q  How long have you been with DTN Management Company?

A  Since 2005.

Q  What do you do for DTN?

A  A property manager.

Q  Are you familiar with property at North Pointe Apartments?

A  Yes.

Q  Where are those located?

A  On Haslett Road in East Lansing.

Q  How long have you been with the North Pointe Apartment Property?

A  We purchased North Pointe Apartments in 2007.

Q  Is this a DTN owned property?

A  Yes.

Q  How many buildings make up the North Pointe Apartment property?

A  Three buildings.

Q  Three buildings?  Are those labeled in any

104

particular way?

A  By letters, A, B, C.

MR. KOOP:  May I approach the witness, Your Honor?

THE COURT:  You may.

Q  (MR. KOOP)  I am showing you what's been marked People's Exhibit 34 and 35.  Do you recognize these, Miss?

A  Yes, I do.

Q  And are you familiar with what's contained in People's 34 and 35?  Are you familiar?

A  Yes.

Q  And that's a map of the North Pointe Apartment complexes?

A  Correct.

Q  And does this map accurately reflect both the general area as well as labeling of the building A, B and C?

A  Yes.

MR. KOOP:  Move to admit People's Proposed Exhibits 34 and 35.

THE COURT:  Any objections?

MR. PERRONE:  Voir dire, Your Honor?

THE COURT:  All right.

(PX-#34 and 35 received into evidence.)

105

VOIR DIRE EXAMINATION

BY MR. PERRONE:

Q Did you take these pictures?

A No.

Q When is the first time you saw these pictures?

A Today.

Q Did you see them prior to getting into the witness chair?

A No.

Q If you could just take another quick look at these?

A Sure.

Q Is there anything on those that indicates any type of a date or timestamp on when that was or do you see anything that may have changed from your current —

A No. I don't see a date stamp, and I don't see any changes.

MR. PERRONE: No objection.

THE COURT: All right. We will admit 34 and 35.

(PX-#34 and 35 are received into evidence.)

CONT'D. DIRECT EXAMINATION

BY MR. KOOP:

Q This is People's Exhibit 34 here. It's just a

106

general aerial view of the North Pointe Apartment complex; is that correct, Miss?

A Yes.

Q People's 35, that zoomed-in view of the North Pointe Apartments, correct?

A Correct.

Q Building A, B and C?

A Correct.

Q Are you familiar with an individual by the name of Tunc Uras?

A Yes.

Q How do you know this person?

A He is a resident, or was a resident.

Q If you saw him again, would you be able to identify him?

A Yes.

Q Do you see him in the court today?

A I do.

Q Could you please identify him for the record?

A He is there on the defense table with glasses on his head.

MR. KOOP: Let the record reflect the witness has identified the Defendant.

THE COURT: Mr. Perrone?

MR. PERRONE: No objection.

107

THE COURT: So identified.

Q (MR. KOOP) Do you know someone by the name of Burak Atamer?

A Yes.

Q How do you know this person?

A He's a resident.

Q Current resident?

A Correct.

Q Did Burak reside at Northpointe Apartments in August of 2016?

A Yes.

Q In your regular course of business at DTN, does DTN keep records of signed lease agreements for your tenants?

A We do.

Q Are you familiar with where those are kept?

A Yes.

Q Do you have access to these records?

A Correct.

MR. KOOP: Approach the witness, Your Honor?

Q (MR. KOOP) I'm handing you what's been marked as People's Proposed Exhibit 33. Do you recognize that, Miss?

A Yes, I do.

108

Q How do you recognize People's Proposed Exhibit 33?

A That is a lease agreement with Burak Atamer.

Q This lease agreement, is that for North Pointe Apartments?

A Correct.

Q This is the 2016 leasing period?

A Yes.

MR. KOOP: Move to admit People's Exhibit 33.

MR. PERRONE: Voir dire?

VOIR DIRE EXAMINATION

BY MR. PERRONE:

Q Is this your signature on behalf of the landlord?

A It is.

Q You met with Mr. Atamer directly?

A I met with him directly.

Q Did you have any encounters with him at — sorry.

MR. PERRONE: No objection.

THE COURT: So admitted.

(PX-#33 is received into evidence.)

CONT'D. DIRECT EXAMINATION

BY MR. KOOP:

Q This lease agreement for Mr. Atamer is for unit C10, correct?

A Correct.



109

MR. KOOP: Nothing further, Your Honor. Thank you.

THE COURT: Questions, Mr. Perrone?

MR. PERRONE: Thank you.

CROSS-EXAMINATION

BY MR. PERRONE:

Q   Does Burak Atamer still reside at North Pointe Apartments?

A   Yes, he does.

Q   Does he still reside in Building C?

A   Yes.

Q   Did Mr. Uraz also reside in Building C?

A   No.

Q   Did Mr. Uraz live in North Pointe?

A   Yes.

Q   What building did Mr. Uraz live in?

A   Building B.

Q   What unit in Building B?

A   I would have to check my records, sir.

Q   Do you recall if it's on the east or west side?

A   Building B is on the west side of C.

Q   But you wouldn't know what unit Mr. Uraz was in —

A   I don't recall.

Q   — in B?

MR. PERRONE: No further questions.

110

THE COURT: Redirect?

MR. KOOP: Thank you.

REDIRECT EXAMINATION

BY MR. KOOP:

Q   Miss, through your work at this property, do you know whether Burak Atamer and the Defendant were associates?

A   Yes.

Q   How do you know that?

A   Mr. Uraz referred Burak Atamer to us as a resident.

Q   Did he actually bring him in?

A   Yes.

Q   So the Defendant brought Mr. Atamer into the office, to the leasing property?

A   Correct.

Q   The property at the North Pointe Apartments, when a tenant moves in, is there internet connectivity right away?

A   Yes.

Q   Can you explain that for us?

A   It's on for the beginning of the lease is, that way if it's a product they're interested in, they can sign up for it. So as a promotional item, it's on at move-in.

111

Q   By on, you mean someone could plug into the internet and access the internet just as freely as any other time?

A   Yes.

MR. KOOP: Thank you. Nothing further.

THE COURT: Any questions on that line of questioning, Mr. Perrone, about the Internet connectivity? Hearing none. The jurors have any questions?

MR. PERRONE: None, Your Honor.

THE COURT: All right. Thank you, ma'am. Free to go.

We will take our lunch break now. We will ask the jurors to come back at 1:20. And, remember, don't discuss the case with anyone. Don't discuss the case amongst yourselves, family, friends. And we will have you report back downstairs at 1:20.

(Jury exits courtroom at 11:49 a.m.)

THE COURT: Okay. Who else do we have this afternoon?

MR. ROTH: Your Honor, we have several other witnesses in can. Potentially Mr. Close and otherwise some more foundational witnesses.

THE COURT: Because I'm only going to about

112

3:00, I assume Mr. Close will be longer?

MR. ROTH: We will do our best to try and fit him in. Otherwise, we have a backup down, a writ to have him down on Monday.

THE COURT: Pardon?

MR. PERRONE: I would just request that I would have a better opportunity to review all the notes and the original notes that were just provided prior to Mr. Close testifying so I can adequately cross-examine him, initially.

THE COURT: I don't have any control over that. But I'm only going to 3:00. It doesn't look like we are going to get to Mr. Close today.

Also, it was just brought to my attention that next Friday is Veteran's Day. So I forgot about that. I don't know if you guys recalled that or not. It doesn't affect the schedule, but we wouldn't be meeting next Friday due to Veteran's Day.

MR. ROTH: Thank you, Your Honor.

THE COURT: All right. We will be in recess.

(Recess taken from 11:51 a.m. to 1:32 p.m.)

THE COURT: Back on the record in 16-1064 and 16-1065. Mr. Roth is here. Mr. Perrone. You

113

are Tunc Uraz, sir?

THE DEFENDANT:  Tunc Uraz. Yes, sir. It's like lunch with a T.

THE COURT:  Yes. Mr. Roth?

MR. ROTH:  We have one witness that we think will be short. We have Mr. Close today. So he can go back to the Department of Corrections.

Is it the Court's preference or Defense counsel's preference that he be in shackles or not in shackles in location of the MDOC guards that are here?  And then does the Court want to bring him out with the side door with the jury in the room or out of the room?  If counsel or Court have any preferences?

THE COURT:  He is going to be in MDOC dress, though, right?

MR. ROTH:  Certainly.

THE BAILIFF:  He is in State Police, yes, sir.

THE COURT:  I don't think he needs to be shackled, if that's what you're asking me.

Does MDOC have a policy?

THE BAILIFF:  Judge, that's strictly up to you, if you want the belly chains off or not. If you don't mind, we will be standing up there by

114

the bus.

THE COURT:  I don't mind you standing up there. Yes, Mr. Perrone?

MR. PERRONE:  Yes, Your Honor. I'm fine with that order. I would just like to reserve the ability to call Mr. Close on my case, given that I just had these notes and haven't had an adequate opportunity to review them in their entirety.

THE COURT:  You always can recall. We can make arrangements for it. That's not an issue. Yes.

MR. ROTH:  Does the Court want to take a break to get the jury out to take Mr. Close in and out of the locked door?

THE COURT:  He is going to be in MDOC. I don't think they need to take a break. They will know he is in custody.

MR. ROTH:  As long as Defense counsel has no objection.

THE COURT:  He is already in custody. We are going to have the corrections officer up here, anyway. Whether he comes out of the lockup or not, I don't think is a real issue. Ready?

(Jury present in courtroom at 1:34 p.m.)

THE COURT:  Be seated. Next witness, Mr.

115

Roth?

MR. KOOP:  Bernard Brown.

THE COURT:  Mr. Koop?  Okay. Raise your right hand. Do you swear or affirm the testimony you are about to give will be the truth, the whole truth, under penalty of perjury?

THE WITNESS:  I do.

THE COURT:  Good seeing you. Would you state your name and spell your last name for the record, please?

THE WITNESS:  Bernard Brown. B-R-O-W-N.

THE COURT:  Mr. Koop?

MR. KOOP:  Thank you.

BERNARD BROWN,

A witness having been sworn to testify under oath as follows:

DIRECT EXAMINATION

BY MR. KOOP:

Q  Good afternoon, sir.

A  Good afternoon.

Q  Mr. Brown, where are you currently employed?

A  Sentinel Offender Services.

Q  What do you do for Sentinel?

A  I am a branch manager of the branch of Ingham County Jail.

116

Q  What is Sentinel?  What do they do?

A  We are the monitoring tether program for Ingham County.

Q  By tether?

A  GPS and alcohol tethers.

Q  Can you explain to the jury what tether is, what it does to your GPS monitoring?

A  Well, GPS tether is attached to the ankle every minute of the day. It gives us a point from where the client is at. It updates on our computer system every half hour. If there comes a time where we want to find out where that individual is at, at any given time, we can manually do that and it will show us where that person is at that time, rather than waiting for the half hour for it to come up.

Q  How long have you been with Sentinel?

A  About two years, eight months.

Q  What are your, I guess, kind of specific duties with this company?

A  Specific duties?

Q  What do you do on a daily basis for them?

A  Install the devices, as with the other case manager, managing clients, taking payments, submitting reports to the courts if they need



117

them.

Q You mentioned reports. So in your regular course of business at Sentinel, you keep a record of location history for individuals that you're monitoring?

A For monitoring, normally we don't. We wait for the court to call us and ask for a specific timeframe where an individual might have been.

Q So let's clarify that. When you ask for location information of an individual, there is a database or something you access?

A Correct.

Q To get these records?

A Yes.

Q And that's something that you're familiar with, how to access that?

A Yes.

Q And then these records you download or --

A Yes.

MR. KOOP: May I approach the witness, Your Honor?

THE COURT: You may.

Q (MR. KOOP) Do you recognize what I am showing you as People's 36?

A Yes.

118

Q This is a disk that you and I reviewed prior to court today, correct?

A Yes.

Q Does this disk contain GPS tether data for the 27th and 31st of 2016?

A It does.

Q You reviewed all that information on the disk?

A Yes.

Q It accurately reflected the information you provided to law enforcement?

A Yes.

MR. KOOP: At this time, Your Honor, I move to admit People's Proposed Exhibit 36, GPS tether data disk containing dates for August 27th and the 31st of 2016.

THE COURT: Mr. Perrone?

MR. PERRONE: Quick voir dire?

VOIR DIRE EXAMINATION
BY MR. PERRONE:

Q When did you put these together?

A These reports? Actually we got from the monitoring center in Irvine, California, because the Defendant had already been deactivated from our program.

Q Did you obtain any certification from the center

119

in California?

A Other than hands-on training, no.

MR. PERRONE: Okay, I would object on the basis of this not being something that he -- that his company produced.

THE COURT: His company? Okay. He has indicated he works for Sentinel. He indicates it came from Sentinel's central database due to the fact that the client was no longer active. And so the Court would allow it to be admitted. I'll overrule the objection.

(PX-#36 is received into evidence.)

CONT'D. DIRECT EXAMINATION
BY MR. KOOP:

Q Specific to this case, Mr. Brown, the record that you provided related to an individual by the name of Tunc Uraz; is that correct?

A Yes.

MR. KOOP: May I approach on this, Your Honor?

THE COURT: You may.

Q (MR. KOOP) Showing you what's been marked People's Proposed Exhibits 37, 38 and 59. Would you review those for me, sir? Do you recognize what it is I have just shown you?

120

A Yes. Those are the movement reports that the monitoring center in Irvine, California sent to me that I sent to you.

Q Specifically, as it relate to People's Proposed Exhibits 37 and 38, sir, those are sections or selections of information that you reviewed this morning on the People's 36, correct?

A Yes.

Q And it is specific to just a certain allotted time, otherwise all information was on that disk, correct?

A Yes.

Q Do 37 and 38 accurately reflect the information, correct?

A Yes.

MR. KOOP: Move to admit People's Exhibit 37 and 38.

THE COURT: Okay. Subject to Mr. Perrone's ongoing objection, I will admit those exhibits.

(PX-#37 and 38 received into evidence.)

Q (MR. KOOP) People's Exhibit 37, Mr. Brown, line 43, with Mr. Uraz, the tether, August 27, 2016, at 8:27. You obviously see some headings there for street, city, state, latitude and longitude.

Focusing on the latitude and longitude,



**121**

that information comes directly from the tether?

A   Yes.

Q   And with that latitude, we see a street address there. With that latitude and longitude, that also provides a specific location?

A   Yes.

Q   Narrows it down a little bit more precisely? Then we see a column there "accuracy" and a 12. What does – "accuracy 24." What does that mean?

A   That's the radius in feet that the individual is at at that time.

Q   So if you plugged in this latitude and longitude in, anywhere within 24 feet, that's where that individual would be?

A   Yes.

Q   Same here, in People's Exhibit 38, a record of the Defendant on 8-31-2016 at 12:20. Again, that longitude and latitude that is entered, a map – on a map, that would give us actually a 12. So wherever that location is?

A   In a 12 feet radius, yes.

Q   Twelve feet? I will hand you what's been marked People's Proposed Exhibit 59. You reviewed it previously?

A   Yes.

**122**

Q   Same with People's Exhibit 59. This is a record for August 16, 2016, beginning at 5:41 through 8:17:16 through 18:59. Did this record accurately reflect the Defendant's movement at that time?

A   Yes.

MR. KOOP:   Move to admit People's Exhibit 59.

THE COURT:   Subject to Mr. Perrone's continued objection.

(PX-#59 is received into evidence.)

Q   (MR. KOOP) We will look on the second page of that exhibit, line 27, on August 17, 2016 at 6:36. What does – what address is provided there?

A   Line 27 is 4896 Dunckel Road, or Dunckel Drive. I'm sorry. Lansing, Michigan, 48910.

Q   We see moving time and then stop duration. What does that mean?

A   The moving time would be from the amount of time it took from the last point to this one. The stop is how long he was at that location.

Q   So if I'm understanding you correctly, it would have been 25 minutes from that last location of 2197; is that accurate?

A   Yes.

Q   And then at the Dunckel Drive the Defendant spent

**123**

10 minutes there?

A   Yes.

Q   Just to go back here, what is reflected in the distance column?

A   The distance would be the miles from the one point to the next.

Q   Do you recall when the Defendant first – when the Defendant was first subject to monitoring through Sentinel? Do you recall the date?

A   Not off the top of my head. No.

Q   When would that have – we have a record here from 8:16. Do you recall approximately how long you were monitoring him?

A   I believe it was just slightly other a month.

MR. KOOP:   Nothing further, Your Honor. Thank you.

THE COURT:   Mr. Perrone?

MR. PERRONE:   Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PERRONE:

Q   Is this the beginning, on 8:16 on this exhibit, is that when he would have initially had the device turned on?

A   No. That wouldn't have been. Because the – I can tell you right now that I am not putting the

**124**

device on at 5:41 in the morning.

Q   Would it have been some time?

A   I'm thinking it was earlier like the – would maybe be the 15th.

Q   Okay. But he would gotten the device on io close proximity to the date that it starts recording?

A   Yes.

Q   Do you see highlight, August 31st, 12:26. How accurate is the 1240 Haslett Road address? How does the GPS work? Is that a point at that address?

A   I don't see – on the farthest over to the right was the accuracy.

Q   Twelve?

A   That would be 12-feet radius. What it does, it has a minimum of three satellites will pick up and do a triangulation of that point. So that's where the more satellites that you have, the more accurate it will be. Twelve feet, I'm guessing that you're probably talking at least six or eight satellites.

Q   Does the division provide output every minute?

A   Yes. Every minute it gives us a point of updates on our computer system once every half hour. If someone was to call and ask exactly where

125

somebody was at this moment, we could do a current, and it will pick that up. We won't have to wait too long for the half hour to come up.

Q Does it end at 8-31 at 12:28:54 pm is the last entry?

A For this report, yes.

Q And the report would have been run by yourself or somebody at your direction?

A When — because he was already deactivated as a client of ours, we went back to the monitoring center and had them pull archived records.

Q Were there additional records that were produced?

A Not that I am aware of, other than what was requested.

Q Isn't any additional entries that would have been from at August 31st, 2016 to 12:28:54 pm?

A I'm believing it was either the date that I was given, or if that's the time that the device was removed.

MR. ROTH: Your Honor, I guess I just want to correct the record. Maybe this will assist with Mr. Perrone's questioning. The testimony earlier -- the disk that is admitted has the longer duration of the record, I think it's probably the full date for each one of these two

126

dates. The ones that are printed are just the relevant time period for our inquiry.

THE COURT: Okay.

MR. PERRONE: If we admitted the disk, I would like to put up the entire list for him to be able to —

Q (MR. PERRONE) Can you identify these on your screen?

A Yes.

MR. PERRONE: Can the jury see?

MR. ROTH: Your Honor, I guess I'm going to object to relevance at this point. I don't know what we're doing, if we are just going to keep zooming out and zooming out. If there is a specific date that he wants to inquire about, I think that's fine. But just to show the jury that there is more data, I don't see the relevance of.

THE COURT: Mr. Perrone?

MR. PERRONE: Again, we have the sequencing events after the highlighted data. I just have two questions in regard to his —

THE COURT: It looks like --

MR. PERRONE: -- travels afterwards.

THE COURT: If you want to go into that. It looks like the disk shows where he went that

127

day. If you want to go afterwards, that's fine.

Q (MR. PERRONE) The last notation in here, 179 at 3:05:55 PM, 530 Beal Drive?

A Yes.

Q Would you have seen him that day, take it off?

A No. That would have been — at that time it would may have been the deputy. I don't remember taking the device off. It may be a deputy after he is booked into receiving at the Ingham County Jail.

Q And between 2:50 PM on this chart and 3:05 it has him going from 496 East to 530 Beal. From your experience in dealing with this, is that the average about trip time from 496 to 530 Beal?

A Well, I would say it depends on who is driving, and he may have been, he may have already been in custody. That's what I'm looking at. It's 496/127 to — back to the County Jail. So I'm thinking that that's — that he was in custody. He wasn't driving himself. I'm speculating there. But I believe that's what it was.

Q And your level of accuracy associated with the last entry, it was 135 feet?

A Yes.

Q Is 530 Beal Drive the jail? In your experience,

128

if that's the last reading on your report, is that somebody reporting back to the jail or being taken back to the jail?

MR. ROTH: I am going to object. I don't think there is foundation to know that. He can say it's the jail, but he can't say why the person was there.

THE COURT: The Court will take judicial notice of the fact that 500 Beal is the Ingham County Sheriff and 55th District Court complex.

MR. ROTH: Certainly. But he can't say why somebody —

THE COURT: I would agree. That's the complex for the County Sheriff jail in the 55th District Court.

MR. PERRONE: No further questions.

THE COURT: Any redirect?

REDIRECT EXAMINATION

BY MR. KOOP:

Q Mr. Brown, these tethers, what sort of battery life do these devices have?

A They have a 24-hour -- would require them to charge every 24-hour period in two hours. So we always tell them if they started, we have them charge prior to going to bed for the night. So

129

if they charge from eight to 10 at night, we tell them to charge the same time every night.

Q   In this case, were you -- do you have actual interactions with the Defendant?

A   We would see him. We would have seen him every two weeks because of him only being monitored.

Q   Do you recall in your monitoring in this case, any issues with battery, low battery notifications?

A   I don't recall any time that there was a low battery.

Q   And the longitude and latitude that was on People's Exhibits 37 and 38, is that more exact than what the street address listed would be?

A   What it would do is the system itself is going to take like a central location within that radius. So there's a couple that were on there that said street. It may have been -- it was so close to two different streets that it was hard to say an intersection or something like that. I know there is another one that said Grand. So it's not -- it's telling us it's not technically one highway or the other, but it's the ramp in between.

Q   So you're saying in this case Haslett Road -- so close to Haslett Road and Saginaw Street, that's

130

why we have the longitude and latitude provided, that's the more specific location?

A   Right.

MR. KOOP:   Nothing further, Your Honor. Thank you.

THE COURT:   Jurors have any questions for Mr. Brown? All right. Thank you. Appreciate you coming in.

THE WITNESS:   Thank you, sir.

THE COURT:   Next witness?

MR. KOOP:   Reginald Close.

THE COURT:   Jurors, because Mr. Close is in custody, we are going to have a deputy, a corrections officer stand up here while he is testifying.

Step up here, Mr. Close. Raise your right hand. Do you swear or affirm the testimony you are about to give will be the truth, the whole truth, under penalty of perjury?

THE WITNESS:   I do.

THE COURT:   Have a seat. State your name. Spell your last name for the Court Reporter, please.

THE WITNESS:   Reginald Close. C-L-O-S-E.

THE COURT:   Thank you. Mr. Koop?

131

MR. KOOP:   Thank you, Your Honor.

**REGINALD CLOSE**

A witness sworn under oath to testify as follows:

DIRECT EXAMINATION

BY MR. ROTH:

Q   Good afternoon, sir. Mr. Close, you go by Reginald Close?

A   Yes.

Q   Do you have any nicknames, sir?

A   Rough.

Q   That's Rough?

A   Yeah.

Q   Mr. Close, how old are you?

A   Thirty-five.

Q   I am stating the obvious. But you're currently incarcerated in the Department of Corrections, aren't you, sir?

A   Yes.

Q   Mr. Close, how long have you been at MDOC?

A   Six months now.

Q   Before being at MDOC, were you previously at the Ingham County Jail?

A   Yes.

Q   Would that be September/October 2016?

132

A   Yes.

Q   But you had actually -- were you in jail even earlier than September/October?

A   Yes. I have been incarcerated since June of 2016.

Q   Mr. Close, did you go straight from Ingham County Jail to MDOC?

A   Yes.

Q   Sir, when you were in the jail, I want to talk about the layout a little bit, the Ingham County Jail. Okay?

A   Okay.

Q   Is there a difference between -- excuse me. Are there different posts in the jail?

A   Yes.

Q   What is a post, Mr. Close?

A   Like a dorm where they keep the inmates.

Q   Do you know approximately how many people are on each post?

A   That would depend. Some eight, some 16. It can be as many as two on one that I was on.

Q   Within each dorm, are there cells? How is it broken down?

A   There are some that are cells. Some that are -- it's just a layout with a couple bunks in a room.

133

Q   I guess my question is, are there specific, you know, posts, post five, cell so and so?

A   Yeah. They go like one maybe up to nine, I believe.

Q   Okay. How many people are usually assigned to each cell?

A   To each cell? Two.

Q   The dorm would be bigger, more the global of how many people are in that dorm, and within that there are cells that house the individuals?

A   Yes.

Q   Mr. Close, while you were in the Ingham County Jail, did you meet a person named Tunc Uruz?

A   Yes.

Q   Did you call him by some other name?

A   Tone.

Q   Tone?

A   Um-hum.

Q   Do you see him in court today, sir?

A   Yes.

Q   Could you identify him, please?

A   Sitting at the table to the left. The black blazer on and black tie.

Q   Thank you, Mr. Close.

MR. KOOP:   I ask the record to reflect he

134

has identified the Defendant.

THE COURT:  Mr. Perrone?

MR. PERRONE:  No objection.

THE COURT:  So identified.

Q   (MR. KOOP) Sir, did you know the Defendant before meeting him in jail?

A   No.

Q   At some point, while you're in the jail, do you have contact with him?

A   Yes.

Q   Do you recall when that first contact with the Defendant was?

A   We were on house — well, it is a few of us housed in a certain dorm, because we couldn't use the phone or anything, so...

Q   Is that referred to as medical?

A   That's where they had us at that time. They usually had us on a different post. But they moved us to medical at that time. Yeah.

Q   You first met the Defendant on medical?

A   Um-hum. Yes.

Q   And although it is called medical, that is for persons so you couldn't use the phone?

A   Yes.

Q   How many other people — when you are first in

135

medical with the Defendant, how many other people are in that dorm there?

A   For one night it is three of us.

Q   Which three people, do you recall?

A   Me, Uruz and another guy. Don't really remember his name. I just know him by a nickname. By CJ.

Q   Mr. Close, do you recall previously testifying at another hearing in this case?

A   Yes.

Q   Do you recall testifying about people in that medical dorm?

A   Yes.

Q   If you read your testimony, would it help you remember who all was in that dorm?

A   Excuse me?

Q   If you read your testimony, would it help refresh —

A   I never got anything.

Q   Yeah, I know. If you read your testimony, would it help you to remember your testimony?

A   Oh, yeah.

Q   Page 118. I just want you to start at line 13, read down and look up if that helps refresh your memory.

A   Yes, it refreshes it. I just didn't know it was

136

actual other than that.

Q   In reading that, does it help refresh your memory as to who else was in that dorm?

A   Yes.

Q   Who is the other person's name?

A   Charles Allen.

Q   How long was Charles Allen with you in the dorm?

A   One night.

Q   Do you and Mr. — the Defendant, remain in medical?

A   Yes.

Q   And you said one night with Charles Allen. Was he then moved out?

A   All of us actually remained in medical. We had moved next door to another room.

Q   Charles Allen was in the room with you?

A   No. Charles Allen moved in the next room. We stayed in the room we were in.

Q   You stayed and Charles Allen left?

A   Yes.

Q   While all of you were in the same dorm or cell with the Defendant, did he ever talk about his life, girlfriend or anything?

A   Yes. He talked about a girl. I can't remember her name right now. Been over a year ago, but he

137

talked about a girl.

Q And that's a fair point. You were — this is over a year ago when you were with the Defendant?

A Yes.

Q Since that time have your even had any police reports or transcripts to review before today's hearing?

A No.

Q So you're going — your testimony today is solely from what you remember that happened a year ago?

A Yes.

Q And, again, if you — would reading your prior testimony help refresh your memory as to what his girlfriend's name is?

A Yes.

Q Page 120. It's right there at the top, sir.

A Yeah.

Q Does that help refresh your memory, sir?

A Yes.

Q Thank you. Mr. Close, what was the Defendant's ex-girlfriend's name?

A Erika Melke.

Q Now, Erika Melke, is that someone that you knew before meeting Mr. Uraz?

A No.

138

Q How long after meeting the Defendant does he bring this person up to you?

A Maybe 48 hours.

Q Relatively quick?

A Yes.

Q And was this while you were in medical?

A Yes.

Q When he brings up the name Erika Melke, what way is he talking about her?

A That she had ruined his life, that she — that Erika had been cheating on with some other guys, and how he is going to get rid of her.

Q He is upset, is that fair?

A Yes.

Q Not nice conversations?

A No.

Q Did he tell you why he was in jail?

A He told me that Erika had lied on him, so she could go out and cheat, do whatever. He said that he was stalking her, or had entered her house or something, without permission. Whatever. But...

Q So he blamed her for his being in jail?

A Basically.

Q Mr. Close, how often would you talk to Mr. Uraz in

139

the jail?

A We were bunks for probably not even four feet apart. So all day for a couple weeks, at least.

Q Pretty regular that you and him would have discussions?

A Yes.

Q Do you recall — did he ever talk about his job that he had before being in jail?

A He told me he worked out at Michigan State and he had worked at LCC as a food tech or professor or something.

Q Did he ever talk about losing his employment at MSU

A At who?

Q At MSU?

A Yes.

Q Did he say what the reason was, why he lost his job?

A He told me that one of his co-workers, he had supposed to — tried to — he said that he was asking about a gun with one of his co-workers. And his co-worker got paranoid and went to one of the bosses and told him that he had asked about a gun.

Q When you say "he," the Defendant was asking the

140

co-worker for a gun; is that correct?

A Yes.

Q Did the Defendant discuss with you why he wanted a gun?

A For Erika. For Erika. He told me he was fed up with her, and he was going to try to kill her.

Q I'll circle back to that, but did he also — do you recall the Defendant ever making a statement about causing damage to Erika's property?

A He said her car, he had flattened her tires or something before, sliced her tires or something of the sort. She was supposedly trying to go to a concert or something at some time. Like I say, this is a year ago. So something about like a concert, or something she was supposed to go to around her birthday or something. And he wasn't — I believe he slashed her tires or something like that at the time.

Q Do you recall the specific concert that the Defendant had mentioned?

A I believe he said it was in Pontiac, I believe. I believe he said it was a Drake concert, I believe.

Q Do you recall him ever making any statements about accessing Erika's phone?

141

A. Something about iCloud. He was – she had accused him of accessing her iCloud on her phone, and watching her text messages and stuff like that.

Q. That was something – did the Defendant ever talk about any roommates of Erika?

A. Honestly, he just said it was a fat girl. I remember he said her roommate was fat, or something. And he was like tired of her, too. Supposed to have been some belief that the girl didn't want him around. It was like her fault, too. She was telling her, Erika, she didn't want him coming around there anymore. So...

Q. Did you recall an interview with the police, actually providing that name with the police?

A. He told me at the time, but now I don't remember. But, yes, he told me back then.

Q. Did you recall getting an interview with the police back in October 2016?

A. Yes.

Q. Would reading a transcript of that interview help refresh your memory as to her name?

A. I believe so.

Q. Start at line 24. Does that help refresh your memory, Mr. Close?

142

A. Yes.

Q. What was her name?

A. Carmen.

Q. So Defendant's talking about damaging Ms. Melke's vehicle. Roommate, Carmen. Do he ever, you recall him, mentioning boyfriends or other males that he wanted to cause damage to, or boyfriends?

A. It was two males. I don't remember the names. Like I said, it is over a year ago. I remember at the time that I was interviewed by the officer. I remember it was two guys, though. One she supposedly had been cheating on at the time and he got locked up and one was just, I guess, an on-and-off boyfriend of hers.

Q. Did he talk about wanting to cause harm or damage to these men?

A. Yes.

Q. He talks a little bit earlier about wanting to cause physical harm to Ms. Melke. Said he wanted to have her killed?

A. Yes.

Q. That is with the gun outside of jail. Did he ever approach you about having Ms. Melke killed?

A. Excuse me?

Q. Did he ever talk to you about having Ms. Melke

143

killed?

A. Yes.

Q. How did that come about?

A. He was asking where I was from. I told him I was from Detroit. He was like, did I know any people that were from there that I could get in contact with that could possibly have her killed and make it look like a robbery or anything.

Q. And you're having this conversation that he wants to have her killed. Is this a one-time conversation?

A. No. It kind of went on for a little while.

Q. So a continuing topic of the conversation with him?

A. Yes.

Q. Do you recall the first time the Defendant told you he wanted Erika Melke killed?

A. I don't recall the date. But I know we were in medical.

Q. So you're still in medical at this time?

A. Yes.

Q. That's a yes?

A. Yes.

Q. And is Charles Allen still in medical with you at this time?

144

A. No. Charles had moved next door the first time. He said something to me about it.

Q. Charles Allen is already out by the door, and the Defendant comes to you about killing Erika?

A. Yes.

Q. While Charles Allen was in medical with you, and the Defendant, did you ever hear the Defendant approach Allen or talk to Allen about killing Erika?

A. Not necessarily. I know they had a conversation. But I don't remember what they had a conversation about. So, no.

Q. How long was – did Charles Allen go in that dorm for a matter of hours?

A. They moved us up at about 10 that night. I believe Charles was – I don't know if it was the time exactly. That morning it was at 3, 4, 5 in the morning. There wasn't a clock up there. We were there for a few hours before they moved Charles.

Q. You were in medical approximately 10 in the early morning hours. The very next day Charles Allen is already gone?

A. Yes.

Q. Now, Mr. Close, when the Defendant first

**145**

approaches you about leaving from Detroit, did he ask you — what did he ask you about any help that you could provide in the killing of Erika Melke?

A He asked me if I had known anyone. He was telling me basically how easy he thought it would be because of where she lived, and if someone knocked on her door, caught her in the parking lot pulling in, just waiting in the parking lot, it would be easy to do it. And it was like he was to the point of it, like telling me how he thought it should be done.

Q Did he specifically ask you if you could help him have her killed?

A Yes.

Q What did you tell him?

A At first it was just a conversation. I didn't know. It was more of him talking than me saying anything, when the first conversation first started. Then when I actually seen that he was serious, I said: Um, well write it down what you're saying. So when he wrote it down, I sent it to my lawyer the next day. I told my lawyer. I didn't know what this guy was — honestly, I didn't know if it was like him trying to set me up or anything. So I sent it to my lawyer the

**146**

next day that he actually wrote anything down, as far as her parking lot looked or anything, saying anything about it. Because I actually told Mr. Uraz, you know, they record stuff in here, like, and you're talking about this. Then he started writing stuff down.

Q That's when you started writing down communication with the Defendant because of telling him that it was being recorded?

A Yes.

Q Mr. Close, you were previously — back that up there a little bit. The communication that you're having with the Defendant, are you actually discussing and developing plans about killing Erika Melke?

A Yes.

Q And you were previously given immunity for that correspondence for agreeing to kill her or aid someone to kill her; is that correct?

A Yes.

Q Was there ever a price discussed to have Ms. Melke killed?

A Once I told him that I probably had know someone in Detroit, Mr. Uraz told me he had like a settlement or buy-out from him being fired or

**147**

moved from his job. And he would have, I don't know, like $10,000 as far as him being brought off his job. I don't remember the exact dollar figure that we came up with, per se.

Q Do you recall your prior testimony where you did testify to that amount? Would that help refresh your memory?

A Yeah. Probably.

Q At the bottom there?

A Yeah.

Q Does that help refresh your memory, sir?

A Yes.

Q What price?

A $1,000.

Q $1,000 to kill Erika Melke?

A Yes.

Q When you are — when the Defendant is discussing this plan to have Erika killed, were you to be the person that actually was to carry out the killing?

A No.

Q Who was? Did you tell him it was somebody that you knew?

A Yeah. I told him I knew some people in Detroit, I could get ahold of someone. Necessarily nobody in specific. I never gave him the person.

**148**

Q Now, you talked about this written correspondence, drawing a map, communication between the two of you?

A Yes.

Q That is something that you gave to your attorney?

A Yes.

Q Showing you People's Proposed Exhibit 39, 40 and 41, do you recognize these, Mr. Close?

A Yeah.

Q How do you recognize them?

A From my handwriting on some, and Tune's handwriting on them.

Q Okay. Are these copies of correspondence that you handed to your attorney?

A Um-hum. Yes.

THE COURT:  Say "yes."

Q (MR. KOOP) This is that back and forth between you and the Defendant while in jail, correct?

A Yes.

Q Was there anyone else whose handwriting was involved in these conversations?

A No.

Q It's just you and the Defendant?

A Yes.

Q Did you actually see the Defendant write portions?



149

A Yes.

MR. KOOP: Move for admission of People's Proposed Exhibits 39, 40, 41.

THE COURT: Mr. Perrone?

MR. PERRONE: Voir dire, Your Honor?

THE COURT: Mr. Perrone. So it's just on voir dire.

VOIR DIRE EXAMINATION

BY MR. PERRONE:

Q So the first person to write on this letter is yourself?

A I'm not sure the first person to write on it.

Q Is this first sentence up here your handwriting?

MR. ROTH: What exhibit?

MR. PERRONE: Exhibit 39.

THE WITNESS: Yes. That's my handwriting.

Q (BY MR. PERRONE) And the second, is that what you're identifying as Tony's?

A Yes.

MR. ROTH: Is this still on 39?

MR. PERRONE: Still on 39.

Q (MR. PERRONE) Where it says you have to draw me a map, is that your handwriting?

A Yes.

Q Are these pages in sequential order, as far as the

150

exhibits, as far as the conversation is concerned, 39, 40, 41?

A I can't see the corner of it. Yes.

Q Are there any other writings besides what's included in these exhibits between yourself and Mr. Uraz?

A No. I don't believe so.

Q And the handwriting on the second page, to start out the second page, is that a continuation of the conversation from the first page?

A I believe it would be for sure.

Q The handwriting here that says wait for me to get out and be sentenced because they might try to keep me here.

MR. ROTH: I'm going to object, Your Honor.

THE COURT: Just voir dire on authenticity. Not the contents, Mr. Perrone.

MR. PERRONE: No objection.

THE COURT: We will admit those exhibits, 39, 40, 41.

MR. KOOP: Correct, Your Honor.

(PX-#39 40 and 41 are received into evidence.)

CONT'D. DIRECT EXAMINATION

BY MR. KOOP:

Q I want to go over these exhibits now with you,

151

Mr. Close. You talked about a map the Defendant had drawn; is that correct?

A Yes.

Q I just want to back up here for a second. What's contained in People's 39, 40, 41? Were these three pieces of paper all written in the same interaction with you and the Defendant?

A Yes, I believe so. Yes.

Q Or was it in one sitting? You said you had multiple conversations with the Defendant about this?

A I believe that is in a couple sittings. I'm not for sure if it is in that one sitting. All I know, the letter was all about the same conversations. I don't know if it's in the one setting.

Q Same topic, but could have been different days?

A Yes.

Q Let's look first here at People's Exhibit 39. Whose handwriting is this top line?

A That's mine.

Q Whose handwriting is this second line?

A Tone's.

Q And, again, third line would be yours?

A Yes.

152

Q That's Tone?

A Yes.

Q Yours?

A Yes.

Q The Defendant's?

A Yes.

Q And then yours again?

A Yes.

Q And then at the bottom here, you have black Charger. Do you know what that — is that your handwriting or the Defendant's?

A That's my handwriting.

Q What's the purpose of the black Charger referenced?

A That is two guys that Mr. Uraz told me that Ms. Malke was, I guess, cheating on with her. Those are like, I guess, a description of the cars he gave me, address, basically their cars. address, their names.

Q So this would be Mike Tovez(sp) in Lansing?

A Yes.

Q That's one of the individuals he named?

A Yes.

Q Is that's someone she was supposed to be having a dating relationship with?

153

A   Yes.

Q   Stan White as well, Holt address, 1883 Dean, Holt. Is that the address for Stan White?

A   Yes.

Q   What did he want to happen to these two individuals?

A   He first started off saying that he just wanted their ass beat. And then he went on to say like he wanted them taken care, too. If the guy that I got in contact with could do something to Erika, he wanted something done to them, too.

Q   With Stan White, do you recall where the Defendant had talked about an argument, any argument or issues with Stan White?

A   I believe he said that Stan White had a silver Buick or something, and had supposed to have been staying with his parents or something out in -- Tune was telling me he was mad because he was staying with his parents out in Holt, and she was cheating on him with him, and he had had a confrontation outside of a restaurant or something in Pontiac, I believe it was Pontiac, around her birthday or something, because Erika was there with him. He had been tracking her phone, or something, and he had tracked it to

154

this restaurant, or whatever, in Pontiac. And he drove there and confronted her with him.

Q   Looking at People's Exhibit 41, this map here, who drew that map?

A   Mr. Uraz.

Q   Was he the one that put the letters, the numbers, directions on there?

A   Yes.

Q   Is anything contained on this map your handwriting?

A   No.

Q   What does that say right there?

A   Quality Dairy Store.

Q   Is that Dunckel Road?

A   Yes.

Q   What was that map supposed to be of?

A   It was supposed to be like her apartment, I believe. Her apartment was on the second floor of 122.

Q   I'll zoom in here. Is that the apartment number there?

A   It could be. I thought it was the one at the top. I believe this could be.

Q   We were looking at different things starting at the top. College Towne Apartments, Apartment 202.

155

Who wrote that?

A   Mr. Uraz.

Q   And what was that address supposed to be for?

A   It's supposed to be Ms. Melke's address.

Q   Where she was living?

A   Yes.

Q   Then going down further here, what are these Erika Melke or Erika Linn Facebook, what is that supposed to be?

A   Because we were talking, and I said: Well, how is this guy supposed to just go to an apartment and doesn't know how the girl looks. He says: Well, she has a Facebook, he can look up this Facebook. If it's not Erika Melke, it's probably Erika Linn, and he can see how she looks that way.

Q   Going down further, what does this say here?

A   A green Toyota Rav Four.

Q   Next line: License plate CB and then dashes?

A   Yeah.

Q   With Spartan Toyota plate cover?

A   Yes.

Q   Who wrote this?

A   Mr. Uraz.

Q   What was supposed to be the significance of that?

156

A   It's supposed to be what car she drives, what car Erika drives and the license plate number, minus a few numbers.

Q   Do you recall the Defendant telling you where Erika worked?

A   He said for like Sparrow's -- it was for different -- I forget right now. It is a while ago. I know it was for like a hospital. She would do like urgent care. She works at different locations.

Q   That would have been different urgent cares or something in medical around the area?

A   Yes.

Q   Mr. Close, I want to go back to this $1,000 that is supposed to be paid to have Erika Melke killed. How are you supposed to get paid when you're in jail?

A   I had told Mr. Uraz that I was going to trial soon. So I would possibly be out. And Mr. Uraz would give me the money once I was out. But it had got to the point I had wrote my lawyer, and it was like an every day conversation now. And I didn't know how to get in touch with the officer that had moved me or anything. So we were still on the same floor having this conversation at the

157

point I had sent the letter to my lawyer. So Mr. Uraz came to me: I could make a down payment on it, right now. I said: Okay. And Mr. Uraz got in touch with his roommate, I believe, at the time. His roommate brought money up to the County jail.

Q Was that actually put on your account?

A Yes.

Q Prior to the money, how much money was put on your account?

A I believe like $150.

Q Prior to that one instance of money being put in your account by this roommate, had the Defendant ever had anybody put money on your account before?

A No.

Q Did he ever put money on your account after that?

A No.

Q On Exhibit 40, whose handwriting is that?

A Mr. Uraz.

Q What is he detailing for you there?

A I can't really make out the top line of it are. This was the time he was telling me he wanted me to wait for him to get out to get in touch with the guy because he didn't want him to keep him in jail after it happened.

158

Q So People's Exhibit 40 here, he is talking, if I understand -- if I understand you correctly, he is talking about when he wants Erika killed?

A Yes.

Q You responded telling him what?

A I told him that they couldn't keep him in jail. He was already in jail when it happened.

Q Did you personally know the individual that put money on your account?

A No.

Q I'm showing you what's been marked as People's Exhibit 43. Have you ever -- do you know that person?

A No.

Q I'm not going to introduce that exhibit with you right now. I just want to confirm in People's 43, that's not someone you ever met before.

A No.

Q Mr. Close, do you recall when it was that you contacted your attorney about the Defendant soliciting to kill Erika?

A It was no more than 48 hours after he said something to me about it, I sent my attorney the correspondence we were having.

Q Were you still in medical with the Defendant?

159

A Yes. At that time, yea.

Q Do you recall what month this would have been? Do you recall ever making a statement about what month this would have been?

A I don't recall what month it would have been in. I know it was toward the end of the year. I'm not sure exactly what month it was. October. November. Somewhere around that time.

Q Would reading a transcript of your interview with the police help refresh your memory?

A Yes.

Q Start there at line seven, Mr. Close. Look up if that helps refresh your memory, if it does.

A Yeah. Just what I said. Yes.

Q Does that help refresh your memory, Mr. Close?

A Yes.

Q When did you contact your attorney about this?

A October.

Q After you contacted your attorney, were you later interviewed by the detectives from the Lansing Police Department?

A Yes.

Q That happened while you were at the jail?

A Yes.

Q Was your attorney present for that interview?

160

A Yes.

Q Now, Mr. Close, you proffered on two other cases before the interview with Detective Krumbach; is that accurate?

A Yes.

MR. PERRONE: Can we approach?

THE COURT: You may.

(Off the record discussion at the bench.)

Q (MR. KOOP) Let me clarify here. With the proffers you had previously done, believe that's an opportunity for you to tell the police and the Prosecutor something about a case to potentially get some sort of benefit or agreement; is that correct?

A Well, when they told me you're doing a proffer, there is no guarantee or nothing on that. So I'm not sure if I'm understanding correctly how you're saying it.

Q Sure. In these proffers, is there something you signed with your attorney and reviewed with your attorney?

A Yes.

Q Okay. When you met with Detective Krumbach and Detective Hogan, this was just a statement that you were given?

161

A  Yes.

Q  You didn't sign a proffer agreement?

A  No. During that interview.

Q  Did you review People's 39, 40, 41 interviews with the detective?

A  Yes.

Q  Those would have been before you met with Detective Krumbach?

A  Yes.

Q  And the money that was placed on your account, was that before or after your interview with Detective Krumbach?

A  Before.

Q  After this interview with law enforcement, did you continue to — did the Defendant continue to pursue this conversation about having Erika killed?

A  I believe after that interview, I believe they moved me that day. But as — when I had sent the letter out, it was persistent, because they moved us all to medical and then they moved us back to the other dorm. It was two dorms from each other. It was an ongoing thing up to the point that I had an interview with the detective or officer, and then they moved me that day.

162

Q  Before you gave your statement to law enforcement, during that interview, were there any promises or plea offers for you to give that statement?

A  No.

Q  And besides the meeting that we touched on earlier, and that you had previously received, you have not received a reduction in a sentence, or had any charges dismissed, reduced?

A  No.

Q  As a result of you cooperating with this?

A  No.

Q  Mr. Close, at any point when the Defendant is soliciting you to have Erika killed, making plans to have her killed, did you ever intend to actually help him?

A  No.

Q  Throughout your conversations with the Defendant, did you ever have a problem communicating or talking with him?

A  No.

Q  Did you feel you understood each other just fine?

A  Yes.

MR. KOOP:  One moment, Your Honor. Nothing further at this time, your Honor.

THE COURT:  All right. Why don't we

163

approach for a moment?

(Off the record discussion at the bench.).

THE COURT:  Members of the Jury, we can't finish with the allotted time I set aside for today. We are going to recess for the day at this time. I would indicate to you that you will come back on Monday at 8:15, again. Hopefully we will get started. We are doing pretty good getting started in the morning. You will be off for the entire weekend. It's important that you don't discuss the case with anyone, family members. The Supreme Court tells me I have to tell you every day. Since we have a record, the record has to show I told you every day. You are not to discuss the case with anyone, read any news reports, radio, broadcasts concerning this matter.

On behalf of the citizens of Ingham County, I would like to thank you very much. See you Monday morning. We will be in recess Monday at 8:30.

(Jury exits courtroom at 3:00 p.m.)

MR. ROTH:  Your Honor, before we go off the record, I don't know if Mr. Perrone got this, but we had emailed all of us this afternoon, and asked if there is any update on who needs attorneys. As

164

for as witnesses, most immediately. I don't know if Mr. Perrone has an update who he actually intends to call on his list.

MR. PERRONE:  Nichtman and Close.

THE COURT:  I'm sorry.

MR. PERRONE:  Nitchman and Close.

MR. ROTH:  Which Close?

MR. PERRONE:  Ashley.

MR. ROTH:  Jackie Close, no problem.

MR. PERRONE:  Actually Jackie.

MR. ROTH:  Jackie Close is in Arkansas. I don't think that's going to happen.

THE COURT:  All right.

MR. WHITE:  Okay. Motion for extraordinary expenses.

THE COURT:  To do what?

MR. PERRONE:  Subpoena witnesses to get them up here.

THE COURT:  I'm not going to pay for a witness to come up on the last minute. Have you ever even contacted her to know that she is available to come up?

MR. ROTH:  Jackie Close is in federal prison in Arkansas.

MR. PERRONE:  Jackie Close is a him.

165

THE COURT: So it has to be a marshal service.

MR. ROTH: If Defense counsel doesn't know the gender of this witness, I'm extremely suspect of the relevance and importance of this witness.

MR. PERRONE: Okay. We will avoid the Closes. I think that Mr. Close's testimony in and of itself will be completely credible. So we can leave the Closes out. Nichtman, we will leave them all out. We don't need an interpreter either.

THE COURT: I want to make sure that we make a record on that. Let's have a seat.

MR. PERRONE: I discussed it with my —

THE COURT: We have to make a separate record. We already had a request.

So, Mr. Uriz, you remember I placed you under oath. Must have been back on Tuesday when we started, when we had this discussion about the interpreter. Do you recall that, sir?

THE DEFENDANT: Yes, Your Honor.

THE COURT: I have been advised by your attorney at this time that you now have reconsidered and you feel you do not need an interpreter present for when you testify; is that

166

correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: So you want as -- we had made arrangements to have the interpreter come back. You were here when we made those arrangements. You want us to abandon those now, and not have her come back to interpret for you?

THE DEFENDANT: Yes, please. The reason I ask for it, I do have an accent. And my pronunciation sometimes is different. I wanted the jury to understand. But I didn't expect this translator coming here. I'm okay.

THE COURT: You're okay going along with that?

THE DEFENDANT: Yes.

THE COURT: Because I guess the translator might have an accent, too.

THE DEFENDANT: I didn't expect that.

THE COURT: We will call off the interpreter based on your request. Yes, Mr. Perrone?

MR. PERRONE: With all of the talk regarding his ability to communicate, and trying to use the interpreter as a mechanism to show that is just a defense, it kind of undermines --

167

THE COURT: To show what?

MR. PERRONE: To show that — they're trying to say he is trying to communicate that he has the interpreter is just a ploy. It takes the ability for him to have an interpreter out completely.

The reason that he is articulating that he wanted it, because he has an obvious somewhat dialect overall, as far as his communication. We have written communications that have been previously addressed. Written form is different than verbal. Again, verbal is more difficult for him to understand. He is more difficult to understand.

I can tell you, personally, based on my own conversations with him, that there is a difficulty understanding what he has to say. And, again, we are willingly, and he is completely willing to waive his right to have the interpreter.

I want to preserve on the record the fact that part of the reason associated with that, from my perspective, so that I can cover myself, is the result of the Prosecution hammering on his communication skills.

168

THE COURT: Well, I would just sense that that became an issue when you put it into play by requesting an interpreter. I don't see there is anything inappropriate with the Prosecution's questions. Mr. Roth?

MR. ROTH: There is two things I want to add to that. First of all is that the reason we took that tactic during some pretrial discussions, off the record, and I believe on the record as well, there was some attribution of these conversations to, I didn't fully understand what these other people were saying to me. So it obviously became important for us to prove that he was conversant in the language.

Second thing I want to address, Mr. Perrone's allegation that we sort of backed him into this position to waive the translator. The Defendant is welcome to have a translator. We have no objection to that for his testimony. If he wants to get up there and explain his reason, I think that's perfectly appropriate that he thinks he can communicate better through a translator, that's appropriate. We're not influencing that decision at all.

MR. PERRONE: We still haven't made a

169

determination at this stage as to whether or not Mr. Uraz will testify. We will cross that bridge when we get to it.

THE COURT: We can't cross the bridge when we get to it.

MR. PERRONE: He is voluntarily waiving his right.

THE COURT: Okay. Because we would have to give notice to the interpreter.

So based on Mr. Uraz's statement today, you no longer wish to have an interpreter; is that correct, Mr. Uraz?

THE DEFENDANT: Yes, sir.

THE COURT: All right. So we will not have an interpreter.

MR. ROTH: Just to confirm the other issue we just addressed. Ashley Close, Jackie Clase, Andrew Nichtman are struck from the Defense witness list?

THE COURT: Mr. Perrone, those are being struck?

MR. PERRONE: Yes.

Just as a housekeeping matter, as a result of the preliminary voir dire associated with Mr. Close and my review of the notes and the

170

context of the notes, I will be bringing a motion on Monday for a mistrial as a result of prosecutorial misconduct in failing to turn over the material and exculpatory documents that are very clearly something that should have been turned over.

And as far as the Prosecution's maintaining that they don't have any idea about these notes or their availability and combatting and sending me emails telling me that they're not relevant or discoverable, however, although the Court has determined that they are relevant, I will intend to make an argument that they were immaterial and exculpatory, I am requesting that the solicitation charges in this case be dismissed with prejudice as a result of the failure of the Prosecution to turn over what is smoking-gun evidence.

THE COURT: Mr. Roth?

MR. ROTH: I just ask that Mr. Perrone show up on time Monday to argue that motion so we are not further delayed in presenting witnesses.

THE COURT: I will indicate, preliminarily, it was my understanding that the Prosecutor didn't have that information of personal knowledge of it.

171

We can address that Monday to find out whether that's accurate or not.

But when they found out, they did produce it. There were some evidentiary issues as to what was going to be relevant, and I reviewed those and directed that they be provided to you.

In addition, I told you that when you made the request, that you wanted some additional time to review the notes, I said we would take care of that today, which, in fact, I have done. I have now given you an entire weekend to review these notes. I think they were not excluded. They might have gotten to you late. But they have not been excluded. And I'm giving you time to thoroughly review those. We can have the motion on Monday.

MR. PERRONE: Your Honor, again, I'm just attempting to preserve the record. Based upon my review, and it's a merited issue, it's for discussing, had not had an opportunity to review all of the notes yet, one of the basis is associated with an argument that I am contemplating making is depending upon the veracity of additional notes. And this is substantial evidence, if I didn't have an

172

opportunity to review this prior voir dire, and the magnitude of the information that's included in here, if it indicates that the materiality associated with it is so high that there is realistically not the ability for the Prosecutor to acknowledge, when we have a certain standard, or should have known. And I think that this is indicative of a should-have-known standard.

THE COURT: Well, we don't know. We will see how it comes out with the information that we have to place on the record on Monday.

MR. ROTH: Thank you, Your Honor.

THE COURT: All right. Anything else?

MR. ROTH: No, Your Honor.

(Proceedings concluded at 3:09 p.m.)

173

STATE OF MICHIGAN        )
COUNTY OF INGHAM       )

        I, TERESA J. ABRAHAM, Certified Shorthand Reporter in and for the County of Ingham, State of Michigan, Thirtieth Judicial Circuit Court, do hereby certify that the facts stated in the foregoing pages are true and correct, and comprise a complete, true and correct transcript of the proceedings taken in this matter on this the 3rd day of November, 2017.

Teresa J. Abraham, CSR-3445

Date:  May 9, 2018