STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

                    Plaintiff,

vs.                         CASE NO:   16-1064-FH
                                       16-1065-FH

TUNC URAZ,

                    Defendant.
_____/

    HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
    LANSING, MICHIGAN -- MONDAY, NOVEMBER 6, 2017

              CRIMINAL JURY TRIAL

APPEARANCES:

FOR THE PEOPLE;

WILLIAM G. CRINO, JD
CHAZ T. KOOP, JD
Assistant Prosecuting Attorney
Prosecuting Attorney's Office
313 W. Kalamazoo
Grady Porter Building
Lansing, Michigan 48933


FOR THE DEFENDANT:

JACOB PERRONE, JD
Perrone Law, PC
221 N. Lake Lansing Road, Ste. 200
East Lansing, MI 48823

ERIC SCHROEDER, JD
HODWIN & ASSOCIATES PC
2970 E. Lake Lansing Rd.
East Lansing, MI 48823-7415


Reported by:  Teresa J. Abraham, CSR-3445
Phone:  (517)483-6404   e-Mail: tjabraham@msn.com

I  N  D  E  X

WITNESSES:

REGINALD CLOSE
Cross-Examination by Mr. Perrone ............. 4
Redirect Examination by Mr. Koop ............. 75/85
Recross-Examination by Mr. Perrone .......... 87

PATRICK BURNETT
Direct Examination by Mr. Roth .............. 89
Cross-Examination by Mr. Perrone ........... 100
Redirect Examination by Mr. Roth ........... 102

ANDREW HOGAN
Direct Examination by Mr. Roth ............. 104
Cross-Examination by Mr. Perrone ........... 111
Redirect Examination by Mr. Roth ........... 114

FRANK MOBLEY
Direct Examination by Mr. Roth ............. 116
Cross-Examination by Mr. Perrone ........... 129
Redirect Examination by Mr. Roth ........... 146

KEVIN JEWELL
Direct Examination by Mr. Roth ............. 150
Cross-Examination by Mr. Perrone ........... 155
Redirect Examination by Mr. Roth ........... 168

EXHIBITS:

| Exhibit # | Description | Received |
|---|---|---|
| PX-#42 | Close Express acct | 108 |
| PX-#43 | Atamer deposit | 110 |
| PX-#44 | 10/24/16 Securus call | 126 |
| PX-#45 | 10/24/16 Securus call | 126 |
| PX-#46 | 10/27/16 Securus call | 129 |
| PX-#C | stipulated order | 9 |
| PX-#D | proffer letter | 11 |
| PX-#E | note to Pierce | 37 |



**Page 1**

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff,

vs.                    CASE NO: 16-1064-FH
                               16-1065-FH

TUNC URAZ,

Defendant.
_____/

HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
LANSING, MICHIGAN - MONDAY, NOVEMBER 6, 2017

CRIMINAL JURY TRIAL

APPEARANCES:

FOR THE PEOPLE:

WILLIAM O. CRINO, JD
CHAZ T. KOOP, JD
Assistant Prosecuting Attorney
Prosecuting Attorney's Office
313 W. Kalamazoo
Grady Porter Building
Lansing, Michigan 48933

FOR THE DEFENDANT:

JACOB PERRONE, JD
Perrone Law, PC
221 W. Lake Lansing Road, Ste. 200
East Lansing, MI 48823

ERIC SCHROEDER, JD
GODWIN & ASSOCIATES PC
3970 E. Lake Lansing Rd.
East Lansing, MI 48823-7415

Reported by: Teresa J. Abraham, CSR-3445
Phone: (517) 483-6404 e-Mail: tjhbraham@msn.com

**Page 2**

INDEX

WITNESSES:

REGINALD CLOSE
Cross-Examination by Mr. Perrone 4
Redirect Examination by Mr. Koop 75/85
Recross-Examination by Mr. Perrone     87

PATRICK BURNETT
Direct Examination by Mr. Roth     89
Cross-Examination by Mr. Perrone   100
Redirect Examination by Mr. Roth   102

ANDREW HOGAN
Direct Examination by Mr. Roth     104
Cross-Examination by Mr. Perrone   111
Redirect Examination by Mr. Roth   114

FRANK MOBLEY
Direct Examination by Mr. Roth     116
Cross-Examination by Mr. Perrone   129
Redirect Examination by Mr. Roth   146

KEVIN JEWELL
Direct Examination by Mr. Roth     150
Cross-Examination by Mr. Perrone   155
Redirect Examination by Mr. Roth   169

EXHIBITS:

| Exhibit # | Description | Received |
| --- | --- | --- |
| PX-#42 | Close Express deposit | 105 |
| PX-#43 | Alamier deposit | 110 |
| PX-#44 | 11/24/16 Securus call | 140 |
| PX-#45 | 11/24/16 Securus call | 155 |
| PX-#46 | 10/27/16 Securus call | 129 |
| PX-#C | stipulated order | 9 |
| PX-#D | proffer letter | 9 |
| PX-#E | note to Pierce | 9 |

**Page 3**

Lansing, Michigan
November 6, 2017
at about 8:42 a.m.

* * * * * * *

THE COURT: Resuming on the matter of People versus Tunc Uraz, 16-1065 and 1064. We have Mr. Roth here. Mr. Perrone. You are Tunc Uraz, sir?

THE DEFENDANT: Tunc Uraz, yes, sir.

THE COURT: Ready to proceed? Preliminary matters?

MR. ROTH: Nothing, Your Honor. Thank you.

THE COURT: Ready to go?

MR. PERRONE: Yes, Your Honor.

THE COURT: Ready for the jury? Still Mr. Close, continue with Mr. Close?

MR. ROTH: Yes, Your Honor. I think they just need a minute to get the cuffs on him.

THE COURT: Hold on just a minute. I would rather have him seated already when they come in.

Resume the stand for us, Mr. Close. Remain standing until the jury comes in, please.

(Jury present in courtroom at 8:46 a.m.)

THE COURT: Be seated. You remain under

**Page 4**

oath from last week Mr. Close?

THE WITNESS: Yes, sir.

THE COURT: Cross-examination by Mr. Perrone.

MR. PERRONE: Thank you, Your Honor.

REGINALD CLOSE,

A witness previously duly sworn under oath testifies as follows:

CROSS-EXAMINATION

BY MR. PERRONE:

Q    Prior to your incarceration in the Ingham County Jail, in July of 2016, had you previously been incarcerated in the Michigan Department of Corrections?

A    Yes.

Q    For how long?

MR. ROTH: Objection. Relevance.

THE COURT: As to what, his previous incarceration?

MR. ROTH: Yes.

THE COURT: I guess you can ask him when he got out. I don't know how long. You can ask him when he got out of the Corrections. I will sustain it in part, overrule in part.

Q    (MR. PERRONE) When did you get out of the

Department of Corrections prior to your incarceration?

A   March 2013, I think he said.

Q   And at the time that you were incarcerated in the Ingham County Jail in October 2016, were you on parole?

A   Yes.

Q   What were you on trial for?

MR. ROTH:  Your Honor, may we approach?

THE COURT:  All right.

(Off the record discussion at the bench.)

THE COURT:  I'll sustain the objection.

Q   (MR. PERRONE) When were you initially incarcerated in the Ingham County Jail?

MR. ROTH:  I object. You don't want initially. You want 2016.

Q   (MR. PERRONE) When were you initially incarcerated at the Ingham County Jail?

A   June 2016.

Q   When did you first come into contact with the Defendant in this case?

A   October 2016.

Q   If I followed you, October 7, when you first came in contact with him on the medical post?

A   That's a possibility.

Q   You were alone on the medical post with Tony?

A   Eventually. After one night, yes.

Q   You guys had numerous discussions amongst yourselves?

A   Yeah.

Q   You talked about cases?

A   Yes.

Q   Did you talk about your cases with other inmates?

A   Did we talk about our case?

Q   Did you talk about your case with other inmates?

A   Yes.

Q   Did you talk about other inmate cases?

MR. ROTH:  I'll object to the compound question.

THE COURT:  Let's just stick with one at a time. He is answering. He did have conversations about his case with other residents of the jail. So I'll sustain that portion. Mr. Perrone?

Q   (BY MR. PERRONE) Did you talk with other inmates about their cases?

A   Yes, I had conversations with other inmates about their cases. Yes.

Q   Did you talk to John Pierce about his case?

A   Somewhat, yes.

Q   Did you write notes between yourself and John Pierce?

A   Yes.

Q   Did you speak with Chris Schinberger about his case?

A   I believe so. Yes.

Q   Is this the information you received on John Pierce's case, but shared it with the Ingham County Prosecutor's office?

A   I shared it with my lawyer.

Q   Did you also indicate to your lawyer that you had information related to homicide that occurred in 2011?

A   Yes.

Q   And this is information that you intended to convey to the Prosecutor?

A   I conveyed it to my lawyer. I never intended to convey it to the Prosecutor.

Q   So you conveyed all the information regarding Chris Schinberger, John Pierce, the 2011 homicide, to Mr. Uraz and your attorney?

A   Yes.

Q   You didn't anticipate he was going to convey to the Prosecutor?

A   I didn't know who he was going to convey it to at the time, no.

Q   It wasn't your intention to get a benefit on your case?

A   No. I went to trial. I was found not guilty on my case.

Q   Did you initially have a trial set for October 31st, 2016?

A   I'm not sure if I had a date set for October. I had probably pretrial leading up to a trial at that time.

MR. PERRONE:  Defendant's Proposed Exhibit

K. May I approach the witness?

THE COURT:  All right.

MR. ROTH:  Your Honor, may I approach?

THE COURT:  You may.

(Off the record discussion at the bench.)

THE COURT:  I'll overrule that objection.

Q   (MR. PERRONE) You can take a look at that quickly. Is that something that you discussed with your attorney?

A   I probably -- I received a few letters. Every time it was adjourned, it was never a discussion why it was adjourned to me.

9

Q But you had received a stipulated order from your attorney showing it was adjourned?

A I don't think I received this stipulated order. But I had received court dates when my hearing was adjourned. But not this one particularly.

Q Did he make you aware of why it was being adjourned?

A No.

MR. PERRONE: Move for admission.

MR. ROTH: Without objection, Your Honor.

THE COURT: All right. We will admit Defendant's Exhibit D.

Mr. Roth: Is that C?

THE COURT: D, wasn't it? C or D, the exhibit?

MR. PERRONE: I believe it's C.

MR. ROTH: I thought it was C.

MR. PERRONE: It was C, because I skipped over one.

MR. ROTH: There should be an A and a C for the Defense.

THE COURT: This is C or D?

MR. ROTH: C, Your Honor.

THE COURT: All right. Thank you.

(PX-#C is received into evidence.)

10

Q (MR. PERRONE) But you do acknowledge that the time that was scheduled for October 21st, 2016, was adjourned?

A Yes.

Q You did not get any type of deal as a result of the information you conveyed to the Prosecutor?

A No.

Q When did you initially meet with your attorney after you got this information from Mr. Uraz?

A Within a couple weeks, I believe.

Q How long after you were put on the post, on September 27, did Mr. Uraz start to approach you to kill Erika Melke?

A No more than 48 hours.

Q So it would have been by September 29?

A Yes. If it was placed on the 27th, it would have been the 29th.

Q You can't recall the exact date you would have met with your attorney?

A No, I can't.

Q Would you have met with your attorney next court appearance?

A No. I believe he came out to the County jail.

Q Is that why you were still on medical?

A I believe so.

11

Q Did you request that he come there?

A No. I just sent him the information and he came. He had been coming bi-weekly, or once, twice a month, leading to trial anyway.

Q Defendant's Proposed Exhibit B –

MR. ROTH: Your Honor, we will stipulate to admit Proposed Exhibit D.

(PX-#D is received into evidence.)

THE COURT: All right. For the record, what is Exhibit D, Mr. Perrone?

MR. PERRONE: Exhibit D is a proffer letter regarding Mr. Close.

THE COURT: All right. We will admit Exhibit D.

MR. ROTH: Yes, Your Honor.

(DX-#D is received into evidence.)

Q (MR. PERRONE) If you would like to take a look at this? What date was that letter written? What date did you sign it?

MR. ROTH: Objection. Compound question. he shoots out one date. It's not clear what he responded to.

THE COURT: He can answer the date – it is written, and he can answer the date of the proffer.

12

MR. ROTH: Yes.

THE WITNESS: It was written 11th of August 2016, signed on the 24th of August 2016.

Q (MR. PERRONE) When did you eventually meet with the Prosecutor?

A About this proffer letter?

Q Yes.

MR. ROTH: I guess I'm going to object to the characterization. He never meets with the Prosecutor. He meets with the police.

Q (MR. PERRONE) When did you meet with the police with regard to the proffer letter?

A I don't remember the exact date I met with this proffer letter.

Q If you were able to review the police report, would that refresh your recollection of the potential meeting?

A Yes.

THE COURT: Well, why don't we approach for just a moment?

(Off the record discussion at the bench.)

THE COURT: Members of the jury, the parties are stipulating this particular proffered letter is not related to Mr. Uraz's case.

MR. ROTH: I think, part and parcel,

13

stipulating to no proffer letter as it relates to Mr. Uraz, the Defendant.

THE COURT: That's fair. Date of this involving other matters has nothing as to Mr. Uraz; is that accurate, Mr. Perrone?

MR. PERRONE: Yes.

MR. ROTH: Nothing as related to this date as to the proffer letter.

THE COURT: We are not talking about a later date. This particular document has nothing involving Mr. Uraz, and this involves another case?

MR. ROTH: Correct.

THE COURT: Mr. Perrone?

Q (MR. PERRONE) If I may approach? Take a look at this. Look down on it. Read it. Do you recall the date that you had met with the dentist in regards to the proffer letter?

A I didn't just look at the date. I just read that. I'm sorry. I didn't know you were looking for a date on that.

Q What was the date?

A August 24th, 2016.

Q Did they discuss with you the potential of taking a polygraph test to verify your

14

statement?

A Yes.

Q Did you offer to take a polygraph test?

A I agreed -- I didn't offer. I agreed that I would.

Q Was your understanding of what you're getting out of this nothing? You're just doing the right thing?

MR. ROTH: I object to the vague nature of the question. When he says "this," talking about today, the proffer was in August 2016. We need specificity.

Q (MR. PERRONE) The proffer interview.

A The proffer interview? They exactly told me they couldn't offer me anything.

Q Who wrote in the proffer admitted by John Pierce?

A I have no -- I don't know.

Q You have no idea who wrote it in?

A No.

Q Did John Pierce come up during the proffer of the interview?

A John Pierce had divulged information that I had conveyed to my lawyer. I would think that that's why that would be on there.

15

Q Did you convey that information to your attorney after you conveyed the information of the 2011 homicide in Chris Schinberger?

A I don't know if it was in the exact same time. I don't know if it was in the exact same letter.

Q In regards to the letter that you had exchanged between yourself and Mr. Uraz with the map, this is an extension of the discussions that you had with him within that first 48 hours, correct?

A Yes.

Q When do you start writing about it?

A It was the beginning of the conversation.

Q This was the beginning of the conversation?

A Yes.

Q When he first starts talking about it?

A Not when he first, like initially said anything, but around the beginning of the conversation, yes.

Q It was your testimony that you told him you knew somebody from Detroit that owed you a favor?

A I don't think I specifically put it in the words about owe me a favor.

16

Q When you testified before this Court, did you say that Mr. Uraz indicated to you that he wanted it to look like a robbery?

A I don't think I testified -- I don't believe so. I don't believe I said he wanted to make it look like a robbery.

Q You indicated that the handwriting on this starts with your handwriting?

A Yes.

Q And you indicate to him that I don't think it would look better as a robbery?

A Yes.

Q That's a follow-up on him telling you he just wants her killed?

A No. That was a follow-up from when we were talking. And it like -- I guess the conversation escalated. I thought maybe we should write, because it was known all around the jail you could be recorded or whatever. I indicated to him that we start writing back and forth rather than just saying it out loud.

Q You thought it was maybe somebody within the jail trying to set you up?

A Yes.

Q Were you playing into that?

17

A  No. It's just surprising immediately after two days he started talking about that. I got to thinking, was this guy putting in a recorder, setting me up. I didn't know what was going on at first.

Q  So you played along with it?

A  Not played along. I went along with it to see where it was going.

Q  And you followed up with I could have him carjacked or beat her as with a gun and shoot her a few times?

A  Yes.

Q  He says, okay, where would he leave her?

A  Not 100 percent sure. But I am sure he knows what he's doing. He would kill her and leave her in her car.

Q  Okay. Good. You tell him he has to draw you a map?

A  Um-hum.

Q  Why did you tell him that?

A  Because he started to talk about where she is, how to get there. I wouldn't know how to tell somebody from Detroit how to get there. I would have to see a map to see what you're talking about.

18

Q  In regards to the sheet on the bottom of this?

A  Uh-huh.

Q  That's your handwriting?

A  Yes.

Q  And is that from a different piece of paper?

A  That was just from — they have like kite paper in the County Jail. I tore that from a piece of kite paper from some information he was giving me about some guys that I guess she had a relationship with.

Q  Did he have any other police reports on him?

A  Excuse me?

Q  Did he have any other police reports on him from his case?

A  Did he have any other police reports?

Q  Yeah.

A  Not that I know of.

Q  When did you first come into contact with Charles Allen?

A  In the medical at that time. Same place.

Q  But he is not in the same unit as you and Mr. Uraz?

A  They put us all in the same room for the night, which was next door to Charles Allen.

Q  You didn't have any affiliation with Charles

19

Allen prior to going into the medical dorm?

A  No.

Q  We will go to People's Exhibit 40. This is the sequential letter. So after you ask him to draw you a map, he responds:

    Wait for me to get out and sentenced, because they may try to keep me here if something happens to her?

A  Yes.

Q  Does it appear to you that he was attempting to backtrack from any intent that he had to follow through?

A  No. He still had intent. He wanted to wait for it to happen. He still had the intent.

Q  And you followed up with:

    You are already in jail. It would look bad if it happens when you are out. You would be a number one suspect?

A  Yes.

Q  Are you trying to emphasize to do this while in jail?

A  I guess you could say that.

Q  Why?

A  I don't have an answer as to why.

Q  Is that where the conversation ends?

20

A  No. That's not where the conversation ends.

Q  Were there additional conversations that you had with him following up on this negotiating?

A  After that, they moved us to a post. There was a couple weeks worth of us just talking that didn't get wrote down. After I sent that to my letter, I didn't want to, I didn't know how — like what is — what my lawyer was going to do about it or anything. It was us on a post, him talking about it every day, him trying to give me money at the time. It was more conversation than just that wrote down. That's just what was wrote down.

Q  And at the same point in time that you are having conversations with him every day, you're having conversations with Charles Allen about his case?

A  No, Charles Allen was in jail on a probation violation at the time.

Q  Why were you on a medical post?

A  It was for — we were supposed to be on basically a protective custody post where people couldn't use the phone. So maybe it is five of us who couldn't use the phone in the County Jail. It was like the Judge's order

21

that they couldn't — that we couldn't use the phone. That's the only place they had to house us at the time, while the jail being full.

Q Do you recall being moved from the medical?

A I don't recall the day.

Q Do you recall about how long you were in medical before being moved?

A Two and a half weeks, maybe.

Q Where do you move to after you leave medical?

A Like a Post 2, I believe. Post 4. One of those.

Q On the same post as Tune Uraz?

A Yes.

Q After you leave medical?

A Yes.

Q How long were you on the post after you were moved from medical?

A A few weeks, maybe.

Q How far from Mr. Uraz were you while on the dorm?

A Two or three dorms, maybe.

Q Do you have any access to him in the day rooms?

A Yes. We were out through the day.

Q How many people in the day rooms?

A It is four people in there.

22

Q Who were the four people in the day room?

A Me, Country, Tune, Charles Allen and another guy, Mohammed, I believe, is his last name.

Q And you testified that you were acquitted?

A I went to trial, yes.

Q You had a pretty good sense that you were going to be acquitted at trial?

A No. I had a pretty serious charge. I didn't have a good sense that I would be acquitted. I had a jury trial and was found not guilty.

Q Given the situation that you were in, all of these different issues that you conveyed to your attorney, you didn't anticipate you were going to try to use those as leverage for your case?

A No. I was told from day one that I wouldn't get any deal, that no deal could be offered. So, no.

Q And that's what you were told August 27th, 2017?

A I was told the first time I got in touch with my attorney, my attorney conveyed to me, even with the proffer, no deal could be offered. It's no time coming off. It was one time I was brought a plea bargain which I turned down.

23

But it wasn't for the proffer.

Q Did you talk with Charles Allen about Mr. Uraz's case?

A No. Mr. Uraz was pretty open for what he was in there initially for. He told maybe all four of us who were on the same post what he was in for. But not about — I didn't talk to Charles Allen about him, what he talked to me about, no.

Q You read a number of notes between yourself and John Pierce. Do you recall the period of time, would that have been subsequent to or prior to you going to the police on Mr. Uraz, or your attorney going?

A It was prior.

Q Were you trying to help John Pierce with his case?

A No, I wasn't trying — I wouldn't say — no. I wouldn't say I was trying to help Mr. Pierce with his case, no.

Q Were you giving him tips on the system?

A No. Mr. Pierce had asked me, had I ever been in prison before, as far as that. But not tips, no. I'm not a lawyer. I'm not a jailhouse lawyer or anything.

24

Q Did you spend any time while in the law library while incarcerated?

A Yeah. I looked a few things up as far as my case. Yes.

Q You don't consider yourself a jailhouse lawyer helping people out with their cases?

A No.

Q How did you get all this information from these people?

A I guess just talking.

Q You're personable?

A Pretty much.

MR. ROTH: That hasn't been admitted. If you want, we can admit it. But it won't be appropriate to put it on the screen until it is.

Q (BY MR. PERRONE) If you can review this quickly as to the date to refresh your recollection as to when the money was put in the account?

A Um-hum.

Q So when Mr. Uraz initially approaches you, he tells you he is going to pay you?

A Yes.

Q That would have been around September 27th?

A Yeah. It had to be, yes. when we were on medical. Yes.

25

Q   After reviewing this, do you recall when you received a deposit?

A   I didn't see the date for the deposit on there. I don't see where it says deposit date on it.

Q   Again?

A   No. I see the beginning date, ending date. I don't ask where it says deposit date, though. Would this be it here? No. That would be a commissary. That's not a deposit date. That's the date.

Q   It's the date? All right.

A   It's a commissary date. That would be to go to the store. That wouldn't be the date they deposited.

Q   That's when it was available to you?

A   It's available as soon as they put it in there. I wouldn't say that's the date that it was deposited. As soon as it's put on there. Five minutes. It's a cash machine. Whenever it's put in there, it's available. That doesn't necessarily mean it's a deposit date when it shows on there. That's when I went to the store.

Q   You didn't deposit it while you were in medical?

26

A   No.

Q   You didn't initially deposit while you were on the post from medical?

A   We went to the other post. It was more like pressing. We were having conversations about it more on a daily basis. And he was really, I guess, wanted to show me that he could have the money. He was like: I can have some of the money brought to you now. When you get a confirmation that is done, I can give you the rest. But by this time I had already been in touch with my lawyer. He had already put the money on there. I told the detectives the day that he had put the money on there, so...

Q   He had continually told you and repeated to you that he was going to put this money on your account just to assure you?

A   After we were moved, yes. He was adamant about giving me some money and getting it done.

Q   You didn't have a request to -- from him to put any money on the commissary?

A   No. It wasn't a request, as far as putting money on the commissary that was an idea he came up with. He told me his roommate was coming to bring money up, and he would drop me

27

off money, too.

Q   You had been incarcerated since July of 2016?

A   June.

Q   June of 2016?

A   Yes.

Q   Had anybody else put any money on your commissary?

A   Not at that time. No.

Q   Did you request an indigent path for resource?

A   While I was in the hole? Yes.

Q   Mr. Uraz was the only one who put money on your account?

A   No. All of my family lives in Detroit. I had actually received -- you get a care package. Someone can order up on the phone, which doesn't show up on the commissary. I did receive care packages from my family.

Q   Are you able to receive indigent tips?

A   Yes. They don't go by the account, they go by the records put on your account.

Q   How many were put on your account?

        MR. ROTH:  Objection. Relevance.

        THE COURT:  What is the relevance?

        MR. PERRONE:  I'll phrase it differently.

        THE COURT:  I'll allow limited questioning

28

to that area.

Q   (MR. PERRONE) Did Mr. Uraz spread money around to other inmates that you saw?

A   No.

Q   So you didn't see him give money to any other inmates in an attempt to help him?

A   No. When we were around each other, only four of us around, me and him in the room, I never seen him spread anything around to anybody.

Q   At this point in time, as far as the -- as for as the money is concerned, there isn't anything that you do to tell him to put that money on the account?

A   No.

Q   Do you still think you're potentially the target of an investigation?

A   After I get in touch with my attorney? Yes. Not at that time. But I was informed that I would be talking to the detectives after the fact. So, no. After that, I didn't believe I was the target of the investigation after that.

Q   Did you think that you were assisting in an investigation?

A   I believe that I was helping out with it after I gave the information that I gave. Yes.

29

Q You were helping out after you gave the information?

A While giving the information, yes.

Q Did you try to dissuade him to put $160 on your account at any time?

A No, I didn't.

Q And it is your understanding that this was a down payment on a hit?

A Yes.

Q At this point in time, you didn't have any fear that potentially the $160 would look bad, you would be implicated in it because you had spoken with your attorney?

A No. I actually told the detectives the day that it happened that he had put money on my account. I think they probably came and seen me within maybe that week of him putting money on my account. I had actually thought at the time the money would be frozen or they would take it, which didn't transpire. But that's what I thought was going to happen.

Q You testified previously that Mr. Uraz was very clear that he wanted it done prior to November 2nd?

A He wanted it done before his sentencing date, I

30

believe.

Q When did he indicate that to you?

A Just every day he would watch the news. I would — we would be talking. I would tell him I got in touch with somebody from Detroit. Maybe it is going to happen. He would want to watch the news at night to see if they found somebody dead, or if something had happened to her, or just in general with anything to her. Like I told him, I had passed the information onto the person that I was supposed to pass it onto.

Q So he wanted it done, prior to sentencing after he told you he didn't want it done, prior to sentencing?

A He wanted it done prior to sentencing, yes. After he wrote the letter and said he didn't want it done, until he got out, he said he wanted it done before sentencing.

Q So he took your advice?

A It was more of his, I guess if you want to put it that way. I believe so, yeah.

Q Was there any clear plan as to how it was going to happen?

A Yes.

31

Q What was the plan?

A Mr. Uraz told me it was big garbage cans in the parking lot which he didn't put on — that he didn't put on the map or wherever. It was big garbage cans. Mrs. Melke usually pulls in the second row of cars. If somebody is behind the garbage cans, they could ambush her, shoot her. She said she had an iPhone. Take her phone, looks like it was a robbery and stuff. So...

Q He said make it look like a robbery?

A Yes.

Q Did he say that prior to what you wrote down telling him whether he wanted to?

A It was after the fact. We were moved off of medical onto the other post. He started just thinking that she carried, as far as —

Q Were you still discussing these issues with him after speaking to the Prosecutor?

A Yes.

    MR. ROTH: I object. Never been any testimony speaking to the Prosecutor's office. He spoke to the police. Mr. Perrone uses these terms interchangeably. Police and prosecutors are very different entities.

    THE COURT: I would ask the jury to strike

32

that comment. Nothing about the interaction with the Prosecutor's office.

Q (MR. FERRONE) So after you speak with the Lansing Police Department —

A Yeah.

Q — you're put back on post with Mr. Uraz?

A Yes.

Q You're continuing to talk to him?

A Yes.

Q About this plot?

A Yes.

Q Is there anything followed up on as far as specificity, as far as someone hiding behind the garbage can?

A Mr. Uraz was telling me, as far as he didn't know if the code or whatever had still worked, with something, an iCloud or something with her phone. That he had told me that he had hacked into or got ahold of, so he would know where she was at. And I can relay the information to the person that I knew, just things of that nature. It was ongoing discussions just like the day before.

Q At this point in time, Charles Allen also gets involved in the conversation?

33

A   No. Charles Allen doesn't get involved with the discussions. No.

Q   So Charles Allen is talking with Mr. Uraz?

A   Yes. Everybody conversed on that post. People had their own private conversations.

Q   You didn't talk to Charles Allen?

A   I talked to him. Not what me and Uraz had talked about.

Q   Did you talk to John Pierce about Chris Schinberger.

A   No. I don't believe so. We were all in a holding cell. So they were down there much longer than I was. So they had their own conversation, I guess, between each other. We were all like one room from each other. So...

Q   Did John Pierce have any issue with the broom?

A   With who?

Q   Did John Pierce, in this case, did you speak with him about hitting someone with a broom?

A   Yes.

Q   What was the nature of that conversation?

    MR. ROTH:   Your Honor, that obviously would be hearsay.

    THE COURT:   Yes. I would sustain that. I don't know what relevance that has here.

34

    MR. PERRONE:   It goes as to the statement --

    THE COURT:   Well, it goes to somebody that's not part of this case. So I'll sustain that objection.

    MR. PERRONE:   It's consistency.

Q   (MR. PERRONE) Did you speak with John Pierce about the percentages that you felt you had in your case?

A   The percentages?

Q   Yeah. What percentage that you thought you would have to win a case, have your case dismissed?

A   It's a possibility I did. I don't remember that. But it's a possibility. I mean --

Q   You don't recall speaking with John Pierce in regards to Chris Schinberger?

A   I don't recall. It's a possibility. We probably talked about him. I don't recall it.

Q   If I was to show you one of the notes that was exchanged between yourself and Mr. Pierce, would that refresh your recollection?

A   Yes. Uh-huh.

Q   Is this you talking to him about Chris or --

A   Yes. I was talking to him about Chris, yes.

Q   Do you tell John Pierce:

35

Maybe to just slap his girl or something with a bathroom stick?

A   Excuse me. Could you rephrase? I didn't understand.

Q   Did you ask John Pierce --

    MR. ROTH:   Your Honor, I am going to object to the relevance, as well as hearsay.

    THE COURT:   Mr. Perrone?

    MR. PERRONE:   Again, we have a consistency here. We have an individual here that's talking about trying to avoid the individual showing up to court. This is a sequence of notes between himself and John Pierce.

    THE COURT:   Well, I think that's hearsay. I think there is another way you can get at it.

    MR. ROTH:   I agree, Your Honor.

    THE COURT:   But this way is hearsay. There is another way to get at it.

    MR. PERRONE:   But I'm asking him, he said --

    THE COURT:   But it's hearsay as to --

    MR. PERRONE:   I will rephrase.

    THE COURT:   If you're asking him what did he say, Mr. Roth, he is not reporting what somebody else said, I think he could say.

    MR. PERRONE:   I agree. There's a different

36

way to word it that I think is fine.

    THE COURT:   Okay.

Q   (BY MR. PERRONE) Did you tell John Pierce, just wondering, I would think you would just maybe slap her or something, the way you say you love her, if you can recall?

A   So just saying what I said, not what he said?

Q   Yes. That's something you would say?

A   Yeah, I did. Asked him, I did ask John, did he strike her with something, instead of just hitting her. That's what that fully said. I asked him why did he hit her with something instead of -- he loved her, I think, why would he push her head with something? That's what I'm asking.

    MR. PERRONE:   We're on Defendant's Exhibit E.

    THE COURT:   I'm sorry. E. Yes. You're at E.

    MR. ROTH:   If we could please have one that Mr. Perrone hasn't written on?

    THE COURT:   One what?

    MR. ROTH:   That Mr. Perrone hasn't written on.

    THE COURT:   Yes. We need a clean copy.

37

MR. PERRONE: These were all produced.

THE COURT: They were produced, but I think the issue is we need a copy that you haven't written on.

MR. ROTH: I think we might be able to find a clean copy.

THE COURT: I should have one here, if you can't.

MR. ROTH: Yeah, we got it. Here you go.

Q (BY MR. PERRONE) Is that your writing to Mr. Pierce telling him, asking him why didn't you just slap her?

A Like I just said, I asked why didn't you just (inaudible) her with a broomstick, instead of just like or something —

THE COURT: That's your writing?

THE WITNESS: Yes.

MR. PERRONE: Move for admission of Defendant's Proposed Exhibit E.

THE COURT: Mr. Roth?

MR. ROTH: Marginal relevance. But we have no objection.

THE COURT: Right. It's offered by Mr. Close, so we will allow this.

(DX-#E is received into evidence.)

38

Q (BY MR. PERRONE) In your case, did you tell John Pierce, as it related to your case, that he didn't have any blood, he didn't do any real police work?

A On my case?

Q Yes.

A There is — there wasn't any blood. I haven't — my case didn't involve any, no. I think I probably told that about his case, or something. I don't think I said it about mine my case didn't involve any violence consistent with blood. So, no.

Q Did you have a witness that the police didn't talk to?

A Excuse me?

Q Did you have a witness that the police didn't talk to?

A On my case?

Q Yes.

A No. Everyone that is there that testified, including the police that showed up on the scene.

Q Did you tell John Pierce that I'm damn talented, most people couldn't tell you weren't telling the truth?

39

A I probably did say that to him. Yes.

MR. ROTH: I would ask that Defense counsel show him things he is referring to. He can see if it's his handwriting or somebody else's.

THE COURT: You're referencing the document off — he needs to be able to see the document if you are asking the question.

Q (MR. PERRONE) That will help refresh your recollection. Take a look at it.

A This is John's handwriting. That isn't my handwriting.

Q (MR. PERRONE) Thank you. But you did tell John Pierce you are a good liar?

A I said — I probably did say something like that to him. That's John's handwriting saying he couldn't tell if people were telling the truth.

Q Did you tell John Pierce to go to the Prosecutor. She lied on the couch at the hospital?

MR. ROTH: Your Honor, I am going to ask if we are referring to the document. Show him the document that it is his, and stop taking stabs in the dark.

THE COURT: Yeah. Otherwise, it's hearsay.

40

MR. PERRONE: This is also John's handwriting where he says he has nine kids.

THE COURT: Don't tell us what he says.

THE WITNESS: Well, this is John's, not my handwriting.

Q (BY MR. PERRONE) Did you tell John Pierce that it was illegal that he —

MR. ROTH: Again, I think we are referring to a document. He can show him a document, see if it is his or Mr. Pierce's.

A This is my handwriting at the top of it. And the lower half where the writer writes something, John's handwriting.

Q Okay. You tell him who sent the order to have your mail received?

A Can I read that and see where it says that out there? Yes. I wrote this.

Q Are you telling me it seems very illegal to you?

A Yes.

Q How much time did you spend in the law library while you were incarcerated in prison?

A None. I just went in the law library recently in the County Jail. When I say looking up stuff, as far as my case went.

41

MR. ROTH:   Your Honor, the Court has reviewed all of these notes that Mr. Perrone is going through one by one.

MR. PERRONE:   Can we approach?

THE COURT:   All right.

(Off the record discussion at the bench.)

THE COURT:   Members of the jury, you have to disregard the fact that I may have looked at something and Mr. Roth's opinion on it.  You are the ones, you are the sole triers of the fact.  So Mr. Roth's opinions should be stricken.  All right?  Mr. Perrone?

Q   (MR. PERRONE) If you want to review.  Did you tell John Pierce, if not, it would be good to say she was just high, fell down, hit her head.  That could be plausible if she doesn't come?

A   If she doesn't come?

Q   Doesn't come -- doesn't come to court?

A   Yes.

Q   Do you tell John Pierce it would be hard for them to get a conviction unless you walk in and admit it and that's not happening?

A   Can I see it?

MR. ROTH:   I object again to the relevance of this.  The Defendant's name hasn't been

42

brought up it in a half hour, because the Defendant, itself, is not brought up in this case.  This is a distraction.

THE COURT:   He said he only had a couple more, if this is it.  This is number two.  So I will allow that answer.

Q   (MR. PERRONE) You can take a look.

A   Yes.  But I referred to something earlier.  I didn't say that part.  I asked her where the -- it would be hard to get a conviction, unless you walked in and admit and that's not happening.

Q   So you're coaching John Pierce as to his case?

A   No.  John Pierce already had his mind made up.  John Pierce had been going through this nine months before he ever met me.  Had court dates.  And so he had -- he already had his mind made up.  I gave him an opinion.  I didn't coach him.  No.

Q   You provided him insight into his case?

A   I gave him an opinion.

Q   And these notes were eventually turned over to the police?

A   Yes.

Q   By you?

43

A   Yes.  They were turned over to my lawyer.

Q   Did Mr. Uraz tell you when he was initially set for sentencing, when you initially started to discuss this?

A   Not initially, no.

Q   You don't recall him telling you that he had a sentencing set for October 19, 2016?

A   No.  I don't remember him telling me a date.  No.

Q   Did you ever discuss any of these issues with a Corrections officer?

A   Corrections officer?

Q   At the Ingham County Jail?

A   I believe I told them that we couldn't be housed together or something.  After the fact I -- yeah, I did.  I sent them an e-mail over the machine.  And I was wondering, because they ended up moving me out of the housing unit into the hole, and I was wondering why I was put in the hole.  And I wasn't an offender.  I was one of the -- more or less wondered more or less why Mr. Uraz wasn't moved to the hole unit and I wasn't left where I was.

Q   You were moved to the hole after you had been on post with Mr. Uraz after speaking with the

44

police?

A   Yes.

Q   You don't recall for how long you were on post with him after --

A   After talking to them?

Q   Yeah.

A   No.  I don't recall exactly.  No.

Q   Couple days?

A   I don't think it was a couple days.  I think I talked to him that morning.  And I believe maybe that they just told me to pack up.  They didn't come in, put me in handcuffs.  They had me like I was moved to another post.  It's the hole.  But they call it protective custody.  But there were people out there that knew how to use the phone, things like that.

Q   You had to request from jail staff to be removed from Mr. Uraz?

A   Did I have to request?

Q   You didn't request?

A   No.  I believe it was something from the detective or the Prosecutor's office.  Not sure.

Q   You said there was an e-mail, you requested it?

A   We have a machine you can e-mail kites through

45

After I was moved I sent an e-mail kite asking why I was moved. They responded me. It's from the Prosecutor's office to be requested that I would not be housed around Mr. Uraz.

Q You never made a request?

A To be moved from?

Q Correct.

A No.

Q Do you tell the police initially that you would be willing to wear a wire?

A I don't recall.

Q Do the police ever instruct you not to speak with Mr. Uraz after you initially meet with them?

A I don't recall. If they told me not to speak, speaking with him. I know I was — I was moved that day. If they had sent a request downstairs that I might not be put back there officially due to hours. I was moved, so...

Q So they never tell you not to engage in Mr. Uraz when you go back?

A They could have. I don't recall.

Q But you did engage?

A When I went back?

Q Yeah. You did continue to talk?

46

A No. Actually when I went back it was around count time. We were locked in the room. When they came to tell me to move, I probably told them that I was moving or something. We didn't have a full-out conversation after that, on.

Q Do you recall when you testified at the preliminary examination in this matter?

A Yes.

Q When would that have been?

A I don't recall the date.

Q You were initially scheduled to on December 1st, 2016, associated with this case?

A It's a possibility. I'm not sure if that was the date.

Q You're from Detroit, originally?

A Yes.

Q Is that something that you emphasize to the other roommates?

A It wasn't an emphasis. No.

Q More credibility placed in Detroit from the street?

A No. I'm not from the street neither, so...

Q And you tell them to write the note because they are recording?

A They tell you in the jail that you could be

47

recorded, it could be everywhere. So -- and where we were -- speakers were directly right over us, so...

Q This was the result, you knew that you had — that they had speakers because you got in trouble with other things about recordings?

A No. I knew being in the County Jail they have speakers. They tell you they can listen in on any dorm. It's a known fact they can listen in on any jail. So...

Q Do you tell Tone that your friends will do it gratuitously. He will do it as a favor?

A I don't know the use of the word "favor." But I told him that I could have him do it.

Q Do you recall testifying at the preliminary examination subsequent to December 1st. on December 13th?

A Yes. I recall it.

Q Taking you to page 133, line 21, to refresh your recollection. If you will take a read on it?

A Um-hum.

THE COURT: You have to say "yes."

THE WITNESS: Yes. Yes.

Q (BY MR. PERRONE) So you tell Mr. Uraz:

48

"The guy owed me a favor, and I was just saying he would do — he would do it for me as a favor"?

A Yes.

Q And you testified that:

"Tone told me he would give me $1,000 for getting it done for me."

A Yes.

Q He told you after you told him you would get it done as a favor?

A No. He told me before the fact. He told me he wouldn't offer me any more money after the fact.

Q Did you misspeak at the preliminary examination, as far as you telling him initially that you had a guy who would do it for you as a favor?

THE COURT: Why don't you say — there's nothing in the testimony that says -- nothing that says pay $1,000.

MR. ROTH: That's Mr. Perrone putting it that way, what he said.

Q (BY MR. PERRONE) It's your testimony you repeatedly told him he wanted it done while he was still in jail?

49

A Yes.

Q You never spoke with Mr. Allen in regards to the solicitation both between yourself and Mr. Uraz?

A No.

Q If I could refresh your recollection. Page 136, lines 21 --

MR. ROTH: He did not express a lack of recollection.

MR. PERRONE: It's from --

THE COURT: You can show him his prior statement, see if that refreshes his memory.

MR. PERRONE: Go through that. It's page 136, line 20 to page 137, line three.

A I've seen it.

Q After reviewing that, did you speak with Charles Allen?

A Yes. After the fact. Yes.

Q In regards to the solicitation plot?

A Yes.

Q What did you tell Charles Allen?

A I believe I told Charles that after we were moved to the post, that Mr. Uraz wanted his girlfriend killed, I believe.

Q Did you tell him that you had spoken with the

50

Prosecutor's?

A No.

Q Because you had spoken with the police?

A I didn't tell him about the police. I didn't tell him I sent letters to my attorney.

Q When you spoke with Charles Allen in regard to this on the 18th of October?

A Could have been. I am not sure of the date.

Q If I can refresh the witness' testimony? It is page 137, line three.

A Going on the third week. So...

Q But it is your testimony at the preliminary examination it is towards the end of October?

A I said it could have gone into the third week, which would be mid -- or I could consider it the end, mid or end.

Q When you sent the information to your attorney, initially, you were still on medical?

A Yes.

Q How did you pay for that attorney?

A Through a letter.

Q You knew that Mr. Uraz had told you that he was going home, that he anticipated he was going home after his next court date?

A No. We initially -- when he first started

51

talking about it, no. I didn't know he was on his way home. No.

Q When did you come to know that he thought he was going home? At his next court date?

A It was some time during the week that he had told me he should be going home, that he should be getting time served or something.

Q You don't remember when he was anticipating time served?

A No.

Q He didn't tell you before he wrote the letter saying that he wanted to wait until he was sentenced?

A No.

Q So you didn't know when you were writing that letter?

A No.

Q That he anticipated he was going to do time served?

A No. I didn't when we were initially writing letters.

Q Did you know prior to sending letters to your attorney?

A I sent my letters within 48 hours, maybe the third day I sent those letters over.

52

Q Do you know, if he thought he was going to be going home, when the next court date was, when you met the police?

A When I met the police I knew he was anticipating going home then, yes.

Q In your proffer testimony, you were encouraging him --

MR. ROTH: Your Honor, is there the rest of the question? I apologize.

Q (BY MR. PERRONE) You were encouraging him, even though you knew he was likely to go home?

MR. ROTH: There has been no testimony about encouraging.

MR. PERRONE: He testified that he encouraged him.

THE COURT: You can ask him what he said, but encouragement is not valid. Sustain the objection. Rephrase it.

Q (MR. PERRONE) While you were incarcerated, did you give him a phone number to call?

A I believe I did.

Q To contact a hitman?

A I believe I did.

Q What was that number?

A It was a number I made up.

53

Q And you're separated from Mr. Uraz after you go to court?

A After I go to court for?

Q You go to court and you come back from court, you're not returned to the post?

A No. I talked to the detectives. I was returned to post. I was moved that day.

Q You were removed the same day?

A Yes.

Q You were returned to the post?

A Yes.

Q After speaking with the police?

A Yes.

Q So it would have been only a day that you would have had an opportunity to speak with Mr. Uraz?

A Not even a day. It was within a few hours. Maybe a couple hours I was moved. I talked to the detective some time around that morning. I don't know, in December, nine, 10:00. By the next count time, they were counting like every hour. By the next count time, when I returned, they told me to -- I went to Mike. They told me to pack my stuff up, I will be moved.

Q It's your testimony you didn't have any conversations with Mr. Uraz after you spoke

54

with the police?

A Maybe moving, something like that. No conversation, no, we didn't. Didn't sit down and talk.

Q If I was to show you your inmate history, would that potentially refresh your memory on who would be moved?

A I mean, it would give me a --.

Q Does that refresh your recollection as to when you moved and dates?

A It doesn't refresh my recollection. I see the dates. I know it would have been in between one of these three days. I don't know exactly what date it was I was moved.

Q But do you recall the date that you met with the detectives?

A No. I don't recall the date.

Q After you moved away from the post and separated from Mr. Uraz, do you subsequently come into contact with him again while incarcerated at the Ingham County Jail?

A No. Other than court, when at the preliminary exam, I haven't had any contact with him since then. No.

Q Would you have had any contact with him in

55

November?

A No.

Q Page 138, lines 21, 25. If you could just review that?

A I didn't have contact with him. They moved us across the hall from each other. I didn't have any contact with him.

Q You moved across the hall from him at the same post?

A Yeah. The same post. But we were separate from doors, glass, whatever. But not any contact as far as us having physical contact or talking or anything.

Q While you are initially in medical, on September 12, the first night you're with Mr. Uraz and Charles Allen?

A Yes.

Q And the first night Mr. Uraz approaches you?

A No.

Q When does he initially approach you? First night after Charles Allen leaves his cell?

A The day after Charles Allen leaves. It's like the daytime. We were talking about basically what we're in jail for, what's going on. They had turned the TV on. They haven't been able

56

to watch TV. And me and a couple, as long as he had been in the county jail, we had TV on, watching TV, just talking. He basically comes to tell me that.

Q So you don't have any indication from the first night when, and Charles Allen is in the same cell that Mr. Uraz is trying to have anybody killed?

A Not within the first night. No.

Q But within 48 hours, the whole plan had evolved to be put on paper?

A Yes.

Q So it would have been 24 hours after Charles Allen was no longer in the cell?

A Somewhat around mid afternoon it kind of came up.

Q Did Mr. Uraz at all talk to you about calling the number that you gave him?

A No. Because we were on phone restriction. There was no way the number could be called because we were on phone restriction.

Q As far as writing to your lawyer, do you write to your lawyer the second day that you're on medical?

A Not the second day. I got there at night. I

57

probably wrote it after the second day. After the conversation turned into Mrs. Melke being killed, I wrote him after that.

Q You previously testified as to the recording system, that you just knew that they were recording. You hadn't been in any prior trouble for anything due to the recording?

A No. I initially reported that I knew in the County Jail, which basically anybody that comes into custody at the County Jail, they tell you with signs on the wall that you can be recorded, that they are recording. If you're on post, they will come over the mike. They can hear everything you're saying. So...

Q So you didn't testify that you got in trouble for them recording you?

A No. I said that I had got in trouble with -- for being on the phone, that I was on phone restriction. I was saying something that I shouldn't have been saying on the phone. I was on phone restriction. So I had been in trouble for that.

Q If I could draw your attention to page 157, line 22 through page 158, line five. If you could just take a look at this. Start there.

58

A You said start where, which line?

Q Start right here. (indicating)

A Yeah.

Q Do you recall testifying that you had gotten in trouble for them recording me?

MR. ROTH: Your Honor, I am going to object. Improper impeachment. He testified, recorded a phone call, which he did something incorrect. Mr. Perrone is trying to make it sound like they recorded something in jail. That's an inconsistent statement.

MR. PERRONE: This is the exact context of the situation, and why they're writing notes, because they're being recorded.

THE COURT: I understand. But he has indicated phone call recorded. This is something about something being recorded. I think you need to ask him is this the same phone call that was recorded.

Q (BY MR. PERRONE) Is this the same phone call that's recorded that you are talking about here, as far as what you had gotten in trouble for?

A Yes. My wife was a witness, and I wasn't supposed to contact her. And I had tried to

59

contact her from the County Jail through my sister. And they recorded the phone call. So they put me on phone restriction.

Q You did not get in any trouble for anything that was recorded in jail?

THE COURT: Strike that. He was --

Q (MR. PERRONE) That was recorded outside the phone call?

A It was recorded in the jail. That's what I was in trouble for.

Q Was the phone call recorded?

A The phone call was recorded.

Q As far as there being any video, did you indicate to Mr. Uraz that there was video?

A Of the recording?

Q That there was video while you guys were in the medical unit, it was on camera?

A It's a camera sitting right in medical that records people in medical. That's a place people are put on the death bed, however you want to put it. I may have told something to Mr. Uraz about a camera being there. Obviously it is something pointed right at us.

Q You're telling them that we had to put this letter together. You're indicating to him

60

that, as you understand it, the jail is recording --

MR. ROTH: Objection. Asked and answered.

THE COURT: It has been. You already said that, so I'll sustain that. In fact, why don't we take our morning break now?

MR. PERRONE: Can I have one more question? I have to get this one in. Sorry.

Q (BY MR. PERRONE) He tells you he is trying to buy a gun while you are incarcerated. Three questions. He tells you he wanted to buy a gun.

MR. ROTH: Who is he?

Q (MR. PERRONE) Did Mr. Uraz tell you he wanted to buy a gun?

A Mr. Uraz told me he tried to buy a gun from his co-worker.

Q And did he tell you why?

A Yes.

Q What did he tell you?

A Mr. Uraz told me he was going to get the gun, and he had like set up something with a phone through Mrs. Melke. And he was going to find her somewhere. He was going to kill her.

Q When you're asked at the preliminary

61

examination, do you respond that you're sure the way the conversation was going, it was for the girl?

A  Could you repeat that?

Q  Was it your testimony in regards to your conversations with Mr. Uraz —

MR. ROTH:  I am going to object. This is improper questioning. He is impeaching what he's previously said right now.

THE COURT:  I think you have to ask him how are you referring to as the girl, Mr. Perrone.

Q  (MR. PERRONE) Who are you referring to as the girl?

A  I was referring to Erika Melke.

Q  But there wasn't anything that led you directly to believe that he intended to kill Erika Melke with the gun that he was trying to, correct?

A  Yes, he indicated to me — yes. He told me.

Q  But your testimony, when asked that, was that you're were sure the way the conversation was going?

A  I was sure because he told me.

Q  So you didn't just assume it?

A  No. I didn't assume it. He told me.

THE COURT:  All right. We're going to take

62

our break now. We will be in recess about 15 to 20 minutes.

(Jury exits courtroom at 10:35 a.m.)

THE COURT:  All right. In recess.

(Recess taken from 10:35 a.m. to 11:02 a.m.)

THE COURT:  Returning on the record in People v Uraz, file 17-1064 and 1065. The parties are here.

Preliminary matters before the jury comes back? Preliminary matters?

MR. ROTH:  No, Your Honor.

THE COURT:  I just want to put on the record there have been a bench conversation when Mr. Roth made a statement about the judge had reviewed certain records and had decided only one of them or a limited amount was relevant. I did give a corrective instruction on that, that that was Mr. Roth's opinion. But I did indicate that I had read that.

We also had an ongoing raising of issue. We are going to grant Mr. Perrone an ongoing objection to the notes that were reviewed in camera by the Court. The Court concluded there really was nothing exculpatory in there, exculpatory in the nature of somebody else might

63

have done it. There were some other defenses, there were credibility questions. Even if the Court's in-camera review, I indicated I could not tell who wrote what. Mr. Close has been able to provide us some information on that, which ones he wrote, which ones others wrote.

The issue of relevance. If it's something Mr. Close wrote, it is. The Court understands that it's the defense's efforts, I guess, which may be two prong. To say, one, is that Mr. Close was only giving his testimony to try to benefit himself on one hand. Or, two, was offering suggestions to Mr. Uraz, and offering suggestions to other parties. I did allow that portion to come in, limitedly, that's opinions. I think, as he indicated, to other persons who were in custody at the jail, we had an issue over the recording issue. And that according to Mr. Close was a recording of jail cells. Of course, we all know that jail calls are recorded, and did not refer to a general recording of the residents on post. Although, Mr. Close testified to, and we all know that recording capabilities is on post. He has indicated there were not any of those that he's

64

aware of with Mr. Uraz.

Anything else, as a result of those comments?

MR. ROTH:  No, Your Honor.

THE COURT:  Anything anybody would like to add, Mr. Perrone?

MR. PERRONE:  No, Your Honor.

THE COURT:  All right. Ready for the jury?

(Jury present in courtroom at 11:05 a.m.)

THE COURT:  Be seated, Mr. Perrone?

MR. PERRONE:  Yes.

Q  (MR. PERRONE) When did you go to trial in your case?

A  January 9th.

Q  Of what year?

A  2016.

Q  You testified that you didn't intend for this to — you didn't actually intend for anything to happen?

A  Intend for anything to happen to?

Q  You never intended to help him carry anything out?

A  Help Mr. Uraz?

Q  Yeah.

A  No.

65

Q  In regard to the specifics of the plan, was there an indication that he's going to give you the remaining money when he got out?

A  Yes.

Q  And you were supposed to hold the money for a third person?

A  We didn't discuss who I was supposed to hold the money for, or anything.

Q  He was going to give somebody money on the outside to hold for you when you get out?

A  I told him to put him in contact with somebody to give the money to.

Q  Did you tell him who that person was?

A  I don't recall if I told him who the person was.

Q  Did you tell him that that person was the individual whose number you gave to him, telephone number?

A  It's a possibility. I am not sure if I told them that that is the number. But --

Q  And the individual on the outside was to hold the money, spin, whatever, based upon your understanding?

A  Hold the money and spin whatever?

Q  To hold for you, to hold, spin, whatever?

66

A  I'm not sure if I told him what was going to happen with the money, once it went to the person. I don't recall that right now.

Q  You do recall at the preliminary examination, as to this third person, if it would refresh your recollection as to what you previously stated?

MR. ROTH:  What page and line, please?

MR. PERRONE:  Page 155, lines 12 through 1

THE WITNESS:  Yes.

Q  (MR. PERRONE) So it is Mr. Uraz -- Mr. Uraz was to give the money to somebody on the outside to hold and spin?

A  Yes.

Q  What does spin mean?

A  I said hold, spin, whatever. We never really made a plan as to what was going to happen to the money once he gave it to someone out there. I just hold, spin whatever. I think they put "spin," but I said "spend."

Q  I got you. Just a typo?

A  Yes.

Q  What specific words did he use to you to indicate that he wanted Erika Melke killed?

A  Specific words, that is that Erika Melke had

67

used him and ruined his life. He wanted her dead.

Q  Did any of the other inmates indicate to you that they wanted their victims dead?

A  No.

Q  While you were incarcerated?

A  No.

Q  They just didn't want their witnesses to show up to court?

MR. ROTH:  Your Honor, I am going to object to speculation as to somebody else.

THE COURT:  Characterization. That's not really a question, Mr. Perrone.

Q  (MR. PERRONE) Did he tell you how -- did he tell you the means to commit the killing?

MR. ROTH:  Your Honor, this is asked and answered. We are on about lap three of this. Mr. Close testified to a plan to get her when she is driving near the garbage cans. This was covered hours ago.

MR. PERRONE:  Previous statement of his -- where he indicates he didn't say the means. We have a lot of contradictory testimony.

THE COURT:  All right. Briefly.

Q  (MR. PERRONE) When you were questioned at the

68

preliminary examination, you responded that he didn't say the means of the killing, correct?

A  The means? Could you specify what you mean by it?

Q  How --

A  Yes.

Q  -- it was going to be carried out.

A  He didn't say whether he wanted a knife or gun at first. But he wanted her dead. Like he didn't say strangulation or anything, but he would have rather it have been with a gun.

Q  But he didn't provide those specifics?

A  Yes. He said he would want her shot. He said that on numerous different occasions besides the letters that were wrote. Like new conversations, yes, he did.

Q  Page 162, line eight, if you could review what you said there?

A  You want me to say what I said?

Q  I just want you to review it, then I'll question you on that. Did you previously state that he didn't say the means while you were under oath at the preliminary examination?

A  Yes. I said that he didn't specify at the time, whether it WAS about a gun, which I just

69

stated.

Q And he said that he wanted her dead?

A He said he wanted her dead, which I said earlier he had tried to purchase a gun. He asked me, did I know anybody that could kill her, did I know anybody that could shoot her and rob her, like this was an ongoing thing.

Q So he repeatedly asked for somebody to shoot her, rob her?

A He repeatedly asked for somebody to kill her.

Q Did you talk with Charles Allen in regards to specifics of the plot as to the addresses to compare?

A Not specifics. As far as the addresses, I didn't go over it with him. I didn't tell my -- I contacted with my attorney. I had contact with the detective. I didn't tell them all of that. I had told him that he was wondering, like, why are you and Uraz always like, you know, talking on some secret stuff. I was like, one day, don't try, because don't cry me to get his girlfriend.

Q But he is telling you things that he already knew as far as the addresses?

MR. ROTH: I object as to who he is.

70

Q (MR. PERRONE) Does Charles Allen tell you about the addresses, etcetera?

A No. Charles Allen doesn't tell me about the addresses. No.

Q Page 64, lines three through 11. If you could review that quickly?

A Um-hum. Yes.

Q Was it your prior testimony that Charles Allen was going on and calling off her address, saying everything that you already knew?

A Did I say calling off the addresses and stuff or her address?

Q Yes. The addresses.

A I said the addresses.

Q Calling her addresses off?

A Can I see that? Um-hum.

Q So you did talk to Charles Allen about the addresses?

A No. I recall saying at the preliminary he is calling addresses off the things that Mr. Uraz had gave me.

Q But you didn't talk to him about the addresses, he talked to you about the addresses?

A Yes, I didn't tell him what was going on with Uraz telling me. Like I said, in the statement

71

I had already known all this stuff, but I didn't repeat it to Charles Allen.

Q How many times did you talk to Mr. Uraz about his intention to have his girlfriend killed, as you classified?

A Maybe 20 occasions.

Q That's what you testified to at the preliminary examination?

A I'm not sure of the exact amount I testified to.

MR. PERRONE: If I may approach? He said he wasn't sure.

MR. ROTH: Page number, please?

Q (MR. PERRONE) Page number 166, line 13.

A Same thing I just said, maybe 20 times.

Q You're able to recall the 20 times, specifically?

A I said maybe 20 times.

Q Did you instigate any of those 20 times?

A No. I instigated conversations, and it would lead to that. But not: Hey, I'm going to have her killed today, anything like that. But, yeah, we had discussed that was what led to that on a lot of occasions.

Q Do you remember Mr. Uraz returning from court

72

on October 19?

A Not that day specifically, no.

Q You don't remember having a conversation with him?

A About going for court that day?

Q When he came home from court after you spoke with the police.

A I don't remember it being the 19th, specifically. I probably had a conversation with him after he came from court. We talked before that day, so...

Q Did you inquire as to what happened at his hearing?

A Not necessarily inquire what's going on. No. Because that's -- I'm not sure if you're familiar with just being in what I'm pretty sure you're not. But people come back and say, hey, this was going on in court, this was going on. So it probably came up what happened in Court that day. I don't remember it being that exact date.

Q But you did say something when he returned from court?

A It's a possibility I did. We talked every day.

Q Was it your understanding that he was going to

73

be getting out from your prior conversations on the 19th?

A  It wasn't even his understanding. It was a wishful thought that he could be getting out at that time. Not it was exactly like, hey, this is what they said. It was nothing in paper or anything that he knew that that was his date or anything. No.

Q  But he is hoping to get out?

A  Yes.

Q  Were you inquisitive as to whether or not the issues that you had brought to the police had become an issue in a Court hearing? Did you ask him about that court hearing? So could you try to inquire as to whether the issues that you conveyed to the police were brought up?

A  No. I didn't ask him if any charges were brought up on him or anything. No.

Q  So you talked to him, but you weren't trying to get any additional information regarding the issues that you spoke with the police about?

A  I pretty much got the information that was, I guess you could say, needed when I talked to the detectives. Like I pretty much knew they were going to charge him. Or if something —

74

like I didn't lead him on and say, hey, I talked to the detectives and they are going to charge you. I didn't want to ask him anything that would tip him off that I had talked to the detectives. No, I didn't ask anything that came up.

Q  But you spoke with him?

A  Yes. I probably did speak with him. We spoke every day.

Q  Are you currently facing a parole hearing?

A  I already had a parole hearing.

Q  When?

A  February.

Q  When is your next parole hearing?

A  I don't have another one coming up. I actually have a parole date now.

Q  You were given a parole date at that hearing?

A  Yes, yes. Not at the hearing. I was given a continuance. My release date was coming up.

Q  Was this case brought up at the hearing?

A  Mr. Uraz's case?

Q  Yes.

A  I had no reason to.

Q  Any other cases on your behalf at the parole?

A  Yes. The case that I went to trial for.

75

Q  Was — were any of the issues regarding the proffered testimony brought up at the parole hearing?

A  They had no reason to. It was separate.

Q  Was it your intent by trying to provide the police with all this information to appear in the light most favorable to the parole board?

A  I had no idea I would be in front of the parole board at the time I gave the information. It was before I even went to trial.

MR. PERRONE:  No further questions.

THE COURT:  Redirect?

MR. ROTH:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. ROTH:

Q  Good morning, Mr. Close. Mr. Close, there has been a lot of testimony about letters between you and Mr. Pierce. I'm sure you recall that; is that fair?

A  Yes.

Q  I just want to go over some of those letters briefly again.

MR. ROTH:  May I approach the witness, Your Honor?

THE COURT:  You may.

76

Q  (BY MR. ROTH) Showing you what's been marked as People's Proposed Exhibits 61 and 62. Sixty-two is a two-page document. Do you recognize that, Mr. Close?

A  Yes.

Q  And can you flip to that next page?

A  Yes.

Q  Do you recognize that as well, sir?

A  Yes.

Q  Is your handwriting contained on either the first or second page of People's Proposed 61?

A  Yes. It's my handwriting on here, as well as John Pierce.

Q  John Pierce is the other person's writing in there?

A  Yes.

Q  If I give you a highlighter, could you highlight the portions that are your handwriting? Thank you, sir. And the portion not highlighted, that would be John Pierce?

A  Yes.

Q  People's Proposed Exhibit 62, is your handwriting contained on that letter at all?

A  No.

Q  Thank you.

77

MR. ROTH: I'm not going to move to admit that at this time, Your Honor.

THE COURT: Any objections?

MR. ROTH: I'm not going to move to admit it.

THE COURT: You're not? Okay.

Q (MR. ROTH) Mr. Close, do you recall in your interview with Detective Krumbach and Detective Hogan in this case, telling them about the Defendant tried to buy a gun from at Michigan State University.

A I didn't know the person, personally. I told them about what Mr. Uraz had told. Yes.

Q Do you recall giving the police any information about this person's prior employment, what they did before that?

A Yes.

Q What is that?

A It was like a cook or something out of Brody Hall at MSU.

Q I guess my question was, do you recall telling the police about what that person did before they worked out at Brody Hall?

A What Mr. Uraz did?

Q The person that he was trying to buy the gun

78

for.

A I just knew that he was a co-worker of him, saying he tried to buy the gun from, at MSU. I don't remember exactly what he did.

Q Would it help if you reviewed your prior statement to the police?

A Yes.

Q Just look up and see if that helps refresh your memory.

A Oh, yes.

Q And do you recall telling the police what that individual did before working at MSU?

A Yes. Mr. Uraz told me that the guy was an ex-Corrections officer.

Q An ex-Corrections officer?

A Yes.

Q You also testified about the Defendant wanting to watch the news at night to see if anything happened. Does that mean anything happens to Erika Melke?

A Yes.

Q Also, you previously testified that the Defendant told him, or you told the Defendant that you had sent the information provided by the Defendant to this person that was going to

79

carry out the murder, correct?

A Yes.

Q When you told the Defendant you should send this information, was that before you met with Detective Krumbach and Detective Hogan?

A Yes.

Q Now, Mr. Close, Mr. Perrone tried to nail down specific dates when the conversation happened and the correspondence between you and Mr. Uraz that had been admitted. Do you know the exact dates that these letters would have been written?

A This was over a year ago. As far as the exact dates, I don't know. I didn't keep track, or anything, what date I would send them off.

Q Do you recall listening to your testimony, or was it your testimony that this occurred after you two were in medical?

A Yes.

Q I guess we will call them Pierce letters or correspondence that you had between yourself and John Pierce?

A Yes.

Q You turned these letters over to the police during your initial interview with them. That

80

had nothing to do with the Defendant, correct?

A No. It had nothing to do with him.

Q Those letters were turned over at that time?

A Yes.

Q By you?

A Yes. Well, they were turned over by my attorney. He had them in an envelope that had an interview with him.

Q He gave them to your attorney, he gave them to law enforcement during that interview?

A Yes.

Q Mr. Close, in all these ongoing 20 some conversations you had with the Defendant, talking about killing, or had killed or wanting to kill Erika Melke, what was his tone, how was he speaking to you about this?

A He was direct. He knew what he wanted to happen. He knew he wanted her dead. It wasn't a time when he backed off of it. It was direct, like he saw what he wanted done.

Q As you sit here today, Mr. Close, have you gained anything from telling the police that the Defendant asked him to kill Erika Melke?

A Nothing.

Q Did you gain anything from testifying in this

81

case?

A No.

Q After you testify today, where are you going back to?

A The Michigan Department of Corrections.

Q And it's your testimony that your participation and testimony in this case does not affect or have any bearing on your parole hearing, or parole sentence with the Michigan Department of Corrections?

A I don't even think it would be illegal to do anything like that. So no.

MR. ROTH: Nothing further, Your Honor. Thank you.

THE COURT: Jurors have any questions for Mr. Close?

(Off-the-record discussion at the bench.)

THE COURT: Mr. Close, Juror number 1 asked that:

You stated from your testimony that you were not from the street. What does that mean, in your opinion? What does he mean from that statement? Is it referring to education level and/or family upbringing?

THE WITNESS: Just in general from what he

82

said is that: Do you represent that you're from Detroit to like basically hold any weight with anybody, that you're street like. No. It doesn't mean like I have a high school education and a couple years of college. I'm not on the street because I committed a crime before. That's what he means by that.

THE COURT: So you were meaning that you didn't make –

THE WITNESS: I didn't make reference I was from Detroit to maybe anybody hold anything different from me. I didn't choose where I was from.

THE COURT: Juror number 3 has several questions. The first question is – he was acquitted, so that's not relevant since he was acquitted.

Juror number 3 also asked: Why would you engage with Mr. Uraz about killing Erika?

THE WITNESS: We were engaging in just the regular conversation. It came up. And at first I didn't know where it was going. So like I testified at the prelim, as soon as it became up, I had already made my mind up, like I testified to, that I was going to send it to my

83

lawyer. There was no plan in my mind that I was ever going to do it. I had already made my mind up that I would send it to my lawyer.

THE COURT: Juror number 3 asked:

After you came out of the hole, you and Mr. Uraz didn't talk anymore, Mr. Uraz had his court date on the October 19th, you guys mentioned you spoke up in the hole up until October 19th?

THE WITNESS: When I said we were in a hole, it's considered the hole, that's the only place they can house us that's on phone restriction. We're not actually in a hole as far as doing sanctions or anything. That's the only place they can house us, is where there is not any phone.

So once they moved us from there, and put me in another part, which was considered the hole, we didn't have any conversation after that.

THE COURT: So the hole can be like solitary confinement?

THE WITNESS: Yeah. But I wasn't on solitary confinement. He was actually in the hole, too but we weren't on solitary.

THE COURT: You referenced the hole, but a

84

restricted area?

THE WITNESS: Yes. Basically phone restriction.

THE COURT: And Juror number 3 asked:

Did you keep notes all the 20 times you and Mr. Uraz talked while you were being recorded?

THE WITNESS: No. After the first few times, then I sent it to my lawyer. It was like, I was expecting they would have done something sooner, as far as moved us, said anything as far as charged him, anything. They went a little longer. I thought it was actually taking for them to come talk to me. So when we were talking I was half expecting for them to move me. I didn't cut the conversation off. It was just on one thing. We would start talking about what we were having for breakfast, and it would turn into Erika, and his life with her.

THE COURT: Juror number 14 asked:

Do you remember a time when you and Mr. Uraz were in the same post, but not on phone restriction?

THE WITNESS: No. We were never on – when I came into the County Jail, I immediately went on phone restriction. Because the second day I

was there, I tried to call my sister and have contact with my wife.

I believe Mr. Uraz came into the County jail, while he was intake, tried to contact Mrs. Melke, they put him immediately on phone restriction. So he never had any kind of contact outside the phone restriction being in the restricted area, which was the hole. So...

THE COURT: Jurors have any additional questions? Mr. Koop, do you have any questions on the juror questions only?

MR. KOOP: Yes, Your Honor. Thank you.

REDIRECT EXAMINATION

BY MR. KOOP:

Q Mr. Close, after it became apparent that the Defendant was serious about having Erika Melke killed, why did you play along?

A It was more along the fact that I had already sent the stuff within 48 hours to my lawyer. It was like I was, I guess I could say, picky. In his mind I didn't know how far he was going to go with it. He had already told me that he was in jail for aggravated stalking. So I had known that he was serious about like trying to do something to Mrs. Melke, after he had told

me that. He was telling me about phone situations and about how he had basically made a key to her house and went to her house and stole her underwear and stuff. And he was telling me about a bunch of stuff that I was just like, in my words, I just thought it was something wrong with him, as far as like that. I was like, shit, excuse my French, but if he did get out, he was going to do something to her.

Q So with these notes, after these notes that you sent to your attorney, were most of the conversations then out loud or not written down?

A We moved to a bigger post. Like we was sitting in a corner, you know, and sit at -- they got like bench tables. We would sit there, talk. It would be more like whispering. It was not nothing out loud where anybody could actually hear us talking, but it would center around Erika. Basically that's what the conversation centered around. It wasn't about what we were doing while we were out or anything. It was about her.

Q And then these conversations outside these

exhibits that we have gone over, the handwritten, were most of these conversations with the Defendant, then, just you speaking back and forth?

A Yes. Yes.

MR. KOOP: Nothing further. Your Honor. Thank you.

THE COURT: Mr. Perrone, any questions as a result of the juror questions?

MR. PERRONE: Yes.

RECROSS-EXAMINATION

BY MR. PERRONE:

Q You sent the written notes between you and Mr. Uraz to your attorney when you initially sent him the information that you received from Mr. Uraz while on medical?

A You said did I send it to him?

Q Yeah. Did you send the note?

A Yes. I sent the notes.

Q After you sent the information to your attorney, did it appear that Mr. Uraz seemed more intent on it happening?

A I wouldn't say it was less or more. He was intent on it happening. He didn't go into a rage about it happening or anything. But he

was intent on it happening.

Q Did it seem like things with him escalated, as the situation went on?

A As far as escalated with?

Q Did he seem to be getting more angry, more specific as the situation went on?

A He was -- I mean, he had like a little -- he was incensed about her. I wouldn't say her getting him locked up, but him getting himself locked up and dealing with her the way he dealt with her. To me he had said she had ruined his life.

Q Did you --

MR. PERRONE: No further questions, Your Honor.

THE COURT: Any additional juror questions? Thank you, Mr. Close. You may be excused. Thank you for coming in. Yes?

MR. ROTH: Call another witness?

THE COURT: We will start, yes.

MR. ROTH: Thank you. People call Patrick Burnett.

THE COURT: Come up here, Mr. Burnett. Do you swear or affirm the testimony you are about to give will be the truth under penalty of

89

perjury?

THE WITNESS: Yes, sir.

THE COURT: Have a seat. State your name. Spell your last name for the Court Reporter, please.

THE WITNESS: Patrick Burnett. B-U-R-N-E-T-T.

THE COURT: Mr. Roth?

MR. ROTH: Thank you, Your Honor.

**PATRICK BURNETT**

BY MR. ROTH:

Q Good morning, sir.

A Good morning.

Q In April of 2016 where were you employed?

A Michigan State University.

Q In what capacity?

A Culinary platform attendant.

Q I am sorry. Say that again?

A A culinary platform attendant.

Q What does that mean, day-to-day?

A I cook in a venue.

Q Thank you. For Michigan State University?

A Yes, sir.

Q Before working at Michigan State University, where did you work?

90

A Michigan Department of Corrections.

Q Thank you. So back in April of 2016 — you know what, I'm going to ask that a lot cleaner. When did you start working at MSU?

A About eight years ago.

Q Thank you. While you're working at Michigan State University in the culinary department, did you work with a person by the name of Tune Uraz?

A Yes.

Q Did you call him by a different name?

A Yes.

Q What did you call him?

A Tony.

Q Sometimes Big Tony?

A Yeah.

Q Do you see that man in the courtroom today?

A Yes, sir.

Q Can you please point him out, identify him for the record?

A Right there (indicating).

MR. ROTH: Thank you. I ask the record to reflect that the witness has identified the Defendant.

THE COURT: Any objections?

91

MR. PERRONE: No objections.

THE COURT: So identified.

Q (MR. ROTH) How long had you worked at MSU with the Defendant?

A Off and on throughout the whole time, the whole eight years.

Q Did he work there before you started there?

A Yes, sir.

Q So over the course of those eight years, did you become friendly with the Defendant?

A Yes, sir.

Q So friendly can mean a lot of things. You guys are friendly while you're at work together?

A Yes, sir.

Q Did you ever do anything outside of work with him socially?

A No, sir.

Q So in April of 2016, do you recall being at work around 5:20 PM with the Defendant and several other employees?

A Yes, sir.

Q Do you know the conversation I'm referring to?

A I believe so.

Q Where did this occur?

A In Landon Hall.

92

Q Say that again?

A At Landon Hall.

Q Could you please tell us what happened then?

A Around at that time we were getting ready to go home, we have a 10-minute cleanup time. We were sitting at the table at the time, just me and another gentleman, I think, and getting ready to go. When he got up and was getting ready to go, Tony came to me and asked me if I trusted him.

Q So you used some pronouns. You said "he." After the other guy leaves you alone, and then the Defendant approaches you?

A Yes, sir.

Q Very good. You told us at that point the Defendant says what?

A He asked me if I trusted him or something like that.

Q How did you respond?

A I told him yeah.

Q What was his tone of voice when he asks you do you trust me?

A Kind of quiet in nature. Kind of, you know, wanted to be just between me and him, I guess.

Q At this point in the conversation, did it

93

strike you as odd?

A  Yeah.

Q  Just by the way he approached you and the tone of voice?

A  Yeah.

Q  After you say "yes," what does he then do?

A  Well, he -- I believe he said that he trusted me, and then asked me for a gun and bullets.

Q  Did he say anything else about wanting a gun and bullets?

A  No. Not that I remember. Just that he wanted a gun and bullets.

Q  All right. Did you end up speaking to a police officer within a few days of this back then?

A  Yes, sir.

Q  All right. And did you give them a pretty full statement about what had happened?

A  Yes, sir.

Q  Was it more recent in your memory back then?

A  Yes, sir.

Q  Would looking at that report help refresh your memory?

A  Probably.

Q  All right.

MR. ROTH:  May I approach the witness, Your

94

Honor?

THE COURT:  You may.

Q  (MR. ROTH) If you want to just take a moment and read this bracketed area silently to yourself and look up when you're done. Does that refresh your memory as to some of the details of that conversation?

A  Yeah.

Q  Did he go on to say anything else about the gun and bullets?

A  Just that he had -- he was in need of a -- in need of it. He seemed like he really needed it.

Q  Did he tell you how he wanted to go about getting them?

A  I don't think initially, he didn't.

Q  Sir, isn't is it true he told: I don't want to go about it the legal way?

A  I believe something to that effect that he didn't want to do that, after I had tried to to tell him if he had a problem, that go to the police, you know, get a gun the regular way if he wanted to do that.

Q  That's little later in the conversation?

A  Yes, sir.

95

Q  Let's go back to the beginning. He says he wants a gun and bullets. Does he ask for your help in getting them?

A  No. Well, at that time when he asked me that, I really didn't think he was serious. I just got up and basically left. And then when I left, I left my phone there in the station later that day. I figured I had left my phone and came back to get it. He asked me, as I was coming down the stairs, because one of my co-workers put it in my locker, and he asked me again something about it. So I gave him a look like: You are you crazy? No, I'm not going to do anything like that for you, and just walked right past him and came back upstairs and left.

Q  So you said that you're -- looking and your statement to say: I'm not going to do anything like that for you. Is he asking for your help to get the gun and bullets?

A  Yeah, I think so.

Q  Okay. That was at least how you interpret it?

A  Yeah.

Q  And you said that at the beginning you think that he was joking. Is his appearance joking at all?

96

A  No. But I say that because Tony, you know, we always joked. Nothing like that. But I didn't take him, you know --

Q  At least in the beginning you didn't think he was serious?

A  No.

Q  You said he told you he needed the gun and bullets. Did he tell you what he needed them for?

A  No. He said one time when we were in the cooler, he pulled me to the cooler and he said that he was scared.

Q  And then you indicated that, again, in this first day of this conversation, you tell him: If you have a problem go to the police. And how does he respond?

A  Like he couldn't.

Q  That's when he tells you, and your quote is that he says: I don't want to go about it the legal way, correct?

A  I'm not sure if he uses those particular words. But something to that effect, that he couldn't go that way.

Q  But he made it clear to you that he could not do this in a legal registered firearm fashion,

97

correct?

A  Right.

Q  And by this point in the conversation, do you realize that this is not a joke?

A  Absolutely.

Q  Did he tell you why he was asking you and not somebody else?

A  No. He was still confused about that.

Q  You indicated that you have this initial conversation, it sort of dissolves, then he re-approaches you a little bit later in the night; isn't that correct?

A  Yes, sir.

Q  Both times in this initial day, did you make clear that you were not going to help him?

A  Yeah.

Q  Did he approach you again the next day asking again about getting an illegal gun?

A  Yes, sir.

Q  Where did this happen, the second day?

A  I was behind the Grill and Sizzles, a venue at the Landon Heritage Common. And he called my name. And as I looked up he was walking towards the cooler that we have behind the counter with us, and waved me towards that way.

98

So I just went with him, you know.

Q  And where did you guys then go?

A  In the cooler. It's like a walk-in cooler.

Q  What happened then?

A  Well, he stated again, and asked me again if I could help him do that. I took that opportunity to tell him: No, I could not, and that he shouldn't do that. It's trouble, you know. I couldn't believe he was doing it at work. That was enough trouble as it stood. And I felt like since I worked at the Department of Corrections, I didn't feel that he was that serious. I tried to tell him about his son, that he wouldn't see him, and just trying to — try to get him out of that.

Q  That it had gone as a bad idea?

A  Absolutely.

Q  Again, during this second conversation, or second day of this conversation, does he again appear serious?

A  Yes.

Q  Was that the final time that you two spoke about it, or was there another time?

A  No. That was it.

Q  After this final conversation with him about

99

him wanting an illegal gun, did you report this to somebody?

A  Yes, sir.

Q  Who did you report it to?

A  My supervisor, Rich Kniff.

Q  Could you spell the last name for us?

A  K-N-I-F-F.

Q  Thank you. Why did you report this to your supervisor?

A  Well, I felt Tony was totally disrespecting me in the workplace by asking me that. And then that I trusted Rich. I wanted to somehow try to help him out of this, you know, Tony out of this by trying to go to Rich, trying to find someone that knew him. Because I couldn't sway him, maybe somebody could sway him from it.

Q  Now, as a result of that, the police get involved and they come speak to you as well?

A  Yes, sir. I was told to go to the office. And everybody left, all the manager's office, the whole floor. And I basically talked to him, a lady on the phone, from Michigan State.

Q  What happened with the Defendant's employment at MSU after this?

A  I believe he was terminated.

100

Q  Did you ever have contact with him again?

A  No, sir. I don't believe so.

MR. ROTH:  Nothing else, Your Honor. Thank you.

THE COURT:  Mr. Perrone?

MR. PERRONE:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. PERRONE:

Q  He didn't tell you why he wanted the gun?

A  No, sir.

Q  He didn't indicate to you any reason, specifically, why he would be trying to obtain the gun?

A  No, sir.

Q  And you testified that he talked to you in the cooler, that it was your perspective that he appeared to be scared?

MR. ROTH:  No, Your Honor. That's a mischaracterization. The Defendant claimed he was scared. The way he testified, he appeared serious.

THE COURT:  That's my recollection, Mr. Perrone.

Q  (MR. PERRONE) Did it appear to you when you spoke with Mr. Uraz that he appeared scared?

101

A Concerned, scared. Yes, sir. He had some issue.

Q But he didn't tell you what that issue was?

A No, sir.

Q And he was clear with you that he was not going to be able to buy a gun legally, himself, based upon what the Prosecutor asked you?

A Could you say that again?

Q Was it clear -- did he make it clear to you he wouldn't be able to buy a gun by himself, that it was illegal for him to buy a gun?

A No. He didn't say it was illegal.

Q You tried to counsel him, telling him that guns aren't a good idea?

A Yes, sir.

Q You knew his family?

A I met his mother. And his son comes in there.

Q How long did you work with him?

A On and off through my whole career. I believe when I started there, Tony was at Brody.

Q How long was that when you started?

A Eight years, eight, nine years ago.

Q You had a lot of interactions with Tony over the years?

A Just through work. Not a whole bunch of

102

interaction. Just when he was working with the -- if I worked Atlanta, he worked there. If we had the issue, he was the go-to guy.

Q You and Tony used to joke around?

A Yeah.

Q Did you get in a more favorable work schedule after reporting this?

A No. I don't think so.

MR. PERRONE: No further questions.

THE COURT: Any redirect?

MR. ROTH: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. ROTH:

Q So Mr. Perrone asked you about whether or not you and the Defendant had joked around before. This series of conversations about helping him get a gun, was that anything like your prior joking around with the Defendant?

A No, sir.

Q Did anything about this feel like he was joking around to you?

A No.

Q Mr. Perrone asked about the legality of the gun. I want to clarify. Is it the Defendant said he could not legally buy a gun or that he

103

specifically told you he wanted an illegal or registered gun?

A I thought like he was asking me he wanted an illegal one.

MR. ROTH: I understand. Nothing else.

THE COURT: Jurors have any questions from Mr. Burnett? Appreciate it. You're all set. Free to go. We will take our lunch break now. I will ask the jury to come back at 1:20. Don't talk with anybody, discuss the case, family, friends. Read any news reports, radio broadcasts, listen to. And on behalf of the Citizens of Ingham County, thank you very much. See you back this afternoon.

(Jury exits courtroom at 12:00 p.m.)

THE COURT: We are in recess until 1:30.

MR. ROTH: Thank you, Your Honor.

MR. PERRONE: Thank you, Your Honor.

(Recess taken from 12:00 a.m. to 1:40 a.m.)

THE COURT: Returning to People versus Tunc Uraz, file 16-1065 and 1064. Mr. Perrone is here. Mr. Roth is here. Mr. Uraz is here. Ready for the jury?

MR. ROTH: Yes, Your Honor.

THE COURT: Ready for the jury, Mr. Perrone?

104

MR. PERRONE: Yes, Your Honor.

THE COURT: Next witness, Mr. Roth?

MR. ROTH: Thank you, Your Honor. The People call Detective Hogan.

THE COURT: Do you swear or affirm the testimony you are about to give will be the truth, the whole truth, under penalty of perjury?

THE WITNESS: Yes, sir.

THE COURT: Have a seat. State your last name for the Court Reporter, please.

MR. ROTH: Andrew Hogan. H-O-G-A-N.

THE COURT: Thank you. Mr. Roth?

ANDREW HOGAN,

BY MR. ROTH:

Q Good afternoon.

A Good afternoon.

Q Where do you work?

A Lansing Police Department.

Q In what capacity?

A Detective assigned to the violent crimes unit.

Q How long have you been with the Lansing Police Department?

A Just shy of 19 years now.

Q What is your responsibility as a detective in

105

the Violent Crimes Unit?

A   I'm assigned to investigate crimes that range from simple assault up to homicides.

Q   In that capacity did you assist with an investigation of the Defendant to solicit to murder – inmates to murder Erika Melke?

A   I did briefly.

Q   Is it fair to say at that point you were not the main investigator?

A   I was not.

Q   Detective Krumbach was?

A   That's correct.

Q   As an assisting detective, could you tell us a little bit about what your responsibilities are?

A   I assisted briefly during the course of this investigation. I had some previous knowledge of a subject --

Q   Let me back you up. I don't want to know specifics. But as an assistant detective, what did you do?

A   Pretty much what the primary asks of you. Take care of some ancillaries, some side work, some stuff that may not be specific to the investigation. Just kind of share the work.

106

Q   Very good. So did you and Detective Krumbach interview an inmate by the name of Reginald Close on October 17, 2016?

A   We did.

Q   Where did that occur?

A   Ingham County Jail.

Q   Who else was present during that interview?

A   The subject and the subject's attorney.

Q   At the beginning of that interview, was it made clear to Mr. Close that he would not receive anything in exchange for his cooperation?

A   As I recall. Yes.

Q   Was Mr. Close cooperative during that interview?

A   Yes.

Q   For more specific information about that interview, we have to talk to Detective Krumbach; is that correct?

A   That's correct.

Q   Did you and Detective Krumbach try to confirm or corroborate information that Reginald Close provided to you?

A   Yes, we did.

Q   Specifically, did Mr. Close tell you he received some initial up-front money, sort of a

107

deposit from the Defendant?

A   He did.

Q   Of his jail account?

A   He did.

Q   Did you try to confirm that?

A   I did.

Q   Can you please explain the process by including that?

A   I learned that the money that goes into the Ingham County Jail is done through a business called Express Accounts. I was able to get the phone number from Express Accounts. I spoke with the CEO owner of the company and discussed the process of how money is deposited into those accounts with him.

Q   Thank you. And in so doing, did you obtain some record regarding Mr. Close's account and some activity on that account?

A   Yes. We were able to find the date and time of the deposit and the amount of money that was deposited.

MR. ROTH:   Your Honor, may I approach the witness, Your Honor?

THE COURT:   You may.

Q   (BY MR. ROTH) Showing you what's been marked as

108

Exhibit – Proposed Exhibit 42, is the transaction record that you obtained?

A   Yes. That looks -- that is it.

Q   And on the back, is there a certificate from Express Accounts about the accuracy of that record?

A   Yes, there is.

MR. ROTH:   Your Honor, I would move admission of Proposed Exhibit 42 pursuant to MRI 902.11.

THE COURT:   Mr. Perrone?

MR. PERRONE:   No objection.

THE COURT:   So admitted.

(PX-#42 is received into evidence.)

Q   (BY MR. PERRONE) So up top we have an account number, a name. We have a date range. Could you tell us what the date range is?

A   9-1 of 2016 to 2017.

Q   So the first two items here, fair to say these are charges against the account?

A   Yes. That's how I understand it.

Q   The third one is a deposit; is that correct?

A   Yes.

Q   For how much?

A   $160 was the amount, apparently minus other

109

numbers, $132.59.

Q So there's some fees that are removed, it looks like?

A Yes, sir.

Q Does the record — I am sorry. What date was that done?

A 10-13 of 2016.

Q Does this record indicate who deposited that money?

A It does not.

Q How was the money deposited in an inmate's account?

A It is done at a kiosk in the lobby of the Ingham County Jail.

Q It's sort of like an ATM machine?

A Very similar.

Q When a person deposits money into an inmate's account, does that kiosk take an automatic picture of the person?

A It does.

Q Did you obtain the picture of the person who deposited the money that we see on People's Exhibit 42?

A Yes.

Q Is that, again, through Express Accounts

110

Company?

A Yes, it is.

Q Let me ask, Detective, first, showing you People's Proposed Exhibit 43, is that the picture you're provided?

A Yes.

MR. ROTH: I move for admission of 43, the Detective's testimony and as well as the 911 certificate attached to 42.

THE COURT: Mr. Perrone?

MR. PERRONE: No objection.

THE COURT: So admitted.

(PX-# 43 received into evidence.)

Q (MR. ROTH) We are going to hear more testimony from Detective Krumbach about the identification of this subject. Is it fair to to say you recognize the background here as part of the jail?

A I do.

Q In your responsibilities assisting in this case, did you also find out from the jail, while he was lodged there, the Defendant had made any complaints about treatment by other inmates?

A No. I did check with the jail. I spoke with a

111

sergeant and a lieutenant. They reviewed the records to see if there had been any threats or promises or assaults against the Defendant. There were none.

Q No complaining by the Defendant of any sort?

A Not relating to those types of issues. No.

MR. ROTH: Nothing else, Your Honor. Thank you.

THE COURT: Mr. Schroeder?

CROSS-EXAMINATION

BY MR. SCHROEDER:

Q Good afternoon, Detective Hagan. How are you doing today?

A Good. How are you.

Q I'm doing all right. How long have you been with the Special Crimes Unit?

A I'm not assigned to the Special Crimes.

Q Or —

A Violent Crimes, sir?

Q Violent Crimes, yes.

A Yes. A little more than seven years now.

Q Okay. And how many cases have you worked on with Detective Krumbach prior to this one?

A I couldn't say specifically, but I would say many.

112

Q Okay. Now, Mr. Roth showed you a picture of the individual who put the money in the kiosk. Did you attempt to interview this individual as part of your investigation?

A I did not specifically attempt to interview him.

Q Excuse me for just a second. All right. You also testified that you interviewed an individual associated with this investigation on October 17 of 2016; is that correct?

A That date sounds correct. Yes.

Q Is that individual Mr. Close?

A I was present at that interview. Yes.

Q Was that the first time you had met Mr. Close?

A No.

Q Okay — when was the — when did you meet him — when was the first occasion you met Mr. Close?

A I couldn't give you a specific date. It was prior to that date.

Q Would October 24th, 2016 be correct?

MR. ROTH: That would be a subsequent date. I think you mean August.

Q (MR. SCHROEDER) August 24th. My mistake

A I don't have it here in front of me, but it

113

sounds approximately correct.

Q Okay. And what was the purpose of that meeting with Mr. Close?

A It was an investigation into another crime, a different crime.

Q Was it one crime or was it multiple crimes?

A My focus was one crime. There was another detective present. He may have had some interest in some other crimes. I know the crime I was specifically interested in.

Q During that August meeting with Mr. Close, was that when a proffer was being offered to Mr. Close?

A I know that we had a proffer letter agreement with him at that time.

Q Okay. And during that August meeting with Mr. Close, did he provide notes for you, for that prior investigation?

A I don't recall getting notes.

Q Was the case you were investigating the John Pierce case?

A No, it was not.

Q Okay. And — so beyond the meeting with Mr. Close, and reviewing the video, you didn't have much involvement with the investigation

114

beyond that, correct?

A I was present about Detective Krumbach when we went to phone restrictions to verify some of the information for the interview. I was present with Detective Krumbach when we attempted to track down and speak to the subject, who you see in the still shot from the kiosk at the Ingham County Jail.

MR. PERRONE: No further questions, Your Honor.

THE COURT: Redirect?

MR. ROTH: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. ROTH:

Q So you indicated that in a prior interview with Reginald Close, you had obtained some information from him about another criminal case?

A From my perspective, yes. That is why I went to meet with him.

Q So we talked about in this case you did a single thing to try and corroborate it because it's Detective Krumbach as the primary investigator. Are you the primary investigator in the other crime that Reginald Close talked

115

to you about?

A Yes, I am.

Q Is it fair to say your responsibilities in that case are much broader, more significant?

A Yes. Absolutely.

Q So in that case, I am not going to get into specifics, Reginald Close provides you with a significant amount of information; is that correct?

A That is true.

Q Were you able to confirm and corroborate all of it?

A I can't say all of it, but a great deal of it.

Q Nothing that was dispelled?

A Nothing that he provided me from my other investigation that was inaccurate or incorrect.

MR. ROTH: Very good. I have nothing else.

THE COURT: Jurors have any questions for Detective Hogan? All right. Thank you, Detective. Next witness?

MR. ROTH: People call Officer Frank Mobley.

THE COURT: Raise your right hand. Do you swear or affirm that the testimony you are about to give will be the truth, the whole truth, under penalty of perjury?

116

THE WITNESS: Yes, sir.

THE COURT: Have a seat. State your name and spell your last name for the court reporter, please.

THE WITNESS: My name is Frank Mobley. Last name spelled M-O-B-L-E-Y.

THE COURT: Thank you. Mr. Roth?

FRANK MOBLEY,

A witness sworn to tell the truth under oath as follows:

MR. ROTH: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. ROTH:

Q Good afternoon, Officer.

A Good afternoon, sir.

Q Where are you employed?

A City of Lansing Police Department.

Q In what capacity?

A I am currently assigned to the Tri — I mean special — SOS, Special Operations Section.

Q How long have you been with the Lansing Police Department, overall?

A It will be 22 years in November, November 19th.

Q So tell us in the Special Operations Section that you're currently assigned, what does that

117

unit do?

A  Our unit does a number of things. We currently from narcotics selling to buying, to hooker stings, to murder for hire. We act in an undercover capacity a lot, so...

Q  So tell us broadly, what does it mean when you are acting in an undercover capacity?

A  You name it. I'll play the bad guy. I will be a dope dealer. I will be a crackhead. Whatever they need me to do, I'll do.

Q  It is not uniform police work?

A  Correct. This is all undercover, plain clothes.

Q  How long have you been in the Special Operations Unit at this time?

A  Actually a year and a half.

Q  Did you have prior undercover experience?

A  Yes.

Q  Tell me about that.

A  I worked in Tri-County Narcotics before.

Q  How long did you work that?

A  For two and a half years, also.

Q  That is another undercover assignment?

A  Yes.

Q  Roughly when was that?

118

A  2006, seven, somewhere around there.

Q  Any other undercover experience?

A  No, sir.

Q  Very good. You talk about your current assignment in Special Operations Section. Is that how you were assigned October 2016, one year ago?

A  Yes, sir.

Q  On October 18, 2016, were you approached about a solicitation of murder investigation in an undercover capacity?

A  Yes, sir.

Q  What was your role to be?

A  My role was to contact the Defendant, Mr. Tune Uraz, who was in the Ingham County Jail. Because we had gotten word that he was trying to solicit someone to kill his ex-girlfriend.

Q  And I assume you weren't going to say you were Officer Frank Mobley?

A  No, sir.

Q  What was your role going to be?

A  I was supposed to be a hitman.

Q  Were you provided with some information to incorporate into your undercover role?

A  Yes, sir.

119

Q  What was that?

A  I had -- they had gave me the name of the subject that wanted me to kill his girlfriend. They gave me a little bit of information about who the information initially came from.

Q  Who is that?

A  Mr. Uraz, who was also a subject incarcerated in the Ingham County Jail.

Q  Rough was a street name you're provided with?

A  Yes, sir.

Q  He was supposed to be the intermediary who put you in touch with the Defendant?

A  Correct.

Q  So you indicated that at that time the Defendant was at the jail. How are you supposed to make contact with him?

A  It was through a video conference call. I think the name of the actual site was Securus. Something new. I didn't even know they had this. But it's like a video conference call that they -- that you can contact someone or make contact with somebody in the Ingham County Jail through just video. So video and voice or whatever. So...

Q  It's not just asking for police officers,

120

people can visit their loved ones by this video chat as well?

A  Yes.

Q  Who arranged that video visit with the Defendant?

A  Lieutenant Robert Backus.

Q  When was your first attempt to make contact with him?

A  That was in October.

Q  Is was reported in your report?

A  Yes. October, I'm sorry. I don't recall that. But if you -- if I can look at my report, it will refresh my memory.

Q  Absolutely. Fair to say you have done a number of cases since that time?

A  Yes.

Q  And you write these reports to help you remember it a year later?

A  Yes.

MR. ROTH:  Very good. May I approach the witness, Your Honor?

THE COURT:  You may.

Q  (MR. ROTH) If you can read the starred part silently to yourself and look up when you are done? Does that refresh your memory?

121

A Yes, sir.

Q When was the first time you attempted to make contact with the Defendant?

A On 10-18-2016.

Q What happened at that time?

A I made contact with him. What -- can I take another look? I'm sorry.

Q Absolutely.

A I'm getting the two dates confused.

Q Absolutely.

A Okay.

Q Were you able to successfully make contact with him on the 18th?

A No, sir.

Q What happened on the 18th?

A My wifi was not acting right. I was unable to make contact with the Defendant at that time.

Q Did you try again at a little bit later date?

A 10-24-2016.

Q Do you recall approximately what time it was, approximately?

A It was approximately 1700 hours.

Q That would be about 5 p.m; is that correct?

A Yes, sir.

Q Was that visit reported?

122

A Yes, sir.

Q Just as a matter of course, these video visits are always recorded anyways?

A Yes, sir.

Q Prisoners are made aware of that?

A Yes, sir.

Q Do you see the person that you spoke to on that video visit in the courtroom today?

A Yes, sir.

Q Could you please point him out and identify him for the record?

A Sitting over there at Defendant's table, in a gray suit, blue shirt, blue tie.

MR. ROTH: Your Honor, I ask the record to reflect the witness has identified the Defendant.

MR. PERRONE: No objection.

THE COURT: So identified.

Q (MR. ROTH) Did you talk any differently on that call than when you are here in court today?

A Yes, sir.

Q Tell me a little bit about that.

A It's almost like acting. You talk the way you -- that a hitman is portrayed. So I threw

123

a little slang in there, swore a little bit more. I don't know.

Q Did you use the word "trash"?

A Yes.

Q So who first used the word "trash"?

A I did.

Q Were you using "trash" in place of a different word?

A Yes, sir.

Q Tell me about that.

A Being that we were recorded, and that this is a murder for hire investigation, I knew I couldn't use the word "kill." So what I did is I used the words "take out trash."

Q Even though you used that phrase "take out the trash," did you use it in such a way to make it clear that you were talking about a person at various points throughout the conversation?

A Yes, sir.

Q Tell me a little bit about how you did that.

A Throughout the conversation I mentioned: Do you want me to beat that trash with a bat? Do you want me to spill that trash over the house? Do you want me to clean up the trash when I'm done? How many bags of trash do you want me to

124

take out?

Q Did you talk about the color of the hair of the trash?

A I asked about the color of hair of the trash. I asked about the actual address of the trash.

Q Very good. Even though you were the one that started this code of "taking out the trash," did the Defendant use it, too?

A Sir?

Q Even though you start this code of taking out the trash, did the Defendant take up that phrase as well and begin using on his side as well?

A Yes, sir.

Q Did he ever express any confusion about what you meant by it?

A No, sir.

Q Did he ever express any confusion during your conversation about what you were saying?

A No, sir.

Q Were there things that he did during this call to show that he was being careful because the call was recorded?

A Yes, sir.

Q Can you tell me what sort of things you're

124

talking about?

A I asked him numerous times about what the address was where this trash was located. His response was: Well, Rough should have told you that information, because he had written it down, I guess. And he said that Rough should have had given you information because it was written down somewhere.

Q So you kept asking for the address, where you were to go, and he refused to provide it?

A Correct.

Q Showing you what's been marked as Proposed Exhibit 44, is this labeled the October 24th video visit?

A Yes, sir.

Q Is that a fair and accurate recording of it?

A Yes, sir.

Q Proposed Exhibit 45, is this a transcript of that phone call?

A Yes, sir.

Q Have you reviewed that transcript?

A Yes, sir.

Q Typing this up, having this to read as you watch, does this help in understanding what's going on?

126

A Yes, it does.

MR. PERRONE:   Approach, Your Honor?

Q (MR. ROTH) Is that a fair and accurate transcript of that call?

MR. PERRONE:   May we approach?

THE COURT:   Yes.

(Off the record discussion at the bench.)

MR. ROTH:   So at this time I am going to move for admission of Proposed Exhibit 44 and 45, though we will not be distributing the transcript to the jury until after the video is played, is my understanding?

THE COURT:   That's right. Any objections to that, Mr. Perrone, 44 being the actual video?

MR. PERRONE:   No objection to admission of 44. As to 45, just continuing the objection as discussed.

THE COURT:   Okay. We will acknowledge continued objection, but after playing of the video, I think the transcript will be appropriate.

MR. ROTH:   Thank you, Your Honor.

(PX-#44 and 45 are received into evidence.)

Q (MR. ROTH) Before I play the video, is it fair to say that at the very beginning there's some

127

sound interference that makes it hard to hear?

A Yes. This was new to me. Technology is new to me, the iPad or iPro, or whatever I had it on, to make this communication. I didn't realize that I needed earphones to -- because of all the outside interference noise. So the first like four minutes, three, four minutes, it's going to be static. Yes, so...

Q Then it goes away and you can hear better?

A Yes. Oh, yeah. Yep.

MR. ROTH:   At this time we will play People's Exhibit 44, at 2:08 p.m. May I approach? Turn up the volume a little bit.

I believe the Court has admitted now into evidence, Proposed Exhibit 45, the transcript of that call?

THE COURT:   Subject to Mr. Perrone's continued objection.

MR. ROTH:   Thank you.

Q (MR. ROTH) Officer, you have reviewed this transcript?

A Yes, sir.

Q It is an accurate transcript of what we just watched?

A Yes, sir.

128

Q At the end of the phone call you indicate that you will call him back the next day to let him know that it's done. Did you contact him the next day or was it a little bit later?

A It was a little bit later.

Q Do you recall the next day you contacted him was?

A I am sorry, I have to look at the report to reflect my memory, so...

MR. ROTH:   May I approach the witness, Your Honor?

THE COURT:   You may.

Q (MR. ROTH) If you can read that silently to yourself and look up when you're done?

A Okay.

Q When was it?

A It's 10-27 of '16.

Q Could you tell us what happened at that time?

A At that time, if I remember correctly, I tried to make contact with him, but no conversation took place. I saw him, if I'm not mistaken, but no conversation actually took place.

Q Is that date, what's on Proposed Exhibit 46 on the label?

A Yes, sir.

129

MR. ROTH: Thank you. Your Honor, I would move for the admission of People's Proposed Exhibit 46.

THE COURT: Mr. Perrone?

MR. PERRONE: No objection, Your Honor.

THE COURT: So admitted.

(PX-#46 is received into evidence.)

Q (MR. ROTH) That attempted contact was also captured; is that correct?

A Yes.

Q That's the end of the call?

A Yes, sir.

(Playing of Exhibit 46.)

Q (BY MR. ROTH) I will note for the record we played People's Exhibit 46.

Did you make any further attempts to contact the Defendant after what we had just watched?

A No, sir.

MR. ROTH: Very good. I have nothing further of this witness.

THE COURT: Mr. Perrone?

MR. PERRONE: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PERRONE:

130

Q Did you obtain any information as to how to make the Securus call, since you are not really familiar with technology?

A I am sorry. Can you rephrase the question?

Q Did you get any assistance from anybody in regard to initiating the Securus video call from the Ingham County Jail?

A If I'm not mistaken, my Lieutenant took care of all of that.

Q That would be Lieutenant Backus?

A Yes, sir.

Q Was there anything initiated from Mr. Uraz's side as to the phone call? Did he have to do anything in order to set the phone call up on his end from the jail?

A No.

Q Did he have to accept to take the call from you?

A Well, I would believe that he had to accept it. He could have said no.

Q Is there a process by which that okays it, though, or does he anticipate the call and make that determination?

A I'm sorry. I do not know what the process is over there. I just get a cold call and be

131

answered.

Q A cold call? What do you mean by cold call?

A I didn't know him at all. He didn't know me at all. I just initiated a conversation.

Q And who did you — did you speak with anyone besides Lieutenant Backus in regards to the information that you were trying to elicit?

A When you say speak to anyone?

Q I am sorry. What was the factual background that you were given, as far as what you were attempting to accomplish with the call? Was there a strategy associated with taking out trash?

A I think in reference to your first question, I think that if I recall correctly, Lieutenant Backus and probably someone over at Ingham County, we had a conversation in reference to what was going on.

Q You think?

A Yeah. I kind of remember that.

Q When did you begin the Special Operations Unit with the Lansing Police Department?

A In June of 2016. June or July.

Q And the prior experience in undercover work came in 2006, 2007, at Tri-County Metro?

132

A Yes, sir.

Q You had been in the undercover game prior to that time?

A Yes, sir.

Q Any work in undercover operations prior to this one after doing the Special Operations Section?

A I am sorry?

Q Did you do any other special operations, undercover operations?

A Yes, sir.

Q Prior to this?

A I'm sorry?

Q After joining the Special Operations Section?

A Correct.

Q Did you have any other undercover —

A From the period of time from the 6th until — yes, sir.

Q June until October?

A Yes, sir.

Q Why did they bring you in to act as an informant?

MR. PERRONE: I am going to object. That calls for speculation or hearsay.

THE COURT: Sustain. That's speculation. He wouldn't know.

133

Q (BY MR. PERRONE) Did they offer you an option as far as this is concerned?

A When you say "option"?

Q Sorry. Was this something that you chose to do, that you took upon yourself or were you told to do? You were you ordered to do it or you chose to do it?

A I chose to do it.

Q Did you think that you would be a good person to do it, given the surroundings?

A I am sorry?

MR. ROTH: Your Honor, I guess I am going to object to the vagueness in the surroundings. I guess I don't know what that means.

THE COURT: Well --

Q (MR. PERRONE) Did you think as a result of Rough being black, that you would have been a good candidate, since you were also black?

A I didn't even know Rough was a black.

Q Did you question why they were using you at all?

A When we get word that this was going on in the Ingham County Jail, my Lieutenant Backus came to our meetings and said this is what was going on. He asked for someone to -- if someone was

134

interested in being a hitman. So out of all of the folks in our unit, I said I'll do it.

Q You said when we got word?

A Yeah.

Q Did you have word prior to Lieutenant Backus?

A No.

Q So you would have had the -- he would have had the information same time as you?

A He brought it to us.

Q And you volunteered to act as the hitman?

A Yes, sir.

Q Have you previously ever acted as a hitman?

A I think one time, back in the days I was supposed to be hitman, but I don't think I ever went through.

Q Do you have any other formal training associated with -- do you have any special training from your captain?

A I am sorry. Special training as in hitman training?

Q Yeah.

A No. There was no course in hitman training in our basic and narcotics -- basic and advanced narcotics school, no, there wasn't.

Q Were you given any specific orders as to how to

135

question Mr. Uraz? Did your superiors?

A Basically it was just trying to get him to incriminate himself. It was simple. I mean, just try to get him to say what he wanted done.

Q So it was your job to get him to say what you wanted him to say?

MR. ROTH: No, Your Honor. That's a mischaracterization.

THE COURT: That's a mischaracterization. Just need to have questions, Mr. Perrone, not opinions.

Q (BY MR. ROTH) As far as the recording is concerned, there is some significant issue with the static, initially, with the call on October 24th?

A Yes, sir.

Q There is also static on the call on October 18th?

A I'm sorry?

Q October 18th, the initial call that you made?

A Seventeenth.

Q You made --

A The 17th?

Q Did you make three calls?

A Yeah. Seven, 17 and the 27th.

136

Q The 18th?

A Okay. I'm sorry.

Q Twenty-four and 27th.

A I am sorry.

Q I'm wondering if it's the 18th and the 19th. What was the delay between the call on the 18th and the call on the 24th? What was the reason for the delay?

A The delay from the 18th to the 24th? There wasn't a real reason for a delay at all. Not that I recall.

Q Did you receive additional information in regards to Mr. Uraz's case prior to initiating the call on October 24th?

A When you say additional information, I'm sorry.

Q Did Special Operations receive any information from another inmate that expedited you calling on the 24th?

A I don't recall.

Q You were not actually having a hard time hearing Mr. Uraz when you were on the phone with him?

A Sort of. Yeah.

Q You were using that as a technique to get him to repeat himself?

137

A Sometimes. A couple of times. Yep.

Q Did you make the initial phone call on October 18th, on the same day that Lieutenant Back was coming to you initially with the information?

A I am sorry. Say that again.

Q Did you make the phone call on the 18th on the same day that Lieutenant Backus came to you with that information?

A Yes, sir.

Q Or did you have information prior to that?

A Yes, sir. The first attempt, yes, sir.

Q Did you speak with anybody at the Ingham County Jail in regards to the operation?

A Yes, I did.

Q Who did you speak with?

A One of the administrators over there along with Lieutenant Backus. I don't recall their name.

Q On the third call on the 24th, after you see it hang up, do you try to reinitiate the call?

A I am sorry. The dates that you are giving me —

Q On October 24th there were technical difficulties.

A Okay.

138

MR. ROTH: No.

THE WITNESS: I thought that was the 27th.

Q (MR. PERRONE) On October 27th, sorry.

A I am sorry. You are confusing me right now. I am not trying to be mean. But —

Q On October 27th the call was terminated?

A Correct.

Q Did you try to initiate the call?

A Yes. I believe I did. Yes, I did.

Q Did Mr. Uraz answer?

A Nope.

Q How many times did you try to reinitiate the call?

A I think I tried about two or three other times.

Q Do you know if he had a deputy near him on the post while this is occurring?

A I don't recall.

Q You didn't have any conversations with deputies on the post informing them that this is going on?

A I made contact with the deputies to make sure that everything was okay on their end. I am sure I did.

Q You didn't — probably haven't dealt with instructions on how to deal with —

139

A When you say instructions, I don't understand.

Q Did you tell them not to become involved in the investigation, not try to press the Defendant to answer the call.

A Can you rephrase that one more time?

Q Did you provide them with any instructions as to what their role in the investigation would be, just to stand aside, not become involved?

A When you say stand aside, what do you mean.

Q Not to be involved in the investigation.

A To allow the communication to go forth?

Q Yes. Not interfere with the investigation.

A I don't recall what I told them. But I got to remember making contact, asking them was everything okay with the video conference.

Q Did you get additional information before the call was placed on October 7 that there were additional inmates that had been solicited by Mr. Uraz, if you can recall?

A I did see additional information about he had approached a number of other inmates in reference to killing his ex-girlfriend. But I don't remember the date at all. I don't know if it was before the 24th. I don't know if it is before the 27th. I don't recall.

140

Q If you had an opportunity to review the testimony from the preliminary examination in this matter, would that refresh your recollection?

A Yes.

Q 183, lines 10 through 24. Did that refresh your recollection as to whether or not —

A Yes, sir.

Q When were you provided with information that another inmate that came forward?

A Before that conversation?

Q On the 24th?

A Yep. Yes, sir.

Q So on the 24th, was there a sense of urgency on your side to get this done as a result of the additional information?

A When you say sense of urgency, it was let me call him again, see if I can make contact with him.

Q When did you get the information with regards to the second inmate? Was it the same day that you placed the call on the 24th?

A I don't recall. I don't recall. I don't recall the dates at all.

Q Who did you receive the information from?

141

A  Lieutenant Backus.

Q  It was your belief that it was necessary to protect Ms. Melke. It was urgent to protect Ms. Melke from Mr. Uraz's attempts with Close and Allen?

A  Yes, sir.

Q  And through the phone call, you were attempting to develop evidence in this case. It was your attempt to develop evidence against Mr. Uraz?

A  Yes, sir.

Q  Why do you make it a package deal towards the end, start talking about the other people and a discount?

A  I am sorry. Can you rephrase that? I'm - I don't understand what you mean.

Q  You were initially talking about two per bag, that's what you charge. You tell them you would do any additional one for 500?

A  Yes, sir.

Q  Was there any specific reason why the second ones were much less expensive than the first?

A  No. During the conversation when I asked him how many bags, he initially said five. So that's how that conversation went. And I said 200th, twa meant 2000 for the first one. And

142

then 500 for each additional bag. So he was the one that brought it up. I just kept going on with it.

Q  Was the bag of trash something that you were using from your experience in order to try to get him to make certain admissions?

A  When you say my experience, I'm not understanding you. I am sorry.

Q  Your undercover experience, as far as taking out the trash, is that slang, is that something that's part of the investigation?

A  Something that I heard, I guess, I couldn't say kill him on the video conference call. So I just said —

Q  Something you heard from a movie?

A  Something I thought would possibly mean the same thing. I mean, if two people with common sense were talking on a video conference, I just said take out the trash.

Q  No one else gave you any information about taking out the trash?

A  No, sir. No, sir.

Q  So you didn't have any information that Close indicated about taking out the trash?

A  I don't recall.

143

Q  No one informed you?

A  Close.

Q  That there was any indication of a garbage can?

A  I don't recall any of that.

Q  After you didn't verify personally any of the information from Close or Allen, you relied on other officers?

A  Only name I was given, really, was Rough.

Q  Towards the end of the conversation it appears you're pressuring him with some form of a down payment?

MR. ROTH:  I am going to object to Mr. Perrone's characterization of what happened.

Q  (MR. PERRONE) Did you pressure him for a down payment? Did you ask him for a down payment?

A  Yes.

Q  Did you ever receive a down payment?

A  No.

Q  Was there any follow-up through Reginald Close as to payment?

A  No, sir.

Q  Was there any follow-up with Reginald Close at all with respect to the 24th?

MR. ROTH:  Your Honor, I am going to ask that the question be restricted to Officer

144

Mobley's follow-up. He is not the investigator.

MR. PERRONE:  He can say I don't know.

THE COURT:  Well, what we have is cross-examination. It doesn't appear as if he is the investigator, so I will allow him to answer this question. But it doesn't appear as if he is the investigator.

THE WITNESS:  Can you repeat the question? Please read back?

(Portion of record read back by reporter.)

THE COURT:  That would be by yourself.

THE WITNESS:  Sir, with all due respect, the only person I made contact with was Mr. Tunc Uraz. I never made contact with no one else within the cell or as an inmate.

Q  (BY MR. PERRONE) But you did speak with deputies?

A  Yes, sir.

Q  Why is the second call necessary? Why was the third call necessary?

MR. ROTH:  I am going to object to the characterization of the question. There's nothing that is saying necessary. He can ask Officer Mobley why did you make the third call.

THE COURT:  Sustained.

145

Q   (MR. PERRONE) Why did you make the third call?

A   To try to get more evidence on him.

Q   He never gave you an address on that video?

A   No, sir.

Q   Never gave you a hair color?

A   No, sir.

Q   Never gave you a car?

A   No, sir.

Q   Why did you tell him at the end that you don't play around because you're from the D?

A   I'm not understanding what you're asking me.

Q   When you told him I'm from the department, I don't play, some reference to the D, what were you trying to establish?

A   Well, I'm a hitman from Detroit. And when this is all done and said there is no going back on it, so--

Q   Were you trying to establish street credibility?

A   I wouldn't say street credibility. It was – I I was saying, hey, when I hang up the phone, this is done, that person is dead.

        MR. PERRONE:  No further questions.

        THE COURT:  Mr. Roth?

        MR. ROTH:  Thank you, Your Honor.

146

## REDIRECT EXAMINATION

BY MR. ROTH:

Q   Officer Mobley, Mr. Perrone asked you questions about the broader investigation?

A   Yes.

Q   Is it fair to say you had a very narrow role in this?

A   Yes, sir.

Q   That is simply to make undercover contact in the jail?

A   Correct, sir.

Q   So it sounds like you obviously had much experience doing undercover hitman work. Is it – is undercover work with drug transactions, I think you also said hooker stings, far more common in your work?

A   Yes, sir.

Q   So you have had training to do undercover work, generally?

A   Yes, sir.

Q   In addition to that training, you have built some work experience, let's say, doing it for some period of time?

A   Yes, sir.

Q   You talked about the need or your desire to use

147

a substitute word for kill, which means take out the trash. So in drug terms would you use a similar code?

A   I'm sorry?

Q   So if you were to contact somebody and ask about drugs, would you use slang to substitute for drugs?

A   Yes, sir.

Q   For example, heroin, what's another commonly accepted term?

A   Dog food.

Q   What about cocaine?

A   Girl.

Q   So these are all sorts of ways people have have to sort of skirting detection?

A   Yes, sir.

Q   You try to apply that technique here?

A   Yes, sir.

Q   Similarly, when you're doing drug transactions, do you, if possible, try to make repeat contact with the person to confirm their intent, things like that?

A   Yes, sir.

Q   Again, you applied a similar technique here?

A   Yes, sir.

148

Q   While you obviously, as we have acknowledged, don't do a lot of work with solicitation of homicide, solicitation of prostitution, is that more common?

A   Yes, sir.

Q   Do you apply those same techniques as it related to solicitation as you would have developed solicitation of prostitution?

A   Yes, sir.

Q   Mr. Perrone asked you what precautions did you take to make sure no jail deputies interfered with your investigation. Did any jail deputies interfere with your investigation?

A   No, sir. Not recall that I recall, no, sir.

Q   But that's something that you would recall if somebody had interfered, correct?

A   Yes. But I never really made contact like that. So, no.

Q   In your conversation with the Defendant, the long conversation, nobody is interfering there, correct?

A   Correct, sir.

Q   Very good. We see that in the second call he hangs up and walks away, correct?

A   Yes, sir.

149

Q At any point during the first conversation, does the Defendant hang up and walk away?

A During the first conversation?

Q Yes. Not during the first call when you can't get through, but during the second extended conversation you had with the Defendant?

A No, he does not, I believe.

Q Not until you have the conversation?

A Correct.

MR. ROTH: Nothing else. Thank you.

THE COURT: Jurors have questions for Officer Mobley? Thank you, you're set.

THE WITNESS: Thank you, sir.

THE COURT: Next witness?

MR. ROTH: People call Sergeant Kevin Jewell.

THE COURT: Step up here for us, Sergeant, please. Raise your right hand. Do you swear or affirm the testimony you are about to give will be the truth, the whole truth, under penalty of perjury?

THE WITNESS: I do.

THE COURT: Have a seat. State your name, spell your last name for the record, please.

THE WITNESS: Sergeant Kevin Jewell.

150

J-E-W-E-L-L.

THE COURT: Thank you. Mr. Roth?

MR. ROTH: Thank you, Your Honor.

KEVIN JEWELL,

A witness sworn to tell the truth under oath testifies as follows:

BY MR. ROTH:

Q Good afternoon, sir.

A Good afternoon.

Q How are you employed?

A I'm employed with the Ingham County Sheriff's Office, Corrections Division.

Q In what capacity?

A I'm a day-shift supervisor.

Q You are a sergeant?

A Yes, sir.

Q How long have you been with the Sheriff's Department?

A March of 2000.

Q And how long with the jail?

A About 17 years.

Q So the whole time?

A Yes, sir.

Q What are your responsibilities in that position?

151

A I supervise the day shift staff, and the 450 prisoners.

Q And so in that capacity you have some awareness of the inmates housed at the jail?

A I'm sorry?

Q In your capacity in your job, you have some awareness of some of the inmates that were housed at the jail?

A That's correct.

Q The Defendant, Tunc Uraz, was incarcerated in your jail throughout 2016?

A Yes, sir.

Q In October of 2016, were you notified of some unusual and inappropriate conduct by the Defendant in the jail?

A I was.

Q How did that first get brought to your attention?

A Inmate kite system.

Q Could you tell us what that means?

A It's a way for inmates to communicate with the staff and certain areas of the jail, whether it be medical, Community Mental Health, command officer.

Q Is a kite like a note?

152

A It is.

Q So how does an inmate send a kite to the jail?

A They request a kite from the deputies that's assigned to that post. They fill it out. And then they gave it back to the deputy. Then they send it to the destination where it's supposed to go.

Q Is there also an electronic way to do it?

A There is none.

Q Tell me about that.

A Electronic kites, we call it. They basically fill it out the same way. It goes directly to the area that they want the kite to go.

Q So getting back to our specific case, regarding the Defendant, who is the inmate who brought this to your attention by way of kite?

A Allen, Charles Allen.

Q Do you recall when he had received the kite?

A As far as the date? No, I do not.

Q Would the kite itself refresh your memory?

A It would.

Q If you can take a moment and read that silently to yourself. Does this reflect whether you actually received it in your hand?

A Yes, it does.

153

Q When is that?
A On/or about 10-24 of '16.
Q So is that the date that it appears it was authored or that you received it?
A It was written on that date. I probably got it maybe the next day. We don't get kites right away.
Q This is the handwritten kite, correct?
A It is.
Q The digital version that came first, you did not receive, correct?
A No.
Q Did you confirm Mr. Allen was, in fact, an inmate at that time, housed with or near the Defendant, Mr. Uraz?
A Yes. I believe they are both housed in the protective custody unit.
Q Is that Post 5?
A Yes, sir.
Q No phone access there?
A No, sir.
Q We've heard testimony about jail staff ability to listen to the discussions. Without disclosing secrets, is that something you guys can actually hear a specific conversation?

154

A We can hear mumblings. We cannot pick up precise pronunciation of words. We can understand basically what they're talking about, but cannot be totally 100 percent sure of what was said.
Q Very good. So let's say very limited application for you guys; is that correct?
A That's correct.
Q Once you received this kite, first of all, what was the general nature of the allegation that Mr. Allen had brought to you?
A As far as what the — what was on the kite?
Q Yes, please.
A Reference to a murder for hire. He was bringing it to our attention.
Q Involving Mr. Uraz?
A That's correct.
Q What did you do once you received that kite?
A I just learned who was doing the investigation.
Q And alerted them?
A Yeah.
Q Very good.
A I alerted the PA's office. And then sent the kite.
MR. ROTH:  Nothing else, Your Honor. Thank

155

you.
THE COURT:  Mr. Perrone?
CROSS-EXAMINATION
BY MR. PERRONE:
Q When is the first that you become aware of the underlying solicitation murder for hire plot that was going on in your jail?
A It was in the end of 2016.
Q Was it when you got the kite from Charles Allen?
A Yeah. It was before, probably. I believe I got the word from the Magistrate Blumer, if I can recall.
Q What word did you get?
A That he needed to be kept separate.
Q That Uraz did or Close?
A That Uraz needed to be kept separate from Charles Allen, and anyone else in that particular dorm where he was housed.
Q Who specifically did you contact once you got the kite on October 24th from Charles Allen?
A I think I looked up who the lead detective was. I had a digital copy of the kite. I forwarded that in my e-mail to the PA's office. And then the detective came later to pick up the kite in

156

the receiving.
Q Which detective came up to the pick up the --
A I don't recall, sir.
Q Did you speak with anybody about assisting them in the investigation pursuant to the mutual aid agreement?
A No. Standard SOP. Standard operating procedure.
Q Were any of the other deputies informed that this was something that was going on?
A Yes. Some of the receiving staff that was working that day.
Q Would the post staff on 5 — Post 5B have been apprized that somebody was on their post was potentially receiving a phone call?
A They would have.
Q As far as the investigation?
A They would have been instructed to, as to Mr. Uraz's whereabouts, I believe we put him into a temporary house-alone situation, until it would be — it could be determined to the extent of what was taking place.
Q Do you recall when you received the information from Magistrate Blumer to separate?
A I do not have a date. No.

157

Q  Did you do a report?

A  No, sir.

Q  So it would be solely something that would be in your memory?

A  I could search and find the day of his arraignment. Then that would be the day I was —

Q  Were there any other reports that were done by the Ingham County Sheriff?

A  Not to my knowledge.

Q  In regards to this incident?

A  Not to my knowledge.

Q  But individuals were apprized that this was something that was going to happen, there was going to be a call made, they were prepared?

A  That, I don't know.

MR. ROTH:  Mr. Perrone keeps referring to a call.

THE COURT:  It seems like you're jumping around. He is talking about from being separated to the call. That means you have to lay some foundation to get there. Those are two separate and distinct incidents. We don't even know he knows anything about the call yet.

Q  (MR. PERRONE) Did you instruct the deputies

158

that there was going to be a call made?

MR. ROTH:  I'm going to object to lack of foundation. First question is does the sergeant know the call was made.

THE COURT:  Let's give a timeframe. Because you're talking about when he was directed to separate him, which is, you know, we don't know and jump straight to the call.

MR. ROTH:  Thank you, Your Honor.

THE COURT:  I need a little foundation.

Q  (MR. PERRONE) So your deputies were instructed to separate Mr. Uraz from Mr. Close?

A  Yes.

Q  And you don't recall what date?

A  I do not.

Q  And did you, after informing them to separate, provide them with any information regarding the Lansing Police Department investigation into Mr. Uraz?

A  Provide who?

Q  The deputies on post that you were told to separate them? Let me rephrase. Did you provide them any contact on why they were separating?

A  Did I explain why we were separating Uraz

159

with —

Q  Specifically what you told them?

A  Yeah. We would have made mention, this is why we are separating them.

Q  And you're familiar with the Ingham County Jail system, cell location history reports?

A  Yes.

Q  Do you recall what day, specifically, that Reginald close was moved off of cell Block B5?

A  I do not.

Q  Would it refresh your recollection if you were able to look at his cell location report?

A  Yes, sir.

Q  And also, just the date that he's moved to the medical floor, moved from the medical floor. Please take a look at this, if you know those, just to review this.

A  Okay.

Q  After you have had an opportunity to review that, do you?

A  This form doesn't look like anything that I would normally have used.

Q  How about this one? Are you familiar with those?

A  Yep. Are you asking for the date in question?

160

Q  The date that he's moved to medical, and the date he was moved from medical, and the date that he was moved from post B5?

MR. ROTH:  At this point I am going to object. I think it's a foundational issue, what I told Mr. Perrone. There is a deputy from the jail that actually pulled those records, who is scheduled to be here, two witnesses from now. I am going to ask to defer those questions as opposed to do this twice and watch him start reading voluminous records that he didn't pull.

MR. PERRONE:  I am only addressing other individuals with Mr. Close.

THE COURT:  Why don't we approach?

MR. PERRONE:  All right.

(Off the record discussion at the bench.)

Q  (MR. PERRONE) What is your position at the Ingham County Jail?

A  At the present time, when this was happening, I was a claims officer.

Q  What does a claims officer do?

A  They assign bed assignments to all the prisoners that come to the jail.

Q  So you're in charge of bed assignments?

A  Assigning security levels, housing assignments

161

to prisoners.

A   Everybody that comes to the jail, they get assigned a security level based on their current charge and their prior conviction.

Q   It's your job to determine when somebody needs to change posts, if somebody needs to?

A   If somebody wants to change posts they need to come through claims, yes.

Q   What if a deputy wants somebody to change posts, would that go through you also?

A   It does.

Q   So you are fairly aware of the comings and goings where inmates are located within the jail?

A   Yes, sir.

Q   When you were approached by the deputies, did they ask if you could produce any of the recordings?

MR. ROTH:   I guess I am going to object.  I don't know what it means when you are approached by the deputies.  I don't know what it's referring to.

THE COURT:   Right.

Q   (MR. PERRONE)  Was there any efforts on behalf of the Sheriff's Department to try to preserve

162

the videos or recordings from the cells where Mr. Uraz and Mr. Close were located?

A   The only thing that we looked into, the kitos, which we forwarded onto the Detective Bureau for LPD.

Q   The Ingham County Jail does have recording capabilities, limited in scope?

A   On the phones?  Yes.

Q   Does the medical unit have video?

A   Video?  Yes.

Q   Was that something that has been looked into?

A   The video?

Q   Yes.

A   Um-hum.

Q   Video of medical post while Mr. Uraz and Mr. Close are on the video post together?

A   It's usually checked every 15 minutes.

Q   Is it reserved?

A   Up to 30 days, I think.  And then that recycles.

Q   Did you receive any type of a request to preserve any video from the medical unit?

A   From the medical unit?  No.

Q   Why is there a video on the medical unit?

A   We had a video in that unit because it's above

163

our receiving area.  So we just keep an eye on it as to what's going on in the system.  Most of our cells in receiving have video surveillance.

Q   Were any of the inmates on – was either Close, Allen, Pierce or Mr. Uraz on the medical floor for medical reasons?

A   I do not believe so.

Q   Is there an administrative segregation of sorts for classification levels?

A   We have an admin segregation, yes.  It does not matter what level you are, though.

Q   Where are inmates usually put if they are put in the administrative segregation?

A   Behavior modification, cell isolation.

Q   And where is that located?

A   In our receiving section.

Q   Is that where Mr. Uraz was at?

A   He was never on administrative segregation.

Q   Is there a separate floor where inmates are put, when they are put on phone restriction?

A   Put forth what, sir?

Q   To prevent them for making phone calls.  Why were the individuals on the medical post for making phone calls?

164

A   I'm sorry.  You're going to have to repeat question again.

Q   Why were Mr. Pierce, Mr. Uraz, Mr. Close, Mr. Allen on the medical post for phone restriction?  Is that a normal course for the Ingham County Jail?

A   If there is no phone that works within that particular dorm, then, yes.

Q   Is that where all individuals for phone restriction go?

A   No.  Because we have control over the posts, and we don't differentiate posts in the jail.

Q   Does the jail have some overcrowding issues recently?

A   Just recently.  Yeah.

Q   Was the medical unit used as an overflow?

A   We use every cell that was available to us for prisoners.

Q   None of the individuals on the medical post were at the highest level of classification associated with discipline?  They weren't in the administrative segregation?

A   As of the prisoners that are there currently today?

Q   If you can just kind of explain the sequence of

165

classification, and how inmates are classified.

A They are classified based on their current charge and their prior criminal conviction, and are given a security number level one through nine based on assaultive felony convictions or current assault charges. That would be a high security prisoner.

Q In classification level, if you reach -- what's the highest level with most restrictions?

A Level one.

Q Do you recall what level that any of the inmates were, that were placed on the medical post?

A I believe they were all lower security levels.

Q The classifications are disciplinary in nature, the reason, the basis for those policies are disciplinary in nature; is that true?

A You said the classification is disciplinary in nature?

Q Yes. There are disciplinary classifications. People are classified higher as a result of the disciplinary issues and privileges get taken away?

A Yes. They can be. Yes.

Q There's also a mechanism by which prisoners are

166

restored their rights?

A That's correct. Over time.

Q How long?

MR. ROTH: Your Honor, I'm going to object to relevance.

THE COURT: I will sustain that. I don't see the relevance.

MR. PERRONE: If we can approach?

THE COURT: You can, but I don't see the relevance.

(Off the record discussion at the bench.)

THE COURT: I will sustain the objection.

Q (MR. PERRONE) How many hours a day are inmates on the medical post allowed outside of the medical post?

A Your question was how many hours a day are inmates allowed outside the medical post?

Q I will rephrase. How many hours a day are inmates on lock-down in medical?

A They are not on lock-down.

Q There has been testimony from the prisoners that it was 23 hours, that they were held for 23 hours.

A In the medical ward?

Q Yes.

167

A That's a dorm in and of itself. There is a phone, there is a shower, there is a television, and there is 30 percent sunlight in that cell. They are not on lock-down.

Q Are they allowed to leave the medical unit for an hour a day?

A Nope.

Q They are not allowed to leave the medical unit at all?

A It's considered a dorm.

Q So are they moved at all within the medical unit?

A No.

Q So they sit in the same place for 24 hours a day?

A They sit in their dorm. Medical ward is not a post, per se. There is no cells. It's an open squad bay, if you will, assignment.

Q Used as a fill-in kind of?

A Originally when they built the jail back in the 60s it was designed for universal precaution of inmates.

MR. PERRONE: No further questions.

THE COURT: Any redirect?

MR. ROTH: Thank you, Your Honor.

168

REDIRECT EXAMINATION

BY MR. ROTH:

Q Mr. Perrone asked about video that is checked visually every 15 minutes in medical?

A Yes, sir.

Q Fair to say there are some video recording capabilities throughout the jail; is that correct?

A That's correct.

Q But they do not have audio accompanied them with the recording, correct?

A That's correct.

Q Now, there is some ability to listen in a little bit with audio, but you testified that the quality so far, that it's not helpful?

A That's correct?

MR. ROTH: I have nothing else. Thank you.

THE COURT: Jurors have any questions for sergeant Jewell? Thank you, sir. Appreciate you coming in.

Okay. We have reached the end of our time for today. We are going to recess for today. We will come back tomorrow at 9:15.

Remember, tomorrow we only go to 1:30. So we won't have a lunch like we did today. We

169

will have two breaks. We won't meet on Wednesday. That's motion Day. Thursday will be like today. Friday, Veteran's Day. We won't be meeting on Friday. A short week for you.

So a reminder not to discuss the case with anyone, family or friends, look at news reports, video, radio broadcasts. Once again, thank you for you taking time out of your lives to assist us.

(Jury exits courtroom at 3:22 p.m.)

THE COURT: We will be in recess until tomorrow 8:30.

MR. ROTH: Your Honor, brief housekeeping issue?

THE COURT: All right.

MR. ROTH: I will anticipate resting tomorrow. It's my understanding Mr. Perrone is not asking that anybody be produced. That we will, then, upon resting, go into the Defense proofs. He has three MDOC inmates ready to appear and potentially the Defendant.

THE COURT: Okay.

MR. PERRONE: I think that tomorrow we are going to be kind of tight.

THE COURT: All right.

170

MR. PERRONE: So any writs were not sent out on MDOC inmates. It'll frankly be tight getting their testimony in tomorrow, given the additional testimony that's going to be required on behalf of the Prosecution's side. I don't anticipate we are going to get any jail witnesses tomorrow. My office put in the writs for Thursday. I haven't determined that I might use them. I might close tomorrow. If the State rests his case, I may just close tomorrow also.

THE COURT: What are you asking me? I guess you want to bring one over, or how long do you think your witness —

MR. PERRONE: It's going to take too long to bring any of them over.

THE COURT: That's the Corrections issue. How long do you estimate it will be tomorrow? How much time will you utilize?

MR. ROTH: I think we can rest before noon.

THE COURT: That gives us like an hour and a half.

MR. ROTH: Even if the inmates are called, they are not long inmates. So I'm ready to proceed with them tomorrow or to close tomorrow.

THE COURT: Did you subpoena them for

171

tomorrow?

MR. PERRONE: There is going to be — the writ got sent out for Thursday. Didn't get sent out for Tuesday.

MR. ROTH: They are not sent out for Thursday. You're going to send it out Thursday.

MR. PERRONE: They have been dropped off to your judicial staff. The writs have been dropped off for Thursday.

THE COURT: I guess I'm confused.

MR. ROTH: I am as well, Your Honor. There is no writ officially outstanding at this time. They aren't going to be here tomorrow?

MR. PERRONE: They are not going to be here tomorrow.

MR. ROTH: My question is if Mr. Perrone talks about closing tomorrow, I guess I don't know what the issues are, we are calling MDOC inmates or not calling them.

MR. PERRONE: They are not going to be called, not going to be heard. I would like John Pierce's involvement tomorrow at this stage.

MR. ROTH: You're talking about closing tomorrow?

172

MR. PERRONE: Potentially.

MR. ROTH: You can't call witnesses after you close.

MR. PERRONE: Again, it's a determination that I will make, depending upon the timing of tomorrow.

MR. ROTH: Okay.

MR. PERRONE: How the proofs come in.

THE COURT: All right. Okay. I wouldn't close over an hour and a half on Tuesday. I would wait for Thursday on closing anyways. It's sort of a complex case. I wouldn't force everybody to close, go right to closing arguments. So closing arguments will be on Thursday, no matter what. And then we will see how it works out with his witnesses. All right?

MR. ROTH: Thank you, Your Honor.

MR. PERRONE: I would just like to further, in discussion associated with this case, for the record. I'm just wondering if the People are going to produce Charles Allen.

MR. ROTH: Yes.

MR. PERRONE: Tomorrow?

MR. ROTH: Yes.

MR. PERRONE: For housekeeping, I don't

173

think we are able to get federal approval for ATF Steve Bailey. I would like Lietenant Backus to be produced tomorrow.

MR. ROTH:   I can set a meeting up.

MR. PERRONE:   That will be good.

THE COURT:   So are you going to produce Backus as part of your case or have him available for Mr. Perrone?

MR. ROTH:   I'll make him available for Mr. Perrone.

THE COURT:   All right. Anything else?

MR. ROTH:   No, Your Honor. Thank you.

THE COURT:   In recess.

(Proceedings concluded at 3:27 p.m.)

STATE OF MICHIGAN   )

174

COUNTY OF INGHAM   )

I, TERESA J. ABRAHAM, Certified Shorthand Reporter in and for the County of Ingham, State of Michigan, Thirtieth Judicial Circuit Court, do hereby certify that the facts stated in the foregoing pages are true and correct, and comprise a complete, true and correct transcript of the proceedings taken in this matter on this the 5th day of August, 2016.

_____
Teresa J. Abraham, CSR-3445

Date:  May 23, 2018