1

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

                    Plaintiff,

vs.                          CASE NO:   16-1064-FH
                                        16-1065-FH

TUNC URAZ,

                    Defendant.
_____/

   HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
   LANSING, MICHIGAN -- MONDAY, NOVEMBER 6, 2017

             CRIMINAL JURY TRIAL

APPEARANCES:

FOR THE PEOPLE:

WILLIAM O. CRINO, JD
CHAZ T. KOOP, JD
Assistant Prosecuting Attorney
Prosecuting Attorney's Office
313 W. Kalamazoo
Grady Porter Building
Lansing, Michigan 48933


FOR THE DEFENDANT:

JACOB PERRONE, JD
Perrone Law, PC
221 W. Lake Lansing Road, Ste. 200
East Lansing, MI 48823

ERIC SCHROEDER, JD
BODWIN & ASSOCIATES PC
2970 E. Lake Lansing Rd.
East Lansing, MI 48823-7415


Reported by:  Teresa J. Abraham, CSR-3445
Phone:  (517)483-6404   e-Mail: tjabraham@msn.com

I  N  D  E  X

WITNESSES:

REGINALD CLOSE
Cross-Examination by Mr. Perrone            4
Redirect Examination by Mr. Koop         75/85
Recross-Examination by Mr. Perrone         87

PATRICK BURNETT
Direct Examination by Mr. Roth             89
Cross-Examination by Mr. Perrone          100
Redirect Examination by Mr. Roth          102

ANDREW HOGAN
Direct Examination by Mr. Roth            104
Cross-Examination by Mr. Perrone          111
Redirect Examination by Mr. Roth          114

FRANK MOBLEY
Direct Examination by Mr. Roth            116
Cross-Examination by Mr. Perrone          129
Redirect Examination by Mr. Roth          146

KEVIN JEWELL
Direct Examination by Mr. Roth            150
Cross-Examination by Mr. Perrone          155
Redirect Examination by Mr. Roth          168

EXHIBITS:

| Exhibit # | Description | Received |
|---|---|---|
| PX-#42 | Close Express acct | 108 |
| PX-#43 | Atamer deposit | 110 |
| PX-#44 | 10/24/16 Securus call | 126 |
| PX-#45 | 10/24/16 Securus call | 126 |
| PX-#46 | 10/27/16 Securus call | 129 |
| PX-#C | stipulated order | 9 |
| PX-#D | proffer letter | 11 |
| PX-#E | note to Pierce | 37 |

**1**

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff,

vs.      CASE NO: 16-1064-FH
                   16-1065-FH

TUNC URAZ,

      Defendant.
_____/

HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
LANSING, MICHIGAN -- MONDAY, NOVEMBER 6, 2017

CRIMINAL JURY TRIAL

APPEARANCES:

FOR THE PEOPLE:

WILLIAM O. CRINO, JD
CHAZ T. KOOP, JD
Assistant Prosecuting Attorney
Prosecuting Attorney's Office
313 W. Kalamazoo
Grady Porter Building
Lansing, Michigan 48933

FOR THE DEFENDANT:

JACOB PERRONE, JD
Perrone Law, PC
221 W. Lake Lansing Road, Ste. 200
East Lansing, MI 48823

ERIC SCHROEDER, JD
BODWIN & ASSOCIATES PC
2970 E. Lake Lansing Rd.
East Lansing, MI 48823-7415

Reported by: Teresa J. Abraham, CSR-3445
Phone: (517)483-6404  e-Mail: tjabraham@msn.com

**2**

### INDEX

WITNESSES:

REGINALD CLOSE
Cross-Examination by Mr. Perrone 4
Redirect Examination by Mr. Koop 75/85
Recross-Examination by Mr. Perrone 87

PATRICK BURNETT
Direct Examination by Mr. Roth 89
Cross-Examination by Mr. Perrone 100
Redirect Examination by Mr. Roth 102

ANDREW HOGAN
Direct Examination by Mr. Roth 104
Cross-Examination by Mr. Perrone 111
Redirect Examination by Mr. Roth 114

FRANK MOBLEY
Direct Examination by Mr. Roth 116
Cross-Examination by Mr. Perrone 129
Redirect Examination by Mr. Roth 146

KEVIN JEWELL
Direct Examination by Mr. Roth 150
Cross-Examination by Mr. Perrone 155
Redirect Examination by Mr. Roth 168

EXHIBITS:

| Exhibit # | Description | Received |
| --- | --- | --- |
| PX-#42 | Close Express acct | 108 |
| PX-#43 | Atamer deposit | 110 |
| PX-#44 | 10/24/16 Securus call | 126 |
| PX-#45 | 10/24/16 Securus call | 126 |
| PX-#46 | 10/27/16 Securus call | 129 |
| PX-#C | stipulated order | 9 |
| PX-#D | proffer letter | 11 |
| PX-#E | note to Pierce | 37 |

**3**

Lansing, Michigan
November 6, 2017
at about 8:42 a.m.

    ********

THE COURT: Resuming on the matter of People versus Tunc Uraz, 16-1065 and 1064. We have Mr. Roth here. Mr. Perrone. You are Tunc Uraz, sir?

THE DEFENDANT: Tunc Uraz, yes, sir.

THE COURT: Ready to proceed? Preliminary matters?

MR. ROTH: Nothing, Your Honor. Thank you.

THE COURT: Ready to go?

MR. PERRONE: Yes, Your Honor.

THE COURT: Ready for the jury? Still Mr. Close, continue with Mr. Close?

MR. ROTH: Yes, Your Honor. I think they just need a minute to get the cuffs on him.

THE COURT: Hold on just a minute. I would rather have him seated already when they come in.

Resume the stand for us, Mr. Close. Remain standing until the jury comes in, please.

(Jury present in courtroom at 8:46 a.m.)

THE COURT: Be seated. You remain under

**4**

oath from last week Mr. Close?

THE WITNESS: Yes, sir.

THE COURT: Cross-examination by Mr. Perrone.

MR. PERRONE: Thank you, Your Honor.

REGINALD CLOSE,

A witness previously duly sworn under oath testifies as follows:

CROSS-EXAMINATION

BY MR. PERRONE:

Q  Prior to your incarceration in the Ingham County Jail, in July of 2016, had you previously been incarcerated in the Michigan Department of Corrections?

A  Yes.

Q  For how long?

MR. ROTH: Objection. Relevance.

THE COURT: As to what, his previous incarceration?

MR. ROTH: Yes.

THE COURT: I guess you can ask him when he got out. I don't know how long. You can ask him when he got out of the Corrections. I will sustain it in part, overrule in part.

Q  (MR. PERRONE) When did you get out of the

**5**

Q Department of Corrections prior to your incarceration?
A March 2013, I think he said.
Q And at the time that you were incarcerated in the Ingham County Jail in October 2016, were you on parole?
A Yes.
Q What were you on trial for?
MR. ROTH:   Your Honor, may we approach?
THE COURT:   All right.
(Off the record discussion at the bench.)
THE COURT:   I'll sustain the objection.
Q   (MR. PERRONE) When were you initially incarcerated in the Ingham County Jail?
MR. ROTH:   I object. You don't want initially. You want 2016.
Q   (MR. PERRONE) When were you initially incarcerated at the Ingham County Jail?
A June 2016.
Q When did you first come into contact with the Defendant in this case?
A October 2016.
Q If I followed you, October 7, when you first came in contact with him on the medical post?
A That's a possibility.

**6**

Q You were alone on the medical post with Tony?
A Eventually. After one night, yes.
Q You guys had numerous discussions amongst yourselves?
A Yeah.
Q You talked about cases?
A Yes.
Q Did you talk about your cases with other inmates?
A Did we talk about our case?
Q Did you talk about your case with other inmates?
A Yes.
Q Did you talk about other inmate cases?
MR. ROTH:   I'll object to the compound question.
THE COURT:   Let's just stick with one at a time. He is answering. He did have conversations about his case with other residents of the jail. So I'll sustain that portion. Mr. Perrone?
Q (BY MR. PERRONE) Did you talk with other inmates about their cases?
A Yes, I had conversations with other inmates about their cases. Yes.

**7**

Q Did you talk to John Pierce about his case?
A Somewhat, yes.
Q Did you write notes between yourself and John Pierce?
A Yes.
Q Did you speak with Chris Schinberger about his case?
A I believe so. Yes.
Q Is this the information you received on John Pierce's case, but shared it with the Ingham County Prosecutor's office?
A I shared it with my lawyer.
Q Did you also indicate to your lawyer that you had information related to homicide that occurred in 2011?
A Yes.
Q And this is information that you intended to convey to the Prosecutor?
A I conveyed it to my lawyer. I never intended to convey it to the Prosecutor.
Q So you conveyed all the information regarding Chris Schinberger, John Pierce, the 2011 homicide, to Mr. Uraz and your attorney?
A Yes.
Q You didn't anticipate he was going to convey to

**8**

Q the Prosecutor?
A I didn't know who he was going to convey it to at the time, no.
Q It wasn't your intention to get a benefit on your case?
A No. I went to trial. I was found not guilty on my case.
Q Did you initially have a trial set for October 31st, 2016?
A I'm not sure if I had a date set for October. I had probably pretrial leading up to a trial at that time.
MR. PERRONE:   Defendant's Proposed Exhibit K. May I approach the witness?
THE COURT:   All right.
MR. ROTH:   Your Honor, may I approach?
THE COURT:   You may.
(Off the record discussion at the bench.)
THE COURT:   I'll overrule that objection.
Q (MR. PERRONE) You can take a look at that quickly. Is that something that you discussed with your attorney?
A I probably — I received a few letters. Every time it was adjourned, it was never a discussion why it was adjourned to me.

9

Q   But you had received a stipulated order from your attorney showing it was adjourned?
A   I don't think I received this stipulated order. But I had received court dates when my hearing was adjourned. But not this one particularly.
Q   Did he make you aware of why it was being adjourned?
A   No.
        MR. PERRONE:   Move for admission.
        MR. ROTH:   Without objection, Your Honor.
        THE COURT:   All right. We will admit Defendant's Exhibit D.
        Mr. Roth:   Is that C?
        THE COURT:   D, wasn't it?  C or D, the exhibit?
        MR. PERRONE:   I believe it's C.
        MR. ROTH:   I thought it was C.
        MR. PERRONE:   It was C, because I skipped over one.
        MR. ROTH:   There should be an A and a C for the Defense.
        THE COURT:   This is C or D?
        MR. ROTH:   C, Your Honor.
        THE COURT:   All right. Thank you.
        (PX-#C is received into evidence.)

10

Q   (MR. PERRONE) But you do acknowledge that the time that was scheduled for October 21st, 2016, was adjourned?
A   Yes.
Q   You did not get any type of deal as a result of the information you conveyed to the Prosecutor?
A   No.
Q   When did you initially meet with your attorney after you got this information from Mr. Uraz?
A   Within a couple weeks, I believe.
Q   How long after you were put on the post, on September 27, did Mr. Uraz start to approach you to kill Erika Melke?
A   No more than 48 hours.
Q   So it would have been by September 29?
A   Yes. If it was placed on the 27th, it would have been the 29th.
Q   You can't recall the exact date you would have met with your attorney?
A   No, I can't.
Q   Would you have met with your attorney next court appearance?
A   No. I believe he came out to the County jail.
Q   Is that why you were still on medical?
A   I believe so.

11

Q   Did you request that he come there?
A   No. I just sent him the information and he came. He had been coming bi-weekly, or once, twice a month, leading to trial anyway.
Q   Defendant's Proposed Exhibit B —
        MR. ROTH:   Your Honor, we will stipulate to admit Proposed Exhibit D.
        (PX-#D is received into evidence.)
        THE COURT:   All right. For the record, what is Exhibit D, Mr. Perrone?
        MR. PERRONE:   Exhibit D is a proffer letter regarding Mr. Close.
        THE COURT:   All right. We will admit Exhibit D.
        MR. ROTH:   Yes, Your Honor.
        (DX-#D is received into evidence.)
Q   (MR. PERRONE) If you would like to take a look at this? What date was that letter written? What date did you sign it?
        MR ROTH:   Objection. Compound question. If he shoots out one date, it's not clear what he responded to.
        THE COURT:   He can answer the date — it is written, and he can answer the date of the proffer.

12

        MR. ROTH:   Yes.
        THE WITNESS:   It was written 11th of August 2016, signed on the 24th of August 2016.
Q   (MR. PERRONE) When did you eventually meet with the Prosecutor?
A   About this proffer letter?
Q   Yes.
        MR. ROTH:   I guess I'm going to object to the characterization. He never meets with the Prosecutor. He meets with the police.
Q   (MR. PERRONE) When did you meet with the police with regard to the proffer letter?
A   I don't remember the exact date I met with this proffer letter.
Q   If you were able to review the police report, would that refresh your recollection of the potential meeting?
A   Yes.
        THE COURT:   Well, why don't we approach for just a moment?
        (Off the record discussion at the bench.)
        THE COURT:   Members of the jury, the parties are stipulating this particular proffered letter is not related to Mr. Uraz's case.
        MR. ROTH:   I think, part and parcel,

13

stipulating to no proffer letter as it relates to Mr. Uraz, the Defendant.

THE COURT: That's fair. Date of this involving other matters has nothing as to Mr. Uraz; is that accurate, Mr. Perrone?

MR. PERRONE: Yes.

MR. ROTH: Nothing as related to this date as to the proffer letter.

THE COURT: We are not talking about a later date. This particular document has nothing involving Mr. Uraz, and this involves another case?

MR. ROTH: Correct.

THE COURT: Mr. Perrone?

Q (MR. PERRONE) If I may approach? Take a look at this. Look down on it. Read it. Do you recall the date that you had met with the dentist in regards to the proffer letter?

A I didn't just look at the date. I just read that. I'm sorry. I didn't know you were looking for a date on that.

Q What was the date?

A August 24th, 2016.

Q Did they discuss with you the potential of taking a polygraph test to verify your

14

statement?

A Yes.

Q Did you offer to take a polygraph test?

A I agreed — I didn't offer. I agreed that I would.

Q Was your understanding of what you're getting out of this nothing? You're just doing the right thing?

MR. ROTH: I object to the vague nature of the question. When he says "this," talking about today, the proffer was in August 2016. We need specificity.

Q (MR. PERRONE) The proffer interview.

A The proffer interview? They exactly told me they couldn't offer me anything.

Q Who wrote in the proffer admitted by John Pierce?

A I have no -- I don't know.

Q You have no idea who wrote it in?

A No.

Q Did John Pierce come up during the proffer of the interview?

A John Pierce had divulged information that I had conveyed to my lawyer. I would think that that's why that would be on there.

15

Q Did you convey that information to your attorney after you conveyed the information of the 2011 homicide in Chris Schinberger?

A I don't know if it was in the exact same time. I don't know if it was in the exact same letter.

Q In regards to the letter that you had exchanged between yourself and Mr. Uraz with the map, this is an extension of the discussions that you had with him within that first 48 hours, correct?

A Yes.

Q When do you start writing about it?

A It was the beginning of the conversation.

Q This was the beginning of the conversation?

A Yes.

Q When he first starts talking about it?

A Not when he first, like initially said anything, but around the beginning of the conversation, yes.

Q It was your testimony that you told him you knew somebody from Detroit that owed you a favor?

A I don't think I specifically put it in the words about owe me a favor.

16

Q When you testified before this Court, did you say that Mr. Uraz indicated to you that he wanted it to look like a robbery?

A I don't think I testified -- I don't believe so. I don't believe I said he wanted to make it look like a robbery.

Q You indicated that the handwriting on this starts with your handwriting?

A Yes.

Q And you indicate to him that I don't think it would look better as a robbery?

A Yes.

Q That's a follow-up on him telling you he just wants her killed?

A No. That was a follow-up from when we were talking. And it like -- I guess the conversation escalated. I thought maybe we should write, because it was known all around the jail you could be recorded or whatever. I indicated to him that we start writing back and forth rather than just saying it out loud.

Q You thought it was maybe somebody within the jail trying to set you up?

A Yes.

Q Were you playing into that?

17

A  No. It's just surprising immediately after two days he started talking about that. I got to thinking, was this guy putting in a recorder, setting me up. I didn't know what was going on at first.

Q  So you played along with it?

A  Not played along. I went along with it to see where it was going.

Q  And you followed up with I could have him carjacked or beat her as with a gun and shoot her a few times?

A  Yes.

Q  He says, okay, where would he leave her?

A  Not 100 percent sure. But I am sure he knows what he's doing. He would kill her and leave her in her car.

Q  Okay. Good. You tell him he has to draw you a map?

A  Um-hum.

Q  Why did you tell him that?

A  Because he started to talk about where she is, how to get there. I wouldn't know how to tell somebody from Detroit how to get there. I would have to see a map to see what you're talking about.

18

Q  In regards to the sheet on the bottom of this?

A  Uh-huh.

Q  That's your handwriting?

A  Yes.

Q  And is that from a different piece of paper?

A  That was just from — they have like kite paper in the County Jail. I tore that from a piece of kite paper from some information he was giving me about some guys that I guess she had a relationship with.

Q  Did he have any other police reports on him?

A  Excuse me?

Q  Did he have any other police reports on him from his case?

A  Did he have any other police reports?

Q  Yeah.

A  Not that I know of.

Q  When did you first come into contact with Charles Allen?

A  In the medical at that time. Same place.

Q  But he is not in the same unit as you and Mr. Uraz?

A  They put us all in the same room for the night, which was next door to Charles Allen.

Q  You didn't have any affiliation with Charles

19

Allen prior to going into the medical dorm?

A  No.

Q  We will go to People's Exhibit 40. This is the sequential letter. So after you ask him to draw you a map, he responds:

Wait for me to get out and sentenced, because they may try to keep me here if something happens to her?

A  Yes.

Q  Does it appear to you that he was attempting to backtrack from any intent that he had to follow through?

A  No. He still had intent. He wanted to wait for it to happen. He still had the intent.

Q  And you followed up with:

You are already in jail. It would look bad if it happens when you are out. You would be a number one suspect?

A  Yes.

Q  Are you trying to emphasize to do this while in jail?

A  I guess you could say that.

Q  Why?

A  I don't have an answer as to why.

Q  Is that where the conversation ends?

20

A  No. That's not where the conversation ends.

Q  Were there additional conversations that you had with him following up on this negotiating?

A  After that, they moved us to a post. There was a couple weeks worth of us just talking that didn't get wrote down. After I sent that to my letter, I didn't want to, I didn't know how — like what is — what my lawyer was going to do about it or anything. It was us on a post, him talking about it every day, him trying to give me money at the time. It was more conversation than just that wrote down. That's just what was wrote down.

Q  And at the same point in time that you are having conversations with him every day, you're having conversations with Charles Allen about his case?

A  No. Charles Allen was in jail on a probation violation at the time.

Q  Why were you on a medical post?

A  It was for — we were supposed to be on basically a protective custody post where people couldn't use the phone. So maybe it is five of us who couldn't use the phone in the County Jail. It was like the Judge's order

21

that they couldn't -- that we couldn't use the phone. That's the only place they had to house us at the time, while the jail being full.

Q  Do you recall being moved from the medical?

A  I don't recall the day.

Q  Do you recall about how long you were in medical before being moved?

A  Two and a half weeks, maybe.

Q  Where do you move to after you leave medical?

A  Like a Post 2, I believe. Post 4. One of those.

Q  On the same post as Tunc Uraz?

A  Yes.

Q  After you leave medical?

A  Yes.

Q  How long were you on the post after you were moved from medical?

A  A few weeks, maybe.

Q  How far from Mr. Uraz were you while on the dorm?

A  Two or three dorms, maybe.

Q  Do you have any access to him in the day rooms?

A  Yes. We were out through the day.

Q  How many people in the day rooms?

A  It is four people in there.

22

Q  Who were the four people in the day room?

A  Me, Country, Tunc, Charles Allen and another guy, Muhammed, I believe, is his last name.

Q  And you testified that you were acquitted?

A  I went to trial, yes.

Q  You had a pretty good sense that you were going to be acquitted at trial?

A  No. I had a pretty serious charge. I didn't have a good sense that I would be acquitted. I had a jury trial and was found not guilty.

Q  Given the situation that you were in, all of these different issues that you conveyed to your attorney, you didn't anticipate you were going to try to use those as leverage for your case?

A  No. I was told from day one that I wouldn't get any deal, that no deal could be offered. So, no.

Q  And that's what you were told August 27th, 2017?

A  I was told the first time I got in touch with my attorney, my attorney conveyed to me, even with the proffer, no deal could be offered. It's no time coming off. It was one time I was brought a plea bargain which I turned down.

23

But it wasn't for the proffer.

Q  Did you talk with Charles Allen about Mr. Uraz's case?

A  No. Mr. Uraz was pretty open for what he was in there initially for. He told maybe all four of us who were on the same post what he was in for. But not about -- I didn't talk to Charles Allen about him, what he talked to me about, no.

Q  You read a number of notes between yourself and John Pierce. Do you recall the period of time, would that have been subsequent to or prior to you going to the police on Mr. Uraz, or your attorney going?

A  It was prior.

Q  Were you trying to help John Pierce with his case?

A  No, I wasn't trying -- I wouldn't say -- no. I wouldn't say I was trying to help Mr. Pierce with his case, no.

Q  Were you giving him tips on the system?

A  No. Mr. Pierce had asked me, had I ever been in prison before, as far as that. But not tips, no. I'm not a lawyer. I'm not a jailhouse lawyer or anything.

24

Q  Did you spend any time while in the law library while incarcerated?

A  Yeah. I looked a few things up as far as my case. Yes.

Q  You don't consider yourself a jailhouse lawyer helping people out with their cases?

A  No.

Q  How did you get all this information from these people?

A  I guess just talking.

Q  You're personable?

A  Pretty much.

MR. ROTH:  That hasn't been admitted. If you want, we can admit it. But it won't be appropriate to put it on the screen until it is.

Q  (BY MR. PERRONE) If you can review this quickly as to the date to refresh your recollection as to when the money was put in the account?

A  Um-hum.

Q  So when Mr. Uraz initially approaches you, he tells you he is going to pay you?

A  Yes.

Q  That would have been around September 27th?

A  Yeah. It had to be, yes, when we were on medical. Yes.

25

Q  After reviewing this, do you recall when you received a deposit?

A  I didn't see the date for the deposit on there. I don't see where it says deposit date on it.

Q  Again?

A  No. I see the beginning date, ending date. I don't ask where it says deposit date, though. Would this be it here? No. That would be a commissary. That's not a deposit date. That's the date.

Q  It's the date? All right.

A  It's a commissary date. That would be to go to the store. That wouldn't be the date they deposited.

Q  That's when it was available to you?

A  It's available as soon as they put it in there. I wouldn't say that's the date that it was deposited. As soon as it's put on there. Five minutes. It's a cash machine. Whenever it's put in there, it's available. That doesn't necessarily mean it's a deposit date when it shows on there. That's when I went to the store.

Q  You didn't deposit it while you were in medical?

26

A  No.

Q  You didn't initially deposit while you were on the post from medical?

A  We went to the other post. It was more like pressing. We were having conversations about it more on a daily basis. And he was really, I guess, wanted to show me that he could have the money. He was like: I can have some of the money brought to you now. When you get a confirmation that is done, I can give you the rest. But by this time I had already been in touch with my lawyer. He had already put the money on there. I told the detectives the day that he had put the money on there, so...

Q  He had continually told you and repeated to you that he was going to put this money on your account just to assure you?

A  After we were moved, yes. He was adamant about giving me some money and getting it done.

Q  You didn't have a request to -- from him to put any money on the commissary?

A  No. It wasn't a request, as far as putting money on the commissary that was an idea he came up with. He told me his roommate was coming to bring money up, and he would drop me

27

off money, too.

Q  You had been incarcerated since July of 2016?

A  June.

Q  June of 2016?

A  Yes.

Q  Had anybody else put any money on your commissary?

A  Not at that time. No.

Q  Did you request an indigent path for resource?

A  While I was in the hole? Yes.

Q  Mr. Uraz was the only one who put money on your account?

A  No. All of my family lives in Detroit. I had actually received — you get a care package. Someone can order up on the phone, which doesn't show up on the commissary. I did receive care packages from my family.

Q  Are you able to receive indigent tips?

A  Yes. They don't go by the account, they go by the records put on your account.

Q  How many were put on your account?

MR. ROTH:  Objection. Relevance.

THE COURT:  What is the relevance?

MR. PERRONE:  I'll phrase it differently.

THE COURT:  I'll allow limited questioning

28

to that area.

Q  (MR. PERRONE) Did Mr. Uraz spread money around to other inmates that you saw?

A  No.

Q  So you didn't see him give money to any other inmates in an attempt to help him?

A  No. When we were around each other, only four of us around, me and him in the room, I never seen him spread anything around to anybody.

Q  At this point in time, as far as the — as far as the money is concerned, there isn't anything that you do to tell him to put that money on the account?

A  No.

Q  Do you still think you're potentially the target of an investigation?

A  After I get in touch with my attorney? Yes. Not at that time. But I was informed that I would be talking to the detectives after the fact. So, no. After that, I didn't believe I was the target of the investigation after that.

Q  Did you think that you were assisting in an investigation?

A  I believe that I was helping out with it after I gave the information that I gave. Yes.

Q  You were helping out after you gave the information?

A  While giving the information, yes.

Q  Did you try to dissuade him to put $160 on your account at any time?

A  No, I didn't.

Q  And it is your understanding that this was a down payment on a hit?

A  Yes.

Q  At this point in time, you didn't have any fear that potentially the $160 would look bad, you would be implicated in it because you had spoken with your attorney?

A  No. I actually told the detectives the day that it happened that he had put money on my account. I think they probably came and seen me within maybe that week of him putting money on my account. I had actually thought at the time the money would be frozen or they would take it, which didn't transpire. But that's what I thought was going to happen.

Q  You testified previously that Mr. Uraz was very clear that he wanted it done prior to November 2nd?

A  He wanted it done before his sentencing date, I

believe.

Q  When did he indicate that to you?

A  Just every day he would watch the news. I would — we would be talking. I would tell him I got in touch with somebody from Detroit. Maybe it is going to happen. He would want to watch the news at night to see if they found somebody dead, or if something had happened to her, or just in general with anything to her. Like I told him, I had passed the information onto the person that I was supposed to pass it onto.

Q  So he wanted it done, prior to sentencing after he told you he didn't want it done, prior to sentencing?

A  He wanted it done prior to sentencing, yes. After he wrote the letter and said he didn't want it done, until he got out, he said he wanted it done before sentencing.

Q  So he took your advice?

A  It was more of his, I guess if you want to put it that way. I believe so, yeah.

Q  Was there any clear plan as to how it was going to happen?

A  Yes.

Q  What was the plan?

A  Mr. Uraz told me it was big garbage cans in the parking lot which he didn't put on -- that he didn't put on the map or wherever. It was big garbage cans. Mrs. Melke usually pulls in the second row of cars. If somebody is behind the garbage cans, they could ambush her, shoot her. She said she had an iPhone. Take her phone, looks like it was a robbery and stuff. So...

Q  He said make it look like a robbery?

A  Yes.

Q  Did he say that prior to what you wrote down telling him whether he wanted to?

A  It was after the fact. We were moved off of medical onto the other post. He started just thinking that she carried, as far as --

Q  Were you still discussing these issues with him after speaking to the Prosecutor?

A  Yes.

MR. ROTH:  I object. Never been any testimony speaking to the Prosecutor's office. He spoke to the police. Mr. Perrone uses these terms interchangeably. Police and prosecutors are very different entities.

THE COURT:  I would ask the jury to strike

that comment. Nothing about the interaction with the Prosecutor's office.

Q  (MR. PERRONE) So after you speak with the Lansing Police Department —

A  Yeah.

Q  — you're put back on post with Mr. Uraz?

A  Yes.

Q  You're continuing to talk to him?

A  Yes.

Q  About this plot?

A  Yes.

Q  Is there anything followed up on as far as specificity, as far as someone hiding behind the garbage can?

A  Mr. Uraz was telling me, as far as he didn't know if the code or whatever had still worked, with something, an iCloud or something with her phone, That he had told me that he had hacked into or got ahold of, so he would know where she was at. And I can relay the information to the person that I knew, just things of that nature. It was ongoing discussions just like the day before.

Q  At this point in time, Charles Allen also gets involved in the conversation?

33

A   No. Charles Allen doesn't get involved with the discussions. No.

Q   So Charles Allen is talking with Mr. Uraz?

A   Yes. Everybody conversed on that post. People had their own private conversations.

Q   You didn't talk to Charles Allen?

A   I talked to him. Not what me and Uraz had talked about.

Q   Did you talk to John Pierce about Chris Schinberger.

A   No. I don't believe so. We were all in a holding cell. So they were down there much longer than I was. So they had their own conversation, I guess, between each other. We were all like one room from each other. So...

Q   Did John Pierce have any issue with the broom?

A   With who?

Q   Did John Pierce, in this case, did you speak with him about hitting someone with a broom?

A   Yes.

Q   What was the nature of that conversation?

    MR. ROTH:   Your Honor, that obviously would be hearsay.

    THE COURT:   Yes. I would sustain that. I don't know what relevance that has here.

34

    MR. PERRONE:   It goes as to the statement --

    THE COURT:   Well, it goes to somebody that's not part of this case. So I'll sustain that objection.

    MR. PERRONE:   It's consistency.

Q   (MR. PERRONE) Did you speak with John Pierce about the percentages that you felt you had in your case?

A   The percentages?

Q   Yeah. What percentage that you thought you would have to win a case, have your case dismissed?

A   It's a possibility I did. I don't remember that. But it's a possibility. I mean —

Q   You don't recall speaking with John Pierce in regards to Chris Schinberger?

A   I don't recall. It's a possibility. We probably talked about him. I don't recall it.

Q   If I was to show you one of the notes that was exchanged between yourself and Mr. Pierce, would that refresh your recollection?

A   Yes. Uh-huh.

Q   Is this you talking to him about Chris or —

A   Yes. I was talking to him about Chris, yes.

Q   Do you tell John Pierce:

35

    Maybe to just slap his girl or something with a bathroom stick?

A   Excuse me. Could you rephrase? I didn't understand.

Q   Did you ask John Pierce --

    MR. ROTH:   Your Honor, I am going to object to the relevance, as well as hearsay.

    THE COURT:   Mr. Perrone?

    MR. PERRONE:   Again, we have a consistency here. We have an individual here that's talking about trying to avoid the individual showing up to court. This is a sequence of notes between himself and John Pierce.

    THE COURT:   Well, I think that's hearsay. I think there is another way you can get at it.

    MR. ROTH:   I agree, Your Honor.

    THE COURT:   But this way is hearsay. There is another way to get at it.

    MR. PERRONE:   But I'm asking him, he said --

    THE COURT:   But it's hearsay as to --

    MR. PERRONE:   I will rephrase.

    THE COURT:   If you're asking him what did he say, Mr. Roth, he is not reporting what somebody else said, I think he could say.

    MR. PERRONE:   I agree. There's a different

36

way to word it that I think is fine.

    THE COURT:   Okay.

Q   (BY MR. PERRONE) Did you tell John Pierce, just wondering, I would think you would just maybe slap her or something, the way you say you love her, if you can recall?

A   So just saying what I said, not what he said?

Q   Yes. That's something you would say?

A   Yeah, I did. Asked him, I did ask John, did he strike her with something, instead of just hitting her. That's what that fully said. I asked him why did he hit her with something instead of -- he loved her, I think, why would he push her head with something? That's what I'm asking.

    MR. PERRONE:   We're on Defendant's Exhibit E.

    THE COURT:   I'm sorry. E. Yes. You're at E.

    MR. ROTH:   If we could please have one that Mr. Perrone hasn't written on?

    THE COURT:   One what?

    MR. ROTH:   That Mr. Perrone hasn't written on.

    THE COURT:   Yes. We need a clean copy.

37

MR. PERRONE:   These were all produced.

THE COURT:   They were produced, but I think the issue is we need a copy that you haven't written on.

MR. ROTH:   I think we might be able to find a clean copy.

THE COURT:   I should have one here, if you can't.

MR. ROTH:   Yeah, we got it. Here you go.

Q   (BY MR. PERRONE) Is that your writing to Mr. Pierce telling him, asking him why didn't you just slap her?

A   Like I just said, I asked why didn't you just (inaudible) her with a broomstick, instead of just like or something --

THE COURT:   That's your writing?

THE WITNESS:   Yes.

MR. PERRONE:   Move for admission of Defendant's Proposed Exhibit E.

THE COURT:   Mr. Roth?

MR. ROTH:   Marginal relevance. But we have no objection.

THE COURT:   Right. It's offered by Mr. Close, so we will allow this.

(DX-#E is received into evidence.)

38

Q   (BY MR. PERRONE) In your case, did you tell John Pierce, as it related to your case, that he didn't have any blood, he didn't do any real police work?

A   On my case?

Q   Yes.

A   There is -- there wasn't any blood.  I haven't -- my case didn't involve any, no.  I think I probably told that about his case, or something.  I don't think I said it about mine my case didn't involve any violence consistent with blood.  So, no.

Q   Did you have a witness that the police didn't talk to?

A   Excuse me?

Q   Did you have a witness that the police didn't talk to?

A   On my case?

Q   Yes.

A   No.  Everyone that is there that testified, including the police that showed up on the scene.

Q   Did you tell John Pierce that I'm damn talented, most people couldn't tell, you weren't telling the truth?

39

A   I probably did say that to him.  Yes.

MR. ROTH:   I would ask that Defense counsel show him things he is referring to.  He can see if it's his handwriting or somebody else's.

THE COURT:   You're referencing the document off -- he needs to be able to see the document if you are asking the question.

Q   (MR. PERRONE) That will help refresh your recollection.  Take a look at it.

A   This is John's handwriting.  That isn't my handwriting.

Q   (MR. PERRONE) Thank you.  But you did tell John Pierce you are a good liar?

A   I said -- I probably did say something like that to him.  That's John's handwriting saying he couldn't tell if people were telling the truth.

Q   Did you tell John Pierce to go to the Prosecutor.  She lied on the couch at the hospital?

MR. ROTH:   Your Honor, I am going to ask if we are referring to the document.  Show him the document that it is his, and stop taking stabs in the dark.

THE COURT:   Yeah. Otherwise, it's hearsay.

40

MR. PERRONE:   This is also John's handwriting where he says he has nine kids.

THE COURT:   Don't tell us what he says.

THE WITNESS:   Well, this is John's, not my handwriting.

Q   (BY MR. PERRONE) Did you tell John Pierce that it was illegal that he --

MR. ROTH:   Again, I think we are referring to a document.  He can show him a document, see if it is his or Mr. Pierce's.

A   This is my handwriting at the top of it.  And the lower half where the writer writes something, John's handwriting.

Q   Okay.  You tell him who sent the order to have your mail received?

A   Can I read that and see where it says that on there?  Yes.  I wrote this.

Q   Are you telling me it seems very illegal to you?

A   Yes.

Q   How much time did you spend in the law library while you were incarcerated in prison?

A   None.  I just went in the law library recently in the County Jail.  When I say looking up stuff, as far as my case went.

**41**

MR. ROTH:   Your Honor, the Court has reviewed all of these notes that Mr. Perrone is going through one by one.

MR. PERRONE:   Can we approach?

THE COURT:   All right.

(Off the record discussion at the bench.)

THE COURT:   Members of the jury, you have to disregard the fact that I may have looked at something and Mr. Roth's opinion on it.  You are the ones, you are the sole triers of the fact. So Mr. Roth's opinions should be stricken.  All right?  Mr. Perrone?

Q   (MR. PERRONE) If you want to review.  Did you tell John Pierce, if not, it would be good to say she was just high, fell down, hit her head. That could be plausible if she doesn't come?

A   If she doesn't come?

Q   Doesn't come -- doesn't come to court?

A   Yes.

Q   Do you tell John Pierce it would be hard for them to get a conviction unless you walk in and admit it and that's not happening?

A   Can I see it?

MR. ROTH:   I object again to the relevance of this.  The Defendant's name hasn't been

**42**

brought up it in a half hour, because the Defendant, itself, is not brought up in this case.  This is a distraction.

THE COURT:   He said he only had a couple more, if this is it.  This is number two.  So I will allow that answer.

Q   (MR. PERRONE) You can take a look.

A   Yes.  But I referred to something earlier.  I didn't say that part.  I asked her where the -- it would be hard to get a conviction, unless you walked in and admit and that's not happening.

Q   So you're coaching John Pierce as to his case?

A   No.  John Pierce already had his mind made up. John Pierce had been going through this nine months before he ever met me.  Had court dates. And so he had -- he already had his mind made up.  I gave him an opinion.  I didn't coach him.  No.

Q   You provided him insight into his case?

A   I gave him an opinion.

Q   And these notes were eventually turned over to the police?

A   Yes.

Q   By you?

**43**

A   Yes.  They were turned over to my lawyer.

Q   Did Mr. Uraz tell you when he was initially set for sentencing, when you initially started to discuss this?

A   Not initially, no.

Q   You don't recall him telling you that he had a sentencing set for October 19, 2016?

A   No.  I don't remember him telling me a date. No.

Q   Did you ever discuss any of these issues with a Corrections officer?

A   Corrections officer?

Q   At the Ingham County Jail?

A   I believe I told them that we couldn't be housed together or something.  After the fact I -- yeah, I did.  I sent them an e-mail over the machine.  And I was wondering, because they ended up moving me out of the housing unit into the hole, and I was wondering why I was put in the hole.  And I wasn't an offender.  I was one of the -- more or less wondered more or less why Mr. Uraz wasn't moved to the hole unit and I wasn't left where I was.

Q   You were moved to the hole after you had been on post with Mr. Uraz after speaking with the

**44**

police?

A   Yes.

Q   You don't recall for how long you were on post with him after --

A   After talking to them?

Q   Yeah.

A   No.  I don't recall exactly.  No.

Q   Couple days?

A   I don't think it was a couple days.  I think I talked to him that morning.  And I believe maybe that they just told me to pack up.  They didn't come in, put me in handcuffs.  They had me like I was moved to another post.  It's the hole.  But they call it protective custody. But there were people out there that knew how to use the phone, things like that.

Q   You had to request from jail staff to be removed from Mr. Uraz?

A   Did I have to request?

Q   You didn't request?

A   No.  I believe it was something from the detective or the Prosecutor's office.  Not sure.

Q   You said there was an e-mail, you requested it?

A   We have a machine you can e-mail kites through.

45

After I was moved I sent an e-mail kite asking why I was moved. They responded me. It's from the Prosecutor's office to be requested that I would not be housed around Mr. Uraz.

Q   You never made a request?

A   To be moved from?

Q   Correct.

A   No.

Q   Do you tell the police initially that you would be willing to wear a wire?

A   I don't recall.

Q   Do the police ever instruct you not to speak with Mr. Uraz after you initially meet with them?

A   I don't recall. If they told me not to speak, speaking with him. I know I was -- I was moved that day. If they had sent a request downstairs that I might not be put back there officially due to hours. I was moved, so...

Q   So they never tell you not to engage in Mr. Uraz when you go back?

A   They could have. I don't recall.

Q   But you did engage?

A   When I went back?

Q   Yeah. You did continue to talk?

46

A   No. Actually when I went back it was around count time. We were locked in the room. When they came to tell me to move, I probably told them that I was moving or something. We didn't have a full-out conversation after that, no.

Q   Do you recall when you testified at the preliminary examination in this matter?

A   Yes.

Q   When would that have been?

A   I don't recall the date.

Q   You were initially scheduled to on December 1st, 2016, associated with this case?

A   It's a possibility. I'm not sure if that was the date.

Q   You're from Detroit, originally?

A   Yes.

Q   Is that something that you emphasize to the other roommates?

A   It wasn't an emphasis. No.

Q   More credibility placed in Detroit from the street?

A   No. I'm not from the street neither, so...

Q   And you tell them to write the note because they are recording?

A   They tell you in the jail that you could be

47

recorded, it could be everywhere. So -- and where we were -- speakers were directly right over us, so...

Q   This was the result, you knew that you had -- that they had speakers because you got in trouble with other things about recordings?

A   No. I knew being in the County Jail they have speakers. They tell you they can listen in on any dorm. It's a known fact they can listen in on any jail. So...

Q   Do you tell Tunc that your friends will do it gratuitously. He will do it as a favor?

A   I don't know the use of the word "favor." But I told him that I could have him do it.

Q   Do you recall testifying at the preliminary examination subsequent to December 1st, on December 13th?

A   Yes. I recall it.

Q   Taking you to page 133, line 21, to refresh your recollection. If you will take a read on it?

A   Um-hum.

THE COURT:  You have to say "yes."

THE WITNESS:  Yes. Yes.

Q   (BY MR. PERRONE) So you tell Mr. Uraz:

48

"The guy owed me a favor, and I was just saying he would do -- he would do it for me as a favor"?

A   Yes.

Q   And you testified that:

"Tunc told me he would give me $1,000 for getting it done for me."

A   Yes.

Q   He told you after you told him you would get it done as a favor?

A   No. He told me before the fact. He told me he wouldn't offer me any more money after the fact.

Q   Did you misspeak at the preliminary examination, as far as you telling him initially that you had a guy who would do it for you as a favor?

THE COURT:  Why don't you say -- there's nothing in the testimony that says -- nothing that says pay $1,000.

MR. ROTH:  That's Mr. Perrone putting it that way, what he said.

Q   (BY MR. PERRONE) It's your testimony you repeatedly told him he wanted it done while he was still in jail?

49

A   Yes.

Q   You never spoke with Mr. Allen in regards to the solicitation both between yourself and Mr. Uraz?

A   No.

Q   If I could refresh your recollection. Page 136, lines 21 --

MR. ROTH:   He did not express a lack of recollection.

MR. PERRONE:   It's from --

THE COURT:   You can show him his prior statement, see if that refreshes his memory.

MR. PERRONE:   Go through that. It's page 136, line 20 to page 137, line three.

A   I've seen it.

Q   After reviewing that, did you speak with Charles Allen?

A   Yes. After the fact. Yes.

Q   In regards to the solicitation plot?

A   Yes.

Q   What did you tell Charles Allen?

A   I believe I told Charles that after we were moved to the post, that Mr. Uraz wanted his girlfriend killed, I believe.

Q   Did you tell him that you had spoken with the

50

Prosecutor's?

A   No.

Q   Because you had spoken with the police?

A   I didn't tell him about the police. I didn't tell him I sent letters to my attorney.

Q   When you spoke with Charles Allen in regard to this on the 18th of October?

A   Could have been. I am not sure of the date.

Q   If I can refresh the witness' testimony? It is page 137, line three.

A   Going on the third week. So...

Q   But it is your testimony at the preliminary examination it is towards the end of October?

A   I said it could have gone into the third week, which would be mid -- or I could consider it the end, mid or end.

Q   When you sent the information to your attorney, initially, you were still on medical?

A   Yes.

Q   How did you pay for that attorney?

A   Through a letter.

Q   You knew that Mr. Uraz had told you that he was going home, that he anticipated he was going home after his next court date?

A   No. We initially -- when he first started

51

talking about it, no. I didn't know he was on his way home. No.

Q   When did you come to know that he thought he was going home? At his next court date?

A   It was some time during the week that he had told me he should be going home, that he should be getting time served or something.

Q   You don't remember when he was anticipating time served?

A   No.

Q   He didn't tell you before he wrote the letter saying that he wanted to wait until he was sentenced?

A   No.

Q   So you didn't know when you were writing that letter?

A   No.

Q   That he anticipated he was going to do time served?

A   No. I didn't when we were initially writing letters.

Q   Did you know prior to sending letters to your attorney?

A   I sent my letters within 48 hours, maybe the third day I sent those letters over.

52

Q   Do you know, if he thought he was going to be going home, when the next court date was, when you met the police?

A   When I met the police I knew he was anticipating going home then, yes.

Q   In your proffer testimony, you were encouraging him --

MR. ROTH:   Your Honor, is there the rest of the question? I apologize.

Q   (BY MR. PERRONE) You were encouraging him, even though you knew he was likely to go home?

MR. ROTH:   There has been no testimony about encouraging.

MR. PERRONE:   He testified that he encouraged him.

THE COURT:   You can ask him what he said, but encouragement is not valid. Sustain the objection. Rephrase it.

Q   (MR. PERRONE) While you were incarcerated, did you give him a phone number to call?

A   I believe I did.

Q   To contact a hitman?

A   I believe I did.

Q   What was that number?

A   It was a number I made up.

53

Q   And you're separated from Mr. Uraz after you go
to court?

A   After I go to court for?

Q   You go to court and you come back from court,
you're not returned to the post?

A   No. I talked to the detectives. I was
returned to post. I was moved that day.

Q   You were removed the same day?

A   Yes.

Q   You were returned to the post?

A   Yes.

Q   After speaking with the police?

A   Yes.

Q   So it would have been only a day that you would
have had an opportunity to speak with Mr. Uraz?

A   Not even a day. It was within a few hours.
Maybe a couple hours I was moved. I talked to
the detective some time around that morning. I
don't know, in December, nine, 10:00. By the
next count time, they were counting like every
hour. By the next count time, when I returned,
they told me to -- I went to Mike. They told
me to pack my stuff up, I will be moved.

Q   It's your testimony you didn't have any
conversations with Mr. Uraz after you spoke

54

with the police?

A   Maybe moving, something like that. No
conversation, no, we didn't. Didn't sit down
and talk.

Q   If I was to show you your inmate history, would
that potentially refresh your memory on who
would be moved?

A   I mean, it would give me a -- .

Q   Does that refresh your recollection as to when
you moved and dates?

A   It doesn't refresh my recollection. I see the
dates. I know it would have been in between
one of these three days. I don't know exactly
what date it was I was moved.

Q   But do you recall the date that you met with
the detectives?

A   No. I don't recall the date.

Q   After you moved away from the post and
separated from Mr. Uraz, do you subsequently
come into contact with him again while
incarcerated at the Ingham County Jail?

A   No. Other than court, when at the preliminary
exam, I haven't had any contact with him since
then. No.

Q   Would you have had any contact with him in

55

November?

A   No.

Q   Page 138, lines 21, 25. If you could just
review that?

A   I didn't have contact with him. They moved us
across the hall from each other. I didn't have
any contact with him.

Q   You moved across the hall from him at the same
post?

A   Yeah. The same post. But we were separate
from doors, glass, whatever. But not any
contact as far as us having physical contact or
talking or anything.

Q   While you are initially in medical, on
September 12, the first night you're with
Mr. Uraz and Charles Allen?

A   Yes.

Q   And the first night Mr. Uraz approaches you?

A   No.

Q   When does he initially approach you? First
night after Charles Allen leaves his cell?

A   The day after Charles Allen leaves. It's like
the daytime. We were talking about basically
what we're in jail for, what's going on. They
had turned the TV on. They haven't been able

56

to watch TV. And me and a couple, as long as
he had been in the county jail, we had TV on,
watching TV, just talking. He basically comes
to tell me that.

Q   So you don't have any indication from the first
night when, and Charles Allen is in the same
cell that Mr. Uraz is trying to have anybody
killed?

A   Not within the first night. No.

Q   But within 48 hours, the whole plan had evolved
to be put on paper?

A   Yes.

Q   So it would have been 24 hours after Charles
Allen was no longer in the cell?

A   Somewhat around mid afternoon it kind of came
up.

Q   Did Mr. Uraz at all talk to you about calling
the number that you gave him?

A   No. Because we were on phone restriction.
There was no way the number could be called
because we were on phone restriction.

Q   As far as writing to your lawyer, do you write
to your lawyer the second day that you're on
medical?

A   Not the second day. I got there at night. I

57

probably wrote it after the second day. After the conversation turned into Mrs. Melke being killed, I wrote him after that.

Q You previously testified as to the recording system, that you just knew that they were recording. You hadn't been in any prior trouble for anything due to the recording?

A No. I initially reported that I knew in the County Jail, which basically anybody that comes into custody at the County Jail, they tell you with signs on the wall that you can be recorded, that they are recording. If you're on post, they will come over the mike. They can hear everything you're saying. So...

Q So you didn't testify that you got in trouble for them recording you?

A No. I said that I had got in trouble with — for being on the phone, that I was on phone restriction. I was saying something that I shouldn't have been saying on the phone. I was on phone restriction. So I had been in trouble for that.

Q If I could draw your attention to page 157, line 22 through page 158, line five. If you could just take a look at this. Start there.

58

A You said start where, which line?

Q Start right here.(indicating)

A Yeah.

Q Do you recall testifying that you had gotten in trouble for them recording me?

MR. ROTH: Your Honor, I am going to object. Improper impeachment. He testified, recorded a phone call, which he did something incorrect. Mr. Perrone is trying to make it sound like they recorded something in jail. That's an inconsistent statement.

MR. PERRONE: This is the exact context of the situation, and why they're writing notes, because they're being recorded.

THE COURT: I understand. But he has indicated phone call recorded. This is something about something being recorded. I think you need to ask him is this the same phone call that was recorded.

Q (BY MR. PERRONE) Is this the same phone call that's recorded that you are talking about here, as far as what you had gotten in trouble for?

A Yes. My wife was a witness, and I wasn't supposed to contact her. And I had tried to

59

contact her from the County Jail through my sister. And they recorded the phone call. So they put me on phone restriction.

Q You did not get in any trouble for anything that was recorded in jail?

THE COURT: Strike that. He was —

Q (MR. PERRONE) That was recorded outside the phone call?

A It was recorded in the jail. That's what I was in trouble for.

Q Was the phone call recorded?

A The phone call was recorded.

Q As far as there being any video, did you indicate to Mr. Uraz that there was video?

A Of the recording?

Q That there was video while you guys were in the medical unit, it was on camera?

A It's a camera sitting right in medical that records people in medical. That's a place people are put on the death bed, however you want to put it. I may have told something to Mr. Uraz about a camera being there. Obviously it is something pointed right at us.

Q You're telling them that we had to put this letter together. You're indicating to him

60

that, as you understand it, the jail is recording —

MR. ROTH: Objection. Asked and answered.

THE COURT: It has been. You already said that, so I'll sustain that. In fact, why don't we take our morning break now?

MR. PERRONE: Can I have one more question? I have to get this one in. Sorry.

Q (BY MR. PERRONE) He tells you he is trying to buy a gun while you are incarcerated. Three questions. He tells you he wanted to buy a gun.

MR. ROTH: Who is he?

Q (MR. PERRONE) Did Mr. Uraz tell you he wanted to buy a gun?

A Mr. Uraz told me he tried to buy a gun from his co-worker.

Q And did he tell you why?

A Yes.

Q What did he tell you?

A Mr. Uraz told me he was going to get the gun, and he had like set up something with a phone through Mrs. Melke. And he was going to find her somewhere. He was going to kill her.

Q When you're asked at the preliminary

61

examination, do you respond that you're sure the way the conversation was going, it was for the girl?

A Could you repeat that?

Q Was it your testimony in regards to your conversations with Mr. Uraz --

MR. ROTH: I am going to object. This is improper questioning. He is impeaching what he's previously said right now.

THE COURT: I think you have to ask him how are you referring to as the girl, Mr. Perrone.

Q (MR. PERRONE) Who are you referring to as the girl?

A I was referring to Erika Melke.

Q But there wasn't anything that led you directly to believe that he intended to kill Erika Melke with the gun that he was trying to, correct?

A Yes, he indicated to me -- yes. He told me.

Q But your testimony, when asked that, was that you're were sure the way the conversation was going?

A I was sure because he told me.

Q So you didn't just assume it?

A No. I didn't assume it. He told me.

THE COURT: All right. We're going to take

62

our break now. We will be in recess about 15 to 20 minutes.

(Jury exits courtroom at 10:35 a.m.)

THE COURT: All right. In recess.

(Recess taken from 10:35 a.m. to 11:02 a.m.)

THE COURT: Returning on the record in People v Uraz, file 17-1064 and 1065. The parties are here.

Preliminary matters before the jury comes back? Preliminary matters?

MR. ROTH: No, Your Honor.

THE COURT: I just want to put on the record there have been a bench conversation when Mr. Roth made a statement about the judge had reviewed certain records and had decided only one of them or a limited amount was relevant. I did give a corrective instruction on that, that that was Mr. Roth's opinion. But I did indicate that I had read that.

We also had an ongoing raising of issue. We are going to grant Mr. Perrone an ongoing objection to the notes that were reviewed in camera by the Court. The Court concluded there really was nothing exculpatory in there, exculpatory in the nature of somebody else might

63

have done it. There were some other defenses, there were credibility questions. Even if the Court's in-camera review, I indicated I could not tell who wrote what. Mr. Close has been able to provide us some information on that, which ones he wrote, which ones others wrote.

The issue of relevance. If it's something Mr. Close wrote, it is. The Court understands that it's the defense's efforts, I guess, which may be two prong. To say, one, is that Mr. Close was only giving his testimony to try to benefit himself on one hand. Or, two, was offering suggestions to Mr. Uraz, and offering suggestions to other parties. I did allow that portion to come in, limitedly, that's opinions. I think, as he indicated, to other persons who were in custody at the jail, we had an issue over the recording issue. And that according to Mr. Close was a recording of jail cells. Of course, we all know that jail calls are recorded, and did not refer to a general recording of the residents on post. Although, Mr. Close testified to, and we all know that recording capabilities is on post. He has indicated there were not any of those that he's

64

aware of with Mr. Uraz.

Anything else, as a result of those comments?

MR. ROTH: No, Your Honor.

THE COURT: Anything anybody would like to add, Mr. Perrone?

MR. PERRONE: No, Your Honor.

THE COURT: All right. Ready for the jury?

(Jury present in courtroom at 11:05 a.m.)

THE COURT: Be seated. Mr. Perrone?

MR. PERRONE: Yes.

Q (MR. PERRONE) When did you go to trial in your case?

A January 9th.

Q Of what year?

A 2016.

Q You testified that you didn't intend for this to -- you didn't actually intend for anything to happen?

A Intend for anything to happen to?

Q You never intended to help him carry anything out?

A Help Mr. Uraz?

Q Yeah.

A No.

65

Q   In regard to the specifics of the plan, was there an indication that he's going to give you the remaining money when he got out?

A   Yes.

Q   And you were supposed to hold the money for a third person?

A   We didn't discuss who I was supposed to hold the money for, or anything.

Q   He was going to give somebody money on the outside to hold for you when you get out?

A   I told him to put him in contact with somebody to give the money to.

Q   Did you tell him who that person was?

A   I don't recall if I told him who the person was.

Q   Did you tell him that that person was the individual whose number you gave to him, telephone number?

A   It's a possibility. I am not sure if I told them that that is the number. But --

Q   And the individual on the outside was to hold the money, spin, whatever, based upon your understanding?

A   Hold the money and spin whatever?

Q   To hold for you, to hold, spin, whatever?

66

A   I'm not sure if I told him what was going to happen with the money, once it went to the person. I don't recall that right now.

Q   You do recall at the preliminary examination, as to this third person, if it would refresh your recollection as to what you previously stated?

    MR. ROTH:   What page and line, please?

    MR. PERRONE:   Page 155, lines 12 through 18.

    THE WITNESS:   Yes.

Q   (MR. PERRONE) So it is Mr. Uraz -- Mr. Uraz was to give the money to somebody on the outside to hold and spin?

A   Yes.

Q   What does spin mean?

A   I said hold, spin, whatever. We never really made a plan as to what was going to happen to the money once he gave it to someone out there. I just hold, spin whatever. I think they put "spin," but I said "spend."

Q   I got you. Just a typo?

A   Yes.

Q   What specific words did he use to you to indicate that he wanted Erika Melke killed?

A   Specific words, that is that Erika Melke had

67

used him and ruined his life. He wanted her dead.

Q   Did any of the other inmates indicate to you that they wanted their victims dead?

A   No.

Q   While you were incarcerated?

A   No.

Q   They just didn't want their witnesses to show up to court?

    MR. ROTH:   Your Honor, I am going to object to speculation as to somebody else.

    THE COURT:   Characterization. That's not really a question, Mr. Perrone.

Q   (MR. PERRONE) Did he tell you how -- did he tell you the means to commit the killing?

    MR. ROTH:   Your Honor, this is asked and answered. We are on about lap three of this. Mr. Close testified to a plan to get her when she is driving near the garbage cans. This was covered hours ago.

    MR. PERRONE:   Previous statement of his -- where he indicates he didn't say the means. We have a lot of contradictory testimony.

    THE COURT:   All right. Briefly.

Q   (MR. PERRONE) When you were questioned at the

68

preliminary examination, you responded that he didn't say the means of the killing, correct?

A   The means? Could you specify what you mean by it?

Q   How --

A   Yes.

Q   -- it was going to be carried out.

A   He didn't say whether he wanted a knife or gun at first. But he wanted her dead. Like he didn't say strangulation or anything, but he would have rather it have been with a gun.

Q   But he didn't provide those specifics?

A   Yes. He said he would want her shot. He said that on numerous different occasions besides the letters that were wrote. Like new conversations, yes, he did.

Q   Page 162, line eight, if you could review what you said there?

A   You want me to say what I said?

Q   I just want you to review it, then I'll question you on that. Did you previously state that he didn't say the means while you were under oath at the preliminary examination?

A   Yes. I said that he didn't specify at the time, whether it WAS about a gun, which I just

69

stated.

Q   And he said that he wanted her dead?

A   He said he wanted her dead, which I said earlier he had tried to purchase a gun. He asked me, did I know anybody that could kill her, did I know anybody that could shoot her and rob her, like this was an ongoing thing.

Q   So he repeatedly asked for somebody to shoot her, rob her?

A   He repeatedly asked for somebody to kill her.

Q   Did you talk with Charles Allen in regards to specifics of the plot as to the addresses to compare?

A   Not specifics. As far as the addresses, I didn't go over it with him. I didn't tell my -- I contacted with my attorney. I had contact with the detective. I didn't tell them all of that. I had told him that he was wondering, like, why are you and Uraz always like, you know, talking on some secret stuff. I was like, one day, don't try, because don't try me to get his girlfriend.

Q   But he is telling you things that he already knew as far as the addresses?

MR. ROTH:   I object as to who he is.

70

Q   (MR. PERRONE) Does Charles Allen tell you about the addresses, etcetera?

A   No. Charles Allen doesn't tell me about the addresses. No.

Q   Page 64, lines three through 11. If you could review that quickly?

A   Um-hum. Yes.

Q   Was it your prior testimony that Charles Allen was going on and calling off her address, saying everything that you already knew?

A   Did I say calling off the addresses and stuff or her address?

Q   Yes. The addresses.

A   I said the addresses.

Q   Calling her addresses off?

A   Can I see that? Um-hum.

Q   So you did talk to Charles Allen about the addresses?

A   No. I recall saying at the preliminary he is calling addresses off the things that Mr. Uraz had gave me.

Q   But you didn't talk to him about the addresses, he talked to you about the addresses?

A   Yes. I didn't tell him what was going on with Uraz telling me. Like I said, in the statement

71

I had already known all this stuff, but I didn't repeat it to Charles Allen.

Q   How many times did you talk to Mr. Uraz about his intention to have his girlfriend killed, as you classified?

A   Maybe 20 occasions.

Q   That's what you testified to at the preliminary examination?

A   I'm not sure of the exact amount I testified to.

MR. PERRONE:   If I may approach? He said he wasn't sure.

MR. ROTH:   Page number, please?

Q   (MR. PERRONE) Page number 166, line 13.

A   Same thing I just said, maybe 20 times.

Q   You're able to recall the 20 times, specifically?

A   I said maybe 20 times.

Q   Did you instigate any of those 20 times?

A   No. I instigated conversations, and it would lead to that. But not: Hey, I'm going to have her killed today, anything like that. But, yeah, we had discussed that was what led to that on a lot of occasions.

Q   Do you remember Mr. Uraz returning from court

72

on October 19?

A   Not that day specifically, no.

Q   You don't remember having a conversation with him?

A   About going for court that day?

Q   When he came home from court after you spoke with the police.

A   I don't remember it being the 19th, specifically. I probably had a conversation with him after he came from court. We talked before that day, so...

Q   Did you inquire as to what happened at his hearing?

A   Not necessarily inquire what's going on. No. Because that's -- I'm not sure if you're familiar with just being in what I'm pretty sure you're not. But people come back and say, hey, this was going on in court, this was going on. So it probably came up what happened in Court that day. I don't remember it being that exact date.

Q   But you did say something when he returned from court?

A   It's a possibility I did. We talked every day.

Q   Was it your understanding that he was going to

73

be getting out from your prior conversations on the 19th?

A   It wasn't even his understanding. It was a wishful thought that he could be getting out at that time. Not it was exactly like, hey, this is what they said. It was nothing in paper or anything that he knew that that was his date or anything. No.

Q   But he is hoping to get out?

A   Yes.

Q   Were you inquisitive as to whether or not the issues that you had brought to the police had become an issue in a Court hearing? Did you ask him about that court hearing? So could you try to inquire as to whether the issues that you conveyed to the police were bought up?

A   No. I didn't ask him if any charges were brought up on him or anything. No.

Q   So you talked to him, but you weren't trying to get any additional information regarding the issues that you spoke with the police about?

A   I pretty much got the information that was, I guess you could say, needed when I talked to the detectives. Like I pretty much knew they were going to charge him. Or if something —

74

like I didn't lead him on and say, hey, I talked to the detectives and they are going to charge you. I didn't want to ask him anything that would tip him off that I had talked to the detectives. No, I didn't ask anything that came up.

Q   But you spoke with him?

A   Yes. I probably did speak with him. We spoke every day.

Q   Are you currently facing a parole hearing?

A   I already had a parole hearing.

Q   When?

A   February.

Q   When is your next parole hearing?

A   I don't have another one coming up. I actually have a parole date now.

Q   You were given a parole date at that hearing?

A   Yes, yes. Not at the hearing. I was given a continuance. My release date was coming up.

Q   Was this case brought up at the hearing?

A   Mr. Uraz's case?

Q   Yes.

A   I had no reason to.

Q   Any other cases on your behalf at the parole?

A   Yes. The case that I went to trial for.

75

Q   Was — were any of the issues regarding the proffered testimony brought up at the parole hearing?

A   They had no reason to. It was separate.

Q   Was it your intent by trying to provide the police with all this information to appear in the light most favorable to the parole board?

A   I had no idea I would be in front of the parole board at the time I gave the information. It was before I even went to trial.

        MR. PERRONE:  No further questions.

        THE COURT:  Redirect?

        MR. ROTH:  Thank you, Your Honor.

        REDIRECT EXAMINATION

BY MR. ROTH:

Q   Good morning, Mr. Close. Mr. Close, there has been a lot of testimony about letters between you and Mr. Pierce. I'm sure you recall that; is that fair?

A   Yes.

Q   I just want to go over some of those letters briefly again.

        MR. ROTH:  May I approach the witness, Your Honor?

        THE COURT:  You may.

76

Q   (BY MR. ROTH) Showing you what's been marked as People's Proposed Exhibits 61 and 62. Sixty-two is a two-page document. Do you recognize that, Mr. Close?

A   Yes.

Q   And can you flip to that next page?

A   Yes.

Q   Do you recognize that as well, sir?

A   Yes.

Q   Is your handwriting contained on either the first or second page of People's Proposed 61?

A   Yes. It's my handwriting on here, as well as John Pierce.

Q   John Pierce is the other person's writing in there?

A   Yes.

Q   If I give you a highlighter, could you highlight the portions that are your handwriting? Thank you, sir. And the portion not highlighted, that would be John Pierce?

A   Yes.

Q   People's Proposed Exhibit 62, is your handwriting contained on that letter at all?

A   No.

Q   Thank you.

77

MR. ROTH:  I'm not going to move to admit that at this time, Your Honor.

THE COURT:   Any objections?

MR. ROTH:   I'm not going to move to admit it.

THE COURT:   You're not?  Okay.

Q  (MR. ROTH) Mr. Close, do you recall in your interview with Detective Krumbach and Detective Hogan in this case, telling them about the Defendant tried to buy a gun from at Michigan State University.

A  I didn't know the person, personally.  I told them about what Mr. Uraz had told.  Yes.

Q  Do you recall giving the police any information about this person's prior employment, what they did before that?

A  Yes.

Q  What is that?

A  It was like a cook or something out of Brody Hall at MSU.

Q  I guess my question was, do you recall telling the police about what that person did before they worked out at Brody Hall?

A  What Mr. Uraz did?

Q  The person that he was trying to buy the gun

78

for.

A  I just knew that he was a co-worker of him, saying he tried to buy the gun from, at MSU.  I don't remember exactly what he did.

Q  Would it help if you reviewed your prior statement to the police?

A  Yes.

Q  Just look up and see if that helps refresh your memory.

A  Oh, yes.

Q  And do you recall telling the police what that individual did before working at MSU?

A  Yes.  Mr. Uraz told me that the guy was an ex Corrections officer.

Q  An ex-Corrections officer?

A  Yes.

Q  You also testified about the Defendant wanting to watch the news at night to see if anything happened.  Does that mean anything happens to Erika Melke?

A  Yes.

Q  Also, you previously testified that the Defendant told him, or you told the Defendant that you had sent the information provided by the Defendant to this person that was going to

79

carry out the murder, correct?

A  Yes.

Q  When you told the Defendant you should send this information, was that before you met with Detective Krumbach and Detective Hogan?

A  Yes.

Q  Now, Mr. Close, Mr. Perrone tried to nail down specific dates when the conversation happened and the correspondence between you and Mr. Uraz that had been admitted.  Do you know the exact dates that these letters would have been written?

A  This was over a year ago.  As far as the exact dates, I don't know.  I didn't keep track, or anything, what date I would send them off.

Q  Do you recall listening to your testimony, or was it your testimony that this occurred after you two were in medical?

A  Yes.

Q  I guess we will call them Pierce letters or correspondence that you had between yourself and John Pierce?

A  Yes.

Q  You turned these letters over to the police during your initial interview with them.  That

80

had nothing to do with the Defendant, correct?

A  No.  It had nothing to do with him.

Q  Those letters were turned over at that time?

A  Yes.

Q  By you?

A  Yes.  Well, they were turned over by my attorney.  He had them in an envelope that had an interview with him.

Q  He gave them to your attorney, he gave them to law enforcement during that interview?

A  Yes.

Q  Mr. Close, in all these ongoing 20 some conversations you had with the Defendant, talking about killing, or had killed or wanting to kill Erika Melke, what was his tone, how was he speaking to you about this?

A  He was direct.  He knew what he wanted to happen.  He knew he wanted her dead.  It wasn't a time when he backed off of it.  It was direct, like he saw what he wanted done.

Q  As you sit here today, Mr. Close, have you gained anything from telling the police that the Defendant asked him to kill Erika Melke?

A  Nothing.

Q  Did you gain anything from testifying in this

81

case?

A   No.

Q   After you testify today, where are you going back to?

A   The Michigan Department of Corrections.

Q   And it's your testimony that your participation and testimony in this case does not affect or have any bearing on your parole hearing, or parole sentence with the Michigan Department of Corrections?

A   I don't even think it would be illegal to do anything like that. So no.

MR. ROTH:   Nothing further, Your Honor. Thank you.

THE COURT:   Jurors have any questions for Mr. Close?

(Off-the-record-discussion at the bench.)

THE COURT:   Mr. Close, Juror number 1 asked that:

You stated from your testimony that you were not from the street. What does that mean, in your opinion? What does he mean from that statement? Is it referring to education level and/or family upbringing?

THE WITNESS:   Just in general from what he

82

said is that: Do you represent that you're from Detroit to like basically hold any weight with anybody, that you're street like. No. It doesn't mean like I have a high school education and a couple years of college. I'm not on the street because I committed a crime before. That's what he means by that.

THE COURT:   So you were meaning that you didn't make --

THE WITNESS:   I didn't make reference I was from Detroit to maybe anybody hold anything different from me. I didn't choose where I was from.

THE COURT:   Juror number 3 has several questions. The first question is -- he was acquitted, so that's not relevant since he was acquitted.

Juror number 3 also asked: Why would you engage with Mr. Uraz about killing Erika?

THE WITNESS:   We were engaging in just the regular conversation. It came up. And at first I didn't know where it was going. So like I testified at the prelim, as soon as it became up, I had already made my mind up, like I testified to, that I was going to send it to my

83

lawyer. There was no plan in my mind that I was ever going to do it. I had already made my mind up that I would send it to my lawyer.

THE COURT:   Juror number 3 asked:

After you came out of the hole, you and Mr. Uraz didn't talk anymore, Mr. Uraz had his court date on the October 19th, you guys mentioned you spoke up in the hole up until October 19th?

THE WITNESS:   When I said we were in a hole, it's considered the hole, that's the only place they can house us that's on phone restriction. We're not actually in a hole as far as doing sanctions or anything. That's the only place they can house us, is where there is not any phone.

So once they moved us from there, and put me in another part, which was considered the hole, we didn't have any conversation after that.

THE COURT:   So the hole can be like solitary confinement?

THE WITNESS:   Yeah. But I wasn't on solitary confinement. He was actually in the hole, too but we weren't on solitary.

THE COURT:   You referenced the hole, but a

84

restricted area?

THE WITNESS:   Yes. Basically phone restriction.

THE COURT:   And Juror number 3 asked:

Did you keep notes all the 20 times you and Mr. Uraz talked while you were being recorded?

THE WITNESS:   No. After the first few times, then I sent it to my lawyer. It was like, I was expecting they would have done something sooner, as far as moved us, said anything as far as charged him, anything. They went a little longer. I thought it was actually taking for them to come talk to me. So when we were talking I was half expecting for them to move me. I didn't cut the conversation off. It was just on one thing. We would start talking about what we were having for breakfast, and it would turn into Erika, and his life with her.

THE COURT:   Juror number 14 asked:

Do you remember a time when you and Mr. Uraz were in the same post, but not on phone restriction?

THE WITNESS:   No. We were never on -- when I came into the County Jail, I immediately went on phone restriction. Because the second day I

85

was there, I tried to call my sister and have contact with my wife.

I believe Mr. Uraz came into the County jail, while he was intake, tried to contact Mrs. Melke, they put him immediately on phone restriction. So he never had any kind of contact outside the phone restriction being in the restricted area, which was the hole. So...

THE COURT: Jurors have any additional questions? Mr. Koop, do you have any questions on the juror questions only?

MR. KOOP: Yes, Your Honor. Thank you.

REDIRECT EXAMINATION

BY MR. KOOP:

Q Mr. Close, after it became apparent that the Defendant was serious about having Erika Melke killed, why did you play along?

A It was more along the fact that I had already sent the stuff within 48 hours to my lawyer. It was like I was, I guess I could say, picky. In his mind I didn't know how far he was going to go with it. He had already told me that he was in jail for aggravated stalking. So I had known that he was serious about like trying to do something to Mrs. Melke, after he had told

86

me that. He was telling me about phone situations and about how he had basically made a key to her house and went to her house and stole her underwear and stuff. And he was telling me about a bunch of stuff that I was just like, in my words, I just thought it was something wrong with him, as far as like that. I was like, shit, excuse my French, but if he did get out, he was going to do something to her.

Q So with these notes, after these notes that you sent to your attorney, were most of the conversations then out loud or not written down?

A We moved to a bigger post. Like we was sitting in a corner, you know, and sit at -- they got like bench tables. We would sit there, talk. It would be more like whispering. It was not nothing out loud where anybody could actually hear us talking, but it would center around Erika. Basically that's what the conversation centered around. It wasn't about what we were doing while we were out or anything. It was about her.

Q And then these conversations outside these

87

exhibits that we have gone over, the handwritten, were most of these conversations with the Defendant, then, just you speaking back and forth?

A Yes. Yes.

MR. KOOP: Nothing further, Your Honor. Thank you.

THE COURT: Mr. Perrone, any questions as a result of the juror questions?

MR. PERRONE: Yes.

RECROSS-EXAMINATION

BY MR. PERRONE:

Q You sent the written notes between you and Mr. Uraz to your attorney when you initially sent him the information that you received from Mr. Uraz while on medical?

A You said did I send it to him?

Q Yeah. Did you send the note?

A Yes. I sent the notes.

Q After you sent the information to your attorney, did it appear that Mr. Uraz seemed more intent on it happening?

A I wouldn't say it was less or more. He was intent on it happening. He didn't go into a rage about it happening or anything. But he

88

was intent on it happening.

Q Did it seem like things with him escalated, as the situation went on?

A As far as escalated with?

Q Did he seem to be getting more angry, more specific as the situation went on?

A He was -- I mean, he had like a little -- he was incensed about her. I wouldn't say her getting him locked up, but him getting himself locked up and dealing with her the way he dealt with her. To me he had said she had ruined his life.

Q Did you --

MR. PERRONE: No further questions, Your Honor.

THE COURT: Any additional juror questions? Thank you, Mr. Close. You may be excused. Thank you for coming in. Yes?

MR. ROTH: Call another witness?

THE COURT: We will start, yes.

MR. ROTH: Thank you. People call Patrick Burnett.

THE COURT: Come up here, Mr. Burnett. Do you swear or affirm the testimony you are about to give will be the truth under penalty of

89

perjury?

THE WITNESS: Yes, sir.

THE COURT: Have a seat. State your name. Spell your last name for the Court Reporter, please.

THE WITNESS: Patrick Burnett. B-U-R-N-E-T-T.

THE COURT: Mr. Roth?

MR. ROTH: Thank you, Your Honor.

PATRICK BURNETT

BY MR. ROTH:

Q  Good morning, sir.

A  Good morning.

Q  In April of 2016 where were you employed?

A  Michigan State University.

Q  In what capacity?

A  Culinary platform attendant.

Q  I am sorry. Say that again?

A  A culinary platform attendant.

Q  What does that mean, day-to-day?

A  I cook in a venue.

Q  Thank you. For Michigan State University?

A  Yes, sir.

Q  Before working at Michigan State University, where did you work?

90

A  Michigan Department of Corrections.

Q  Thank you. So back in April of 2016 — you know what, I'm going to ask that a lot cleaner. When did you start working at MSU?

A  About eight years ago.

Q  Thank you. While you're working at Michigan State University in the culinary department, did you work with a person by the name of Tunc Uraz?

A  Yes.

Q  Did you call him by a different name?

A  Yes.

Q  What did you call him?

A  Tony.

Q  Sometimes Big Tony?

A  Yeah.

Q  Do you see that man in the courtroom today?

A  Yes, sir.

Q  Can you please point him out, identify him for the record?

A  Right there (indicating).

MR. ROTH: Thank you. I ask the record to reflect that the witness has identified the Defendant.

THE COURT: Any objections?

91

MR. PERRONE: No objections.

THE COURT: So identified.

Q  (MR. ROTH) How long had you worked at MSU with the Defendant?

A  Off and on throughout the whole time, the whole eight years.

Q  Did he work there before you started there?

A  Yes, sir.

Q  So over the course of those eight years, did you become friendly with the Defendant?

A  Yes, sir.

Q  So friendly can mean a lot of things. You guys are friendly while you're at work together?

A  Yes, sir.

Q  Did you ever do anything outside of work with him socially?

A  No, sir.

Q  So in April of 2016, do you recall being at work around 5:20 PM with the Defendant and several other employees?

A  Yes, sir.

Q  Do you know the conversation I'm referring to?

A  I believe so.

Q  Where did this occur?

A  In Landon Hall.

92

Q  Say that again?

A  At Landon Hall.

Q  Could you please tell us what happened then?

A  Around at that time we were getting ready to go home, we have a 10-minute cleanup time. We were sitting at the table at the time, just me and another gentleman, I think, and getting ready to go. When he got up and was getting ready to go, Tony came to me and asked me if I trusted him.

Q  So you used some pronouns. You said "he." After the other guy leaves you alone, and then the Defendant approaches you?

A  Yes, sir.

Q  Very good. You told us at that point the Defendant says what?

A  He asked me if I trusted him or something like that.

Q  How did you respond?

A  I told him yeah.

Q  What was his tone of voice when he asks you do you trust me?

A  Kind of quiet in nature. Kind of, you know, wanted to be just between me and him, I guess.

Q  At this point in the conversation, did it

93

strike you as odd?

A   Yeah.

Q   Just by the way he approached you and the tone of voice?

A   Yeah.

Q   After you say "yes," what does he then do?

A   Well, he -- I believe he said that he trusted me, and then asked me for a gun and bullets.

Q   Did he say anything else about wanting a gun and bullets?

A   No. Not that I remember. Just that he wanted a gun and bullets.

Q   All right. Did you end up speaking to a police officer within a few days of this back then?

A   Yes, sir.

Q   All right. And did you give them a pretty full statement about what had happened?

A   Yes, sir.

Q   Was it more recent in your memory back then?

A   Yes, sir.

Q   Would looking at that report help refresh your memory?

A   Probably.

Q   All right.

       MR. ROTH:   May I approach the witness, Your

94

Honor?

       THE COURT:   You may.

Q   (MR. ROTH) If you want to just take a moment and read this bracketed area silently to yourself and look up when you're done. Does that refresh your memory as to some of the details of that conversation?

A   Yeah.

Q   Did he go on to say anything else about the gun and bullets?

A   Just that he had -- he was in need of a -- in need of it. He seemed like he really needed it.

Q   Did he tell you how he wanted to go about getting them?

A   I don't think initially, he didn't.

Q   Sir, isn't is it true he told: I don't want to go about it the legal way?

A   I believe something to that effect that he didn't want to do that, after I had tried to to tell him if he had a problem, that go to the police, you know, get a gun the regular way if he wanted to do that.

Q   That's little later in the conversation?

A   Yes, sir.

95

Q   Let's go back to the beginning. He says he wants a gun and bullets. Does he ask for your help in getting them?

A   No. Well, at that time when he asked me that, I really didn't think he was serious. I just got up and basically left. And then when I left, I left my phone there in the station later that day. I figured I had left my phone and came back to get it. He asked me, as I was coming down the stairs, because one of my co-workers put it in my locker, and he asked me again something about it. So I gave him a look like: You are you crazy? No, I'm not going to do anything like that for you, and just walked right past him and came back upstairs and left.

Q   So you said that you're -- looking and your statement to say: I'm not going to do anything like that for you. Is he asking for your help to get the gun and bullets?

A   Yeah, I think so.

Q   Okay. That was at least how you interpret it?

A   Yeah.

Q   And you said that at the beginning you think that he was joking. Is his appearance joking at all?

96

A   No. But I say that because Tony, you know, we always joked. Nothing like that. But I didn't take him, you know --

Q   At least in the beginning you didn't think he was serious?

A   No.

Q   You said he told you he needed the gun and bullets. Did he tell you what he needed them for?

A   No. He said one time when we were in the cooler, he pulled me to the cooler and he said that he was scared.

Q   And then you indicated that, again, in this first day of this conversation, you tell him: If you have a problem go to the police. And how does he respond?

A   Like he couldn't.

Q   That's when he tells you, and your quote is that he says: I don't want to go about it the legal way, correct?

A   I'm not sure if he uses those particular words. But something to that effect, that he couldn't go that way.

Q   But he made it clear to you that he could not do this in a legal registered firearm fashion,

97

correct?

A  Right.

Q  And by this point in the conversation, do you realize that this is not a joke?

A  Absolutely.

Q  Did he tell you why he was asking you and not somebody else?

A  No. He was still confused about that.

Q  You indicated that you have this initial conversation, it sort of dissolves, then he re-approaches you a little bit later in the night; isn't that correct?

A  Yes, sir.

Q  Both times in this initial day, did you make clear that you were not going to help him?

A  Yeah.

Q  Did he approach you again the next day asking again about getting an illegal gun?

A  Yes, sir.

Q  Where did this happen, the second day?

A  I was behind the Grill and Sizzles, a venue at the Landon Heritage Common. And he called my name. And as I looked up he was walking towards the cooler that we have behind the counter with us, and waved me towards that way.

98

So I just went with him, you know.

Q  And where did you guys then go?

A  In the cooler. It's like a walk-in cooler.

Q  What happened then?

A  Well, he stated again, and asked me again if I could help him do that. I took that opportunity to tell him: No, I could not, and that he shouldn't do that. It's trouble, you know. I couldn't believe he was doing it at work. That was enough trouble as it stood. And I felt like since I worked at the Department of Corrections, I didn't feel that he was that serious. I tried to tell him about his son, that he wouldn't see him, and just trying to — try to get him out of that.

Q  That it had gone as a bad idea?

A  Absolutely.

Q  Again, during this second conversation, or second day of this conversation, does he again appear serious?

A  Yes.

Q  Was that the final time that you two spoke about it, or was there another time?

A  No. That was it.

Q  After this final conversation with him about

99

him wanting an illegal gun, did you report this to somebody?

A  Yes, sir.

Q  Who did you report it to?

A  My supervisor, Rich Kniff.

Q  Could you spell the last name for us?

A  K-N-I-F-F.

Q  Thank you. Why did you report this to your supervisor?

A  Well, I felt Tony was totally disrespecting me in the workplace by asking me that. And than that I trusted Rich. I wanted to somehow try to help him out of this, you know, Tony out of this by trying to go to Rich, trying to find someone that knew him. Because I couldn't sway him, maybe somebody could sway him from it.

Q  Now, as a result of that, the police get involved and they come speak to you as well?

A  Yes, sir. I was told to go to the office. And everybody left, all the manager's office, the whole floor. And I basically talked to him, a lady on the phone, from Michigan State.

Q  What happened with the Defendant's employment at MSU after this?

A  I believe he was terminated.

100

Q  Did you ever have contact with him again?

A  No, sir. I don't believe so.

MR. ROTH:  Nothing else, Your Honor. Thank you.

THE COURT:  Mr. Perrone?

MR. PERRONE:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. PERRONE:

Q  He didn't tell you why he wanted the gun?

A  No, sir.

Q  He didn't indicate to you any reason, specifically, why he would be trying to obtain the gun?

A  No, sir.

Q  And you testified that he talked to you in the cooler, that it was your perspective that he appeared to be scared?

MR. ROTH:  No, Your Honor. That's a mischaracterization. The Defendant claimed he was scared. The way he testified, he appeared serious.

THE COURT:  That's my recollection, Mr. Perrone.

Q  (MR. PERRONE) Did it appear to you when you spoke with Mr. Uraz that he appeared scared?

101

A   Concerned, scared. Yes, sir. He had some issue.

Q   But he didn't tell you what that issue was?

A   No, sir.

Q   And he was clear with you that he was not going to be able to buy a gun legally, himself, based upon what the Prosecutor asked you?

A   Could you say that again?

Q   Was it clear -- did he make it clear to you he wouldn't be able to buy a gun by himself, that it was illegal for him to buy a gun?

A   No. He didn't say it was illegal.

Q   You tried to counsel him, telling him that guns aren't a good idea?

A   Yes, sir.

Q   You knew his family?

A   I met his mother. And his son comes in there.

Q   How long did you work with him?

A   On and off through my whole career. I believe when I started there, Tony was at Brody.

Q   How long was that when you started?

A   Eight years, eight, nine years ago.

Q   You had a lot of interactions with Tony over the years?

A   Just through work. Not a whole bunch of

102

interaction. Just when he was working with the — if I worked Atlanta, he worked there. If we had the issue, he was the go-to guy.

Q   You and Tony used to joke around?

A   Yeah.

Q   Did you get in a more favorable work schedule after reporting this?

A   No. I don't think so.

MR. PERRONE:  No further questions.

THE COURT:  Any redirect?

MR. ROTH:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. ROTH:

Q   So Mr. Perrone asked you about whether or not you and the Defendant had joked around before. This series of conversations about helping him get a gun, was that anything like your prior joking around with the Defendant?

A   No, sir.

Q   Did anything about this feel like he was joking around to you?

A   No.

Q   Mr. Perrone asked about the legality of the gun. I want to clarify. Is it the Defendant said he could not legally buy a gun or that he

103

specifically told you he wanted an illegal or registered gun?

A   I thought like he was asking me he wanted an illegal one.

MR. ROTH:  I understand. Nothing else.

THE COURT:  Jurors have any questions from Mr. Burnett? Appreciate it. You're all set. Free to go. We will take our lunch break now. I will ask the jury to come back at 1:20. Don't talk with anybody, discuss the case, family, friends. Read any news reports, radio broadcasts, listen to. And on behalf of the Citizens of Ingham County, thank you very much. See you back this afternoon.

(Jury exits courtroom at 12:00 p.m.)

THE COURT:  We are in recess until 1:30.

MR. ROTH:  Thank you, Your Honor.

MR. PERRONE:  Thank you, Your Honor.

(Recess taken from 12:00 a.m. to 1:40 a.m.)

THE COURT:  Returning to People versus Tunc Uraz, file 16-1065 and 1064. Mr. Perrone is here. Mr. Roth is here. Mr. Uraz is here. Ready for the jury?

MR. ROTH:  Yes, Your Honor.

THE COURT:  Ready for the jury, Mr. Perrone

104

MR. PERRONE:  Yes, Your Honor.

THE COURT:  Next witness, Mr. Roth?

MR. ROTH:  Thank you, Your Honor. The People call Detective Hogan.

THE COURT:  Do you swear or affirm the testimony you are about to give will be the truth, the whole truth, under penalty of perjury?

THE WITNESS:  Yes, sir.

THE COURT:  Have a seat. State your last name for the Court Reporter, please.

MR. ROTH:  Andrew Hogan. H-O-G-A-N.

THE COURT:  Thank you. Mr. Roth?

ANDREW HOGAN,

BY MR. ROTH:

Q   Good afternoon.

A   Good afternoon.

Q   Where do you work?

A   Lansing Police Department.

Q   In what capacity?

A   Detective assigned to the violent crimes unit.

Q   How long have you been with the Lansing Police Department?

A   Just shy of 19 years now.

Q   What is your responsibility as a detective in

105

the Violent Crimes Unit?

A  I'm assigned to investigate crimes that range from simple assault up to homicides.

Q  In that capacity did you assist with an investigation of the Defendant to solicit to murder -- inmates to murder Erika Melke?

A  I did briefly.

Q  Is it fair to say at that point you were not the main investigator?

A  I was not.

Q  Detective Krumbach was?

A  That's correct.

Q  As an assisting detective, could you tell us a little bit about what your responsibilities are?

A  I assisted briefly during the course of this investigation. I had some previous knowledge of a subject --

Q  Let me back you up. I don't want to know specifics. But as an assistant detective, what did you do?

A  Pretty much what the primary asks of you. Take care of some ancillaries, some side work, some stuff that may not be specific to the investigation. Just kind of share the work.

106

Q  Very good. So did you and Detective Krumbach interview an inmate by the name of Reginald Close on October 17, 2016?

A  We did.

Q  Where did that occur?

A  Ingham County Jail.

Q  Who else was present during that interview?

A  The subject and the subject's attorney.

Q  At the beginning of that interview, was it made clear to Mr. Close that he would not receive anything in exchange for his cooperation?

A  As I recall. Yes.

Q  Was Mr. Close cooperative during that interview?

A  Yes.

Q  For more specific information about that interview, we have to talk to Detective Krumbach; is that correct?

A  That's correct.

Q  Did you and Detective Krumbach try to confirm or corroborate information that Reginald Close provided to you?

A  Yes, we did.

Q  Specifically, did Mr. Close tell you he received some initial up-front money, sort of a

107

deposit from the Defendant?

A  He did.

Q  Of his jail account?

A  He did.

Q  Did you try to confirm that?

A  I did.

Q  Can you please explain the process by including that?

A  I learned that the money that goes into the Ingham County Jail is done through a business called Express Accounts. I was able to get the phone number from Express Accounts. I spoke with the CEO owner of the company and discussed the process of how money is deposited into those accounts with him.

Q  Thank you. And in so doing, did you obtain some record regarding Mr. Close's account and some activity on that account?

A  Yes. We were able to find the date and time of the deposit and the amount of money that was deposited.

MR. ROTH:  Your Honor, may I approach the witness, Your Honor?

THE COURT:  You may.

Q  (BY MR. ROTH) Showing you what's been marked as

108

Exhibit -- Proposed Exhibit 42, in the transaction record that you obtained?

A  Yes. That looks -- that is it.

Q  And on the back, is there a certificate from Express Accounts about the accuracy of that record?

A  Yes, there is.

MR. ROTH:  Your Honor, I would move admission of Proposed Exhibit 42 pursuant to MRI 902.11.

THE COURT:  Mr. Perrone?

MR. PERRONE:  No objection.

THE COURT:  So admitted.

(PX-#42 is received into evidence.)

Q  (BY MR. PERRONE) So up top we have an account number, a name. We have a date range. Could you tell us what the date range is?

A  9-1 of 2016 to 2017.

Q  So the first two items here, fair to say these are charges against the account?

A  Yes. That's how I understood it.

Q  The third one is a deposit; is that correct?

A  Yes.

Q  For how much?

A  $160 was the amount, apparently minus other

109

numbers, $132.59.

Q So there's some fees that are removed, it looks like?

A Yes, sir.

Q Does the record -- I am sorry. What date was that done?

A 10-13 of 2016.

Q Does this record indicate who deposited that money?

A It does not.

Q How was the money deposited in an inmate's account?

A It is done at a kiosk in the lobby of the Ingham County Jail.

Q It's sort of like an ATM machine?

A Very similar.

Q When a person deposits money into an inmate's account, does that kiosk take an automatic picture of the person?

A It does.

Q Did you obtain the picture of the person who deposited the money that we see on People's Exhibit 42?

A Yes.

Q Is that, again, through Express Accounts

110

Company?

A Yes, it is.

Q Let me ask, Detective, first, showing you People's Proposed Exhibit 43, is that the picture you're provided?

A Yes.

MR. ROTH: I move for admission of 43, the Detective's testimony and as well as the 911 certificate attached to 42.

THE COURT: Mr. Perrone?

MR. PERRONE: No objection.

THE COURT: So admitted.

(PX-# 43 received into evidence.)

Q (MR. ROTH) We are going to hear more testimony from Detective Krumbach about the identification of this subject. Is it fair to to say you recognize the background here as part of the jail?

A I do.

Q In your responsibilities assisting in this case, did you also find out from the jail, while he was lodged there, the Defendant had made any complaints about treatment by other inmates?

A No. I did check with the jail. I spoke with a

111

sergeant and a lieutenant. They reviewed the records to see if there had been any threats or promises or assaults against the Defendant. There were none.

Q No complaining by the Defendant of any sort?

A Not relating to those types of issues. No.

MR. ROTH: Nothing else, Your Honor. Thank you.

THE COURT: Mr. Schroeder?

CROSS-EXAMINATION

BY MR. SCHROEDER:

Q Good afternoon, Detective Hogan. How are you doing today?

A Good. How are you.

Q I'm doing all right. How long have you been with the Special Crimes Unit?

A I'm not assigned to the Special Crimes.

Q Or --

A Violent Crimes, sir?

Q Violent Crimes, yes.

A Yes. A little more than seven years now.

Q Okay. And how many cases have you worked on with Detective Krumbach prior to this one?

A I couldn't say specifically, but I would say many.

112

Q Okay. Now, Mr. Roth showed you a picture of the individual who put the money in the kiosk. Did you attempt to interview this individual as part of your investigation?

A I did not specifically attempt to interview him.

Q Excuse me for just a second. All right. You also testified that you interviewed an individual associated with this investigation on October 17 of 2016; is that correct?

A That date sounds correct. Yes.

Q Is that individual Mr. Close?

A I was present at that interview. Yes.

Q Was that the first time you had met Mr. Close?

A No.

Q Okay -- when was the -- when did you meet him -- when was the first occasion you met Mr. Close?

A I couldn't give you a specific date. It was prior to that date.

Q Would October 24th, 2016 be correct?

MR. ROTH: That would be a subsequent date. I think you mean August.

Q (MR. SCHROEDER) August 24th. My mistake.

A I don't have it here in front of me, but it

113

sounds approximately correct.

Q Okay. And what was the purpose of that meeting with Mr. Close?

A It was an investigation into another crime, a different crime.

Q Was it one crime or was it multiple crimes?

A My focus was one crime. There was another detective present. He may have had some interest in some other crimes. I know the crime I was specifically interested in.

Q During that August meeting with Mr. Close, was that when a proffer was being offered to Mr. Close?

A I know that we had a proffer letter agreement with him at that time.

Q Okay. And during that August meeting with Mr. Close, did he provide notes for you, for that prior investigation?

A I don't recall getting notes.

Q Was the case you were investigating the John Pierce case?

A No, it was not.

Q Okay. And — so beyond the meeting with Mr. Close, and reviewing the video, you didn't have much involvement with the investigation

114

beyond that, correct?

A I was present about Detective Krumbach when we went to phone restrictions to verify some of the information for the interview. I was present with Detective Krumbach when we attempted to track down and speak to the subject, who you see in the still shot from the kiosk at the Ingham County Jail.

MR. PERRONE: No further questions, Your Honor.

THE COURT: Redirect?

MR. ROTH: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. ROTH:

Q So you indicated that in a prior interview with Reginald Close, you had obtained some information from him about another criminal case?

A From my perspective, yes. That is why I went to meet with him.

Q So we talked about in this case you did a single thing to try and corroborate it because it's Detective Krumbach as the primary investigator. Are you the primary investigator in the other crime that Reginald Close talked

115

to you about?

A Yes, I am.

Q Is it fair to say your responsibilities in that case are much broader, more significant?

A Yes. Absolutely.

Q So in that case, I am not going to get into specifics, Reginald Close provides you with a significant amount of information; is that correct?

A That is true.

Q Were you able to confirm and corroborate all of it?

A I can't say all of it, but a great deal of it.

Q Nothing that was dispelled?

A Nothing that he provided me from my other investigation that was inaccurate or incorrect.

MR. ROTH: Very good. I have nothing else.

THE COURT: Jurors have any questions for Detective Hogan? All right. Thank you, Detective. Next witness?

MR. ROTH: People call Officer Frank Mobley.

THE COURT: Raise your right hand. Do you swear or affirm that the testimony you are about to give will be the truth, the whole truth, under penalty of perjury?

116

THE WITNESS: Yes, sir.

THE COURT: Have a seat. State your name and spell your last name for the court reporter, please.

THE WITNESS: My name is Frank Mobley. Last name spelled M-O-B-L-E-Y.

THE COURT: Thank you. Mr. Roth?

FRANK MOBLEY,

A witness sworn to tell the truth under oath as follows:

MR. ROTH: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. ROTH:

Q Good afternoon, Officer.

A Good afternoon, sir.

Q Where are you employed?

A City of Lansing Police Department.

Q In what capacity?

A I am currently assigned to the Tri — I mean special — SOS, Special Operations Section.

Q How long have you been with the Lansing Police Department, overall?

A It will be 22 years in November, November 19th.

Q So tell us in the Special Operations Section that you're currently assigned, what does that

117

unit do?

A  Our unit does a number of things. We currently from narcotics selling to buying, to hooker stings, to murder for hire. We act in an undercover capacity a lot, so...

Q  So tell us broadly, what does it mean when you are acting in an undercover capacity?

A  You name it. I'll play the bad guy. I will be a dope dealer. I will be a crackhead. Whatever they need me to do, I'll do.

Q  It is not uniform police work?

A  Correct. This is all undercover, plain clothes.

Q  How long have you been in the Special Operations Unit at this time?

A  Actually a year and a half.

Q  Did you have prior undercover experience?

A  Yes.

Q  Tell me about that.

A  I worked in Tri-County Narcotics before.

Q  How long did you work that?

A  For two and a half years, also.

Q  That is another undercover assignment?

A  Yes.

Q  Roughly when was that?

118

A  2006, seven, somewhere around there.

Q  Any other undercover experience?

A  No, sir.

Q  Very good. You talk about your current assignment in Special Operations Section. Is that how you were assigned October 2016, one year ago?

A  Yes, sir.

Q  On October 18, 2016, were you approached about a solicitation of murder investigation in an undercover capacity?

A  Yes, sir.

Q  What was your role to be?

A  My role was to contact the Defendant, Mr. Tunc Uraz, who was in the Ingham County Jail. Because we had gotten word that he was trying to solicit someone to kill his ex-girlfriend.

Q  And I assume you weren't going to say you were Officer Frank Mobley?

A  No, sir.

Q  What was your role going to be?

A  I was supposed to be a hitman.

Q  Were you provided with some information to incorporate into your undercover role?

A  Yes, sir.

119

Q  What was that?

A  I had — they had gave me the name of the subject that wanted me to kill his girlfriend. They gave me a little bit of information about who the information initially came from.

Q  Who is that?

A  Mr. Uraz, who was also a subject incarcerated in the Ingham County Jail.

Q  Rough was a street name you're provided with?

A  Yes, sir.

Q  He was supposed to be the intermediary who put you in touch with the Defendant?

A  Correct.

Q  So you indicated that at that time the Defendant was at the jail. How are you supposed to make contact with him?

A  It was through a video conference call. I think the name of the actual site was Securus. Something new. I didn't even know they had this. But it's like a video conference call that they — that you can contact someone or make contact with somebody in the Ingham County Jail through just video. So video and voice or whatever. So...

Q  It's not just asking for police officers,

120

people can visit their loved ones by this video chat as well?

A  Yes.

Q  Who arranged that video visit with the Defendant?

A  Lieutenant Robert Backus.

Q  When was your first attempt to make contact with him?

A  That was in October.

Q  Is was reported in your report?

A  Yes. October. I'm sorry. I don't recall that. But if you -- if I can look at my report, it will refresh my memory.

Q  Absolutely. Fair to say you have done a number of cases since that time?

A  Yes.

Q  And you write these reports to help you remember it a year later?

A  Yes.

MR. ROTH:  Very good. May I approach the witness, Your Honor?

THE COURT:  You may.

Q  (MR. ROTH) If you can read the starred part silently to yourself and look up when you are done? Does that refresh your memory?

121

A   Yes, sir.
Q   When was the first time you attempted to make contact with the Defendant?
A   On 10-18-2016.
Q   What happened at that time?
A   I made contact with him.  What — can I take another look?  I'm sorry.
Q   Absolutely.
A   I'm getting the two dates confused.
Q   Absolutely.
A   Okay.
Q   Were you able to successfully make contact with him on the 18th?
A   No, sir.
Q   What happened on the 18th?
A   My wifi was not acting right.  I was unable to make contact with the Defendant at that time.
Q   Did you try again at a little bit later date?
A   10-24-2016.
Q   Do you recall approximately what time it was, approximately?
A   It was approximately 1700 hours.
Q   That would be about 5 p.m; is that correct?
A   Yes, sir.
Q   Was that visit reported?

122

A   Yes, sir.
Q   Just as a matter of course, these video visits are always recorded anyways?
A   Yes, sir.
Q   Prisoners are made aware of that?
A   Yes, sir.
Q   Do you see the person that you spoke to on that video visit in the courtroom today?
A   Yes, sir.
Q   Could you please point him out and identify him for the record?
A   Sitting over there at Defendant's table, in a gray suit, blue shirt, blue tie.
    MR. ROTH:   Your Honor, I ask the record to reflect the witness has identified the Defendant.
    MR. PERRONE:   No objection.
    THE COURT:   So identified.
Q   (MR. ROTH) Did you talk any differently on that call than when you are here in court today?
A   Yes, sir.
Q   Tell me a little bit about that.
A   It's almost like acting.  You talk the way you -- that a hitman is portrayed.  So I threw

123

a little slang in there, swore a little bit more.  I don't know.
Q   Did you use the word "trash"?
A   Yes.
Q   So who first used the word "trash"?
A   I did.
Q   Were you using "trash" in place of a different word?
A   Yes, sir.
Q   Tell me about that.
A   Being that we were recorded, and that this is a murder for hire investigation, I knew I couldn't use the word "kill."  So what I did is I used the words "take out trash."
Q   Even though you used that phrase "take out the trash," did you use it in such a way to make it clear that you were talking about a person at various points throughout the conversation?
A   Yes, sir.
Q   Tell me a little bit about how you did that.
A   Throughout the conversation I mentioned:  Do you want me to beat that trash with a bat?  Do you want me to spill that trash over the house?  Do you want me to clean up the trash when I'm done?  How many bags of trash do you want me to

124

take out?
Q   Did you talk about the color of the hair of the trash?
A   I asked about the color of hair of the trash.  I asked about the actual address of the trash.
Q   Very good.  Even though you were the one that started this code of "taking out the trash," did the Defendant use it, too?
A   Sir?
Q   Even though you start this code of taking out the trash, did the Defendant take up that phrase as well and begin using on his side as well?
A   Yes, sir.
Q   Did he ever express any confusion about what you meant by it?
A   No, sir.
Q   Did he ever express any confusion during your conversation about what you were saying?
A   No, sir.
Q   Were there things that he did during this call to show that he was being careful because the call was recorded?
A   Yes, sir.
Q   Can you tell me what sort of things you're

125

talking about?

A   I asked him numerous times about what the address was where this trash was located. His response was: Well, Rough should have told you that information, because he had written it down, I guess. And he said that Rough should have had given you information because it was written down somewhere.

Q   So you kept asking for the address, where you were to go, and he refused to provide it?

A   Correct.

Q   Showing you what's been marked as Proposed Exhibit 44, is this labeled the October 24th video visit?

A   Yes, sir.

Q   Is that a fair and accurate recording of it?

A   Yes, sir.

Q   Proposed Exhibit 45, is this a transcript of that phone call?

A   Yes, sir.

Q   Have you reviewed that transcript?

A   Yes, sir.

Q   Typing this up, having this to read as you watch, does this help in understanding what's going on?

126

A   Yes, it does.

MR. PERRONE:   Approach, Your Honor?

Q   (MR. ROTH) Is that a fair and accurate transcript of that call?

MR. PERRONE:   May we approach?

THE COURT:   Yes.

(Off the record discussion at the bench.)

MR. ROTH:   So at this time I am going to move for admission of Proposed Exhibit 44 and 45, though we will not be distributing the transcript to the jury until after the video is played, is my understanding?

THE COURT:   That's right. Any objections to that, Mr. Perrone, 44 being the actual video?

MR. PERRONE:   No objection to admission of 44. As to 45, just continuing the objection as discussed.

THE COURT:   Okay. We will acknowledge continued objection, but after playing of the video, I think the transcript will be appropriate.

MR. ROTH:   Thank you, Your Honor.

(PX-#44 and 45 are received into evidence.)

Q   (MR. ROTH) Before I play the video, is it fair to say that at the very beginning there's some

127

sound interference that makes it hard to hear?

A   Yes. This was new to me. Technology is new to me, the iPad or iPro, or whatever I had it on, to make this communication. I didn't realize that I needed earphones to -- because of all the outside interference noise. So the first like four minutes, three, four minutes, it's going to be static. Yes, so...

Q   Then it goes away and you can hear better?

A   Yes. Oh, yeah. Yep.

MR. ROTH:   At this time we will play People's Exhibit 44, at 2:08 p.m. May I approach? Turn up the volume a little bit.

I believe the Court has admitted now into evidence, Proposed Exhibit 45, the transcript of that call?

THE COURT:   Subject to Mr. Perrone's continued objection.

MR. ROTH:   Thank you.

Q   (MR. ROTH) Officer, you have reviewed this transcript?

A   Yes, sir.

Q   It is an accurate transcript of what we just watched?

A   Yes, sir.

128

Q   At the end of the phone call you indicate that you will call him back the next day to let him know that it's done. Did you contact him the next day or was it a little bit later?

A   It was a little bit later.

Q   Do you recall the next day you contacted him was?

A   I am sorry, I have to look at the report to reflect my memory, so...

MR. ROTH:   May I approach the witness, Your Honor?

THE COURT:   You may.

Q   (MR. ROTH) If you can read that silently to yourself and look up when you're done?

A   Okay.

Q   When was it?

A   It's 10-27 of '16.

Q   Could you tell us what happened at that time?

A   At that time, if I remember correctly, I tried to make contact with him, but no conversation took place. I saw him, if I'm not mistaken, but no conversation actually took place.

Q   Is that date, what's on Proposed Exhibit 46 on the label?

A   Yes, sir.



133

Q (BY MR. PERRONE) Did they offer you an option as far as this is concerned?

A When you say "option"?

Q Sorry. Was this something that you chose to do, that you took upon yourself or were you told to do? You were you ordered to do it or you chose to do it?

A I chose to do it.

Q Did you think that you would be a good person to do it, given the surroundings?

A I am sorry?

MR. ROTH: Your Honor, I guess I am going to object to the vagueness in the surroundings. I guess I don't know what that means.

THE COURT: Well --

Q (MR. PERRONE) Did you think as a result of Rough being black, that you would have been a good candidate, since you were also black?

A I didn't even know Rough was a black.

Q Did you question why they were using you at all?

A When we get word that this was going on in the Ingham County Jail, my Lieutenant Backus came to our meetings and said this is what was going on. He asked for someone to -- if someone was

134

interested in being a hitman. So out of all of the folks in our unit, I said I'll do it.

Q You said when we got word?

A Yeah.

Q Did you have word prior to Lieutenant Backus?

A No.

Q So you would have had the -- he would have had the information same time as you?

A He brought it to us.

Q And you volunteered to act as the hitman?

A Yes, sir.

Q Have you previously ever acted as a hitman?

A I think one time, back in the days I was supposed to be hitman, but I don't think I ever went through.

Q Do you have any other formal training associated with -- do you have any special training from your captain?

A I am sorry. Special training as in hitman training?

Q Yeah.

A No. There was no course in hitman training in our basic and narcotics -- basic and advanced narcotics school, no, there wasn't.

Q Were you given any specific orders as to how to

135

question Mr. Uraz? Did your superiors?

A Basically it was just trying to get him to incriminate himself. It was simple. I mean, just try to get him to say what he wanted done.

Q So it was your job to get him to say what you wanted him to say?

MR. ROTH: No, Your Honor. That's a mischaracterization.

THE COURT: That's a mischaracterization. Just need to have questions, Mr. Perrone, not opinions.

Q (BY MR. ROTH) As far as the recording is concerned, there is some significant issue with the static, initially, with the call on October 24th?

A Yes, sir.

Q There is also static on the call on October 18th?

A I'm sorry?

Q October 18th, the initial call that you made?

A Seventeenth.

Q You made --

A The 17th?

Q Did you make three calls?

A Yeah. Seven, 17 and the 27th.

136

Q The 18th?

A Okay. I'm sorry.

Q Twenty-four and 27th.

A I am sorry.

Q I'm wondering if it's the 18th and the 19th. What was the delay between the call on the 18th and the call on the 24th? What was the reason for the delay?

A The delay from the 18th to the 24th? There wasn't a real reason for a delay at all. Not that I recall.

Q Did you receive additional information in regards to Mr. Uraz's case prior to initiating the call on October 24th?

A When you say additional information, I'm sorry.

Q Did Special Operations receive any information from another inmate that expedited you calling on the 24th?

A I don't recall.

Q You were not actually having a hard time hearing Mr. Uraz when you were on the phone with him?

A Sort of. Yeah.

Q You were using that as a technique to get him to repeat himself?

137

A   Sometimes. A couple of times. Yep.

Q   Did you make the initial phone call on October 18th, on the same day that Lieutenant Back was coming to you initially with the information?

A   I am sorry. Say that again.

Q   Did you make the phone call on the 18th on the same day that Lieutenant Backus came to you with that information?

A   Yes, sir.

Q   Or did you have information prior to that?

A   Yes, sir. The first attempt, yes, sir.

Q   Did you speak with anybody at the Ingham County Jail in regards to the operation?

A   Yes, I did.

Q   Who did you speak with?

A   One of the administrators over there along with Lieutenant Backus. I don't recall their name.

Q   On the third call on the 24th, after you see it hang up, do you try to reinitiate the call?

A   I am sorry. The dates that you are giving me —

Q   On October 24th there were technical difficulties.

A   Okay.

138

MR. ROTH:  No.

THE WITNESS:  I thought that was the 27th.

Q   (MR. PERRONE) On October 27th, sorry.

A   I am sorry. You are confusing me right now. I am not trying to be mean. But --

Q   On October 27th the call was terminated?

A   Correct.

Q   Did you try to initiate the call?

A   Yes. I believe I did. Yes, I did.

Q   Did Mr. Uraz answer?

A   Nope.

Q   How many times did you try to reinitiate the call?

A   I think I tried about two or three other times.

Q   Do you know if he had a deputy near him on the post while this is occurring?

A   I don't recall.

Q   You didn't have any conversations with deputies on the post informing them that this is going on?

A   I made contact with the deputies to make sure that everything was okay on their end. I am sure I did.

Q   You didn't -- probably haven't dealt with instructions on how to deal with —

139

A   When you say instructions, I don't understand.

Q   Did you tell them not to become involved in the investigation, not try to press the Defendant to answer the call.

A   Can you rephrase that one more time?

Q   Did you provide them with any instructions as to what their role in the investigation would be, just to stand aside, not become involved?

A   When you say stand aside, what do you mean.

Q   Not to be involved in the investigation.

A   To allow the communication to go forth?

Q   Yes. Not interfere with the investigation.

A   I don't recall what I told them. But I got to remember making contact, asking them was everything okay with the video conference.

Q   Did you get additional information before the call was placed on October 7 that there were additional inmates that had been solicited by Mr. Uraz, if you can recall?

A   I did see additional information about he had approached a number of other inmates in reference to killing his ex-girlfriend. But I don't remember the date at all. I don't know if it was before the 24th. I don't know if it is before the 27th. I don't recall.

140

Q   If you had an opportunity to review the testimony from the preliminary examination in this matter, would that refresh your recollection?

A   Yes.

Q   183, lines 10 through 24. Did that refresh your recollection as to whether or not --

A   Yes, sir.

Q   When were you provided with information that another inmate that came forward?

A   Before that conversation?

Q   On the 24th?

A   Yep. Yes, sir.

Q   So on the 24th, was there a sense of urgency on your side to get this done as a result of the additional information?

A   When you say sense of urgency, it was let me call him again, see if I can make contact with him.

Q   When did you get the information with regards to the second inmate? Was it the same day that you placed the call on the 24th?

A   I don't recall. I don't recall. I don't recall the dates at all.

Q   Who did you receive the information from?

141

A  Lieutenant Backus.

Q  It was your belief that it was necessary to protect Ms. Melke. It was urgent to protect Ms. Melke from Mr. Uraz's attempts with Close and Allen?

A  Yes, sir.

Q  And through the phone call, you were attempting to develop evidence in this case. It was your attempt to develop evidence against Mr. Uraz?

A  Yes, sir.

Q  Why do you make it a package deal towards the end, start talking about the other people and a discount?

A  I am sorry. Can you rephrase that? I'm -- I don't understand what you mean.

Q  You were initially talking about two per bag, that's what you charge. You tell them you would do any additional one for 500?

A  Yes, sir.

Q  Was there any specific reason why the second ones were much less expensive than the first?

A  No. During the conversation when I asked him how many bags, he initially said five. So that's how that conversation went. And I said 2000, two meant 2000 for the first one. And

142

then 500 for each additional bag. So he was the one that brought it up. I just kept going on with it.

Q  Was the bag of trash something that you were using from your experience in order to try to get him to make certain admissions?

A  When you say my experience, I'm not understanding you. I am sorry.

Q  Your undercover experience, as far as taking out the trash, is that slang, is that something that's part of the investigation?

A  Something that I heard, I guess. I couldn't say kill him on the video conference call. So I just said --

Q  Something you heard from a movie?

A  Something I thought would possibly mean the same thing. I mean, if two people with common sense were talking on a video conference, I just said take out the trash.

Q  No one else gave you any information about taking out the trash?

A  No, sir. No, sir.

Q  So you didn't have any information that Close indicated about taking out the trash?

A  I don't recall.

143

Q  No one informed you?

A  Close.

Q  That there was any indication of a garbage can?

A  I don't recall any of that.

Q  After you didn't verify personally any of the information from Close or Allen, you relied on other officers?

A  Only name I was given, really, was Rough.

Q  Towards the end of the conversation it appears you're pressuring him with some form of a down payment?

MR. ROTH:  I am going to object to Mr. Perrone's characterization of what happened.

Q  (MR. PERRONE) Did you pressure him for a down payment? Did you ask him for a down payment?

A  Yes.

Q  Did you ever receive a down payment?

A  No.

Q  Was there any follow-up through Reginald Close as to payment?

A  No, sir.

Q  Was there any follow-up with Reginald Close at all with respect to the 24th?

MR. ROTH:  Your Honor, I am going to ask that the question be restricted to Officer

144

Mobley's follow-up. He is not the investigator.

MR. PERRONE:  He can say I don't know.

THE COURT:  Well, what we have is cross-examination. It doesn't appear as if he is the investigator, so I will allow him to answer this question. But it doesn't appear as if he is the investigator.

THE WITNESS:  Can you repeat the question? Please read back?

(Portion of record read back by reporter.)

THE COURT:  That would be by yourself.

THE WITNESS:  Sir, with all due respect, the only person I made contact with was Mr. Tunc Uraz. I never made contact with no one else within the cell or as an inmate.

Q  (BY MR. PERRONE) But you did speak with deputies?

A  Yes, sir.

Q  Why is the second call necessary? Why was the third call necessary?

MR. ROTH:  I am going to object to the characterization of the question. There's nothing that is saying necessary. He can ask Officer Mobley why did you make the third call.

THE COURT:  Sustained.

## 145

Q (MR. PERRONE) Why did you make the third call?

A To try to get more evidence on him.

Q He never gave you an address on that video?

A No, sir.

Q Never gave you a hair color?

A No, sir.

Q Never gave you a car?

A No, sir.

Q Why did you tell him at the end that you don't play around because you're from the D?

A I'm not understanding what you're asking me.

Q When you told him I'm from the department, I don't play, some reference to the D, what were you trying to establish?

A Well, I'm a hitman from Detroit. And when this is all done and said there is no going back on it, so...

Q Were you trying to establish street credibility?

A I wouldn't say street credibility. It was -- I I was saying, hey, when I hang up the phone, this is done, that person is dead.

MR. PERRONE: No further questions.

THE COURT: Mr. Roth?

MR. ROTH: Thank you, Your Honor.

## 146

REDIRECT EXAMINATION

BY MR. ROTH:

Q Officer Mobley, Mr. Perrone asked you questions about the broader investigation?

A Yes.

Q Is it fair to say you had a very narrow role in this?

A Yes, sir.

Q That is simply to make undercover contact in the jail?

A Correct, sir.

Q So it sounds like you obviously had much experience doing undercover hitman work. Is it -- is undercover work with drug transactions, I think you also said hooker stings, far more common in your work?

A Yes, sir.

Q So you have had training to do undercover work, generally?

A Yes, sir.

Q In addition to that training, you have built some work experience, let's say, doing it for some period of time?

A Yes, sir.

Q You talked about the need or your desire to use

## 147

a substitute word for kill, which means take out the trash. So in drug terms would you use a similar code?

A I'm sorry?

Q So if you were to contact somebody and ask about drugs, would you use slang to substitute for drugs?

A Yes, sir.

Q For example, heroin, what's another commonly accepted term?

A Dog food.

Q What about cocaine?

A Girl.

Q So these are all sorts of ways people have have to sort of skirting detection?

A Yes, sir.

Q You try to apply that technique here?

A Yes, sir.

Q Similarly, when you're doing drug transactions, do you, if possible, try to make repeat contact with the person to confirm their intent, things like that?

A Yes, sir.

Q Again, you applied a similar technique here?

A Yes, sir.

## 148

Q While you obviously, as we have acknowledged, don't do a lot of work with solicitation of homicide, solicitation of prostitution, is that more common?

A Yes, sir.

Q Do you apply those same techniques as it related to solicitation as you would have developed solicitation of prostitution?

A Yes, sir.

Q Mr. Perrone asked you what precautions did you take to make sure no jail deputies interfered with your investigation. Did any jail deputies interfere with your investigation?

A No, sir. Not recall that I recall, no, sir.

Q But that's something that you would recall if somebody had interfered, correct?

A Yes. But I never really made contact like that. So, no.

Q In your conversation with the Defendant, the long conversation, nobody is interfering there, correct?

A Correct, sir.

Q Very good. We see that in the second call he hangs up and walks away, correct?

A Yes, sir.

149

Q   At any point during the first conversation, does the Defendant hang up and walk away?

A   During the first conversation?

Q   Yes. Not during the first call when you can't get through, but during the second extended conversation you had with the Defendant?

A   No, he does not, I believe.

Q   Not until you have the conversation?

A   Correct.

MR. ROTH:   Nothing else. Thank you.

THE COURT:   Jurors have questions for Officer Mobley?   Thank you, you're set.

THE WITNESS:   Thank you, sir.

THE COURT:   Next witness?

MR. ROTH:   People call Sergeant Kevin Jewell.

THE COURT:   Step up here for us, Sergeant, please. Raise your right hand. Do you swear or affirm the testimony you are about to give will be the truth, the whole truth, under penalty of perjury?

THE WITNESS:   I do.

THE COURT:   Have a seat. State your name, spell your last name for the record, please.

THE WITNESS:   Sergeant Kevin Jewell.

150

J-E-W-E-L-L.

THE COURT:   Thank you. Mr. Roth?

MR. ROTH:   Thank you, Your Honor.

KEVIN JEWELL,

A witness sworn to tell the truth under oath testifies as follows:

BY MR. ROTH:

Q   Good afternoon, sir.

A   Good afternoon.

Q   How are you employed?

A   I'm employed with the Ingham County Sheriff's Office, Corrections Division.

Q   In what capacity?

A   I'm a day-shift supervisor.

Q   You are a sergeant?

A   Yes, sir.

Q   How long have you been with the Sheriff's Department?

A   March of 2000.

Q   And how long with the jail?

A   About 17 years.

Q   So the whole time?

A   Yes, sir.

Q   What are your responsibilities in that position?

151

A   I supervise the day shift staff, and the 450 prisoners.

Q   And so in that capacity you have some awareness of the inmates housed at the jail?

A   I'm sorry?

Q   In your capacity in your job, you have some awareness of some of the inmates that were housed at the jail?

A   That's correct.

Q   The Defendant, Tunc Uraz, was incarcerated in your jail throughout 2016?

A   Yes, sir.

Q   In October of 2016, were you notified of some unusual and inappropriate conduct by the Defendant in the jail?

A   I was.

Q   How did that first get brought to your attention?

A   Inmate kite system.

Q   Could you tell us what that means?

A   It's a way for inmates to communicate with the staff and certain areas of the jail, whether it be medical, Community Mental Health, command officer.

Q   Is a kite like a note?

152

A   It is.

Q   So how does an inmate send a kite to the jail?

A   They request a kite from the deputies that's assigned to that post. They fill it out. And then they gave it back to the deputy. Then they send it to the destination where it's supposed to go.

Q   Is there also an electronic way to do it?

A   There is none.

Q   Tell me about that.

A   Electronic kites, we call it. They basically fill it out the same way. It goes directly to the area that they want the kite to go.

Q   So getting back to our specific case, regarding the Defendant, who is the inmate who brought this to your attention by way of kite?

A   Allen, Charles Allen.

Q   Do you recall when he had received the kite?

A   As far as the date? No, I do not.

Q   Would the kite itself refresh your memory?

A   It would.

Q   If you can take a moment and read that silently to yourself. Does this reflect whether you actually received it in your hand?

A   Yes, it does.

153

Q When is that?

A On/or about 10-24 of '16.

Q So is that the date that it appears it was authored or that you received it?

A It was written on that date. I probably got it maybe the next day. We don't get kites right away.

Q This is the handwritten kite, correct?

A It is.

Q The digital version that came first, you did not receive, correct?

A No.

Q Did you confirm Mr. Allen was, in fact, an inmate at that time, housed with or near the Defendant, Mr. Uraz?

A Yes. I believe they are both housed in the protective custody unit.

Q Is that Post 5?

A Yes, sir.

Q No phone access there?

A No, sir.

Q We've heard testimony about jail staff ability to listen to the discussions. Without disclosing secrets, is that something you guys can actually hear a specific conversation?

154

A We can hear mumblings. We cannot pick up precise pronunciation of words. We can understand basically what they're talking about, but cannot be totally 100 percent sure of what was said.

Q Very good. So let's say very limited application for you guys; is that correct?

A That's correct.

Q Once you received this kite, first of all, what was the general nature of the allegation that Mr. Allen had brought to you?

A As far as what the — what was on the kite?

Q Yes, please.

A Reference to a murder for hire. He was bringing it to our attention.

Q Involving Mr. Uraz?

A That's correct.

Q What did you do once you received that kite?

A I just learned who was doing the investigation.

Q And alerted them?

A Yeah.

Q Very good.

A I alerted the PA's office. And then sent the kite.

MR. ROTH:   Nothing else, Your Honor. Thank you.

155

THE COURT:  Mr. Perrone?

CROSS-EXAMINATION

BY MR. PERRONE:

Q When is the first that you become aware of the underlying solicitation murder for hire plot that was going on in your jail?

A It was in the end of 2016.

Q Was it when you got the kite from Charles Allen?

A Yeah. It was before, probably. I believe I got the word from the Magistrate Blumer, if I can recall.

Q What word did you get?

A That he needed to be kept separate.

Q That Uraz did or Close?

A That Uraz needed to be kept separate from Charles Allen, and anyone else in that particular dorm where he was housed.

Q Who specifically did you contact once you got the kite on October 24th from Charles Allen?

A I think I looked up who the lead detective was. I had a digital copy of the kite. I forwarded that in my e-mail to the PA's office. And then the detective came later to pick up the kite in

156

the receiving.

Q Which detective came up to the pick up the —

A I don't recall, sir.

Q Did you speak with anybody about assisting them in the investigation pursuant to the mutual aid agreement?

A No. Standard SOP. Standard operating procedure.

Q Were any of the other deputies informed that this was something that was going on?

A Yes. Some of the receiving staff that was working that day.

Q Would the post staff on 5 -- Post 5B have been apprized that somebody was on their post was potentially receiving a phone call?

A They would have.

Q As far as the investigation?

A They would have been instructed to, as to Mr. Uraz's whereabouts. I believe we put him into a temporary house-alone situation, until it would be -- it could be determined to the extent of what was taking place.

Q Do you recall when you received the information from Magistrate Blumer to separate?

A I do not have a date. No.

157

Q Did you do a report?

A No, sir.

Q So it would be solely something that would be in your memory?

A I could search and find the day of his arraignment. Then that would be the day I was —

Q Were there any other reports that were done by the Ingham County Sheriff?

A Not to my knowledge.

Q In regards to this incident?

A Not to my knowledge.

Q But individuals were apprized that this was something that was going to happen, there was going to be a call made, they were prepared?

A That, I don't know.

MR. ROTH: Mr. Perrone keeps referring to a call.

THE COURT: It seems like you're jumping around. He is talking about from being separated to the call. That means you have to lay some foundation to get there. Those are two separate and distinct incidents. We don't even know he knows anything about the call yet.

Q (MR. PERRONE) Did you instruct the deputies

158

that there was going to be a call made?

MR. ROTH: I'm going to object to lack of foundation. First question is does the sergeant know the call was made.

THE COURT: Let's give a timeframe. Because you're talking about when he was directed to separate him, which is, you know, we don't know and jump straight to the call.

MR. ROTH: Thank you, Your Honor.

THE COURT: I need a little foundation.

Q (MR. PERRONE) So your deputies were instructed to separate Mr. Uraz from Mr. Close?

A Yes.

Q And you don't recall what date?

A I do not.

Q And did you, after informing them to separate, provide them with any information regarding the Lansing Police Department investigation into Mr. Uraz?

A Provide who?

Q The deputies on post that you were told to separate them? Let me rephrase. Did you provide them any contact on why they were separating?

A Did I explain why we were separating Uraz

159

with --

Q Specifically what you told them?

A Yeah. We would have made mention, this is why we are separating them.

Q And you're familiar with the Ingham County Jail system, cell location history reports?

A Yes.

Q Do you recall what day, specifically, that Reginald close was moved off of cell Block B5?

A I do not.

Q Would it refresh your recollection if you were able to look at his cell location report?

A Yes, sir.

Q And also, just the date that he's moved to the medical floor, moved from the medical floor. Please take a look at this, if you know those, just to review this.

A Okay.

Q After you have had an opportunity to review that, do you?

A This form doesn't look like anything that I would normally have used.

Q How about this one? Are you familiar with those?

A Yep. Are you asking for the date in question?

160

Q The date that he's moved to medical, and the date he was moved from medical, and the date that he was moved from post B5?

MR. ROTH: At this point I am going to object. I think it's a foundational issue, what I told Mr. Perrone. There is a deputy from the jail that actually pulled those records, who is scheduled to be here, two witnesses from now. I am going to ask to defer those questions as opposed to do this twice and watch him start reading voluminous records that he didn't pull.

MR. PERRONE: I am only addressing other individuals with Mr. Close.

THE COURT: Why don't we approach?

MR. PERRONE: All right.

(Off the record discussion at the bench.)

Q (MR. PERRONE) What is your position at the Ingham County Jail?

A At the present time, when this was happening, I was a claims officer.

Q What does a claims officer do?

A They assign bed assignments to all the prisoners that come to the jail.

Q So you're in charge of bed assignments?

A Assigning security levels, housing assignments

161

to prisoners.

A   Everybody that comes to the jail, they get assigned a security level based on their current charge and their prior conviction.

Q   It's your job to determine when somebody needs to change posts, if somebody needs to?

A   If somebody wants to change posts they need to come through claims, yes.

Q   What if a deputy wants somebody to change posts, would that go through you also?

A   It does.

Q   So you are fairly aware of the comings and goings where inmates are located within the jail?

A   Yes, sir.

Q   When you were approached by the deputies, did they ask if you could produce any of the recordings?

MR. ROTH:   I guess I am going to object. I don't know what it means when you are approached by the deputies. I don't know what it's referring to.

THE COURT:   Right.

Q   (MR. PERRONE) Was there any efforts on behalf of the Sheriff's Department to try to preserve

162

the videos or recordings from the cells where Mr. Uraz and Mr. Close were located?

A   The only thing that we looked into, the kites, which we forwarded onto the Detective Bureau for LPD.

Q   The Ingham County Jail does have recording capabilities, limited in scope?

A   On the phones?  Yes.

Q   Does the medical unit have video?

A   Video?  Yes.

Q   Was that something that has been looked into?

A   The video?

Q   Yes.

A   Um-hum.

Q   Video of medical post while Mr. Uraz and Mr. Close are on the video post together?

A   It's usually checked every 15 minutes.

Q   Is it reserved?

A   Up to 30 days, I think.  And then that recycles.

Q   Did you receive any type of a request to preserve any video from the medical unit?

A   From the medical unit?  No.

Q   Why is there a video on the medical unit?

A   We had a video in that unit because it's above

163

our receiving area.  So we just keep an eye on it as to what's going on in the system.  Most of our cells in receiving have video surveillance.

Q   Were any of the inmates on -- was either Close, Allen, Pierce or Mr. Uraz on the medical floor for medical reasons?

A   I do not believe so.

Q   Is there an administrative segregation of sorts for classification levels?

A   We have an admin segregation, yes.  It does not matter what level you are, though.

Q   Where are inmates usually put if they are put in the administrative segregation?

A   Behavior modification, cell isolation.

Q   And where is that located?

A   In our receiving section.

Q   Is that where Mr. Uraz was at?

A   He was never on administrative segregation.

Q   Is there a separate floor where inmates are put, when they are put on phone restriction?

A   Put forth what, sir?

Q   To prevent them for making phone calls.  Why were the individuals on the medical post for making phone calls?

164

A   I'm sorry.  You're going to have to repeat question again.

Q   Why were Mr. Pierce, Mr. Uraz, Mr. Close, Mr. Allen on the medical post for phone restriction?  Is that a normal course for the Ingham County Jail?

A   If there is no phone that works within that particular dorm, then, yes.

Q   Is that where all individuals for phone restriction go?

A   No.  Because we have control over the posts, and we don't differentiate posts in the jail.

Q   Does the jail have some overcrowding issues recently?

A   Just recently.  Yeah.

Q   Was the medical unit used as an overflow?

A   We use every cell that was available to us for prisoners.

Q   None of the individuals on the medical post were at the highest level of classification associated with discipline?  They weren't in the administrative segregation?

A   As of the prisoners that are there currently today?

Q   If you can just kind of explain the sequence of

165

classification, and how inmates are classified.

A They are classified based on their current charge and their prior criminal conviction, and are given a security number level one through nine based on assaultive felony convictions or current assault charges. That would be a high security prisoner.

Q In classification level, if you reach -- what's the highest level with most restrictions?

A Level one.

Q Do you recall what level that any of the inmates were, that were placed on the medical post?

A I believe they were all lower security levels.

Q The classifications are disciplinary in nature, the reason, the basis for those policies are disciplinary in nature; is that true?

A You said the classification is disciplinary in nature?

Q Yes. There are disciplinary classifications. People are classified higher as a result of the disciplinary issues and privileges get taken away?

A Yes. They can be. Yes.

Q There's also a mechanism by which prisoners are

166

restored their rights?

A That's correct. Over time.

Q How long?

MR. ROTH:   Your Honor, I'm going to object to relevance.

THE COURT:   I will sustain that. I don't see the relevance.

MR. PERRONE:   If we can approach?

THE COURT:   You can, but I don't see the relevance.

(Off the record discussion at the bench.)

THE COURT:   I will sustain the objection.

Q (MR. PERRONE) How many hours a day are inmates on the medical post allowed outside of the medical post?

A Your question was how many hours a day are inmates allowed outside the medical post?

Q I will rephrase. How many hours a day are inmates on lock-down in medical?

A They are not on lock-down.

Q There has been testimony from the prisoners that it was 23 hours, that they were held for 23 hours.

A In the medical ward?

Q Yes.

167

A That's a dorm in and of itself. There is a phone, there is a shower, there is a television, and there is 30 percent sunlight in that cell. They are not on lock-down.

Q Are they allowed to leave the medical unit for an hour a day?

A Nope.

Q They are not allowed to leave the medical unit at all?

A It's considered a dorm.

Q So are they moved at all within the medical unit?

A No.

Q So they sit in the same place for 24 hours a day?

A They sit in their dorm. Medical ward is not a post, per se. There is no cells. It's an open squad bay, if you will, assignment.

Q Used as a fill-in kind of?

A Originally when they built the jail back in the 60s it was designed for universal precaution of inmates.

MR. PERRONE:   No further questions.

THE COURT:   Any redirect?

MR. ROTH:   Thank you, Your Honor.

168

REDIRECT EXAMINATION
BY MR. ROTH:

Q Mr. Perrone asked about video that is checked visually every 15 minutes in medical?

A Yes, sir.

Q Fair to say there are some video recording capabilities throughout the jail; is that correct?

A That's correct.

Q But they do not have audio accompanied them with the recording, correct?

A That's correct.

Q Now, there is some ability to listen in a little bit with audio, but you testified that the quality so far, that it's not helpful?

A That's correct?

MR. ROTH:   I have nothing else. Thank you.

THE COURT:   Jurors have any questions for sergeant Jewell? Thank you, sir. Appreciate you coming in.

Okay. We have reached the end of our time for today. We are going to recess for today. We will come back tomorrow at 8:15.

Remember, tomorrow we only go to 1:30. So we won't have a lunch like we did today. We

169

will have two breaks. We won't meet on Wednesday. That's motion Day. Thursday will be like today. Friday, Veteran's Day. We won't be meeting on Friday. A short week for you.

So a reminder not to discuss the case with anyone, family or friends, look at news reports, video, radio broadcasts. Once again, thank you for you taking time out of your lives to assist us.

(Jury exits courtroom at 3:22 p.m.)

THE COURT: We will be in recess until tomorrow 8:30.

MR. ROTH: Your Honor, brief housekeeping issue?

THE COURT: All right.

MR. ROTH: I will anticipate resting tomorrow. It's my understanding Mr. Perrone is not asking that anybody be produced. That we will, then, upon resting, go into the Defense proofs. He has three MDOC inmates ready to appear and potentially the Defendant.

THE COURT: Okay.

MR. PERRONE: I think that tomorrow we are going to be kind of tight.

THE COURT: All right.

170

MR. PERRONE: So any writs were not sent out on MDOC inmates. It'll frankly be tight getting their testimony in tomorrow, given the additional testimony that's going to be required on behalf of the Prosecution's side. I don't anticipate we are going to get any jail witnesses tomorrow. My office put in the writs for Thursday. I haven't determined that I might use them. I might close tomorrow. If the State rests his case, I may just close tomorrow also.

THE COURT: What are you asking me? I guess you want to bring one over, or how long do you think your witness --

MR. PERRONE: It's going to take too long to bring any of them over.

THE COURT: That's the Corrections issue. How long do you estimate it will be tomorrow? How much time will you utilize?

MR. ROTH: I think we can rest before noon.

THE COURT: That gives us like an hour and a half.

MR. ROTH: Even if the inmates are called, they are not long inmates. So I'm ready to proceed with them tomorrow or to close tomorrow.

THE COURT: Did you subpoena them for

171

tomorrow?

MR. PERRONE: There is going to be -- the writ got sent out for Thursday. Didn't get sent out for Tuesday.

MR. ROTH: They are not sent out for Thursday. You're going to send it out Thursday.

MR. PERRONE: They have been dropped off to your judicial staff. The writs have been dropped off for Thursday.

THE COURT: I guess I'm confused.

MR. ROTH: I am as well, Your Honor. There is no writ officially outstanding at this time. They aren't going to be here tomorrow?

MR. PERRONE: They are not going to be here tomorrow.

MR. ROTH: My question is if Mr. Perrone talks about closing tomorrow, I guess I don't know what the issues are, we are calling MDOC inmates or not calling them.

MR. PERRONE: They are not going to be called, not going to be heard. I would like John Pierce's involvement tomorrow at this stage.

MR. ROTH: You're talking about closing tomorrow?

172

MR. PERRONE: Potentially.

MR. ROTH: You can't call witnesses after you close.

MR. PERRONE: Again, it's a determination that I will make, depending upon the timing of tomorrow.

MR. ROTH: Okay.

MR. PERRONE: How the proofs come in.

THE COURT: All right. Okay. I wouldn't close over an hour and a half on Tuesday. I would wait for Thursday on closing anyways. It's sort of a complex case. I wouldn't force everybody to close, go right to closing arguments. So closing arguments will be on Thursday, no matter what. And then we will see how it works out with his witnesses. All right?

MR. ROTH: Thank you, Your Honor.

MR. PERRONE: I would just like to further, in discussion associated with this case, for the record, I'm just wondering if the People are going to produce Charles Allen.

MR. ROTH: Yes.

MR. PERRONE: Tomorrow?

MR. ROTH: Yes.

MR. PERRONE: For housekeeping, I don't

173

think we are able to get federal approval for ATF Steve Bailey. I would like Lietenant Backus to be produced tomorrow.

MR. ROTH:   I can set a meeting up.

MR. PERRONE:   That will be good.

THE COURT:   So are you going to produce Backus as part of your case or have him available for Mr. Perrone?

MR. ROTH:   I'll make him available for Mr. Perrone.

THE COURT:   All right.  Anything else?

MR. ROTH:   No, Your Honor.  Thank you.

THE COURT:   In recess.

(Proceedings concluded at 3:27 p.m.)

STATE OF MICHIGAN    )

174

COUNTY OF INGHAM    )

I, TERESA J. ABRAHAM, Certified Shorthand Reporter in and for the County of Ingham, State of Michigan, Thirtieth Judicial Circuit Court, do hereby certify that the facts stated in the foregoing pages are true and correct, and comprise a complete, true and correct transcript of the proceedings taken in this matter on this the 5th day of August, 2016.

_____

Teresa J. Abraham, CSR-3445

Date: May 23, 2018

1

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

                    Plaintiff,

vs.

                   CASE NO:  16-1064-FH
                           16-1065-FH

TUNC URAZ,

                 Defendant.
_____/

HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
LANSING, MICHIGAN -- TUESDAY, NOVEMBER 7, 2017

              CRIMINAL JURY TRIAL

APPEARANCES:

FOR THE PEOPLE:

WILLIAM O. CRINO, JD
CHAZ T. KOOP, JD
Assistant Prosecuting Attorney
Prosecuting Attorney's Office
313 W. Kalamazoo
Grady Porter Building
Lansing, Michigan 48933


FOR THE DEFENDANT:

JACOB PERRONE, JD
Perrone Law, PC
221 W. Lake Lansing Road, Ste. 200
East Lansing, MI 48823

ERIC SCHROEDER, JD
BODWIN & ASSOCIATES PC
2970 E. Lake Lansing Rd.
East Lansing, MI 48823-7415


Reported by:  Teresa J. Abraham, CSR-3445
Phone:  (517)483-6404   e-Mail: tjabraham@msn.com

I  N  D  E  X

WITNESSES:

CHARLES ALLEN
Direct Examination by Mr. Roth                4
Cross-Examination by Mr. Perrone            29
Redirect Examination by Mr. Roth          65/71

SANDRA DOUSE
Direct Examination by Mr. Koop              72
Cross-Examination by Mr. Schroeder          85

ROBERT BACKUS
Direct Examination by Mr. Roth              95
Cross-Examination by Mr. Perrone           101
Redirect Examination by Mr. Roth           109
Recross-Examination by Mr. Perrone         111

MATT KRUMBACH
Direct Examination by Mr. Koop             114
Voir Dire Examination by Mr. Perrone       139
Cont'd. Direct Exam. by Mr. Koop           140
Cross-Examination by Mr. Perrone           149

EXHIBITS:

| Exhibit # | Description | Received |
|---|---|---|
| PX-#47 | U jail movement rcd | 75 |
| PX-#48 | C jail movement rcd | 75 |
| PX-#49 | A jail movement rcd | 75 |
| PX-#54 | 8/27/16 gps map | 124 |
| PX-#55 | 8/31/16 gps map | 124 |
| PX-#58 | Tyrone Jones Securus | 111 |
| PX-#63 | 2nd kite | 60 |

**1**

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff,

vs.    CASE NO: 16-1064-FH
             16-1065-FH

TUNC URAZ,

    Defendant.
_____/

HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
LANSING, MICHIGAN -- TUESDAY, NOVEMBER 7, 2017

CRIMINAL JURY TRIAL

APPEARANCES:

FOR THE PEOPLE:

WILLIAM O. CRINO, JD
CHAZ T. KOOP, JD
Assistant Prosecuting Attorney
Prosecuting Attorney's Office
313 W. Kalamazoo
Grady Porter Building
Lansing, Michigan 48933


FOR THE DEFENDANT:

JACOB PERRONE, JD
Perrone Law, PC
221 W. Lake Lansing Road, Ste. 200
East Lansing, MI 48823

ERIC SCHROEDER, JD
BODWIN & ASSOCIATES PC
2970 E. Lake Lansing Rd.
East Lansing, MI 48823-7415


Reported by: Teresa J. Abraham, CSR-3445
Phone: (517)483-6404  e-Mail: tjabraham@msn.com

**2**

I N D E X

WITNESSES:

    CHARLES ALLEN
Direct Examination by Mr. Roth  4
Cross-Examination by Mr. Perrone  29
Redirect Examination by Mr. Roth  65/71

    SANDRA DOUSE
Direct Examination by Mr. Koop  72
Cross-Examination by Mr. Schroeder  85

    ROBERT BACKUS
Direct Examination by Mr. Roth  95
Cross-Examination by Mr. Perrone  101
Redirect Examination by Mr. Roth  109
Recross-Examination by Mr. Perrone  111

    MATT KRUMBACH
Direct Examination by Mr. Koop  114
Voir Dire Examination by Mr. Perrone  139
Cont'd. Direct Exam. by Mr. Koop  140
Cross-Examination by Mr. Perrone  149

EXHIBITS:

| Exhibit # | Description | Received |
|---|---|---|
| PX-#47 | U jail movement rcd | 75 |
| PX-#48 | C jail movement rcd | 75 |
| PX-#49 | A jail movement rcd | 75 |
| PX-#54 | 8/27/16 gps map | 124 |
| PX-#55 | 8/31/16 gps map | 124 |
| PX-#59 | Tyrone Jones Securus | 111 |
| PX-#63 | 2nd kite | 60 |

**3**

Lansing, Michigan
November 7, 2017
at about 8:38 a.m.
    *********
    THE COURT:  Returning on the record in the matter of People versus Tunc Uraz, file number 16-1064 and file number 1065.  Are we ready for the jury?

    MR. ROTH:  I think we can probably get the witness on the stand first.

    THE COURT:  Do what?

    MR. ROTH:  If we can get the witness on the stand first, it might be a little easier, since he is coming from lockup.  Other than that, we are ready to proceed.

    THE COURT:  Mr. Perrone, are you ready to proceed?

    MR. PERRONE:  Yes, Your Honor.

    THE COURT:  Is this Mr. Allen?

    MR. ROTH:  It is.

    THE COURT:  Step right over here, Mr. Allen. Thank you.  And you can remain standing until the jury comes in.  Then you can sit down.  Then I have to swear you once the jury comes in.

    THE WITNESS:  Okay.

**4**

    THE COURT:  Remain standing.  I will swear you and you can sit down.

    (Jury present in courtroom at 8:44 a.m.)

    THE COURT:  Be seated, except for Mr. Allen. Mr. Allen, raise your cast a little bit.  Do you swear or affirm the testimony you're about to give will be the truth, under the penalty of perjury?

    THE WITNESS:  Yes, I do.

    THE COURT:  Have a seat.  And then once you get set, state your name and spell your last name for the Court Reporter.

    THE WITNESS:  Into the microphone?

    THE COURT:  Yes.

    THE WITNESS:  I am Charles Allen. C-H-A-R-L-E-S, A-L-L-E-N.

    THE COURT:  Thank you. Mr. Roth?

    MR. ROTH:  Thank you, Your Honor.

    CHARLES ALLEN,
    A witness having been sworn under oath to testify as follows:
    DIRECT EXAMINATION
BY MR. ROTH:

Q  Good morning, sir.

A  Good morning.

**5**

Q   How old are you?
A   Twenty-four.
Q   You are currently incarcerated at the Ingham County Jail; is that correct?
A   I am.
Q   Were you in custody at the jail in September, October of 2016?
A   I was.
Q   Do you recall when it was you had gone to jail at that time?
A   Around August 2nd.
Q   2016?
A   2016.
Q   Thank you.  Were you released at some point in between then and now?
A   Yes.
Q   Do you recall when that was?
A   January 23rd, I believe.
Q   Thank you.  Of 2017?
A   2017, yes.
Q   I want to talk a little bit about how the jail is laid out.  Are there different posts?
A   Yes.
Q   Tell us what a post is.
A   A post is a floor in the jail that houses

**6**

inmates in separate dorms.
Q   So a post is then subdivided into dorms?
A   Yes.
Q   Tell me how many dorms are there, roughly, per post.
A   Four.
Q   In each dorm, about how many different people are housed?
A   From eight to 30, I believe.
Q   And then, within the dorm, is it fair to say that a dorm is sort of a -- sort of like a main room and has little cells coming off of it?
A   Yes, it is.
Q   So I want to talk about where you were in fall of 2016, when you go in, in August, September. Do you recall being in post 5E block?
A   Yes.
Q   About how many people were in that area?
A   Eight, I believe.
Q   Is it one person per individual cell, or are there two people per cell?
A   In the particular post that I was on, there was one person each cell.
Q   And and while you were in that particular dorm, were you allowed to come and go from your cell,

**7**

or were there a certain amount of hours each day when you were fixed within your cell?
A   We were allowed an hour out of our cell a day. And the other 23 hours were within our cell.
Q   What sorts of things could you do during that hour out each day?
A   You could clean your room, you could get on the kiosk, check your kites, see if you have visits.  You can take a shower.  You can talk amongst inmates in the dorm.
Q   So when you are on your hour out, are all of the other inmates having the same hour out?
A   No.  They are in their cells.
Q   So they sort of stagger them?
A   Yes.
Q   So if you are the one out, the others in, are you able to talk to the others that are out?
A   Yes.
Q   How is that?
A   You can talk to them through the window.
Q   So while you were there, did you meet a person by the name of Tunc Uraz?
A   Yes.
Q   Did you call him by a different name?
A   A few different names.

**8**

Q   Tell me what they were.
A   Turk. Tunc. Uraz. Bro.
Q   Do you see that person in the courtroom today?
A   Yes, I do.
Q   Can you please point him out and identify him for the record?
        THE WITNESS:  Right there.(indicating)
        MR. ROTH:  I ask the record to reflect that the witness has identified the Defendant.
        THE COURT:  Mr. Perrone?
        MR. PERRONE:  No objection.
        THE COURT:  So identified.
Q   (MR. ROTH) I am going to ask a lot of information back then.  This is about a year ago.  Did you talk to the police back then?
A   Yes.
Q   You were aware those were recorded?
A   Yes.
Q   Is it fair to say that some of the things might be fresher in your memory back then than they are now?
A   Yes.
Q   If certain things I ask you, you don't remember, let me know and I will show you your statement.

9

A   Okay.

Q   Approximately when did you come in contact with the Defendant?

A   I have to say probably somewhere at the end of August, middle of September.

Q   Somewhere in that window?

A   Yes.

Q   Did you know the Defendant before you met him in the jail?

A   No.

Q   While you were in the jail, did you become friendly with him?

A   Yes.

Q   Please explain for us how that happened.

A   He came in, he didn't look like he had been in the jail before. I tried to make him feel more comfortable, tell him how things operate, how the times work, what he needed to do, if he needed anything, how to get it from deputies, stuff like that.

Q   Generally just being friendly with him?

A   Right.

Q   Very good. When would you two talk?

A   When he was out of his cell or when I was out of my cell, or when we're both in our cells.

10

Q   How would you talk when you are both in your cells?

A   There is a little window. Above the window there is a little square hole in the door.

Q   So could you hear each other?

A   Yes.

Q   How often would you two talk?

A   Often, I guess.

Q   Daily?

A   Yes.

Q   So as time passes, as you two are talking, do you guys start talking about your personal lives, your lives on the outside?

A   Yes.

Q   Did he tell you when he was in jail?

A   Not at first. But later on down the road he did.

Q   As you two become more comfortable in this friendship --

A   Yes.

Q   -- what did he tell you at that time when he is in jail?

A   He said what he was in for, I think, stalking, I think.

Q   Did he tell you who he had stalked?

11

A   A girl that he had a relationship with.

Q   Do you recall her name?

A   I don't.

Q   Let me ask it differently. Did he tell you her name?

A   Yes.

Q   You just don't recall it now?

A   Right.

Q   Would looking at your prior testimony refresh your memory?

A   Yes.

MR. ROTH:   May I approach the witness, Your Honor?

THE COURT:   You may.

Q   (BY MR. ROTH) All right. So I am going to ask you to silently read this to yourself and look up when you're done. Does that refresh your memory, sir?

A   Yes, sir.

Q   What did he tell you the name of this young woman who he had stalked was?

A   Erika Melke.

Q   Did you talk about your girlfriend or ex-girlfriend with the Defendant as well?

A   Yes.

12

Q   Tell us a little bit how that happened, how you guys would talk about this.

A   It would usually -- it would be around later at night when everything is more quiet. You get to thinking about wishing we were out. We were just discussing things we would do with our girlfriends, things we missed doing, things we wished we could do, things like that.

Q   At the beginning, how would he describe how he felt about Ms. Melke?

A   He was like he really liked her, but she had done a lot of things to him that were making him mad, making him angry.

Q   So as time progressed, did he get more and more mad about her?

A   There were times when he would be a little more infuriated, and other times he wouldn't want to talk about it at all.

Q   There were times I think you said infuriated. How could you tell he would be infuriated about her?

A   From the way he would express the things he wished he could do to her.

Q   What does that mean?

A   Like he wished that he could get her back for

13

the way that she treated him.

Q Did he tell you what he meant by getting her back?

A Like hurting her.

Q Hurting her?  Did he ever take it beyond that with you?

A Yes.

Q Tell me about that.

A He, at one point in time, he asked me if I could do damage to her, if I could assault her.

Q Do you recall the time before when he used the phrase "this bitch got to pay"?

A Yeah.

Q Tell me about that.

A He was talking about how she had cheated on him with another guy, which he knew about.  And we were going back and forth about how our girlfriends had did us wrong.  He basically said like this bitch got to pay.

Q How did you feel when you heard that?

A I felt like, damn, that's deep.

Q Did you follow up with him on that?

A Yes.

Q Tell me about that.

A I asked him what he meant by that.  At first he

14

didn't want to go into detail.  He didn't know if anyone was listening or anyone could hear him.  Eventually he was like, yeah, I would pay to have her messed up.

Q Did you ask him more specifically what he meant by messed up?

A He wanted her to be beaten with a baseball bat.

Q Did you confront him about whether or not this meant killing her?

A Yes.

Q Tell me about that.

A I asked him when he said he wanted her beaten with a baseball bat, I asked him did he want her dead or alive.  He said he wanted her fucked up pretty bad.  He wanted proof, like a picture of it.

Q Did you try and warn him about this?

A I sort of did.  I told him you got to be careful who you talk to about this, you know.  You don't want to tell the wrong person.

Q What did that mean you don't want to tell the wrong person?

A You know, people are always listening in the dorm.  I told him be careful how loud he is, who he spoke to about it.

15

Q So you guys are talking still on a daily basis?

A Um-hum.

Q Is that yes?

A Yes.

Q How often during these conversations would he bring her up?

A I mean, that was pretty much after a while.  That was the basis of our conversation.

Q I talked about after a while.  Ms. Melke is the basis of your conversations.  Is it always in the context of having somebody hurt her?

A Yes.

Q How did he act when he is talking about having somebody hurt her?

A I mean, he seemed normal.  He wasn't like — there was times when he would be like, from dealing with the day he would be angry, and like just tired.  And he just, he would be like I wish like she wasn't there.  There were times where it was just like, whatever, you know.

Q Did you tell the Defendant that you had an outdate, release date coming up?

A Yes, I believe I did.

Q Did he ask you to do anything once you were released?

16

A He asked me to find her and fuck her up and have proof of it.  He had given me a few different places where I could find her.

Q So you are using the term "fuck her up" in your testimony today.  Do you recall testifying previously, page 26:  He wanted me to either go to her house or her work after she got out of work, you know, kill her wherever I went?

A Yes.

MR. PERRONE:  I'm going to object.  I think this is improper impeachment in the reading transcript into the record.

THE COURT:  I don't think it's impeachment.  It's reading it into the record.  But I agree with you.

Q (MR. ROTH) If you can take a moment and read this silently to yourself, sir.  Page two through six.  Specifically, what did he ask you to do when he got out?

A He asked me to go find her at her work or her home, and kill her and then dump her body off where no one could find her.

Q Did he talk to you about payment in exchange for doing that?

A He told me he would give me half up front and

17

half afterwards.

Q  How did you feel when he asked you to do this for him?

A  I was surprised at first, at the beginning, like I really didn't think it was like real until later down the road. And it was still the basic conversation. It was actually -- it was real. I was like, wow, I can't do this.

Q  So while you're in this particular post, is it fair to say you don't have a lot of options about who you're going to talk to?

A  There is options, there are other people I could talk to.

Q  But you continued the friendship with the Defendant?

A  Correct.

Q  Why was that?

A  I don't know.

Q  Okay. Would it be fair to say you sort of played along with this discussion for a while?

A  Yes.

Q  Why did you do that?

A  I wanted to see how real it was, see how far he was willing to go.

Q  In your conversations what did you figure out,

18

what did you find out?

A  I figured this was a -- this wasn't a joke, it is real. The information he gave was real.

Q  We are going to get back to that information. You mentioned before he was going to give half up front and half at proof. What price did he say he would pay you to kill her for him?

A  I believe it was around 3000, 4000, something like that.

Q  Would your prior testimony refresh your memory as to the specific number?

A  Yes.

Q  Page 24. If you can read this silently to yourself. Look up when you're done. Does that refresh your memory?

A  Yes, sir.

Q  What was the price he told you to pay you to kill Ms. Melke?

A  $2500.

Q  So you mentioned earlier that what convinced you that he was so serious was the detailed information that he provided you. So first let me ask you, what kind of information are we talking about?

A  He told me where she lived at, how to identify

19

her house, where she worked at, what type of car she drove.

Q  So very specific things?

A  Yes.

Q  Do you recall any of that information today?

A  Yes.

Q  All right. So I'm going to ask you some specifics, make and model of her car.

A  Green Toyota Rav 4.

Q  Did he give you her specific home address?

A  He did. It's College Towne. I don't remember the address.

Q  Page 24. If you can read that silently to yourself and look up when you're done. Does that refresh your memory, sir?

A  It does.

Q  Where did he tell you she lives?

A  3925 College Towne, Apartment 202.

Q  202 is the specific apartment number?

A  Yes.

Q  Did he tell you about what her specific unit looked like there?

A  I believe he said there was a blue couch on the porch or something like that.

Q  Did he talk to you about any surveillance or

20

cameras that might be near that?

A  He said that there was a camera in the house.

Q  Did he tell you where in the house the camera was?

A  No.

Q  Did he tell you where she worked?

A  Yes.

Q  Do you recall where that was?

A  The Lansing Urgent Care on Cedar.

Q  Did he tell you about whether or not she lived with somebody else?

A  I believe she lived with another girl.

Q  Did he describe that girl for you?

A  I believe she was Mexican.

Q  Did he provide you with any detail about how he wanted her killed?

A  He said he wanted her beaten with a baseball bat beyond recognition.

Q  Did he tell you anything specific he wanted you to do after you killed her?

A  He wanted it recorded.

Q  What specifically?

A  The beating.

Q  Was there anything that he wanted photographed?

A  I believe he either wanted her ID or a

**21**

photograph of her ID.

Q  Like her driver's license, something like that?

A  Correct.

Q  Did he tell you what he wanted to do with those pictures of that video?

A  He said he wanted them so he could jack off to them.

Q  You knew what he meant by that?

A  Yeah.

Q  Did he ask you to do anything else for him, or get anything for him?

A  A gun.

Q  When he would talk about this, would he always use the word gun or sometimes use a different word?

A  He would say a toy.

Q  When would he use the word gun, when would he say toy?

A  He would say toy in front of people, and he would say gun when it was just like me and him.

Q  Did he tell you what he wanted this gun for?

A  To go after the boyfriend that she cheated with.

Q  So this is something he wanted to do separately on his own?

**22**

A  Right.

Q  I know this may sound obvious, but what did he want to do once he found the other boyfriend?

A  I believe he intended to kill him.

Q  So we talked a little while ago about how you're playing along to find out how serious he is as he provides you with this information. You said you learned he was pretty serious. How do you respond once you learned that it was serious?

A  I take it upon myself to notify the post, the deputy.

Q  How are you acting with the Defendant when he tells you these things, though, when he offers you $2500, things like that?

A  I acted like normal. I acted like it was all right. There was nothing wrong with it, that I was down to do it.

Q  When you say down to do it, you agreed to do it?

A  Yes.

Q  Did you ever actually intend to do it?

A  No.

Q  Now, you were given what's called use immunity for your participation in this conversation,

**23**

correct?

A  Correct.

Q  In other words, you would have no criminal culpability only for your conversation with the Defendant about killing Ms. Melke?

A  Correct.

Q  So you guys are talking on it sounds like at least a daily basis for over a long period of time on this first dorm. About how many times do you think you guys talked about the subject of killing Ms. Melke?

A  It was like every day or every other day. Can you explain? You said immunity, given immunity for what?

Q  For your conversations with the Defendant about this topic.

A  Okay.

Q  So it doesn't apply to your other case or anything like that, you understand that?

A  Okay.

Q  Is that correct?

A  I believe so.

Q  You knew that ahead of time?

A  Correct.

Q  How serious did he appear during those

**24**

conversations about killing Ms. Melke?

A  Serious as can be.

Q  Do you recall using the phrase before: Set in stone?

A  No, I don't.

Q  Page 105. Read that part silently to yourself. Look up when you're done. Does that refresh your memory, sir?

A  It does.

Q  Do you remember describing him as set in stone?

A  I do.

Q  What does that mean?

A  It means either way it was going to be done, whether I did it or anybody else did it.

Q  All right. You talked a few minutes ago about taking it upon yourself to tell somebody. Tell me what you mean by that.

A  After a while I knew I was getting closer to going home. I wanted somebody else to know, somebody that could do something about it. So I wrote a kite, I wrote two kites. I wrote the first kite to the post deputy. I don't believe it got anywhere. The same thing continued, the conversations with him continued. No one ever came to talk to me or notify me or anything

25

about the situation. So I wrote another kite.
Then the second kite got to someone. Then I
was able to tell someone.

Q So the first kite that you sent, did you have
any idea in your mind about when you would have
sent the first one?

A No.

Q How much time passes between when you sent the
first one and the second one?

A Approximately?

Q Approximately.

A Two weeks, maybe.

Q Do you recall when you sent the second one?

A I don't.

Q Would looking at the kite refresh your memory?

A Yes.

Q If you can read that to yourself, and look up
when you're done. Is that the second kite
you're looking at to refresh your memory?

A Yes.

Q What's the date on that?

A October 24th.

Q First time you would have let somebody know
would have been two or so weeks before that?

A Correct.

26

Q So in that meantime, had you guys moved to
medical?

A I don't really remember when we went to
medical, but we did move to medical.

Q So you don't remember the dates, but you
remember going to medical?

A Correct.

Q When you are in medical, do you get separated
from the Defendant?

A Yes.

Q Is that, at that point, fair to say you guys
are talking a little bit less for a while?

A Correct.

Q Was there another person in medical by the name
of Reginald Close?

A There was.

Q Did you know him by a different name?

A Yes.

Q What did you call him?

A Rough.

Q When you first get to medical, is it fair to
say that you, Rough, the Defendant, shared a
cell?

A When we first get on medical?

Q Very shortly thereafter you get moved out,

27

Rough is sharing a cell alone with the
Defendant?

A Correct.

Q Do you -- did you know Rough before you were in
jail?

A No.

Q Do you recall talking to him at one point about
the things that the Defendant had asked you?

A I don't remember.

Q You indicated when you sent out that first
kite, you didn't receive a response. You
waited approximately two weeks, you sent a
second one. Did you get a response?

A Yes.

Q How was that?

A I was called out into the porter area over
there where I had another deputy escort me
downstairs where I met with the detective.

Q When you talk about meeting with the detective,
is that Detective Krumbach who is here in
court?

A It is.

Q Do you recall asking him if it would be
possible to get out of jail?

A Yes.

28

Q He told you no?

A Correct.

Q He told you the only thing he could do for you
was to tell your probation officer that you
were helpful?

A Yes.

Q Which brings up a good point. At that point
you did not have an open case, correct?

A Correct.

Q You had already been sentenced?

A Correct.

Q Did you cooperate with Detective Krumbach that
day and tell him the things that the Defendant
had asked you to do?

A I did.

Q Why did you do that?

A I felt that it was necessary.

Q For what?

A For the sake of the girl's life.

Q Other than that very narrow immunity we talked
about, for having these conversations about the
Defendant, did you receive anything else for
your cooperation in this case?

A No.

Q Any benefit for your testimony in this case?



29

A   No.
    MR. ROTH:   Nothing further, Your Honor.
    THE COURT:   Mr. Perrone?
    MR. PERRONE:   Yes, Your Honor.
    CROSS-EXAMINATION
BY MR. PERRONE:
Q   Did you get any response on the first kite?
A   No.
Q   What did you say on the first kite?
A   I can't even recall. I know that I mentioned that there was something going on with another inmate in my post.
Q   What?
A   He was trying to get someone to assault someone.
Q   He was trying to get someone to assault someone?
A   Right.
Q   Is that where it starts?
A   What do you mean?
Q   Is that where it starts initially that he initially approaches you to assault her? How do these discussions begin?
A   We just begin talking about our girls.
Q   What were you saying about your girl?

30

A   I was -- I would just say, you know, about stuff that I have done with my girl, many things I wish I could have changed. Things that she did that put me in jail. Just stuff that I did to her that put me in jail.
Q   And why were you on the medical post?
A   Because they moved us from the Post 5, because they were making room for other people, I believe.
Q   Were there any restrictions?
A   Yes.
Q   Were you subject to any restrictions?
A   Yes.
Q   Why?
A   Because I couldn't have contact with my ex-girlfriend.
Q   Was it because you attempted to have contact with her, after you were ordered not to have contact with her?
A   No.
Q   Did you attempt to call her from the jail?
A   No.
Q   Did they allege that you attempted to call her from the jail?
A   No.

31

Q   Did they allege that you had done anything to merit phone restrictions?
A   No.
Q   Why were you put on phone restriction?
    MR. ROTH:   I guess I am going to object. This would not be his decision to be put on phone restrictions. He wouldn't have personal knowledge of it.
    THE COURT:   I'm going to let him answer that.
    THE WITNESS:   They felt that it was necessary because I wasn't doing what I was supposed to do. I wasn't following the instructions that I was given. I wasn't abiding by what I was told.
Q   (BY MR. PERRONE) You weren't abiding by the order?
A   I was -- no.
Q   You were initially incarcerated on August 2nd?
A   I believe so, yes.
Q   You were sentenced to a fixed term, you were set to be released January 23rd on 2017?
A   Correct.
Q   That end date was August 2nd of 2016?
A   What?

32

Q   August 2nd of 2016?
A   Yes.
Q   And you were initially placed on the B dorm when you go in?
A   I think it was -- I think it was a different dorm. I thing it was like C or D.
Q   Prior to going to the medical floor, were you on the B dorm?
A   I don't remember.
Q   Were you on a dorm with Mr. Uraz?
A   Yes.
Q   For how long?
A   Month. Two months.
Q   Do you recall when Mr. Uraz came into the jail?
A   Around September.
Q   That would be the beginning, end?
A   I would say the middle, maybe.
Q   And prior to being moved to medical, Reginald Close isn't on the same floor as you?
A   Yes, he was.
Q   Reginald Close was on B dorm with you?
A   No.
Q   He was not?
A   No.
Q   Did you know Reginald Close prior to being on

33

medical with him?

A  I knew him from when I came in to Post 5.  I was in the same dorm with him.

Q  So you knew Reginald Close prior to Tony Uraz coming into B dorm?

A  Yes.

MR. ROTH:  Your Honor, I am going to object. Mr. Perrone keeps say saying B dorm.  The witness doesn't recall it being B dorm. So I guess all I'm asking, just say post or a dorm. It seems like facts not in evidence.

THE COURT:  Okay. That's reasonable.

Q  (MR. PERRONE) You can't recall what dorm you were on?

A  There was five other dorms. I don't remember.

Q  If you were able to review the location through the history report, would that potentially refresh your recollection?

A  I believe it was F dorm.

Q  You believe it was F dorm prior to going to medical?

THE COURT:  You have to answer "yes."

THE WITNESS:  I'm trying to remember.

THE COURT:  Sorry. I didn't want to pressure you.

34

THE WITNESS:  I want to say yes.

Q  (MR. PERRONE) Were you moved back to the same dorm from medical?

A  No.

Q  Where were you moved?

A  I moved to a whole other post.  I believe it was Post 8.

Q  You were moved to a post with Mr. Uraz?

A  No.

Q  After you get out of medical, does there come a point in time where you're back on post with Mr. Uraz?

A  No.

Q  The last you can recall, of having any conversations with Mr. Uraz is while you're on medical?

A  We may have moved — we may have moved back to Post 5. It's just hard for me to remember.

Q  You had an opportunity to review your preliminary examination transcript. Would that potentially refresh your recollection?

A  Yes.

Q  Page 69, lines 11 through 25. Just read this to yourself. Actually lines 10 through 25. Take a read on that.

35

MR. ROTH:  I guess I just want to be clear on the question.  Were you in the dorm with the Defendant before medical or after medical?

MR. PERRONE:  After medical.

MR. ROTH:  Okay.

MR. PERRONE:  This is just as to the dorms, what dorm he is in.

MR. ROTH:  You can refresh his memory about pre-medical.

THE WITNESS:  This doesn't tell me what you asked me.

Q  (MR. PERRONE) Okay. So you can't recall being on a dorm after leaving the medical post with Mr. Uraz?

A  No.

Q  Can you recall being on a post with Mr. Close after leaving medical?

A  Yes. I was on a post with Mr. Uraz after medical.

Q  Was Mr. Close also on the post at that time?

A  He was on the post for like two or three weeks.

Q  Did you speak with Mr. Close about Mr. Uraz's case?

A  I don't recall.

Q  You talked about passing notes. Did you pass

36

any notes?

MR. ROTH:  Your Honor, I am going to object. Assumes facts not in evidence. He never talked about passing notes.

Q  (BY MR. PERRONE) Did you pass any notes with Mr. Uraz?

MR. ROTH:  That's the proper question.

THE WITNESS:  Yes. I believe so.

Q  (BY MR. PERRONE) Did you pass those notes through anyone?

A  Yes.

Q  Who?

A  John Pierce.

Q  Why did you use John Pierce?

A  Because John, if I remember correctly, if I was passing notes, John was in a cell that wasn't on the wall. He was on the cell that faced the guard box. So in order to make a note go anywhere, you had to go through Mr. Pierce.

Q  So you went through Mr. Pierce?

A  Yes.

Q  Did you ever keep any of those notes?

A  No.

Q  Did you provide notes to law enforcement?

A  Honestly, I don't remember if I did or not. If



37

I did, that's how it went. I didn't keep anything.

Q  Do you recall the date you sent the second kite?

A  October 24th.

Q  Do you recall what you initially indicated to them?

A  Yes.

Q  What did you indicate?

A  That there was a guy in our dorm that was trying to have someone killed in a dorm.

Q  Did you tell them that there was somebody that was asking to kill or assault —

A  Yes.

Q  — his ex-girlfriend for money?

A  Yes.

Q  Did you also tell them that he was asking to buy a gun from you?

A  I don't recall. I don't believe I wrote that in the kite.

Q  And you received some notification back from the deputy?

A  Yes.

Q  What did they indicate to you?

A  They asked me to put a name on who I was

38

talking about.

Q  They asked for more information?

A  Just who the person was.

Q  It's your testimony he told you that he wanted a gun to take care of his ex-boyfriend(sic)?

A  Yes.

Q  Did you provide them with any indication of an address or a workplace?

A  No.

Q  Did you tell them that it was the Lansing Urgent Care on South Cedar or any time prior to today?

A  Tell who?

Q  The police, law enforcement, when they questioned you?

A  When they asked me who she was? Like when they asked me questions?

Q  Yes.

A  I believe I did. Yes.

Q  Now, you testified that you were trying to show Mr. Uraz the ropes in jail?

A  Correct.

Q  What did you have to offer him?

A  In the beginning, just friendship.

Q  Did Mr. Uraz ever give you anything of value

39

while you were in jail?

A  We traded stuff. We traded food off the trays.

Q  Did you see Mr. Uraz ever give anybody else anything, any of the other inmates?

A  I'm sure he did. But, I mean, no.

Q  Did it appear to you Mr. Uraz was being taken advantage of by the other inmates?

A  No.

MR. ROTH:  I am going to object to the speculation. He can say what he saw. He is asking other people's other states of mind.

MR. PERRONE:  I'm asking his state of mind, what it appeared to him.

THE COURT:  He answered the question. He said no.

Q  (MR. PERRONE) You wanted to make him feel at home in jail, comfortable?

A  A little more comfortable. Yes.

Q  Why did you feel he needed that support?

A  Because he came in pretty scared, pretty shook up. He was red in the face. He was nervous.

Q  What did this appear to you? How did he appear to you?

A  Like a lost dog.

Q  And you were going to make him feel at home?

40

A  Make him feel more comfortable.

Q  And prior to going into medical, you're on a dorm with Fateen Muhammed?

A  Yes.

Q  John Pierce?

A  Yes.

Q  When you initially go on medical, first night of medical who are you housed with?

A  Reginald Close and Uraz.

Q  How long are you in the same cell as them?

A  A few hours, I believe.

Q  About how many approximately?

A  I don't recall.

Q  And are there discussions yourself and Mr. Uraz and/or Mr. Close in regards to this plot?

A  No.

Q  On the first night of medical?

A  No.

Q  How far away are you from Mr. Close and Mr. Uraz when you are moved from the cell with them?

A  I'm next door.

Q  Could you hear them if they were talking?

A  Not unless I was out by the door.

Q  But could you — if you were trying to hear

41

them, you could hear them?

A  Barely.

Q  You're on lock-down at this point?

A  I'm on 24 lock-down.

Q  You guys had the ability to use showers?

A  Um-hum.  Showers in the cell.

Q  And you had the ability to use the toilet?

A  Toilet was in the room.

Q  What other entertainment, what else do you have to do?

A  There was a television.  That's it.

Q  What channels do you get on the television?

MR. ROTH:  Objection, relevance.

Q  (MR. PERRONE) While you're on lock-up, are you able to watch the television?

A  Yes.

Q  While you're in a cell, are you able to watch the television at all times?

A  Most of the time.

Q  And I talked about you saw a lot of different people talking about their girlfriend's victims.  How do you see somebody talking, you see people talking, did you see people while you were incarcerated talk about their victims?

A  I heard people talk.

42

Q  So you heard people talk?

A  Right.

Q  In regards to the issues that they had with their victims?

A  Correct.  Did you say victims?

Q  Victims.  Yes.

A  No, not victims.  Girlfriends.

Q  You were on a floor with individuals that are all on phone restrictions?

A  Correct.

MR. ROTH:  Your Honor, I guess I am going to object with more specificity, talking about do you recall before medical or --

MR. PERRONE:  While on medical, while on medical.

MR. ROTH:  Thank you.

THE WITNESS:  Can you repeat the question?

Q  (MR. PERRONE) Do you, in your understanding, being the jail liason --

MR. ROTH:  I'm going to object to Mr. Perrone's commentary.

THE COURT:  I don't think his jail liason is in evidence.

MR. ROTH:  Thank you.

THE COURT:  And real -- it's questionable

43

relevance, Mr. Perrone.

Q  (MR. PERRONE) Have you ever previously been put on restrictions while in the Ingham County jail?

A  No.

Q  What was it like to be in a cell for 24 hours a day as you described it?

MR. ROTH:  Objection, relevance.

THE COURT:  Sustained.

THE WITNESS:  I mean --

THE COURT:  You don't have to answer that.

THE WITNESS:  Okay.

Q  (MR. PERRONE) Did you end up getting moved off of the post with Muhammed and Uraz for a period of time as a result of an altercation?

A  Yes.

Q  That was an altercation with Mr. Muhammed?

A  Correct.

Q  What was the nature of that altercation?

MR. ROTH:  Objection.  Relevance.

THE COURT:  Sustained.

Q  (MR. PERRONE) How long were you off post for?

A  I'm on the same post, different dorm.

Q  When you were removed from that post as a result of what happened, how long?

44

A  Maybe a month.

Q  Do you recall when that occurred, whether it was before or after medical?

Q  The issue with Mr. Muhammed?

A  I believe it was after medical.

Q  After you were removed and brought back, are you -- after you're removed for the issue with Mr. Muhammed, are you put back on a post with Mr. Uraz?

A  Yes.  I believe so.

Q  Is this before or after you write the first kite?

A  That's after.  I don't think he came back when I got moved back in the dorm.  I don't think he was in there.

Q  After medical?

A  After medical.  When I got moved with the altercation with Muhammed, was moved to a different dorm.  I came back.  I don't remember if he was in this dorm still or not.  I don't think he was.

Q  When you write the second kite on 10-24-2016, are you still on the same post with Mr. Uraz?

A  Yes.

Q  Was that post the 5B, B5?

45

A   Yes. I believe so.

Q   And do you recall if Mr. Close is on the dorm at that point?

A   I don't believe so.

Q   Do you believe that you had any contact with Mr. Close after leaving medical?

A   I could see him through the glass. You could say what's up, stuff like that, hello, what up, ask him when I'm getting out.

Q   But you didn't talk to him about this case?

A   No, I don't believe so.

Q   Dorm 5B, is it a long dorm?

A   It's a small dorm, from what I can remember.

Q   What is the — what's the makeup of the long dorm?

A   What do you mean?

Q   Are you around people -- are you locked away from people, or are you in a group dorm?

A   When?

Q   How many people are in a cell on a long dorm on B?

A   On a long dorm there can be anywhere from -- a bigger dorm is usually about 30 people. But I wasn't able to be around people or the phone.

Q   Do you have some type of an issue with

46

classification after the issue with Fateen being reclassified?

A   Objection. Relevance.

THE COURT:  Hold on. What's the relevance. Really?

MR. PERRONE:  If we may approach briefly?

THE COURT:  All right.

Q   (BY MR. PERRONE) Were you moved from B dorm after you wrote the kite on October 24th?

A   Yes.

Q   Do you recall where you were moved to?

A   C dorm.

Q   Are you moved back in a dorm with Mr. Uraz after being moved from C dorm?

A   I don't believe so.

Q   Now, you don't have the greatest handle with time?

A   No.

Q   It's your belief that time is irrelevant?

A   Right.

Q   And the past regardless?

A   Right. Sounds like something I would say.

Q   Are you a person of philosophy?

A   Yes. I guess you could say that.

Q   You are a little bit worried for Mr. Uraz. I

47

guess from your perspective people get hurt that way in jail. His general demeanor, did Mr. Uraz's general demeanor cause you concern that he would be hurt?

A   That he would be hurt?

Q   Yes.

A   I mean, it would be easy to take advantage of him, you could say that. I could see other people trying to take advantage of him. I didn't like physically see, but I could see something like that happened if he was to be in another dorm.

Q   And when you initially talked, this all starts with you hearing Mr. Uraz generally saying this bitch got to pay?

A   Yes.

Q   What was your response when you heard bitch has to pay?

A   I would say that my response was probably what did he mean by that.

Q   What did he say?

A   He said she has got to pay.

Q   And you have heard Mr. Uraz make the bitch got to pay statement in early October?

A   I don't recall.

48

Q   That would have been initially when you sent the first kite?

A   Okay.

Q   Would that have been when you sent the first kite? How long after you hear him say bitch got to pay, do you send the first kite?

A   I would probably have to say maybe a few weeks.

Q   You didn't see any follow-up on the first kite?

A   No.

Q   What specific detail did you put in the first kite?

A   That I worded it almost the same as the second one.

Q   Do you remember the deputy you gave the first kite to?

A   Tryon Calkins (sp).

Q   You never got any follow-up?

A   Uh-huh.

Q   Is that a no?

THE COURT:  You have to say no.

THE WITNESS:  No. I am sorry.

Q   (MR. PERRONE) And the decision you believe that Mr. Uraz was intent on this happening as a result of the conversation that you had with him while watching TV?

**49**

A  No. We had no TV.

Q  You didn't have any TV while you were on medical?

A  We had TV on medical. Yes.

Q  Did you have any concerns regarding the nature of your discussions getting you in trouble?

A  I guess I never really thought about it. But if I was to say anything, I would say yes.

Q  But that's not definitive. You don't really recall?

A  No.

Q  Have you had — if you had an opportunity to review your prior testimony, would that refresh your recollection?

A  Yes.

Q  Page 96, lines four through nine, read lines four through nine.

A  If you asked me a different question, I would have answered that, yes.

Q  So you were worried that you would potentially be in trouble as a result of these conversations?

A  Yes.

MR. ROTH:   Your Honor, the question was were you worried you would get in trouble. The thing

**50**

is, are you concerned it would be recorded. This is improper questioning.

THE COURT:  It's not related at all.

MR. PERRONE:  If we may approach? Again, my position is that would refresh his recollection as to wanting to be in trouble because he is talking about --

THE COURT:  Okay. We can approach.

(Off the record discussion at the bench.)

Q  (MR. PERRONE) Were you aware that in the dorm everything was being recorded?

A  Yes.

Q  That would make you feel that you would get in trouble with this?

A  Yes.

Q  That is one of the reasons why you took this information to the deputies?

A  No.

Q  Why did you take the information to the deputies?

A  Because somebody's life was at risk.

Q  Did you have a kid on the way?

A  Yes.

Q  What's the first thing that you told the officer when you spoke with him in the

**51**

interview?

A  That I had a child on the way and I wanted to get out.

Q  So you were attempting to use the information you had to leverage your situation to get out early?

A  I tried.

Q  You didn't get a benefit out of it, you served your whole sentence?

A  Correct.

Q  Did Officer Krumbach tell you he put a good word in for your judge?

A  He said he would speak to the judge.

Q  What did you think that meant?

A  He would speak — he would talk to the judge, let him know what I was doing, what was going on.

Q  So you did not receive a benefit from this?

A  No.

Q  But you were attempting?

A  I tried.

Q  And the first time that he comes to you, after he initially comes into the jail, how long is it before he initially starts talking about bitch got to pay, and any plans that he has,

**52**

details?

A  Who? The first time since who came to the jail?

Q  Mr. Uraz.

A  How long before he spoke of that?

Q  Yes.

A  I would probably say at the end of September, somewhere in October, roughly. I don't recall. But that's what I would guess.

Q  So the conversations, from your perspective, started the end of September, early October, the conversations of bitch got to pay, the details?

A  I would say -- I would say -- I would say mid, like middle, end of — end of September, early October.

Q  How long had you been in the same dorm with Mr. Uraz prior to the conversations starting?

A  Two weeks, maybe.

Q  Did you send the first kite before or after you were on medical?

A  You said what?

Q  Did you send the first kite before or after you were on medical?

A  Before, I believe. It may be after.

53

Q   Do you know what use immunity is?
A   No.
Q   You were offered use immunity?
A   Okay.
        MR. ROTH:   Your Honor, I guess I'm going to object to that phrasing. Immunity is not offered, it's granted. There is no deal here.
Q   (MR. PERRONE) Were you granted use immunity for your testimony today?
A   Yes.
Q   Do understand what that means?
A   Yes, I think so.
Q   What does that mean to you?
A   That -- I don't know. Whatever I say is okay as long as -- I don't know.
        THE COURT:   So Mr. Allen's use immunity is whatever occurred during this timeframe would not be charged with any offenses. That's what use immunity is.
        MR. ROTH:   I guess more specifically when you say whatever happened in this timeframe, we are referring to only with the solicitation of murder with the Defendant.
        THE COURT:   That's why I said the timeframe. Thank you. That's what use immunity is.

54

        THE WITNESS:  Okay.
Q   (BY MR. PERRONE) After you heard Mr. Uraz say bitch got to pay, did you initiate the conversations with him with regards to what he means about that statement?
A   Yes.
Q   Why?
A   I was curious.
Q   Why were you curious?
A   I was in jail. There is not a whole lot to do. Drama fuels people in jail.
Q   You started pressing him?
A   For what?
Q   By questioning him?
A   I mean, it's not like I —
Q   By what you mean, bitch got to pay?
        MR. ROTH:   I object. He has to let the witness answer the question.
        THE COURT:   You have to ask the questions. It's not commentary, Mr. Perrone. You have to ask questions. What did he do. What did he see, etcetera.
Q   (MR. PERRONE) Did you press Mr. Uraz by asking questions like what did he mean by it, bitch have to pay?

55

        THE COURT:   Well, I think the issue is press is a connotation. I think you can ask him why he asked him those questions.
Q   (MR. PERRONE) Why did you ask those questions?
A   Because I wanted to know what he meant. I wanted to know.
Q   And what manner did you ask those questions?
A   Like a normal person. Like I asked him like a person would ask a person a question. Like what do you got going on here, what are you talking about, what do you mean, you know.
Q   Did you attempt to pressure him to answer?
A   No.
Q   If you could review this briefly. Page 81, lines 17 through 19, lines 13 through 19. Take a look at it, when you're done reading it, specifically line 18.
A   Yeah. I mean, by pressing I meant asking. It's not like I was like forcing him to tell me. I was just basically asking a question. I said yes.
Q   But you previously stated that you were --
        MR. ROTH:   Your Honor, Mr. Perrone hasn't stopped cutting off the answers.
        THE COURT:   Complete your answer.

56

        THE WITNESS:  I wasn't like making him tell me what was going on. I was basically asking the question. Like I said, I was, I guess, initiating further contact. Like I was asking more like, you know, what do you mean, how, why, like, you know, what's going on. It wasn't like I was forcing him or bullying him to tell me what was going on.
Q   Did you feel like you needed to act for the safety of this individual?
A   In the beginning I was interested. But as time went along, I was like I want to know. I want to know how serious this is.
Q   When you first met with the Detective Krumbach, did you ask him if he can get you out on tether?
A   I probably did.
Q   You believed what you were doing was doing the right thing?
A   Yes.
Q   As far as — your testimony is that Mr. Uraz indicated that he would pay you half down and half upon completion. Did Mr. Uraz ask you — did he tell you he would pay you half down and half upon completion?

## 57

A   Yes.

Q   Did Mr. Uraz ever give you half down?

A   No.

Q   Did you guys ever talk about the manner in which he would give you the money?

A   In the beginning he was trying to put money in my account, but wasn't able to.

Q   Did you ask him to put money in your account?

A   I don't believe so.

Q   To the best of your recollection, Mr. Close was not on the B dorm after he left medical?

A   I think he may have been there for a few days, but I don't recall him being there that well.

Q   Do you recall the time of day that it was when you made these statements in regards to the details?

A   Time runs together in jail. I don't remember.

Q   When he made these statements to you, it was just you and him, there wasn't anybody around?

A   I believe so.

Q   You previously testified that the TV, you were not watching TV when this conversation occurred?

A   We had no TV until we got the medical, and then after we left medical, I believe we had a TV on

## 58

the other dorm.

A   I know there is a long time period where we didn't have TV. So it's kind of hard to remember when there was and wasn't TV.

Q   So there is no TV on B dorm?

A   There is a TV in every dorm.

Q   But the conversation you had with him while he is going over the details, you don't recall if the TV was on?

A   I don't remember.

Q   Page 95, six through 10?

A   You said what numbers?

Q   Six through 10.

A   I guess the TV was on.

Q   TV was on when he told you the details, the specific details?

A   I don't remember. But the TV was on. So yes.

Q   You don't remember or the TV was on?

A   No. But it said they say the TV was on, so the TV was on.

Q   Was the TV on?

A   The TV was on. That's what it said, the TV was on. I told you I don't remember the TV was on. You keep asking the same thing.

THE COURT:  He has indicated the transcript

## 59

said it was on. He doesn't recall. Asked and answered. Let's move on.

Q   (MR. PERRONE) You can't recall the TV was on, but you can remember the specific details?

THE COURT:  Let's move on. Let's move on. In fact, let's take our morning recess now, 15 minutes.

(Jury exits courtroom at 10:06 a.m.)

THE COURT:  We will be in recess for about 15 minutes.

(Recess taken from 10:06 a.m. to 10:29 a.m.)

THE COURT:  Back on the record in the matter of People versus Uraz, file 1064, 1065. All parties are here. You are Tunc Uraz, sir?

THE DEFENDANT:  Uraz.

THE COURT:  Are we ready for the jury?

MR. ROTH:  One stipulation on the record. When the jury comes in, we are going to admit an exhibit.

THE COURT:  Okay. Continuing.

(Jury present in courtroom at 10:30 a.m.)

MR. ROTH:  We are going to stipulate to admit People's Proposed Exhibit 63, the second kite sent by Mr. Allen on October 24th, 2016.

THE COURT:  Is that accurate, Mr. Perrone?

## 60

MR. PERRONE:  Yes.

THE COURT:  We will admit that as Exhibit 63. Continuing that, Mr. Perrone?

MR. PERRONE:  That's correct, Your Honor.

Q   (MR. PERRONE) How did you break your arm?

MR. ROTH:  Not relevant.

THE COURT:  I'm sorry?

MR. PERRONE:  May we approach?

THE COURT:  You may.

(PX-#63 is received into evidence.)

MR. ROTH:  Objection withdrawn.

THE COURT:  Do you want to tell them how you broke your hand, Mr. Allen?

THE WITNESS:  On the concrete doing karate with my son.

Q   (BY MR. PERRONE) Same son you referred to when you had the initial discussion with Detective Lewandowsky?

A   Lewandowsky?

Q   With Detective Krumbach?

A   No.

MR. ROTH:  Your Honor, I am going to object. This is three minutes between questions. This cross-examination rambles on for hours.

THE COURT:  I can't help that.

61

MR. ROTH:   We took a break so he would gather his thoughts.

THE COURT:   I can't press that.

MR. ROTH:   Thank you, Your Honor.

THE COURT:   This is a serious matter.  So he can utilize whatever strategy he so desires.

Q   (BY MR. PERRONE) Who initiated the conversation AS to bitch has to pay?  Did you initiate the conversation?

A   I would say so.  Probably.

Q   Do you recall how the conversation ended?

A   No.

Q   Where were you at when the conversation ended?

A   What conversation?

Q   The conversation in regards to him telling you that he intended to have her killed and pay you 2500?

A   In the day room.

Q   Would the conversation potentially have ended in the shower, the conversation where he specifies?

A   Yeah.  If I was getting in the shower, probably, yes.

Q   But you don't specifically recall?

A   No.

62

Q   If you had an opportunity to review your testimony from the preliminary examination, would that potentially refresh your recollection?

A   Yes.  But I just said it probably ended in the day room.  The shower is in the day room.  So if I was going to go to the shower, the conversation would be in the day room.

Q   Page 83, lines nine through 11.  Take a read on them.

A   That's what I just told you.

Q   Did you acknowledge that you previously stated that it may be in the shower?

A   Yeah.  Like --

Q   Maybe you put it in the store?

A   Correct.

Q   What did you mean by that?

A   What I mean by that?  Maybe I put it in a store?  Maybe I put it in a store order.

Q   That's when the conversation ended?

A   In the day room.  Everything is in the day room.

Q   You never had one conversation with Mr. Close regarding Mr. Uraz?

MR. ROTH:   Objection.  Asked and answered.

63

The witness has said repeatedly I don't recall.

THE COURT:   Sustained.  Sustained.

Q   (BY MR. PERRONE) Would it potentially refresh your recollection if you had the ability to review your preliminary examination testimony?

A   Yeah.

Q   Looking at page 107, lines 25 through 108, line four -- line two.  Do you recall speaking at all after reviewing that?

A   No.

Q   So you did not?

A   No.

Q   You did not talk to Mr. Close?

A   About the situation?  No.  Not that I can recall.

Q   If Mr. Close said he talked to you about the situation --

MR. ROTH:   Your Honor, I am going to object. We don't tell other witnesses what other witnesses say.

THE COURT:   Sustained.

Q   (BY MR. PERRONE) The initial kite, you're unable to accept the first kite out for a couple of days because you're unable to get kite paper?

64

A   Why would I be unable to get kite paper?

Q   That's what I'm asking you.

A   Can you repeat the question?

Q   Did you have an issue getting kite paper when you sent the first kite?

A   I don't believe so.

Q   You can't recall?

A   I don't recall.

Q   Would it refersh your recollection if you had an opportunity to review your preliminary examination transcript?

A   Yes.

Q   Page 104, line 20.

A   Where am I reading?

Q   Highlighted portion.

A   Oh, yeah.  The kiosk.  We have a kiosk now, so it's harder to get kite paper.

THE COURT:   There is a difference between kiosk and kite paper?

THE WITNESS:   Yeah.  There is an electronic kite machine now.  So getting kite paper would have been harder to get because it's on the machine now.

Q   (BY MR. PERRONE) Testifying here today, there is a lot about the situation you can't recall?

65

A   Correct.

MR. PERRONE:   No further questions.

THE COURT:   Redirect, Mr. Roth?

MR. ROTH:   Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. ROTH:

Q   So Mr. Perrone just asked you, there is a lot you can't recall, things like dates, and whether the TV was on, things like that?

A   Right.

Q   What about the contents of the conversations with the Defendant about hurting or killing Ms. Melke? Do you recall those better?

A   Yes.

Q   Why do those stand out in your mind, with those other details not as much?

A   I don't know why I would remember the TV on or off or what date. I didn't decide to remember what date, what time. If it was day or night, I didn't decide to remember things like that.

Q   Were these conversations with the Defendant more unusual, more troubling to you?

A   Yes.

Q   For that reason more memorable?

A   Correct.

66

Q   One of the things Mr. Perrone asked you about was whether or not you had talked to Reginald Close about this. And he asked you to read page 108. He told you to stop at line two. I will ask you to read to line four so we actually get the full answer.

A   Just read to myself?

Q   Yep.

A   Okay.

Q   Is it correct to say, even back then, your answer about whether or not you had talked to Mr. Close was: Not that I can recall?

A   It is.

Q   Mr. Perrone asked you about the time of day for this conversation. Was this a single conversation that you had with the Defendant, or an ongoing conversation over the week that you knew him?

A   It was an ongoing conversation.

Q   Is it fair to say that the bulk of this conversation about killing her occurred before you went to medical?

A   Yes.

Q   Could you give me an estimate of how much of that conversation is before medical? If it's

67

all of that, that's fine.

A   I would say most of it.

Q   You're separated in medical after the first day. Then you have some carry-over afterwards?

A   Correct.

Q   Very good. Mr. Perrone asked you about concerns you had about being recorded in there. Did you and the Defendant do certain things to try and make sure your conversations wouldn't be picked up?

A   No. When we would talk, I would be further at the front of the dorm where the microphone was.

Q   Because you believed it was recorded?

A   Correct.

Q   So you testified on direct that this went from initially bitch has to pay to wanting somebody to assault her to then ultimately wanting somebody to kill her?

A   Correct.

Q   Who escalates it, who brings up to hurting her, to killing her?

A   He does, Mr. Uraz.

Q   Do you ever make it more serious and say, you know what, don't stop at hurting her, kill her?

A   No.

68

Q   You describe the Defendant when he first got there as like a lost puppy. As time goes on does he get more comfortable there?

A   He starts to, yes.

Q   You never saw anybody hurt him?

A   No.

Q   Never saw anybody take advantage of him?

A   No.

Q   Take anything from him?

A   No.

Q   There was a few arguments between him and another inmate, that was pretty much it.

Q   Nothing bad happened?

A   No.

Q   The Defendant is a pretty big guy, right?

A   Correct.

Q   Bigger than you?

A   Correct.

Q   Mr. Perrone asked, isn't it true that you hadn't disclosed that Ms. Melke worked at Urgent Care. I'm going to show you page 112. Did you mention it there?

A   Yes.

Q   So this is something you had talked about before, disclosed before?

## 69

A Yes.

MR. PERRONE: I am going to object. That mischaracterizes what was specifically stated, a specific Urgent Care. That does not state a specific Urgent Care. He said South Cedar.

THE COURT: Okay. We will note that.

Q (BY MR. ROTH) You told Mr. Perrone it was a few weeks from the first comment: The bitch has to pay, to the time you sent the first kite. What's going on in those few weeks that you didn't send it right away?

A I was gathering information.

Q All right. Figuring out how serious this was?

A Correct.

Q Mr. Perrone asked you --

MR. PERRONE: Your Honor, may we approach?

THE COURT: All right.

(Off the record discussion at the bench.)

Q (BY MR. ROTH) Defense counsel had asked you about your expectations when you went into the interview with Detective Krumbach. The detective made clear to you that he could give you no benefit on this, correct?

A Correct.

Q You did not receive any benefit on that

## 70

sentence, correct?

A No.

Q You ended up serving that whole sentence and then getting out as originally scheduled?

A Correct.

Q You testified on the hearing back on December 16th and getting no benefit?

A Correct.

Q And again today?

A Correct.

Q No expectation of benefit?

A Correct.

Q Then why testify?

A Because it's the right thing to do.

MR. ROTH: Nothing else, Your Honor. Thank you.

THE COURT: Jurors have any questions for Mr. Allen?

(Off the record discussion at the bench.)

THE COURT: Mr. Allen, Juror number 2 has a question: Is it uncommon for a resident of Ingham County Jail to be moved often?

THE WITNESS: It's common.

THE COURT: And the second question is: Is there a code of silence when you have a

## 71

discussion with one resident to not discuss it with anyone else? That's a conversation between inmates?

THE WITNESS: Yes and no.

THE COURT: Can you explain that for us?

THE WITNESS: I guess if someone was a friend, then you wouldn't go and tell someone else the same thing that that person just told you. But if they're not, and it's necessary, then tell everyone you want, tell whatever.

THE COURT: Any other questions, Juror number 2?

JUROR 2: No, sir.

THE COURT: Follow-up?

REDIRECT EXAMINATION

BY MR. ROTH:

Q I just want to make sure I heard the first line. It is common to be moved often?

A Correct.

MR. ROTH: Nothing else.

THE COURT: Any questions, Mr. Perrone, of the juror questions?

MR. PERRONE: No, Your Honor.

THE COURT: Thank you, Mr. Allen. Thank you for coming again, I guess. He may be excused.

## 72

MR. ROTH: Next will be Deputy Douse, Your Honor.

THE COURT: Step up here, Deputy. Raise your right hand. Do you swear or affirm the testimony you are about to give will be the truth, the whole truth, under penalty of perjury?

THE WITNESS: I do.

THE COURT: Have a seat. State your last name for the Court Reporter, please.

THE WITNESS: Sandra Douse. D-O-U-S-E.

THE COURT: Thank you.

SANDRA DOUSE,

A witness, having been duly sworn to testify under oath as follows:

DIRECT EXAMINATION

BY MR. KOOP:

Q Good morning, Miss. Where are you currently employed?

A Ingham County Sheriff's Department.

Q How long have you been employed with the Ingham County Sheriff's Department?

A Twenty years.

Q What is your current duty and assignment?

A I'm a deputy. I am assigned to the jail. I'm

73

in the receiving section.

Q In this capacity of the receiving section, are you aware, does the jail keep records of inmate's movements while they are in the custody of the sheriff?

A Yes.

Q Is this something done — is this something that is done for every inmate?

A Explain that.

Q Meaning the movement record, or for each particular inmate?

A Yes.

Q Are these kept on people that are housed at the jail?

A There are reports that are run, the computer keeps track of them. At any time we can pull that up from the computer program and see where they have been housed at what date and times.

Q That's for each particular inmate?

A Yes.

Q When you say the computer keeps track of it, is that entered in by a deputy or officer?

A Any housing location it will pull up that record before and after each movement.

Q They being inmates?

74

A Yes. Any person that you got that's put into the computer.

Q Who puts this information into the computer?

A It varies. With our previous booking program, when we send to the Court the person in the receiving area, we would put them in that transport. Otherwise it would typically be the classification officer that would assign them their housing location.

Q So its someone's job inside the jail to actually enter this into the computer?

A Yes.

Q Are these reports that you are familiar with, that you have access to?

A Yes.

Q These records, are they something kept in the regular course of the jail administration?

A They are not printed out regularly, except phone requests.

Q But it is a record that the jail keeps as a matter of course to have this record?

A Yes.

MR. KOOP:   May I approach the witness, Your Honor?

THE COURT:   You may.

75

Q (BY MR. KOOP) Showing you what's been marked as People's Exhibits 47, 48, 49, could you just briefly look over those, Miss?

A Um-hum.

Q In regards to People's 47, do you recognize that?

A Yes. It's the movement history for Mr. Uraz.

Q In regards to People's 48, do you recognize that?

A Yes.

Q What?

A It's a movement for Mr. Close, Reginald Close.

Q People's 49, do you recognize that?

A It's the movement record for Charles Allen.

MR. KOOP:   Move for admission of People's Proposed Exhibits 47, 48 and 49, Your Honor.

THE COURT:   Any objections?

MR. PERRONE:   No objection, Your Honor.

THE COURT:   So admitted.

(PX-#47, 48 and 49 are received into evidence.)

Q (BY MR. KOOP) Looking at People's Exhibit 47, are you able to see that? Is it clear on your screen for you, Deputy?

A Yes.

Q And this is for which inmate?

76

A Mr. Uraz.

Q Looking at this entry here, on 8-31, could you explain or break that down for the jury what is detailed there?

A Okay. So any change in the computer has a from and a to. So your 47, from is where it started. So if I am assuming correctly, that August 31st is the date that he got booked in, that was his first housing assignment in our jail. Then he got classified. So the two locations where he was moved to, in this case 4A2, four being the post, A being the dorm, 2 being the cell.

Q Can you actually explain that to us a little bit between floor, dorm, post and cell? What does that mean?

A On here, the wording, they use floor references, what we call posts. We have called them that for years. When they use the new terminology, floor is the same as post. Dorm is a group of rooms, anywhere from one to three rooms to as many as 15 rooms. Typically housing two inmates per cell for general population inmates.

Q And what does block mean?

77

A   Block is, again, the same as the post. It's kind of redundant.

Q   And then cell?

A   Cells, individual room location.

Q   How many inmates to a cell?

A   Typically they would be two to a cell, depending on the location of their general population.

Q   So depending on the cell, depending on how many inmates in a particular cell?

A   There were some where there have been as many as three or four, because of their location holds more beds.

Q   Looking here on November — excuse me, September 1st, 2016, where was Mr. Uraz ultimately moved to within the jail?

A   He was moved from post 4A2 to 5F27.

Q   And that's what we see right here?

A   Yeah.

Q   How long did he remain on cell — excuse me, at F27?

A   It looks like almost three weeks since 27, when he was moved to the medical housing.

Q   So, from cell F to seven, he remained there all the way until September 27th?

78

A   Yes.

Q   And then the medical housing that you just referenced, is that an actual dorm where inmates receive medical attention?

A   Sometimes. Sometimes they are housed up there because they have special medical needs for being there. They have handicap accessible showers. But sometimes we have used it for other purposes, such as just needing more space to put similar people together. And right now we have a lot of just non-medical necessity inmates in the cells.

Q   When you say needing to keep people together, that could be multiple individuals that weren't allowed to have phone access?

A   Correct.

Q   After September 27, 2016, where is inmate Uraz moved to?

A   It shows that he got moved to M4 the next day. And then it looks like he stayed up there for a little over a week where he was moved to 5B43 on October 6th.

Q   October 6th, 2016, he was moved to 5B43, you said?

A   Yes.

79

Q   And then through how long does he remain in that cell?

A   This is where the court information was relevant, because the next several entries it will say LPD, it says transport. This is when he was going to court. So it looks like he moved a lot when really it was just him moving to and from court appearances. He stayed assigned to 5B43. It goes to the next page, it looks like.

Q   So through —

A   Yes. Because he kept going to court. He was running to 5B43. It looks like he was there until November 10th.

Q   And then he is back. Where does he move to then?

A   On the 10th of November he moved to isolation Cell 3.

Q   On the 16th does it show he was moved again?

A   Yes. That's when he moved out of isolation to medical housing Cell 5.

Q   You mentioned something here. You can actually circle on your screen there. You talked about being transported to court. Where do we see that?

80

A   Sorry. It's a little off from what I am trying to mark.

THE COURT:   It's off, but it's the wrong color.

THE WITNESS:   I'm touching lower. I am trying to mark down here. Below that green line it says Lansing City Jail. Then I don't know how their blocks and cells are. This is showing they're going to court. Then you'll see the next line, in transit. That's when he is moving from LPD back from the jail. It says block LPD to cell ICJ. You can see going down, it skips two lines. You'll see it says, again, block ICJ to LPD. So he is going to court. They take him in that transit, and put him in the cell at LPD.

Q   When you see transport or transit, that's referring to court dates?

A   Yes. Or even when they say Lansing or LPD.

Q   Referring to People's Exhibit 48, for inmate Reginald Close, the first record that we have here is for what date?

A   July 1st, 2016.

Q   And there we see?

A   He is at LPD custody. Then he came to us. It looks like he actually came to us later at the

81

end of the day on the first. It's three lines down where it says O2 housing.

Q  It says booking here?

A  That's where they initially booked him in at LPD.

Q  Okay. Based on this record, it was in early July, then, that Reginald Close comes to the jail?

A  Yes.

Q  I want to look at page three of three for Mr. Close's record. Looking at August 24th, specifically, where was Mr. Close housed?

A  He was in 5E18 and moved to 5F26.

Q  And how long did he remain there?

A  Well, actually that might have been when we were trying to move some people. Since I see a lot of movement right after the other the way the program is designed, you cannot fill a bed if somebody is still digitally assigned to a bed. You assign them to the H-cell that was open so that you could move them. So he went from E18 to F26 to finally E17. So he literally moved one room.

Q  So on 824 he moved from E17?

A  Yes.

82

Q  How long did he remain on E17?

A  It looks like September 19th he moved.

Q  Where did he move to?

A  E21.

Q  For about a month he was on E17?

A  Um-hum.

Q  That would be E21. After E21 where does he move to?

A  He went to medical housing Cell 4 on the 27th.

Q  September 27th?

A  Yes.

Q  How long was he housed in that medical M4?

A  Looks like just over a week. Because on October 5th or 6th, I'm trying to read that date, he was moved to 5B41.

Q  How long did he move to 5B41?

A  About 15 days. On October 20th he moved to 5E20.

Q  And right after October 21st he is moved again?

A  Yeah. He moved from E20 to 5G34. He stayed there for, it looks like, close to two weeks. On November 3rd he moved back to 5E20.

Q  November 3rd he moved back to 5E20?

A  Yes.

Q  And then he remained there?

83

A  Until November 27th when he moved from 5F26.

Q  Then, again, another entry for November 27th?

A  Yeah. The 27th. Sorry. It looks like we were trying to actually ultimately put him in the one bed. No, that was later in the night. Sorry, he went to E20 again from F26.

Q  So between — I just want to go back. Between September 27th and October 5th, Mr. Close would have been housed in the medical dorm Cell M4?

A  Correct.

Q  With that cell, how many people would that cell accommodate, how many people would be put in that cell?

A  M4 and M5 would hold two people each, at most.

Q  Finally, People's Exhibit 49 here. This is records for Charles Allen. Turn to the first entry here. Again, we see that LPD booking on August 3rd, 2016, that's where they would have been booked in at LPD jail, and then transfer to Ingham County Jail?

A  Yes.

Q  Looking forward to August 24th, 2016 here, where was Mr. Allen moved to?

A  He was moved from 5E17 to five F25.

Q  How long does he ultimately stay there?

84

A  It looks like a couple weeks, maybe a week, September 2nd he moved to 5C.

Q  5C?

A  Yes.

Q  And there's, again, another quick entry right behind that?

A  Yes.

Q  Does that signify he was moved from C8 to be moved somewhere else?

A  Yes. He was moved into — C8 was open, so he was put into F25.

Q  How long does he stay in F25?

A  The 27th he moved to F.

Q  Medical dorm cell 4?

A  Yes.

Q  He stays in that cell for how long?

A  For about a day. We moved him the next day to M5.

Q  That being September 28th?

A  Yes.

Q  How long did he remain in cell M5 for?

A  I assume that's on the next page. It looks like he moved out of M5 on October 6th to 5B42.

Q  So, again, he was in cell M5 for approximately a week or so?



85

A   Correct.

Q   Where was he transferred after that?

A   M5 to 5B42, he stayed close to a week. He went from B42 to B39. So within the same dorm.

Q   And then he was there for another 16 days. Where does he move to on October 29th?

A   From 5B39 to 5C2.

Q   He is ultimately moved from C2 to Cell B39 on November 16th?

A   Yes.

        MR. KOOP:   Nothing further, Your Honor. Thank you.

        THE COURT:   Mr. Perrone?

        CROSS-EXAMINATION

BY MR. SCHROEDER:

Q   Good morning, Deputy. I just have a couple follow-up questions. Now, first of all, what's the purpose of putting an inmate in administrative segregation?

A   Various reasons. There could be, could be major rule violations where they have broken major rule violations where they had several write-ups that require their behavior.

Q   As part of administrative segregation, would they be put in the medical cell?

86

A   No.

Q   What's the purpose of the medical cell then?

A   Medical cell, if I recall correctly, he was moved up there to limit phone access.

Q   Okay. I would like to ask you a couple questions about the layout of the jail. In a particular cell block, I think it's in the original cell, is given a letter and a number?

A   Yes.

Q   How are the jail cells arranged?

A   It really depends on each location. The facility is designed a little bit differently than other locations.

Q   So help in my understanding. Cell B-1, B2 and B3 will all be lined up together?

A   All the cells on 5B, for example, are lined up in a row.

Q   Okay. I would like to go back to the September 27th date. So, first of all, Mr. Uraz was originally in M3 starting on the 27th; is that correct?

A   Without the paper in front of me, I couldn't guess.

        THE COURT:   She needs the exhibit.

        MR. SCHROEDER:   If I can recall the exhibit,

87

I will be able to, Your Honor.

        THE COURT:   If you put it on the screen so everybody can see?

        MR. SCHROEDER:   I can do that, Your Honor.

        THE COURT:   Just identify which one it is.

Q   (MR. SCHROEDER) This is Mr. Uraz's sheet, correct?

A   Yes.

Q   The third entry down, it indicates he was originally in M3. Can you read that okay?

A   September 27th, 2016, he is moved from 5F27 to M3.

Q   And then the next day he is moved to M4; is that correct?

A   Yes.

Q   He remains there until October 6th?

A   Yes.

Q   When he is moved into B43?

A   Yes.

Q   Now, I'm putting up the sheet for Reginald Close. Okay? So if you look at the entry on the middle of the page, Mr. Close, starting on September 27th, was in M4; is that correct?

A   On September 27th he was moved from E21 to M4, correct.

88

Q   He remained there until October 6th?

A   Yes.

Q   So him and Mr. Uraz would have been in the same cell together from September 20th to October 6th?

A   Was his cell location F4, or M3? I'm sorry.

Q   It was M3 until the 28th and then M4.

A   Then, yeah.

Q   Okay. I'm going to pull up the sheet from Mr. Charles Allen as well. Actually hold on a second. I want to go back to Mr. Close for a second. So on the next entry, on October 6th, Mr. Close was moved from M4 to B41; is that correct?

A   Yes.

Q   Mr. Uraz, after this section, was moved to B43; is that correct?

A   Without the paper in front of me, I know he was on a couple different cells on 5B. I don't remember which specific cells.

Q   So this is the sheet for Charles Allen. If you look at this entry, second from the bottom, does that indicate that Mr. Allen is being moved to M4 as well?

A   Yes. On the 27th he was moved from 5F25 to M4.

89

Q   So that would have also overlapped at the time that Mr. Uraz and Mr. Close are in that cell?

A   Yes.

Q   Then Mr. Allen is moved out on the last entry of the page. It indicates he is moved from M4 to M5; is that correct?

A   Yes.

Q   M5 would have been next door to M4?

A   Yes.

Q   And then first entry on this page, is that indicating that Mr. Allen is being moved from M5 to Cell B42 in Cell Block 5?

A   Yes.

Q   I'm going to bring Mr. Allen back up for a second. Okay? So on October 6th Mr. Allen was also moved to Cell B41 in Cell Block 5?

A   Yes.

Q   So would that have been next door to Mr. Allen in Cell Block 5B42?

A   Yes.

Q   Okay. And then for Mr. Uraz, on October 6th, he was moved from M4 to Cell B43 in Cell Block 5?

A   Yes.

Q   So three of them would have been together in

90

the same row?

A   Yes.

Q   With Mr. Uraz being in 43, Allen being in 42, and Close being in 41?

A   Okay.

Q   So, theoretically, if Mr. Close wanted to send a letter to Mr. Uraz in 43, would have had to have passed —

    MR. ROTH:   Objection. Calls for speculation.

    MR. SCHROEDER:   No.

    MR. ROTH:   He said "theoretically," by the very nature, calls for speculation.

    MR. SCHROEDER:   I can rephrase my question briefly.

Q   (MR. SCHROEDER) Based on the setup of the cells, if Close wanted to send a letter to Uraz from B41 to B43, he would have had to have given that letter to Mr. Allen in B43?

    MR. ROTH:   We don't have the proper foundation.

    THE COURT:   Let's go back. If a note was to be passed, how would it happen, if you know?

    THE WITNESS:   Well, I'm guessing they had them housed up there and they came out one at a

91

time on their rotations, and not all at the same time. He could have walked directly to his cell door. He would not have had to have gone through the door in between them. It's not like they had to relay it. He can walk directly from that room to the other room.

Q   If it's possible, they could have relayed it as well?

    MR. ROTH:   Objection. Calls for speculation.

    THE COURT:   Well, relaying another technique.

    THE WITNESS:   It's unlikely they would have relayed it, because the doors are all on the same side, and the openings for the slots, it's really, I would say, impossible to relay it through the doors that way.

Q   (MR. SCHROEDER) All right. Around the same time that Mr — that Allen, Close and Uraz were being housed, was there another inmate in the facility by the name of Muhammed Fateen?(sic)

A   Yes, I believe so.

    MR. SCHROEDER:   Excuse me for one second, Your Honor. At this time I would like to admit Defense Exhibit F, which is the inmate history

92

of Mr. Muhammed.

    MR. ROTH:   Your Honor, I don't think there has been any showing of the relevance of Mr. Muhammed's housing situation.

    MR. SCHROEDER:   Your Honor, I can't show relevance unless I will be able to show the --

    MR. ROTH:   May we approach?

    THE COURT:   All right.

(Off the record discussion at the bench.)

Q   (BY MR. SCHROEDER) Deputy, I am going to show you Defense Proposed Exhibit F. Can you tell me what that is?

A   It looks like the movement history for Fateen Muhammed.

Q   And I would like to -- I would like to start entry on the second page, which is July 7th. Can you please read that line for me?

A   July 7, 2016, it is moved from 5E18 to F24, 5F24.

Q   Okay. And was that the -- all right. So -- or it might be 16. Sorry. So he was moved to F24; is that correct?

A   Yes.

Q   Would that be the -- in Cell Block 5, correct?

A   Yes.

93

Q  Would that be the same cell block that Allen and Uraz were initially assigned to?

A  I know they were assigned in F dorm. I don't recall which rooms.

Q  It's the same dorm?

A  It is the same dorm, yes. The letters designate the same dorm. It's all the same. F is all the same.

Q  Okay. And then can you read the line from September 27th?

A  September 27th, 2016, moved from 5F24 to M3.

Q  Okay. So that would be in the medical wing, correct?

A  Yes.

Q  Also where Mr. -- where Allen, Close and Uraz were housed?

A  Yes.

Q  All right. And then can you read the line below that?

A  It looks like it says September 28, 2016, he is moved from M3 to H12.

Q  Okay. And then can you read the line below that?

A  It is moved from H12 to M5. It looks like H12, the stop to move him. He was actually moved

94

from M3 to M5.

Q  And Charles Allen was sent to M5 on that date, correct?

A  Without seeing the paperwork, it sounds like it might be accurate. I don't have it in front of me.

Q  Fair enough. Then can you read the second line on this page?

A  The dates cut off. I'm going to guess that it says October 5th or 6th, 2016, moved from M5 to 5B40.

Q  That would have been in the same dorm as Close, Allen and Mr. Uraz?

A  Yes.

Q  All right.

MR. SCHROEDER:  No further questions, Your Honor.

THE COURT:  All right. Any redirect, Mr. Koop?

MR. KOOP:  No, Your Honor. Thank you.

THE COURT:  Jurors have any questions for Deputy Douse? Thank you for coming in, Deputy. Appreciate it.

THE WITNESS:  Thank you.

THE COURT:  Next witness?

95

MR. ROTH:  People call Lieutenant Robert Backus.

THE COURT:  Step up here for us, Lieutenant. Raise your right hand. Do you solemnly swear or affirm the testimony you are about to give will be the truth under penalty of perjury?

THE WITNESS:  Yes, sir, I do.

THE COURT:  Have a seat. State your name. Spell your last name for the Court Reporter, please.

THE WITNESS:  My name is Robert Backus. Last name B-A-C-K-U-S.

THE COURT:  Mr. Roth?

MR. ROTH:  Thank you, Your Honor.

ROBERT BACKUS.

A witness having been duly sworn to testify on his oath as follows:

DIRECT EXAMINATION

BY MR. ROTH:

Q  Good morning.

A  Good morning.

Q  Where are you employed?

A  I am employed through the Lansing Police Department.

Q  In what capacity?

96

A  I am a lieutenant with the Lansing Police Department Special Operations Section.

Q  How long have you been working for the Lansing Police Department?

A  I have worked for the Police Department for approximately 17 years as an officer.

Q  What are your responsibilities as a lieutenant in the Special Operations Section?

A  My responsibilities include managing our personnel assigned to our Narcotics Unit as well as our Violent Crimes Unit. I also gather and report our statistical products, and I also help to create and review our strategies.

Q  The Special Operations Section that you mentioned, the Narcotics as well as Violent Crimes, is there undercover officers assigned to each?

A  Primarily our Undercovers are assigned to just our Narcotics Division.

Q  And that Narcotics Division, in addition to Narcotics, will do things like what is referred to as hooker stings, other needed undercover jobs as well?

A  That's correct. We refer to it as a Vice Unit.

Q  Thank you. In October 2016, were you made

97

aware of an inmate at the Ingham County Jail
who would solicit one or more fellow inmates to
kill another victim?

A Yes.

Q How were you made aware of that?

A I was contacted by Detective Krumbach who
provided me information regarding inmates who
had information about another inmate who was
attempting to solicit someone for murder for
hire.

Q The jail is in Mason, correct?

A That is correct.

Q But the underlying case, the reason that the
person doing the soliciting there was a Lansing
Police Department investigation?

A Yes.

Q What did you end up doing in response to
learning this information?

A With that information, Detective Krumbach
invited me to a preliminary meeting with
himself, Detective Andy Hogan, as well as the
Prosecutor's office to speak about the
information that we had, and to evaluate the
information, and what we could do with it.

Q Did you end up determining to have an

98

undercover officer to make contact with this
person?

A Yes, we did.

Q Who ended up serving as the undercover officer?

A I requested Officer Frank Mobley be our
undercover officer for this case.

Q Did you gather some preliminary information to
provide to Officer Mobley?

A Yes, I did.

Q What was that information?

A I was provided information through Detective
Krumbach as well as some evidence,
specifically, some notes about the potential
victim or victim's locations, such as
addresses, vehicles, as well as names.

Q Did you provide some of that to Officer Mobley?

A Yes, I did.

Q For what purpose?

A So that he would have some background knowledge
in regards to what he's supposed to have
already known, or information he was supposed
to have already been given before he were to
contact the suspect or the Defendant in this
case.

Q Did that include the name of the person who had

99

allegedly acted as the intermediary, the person
who put Officer Mobley in contact with the
Defendant?

A It included what his name was, but more
specifically what his alias was or what he was
known to be called or referred to as.

Q Was that the name Rough?

A Yes, it is.

Q Did you coordinate a way for Officer Mobley to
contact the Defendant?

A Yes, I did.

Q Can you please explain that?

A I indicated that the administrative staff at
the Ingham County Jail, I requested that the
Lansing Police Department be given a covert or
undercover account through their Securus
system, so that we could utilize this system to
attempt to contact with the Defendant.

Q This Securus system, is that the normal way in
which an outside person in non-law enforcement
would make contact with an insider?

A Yes, it is.

Q Officer Mobley made three attempts to contact
the Defendant. The first, doesn't connect.
The second connects. They have a lengthy

100

conversation. Third, it appears to be static
or hearing problems and hangs up. Were you
present for any of those calls?

A I was present for all three of the calls.

Q The second call, the one that they had a
lengthy conversation, is that consistent with
what you asked Officer Mobley to do?

A Yes, it was consistent.

Q Was it consistent with all Lansing Police
Department undercover practices and procedures?

A Yes, it was.

Q Did you communicate with Officer Mobley in
advance of the third call?

A Yes, I did.

Q What was the purpose in that third potential
call?

A In reviewing the second call, and the strategy,
in terms of what we had hoped to, all the
evidence we hoped to have obtained from the
phone call conversations, the third call was
just to reiterate basically what the second
call was, to finalize the plans, to see if we
can garner any other evidence from a third
conversation.

Q Is that common practice in an undercover

101



operation to try and solidify, if possible, further contact?

A   It is. The more conversation you have, the more evidence you get, the stronger your case will be, the greater understanding you're going to have of the operation. So a third call was just to develop more information.

Q   When that call didn't work, the undercover operation was completed?

A   That's correct.

Q   The balance of the investigation was returned to Detective Krumbach?

A   Yes.

MR. KOOP:   Nothing further, Your Honor.

THE COURT:   Mr. Perrone?

CROSS-EXAMINATION

BY MR. PERRONE:

Q   So in regards to the third call, you are attempting to develop additional evidence against Mr. Uraz by placing the third call by having Officer Mobley place the third call?

A   There is a potential for additional evidence, but we are also trying to confirm what was already stated in the second call.

Q   And you set up the account?

102

A   That's correct.

Q   Is there any record of setting up the account or the call that was made, initially, the first call by Officer Mobley?

A   In terms of setting up the account, I did set up a covert account. So I'm sure that the account still exists in terms of the name that was put in, and an e-mail address that was created in terms of the, or regarding the video evidence of the first call. I'm not sure if that first call was recorded or if it still exists or how long they keep the record for.

Q   You instructed him to make the first call. You instructed Officer Mobley to make the first call?

A   Yes, I did.

Q   You don't know where any evidence of that call would be?

A   I do not.

Q   And Detective Krumbach was the individual that brought this information to you, initially, correct?

A   That's correct.

Q   How long did Detective Krumbach be with the Special Operations Unit?

103

A   Detective Krumbach is not with the Special Operations Section.

Q   How many times has the Special Operations Section, while you have been employed there, done any undercover operations associated with murder-for-hire plots?

A   Specifically, the Lansing Police Department, Special Operations, in my experience, we've had done --

Q   You, specifically, under your control?

THE COURT:   I think that's what he's saying, his experience. Proceed.

THE WITNESS:   Specifically, with the Lansing Police Department Special Operations Section, the officers and supervisors were involved with a similar case the summer before for a murder for hire, or solicitation for murder for hire, in conjunction with the Federal Bureau of the ATF.

Q   Did you engage the ATF in this investigation?

A   Yes, I did.

Q   Did they participate in the investigation?

A   Their participation -- their participation was limited only to the planning section on the day that we had a meeting at the Prosecutor's

104

office.

Q   Why did you pick Officer Mobley?

A   Officer Mobley is a 20-plus year veteran. He has done numerous tours in our undercover unit. He was very comfortable. He's a great communicator.

In addition to that, out of the cover story or the back story was from an inmate who was African-American. And he is also an African-American officer. So the role actually fit him as well. As well, it also matched up with his skill sets.

Q   And you told him to try to get the information from Mr. Uraz by pretending that he couldn't hear Mr. Uraz as an investigative technique?

A   Everything that was witnessed in a video or recordings where you here that there is a communication breakdown in terms of the sound or the static. That was not planned for. That was not part of the strategy. That was actual technical difficulties that we were experiencing.

Q   So there wasn't any investigative technique that was instructed by you in any way he was associated with trying to pretend he couldn't

**105**

hear him?

A  No. That was not part of our strategy or technique.

Q  Did you tell Officer Mobley to use trash bags as a euphemism for murder?

A  I did not instruct him to use that terminology when he is speaking. That was something that he developed and he was comfortable using.

Q  So there was no attachment associated with the trash bags to your investigation?

A  I'm sorry. I don't understand.

Q  Officer Mobley's use of the trash bags, there wasn't any type of an indication that was provided to him associated with that playing into the ultimate outcome? There wasn't anything specific as to the underlying plans as you had been made aware?

A  If I am understanding the question correctly, the term or the use of trash or trash bags was not something that we specifically decided or planned that we would use.

Q  It was not a strategic — it wasn't strategic as it pertains specifically to this investigation?

A  The terminology that was used was strategy

**106**

employed by Officer Mobley. It was not part of an overall strategy which was developed or coordinated through me or any of the other members.

Q  There has been some clarification associated with Special Operations dealing with prostitution and drug sting operations; is that accurate? That's what Vice does, primarily? Does Vice primarily deal about prostitution and drug undercover operations?

A  I would agree, primarily, yes. But it's not limited to that.

Q  What was the difference between — from your perspective, what's the difference between prostitution stings and a murder-for-hire sting?

A  It — I am sorry. Are you asking for a difference being prostitution stings?

Q  Yes. From your experience and your opinion, would you, as head of the operations, agree to get more information from a strategic standpoint as to the murder-for-hire plot or the prostitution?

A  What I am going to say, our prostitution investigations aren't typically something that

**107**

we have to sit down, coordinate strategies, that we have information coming to us, and asks us to respond to it. Our prostitution investigations are really something that our -- they are, while we may plan an event, we don't specifically plan that there is a specific person that we are going to target. We don't usually respond to specific information. Whereas, when you deal with a solicitation for murder case, we had specific information regarding an act, a specific request and intelligence about that act and victim. So we were able to coordinate more. There was another plan involved. So it was a different approach than prostitution.

Q  Were you in the initial meeting with Reginald Close when he gave his initial statement?

A  I was not.

Q  When does the name Charles Allen come to you?

A  That name does not come to me in terms of any of the planning or coordination of investigation. That is part of the Special Operations Section.

Q  The call that was made by Officer Mobley on October 24th, was that as a result of the

**108**

information that Charles Allen brought to the Special Operations Unit?

A  No, it was not.

Q  Did you have any further interactions with the jail staff, the deputies at the Ingham County Jail, beyond setting up the Securus account, informing them of the investigation?

A  I did inform them when we would not need their assistance anymore. I kept them updated that we would be making phone calls, we would be using our system so that they knew when the investigation was complete. After that third call, I did advise them we did not need their assistance anymore, setting up more phone calls or video visits.

Q  In setting up the call on the 27th, October 27th, did you review any information from Charles Allen?

MR. ROTH:  Your Honor, I am going to object. Asked and answered. The lieutenant has testified that Charles Allen was not a factor in any of these calls.

THE COURT:  That's been the testimony so far. I'll allow one more question of the lieutenant.

**109**

THE WITNESS: I do not recall using any of the information that was obtained from Charles Allen in the Special Operations Section of this investigation.

Q (MR. PERRONE) Was your role primarily logistical in this investigation?

A That is true, it was logistical as well as supervisory for the undercover officer that was offered.

MR. PERRONE: No further questions. Thank you, Your Honor.

THE COURT: Mr. Roth, redirect?

MR. ROTH: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. ROTH:

Q Lieutenant, you testified that Detective Krumbach is not in the Special Operations Section. What unit is he in?

A He is assigned to our Detective Bureau.

Q You are two units coordinated for this particular portion of the investigation?

A Yes, we did.

Q And mr. Perrone asked you about the first call. Fair to say the first call actually does not go through. There is some wifi problem?

**110**

A What we had discovered, the Securus system operates through an app on your phone. What we had discovered was if your wifi was enabled on your phone, that the sound does not work. The minute we took the wireless searching portion of our phone off, the program worked fantastic.

Q All right. So the first one does not go through because of that?

A That's correct.

Q Showing you — I'm not going to move for admission at this time — Proposed Exhibit 58, the record of those calls. That's why it doesn't appear?

A Can you repeat that?

Q So the first call does not appear on the record of those because there is a technical problem with that; is that correct?

A Yes.

Q So it shows the — I will get the dates right here — October 24th and October 27th calls, but not before that?

A That's correct.

Q Does it also have the name that you set up the account up under?

A Yes.

**111**

Q What is the name you used?

A Tyrone Jones.

MR. ROTH: Nothing else, Your Honor. Thank you.

THE COURT: All right. Jurors, if you want to have a question on that document?

MR. PERRONE: Can we approach?

(Off the record discussion at the bench.)

THE COURT: I'll allow it, since it was something new.

MR. ROTH: Your Honor, at this time we are going to move for admission of Proposed Exhibit 58.

THE COURT: Any objection?

MR. PERRONE: No objection.

THE COURT: All right.

(PX-#58 is received into evidence.)

RECROSS-EXAMINATION

BY MR. PERRONE:

Q You can see this on the screen currently?

A Yes, I can.

Q And this encompasses the two calls that were made. There is not a third call that shows it was attempted on there?

THE COURT: I believe that is the earlier

**112**

testimony that it didn't show.

Q (MR. PERRONE) But those are the only two entries?

A Correct. I see two entries.

Q There isn't any — from your understanding, there isn't any specific purpose — you don't understand how this prints out, correct?

A I'm not familiar with the system in terms of the administrative side where it prints out. No.

Q So as far as your answer, that there is not an entry in here for the first call as a result of technical difficulties, that's speculation?

A What I can say is that on our end, when we tried to make that first call, Officer Mobley tried to place that first call, we experienced technical difficulties because of the app and because of having our wifi feature enabled on our phone.

Q Did you follow-up and get any type of electronic evidence from the transition or from Securus besides this?

A No, I did not.

MR. PERRONE: No further questions.

THE COURT: All right. Jurors have any

**113**

questions for Lieutenant Backus?  All right. Thank you, Lieutenant.

THE WITNESS:  Thanks.

THE COURT:  Appreciate it.

MR. ROTH:  Next witness will be Detective Krumbach.

THE COURT:  Let's take about 15 minutes before we start, come back about noon.

(Jury exits courtroom at 11:47 a.m.)

THE COURT:  We are in recess.

MR. ROTH:  Thank you, Your Honor.

(Recess taken from 11:47 a.m. to 12:08 p.m.)

THE COURT:  Returning on People v Uraz, file 1064, 1065.  All parties are present.  Are we ready for the jury?

MR. ROTH:  Yes, Your Honor.

THE COURT:  Mr. Perrone?

MR. PERRONE:  Yes, Your Honor.

(Jury present in courtroom at 12:09 p.m.)

THE COURT:  All right.  Be seated.  Next witness, Mr. Koop?

MR. KOOP:  People call Detective Krumbach, Your Honor.

THE COURT:  Raise your right hand for us. Do you swear or affirm the testimony you are

**114**

about to give will be the truth, the whole truth, under penalty of perjury?

THE WITNESS:  Yes, sir.  I do.

THE COURT:  Have a seat.  State your name, spell your last name for the Court Reporter, please.

THE WITNESS:  Matt Krumbach. K-R-U-M-B-A-C-H.

THE COURT:  Mr. Koop?

MR. KOOP:  Thank you, Your Honor.

MATT KRUMBACH.

A witness having been duly sworn under oath to testify as follows:

DIRECT EXAMINATION

BY MR. KOOP:

Q   Good afternoon.

A   Good morning.

Q   Where are you employed?

A   I am employed with the Lansing Police Department?.

Q   How long have you been employed with the City of Lansing Police Department?

A   Over 21 years.

Q   What is your current rank and assignment, sir?

A   I'm a detective assigned to the Detective

**115**

Bureau, and investigate violent crimes, especially domestic assaults.

Q   How long have you been a detective with the Lansing Police Department?

A   Over four years now.

Q   How much of that time is focused on the specific assignment of domestic assault?

A   I would say approximately three years now.

Q   Detective, could you explain broadly what your duties as a detective are?

A   My duties as a detective include having reports that are initially taken by road patrol officers, and they are reviewed by a sergeant and another layer of command.  And if there is any follow-up that needs to be done for specific reports and investigation, they will get assigned to me based upon what type of a crime they are.  At this point in time, if they are domestic-related crimes, I would probably have those assigned to me for further investigation or follow-up.

Once that is completed, I would put a packet together to present to the Prosecutor's office for the warrant consideration.

Q   Now, Detective, you were present for this

**116**

trial.  Do you recall the testimony from Ms. Melke detailing the May 25th, 2016 incident, and the Defendant was seen in her house on a trail cam?

A   Yes, sir, I do.

Q   Were you involved in that case at all?

A   Yes, sir, I was.

Q   As a detective?

A   Yes.

Q   And were charges authorized in that case?

A   Yes, they were authorized.

Q   Following that May 25th, 2016 incident, were you asked to investigate another incident of aggravated stalking between -- alleged by Ms. Melke and the Defendant?

A   Yes, sir, I was.

Q   What was that aggravated assault about?

A   It was brought to my attention that the victim in this case, Ms. Erika Melke, had been contacted by the Defendant, the accused, through Facebook.  And she had a letter sent to her.  And that she he was in possession of -- excuse me, documentation.  That she had been contacted by the Defendant.

Q   And the documentation, are you referring to

**117**

screenshots as well as the email that's been previously introduced?

A Yes, sir.

Q Regarding your investigation into the aggravated stalking that we heard from Ms. Melke, concerning those incidents in August and September 2016, did you review that material that was provided to you, the emails and screenshots?

A Yes. I reviewed them and made notations that it appeared that there was two different dates where IP addresses had been changed.

Q And that's in relation to the Facebook alerts?

A Yes. Facebook alerts, that passwords had been changed. Yes.

Q Were you able to use that information, these IP addresses, to further your investigation in any way?

A Yes, sir, I was.

Q What specifically did that entail?

A What I did is I asked one of my fellow detectives about IP addresses, because I had limited knowledge of what they were. And he is a detective that utilizes cell phone technology. Anyways, he told me that I could

**118**

request a search warrant to check on these IP addresses, because they were specific dates, times. And that's exactly what they were, they were addresses. So I had requested a search warrant to get further information regarding those IP addresses.

Q Was that search warrant authorized or signed off on by a judge?

A Yes, it was.

Q What did you do with that search warrant? What's that next step?

A What I did was, I served the search warrant. This is a search warrant where I'm trying to recover data. Not like I was serving a search warrant at a residence. I was trying to recover a specific item. This was data. So I did ask for some assistance in serving that search warrant. I was given some suggestions by another detective. I served this search warrant electronically. At first, the search warrant was sent to Merit Technology, or Merit, I would have to look at it. It was the company where the IP addresses, I believe, originated.

Q And did you receive -- what, if any, information did you see from Merit?

**119**

A The -- Merit told me that I should contact Spartan Net. And that Spartan Net was actually the provider that had the information that I was requesting about the IP addresses.

Q Did you, in fact, contact Spartan Net, sir?

A Yes, I did. I ended up getting contact information from Merit that I contacted Spartan Net and spoke to a Mr. Richard Laing at that time.

Q Did Mr. Laing provide you any information as it related to the IP addresses concerning the Facebook on the 27th and 31st?

A Yes, he did.

Q What was that information?

A That information that he provided to me was that those IP addresses for those specific dates and times correlated to an address at 12 -- well, actually North Pointe Apartments. I'm sorry. North Pointe Apartments in the City of East Lansing. Specifically building number, or letter C. So I am the one who looked up the address at North Pointe. But he told me it was North Pointe Apartments.

Q You said you looked up the address to North Pointe Apartments? Did you follow-up on that

**120**

information?

A Yes, I did.

Q How so?

A I was unfamiliar with where North Pointe Apartments was, because that's in the City of East Lansing, it's outside my jurisdiction. I drove over there to verify what their location was and found that it was 1242. And that there was three buildings associated with that apartment complex, A, B and C.

Q In addition to just finding out these building locations and building A, B and C, were you able to get any other information relative to this investigation about those buildings?

A Yes.

Q What is that?

A That these buildings were run by DTN Management.

Q Specific to your investigation, were you provided any -- or did you inquire about whether the Defendant was a resident at that location?

A Yes. I did do some follow-up investigation. I spoke with a lady, a Ms. Heather Heitman, I believe was her name, who was the manager for

121

those properties, and did request some information, initially, if the Defendant had been a resident of those properties, North Pointe Apartments.

Q  Were you able to confirm whether he had been -- was a resident or was a resident?

A  At one point in time I was advised that he had been a resident of that property, but not building C. I think it was building B at that time. I was advised that he had still held a lease, but not at that particular North Pointe, but a different property managed by DTN. And she provided me that information.

Q  Based on knowing the location of where these IP addresses came from, did you do any further investigation to try to determine where specifically the IP address was associated with or who could have accessed it at that building?

A  Yes, I did.

Q  What was that, Detective?

A  Well, at one point I learned that the Defendant had been placed on an electronic tethering system during the course of my investigation.

Q  And with that information what did you do or attempt to follow-up on?

122

A  Well, because I wanted to know whether or not he had been on a tether while this had been going on, I requested, through Sentinel, a group that is the person that runs the tether system, if I could please have the coordinates that were associated longitude and latitude for the date and time I was receiving for the IP addresses. I had a general location.

Now, I was requesting GPS latitude and longitude on those dates associated with what I utilized for the specific warrants on the IP addresses.

Q  Did you in fact see documents or records for the Defendant's tether in relation to the 27th and 31st?

A  Yes, sir.

Q  With that information, were you able to use anything from that to further your investigation?

A  Yes.

Q  Specifically, as it relates to the longitude and latitude, did you use that information in any way?

A  Yes.

Q  What was that, Detective?

123

A  It was plotted in to see where that actual location is. They both showed me utilizing the Google map overhead earth. Both those locations were at 1242 Haslett Road in the City of East Lansing. And that the apartment that I previously advised when I entered that, it indicated an area of an apartment from C10.

MR. KOOP:  May I approach the witness, Your Honor?

THE COURT:  You may.

Q  (MR. KOOP) Detective, I am handing you what's been marked as People's Proposed Exhibits 54 and 55. Do you recognize what I'm showing you?

A  Yes, sir.

Q  How do you recognize this?

A  This is an overhead map of the North Pointe Apartments with the latitude and longitude for both August 27 of 2016, and August 31st of 2016, with the specific times.

Q  And these coordinates that we referenced with the longitude and latitude and the specific dates, these were entries that were taken directly from the Sentinel records?

A  Yes.

MR. KOOP:  Move to admit People's Proposed

124

Exhibits 54 and 55.

THE COURT:  Mr. Perrone?

MR. PERRONE:  No objection.

THE COURT:  So admitted.

(PX-#54 and 55 received into evidence.)

Q  (MR. KOOP) Detective, I'm showing you People's Exhibit 54. Can you explain for the jury what we see here?

A  What we're looking at right here is an overhead picture of the North Pointe Apartment complex where you see the little pinpoint to the right.

Q  You can just circle it right on the screen. Detective, does that pinpoint --

A  Yes. That's the point is where the latitude and longitude, which you notice has been highlighted for you in yellow, with the address, date and time of the coordinates that's received from Sentinel.

Q  And that's --

A  So that tells us, at that point in time, the Defendant was right there.

Q  And in relation to People's Exhibit 55, again, what is this exhibit document?

A  This is very similar. However, the date and time for this one is for the latitude and

125

longitude, would be August 31st of 2016 at 12:20 hours.

Q  Detective, I'm placing on the screen here people's previously admitted Exhibit 35. We have Apartment C10 marked on the map there. Did you receive any information about who resided at C10?

A  Yes, sir.

Q  And who was that?

A  It is a Burak Atamer, if I'm pronouncing it correctly.

Q  Did you inquire further from the DTN Management about Burak Atamer?

A  Yes, I did.

Q  Did you receive any information relevant to your investigation in this case?

A  Yes. I was advised by management that the residents of Apartment C10 was a Mr. Burak Atamer. I asked if he had any affiliation with the Defendant, and Ms. Heitman stated, yes, actually that resident, Burak Atamer, had been introduced to her at the leasing office as a potential client. And that he did ultimately secure a lease at North Pointe. And that she also told me that the Defendant was provided a

126

key with a permission of Mr. Atamer to sometimes check on his apartment. That Mr. Atamer sometimes would leave the country, and would want somebody to look after his apartment.

MR. PERRONE:  Objection. This is hearsay. He is saying what another person said.

MR. KOOP:  I can move on.

THE COURT:  All right. Sustained.

Q  (MR. KOOP) So, Detective, you now, at this point in the investigation, determined where the IP addresses came from, the actual specific location and that the Defendant was at that location at the time the IP addresses were used. At this point in your investigation, does the aggravated stalking component morph of into a different or a new investigation?

A  Actually it does, yes. It started turning into a different investigation.

Q  What was that, sir?

A  Well, I received additional information. This particular investigation turned into a solicitation of murder investigation.

Q  Who did you receive the information about the solicitation of murder from who provided that

127

information?

A  I did receive information from Ingham County Prosecutor's office that an attorney had contacted the Ingham County Prosecutor's office with information regarding the Defendant that this person had reached out to their attorney and wanted to pass along information in regard to an inmate attempting to solicit them for murder.

Q  And that individual would have been Reginald Close?

A  Yes.

Q  And his respective attorney?

A  Yes.

Q  This solicitation by the Defendant to murder Ms. Melke, was it your understanding this all occurred within the Ingham County Jail?

A  Yes. That was my understanding.

Q  Is the Ingham County Jail within the jurisdiction of the Lansing Police Department?

A  No, it is not.

Q  Is there some agreement that allows Lansing Police Department to coordinate their Law enforcement efforts with the Sheriff's?

A  Yes, there is. It's called a mutual aid

128

agreement between the department.

Q  And did you seek to use that mutual aid to further investigate the further solicitation of murder?

A  Yes, I did. I made contact of the investigation division of the Ingham County Sheriff's Department and advised them I had an ongoing investigation involving the Defendant and the victim. And that I had a previous investigation involving them, also, and then advised them that initially it appeared that there would have to be another investigation. At that point in time I was given permission under the mutual aid agreement to continue my investigation, which gave me the authority to work outside the scope of the actual venue of City of Lansing.

Q  To further this investigation, did you conduct an interview with Reginald Close?

A  Ultimately I did, yes.

Q  That would have been on/or about October 17, 2016?

A  Yes, sir. I believe it was October 17th.

Q  For that interview, where did that take place?

A  That interview took place at the Ingham County

129

Jail.

Q   Who is present for that interview, Detective?

A   At that point in time Mr. Close was present, his attorney was present, and I want to say his name was Mr. Rusek. And I made a previous contact with Mr. Rusek requesting if I could have a chance to speak with his client. He agreed. I also requested Detective Hogan to accompany me for this attempt interview.

Q   So that interview takes place on October 17th. We've heard some testimony about proffer or a proffer interview. Detective, what's your understanding of a proffer interview? What's that?

A   My understanding of what a proffer interview is, it's an agreement between the Prosecutor's office and a defendant's attorney. It's a written agreement that is read by the defendant's attorney. And it's an agreement that they will, the defendant, and any type case, would be forthcoming and honest with the detective's questions in regards to a criminal investigation. And that were cooperating fully. That the Defendant may see some form of a benefit. It is something that has to be

130

signed and reviewed by an attorney for the Defendant also.

Q   So it's, I guess, in short, it's a signed document by the defendant, the attorney, and the Prosecutor's office that outlines -- gives the Defendant an opportunity to tell law enforcement some information they have. And in exchange the possibility to receive a benefit or agreement by the Prosecutor's office?

A   Yes, sir. That's my understanding.

Q   The interview with Reginald Close, was this a proffer interview?

A   This was not a proffer interview.

Q   So, in essence, this is just an interview that he could talk or not?

A   That is correct, sir.

Q   There were no promises at the outset of offers or plea bargain, anything like that?

A   There was no promises, no offers.

Q   During the course of the interview, you have seen various details from Reginald Close; is that accurate?

A   Yes, sir, I did.

Q   Also during that interview, did you receive written correspondence between Close and who he

131

identified as the Defendant?

A   Yes, sir.

Q   That would have been the written letters in People's Exhibit 39 through 41?

A   Yes. And I believe there is a map, also, sir.

Q   Those were handed over to you on October 17th?

A   Yes, sir.

Q   Following that interview with Mr. Close, did you attempt to corroborate or further investigate any of the information he provided to you?

A   Yes, sir.

Q   What's the purpose in your -- in attempting to corroborate or follow-up on that information?

A   To see how credible that that information is, to see if it's accurate, to see if it warrants further investigation.

Q   What did you do to follow-up on some of that information that was provided?

A   Some of what I did was that the information that I learned, I had was fresh information to me. So I was given some information regarding the Defendant.

Q   Let me stop you right there. What do you mean by fresh information, Detective?

132

A   I was learning of this as the interview had started. I had a previous investigation involving the Defendant and the victim. But this was at this point in time, the first time anyone was providing me new information regarding solicitation for murder.

Q   What did you do? And I interrupted you. What did you do with that information to follow-up on it?

A   I verified some of the information.

Q   How so?

A   I did have Detective Hogan with me. And Detective Hogan was kind enough to obtain some documentation while we were there that there had been a claim made that a certain amount of money that had been placed upon Mr. Reginald Close's account at the jail.

MR. PERRONE:   I am going to object again. This is hearsay. He is talking about what Detective Hogan was giving him, telling him -- he is talking about a third document that Detective Hogan had.

THE COURT:   I'll sustain that. Rephrase it, please.

Q   (MR. KOOP) Was there some follow-up

## 133

investigation that was done; is that accurate, Detective?

A  Yes, sir.

Q  In that follow-up investigation, was any information from the jail obtained?

A  Yes, sir.

Q  What is that?

A  That would have been documentation regarding a money amount placed upon the person that I was interviewing, Mr. Close's account.

Q  And that's in reference to People's Exhibit 42. Is that what you're speaking to?

A  That is exactly what I'm speaking to.

Q  So you obtained the account history that correlated to money deposits that Mr. Close had stated had been on his account. Did you do anything else to follow-up on some of the details that Mr. Close provided you?

A  Yes, sir. It was advised to us during the course of this investigation. That at that interview, that the Defendant had -- was employed in an area, I don't know if I can say that, Michigan State University. And that he had committed solicitation for the purchase of a handgun over there. It's the first I had

## 134

heard of that.

So when I left the Ingham County Jail, I drove directly over to Michigan State University to see if that was true and verify it. And, low and behold, it is. I asked for a copy of that report from Michigan State University Police Department and reviewed it.

Q  And that report, what did that report relate to, Detective?

A  That report related to the Defendant attempted to solicit a co-worker to purchase a firearm in an illegal fashion for his use.

Q  And that would have been Patrick Burnett who we already heard testify?

A  That is correct.

Q  So after verifying some of this information provided by Mr. Close in that interview, there is a meeting on October 18, 2016, that Sergeant Backus just testified to. Were you present for that?

A  Yes, sir, I was.

Q  And that meeting related to the investigation or undercover that would be an operation that you set up; is that accurate?

A  That is accurate.

## 135

Q  Were you involved with the actual undercover portion of this investigation?

A  No, sir, I was not.

Q  But as this is ongoing with the Special Operations Section. Are you receiving updates about that portion of the investigation?

A  Yes. I was kept advised of their activities.

Q  And subsequent to the video visit, or the video between the Defendant and Detective Mobley, did you receive other information about another inmate within the jail trying to solicit the Defendant soliciting to kill Erika Melke prior to following it?

A  Following? Yes, I did.

Q  What did you do with that information, Detective?

A  I investigated it. I was given information that there was a subject at the Ingham County Jail that was providing information, that he was attempting to be solicited for a murder of an individual. I obtained that information and I then went down to the jail at a later time and interviewed that person.

Q  Would that have been Charles Allen?

A  Yes, sir, it was.

## 136

Q  The interview with Charles Allen, you said you later went and interviewed him. Would that have been October 31st, 2016?

A  It was Halloween at 2016.

Q  The interview occurred at the jail?

A  It occurred at the Ingham County Jail. I traveled down there and conducted this. These interviews were conducted in a room that's audio and video recorded.

Q  Now, you just went over a proffer interview and what that entails, similarly, with Charles Allen. Was this a proffer interview or something else?

A  This was not a proffer interview. I made it very clear that there was nothing I would be able to do for Mr. Allen in regards to him giving me a statement.

Q  Were you aware at the time of the interview, if Mr. Allen had any open or pending cases in terms of charges that had yet to be disposed of?

A  He had no pending charges. And to the best of my belief he was there for a probation violation. When I say down there, and speaking to him initially at the beginning of the

137

interview, I verified this. I said: Do you have any outstanding charges that I do not know about. He told me no. He verified. He was there for a probation violation that he had been sentenced, just serving his term. After that term was done, he had no other charges or no other warrants on him.

Q Now, I just want to back up here a little bit. You referenced about Burak Atamer living at the North Pointe Apartment C10. We've heard some other witnesses testify to that name or bring that name up. Did you do any investigation, further investigation as it relates to Burak Atamer?

A Well, that name did come up. Because during the course of my investigation, I did check to see if the Defendant was making any telephone calls on the telephone line at the Ingham County Jail through the Securus System.

Q These telephone calls, they can be both just voice and video; is that accurate?

A Yes. They do have the option. Some of them are just audio. Some are video chat also.

Q Were you able to determine whether the Defendant had communicated with Burak Atamer

138

since he had been at the jail?

A Yes. The name Burak Atamer became very familiar, when you say looking at the Securus telephone record.

MR. KOOP: May I approach the witness, Your Honor?

THE COURT: You may.

Q (MR. KOOP) Detective, I am handing you what's been marked as People's Proposed Exhibit 56 and People's Proposed Exhibit 57. Do you recognize that?

A Yes, I do.

Q How do you recognize those exhibits?

A This is a record of the Securus video chat between Defendant Tunc Uraz and Mr. Burak Atamer.

Q That is in 56?

A In 56 and 57. This is a picture of Burak Atamer as he signed up for a chat in person, at the Ingham County Jail, and that you do not visit in person, you have to do it through a video chat.

MR. KOOP: At this time, Your Honor, I move to admit People's Exhibits 56 and 57.

THE COURT: Mr. Perrone?

139

MR. PERRONE: Voir dire briefly?

THE COURT: Briefly? All right.

VOIR DIRE EXAMINATION

BY MR. PERRONE:

Q In regards to People's Exhibit 56, is this something you pulled directly or by someone else?

A That was done at my request, sir.

Q And it appears that there is a date stamp, a time stamp associated with the People's Exhibit 57.

A Okay.

Q Did you cross-reference that at all?

A I would have to review it again, sir.

Q (Counsel handing to the witness.)

A Thank you. Forgive me. I didn't bring my reading glasses. Yes, it's Burak Atamer in the upper left-hand corner. It states a date of 10-13-16 at 9:31 a.m. that this image was captured, if I read that right. Please forgive me.

Q I am wondering if you —

A I thought you wanted me to verify.

Q My only question was whether or not you cross-referenced the date stamp?

140

A Now, what the date stamp is, sir? My apologies.

Q You're fine. So did you cross-reference the date stamp?

A Yes, I know what date that is there.

Q Did you cross reference the date stamp?

A With what, sir?

Q With any other investigation?

A That's the same date that money was put on the — Mr. Reginald Close's jail account. So, yes, I did cross-reference it, I thought, sir.

MR. PERRONE: No further voir dire. No objection.

THE COURT: All right.

CONT'D. DIRECT EXAMINATION

BY MR. KOOP:

Q So in People's Exhibit 57, who's pictured here, Detective?

A That would be the Defendant, Tunc Uraz.

Q And there is some inquiry about a cross-reference on 10-13 of '16?

A Yes, sir.

Q Right there, that corresponded with People's Exhibit 56, then, about Burak Atamer on 10-13 at 9:31 A.M; is that accurate?

141

A That is correct.

Q Which also corresponded to People's Exhibit 42, with a deposit on Mr. Close's account of 10-13 as well?

A Yes, sir. There we go right there.

MR. PERRONE: Your Honor, if we could speed the questioning up a little bit, his pauses.

THE COURT: Come on, Mr. Perrone. Seriously? Go ahead.

Q (MR. KOOP) Detective, so we had the record as obtained from Securas on about Burak Atamer's account?

A Yes, sir.

Q That corresponded with the information provided by Mr. Close as to someone putting money on its account on that date. On both of those cases, both the aggravated stalking what you were investigating as it related to incidents in August 23rd, 2016 to the 31st, as well as the solicitation to murder, did you submit a warrant request for these two files?

A Yes, I did. I ultimately submitted two different warrant requests. When you are investigating a particular incident, I started off with the aggravated stalking complaint.

142

Put that packet together. Submitted it to the Prosecutor's office for warrant consideration. I ultimately, at a later date and time, put together a separate packet for the solicitation of murder investigation.

Q So these warrant requests came through two separate times as the cases closed individually?

A Yes, sir.

Q The aggravated stalking, in that case you swore to the warrant from the Magistrate on October 16, 2016; is that accurate?

A I believe so. It is.

Q When I say swear to, what is the -- if you're a detective, what does that mean?

A When I receive a warrant from the Prosecutor's office, I review it for accuracy, make sure it matches the information I provided in the report. I have to go in front of a judge or a magistrate, and I have to testify to that warrant that that is true and accurate to the best of my ability.

And once that I have sworn to it and signed on it, it then is entered into the LEIN, Law Enforcement Information Network, and it is

143

certified as valid for any other officer who may have to arrest that subject based upon the validity of the warrant.

Q So the aggravated stalking, that sweared to have occurred on October 26th, that the solicitation of murder that swear to did not occur until October 16; is that accurate?

A It was. It was at a later time.

Q In both of these cases, did you prepare separate reports?

A Yes, sir.

Q In these reports, did these reports contain some information that had not been included in previous complaints by Ms. Melke involving aggravated stalking?

A Yes.

Q What I mean by that, that nothing was contained in the aggravated stalking complaint or the police report, that information could not have been gleaned or was not entered into a previous report; do you understand that? That's a little clunky.

A Yeah.

Q Let's do it this way.

A Okay.

144

Q The reports for these incidents, police reports, are those later sent to a defendant or defendant's attorney?

A Yes, they are.

Q And those reports, as it related to these two cases, the aggravated stalking and solicitation of murder, were you able to verify with the Prosecutor's office when those reports would have been sent?

A Yes. I believe those certified copies would have been sent in November 17th of 2016.

Q And that's in both cases?

A That is correct, sir.

Q And the information contained in those reports that were sent to the respective defense attorneys on November 17th, those reports had not been disclosed or that information produced before that date?

A No.

Q Looking at this investigation, specifically Reginald Close's interview, was information provided to you that had not been included in previous police reports?

A There was information that had not been included in previous police reports.

145

Q I guess, more specifically, not just global information, but information specific to Ms. Melke?

A Yes. Information specific to Mrs. Melke. I am sorry, Erika Melke.

Q As it related to the Defendant, correct?

A Yes.

Q Is this your interview with Reginald Close, do you recall him detailing an incident about the Defendant having slashed Erika's tires before a concert?

A Yes.

Q And in that interview, did Mr. Close testify to it, but in the interview, did he provide you with the specific performer of the concert she was going to see?

A He told me it was a Drake concert.

Q That she was going to a Drake concert that had never appeared any police report before?

A No, it had not.

Q In your interview with Mr. Close, did he also detail an event where the Defendant helped Erika move into her apartment?

A Yes, he did.

Q And had that information ever been detailed in

146

her report, prior to the report you submitted in relation to the aggravated stalking and solicitation of murder?

A No, it had not.

Q Mr. Close had also testified about Patrick Burnett being an ex-corrections officer. Was that information provided to you at the time of the interview?

A Yes, it was.

Q Sorry. I cut you off. That was a yes? I cut you off.

A Yes. I am sorry.

Q That Patrick Burnett was an ex-corrections officer. Was that information ever included in a previous police report?

A No, it was not.

Q What about the names of Stan White and Mike Topes? Was this — were these individuals that were known to you before the aggravated stalking?

A I did not know the names of those individuals.

Q And, specifically, their address and where they lived?

A I did not know.

Q Their names and addresses, had they had been

147

included in the report prior to your incident report in this case?

A No.

Q As it relates to Ms. Melke?

A Yes. No. They had not.

Q As it relates to Mr. Allen in the interview you conducted with him, did Mr. Allen provide you with information equally that was not included in any previous police report as it related to Ms. Melke?

A Yes, sir.

Q And any information that also Mr. Close had not provided?

A Yes, sir.

Q Such as what?

A He mentioned to me that Ms. Melke had a blue couch, a blue piece of furniture out on her porch area of the residence.

Q I just covered a few things with Mr. Close such as the Drake concert and Patrick Burnett being an ex-corrections officer. Were those details, were those provided by Mr. Allen?

A I don't believe so. No.

Q It's fair to say both Mr. Close and Mr. Allen provided information that the others did not?

148

A That's correct.

Q Focusing again on the solicitation of murder. After the undercover video calls were conducted, did you do further follow-up as it relates to documenting those calls from Securus?

A Yes.

MR. KOOP: May I approach the witness, Your Honor?

THE COURT: You may.

MR. KOOP: At this time the People will stipulate to Exhibit 58 as already having been admitted.

Q (BY MR. KOOP) Detective, this is a record of the phone calls placed by Officer Mobley of the Defendant. What was the purpose in obtaining this document?

A To verify the date and time that he made contact with the Defendant through the video chat system.

Q And this record is specific to completed calls?

A Yes. Only the completed calls.

MR. KOOP: Just one moment, Your Honor.

Q (BY MR. KOOP) A couple other points, Detective, as it relates to the Defendant's tether that he

149

was placed on. Do you recall the date that the Defendant began to have that GPS tether on his ankle?

A July 28, 2016, some time in late July.

Q As to Burak Atamer, were there any -- did you make any attempt to contact Mr. Atamer?

A Yes, I did.

Q And were you able to interview or speak with him about this case?

A Unfortunately, no.

Q Why is that?

A Because he would not return my request.

Q So you attempted to contact him, he never agreed to interview with you?

A No.

MR. KOOP: Nothing further, Your Honor.

THE COURT: Mr. Perrone?

MR. PERRONE: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. PERRONE:

Q Who's all present in the initial interview with Reginald Close on October 17th?

A That would be myself, Detective Andrew Hogan, Reginald Close and his attorney, Alex Rusek.

Q And you spoke with Mr. Close's attorney, Alex

150

Rusek on October 13th?

A No, I did not.

Q When did you first speak with Mr. Rusek in regards to the issues underlying Mr. Close's allegations?

A That would have been the morning of the 17th.

Q Did you see information on the 13th from the Prosecutor's office? Very late in the afternoon of the 13th, yes, which was a Thursday. What was the reason for the delay between the 13th and 17th, as far as following up on this information?

At that point in time I was working on 10-hour shifts, I worked in the morning from seven in the morning to five in the afternoon. Since that time I have been changed to eight-hour shifts. I work seven in the morning until three in the afternoon. At the point in time that I received this information, which was the 13th, which was a Thursday, I believe I received the information almost five minutes before I was getting ready to go home. So, therefore, I had the information, and was leaving for the day. I took the information with me. I was interested in the information.

151

And when I returned back to work on Monday, the 17th, it was the first thing that I began my investigation on, because it took the greatest priority because of the severity of it.

Q Why did your shifts change to from 10-hour to an 8-hour shift?

MR. ROTH: Objection. Relevance.

THE COURT: It's not really relevant. But if you want to ask him, go ahead.

Q (MR. PERRONE) Was there any specific reason?

A Per the command my captain wanted the detectives to be on eight-hour shifts instead of 10. So he changed it.

Q It was not the result of any type of financial issues with the Defendant?

MR. ROTH: Objection. Relevance.

THE COURT: Sustained.

Q (BY MR. PERRONE) as part of your investigation, you determined that Mr. Uraz was residing at a different address?

A I am sorry?

Q As part of your investigation, you found out that Mr. Uraz had been living at a different address from the North Pointe Apartments?

A Yes.

152

Q He did not live at North Pointe apartments?

A No. At that time he moved to a different apartment, DTN-owned property.

Q What did you do in attempt to talk to Burak Atamer?

A At a certain point in time, when I learned Mr. Atamer was a resident of North Pointe Apartments, Detective Hogan and I went over to C10 and knocked on the door and got no response. I carry business cards with me at all times. I had my specific information on them. I put a note on the back of them and left it on the door. Normally the note will consist of something like: Call me as soon as possible. Thank you. Detective Matt Krumbach.

Q Did you include that in your report?

A What's that, sir?

Q Your communication with your attempts to contact Burak Atamer?

A I don't believe so, sir.

Q Did you go to the academy, did you go to the police academy?

A Yes, sir. I did go to the police academy.

Q Did they teach you how to write reports?

A Yes, sir, they did.



153

Q Did they tell you to include all pertinent information, both sides try to be unbiased?
A Absolutely, sir.
Q You didn't feel your attempts to contact Mr. Atamer were worthy to be put into a police report?
A I did not make any contact with Mr. Atamer.
Q You didn't feel it was pertinent to include attempts to contact Mr. Atamer given his alleged role?
A His alleged role?
Q His alleged role in your investigation?
A At that point in time, no.
Q You served — as part of your investigation, did you do any investigation as to Reginald Close's background?
A The name Reginald Close came up. I did, as a point of interest, and part of my investigation, put him into what we would consider our local IIQ system.
    MR. KOOP:  Objection. I guess he answered the question before. I don't know where Mr. Perrone is going with this. Before he goes into anything further about Mr. Close's background, I think that's objectionable.

154

    MR. PERRONE:  I don't think it's objectionable as part of the investigation. He's a prime witness in the investigation.
    THE COURT:  I think he can testify as to what efforts he made. But I don't know if he can testify as to what his findings were.
    MR. PERRONE:  Correct.
    THE COURT:  You can tell us about the system, what information he gives you.
    THE WITNESS:  Okay.
    THE COURT:  Okay.
    THE WITNESS:  Sure. What would you like to know, sir?
Q (MR. PERRONE) What did you know about the prior attempts to proffer by Mr. Close?
    MR. ROTH:  I would object. That obviously would be hearsay, what does he know about what other People's attempt were.
    THE COURT:  That would be hearsay. Sustained.
Q (MR. PERRONE) Did you uncover anything in your investigation associated with prior attempts by Mr. Close to make statements to the police?
A Ultimately at one time, yes, sir, I did.
Q Ultimately as in when?

155

A After the fact.
Q After what fact?
A After he had made a proffer in a different situation.
Q Specifically, how far after meeting with him on the 17th, did you verify his background?
A I'm sorry, sir. Could you be more specific? What do you mean verify his background in what, sir?
Q His credibility.
A Well, sir —
    MR. ROTH:  I am going to object. The witness can't testify to another witness' credibility. So if there is a specific piece of information that Mr. Perrone is asking about.
    MR. PERRONE:  I'm asking if he investigated the credibility.
    THE COURT:  You can say he investigated credibility is an issue for the jury to determine. So I guess sustain in part, overrule in part. You can ask him what he did to investigate.
Q (MR. PERRONE) When did you become aware that there were other cases that Mr. Close had made statements to the police on?

156

A Prior to my interview?
Q Prior to the interview with?
A With Mr. Close.
Q Did you understand the nature -- were you aware of any issues between Mr. Close and Mr. Pierce, John Pierce?
A I was not aware of any.
Q In October?
A I'm sorry, sir. What?
Q Were you aware that there had been any information that had been turned over by Mr. Close on John Pierce's case at the time of the interview?
A No.
Q When did you become aware Mr. Close had been involved in John Pierce's case also?
A I knew that Mr. Close had provided a proffer statement prior to my interview with him.
Q But looking into the specifics associated with the prior proffer?
A Not prior to my interview, sir.
Q When did you become aware that Mr. Close had made statements on Mr. Pierce's case?
A Sir, once again, I understood that he had made a proffered statement. I had not pulled up

157

that investigation and reviewed it prior to my interview of him.

Q  As part of your initial investigation, did you review any evidence from the John Pierce case where Mr. Close's made statements?

A  Not prior to my interview of him, sir.

Q  How about afterward?

A  I may have reviewed some of the limited information at that point in time.

Q  Did you --

A  I am sorry.  Go ahead.

Q  Continue.

A  No, I'm good.

Q  Were you going to say it didn't seem relevant?

A  No.

Q  Did you review the different notes between Mr. Close and Mr. Pierce prior to the third call being made on October 7, 2016?

A  No, sir, I did not.

Q  Did you review anything associated with the case of Chris Schinberger?

A  No, sir.

Q  Did you review anything associated with the information provided as to the 2011 homicide?

A  No, sir, I did not.

158

Q  Did you talk to Detective Backus and ask him if he had any information?

A  In regards to what, sir?

Q  In regards to the proffers.

A  With who, sir?

Q  Were you aware at the time of the interview with Reginald Close that Detective Hogan had previously been involved in the proffer interview on August 24th with Mr. Close in 2016?

A  Yes.

Q  Now, you said as part of this investigation, you initially were assigned to the aggravated stalking case?

A  Initially I was assigned a case back in, I want to say it was June, of home invasion, aggravated stalking by a personal protection order violation, my first contact.

Q  Were you aware that Mr. Uraz had a sentencing set for October 19th of 2016, when you interviewed Reginald Close on October 17th?

A  I don't recall that.

Q  Would you have previously been made aware through your aggravated stalking investigation, as to any sentencing dates that the Defendant

159

had coming up?

A  Unless I was subpoenaed for those, I don't know, sir.

MR. PERRONE:  If I may approach the witness and attempt to refresh recollection about a swear-to?

THE COURT:  About what?

MR. PERRONE:  A search warrant as to his knowledge associated with the sentence date on October 19, 2016.

THE COURT:  All right.

THE WITNESS:  Are you stating that's how I --

Q  (BY MR. PERRONE) No.  Just read it and I'll ask you questions.

A  Oh.  I'm sorry.

Q  Does that refresh your recollection as to knowing at the time of the filing of the affidavit of the search warrant, a sentencing date for Mr. Uraz?

A  No, sir.  No, sir.  I read that, what you showed me.  Yes.  It has dates on it, yes.  I did not swear to that date and time.

Q  Did you sign the affidavit for the search warrant?

160

A  For?

Q  Did you sign the affidavit for search warrant?

A  I must have.  Yes.

Q  So what are you signing to?

MR. KOOP:  I guess Mr. Perrone didn't show him the full document.

MR. PERRONE:  I showed him the full document.

THE COURT:  Do you have a signature?

THE WITNESS:  Let's see that.  Thanks. Okay.  This makes sense now.  All right.  This is a search warrant for the IP address.  Yes. There you go.  I thought you meant something else, sir.  Thank you for showing me the full document.

Q  (BY MR. PERRONE) Do you recall on the date that this affidavit was sworn to?

A  Yes.

THE COURT:  What is the date?

THE WITNESS:  It's dated --

Q  (MR. PERRONE) What is the date?

A  Show it to me again, sir.  I would like to say in the course of this investigation there were multiple dates.

Q  Can we --

161

A   I am sorry.

Q   I'll refresh your recollection. Then you can answer questions.

A   Subscribed and sworn to on September 7, 2016 at 1:01 p.m.

Q   After reviewing this affidavit for search warrant, are you able to verify all of the information in there was true and accurate at the time you signed for it?

A   Yes, sir.

Q   Did you know all of the information that was contained in the affidavit of the search warrant? Did you have personal knowledge as to all the information?

A   Let me review it again, sir. It's a long document.

THE COURT:   He has finished his review.

Q   (BY MR. PERRONE) So at the time that you swore to this on September 27, 2016, were you aware that the Defendant had a sentencing date for October 19th?

A   Yes.

MR. ROTH:   I'm going to object to this line. This is hearsay. If he is aware of that date, it's because somebody told him that date. The

162

Court is the one who maintains it. The dates get postponed. And nobody alerts the police on that. And so it is now obviously outdated, and now obviously will be based on hearsay.

MR. PERRONE:   This is an affidavit.

THE COURT:   The affidavit speaks for itself, Mr. Perrone. I mean, that's what it says. So, I mean, it's like not very relevant in the Court's mind. But I will allow you to ask a few questions along those lines of what the significance of the sentencing date might have been.

MR. PERRONE:   If we may approach, Your Honor?

THE COURT:   All right.

(Off the record discussion at the bench.)

THE COURT:   Members of the jury, the parties are going to stipulate that the October 19th date was adjourned to November 3rd.

MR. ROTH:   At some point it was adjoined from the October date to the November 7th date.

THE COURT:   Adjourned means rescheduled, that's by stipulation?

MR. ROTH:   Yes, Your Honor. Thank you.

THE COURT:   Mr. Perrone?

163

MR. PERRONE:   Yes, Your Honor.

Q   (BY MR. PERRONE) As part of your investigation in this case, you also reviewed some reports from the Michigan State Police Department?

A   No, sir.

Q   Michigan State University Police Department?

A   Yes, sir.

Q   Those were in regards to some allegations that were made by Patrick Burnett?

A   That is correct, sir.

Q   Did you interview Patrick Burnett?

A   No, sir.

Q   You relied on the report?

A   I reviewed the report, yes, sir.

Q   You did not follow up with Patrick Burnett to interview him?

A   He was followed up when I read the report.

Q   Did you follow up with him?

A   No, sir. I did not.

Q   Who followed up with him?

A   Let's review the report, and I will tell you the reporting officer who reviewed and spoke to him, sir.

THE COURT:   The relevance, Mr. Perrone, is? He says he didn't talk with Mr. Burnett. The

164

officer authored the report came from the Michigan State police. He said he did not talk to him.

Q   (BY MR. PERRONE) Do you recall when that incident occurred?

A   I would have to review the report at the date and time that that incident occurred.

MR. ROTH:   Your Honor, I am going to object to the relevance and foundation. Mr. Burnett has already testified as to what happened. Asking this witness does nothing in addition to that.

THE COURT:   Mr. Perrone?

MR. PERRONE:   Again, we have time in proximity here. I think that it's something that he should testify as to his investigation.

THE COURT:   But he said he read the report. We had Mr. Burnett who already testify. So what can it add? I guess if you want to look at it, fine. You can ask him. But he already said he didn't talk to him. Why don't you just tell us when the date was, so we can move on, really.

MR. PERRONE:   April 7, 2016.

THE COURT:   All right.

MR. ROTH:   Stipulated. That's fine.



165

THE COURT: Thank you.

Q (MR. PERRONE) The information that you received was on October 17 of 2016 that led you to review the report from MSUPD?

A Yes, sir. That is correct.

Q Did you review a report from August 25, 2017 associated with damage to a vehicle?

A That sounds familiar, sir.

Q As part of your aggravated stalking investigation?

A Yes, sir.

Q That was a report that was damage to Mrs. Melke's car?

A Sir, if I can answer this question. Would you give me just a little bit of latitude?

MR. ROTH: Well, I am going to object to the hearsay. This witness has no personal knowledge about that. If he were reviewing somebody else's report, then it's hearsay.

THE COURT: Well, he has testified that he reviewed the report. He can't really go behind the report because it would be hearsay.

MR. ROTH: Correct. Thank you, Your Honor.

THE COURT: I would sustain that objection.

Q (BY MR. PERRONE) Did you attempt to discuss the

166

situation with investigating officers as part of your investigation on the August 25th, 2016 date?

A If I understand you correctly, did I interview the reporting officer for the report of that date, sir?

Q Yes.

A No, I did not.

Q How did you verify the information associated with the license plate number conveyed to you by Mr. Close?

A There were photographs taken of the vehicle and the license plate number. And at that point in time I had spoken with the victim at one point in time and verified that she had a plate cover around it, that it had something to do with Spartan Toyota.

Q Did you review the photographs of the report prior to discussing the vehicle with Ms. Melke?

A I may, sir. I'm not sure. There were a lot of reports.

Q If you were able to review that specific report, would it potentially refresh your recollection?

A Yes, sir.

167

THE COURT: Why don't the parties approach?

(Off the record discussion at the bench.)

Q (MR. PERRONE) When you spoke with Mr. Rusek, Mr. Close's attorney, on the 17th, you told him before going into the interview there were no promises and no offers associated with the information being conveyed?

A Yes. When I spoke with Mr. Rusek prior to going down for the interview, I had advised him that this would be no proffer agreement with Mr. Close.

Q There would be no proffer agreement? There would be no agreement, no promises that were being made, but there was no -- if he testified he could potentially get a benefit out of it if he testified truthfully?

A I did not do that.

Q You did not have a proffer agreement with Mr. Close similar to the proffer agreement that you previously had with the Ingham County Prosecutor's office as to this case?

A Can you focus that for me, sir, so I can read it? Thank you, sir. What was your question again?

Q You did not have a proffer letter for Mr. Close

168

as it related to the information that he was provided with?

A That is correct, sir. No proffer agreement.

THE COURT: He has testified he does not have a proffer agreement.

I think we have reached the end of our allotted time for today. So we're going to recess until Thursday.

Now, remember we don't meet tomorrow. We will come back Thursday at 8:15. And we will only go on Thursday. Won't go on Friday. That's when the County celebrates Veterans Day. Then we will come back Monday. Like we are still on track to me.

On behalf of the citizens of Ingham County, please do not discuss the case with anyone, talk with friends or relatives about the case, news reports, radio or television. And thank you very much. All right.

(Jury exits courtroom at 1:30 p.m.)

THE COURT: Be seated. The record should reflect we have had several sidebars, too many. We had a lot during the course of this trial on issues over relevancy, form of questions, complaints about people taking too long to

169

answer questions or ask questions. I have no control over that, as I indicated, most recently, though, there is an effort to ask Detective Krumbach from some report, from date of vandalism to Ms. Melke's vehicle, which she really didn't have any information. As indicated by Mr. Perrone, he wanted to advocate that somehow Mr. Uraz had gotten his police reports and shared them with other folks.

We had prior testimony from another hearing that said at the time in question Mr. Uraz did not have his report. The Court felt it was not relevant. Apparently there was a visual of a license plate number of Ms. Melke's car. And it was suggested that someone was going to testify that they had read this in the jail. And that's why he wanted to ask Detective Krumbach about that. This was not within Detective Krumbach's purview. I guess if he had somebody coming in, he can testify that they saw it in the jail.

That's the Court's position. It is Mr. Roth's objection. Mr. Roth?

MR. ROTH:   At the motion hearing we previously had, the Defendant testified unequivocally to a hearing on October 20, 2017.

170

The Defendant unequivocally testified on pages 13 and 14 that he did not have his police reports in jail. He did not receive them in jail until he was charged, meaning the November date.

So it was impossible for it -- don't give me that look -- it was impossible for the Defendant to have his police reports -- excuse me. It was impossible for Mr. Close or Mr. Allen to review those police reports before they gave the proffer interviews.

So any efforts to suggest to the jury that that was what happened would be unethical. While the Defendant's testimony from that transcript is not admissible, the ethics rule still apply. We may not mislead the jury about something we know to be true.

THE COURT:   Mr. Perrone?

MR. PERRONE:   Again, the testimony that he is pointing to on pages 13 and 14, this is an issue as far as questioning that comes down to where he was at when he had it, and what dates and times. Also semantics, as far as what a charge means. No, not until I get charged, did it happen at the time. I didn't think he had an

171

understanding of what exactly was going on. I don't think he necessarily knew.

THE COURT:   I am going to take judicial notice that the Defendant or his attorney would not have police reports until such time as he was charged. So if he was not charged until after this interview took place with Mr. Close, and Mr. Allen, he would not have had the reports. So...

MR. PERRONE:   The reports were made previous to the charge. These were prior reports.

THE COURT:   I am not saying the reports were not made prior to him being charged. But normally they aren't given to the defense attorney until he is charged and the defense attorney's responsible for giving them to Mr. Uraz. So all that took place after these proffer interviews. They really weren't proffers unless you have somebody going to come in and testify that he somehow got the reports before the Prosecutor decided to issue it, which I think is highly unlikely. Then it is impermissible.

MR. PERRONE:   One of the issues of the reports done prior to this case, as far as

172

Mr. Uraz is concerned, we are talking about reports. We have 15 records here.

THE COURT:   Right. But you're trying to introduce one report and create a scenario where somehow somebody may have read this report and had an opportunity to give the information to Mr. Close or Mr. Allen prior to them switching their statement. Do we have anybody going to say that?

MR. PERRONE:   Very consistent with the information.

THE COURT:   Do you have anybody that's going to say that?

MR. PERRONE:   I have somebody that's going to say, without putting anything forward, that we will be able to establish that connection.

THE COURT:   Not the connection. The issue is the timing, the fact that the reports weren't even available for distribution unless he was charged. The statement by Mr. Allen and Mr. Close were made prior to that date. So, therefore, the Court would not have been in possession of Mr. Uraz's.

MR. PERRONE:   Again, that was something I spoke with Chris Bergstrom. I tried to question

173

Chris Bergstrom on it when the reports would have been sent, his office said when he would have sent them. I said I would follow up with him.

THE COURT:   You have been practicing long enough as I have been. Had a lot of criminal cases. It's highly unusual that the reports would be made available prior to charges being issued.

MR. PERRONE:   They were different cases. Those cases had already been reported on.

THE COURT:   I'm just saying. I understand you're saying it's possible somebody read the report, and gave up the license number. I don't know. But we do have some other exhibits out there including the notes that also had the information on it, apparently authored by Mr. Uraz. I am not inclined to allow that in. I don't think it's supported by the timing of the case. Okay?

MR. PERRONE:   Fair enough, Your Honor. I caught that one from one of my clients a long time ago. He was the one that told me -- actually, he didn't want any police reports because people would steal police reports. I

174

advise all my clients to put their police reports in their heads.

THE COURT:   That's fine. But the timing, he would not have been able to have the reports. You can't argue something that's not factually possible.

Anything else you want to put on the record about some of the other conflicts that we had, so the record is clear?

MR. ROTH:   No, Your Honor.

THE COURT:   Mr. Perrone?

MR. PERRONE:   It's entirely factually possible as part of the PPO case was being violated. That information is something that is somewhat an alternate to this. I think the Defendant may have misspoke as far as reports. What reports are we talking about? The report I'm talking about is the report that was done on 8-25 in reference to the PPO, something more than likely would have been made available to Mr. Bergstrom, who would have forwarded it onto Mr. Uraz.

THE COURT:   I don't know. You can ask Mr. Bergstrom. But certainly the detective didn't have anything to do with it. He is not

175

the person to ask questions about. It's irrelevant from his testimony.

MR. PERRONE:   The other report is from April 2016 as related to the gun. These are the two consistencies that I see between both individual statements.

THE COURT:   Mr. Burnett had already come in and testified about that. The detective said I saw the report. Mr. Burnett had come in and testified, verified who was in the report. I don't know what you're trying to allege as part of his investigation, after he had the report from the Michigan State Police that he somehow should have gone and interviewed Mr. Burnett, himself, rather than rely on fellow officers who had already taken reports. And, in this particular case, disciplinary action had been taken by the event. He was discharged. I don't know if your position is that somehow he should have taken some efforts to go behind that and see if that's what happened or not.

MR. PERRONE:   No. I'm just trying to establish that there was a report there. The report was made a long time ago. The individuals in the jail, if they would have had

176

access to the report, could have pulled the report.

THE COURT:   Unless you have a witness that is going to come in and say I looked at these reports, I'm not going to get to that. That's pure speculation that you don't have anybody. In fact, you just told me you heard about it from some other case. It seems, again, I'm relying on the facts in this case shows reports associated with this case would not have been made available until after he was charged, which was in November after the discussion.

Anything else? Where do we stand on any other witnesses?

MR. ROTH:   I am going forward. We will rest at the conclusion of Detective Krumbach's testimony, verified that the exhibits have been admitted. Excuse the balance of our witnesses.

We produced everything. Mr. Perrone has requested then we go into the Defense case, as I understand it. Three potential inmates as well as the Defendant's testimony. Then we will be ready for closing.

THE COURT:   Mr. Perrone?

MR. PERRONE:   As far as my case is

177

concerned, we reserve the right to call three inmates. They have been writted. I am not sure who I will call. The Defendant obviously has a right as to whether or not he is going to take the stand. Obviously that's his right. We will go through those motions as far as he is willing to waive that right.

THE COURT: We are going to need some instructions. I think we will be getting to closings on Thursday?

MR. PERRONE: Yes.

MR. ROTH: The People submit there's nothing that changed that.

MR. PERRONE: I think the only issue is going to be specific intent elements of the jury instruction based upon prior case law, we want to make sure that to emphasize the specific intent aspect of it, or the intent aspect of it. In previous cases in People v Freid, there was an issue associated with that case.

THE COURT: I mean --

MR. ROTH: The Court has already given that instruction. There's no reason to change that. They are taken from the case law. When we submitted our request for them, they gave a

178

specific published case.

MR. PERRONE: The People v Freid case spoke about specific intent, when there is intent, and there is connoted associated with just the second-degree murder, which they found to be --

THE COURT: We don't have that here, do we?

MR. ROTH: That's correct.

THE COURT: This is a solicitation to murder. So you just have the standard specific instance. There isn't distinct testimony. There is distinctions about first degree and second-degree murder. Here is just a solicitation charge. I would think the standard specific intent instruction would be applicable. There is no lesser. Of course, in a capital murder case, you always have to give second-degree, anyways. That's mandatory.

MR. ROTH: That's correct, Your Honor.

MR. PERRONE: There is not a specific intent. That was removed from the jury instructions. As far as specific intent, I have articulated in a brief from Fried --

THE COURT: I don't need a brief. I need a proposal.

MR. PERRONE: I will give you a proposal.

179

THE COURT: I don't need a brief on it. I just need a proposal so I can look at it.

MR. PERRONE: We made it this far. We'll get the jury instructions done. That seems to be based upon the Fried case. It's very important --

THE COURT: I am saying, get the proposal.

MR. ROTH: You are saying the wrong case. Fyda, not Fried.

MR. PERRONE: Fyda. I will put it in the paper. I have the case. I am a little tired.

MR. ROTH: F-Y-D-A.

THE COURT: I need to --

MR. ROTH: We will be prepared to close on Thursday, Your Honor.

THE COURT: Anything else?

MR. ROTH: No, Your Honor.

THE COURT: We will be in recess until 8:30, Thursday.

(Proceedings concluded at 1:43 p.m.)

180

STATE OF MICHIGAN    )
COUNTY OF INGHAM    )

I, TERESA J. ABRAHAM, Certified Shorthand Reporter in and for the County of Ingham, State of Michigan, Thirtieth Judicial Circuit Court, do hereby certify that the facts

181

stated in the foregoing pages are true and correct, and comprise a complete, true and correct transcript of the proceedings taken in this matter on this the 7th day of November, 2017.



Teresa J. Abraham, CSR-5445

Date:  May 22, 2018