STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff,

vs                          CASE NO:   16-1064-FH
                                       16-1065-FH

TUNC URAZ,

Defendant.
_____/

HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
LANSING, MICHIGAN -- THURSDAY, NOVEMBER 9, 2017

CRIMINAL JURY TRIAL

APPEARANCES:

FOR THE PEOPLE:

WILLIAM O. CRINO, JD
CHAZ T. KOOP, JD
Assistant Prosecuting Attorney
Prosecuting Attorney's Office
313 W. Kalamazoo
Grady Porter Building
Lansing, Michigan 48933


FOR THE DEFENDANT:

JACOB PERRONE, JD
Perrone Law, PC
221 W. Lake Lansing Road, Ste. 200
East Lansing, MI 48823

ERIC SCHROEDER, JD
BODWIN & ASSOCIATES PC
2970 E. Lake Lansing Rd
East Lansing, MI 48823-7416


Reported by:   Teresa J. Abraham, CSR-3445
Phone:   (517) 483-6404   e-Mail: tjabraham@msn.com

2

I N D E X

The People Rest                                      58
Motion for Directed Verdict                          62
The Defense Rests                                    78
Closing Argument by Mr. Swen                         78
Closing Argument by Mr. Perrone                     135
Rebuttal Argument by Mr. Swen                       137
Jury Charge                                          63
Jury Verdict                                        186

WITNESSES

          DAVE KRUMBACH
Cont'd. Cross-Exam by Mr. Perrone                    29
Redirect Examination by Mr. Roth                     48

          JOHN PIERCE
Direct Examination by Mr. Perrone                    60
Cross-Examination by Mr. Roth                        65

          FATEEN MUHAMMAD
Direct Examination by Mr. Perrone                    68
Cross-Examination by Mr. Roth                        70
Redirect Examination by Mr. Perrone                  75

EXHIBITS:

EXHIBIT #          Description                   Received

PX-#62          Note from Pierce                    66

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff,

vs.                    CASE NO: 16-1064-FH
                       16-1065-FC

TUNC URAZ,

Defendant.
_____/

HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
LANSING, MICHIGAN — THURSDAY, NOVEMBER 9, 2017

CRIMINAL JURY TRIAL

APPEARANCES:

FOR THE PEOPLE:

WILLIAM O. CRINO, JD
CHAZ T. KOOP, JD
Assistant Prosecuting Attorney
Prosecuting Attorney's Office
313 W. Kalamazoo
Grady Porter Building
Lansing, Michigan 48933

FOR THE DEFENDANT:

JACOB PERRONE, JD
Perrone Law PC
221 W. Lake Lansing Road, Ste. 200
East Lansing, MI 48823

ERIC SCHROEDER, JD
BROWN & ASSOCIATES PC
6070 E. Lake Lansing Rd.
East Lansing, MI 48823-7415

Reported by: Teresa J. Abraham, CSR-3445
Phone: (517)483-6404  e-Mail: tjabraham@msn.com

---

INDEX

The People Rest                                        50
Motion for Directed Verdict                                  52
The Defense Rests                                            70
Closing Argument by Mr. Roth            135                  78
Closing Argument by Mr. Perrone  135
Rebuttal Argument by Mr. Roth                               152
Jury Charge                             143
Jury Verdict                            180

WITNESSES:

MATT KRUMBACH
cont'd. Cross-Exam by Mr. Perrone                    29
Redirect Examination by Mr. Roth  48

JOHN PIERCE
Direct Examination by Mr. Perrone 60
Cross-Examination by Mr. Roth                        62

FATEEN MUHAMMAD
Direct Examination by Mr. Perrone 63
Cross-Examination by Mr. Roth                        70
Redirect Examination by Mr. Perrone                  75

EXHIBITS:

Exhibit #    Description        Received

PX-#62    Note from Pierce                            66

---

Lansing, Michigan
November 9, 2017
at about 8:43 a.m.
************

THE COURT: We are returning on the record in People versus Tunc Uraz, file 16-1064 and 1065. We have Mr. Perrone here, Mr. Roth and Mr. Uraz. You are Mr. Tunc Uraz, sir?

THE DEFENDANT: Tunc Uraz. Yes, sir.

THE COURT: A couple preliminary matters. One, we have some agreed-upon changes of the instructions that the Court has been presented, which we were working on. I also was presented a request from the Defense for instructions, which we filed, and copies which were served upon the Prosecution. So we're going to consider that to be a proof of service. But I didn't have a chance to review what additional items the Defense was requesting, if any. Mr. Perrone?

MR. PERRONE: Yes, Your Honor. The proposed jury instructions were not filed. I didn't send them. I sent them to the Jonathan on the first trial date, I believe. He had an e-mail, he has a copy today. We will discuss which ones are

---

available.

The main issue as to the solicitation counts, from the jury instruction's perspective, as we discussed, we believe there has to be some additional language to itemize the elements of first-degree murder, deliberate, premeditate, something associated with intent, not just intent to kill. It seems intent to kill is too general for a specific intent crime.

THE COURT: Let me go back and understand what you're suggesting the charge is. Solicitation to commit murder?

MR. PERRONE: Correct.

THE COURT: And so there's an instruction on that. I believe your issue is specific intent. But how is that tied to the elements for murder?

MR. PERRONE: The jury instruction for solicitation has a space to incorporate the elements of the underlying offense that was solicited. If we put in the elements of murder there is, in the jury instruction for homicide, for first-degree murder, language associated with deliberate -- what deliberate means. That the Defendant considered the pros and cons of the killing, thought about the pros and cons,

chose to have the murder committed. I think we have to have that at the level of People versus Fyda indicated the specific intent instruction has to be carefully drafted. In that case they found that the instruction was not appropriate because it didn't articulate specific intent. I think that's something we want to be cautious of here.

I think the elements associated with first-degree murder, specific intent, associated with deliberate actions, random numbers, are going to be necessary to instruct the jury.

THE COURT: Mr. Roth?

MR. ROTH: I want to be very careful not to try to reinvent the wheel. Let's stick with published case law. People v Fyda, 288 Mich App 446, which Mr. Perrone has referenced, does not say what Mr. Perrone says it says.

In that case they gave elements, second-degree murder with the crime. The problem with that, second-degree murder contains a possible mens rea of assault GBH, not consistent with our crime involved today. There was specific error found in that case.

But what we do have, People v Crawford, 232

Mich App 608, which expressly lays out the elements of this crime.

Solicitation to commit murder occurs when element one, the solicitor is purposefully seeking to have someone killed.

Element two, tries to engage in someone to do the killing.

That's the language we included in our request, because that's the language that the Court of Appeals unpublished opinions has found appropriate. That is a 1998 case.

We have a 2009 case, People v Larry, an unpublished opinion. Court of Appeals 283, 364.

Continuing 20 years later, to use that exact same language, the elements of solicitation to commit murder are, quote:

Element one, the solicitor purposely seeks to have someone killed. And, two, tries to engage someone to do the killing.

That's the language we used in our request. That's the language the Court of Appeals has approved.

THE COURT: Mr. Perrone?

MR. PERRONE: Again, as far as the Court of Appeals approving that language as to

solicitation of murder, I don't believe that that is appropriate. It's too general a statement. We have specific intent. Specific intent has been moved from the jury instruction. We have to infuse some element of specific intent or intent, not just purposefully intended.

This is a solicitation to commit first-degree murder. There has to be some standard, aside from intent, the jury has to be instructed. We are talking about intent here. A very specific issue that the jury has to become aware of.

The jury is not going to be able to understand the nature of specific intent by purposefully intent. We have case law as far as the cases that are cited. We have the Court of Appeals okayed it. That doesn't mean it wasn't reversible error in those cases.

MR. ROTH: That's a misstatement of the law. It's not saying it was not reversible error. Fyda said not reversible error. The other two said that is correct. So let's not misrepresent the law.

THE COURT: Again, I mean, specific intent.

you're asking that they have to prove specific intent that he really planned on killing her; is that what you're saying?

MR. PERRONE: Yes.

THE COURT: Well, right, but solicitation does not involve that. Solicitation is saying that I attempted to get somebody to go kill her. And I think the words, what's purposeful and what was the wording, Mr. Roth?

MR. ROTH: Purposefully seeking to have someone killed. That's the intent.

THE COURT: I'm going to go with that.

MR. PERRONE: Thank you, Your Honor.

THE COURT: Is that in the instructions that we have now?

MR. ROTH: That's in the instructions as Ms. Smith wrote them out.

THE COURT: The reason being, I don't know if -- I don't know if there is an added step that has to be proved, that conviction and -- on solicitation of intent to murder, that you have to meet the elements of premeditated murder. In other words, I think the statement listed in the cases cited by Mr. Roth cover the facts in this case. It's not a two-tier level. A, you

9

specifically have to show that he solicited someone, and, B, he solicited intentionally one of the killers. It's really just a one-stage test. I think it's covered by those instructions that have been approved by the Court of Appeals.

Okay. Anything else we have?

MR. ROTH: So as to the jury instructions that Mr. Perrone has asked for, I think there's roughly a third of them that I don't find applicable in this case, that we need to address at some point. It doesn't need to be now. If Defense counsel would please somehow substantiate through the defense testimony.

THE COURT: What are the instructions that we have that are agreed upon currently? Is that the standard set of the instructions?

MR. ROTH: Yes, Your Honor.

MR. PERRONE: Yes.

THE COURT: These are additional instructions you're asking, Mr. Perrone, above and beyond?

MR. PERRONE: Yes.

THE COURT: We might as well do it now.

MR. PERRONE: Okay.

10

THE COURT: Which ones are you asking for?

MR. ROTH: Since he has filed the document, I think it will be faster if I addressed which ones I don't find applicable.

Starting on what's labeled page three of five, toward the bottom, witness' impeachment by prior conviction. To this point no witness has been impeached towards prior conviction.

THE COURT: Are we going to have that, Mr. Perrone, no one has been impeached?

MR. PERRONE: I, again, don't anticipate that's going to come — it would come from the Prosecution's side as to the witnesses that I am going to proffer to them.

MR. ROTH: I don't intend to.

MR. ROTH: 5.7 addict's informer.

THE COURT: Okay. I don't think any evidence of addicts, that anybody was an addict while incarcerated, Mr. Perrone.

MR. PERRONE: Mr. Close has a prior conviction for delivery of controlled substance. That's what he was in prison for, initially. And based upon that conviction, that that would necessitate the addict informant instruction.

THE COURT: But there was no testimony about

11

anybody being an addict. If they were on the street, it might be a little different. But we know Mr. Close was in custody for a long time.

MR. ROTH: I agree, Your Honor.

THE COURT: I don't think we have that yet. Maybe something else will come up.

MR. ROTH: 5.8, character evidence regarding credibility of witness.

THE COURT: Okay. Go ahead. Character evidence regarding credibility of witness. Have we had any?

MR. ROTH: I don't believe so.

MR. PERRONE: I don't believe so either, up to this point in time.

MR. ROTH: 5.8A, character evidence regarding conduct of the Defendant.

THE COURT: Have we had that?

MR. PERRONE: We've had character evidence of the Defendant. Mr. Burnett testified as to his general demeanor and character.

THE COURT: What?

MR. PERRONE: Mr. Burnett testified as to his general demeanor and character, knowing him for some period of time at MSU. We had 404B, significant prior acts that were introduced. I

12

think that necessarily would be —

THE COURT: I am allowing that.

MR. ROTH: There is a different instruction specific to that, character of the Defendant. People come in say, I know the Defendant, he is a great guy. Hold on. We have had specific sets cautionary instruction included in that.

THE COURT: Which one is that, do we know offhand?

MR. ROTH: 4.11. Mr. Burnett's testimony necessitates, again —

THE COURT: 4.11, evidence of a limited purpose? Okay. All right. And your position is that we just haven't had anybody come in and testify as to his reputation for truth and veracity?

MR. PERRONE: It's also anticipated that the witnesses from MDOC are going to testify as to their view of him, and him basically being given to the inmates.

THE COURT: They're limited on what they can testify to in regards to character. All they can say is basically are you familiar with his reputation for truth and veracity in the community. They can't really come in and give

generally character evidence.

MR. ROTH: They can only give the truth and veracity if the Defendant testifies, otherwise truth and veracity isn't relevant.

THE COURT: They can't come in and say he is a good guy, try to use that as character evidence. They can only use the issue of truth and veracity. That's true, unless he tests.

MR. ROTH: Right. 5.8C, evidence of other acts of domestic violence. Again, there was no specific domestic violence. There was other acts of stalking, which is included in 4.11, the limiting instruction that Mr. Perrone has already approved.

THE COURT: There is 4.11A that talks about domestic violence also.

MR. ROTH: That's correct. I missed that 4.11 should be struck as well.

THE COURT: All right? 5.8C should be struck. Mr. Roth?

MR. ROTH: 5.12, prosecutor's failure to produce a witness.

MR. PERRONE: Inapplicable.

MR. ROTH: Inapplicable? Okay. Strike that. 5.13, agreement for testimony. There is

no evidence that any witness has an agreement for testimony.

MR. PERRONE: That is not true.

THE COURT: Where is your evidence of that?

MR. PERRONE: Detective Krumbach testified that he would put a good word in for Judge Clarke on Charles Allen's case.

THE COURT: He did testify to that? I guess he said he would do that. He had an agreement, if it could be interpreted that way.

MR. ROTH: Well, I think that goes to the credibility instruction of have there been any promises or suggestions. But an agreement for testimony is if you come in and testify, I will — you know, your charges will be reduced, or you will be released on tether.

Detective Krumbach expressly said: I can't promise you anything. All I can tell you is, I can tell the judge you cooperated.

THE COURT: That's the testimony. Mr. Perrone?

MR. PERRONE: Again, I think that that is indicative of an agreement. We had an individual that promised a benefit to Mr. Allen in this case.

THE COURT: Okay.

MR. PERRONE: I don't see how that doesn't come in. We have a proffer agreement. Yes. Okay. The proffer agreement that they had said that there's no promises. It could be interpreted by a jury as potentially being promises in there. So, therefore, they should be instructed as to what they hear in the testimony.

THE COURT: It can't be interpreted by a jury if there is no evidence of a promise. You're going by speculation. I think the real issue is agreement for testimony, possible penalty. You can even look at it and say he was going to put a word in with the judge on some other case that had nothing to do with this, that had — so there was no potential change in his penalty. So let me just look at the wording.

MR. ROTH: Mr. Koop pointed out the wording as well to me. And that's probably the easiest way to address this. It's 5.13. It begins with:

You have heard testimony that a witness made an agreement with the Prosecutor about charges

against him.

Well, obviously we haven't had testimony about that.

MR. PERRONE: He had an agreement with the police.

THE COURT: The instruction said the Prosecutor.

MR. PERRONE: At the behest of the Prosecutor, during the course of the investigation.

THE COURT: That a witness has made an agreement about charges in exchange for his testimony, that he faces possible charges as a result of that. Okay.

So we really don't have any agreement with the Prosecution. And I guess you can argue to the jury that the detective said he would help out.

MR. ROTH: Absolutely. That would certainly be fair.

Moving to 6.2, intoxication as a defense to a specific intent crime. There has been no indication that the Defendant was intoxicated. He was in jail.

MR. PERRONE: I just want to leave that one

17

open in case the testimony establishes it.

THE COURT: Well, he was in jail. How is he going to be intoxicated while he is in custody? All this occurred while he was in custody. He had been there for some time.

MR. ROTH: Other than the stalking case.

MR. PERRONE: There was documentation in the jail that he participated in the CATS program. That is fairly substantiated.

THE COURT: Okay. So he participated in CATS. It's not relevant to the case.

MR. ROTH: The other thing to consider as intoxication of a defense, there has to be evidence that he had no idea that the substances would cause him to become intoxicated. There certainly won't be any testimony there.

THE COURT: I don't think we have any testimony about intoxication while he was in jail. We'll strike that.

MR. ROTH: 6.5, intent to injure or defraud.

MR. PERRONE: We can strike that one.

MR. ROTH: 7.8, identification. I don't think there is that issue here.

THE COURT: Of who it is, you mean?

MR. ROTH: Yes. I mean, the question is

18

intent or did it happen. It's not who solicited.

THE COURT: All right.

MR. PERRONE: I will agree that identification may be removed.

THE COURT: That's not applicable. Okay.

MR. ROTH: 7.23, past violation by complainant or decedent.

MR. PERRONE: We can get rid of that one.

MR. ROTH: 8.4, inducement. That's to be given with aiding and abetting, which no party is requesting. 8.5, same thing.

THE COURT: All right.

MR. ROTH: 10.2, agreement. I think that's for a conspiracy charge. The parties have to have agreed.

THE COURT: All right. There is no allegation of conspiracy here. Let's look at 10.2 to be sure.

MR. PERRONE: I'll agree for 10.2 to be removed.

THE COURT: There is no agreement here.

MR. ROTH: I think 10.4 is the same issue.

MR. PERRONE: Yes.

THE COURT: Okay.

19

MR. ROTH: 10.7. Enunciation as to defenseless solicitation. Again, this could have changed, but thus far there has been no evidence of enunciation.

THE COURT: All right.

MR. PERRONE: Depending upon the testimony, we'll leave that one open.

MR. ROTH: 13.9, lawfulness of confinement, affirmative defense. I think that's for unlawful imprisonment.

THE COURT: Okay. There is no issue of lawfulness of confinement here. We'll strike that too.

MR. ROTH: 13. -- I think it's -- 13.12, definition of jail.

THE COURT: Right. We don't have that here.

MR. ROTH: 13.20, concealing facts or misleading police. That's not a charged offense.

THE COURT: We don't have that here either.

MR. ROTH: 14.1, perjury committed in course. That's not a charged offense.

THE COURT: Okay.

MR. PERRONE: We can get rid of the 14s.

MR. ROTH: All the 14s could be struck.

20

MR. PERRONE: As far as homicide, we can address that.

THE COURT: I'm sorry. I can't hear you.

MR. ROTH: So all the 16s could be struck, as well, pursuant to the Court's earlier ruling.

MR. PERRONE: You can strike homicide. 16.1 through 16.25. I think 16.23, as far as state of mind, I would ask that that be added since the state of mind is at issue here.

THE COURT: Well, state of mind?

MR. PERRONE: Referring to state of mind,

THE COURT: That goes to homicide, right?

MR. ROTH: I believe so.

THE COURT: 16.23 is homicide.

MR. ROTH: May we approach and look at those? I am sorry. I haven't pulled those.

THE COURT: It's not enough that the Defendant did an act that caused death. That's not relevant here. That's out.

MR. PERRONE: You can get rid of that one.

THE COURT: So all the 16s.

MR. PERRONE: 21.1, you can get rid of.

THE COURT: All the extortions? Okay.

MR. PERRONE: That sums it up.

MR. ROTH: We will revisit 10.7 at the

**21**

conclusion of proofs. Otherwise, we are in agreement, then.

MR. PERRONE: Yes.

THE COURT: So we're going to do the standard, which we've already done, number one is done. We have already done the procedural instructions. So composite, starting at three series, we'll do the three series, which is a standard one that we usually do. The four series, except we're striking 4.11A. What about 4.11?

MR. ROTH: 4.11 is stipulated, the. Language has been approved and it has been provided.

MR. PERRONE: Yes.

THE COURT: Okay. And then this is where I -- we have witnesses. 5.1, we don't have prior convictions. We do have 5.2, weighing conflicting evidence. 5.3, those are pretty standard ones.

MR. ROTH: Yes.

THE COURT: We have police witness, 5.1L. We do not have 5.13 because there was no agreement. We have 10.6. Is that the one we're going to use for solicitation?

**22**

MR. ROTH: We have a modified 10.6, put in the language of the case law.

THE COURT: All right. So she has that?

MR. ROTH: She already has that.

THE COURT: All right. We don't have any evidence of enunciation at this time. So I guess we're holding that in reserve. That's it. Okay?

MR. ROTH: Based on the Court's rulings this morning, that will not change the packet that we agreed upon at all.

THE COURT: Okay. Has the decision been made as to whether or not Mr. Urez is going to testify yet, Mr. Perrone?

MR. PERRONE: It has.

THE COURT: It has? It has or has not?

MR. PERRONE: It has.

THE COURT: What is that decision?

MR. PERRONE: He is not going to testify.

THE COURT: So why don't you stand right now for us, Mr. Urez? Raise your right hand. Do you solemnly swear or affirm the testimony you are about to give will be the truth, the whole truth, under penalty of perjury?

THE DEFENDANT: Yes, I do.

**23**

THE COURT: Have a seat. You understand that you do, and apparently you want to exercise your right to remain silent. That's not a requirement that you present any testimony. Do you understand that?

THE DEFENDANT: Yes I do.

THE COURT: Okay. Now, also, you understand that you could give up that right or waive it if you wanted to testify, and take the stand and testify. Do you follow me?

THE DEFENDANT: Yes, I do.

THE COURT: That means that even though you don't have to, and you have a right not to, you can. But if you wanted to do that, you would have to give up your right not to. It's one of those circular statements of the law. Okay?

Now, after consultation with your attorney he has indicated today that you do wish to exercise your right to remain silent. Is that correct?

THE DEFENDANT: Yes, I do.

THE COURT: And you understand that that is your right, and that we always allow that? Okay. Any questions for me?

THE DEFENDANT: No, Your Honor.

**24**

THE COURT: You made the decision after consultation with your attorney?

THE DEFENDANT: Yes, sir, Your Honor.

THE COURT: You're not under any threats or duress or anything like that, right?

THE DEFENDANT: No, Your Honor.

THE COURT: You're of sound mind today?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. So Mr. Urez has indicated he desires not to testify, and wants to exercise his right to remain silent. I think he made an informed decision without any undue influence. So thank you, sir. I appreciate it.

THE DEFENDANT: You're welcome. Thank you.

THE COURT: All right. So we have the continuing cross-examination of Detective Krumbach?

MR. PERRONE: Yes.

THE COURT: Have you talked to your witnesses from the Corrections yet?

MR. PERRONE: I have, yes.

THE COURT: Are you going to call them?

MR. PERRONE: Yes. I'm going to call Falcon and Mr. Pierce.

THE COURT: Okay.

15

MR. PERRONE: Just to kind of get ahead of this. One of the questions that I'm going to ask Mr. Pierce is in regards to his different interactions with Mr. Close and who instigated writing notes, who started — whether or not Mr. Close is the one that instigated writing notes in that case.

THE COURT: Well, notes between him and Mr.?

MR. PERRONE: Close. Between Pierce and Close.

THE COURT: I guess, you know, it doesn't make any difference. We know the notes were written. If he wants to say that whoever instigated them, that's fine.

MR. ROTH: I think there's a 404(B) problem. But it's not worth the fight. That's fine.

THE COURT: Yeah. The notes weren't really that, you know — all right. Then let's go.

MR. ROTH: I have two small issues. The first is administrative in nature. Detective Krumbach has something of a family emergency. He is asking to be excused from the courtroom when he is done with his testimony.

THE COURT: That's fine.

MR. ROTH: And the second issue I have, when

26

wo left off Tuesday, Defense counsel was, through Detective Krumbach, sort of insinuating the Defendant had his police reports in jail between when he gets remanded and charging time when he is with Close or Allen or both. The Court had, at that time, based on the Defendant's own prior testimony, as well as sort of common sense, indicated that that was not possible.

What I'm asking the Court is if defense counsel continues down that road, either with Detective Krumbach, or puts up a witness who claims that he saw the Defendant with his police reports during that time, that the Court should take judicial notice as it had offered on Tuesday, something to the effect that the Defendant previously stated that he did not have police reports in jail from the time he was incarcerated to the time he was charged with the current offenses.

THE COURT: Okay.

MR. ROTH: That's consistent with his prior testimony.

MR. PERRONE: This is what my client has now. As far as reports in the jail, I think

27

that the testimony he made as far as reports would have been regarding the underlying solicitation case.

As far as PPO is concerned, he did have a PPO violation, Detective Krumbach would have been aware of. He took the initial report and put a warrant out for the PPO.

Mr. Bergstrom testified that his office, as a matter of course, makes sure that the inmates receive their police reports.

THE COURT: I think the issue is the reports, concerning the solicitation, the reports concerning Mr. Close's statements would not have been made available at the time of the incident occurring on the solicitation charge. Okay?

Now, I guess, in regard to — could he have had some reports from the aggravated stalking? Yes. Probably did. He probably had two sets of reports from that, since he had two sets of cases. But as to, I don't know, I mean, if you're — if your theory is that Mr. Close only made this up and Mr. Uraz never told him because he read the reports, I don't know if those reports were there. I don't know.

28

MR. PERRONE: One of the primary issues from my perspective is the reliance of Mr. Close on the license plate cover. It doesn't seem that that is something that would have been reasonable to give over. And the pictures that are included in the reports of the Rav 4 have a very blown-up picture of the license plate cover that says Spartan Toyota on it.

THE COURT: If that's the only issue.

MR. PERRONE: I won't go down that road. I don't need to.

MR. ROTH: Thank you, Your Honor.

THE COURT: Ready for the jury?

MR. ROTH: We are, Your Honor.

THE COURT: Ready for the jury?

MR. PERRONE: Yes, Your Honor.

(Jury present in courtroom at 9:14 a.m.)

THE COURT: Be seated. Detective, resume the stand from Tuesday. You remain under oath, and the record should reflect that. Detective Krumbach is continuing his cross-examination by Mr. Perrone.

MATT KRUMBACH,

A witness, having previously been sworn to testify under oath as follows:

29

CONT'D CROSS-EXAMINATION

BY MR. PERRONE:

Q   Detective Krumbach, you were the lead detective on the solicitation case?

A   Yes, sir.

Q   You were the lead detective on the stalking case, also?

A   One of them.

Q   Okay. Which one would that have been?

A   The one prior to the solicitation case. My memory believes there is a couple of other stalking cases. So it would have been the most recent aggravated stalking case is the one I was in charge of, sir.

Q   Did you request the charges be issued for that case?

A   Which one, sir?

Q   The aggravated stalking case that you were investigating as it pertains to this matter.

A   Did I request it?

Q   Yes.

A   Yes. I prepared an investigation. And I prepared a packet for the Ingham County Prosecutor's office. And I presented it to the Prosecutor's office requesting that charge.

30

Q   What day did you write the police report?

A   I would have to review the report, sir, to tell you exactly what date. There were so many different reports and investigations. I'm so sorry. I can't keep that timeline straight, sir.

Q   That's fine. Just to — for the record, the question is, what date did you write the report for the aggravated stalking case?

A   Okay. Thank you, sir.

Q   Do you want to take a read?

A   Thank you.

Q   Give it back when you're done.

A   Thank you, sir.

    MR. ROTH:   I want to clarify on the question. When was the warrant requested or narrative report?

    MR. PERRONE:   When was the narrative report.

    THE COURT:   For time sakes, can't you ask him if that's the date?

    MR. ROTH:   I have no objection to that.

    THE WITNESS:   It appears, sir, that I entered this date and time would have been October 24th, 2016, at 17:11:06. There you go, sir. I'm sorry.

31

Q   (BY MR. PERRONE) That was the same date that the call was made by Officer Mobley?

A   I believe that was the same date, sir. Yes.

Q   You believe that was the same date?

A   I would have to review the document. This is a long timeline. I'm very sorry if you're asking me to specify to specific dates. I have to have that report so I do not give you an inaccurate date. This was an investigation that went on, in hindsight, with over almost a year. So there is a lot of different dates. Some were the 24th. Some were the 26th. Yes, sir. Please bring it here.

Q   Would you like to review your report?

A   Yes, sir. Bring it here. What was your specific question on this date, sir?

Q   What was the date of Officer Mobley's call to the Defendant?

A   The first attempt, the second one or the third one, sir?

Q   Second one.

A   Okay. That would have been October 24th, 2016, at 17:30 hours Officer Mobley made contact with the Defendant via a Securus videochat, sir.

Q   So you wrote the solicitation report right

32

after the call from Mobley?

A   Sir, I can tell you that that is the date that I completed that report. I suppose I would have to look at the warrant request sheet to see what day I actually submitted it to the Ingham County Prosecutor's office. I'm sure it was within a day or two. But I had been writing the report or investigating it up to that —

Q   Did you —

A   Go ahead.

Q   Would it potentially refresh your recollection if you had an opportunity to review the complaint warrant authorization?

A   Yes, sir.

    MR. ROTH:   Well, I guess — I don't think the question — the question when does he request the warrant, it's different than when was the warrant approved.

    THE COURT:   He can ask if he requested it.

    MR. ROTH:   Yeah.

    MR. PERRONE:   My question —

    THE COURT:   Detective, hold on for a minute. Your question is?

33

MR. PERRONE: The question was as to sequencing.

THE COURT: I didn't hear you.

MR. PERRONE: The question was as to sequencing associated with the dates, whether the report for the aggravated stalking case was written after Mobley, after the Mobley call. He wasn't able to recall that. He said he could review authorization, he could swear to refresh his recollection of all the dates, if I recall.

THE COURT: So you're asking --

MR. PERRONE: I asked --

THE COURT: -- if the report for aggravated stalking was written before or after the Mobley video call?

MR. PERRONE: The second Mobley video call.

THE COURT: For what it's worth, okay.

MR. ROTH: I think that's fine. I don't think that's what was asked the first time.

THE COURT: Okay.

MR. PERRONE: May we approach?

THE COURT: You may.

(Off the record discussion at the bench.)

Q (MR. PERRONE) In reviewing the swear-to, does that refresh your recollection?

34

THE COURT: There we go. All right.

THE WITNESS: So sorry. Can you please ask your question again about what date you want from this?

Q (BY MR. PERRONE) Again, I want whether or not you wrote the report after the call was made.

A Which call?

Q After the call from Mobley, the second video call.

A I think the date that I have for the report is the same date that Detective Mobley made the second --

THE COURT: Okay. Sorry about that.

(Interruption from loud noise coming from the microphone.)

Q (MR. PERRONE) The question is, did you write the aggravated stalking report after the call was made by Detective Mobley?

A It was the same day.

Q Was it before or after?

A Sir, I don't know. I need to review the reports.

MR. ROTH: I have no objection if counsel wants to sort of lead on this issue, did you complete this one at that time and this one at

35

that time. That moves it along.

THE COURT: Okay.

Q (MR. PERRONE) When you initially talked with Reginald Close's attorney, Alex Rusek, on October 13th, did you tell him that there isn't going to be any kind of a deal when you speak with the Prosecutor's office?

A Okay.

Q Did you speak with Alexander Rusek on the 13th?

MR. ROTH: I just want to be clear what the question is. It started a few times. Mr. Rusek is not with the Prosecutor's office.

Q (BY MR. PERRONE) Did you speak with Reginald Close's attorney, Alex Rusek, on October 13th?

A No.

Q Did you speak with him on the 17th?

A Yes, sir.

Q At the initial meeting with Reginald Close?

A I think I may have contacted him via telephone. And the reason I would have done that is the jail, the Ingham County Jail, prior to making a trip down there, made a telephone call. I knew he had legal representation. I didn't want to make a wasted trip for everyone to go drive down to Mason for that. I think I may have

36

called him prior to going to that meeting in the jail.

Q Did you provide any instruction to Mr. Close in regards to avoiding the Defendant, not instigating or not instigating(sic)?

A In what fashion, sir?

Q Did you tell him not to further engage?

A No, sir.

Q Did you request that the -- that Mr. Close be separated from Mr. Uraz with the Ingham County Jail?

A I would imagine that, yes, that he was going to be separated from him after speaking with me and Detective Hogan.

Q You imagined?

A He was going to be. It was my understanding that he was going to be separated. Yes. You have to remember something, sir --

Q Did you do anything to, as the lead detective, communicate with the Ingham County Jail to ensure that there was a separation?

A It was my understanding, sir, that there was going to be a separation. The Ingham County Jail is a different entity than the Lansing Police Department. It would have been my

37

understanding that if once he had spoken to me, and given a statement, that he was going to be separated. A request could have been made. It was my understanding that when I left the jail, that he was going to be separated at some point in time, that he needed to be separated from the Defendant because he had just given me a statement with regard to the solicitation of murder.

Q Going back to that, was it safe to say that you didn't know whether or not they had been separated?

A I'm sorry, sir?

Q Is it safe to say you did not know whether they had been separated?

A Had been or going to be?

Q You did not know whether or not Close had been separated from Mr. Uraz?

A Eventually I knew they would, yes.

Q Eventually? When?

A I think after he gave the statement I did some follow-up on it. I was told at a later date and time that Mr. Close had been separated from the Defendant. That was just common sense. You're not going to keep them together after he

38

has given me a statement that he has been solicited for murder.

Q It's common sense that they be separated?

A It's — yes, sir. I'm sorry. Yes.

Q But you didn't do anything to separate them?

A Sir, once again, this is two different entities. This is the Ingham County Jail. I am a City of Lansing detective. Because I am a City of Lansing detective, I cannot go into the Sheriff's Department and tell them how they're going to do things. Sometimes when we have prisoners in the LPD jail, they make requests upon us. We do whatever we can to facilitate that. This isn't an argumentative thing. It's a housekeeping thing. I'm in their house. I'm requesting their assistance, their help. When I go down to their place, I ask: Can I please use your videochat rooms, and things of that nature. I can make a request and ask them to please separate them, but I ultimately don't have that authority. It's just a mutual aid agreement and respect between two different departments.

Q You were in contact with the Ingham County jail?

39

A Several times, sir, yes.

Q When did you initially make contact with the Ingham County Jail, after meeting with Reginald Close on October 17th?

A I would have to review my reports. I can't remember specifically a date and time. Because I don't know whether or not it had -- I had anything specific to check on at that point in time. I know that at a later date and time I was provided information that another person had information that they wanted to talk to me about, you know. So I know that I was in contact with them. But I can tell you this, I was not on the phone on a daily basis with the Ingham County Jail speaking with somebody.

Q Did you talk with the Prosecutor's Office regarding Mr. -- regarding the new charges, and any conflict they would have with Mr. Uraz's sentencing date of October 19th, 2017?

A I had spoken to the Prosecutor's office. And in regards to what, sir?

Q October 19th?

A Yes, sir.

Q New charges being issued. Did you speak with the Prosecutor's office about new charges being

40

issued, and how that could potentially be a conflict with Mr. Uraz's sentencing set for October 19th, 2017?

A Did I speak with them in regards to that? I presented the charges. I was not particularly concerned one way or another if it was going to affect his sentencing. It's not how I present cases to the Prosecutor's office. When it's ready, it's finished. I present it. If a warrant is issued, then I swear to it. I don't sit there and propose a timeline trying to, one way or another.

Q So you don't feel it's imperative to be very detailed?

A Of course I do. I am a detective.

MR. ROTH: I am going to object.

THE WITNESS: The nature of my job is to be detail-oriented.

THE COURT: Sustained.

Q (MR. PERRONE) Now, do you recall the date that — did you swear to the complaint and authorization on November 10th, 2016?

A I believe I did, sir. I think that is a — I swore to a — down in Mason, Michigan.

Q And did you swear to that before Mark Blumer?

41

A  Yes, sir.

Q  Were there any — did you discuss separating Mr. Uraz from Mr. Close with Mr. Blumer at that point?

A  With — no, I don't believe I did, sir.

Q  Did you you ever discuss separating Mr. Close from Mr. Uraz with Mr. Blumer?

A  The Magistrate?

Q  With the Magistrate. Yes.

A  I do not believe I did, sir.

Q  Did you have any correspondence from Magistrate Blumer prior to October 10th of 2016?

A  I do not believe, sir. No.

Q  Were you aware that Mr. Blumer had informed the jail to separate Mr. Close and Mr. Uraz?

MR. ROTH:  Objection. Assumes facts not in evidence.

MR. PERRONE:  I'll withdraw.

THE COURT:  All right.

MR. PERRONE:  That doesn't assume facts not in evidence. Sorry. It was testified to that Blumer was the individual Detective Hogan — or it was Detective Jewell, or Deputy Jewell that said that he received information, he received an e-mail from Blumer, Magistrate Blumer, to

42

separate Close and Allen.

THE COURT:  Okay.

MR. PERRONE:  So that fact is in evidence.

THE COURT:  So what's this question?

MR. PERRONE:  Was he aware of that.

THE COURT:  All right.

THE WITNESS:  I am sorry, sir. What was your question again?

Q  (MR. PERRONE)  Were you aware that Mr. Blumer had instructed the Ingham County Jail to separate Close and Allen?

A  No, sir.

Q  Or Close and Mr. Uraz?

A  No, sir.

Q  What is a swear-to?

A  When I receive a warrant I have to go in front of a judge or a magistrate and orally testify to the basic facts of the case, to determine if not — whether or not there is enough probable cause to issue the warrant. The Judge or Magistrate listens to that, he asks me any questions after I'm done. If there is no questions and probable cause has been determined, the Judge will sign a warrant, take a date stamp and sign it and date it. And I

43

will sign it also. Then it will be turned over to clerical staff. My understanding is at that point in time it is entered into the Law Enforcement Information Network, which is what we call LEIN. It's a valid warrant at that point and can be served.

Q  Did you include in your swear-to that Mr. Close had indicated to you where Ms. Melke worked?

A  I may, sir.

Q  If you were able to review the report, would that potentially refresh your recollection?

A  Yes, sir. Thank you. Yeah.

Q  Did Mr. Close tell you where she worked?

A  Yes.

Q  Did Mr. Close tell you that she worked for an Urgent Care?

A  Yes.

Q  Did he give you a specific Urgent Care?

A  I believe he told me there were more than one, but one specifically more, often than not. I believe it was the one up in Frandor.

Q  The call that was placed on October 24th by Frank Mobley occurred at 5:30 p.m.?

A  To the best of my knowledge, I was not involved in that aspect of the investigation. I know it

44

was documented what time he attempted to make that call on the 24th. If you're asking me specifically, I would have to review the report to give you the time that it says on the report, sir.

THE COURT:  But you wouldn't have personal knowledge because you weren't there?

THE WITNESS:  Correct, sir.

THE COURT:  Do you want me to review that for you, sir?

MR. PERRONE:  Yes.

THE COURT:  Thank you. The exact time of the Mobley call.

THE WITNESS:  Okay. Sir, this report indicates that Officer Mobley — that 17:30 hours, which would be 5:30 pm, is accurate.

Q  (BY MR. PERRONE)  Do you recall what time on October 24th that you entered the aggravated stalking report?

A  No, sir.

Q  Would it refresh your recollection if you review the report?

A  Sure. Do you have the cover pages from my report on this?

Q  Yes.

45

A Thanks.

Q This is the only narrative?

A I know I need the cover pages. It will probably have more, if you want the date that was entered, key strokes, blah-blah blah. Probably late in the afternoon, sir. But —

Q As part of a report, when you initially start writing the report, did you put in enter date and time? Did you write a narrative on a report?

A I'm sorry, sir?

Q When you write a narrative on a report —

A Yes, sir.

Q — do you put in the date and time that you entered a narrative?

A A lot of times that is already prefilled in.

Q So if I was to provide you a narrative of your report —

MR. KOOP: Objection. He has to let him answer.

THE COURT: Hold on. He testified he needs the cover sheet in order to see. That has more information on it. So do we have that?

MR. PERRONE: Yes.

Q (BY MR. PERRONE) Do you want the whole packet

46

A Probably just the front page, sir. Sir, by reviewing this, this does not give me any information that I was hoping for. However, it does indicate that I wrote this report some time on the 24th, because it was approved the next day, at 8:06 the next morning. It does say I entered the narrative, which is —

Q I was trying to refresh your recollection.

A Well, sir, I'm just trying to be as specific as I can.

Q This is ordinarily the way we do this at a trial.

MR. ROTH: Objection, Your Honor.

MR. PERRONE: Refresh recollection. Can't read from the document.

THE COURT: Hold on. Give him the document back. If you didn't get a chance to read enough, either it refreshes your memory or it doesn't. Does it refresh your memory?

THE WITNESS: Yes, sir.

Q (MR. PERRONE) So if the entered date and time 10-24-2016 at 5:11 p.m; is that accurate?

A Yes, sir.

Q So you were writing the report prior to the Mobley call being initiated?

47

A Yes, sir.

Q You were writing the report of aggravated stalking prior to the initiated phone call by Officer Mobley?

A Yes, sir.

Q The video call?

A Yes, sir.

Q In your swear-to, why do you state and correct yourself — why do you correct yourself. You state we would have an undercover officer solicit or Securus videos of the accused which did occur. Why did you change your terminology?

A Well, I think that at that point in time I may have been confused with the actual charge of solicitation of murder, with the actual just attempting to continue the conversations with Mr. Reggie Close in a timeline and fashion that the Defendant was attempting to solicit murder.

Q That is what you — that you got confused?

A I wouldn't say I got confused. I would say initially I used the term solicit. Recognized that I probably should not use the term solicit. That was the charge that I was seeking, and just wanted to tell the Court that

48

I was attempting to continue a conversation that had already been started between Mr. Close and the Defendant.

MR. PERRONE: No further questions. Thank you.

THE COURT: All right. Redirect, Mr. Roth? Mr. Koop, I am sorry.

MR. ROTH: I am going to take this one just quick.

REDIRECT EXAMINATION

BY MR. ROTH:

Q Mr. Perrone asked about the dates that you wrote in some of the reports. Is it fair to say that there is supplemental reports over the course of the investigation?

A Absolutely.

Q Sir, the dates you asked were only the initial ones?

A Yes.

MR. ROTH: All right. Nothing else.

THE COURT: Jurors have any questions for Detective Krumbach?

(Off the record discussion at the bench.)

THE COURT: Detective, Juror number 2 asks: Is it common practice to separate inmates if

49

one makes a statement against the other such as Mr. Close and Mr. Uraz?

THE WITNESS: I would say, under these circumstances, because of the nature of what was being involved, I would say; yes, that it would be prudent to have them separated.

THE COURT: Any follow-up questions?

MR. ROTH: No, Your Honor.

THE COURT: Any other questions from the jury? Thank you, Detective.

THE COURT: Mr. Roth?

MR. ROTH: Thank you, Your Honor. I want to verify that the Court has received into evidence Proposed Exhibits one through 60, as well as 63 at this time. At this time there is no 61 or 62.

THE COURT: I thought I had a 64 and 65. Overhead and —

MR. ROTH: That's correct, Your Honor.

THE COURT: And, in addition -- okay. So I have all those, plus 63 and —

MR. ROTH: If all those had been admitted, the parties would stipulate to excuse the balance of the People's witness list.

MR. PERRONE: Yes.

50

MR. ROTH: With that the People Rest.

THE COURT: Do you agree with that, Mr. Perrone?

MR. PERRONE: Yes, Your Honor.

THE COURT: And the People rest?

MR. ROTH: And the People rest.

THE COURT: Why don't we take about five or ten minutes, come back and we'll start with the Defense's case? About 10 minutes. Not very long.

(Jury exits courtroom at 9:43 a.m.)

(Recess taken from 9:43 a.m. to 10:03 a.m.)

THE COURT: Ma'am, would you come forward, please? Returning to the record of People v Uraz. I have been advised that you were coming in, in the event Mr. Uraz needed an interpreter; is that correct?

INTERPRETER: That's correct, Your Honor.

THE COURT: State your name for the record.

INTERPRETER: My name is Peggy T., middle initial, Yilmaz, last name, Y-I-L-M-A-Z.

THE COURT: It's my understanding that you were appearing, pro bono, or without charge?

INTERPRETER: That's correct, Your Honor.

THE COURT: In the event that Mr. Uraz

51

needed you; is that correct?

INTERPRETER: That's correct. Just because this is my first time in the Michigan courts, I'm not registered here.

THE COURT: Okay. So Mr. Uraz said he didn't need an interpreter. I don't know. Mr. Uraz, has that changed at any time?

MR. PERRONE: Your Honor, if I could shed some light on this? I did have conversations with the Turkish Consulate last night. If there were testimony that they would like to have an interpreter that's qualified, given the number of dialects. They had somebody available at the Turkish Consulate. They wanted to ensure that he had the ability to have an interpreter who had a specific dialect, if in fact he needed it.

Given the Defendant's current position, and waiver of his rights to testify, we do not require the assistance of an interpreter.

THE COURT: Okay. Because we had an interpreter before. There was an issue with dialect. So I'm glad you speak the same dialect that Mr. Uraz does. Apparently we are not going to use you since he exercised his right to remain silent. I just want to put that on the

52

record that you were here and available.

INTERPRETER: Thank you, Your Honor.

THE COURT: Thank you came for coming in. Appreciate it.

MR. PERRONE: If I could just reserve the motion for directed verdict?

THE COURT: Sure.

MR. PERRONE: Defense at this time makes the motion for directed verdict based on the proofs' confusion. The testimony wasn't very credible. There was nothing definitive associated with regards to plans of Mr. Close and Mr. Allen. I don't think a rational jury, any rational jury could come to a conclusion that the State has met its burden of proof, beyond a reasonable doubt, as to the solicitation to murder counts.

Further, given the additional information that was elicited during the trial, I would renew my motion for dismissal on the basis of entrapment. The totality of the circumstances in this case, obviously the trial has given us an opportunity to get a significant amount of additional information as it pertains to the investigation, the underlying investigation, of all the parties involved here.

I think at a minimum, Your Honor is of the opinion that there was some issues here. I feel that if I was to bring this to a bench trial, not necessarily the same standard, but I don't think a bench trial — I think this would be not guilty of a bench trial.

Based on my review of the evidence, my understanding of how everything is presented at this point in time, I don't think they have enough for the solicitation of murder case. And we would ask the Court for a directed verdict on the basis of lack of evidence, and my renewed objection regarding entrapment as the officers sent an officer in to solicit, did not adequately verify the information they had. They rushed the investigation. They relied upon people who they did not appropriately vet. They allowed Mr. Close to be with Mr. Uraz in the cell, in the same general area. No one has any idea whether they were told to be separated. We know they were together. It was represented by Prosecutor in his opening statement that they had been separated, which isn't the case.

Given the nature of the testimony here, it shows that the State used, whether knowingly or unknowingly, Mr. Close and Mr. Allen as informants to instigate the intent in this case, I think it's very clear, from the record. And I think at this stage your Honor is required to order a directed verdict as to the solicitation to murder count.

THE COURT: And this motion is only to the solicitation charge, not to the aggravated?

MR. PERRONE: Correct, Your Honor.

THE COURT: All right. Mr. Roth?

MR. ROTH: We believe that there is more than enough evidence to send this case to the jury, especially taking it into the light most favorable to the People.

As to the entrapment motion, Close and Allen were not acting as police agents. There was no testimony presented during the course of the trial or the motion to suggest that they were, that is a necessary element of entrapment. We ask the Court to deny that motion as well. Thank you.

THE COURT: Mr. Perrone?

MR. PERRONE: There is evidence, Mr. Close testified that he felt like he was part of the investigation. And there is also testimony that

there was not any instruction provided to Mr. Close. There is testimony that he was not separated from Mr. Uraz for a number of days prior to the call being initiated by the police. That the swear-to had to be corrected as far as solicit. This is woefully.

In the light most favorable to the Prosecution it still necessitates a directed verdict. I anticipate that that will be something on appeal that will be achievable.

THE COURT: In this matter, the Defense has requested a directed verdict on the solicitation of murder. There is no such motion in regards to the aggravated stalking.

In this matter, in looking at the light most favorable to the Prosecution, we have Mr. Close who testified that he was approached by Mr. Uraz talking about could he arrange, ultimately, over time — I'm not saying this took place in one conversation — whether or not he could assist to him in doing damage to Ms. Melke.

He indicated that he sent a kite and got no response. He gave a second kite, and then there was a couple weeks difference, and that he did get a response.

During the interim, however, apparently, Mr. Uraz provided him information that looking in the light most favorable to the Prosecution, in response to written questions by Mr. Close, which I believe was before he had contact with the authorities, detailing the type of vehicle that Ms. Melke drove, detailing a schematic drawing of her residence, indicating where her residence was, given an actual address. So this was before he had any contact with authorities.

Thereafter, apparently, on a separate occasion, after they, being Mr. Close and Mr. Uraz, were separated, comes into contact with Mr. Allen in a similar conversation, according to Mr. Allen, ensues. There is no testimony that Mr. Allen had any contact with authorities until he said he became concerned that Ms. Melke might be injured and reported that, apparently, to the authorities.

Subsequent to that, we have the video call, where I guess was subject to the jury's interpretation. But in the light most favorable to the Prosecution, it clearly discussed removing trash, clearly discussed that it needed to be done before his sentencing date in

57

November, and clearly indicated that he had provided detailed information previously to Rough. And Rough should have given it to the undercover agent. And Rough, it was testified as Mr. Close who in fact had received the information based on documents that had been placed into evidence.

So, based on that, and looking in the light most favorable to the Prosecution, I would have to indicate that there could be a basis for the jury to reach a conclusion of guilt.

In regard to entrapment, again, the testimony showed that there was no police involvement until after the notes had been written, some delay on part of Mr. Close. And he was separated after that, he said. He testified he was separated after he gave his statement. And then Mr. Allen, who, himself, reported this incident, and wasn't contacted by the police, who were our trying to do some dragnet to ascertain whether he had talked or spoken to somebody else.

So there's no new evidence that's been presented at the trial that wasn't at the hearing on the request of entrapment, and the

58

Court still stands by that original ruling. So I will deny that request.

MR. PERRONE: Thank you, Your Honor.

MR. ROTH: The only other issue, two issues to put on the record. Both parties looked at our exhibit list over the break. We can't find 64 or 65. We don't think there is one.

THE COURT: Okay. I have written down 64 and 65 as being an overhead of the North Pointe.

MR. ROTH: Those are earlier. Those are — there's two with Detective Krumbach. Those would be 54 and 55 is what those are.

THE COURT: Well, those are the GPS coordinates, if I recall correctly. This was an overhead of the — without the GPS marker on it, it was the overhead of the three buildings, and another shot of the North Pointe Apartment complex.

MR. ROTH: I believe those are 34 and 35. Thirty-four is an overhead of North Pointe. Thirty-five being the building labels.

THE COURT: Okay. I don't know how I got those down to that. Okay. One was pretty big, though. Wasn't one of them during the testimony of the apartment manager?

59

MR. ROTH: Yes.

THE COURT: Is that Ms. Heitman?

MR. ROTH: Yes. That's 34 and 35.

THE COURT: All right. Okay. I'll strike my 64 and 65. That's actually 34 and 35.

MR. ROTH: Thank you, Your Honor.

THE COURT: I may have misheard it.

MR. ROTH: I certainly may have misspoke.

The only other issue that Mr. Perrone and I discussed over break, he is going to be presenting two prisoner witnesses in succession. We agree that they will not be in chains the same way that the People's witnesses were not in chains.

THE COURT: Who is the first one going to be?

MR. PERRONE: John Pierce, Your Honor.

THE COURT: Let's bring him out now.

MR. ROTH: And then off the record?

(Off the record discussion at the bench.)

THE COURT: Right here, Mr. Pierce. We are going to have the jury come in. I need you to remain standing until the jury comes in. Once they come in, I will then swear you while you're still standing, and then you can sit down.

60

THE WITNESS: Okay.

THE COURT: All right?

(Jury present in courtroom at 10:16 a.m.)

THE COURT: Be seated. First witness. Mr. Perrone?

MR. PERRONE: The Defense calls John Pierce.

THE COURT: You are John Pierce, sir?

THE WITNESS: Correct.

THE COURT: Raise your right hand for us. Please do you swear or affirm the testimony you are about to give will be the truth, the whole truth, under penalty of perjury?

THE WITNESS: Yes, sir, I do.

THE COURT: Have a seat. State your name. Spell your last name for the Court Reporter, please.

THE WITNESS: John Pierce. P-I-E-R-C-E

THE COURT: Thank you. Mr. Perrone?

JOHN PIERCE,

A witness duly authorized to testify under oath as follows:

DIRECT EXAMINATION

BY MR. PERRONE:

Q Mr. Pierce, were you incarcerated at the Ingham County Jail in October and November of 2016?

61

A   Yes, sir, I was.

Q   And do you recall being placed in the medical unit on September 7th?

A   Yeah.

Q   Why were you placed on the medical unit?

A   I think they were just moving us around to rearrange where we were staying at. I think they had a problem with the way that they had us in the jail and had put us up there to temporarily, while they fixed up where we were staying.

Q   Did you have an issue -- were you put there because you made contact when you weren't supposed to?

A   I was placed in PC and maximum because I made contact with my girlfriend that I wasn't supposed to.

Q   And.

Q   Did you come in contact at any point in time with an individual by the name of Reginald Close?

A   Yes, sir, I did.

Q   What was the nature of your interactions with Mr. Close?

A   We was in PC together in separate rooms. And

62

once a day I would be left out of my cell for an hour. I would walk around and talk to people. How I got to know Mr. Tunc-- Mr. Uraz, that's how I got to know Mr. Close and Mr. Allen.

Q   And you were on the medical post with Mr. Close, Mr. Allen and Mr. Uraz?

A   Temporarily, yes.

Q   For about how long?

A   I was only out there for a couple hours. Those guys were up there for two days, I think.

Q   And you were passing notes --

    MR. ROTH:  Objection. Facts not in evidence.

Q   (MR. PERRONE) Did you pass notes with Mr. Close regarding your case?

    MR. ROTH:  Objection, leading.

    THE WITNESS:  Yes.

    THE COURT:  I am going to allow it so we can move along.

    THE WITNESS:  Yes, I did.

Q   (MR. PERRONE) And who instigated writing notes?

A   I don't recall. It was either him or I. I was already writing notes to Schinberger who was in

63

the cell next to him. Mr. Close came in, in the middle of that. He wanted to get in on our conversation.

Q   Did you hear -- how did he want to get in on your conversation?

    MR. ROTH:  Objection. I think that would call for Mr. Close's state of mind.

    THE COURT:  I would agree. That would be speculation. He wouldn't know why.

Q   (MR. PERRONE) How did it appear to you that he wanted to become involved in your conversation?

A   It appeared to me that Mr. Close was overly curious.

    MR. ROTH:  Your Honor, I would object. That would be speculation as to Mr. Close.

    THE COURT:  Speculation. You can't tell us what Mr. Close -- he can tell us what Mr. Close did, but not what he thought or how he acted. I will sustain that objection.

Q   (MR. PERRONE) Did you hear any discussions between Mr. Close and Mr. Uraz while on medical?

A   No, I didn't.

Q   And you weren't sent back to Post 5B after medical?

64

A   Yeah, I was.

Q   For how long?

A   For four, five months.

Q   Did you see Mr. Uraz and Mr. Close talking to each other?

A   Yes, I did.

Q   Can you describe how that appeared to you?

A   I was only allowed out myself for an hour a day. When I say allowed out myself for that hour, I saw them through the window. They were in a different section. And I seen them walking back and forth, talking.

Q   Did you see Mr. Close and Mr. Allen talking?

A   Yes.

Q   How often?

A   Quite often.

Q   Did you see Mr. Close and Mr. Allen and Mr. Uraz talking together?

A   Yes.

Q   Was this consistent throughout the entire period of time that you were on Post 5B after being transferred from the medical post?

A   After being transferred from medical? I mean, we were in together before that, into 5B. And those guys really didn't hang out or talk much

65

there. It was after they went to medical. I believe it is when they started talking. When I first noticed they were hanging pretty close. And I was --

MR. ROTH: I object to the narrative. This is not in response to the question.

MR. PERRONE: No further questions.

THE COURT: Hold on for just a minute. All right, Mr. Roth?

MR. ROTH: Thank you, Your Honor. May I approach the witness?

THE COURT: You may.

CROSS-EXAMINATION

BY MR. ROTH:

Q Showing you what's been marked as People's Proposed Exhibit 62. Do you recognize this? You may have a seat.

A I couldn't tell you if that was one I wrote or not.

Q Sir, you wrote a stack of messages between you and Mr. Close, correct? He would write, you would write?

A Yes.

Q And so this isn't Mr. Close's handwriting, is it?

66

A Like I said, I couldn't tell ya.

Q All right. I'm going to show you this letter that you wrote and put your name at the bottom. That's yours, right?

A That -- It looks like it.

Q Okay. And that's the same handwriting that we see in 62, isn't it?

A Looks like it.

Q Okay. And in 62 this handwriting looks like yours. You say:

"I'm a damn talented – excuse me – I'm damn talented at lying to people. Couldn't tell what – excuse me. I'm damn talented at lying. Most people couldn't tell when I was telling the truth. Lie detector can't."

Right?

A That sounds like something I would say.

Q Okay.

MR. ROTH: Your Honor, I move for admission of People's Proposed Exhibit 62.

THE COURT: Mr. Perrone?

MR. PERRONE: No objection.

THE COURT: All right. We will admit Exhibit 62, a note by Mr. Pierce.

(PX-#62 is received into evidence.)

67

Q (BY MR. ROTH) Sir, you also testified that you saw some of these people talking? These were people in different dorms, correct?

A Correct.

Q You can't tell us at all what they said?

A No, I couldn't.

MR. ROTH: Nothing else. Thank you.

THE COURT: Redirect, Mr. Perrone?

MR. PERRONE: No.

THE COURT: Jurors have any questions for Mr. Pierce? Okay. Thank you, sir. Appreciate it. You're all set.

THE WITNESS: All right.

THE COURT: I want the parties to approach for me.

(Off the record discussion at the bench.)

THE COURT: Mr. Muhammad, right here, this jury witness box. And would you raise your right hand for me, please? Do you swear or affirm the testimony you are about to give will be the truth under penalty of perjury?

THE WITNESS: To the best of my knowledge, sir.

THE COURT: That's good enough. It may be better to spell both your first and last name

68

for the Court Reporter for us, please.

THE WITNESS: First name is Fateen. F-A-T-E-E-N. Last name Muhammad. M-U-H-A-M-M-A-D.

THE COURT: Could you slide up a little bit so we can get you in the mike. The mike is sort of directional. Appreciate it. Mr. Perrone?

FATEEN MUHAMMAD,

A witness duly sworn to tell the truth under penalty of perjury:

DIRECT EXAMINATION

BY MR. PERRONE:

Q Mr. Muhammad, were you incarcerated in the Ingham County Jail in October and September and October of 2016?

A Yes.

Q Were you incarcerated with Charles Allen?

A I was incarcerated with a lot of people.

Q Can you recall being incarcerated with Charles Allen?

A I was in solitary confinement. There was a lot of people that were there.

Q Okay. While you were in solitary confinement did you hear or see anything that was out of the ordinary, from your perspective?

69

A   Normal jail stuff.

Q   Why were you on the medical post?

A   Because my wife called the jail and said I called her, and instead of giving me a hearing, they just put me in solitary confinement.

Q   Did you talk with anybody about your case while in jail?

A   I talked with my lawyer, I talked with the judge.

Q   Did you talk with the other inmates?

A   I'm not a very friendly person.

Q   And you were moved to Post 5B after you were transferred out of the medical post?

A   That's correct.

Q   And do you recall whether Mr. Close, Mr. Allen, Mr. Uraz were also on that floor at that time?

A   They took us out of solitary confinement, put us on a post where we were allowed to come out and eat with each other. We were still in solitary confinement in the cells.

Q   Did you see Charles Allen and Reginald Close talking with each other over the course of while you were on B5?

A   I do not pay attention to what people are doing. This is a small cell. Little blacks

70

that we was on. Very small, you know. People —

Q   When is the first time that anyone from law enforcement questioned you in regards to this case?

A   A couple weeks ago.

MR. PERRONE:  No further questions.

THE COURT:  Any questions, Mr. Roth?

CROSS-EXAMINATION

BY MR. ROTH:

Q   Sir, during that interview that Mr. Perrone just talked about, you were interviewed by Detective Andrew Hogan; is that right?

A   I don't remember the detective's name. Police are police to me.

Q   All right. So there is a detective. Do you recall telling him that you felt like the Defendant took advantage of you in jail?

A   No, I did not.

Q   Would looking at your statement refresh your memory?

A   Don't matter what you wrote down on the paper. I know I ain't never said nothing like that.

MR. ROTH:  Page five. May I approach, Your Honor?

71

THE COURT:  You may.

Q   (MR. ROTH) If you can look down here for me and read that silently to yourself. Then look up when you're done.

A   I never said that.

Q   Hold on. Just read silently to yourself. Just look up when you're done. Okay. Sir, isn't it true that you told the detective you thought the Defendant was being, quote, a little bit manipulative?

A   That's not what you just asked me.

Q   You're right. I apologize. Down here. He asked you: You felt like he was taking advantage of you? You said: Yeah, in all honesty?

A   You just asked me did I feel like he was taking advantage of me. And I said no. I said: That's not what I said. That's what you just got a pen and agreed to.

Q   So you're saying this transcript doesn't say you agreed to this question?

A   That's not what you're asking me.

Q   Well, let me ask you again. Maybe we are getting confused.

A   No. You're getting confused.

72

Q   And that may be true, so I just want to straighten it out for myself. The Defendant asked you: You felt like he, referring to the Defendant, was taking advantage of you, correct?

A   No.

Q   You weren't asked that?

A   I was never asked that.

Q   Isn't it true that you answered that question: Yeah, in all honesty?

A   I said I don't remember being asked a question.

Q   Do you recall telling the detective: I felt he was being a little bit manipulative, referring to the Defendant?

A   Who is the Defendant?

Q   Mr. Uraz.

A   Mr. Uraz? I think Mr --

Q   Sir, listen to the question. Do you recall telling the detective that you thought that the Defendant, Mr. Uraz, was being a little bit manipulative towards you?

A   Towards me?

Q   Yes.

A   No.

Q   That's not what you told the detective at the

**73**

time?

A No. I didn't say he was being manipulative towards me. I told you I had no relationships with him.

Q Did you feel the Defendant was being manipulative towards other people?

A Whatever I felt, that's my personal opinion.

Q But that's what you told the detective?

A And I'm saying again that whatever I felt, that was my personal opinion. It has nothing to do with whatever he is on trial for. I got a personal about opinion about you.

Q Sir, stop. Please stop. There is no question right now. Do you recall telling the detective that Tone — and you knew the Defendant as Tone, correct? Correct?

A What is the question?

Q Did you call the Defendant Tone when you guys were in jail?

A He told me his name was Tony.

Q You called him Tone, correct?

A Tony. That's his name. Tony. Tone.

Q Do you recall telling the detective: I didn't see Tone being set up for anything he didn't want to be?

**74**

A No. I don't remember I said that.

Q Would you like to look at your statement, sir?

A You can show it to me all day. I'm going to say again —

Q Humor me. Just take a moment and look at that. Sir, isn't it true that you told the detective: I don't see Tone being set up for anything he didn't want to be?

A Excuse me, sir. Why don't you read the whole statement? Because the part that you're saying is being manipulative.

Q I'm going to read the whole sentence. With — excuse me:

"I believe, if the opportunity presented itself, Rough would have, with all the enthusiasm he could muster, Tone sets(ph). But for my dealings with Tone, I don't see Tone being set up for anything that he didn't want to be." Correct?

A Did you read the whole statement?

Q Sir, is this what you said:

"I don't see Tone being set up for anything that he didn't want to be"?

A I said I don't think that Tone could be set up.

MR. ROTH: I have nothing further. Thank

**75**

you.

THE COURT: Any redirect, Mr. Perrone?

REDIRECT EXAMINATION

BY MR. PERRONE:

Q Why did you say you didn't think Tone could be set up?

A Because Mr. Tone is an intelligent person. The the guys that he was dealing with were inmates in County Jail. Just like most inmates, they are setting up there, they are trying to find a way to get out of trouble.

MR. ROTH: Your Honor, I am objecting as to speculation.

THE WITNESS: You just asked me to speculate —

THE COURT: Hold on. You can't speculate what somebody else may have been doing. You can talk about what you saw or heard.

THE WITNESS: What I actually saw and what I actually heard?

THE COURT: You can't go to the conclusion based on that. You only can say: I saw this, I heard this. You can't conclude what was going on in their mind. That's what this is really about.

**76**

THE WITNESS: What I was told by inmates —

THE COURT: Well, it has to be — can't tell us what somebody, some other person told you, either. That would be hearsay.

THE WITNESS: Yes, sir.

THE COURT: I know it's kind of difficult. Not difficult. But try. You can't tell us what somebody else said. You can tell us what you saw, or what you actually saw or saw somebody do.

THE WITNESS: May I speak freely, sir?

THE COURT: No. You can't speak freely at this point.

THE WITNESS: Okay.

Q (MR. PERRONE) You testified that you don't try to talk to people in jail, don't try to involve yourself in the affairs of jail?

A Because people tend to take what you say —

MR. ROTH: Your Honor, that's a yes or no question. I am going to object as non-responsive.

THE COURT: Okay. You have to answer yes or no.

THE WITNESS: What's your question again, sir?

77

Q (BY MR. PERRONE) You mind your own business while you're in jail?

A Absolutely. Yes.

Q In your time in jail, did you hear people talk about preventing their victims from showing up to testify?

A A lot of people -- I don't know how to answer that yes or no. Because you're in jail. A lot of people talk.

Q Right. Did you notice anything about Mr. Tunc's demeanor that showed that he was giving to the other inmates?

A Tone was kind and caring. He didn't care what other people thought he shouldn't have shared with, because of theirs.

Q That's good enough.

MR. PERRONE: No further questions. Thank you, Your Honor.

THE COURT: Do the jurors have any questions for Mr. Muhammad? All right. Thank you, Mr. Muhammad.

THE WITNESS: Thank you, sir.

THE COURT: I appreciate it.

THE WITNESS: Thank you.

THE COURT: All right. Next witness,

78

Mr. Perrone?

MR. PERRONE: The Defense rests, Your Honor.

THE COURT: Any rebuttal witnesses, Mr. Roth?

MR. ROTH: May we approach?

(Off the record discussion at the bench.)

THE COURT: Are we ready for closing?

MR. ROTH: Yes, Your Honor.

THE COURT: All right. Members of the jury, that concludes the evidence. And we are going to proceed to closing arguments. The Prosecution goes first followed by the Defense. So Mr. Roth will proceed first.

MR. ROTH: Good morning, ladies and gentlemen.

How did we get here more than a year later? The answer is simple, and it's one word, and it is obsession. From a knowing, to harassing, to lethal. The Defendant simply could not let go. When Erika Melke broke up with him, he could not move on. Could he not let it go.

We all know how powerful love can be. But this trial illustrated the darker side of that love when it takes the form of obsession. And as the Defendant's obsession with Erika Melke

79

increased after their breakup, his regard for her health and safety and welfare dropped.

Before the Defendant ever met Reginald Close or Charles Allen or Frank Mobley, she was scared for her life. And she was right. Months before the Defendant ever met Allen or Close or Mobley, or was ever in jail, he was already trying to buy a gun, already trying to kill her.

How did we get here? When the Defendant realized that he could not have Erika Melke he believed that nobody should then.

You heard a lot of testimony in this case, and it starts with a large body of stalking activity.

The Defendant and Ms. Melke broke up in June of 2015. Afterwards he repeatedly tried to communicate and engage her by calling and texting. It starts in a conciliatory manner. It starts, on its surface, by saying things like: I'm sorry, I want to get back together, let's just talk. But then when Ms. Melke makes clear that she doesn't want to get back together, doesn't want to talk.

Now it changes its tone. It starts by harassing as we see in Exhibit 13, calling her

80

a ho. She made it clear she wanted it to stop. Then as his frustration grew, the Defendant's actions escalated.

Exhibit 10. He scratched her car on a separate incident. Excuse me. Exhibit 8. He scratched off the sticker on her license plate. Exhibit 5. Threw eggs at her car. As Erika began a relationship with another man, Stan White, the Defendant's actions escalated.

He brought into the scope of his stalking and his harassment, not just to Erika, but to those around her, to her roommate, Carmen Elias, whose lugnuts he loosened on her car, to Stan White, puncturing the tires on his car on several occasions, texting him. Ever more desperate, ever more obsessed, ever more dangerous, the Defendant began following Erika.

In Exhibit 3 he followed her to Best Buy and stayed there for 30 minutes until the police got there. The testimony was that when she pulls in, she sees him right away. The officers told you it was maybe up to 30 minutes before he got there. And as he got there, the Defendant was leaving. So he is in that parking lot just sitting and waiting.

81

intimidating her for 30 minutes.

Look at Defendant's Exhibit A. This was noticed by other people. It says — this statement by Ms. Melker. She talks about what her — somebody else in her unit observed:

On January 1st, 2016, it was shortly after eight p.m. I was home alone when I received a call from neighbor, Andrew Nicthman. I didn't answer right away, so he sent me a text that said: Hey, there is some dude creeping in your apartment. I called him and he told me that some guy named Tony was knocking on my door. Andrew told me he went out in the hall to make sure everything was okay, and Tony told him he was just looking for his friend and then he left.

During this time I had been in my room, talking on the phone, and never heard the knock on my door. Andrew got a couple pictures of Tony and sent them to me. Pictures were blurry but definitely resembled Tony. Tony is unwanted anywhere near my apartment, and has no business being here.

So this behavior is not only in secret, it's in public as well. He has no regard for

82

people catching him doing this. That's on New Years' Day.

Earlier in that day he had followed her to Dave and Buster's all the way to east side of the state. His behavior during that night is a perfect illustration of his state of mind.

When he first arrives at Dave and Buster's, he sees Erika and Erika's new boyfriend, his friend, Noelle, and Noelle's boyfriend. He begins by trying to be conciliatory, by trying to talk calmly. But when she rebuffs those efforts, he immediately gets frustrated and immediately returns to disparaging her.

Now he tries to make her unhappy. If you're not going to with me, I want you to be unhappy. He calls her names, calls her a slut, tries to make her look bad to her friends, and especially her new boyfriend. Because all that matters at that moment is making her pay for not being with him anymore. If he can't have her, then she can't have happiness.

People's Exhibit 12, a little more than a week later, on January 2016, she got a PPO, a Personal Protection Order, protecting her from

83

the Defendant. A court order that prohibited him from following her, communicating with her in any way, approaching her, confronting her, going to her work or her home. And as we saw and heard, his attorney provided him with a copy of this document. So he absolutely knew about it and he absolutely knew its terms. But he still could not stop. He escalated further. He violated her home.

She noticed over a long period of time personal items, bras, underwear, shoes were missing. She suspected the Defendant, but couldn't prove it. So she purchased a trail cam, and she set it up in her room, aiming it at that area. And what did she observe? In Exhibit 15, the Defendant breaking in without permission, having no idea how he could have gotten in and caught him doing it.

But this time wasn't the underwear. This time what was there was tickets for a future date. A date with Stan White. We know that he read those tickets because he later told Reginald Close about that concert, not just that it was a concert, but he was so specific with Reginald Close he knew it was a Drake concert.

84

How else do we know that he knew about that concert? Because that very night when they're out at the concert, in Exhibit 52, the Defendant punctures all of Erika's tires in her car.

And this time he also creates an Instagram account in her name, which we see in the cover of in Exhibit 20, and uploads pictures of a plastic penis, pictures of her with a new boy, pictures that he should never have any access to, but for the fact that he's somehow accessing her phone mobily(sic), without her permission.

We know it's the Defendant that does that, because Erika contacted the account holder for that Instagram account. And we see that conversations in Exhibit 24, by the content, she and we absolutely know that the person who created that account, the person communicating under that account, was the Defendant. His purpose in uploading these pictures was to embarrass her and to make her know that he had access to everything in her life.

Around this time she also receives two messages from Facebook, first on August 27th, 2016, at 8:27 p.m, she gets an e-mail from Facebook, an automatic e-mail indicating that

85

her password was changed on Saturday, August 27th, 2016, at 8:27 p.m. She had not done that to her account.

She receives another one on August 31st, 2016, at 12:20 p.m. indicating that her password was reset.

Each of the IP addresses where these things were done were included in these emails. We heard testimony from Richard Lainge, who runs Spartan Net, who was able to definitively tell us that those IP addresses at those dates and those times were assigned to Building C of North Pointe A.

Now, he was not able to say which unit in Apartment C, but we know two very important facts about Apartment C.

The first is that Barak Atamer has an apartment unit there. We know Burak Atamer was a friend of the Defendant's. We know that the Defendant referred Burak Atamer to North Pointe apartments to get an apartment there. But more specifically we know that the Defendant was in North Pointe apartments at each of these two times. When you look at the times the passwords were reset or changed, you look at the IP

86

addresses. We look at the exact time corresponding to the Defendant's tether, and each time he was squarely in building C of North Pointe apartments. And if you look where exactly that little balloon pops up, that is specific to the GPS coordinate, it's almost exactly where Burak Atamer's Apartment Unit, C10, was.

We also know from that tether that on August 16th he had gone to her address as well. He is prohibited from going over there. But on August 16th he goes over there as well, all of this in violation of the PPO, all of this in violation of Ms. Melke's desire to stay away from the Defendant. All of this making her anxious and scared. And when we think about how anxious and scared was she, that when she would go on a date with Stan White she would turn off her phone, because she believed he was tracking her that way. This is affecting how she goes about her life. That's how dominant this was. That's how scared she was, that it affected just going out.

How scared was she? She broke up with Stan White. The young man she is having a new

87

relationship with, for fear of his safety and for fear of the safety of his child. That they're not having problems between the two of them. They break up because they both feel it's unfair for this terrible, toxic, broken relationship that she has with this man, to be put in jeopardy Stan White and his young child. When they break up they didn't see each other again until court last week.

And he continues. On August 31st, 2016, he gives a letter to his attorney to provide to the Prosecutor, addressed to Ms. Melke, a message that he wanted to be conveyed to Ms. Melke. Not trusting that that would be enough, he creates another account in her name, this time Gmail, appearing to be like her name as if she had sent it to herself. And the content of that e-mail clearly mirror the letter that the Defendant had written and given to his attorney. That's how we know that it was the Defendant that made this account, that it was the Defendant that wrote this email and sent it to her.

And on that very date, August 31st, 2016, the Defendant was sent to jail. Finally something that should make Erika feel safer,

88

finally something that should prevent her from being harassed anymore. But it didn't. As soon as he gets there, People's Exhibit 29, he, twice, 9:06 p.m. and 9:12 p.m. calls her number from the jail, with her prerecorded message of him saying: I hope you're happy. She instantly and definitively recognized that voice as belonging to the Defendant, her scorn lover who just can't move on, her scorn lover who keeps harassing and scaring her.

And as a result of these calls, the Defendant was placed in a dorm without access to the phone. And there he first met Charles Allen. Allen testified that he befriended the Defendant, that the Defendant initially came in looking a little scared. And that Allen became his friend. That he talked often, at least daily. As they become more and more friendly, the more they discussed their personal lives. And for the Defendant, what is his personal life but for his obsession with Ms. Melke. That's what he talks to Allen about.

At first his frustrations, he blamed them on Ms. Melke. He believed she put him there, not his actions, but she believed in what he

89

expressed to Allen was that Ms. Melke's actions put him in jail. Those frustrations led him to telling Allen: That bitch needs to pay. Allen followed up with the Defendant and asked what that meant. The Defendant said he wanted someone to hurt her. The more the Defendant got comfortable with Allen, the more his obsession grew, the more his frustration grew. He started being more detailed, more specific. He started talking about wanting somebody to not just hurt her, but kill her.

Knowing that Allen was going to get out in January, he asked if Allen could do that. Allen played along. Allen played along for a couple of reasons. One, he said he wanted to know if this was serious. Because if it was serious, even he had a problem with it. But also he admitted for the entertainment in jail.

As time grew, it was very clear to Charles Allen that the Defendant was serious because of the way he talked about it, because of how often he talked about it, daily, but, also, the detail with which he provided, Allen helped to kill her.

Obviously Allen couldn't just get out and

90

kill somebody that he knew, never met, didn't recognize. So the Defendant provided personal identifying information to Allen. Told her that she lived -- excuse me. Told him that she lived at 3925 College Towne Apartments. Told him that she lived at Apartment 202.

Let's stop and talk about this for a minute. All of his prior vandalism, all of those prior things, when he breaks in and steals her underwear, breaks in and steals the keys, when you're outside the unit, that's all at Apartment 309, the one where he helped her move in. So at least we know why he knows where she lives then.

How does he know that she has recently moved to 202? That's a level of stalking that as recent as that move was, he had already knew that she had moved into the unit, and he is already directing Allen to go to her new apartment. He told Allen that he might be able to use the passcode to track Erika's phone, like he had. He described the blue couch on her patio. He said that there was an owl camera, presumably referring to the trail camera, inside the apartment. He told her that she worked -- excuse me -- told him that she worked at the

91

Lansing Urgent Care on Cedar, and told him that her roommate was Mexican.

The Defendant further described that he wanted Allen to beat her to death with a baseball bat beyond recognition. And that he wanted it videotaped, and provided to him, as well as either her actual identification, or a copy of her identification.

The Defendant said that he would pay Allen $2500 to do these things, that he would provide half of it up front, and half of it upon proof of completion.

He also said that when he, the Defendant, got out, he wanted to help, he wanted Allen to help him get a gun. And he didn't stop there, but he told Allen what he wanted this gun for. He said he wanted it to kill the man or men that Ms. Melke had cheated on him with.

Allen testified that in all of these conversations the Defendant appeared absolutely serious, that even for people in jail this was alarming. Even for people in jail, this was absolutely unacceptable. And so he sent out a kite to report it. Around the time that he got

92

transferred to medical, he had not gotten a response, so he sent another one.

People's Exhibit 63, we have that second kite dated October 24th, 2016. This one finally got through to jail authorities, was passed along to Detective Krumbach, who then came out and reviewed Allen. And at the beginning of that interview, as it was testified repeatedly, Detective Krumbach made clear to Allen that he could not do anything to help him beyond letting the judge or probation officer know that Allen was cooperating in this investigation. There was no deals, no promises. In fact, very much the opposite.

Detective Krumbach was very honest and upfront with Allen saying: Not really anything I could do to help you here. But Allen cooperated anyway, because he believed, as he told you, it was the right thing to do. He has not and will not receive any benefit from his cooperation, participation or testimony in this case.

So going back in time a little bit, because these things overlap, once the Defendant was transferred to medical, away from

Charles – initially with Charles Allen, but after one night Charles Allen is taken out, the Defendant is now housed in medical with Reginald Close.

So let's keep in mind the context. The Defendant and Charles Allen have been talking at length on a daily basis about this plot to kill Erika Melke. When we get to day two on medical, Charles Allen is no longer there. The Defendant doesn't know if he is ever going to communicate with him again. So he has already got his mind set on this. He communicates to Reginald Close. They start becoming friends. And after about 48 hours, his favorite topic was his ex-girlfriend, Erika Melke.

The Defendant told Reginald Close that Erika Melke ruined his life, that she had cheated on him, and that he had wanted to get rid of her. He told Close about the things that he had done to her. He told him about slashing her tires on the night of the Drake concert. Talked about activating her iCloud account. Talked about being fed up with her roommate, Carmen, as well.

The Defendant told Close he had previously tried to buy a gun. And not just that, but more specific. Tried to buy a gun with somebody he worked with, at MSU. And that the guy used to be an MDOC officer. And he told Reginald Close that he intended to use that gun to kill Erika Melke.

All of this warmed him up to asking Close if he knew somebody who could kill Erika for him. Close played along, too. Again, even by the standards of jail inmates, this behavior, this conversation was odd. And it was unacceptable. The Defendant told Close that he thought it would be easy to do because Close said, yeah, I know a guy. The Defendant told Close that it would be easy if there was some garbage cans outside where she would pull up in the parking lot between where she parks and where her unit is, that the person could get her in or around that parking lot and simply kill her.

Close and him continued that conversation in writing, passing notes. And Close provided those notes to the police. Starting with 39, this is Close's handwriting at the top. You don't think it will look.

better as a robbery? So clearly what we know from this, is that this is already a continuation of a conversation that had long gone on. We don't see the beginning of it. We are clearly in the middle stages.

Close says: You don't think it will look better as a robbery? The Defendant said: Okay. But I want it done -- but I want it gone. Beat up badly.

Close goes on to say: I could have him carjack her, beat her ass with a gun, and shoot her a few times.

The Defendant's response: Okay. Three exclamation points. He was pretty excited about that idea.

Where would he leave her? Close says. Not 100 percent sure, but I'm sure he knows what he's doing. He would kill her and leave her in her car.

Okay. Three exclamation points again. This idea of shooting her and killing her, leaving her in the car is very exciting to the Defendant.

Okay. Good.

Close then says: You have to draw me a map.

And 41, we have that map. Let's talk about the information contained on this map. Starting at the top left, going counter-clockwise. College Towne Apartments. 4925 Dunckel Drive, Apartment 202. There is that brand new address again. Lansing, Michigan, 48910. So that the person who does the killing could recognize and kill the right person, we have, the Defendant provides her Facebook account to get pictures of her. Provides her vehicle description, a green Toyota Rav 4. License plate, CB something with Spartan Toyota plate cover. The Defendant knows that very well because he's scratched that plate already, he vandalized that car before. He knows that information well.

Then we have the map to her apartment, which in Exhibit 53 we have a map, the real overhead map, 4925 Dunckel, Quality Dairy, Speedway, 127 off to the east, Dunckel Road exit where it intersects. All this information the Defendant includes in his map for Close to provide to the killer. Dunckel Road exit on 127 north. Quality Dairy store is on this corner.

Speedway is over here. And then here he labels her specific building, Dunckel Road, Apartment 202. This map is a murder invitation. This map is designed and intended to provide all of the information necessary to locate and kill the Defendant's intended victim.

Their notes go on in Exhibit 40, from the Defendant: Wait for me to get out and sentenced, because they may try to keep me here if something happens to her.

Close says: They can't. You're already in jail. It would look bad if it happens when you're out.

The Defendant replies: Okay.

Close warns him: You would be the number one suspect.

With that, the Defendant also provides the names and identifying information, address locations for two men that Erika is associated with as well. Stan White, who you heard from, that she had dated during that time, as well as Mike Topes who you saw pictures of on that fake Instagram account that the Defendant had posted. These were in Close's handwriting, based on things that the Defendant had told

him.

The Defendant told Close that he would give him $1,000 to have this done. And to demonstrate that, to show how serious he was, we see on Exhibit 56 that they had phone contact on October 11, 2016. We see about a day and a half later on Exhibit 42, somebody has suddenly put $160 in Close's account.

On Exhibit 43 we see the still that was taken by the kiosk in exactly the moment of that transaction. We know that person identified by Detective Krumbach is Burak Atamer. Same Burak Atamer who makes a video call to the Defendant that very same day. Same Burak Atamer who owns the apartment that the Defendant used to change the password on Erika's Facebook account on at least two or three different occasions.

Once he realized how serious the Defendant is, Reginald Close sends those notes to his attorney. His attorney provides them to the police, and an interview is arranged. Like with Allen, the detectives make clear that there was not going to be any benefit to Close's case as a result of this. And, again,

Mr. Close has not and will not receive any benefit based on his cooperation or testimony in this case. He simply did it because it was the right thing to do. But even by jail inmates' standards, this was wrong and this was unacceptable.

Detective Krumbach contacted the Lansing Police Department Special Operations Section, communicated and coordinated with Lieutenant Backus. Lieutenant Backus worked with Officer Frank Mobley and they were able to open an account with Securus under the name Tyrone Jones for Officer Mobley to use.

The first time they tried to contact the Defendant, the wifi issue prevented it from going through. Officer Mobley again tried on 10-24, and successfully made contact with the Defendant. You have the video of that call. You also will have, in the back with you, a transcript of that call. You've watched the video. I recommend watching it again with the transcript. It will help in understanding everything. Because there is a lot of details in that call that are important.

Page two, line four.

MR. PERRONE: Your Honor, may we approach?

THE COURT: All right.

(Off the record discussion at the bench.)

Q    (MR. ROTH) Page two, line four. The Defendant asks:

Who put Officer Mobley posing as TJ in touch with the Defendant.

Officer Mobley says Rough. The Defendant expresses zero confusion as to this. He doesn't say who is Rough. The mention of Rough doesn't cause him any confusion. Doesn't make him hang up. It makes sense to him, because he was expecting Rough to communicate with an outside person about arranging for the murder of Erika Melke. This conversation was a continuation of the one that the Defendant and Reginald Close, or Rough, began in jail.

Page one. Line 33. Officer Mobley starts talking about garbage or trash, a code that he has come up with because he knows that the Defendant knows that these are recorded calls, and they can't simply come out and talk about murder, so he uses the code trash or garbage, or taking out the trash or garbage to represent Ms. Melke's body and her murder. And

101

he asks:

Does the Defendant still want that done. Again, the Defendant expresses no confusion whatsoever. That's how much he has been talking about this. That when somebody calls him up out of the blue and talks about taking out the trash, this topic is so prevalent in his life that he immediately knows what that code means, and immediately plays along with it.

Officer Mobley, for the rest of that conversation, makes it very clear that he's talking about a person. Page three, line 6. He asks if that trash is a red-head.

Page three, lines eight and 10. He talks about what kind of car that trash might be in. Page three, line 35. He talks about beating that trash up with a bat.

Page five, lines 10 and 11, he asks: Do you want me to beat that shit up, beat that ass. They go on to agree that the Defendant would pay $2,000 for the first bag and $500 for each additional bag. Obviously that's not a reasonable price to remove trash. The Defendant knows exactly what this code is.

102

That's indicated by what he says as well. He knows that he is discussing the murder of another person on a recorded line.

Page four, line 17. Officer Mobley asks: Could you give me an address where that trash might be at?

The Defendant says: I can't. He knows he is on a recorded line. He can't give out Ms. Melke's address because there is about to be a murder there.

Page four, lines 29 and 30. Again on the subject of the address, the Defendant says:

I don't have any information, that type of information about that. Rough should have told you. I can't talk over the phone like this. He knows this is a recorded call. And so what does he do? He references the information Rough should have given. He references that murder map that the Defendant wrote and gave to Rough. This information was supposed to be passed along to the murderer. That's why the Defendant says:

I can't talk about this on the phone. Rough should have given it to you. That's the only information that Rough has to give to the murderer.

103

Page three, line 15. The Defendant asks: Didn't he, referring to Rough, write all that stuff about the trash and everything to be picked up. He is referencing that map again.

Page four, line 24: Rough should have given you the address. All the time he is referring him back to that map that he made for Rough, that Rough was supposed to give to him.

And at the end of the call, when Officer Mobley gives the Defendant a way out, when Officer Mobley repeatedly says:

When I hang up, this is going to get done. Are you sure this is what you want.

Page seven, lines 11 and 12. He definitively, unequivocally says "yes."

When Mr. Perrone and I are done, the Judge is going to read to you series of instructions. They are meant to help you understand and apply the evidence. One of them is going to be about credibility. It's a series of questions for you ask yourselves and for each other to decide who you believe, why you believe them, how much you believe them.

We see that -- 3.06. We are going to go through some of these individually. Not going

104

to spend much time talking about the testimony of Erika Melke, Noell VanSlambrouck, Carmen Elias or Stan White, their testimony about the body of stalking, the body of harassment, all of the things that the Defendant had done to scare and intimidate Ms. Melke leading up to this was unrebutted. They have no incentive to lie, no reason to make this up. All the physical evidence, all of the investigations, corroborates all of those things.

The Judge is going to ask you to consider about each witness, how did the witness look and act while testifying. And when you think about and discuss the way that each of those people testified about those events, you will remember and think about how scared each of them looked about their individual and collective experiences that they went through at the hands of the Defendant.

The more important question for us is about Reginald Close and Charles Allen. We talked in jury selection about evaluating their testimony like every other witness. But obviously something worth discussing in more detail, when you want somebody killed and you don't want to

105

do it yourself, or can't do it yourself, you approach another person to do it for you. You don't solicit nuns or third grade teachers or police officers, if you can help it, to kill somebody for you. Who do you approach? Other criminals, people who you think are willing to do illegal actions like that. And for the Defendant that meant two guys that he met in jail, Charles Allen and Reginald Close. Just because they are in jail does not mean that they're not credible. It does not mean they're telling the truth. It means that we have to talk about what we know about their statement and why it fits with credibility, why it fits with the truth. Neither of these men had any incentive to disclose this information to the police. So when the Judge asks you: Does the witness have any bias, prejudice or personal interest in how this case is decided, have there been any promises, threats, suggestions or other influences that affected how the witness testified, Close knew what a proffer interview was. He had an opportunity to provide information to be evaluated for a possible cooperation agreement in prior cases. He had

106

done it, and he very clearly and very unequivocally did not have that here.

There is a proffer letter in evidence from the Defense that you can review, and it talks about three other cases, that months earlier, in August, Reginald Close sat down talked to the police about some other information. Reginald Close did not have any of that here. In fact, all parties told him ahead of time: You're not getting anything for this. And he did it anyway. He has never not then, and he has not now, and he will not in the future, derive any benefit from his cooperation or testimony in this case.

So does he have any bias, prejudice or personal interest? Have there been any promises or threats or suggestions to influence him? Absolutely not. And Charles Allen. His case was already closed. He had been sentenced. He was in jail serving that sentence. He asked if he could be let out on tether. The detective told him no. He cooperated anyway. The detective told him: All I can say is I'll put in a good word for your judge or probation officer for you. It made no difference.

107

As Charles Allen told you, he ended up serving his sentence in its entirety. That's closed. And he continued to cooperate and testify, because, as he said, it was simply the right thing to do.

This was not simply one time that Allen and Close said these things. As you heard testimony at their initial disclosure with the police, everybody repeatedly told him you are not getting anything. And they moved forward, they testified at the preliminary examination back in 2016, you heard, again, don't receive anything. Now, almost a year later, after even that, they continued to cooperate and testify to the same things without benefit because simply it was the right thing to do. They have never gained anything from this case.

But maybe the most important thing to consider as it relates to their credibility is this final one here. Something we talked about in jury selection. All in all, how reasonable does the witness' testimony seem when you think about all the other evidence in the case. How well do the pieces fit together around, and including, Allen and Close's testimony?

108

First of all, they provided information they could not have had, but for the Defendant telling them, information that they would not have any interest in if the Defendant wasn't telling them how to locate and kill Erika Meike. They're able to tell the detectives — Close tells the detectives that Erika was with her boyfriend at a Drake concert on the night that he punctured the tires. They're able to tell the detective the name of other men in Erika's life. Close had even passed notes with the Defendant and provided those notes. And they included her new address. That note makes unequivocal, that conversation with the Defendant.

But, also, putting on top of it is a layer to their credibility, is Officer Mobley's conversation afterwards, after Reginald Close's conversation. That further confirms the details that Reginald Close told you, that the Defendant isn't at all surprised by this call, or the invocation of Rough's name. That he expresses no surprise about that whatsoever. Confirms what Close tells you, that he and the Defendant agreed that Close would get him a killer to do

109

this for him. He is expecting it. It's the continuation of a conversation that he began in private in the jail.

And how do we know the content is confirmed through all of the things that we just talked about in that call? He talks about hurting the trash, beating the trash up, making sure the trash hurts, blonde trash, red-head trash. He knows this is obviously a person.

All of those details confirmed and corroborate Reginald Close's testimony.

But also consider how consistent what Close and Allen told you is with the rest of the Defendant's conduct. He had been escalating since the time of the breakup, all of his acts cry one: If I can't have her, nobody will.

We even know that he had lethal desires, lethal intentions, in April of 2016, four months before he meets Close or Allen. He approaches his co-worker at MSU and he tells him: Can you help me get a gun, a gun and bullets. And he doesn't stop there. He says: I want to get it in the illegal, unregistered way. Why, at this point in his life, does he suddenly need a gun? Because his frustration with Erika Melke boiled

110

over. And he was finally to the point that if he can't have her, nobody will. That is what he told Close, that he got that gun or wanted to get that gun to use to kill her.

And this simply wasn't a one-time conversation with his co-worker. This was something he brought up day after day until the co-worker reported it to his boss and the Police Department got involved, and the Defendant lost his job over it. That's how serious this conversation was, that's how serious the Defendant wanted that gun, to kill Erika Melke, four months before he ever met Reginald Close or Charles Allen.

The Judge is also going to tell you that sometimes testimony of different witnesses will not agree. You must decide which testimony you accept, and you should think about whether the disagreement involves something important or not, and whether you think someone is lying or simply mistaken. People see and hear things differently. Witnesses may testify honestly, but simply be wrong about what they thought they saw or remembered.

It is also a good idea to think about which

111

testimony agrees best with the other evidence in this case. So what that says is that there is certainly some inconsistent testimony in small details. And that that is so common that the law takes into account, and that instruction is read in every case.

In this case what that most took the form of was the cross-examination by Mr. Perrone about dates of things. That nobody was exactly sure about specific dates on which things happened. But they remember the sequence of events much better.

Now, as a result of his crimes, the Defendant is charged with four crimes. Excuse me. As a result of his actions he is charged with four crimes. The first one is aggravated stalking. There are six elements to this crime. First, that the Defendant committed two or more willful, separate and noncontinuous acts of unconsented contact with Erika Melke.

So what goes with that is this instruction: The Prosecutor must also prove, beyond a reasonable doubt, that the crimes occurred between October 23rd, 2016 and October 31st, 2016, within Ingham County.

112

So we gave you a lot more history than just those dates. We did that to give you the context of what happened, the common plan or scheme the Defendant employed to harass her or stalk her throughout the entire body of their ex-relationship.

But what specifically happened between those dates that constitutes those acts? On/or about August 27th he changes her Facebook password for the first time. Around that same date, around that same date, he posts the Instagram account, fraudulently. On August 31st he sends her the email that he then also gives to his attorney to provide to her. He calls her from the jail twice. He, again, changes her Facebook password. All of those events were within this window of time that you are to consider.

The second element is that the contact would cause a reasonable individual to suffer emotional distress. So for this one you could consider why those events on those days caused such a reaction, that there was a lot of events that led up to them.

And that's why, when these things continue to happen, after she has got her PPO, after she

113

tried and tried and tried to get him to stop, after he has broken into her apartment, why messages from Facebook saying that her password has been changed. Why fake an account in Instagram in her name by the Defendant. Why all those things caused that emotional distress that you saw and heard about.

The third element is that the contact caused Erika Melke to suffer emotional distress. So the difference between element two and three is: Would a reasonable person feel that way in those circumstances? And element three is did she actually feel that way. And what you then consider is if a reasonable person had to endure all those things that Ms. Melke did, would they feel the same way? And the answer is absolutely yes, if not worse.

The fourth element is that the contact would cause a reasonable individual to feel terrorized, frightened, intimidated, threatened, harassed or molested. This goes hand in hand with what we talked about. Anybody having all those things done to them would feel harassed or threatened or intimidated or frightened or terrorized or molested.

114

And to the fifth element, Erika Melke certainly did as well.

The sixth and final element is that the stalking was committed in violation of a court order or a restraining order of which the Defendant had actual notice.

People's Exhibit 12, that's the PPO, the Court order saying the Defendant was not in any way to contact her. All of these things that we talked about during that window of time are various ways he has found to contact her. All of it prohibited by that personal protection order.

The Defendant is also charged with three counts of solicitation to murder. I'm going to talk about them mostly as a group. In Count 1, first, that the Defendant, through words or actions, offered, promised, or gave money, services or anything of value to another person. And, second, that the Defendant intended that what he said or did would cause Reginald Close or anyone on his behalf to kill Erika Melke.

The only difference with that, in Count 2, Count 2 says Charles Allen or anyone on his behalf. Only difference with Count 3, it says

115

Frank Mobley.

So taking these elements –

MR. PERRONE: Excuse me, Your Honor. May I approach, Your Honor?

(Off the record discussion at the bench.)

MR. ROTH: So to the first element first, speaking first to Reginald Close, the Defendant offered him $1,000, and actually gave him $160 as a deposit. It does not matter, as you see, whether he completes the transaction or not, whether he gives money or not.

First, that the Defendant, through words or actions, offered or promised or gave money or services. That he actually gives $160 does not matter. That he offered $1,000 is simply enough.

For the second count of Charles Allen or somebody on his behalf, that the Defendant offered $2500.

For the third count with Officer Mobley, we heard the call the Defendant offered him $2,000, plus an additional $500 per person, presumably referring to the men in Erika's life whom she may have been with at the time.

Please note that it does not matter who

116

brought up the topic of payment first. It is not legally relevant. Only the elements are. So it does not matter who brings up the topic of money. It does not matter who puts out a specific amount of money. You will never hear any instruction to the contrary. That is not an element in this case. There are only two elements, and who talks first, who gets the money first, who says any of those things is not one of those elements.

The second element is the Defendant intended that what he said or did would cause Frank Mobley or Reginald Close or somebody on his behalf or Charles Allen or somebody on his behalf to kill Erika Melke.

The Judge will tell you with that that the Prosecution does not have to prove that any of those people actually committed, attempted to commit or intended to commit murder.

That means the fact that none of these men, Charles Allen, Reginald Close or Officer Frank Mobley, ever intended to go through with this does not matter for our purposes. All that matters is when the Defendant offered the money, did he intend for them specifically to kill her,

117

or somebody on their behalf.

Again, it does not matter who brought up the topic first. That is not a legal element. The Judge will never tell you to the contrary. It does not matter who brings up that topic first.

How do we know that he intended to cause these three people to kill Erika Meike? By his deliberate and repeated way of talking about it. When they talk about the devil's in the details, that's what we have here. It's those details that he provides to help each of them do it that shows how serious he is, that shows that that's what he intends for them to do.

We know that before he ever talks to them, he intends for this happen. But in April of 2016 he is already trying to buy a gun and bullets illegally, unregistered, to kill her. So before he meets them, he is already talking about killing her.

So when he gets to jail, he meets, first, with Charles Allen. He sees it as an opportunity. Unlike the guy from MSU kitchen who turns him in, he thinks this is the guy who can get it done, this is a criminal. So he offers Allen money.

118

More important for this element, he tells Allen the specific information he is going to need to find and kill Erika. That specific information is what makes this plan credible. It's this information that distinguishes a crime from a joke two guys are telling. He was intent, the Defendant was intent on having Allen kill her. That's why he gave the information about where she lived and who she was associated with, and where she worked. But Allen was transferred away, and the Defendant met Reginald Close. The Defendant had already done this once, so he was much faster in approaching and propositioning Close at this time. He was even more detailed.

They talked about whether or not to make it look like a robbery, talked about shooting her, and what to do with the body, and then the real specific details. You look at the map that he gave Close. That map that invites that person to kill Erika Meike. The only reason to give him all of that information is to facilitate her killing, to make sure that the person that Close finds to do the killing gets the right person and gets it done.

119

But, again, Close was moved. So Officer Mobley contacts the Defendant and continues his conversation. And, as we discussed, Officer Mobley makes clear, pursuant to the Defendant's prior request of Rough that he was willing and able to kill Erika Meike, that he was willing to kill her, the Defendant's trash, for $2,000. And that the Defendant definitively and without hesitation, says yes.

Officer Mobley gives him, time after time after time, a way out. When I hang up, is this going to get done? Are you sure you want it? The Defendant says yes because he intends for this to contact — this contact to cause him to go and kill Erika Meike. Same way he intended it with Charles Allen, he intended it with Reginald Close.

I am going to have one more opportunity to speak to you when Mr. Perrone is done. At the end of the time, I will ask you to find the Defendant guilty of, first, aggravated stalking. And, additionally, three counts of solicitation of murder. One for at Allen, one for Close, one for Officer Mobley. Thank you, Your Honor.

THE COURT:  All right. So we are going to

120

take our lunch recess now. And we will come back about 12:45 with the closing arguments on behalf of Mr. Uraz. So we will be in recess.
(Jury exits courtroom at 11:36 a.m.)

THE COURT:  Be seated. All right. So Mr. Perrone wanted to place an objection concerning reference to what Mr. Roth referenced as the jury instruction. I think we were still working on them. But he did put a basic instruction up there for solicitation of murder. Mr. Perrone indicated he had an objection to the language that was proposed to be used in those instructions for Counts 1, 2 and 3. Mr. Perrone?

MR. PERRONE:  Yes, Your Honor. In discussing this matter, I was handed a packet of papers this morning, told to review them, and we would discuss the solicitation of murder count on the record, which we did. The Prosecutor specifically stated and requested that to this Court.

And, Your Honor, also in the Jury instruction, something that was stated, purposefully seeks. Then he puts up a jury instruction in his closing argument that has

121

solely an intent, not to mention every statement that he made in his closing argument was extremely conclusory, so inconsistent with the record, and, frankly, appeared solely to confuse the jury overall.

THE COURT: Okay.

MR. PERRONE: Again, I don't understand what the issue is here. We had the issue on the record. We made the determination. Mr. Roth is an intelligent, ordered individual. He should have at least incorporated his own argument into his closing statement.

THE COURT: Mr. Roth?

MR. ROTH: The language that was on the instructions put on the screen was the language that this Court provided to us this morning, that both parties said after the Court's ruling is fine. And that's why I put it on the screen.

MR. PERRONE: It's not true. Go to the record. What does the record say this morning?

THE COURT: We can go back and play the record. I mean, my recollection is I don't recall that, personally. I know we had a discussion. I know you wanted to have an instruction that included the elements of

122

first-degree murder, and a specific intent definition that I indicated we would not use, because specific intent is no longer an instruction. And we would go with this one, I thought. But I don't know.

Where do you think purposefully intended should be inserted?

MR. PERRONE: Purposefully seeks?

THE COURT: Yes. Where should it be inserted? I mean, if we had discussed that, we would have decided where to put it.

MR. PERRONE: Mr. Roth requested it.

MR. ROTH: So the case law uses the phrase "purposefully seeks." The standard instruction uses the word "intends," or "intended." Excuse me.

THE COURT: So the words "purposefully seek" came from the case?

MR. ROTH: Yes. And the word "intent" comes from the —

MR. PERRONE: Your Honor ordered that that would be incorporated. It is your ruling.

THE COURT: I don't remember ordering that. But I don't have a problem doing it.

MR. ROTH: I don't either. Frankly, the use

123

of the word "intended" is more consistent with what Mr. Perrone wants.

MR. PERRONE: No, it's not.

MR. ROTH: Stop.

MR. PERRONE: Please don't put words in my mouth.

MR. ROTH: No. No. No. You are over-talking me.

MR. PERRONE: I am not.

THE COURT: One at a time.

MR. ROTH: And, secondly, there is a jury instruction that tells the jury how to determine "intent." There's not a jury instruction that tells the jury how to determine "purposefully seeks."

THE COURT: Well, I think —

MR. PERRONE: I'll make a motion with mistrial for prejudice.

THE COURT: Excuse me. We would have discussed, if I was going to agree with you, where "purposefully seeks" should be inserted. So I'm asking you that now. Where would "purposefully seek" be inserted?

MR. ROTH: In the second element.

MR. PERRONE: "Purposefully seeks" and

124

"intends." However it was written in the case cited by Mr. Roth.

THE COURT: I'm asking you, where would you insert "purposefully seeks"? Where would it go?

MR. ROTH: In the second element we would drop the word "intended" and replace it with the phrase: "Purposefully seeks" or "purposefully sought."

MR. PERRONE: Yes. That's fine.

THE COURT: Are you sure you want that change? I mean, really, it would seem that intended would be —

MR. PERRONE: Intended. What's the language that is incorporated in the case? The ruling was already made on it.

THE COURT: You can show him. Let's speed up the process.

MR. PERRONE: This is his —

THE COURT: The case used the word "intended." The instruction uses the word "intended." Although, the dicta of the case referenced "purposefully seeking." But the actual instruction was "intent," used the word "intent."

MR. PERRONE: This morning we had this

125

discussion. I asked for something more onerous, and the Court ruled that "purposefully seeks," the ruling associated with the case, it has to be incorporated into the jury instruction.

THE COURT: It is.

MR. PERRONE: We can have discussions, "intent" and "purposefully seeks."

THE COURT: But I said we would use the instruction that was in --

MR. PERRONE: I want an order -- I want an order --

THE COURT: Excuse me. I said we would use the instruction in the case. And this is it, isn't it?

MR. ROTH: That is the one distinction. They replace the words "purposefully seeks" with the word "intended." A, they mean the same thing. And, B, I think the reason they do so is because there is a jury instruction that talks about how the jury is to determine "intent."

MR. PERRONE: I want "purposefully seeking." That's fine. I want "purposefully seeking" instead of "intent."

THE COURT: If that's what you want, that's fine.

126

MR. PERRONE: That's what I want.

MR. ROTH: I think the word "intent" is appropriate because it fits hand-in-hand with the jury instruction that tells the jury how to determine a person's intent.

MR. PERRONE: He made the exact opposite argument this morning.

THE COURT: I'm sorry?

MR. PERRONE: He made the exact opposite argument this morning, how --

THE COURT: So, second, that the Defendant "purposefully sought"?

MR. PERRONE: Yes.

THE COURT: "-- by what he said or did would cause them to kill"? I don't have a problem -- I guess that removes the other instruction concerning definition of "intent." If you want to just go with that general phrase, "purposefully sought."

MR. ROTH: I think it would --

MR. PERRONE: I don't think it negates intent.

THE COURT: What's the instruction that covers the intent question? Let me find that.

MR. ROTH: 4.16.

127

THE COURT: Let me find it.

So the Defendant's intent may be proved by what he said, how he did it, or by any other facts and circumstances in evidence.

Well, I guess, technically, purposefully seek is intent. So we would still give 4.16 anyways.

MR. PERRONE: Yes.

MR. ROTH: Yes. I think it would just be more difficult to the jury to understand that "purposefully sought" means -- refers them back to that instruction.

THE COURT: Well, I mean, to me, I mean, "purposefully sought" is sort of interchangeable with "intent."

MR. ROTH: I agree.

THE COURT: So as long as we give 4.16, we still have intent there. So...

MR. PERRONE: Are we going to do some type of curative instruction?

THE COURT: There is no curative instruction. This is argument. The actual instructions have not been given to the jury. They are instructed to use my instructions, the final instructions that I give them at the time

128

I give them out. So that would be like a demonstrative aid at this point.

MR. PERRONE: Fine.

MR. ROTH: Thank you, Your Honor.

THE COURT: All right. So we are going to change the solicitation of murder Counts 1, 2 and 3. Second element to read:

Second, that the Defendant purposefully sought by what he said or did would cause Reginald Close or anyone else on his behalf to kill Erika Melke.

That doesn't really sound that smooth, but...

MR. ROTH: It does not.

THE COURT: Second, that the Defendant purposefully sought by what he said or did. We have to change that.

MR. ROTH: To cause.

THE COURT: Pardon?

MR. ROTH: I think it would be then to cause.

THE COURT: Right. To cause.

Okay. Second, that the Defendant purposefully sought by what he said or did. Second, that the Defendant purposefully

129

sought -- I guess we have to add something like by his conduct or by something. What's the case say? By his actions. We have to add something like that. Purposefully sought by his actions, that what he said or did would cause Reginald --

MR. ROTH: Words or actions.

THE COURT: All right. So purposefully sought by -- it's more than words, right?

MR. ROTH: It doesn't say it has to be more than words.

THE COURT: All right. Pardon? I mean, the evidence would show that it's more than words.

MR. ROTH: Right.

THE COURT: As to Mobley, it would be as to Close. There is more than words. So it would be by his actions, right? It might be different for Mobley. Mobley is like only by words.

MR. ROTH: Sure. For all three of them, have them read the same.

Second, that the Defendant intended that what he said or did would cause Reginald Close or somebody on his behalf to kill Erika Melke.

THE COURT: Change intended to purposefully sought.

MR. ROTH: Right. The Defendant

130

purposefully sought by what he said or did.

THE COURT: Purposefully sought by what he said or did, but would cause --

MR. ROTH: To cause.

THE COURT: All right. Strike "would?"

MR. ROTH: Correct.

THE COURT: Second, the Defendant purposefully sought by what he said or did, would cause -- that's a period?

MR. ROTH: To cause.

THE COURT: I don't see to cause really flowing that good. That's why I'm really hesitant. Second, that what the Defendant purposefully sought by what he said or did. I think it's better to say:

Second, that the Defendant purposefully sought by his actions.

MR. ROTH: But it has to be words or actions.

THE COURT: Words or actions. That's fine. It gets kind of long.

Secondly, that the Defendant purposefully sought by his words or actions that what he said or did would cause Reginald Close or anyone on his behalf to kill Erika Melke.

131

MR. ROTH: That would be fine, Your Honor.

THE COURT: Purposefully sought by his words or actions. Is that acceptable to you, Mr. Perrone?

MR. PERRONE: That is acceptable. It's just I want to preserve the objections as to my maintaining that there should be more of an intent element, aside from that case and that being the ruling of the Court, as to ensure that we address that specific intent. I want to ensure that the objection and prior arguments I made associated with the jury instruction are preserved for the Court of Appeals.

THE COURT: You can do that. Mr. Roth?

MR. ROTH: The Defense wants it both ways. If he is preserving the objection, then give the right instruction pursuant to the one that's half the language, because it's simple to understand. It says: All the --

MR. PERRONE: If he is going to laugh at me again? All he does is laugh.

THE COURT: Excuse me. Please. I mean, it is sort of inconsistent.

MR. ROTH: He said I object to the first instruction, I object to this instruction, but

132

do it anyway. We are making this modification at his request, and he is not even agreeing to it. Let's simplify the language as is recommended by the Supreme Court that wrote the instruction and simply say that the Defendant intended, through what he said or did, would cause, however it's worded, in the one that we had before.

You know, if the Defense isn't going to agree to that, what's the purpose of bending over backwards to get them to --

MR. PERRONE: This ruling was already made.

THE COURT: Excuse me. One at a time. Yes, Mr. Perrone?

MR. PERRONE: This ruling was already made at the request of Mr. Roth. If he wants to talk out of both sides of his mouth.

THE COURT: I don't recall I said I would have purposefully sought. I said I would use the instruction in the case that uses the word intended. That's just my recollection. That's neither here nor there. I'm prepared to change it.

But I do think it's inconsistent that you're saying that -- I'm objecting, I want to preserve

133

my objection to specific intent, but you want me to use purposefully sought. That's your request. So this is the request of the Defense that the phrase purposefully sought be inserted where intended is in the instruction. But my recollection is I said we would use the instruction in the case. I'm prepared to give you this one, if that's what you like.

MR. PERRONE: Purposefully sought is acceptable to the Defense.

THE COURT: That's fine.

MR. ROTH: That's fine, Your Honor.

THE COURT: That's what we'll use.

Second, that the Defendant purposefully sought by his words or actions, that what he said or did would cause Reginald Close, one, or Charles Allen in the the other, and Frank Mobley as the third, or we can still use 4.16 about how that could be established by using Intent. Okay?

And I, again, I think that is a demonstrative aid. So the actual instructions haven't gone to the jury yet. I guess if you want to put up a modified one during your closing, saying purposefully sought, that is

134

fine.

MR. PERRONE: I might as well.

MR. ROTH: Thank you, Your Honor.

MR. PERRONE: Thank you, Your Honor.

THE COURT: All right. So the rest of the instructions we distributed. So look them over during the break because it will be my intent to go right into those instructions. Did we have a jury form?

THE CLERK: It's attached.

MR. ROTH: It was included and agreed upon.

THE COURT: All right. We will be in recess.

MR. ROTH: Thank you, Your Honor.

(Recess taken from 11:52 a.m. to 12:55 p.m.)

THE COURT: Resuming on the matter of People versus Uraz, file number 16-1064 and 65. All the parties are here. Mr. Roth, Mr. Perrone. Mr. Uraz. Everybody can be seated.

Just as a preliminary matter, I will go straight into instructions. I want to confirm, you had previously stipulated to strike Juror number 1 as within the two jurors to be stricken to get down to 12?

MR. ROTH: Yes, Your Honor.

135

THE COURT: Mr. Perrone?

MR. PERRONE: Yes, Your Honor.

THE COURT: Next juror will be randomly selected in the usual process?

MR. ROTH: Yes, Your Honor.

THE COURT: Ready for the jury?

MR. ROTH: Yes, Your Honor.

THE COURT: Mr. Perrone, ready yet?

MR. PERRONE: Just about, Your Honor.

THE COURT: Let us know when you are ready. I don't want to be waiting.

(Jury present in courtroom at 12:56 a.m.)

THE COURT: Be seated. On behalf of Mr. Uraz. Mr. Perrone?

MR. PERRONE: Thank you, Your Honor.

Thank you ladies and gentlemen of the jury for maintaining your attentiveness throughout the trial. We do appreciate that.

I'm rubber and you're glue. Whatever you say bounces off you and sticks to me. Sorry about that. I am rubber and you're glue, whatever you say bounces off me and sticks to you.

Accountability is one of the aspects that I would like you guys to look into.

136

Talked a little about the historical nature of the process in my opening. You seemed to be very attentive at that point in time as to both my opening and the State's opening. You now have had an opportunity to review all the evidence. The Prosecution has had an opportunity to make a statement. They are going to be given an opportunity to make additional an statement. I get to make one statement. They get to make two. They get an opportunity to be heard last. This is part of the process.

Reasonable doubt. That's going to be what the Judge instructs you that you're going to have to find. Proof beyond a reasonable doubt as to all of the charged offenses. Reasonable doubt is something that the Judge will instruct you on. But you're going to have to somewhat use your own reasoning in order to determine that.

An analogy I like to use sometimes, I look at WILX and they have What's Going Around. They tell you that bronchitis is going around or the flu, and my child will have sniffles. I assume that they have whatever is on the What's Going On section. That's my reasoning for it. It

137

seems like it will probably be attached to that, or it could be. What I'm looking at — what we're looking at is when you have a child, a child starts to cough, you think they may have whooping cough, so you take them in. You don't know. They're coughing. They may have a harsh cough. So they have a harsh cough. It could be whooping cough. You draw that conclusion based upon common sense. And you are a parent overall. That's what you're going to be doing.

The Judge will instruct you as to the law, as to the solicitation of murder, he is going to instruct you that you will have to find that the Prosecutor established his burden beyond a reasonable doubt associated with all of those counts.

My client purposely sought the aid of either Close, Allen or Mobley. Now, in looking at that, we have to take all of those three together. Talk a little bit about the aggravated stalking case, initially.

One of the aspects of the case here and the Prosecutor represented, there is a large body of stalking in this case. I would ask that you look at the dates that the Judge instructs you

138

an in making your determination in the evidence that is presented by the Prosecutor.

One of the largest aspects of this entire equation that the Prosecutor has used to tie everything in, to connect the dots, is that in April of 2016, the Defendant attempted to purchase a firearm. He made the assertion that he bought that firearm to kill Ms. Melke. You guys had an opportunity to review all of the information that was presented today. That's an inference the Prosecutor is making. What I say, what he says, that's not evidence. The evidence is what was put forward. There was nothing on the record.

Mr. Burnett testified that Mr. Uraz asked him if he needed a gun, on illegal means. Now, what we have is there is obviously a PPO outstanding. So he couldn't get a gun legally.

MR. ROTH: Your Honor, I am going to object to that. That was not what was testified to from Mr. Burnett, and was not in the PPO.

THE COURT: Okay.

MR. PERRONE: There is nothing — Mr. Burnett testified — I will withdraw that. Again, the PPO, in and of itself, by its

139

very nature, shows, on the face of the PPO that you can't hold a firearm.

THE COURT: All right. But Mr. Burnett didn't say that. Strike the portion that he said about Mr. Burnett.

MR. PERRONE: Mr. Burnett said that Mr. Uraz appeared scared. This is during a period of time where there was the end of a three-year relationship. Ms. Melke testified that she didn't want to talk to him anymore. He did not get the closure that he wanted. He went to Dave and Buster's in January. You'll read, you'll look at the PPO filing. Look at all the filings beforehand. Look at what happened on August 31st. Look at the timing. If you look at the addresses, Mr. Uraz goes from court to jail. He ends up — the last entry is at 3:05 p.m. If we look at the timing, he would have been — had his tether off or in the jail at the time the email was sent. There are going to be some significant logical jumps that you are going to have to make as to that case. There was obviously an investigation that was somewhat tainted overall. It was not even based upon the testimony that you saw. There was a lot of

140

confusion even amongst the officers as to what was going on. It morphs into a solicitation of murder investigation from the aggravated stalking investigation.

Small details. Dates and times. It's not my intention to mislead you. I just want to try to ensure that the record is accurate. You have all the dates and times associated with it. The Prosecutor, in this case, attempted to deflect and defray all wrongdoing. This is America. This is not a third-world country. We have rights, the rights to be tried by a jury, and to have a jury be the person who determines the facts. You determine the facts. I don't determine the facts. The Prosecutor doesn't determine the facts. We give you a synopsis of the summary of the evidence to a certain extent.

In this case there has been a significant lack of evidence as it goes through the solicitation of murder case.

The aggravated stalking case, the investigation associated with that because of the issues with the solicitation of murder case, was somewhat rushed. We have the police report being filled out at the same point in time that

141

the call was being placed by Officer Mobley.

Purposefully sought. One of the aspects associated with -- purposefully sought. That Mr. Close gave a phone number. It wasn't a real number, but he gave a phone number to Mr. Uraz. There wasn't any evidence that that phone number was used, that he attempted to contact somebody, that there was any follow-up from him as to what Mr. Close described as somewhat of an unrealistic plan.

A lot of absolutes in the State's case. These are things that you guys are going to be charged in making the determination of. I want to make sure you look at the evidence, look at it carefully, thoroughly. Compare different pieces of evidence. A couple pieces I'll look at quickly.

When the Prosecutor is relying solely on the incident from April -- April 7th, he says four months. September 27th is when the testimony establishes that there was first any communication regarding a plan from either Allen or Close.

That's closer to five months, but the Prosecutor says four because of the -- sounds

142

better.

And I'm not attempting to obscure the issues. It's the State's burden, it's the State's case. I do not have to present any evidence. I'm relying upon the Prosecutor to provide that evidence. However, I attempted to bring some witnesses to give you somewhat of an (inaudible) if possible. The State did not produce any recordings. They did not produce any audio, of the interactions between these inmates in the jail. Although they said they had the capacity to, but, of course, they minimize that also. They're not of that much value. They're not the greatest recordings. They didn't afford you guys the opportunity to see those. They don't have those. They don't have the necessary connections.

One of the aspects of this, as far as the details are concerned, there isn't anything between these three that you can connect the dots to purposefully sought to kill.

The call was initiated by Officer Mobley. Officer Mobley testified that it was expedited because they had this new information from Allen, a new amazing witness that ties

143

everything in together. Although they also said that he was instructed by Lieutenant Backus to initiate it. But Lieutenant Backus' testimony was inconsistent with that.

If you look at the testimony, we have to weigh the testimony, the credibility associated with the witnesses. And Mr. -- the Prosecutor went over all of the specifics associated with it. We talked about, in voir dire, associated with jury informants, and using the credibility standards. I would ask you to use the same credibility standards on the opposite, with jail informants. And you guys can view the testimony if you want, but there is a lot of jumping around.

There wasn't much definitive that you heard from law enforcement. You heard a lot of jumping around, as far as investigation is concerned. And a lot of: It's not my fault, in placing blame in other places. Accountability is what I ask ask you for today.

We look at the phone call. We talk about trash. That's a euphemism. They're trying to use the phone call. They want you to focus on the second call to attempt to

144

establish that is all that they need to show that Mr. Uraz purposefully sought to have Ms. Melko killed through Mr. Close, Mr. Allen or Mobley. If you read the call, it talks about trash. There aren't any definitive details that he gives. Okay. The name of Rough is initially brought up by Officer Mobley. Officer Mobley said he was rushed. He's using investigative techniques in order to get affirmations from the Defendant, which would be Officer Mobley purposefully seeking to get something from Mr. Uraz.

The $160 on the account transaction. They're going to use that as a payment, down payment for murder. Mr. Allen. There was an agreement. No money exchanged. And when you talk about Mr. Close, this $160 is what they have. He initially testified that he just told them: I got a guy from Detroit. We can get this all set up for you.

We look at the letters, we look at the IPs. The investigation associated with the IPs in this matter. They testified that had the investigation gone quicker, they could have potentially had a greater amount of detail

145

associated where it came from. But they didn't get that information soon enough.

We look at the letters. We look at the times that they're sent. This is an email sent at 3:32 PM, allegedly. 3:05 PM the tether stops, the Sentinel tether stops. And it shows that my client is at the Ingham County Jail.

Now, if you look at all the evidence in the large body of stalking evidence that the Prosecutor talks about, this is all going to come before that August 31st -- primarily, going to come before the August 31st date. And if you read all of the letters, there was an indication that there were any police reports that had been previously filed. There was an indication from Ms. Elias that she had heard anything in living with the Defendant.

Ms. VanSiembrouck lived in the room next to Mr. Uraz, lived in the room next to Ms. Melke, and she didn't appear anything, or witness any type of incidents of physical violence, as her testimony indicated.

If you look at the letters, there is no indication here that this is an individual that is attempting to set up a murder. He remanded

146

himself to the Ingham County Jail on August 31st. He had a sentencing set for October 19th. Based upon the testimony of the witnesses, he thought that he may be getting out with time served.

This is a year ago. These are the calls from the Ingham County Jail that they are attempting to use as additional contacts to substantiate the aggravated stalking case. It's a call from the Ingham County Jail. It is -- there is no indication, other than the circumstances, that indicates that comes from him.

The Prosecutor talks in his closing that Mr. Uraz specifically intended for this to have occurred. He indicates that there was a deliberate action on the part of my client. It's my position that the deliberate action was on the part of the police. This was manufactured by the police in order to escalate the issues associated with this conduct.

The primary detective, you saw some of his testimony today. There wasn't much that he could recall associated with the investigation. And I would ask that you weigh his testimony as

147

instructed by the Judge in the same manner as you would somebody else, as far as evasiveness.

So, as a logical conclusion, the Defendant's purposefully seeking this, would have happened after he had went to jail. He remanded himself to jail, and either he intended to find a hitman by remanding himself to jail, or that intent that the Prosecutor was trying to establish occurred while he was incarcerated.

Now, we are going to, at a point -- the Prosecution is going to point to the one letter that has started off by Mr. Close. Mr. Close had three prior proffers. His veracity was not appropriately verified. Doesn't seem many people would talk with each other. And what you heard today, it's not that big of a deal. Sometimes we just don't talk to each other. They are in jail, separate entities. Communication apparently isn't an issue.

Magistrate Blumer is the individual that talked about separating the deputy from the jail. Said Magistrate Blumer told them to separate these people. We know they weren't separated. You know they weren't separated. To this day the prime detective just thinks they

148

were separated. Has no reason or definitive action on his behalf that he did. But he has excuses for why he didn't do that. It's not the way things are done.

These aren't small details. We have a kite from Allen. No one knows where it's at. Apparently he sent a kite. You guys heard Allen's testimony. He couldn't be held to anything. He says that the specific conversations that he had, there was no TV around, but he acknowledged he previously testified that there was a TV.

Mr. Allen testified that Mr. Uraz looked like a new and lost puppy when he came to jail, inexperienced. Pretty much all of his testimony had to be refreshed to get anything out of him. He had to be refreshed as to the amount of money that was involved.

And the Prosecution has made a very large deal about neither of these individuals getting any type of benefit out of this at all. Their testimony is completely voluntary. They're just doing the right things. That's all it is. That's not plausible.

Mr. Close acknowledged that prior to being

149

incarcerated he is on parole, he had a parole hold. He also acknowledged that there was an adjournment of his trial date. He was eventually acquitted. He has gone before the parole board. He is in the process of reentering society.

The Mobley call. We have a lot of different indications here. Is this murder? We have baseball bats. Beatings. There isn't anything definitive on their side. There is nothing definitive on the State's side. It's speculative at best. The hair color, the indications from Mobley, the third call, lack of documentation.

The Prosecutor uses a transcript of the phone call overall to try to say something definitive, but he can't even do it because we're talking about trash. Officer Mobley testified that trash was a euphemism for something. There wasn't a connection associated with the words or the investigation associated with garbage cans as alleged. That is something that he came up with.

So what are we talking about here? Are we talking about beating with a baseball bat? Are

150

we talking about murder?

Now, this was the logical conclusion of the discussions that occurred on the medical post in two days of Mr. Close coming in contact with Mr. Uraz. Conveniently. He just apparently, Mr. Uraz was -- saw Mr. Close and immediately confided in him based on the testimony of Mr. Close.

Mr. Close had an indigent poet previously. Had been in jail since June. If he played the system, could he play Mr. Uraz? Beyond that, when we look at this, if this is the normal conclusion, purposefully sought, you don't think it would look better as a robbery? Okay. I want it gone. I beat on. I could have him carjacked, beat her ass, the gun, and shoot her a few times. Okay. Where would he leave her? Fantasy. Not 100 sure. But I am sure he knows what he's doing. He would kill her. Leave her in her car. Okay. Exclamation point. You have to draw a map.

The writing is in the handwriting of Mr. Close. This follows with the new and lost puppy, Mr. Uraz, saying: Wait for me to get out and sentenced because they may try to keep me

151

here if something happens to me -- to her. Look at the writing. The proof is in the details. Mr. Close responds by saying: You can't. You're already in jail. It looks bad if it happens when you're out, trying to tell him move forward. You would be the number one suspect. Coaching him.

And last, definitely not least, is the map. Now, this is somewhat obscured here. But if you listen, Allen was fairly important for the state here. Apparently he is what expedited the investigation. They believed him.

The testimony shows Reginald Close says that he talked to Charles Allen about it. He talked to him specifically about it. Charles Allen, we don't know what he can commit to, or can't commit to. He says that he can't remember. He previously said he didn't. But, of course, you know, we can't hold him to that. Right after the preliminary examination he said I don't think so. So, you know, that's how his character is rehabilitated.

Look at the map. Think about numbers. Think about addresses. Think about small details. If you look at this map here, you

152

recall what the Prosecutor said that Allen told them. He had all of the information. 3925 Donckel Road. You guys can determine what that number is in looking at it.

You can't make one without connecting all three. Thank you.

THE COURT: Mr. Roth?

MR. ROTH: Thank you, Your Honor.

So Mr. Perrone makes a very good point at the end. I misspoke when I gave the address. Look at your notes when you consider what Mr. Allen actually said. He testified. I think I gave the address wrong during my closing and I apologize.

Mr. Perrone talked about confusion over the word "trash," and he expressed confusion over what that could possibly mean. That's what it looks like when somebody is acting like they don't understand something, didn't act like that, the Defendant, when the Defendant is on the phone, having this conversation with Mr. Close about trash. There is not one hint of confusion from the Defendant. He knows exactly what they're talking about. They're talking about killing and getting rid of Erika Meike's

153

body while Mr. Perrone expresses confusion about it, some ambiguity about it. The Defendant expresses none of that on that call because he knew exactly what they were talking about.

Mr. Perrone talks about some confusion on the call about whether it's assaulting him or — excuse me — assaulting her or beating her. There is no confusion about that as well. Because Officer Mobley, acting as TJ, makes clear what they are talking about. Do you want me to beat her or do you want it gone, gone? And the Defense says: Get rid of it. He does not, he makes clear, want just a beating. He wants her gone, gone. We're not talking about just beating her up. We're talking about killing her.

Mr. Perrone talked about Close and Allen doing the right thing, simply not being plausible, except he fails to explain how or why. Why are these two people not capable of doing the right thing? And the answer is: There is no reason. But there is no other way to rebut the fact that they stand to gain nothing from this.

Mr. Perrone tries to allege that the

154

adjournment of the trial is because of some hidden incentive in this case. But when we look at the Defense's own exhibit, Exhibit C, the decision and agreement to adjourn trial, we look at paragraph three and four. The preliminary examination transcript in this matter has not been completed at this time. Defense counsel, so Mr. Close's attorney, anticipates filing, at a minimum, a motion to quash bindover once the preliminary examination transcript has been completed.

The trial is adjourned because the transcript isn't done, not because it's some hidden benefit to Mr. Close. Mr. Close, as he testified, already has a parole decision in his current case. Mr. Close gains absolutely nothing, not then, not now, not later from his cooperation in this case.

Same for Mr. Allen. There has never has never been an articulation of one thing to the contrary there.

Mr. Perrone suggested that in the prior interviews, or prior information that Reginald Close gave to the police, that information was not appropriately verified. Detective Hogan

155

testified that he obtained information about Mr. Close about a homicide from several years ago. He was able to verify and confirm that information.

Mr. Perrone talks about the fact that the Defendant and Close and the Defendant and Allen were not separated, or they were not separated timely enough. We know from the records that in fact they were separated on October 19th, Close and the Defendant, October 19th, 2016.

Mr. Perrone suggested at the beginning of his closing argument that what we're asking you to do is something like assuming, something like what you may see on the news with colds going around. That is very much not what we're asking you to do. What we're asking you to do is to consider all of the evidence we presented to you, and what that evidence means is the exhibits, the documents, the recording. It includes all the testimony from all the witnesses as well. It's the culmination of the investigation that was done by the Lansing Police Department, as you heard, also the Michigan State University Police Department, and all of the people responded to all of these

156

incidents over the course of more than a year. We're not asking you to assume anything. We're asking you to review the evidence and make a decision based on that.

So when he says that the detective couldn't recall much of anything on cross-examination, that's not exactly accurate. What the detective asked was to look at his police reports to verify specific dates and times. We know that's why they write these reports, so they have those specific dates and times available later.

Mr. Perrone suggested that the police manufactured this entire investigation. To what end? To what end? They don't run on commission. Why would the police manufacture this? Why would they try to make this terrible thing to scare this poor young woman? Why even accuse that, if anything, except for the fact that this is what the evidence indicated the Defendant did. This wasn't manufactured by the police. This was manufactured by the Defendant. It was manufactured in April when he tried to buy an illegal and unregistered gun. It was manufactured in jail when he met Charles Allen. It was manufactured by the Defendant when he met

157

Reginald Close. It was manufactured by the Defendant when he spoke to Officer Mobley on the video call.

So when Mr. Perrone talks about accountability, we agree, it is. But the one person who is accountable for all of the things that we heard during this trial is right there, it's the Defendant, the one person who is accountable for terrorizing Erika Melke and Stan White, and Noell and Carmen. The one person accountable for soliciting Officer Mobley and Reginald Close and Charles Allen. One person accountable for all those things, and it's the Defendant.

Mr. Perrone talked about the dates that are charged. Specifically, the thing at the end of August. So within the time period we have on 8-27 the fake Instagram account. On 8-27 the Facebook password change. On 8-31 the Facebook password change again. On 8-31 the e-mail letter. On 8-31, two phone calls from the jail.

So while all of those are what's to be considered for the aggravated stalking charge, you're to consider them in the context of the greater plan and scheme by the Defendant, in the

158

context of all of the stalking and harassment that he has done to her leading up to that point.

Mr. Perrone talked about the fact that it would be impossible for the Defendant to have sent the e-mail on August 31st because he was at the jail. But what we see when we look at People's Exhibit 47, the Defendant's movement records within the jail, he was not booked until 8:45 p.m. So while his tether was off around 3:05, it sounds like he was not actually booked until quite some time later.

And if it wasn't the Defendant who sent that e-mail, then who was it? Because those are his words. Who else would have had access to his words and his letter to do that? Obviously the Defendant sent it. Who else would have had the motivation to do it? There is nobody else that's obsessed with Erika Melke. Nobody else has been bothering her, threatening her, stalking her, communicating with her against her will. That's all the Defendant.

Mr. Perrone talked about the fact that we have asked you to simply assume that the gun that the Defendant tried to purchase in April

159

was intended to be used to kill Erika. We are not asking you to make that assumption. Because remember where that information first came from. Reginald Close disclosed during his interview that the Defendant told him that he previously tried to buy a gun from somebody he worked at MSU with, a guy who used to be a Corrections officer, and that included in that same disclosure was the Defendant said he was going to use that gun to kill Erika Melke. The police had no idea about that gun at that time. It was only then that they go to the Michigan State University Police Department and find that information out, and confirm and corroborate that information.

So how do we know that that's what the Defendant intended to do with the gun? Because that's what he said he intended to do with the gun.

Mr. Perrone suggested that he wanted the gun simply because he was scared. If you want a gun because you're scared, you don't need it to be illegal, you don't need it to be unregistered. Who is he scared of? Who is threatening him? Who is harassing him? Who is stalking him? Is

160

it Ms. Melke? Does Ms. Melke look scary? Is Ms. Melke the one stalking the Defendant? No. It's the other way around. He wants the gun, not because he is scared, he wants the gun because he is desperate. Because if he can't have Erika Melke, nobody will.

Mr. Perrone suggested that the plan with Reginald Close was unrealistic. He used the word "fantasy." The details prove otherwise. The difference between fantasy and reality is all of those details. The things that shows how serious this is, is that the Defendant gives all the real information. So we know that for Close, he is faking it, because he gives fake information. He gives a fake phone number. The Defendant doesn't give fake information. He gives Ms. Melke's real home address, her real apartment number, her real boyfriend, her real car license plate number, her real job, all of this real information, because this is anything but a fantasy. This is a plan set to be carried out in reality.

Mr. Perrone talked about audio recordings in the jail. So let's talk about that testimony for a moment. The video is recorded in the

161

Jail. The video does not come with audio. They have the ability, through the speaker, to monitor for some audio, but not record it. Even what they're able to monitor, which is not done live, is of a low quality, is what was testified to. That's why there are no recordings to give to you. That is why they used a recorded video call later to contact the Defendant.

Mr. Perrone brought up the fact that the Defendant was never physically violent with Ms. Melko during the course of their relationship. There is nothing that could be less relevant to this case than whether or not he hit her while they were together. The whole source of his frustration, the whole source of his motivation to stalking her and have somebody -- want to have somebody kill her, is that she broke up with him. So that he's a sweet boyfriend when they're together does not matter one bit, that doesn't console her one bit, it doesn't make it any less dangerous.

During jury selection we talked about the burden in this case. It's beyond a reasonable doubt. The Judge is going to define for you exactly what that means. He is going to tell

162

you not beyond all doubt. Excuse me. Not beyond all doubt or beyond a shadow of a doubt. He's going to tell you that it's a fair and honest doubt growing out of the evidence. Not an imaginary or possible doubt, but a doubt based on reason and common sense. That's exactly what we are going to ask you to use when you go back to deliberate. When you do, you're going to find that the Defendant terrorized Erika Melke.

In short order, he went from scorn lover to relentless stalker. That he knew no boundaries, certainly not her happiness, certainly not her safety. And as his desperation and obsession grew, his regard for her health and welfare plummeted months before ever meeting Reginald Close, months before ever meeting Charles Allen, or Frank Mobley, or going to jail. He tried to buy a gun to kill her because he had already decided that's what he wanted, that's what he wanted the end of the story to be, her dead if she wasn't going to be with him. He couldn't have her so nobody would. When he went to jail, in his mind, because of her, he believed that this was just another opportunity.

163

When he met Reginald Allen -- excuse me -- Reginald Close and Charles Allen, he saw them as an opportunity. He believed they were going to be the conduits by which he could have her killed. And he offered what he had, money, to make that happen, to have Erika Melke killed.

I think all of us have known the feelings when you think somebody might be following you. Erika Melke knew that feeling. Not out of paranoia, but out of fact, every day. Most of us will never experience love turning not only violent, but fatal. The fear that comes with an intimate partner who knows everything about you, now using that information to try to kill you. But none of us will ever know the cost of our lives. Erika Melke does, because the Defendant negotiated that price again and again and again. And for that we ask you to return the only verdict supported by the evidence: Guilty of aggravated stalking and guilty of three counts of solicitation of murder.

Thank you, Your Honor.

THE COURT: All right. Thank you.

Members of the jury, the evidence and the arguments in the case are now finished. I will

164

now instruct you on the law. That is, I will explain the law that applies to the case.

Remember that you have taken an oath to return a true and just verdict based only on the evidence and my instructions on the law. You must not let sympathy or prejudice influence your decision.

As jurors, you must decide what the facts of this case are. This is your job and nobody else's.

You must think about all the evidence and then decide what each piece of evidence means and how important you think it is. This includes whether you believe what each of the witness's said. What you decide about any fact in this case is final.

It is my duty to instruct you on the law. You must take the law as I give it to you. If a lawyer says something different about the law, follow what I say.

At various times I have already given you some instructions about the law. You must take all of my instructions together as the law you are to follow. You should not pay attention to some instructions and ignore others.

165

To sum it up, it is your job to decide what the facts of the case are, to apply the law as I give it to you and in that way decide the case.

A person accused of a crime is presumed to be innocent. This means that you must start with the presumption that the Defendant is innocent. This presumption continues throughout the trial and entitles the Defendant to a verdict of not guilty, unless you're satisfied, beyond a reasonable doubt, that he's guilty.

Every crime is made up of parts called elements. The Prosecutor must prove each element of the crime beyond a reasonable doubt.

The Defendant is not required to prove his innocence or to do anything. If you find that the Prosecutor has not proven every element, beyond a reasonable doubt, then you must find the Defendant not guilty.

A reasonable doubt is a fair, honest doubt growing out of the evidence or lack of evidence. It is not merely an imaginary or possible doubt, but a doubt based on reason and common sense. A reasonable doubt is just that, a doubt that is reasonable, after a careful and considered examination of the facts and circumstances of

166

this case.

When you discuss the case and decide on your verdict, you may only consider the evidence that has been properly admitted in the case. Therefore, it is important for you to understand what is evidence and what is not evidence.

Evidence includes only the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence.

Many things are not evidence, and you must be careful not to consider them as such.

I will now describe some of the things that are not evidence:

The fact that the Defendant is charged with a crime and is on trial is not evidence. Likewise, the fact that he is charged with more than one crime is not evidence.

The Lawyers' statements and arguments are not evidence. They are only meant to help you understand the evidence and each side's legal theories. You should only accept things the lawyers say that are supported by the evidence, or by your own common sense and general knowledge.

167

The lawyers' questions to the witnesses, your questions to the witnesses, and my questions to the witnesses, are also not evidence. You should consider these questions only as they give meaning to the witnesses' answers.

My comments, rulings, questions, and instructions are also not evidence.

It is my duty to see that the trial is conducted according to the law, and to tell you the law that applies to this case. However, when I make a comment or give an instruction, I am not trying to influence your vote or express a personal opinion about the case. If you believe that I have an opinion about how you should decide the case, you must pay no attention to that opinion.

You are the only judges of the fact. And you should decide this case from the evidence.

At times during the trial I have excluded evidence that was offered or stricken testimony that was heard. Do not consider those things in deciding the case. Make your decision only on the evidence that I let in, and nothing else.

Your decision should be based on all the

168

evidence, regardless of which party produced it. You should use your own common sense and general knowledge in weighing and judging the evidence, but you should not use any personal knowledge you may have about a place, person or event. To repeat once more, you must decide this case based only on the evidence admitted during the trial.

As I said before, it's your job to decide what the facts of the case are. You must decide which witnesses you believe and how important you think their testimony is. You do not have to accept or reject everything a witness says. You are free to believe all, none or part of any person's testimony.

In deciding which testimony you believe, you should rely on your own common sense and every-day experiences. However, in deciding whether you believe a witness' testimony, you must set aside any bias or prejudice you may have based on the race, gender or national origin of a witness.

There is no fixed set of rules for judging whether you believe a witness. But it may help you to think about these questions:

169

Was the witness able to see or hear clearly? How long was the witness watching or listening? Was anything else going on that may have distracted the witness? Did the witness seem to have a good memory? How did the witness look and act while testifying? Did the witness seem to be making an honest effort to tell the truth, or did the witness seem to evade the questions or argue with the lawyers.

Does witness' age and maturity affect how you judge his or her testimony.

Does the witness have any bias, prejudice or personal interest in how this case is decided?

Have there been any promises, threats, suggestions, or other influences that affected how the witness testified.

In general, does the witness have any special reason to tell the truth or any special reason to lie.

All in all, how reasonable does the witness' testimony seem when you think about all the other evidence in the case.

Sometimes the testimony of different witnesses will not agree. You must decide which testimony you accept. You should think

170

about whether the disagreement involves something important or not, and whether you think someone is lying or simply mistaken.

People see and hear things differently, and witnesses may testify honestly, but simply be wrong about what they thought they saw or remembered. It is also a good idea to think about which testimony agrees best with the other evidence in the case.

However, you may conclude that a witness deliberately lied about something that is important to how you decide the case. If so, you may choose not to accept anything that witness said. On the other hand, if you think the witness lied about some things, but told the truth about others, you may simply accept the part you think is true and ignore the rest.

The Prosecutor also must prove, beyond a reasonable doubt, that the crimes occurred between August 23, 2016 and October 31st, 2016, within Ingham County.

The Prosecution has introduced evidence of a statement that it claims that the Defendant made. Before you may consider such an out-of-court statement against the

171

Defendant, you must first find that the Defendant actually made the statement as given to you. If you find that the Defendant did make the statement, you may give the statement whatever weight you think it deserves.

In deciding this, you should think about how and when the statement was made, and about all the other evidence in the case. You may consider the statement in deciding the facts of the case.

Facts can be proved by direct evidence from witnesses or an exhibit. Direct evidence is evidence about what we actually see or hear. For example, if you look outside and see rain falling, that's direct evidence that it is raining.

Facts can also be proved by indirect or circumstantial evidence. Circumstantial evidence is evidence that normally or reasonably leads to other facts.

So, for example, if you see a person come in from the outside wearing a raincoat, covered with small drops of water, that would be circumstantial evidence that it is raining.

You may consider circumstantial

172

evidence, circumstantial evidence by itself or a combination of circumstantial evidence and direct evidence can be used to prove the elements of a crime. In other words, you should consider all the evidence that you believe.

In file number 16-1064-FC, aggravated stalking, the Defendant is charged with aggravated stalking. To establish this charge the Prosecutor must prove each the following elements beyond a reasonable doubt. I think that really should be FH. That's just the file number.

MR. ROTH: Correct.

THE COURT: So the file number on aggravated stalking is actually 16-1064-FH. But we'll have that in writing for you.

Aggravated stalking: The Defendant is charged with aggravated stalking. To establish this charge the Prosecutor must prove each element of the following element beyond a reasonable doubt:

First, that the Defendant committed two or more willful, separate and non-continuous acts of unconsented contact with Erika Mrlke.

173

Second, that the contact would cause a reasonable individual to suffer emotional distress.

Third, that the contact caused Erika Melke to suffer emotional distress.

Fourth, that the contact would cause a reasonable individual to feel terrorized, frightened, intimidated, threatened, harassed or molested.

Fifth, that the contact caused Erika Melke to feel terrorized, frightened, intimidated, threatened, harassed or molested.

Sixth, that the stalking was committed in violation of a court order or a restraining order of which the Defendant had actual notice.

In file number 16-1065-FC, there are three counts of solicitation to commit murder. The Defendant is charged with solicitation to commit murder.

To prove the Defendant's guilt, the Prosecutor must prove each of the following elements beyond a reasonable doubt:

First, that the Defendant, through words or actions, offered, promised, or gave money, services, or anything of value to another

174

person.

Second, that the Defendant purposefully sought, by his words or actions, that what he said or did would cause Reginald Close or anyone on his behalf to kill Erika Melke.

The Prosecution does not have to prove that Reginald Close actually committed, attempted to commit, or intended to commit murder.

Count two, the Defendant is charged with solicitation to commit murder. To prove the Defendant's guilt, the Prosecution must prove each of the following elements beyond a reasonable doubt:

First, that the Defendant, through words or actions, offered, promised or gave money, services or anything of value to another person,

Second, that the Defendant purposefully sought, by his words or actions, that what he said or did would cause Charles Allen, or anyone on his behalf, to kill Erika Melke,

The Prosecution does not have to prove that Charles Allen Close(sic) actually committed, attempted to commit or intended to commit murder.

Count 3: Solicitation to commit murder:

175

The Defendant is charged with solicitation to commit murder. To prove the Defendant's guilt, the Prosecutor must prove each of the following elements beyond a reasonable doubt:

First, that the Defendant, through words or actions, offered, promised or gave money, services or anything of value to another person.

Second, that the Defendant purposefully sought, by his words or actions, that what he said or did would cause Frank Mobley to kill Erika Melke,

The Prosecution does not have to prove that Frank Mobley actually committed, attempted to commit or intended to commit murder.

You may consider whether the Defendant had a reason to commit the alleged crime. But a reason by itself is not enough to find a person guilty of a crime.

The Prosecutor does not have to prove that the Defendant had a reason to commit the alleged crime. He only has to show that the Defendant actually committed the crime, and that he meant to do so.

You have heard evidence that is introduced to show that the Defendant committed other acts

176

for which he is not on trial. If you believe this evidence, you must be very careful only to consider it for certain purposes. You may only think about whether this evidence tends to show, one, that the Defendant had a reason to commit the crimes. Two, that the Defendant specifically meant to repeatedly contact Erika Melke against her wishes, and/or that the Defendant used a plan, system, or characteristic scheme that he had used before or since.

You must not consider this evidence for any other purpose. For example, you must not decide that it shows that the Defendant is a bad person or that he is likely to commit crimes. You must not convict the Defendant here because you think he is guilty of other bad conduct. All the evidence must convince you, beyond a reasonable doubt, that the Defendant committed the alleged crime, or you must find him not guilty.

The alleged crime in this case is made up of several acts. The Prosecutor only has to prove one of these acts took place in Ingham County. He does not have to prove that all of them took place there.

The Defendant's intent may be proved by what

177

he said, what he did, how he did it, or by any other facts and circumstances in evidence.

You should not decide the case on which side presented more witnesses. Instead, you should think about what each witness and each piece of evidence and whether you believe them. Then you must decide whether the testimony and evidence you believe proves, beyond a reasonable doubt, that the Defendant is guilty.

You heard that a lawyer talked to one of the witnesses. There is nothing wrong with this. A lawyer must talk to the witness to find out what the witness knows about the case, and what the witness' testimony will be.

You heard testimony from witnesses who are police officers. That testimony is to be judged by the same standard you use to evaluate the testimony of any other witness.

Now, when you go to the jury room, you will be provided with a written copy of these final jury instructions. You should first choose a Foreperson. The Foreperson should see to it that your discussions are carried on in a businesslike way, and that everyone has a fair chance to be heard.

178

During your deliberations we will select your cell phones and other communication devices until we recess.

A verdict in a criminal case must be unanimous. In order to return a verdict, it's necessary that each of you agrees on that verdict.

In the jury room you will discuss the case amongst yourselves. But ultimately each of you will have to make up your own minds. Any verdict must represent the individual considered judgment of each juror.

It is your duty, as jurors, to talk to each other, and make every reasonable effort to reach an agreement, and express your opinions and reasons for them,

But keep an open mind as you listen to your fellow jurors. Rethink your opinions, and do not hesitate to change your mind if you decide that you were wrong. Try your best to work out your differences. However, although you should try to reach an agreement, none of you should give up your honest opinion about the case just because other jurors disagree with you, or just for the sake of reaching a verdict.

179

In the end, your vote must be your own, and you must vote honestly and in good conscience.

If you have any questions about the jury instructions before you begin deliberations, or questions about the instructions that arise during deliberations, you may submit them in writing to the Bailiff and pass them onto me.

Possible penalties must not influence your decision. It's the duty of the Judge to fix the penalty within the limits prescribed by law.

If you want to communicate to me while you're in the jury room, please have your Foreperson write a note and give it to the Bailiff.

It's not proper for you to talk directly with the Judge, the lawyers, the Court officers, or anyone else involved in the case. As you discuss the case, you must not let anyone, even me know how your voting stands. Therefore, until you return with a unanimous verdict, do not reveal this to anyone outside the room.

We had numerous exhibits in this matter and videos. So when you go to the jury room, you may take your notes and full instructions. We do have the capability of replaying the video if

180

you so desire. We do have the ability to request the testimony of any witnesses to be transcribed by the Court Reporter, as well as review all the exhibits that have been introduced.

You may also take your notes and a copy of the full instructions. As I indicated, if you want to look at any or all of the referenced documents that have been exhibits, that have been admitted, just ask for them.

The Defendant is charged in case number 16-1064-FH with Count 1, stalking, aggravated. The Defendant is charged in case number 16-1065-FC with three counts. That is, the crimes of solicitation of murder on all separately in each of the three counts.

Now, those are all separate crimes, and the Prosecutor is charging that the Defendant committed all of them. You must consider each crime separately in light of all the evidence in the case.

You may find the Defendant guilty of all, or any one, or any combination of these crimes, or not guilty.

To assist you we have a verdict form

181

that we prepared. It indicates that on case number 16-1064, aggravated stalking, one of two results, either not guilty or guilty. And in case number 16-1065, in Count 1: Not guilty or guilty. Count 2: Not guilty or guilty. Count 3: Not guilty or guilty. And a place for the Foreperson to sign and date.

You can consider each one of these separately.

All right. In order to get to a jury of 12, it's necessary that the Clerk strike two people. Now, if you're one of the two people who are struck today, you aren't quite done. You still can't discuss the case with anybody, family or friends until a verdict is returned.

The reason that we have all 14 people here, and this has happened on more than one occasion, suppose you aren't able to reach a decision today. We have to come back on Monday. Somebody gets sick and can't come in. We have to call in one of the other jurors that heard all the evidence. So that's why everybody has to hear everything so that they can come back, if necessary. Hopefully that's not going to happen. It has happened. That's

182

why you can't discuss it with anyone.

I would ask the Clerk to strike two persons, please.

THE CLERK: Juror number 1 and Juror number 5.

THE COURT: Okay. So Jurors 1 and 5, go with Ms. Smith, gather your belongings. Don't discuss the case with anyone.

On behalf of the citizens of Ingham County, thank you very much. And we will let you know Monday if we need you.

(Stricken jurors exit courtroom at 2:00 p.m.)

THE COURT: The jurors stay. We have one more oath before you go out.

Be seated while we are waiting for Ms. Smith.

All right. I will ask the Clerk to please administer the oath to the Bailiff, please.

THE CLERK: Do you solemnly swear or affirm that you will, to the utmost of your ability, keep the persons sworn as jurors on this trial from separating from each other? And that you will not suffer any communication to be made to them, or any of them, orally or otherwise? And that you will not communicate with them, orally

183

or otherwise, except upon the order of this court, or to ask them if they have agreed upon a verdict until they shall be discharged. And that you will not, before they render their verdict, communicate to any person the state of their deliberations or the verdict they have agreed upon? If so, please say: I do.

THE BAILIFF: I do.

THE COURT: Thank you. All right. So now you can go to the jury room and commence your deliberations.

(Jury exits courtroom at 2:02 p.m.)

THE COURT: Any corrections or additions to the jury instructions, Mr. Roth?

MR. ROTH: Has the Court already printed all the copies?

THE COURT: Yes.

MR. ROTH: Then no.

THE COURT: But I did change — the one we gave them, I changed the suffix on the case.

MR. PERRONE: Yeah. The suffix on the other.

THE COURT: It is only on one.

MR. PERRONE: Well, the others were FH.

THE COURT: Correct.

184

MR. PERRONE: The capitals were FH.

THE COURT: Yeah. That's the one I said I changed.

MR. PERRONE: You changed the —

THE COURT: I changed the —

MR. PERRONE: — aggravated stalking?

THE COURT: I changed the next one to FC, because they were reversed. So I changed both of those on the copy.

MR. PERRONE: I'm good.

MR. ROTH: If the Court is going to be making changes on Count 2, at the very bottom it says Charles Allen Close. It should just say Charles Allen. A few small things, not a big deal.

THE COURT: Okay. We need to make a —

MR. PERRONE: Your Honor, can I make a request? I know it's little preliminary. The Turkish Consulate is here. I wonder if they could have an opportunity, during a deliberations period, to speak with Mr. Uraz?

THE COURT: Downstairs. Can they talk downstairs in the regular —

SHERIFF: We typically only allow attorneys.

THE COURT: I entered an order previously

185

that members of the Turkish Consulate could contact Mr. Uraz. So I will allow the Sheriff.

SHERIFF: We will do it downstairs.

MR. PERRONE: It's okay if they go down there?

THE COURT: Yes. We'll let them use the regular consultation rooms, and talk with Mr. Uraz. Yeah.

MR. PERRONE: Perfect.

THE COURT: All right. We are off the record.

(Recess taken at 2:06 p.m.)

(Back on the record at 3:46 p.m.)

THE COURT: We are on the record in People v Uraz, 16-1065 and 16-1064. Mr. Roth is here. Mr. Perrone. You are Tunc Uraz, sir?

THE DEFENDANT: Yes.

THE COURT: Tunc Uraz?

THE DEFENDANT: Yeah, Your Honor.

THE COURT: The jury has indicated they reached a verdict. So we will bring them in.

(Jury present in courtroom at 3:52 p.m.)

THE COURT: Be seated. I have been advised that the jury has reached a verdict.

Who is the Foreperson?

186

JUROR 2: Yes.

THE COURT: Juror number 2, did you sign the form?

JUROR 2: I did, Your Honor.

THE COURT: Hand it to the Bailiff for us, please. I have the verdict form that's been signed by the Foreperson. It indicates in file number 16-1064-FH, in Count 1, aggravated stalking: Guilty.

And in file number 16-1065-FC, Count 1 is: Guilty. Count 2 is: Guilty. And Count 3 is: Guilty.

Because the verdict has to be unanimous, we have to ask each of you individually, or the Clerk will, as to whether is this and was that your verdict.

So I would ask the Clerk to poll the jury, please.

THE CLERK: Juror number 2, is this and was that your verdict?

JUROR 2: Yes, ma'am.

THE CLERK: Juror number 3, is this and was that your verdict?

JUROR 3: Yes, ma'am.

THE CLERK: Juror number 4, is this and was

187

that your verdict?

JUROR 4: Yes, ma'am.

THE CLERK: Juror number 6, is this and was that your verdict?

JUROR 6: Yes, ma'am.

THE CLERK: Juror number 7, is this and was that your verdict?

JUROR 7: Yes, ma'am.

THE CLERK: Juror number 8, is this and was that your verdict?

JUROR 8: Yes.

THE CLERK: Juror number 9, is this and was your verdict?

JUROR 9: Yes.

THE CLERK: Juror number 10, is this and was that your verdict?

JUROR 10: Yes, ma'am.

THE CLERK: Juror number 12, is this and was that your verdict?

JUROR 12: Yes, ma'am.

THE CLERK: Juror number 13, is this and was that your verdict?

JUROR 13: Yes.

THE CLERK: Juror number 14, is this and was that your verdict?

188

JUROR 14: Yes, ma'am.

THE COURT: On behalf of the citizens of Ingham County, once again, I would like to thank you. The prohibition of discussing this case is over. You can talk with anyone you want. You only have to talk to me. That's mandatory.

On behalf of the citizens of Ingham County, I would like to thank you very much for taking the time out of your lives to assist us with this situation. Much appreciated. You will be free to go. Thank you very much.

(Jury exits courtroom at 3:57 p.m.)

THE COURT: All right. Be seated. Any comments or questions, Mr. Roth?

MR. ROTH: If it's not already, I ask that bond be revoked on both files.

THE COURT: Any comments or requests, Mr. Perrone?

MR. PERRONE: Again, given the nature of that, Mr. Uraz's intention is to appeal.

THE COURT: Well, that can't happen until sentencing.

MR. PERRONE: Correct.

THE COURT: That's fine. Okay. So if there was a bond, we're going to cancel the bond, and

189

we're going to set sentencing in this matter for?

THE CLERK: December 20th, 8:30 a.m.

THE COURT: December 20th, 8:30 will be the sentencing date.

We are going to give you information about fines and costs, Mr. Uraz. I know you might not be in a position to do much about it, but I'm simply required to give you that information.

Anything else from the parties today?

MR. ROTH: No, Your Honor. Thank you.

THE COURT: Mr. Perrone, on behalf of Mr. Uraz?

MR. PERRONE: No, Your Honor.

THE COURT: Okay. See you back on December 20th.

(Proceedings concluded at 3:57 p.m.)

190

STATE OF MICHIGAN )
COUNTY OF INGHAM )

I, TERESA J. ABRAHAM, Certified Shorthand Reporter in and for the County of Ingham, State of Michigan, Thirtieth Judicial Circuit Court, do hereby certify that the facts stated in the foregoing pages are true and correct, and comprise a complete, true and correct transcript of the proceedings taken in this matter on this the 9th day of November, 2017.

Teresa J. Abraham, CSR-3445

Date: June 1, 2018