STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

                              Plaintiff,

vs                            CASE NO:   16-1064-FC
                                         16-1065-FC

TUNC URAZ,

                              Defendant.
_____/

        HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
     LANSING, MICHIGAN -- WEDNESDAY, JANUARY 24, 2018

                         SENTENCING

APPEARANCES:

FOR THE PEOPLE:

WILLIAM O. CRINO, JD
CHAZ T. KOOP, JD
Assistant Prosecuting Attorney
Prosecuting Attorney's Office
313 W. Kalamazoo
Grady Porter Building
Lansing, Michigan 48933


FOR THE DEFENDANT:

DUANE SILVERTHORN, JD
DUANE S. SILVERTHORN ATTORNEY AT LAW
2155 Commons Parkway
Okemos, MI 48864




Reported By:  Teresa L. Abraham, CSR-3445
Phone:  (517)483-6404   e-Mail: tjabraham@men.com

INDEX

WITNESSES:

None.

EXHIBITS:

Exhibit #     Description     Received

None.

Lansing, Michigan

January 24, 2018

at about 9:33 a.m.

********

MS. SHEPPARD:  Next matter set for sentencing in file 16-1064-FH and 16-1065-FC, People versus Tunc Uraz with Assistant Prosecutor Jonathan Roth, Chaz Koop, and Defense Attorney, Dwayne Silverthorn.

THE COURT:  We have Mr. Roth and Mr. Koop here for the Prosecution.  Mr. Silverthorn is for Mr. Uraz.  You are Tunc Uraz, sir?

THE DEFENDANT:  Tunc Uraz, yes, sir.

THE COURT:  And I have received numerous letters from supporters from a wide array of the community.  I've also read Mr. Silverthorn's sentencing memorandum.  We did have a discussion prior to the time of sentencing over a couple things.  One had to do with a letter written by Mr. Perrone.  Mr. Silverthorn?

MR. SILVERTHORN:  That's correct.  On November the 8th.

THE COURT:  You were going to mark that as an exhibit?

MR. SILVERTHORN:  Please.

THE COURT: Why don't we put today's date? I'm going to probably need to write the file number on it, too. At least one of the file numbers. And I am going to direct that the Clerk's file is in one of those files, in 64 or 65.

The other thing was something that dealt with an e-mail, Mr. Roth?

MR. ROTH: Thank you, Your Honor. In Mr. Silverthorn's sentencing memorandum, one of the people writing a letter makes reference of an email between Mr. Koop and the victim, sort of alleging that there's an indicator of an inappropriate relationship. I had an opportunity to speak with Mr. Silverthorn about this. He had actually reviewed that e-mail. I have not, because it was not in the packet. Mr. Silverthorn assured me that upon his review, there was actually nothing concerning about it. That he ascribes a misinterpretation to a cultural difference, and not any sort of inappropriate relationship between the two. I just wanted to clear that up, if there's now any record about it.

THE COURT: Mr. Silverthorn?

MR. SILVERTHORN: That is correct. In

reviewing the e-mail, I didn't find anything on its face that may be inappropriate. It may be interpreted from a different culture as being inappropriate or overly familiar. But beyond that, it would be within the accepted norms of our culture, in terms of one person referring to another.

THE COURT: Mr. Uraz, you were convicted by a jury in file number 16-1064, aggravated stalking as an habitual second. And it has a maximum penalty of 90 months in the Michigan Department of Corrections.

And in file number 16-1065, you were convicted of three counts of solicitation of murder as an habitual second. And each of those had a maximum penalty of life. Do you recall that, sir?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And you have the right to an attorney and Mr. Silverthorn is representing you today; is that correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Did you have an opportunity to review the presentence report?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Any corrections to the report, Mr. Silverthorn?

MR. SILVERTHORN: As the Court noted, this was originally set for a sentencing date of December 20th. Thirty-five days had elapsed since then. So 35 days need to be added to the respected two -- thirty-five days to the respective stalking charge. Thirty-five days for the solicitation.

THE COURT: Any objection?

MR. ROTH: No, Your Honor.

THE COURT: That will be --

MR. ROTH: 457.

THE COURT: Thank you. 457 and -

MR. ROTH: 440.

THE COURT: -- in 1064, 440. And in 1065. So I need to make that change on the Basic Information Report.

MR. ROTH: 453, I apologize. Not 457.

THE COURT: 453?

MR. ROTH: 453, not 457.

THE COURT: 453 and 440?

MR. ROTH: That's correct.

MR. SILVERTHORN: Correct, Your Honor.

THE COURT: So I see the Basic Information

Report, 54 days anyways. So it will be 440 days on the aggravated stalking. That will be 453 on the aggravated stalking. And that was an old case. All right. There we go. I was looking at the attached Basic Information Report. So in 16-1065 he now has 440 days credit. And in the aggravated stalking he now has 453 days credit.

THE COURT: All right.

MR. SILVERTHORN: Also on the face sheet it indicates that he has zero prior felonies. I believe he had the initial stalking case before Your Honor that would have formed a first felony. It should appear there.

THE COURT: Yes. I noticed that. I will make that change. It has to be changed on the Basic Information Report. Yes. They had it correct on the Basic Information Report, one prior felony.

MR. SILVERTHORN: I believe a third minor error. I don't have it, but Mr. Roth noticed it. The word "die" in the narrative portion. Mr. Roth?

MR. ROTH: On what is labeled page five, under Defendant's description of the offense.

THE COURT: Okay.

MR. ROTH: On the very last line. On that page it said: "Could not get help die to lack of insurance." The "I" should be a "U." "Due to lack of insurance."

THE COURT: All right. Made that change.

Any other changes to the body of the report?

MR. SILVERTHORN: None, Your Honor.

MR. ROTH: No.

THE COURT: The guidelines in this matter scored in regards to the solicitation of murder, has prior record variable 40 for a level D. Offense variable 120 for a level six. A guideline range of 171 to 356. Are those scored correctly?

MR. ROTH: The range is correct. We have one stipulated change to the OVs.

THE COURT: Which one?

MR. ROTH: OV-14 is currently scored at 10. It should be zero.

THE COURT: For the record, OV-14 is?

MR. ROTH: It's offender's role. Ten should be scored if he is a leader in a multiple offender situation. Given the solicitation never culminated in a conspiracy, I don't believe it's a multiple offender situation.

THE COURT:  So it'll be 110?

MR. ROTH:  Yes, Your Honor.

THE COURT:  Is that accurate, Mr. Silverthorn?

MR. SILVERTHORN:  Yes, Your Honor.

THE COURT:  I will make that change on the Basic Information report.  I guess they didn't score it because it was a life offense.  We will note that, 171 to 356.

In regards to the aggravated stalking in 1064, still 40 prior record points, total offense variable 50, for a level five.  Forty prior record level would be an E-5, 14 to 36.  Are those scored correctly?

MR. ROTH:  I believe that's correct, Your Honor.

MR. SILVERTHORN:  Your Honor?

THE COURT:  Yes.

MR. SILVERTHORN:  After I spoke with Mr. Roth, I advised with Mr. Tunc and discussed the scoring.  He would like me to raise on OV6 that it's scored 50.  I did not conduct this trial, so I don't know how the evidence fell.  He has indicated that the evidence fell such that he may not have agreed to descriptions of intent to kill,

but he didn't initiate it.

And, again, I know that the Court must accept the jury's verdict. I have explained that to him, that normally that -- normally that would be properly scored at 50 based merely, really, on the finding of guilt for the jury. But he wishes me to contest it.

THE COURT: Okay. So just for the record, OV-10 is scored at 15. What's OV-10, for the record?

MR. ROTH: Predatory conduct, Your Honor.

THE COURT: And OV-13 is scored at 25?

MR. ROTH: That's for three crimes against a person.

THE COURT: All right. So in regards to OV-10, there was a pattern of ongoing stalking and harassment when he had a prior conviction. And that led to him being charged as an habitual second. We had testimony at the trial, frankly, just the ongoing stalking, going down to another city, breaking into her residence, doing multiple damage to her vehicle and then the boyfriend's vehicle. So I would think OV-10 is scored appropriately.

MR. ROTH: The other thing that I can add

for OV-10, specific predatory conduct. The thing that I find most compelling is the map the Defendant drew for the other inmates to enable them to find her and her residence, pointing out different milestones in that area to really zero in on her residence, including her apartment number of her residence, which he should not have even known at that time. So that all goes to predatory conduct.

THE COURT: All right. I would think, also, the fact that he attempted to contact her at her mother's house --

MR. ROTH: Mother's house and place of employment.

THE COURT: -- which was out of the city, another city altogether. So I would think that in the 25, we have three counts of solicitation of murder. So that would qualify, it appears, if that's accurate, so OV-4 is scored at 10, for the record.

MR. ROTH: That's for psychological injury. And I think given the victim's statement, with the PSI of the trauma that she had sustained, certainly that makes sense given the nature and the length of time that this behavior has gone on.

THE COURT:  She indicated she had suffered severe psychological issues.  Sought counseling, medical treatment.  Traumatized her relationship with her significant other was destroyed.  So the Court would feel that OV10 is adequately scored.

Comments, Mr. Silverthorn?

MR. SILVERTHORN:  Again, I'm not sure when I brought up OV6 at 50, it seemed -- the Court seemed to go on to other later OVs.

THE COURT:  Well, the total is 50.  Maybe I missed something.

MR. ROTH:  I think Mr. Silverthorn is speaking directly to the solicitation of murder count.

THE COURT:  Okay.  I was on the wrong one, then.  But those OVs would still be appropriate.  Let's address OV6.  What's that, for the record?

MR. ROTH:  OV6 should be scored at 50 points only in cases resulting in convictions or conspiracy or solicitation to commit homicide or attempted homicide.  In this case that obviously qualifies.  Fifty points if the offender had a premeditated intent to kill or the killing was committed while committing or attempting to commit arson, criminal sexual conduct in the first and

third degree, child abuse in the first degree, a major controlled substance offense. It goes on and on.

It's the first part. The offender had a pre-meditated attempt to kill. This case, it's obviously pre-meditated in that well before it would ever have happened, he solicits three different people in the jail, or from the jail, to commit this crime for him. It's obviously something he deliberated upon and decided upon well in advance.

THE COURT: Mr. Silverthorn?

MR. SILVERTHORN: Yes, in speaking with Mr. Tunc, again, not being present, not being the person that defended this case, and tried it, he indicated that the record would reflect, I think on the videotapes, that the murder plot, such as it were, was brought to him by inmates, and later by an undercover officer, to which he may have not had or assented to, but to which he was not the primary initiator. And, again, I don't have the benefit of having conducted this. But he wishes me to assert that. If that's true, then that may be the case.

THE COURT: If I recall correctly, the

testimony of the trial was alluded to by Mr. Roth that he prepared maps, gave detailed information, prior to the video, as to where she could be found, where she lived. Might have even had a license plate number for her vehicle, the description of the vehicle.

MR. ROTH: It did.

THE COURT: And so all of those would, in the Court's opinion, go to his intent. So I would leave OV6 scored at 50.

MR. SILVERTHORN: Thank you, Your Honor.

THE COURT: That's on the solicitation of murder matter.

All right. Anything else in regard to the guidelines?

MR. ROTH: Not for either count, Your Honor.

MR. PERRONE: No, Your Honor.

THE COURT: Is the victim -- we heard from her previously. She had written a lengthy statement. She also testified. She also remained here throughout the trial. So is she here today, does she wish to add anything?

MR. ROTH: Ms. Melke is present today. She wishes to add a statement that Mr. Koop is going

to read, for the record.

THE COURT:  All right.

MR. KOOP:  "The impact of this case has had on me is too traumatic and tremendous to even put into words.  I have been violated in so many ways, that I don't know it's possible to ever trust again.  I feel like I am constantly being watched every single day.  I seclude myself from others much more than I should.

I have been treated for anxiety and depression currently.  I know I need counseling to help me begin the process of rebuilding my life, and for getting past the constant fearful state.

The Defendant committed several crimes, completely disrespecting the law.  Several PPO violations.  Home invasion.  Multiple vandalism incidents.  Hacking my social media and email accounts.  Stalking and soliciting my murder.

I feel the Defendant should receive substantial punishment.  Incarceration, (inaudible), restitution, psychological mental health, wellness, and a definite extension of my personal protection order.

THE COURT:  Comments, Mr. Roth?

MR. ROTH:   Thank you, Your Honor.

There are a couple of issues that I wanted to address.  First, following up on the statement that she is requesting restitution in the amount of $2,273   I believe that's been communicated to Mr. Silverthorn.  There is not an objection.

I would also ask for, consistent with her request, a no-contact order as part of his sentence.

In the sentencing memorandum that Mr. Silverthorn filed, there's a couple things the People rely on in sort of trying to excuse or mitigate Mr. Uraz's culpability in this offense that I want to address.

First, they ascribe his behavior to a depression rooted in missing his wife.  I think it's very important to put that in context, which is that he was having a prolonged affair with Ms. Melke while his wife was here.  So this idea that he does this because he misses his wife is wildly insincere and inappropriate.

The second is there are allegations about Mr. Perrone.  And, first of all, I disagree with them, substantively, about the effect on this case.  And, secondly, that is an appellate issue.

It's not in any way a mitigation issue to be addressed at sentencing.

So with all that in mind, the sentencing -- the sentence that I believe that would be appropriate in this case is one that is recommended at the top of the guidelines. There is a couple very important things. First of all is that this Court has sentenced, in many cases, defendants who make compulsive decisions to hurt people, that do very long sentences. This isn't that. This is a man who woke up and made this decision every day for an extended period of time. This isn't somebody acting on impulse or emotion. This is somebody who made a prolonged decision to attempt to hurt somebody close to him. I think that's about as serious as it gets.

The second thing I think is important is that he has shown, over the course of this time, no let up, no ability to let this issue go at all. And I don't think there's anything after the trial to indicate that that's happened either

So every day that he's incarcerated is another day that Ms Melke is safe, that she doesn't have to look over her back.

So, for those reasons, again, we ask the Court to sentence the Defendant consistent with the PSI on the top of the guidelines. Thank you.

THE COURT: Okay. Also, in the discussion that we had this morning, prior to sentencing, I just wanted to place on the record that in trial, Mr. Uraz, after being thoroughly advised of his rights, didn't wish to have an interpreter present. But there was an interpreter present anyway throughout most of the trial. So I read that now he stated he didn't understand. Basically we had an extensive advisement of rights on the record. We had an extensive discussion with that. I asked Mr. Uraz: Are you sure. He indicated that he did not wish to have an interpreter.

In addition to that, I think the Court had provided an interpreter. But then there was a representative from the Consulate who represented herself as an interpreter, who sat here throughout the trial in the event Mr. Uraz needed her. Although she wasn't doing it simultaneously, she was here in the courtroom listening. And at no time did Mr. Uraz solicit her services. So I just wanted the record to be

clear on that.

Okay. Mr. Silverthorn, on behalf of Mr. Uraz?

MR. SILVERTHORN: I have only known Mr. Uraz a few weeks. As the Court's aware, I found him engaging. I looked at his background. You can tell a lot by a person's family. I had spoken on several occasions to Mr. Uraz. And forgive me if I'm not pronouncing that correctly. He indicated that he had a good background, came from good family, achievements, dignity. More important, I had spoken to his brother, Cenk.

THE DEFENDANT: Cenk.

MR. SILVERTHORN: Cenk Uraz, who is in the Foreign Affairs Office, I believe, in the Ukraine.

THE DEFENDANT: No. In Moscow.

MR. SILVERTHORN: In Moscow. In Russia. I have spoken on several occasions to the Consulate's office in Chicago, all giving glowing reports of Mr. Uraz. Obviously their knowledge of him, you know, is somewhat distant, in terms of time.

From what I can tell from Mr. Uraz, he was a valuable member of both ICC and Michigan State University. He seemed to have some mental

issues. I believe that some of the documents I supplied the Court, one was from Doctor Sharon Hobbs with a diagnosis. Another from a clinic in which he had been diagnosed and was seeking help. He had actually taken a family medical leave from Michigan State University to get help. So he was basically crying out for help in this matter.

When he picked up his first stalking case, he hadn't been in jail. Well, he had never been in jail in his life before that. When he picked up the case, and then at the time of sentencing, was persuaded that since the sentence would include jail, he might as well start right then. So he didn't have much prep time. He went immediately from the plea, from what I understand, to jail at that time. Since jail was part of the deal, he had been convinced that he should go to jail right then and there. He is at the jail for, I think, no more than 24 hours, then he was put in solitary confinement. That was hard on him. He has type-two diabetic, which is controlled mainly through the use of diet, that hadn't been controlled, that had negative effects.

From what I can tell, Mr. Uraz, this case

aside, has never raised his hand in anger against anyone. This is, again, based upon my speaking with his sister and with his brother, and then a thorough review of the file that I did receive.

Yes, this is a bad offense. I don't know of any solicitation of murder case that would be a good offense, that wouldn't have premeditation, that wouldn't have malice towards it. But he has no prior record up to, I think, his 48th birthday.

In fact, he had a stellar -- are the actions, if true, bad? Yes. We are not talking about whether they are bad. Okay? Because the Court has to assume that because of the jury verdict.

But when you're looking at his proportionality, the guideline range is 171 to 356. Someone that has never been involved in the justice system before, that two masters degrees, is a tax paying, law-abiding citizen. That has never physically harmed anyone. And, again, I understand the nature of the offense. I'm sure the State will remind the Court of that, but, again, has never physically harmed anyone. 171 to 356.

Taking the 356 very maximum of that range, is that a just sentence in this individual's case? I would argue that it's not. I would argue that the Court should temper that significantly based on his prior background.

The guidelines account for what occurred here. Prior record variables account for what's here. It still would be a very significant sentence. Just, I don't see the 356. That is four months shy of 30 years.

He's a type-two diabetic. He has a child, a boy that he probably will never see since he's in Turkey.

I understand how the victim feels in this case. This seems to be -- I think this will be the topic of 2018 and thereafter, with everything that's going, not just locally, but throughout this country, there is going to be a growing awareness of offenses of this nature. I think in this individual case, however, a moderated sentence would be more just.

I'm not going to go on anymore, because I understand Mr. Uraz has indicated that, relatively speaking, he has been quiet throughout these proceedings, and he wishes to address the

Court.

THE COURT: Mr. Uraz, this is your opportunity to address the Court, sir.

THE DEFENDANT: Thank you. I am sorry for taking your time in almost 17 months that I've been in jail, Your Honor. I apologize for Ms. Melke for the burden that I have created for her. And I cannot change the past. I can change the future.

And, unfortunately, with my luck, I guess that, as my attorney was appointed to me, as you know, was mentally incapacitated, and he came and told you himself.

The trial of my life, I should have had somebody with a clear mind representing me. I had believed in him. I thought that there would be justice, and with his knowledge he would help me. He sounded very credible at that time.

When I asked for an interpreter, he said: well you don't need it. I said: What makes you think I don't need it. He said: You speak English just fine. And you told me same thing, too.

Sir, with all respect, this is the second language. She should, regardless, be there for

me, or for anybody else that speaks a second language, also. And he told me, for me to get a better interpreter other than what the Court found. A Ukranian lady that speaks a different Turkish dialect would not help me anyways. He said: Well, we don't have time to get you a different interpreter, so we'll let it go. I said: Fine, I will let it go.

When the Turkish Embassy's interpreter showed up, I wasn't sure, I was not told that she would be eligible to interpret for me here in the State of Michigan since she was from the State of Illinois. So I asked the Court --

THE COURT: As I recall, we questioned her on the record. I asked if she was certified or qualified. I said I would qualify her as an interpreter. She indicated -- you indicated you didn't need it. She said in case it changed, she was here throughout the proceedings.

THE DEFENDANT: Since I was persuaded by my lawyer, Mr. Perrone, not to testify, I didn't see a need for it at that time, because I was told that if I didn't testify, I should be fine. I'm very frustrated. I couldn't get to tell my side of the story. And that's what I wanted to do for

the jury.

But, also, I was very frustrated with the jury selection as well, too. Ms. Meike was allowed to sit in the jury selection throughout that process. Is that legal in the State of Michigan?

THE COURT: Yes. Anybody can come in during jury selection, be present. In fact, I can't exclude people in the courtroom during jury selection.

THE DEFENDANT: Okay. Okay. I guess it makes -- and the other thing that I wanted to address the Court is this so-called GPS. I was wearing a tether first, if you remember, when I went to the jail. I am -- do you have the records for GPS with you at all, sir?

MR. ROTH: (Prosecutor shakes his head.)

THE DEFENDANT: You don't? Well, I do, sir. I have a part of it. What is the address here? Three --

THE COURT: 313 West Kalamazoo.

THE DEFENDANT: Okay. If I remember correctly, from the offender's services, Mr. Bernard, his name, right? He said six set of (inaudible) realtime. According to what I have

from the police report, the address shows here 272 W. St. Joseph Street is the court address for GPS. And the time that shows that I was here, 1:30 p.m, are meeting that August 31, 2016 was at 3:30. And by 3:05 I was at 530 Buhl Drive, which happens to be the jail address, but it's 640 North Cedar. And the Court address is 700 Buhl Drive.

So my point is, the GPS records are wrong. I cannot be in two places at the same time, within the time frames.

THE COURT: Okay. I don't know.

THE DEFENDANT: That's one.

THE COURT: I don't know. What's the relevance?

THE DEFENDANT: The relevance is that they were using this GPS to try to locate me in the apartment that I was supposed to be in.

THE COURT: Well, you were on video, Mr. Uraz. We had a video of you in her apartment, So --

THE DEFENDANT: No, I am not talking about the apartment. I'm talking about --

THE COURT: If you're saying the GPS is wrong, in the overall course, there was a video of you being there. You were seen there on several

occasions. So I don't know what the tether said. But we have eye witnesses who put you in the parking lot, hanging out in the parking lot.

THE DEFENDANT: Your Honor, I am not talking about that apartment. I am talking about the apartment that I was being accused of. I'm talking about myself.

THE COURT: I don't think there was any allegation that there were any major tether violations. I don't know what information you gave to the tether people to allow you to be out, to allow you to go down to --

THE DEFENDANT: It was just a monitoring tether, sir. There were no stipulations on that tether.

THE COURT: Okay.

THE DEFENDANT: The time and the location are probably wrong, Your Honor. That's what I'm making a point to you.

THE COURT: All right. We will note that, Mr. Uraz.

THE DEFENDANT: Okay. And the second thing is regarding to the map that was drawn for my sister.

THE COURT: The what now?

THE DEFENDANT:  The map.

THE COURT:  The map was drawn at the time of trial?

THE DEFENDANT:  For my sister.  She was supposed to come and get me.  When we were leaving, I was going to have her contact and somehow compensate Ms. Melke for her losses.  But, again, you know, this was stolen from me.  And what frustrated me when I first came to jail, again, the very next day I was placed in solitary confinement for 23 hours a day for one month.  I have been in jail for almost 500 days, 250(ph) days spent in solitary confinement for me.

I have never been in jail in my life.  You know what happens in solitary confinement?  You lose your mind.  Everything abnormal becomes normal.  It's really depressing.  I already came to jail with a manic depressive mind anyways, and it really didn't help my case at all.

And now -- I can't go one by one of every single thing that they got wrong.

THE COURT:  Well, I think that's what the appellate process is for.

THE DEFENDANT:  That's fine.  I will wait for the appellate process, regardless.  And that's

the thing that it's -- yes. I mean, you can put me away for 40 years, 50 years. That's fine. But in a couple years I will be back here for a new trial regardless of my lawyer's ineffective counsel. So this is never going to go away, one way or another. And we are going to start all over again. And this time I will be very serious about taking the stand and telling my side of the story as well, too.

But my point is, my son is taken by the Turkish CPS, Child Protection Services, from his mother. I'm the only guy that can get him out in Turkey. And that's what I am concerned. That's why I fought this case for 17 months is I waited for my son's sake. The letters that was written, I don't know who wrote these letters, it would be nice to use some of them, but it wasn't the love of my wife, it was the love for my son. Because he couldn't hear from me for six months because Prosecution banned me to contact my 11 year old son thinking that I had conspired against Ms. Melke.

THE COURT: There was some evidence that you were using the telephone.

THE DEFENDANT: No. The evidence —

THE COURT: The Court did allow and make arrangements for you to have communication with your son.

THE DEFENDANT: After five months, sir.

THE COURT: We did that.

THE DEFENDANT: After five months. And before that I was -- because the issue was that they didn't want to pay hundreds of dollars for transition services for every time I had a video with my son.

And here is the part that I don't understand. I have a right to speak my own language, regardless. And if you have to speak English, you have to speak English to your own family so we can understand what you're talking about. Because if --

THE COURT: Well, I think we said that we needed to have an interpreter if you were going to do that because we did not know what you were going to be saying, based on your past conduct in this case. We didn't know. So all -- if I recall correctly, I said if you need to have an interpreter, you have to pay for the interpreter.

THE DEFENDANT: Your Honor, none of these videos and phone conversations indicate nothing

THE COURT:  Let's talk about the sentencing.  Let's focus on the sentencing.

THE DEFENDANT:  Okay.  That's fine.  My family speaks English.  My son speaks English.  I spoke English for a while, regardless.  And it's the phone restrictions.  I couldn't contact my lawyers when I wanted to.  I had to send postcards every time.  It was a two to three-day process for me.  That was taken away from me as well, too.  And when the Turkish Embassy came to visit me, they weren't allowed to visit me for the first time October of 2016.

THE COURT:  Well, I made a special dispensation for you to have contact with the Turkish Consulate.

THE DEFENDANT:  You did.  I appreciate that.

THE COURT:  I allowed them to have access to the jail.  I signed an order to that effect.  I allowed them to have access here in the courtroom.  So when that came to my attention, I allowed that.

THE DEFENDANT:  I appreciate.  Yes.  I have no

THE COURT:  So let's focus on the

sentencing.

THE DEFENDANT:  That's fine.  Let's focus on the sentencing.

Anyway, my son will be turning 18 in the next six years.  After that, I am assured he will come back here to find out what's happening to his father, regardless

Again, if there is a new trial, we will see what happens at that time, and we will go from there.  But I have not, or I did not do anything in that nature.  I wish I had a chance to testify on my behalf to protect myself of what actually occurred.

But I'm very frustrated.  I'm very upset with this system right now.  I wish I had a chance to explain.  I believe in the system.  I didn't run away.  I had many chances to run away, also, which I didn't.  Again, I stayed.  When my paid attorney, Chris Bergstrom, decided to testify against me for the alleged letter that I had sent to her, and then yet he shared this letter with the Prosecution, which made my witnesses in this case turn to the Prosecution.

THE COURT:  Well, that's another issue.

THE DEFENDANT:  I know.  But to where is

the attorney/client privilege? Is there such a thing in this country?

THE COURT: That's an appellate issue.

THE DEFENDANT: Again, I have taken actions to show my remorse for Ms. Melke. That's why I turned myself in to jail. Because when I needed help, I got fired from Michigan State University. When I needed help, I got jail. When my son needed help, I'm being sent to prison right now.

THE COURT: Well, if I recall correctly, you went to jail in order to get credit for the sentence that was upcoming for your second conviction, for stalking Ms. Melke. So, I mean, it's not like -- you had back-to-back convictions, or allegations. So that's my recollection, that you volunteered to go in.

THE DEFENDANT: Yes. I gave up my most precious thing in my life, my freedom. For that I can show my seriousness about going to correct my behavior. While I was in jail I seeked help with the CATS programs, which I have got the help that I needed within the first 15 days.

You know what was the first thing I wrote out of jail? It was to her mother to apologize for my actions. And they didn't see that. It

was probably part of the police investigation, didn't make it to the jury's eyes. I don't know why. That was the first thing I wrote out of the jail to her mother to apologize.

THE COURT: That was before the video.

So anything else you have? I have to zero you back in. Anything else? I don't want to know about all these things in the jail, your position on the case. You made it clear.

Anything else you would like for me to hear that's germane and points to this sentence.

THE DEFENDANT: Well, your Honor, I wish things were different. I don't know, I'm just nervous, to be honest with you. Best I can tell you.

THE COURT: Thank you very much.

All right. I would indicate of greatest concern to the Court is just the fact that there's just, you know, no remorse. All I hear: I really didn't do anything. I don't know what happened. It seems like your friends and supporters thought that you were a pretty good guy. All of them said that. I don't know what happened in this relationship. But you had a stalking case. And then you got another stalking

case. And then you got another stalking case. Following Ms. Melke down to the Detroit area on New Years'. You were there and got into, not necessarily a fight, I agree it doesn't appear. It was fortunate that there wasn't a violent assault. But you stalked her down to some club in Detroit. Tried to explain

THE DEFENDANT: Sir --

THE COURT: Excuse me, sir. I am talking now. You just happened to be there. Then all of a sudden the vehicle in which her significant other was riding in was vandalized. While they couldn't say it was you, it was sort of coincidental.

You were seen after that on numerous occasions in her parking lot by Ms. Melke and her roommate. She became so concerned that she put a camera in her room, and the camera displayed you coming into the residence without her permission. She doesn't know how you got the key. You were snooping around in her lingerie drawer on video. All right? I mean, we had a trial on that matter, but those certainly, in regards to the aggravated stalking, is clear evidence that there was a problem. It's clear evidence that there

was a problem, that you still denied that it existed. So I don't know what we can do for that. If I recall correctly, I think on the first case, either you were in jail or had just gotten out of jail

Then the second case arose. And then while you're in jail, it continues. It continued to escalate. You had the PPO. You knew you couldn't buy a gun. You were trying to go behind the scene and seek out an employee, somebody else to, a strong man, so to speak, to buy you a gun. All right. I mean, all those things have a continuing pattern of escalation.

So to go from that, from buying the gun to continuing to stalk, to being in jail, to attempting to solicit her murder We saw the videos. I don't think there was any other conclusion that the jury could have arrived at sir. I think the evidence is fine

So when I look at this, the Snow factors, we have to take into account punishment. I thought I was very liberal with you. I talked to you extensively on the first case saying, hey, what's going on here. Gave you an opportunity. Put you on probation. I think I gave you 769.4A

chance not to have a record.  And we continued on down the road.  So punishment is here.

Rehabilitation, I would have to say is not likely in regards to Ms. Melke.  I have to look at her, look at how her life was frankly destroyed by your actions, ongoing, and her fear

Protection of society.  She deserves to be protected.  And for deterrence.

So it's the sentence of the Court that in file number 17-1065, that there be a crime victim's fund of $130, state costs of $204 Attorney fee for $600.  Restitution, I'll make the restitution the same in both files.  $2,273 to Erika Melke.  Fine of $100.  Costs of $700. DNA of 60.  You will have a no-contact order, Mr. Uraz.  You are not to have any contact with Ms. Melke.

It's the sentence of the Court in file number 16-1065, in regards to both -- all counts, Count 1, Count 2, Count 3, that Mr. Uraz be sentenced to not less than 200 months, nor more than 360 months, with credit for 443 days.

And in file number 16-1064 it will be a Crime Victim fee of 130, state costs 68, attorney fee of $600.  Again, we will have the restitution

to Ms. Melke in the amount of $2,273, to Erika Melke. $100 fine. Costs of $700. DNA fee of 60.

And it's the sentence of the Court that Ms. Uraz be sentenced to not less than 36 months, nor more than 90 months, with credit for 443 days.

Will you approach for me, please, Mr. Silverthorn? Yes, Mr. Roth?

MR. ROTH: A couple things, Your Honor. One, the Court mentioned that it thought it gave the Defendant 769.4 in the old case. It did not because it was an act of stalking, thus, not eligible. I just wanted to make it clear on the record that was not something relied upon by the Court.

THE COURT: Okay. It wasn't something I relied upon. I might have been wrong.

MR. ROTH: And then with 1064-FH, I just wanted to make sure I heard the Court right. It's 453 days credit?

THE COURT: Yes.

MR. ROTH: Thank you, Your Honor.

THE COURT: I said 443. Is it 453?

MR. ROTH: It should be 453.

THE COURT:  I wrote 443.

MR. ROTH:  And these will be served concurrently?

THE COURT:  The sentences are concurrent. That's correct.

MR. ROTH:  Thank you, Your Honor.

THE COURT:  Mr. Uraz, I would advise you that you are entitled to file an application for a review of your sentence and conviction.  If you are financially unable to retain a lawyer, the Court will appoint a lawyer to represent you on appeal.  A request for a lawyer must be made within 42 days.

I have given you two forms.  I know that you had previously filed a form, but it was premature.  I acknowledged you had signed it.  We had not had the sentence yet.  Your right to appeal had not arisen at that time.  You need to just fill these out and send those in, like you did the last one.  We will get started on that.

MR. SILVERTHORN:  Mr. Uraz would like me to notarize.  I am a notary.  I don't know if I, as the attorney, would be appropriate?

THE COURT:  I don't know if that's an issue or not.  I know he wants to appeal.  It's already

Filed. That's fine.

MR. SILVERTHORN: He wants to get it beginning as soon as possible. If I could get his signature, then I could fill out the rest of the forms.

THE COURT: All right.

MR. SILVERTHORN: Your Honor, I am not sure if a DNA fee gets paid each time.

THE COURT: For each conviction.

MR. SILVERTHORN: Each time?

THE COURT: Yeah. Each conviction.

So the record should reflect, I know Mr. Uraz intends to appeal. And he is filling out the forms at this time. If there is any dispute later as to the timeliness of his request, I would indicate on the record that we know he is making his request as of today.

MR. SILVERTHORN: Good day, your Honor. Thank you.

THE COURT: Thank you.

THE DEFENDANT: Okay.

[Proceedings concluded at 10:20 a.m.]

STATE OF MICHIGAN          )

COUNTY OF INGHAM          )

I, TERESA J. ABRAHAM, Certified Shorthand Reporter in and for the County of Ingham, State of Michigan, Thirtieth Judicial Circuit Court, do hereby certify that the facts stated in the foregoing pages are true and correct, and comprise a complete, true and correct transcript of the proceedings taken in this matter on this the 24th day of January 24, 2018.

_____

Teresa J. Abraham, CSR-3445

Date:   June 1, 2018