STATE OF MICHIGAN

THIRTIETH JUDICIAL CIRCUIT COURT

INGHAM COUNTY

PEOPLE OF THE STATE OF MICHIGAN,

v                                          File No.   16-1064-FC
                                                      16-1065-FC
                                           Hon. Clinton Canady

TUNC URAZ,

                    Defendant.

_____/

GINTHER HEARING

BEFORE HONORABLE CLINTON CANADY, III, CIRCUIT COURT JUDGE

Lansing, Michigan – Monday, October 4, 2021

APPEARANCES:

For the People:              KAHLA D. CRINO (P71012)
                             Ingham County Prosecutor's Office
                             303 West Kalamazoo Street, Fourth Floor
                             Lansing, Michigan 48933
                             (517) 483-6108


For the Defendant:           SUSAN K. WALSH (P40447)
                             P.O. Box 157
                             Northville, Michigan  48167
                             (248) 563-9149

FILED 30th CIRCUIT COURT
BY:
NOV 12 2021
Deputy Clerk

Recorded By:                 Toni Coltman, CER 8226
                             Certified Electronic Recorder
                             (517) 483-6404

OFFICIAL COURT REPORTER/RECORDER
**30TH JUDICIAL CIRCUIT COURT**
LANSING, MICHIGAN

ORIGINAL

# TABLE OF CONTENTS

WITNESSES:                                                                PAGE

JACOB PERRONE
        Direct Examination by Ms. Walsh                                      7
        Cross-Examination by Ms. Crino                                      12
        Redirect Examination by Ms. Walsh                                   38
        Recross-Examination by Ms. Crino                                    41
ERIC SCHRODER
        Direct Examination by Ms. Walsh                                     43
        Cross-Examination by Ms. Crino                                      45
NICHOLAS FERNANDEZ
        Direct Examination by Ms. Walsh                                     52
CHARLES KOOP
        Direct Examination by Ms. Walsh                                     55
DUANE SILVERTHORN
        Direct Examination by Ms. Walsh                                     57
ANDREW VUCKOVICH
        Direct Examination by Ms. Walsh                                     61

EXHIBITS:                                    MARKED        ADMITTED
*None*

1     Lansing, Michigan

2     Monday, October 4, 2021 - 9:24 a.m.

3          THE COURT:  We're on the record in the matter of

4     People versus Tunc Uraz, file number 16-1064-FH.  This is a

5     Ginther evidentiary hearing that Mr. Uraz requested that he

6     be in person for.  So there's been an unusual delay because

7     corrections wasn't transporting folks during the height of

8     the Covid epidemic.  Once they resumed, we scheduled it as

9     soon as we could.

10          May I have appearances, please?

11          MS. CRINO:  Kahla Crino on behalf of the People.

12          MS. WALSH:  Susan Walsh on behalf of Mr. Uraz.

13          THE COURT:  And you are Tunc Uraz, sir?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  And he's present.  Okay, I've been

16    advised that one of the witnesses, a Mr. Lyon -- who

17    subpoenaed Mr. Lyon?  Did somebody subpoena Mr. Lyon?

18          MS. CRINO:  Your Honor, no one has subpoenaed a Mr.

19    Chuck Lyons; however, it's my understanding that the Court

20    received a message that states as follows: Chuck Lyons

21    called, is supposed to be here today for Tunc Uraz.  He has

22    Covid and will not appear today.

23          This -- being informed of this message was the

24    first that I had heard of a Mr. Chuck Lyons.  He is not

25    scheduled to be a witness in this matter.  That name has not

1    been disclosed to the People as a witness who has direct

2    knowledge regarding Mr. Perrone's mental state during the

3    course of this trial.  That's what we're ultimately here to

4    determine.  So that's all that the People have any

5    information about with regard to Mr. Lyons.

6            THE COURT:  Ms. Walsh, do you have any information

7    on that?

8            MS. WALSH:  Yes.  My client has just informed me

9    that Mr. Lyons was the chaplain at the jail and just wanted

10   to come and observe the proceedings.

11           THE COURT:  The chaplain at the Ingham County Jail?

12           MS. WALSH:  Yes.

13           THE COURT:  Okay, so that really wouldn't be

14   relevant to this proceeding.

15           MS. WALSH:  No, he wasn't subpoenaed.  He was just

16   going to come and observe.

17           THE COURT:  I guess he just wanted Mr. Uraz to know

18   that he wasn't going to be able to come --

19           MS. WALSH:  Yes.

20           THE COURT:  -- due to Covid, all right.

21           MS. WALSH:  Yes.

22           THE COURT:  Okay.  All right, I've also been

23   advised that some witnesses are not available today due to

24   professional obligations, Ms. Crino?

25           MS. CRINO:  That is correct.  There are two

1   witnesses who the People did subpoena on behalf of the

2   defense today.   The first is Jonathon Roth.   As the Court is

3   aware, Mr. Roth is a federal prosecutor now.   He is scheduled

4   to be in trial with the case beginning today, so he would not

5   be available to appear either in person or via Zoom.

6           In addition, Andrew Vuckovich is an attorney.   He

7   had a hearing this morning in another county.   We made

8   preliminary arrangements for Mr. Vuckovich to appear via Zoom

9   at 11:00 o'clock, if Ms. Walsh is willing to consent to that

10  procedure.   If she is not willing to consent to that, what

11  the People would propose is that we take Mr. Vuckovich's

12  testimony on the same day that we ultimately take Mr. Roth's

13  testimony.

14          THE COURT:   Ms. Walsh, any comments on that?

15          MS. WALSH:   Either one of those would be

16  acceptable.

17          THE COURT:   I have a tentative date of October 18th

18  at 1:00.   Can you check your calendars for us, please?

19  October 18th at 1:00.

20          MS. WALSH:   I have two hearings in Saginaw County

21  that afternoon.

22          THE COURT:   All right, that's not going to work.

23          MS. WALSH:   Sorry.

24          THE COURT:   All right, we'll keep looking.   All

25  right, anybody want to make an opening statement?   I'm pretty

1    familiar, but you might want to just make a record I guess.

2              MS. CRINO:  Nothing from the People, your Honor.

3              THE COURT:  All right, Ms. Walsh?

4              MS. WALSH:  Just really briefly.  We're just here

5    today to get information to you about things that were going

6    on, maybe, behind the scenes that you or the prosecutors

7    might not have known about so that you can make an informed

8    ruling regarding whether or not Mr. Uraz received effective

9    assistance of counsel during his trial.

10             THE COURT:  Okay, how are we going to proceed?

11             MS. CRINO:  Your Honor, Ms. Walsh has the burden

12   because it's a Ginther hearing and she's attempting to

13   establish ineffective assistance of counsel pursuant to an

14   evidentiary hearing.  So my understanding is that she will be

15   calling each of the witnesses.  I will then have an

16   opportunity to cross-examine each of those witnesses.

17             THE COURT:  All right, Ms. Walsh, your first

18   witness?

19             MS. WALSH:  We would like to call Mr. Jacob

20   Perrone.

21             THE COURT:  Step up here for us, Mr. Perrone.

22   Raise your right hand for me, Mr. Perrone?  Do you swear or

23   affirm the testimony you're about to give will be the truth

24   and the whole truth under the penalty of perjury?

25             MR. PERRONE:  I do.

1                     **JACOB PERRONE**

2            (At 9:29 a.m. witness sworn and testified)

3            THE COURT:  All right, would you be seated.  And

4     while testifying, pull your mask down for us, please.  State

5     your name and spell your last name for the recorder.

6            THE WITNESS:  Jacob Perrone, J-a-c-o-b, P-e-r-r-o-

7     n-e.

8            THE COURT:  Ms. Walsh?

9              **DIRECT EXAMINATION**

10  BY MS. WALSH:

11  Q    Good morning.

12  A    Good morning.

13  Q    So you represented Mr. Uraz at his trial in November of 2017?

14  A    I did.

15  Q    And did you review your notes from that representation prior

16     to the hearing?

17  A    Briefly.

18  Q    Do you have a good recollection of the trial?

19  A    I have a pretty good recollection.

20  Q    Okay.  Do you believe that during the trial symptoms of your

21     bipolar disorder condition began to affect your ability to

22     properly represent Mr. Uraz?

23  A    No.

24  Q    No, okay.  So you can remember the trial?  You can remember

25     everything?  You didn't have any lapses of memory or anything

1    like that?

2  A    No.

3  Q    Do you think that your condition affected your ability to

4    make good decisions about trial strategy?

5  A    No.

6  Q    So you felt like the same as you have felt in other trials

7    that you had done previously and since then?

8  A    Yes, I thought it was an effective trial strategy, given the

9    circumstances.

10              THE COURT:  Did you hear him?

11              MS. CRINO:  I did not hear that answer.

12              THE COURT:  Could you repeat that for us, Mr.

13    Perrone?

14              THE WITNESS:  I felt it was an effective trial

15    strategy, given the circumstances.

16              THE COURT:  Okay, so just sit closer to the mic.

17    The mic is adjustable, and so it goes up and down.

18  BY MS. WALSH:

19  Q    Do you think any of your decisions during the trial

20    prejudiced Mr. Uraz?

21  A    I don't.

22  Q    Do you -- are you aware that Mr. Close and Mr. Allen both had

23    prior convictions for theft related offenses?

24  A    I cannot recall.

25              MS. WALSH:  Should I approach with the -- with the

1        IChat criminal history records?

2             THE COURT:  No.  Just for the record, these were

3    two, what, witnesses?  Or who are they, just so that we're

4    clear, because my memory needs to be refreshed.

5             MS. CRINO:  Well, your Honor, if I may just briefly

6    interject here, I believe the answer to the question was that

7    he does not recall if he was aware that Mr. Close and Mr.

8    Allen had theft related offenses.

9             So that being the case, you know, I would certainly

10   stipulate that they do.  The information about that in Ms.

11   Walsh's pleadings are correct.  But if the answer is he

12   doesn't remember if he knew at the time of the trial then,

13   you know, observing an IChat printout isn't really going to

14   move the ball forward on that point.

15            THE COURT:  Okay.  So just for my benefit though, I

16   don't recall what Mr. Close's role was in the case.

17            MS. WALSH:  Mr. Close and Mr. Allen were the

18   jailhouse informants who testified against -- who gave

19   information, allegedly comments that Mr. Uraz made to them in

20   the matter in an effort to --

21            THE COURT:  And the map?  Wasn't there a map or

22   something?

23            MS. WALSH:  Pardon?

24            THE COURT:  Wasn't there a map of some type, a

25   drawing, a diagram of some type?

```
1            MS. WALSH:  There were notes passed between --
2    between them.
3            THE COURT:  Okay.  So the Prosecution has
4    stipulated they have convictions for theft, but I think they
5    were in jail at the time it happened, right?
6            MS. WALSH:  Yes, right.
7            THE COURT:  All right.
8            MS. WALSH:  So I guess your answer is that you
9    didn't -- you didn't know that they -- or you can't remember
10   --
11           THE COURT:  No, he said he didn't -- he said he
12   didn't recall, but now we've stipulated that they do, or did.
13   Okay, proceed.
14 BY MS. WALSH:
15 Q   Did you -- do you remember doing any kind of an investigation
16     into their criminal records?
17 A   Yes, I spent considerable amount of time under -- attempting
18     to undermine Mr. Close's testimony by reviewing what happened
19     with his existing case as a result of the proffer that he
20     made in regards to Mr. Uraz, and also Mr. Allen, and
21     attempted to impeach their testimony on the basis of how it
22     affected their current circumstance.
23 Q   Okay.  But you did not bring to the attention of the jury
24     that they had prior theft related convictions?
25 A   I can't recall.  I don't believe so.
```

| | | |
|---|---|---|
| 1 | Q | Do you agree that the -- that those would have been a good |
| 2 | | way to impeach the credibility of these witnesses? |
| 3 | A | It would have been one way to do so. |
| 4 | Q | And do you think that the worsening -- your worsening |
| 5 | | condition around the time of the trial may have impacted your |
| 6 | | decision whether to make that investigation into -- |
| 7 | A | No.  Potentially inexperience. |
| 8 | Q | Pardon? |
| 9 | A | Potentially inexperience, it was one of my first appointed |
| 10 | | capital cases -- |
| 11 | Q | Okay. |
| 12 | A | -- that I tried. |
| 13 | Q | Okay. |
| 14 | A | It didn't seem to me as a potential option.  It's not |
| 15 | | something that came into my mind.  I thought we had a pretty |
| 16 | | strong method of impeachment with their current cases and how |
| 17 | | they ended up getting -- Mr. Close specifically got a delay |
| 18 | | that ended in a dismissal, which I thought was a very good |
| 19 | | way to impeach. |
| 20 | Q | Okay.  Do you remember at all during the trial the Prosecutor |
| 21 | | objecting to -- to you taking a long period of time in |
| 22 | | between questions? |
| 23 | A | I don't.  I don't believe that that was an issue, except for |
| 24 | | maybe one or two witnesses that I was closing out and waiting |
| 25 | | to ask my final questions, and consulting with Mr. Uraz in |

1  regards to any additional questions.

2  MS. WALSH:  Okay.  All right, I don't have any

3  further questions.

4  THE COURT:  All right, thank you.  Ms. Crino?

5  MS. CRINO:  Good morning, Mr. Perrone, how are you

6  today?

7  THE WITNESS:  Doing good.

8  MS. CRINO:  May I take my mask off, your Honor?

9  THE COURT:  You may, yes.

10  MS. CRINO:  Thank you.

11  **CROSS-EXAMINATION**

12  BY MS. CRINO:

13  Q  Mr. Perrone, you're a licensed attorney in the State of

14  Michigan, correct?

15  A  Yes.

16  Q  And you've been practicing law since 2008?

17  A  Yes.

18  Q  Do you specialize in a particular area?

19  A  Criminal defense.

20  Q  Mr. Perrone, you're aware that Mr. Uraz's appeal in this case

21  involves a claim that you were ineffective during the course

22  of his trial?

23  A  Yes.

24  Q  And you're aware that by making that claim Mr. Uraz is giving

25  up any attorney client privilege that he may have as to that

1        defense, correct?

2  A    Correct.

3  Q    Do you see Mr. Uraz in the courtroom today?

4  A    I do.

5  Q    Can you describe an article of his clothing and where he's

6        seated, please?

7  A    He's seated at defense table.  He's got blue and red prison

8        garbs.

9              MS. CRINO:  Your Honor, may the record reflect

10       identification of the Defendant.

11             THE COURT:  Any objections, Ms. Walsh?

12             MS. WALSH:  No.

13             THE COURT:  So identified.

14 BY MS. CRINO:

15  Q    Mr. Uraz had two cases in 2016, an Aggravated Stalking case

16        and a Solicitation of Murder case, correct?

17  A    Correct.

18  Q    And initially you were appointed to represent him on both,

19        correct?

20  A    Yes.

21  Q    And then at some point Mr. Uraz retained Mr. Mike Nichols on

22        the Solicitation case, correct?

23  A    Correct.

24  Q    Did there come a time when you were reappointed to represent

25        Mr. Uraz on both cases?

| | | |
|---|---|---|
| 1 | A | There was, when Mr. Nichols withdrew. |
| 2 | Q | And at that time it was the Court's decision to reappoint |
| 3 | | you, correct? |
| 4 | A | Correct. |
| 5 | Q | Did Mr. Uraz ever object to you being reappointed on the |
| 6 | | Solicitation of Murder case? |
| 7 | A | No. |
| 8 | Q | All right.  Now for a moment I'm just going to ask you some |
| 9 | | general questions about your health and about the arguments |
| 10 | | that have been made here in this case.  I'm not trying to |
| 11 | | invade your privacy in any way.  And if there is any question |
| 12 | | that you're uncomfortable with, in my view, you're free to |
| 13 | | tell me that and we'll deal with it, okay?  During Mr. Uraz's |
| 14 | | trial, did you have any active mental health diagnoses that |
| 15 | | you were aware of at that time? |
| 16 | A | No. |
| 17 | Q | During his trial did any symptoms give you concern that there |
| 18 | | might be a mental health issue during that trial? |
| 19 | A | Not from my perspective. |
| 20 | Q | Okay, fair enough.  Before Mr. Uraz's trial did you have any |
| 21 | | kind of mental health diagnoses? |
| 22 | A | No. |
| 23 | Q | What was Mr. Uraz like as a client? |
| 24 | A | Very difficult, very unreasonable.  It was a case where he |
| 25 | | was emphasized to take a plea because of the substantial |

1    evidence and the nature of the video that was going to be

2    offered to the jury on multiple occasions.  And he was out of

3    touch to an extent as to the reality of his circumstances.

4    And it seemed to me that the people at the jail had, kind of,

5    gotten into his head as far as what reasonable outcome was

6    and that undermined his ability to make reasoned judgments as

7    far as taking a plea.

8  Q  Do you feel like Mr. Uraz understood how substantial the

9    evidence of his guilt was?

10 A  No, I don't think that he completely understood or

11   appreciated it.  There seemed to be a significant disconnect

12   when we discussed it.  And I had discussions with him and

13   with Mr. Nichols in regards to the nature of the evidence

14   that was going to be proffered against him.

15 Q  And you mentioned Mr. Nichols.  Is it your understanding that

16   Mr. Nichols tried to help Defendant understand how

17   substantial the evidence was?

18 A  Correct.

19 Q  And you also tried to help the Defendant understand how

20   substantial the evidence was, correct?

21 A  Yes.

22 Q  You said that he was difficult.  Can you elaborate on that?

23   What do you mean when you say he was difficult, aside from

24   perhaps not being grounded in reality when it came to

25   understanding how substantial the evidence was?

```
 1                MS. WALSH:  Your Honor, I'm going to object.  I've
 2       given a lot of leeway.  I think that -- I don't know if this
 3       is really relevant to the issue at hand today.
 4                THE COURT:  The relevance of the relationship
 5       between Mr. Uraz and Mr. Perrone is not relevant?
 6                MS. WALSH:  Well, I just think that the question --
 7       what was the question again?
 8                MS. CRINO:  The witness described Mr. Uraz as a
 9       difficult client.  I'm asking him to explain what he means by
10       that.
11                THE COURT:  I'm going to overrule the objection.
12                MS. CRINO:  Thank you, your Honor.  Go ahead.
13                THE WITNESS:  I spoke with Mr. Uraz about the
14       potential of going to the Forensic Center, and it was also
15       something that was discussed with Mr. Nichols.  He didn't
16       want to go, for whatever reason.  From my perspective it
17       would have been beneficial for him to get some type of a
18       diagnosis himself because of the way that he was acting.
19                I was getting a significant amount of calls from
20       the Turkish Embassy in Chicago in regards to his case, and
21       frankly I explained to them the nature of his circumstances
22       also so that they could attempt to convey to him what he was
23       up against if he were to go to trial.
24  BY MS. CRINO:
25  Q    Mr. Uraz had a plea offer to plead guilty to one count of
```

| | | |
|---|---|---|
| 1 | | Solicitation, and in exchange for that the balance of the |
| 2 | | charges would be dismissed, correct? |
| 3 | A | I believe so. |
| 4 | Q | Did you advise him to take that plea offer? |
| 5 | A | Yes. |
| 6 | Q | And did he indicate to you that he did not want to? |
| 7 | A | Yea.  If I recall correctly, he said that from what the |
| 8 | | people at the jail were telling him, that anything over two |
| 9 | | years is unreasonable, given his particular circumstance. |
| 10 | Q | And did you advise him that he ought to take the plea |
| 11 | | agreement? |
| 12 | A | Yes. |
| 13 | Q | And did he -- |
| 14 | | THE COURT:  Okay, I'm going to stop, just so the |
| 15 | | record is clear.  When you're talking about two years, two |
| 16 | | years of incarceration? |
| 17 | | THE WITNESS:  Correct. |
| 18 | | THE COURT:  So that the record's clear. |
| 19 | | MS. CRINO:  Thank you, your Honor. |
| 20 | BY MS. CRINO: | |
| 21 | Q | Did Mr. Uraz make it clear that he was not going to accept |
| 22 | | that offer? |
| 23 | A | Yes, after a lengthy discussion. |
| 24 | Q | Okay.  Based on that, did you begin preparing for trial with |
| 25 | | Mr. Uraz? |

1   A   Correct.

2   Q   What did you and Mr. Uraz do to prepare for trial?

3   A   Um, I went over a 25 person witness list, something along

4       those lines, and various theories that Mr. Uraz had.  I had

5       to narrow down the witnesses to those that were relevant, or

6       even remotely relevant because some of them were, from my

7       perspective, from a trial strategy standpoint, unreasonable.

8       One particular witness he wanted to call was his neighbor,

9       who was going to testify that Mr. Uraz took out his -- her

10      trash and that's what he was talking to the undercover

11      officer about when they were talking about taking out the

12      trash.  It didn't, from my perspective, match the context of

13      the video, so eventually he agreed that that was not

14      something that we would use.

15  Q   Okay, so you've mentioned a couple different things there

16      with your answer.  First of all, let me ask you about the

17      witness list.  You did file a witness list in this matter,

18      correct?

19  A   Correct.

20  Q   And that initial witness list included, if I recall, nearly

21      30 witnesses, correct?

22  A   It sounds appropriate, yes.

23  Q   Where did those names come from?  Are those witnesses that

24      you came up with, or witnesses that Mr. Uraz demanded?

25  A   Mr. Uraz demanded.

```
 1   Q   Okay, and you're familiar with your statutory deadlines in
 2       terms of filing a witness list for trial?
 3   A   Yes.
 4   Q   And you understand that after a certain point you can only
 5       modify a witness list upon leave of the Court, correct?
 6   A   Yes.
 7   Q   And is that why you ultimately made the decision to include
 8       all of those witnesses that Mr. Uraz mentioned?
 9   A   Yes.
10   Q   Because you knew that it would be easier, essentially, to
11       strike witnesses then to add them?
12   A   Correct.
13   Q   Okay, fair enough.  You also mentioned defenses and
14       strategies that you and Mr. Uraz talked about.  You mentioned
15       the idea of attacking the language that was used in the
16       video, correct?
17   A   Yes.
18   Q   Did you also discuss the idea of an entrapment defense,
19       either as a legal defense or as a strategy to argue to the
20       jury?
21   A   It was a legal defense, as well as one of the primary
22       defenses that we were arguing to the jury.
23   Q   Okay, so let's talk about it in each of those contexts, okay.
24       You filed a pretrial motion arguing entrapment on behalf of
25       the Defendant, correct?
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And you took testimony from the Defendant, among other |
| 3 | | witnesses, at that hearing, correct? |
| 4 | A | Yes. |
| 5 | Q | And ultimately the Court decided that that was not going to |
| 6 | | be a full legal defense to the charges, correct? |
| 7 | A | Correct. |
| 8 | Q | All right.  So, first of all, did Mr. Uraz agree with that |
| 9 | | strategy of filing a pretrial motion based on entrapment? |
| 10 | A | He did. |
| 11 | Q | And that was something you guys talked about ahead of time? |
| 12 | A | Yes. |
| 13 | Q | All right.  When that argument ultimately failed because |
| 14 | | Judge Canady ultimately ruled against you, did you still |
| 15 | | argue that general theory to the jury? |
| 16 | A | Yea.  The general theory was that the police were overzealous |
| 17 | | in attempting to send the informant -- the informants in, |
| 18 | | that they worked with the informants, who were obviously not |
| 19 | | police officers, and they overstepped their bounds.  And |
| 20 | | based on his circumstance of being incarcerated 23 hours a |
| 21 | | day that he didn't have the mental capacity or ability or |
| 22 | | intent for anybody to be specifically harmed in any way. |
| 23 | Q | So at trial you ultimately argued that the inmates, Reginald |
| 24 | | Close and Charles Allen, took advantage of the Defendant, |
| 25 | | right? |

1  A    Yes.

2  Q    You also argued that the police essentially set the Defendant

3       up, correct?

4  A    Yes.

5  Q    And so those are some of the ways that you -- while it wasn't

6       a full entrapment defense, you argued that theory to the

7       jury, right?

8  A    Yes.

9  Q    Very good.  Now who is Eric Schroeder?

10 A    He was an associate attorney that was working with me at the

11      time.

12 Q    And did Mr. Schroeder assist you with the trial?

13 A    He did.  He did some questioning.  He questioned a couple of

14      the witnesses.  But he had a very limited role in the trial.

15      I was the attorney that was doing all of the work.

16 Q    Prosecutor's often use the term first chair and second chair.

17      Is that terminology that you're familiar with as well?

18 A    Yes.  I wanted to get more people, besides Mr. Uraz, so that

19      it appeared that he had people supporting him.  So I thought

20      it was essential to have additional attorneys.  Mr. Schroeder

21      was a young attorney at that point in time, a very good

22      attorney, but he did have an extremely limited role.  It was

23      very effective in cross-examining, I believe, Mr. Allen or

24      Mr. Close, one of the two.

25 Q    Ms. Melke as well, is that correct?

| 1 | A | Correct, yes. |
|---|---|---|
| 2 | Q | Okay, fair enough.  Had something happened in terms of your |
| 3 | | mental health during the trial would you have trusted Mr. |
| 4 | | Schroeder to continue with representing Mr. Uraz? |
| 5 | A | I would have.  As far as the Court, what their position would |
| 6 | | be, would be a separate issue.  But he was familiar with a |
| 7 | | lot of the circumstances. |
| 8 | Q | All right, so I'm going to ask you some questions about voir |
| 9 | | dire and the first day of trial.  Any issues with your mental |
| 10 | | health the first day of trial? |
| 11 | A | No. |
| 12 | Q | In terms of the questions that you asked during voir dire, |
| 13 | | were those questions and strategies that you and Mr. Uraz |
| 14 | | agreed on ahead of time? |
| 15 | A | Yes. |
| 16 | Q | So some of the topics that you discussed during voir dire |
| 17 | | included using common sense, the presumption of innocence, |
| 18 | | reasonable doubt, any possible bias based on domestic |
| 19 | | violence, law enforcement bias, bias based on race, questions |
| 20 | | regarding credibility, issues regarding guns, and |
| 21 | | preconceived ideas about murder for hire plots.  Were those |
| 22 | | all topics that you and Mr. Uraz talked about ahead of time? |
| 23 | A | Yes. |
| 24 | Q | Very good.  Second day of trial, November 2nd, 2017, voir dire |
| 25 | | continued that day, correct? |

```
 1   A    Yes.

 2   Q    And you also gave an opening statement that day, correct?

 3   A    I did.

 4   Q    You had arguments regarding various items of evidence,

 5        correct?

 6   A    Yes.

 7   Q    You cross-examined several of the People's witnesses,

 8        correct?

 9   A    Correct.

10   Q    And were you adequately prepared for that component of trial,

11        for everything that occurred on that first day?

12   A    Yes.

13   Q    Anything about your mental health that impacted your

14        representation of the Defendant on that day?

15   A    No.

16   Q    Next day, November 3rd, the record reflects that you cross-

17        examined several witnesses, but that Mr. Schroeder, as you

18        already said, cross-examined the victim.  What was the reason

19        for having Mr. Schroeder cross-examine the victim?

20   A    Um, I was kind of coming off as the bad guy and so I didn't

21        want to cross-examine the victim because it may come off in a

22        negative manner.  And she wasn't an overly relevant witness,

23        so I kind of threw him out there because I knew that he

24        wouldn't appear as to be attacking in any way.

25   Q    So that was a strategy that was intended to help the
```

| 1 | | Defendant, correct? |
|---|---|---|
| 2 | A | Yes. |
| 3 | Q | That same day, November 3rd, there was also extensive |
| 4 | | discussion regarding the witnesses that we've already talked |
| 5 | | about that were on your witness list.  Some of those |
| 6 | | witnesses were struck that day, correct? |
| 7 | A | Yes. |
| 8 | Q | And is that because you ultimately learned that those |
| 9 | | witnesses did not have relevant information to add to the |
| 10 | | case? |
| 11 | A | Correct. |
| 12 | Q | Very good.  Also on November 3rd I see that you objected to |
| 13 | | what you describe as a late disclosure of notes purporting to |
| 14 | | be between Reginald Close and John Pierce, is that correct? |
| 15 | A | Correct. |
| 16 | Q | And was that objection intended to benefit the Defendant and |
| 17 | | help his case? |
| 18 | A | It was. |
| 19 | Q | Any mental health issues that impacted your representation of |
| 20 | | the Defendant on November 3rd, 2017? |
| 21 | A | No. |
| 22 | Q | Okay, moving on to November 6th, I see that on that day you |
| 23 | | cross-examined Reginald Close, correct? |
| 24 | A | Yes. |
| 25 | Q | And you made several important points during that cross-exam, |

| | | |
|---|---|---|
| 1 | | correct? |
| 2 | A | Yes. |
| 3 | Q | And you've already brought some of those up during the course |
| 4 | | of your direct testimony.  You established that Close |
| 5 | | proffered on John Pierce's case, correct? |
| 6 | A | Correct. |
| 7 | Q | You established that Close's own trial was adjourned and that |
| 8 | | he was eventually found not guilty in that matter, correct? |
| 9 | A | Yes. |
| 10 | Q | You established that Close, Allen, and Muhammed were in a |
| 11 | | cell together at one point, correct? |
| 12 | A | Yes. |
| 13 | Q | You were able to impeach Close's trial testimony that he had |
| 14 | | never talked to Allen about Uraz's case, correct? |
| 15 | A | Correct. |
| 16 | Q | And that was a very big point for your overall defense, |
| 17 | | wasn't it? |
| 18 | A | Yes. |
| 19 | Q | Were these all important facts in your defense ultimately |
| 20 | | that it was Close, Allen, and the police who set the |
| 21 | | Defendant up? |
| 22 | A | Yes. |
| 23 | Q | I see that on November 6th, 2017 you also cross-examined |
| 24 | | Patrick Burnett, correct? |
| 25 | A | Yes. |

| | | |
|---|---|---|
| 1 | Q | And you elicited testimony from him that the Defendant looked |
| 2 | | scared when he was trying to buy a gun? |
| 3 | A | Yes. |
| 4 | Q | You also cross-examined Officer Frank Mobley and elicited |
| 5 | | testimony about the ambiguous language that was used in the |
| 6 | | phone call and video, correct? |
| 7 | A | Yes. |
| 8 | Q | Were there any mental health issues you had that impacted |
| 9 | | your representation of the Defendant on the date of November |
| 10 | | 6th, 2017? |
| 11 | A | No. |
| 12 | Q | Moving onto November 7th, 2017, on that day you cross-examined |
| 13 | | Charles Allen, correct? |
| 14 | A | Yes. |
| 15 | Q | And I see that you attacked his credibility in numerous ways, |
| 16 | | correct? |
| 17 | A | Correct. |
| 18 | Q | You established that he was on phone restrictions due to |
| 19 | | alleged misconduct for calling his girlfriend when he wasn't |
| 20 | | supposed to, correct? |
| 21 | A | Yes. |
| 22 | Q | You established that he knew Reginald Close, correct? |
| 23 | A | Correct. |
| 24 | Q | You established that he tried to leverage information |
| 25 | | regarding Uraz to improve his own situation, correct? |

1    A     Correct.

2    Q     You established that Allen initiated one of the conversations

3          with Uraz, correct?

4    A     Correct.

5    Q     You established that there was a lot about the situation that

6          Allen did not recall, correct?

7    A     Yes.

8              MS. CRINO:   Okay.  Now in pleadings, and also in

9          your direct testimony, Ms. Walsh has pointed to a specific

10         part of the transcript from your cross-exam of Allen as

11         evidence that you were having a mental breakdown during

12         trial.

13             This is all part of the record already, your Honor,

14         by virtue of it being in the transcript, but in terms of

15         creating a transcript for today, this is again November 7th,

16         2017.  I'm directing your attention to the bottom of page 60

17         continuing to the following page 61.  I'm handing you that

18         transcript, just so you can take a look at it and see exactly

19         what my questions are going to be.  And when you're done with

20         page 60, just flip to the following for 61.  It will continue

21         there.

22   BY MS. CRINO:

23   Q     Are you all set with that?

24   A     Yea.

25   Q     And I'm going to ask you just a couple questions about it,

1    and you can also add anything that you need to.  Would you

2    agree that Mr. Roth objected to your testimony and alleged

3    that there were three minutes between questions?

4  A  Yea, I don't --

5  Q  Okay.  So was it actually three minutes between questions?

6  A  I don't believe so.

7  Q  Okay.  He also alleges, "This cross-examination rambles for

8    hours."  Did your cross-exam of Allen actually ramble for

9    hours?

10 A  No, I think that Mr. Roth was trying to undermine the cross-

11   examination because it was effective.

12 Q  Fair enough.  So is it fair to say that whatever Mr. Roth is

13   alleging here was an exaggeration?

14 A  Yes.

15 Q  Is it fair to say that it's not consistent with what was

16   actually happening in court?

17 A  Correct.

18 Q  All right.  Page 61 Mr. Roth states, "We took a break so he

19   could gather his thoughts."  Did that occur, to your

20   recollection?  Was there a break during Allen's cross-exam so

21   that you could gather your thoughts?

22 A  No, not that I can recall.

23 Q  Was there a morning break in the usual course of the Court's

24   business?

25 A  I believe so.

| | | |
|---|---|---|
| 1 | Q | All right, fair enough.  Did you have a mental health |
| 2 | | breakdown of any kind on November 7th? |
| 3 | A | No. |
| 4 | Q | Anything about your mental health that impacted your |
| 5 | | representation of the Defendant on November 7th? |
| 6 | A | No. |
| 7 | Q | Moving onto November 9th.  On that day we had jury |
| 8 | | instructions, correct? |
| 9 | A | Yea. |
| 10 | Q | And you called the witness, John Pierce, correct? |
| 11 | A | Correct. |
| 12 | Q | And you also called the witness Fateen Muhammed, correct? |
| 13 | A | Correct. |
| 14 | Q | Starting with instructions, on that day you successfully |
| 15 | | argued for a modification to the jury instruction for |
| 16 | | Solicitation of Murder, correct? |
| 17 | A | Yes. |
| 18 | Q | And that was for the phrase "purposefully intends or |
| 19 | | intended" to be added to the jury instructions, correct? |
| 20 | A | Correct. |
| 21 | Q | Was that part of your defense? |
| 22 | A | Yea, that was the main crux of the defense as far as the |
| 23 | | intent that he -- arguing that he didn't have the intent to |
| 24 | | have any type of harm carried out. |
| 25 | Q | And that also related back to the ultimate argument that the |

1              Defendant was set up by others, correct?

2    A    Correct.

3    Q    All right.  So in the course of those arguments you made the

4         statement, and I don't know that we need to specifically look

5         at the transcripts because I think you might remember it

6         independently, you mentioned something referring to Mr. Roth,

7         "If he is going to laugh at me.  All he does is laugh."  Do

8         you remember anything about what was going on in court at

9         that moment?

10   A    Yea.  There was significant gamesmanship going on between

11        myself and Mr. Roth.  And Mr. Roth was trying to undermine a

12        lot of the points that we were making by attacking my

13        credibility, so I was trying to point that out.

14   Q    And regardless of that, you ultimately won your argument to

15        modify the jury instructions for the Defendant, correct?

16   A    Yes.

17   Q    You also, that same day, made a Motion for a Directed

18        Verdict, right?

19   A    Yes.

20   Q    And you also renewed your entrapment motion, correct?

21   A    Correct.

22   Q    And did the Defendant agree with you doing that?

23   A    Yes.

24   Q    Who wanted John Pierce to testify?

25   A    After we were informed that Mr. Pierce had notes and had more

| | | |
|---|---|---|
| 1 | | involvement, there was a mutual agreement. |
| 2 | Q | Okay, so that was something that fit into the strategy that |
| 3 | | you agreed with as well, correct? |
| 4 | A | Yes. |
| 5 | Q | And the Defendant agreed with it also? |
| 6 | A | Correct. |
| 7 | Q | What about Fateen Muhammed?  Who wanted him to testify? |
| 8 | A | Mr. Uraz wanted Mr. Muhammed to testify primarily. |
| 9 | Q | And did you want Mr. Muhammed to testify for any reason? |
| 10 | A | I didn't think that there was any real benefit to Mr. |
| 11 | | Muhammed. |
| 12 | Q | But did Mr. Uraz insist on him being called as a witness? |
| 13 | A | Yes. |
| 14 | Q | As to John Pierce, you questioned him on direct exam and |
| 15 | | established that he passed notes for Close and Allen, |
| 16 | | correct? |
| 17 | A | Yes. |
| 18 | Q | You also established that Close was overly curious about |
| 19 | | Uraz's case, correct? |
| 20 | A | Correct. |
| 21 | Q | And you established that John Pierce saw Close, Allen, and |
| 22 | | Uraz talking at least on one occasion, correct? |
| 23 | A | Yea. |
| 24 | Q | And were those things that were important for the defense |
| 25 | | that you and Mr. Uraz agreed upon? |

1  A    Yes.

2  Q    As to Muhammed, did his testimony even go as you expected?

3  A    I felt that any testimony that he would give would be

4       duplicative of what Mr. Pierce gave.  And I -- from what I

5       recall, he kind of went sideways because he ended up saying

6       that Mr. Uraz got what he deserved.

7  Q    Uh-huh.  He -- he also said that he wasn't really paying

8       attention to much about what went on with other inmates,

9       correct?

10  A    Correct.

11  Q    Fair enough.  Mr. Uraz chose not to testify in this case.

12       How did that decision come about?

13  A    It didn't.  After a lengthy discussion with Mr. Uraz, because

14       it wouldn't have fit in with the context of the video, I

15       thought that he -- if he were to testify that it would

16       undermine the underlying agreements and he would expose

17       himself as far as his ability to form an intent.

18  Q    Mr. Uraz also, as we discussed earlier, testified at the

19       entrapment hearing, correct?

20  A    Correct.

21  Q    And at that hearing Mr. Uraz essentially admitted to every

22       element of the crimes that he was charged with, correct?

23  A    Yes.

24  Q    However, Mr. Uraz clearly didn't view it that way, did he?

25  A    No.

| | | |
|---|---|---|
| 1 | Q | Was that part of the decision for the Defendant not to |
| 2 | | testify? |
| 3 | A | Correct. |
| 4 | Q | And you understood that he could be impeached with that |
| 5 | | testimony if he said something different, correct? |
| 6 | A | Yes. |
| 7 | Q | But ultimately it was Mr. Uraz's decision not to testify, |
| 8 | | correct? |
| 9 | A | Correct. |
| 10 | Q | All right, so closing arguments.  During your closing |
| 11 | | argument you used some of the facts that you elicited during |
| 12 | | the testimony in the case, correct? |
| 13 | A | Correct. |
| 14 | Q | And that was consistent with the strategy you and the |
| 15 | | Defendant agreed upon, correct? |
| 16 | A | Yes. |
| 17 | Q | That included testimony that you had elicited regarding |
| 18 | | Burnett thinking that the Defendant looked scared during the |
| 19 | | gun conversation, correct? |
| 20 | A | Correct. |
| 21 | Q | That included the argument around the jury instruction |
| 22 | | modification that you successfully obtained for the |
| 23 | | Defendant, correct? |
| 24 | A | Correct. |
| 25 | Q | That included what you viewed as the Defendant's lack of |

| | | |
|---|---|---|
| 1 | | follow up in terms of taking actual action toward the crimes, |
| 2 | | correct? |
| 3 | A | Correct. |
| 4 | Q | That included that it was others, not the Defendant, who in |
| 5 | | your view initiated the conversations, correct? |
| 6 | A | Correct. |
| 7 | Q | That included pointing to the ambiguous language used by |
| 8 | | Officer Mobley in the video, correct? |
| 9 | A | Correct. |
| 10 | Q | That included arguing that it was the police, not the |
| 11 | | Defendant, who engaged in deliberate conduct, correct? |
| 12 | A | Correct. |
| 13 | Q | You argued that the State's witnesses were not credible, |
| 14 | | correct? |
| 15 | A | Correct. |
| 16 | Q | And, of course, you also argued reasonable doubt, correct? |
| 17 | A | Yes. |
| 18 | Q | Did your closing argument include the best defenses that you |
| 19 | | felt were applicable to the case? |
| 20 | A | Yes. |
| 21 | Q | And those were all things that you and the Defendant agreed |
| 22 | | upon? |
| 23 | A | Correct. |
| 24 | Q | Did you have a mental breakdown of any kind on November 9th, |
| 25 | | 2017? |

| 1  | A | No. |
|----|---|-----|
| 2  | Q | Ultimately the jury found the Defendant guilty, correct? |
| 3  | A | Correct. |
| 4  | Q | After the jury found the Defendant guilty, did an issue arise |
| 5  |   | with your mental health? |
| 6  | A | Yes, about a week after the trial. |
| 7  | Q | Okay, fair enough.  So limiting it to what you're willing to |
| 8  |   | share with us today, what is it that happened the week after |
| 9  |   | the guilty verdict in this case? |
| 10 | A | Well, I ended up having -- I took a trip to Dallas right |
| 11 |   | after I got done with the trial and didn't sleep really, and |
| 12 |   | hadn't gotten that much sleep during the trial in |
| 13 |   | preparation.  I had to fly back sooner than anticipated for a |
| 14 |   | family issue, which caused significant exhaustion, which led |
| 15 |   | to me having some different -- I had to go to a hospital |
| 16 |   | because of the exhaustion, which caused my family significant |
| 17 |   | concern, which ended up leading to having an episode, a |
| 18 |   | bipolar episode. |
| 19 | Q | Okay.  So is it fair to say then that a week after the |
| 20 |   | verdict in this case you had an episode, and that episode led |
| 21 |   | to a mental health diagnosis? |
| 22 | A | Correct. |
| 23 | Q | Okay, and you mentioned bipolar.  Is that the diagnosis that |
| 24 |   | you ultimately received? |
| 25 | A | Yes. |

| | | |
|---|---|---|
| 1 | Q | Okay, did you share that information with Mr. Uraz the next |
| 2 | | time that you saw him? |
| 3 | A | I did. |
| 4 | Q | How -- how and when exactly did that occur? |
| 5 | A | As soon as I was available I had spoke with Mr. Uraz and |
| 6 | | explained to him why I had been unavailable.  And then we had |
| 7 | | to address it with the Court, I believe. |
| 8 | Q | Did Mr. Uraz tell you that he wanted you to continue |
| 9 | | representing him? |
| 10 | A | He did. |
| 11 | Q | What did he say exactly? |
| 12 | A | Given the nature of our relationship at that point in time he |
| 13 | | was happy with what we'd done and the efforts that I'd put |
| 14 | | in, so he told me that he wanted me to continue as his |
| 15 | | attorney. |
| 16 | Q | On December 12th, 2017 there was an in chambers conference |
| 17 | | with the Court, correct? |
| 18 | A | Yes. |
| 19 | Q | And you were present for that? |
| 20 | A | Yes. |
| 21 | Q | Were the acute issues with this episode that you had resolved |
| 22 | | by that day? |
| 23 | A | I believe -- yes. |
| 24 | Q | And you informed the Court on that day that Mr. Uraz wanted |
| 25 | | you to continue representing him, correct? |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And you informed the Court on that day that you did not have |
| 3 | | an episode during trial, correct? |
| 4 | A | Correct. |
| 5 | Q | On December 13th, 2017, the next day, you were in court again, |
| 6 | | correct? |
| 7 | A | Yea. |
| 8 | Q | And on that day Mr. Uraz, on the record, requested that you |
| 9 | | continue representing him, correct? |
| 10 | A | Correct. |
| 11 | Q | And did something change about that between December 13th and |
| 12 | | the sentencing ultimately? |
| 13 | A | Um, I believe I had a conversation with Mr. Silverthorn and |
| 14 | | he didn't want to have me on continuing as the attorney and |
| 15 | | felt it was in Mr. Uraz's best interest, so the decision was |
| 16 | | made that I wouldn't -- I would turn the file over to Mr. |
| 17 | | Silverthorn. |
| 18 | Q | Okay, so ultimately you did not appear for sentencing, |
| 19 | | correct? |
| 20 | A | Correct. |
| 21 | Q | All right.  And again, I'm going to ask you a question and I |
| 22 | | don't -- I'm not intending to invade your privacy here, but I |
| 23 | | am wondering.  If you had had some kind of an active episode |
| 24 | | that happened during trial, what would that have looked like |
| 25 | | and would it have been even possible for you to continue |

1       litigating a serious offense like this?

2   A   I would have been unintelligible.

3   Q   Okay, so it would have been obvious to the Court that this

4       couldn't continue?

5   A   It would have been obvious, yes.

6   Q   It would have been obvious to everyone?

7   A   It would have been obvious to the jury --

8   Q   We would have been calling for help for you?

9   A   Yes.

10  Q   Okay.  So then fair to say there was no episode that occurred

11      during trial, correct?

12  A   Correct.

13  Q   In terms of your just general mental health and ability, was

14      there a decline that occurred during trial?

15  A   No, I don't believe so.

16              MS. CRINO:  Okay, thank you.  I do not have any

17      other questions.

18              THE COURT:  Any redirect, Ms. Walsh?

19                  **REDIRECT EXAMINATION**

20  BY MS. WALSH:

21  Q   Okay.  You testified that -- that you had been urging Mr.

22      Uraz to take the plea?

23  A   Correct.

24  Q   Okay.  Are you familiar with Defendant's Exhibit A from the

25      hearing regarding your -- the decision to have somebody else

```
 1          do the sentencing?  It's an email that you sent to Aysem Uraz
 2          and Cenk Uraz on November 8th, 2017 during the trial?
 3  A       I'd have to see it.
 4                    MS. WALSH:  May I approach?
 5                    THE COURT:  Yes.
 6                    MS. CRINO:  I would also note, this is already part
 7          of the record, so I don't think that there's a need to admit
 8          it as an independent exhibit.  I have no problem with
 9          questions around it.
10                    THE COURT:  All right, so noted.
11                    THE WITNESS:  Yes, I can recall this now.  I -- I
12          believe that after we started with the trial that we were
13          going to try to get the most out of it.  And I thought we did
14          fairly well during trial.  And there did appear to be some
15          dejection on the Prosecutor's part.  I think that was after
16          the trial had been concluded, but I was trying to be positive
17          for Mr. Uraz after he'd made the decision to go to trial and
18          there was no other option.
19  BY MS. WALSH:
20  Q       So you -- you believed that there would be a not -- a not
21          guilty verdict?
22  A       I believed that there would be a not guilty verdict.
23  Q       Okay.
24  A       I thought that we'd done a very good job in undermining the
25          State's case.
```

1   Q    And -- and at that time you believed that you could establish

2        $10 million dollars in damages against the Prosecution?

3   A    Um, in an unlawful imprisonment type case that would be a

4        small award.

5   Q    And you believed that that -- at that time that that was a

6        reasonable statement to make about this case?

7   A    Um, again, that may have been a little bit expansive, but I

8        was trying to keep their moral up also.  I'd had significant

9        conversations with the sister because there were some issues

10       that I recall he had going -- going on back in Turkey.  But I

11       was trying to be positive at that point.

12  Q    So what you're saying is that when you testified that your

13       opinion was that there wasn't a good case and that he should

14       take a guilty plea, that that was before the trial?

15  A    I thought we did very good at the trial.  I thought that we'd

16       done a very good job in trying to show the jury that the case

17       was basically started by the police and that there wasn't a

18       real intent on his part.  That it was just a creation of the

19       police.  That it wasn't anything that was going to eventually

20       happen.  It was kind of artificial.

21  Q    That they had put the whole thing into his head and got the

22       ball rolling on it --

23  A    Right.

24  Q    -- and basically entrapped him?

25  A    Yes.

1    Q    And you indicated on here that you routinely work 120 hours a

2         week?

3    A    I was working a considerable number of hours at that point in

4         time in my career.

5    Q    And it's your belief that that didn't impact this trial?

6    A    That may have been an embellishment as far as the total

7         number of hours that I worked.  I did get sleep during the

8         trial, it just wasn't the greatest amount.  But no, I don't

9         believe that it impacted the trial.  I thought that the trial

10        strategy and what we were attempting to establish was

11        effective.

12   Q    Okay.  So you don't believe that your bipolar disorder

13        impeded you from getting sleep during that time?

14   A    No.

15                  MS. WALSH:  I don't have any further questions.

16                  THE COURT:  Any follow up, Ms. Crino?

17                  MS. CRINO:  Just so briefly.

18                       **RECROSS-EXAMINATION**

19   BY MS. CRINO:

20   Q    The email that Ms. Walsh was asking you questions about, that

21        was not something that was presented to the jury, correct?

22   A    No.

23   Q    That was an email sent to a family member of the Defendant's

24        during the course of the trial, correct?

25   A    I think it was the end of trial.

1          MS. CRINO:  Fair enough.  No other questions.

2    Thank you.

3          THE COURT:  All right, I have no questions for Mr.

4    Perrone.  Thank you for coming in.  I appreciate it.

5          (At 10:14 a.m. witness excused)

6          THE COURT:  Next witness, Ms. Crino?

7          MS. CRINO:  Oh, Ms. Walsh actually, your Honor.

8          THE COURT:  Oh, I'm sorry.  I'm so used to it being

9    -- Ms. Walsh?

10         MS. CRINO:  As am I.

11         MS. WALSH:  Ms. Crino, I'm afraid I don't know who

12   this witness is.

13         MS. CRINO:  Okay, this is Mr. Schroeder right here.

14         MS. WALSH:  Mr. Schroeder.  I'll call Mr. Schroder

15   at this time.

16         THE COURT:  All right.  And raise your right hand

17   for me, Mr. Schroeder.  Do you swear or affirm the testimony

18   you're about to give will be the truth and the whole truth

19   under the penalty of perjury?

20         MR. SCHROEDER:  I do, your Honor.

21              **ERIC SCHROEDER**

22         (At 10:15 a.m. witness sworn and testified)

23         THE COURT:  Have a seat.  Take down your mask while

24   testifying.  State your name and spell your last name for the

25   recorder, please.

```
1              THE WITNESS:  My first name is Eric, E-r-i-c.  My
2         last name is Schroeder, S-c-h-r-o-e-d-e-r.
3              THE COURT:  Thank you.  Ms. Walsh?
4                        DIRECT EXAMINATION
5    BY MS. WALSH:
6    Q    Good morning, Mr. Schroeder.  Can you tell us a little bit
7         about your relationship with Mr. Perrone, how you met him,
8         and how you came to be a part of the trial, Mr. Uraz's trial?
9    A    Sure.  I met Mr. Perrone in March of 2017.  I worked with him
10        part time up until September of that year.  Around September
11        I was working for him full time, and then I left his firm at
12        the end of the year.
13   Q    At the end of 2017?
14   A    Yes.
15   Q    Okay.  So you assisted Mr. Perrone during Mr. Uraz's trial?
16   A    Yes.
17   Q    And so you were in constant contact with Mr. Perrone,
18        extensive discussions about the trial and different
19        strategies and what not?
20   A    Um, I was in communication with Mr. Perrone about the trial.
21        I more or less just assisted him with any tasks he asked me
22        to do.
23   Q    Okay.  Do you think that Mr. Perrone's bipolar disorder
24        condition affected his ability to make good decisions about
25        trial strategy?
```

| 1 | A | My understanding is that his condition was unknown at the |
| 2 | | time of trial.  I did not see any issues with Mr. Perrone's |
| 3 | | mental state that impacted his ability to try the case. |
| 4 | Q | How long had you practiced law at that time? |
| 5 | A | At the time of Mr. Uraz's trial I had been licensed a little |
| 6 | | over two years. |
| 7 | Q | Had you sat in on trials previously? |
| 8 | A | I had actually conducted a misdemeanor trial for Mr. Perrone, |
| 9 | | I believe it was that August. |
| 10 | Q | Okay.  Do you think that any of the decisions that were made |
| 11 | | by Mr. Perrone during the trial prejudiced Mr. Uraz? |
| 12 | A | I don't. |
| 13 | Q | Did you notice any change in Mr. Perrone's ability to handle |
| 14 | | his practice during the time of the trial? |
| 15 | A | Not during the time of his trial. |
| 16 | Q | Did Mr. Perrone seem distracted? |
| 17 | A | No. |
| 18 | Q | Did he seem to be well rested and confident to do the job? |
| 19 | A | He -- during Mr. Uraz's trial he seemed normal to me. |
| 20 | Q | Okay. |
| 21 | A | Or what I understood Mr. Perrone's personality and ability to |
| 22 | | be. |
| 23 | | MS. WALSH:  Okay, I don't have any further |
| 24 | | questions. |
| 25 | | THE COURT:  Any questions, Ms. Crino? |

| 1 | | **CROSS-EXAMINATION** |
|---|---|---|
| 2 | BY MS. CRINO: | |
| 3 | Q | Good morning.  How are you? |
| 4 | A | I'm doing fine.  How are you? |
| 5 | Q | I'm well.  Mr. Schroder, you understand that Mr. Uraz has |
| 6 | | made an argument that Mr. Perrone was ineffective during the |
| 7 | | course of his trial, correct? |
| 8 | A | I understand it's one of his arguments. |
| 9 | Q | You had an opportunity to review some of those pleadings? |
| 10 | A | I did. |
| 11 | Q | And so because of that you also know that Mr. Uraz has given |
| 12 | | up any attorney client privilege as it pertains to that |
| 13 | | argument, correct? |
| 14 | A | That's what I was -- that's what I've been advised of, yes. |
| 15 | Q | Okay, fair enough.  Thank you.  So you've testified that in |
| 16 | | September of 2017 you were working for Mr. Perrone, correct? |
| 17 | A | Yes. |
| 18 | Q | And you became involved with assisting him in representing |
| 19 | | Tunc Uraz in dockets 16-1064-FH and 16-1065-FC, correct? |
| 20 | A | Yes. |
| 21 | Q | And you became involved because of your employment with Mr. |
| 22 | | Perrone? |
| 23 | A | Yes. |
| 24 | Q | Fair to say Mr. Perrone would have been lead attorney or |
| 25 | | first chair, and you would have been second chair, correct? |

|    |   |                                                                      |
|----|---|----------------------------------------------------------------------|
| 1  | A | He was certainly -- he was certainly the lead attorney, yes.        |
| 2  |   | And I, as I previously testified, I -- whatever tasks he            |
| 3  |   | asked me to assist him with I just -- are the tasks I               |
| 4  |   | performed on the case.                                              |
| 5  | Q | Okay, fair enough.  And even as an assisting attorney you           |
| 6  |   | understand that you have ethical obligations to your client,        |
| 7  |   | correct?                                                             |
| 8  | A | Yes.                                                                 |
| 9  | Q | And those obligations include handling legal matters with          |
| 10 |   | adequate preparation under Michigan Rules of Professional           |
| 11 |   | Conduct 1.1, correct?                                                |
| 12 | A | Yes.                                                                 |
| 13 | Q | And those obligations include not neglecting a legal matter        |
| 14 |   | that is entrusted to you, correct?                                  |
| 15 | A | Yes.                                                                 |
| 16 | Q | And those obligations include a duty to inform the Attorney        |
| 17 |   | Grievance Commission regarding matters that raise a                 |
| 18 |   | substantial question as to another lawyer's honesty,               |
| 19 |   | trustworthiness, or fitness as a lawyer, correct?                   |
| 20 | A | Yes.                                                                 |
| 21 | Q | And that's under Rule 8.3, correct?                                 |
| 22 | A | Yes.                                                                 |
| 23 | Q | And you understood all of those obligations in 2017?               |
| 24 | A | Yes.                                                                 |
| 25 | Q | You understand them as well today, correct?                         |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | So you assisted Mr. Perrone in prepping Mr. Uraz's case for |
| 3 | | trial, right? |
| 4 | A | Yes. |
| 5 | Q | And in the preparation phase did you observe anything |
| 6 | | regarding Mr. Perrone's mental state that gave you pause |
| 7 | | under your ethical obligations? |
| 8 | A | No. |
| 9 | Q | Did you observe anything that you believe prejudiced Mr. |
| 10 | | Uraz? |
| 11 | A | No. |
| 12 | Q | During trial you cross -- you did the cross-examination for |
| 13 | | several witnesses, correct? |
| 14 | A | Two witnesses that I can recall. |
| 15 | Q | And one of them was Erika Melke, correct? |
| 16 | A | Yes. |
| 17 | Q | And Mr. Perrone questioned the remaining witnesses, correct? |
| 18 | A | Yes. |
| 19 | Q | As one of Mr. Uraz's attorneys, did you have any concerns |
| 20 | | regarding the way that Mr. Perrone cross-examined any of the |
| 21 | | witnesses? |
| 22 | A | No. |
| 23 | Q | Was there anything that was glaringly absent, from your |
| 24 | | perspective? |
| 25 | A | No. |

| | | |
|---|---|---|
| 1 | Q | Would you have been capable of stepping in for your client if |
| 2 | | something had been glaringly absent? |
| 3 | A | As in taking over as the lead counsel or -- |
| 4 | Q | As in speaking up if there was an issue. |
| 5 | A | Yes. |
| 6 | Q | Mr. Perrone conducted voir dire, correct? |
| 7 | A | Yes. |
| 8 | Q | Did you observe any issues during voir dire? |
| 9 | A | No. |
| 10 | Q | Did you observe any issues during opening statement? |
| 11 | A | No. |
| 12 | Q | Did you observe any issues during cross-exam of the People's |
| 13 | | witnesses? |
| 14 | A | No. |
| 15 | Q | Did you observe any issues during direct exam of Mr. |
| 16 | | Perrone's own witnesses? |
| 17 | A | No. |
| 18 | Q | Did you observe any issues during closing arguments? |
| 19 | A | The only issue I can recall is he might have lost his train |
| 20 | | of thought at one point during the closing argument, but |
| 21 | | other than that, no. |
| 22 | Q | Is that unusual? |
| 23 | A | No. |
| 24 | Q | Is that something that happens to a lot of attorneys? |
| 25 | A | I'd say it happens to some.  I'm not sure how I would |

|     |   |                                                              |
|-----|---|--------------------------------------------------------------|
| 1   |   | characterize it as -- I'm not sure if I would use the term a |
| 2   |   | lot, but certainly some attorneys.                           |
| 3   | Q | Fair enough.                                                 |
| 4   | A | It's happened to me before.                                  |
| 5   | Q | Fair enough.  It's happened to me before as well.  It        |
| 6   |   | happens, is that fair to say?                                |
| 7   | A | Yes.                                                         |
| 8   | Q | As one of Mr. Uraz's attorneys, you would have acted in his  |
| 9   |   | interest if there had been an issue, correct?                |
| 10  | A | If I -- if Mr. Perrone had had a health -- had a health issue|
| 11  |   | during trial I would have advised the Court of that.         |
| 12  | Q | Okay.  And one of the options available to you would have    |
| 13  |   | been to let the Court know and move for a continuance, right?|
| 14  | A | Yes.                                                         |
| 15  | Q | And you never felt the need to do that, correct?             |
| 16  | A | No.                                                          |
| 17  | Q | All right, a couple really specific things that Ms. Walsh has|
| 18  |   | raised on behalf of Mr. Uraz in the pleadings.  First, Ms.   |
| 19  |   | Walsh alleges that Mr. Perrone had a mental breakdown during |
| 20  |   | trial and failed to ask for a continuance.  Did that happen? |
| 21  | A | No.                                                          |
| 22  | Q | Did you observe Mr. Perrone have a mental breakdown during   |
| 23  |   | trial?                                                        |
| 24  | A | Not during trial.                                            |
| 25  | Q | All right.  Second, Ms. Walsh has alleged that Mr. Perrone's |

1  mental ability to try the case declined during trial.  Did

2  that happen?

3  A  Not to my knowledge.

4  Q  Third, Ms. Walsh has alleged broadly that Mr. Perrone failed

5  to properly cross-examine the State's witnesses.  Did that

6  occur?

7  A  No.

8  Q  Fourth, Ms. Walsh has alleged that Mr. Perrone did not

9  properly examine his own witnesses, the Defendant's

10  witnesses.  Did that occur?

11  A  No.

12  Q  Last, Ms. Walsh has alleged a specific moment in trial that's

13  indicative of a mental breakdown in her view that would be

14  occurring on November 7th, 2017.  Mr. Roth made an objection

15  stating that it was three minutes between questions during

16  cross-exam of a particular witness.  Did that happen?  Was it

17  actually three minutes between each question?

18  A  No.

19  Q  Did that cross-exam of that particular witness actually drag

20  on for hours, as Mr. Roth alleged?

21  A  Which witness would that be?

22  Q  This would be Charles Allen.

23  A  From what I recall, since he was a key witness, that there

24  was a lengthy cross-examination, but I wouldn't say it lasted

25  for hours.

```
 1   Q    Fair enough.  And when you say lengthy, is that because there

 2        was a lot of substance to cover, or because there were three

 3        minute breaks between the questions?

 4   A    There was a lot of substance to cover.

 5              MS. CRINO:  All right, no other questions for you.

 6        Thank you.

 7              THE COURT:  Any redirect, Ms. Walsh?

 8              MS. WALSH:  No, I have no further questions.

 9              THE COURT:  Thank you, Mr. Schroeder, I appreciate

10        you coming in.

11              (At 10:24 a.m. witness excused)

12              THE COURT:  Your next witness?

13              MS. CRINO:  Do you want Nick Fernandez, he's here?

14              MS. WALSH:  Yes.  Nicholas Fernandez.

15              THE COURT:  Raise your right hand.  Do you swear or

16        affirm the testimony you're about to give will be the truth

17        and the whole truth under the penalty of perjury?

18              MR. FERNANDEZ:  I do, your Honor.

19                        NICHOLAS FERNANDEZ

20              (At 10:25 a.m. witness sworn and testified)

21              THE COURT:  All right, have a seat.  Pull down your

22        mask and then state your name and spell your last name for

23        the recorder.

24              THE WITNESS:  My name is Nicholas Fernandez, F-e-r-

25        n-a-n-d-e-z.
```

1           THE COURT:  Thank you.

2                 **DIRECT EXAMINATION**

3    BY MS. WALSH:

4    Q     Good morning, Mr. Fernandez.

5    A     Good morning.

6    Q     Can you tell us a little bit about your -- how you met Mr.

7          Perrone and what role you played in the trial of Mr. Uraz?

8    A     I've known Mr. Perrone since middle school.  My role during

9          the trial was very limited.  If Mr. Schroeder was second

10         chair, I would be third.  More of an administrative role I

11         would say.

12   Q     So you were just help -- kind of helping out --

13   A     That's correct.

14   Q     -- during the trial?

15   A     That's correct.

16   Q     Okay.  Did you see any kind of a downturn in Mr. Perrone's

17         behavior during the course of the trial?

18   A     Not during the course of the trial, no.

19   Q     You didn't see him losing his temper or having any kind of

20         outbursts or anything like that during the course of the

21         trial?

22   A     There was one or two occasions, I believe it was after the

23         jury was dismissed, that he -- I don't know what you want to

24         call it -- an outburst maybe directed at the Prosecution

25         table, and I believe Detective Krum, if my memory serves me

| | | |
|---|---|---|
| 1 | | correctly. |
| 2 | Q | I'm sorry, I could barely hear you. |
| 3 | A | He had, I remember, at least one, I guess you would call it |
| 4 | | an outburst after the jury was let out.  I believe it was |
| 5 | | Detective Krum. |
| 6 | Q | And what happened in that? |
| 7 | A | He just raised his voice.  I can't remember specifics about |
| 8 | | what he was upset about.  But other than that, no. |
| 9 | Q | Was that out of character for Mr. Perrone? |
| 10 | A | No. |
| 11 | Q | So you would -- in your long history with him, had seen him |
| 12 | | lose his temper on other occasions? |
| 13 | A | I wouldn't say lose his temper.  He's an excitable guy. |
| 14 | Q | So like a high energy person is what you're saying? |
| 15 | A | Yes, high energy. |
| 16 | Q | Okay.  Do you believe that his emotional state negatively |
| 17 | | impacted his ability to effectively defend Mr. Uraz? |
| 18 | A | I do not. |
| 19 | Q | Do you think that any of Mr. Perrone's decisions prejudiced |
| 20 | | Mr. Uraz? |
| 21 | A | No. |
| 22 | Q | Okay.  So you would say that although he had this -- you |
| 23 | | know, kind of raised his temper a little bit at the -- at the |
| 24 | | end of the trial you didn't think that that impacted his |
| 25 | | ability to handle the trial, am I correct on that? |

1   A   Yea, you are correct.

2   Q   Okay.  Do you recall any decisions that Mr. Perrone might

3       have made that -- that were, you thought, to be a poor

4       strategy?

5   A   No, I do not.

6   Q   Do you think that there's anything else that you can tell

7       this Court that would help the Court make a decision on

8       whether or not Mr. Uraz had effective assistance?

9   A   I can say that during the trial we put in the hours.  I think

10      we did as best as we could.

11              MS. WALSH:  Okay, thank you.

12              THE WITNESS:  You're welcome.

13              MS. WALSH:  I don't have any further questions.

14              THE COURT:  Questions, Ms. Crino?

15              MS. CRINO:  No questions, your Honor.  Thank you.

16              THE COURT:  Thank you, Mr. Fernandez.  I appreciate

17      you coming in.

18              (At 10:28 a.m. witness excused)

19              THE COURT:  Any additional witnesses today, Ms.

20      Walsh?

21              MS. CRINO:  Give me a moment, your Honor.

22              THE COURT:  All right.

23              MS. CRINO:  Ready whenever you are.

24              MS. WALSH:  Okay, I'm ready whenever the Court is

25      ready.

1          (At 10:29 a.m. to 10:31 a.m. off the record)

2               THE COURT:  All right, be seated.  This is -- just

3      for the record, call the witness for me, Ms. Walsh?

4               MS. WALSH:  This is Charles Koop.

5               THE COURT:  Do you swear or affirm the testimony

6      you're about to give will be the truth and the whole truth

7      under the penalty of perjury?

8               MR. KOOP:  I do.

9                         **CHARLES KOOP**

10              (At 10:32 a.m. witness sworn and testified)

11              THE COURT:  Have a seat.  Pull down your mask.

12     State your name and spell your last name for the record,

13     please?

14              THE WITNESS:  Charles Koop, K-o-o-p.

15                       **DIRECT EXAMINATION**

16  BY MS. WALSH:

17  Q    Good morning, Mr. Koop.  Thank you for being here.  What was

18       your job at the time of Mr. Uraz's trial in November of 2017?

19  A    I was an assistant prosecutor for Ingham County.

20  Q    For Ingham County.  Were you the lead prosecutor?

21  A    I split the trial with Jonathon Roth.  I would probably more

22       accurately describe him as the lead prosecutor.

23  Q    Okay.  Did you notice any changes during the trial in Mr.

24       Perrone's condition or ability to handle the trial?

25  A    Not during the pendency of the trial, no.

1   Q   Did you notice that he was distracted or fatigued or anything

2       like that?

3   A   I did not notice that.

4   Q   Okay.  Do you think that his -- anything about his mental

5       health condition affected his ability to properly defend Mr.

6       Uraz?

7   A   No.

8   Q   Do you think that the jury might have noticed any problems

9       with Mr. Perrone during the trial?

10  A   I don't think so.  That'd be a question for the jury, but no.

11  Q   Okay.  Is there anything else that you think that the Court

12      should know about things that might have happened behind the

13      scenes that would help the Court in making this determination

14      as to whether Mr. Uraz had effective assistance of counsel?

15  A   Not that I'm aware of, no.

16              MS. WALSH:  I have no further questions.

17              THE COURT:  Questions, Ms. Crino?

18              MS. CRINO:  No questions, thank you.

19              THE COURT:  Thank you, Mr. Koop.  Good seeing you.

20              THE WITNESS:  Thank you, Judge.  Good to see you.

21              (At 10:34 a.m. witness excused)

22              THE COURT:  Any additional witnesses for today?

23              MS. CRINO:  Mr. Silverthorn is here in person.  I

24      can go grab him.

25              THE COURT:  All right.  Step up here for us, Mr.

1    Silverthorn.  Raise your right hand for me.  Do you swear or

2    affirm the testimony you're about to give will be the truth

3    and the whole truth under the penalty of perjury?

4                 MR. SILVERTHORN:  I do.

5                      **DUANE SILVERTHORN**

6             (At 10:35 a.m. witness sworn and testified)

7             THE COURT:  Have a seat.  Pull down your mask for

8    us, please, and then state your name and spell your last name

9    for the reporter.

10            THE WITNESS:  Duane Silverthorn.  Last name is

11   spelled S-i-l-v-e-r-t-h-o-r-n.

12            THE COURT:  Pull your mask down while testifying.

13   Thank you.

14                      **DIRECT EXAMINATION**

15   BY MS. WALSH:

16   Q    Good morning, Mr. Silverthorn.  Thanks for being here this

17        morning.  Could you explain to the Court the role you played

18        in the trial of Mr. Uraz?

19   A    I was appointed by the Court to handle the sentencing for Mr.

20        Uraz.

21   Q    And did you meet with Mr. Perrone at all during that time?

22   A    Yes, in my office in Okemos.

23   Q    Okay.  And what did -- did you think that Mr. Perrone was

24        behaving oddly or anything?

25                 MS. CRINO:  It's not an objection.  I'm just

1    wondering if we could have foundational clarification for the

2    approximate date for when this took place?

3         THE COURT:  All right, do you know when this was?

4    This was post-trial, I believe, so we need to establish the

5    record on that.

6  BY MS. WALSH:

7  Q    Yes, what date?  Do you recall what date --

8  A    No, I don't recall that.  But it was following the trial and

9    prior to sentencing, which I think are all on the record.

10 Q    Okay.  Did you note any -- notice anything concerning about

11   Mr. Perrone's behavior?

12 A    He was -- he was agitated.  Had difficulty focusing.  He was

13   speaking really fast.  He was cordial, but like I said,

14   agitated.

15 Q    Okay.  But you don't have any -- any personal knowledge of

16   what happened during the trial?

17 A    No.  No, none whatsoever.

18 Q    You were not at the trial?

19 A    I wasn't at the trial.  I had never met Mr. Perrone before.

20 Q    Okay.  All right, do you think there's anything else that you

21   have any information about that would help the Court make a

22   determination as to whether there was effective assistance of

23   counsel?

24 A    I hadn't ever met Mr. Perrone before, and everybody is a

25   different person.  Some people are excitable and talk,

1    particularly trial attorneys, talk and some are tightly

2    controlled.  So I had some -- I had no base to judge on.  I

3    thought it was concerning, the focus wasn't there and that he

4    was speaking so quickly and was clearly agitated.  But

5    whether he was that way during the trial, I would have no way

6    of knowing.

7              MS. WALSH:  Okay, thank you very much.

8              THE COURT:  Ms. Crino, any questions?

9              MS. CRINO:  No questions, Mr. Silverthorn.  Thank

10   you.

11             THE COURT:  Thank you for coming in.

12             (At 10:38 a.m. witness excused)

13             THE COURT:  Any additional witnesses for today?

14             MS. CRINO:  Yes, Andrew Vuckovich will be standing

15   by and ready to Zoom in at 11:00.  I'm going to send him an

16   email and see if he's available now, since we have the time.

17             THE COURT:  All right, do you have any objections

18   to Mr. Vuckovich appearing by Zoom, Ms. Walsh?

19             MS. WALSH:  I was just going to say that I would --

20   since we do have to come back, I would -- if he is not

21   available right now I would maybe discuss with Mr. Uraz the

22   necessity of Mr. Vuckovich's testimony at this time.  Whether

23   he's available by Zoom --

24             THE COURT:  Okay.  Let me make sure I understand.

25   So, I mean, either you want him to come back or you don't.

| | |
|---|---|
| 1 | If he's available are you saying you'll do it by Zoom? If |
| 2 | he's not available you want him to come back? |
| 3 | MS. WALSH: I was -- I was going to review the -- |
| 4 | my notes from today and the notes that I had prior to today |
| 5 | and decide whether or not he's a necessary witness. |
| 6 | THE COURT: So why don't we email him and say we'll |
| 7 | be ready for him at 11:00. |
| 8 | MS. CRINO: That sounds good, your Honor. I just |
| 9 | -- I just emailed him. I'll let the Court know if I hear |
| 10 | back from him. |
| 11 | THE COURT: All right, I think that will give Ms. |
| 12 | Walsh some opportunity to review her notes and or discuss it |
| 13 | with Mr. Walsh if he so desires. |
| 14 | MS. CRINO: Sounds good. Thank you, your Honor. |
| 15 | THE COURT: All right, so we'll be in recess until |
| 16 | 11:00. |
| 17 | (At 10:39 a.m. to 11:02 a.m. off the record) |
| 18 | THE COURT: Returning on the matter of People v |
| 19 | Uraz. I think I had -- he had a lot of cases with us, so |
| 20 | really we're on 16-1064 and 65. We have an additional |
| 21 | witness that is available currently by Zoom. And I don't |
| 22 | know if Ms. Walsh wants him to appear by Zoom or not. |
| 23 | MS. WALSH: Yes, that will be fine. |
| 24 | THE COURT: All right, so we'll bring Mr. Vuckovich |
| 25 | in. Can you hear us, Mr. Vuckovich? |

1      MR. VOCOVICH:  Yes, your Honor.

2      THE COURT:  All right, would you stand and raise

3  your right hand and be sworn by the clerk, please?

4      MR. WIER:  Mr. Vuckovich, do you swear or affirm

5  the testimony you're about to give will be the truth, the

6  whole truth, and nothing but the truth under the penalty of

7  perjury?

8      MR. VUCKOVICH:  I do.

9               **ANDREW VUCKOVICH**

10      (At 11:03 a.m. witness sworn and testified)

11      THE COURT:  All right, you can be seated.

12      THE WITNESS:  Thank you, your Honor.

13      THE COURT:  And then state your name -- let the

14  record reflect that Mr. Vuckovich is appearing by Zoom with

15  the consent of the parties.

16      And so would you state your name and spell your

17  last name for the court recorder, please?

18      THE WITNESS:  Andrew Vuckovich, V-u-c-k-o-v-i-c-h.

19      THE COURT:  And we have Ms. Walsh here and Ms.

20  Crino.  And Ms. Walsh is going to be questioning you at this

21  time.  Ms. Walsh?

22               **DIRECT EXAMINATION**

23  BY MS. WALSH:

24  Q    Good morning, Mr. Vuckovich.  Thank you.  Can you explain to

25  us a little bit about your relationship with Mr. Perrone in

1      2017 and your -- and the involvement you had in the trial of

2      Mr. Uraz?

3  A   Sure, to the best of my ability.  And if you have any follow

4      ups I'd be happy to answer them.  So 2017 was the third and

5      final year that I worked with or for Attorney Perrone.  2015,

6      I believe, is when I -- maybe at the end of 2014 when I

7      started with him right out of law school he was just, sort of

8      -- the intention was always for him to show me the ropes so

9      that if I was interested in what he was doing that I could

10     open up my own practice.  In 2017 -- I don't know if that's

11     the year that he received the appointment on the Uraz case.

12     If it is, I remember his name.  I remember him being a client

13     of Attorney Perrone's.  And I remember actually receiving

14     phone calls from the Embassy to Attorney Perrone's office

15     regarding Mr. Uraz.  We never got in any real content.  I

16     don't really remember what they were calling about.  But

17     other than that, my involvement with the case was very

18     limited.  Typically when Attorney Perrone had serious felony

19     cases, those were sort of his cases.  And my job was to deal

20     with misdemeanors and traffic tickets to free him up to deal

21     with those cases.  There was a time when he asked me to go

22     meet with Mr. Uraz in person at the -- at the Ingham County

23     Jail, I believe.  I remember meeting with Mr. Uraz.  It was a

24     situation where I was called just maybe an hour beforehand.

25     Mr. Perrone was going to meet with him and then something

1    came up.  I don't remember what it was.  But I went and met

2    with Mr. Uraz with basically a legal pad and pen in hand to

3    write down any concerns or convey anything that he wanted to

4    talk to Jake about so that I could inform Mr. Perrone of any

5    concerns that Mr. Uraz had.  I remember jotting some things

6    down.  I don't remember exactly what the nature of them were.

7  Q  Thank you.  Did you have any involvement in the trial?

8  A  No.

9  Q  Did you see Mr. Perrone back in the office during the trial?

10  A  I don't know when the trial was.  And the reason I say that

11    is because I believe it was August of 2017 -- I already

12    alluded that this was my last year working for him -- is when

13    I informed him that I would no longer be working for him.

14    And that's when I stopped going to the office with any sort

15    of regularity.

16  Q  So you stopped working with Mr. Perrone in August of 2017?

17  A  That's what I recall.  Beyond that date, there were some

18    court appearances that he needed coverage on that I tried to

19    continue to help him for a couple of months with those types

20    of issues.  But he had hired somebody else right around that

21    time, so I didn't feel like he needed me too much at that

22    point.

23  Q  So you recall -- the trial was in the first two weeks of

24    November of 2017.  Did you have any contact with Mr. Perrone

25    during that time?

| | | |
|---|---|---|
| 1 | A | Possibly.  Possibly.  Like I said, if I did it was just |
| 2 | | probably regarding covering something that he needed coverage |
| 3 | | for. |
| 4 | Q | Did you notice any problems with his mental health, or his |
| 5 | | health in general when you had those discussions with him? |
| 6 | A | I know, like, since then that he's -- he's come out with some |
| 7 | | mental health issues.  Like, for me he was my boss at the |
| 8 | | time, so I -- like, I thought that he, you know, was an |
| 9 | | asshole like -- I'm sorry.  I'm sorry, your Honor.  I thought |
| 10 | | he was -- I thought he was a jerk like many people would say |
| 11 | | they think their bosses are.  So that's kind of -- I wasn't |
| 12 | | assessing his mental health in any sort of way. |
| 13 | Q | But there's nothing that stands out in your memory about any |
| 14 | | changes in his behavior or anything during that time? |
| 15 | A | No. |
| 16 | | MS. WALSH:  Okay, thank you.  I don't have any |
| 17 | | other questions. |
| 18 | | THE COURT:  Questions, Ms. Crino? |
| 19 | | MS. CRINO:  No questions for you, thank you. |
| 20 | | THE COURT:  All right, thank you, Mr. Vuckovich. |
| 21 | | Thank you for accommodating us, and you are concluded. |
| 22 | | THE WITNESS:  Thank you, your Honor. |
| 23 | | (At 11:10 a.m. witness excused) |
| 24 | | THE COURT:  Okay, going back to the continuation |
| 25 | | dates, I have October 19th at 9:00, or November 9th at 9:00. |

1           MS. WALSH:  November 19th or November 9th?

2           THE COURT:  October 19th or November 9.

3           MS. WALSH:  November 9th.

4           THE COURT:  November 9?

5           MS. WALSH:  Yea.

6           THE COURT:  Okay, that will be at 9:00 a.m.  So

7     we'll need another writ for Mr. Uraz.

8           MS. CRINO:  I will take care of the writ for Mr.

9     Uraz.  I will also get with Mr. Roth just to make sure that

10    that date works for him.  I anticipate it will, and I'll let

11    the Court know if there's any problems.

12          THE COURT:  All right.  So we'll continue this

13    matter on November 19th.

14          MS. CRINO:  You know, I just thought of something

15    else.

16          THE COURT:  Excuse me, it's November 9th, not 19th.

17    November 9th.  Yes, Ms. Crino?

18          MS. CRINO:  Pardon, your Honor.  Sorry about that.

19    Just because I know that with the fall and things at the

20    Michigan Department of Corrections currently, there could

21    potentially be an issue with getting Mr. Uraz here in person

22    for this final witness and for any argument regarding this

23    motion.  So I'm wondering if it might be wise to perhaps

24    create a record as to that.  I don't think it's unreasonable

25    that we might have issues with resuming this in person in

1    November if things get worse with Covid.  So I'm just

2    wondering, you know, does Mr. Uraz want to do the rest of

3    this hearing via Zoom, if we have to.  Or will we be looking

4    to continue this in person regardless?  And I'm, frankly,

5    fine either way.

6              THE COURT:  I mean, that's a reasonable request.

7    So basically if there's another suspension of in person

8    appearances and Mr. Uraz is desirous of being in person we'd

9    have to wait until that was over before we could conclude the

10   hearing, only in the event that arises.  We aren't saying

11   that that is the case.

12             But should there be a new edict between now and

13   then, that might put us in a situation where we could

14   conclude on Zoom or we could come back in person.  We're

15   scheduled to come back in person, and that's the way it will

16   remain, unless there's a change.

17             MS. WALSH:  Okay.

18             THE COURT:  Do you want to inquire from Mr. Uraz

19   how he wants to proceed?

20             MS. WALSH:  Yes, he is indicating that he wants it

21   to be in person.

22             THE COURT:  He wants it to be in person.

23             MS. WALSH:  Yea, he's waited all this time for it

24   to be in person.

25             THE COURT:  All right, so right now it's not an

1    issue, but if it becomes an issue we'd have to, I guess, put

2    it back on hold until the suspension of transportation is

3    lifted.  So right now it's November 9th at 9:00.

4              MS. WALSH:  Okay.

5              MS. CRINO:  So I heard a uh-huh from Mr. Uraz.  I'm

6    assuming that's yes, for the record, from the Defendant that

7    he's -- he wants it in person, regardless of whether there's

8    additional delay?

9              THE DEFENDANT:  That is correct, yes.

10             THE COURT:  Okay, that was my interpretation.  But

11   for the record, yes.

12             That's correct, Mr. Uraz, right?  You want to it to

13   always be in person, right?

14             THE DEFENDANT:  Yes, please, your Honor.

15             THE COURT:  All right, thank you.

16             MS. CRINO:  Thank you, your Honor.

17             (At 11:13 a.m. proceeding ended)

18

19

20

STATE OF MICHIGAN     )

                      )

COUNTY OF INGHAM      )


       I certify that that this transcript, consisting of (68) pages, is a complete, true, and correct transcript of the Ginther Hearing and testimony taken in this case on Monday, October 4, 2021.


November 3, 2021                    _____
                                   Toni Coltman, CER 8226
                                   Veteran's Memorial Courthouse
                                   313 West Kalamazoo Avenue
                                   Lansing, Michigan 48933
                                   517-483-6404

STATE OF MICHIGAN     )

                      )

COUNTY OF INGHAM      )


    I certify that that this transcript, consisting of (68) pages, is a complete, true, and correct transcript of the Ginther Hearing and testimony taken in this case on Monday, October 4, 2021.


November 8, 2021

Toni Coltman, CER 8226
Veteran's Memorial Courthouse
313 West Kalamazoo Avenue
Lansing, Michigan 48933
517-483-6404