STATE OF MICHIGAN

THIRTIETH JUDICIAL CIRCUIT COURT

INGHAM COUNTY

PEOPLE OF THE STATE OF MICHIGAN,

v                                                    File No.   16-1064-FC
                                                               16-1065-FC
                                                     Hon.  Clinton Canady

TUNC URAZ,

                    Defendant.

_____/

GINTHER HEARING

BEFORE HONORABLE CLINTON CANADY, III, CIRCUIT COURT JUDGE

Lansing, Michigan – Wednesday, April 13, 2022

APPEARANCES:

For the People:            KAHLA D. CRINO (P71012)
                           Ingham County Prosecutor's Office
                           303 West Kalamazoo Street, Fourth Floor
                           Lansing, Michigan 48933
                           (517) 483-6108


For the Defendant:         SUSAN K. WALSH (P40447)
                           P.O. Box 157
                           Northville, Michigan  48167
                           (248) 563-9149


Recorded By:               Toni Coltman, CER 8226
                           Certified Electronic Recorder
**FILED** - 30th CIRCUIT COURT     (517) 483-6404

APR 27 2022

BY:_____
      Deputy Clerk

OFFICIAL COURT REPORTER/RECORDER
**30TH JUDICIAL CIRCUIT COURT**
LANSING, MICHIGAN

ORIGINAL

1

## TABLE OF CONTENTS

WITNESSES:                                                                    PAGE


JONATHAN ROTH
        Direct Examination by Ms. Walsh                                          5
        Cross-Examination by Ms. Crino                                          7
        Redirect Examination by Ms. Walsh                                      21

TUNC URAZ
        Direct Examination by Ms. Walsh                                        27
        Cross-Examination by Ms. Crino                                         42
        Redirect Examination by Ms. Walsh                                      52

EXHIBITS:                                            MARKED            ADMITTED
*None*

1       Lansing, Michigan

2       Wednesday, April 13, 2022 - 1:38 p.m.

3       THE COURT:  All right, we're on the record in the

4  matter of People v Tunc Uraz.  He has three file numbers; 16-

5  534-FH, 16-1064-FH, and 16-1065.  This is post-conviction

6  motions.  We've been at this for a while.  When the action

7  was first filed, Mr. Uraz wanted to exercise his right to

8  appear in person, versus us being available to do it by Zoom.

9  So the Department of Corrections was transporting prisoners

10  for a long period of time during the first Covid major

11  outbreak.

12       We did come here on October 4th of '21 and started

13  the matter with a Ginther hearing.  Mr. Perrone testified.

14  We had several other witnesses testify.  We were unable to

15  complete that day.  I think former Prosecutor Roth wasn't

16  available.  We had continued it initially to November 9th.  I

17  don't know what happened then, but I know the second Covid

18  outbreak came up, and again Mr. Uraz wanted to personally be

19  present, while we offered to do it on Zoom.  And so now we're

20  here today for a continuation of the hearing.

21       May I have appearances, please?

22       MS. CRINO:  Kahla Crino appearing on behalf of the

23  People.

24       MS. WALSH:  Susan Walsh, appearing on behalf of

25  Tunc Uraz.

1    THE COURT:  I'm sorry, I couldn't quite hear you.

2    MS. WALSH:  Susan Walsh.

3    THE COURT:  Susan Walsh, okay.

4    MS. WALSH:  Walsh.

5    THE COURT:  Okay.  And you are Tunc Uraz, sir?

6    THE DEFENDANT:  Yes, sir.  I'm Tunc Uraz, yes.

7    THE COURT:  All right.  Then continuing, I guess

8    who's up?  You, Ms. Crino, or Ms. Walsh?

9    MS. CRINO:  It's not my turn yet, your Honor.

10    THE CLERK:  Your Honor, the courtroom is muted, I

11    can't hear.

12    THE COURT:  Okay.  All right, Ms. Walsh.

13    MS. WALSH:  Okay, yes.  We would call Jonathan Roth

14    to the stand.

15    THE COURT:  All right.  Mr. Roth, you know where

16    the spot is.

17    THE BAILIFF:  Do you swear or affirm to tell the

18    truth, the whole truth, and nothing but the truth under the

19    penalty of perjury?

20    MR. ROTH:  I do.

21    **JONATHAN ROTH**

22    (At 1:41 p.m. witness sworn and testified)

23    THE COURT:  Ms. Walsh.  Well, state your name and

24    spell your last name for the recorder, Mr. Roth.

25    THE WITNESS:  Thank you.  Jonathan Roth, R-o-t-h.

| 1 | | THE COURT: Ms. Walsh. |
|---|---|---|
| 2 | | **DIRECT EXAMINATION** |
| 3 | | BY MS. WALSH: |
| 4 | Q | Good afternoon, Mr. Roth. |
| 5 | A | Good afternoon. |
| 6 | Q | Why don't we -- you just start by explaining what your role |
| 7 | | was in the trial of Mr. Uraz. |
| 8 | A | I can. So at the time I was the unit chief of the Circuit |
| 9 | | Court Unit for the Ingham County Prosecutor's Office. The |
| 10 | | docket attorney assigned to Judge Canady's court was Charles |
| 11 | | or Chaz Koop. I supervised Mr. Koop because of the nature of |
| 12 | | the investigation and the seriousness of it. I worked with |
| 13 | | him throughout the -- as the case was developed, and worked |
| 14 | | with him during the trial as well. |
| 15 | Q | Okay, and you -- you just stated that at the time, am I |
| 16 | | correct, that you are no longer in that position? |
| 17 | A | That's correct. |
| 18 | Q | Okay. Did you think that -- you're familiar with Mr. Perrone |
| 19 | | as being the assigned trial attorney for Mr. Uraz? |
| 20 | A | At the time of the trial, yes. |
| 21 | Q | Okay. Do you think that -- and you are familiar with the |
| 22 | | fact that shortly after the trial, Mr. Perrone had a mental |
| 23 | | breakdown requiring hospitalization? |
| 24 | A | I don't know if I'd say mental breakdown. I certainly don't |
| 25 | | know the specifics of it. I know that there was an issue, |

| | | |
|---|---|---|
| 1 | | and I was alerted to it in early December, which is a few |
| 2 | | weeks after trial. |
| 3 | Q | Okay.  Do you think that Mr. Perrone's condition affected his |
| 4 | | ability to properly defend Mr. Uraz during the trial? |
| 5 | A | I do not. |
| 6 | Q | Okay, and on what do you base that opinion? |
| 7 | A | I've known Mr. Perrone a long time.  I went to law school |
| 8 | | with him.  He was in my section in my first year of law |
| 9 | | school.  So by the time we tried this case, I had known him |
| 10 | | for probably 10, 12 years.  I didn't notice anything |
| 11 | | different about him during the course of trial, than I did |
| 12 | | any time before.  I don't think that he made any decisions |
| 13 | | that indicated that he was having difficulties making good |
| 14 | | decisions.  So there was nothing that -- that I noticed that |
| 15 | | would indicate that. |
| 16 | Q | Did you think that any of Mr. Perrone's decisions prejudiced |
| 17 | | Mr. Uraz during the trial? |
| 18 | A | No.  I think Mr. Uraz's decisions prejudiced him during the |
| 19 | | trial. |
| 20 | Q | Did you -- did you notice -- this might be a little bit |
| 21 | | repetitive, but did you notice any changes in Mr. Perrone's |
| 22 | | demeanor throughout the course of the trial? |
| 23 | A | I did not. |
| 24 | Q | Okay.  So you didn't notice that he was distracted, or maybe |
| 25 | | overly tired? |

1   A     To the contrary, I didn't notice either of those things.

2              MS. WALSH:   Okay.   All right, thanks.   I have no

3       further questions.

4              THE COURT:   Ms. Crino?

5                         **CROSS-EXAMINATION**

6   BY MS. CRINO:

7   Q     Good afternoon, Mr. Roth, how are you?

8   A     I'm good, how are you?

9   Q     Doing well.   How are you currently employed?

10  A     I'm an Assistant United States Attorney for the United States

11      Attorney's Office in the Western District of Michigan.

12  Q     And previous to that, how were you employed?

13  A     I was an Assistant Prosecutor for the Ingham County

14      Prosecutor's Office from 2008 until 2018.

15  Q     Are you aware of a Defendant in Ingham County named Tunc

16      Uraz?

17  A     I am.

18  Q     How did you first become aware of him?

19  A     So the first contact I would have had, or first knowledge, is

20      I remember when his initial stalking case was reviewed by our

21      office, as it was in the District Court.   So I was vaguely

22      aware of the allegations of him breaking into his ex-

23      girlfriend's house and stealing, I think, her underwear at

24      the time, and that being captured on video.   As that case

25      made it from District Court to Circuit Court, it was assigned

| | | |
|---|---|---|
| 1 | | to Assistant Prosecutor Charles Koop, who I supervised in the |
| 2 | | Circuit Court Unit at that time.  Because of the subsequent |
| 3 | | development where he had solicited people to kill his ex- |
| 4 | | girlfriend, given the seriousness of it, I worked with Mr. |
| 5 | | Koop to develop the case throughout its time in District |
| 6 | | Court, then in Circuit Court in preparation for trial. |
| 7 | Q | And are you familiar with the terminology that we use in |
| 8 | | Ingham of first chair, second chair prosecutor? |
| 9 | A | Yes. |
| 10 | Q | What does that mean? |
| 11 | A | First chair has, sort of, lead responsibilities; second chair |
| 12 | | is less.  Batman and Robin. |
| 13 | Q | And what was your role, Batman? |
| 14 | A | I don't know.  It was -- we were closer than -- than normal, |
| 15 | | given that Mr. Koop had worked on the file longer than I had. |
| 16 | | I did closing argument, which is, you know -- or the tell |
| 17 | | tail first chair, I guess. |
| 18 | Q | Are you aware of the pretrial motion practice that occurred |
| 19 | | in this case? |
| 20 | A | I was. |
| 21 | Q | And are aware of what Mr. Perrone's actions were in arguing |
| 22 | | those motions, generally? |
| 23 | A | I was.  And I was present for those. |
| 24 | Q | Did that include an entrapment motion? |
| 25 | A | It did. |

| | | |
|---|---|---|
| 1 | Q | And did that also include responding to motions that you and |
| 2 | | Mr. Koop filed on behalf of the People? |
| 3 | A | It did. |
| 4 | Q | Did that include a Motion to Admit Other Acts under MRE |
| 5 | | 404(b)? |
| 6 | A | It did. |
| 7 | Q | In your view, did Mr. Perrone argue those motions |
| 8 | | appropriately on behalf of the Defendant? |
| 9 | A | He did. |
| 10 | Q | And were his written responses otherwise appropriate on |
| 11 | | behalf of the Defendant? |
| 12 | A | Yes. |
| 13 | Q | Do you have any personal knowledge regarding what Mr. Perrone |
| 14 | | did or did not do to prepare for trial? |
| 15 | A | So normally my answer would be no.  But in this case I can |
| 16 | | tell you that it was certainly more than that.  He filed a |
| 17 | | witness list of north of 30 witnesses, many of whom were |
| 18 | | Michigan Department of Corrections inmates.  And so at the, |
| 19 | | either motion or request of Mr. Perrone, and under the |
| 20 | | Court's order, we made available those MDOC witnesses by |
| 21 | | video here on the third floor of the courthouse.  And so -- |
| 22 | | and I can't recall what happened exactly, but either we |
| 23 | | interviewed them by video all in a group, and then Mr. |
| 24 | | Perrone interviewed them all in a group, or we did one at a |
| 25 | | time and rotated back and forth.  But I recall seeing him as |

| | | |
|---|---|---|
| 1 | | we transferred so he could interview those witnesses. |
| 2 | Q | And based on your observations, did he appear to be prepared |
| 3 | | to do that at that time? |
| 4 | A | Certainly.  You know, he was the one that found these people. |
| 5 | Q | October 31st, 2017, that was the first day of trial, correct? |
| 6 | A | Yes. |
| 7 | Q | And did you observe Mr. Perrone have a mental breakdown on |
| 8 | | that day? |
| 9 | A | I did not. |
| 10 | Q | And did you observe him experience any type of mental decline |
| 11 | | on that day? |
| 12 | A | I did not. |
| 13 | Q | Instead voir dire took place, at least in part that day, |
| 14 | | correct? |
| 15 | A | Yes. |
| 16 | Q | And was Mr. Perrone's representation of the Defendant during |
| 17 | | the course of voir dire appropriate, in your view? |
| 18 | A | Yes. |
| 19 | Q | Was he able to weave things about his theory of the case into |
| 20 | | his questions for prospective jurors? |
| 21 | A | Yes. |
| 22 | Q | November 2nd, 2017, the trial continued with more voir dire, |
| 23 | | correct? |
| 24 | A | Yes. |
| 25 | Q | Opening statements, correct? |

```
 1   A    Yes.

 2   Q    And argument on various evidentiary items, correct?

 3   A    Yes.

 4   Q    And I believe we also -- the People also called their first

 5        witnesses as well, correct?

 6   A    Yes.

 7   Q    Did you observe Mr. Perrone have a mental breakdown of any

 8        kind during the course of that day?

 9   A    I did not.

10   Q    Did you observe him experience any type of mental decline

11        that day?

12   A    I did not.

13   Q    Did you observe any glaring problems with his opening

14        statement, the way he argued those evidentiary issues, or the

15        component of his voir dire that took place that day?

16   A    Not at all.  And I -- I reread his opening statement this

17        morning actually and -- and had forgotten.  It was a pretty

18        clever opening statement.  And he was careful to emphasize

19        the law and presumption of innocence and things like that

20        throughout and focus on those, because that was a much better

21        argument than what he had with his client's facts.  And so I

22        thought it was an appropriate opening statement.

23   Q    And consistent with the things that he talked about in voir

24        dire as well, correct?

25   A    Certainly.
```

| | | |
|---|---|---|
| 1 | Q | Next day, November 3rd, 2017, the trial continued and there |
| 2 | | was discussion regarding that lengthy witness list I believe |
| 3 | | as well? |
| 4 | A | I don't recall the day that we discussed that, but yes, |
| 5 | | certainly. |
| 6 | Q | You do recall that occurring though, correct? |
| 7 | A | I remember that conversation. |
| 8 | Q | Very good.  And is it unusual for a party to strike witnesses |
| 9 | | during or immediately before a trial starts? |
| 10 | A | In my experience, most defense witnesses fall off the list as |
| 11 | | the trial proceeds. |
| 12 | Q | And are there valid reasons why a defense attorney might want |
| 13 | | particular people on a witness list -- |
| 14 | A | Certainly. |
| 15 | Q | -- and they choose to strike them later? |
| 16 | A | Yes. |
| 17 | Q | Did you observe Mr. Perrone have a mental breakdown on that |
| 18 | | day? |
| 19 | A | I did not. |
| 20 | Q | Did you observe him have a mental decline that day? |
| 21 | A | I did not. |
| 22 | Q | November 6th, the trial continued, correct? |
| 23 | A | Yes. |
| 24 | Q | And Reginald Close testified that day, correct? |
| 25 | A | Yes. |

```
 1   Q   And Mr. Perrone cross-examined Close that day as well?

 2   A   He did.

 3   Q   And through cross-examination, Mr. Perrone made several

 4       important points for his defense in his cross of that

 5       witness, correct?

 6   A   He did.

 7   Q   He established that Close proffered on John Pierce's case,

 8       correct?

 9   A   Correct.

10   Q   He established that Close's own trial was adjourned and that

11       ultimately he was found not guilty after that, correct?

12   A   Correct.

13   Q   He established that Close, Allen, and Muhammed were in a cell

14       together, correct?

15   A   Correct.

16   Q   He impeached Close's trial testimony that he had never talked

17       to Allen about Uraz's case, correct?

18   A   That's correct.

19   Q   In your view, were these important facts for Mr. Perrone to

20       establish as a part of his theory of a defense in this case?

21   A   Certainly.

22   Q   That same day Mr. Perrone also cross-examined Officer Frank

23       Mobley, correct?

24   A   Yes.

25   Q   And that day he elicited testimony regarding the somewhat
```

| | | |
|---|---|---|
| 1 | | ambiguous language that was used during the Frank Mobley |
| 2 | | phone call, correct? |
| 3 | A | Yes. |
| 4 | Q | And that being referring to the victim as trash, or more |
| 5 | | fully red-haired trash, correct? |
| 6 | A | Yes.  I would refer to it as coded language, not ambiguous |
| 7 | | language.  But certainly the argument that -- that Mr. |
| 8 | | Perrone was advancing. |
| 9 | Q | And I would entirely agree with your assessment of that, but |
| 10 | | recognizing that Mr. Perrone's theory of defense was that |
| 11 | | this was ambiguous. |
| 12 | A | Yes. |
| 13 | Q | Was he able to at least make an effort at making points |
| 14 | | toward that? |
| 15 | A | Yes. |
| 16 | Q | You didn't observe Mr. Perrone have a mental breakdown that |
| 17 | | day? |
| 18 | A | No. |
| 19 | Q | And you didn't observe him have mental decline that day |
| 20 | | either, did you? |
| 21 | A | No. |
| 22 | Q | Moving onto November 7th, and on that day Mr. Perrone cross- |
| 23 | | examined Charles Allen, correct? |
| 24 | A | Yes. |
| 25 | Q | And through cross-examination he made several important |

| 1 | | points with that witness as well? |
|---|---|---|
| 2 | A | Yes. |
| 3 | Q | He established that he was on phone restrictions due to |
| 4 | | alleged misconduct, or calling his girlfriend when he wasn't |
| 5 | | supposed to, correct? |
| 6 | A | Yes. |
| 7 | Q | He established that he actually, he the witness, actually |
| 8 | | knew Reginald Close, correct? |
| 9 | A | Yes. |
| 10 | Q | He established that he tried to leverage information |
| 11 | | regarding Tunc Uraz to help his own situation, correct? |
| 12 | A | Yes. |
| 13 | Q | He established that Allen initiated one of the conversations |
| 14 | | with Uraz, correct? |
| 15 | A | Yes. |
| 16 | Q | And he established that there was a lot about the entire |
| 17 | | situation that he just didn't recall, correct? |
| 18 | A | Yes. |
| 19 | Q | Now, Ms. Walsh has pointed to a very specific portion of the |
| 20 | | transcript as a part of her argument that the Defendant |
| 21 | | received ineffective assistance of counsel.  And that |
| 22 | | particular portion did occur on November 7th, 2017 and it |
| 23 | | dealt with an objection that you made.  Do you know the |
| 24 | | objection that I'm talking about? |
| 25 | A | I do. |

1    Q    And a part of that objection -- during a part of that

2         objection you indicated that there were three minutes between

3         questions.  Can you explain what you meant by that, if

4         anything?

5    A    That a large amount of time, and I would estimate literally

6         minutes, was passing between the questions of the witness.

7    Q    Okay.  And you also indicated that this cross-examination is

8         dragging on for hours, do you remember that component as

9         well?

10   A    I do.

11   Q    And what, if anything, were you talking about there?

12   A    That the cross-examination had gone for a very long time.

13        And I guess I can't -- I don't have memory as to whether or

14        not it was literally hours or not, but it went on certainly

15        much longer than -- than it needed to.

16   Q    And the Court has heard a lot of testimony about this

17        objection and what different people think was actually going

18        on during this time.  What did you think was actually going

19        on during this time, other than what you've already told us?

20   A    My perception was that this was a matter of trial strategy,

21        and this was something that I had observed throughout trial

22        with Mr. Perrone, and even before trial.  At one of the

23        pretrial hearings he talked about how this case was going to

24        take weeks, and he may have said even if not months.  But he

25        said it was going to take a very long time, and certainly in

1    weeks.   Then he files a witness list of 30 some odd

2    witnesses.   And then he is very slow as he goes through the

3    cross-examination.   This was -- it appeared deliberate to me,

4    because it was not the way he cross-examined all of the

5    witnesses.   I believe that this was an effort to dilute the

6    testimony of the most important witnesses.   That by, sort of,

7    holding the ball and dragging out cross-examination, it was

8    putting more time between the direct examination and when the

9    jury would ultimately consider the case.

10   Q   So you viewed it as -- I don't want to put words in your

11       mouth here -- but intentional, not something that was

12       indicative of a mental breakdown of some kind?

13   A   I thought that in the moment.   I think that now.

14   Q   Fair enough.   And you did not observe him have a mental

15       breakdown that day on November 7th, correct?

16   A   Very much to the opposite.   I spoke to him, not only, you

17       know, before trial that day, but certainly after trial that

18       day, the time surrounding it, and I detected nothing of that

19       sort.

20   Q   Fair enough.   So moving onto the last day of trial, which was

21       November 9th, 2017, that day the defense argued for a

22       modification to the jury instruction for solicitation of

23       murder, correct?

24   A   Yes.

25   Q   And that was specifically the addition of the phrase

| 1  |   | "purposefully intends or intended," correct? |
|----|---|---|
| 2  | A | Correct. |
| 3  | Q | And that was something that Mr. Perrone felt was important |
| 4  |   | for his trial strategy, correct? |
| 5  | A | Yes. |
| 6  | Q | And he was successful in obtaining that modification, |
| 7  |   | correct? |
| 8  | A | He was. |
| 9  | Q | Also on that day Mr. Perrone called John Pierce and Fateen |
| 10 |   | Muhammed as witnesses for the defense, correct? |
| 11 | A | Yes. |
| 12 | Q | Fair to say Muhammed was uncooperative with both Perrone and |
| 13 |   | with you? |
| 14 | A | Yes. |
| 15 | Q | And as to John Pierce, fair to say that Mr. Perrone was able |
| 16 |   | to make important points for the defense with his direct |
| 17 |   | examination of Mr. Pierce? |
| 18 | A | Yes. |
| 19 | Q | He established that he passed notes for Close and Allen, |
| 20 |   | correct? |
| 21 | A | Yes. |
| 22 | Q | And he established that Close was overly curious about Uraz's |
| 23 |   | case, correct? |
| 24 | A | Yes. |
| 25 | Q | And Mr. Perrone established that he saw Close, Allen, and |

| | | |
|---|---|---|
| 1 | | Uraz talking, correct? |
| 2 | A | Yes. |
| 3 | Q | Ms. Walsh has alleged, and the People have stipulated, that |
| 4 | | Mr. Allen and Mr. Close each had prior misdemeanors involving |
| 5 | | theft or dishonesty.  Are you now familiar with that? |
| 6 | A | Yes. |
| 7 | Q | And part of her argument is that those misdemeanors could |
| 8 | | have been used to impeach Mr. Allen and Mr. Close, correct? |
| 9 | A | Yes. |
| 10 | Q | And would impeachment with those convictions have changed |
| 11 | | anything about your trial strategy or the way that you argued |
| 12 | | the case? |
| 13 | A | No.  Their credibility came not, or depended not on prior |
| 14 | | convictions for misdemeanors.  The jury was well aware that |
| 15 | | these were guys that had done very bad things.  They were in |
| 16 | | custody at the time of the trial, I believe.  That they were |
| 17 | | in custody at the time that they met Mr. Uraz.  Small |
| 18 | | misdemeanors were not going to affect that credibility |
| 19 | | determination.  They had corroborating evidence, which is |
| 20 | | what their credibility rested on.  And they also had an |
| 21 | | interview or a recorded session between the undercover and |
| 22 | | the Defendant. |
| 23 | Q | So you did not ever argue to the jury, hey, you should |
| 24 | | believe these guys because they're super great, honest guys. |
| 25 | | The fact that -- I'm going to say the fact that they were |

1    criminals was part of your case, correct?

2  A  Certainly.

3  Q  Would impeachment with those prior misdemeanors have done

4     anything to change the substantial evidence of Mr. Uraz's

5     guilt?

6  A  No.

7  Q  Did you observe Mr. Perrone have a mental breakdown that day?

8  A  I did not.

9  Q  Did you observe him experience any type of mental decline

10    that day?

11 A  I did not.

12 Q  And he gave a closing argument, correct?

13 A  Yes.

14 Q  Did you observe any glaring issues with that closing

15    argument?

16 A  I did not.

17 Q  And the jury ultimately found the Defendant guilty of all

18    counts, correct?

19 A  They did.

20 Q  Now sometime after the jury's verdict you've indicated that

21    you were informed that Mr. Perrone had some type of episode.

22    How is it that you were informed of that?

23 A  By way of an email.

24 Q  Uh-huh.

25 A  It was around -- I think it was on December 2nd, 2017 I

1     received an email indicating that -- that he had had what we

2     refer to as PRT proceedings, I think in Oakland County.  And

3     that's the extent of the detail that I know.

4 Q   And ultimately Mr. Perrone did not represent the Defendant at

5     sentencing.  Mr. Duane Silverthorn did, correct?

6 A   That's correct.  Mr. Perrone did represent him at a hearing

7     that we had with -- with your Honor in the jury room, so

8     sometime between verdict and sentencing.  So there was some

9     continued representation.

10 Q   Correct.  And that was actually at the Defendant's request,

11     if I recall.

12 A   I think that's correct.

13 Q   Okay.  And in your view, was there substantial evidence of

14     the Defendant's guilt in this case?

15 A   Overwhelming.

16 Q   Did you observe anything about Mr. Perrone's mental health or

17     performance that you believe impacted the jury's verdict in

18     this case?

19 A   I did not.

20          MS. CRINO:  Thank you.

21          THE COURT:  Any questions, Ms. Walsh?

22          MS. WALSH:  Yes.

23          **REDIRECT EXAMINATION**

24 BY MS. WALSH:

25 Q   Well, that was a very detailed overview.  And I just would

1    like to ask, and maybe you can put yourself in defender's

2    shoes for a minute.  And you were going -- there were going

3    to be witnesses for the prosecution who were in the MDOC.

4    Would one of the first things that you would want to find out

5    it -- would that be their prior convictions, what prior

6    convictions they had?

7  A    No.

8  Q    And why not?

9  A    I've been a prosecutor for 14 years now.  I have never once

10    impeached a witness with a 608 or 609 conviction.  I find it

11    patently ineffective.  As ineffective as it is in normal

12    situations, it is doubly ineffective when you have people who

13    are already inmates.  The purpose of a 608 or 609 conviction

14    or impeachment is -- I say 609, I apologize, a 609.  The

15    purpose of that impeachment is to dirty up the witness.  But

16    if the person's already in custody, if the jury knows they're

17    already in custody, if the jury knows that they're in there

18    because they battered their spouse, or their girlfriend, that

19    witness is already dirty.  And letting the jury know that

20    they shoplifted is not going to make that any better or

21    worse.  Cross-examination about inconsistent statements,

22    about taint and things like that, are the effective cross-

23    examination on those issues.

24  Q    Well, if you're the defense attorney and the witness has a

25    prior conviction that's theft related, I mean, we have rules

1    of evidence that cover it, you don't think it would be

2    ineffective on your part -- I mean, why wouldn't you just

3    mention it?  Why wouldn't you bring it up?  I don't

4    understand that.

5  Q  In every trial, whether you're the prosecutor or the defense

6    attorney, you have this much evidence, whatever that amount

7    is.  You never put in all of that evidence.  You have to make

8    careful decisions about how you're going to use your time

9    with the jury to maximize their attention, so you don't lose

10   credibility with them, and to make your most persuasive

11   arguments.  You can't throw everything at the wall.  If Mr.

12   Perrone, or anybody else, stood up there and said the reason

13   to not believe these two gentlemen is because they did a

14   shoplifting, or whatever other misdemeanor it was, he would

15   have lost credibility with the jury.  That is not the reason

16   to not believe them.  The reason to not believe them, if

17   you're not going to believe them, are the things that he

18   established, which is that they spoke to each other, which is

19   that they were trying to better their own circumstance.

20 Q  Have you sat on a jury?

21 A  I have been picked for a jury, but never ended up going to

22   trial.

23 Q  Okay.  So your assertion is that to merely bring up that this

24   witness, in the past, has been convicted of crime related to

25   dishonesty, would muddy the water so much that you would lose

```
 1        your credibility with the jury?  You really believe that?
 2   A    Well, I don't think that's what I said.  What you asked me is
 3        do I think it would have made a difference?  Do I think that
 4        that's good trial strategy?  And I don't.  If the question is
 5        do I think you could say it?  Sure, you can say it.  But I
 6        don't think that that's a great decision.  I don't think it's
 7        the best trial decision you can make for your client.
 8   Q    Okay.  Well, I guess we'll just have to agree to disagree.
 9   A    Is that a question?
10   Q    No, no.
11   A    Okay.
12             MS. WALSH:  I guess I have no further questions
13        then.
14             THE COURT:  Any additional questions, Ms. Crino?
15             MS. CRINO:  No, your Honor, thank you.
16             THE COURT:  Thank you, Mr. Perrone, good seeing
17        you.
18             THE WITNESS:  Thank you, your Honor.
19             THE COURT:  Drive safely.
20             THE WITNESS:  Thank you.  Have a good day.
21             (At 2:03 p.m. witness excused)
22             THE COURT:  All right, next?
23             MS. WALSH:  Yes, we would call -- I would call my
24        client, Mr. Tunc Uraz, to the stand.
25             THE COURT:  All right.
```

1          MS. WALSH:  He has a box of materials that he would

2     like to have near him while he's testifying.  Is it okay if I

3     carry those up there?

4          THE COURT:  All right.

5          THE DEFENDANT:  Is it okay to free one of my hands,

6     your Honor, so I can get effectively pull these papers?  This

7     is the reason I wanted to see you in person.

8          THE COURT:  I don't know what their policy is.  It

9     depends on what their policy is.  I don't know what the

10    policy is.

11         THE DEFENDANT:  It depends on you, your Honor.

12    It's usually your decision.

13         THE COURT:  All right.

14         THE DEFENDANT:  At least one hand, so I can pull

15    the papers out of here.

16         THE COURT:  I don't think so, Mr. Uraz.  I'll give

17    you time.

18         THE DEFENDANT:  Can I put them on a chair, your

19    Honor?

20         THE COURT:  You can, yes.  You can pull the chair

21    over.  And if you want, we can clear off some of that stuff

22    there to give you more operating room.

23         All right, so state -- well, first of all, stand up

24    and raise your right hand and be sworn.

25         THE BAILIFF:  Do you swear or affirm to tell the

1    truth, the whole truth, and nothing but the truth under

2    penalty of perjury?

3            MR. URAZ:  Yes, I do.

4                    **TUNC URAZ**

5            (At 2:05 p.m. witness sworn and testified)

6            THE COURT:  Okay, and then be seated there.  State

7    your name and spell both your first and last name for the

8    recorder, please?

9            THE WITNESS:  First name is Tunc, last name is

10   Uraz, T-u-n-c, U-r-a-z.

11           THE COURT:  Thank you.  Ms. Walsh?

12           MS. WALSH:  Are you all set over there?

13           THE WITNESS:  Can you give me a few seconds,

14   please?

15           MS. WALSH:  Yes.

16           THE COURT:  All right, give him a second to grab

17   his relevant documents.

18           THE WITNESS:  Okay.

19           THE COURT:  Okay, so just for the record, can you

20   tell us what you're referencing?

21           THE WITNESS:  These are my notes, my transcript

22   notes that I combed through everything that I wrote.

23           THE COURT:  All right, these are your notes from

24   the -- reviewing the transcript?

25           THE WITNESS:  And pretrial motions -- pretrial

1   hearings also, sir.

2            THE COURT:  All right, thank you.  Ms. Walsh?

3            MS. WALSH:  Okay.

4                      **DIRECT EXAMINATION**

5   BY MS. WALSH:

6   Q    All right, Mr. Uraz, when did you first meet with Mr. Perrone

7        regarding this case?

8   A    He was appointed to me on November 11th -- November 17, 2016.

9        That's the first time I met him at the -- at the preliminary

10       examination in Judge Boyd's courthouse in Mason.  He showed

11       up as my court appointed attorney at that time.  And I -- a

12       week later I hired my own attorney, Mr. Nichols, Michael

13       Nichols.  And then we switched to Michael Nichols at that

14       time.

15  Q    And then you ultimately did not continue with Mr. Nichols, is

16       that correct?

17  A    Well, what happened is these were two separate trials because

18       I was charged with Second Aggravated Stalking and also

19       Solicitation of Murder charges.  What happened is I had

20       another attorney appointed to me for stalking charges, second

21       stalking charges, Mr. Jeffrey Rothstein.  And there was

22       another attorney appointed to me at that time.  But all of a

23       sudden we had this -- we went for a preliminary examination

24       and what not, and they just postponed all these on November

25       4th and 8th for Aggravated Stalking.  They were all postponed.

1 And while -- I had two preliminary examinations for

2 Solicitation of Murder charges, which is one of -- one of

3 them was December 1st, 2016. The second one was December

4 13th, 2016. And what happened is the December 13, 2016 went

5 all the way until 8:30, 9:00 o'clock. And then after that I

6 come back to jail --

7    THE COURT: Mr. Uraz, I think the question simply

8 was you, at some point, discharged Mr. Nichols?

9    THE WITNESS: Yes, I did.

10    THE COURT: All right, that was the question.

11    THE WITNESS: I didn't discharge him. He

12 discharged himself actually, your Honor.

13    THE COURT: All right, Mr. Nichols was no longer on

14 your case.

15    THE WITNESS: No, but Mr. Perrone popped up all of

16 a sudden in the Ingham County Jail saying that, "I will be

17 representing you for Aggravated Stalking." I said, "Okay."

18 That next morning on the 14th of December 2016 we go to

19 downtown Lansing for a preliminary examination --

20    THE COURT: Let me stop right here. We're

21 concerned with post-conviction, so we're concerned with what

22 happened at the trial, in your opinion, and subsequent

23 thereto. I'm not really interested about the preliminary

24 examination, or what happened at the preliminary examination,

25 or what conversations you had leading up to the trial. So we

1    have to start at some point -- I'm not going back to day one,

2    and I don't need all that history, okay.

3              THE WITNESS:  But, your Honor, I won't give you the

4    whole story, but I need to set up a foundation so that I can

5    explain our relationship with Perrone, how we got here.

6              THE COURT:  Well, there's no foundation to

7    establish what happened back at the preliminary examination,

8    all right.  So I want to know leading up to the trial, not

9    way back at the preliminary examination, what you have to

10   tell us.  So I'm not going to -- I don't think it's

11   appropriate in this motion for me to go all the way back to

12   the history of your representation with Mr. Perrone, or Mr.

13   Silverthorn, or Mr. Rothstein, or Mr. Nichols, okay.  So I'm

14   not -- I don't need to hear all that, okay.

15             THE WITNESS:  Okay.

16             THE COURT:  So I don't know how that helps you

17   where we can start, but I'm not going all the way back.

18             THE WITNESS:  Well I -- all I wanted to say was the

19   next morning he waived the hearing all of a sudden without

20   even checking with me.

21             THE COURT:  Well, but the preliminary examination

22   was way before the trial.  There was opportunities for

23   motions.  We had a lot of litigation in this matter, Mr.

24   Uraz.  I have a pretty good memory of the case myself.  So

25   it's not necessary, in this motion, to go way back to some

```
 1        preliminary examination that took place months before the

 2        trial, okay.  So I don't know, trial prep or something.

 3        Start somewhere, but not --

 4                 MS. WALSH:  Yeah, if I could, your Honor, at the

 5        last hearing that we had on this issue Ms. Crino was allowed

 6        to ask quite a few questions of Mr. Perrone about his

 7        representation and the lead up to the trial, and the

 8        investigation for the trial.  And I did object at that point

 9        that it was going too far, but the Court did allow the

10        questions.

11                 THE COURT:  All right, so I've been with Mr. Uraz

12        for a long time, so he really brings in a lot of irrelevant

13        things, okay.  He has been from day one, and I allowed great

14        latitude.  So I'm not using this hearing as an opportunity

15        for him to go all the way back to the beginning and come

16        forward, okay.  I'm not going to go all through every

17        hearing.  I'm not going to go through every motion in

18        retrospect what he thought should be done, because they did

19        go to trial.  It was a lengthy trial.  There was some

20        compelling evidence, like videos, etcetera.

21   BY MS. WALSH:

22   Q    Well, why don't we then focus on the trial, and could you --

23        could you testify as to things that were happening right

24        around the time of the trial regarding investigation, or

25        witnesses that you wanted to be called at the trial that were
```

1   not?

2 A   In much of 2017, after Mr. Nichols got dropped off from the

3   trial, he said he didn't want to represent me anyone, Mr.

4   Perrone was appointed to me for both trials at the same time.

5   And your Honor was gracious enough to give him time to

6   prepare for the pretrials at that time.  So the first

7   pretrial was May 5th and then after my sister came and

8   testified at that time about my son's visitation and

9   everything, then we postponed everything until August 15th for

10   pretrial motions, which he wasn't ready.  And you were very

11   upset with him at that time.  The trial transcript will show

12   that how come he's not -- you're not ready for this.  He said

13   he had issues.

14           THE COURT:  Slow down a little bit.

15           THE WITNESS:  Okay, I'm sorry.  Am I too loud, or

16   am I just --

17           THE COURT:  Too quick.

18           THE WITNESS:  Too quick, okay.  That's fine.  Thank

19   you, your Honor, I'll slow down.  So he wasn't ready for any

20   motions at that time.  And when you questioned him, he said

21   he had a busy summer.  He had a kid at this time, that he

22   just -- personnel changes, therefore he wasn't ready for it.

23   Come forward, 11th of October, again it's the same story, he's

24   not ready for anything.  You're asking him why, "How come

25   you're not ready?  This is a serious matter for Mr. Uraz.

1    You should be ready for these things."  And again he's not

2    ready.

3            At that time Mr. Roth brought up all the 404(b)

4    misconducts, or the past acts evidence to be used against me.

5    And this is what's so important, I never talked to any police

6    or any investigators until that -- my evidentiary hearing

7    time.  And they --

8            THE COURT:  You didn't talk to any --

9            THE WITNESS:  Any police.  Nobody asked me what

10   happened, really.

11           THE COURT:  About the 404(b) witnesses?

12           THE WITNESS:  No.  On the 11ᵗʰ -- I'm sorry, your

13   Honor, may I look at my notes real quick?  Is that okay?

14           THE COURT:  Yes.

15           THE WITNESS:  Okay, thank you.

16           THE COURT:  Take your time.

17           THE WITNESS:  Okay, here we go.  On the motions

18   hearing on the 11ᵗʰ, again, he was not ready at all.  And it

19   was just motions hearing.

20           THE COURT:  This is the 404(b) motion?

21           THE WITNESS:  No, it was -- that was on the -- I

22   believe on the -- they offered it, and then his responses to

23   404(b) was well, these are not really the -- even Mr. Roth

24   said these cases that he is quoting is not relevant to what

25   we are talking about here.

1           THE COURT:  Okay.

2           THE WITNESS:  And that was one of the problem that

3    -- the issue was that he was not ready and it was just

4    substandard briefs that was written.  Which I turned in

5    copies with the appeals court as well too.  But it's the fact

6    that his -- this is, for example, from the October 11, page

7    8, line 13 through 16, Mr. Roth says, "Mr. Perrone also

8    mentions these other acts weren't charged.  He cites

9    absolutely no cases that will make a relevant argument in

10   this case, because there is not."  That's his exact words

11   that Mr. Roth told him.

12           And going forward again for the 404(b), especially

13   the MSU gun incident was you found it very prejudicial

14   against me.  You denied it at that time, which was great.

15   But then come the first day of trial, they brought it back

16   again, because after my October 20th evidentiary hearing

17   testimony.  And everything I said on the evidentiary hearing,

18   because I was being honest, I didn't perjure or anything,

19   they turned around and used it against me in the trial.

20   Which I didn't testify, if you remember, in the trial, your

21   Honor.

22           So therefore, because I didn't testify, they used

23   my evidentiary hearing testimony against me.  I mean, if I

24   would have testified, that's fine, you could have impeached

25   me whatever I said.

1    THE COURT:  Well, I mean, I don't actually recall

2    -- I think I do recall saying that I didn't feel the gun was

3    related to the stalking charges per se.  But once there's

4    testimony, they can ask you did it happen.  So they weren't

5    going to be able to introduce it directly, but they could ask

6    you about it.

7    THE WITNESS:  Well they -- they -- a motion on the

8    first day of trial, right before the jury is waiting outside,

9    they say well, we want to bring this back again and

10    reconsider, and then you allowed it at that time.  But --

11    THE COURT:  All right, well the transcript will

12    speak for itself, okay.

13    THE WITNESS:  Yes.  And the other thing is you

14    would have gotten the MSU --

15    MS. CRINO:  At this point, your Honor, I'm going to

16    have to object.  This -- I want to give so much latitude

17    here, but this is a long, long narrative.  And so maybe we

18    could have questions and answers.

19    THE COURT:  It's long, but I mean, I'll accept

20    that.  I understand.

21    MS. CRINO:  All right, okay.

22    THE COURT:  So I'm not going to go behind the

23    decisions I made pretrial, or decisions I made during the

24    trial, Mr. Uraz, okay.

25    THE WITNESS:  Okay, your Honor.

1              THE COURT:  All right, so the attorney makes the

2        argument and I make a ruling.  I'm not going to go behind

3        those.

4              THE WITNESS:  I understand that, your Honor.

5              THE COURT:  Okay, so --

6              THE WITNESS:  It's -- I understand it's --

7              THE COURT:  I mean, we don't need that background.

8        I understand you've been waiting a long time, but I think

9        we're sort of limited in the scope that we can work with

10       here.

11             THE WITNESS:  All right, let's start with trial.

12             THE COURT:  All right, do we have a new question,

13       Ms. Walsh?

14             MS. WALSH:  Yes.

15   BY MS. WALSH:

16   Q    So during the trial, did you -- did you begin to have any

17        concerns for Mr. Perrone's mental capabilities to handle the

18        trial?

19   A    Well, actually if you would let me just -- with the bipolar

20        disorder it's a two to three week period of time that they --

21        there's manic episodes that they go through.

22             THE COURT:  Mr. Uraz, so all of your testimony is

23        after the fact, okay.  So what we're trying to get at is -- I

24        know you've done a lot of research since the jury rendered

25        their verdict, but I mean, that's not really it here today.

1      It's like what were your observations?  What made you think

2      something was wrong?  Not the fact that after the fact you've

3      done some research and now say this was wrong.  Do you follow

4      me?

5                   THE WITNESS:  Yes, your Honor.  I do.  It's --

6      again, the issue was that --

7                   THE COURT:  What your observation was, per se, and

8      what your thought process was about Mr. Perrone.

9                   THE WITNESS:  That he didn't screen any of the

10     witnesses.  Yes, he put 30 names on the witness --

11                  THE COURT:  Too quick.

12                  THE WITNESS:  Okay.  He put 30 names on the witness

13     list, but he did not contact any of them, any of them at all.

14     I mean, I could put 30 names on a witness list also.  If you

15     don't contact them or investigate, which is the basis of the

16     attorney's research or investigation, nothing.  The only

17     thing that he did -- the two MDOC witnesses that he called

18     in, which he -- I asked for four.  He still called two.  And

19     which they lacked credibility at that time.

20                  THE COURT:  Okay.  I mean, I thought we had some

21     arguments on that.  And really, some of the witnesses really

22     didn't have any relation to the case, other than you wanted

23     them to come in.  They weren't really going to be relevant,

24     if I recall correctly.

25                  THE WITNESS:  Your Honor, he was so confused about

1    who was who in the evidentiary hearing.  He was even mixing

2    up names and they are saying that too.

3            THE COURT:  Well, then that's something that's

4    important, mixing up names.  But I think the number of

5    witnesses, if I recall, was a big list.  But some of them

6    were just -- didn't have anything to offer in the case.

7            THE WITNESS:  But they were all somehow related,

8    which I justified in every -- the briefs that I had written.

9    But, for example, my roommate at that time, Brock Ultimer,

10   this is the person who deposited money to Mr. Reggie Close's

11   account.  And, I mean, I think he was a relevant witness to

12   have.

13           THE COURT:  Okay.

14           THE WITNESS:  Or the second guy who was -- I was

15   accused of damaging their car on New Year's Eve in 2015.  I

16   had the Turkish guy with me again, Mr. Oz.  I think you have

17   relevant evidence to a person to come in and testify that at

18   that meeting I didn't do anything at that time.

19           THE COURT:  Okay.

20           THE WITNESS:  I mean, there is more.  My neighbor,

21   yes, I did have trash because I foreclosed my home and I had

22   trash in my house.  And she was in charge --

23           THE COURT:  Well, I think you explained that at

24   trial though.

25           THE WITNESS:  Yea, it was on my evidentiary hearing

1   I explained that.

2            THE COURT:  You explained that in trial, right?

3            THE WITNESS:  Evidentiary hearing, not trial.

4            THE COURT:  Oh, it was the evidentiary hearing?

5            THE WITNESS:  Yes.

6            THE COURT:  I know we had some testimony on that.

7            THE WITNESS:  Yes, it was only -- I never testified

8   in trial.  It was only evidentiary hearing.

9            THE COURT:  Right.  So I know we had testimony on

10  it.

11           THE WITNESS:  So it's -- so those are issues that I

12  had.  Because if you look at the evidentiary hearing, from

13  page 124 to 147, the witness debacle that we had is just

14  horrible.  He said, "Well, you know, I should have -- the

15  Ingham County prosecutor should screen all these witnesses,

16  but I wasn't getting paid from last time I did this."  And

17  you said, "Hold on, this is an appeal issue.  Don't say that.

18  How can we help you?"  Again, you are trying to help him to

19  get these witnesses somehow.  And he said, "Okay, I'll use

20  the video room."

21           He contacts two MDOC witnesses and writs them out

22  and brings them to the court.  That's the easiest thing you

23  can do in the world.  But he didn't secure any Turkish guys,

24  who they were in Turkey by the time this trial started

25  because they didn't want to get involved with it.  He could

1    have secured any of these witnesses that I gave him six

2    months ago.  Because in April of 2017 I sent him a letter,

3    which I have right here also.  He sent it to me.  I listed

4    every person I wanted.  I justified every single time too.

5    But not him.  The witnesses are not having hard evidence to

6    prove to the jury, because he kept repeating in the trial

7    also, "I don't have to do anything.  It's the prosecutor's

8    responsibility.  This is a court appointed case to me.  This

9    is…," and that's the basics of that he just stuck to.  That's

10    what my frustration was.

11          THE COURT:  All right.

12          THE WITNESS:  Anyway, go ahead.  I'm sorry, Ms.

13    Walsh, go ahead.

14          THE COURT:  All right, next question?

15  BY MS. WALSH:

16  Q    Well, did you notice anything about Mr. Perrone's demeanor?

17     Did you notice that he was overtired, or distracted during

18     the trial?

19  A    Well, he was -- I mean he would, for example, look at Mr.

20     Kronbach, the police detective.  And I said, "Why are you

21     laughing at me?"  Out of the blue.  That was one of the

22     things.  And it's the -- that he was just looking around and

23     just smile and sit down and do these subtle motions with any

24     kind of bipolar person will go through.  Because, believe me,

25     my wife has bipolar disorder.  My mother-in-law had it.  My

1    son has it.  I've been dealing with bipolar all my life.  So

2    I understand there's something wrong with him because the way

3    that he's talking, the way that he's acting, and sometimes he

4    gets confrontational with Mr. Roth.  And he calls it

5    gamesmanship that he was testifying last -- six months ago

6    here.

7            But it was more than -- it was more than -- because

8    if I had the emails here.  I wish I can show you what he

9    wrote to my family, especially.  And his text messages is

10   outrageous.  And I put these in my brief also, but I would

11   love to share these with you if you want to look at them,

12   your Honor.  These are -- this is after his treatment

13   supposedly he got better and medicated, because he was still

14   saying that, "I did not lose the effing trial.  I won the

15   good versus evil."  Would you like to look at them, the text

16   messages?  I have them right --

17           THE COURT:  I don't want to look at the text

18   messages.

19           THE WITNESS:  Okay.  I mean, it's -- but it's the

20   -- this is all part of that -- supposedly that the manic

21   depressive state lasts for three weeks.  And during the

22   trial, yes, he worked 120 hours a week.  Yes, he did his best

23   that he could possibly do.  But it happens with bipolar is

24   that they work extra hours.  They do -- they do over --

25   trying to overachieve something and they crash.  That's why

1   he checked himself to a psych ward --

2   THE COURT:  Can we go off the record for a moment

3   here?  Can we go off the record?

4   (At 2:23 p.m. to 2:25 p.m. off the record)

5   THE COURT:  All right, we can go back on the

6   record.  Ms. Walsh?

7   BY MS. WALSH:

8   Q   So you believe that Mr. Perrone was affected by his bipolar

9       disorder during the trial, and that impacted his ability to

10      cross-examine the witnesses and bring forth the -- all the

11      evidence?

12  A   Because his -- his pretrial preparation, not doing any

13      investigation at all, and then trying to cram this

14      investigation in the last 15 days before the trial starts,

15      that's -- we have a magnitude of evidence that -- he even

16      said, "This is a foot tall file here that I have to go

17      through," which he never had time for.  I don't know why.

18      And that's the -- this is the result that I'm here.  But

19      that's why I'm here to put everything on record, which I have

20      a right to, to what evidence that he would have brought that

21      maybe would have proved my innocence.  And that's what I'm

22      looking for, your Honor, if you would just let me.

23      THE COURT:  Well, I think we have wide latitude,

24      and so we were letting you do that.  But these are all

25      retrospective opinions that you're offering.  So that's the

1    decision I have to make, okay.  So, go ahead.

2                  MS. WALSH:  Pardon?

3                  THE COURT:  Go ahead.

4                  MS. WALSH:  I have no further questions.

5                  THE COURT:  All right, so let's turn to Mr. Uraz

6    before we -- well, let's let Ms. Crino -- no?

7                  MS. CRINO:  However you want to do it, your Honor.

8                  THE COURT:  Well, I'd rather have you ask your

9    questions and then we'll let Mr. Uraz -- I'm sure he has more

10   he wants to tell me.

11                 MS. CRINO:  Very good.

12                 THE WITNESS:  Thank you, your Honor.

13                        **CROSS-EXAMINATION**

14   BY MS. CRINO:

15   Q    Good afternoon, Mr. Uraz, how are you today?

16   A    Thank you, ma'am.  How are you?

17   Q    I am well.

18   A    And I would like to thank you before you start for sending

19        me, in December, the -- the GPS stuff and everything, which I

20        never got in part of the discovery package as well.  I would

21        like to thank you for that.

22   Q    You are welcome.

23   A    I've been trying to get that for three years.

24   Q    You are welcome, sir.  My questions are going to be really

25        focused on just one thing, okay?

| | | |
|---|---|---|
| 1 | A | Sure. |
| 2 | Q | And that is just so that you know where I'm going.  Your |
| 3 | | failure to ever complain about Mr. Perrone to the Court, so |
| 4 | | that's where I'm coming from.  Those are the types of |
| 5 | | questions I'm going to ask you. |
| 6 | A | My failure to -- my failure -- |
| 7 | Q | So let me -- let me ask questions, and if you don't |
| 8 | | understand my questions, I'd be happy to clarify them for |
| 9 | | you, okay? |
| 10 | A | Sure. |
| 11 | Q | So you would agree that on March 27th, 2017 that Mr. Nichols |
| 12 | | no longer represented you at that point, correct? |
| 13 | A | He dropped himself.  Yes, he said -- |
| 14 | Q | So it's really just a yes or no question. |
| 15 | A | Yes. |
| 16 | Q | If we can keep it that way, okay. |
| 17 | A | Sure. |
| 18 | Q | And you would agree that at that point Mr. Perrone began to |
| 19 | | represent you on both cases, correct? |
| 20 | A | Because your Honor suggested that, yes. |
| 21 | Q | Again, just yes or no.  We can make this really fast if you |
| 22 | | hit me with the yes or no's, okay? |
| 23 | A | Yes. |
| 24 | Q | Okay, very good.  So you would agree that on March 27th, 2017 |
| 25 | | you never told Judge Canady that you had a problem with Mr. |

| | | |
|---|---|---|
| 1 | | Perrone representing you on both cases, correct? |
| 2 | A | Not at that time. |
| 3 | Q | All right, very good.  And you could have if you wanted to, |
| 4 | | correct? |
| 5 | A | I mean, granted that he came to jail four times in that whole |
| 6 | | thing. |
| 7 | Q | No, I'm not asking about jail visits. |
| 8 | A | Sure, okay. |
| 9 | Q | I'm just asking you if on that day you had a problem with Mr. |
| 10 | | Perrone representing you, you could have told the Court, |
| 11 | | correct? |
| 12 | A | Sure. |
| 13 | Q | Okay.  And then same thing on May 2nd, 2017, you've mentioned |
| 14 | | you had a pretrial conference that day, correct? |
| 15 | A | Correct. |
| 16 | Q | And you could have told Judge Canady that there was a problem |
| 17 | | with Mr. Perrone, correct? |
| 18 | A | Correct. |
| 19 | Q | If you had been observing that he had symptoms of bipolar up |
| 20 | | to that point, you could have told the Judge about that, |
| 21 | | right? |
| 22 | A | I didn't know if I had that many rights -- |
| 23 | Q | It's just yes or no, you could have told the Judge that day |
| 24 | | you were in front of the Judge? |
| 25 | A | No.  No, because I didn't know my rights. |

```
 1   Q    Well, you're certainly not shy about speaking in court,

 2        correct?

 3   A    Now I am not.  Now I am not.  But back then, yes, I was very

 4        shy.

 5   Q    And we both looked at these transcripts, so you know that

 6        every time you go on the record the Judge is going to address

 7        you directly, correct?  You are Tunc Uraz?  You are present

 8        today for your pretrial conference?

 9   A    My name is Tunc.

10   Q    I mean, this is what happens --

11   A    Like --

12   Q    Let me finish.  Let me finish.  Let me finish.  This is what

13        happens every time you go on the record with Judge Canady?

14        This is no secret.  You've been here many times, right?  So

15        my question is on May 2nd, did you tell Judge Canady that you

16        were having a problem with Mr. Perrone?

17   A    No, I didn't have any problem at that time.

18   Q    Okay.  And you could have written a letter if you were

19        uncomfortable with saying something in court, right?  You

20        know how to write letters.  We both know.

21   A    I have written a letter actually.

22   Q    You've written a couple letters, haven't you?

23   A    More than a couple.  But yes, I have written a letter, yes.

24   Q    More than a couple.  So if you had a problem, you could have

25        written a letter to the Court, correct?
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | But you didn't do that? |
| 3 | A | I did, after the trial. |
| 4 | Q | After October 20th, 2017 you were in court for an entrapment |
| 5 | | motion that Mr. Perrone filed on your behalf, correct? |
| 6 | A | Well, I didn't know what -- |
| 7 | Q | That's yes or no, were you in court for that or not? |
| 8 | A | No, I didn't know because I showed up that day.  I didn't |
| 9 | | know what to expect and I was told that you are going to |
| 10 | | testify on the last minute. |
| 11 | Q | Okay, this is a real easy question.  It's yes or no.  Were |
| 12 | | you in court October 20th, 2017 for that motion? |
| 13 | A | Yes, I was at court. |
| 14 | Q | And that was your entrapment motion, correct? |
| 15 | A | That is correct. |
| 16 | Q | So if you were having a problem with Mr. Perrone up to that |
| 17 | | point, that was an opportunity that you could have told the |
| 18 | | Court about it, correct? |
| 19 | A | I mean, I could have probably. |
| 20 | Q | And you didn't, correct? |
| 21 | A | Correct. |
| 22 | Q | Okay.  You had jury selection on October 31st, 2017, correct? |
| 23 | A | Correct. |
| 24 | Q | And you did not tell the Court that you were having a problem |
| 25 | | with Mr. Perrone that day, correct? |

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | And the trial continued on the dates of November 2nd, 2017; |
| 3 | | November 3rd, 2017; November 6th, 2017; and November 9th, 2017, |
| 4 | | correct? |
| 5 | A | Correct. |
| 6 | Q | And you did not tell the Court on any of those days that you |
| 7 | | were having a problem with Mr. Perrone, correct? |
| 8 | A | Correct. |
| 9 | Q | And you could have, correct? |
| 10 | A | No, I couldn't have because it's the -- you have to |
| 11 | | understand, the culture that I come from, we respect |
| 12 | | authority and respect the attorneys.  So we assume that they |
| 13 | | are trying their best at that time. |
| 14 | Q | And, sir, the Court treats you with respect as well, and he |
| 15 | | addressed you directly every one of those days, correct? |
| 16 | A | Who addressed me? |
| 17 | Q | The Court. |
| 18 | A | Identification purposes, yes. |
| 19 | Q | Yes.  You could have told the Court that you were having a |
| 20 | | problem with Mr. Perrone on any of those days, correct? |
| 21 | A | Correct, but I didn't know that I had that right. |
| 22 | Q | No, that's -- I did not ask you to explain. |
| 23 | A | I'm just telling you my opinion. |
| 24 | Q | And you did not, correct? |
| 25 | A | No, I did not. |

| | | |
|---|---|---|
| 1 | Q | Okay.  December 13th, 2017, do you remember what happened that |
| 2 | | day in your case? |
| 3 | A | Yes. |
| 4 | Q | Okay.  And that was an opportunity that you could have told |
| 5 | | the Court that you had a problem with Mr. Perrone continuing |
| 6 | | on your case, correct? |
| 7 | A | I was told at that day that my attorney will be switched |
| 8 | | because the prosecution didn't want Mr. Perrone to represent |
| 9 | | me for my sentencing, and that Mr. Silverthorn was already |
| 10 | | appointed for me by December 6th.  I only acknowledged what |
| 11 | | Judge told me.  Your Honor told me, he said, "This is what's |
| 12 | | going to happen, okay."  "Okay."  And we went along with it. |
| 13 | | That's all. |
| 14 | Q | And I don't disagree with you about that, but isn't it true |
| 15 | | that on that day you were also informed that Mr. Perrone was |
| 16 | | going to continue representing you by assisting Mr. |
| 17 | | Silverthorn at your sentencing? |
| 18 | A | No, he made that comment to him at that time. |
| 19 | Q | No, he made that comment to you at that time, isn't that |
| 20 | | true, sir? |
| 21 | A | No, because I'm -- I'm not on the record -- |
| 22 | Q | Sir, isn't it true that the Court stated, "All right, so that |
| 23 | | Mr. Silverthorn would be the attorney of record, Mr. Perrone |
| 24 | | says that he -- he's available, due to the complexities of |
| 25 | | the case, to work with Mr. Silverthorn, but Mr. Silverthorn |

| | | |
|---|---|---|
| 1 | | would be the attorney of record." And you replied, "I |
| 2 | | understand." And the Court stated, "Is that fine with you?" |
| 3 | | And you stated, "Yes, your Honor." And the Court asked, "Is |
| 4 | | that how you wish to handle this matter?" And you said, |
| 5 | | "Yes." Isn't that true, sir? |
| 6 | A | I acknowledged what I was told. |
| 7 | Q | Do you also acknowledge that this is what you said to the |
| 8 | | Court that day, December 13th? |
| 9 | A | If it is on the record that way, yes, I am acknowledging what |
| 10 | | I was told. |
| 11 | Q | Okay, sir. And at that time you did not tell the Court that |
| 12 | | you had all of these global issues with Mr. Perrone, did you? |
| 13 | A | I didn't -- no, on November 30th of 2017 I did write a letter |
| 14 | | to Judge Canady about the issue that I had. |
| 15 | Q | Sir, that is not my question. I am not asking you about |
| 16 | | that. I am asking you about this conversation that you had |
| 17 | | with Judge Canady on this day. Isn't it true that you said |
| 18 | | it would be fine for Mr. Perrone to continue in the manner |
| 19 | | described by the Court? |
| 20 | A | No, he talked to -- you are taking it out of context. |
| 21 | Q | Sir -- no, no, no. This is yes or no. This is the words |
| 22 | | from the transcript. Did you say this, yes or no? |
| 23 | A | Because per Michigan Rule of -- |
| 24 | Q | No, no, I'm not asking you for an explanation. I'm asking |
| 25 | | you -- |

```
 1   A    But I'm telling you because he's supposed to help him.
 2   Q    -- did you say this --
 3   A    He's supposed to help him with sentencing.
 4   Q    Uh-uh, no.  This is -- this is yes or no.  Did you say this?
 5             THE COURT:  Okay, it's really a yes or no, Mr.
 6        Uraz.  You said it, or no?
 7             THE WITNESS:  No.
 8   BY MS. CRINO:
 9   Q    You did not say the words that are documented here in the
10        transcript?
11   A    I acknowledged what I heard.  That's what I'm telling you.
12   Q    Are you saying that these are not your words, is what you're
13        telling the Court today, sir?
14   A    What I'm telling you, ma'am, is that I'm acknowledging what
15        Judge, your Honor, told me to agree to, and that's what I
16        agreed to.
17   Q    That does not answer my question at all, sir.
18   A    I don't know how to answer you.
19   Q    Do you want me to read it to you again?  I would be happy to.
20   A    Please.
21   Q    Okay.  So the Court stated, "All right, so that Mr.
22        Silverthorn would be the attorney of record.  Mr. Perrone
23        says that he -- he's available, due to the complexities of
24        the case, to work with Mr. Silverthorn.  But Mr. Silverthorn
25        would be the attorney of record."  Sir, is it true, yes or
```

1       no, that in reply to that you stated, "I understand."

2  A    Yes, I understand.  I --

3  Q    Okay, good.  Now stop.

4  A    Okay.

5  Q    Is it true that after that the Court inquired, "Is that fine

6       with you?"  And, sir, isn't it true that after that you

7       replied, "Yes, your Honor."

8  A    I was acknowledging Mr. Silverthorn --

9  Q    Sir, that's a -- that's a very simple yes or no question.

10  A    Yes, I was acknowledging Mr. Silverthorn representing me.

11  Q    That is -- no, stop, sir.  That is a yes or no question.

12       Were those your words, "Yes, your Honor."  If your attorney

13       wants you to explain anything else, you will get that chance.

14  A    Sure.

15  Q    My question is, were those your words, yes or no.

16  A    Yes.

17  Q    And next the Court said, "Is that how you wish to handle this

18       matter?"  And you replied, "Yes," correct?

19  A    Yes.  Yes to Mr. Silverthorn.

20  Q    I have no -- I have no -- I am not asking you to explain

21       yourself.  I am not.  I am asking, were those your words?

22  A    Yes.  I wish we had video footage.

23  Q    No, I -- I am not asking you for any explanation beyond that.

24  A    Okay.

25             MS. CRINO:  Thank you.  I have no other questions.

```
1              THE COURT:  All right.  Redirect, Ms. Walsh?
2                      REDIRECT EXAMINATION
3    BY MS. WALSH:
4    Q    Okay, and just a couple quick questions to clarify that
5         although you have a done a lot of research over these last
6         four years, and learned a lot about the law, you are not an
7         attorney, correct?
8    A    No, ma'am.
9    Q    And you have no criminal justice or criminal law education or
10        background?
11   A    No.
12   Q    Okay.  So -- and at the time of your trial, you knew a lot
13        less about criminal law than you do now, correct?
14   A    That is correct, ma'am.
15   Q    Okay.  So during the stress of the trial, you might not have
16        been able to make a decision, or an educated decision, about
17        whether or not your attorney was giving you effective
18        assistance of counsel?
19   A    That is correct.
20             MS. WALSH:  Okay, I have no further questions.
21             THE COURT:  Okay.  Do you have anything further?
22             MS. CRINO:  No, your Honor.
23             THE COURT:  Are there other areas you want to hit
24        with me while you're here?
25             THE WITNESS:  Can I say a few things about the
```

1   evidence at least that was not presented, the way that it

2   should have presented, just a couple things.

3           THE COURT:  Well, as long as -- all right, the

4   evidence that was presented speaks for itself.  So if your

5   complaint is that it could have been presented differently,

6   I'll allow you to express some brief opinions on that.

7           THE WITNESS:  Yes, differently.  It's -- the

8   alleged phone call from the jail.  I could not have done

9   that, because if you look at the jail -- my jail phone call

10  logs, my first phone call is on the 1st of September 2016 to

11  my attorney.  And I have the phone log if you want to look at

12  it.  I have it right here.  Because I -- I got that on the

13  Freedom of Information Act.  That's why.

14          The second thing, the -- do you have the -- I don't

15  know if you have the search warrant that's signed on the 27th,

16  9/27/2016.  It states right there that her Facebook account

17  was -- the password was switched by an email, with her old

18  email.  And the way that they presented it in court that I

19  did all that stuff.  And that's one that I have all this

20  evidence that I can show you.  It's all -- these are all

21  based on perjury that --

22          THE COURT:  Okay.  But, I mean, at this point, I

23  mean, I'm letting you so you can make your record on that.

24  But I think -- I think evidence was presented both ways.  An

25  argument was made that it wasn't you.

| | |
|---|---|
| 1 | THE WITNESS:  No, it wasn't made that way.  It's |
| 2 | just that it was -- he never -- my GPS records, for example. |
| 3 | It's the -- I'll give you the last day of the -- when we had |
| 4 | this hearing at -- before I remanded myself to jail on August |
| 5 | 31st, 2016.  We had a meeting at 3:30 here. |
| 6 | THE COURT:  Okay. |
| 7 | THE WITNESS:  But all my GPS tether that I had on |
| 8 | show me at 2:30 I'm at the Ingham County Jail.  How could I |
| 9 | be in Ingham County Jail at 2:30 and then be here at 3:30 at |
| 10 | the same time with a tether on me?  Because they take the |
| 11 | tether off in Ingham County -- Ingham County Jail for me. |
| 12 | And even my location's showing that I'm in -- on Saint |
| 13 | Joseph, 272 Saint Joseph, versus 313 Kalamazoo here. |
| 14 | And these are the -- these -- that means it's a |
| 15 | faulty GPS, sir, therefore that negates -- because the |
| 16 | prosecution used the -- my GPS locations and the IP |
| 17 | addresses, which were all expired.  And based on the Spartan |
| 18 | Net's owner at that time, he said well, based on his -- these |
| 19 | are just lumps of building seed.  That's it. |
| 20 | And when I looked at Mr. -- Ms. Crino's papers that |
| 21 | she sent, there's three different IP addresses there, and |
| 22 | they're all expired.  And using IP addresses as fingerprints, |
| 23 | when I'm not at the apartment complex, is -- it could happen |
| 24 | to anyone.  And, by the way, her apartment complex also run |
| 25 | by the same company, Spartan Net.  So, go figure. |

1        And even he testifies saying that the IP addresses

2   were traced to Mac computer.  If you look at one of them it

3   says -- one of them is a Samsung phone.  And she owned an

4   iPhone.  So that's what I'm trying to tell you.  These are

5   all the -- if he would have did his investigation that he was

6   supposed to -- which I wrote all this to him in the letters

7   that I have sent.  And nothing, he didn't read nothing,

8   anything, nothing.  Nothing is read.  Nothing is -- well,

9   that's what my frustration is.

10       The 609 for the criminals that testify against me,

11  they are not misdemeanors.  One of them was in prison for

12  nine years, Mr. Close.  The other one had from domestic

13  violence, to strangulation, to drug charges, to everything.

14  These aren't misdemeanors.  These are all felonies.

15       Now finally, in 2019, Mr. Allen came to prison.

16  Guess where he came, your Honor?  To Saginaw facility where I

17  was at.  And they rode me up next day to Alger, above the

18  bridge, which I didn't understand why am I up here.  When I

19  said, "What are we doing up here?"  "Oh, I don't know."  And

20  I came down again 10 months later, but that's the reason.

21  Now he's in prison.

22       Here's the point I'm trying to make to you.  Did

23  they charge him in a habitual?  No.  He had an Armed Robbery.

24  They switched it to Unarmed Robbery.  With all his 20 page

25  criminal record, no habitual, nothing.  The only plea that he

1    accepted, 9½ years to 16 years.  I had nothing on my record

2    until that point.

3            Mr. Close, the way that it was adjourned, because

4    his attorney didn't -- he had another trial at that time.

5    But again, he was found not guilty because his victim --

6    because Mr. Nichols hired a private investigator at that

7    time, his victim showed up to the preliminary examination,

8    which I have the records of that.  She did not show up to the

9    trial because she was threatened by him.

10           But if he would have done his investigation, it

11   would have all come out that way.  That's why they found him

12   not guilty because the victim wasn't at the trial to testify.

13   Again, he had no habitual.  He was a PV.  Nothing again.  He

14   paroled because he cooperated with the police and -- with the

15   police.  That's one of the Parole Board's requirements I

16   guess that -- I mean, again nothing.

17           And all these things are -- these are not

18   misdemeanors, please.  I mean, these are realities of -- they

19   try to minimize their background, but they are horrible.

20   Each of them has 20 pages, which I subpoenaed all that.  I

21   mean, we tried all -- I got all that on the Freedom of

22   Information Act.  Which I put it in that brief right there

23   too.

24           THE COURT:  Okay.  All right, so anything else you

25   want to cover?  I don't want to go through the whole thing.

1    Highlights.

2         THE WITNESS:  And the other thing that my other

3    hired attorney, Mr. Bergstrom, testifying against me for a

4    letter that I provided.  Which, again, doesn't make sense

5    because the email that's sent, it was her email.  And I have

6    it on there.  I am proving to you that it was her email,

7    because that email account was opened up in 2019.  I didn't

8    meet Ms. Melke until 2012.  So these are all the differences

9    that if he would have done his homework, he would have proved

10   my innocence on these things.

11        And I contacted Google through my family.  We asked

12   what year these emails started, 2009 -- November something in

13   2009.  I didn't know her back then.  I didn't meet her until

14   2012.  So all these things are -- could have given the

15   benefit of the doubt, reasonable doubt.  That's what I'm

16   looking for.  That's what I was looking for.  Which I wrote

17   all that on the letters I have sent.

18        One more thing.  His roommate, I was accused of

19   loosening her car tires.  There were three police reports

20   filed in July of 2016.  None of them matches any kind of tire

21   damage or anything like that.  The concert tickets.  She's

22   claimed that concert tickets were stolen from her room the

23   day that I was in her apartment.  Guess what?  The concert

24   tickets didn't go on sale until May 26th.  This incident

25   happened on May 25th.

1        And the year before that she went to the same

2   concert.  She buys them all online.  And the email that she

3   sent to Prosecutor Koop at that time saying that well, it was

4   electronically changed.  So somebody obviously get into the

5   tickets electronically because they show their phone and they

6   get into the concert that way.  There was not Heart tickets

7   at all purchased and printed tickets at that time.  So there

8   was no tickets in her apartment.  Because I know what I did

9   and what I didn't do.  So these are all the lies that somehow

10  she decided to talk about it, and then maybe she was

11  supported by the prosecution.

12        Here's another one.  The letter that was shown to

13  Mr. Koop made him a witness in my trial.  That is a conflict.

14  If you look at November 2nd, 2016, my sentencing for my first

15  stalking charge, he says right to you, "Yes, I have a

16  conflict with Mr. Bergstrom right now.  I don't know what's

17  going to happen."  Ten months passes, he's a prosecutor in my

18  -- in my trial.  He should have been a witness, if any.  See,

19  that's the point I'm trying to make to you, your Honor.

20        THE COURT:  Okay.

21        THE WITNESS:  And these are the realities of it,

22  that they all -- Ms. Crino can look at all these transcripts

23  also, if she wants to.  The most important one, your Honor,

24  is the -- on December 12th in your chambers meeting with Mr.

25  Perrone, Mr. Schroeder, Mr. Roth, Mr. Fernandez, and Mr.

1    Koop, Mr. Perrone was representing his own interest about his

2    mental illnesses.  And all he said to you was, "Yes, I was

3    not medicated during the trial.  Now I'm properly medicated."

4    Mind you, he checked himself, or somebody checked him into a

5    psych ward three days after the trial.

6            How did I find out this?  I come here on the 13th.

7    He gave me his hospital records.  I didn't ask for it.  He

8    handed them to me with a bunch of other papers I asked him to

9    bring to me.  But it was between those papers.  That's -- it

10   was kind of surprising.  I looked at what they gave him, but

11   it's -- they have him -- he had schizophrenia and bipolar

12   disorder.  They gave him a very heavy medication.

13           My wife checked herself to psych ward three days --

14   for three days also.  I know the same course down the road

15   like that.  I know the process.  I had -- because she said

16   somehow that her doctor told me that she's talking about

17   suicide.  So he told me, "Take her to psych ward right away."

18   So I did that.

19           And when Mr. Perrone had an episode?  Yes, but

20   didn't take a couple Tylenols and slept it off.  Somebody

21   checked him into psych ward.  Nobody goes to psych ward

22   voluntarily, I mean, in my personal opinion.  Maybe somebody.

23   So therefore, all these things could have made a big

24   difference in the trial is what I'm trying to tell you.

25   Again, I was contacted.

1    Now, the jury instructions, yes, he changed the

2    jury instructions to purposefully cease.  And Mr. Roth

3    decided to first -- first started the jury trial and he said

4    -- I mean, at closings he says "purposefully intended or

5    intends."  Then Mr. Perrone says well, this is not the

6    agreement that we had."

7    Because, guess what, he gave the jury instructions

8    first day of trial to Mr. Roth.  He didn't ask me anything.

9    He didn't say, "Hey, is it okay with you," nothing.  So also

10   you had made a comment.  If you look at the October 31st, you

11   said, "Isn't that kind of early to give a jury trial

12   instructions on the first day of trial?"  So okay, I guess

13   it's not a big deal.  The jury verdict form was never

14   discussed with me.

15   So we come -- come fast forward to the last day of

16   trial, we are going through the beginning of the -- that day

17   we started to go through the jury instructions.  Mr. Roth is

18   going through very effectively deleting every single one.

19   Guess what the major jury instruction missing -- missing

20   there?  That I didn't testify.  First, you didn't give the

21   instruction for that, 3.3, the defendant has a right not to

22   testify.

23   Jury verdict -- two alternate jurors were dropped,

24   not randomly, but knowingly because one of them got up and

25   said the third day of trial that he was biased against

1    Turkish people for me.  I don't know how he found out.  He

2    must have Googled my name.  That's the only way I can think

3    of because nobody still told anybody that I was from Turkey.

4    I was born here; raised in Turkey.  I was born in Lansing,

5    Michigan.

6         But -- so all these things could have made a

7    difference in the trial.  That's what I'm trying to tell you,

8    your Honor.  And there's red flags every step of the way as

9    this is happening.  And then you tried to help the guy out,

10   Mr. Perrone, a little bit.  But again, it didn't work out.

11   What else I can tell you?

12        So jurors were dropped knowingly.  It should be

13   randomly because your decision at that time was well, this

14   happens all the time, so we're just going to drop him

15   knowingly.  But, you know, MCR 6.411 tells us that it has to

16   be done randomly.  Or MCL 768.7 tells us the same thing too.

17   I mean, I'm reading these at the law library, trust me.  The

18   last four years of my life I just live there.

19        But again, Mr. Perrone's inexperience, because

20   although he said that he didn't feel like 609 should have

21   made a difference, but because he was inexperienced at that

22   time.  I mean, the basics of indigent attorneys -- you know,

23   I looked at it.  What we are looking for is the -- just if he

24   would have done the basics even it would have made a

25   difference, but nothing.

1      He came to jail to see me four times.  Four times,

2   that's it.  I have the jail records that my attorney was

3   there.  I can show you that right now.  The first two was the

4   same day there because my preliminary hearing wasn't done.

5   He waives the preliminary hearing, not investigating any of

6   this IP stuff I am telling him, nothing.  And that's

7   frustrating.  That's a major thing that happens.  So --

8           THE COURT:  Okay, well I appreciate it.

9           THE WITNESS:  I mean, thank you for letting me put

10   these on the record.  I do appreciate the sincere -- you're

11   sincere for letting me do that.  And I did tell the same

12   during sentencing.  And also we had some kind of a debate at

13   that time that you said, "This is the sentencing.  You

14   shouldn't be doing this."  But I didn't know how to put on

15   the record everything.  That's why I tried as much as I can.

16           THE COURT:  All right, I appreciate it.  Okay, all

17   right.  Anybody have any questions as a result of Mr. Uraz's

18   latest statements?

19           MS. CRINO:  No, your Honor, thank you.

20           THE COURT:  Ms. Walsh?

21           MS. WALSH:  No, thank you.

22           THE WITNESS:  And one more thing that I need to

23   add.

24           THE COURT:  One more.

25           THE WITNESS:  One more and then I'm done.  January

```
 1   of 2017 I made it to Lansing -- Lansing State Journal.  I
 2   don't know how, which is fine.  But do you know what happened
 3   after that?  You know how many times I got solicited at the
 4   jail by different -- and I wrote these to Mr. Nichols.  I
 5   send it.  They wrote me notes.  I told them, "Look, I'm
 6   worried."  That's why I was so adamant of not having a
 7   presence of the media, because I was trying to protect her.
 8   Because it's just horrible.  In jails and prisons it works
 9   differently, these things are.  And if they think you have
10   money, oh my God, I mean, it's just -- they are like leeches.
11              THE COURT:  All right.
12              THE WITNESS:  That's all.
13              THE COURT:  Okay, thank you.  I appreciate it.
14              (At 2:51 p.m. witness excused)
15              THE COURT:  All right, any additional witnesses,
16   Ms. Walsh?
17              MS. WALSH:  No.
18              THE COURT:  Any witnesses, Ms. Crino?
19              MS. CRINO:  No, your Honor.
20              THE COURT:  All right.
21              THE DEFENDANT:  Are we done?
22              THE COURT:  Yep.
23              THE DEFENDANT:  All right, thank you very much,
24   your Honor.  I appreciate your time.  Thank you, ma'am.
25              THE COURT:  So a briefing schedule?
```

1          MS. CRINO:  Well, in my view, briefs are definitely

2     not necessary.  I mean, at this point the Court has sat

3     through three different days of hearing testimony.  I believe

4     when we were here last time, what we discussed procedurally

5     is that the parties would be prepared to present an oral

6     closing argument regarding this.  The People are certainly

7     prepared to do that.

8          And I would note that in terms of the remand order

9     from the Court of Appeals, what they indicated was that

10    supplemental briefs could be filed in the Court of Appeals

11    regarding the remand proceedings.  And so we'll certainly be

12    prepared to file briefs for the Court of Appeals.  But they

13    did retain jurisdiction, so in my view, additional briefing

14    is not necessary.  But certainly if the Court wants briefs,

15    we'll gladly comply with that.

16          THE COURT:  Yea.  I mean, I'd rather have the

17    briefs so I can look at everything and get everybody's

18    position in writing.  If you want to do it orally, you can.

19    Or you can do it by brief.  But I'm still going to have

20    briefs, even if you do it orally.

21          MS. CRINO:  Fair enough, your Honor.

22          MS. WALSH:  Yea, I know Ms. Crino is a trial gal,

23    and I think she does an excellent job.  I'm a writer, so I

24    would prefer to do a brief.

25          THE COURT:  So everybody's going to submit -- all

1   right, so how long do we need for that?  I guess --

2                MS. CRINO:  I guess it depends on which --

3                THE COURT:  You're first, Ms. Walsh, huh?  Or do

4   you want to submit them simultaneously?  You don't want to

5   have reply briefs and all that, or just like treat it like a

6   closing argument and everybody have --

7                MS. CRINO:  I would close this case for you right

8   now, your Honor.  But -- no, so whatever briefing schedule

9   the Court would like to impose, we can comply with.

10               MS. WALSH:  I would like to get a copy of the

11  transcript to look at, and then be able to write my brief.

12               THE COURT:  Ms. Coltman's on transcripts.  You got

13  all the other transcripts, right?

14               MS. WALSH:  Yes.

15               THE COURT:  So it's not going to take her more than

16  two weeks to do that.

17               MS. WALSH:  Okay, so how about as soon as we get

18  the transcript, a month?

19               MS. CRINO:  Whatever you need is fine with me.

20               MS. WALSH:  Okay, a month?

21               THE COURT:  Can I push it past December?

22               MS. CRINO:  Don't do that.  Don't do that to me,

23  Judge.

24               THE COURT:  All right, so let's see.  We've got two

25  weeks.  That will take us to the end of April.  So why don't

1    we say by Friday, June -- that's the wrong year.  By Friday,

2    June 2nd.

3                    MS. WALSH:  That's fine with me.

4                    THE COURT:  We'll have the briefs, because Ms.

5    Coltman is on getting the transcripts out.

6                    MS. WALSH:  Okay.

7                    THE COURT:  All right?  Yes, Mr. Uraz?

8                    THE DEFENDANT:  I'm sorry, your Honor, but the

9    original order from 2020 from Court of Appeals stated that

10    within 14 to 28 days that we have to turn in briefs.  Should

11    we worry about that at all?

12                    THE COURT:  Well, but what happened, Mr. Uraz, the

13    delay really is attributable to your desire to come in and

14    testify personally.  I had it set within the timeframe.  You

15    wanted to come in personally.

16                    THE DEFENDANT:  No, I'm not talking about that.

17    I'm talking about the briefs, your Honor.

18                    THE COURT:  So we're doing the best we can do under

19    Covid, that a lot of matters got backed up.  So we're trying

20    to expedite this through at this particular point.  So to

21    quibble over that directive, when there's been like an 18

22    month delay, due in part to you wanting to be present.  It's

23    you're right, so I'm not holding it against you.  But if we

24    would have done it on Zoom, we would have been done.

25                    THE DEFENDANT:  Your Honor, I'm not talking about

1    that.  I'm talking about the time of the appeal.  The Court

2    of Appeals said that you have to file a brief within 28 days

3    after the hearing.    Should I worry about that?

4              THE COURT:  Well, but the hearing's not over until

5    I get these briefs and enter my order.

6              THE DEFENDANT:  I'm sorry.

7              THE COURT:  And then that starts the 28 days.

8              THE DEFENDANT:  Thank you, your Honor.

9              THE COURT:  So they have to get an order from me

10    first, and then that starts the 28 days.

11             MS. CRINO:  Thank you, your Honor.

12             THE COURT:  All right, thank you.

13             (At 2:55 p.m. proceeding ended)

14

15

16

STATE OF MICHIGAN   )

                    )

COUNTY OF INGHAM    )


I certify that that this transcript, consisting of (68) pages, is a complete, true, and correct transcript of the proceedings and testimony taken in this Ginther hearing on Wednesday, April 13, 2022.


April 19, 2022

Toni Coltman, CER 8226
Veteran's Memorial Courthouse
313 West Kalamazoo Avenue
Lansing, Michigan 48933
517-483-6404