STATE OF MICHIGAN

IN THE 30TH CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff/Apellee,

v

TUNC URAZ,

    Defendant/Appellant.

**ORDER**

HON. CLINTON CANADY III

Case Nos. 16-1064-FH
           16-1065-FC

At a session of said Court held in the City of
Lansing, County of Ingham, State of Michigan,
this __ day of August of 2022.

Tunc Uraz was a professor at Michigan State University teaching Culinary Arts Management when he entered into a dating relationship with Melke, a student at the university. After Melke ended the relationship, Uraz began to stalk her, committing a series of escalating acts that culminated with soliciting her murder on multiple occasions. Uraz was convicted of one count of aggravated stalking and three counts of solicitation of murder. Uraz now argues his counsel, Jacob Perrone, was ineffective and requests a new trial. After conducting a *Ginther* hearing, the Court DENIES Uraz's motion for the reasons laid forth below.

FACTS

The issue before the Court is whether Uraz received ineffective assistance of counsel under the state or federal constitutions. To prove Perrone provided ineffective assistance of counsel, Uraz must show that Perrone's actions were objectively unreasonable and that he was prejudiced. To prove prejudice, Uraz must show that, had Perrones's performance not been deficient, there was a reasonable

possibility that the outcome of his trial would have been different.

### A. Background Facts

Uraz and Melke remained congenial immediately following their breakup in June. However, after learning Melke may have begun a new dating relationship, he became upset and confronted her in a grocery store. This resulted in Melke requesting that he stop contacting her. In August, she found someone had keyed her car and peeled off its registration tab.

On New Year's eve Uraz confronted Melke again, this time while she was celebrating at a local restaurant with White, her boyfriend at the time. Uraz was eventually escorted from the restaurant after yelling obscenities and indignities at Melke and White. When Melke and White went to leave the restaurant, they found that someone had punctured the side walls of White's vehicle tires.

Following these incidents, Melke obtained and served a personal protection order on Uraz. But this did not deter Uraz. He continued to text Melke and those close to her, often using thinly veiled aliases. On at least one occasion, he tailed her car and attempted to confront her after she parked, only leaving after she had taken a picture of him and called the police. Uraz also continued to damage her property and the property of her boyfriend. Uraz egged Melke's vehicle and, again, slashed the tires of White's vehicle while Melke stayed the night at his house. Eventually, Melke ended her relationship with White out of fear that Uraz may hurt him.

Uraz's actions again escalated when he asked a co-worker to assist him in illegally obtaining a firearm and ammunition because he could not get one the "legal way." The co-worker reported Uraz to the university after he became convinced of Uraz's seriousness. Uraz was subsequently fired. During his later incarceration, Uraz told a fellow inmate about the incident and admitted that he had planned to use the gun to kill Melke.

While it is not clear what lead to her uneasiness, Melke began to fear Uraz had entered into her apartment without her knowledge or consent. This led her to install a video camera in her room. Her concerns were validated when the camera caught Uraz entering and rummaging through her bedroom while she was out of her apartment. Following this intrusion, several of Melke's undergarments and a pair of her shoes went missing. On another occasion, Melke's roommate saw Uraz parked outside the apartment and confronted him. Subsequently, the roommate found the lug nuts on her car had been loosened.

Melke obtained another Personal Protection Order. Near the same time, Uraz increased his online harassment of Melke. Uraz attempted to gain access to Melke's social media accounts and change their passwords. Uraz also created fake social media accounts that mimicked Melke's real account. These fake accounts posted pictures that he had copied from her actual account, making it appear as if it were Melke's real account and that she was making the posts. Alongside these genuine seeming posts, Uraz then posted defamatory messages and obscene pictures. This information was gathered by the police, who were able to track the IP addresses associated with the above-mentioned activity back to Uraz's and his associate's residences. During this time Uraz did not stop his physical harassment of Melke. Following a concert, Melke found the walls of her tires had been punctured. Melke believed Uraz knew that she was going to attend the concert because he had seen the tickets on the day he snuck into her room.

Eventually, Uraz was charged with Aggravated Stalking and Second Degree Home Invasion. He took a plea to one count of Aggravated Stalking. But this did not stop Uraz, who, at this time, was subject to both a personal protective order and a no-contact order. Before sentencing, Uraz continued his attempts to contact Melke through phone and email including leaving her voice messages on her phone. Uraz

was sentenced six months for his first Aggravated Stalking.

While serving his sentence in the Ingham County Jail, Uraz again escalated his conduct towards Melke. Uraz told a fellow inmate that he wanted "to get rid of [Melke]" because she ruined his life and solicited to have Melke killed on three separate occasions.

Uraz first asked a fellow inmate, Charles Allen, to kill Melke. The two met while housed together. Uraz told Allen about his history with Melke and made numerous, specific, obscene requests that Allen kill Melke, including that she be beaten beyond recognition with a baseball bat and that it be recorded so he could masturbate to it. Eventually, Allen notified a deputy. In return, the deputy promised to tell Allen's probation officer that he had been helpful. Allen did not receive any other benefit.

Uraz then asked another inmate, Reginald Close, to kill Melke. Almost immediately after meeting Close, Uraz disclosed his history with Melke and told Close that she had ruined his life. He also disclosed facts related to his stalking, including losing his job for trying to buy a gun so that he could kill Melke, that he had gained access to her phone by hacking her iCloud account, and that he had slashed her tires while she was attending a concert. Close told his lawyer about the request when he realized Uraz was serious about his desire to have Melke killed. Close then agreed to help kill Melke, and Uraz provided Close with detailed information about Melke, including her place of employment, the location of her apartment, and other facts he believed would be useful for the task. Uraz agreed to pay Close $1,000 and made arrangements with an associate to put some of the money in Close's jail account. Close was interviewed by a detective, who did not offer Close anything in return for his testimony except immunity for agreeing to kill Melke.

Finally, Uraz asked an undercover officer, who was pretending to be a hitman and Close's friend, to kill Melke. During a recorded call, Uraz and the officer talked about "tak[ing] out the trash," "beating" the trash, and what color hair the trash had, along with other indiscreet language which indicated that Uraz wished to have Melke killed. Uraz agreed to pay the officer $2,000 to have Melke "taken out" and $500 for any other "bags" that were taken out in the process. Uraz indicated that he wanted the trash to be taken out before his sentencing date.

Uraz was charged in 16-1064-FH with Aggravated Stalking for his conduct following his August plea and sentencing. He was charged in 16-1065-FC with three counts of solicitation to murder.

**B. Uraz's Trial and Sentencing**

Leading up to and during the trial, Uraz was represented by Jacob Perrone, a private defense attorney. It was Perrone's first capital case and, during trial, he was provided legal assistance by Eric Schroder. Prior to trial, Perrone attempted to obtain favorable evidentiary rulings. He filed a motion to sever and a motion arguing that the police entrapped Uraz into soliciting Melke's murder. Perrone also contested the State's 404(b) motion. After numerous hearings, Uraz's motions were denied and the State was permitted to bring in evidence of Uraz's previous acts. Perrone interviewed thirty potential witnesses, whose names Uraz provided, to determine who he should call during trial. He also did considerable research on Allen's and Close's criminal records.

At trial, Perrone's theory of the case was that the evidence against Uraz was manufactured and that the officer had entrapped Uraz into soliciting Melke's murder. Perrone argued that the evidence of Uraz's previous behavior, including his previous stalking conviction, was not charged in the present case and, therefore, should be given little consideration in the jury's deliberation.

The State called Allen and Close to testify. Both testified consistently with the facts laid forth above. Perrone worked to undermine their credibility on cross-examination in a number of ways. To begin, the jury was made aware that both were incarcerated. As to Allen's credibility, Perrone sought to undermine him on cross-examination by showing that he had a motive for testifying against Uraz. Allen stated that he reported Uraz's request because he hoped his cooperation would lead to a shorter stay in prison. Allen also admitted that he was subject to phone restrictions due to his misconduct while in prison.

Perrone impeached Close on cross-examination by showing that he had discussed Uraz's case with Allen (after testifying to the opposite on direct-examination). Perrone also elicited testimony showing that Close was overly curious about Uraz's case and that he had a history of proffering in cases to improve his own situation. Close also testified that he was worried that Uraz was trying to set him up. During his cross-examination, particularly during the examination of Allen, Perrone, at times, took several minutes between questions.

Before the verdict, Perrone sent an email to Uraz's sister. In the email, Perrone alleged he was working nearly 120 hours a week. The email stated that Perrone believed the jury would be hung on the aggravated stalking count and find Uraz not guilty on the solicitation counts.

In the end, the jury was unconvinced and convicted Uraz on all counts. Several weeks after trial, Perrone informed the Court that he had been diagnosed with bipolar disorder following an episode that occurred the week after trial. Perrone stated that he did not suffer from any symptoms during the trial. The Court informed Uraz that Perrone had suffered from an illness and appointed Duane Silverthorn, a public defender, to represent him at sentencing. Uraz, however, requested that Perrone stay on as his counsel along with Silverthorn. The Court sentenced Uraz

from 200 to 360 months for each count of Solicitation of Murder and 36 to 90 months for the count of Aggravated Stalking. Uraz appealed his conviction and made a motion to remand for a *Ginther* hearing on the basis that Perrone provided ineffective assistance of counsel. Specifically, Uraz alleged that Perrone failed to impeach Allen and Close with their prior theft-related offenses and that Perrone's cross-examination and closing argument were inadequate.

### C. Uraz's *Ginther* Hearing and Subsequent Briefing

Due to the COVID-19 Pandemic, the availability of witnesses, and Uraz's request that he attend the hearing in-person, the Court conducted the *Ginther* hearing over two days. The first hearing was held in October 2021 and the next in April 2022. At the hearing, the Court heard from seven witnesses in total. Testimony was received from Perrone, Schroder, and Silverthorn, the three lawyers who represented Uraz. The Court also heard from Nicholas Fernandez and Andrew Vukovich, two individuals who worked at the same firm as Perrone. The prosecutors, Jonathan Roth and Charles Koop, also testified. Uraz testified last.

Perrone testified first. He flatly denied that his subsequent diagnosis and breakdown negatively affected his representation of Uraz in any way. Stating that if he had had an episode, it would have been clear as he would have been "unintelligible." Perrone stood by his trial strategy given the circumstances of the case. While he could not recall if he had known about the theft-related convictions of Allen and Close, he testified that he did considerable investigation into their criminal records. His investigation focused on the benefit that each individual was attempting to obtain by testifying against Uraz, including monitoring one of Closes's existing cases to determine whether Close received a benefit from his testimony. Perrone testified that prior to trial he encouraged Uraz to take a plea as the weight of the evidence weighed heavily against him, but that Uraz appeared

out-of-touch with the reality of his circumstances and insisted on going to trial.

Perrone also testified regarding Uraz's specific claims that he was ineffective. Perrone stated any long breaks between his questions to Allen was because he had to consult with Uraz about what further issues Uraz wanted him to question the witness's about. Perrone stated that the prosecutor's remarks to the jury during closing arguments that Perrone had taken "three minutes between questions" and that his cross-examination "rambled on for hours" were exaggerations used to undermine his effectiveness in the eyes of the jury. Regarding the email he sent to Uraz's sister, Perrone testified that he was trying to be positive and that he believed he had done enough to get a not guilty verdict but admitted his claims were perhaps too "expansive" and that he embellished the number of hours a week he worked.

Finally, Perrone testified that he was hospitalized due to exhaustion following a trip to Dallas, which was cut short due to a family issue, and that his bipolar episode followed the hospitalization suddenly and without warning. Perrone believed these events following trial, combined with the natural exhaustion of going through a trial, led to his episode.

Next, Eric Schroder and Nicholas Fernandez testified; both had helped Perrone during trial. Schroder was the second chair attorney and Fernandez worked in an administrative capacity. Both testified that they believed Perrone was not negatively impacted during trial due to his mental state. Schroder testified that if he believed Perrone was unable to adequately represent Uraz, he would have reported it. Schroder testified that Perrone did not take too long between questions and that his cross-examination of Allen did not last for hours, stating that the prosecutor's statements otherwise were exaggerated. Fernandez testified that he knew Perrone since middle school and that Perrone's demeanor, such as raising his voice and being excitable, during trial were not out-of-character as Perrone is generally a

high-energy person.

The last person on Perrone's team to testify was Andrew Vukovich. Vukovich practically ended his job with Perrone before trial and maintained little communication with Perrone during the time of trial. Vukovich's role was also very limited for Perrone's felony cases, but he stated that he was not aware of Perrone having issues during trial.

Uraz's appointed attorney for sentencing, Silverthorn, testified as well. Because Silverthorn was not present during trial and was only appointed to handle Uraz's sentencing, he offered little testimony about Perrone's performance. Silverthorn stated that he first met Perrone after trial and observed that Perrone appeared to be agitated and had trouble focusing.

Both prosecutors, Charles Koop and Jonathan Roth, testified that they believed Perrone was not negatively affected by his condition, nor did he have a mental breakdown at any point during trial. Roth stated that he attended law school with Perrone and that they were in the same section during their first year. Roth stated he believed that Perrone's cross-examination went on for longer than it could have, but that he believed it was part of Perrone's trial strategy. Roth stated that by taking a significant amount of time to cross-examine a key witness, Perrone was hoping to dilute the witness's testimony by putting time between that testimony and the jury's deliberation. Finally, Roth stated that he believed it was not a good strategy to impeach a witness of minor, prior theft convictions when the jury already knew that the witness was in jail.

Uraz was the last person to testify. Uraz claimed that many of his family members have bipolar disorder which enabled him to be able to recognize the signs of a breakdown. Based on this knowledge, he believed Perrone was having an episode during his trial. Specifically, that Perrone made "subtle motions" indicative

Page 9

of bipolar disorder and that Perrone laughed and raised his voice at inappropriate times during trial. However, when asked why he did not raise any concerns about Perrone's condition during the numerous pretrial hearings, the trial, or any of the post-trial hearings, Uraz could only state that he did not believe it was appropriate at the time. He also could not provide a reason why, after his sentencing, he requested Perrone stay on as his attorney despite his later alleged belief knew Perrone was going through a mental breakdown. Following the hearing, the parties provided briefing on the issues.

## STANDARD OF REVIEW

Whether a defendant has been denied effective assistance of counsel is a mixed question of law and fact. *People v LeBlanc*, 465 Mich 575, 579 (2002). Meaning, the judge must first find the facts, and then, based on those facts, determine whether the defendant has been afforded effective assistance. *Id.*

## LAW & ANALYSIS

The Michigan and Federal constitutions guarantee a criminal defendant the effective assistance of counsel. Const 1963, art 1, § 20; US Const, Am VI; *People v Pickens*, 446 Mich 298 (1994) (holding that the Michigan Constitution provides no greater protection for ineffective assistance than its federal counterpart). The ultimate question in an ineffective assistance claim is whether trial counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *People v Hunter*, 141 Mich App 225, 229-230 (1986).

Michigan has adopted the federal, two-prong *Strickland* test for proving ineffective assistance. *Pickens*, 446 Mich at 325 (citing *Strickland v Washington*, 466 US 668 (1984)). First, a defendant must show that his trial counsel's performance was objectively deficient. *People v Randolph*, 502 Mich 1, 9 (2018).

Page 10

Second, the defendant must show that, but for counsel's deficient performance, a different result would have been reasonably probable. *State v Armstrong*, 490 Mich 281, 290 (2011).

Uraz advances two main arguments that Perrone's representation constituted ineffective assistance of counsel under the State and Federal Constitutions. First, Uraz argues that Perrone was ineffective for failing to undermine Close's and Allen's credibility with their previous theft-related crimes. Second, that Perrone's cross-examination and closing argument were so inadequate as to be ineffective. The Court considers each argument in turn. Finally, the Court addresses Perrone's subsequent breakdown and whether it warrants granting Uraz relief.

### A. Uraz Failed to Demonstrate that Perrone's Representation was Objectively Unreasonable

A defendant must overcome the strong presumption that trial counsel's performance was born from a sound trial strategy. *People v Trakhtenberg*, 493 Mich 38, 52 (2012). Counsel has a duty to reasonably investigate his client's case, and what is reasonable must be considered in light of the circumstances of the case. *Id*. Counsel's decision not to investigate an avenue of defense may constitute ineffective assistance if the decision is not justified. *Id*. Counsel is given wide latitude in making tactical decisions. *Harrington v Richter*, 562 US 86 (2011). The ultimate question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or customs. *Harrington v Richter*, 562 US 86 (2011).

> *i. Uraz has not Proven Perrone's Failure to Introduce Allen's and Close's Convictions was not Objectively Unreasonable*

Uraz bears the burden of proving that Perrone's failure to undermine Allen's and Close's credibility was objectively unreasonable. Michigan Rule of Evidence

(MRE) 609 allows a lawyer to attack the credibility of a witness during cross-examination by introducing evidence of his conviction for a past theft-related offense. Here, the parties do not debate that Allen and Close had convictions that qualified under MRE 609, misdemeanor larceny and home invasion third respectively, and that Perrone did not attack their credibility with these convictions.

In determining that Perrone's failure to introduce these convictions to the jury was not unreasonable, the Court considers the surrounding facts and circumstances. Uraz has failed to prove that Perrone did not adequately investigate his case, specifically, that Perrone failed to uncover Allen's and Close's convictions. Perrone testified that he could not remember if he knew about the convictions, but that he conducted a thorough investigation of each inmate's criminal record. Perrone's assistants likewise testified to the thoroughness of his investigation.

Rather, the record indicates Perrone may have believed his trial strategy would not be materially benefitted by the MRE 609 evidence. Decisions surrounding how to cross-examine witnesses are matters of trial strategy. *In re Ayres*, 239 Mich App 8, 23 (1999). Here, Perrone stated that the convictions were immaterial to his trial strategy because the jury already knew each inmate was incarcerated, and his trial strategy was to focus on providing evidence of each inmate's motive for testifying against Uraz.

Uraz makes the related argument that if Perrone had known about the convictions, it was unreasonable for him not to raise them to the jury. Essentially, Uraz argues that a lawyer always acts unreasonably when he fails to attack an adverse witness's testimony with MRE 609 evidence. However this is not the case. The determination of whether to introduce MRE 609 evidence is a matter of trial strategy and, therefore, is strongly presumed to be constitutional. Here, Perrone

attempted to undermine both inmate's testimonies by introducing evidence that each had a motive for testifying against Uraz. Perrone also impeached Close regarding his statements that he had not discussed Uraz's case with Allen. Therefore, Perrone may have viewed the MRE 609 evidence as cumulative or as distracting from his primary strategy of showing each inmate's motive. Such decisions of trial strategy are within the wide discretion of the lawyer and, in this case, do not raise to the level of being objectively unreasonable.

Uraz analogizes his case to *Trakhtenberg*, 493 Mich 38 (2012), where the court held that a defense counsel acted unreasonably by failing to investigate his client's case. The court held that the attorney failed to investigate such that she was unable to sufficiently develop her defense strategy at trial. Here, no such concerns are present. Going into and throughout trial, Perrone developed his trial strategy by attempting to show that Uraz was being set up and that those testifying against him were doing so for their own personal benefit. The record indicates that Perrone went through substantial effort, including interviewing thirty witnesses named by Uraz, to develop this strategy. Accordingly, the Court finds Uraz has failed to show that Perrone acted unreasonably by not introducing evidence of Allen's and Close's prior theft-related convictions.

### ii. Perrone's Cross-Examination and Closing Argument were Reasonable

Uraz next argues that Perrone's delays during cross-examination and his closing argument were objectively unreasonable. However, Uraz provides little-to-no argument on the issue. In support of his contention that Perrone took too long between questions, Uraz does not cite to the record. Rather he cites to Prosecutor Roth's statement before the jury that Perrone took "three minutes between questions" and that Perrone "ramble[d] on for hours." Uraz does not state how Perrone's closing was ineffective

A party may not simply announce a position and leave it to this Court to make the party's arguments and search for authority to support the party's position. *Wilson v Taylor*, 457 Mich 232, 243 (1998). Failure to adequately brief an issue constitutes abandonment. *McIntosh v McIntosh*, 282 Mich App 471, 484 (2009). However, the Court does note that Perrone stated any delays in questioning were due to him conferring with Uraz about any additional lines of questioning Uraz desired. Accordingly, any unnecessary delay was likely attributable to Uraz and further dilutes his contention that Perrone acted unreasonably.

### iii. Uraz Failed to Prove Perrone Suffered a Breakdown Before or During Trial

Finally, Uraz states that Perrone had a mental breakdown during his trial that affected his ability to properly represent Uraz's interests. Uraz does not cite any support that a counsel's breakdown alone is adequate grounds to grant a new trial. Read generously, Uraz's claim may be understood that he was, in a sense, deprived of counsel if his lawyer was unable to adequately function despite any evidence that his lawyer lacked the ability to represent him.

The evidence in the record shows that Perrone was not suffering from a breakdown during the trial and that it occurred only after the trial had concluded.

Uraz offers his own, self-serving testimony in support of his argument that Perrone suffered a breakdown. Uraz stated that he knew the signs of a breakdown because he has family members that suffer from bipolar disorder. He stated that he recognized the "subtle motions" that Perrone made as consistent with a breakdown.

Whereas, Perrone, the lawyers he worked with, and the prosecutors all testified that they did not believe he was suffering from a breakdown. Perrone testified that his breakdown came as a result of his lack of sleep combined with family issues and having to travel after the trial ended. All of which led to him being hospitalized due to exhaustion. Likewise, those who knew Perrone stated that his actions and behavior throughout trial remained consistent with his normal demeanor.

Uraz also points to the email sent by Perrone to his sister near the end of his trial. But the email does not prove that Perrone suffered from a breakdown, while the email was admittedly overly optimistic and exaggerated it does not clearly signify a mental break. As a final point, Uraz was given numerous opportunities, before, during, and after trial to raise any issues he had with Perrone's representation, but he declined to do so. Instead, even after he was informed of Perrone's issue and granted a new lawyer, he requested that Perrone continue to represent him. Accordingly, the evidence in the record indicates that Perrone was not suffering from a psychological condition during Uraz's trial

### B. Uraz Has Failed to Prove Prejudice

To warrant relief, a defendant must also show that, but for his counsel's objectively unreasonable performance, there is a reasonable probability that the result of the trial would have been different. *Pickens*, 446 Mich 298, 303 (1994). A reasonable probability is a probability sufficient to undermine the confidence of the trial. *Id*. The more evidence there is of guilt, the less likely it is that the result of the trial would have been different had the lawyer's mistake not occurred.

While a determination of prejudice is not necessary because the Court holds Perrone acted reasonably, as a matter of prudence the Court considers the question anyway. Assuming arguendo that Perrone acted unreasonably, the Court holds, given the overwhelming evidence of Uraz's guilt, Uraz has not proven prejudice.

To prove prejudice, Uraz must prove that had Perrone introduced Allen's and Close's previous theft-related convictions, there is a probability he would not have been found guilty on all counts. As previously noted, Perrone elicited testimony by each inmate that they had a self-serving motive to testify against Uraz and that they were incarcerated. Accordingly, further reduction in their credibility through evidence of past offenses would be of marginal advantage.

This marginal advantage is not sufficient to overcome the immense evidence of Uraz's guilt. The record clearly establishes that Uraz believed that Melke had ruined his life. For months Uraz's actions escalated in series of acts designed to threaten and scare Melke and, ultimately, to kill her. The jury heard evidence that Uraz became upset after he learned that Melke had begun to date someone new. That this led him to take physical retribution against both Melke and her boyfriend by destroying their property on multiple occasions. The jury also heard that Uraz became preoccupied with Melke, following her around in violation of several PPO's against him, creating fake internet profiles to slander her, hacking into her social media accounts, and sneaking into her room and stealing her undergarments. And that these actions ultimately lead to Melke break up with her boyfriend out of fear for his physical safety. The jury learned that Uraz had attempted to purchase a firearm through means he believed to be illegal, which he later confided he had planned to use to kill Melke. Uraz contends that his conversation with the undercover officer about having Melke killed vague. However, in context of asking the officer, posing as a hit-man, to "take out" the "red-haired" "trash," Uraz's

intentions are clear. All-in-all, the evidence of Uraz's guilt was overwhelming and there is no reasonable possibility the outcome of the trial would have been different had the jury heard evidence that Allen and Close had previous theft-related convictions. Likewise, there is no reasonable possibility that, had Perrone taken less time between questions, the outcome of the trial would have been different.

CONCLUSION

Perrone's representation of Uraz was not constitutionally deficient under the State or Federal Constitutions. The actions he took and trial strategy he adopted were reasonable and, even if they were not, Uraz has failed to prove that he suffered any prejudice. Accordingly, the Court DENIES Uraz's motion and request for a new trial.

In accordance with MCR 2.602(A)(3), the Court finds that this Order disposes of the last pending claim, and closes this case.

_____
Hon. Clinton Canady III (P23262)

PROOF OF SERVICE

I hereby certify that I provided a copy of the above ORDER to each attorney of record, or to the parties, by hand delivery, or by placing a true copy in a sealed envelope, addressed to each, with full postage prepaid and placing said envelope in the United States mail; on _August 8_, 2022.

_____
Samuel Kane
Law Clerk | Court Officer
Circuit Court Judge

Page 17