***PG 152 Lines 9-12

Koop: Black charger, si that your handwriting?

Close: that's my handwriting.

**Defendant wrote a big "NO" under all notes exchanged this is why there are rip marks on the paper where notes exchanged****

LEGAL STANDARD:

As used in MCL 777.40(1)(a) ""[p]redatory conduct means pre offense conduct directed at a complainant/victim or a law enforcement officer posing as a victim for the primary purpose of victimization."

MCL 777.40(3)(a) "predatory conduct" means conduct that "OCCURRED BEFORE" the commission of the offense and that was direct at the complainant/victim for the primary purpose of victimization. People v Cannon, 481 Mich 152, 160-161; 749 NW2d 257 (2008)

Predatory conduct encompasses only "those forms of "pre offense conduct that are commonly understood as being "Predatory" in nature e.g. lying in wait and stalking (Defendant-Appellant was in jail at the time of the alleged conducts) as opposed to purely opportunistic criminal conduct or pre offense conduct involving nothing more than run-off-the mill planning to effect a crime or subsequent escape without

RECEIVED by MCOA 11/9/2022 3:25:00 PM

43

MCL 777.43 (OV 13) and MCL.39 (OV 9): MCL 777.40 (OV 10) (OV 13) should have been scored where the joined offenses in a trial unfairly scored the Defendant 25 points for each offense (Solicitation to Murder and Aggv. Stalking). Because these conviction constitute one or two felony event, they cannot be scored 25 points for three or more crimes against a person in five year period. People v Carll, 322 Mich App 690 (2018).

MCL 77.43 Provides in part:
1) Offense variable (OV 13) is continuing pattern of criminal behavior, scored OV 13 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:
C) The offense was part of a pattern of felonious criminal activity involving 3 or more crime against a person. (15 points)
2) All of the following apply to scoring OV 13
A) For determining the appropriate points under this variable all crimes within 5 year period, including the sentencing offense, shall be counted regardless of whether the offense resulted in convicted

In "Carll" tis Court agreed that with the Defendant that:
(A) single felonious act cannot constitute a pattern and that the trial court erred by concluding otherwise. Although the statute provides guidance to the court's on how to scored OV 13.
MCL 777.43(2), It does not define the term "continuing pattern of criminal behavior" the word "Continuing" clearly refers to an event or process that take place over time. Merriam Webster's Collegiate Dictionary (11th. ED). Defines "Continuing" as to "keep going or add to", It defines "Pattern" as "A reliable sample of traits, acts, tendencies, or other observable characteristics of a person...." Id.

Accordingly, the statute contemplates that three must be more than one felonious event. Id at 704-705.

In this case at bar: The holding in "Carll" applies equally to Defendant Mr. Uraz's joined trial. He was involved in one act against the complainant

RECEIVED by MCOA 11/9/2022 3:25:00 PM

only by virtue of the same conduct rule of "Blockburger" does he end up with three convictions. The prosecution and trial court has stretched those three cases into joined trials to inflate the minimum guidelines in this case OV 13 is being stretched to create a pattern that doesn't simply exist.

MCL 770. 9(a) SOLICITATION TO MURDER IS NOT AN "ASSAULTIVE CRIME" THERE IS NO LAYING AND WAITING.

SOLICITATION TO MURDER IS "NOT AN OVER ACT"

In People v Jamison 292 Mich App 440 (2011), this court said:
If a Statute, does not provide a definition for particular term, courts must "give the term it's plain and ordinary meaning" when determining the common, ordinary meaning of word or phrase, consulting a dictionary is appropriate.

Merriam Webster's Dictionary and Thesaurus (2007):
Predatory means: 1) Of or relating to plunder 2) Disposed to exploit others 3) Preying upon other animals.

Merriam Webster's Dictionary Of Law (1996).
Conduct means: 1) The act, Manner, or Process of Carrying On Or Managing, 2) An Act Or Omission To Act.

For both charges (Joined) OV 10 should been scored 0 (Zero), correcting this variable alone would change the sentencing guidelines. If this court agrees with the argument, then sentencing is required. People v Fransisco, 474 Mich 82 (2006).

ANALYSIS:
Defendant did not exploit victim vulnerability. MCL.40(3)(b). The statute defines "Exploit as to manipulate a victim for selfish or unethical purpose". "Vulnerability" is defines as "the readily apparent susceptibility of a victim to injury, physical restrain, persuasion or temptation. MCL 777.40(3)(c).

In this case Defendant was already in jail when all theses charges were

45

brought up. Complainant in this these joined cases (Ms. Erika Melke) were 25 years old. These joined case did not involve predatory conduct.

The Supreme Court of North Caroline ruled that hiring an undercover officer posing as a hit man to kill another person does not satisfy the element of committing "An Overt Act" toward completion of the offense. Alleged hiring and paying a hired killer do not satisfy our requirement of "Overt Act". Accordingly because accused did not make an Overt Act (Not Secret) toward completion of the offense. The Court remanded to the Court of Appeals for further remand to the trial court with instructions to vacate accused's conviction for solicitation of murder and for sentencing consistent with court opinion. State v Melton, 821 S.E.2d 424 (N.C 2018).

Allegedly hiring and paying a hired killer...Do not satisfy our requirement of overt acts necessary to prove attempt. Accordingly because Melton did not make an overt act (Not Secret) toward completion of the offense, the Court remanded to the Court of Appeals for further remand to the trial court with instructions to vacate Melton's conviction for attempted murder and for resentencing consistent with the court's opinion. See State v Melton, 821 S.E.2d 424 (N.C. 2018).

Defendant is entitled to resentencing and correction of his presentence report (PSIR) where it contains inaccurate and irrelevant information. Defendant has a due process right to be sentenced on the basis of accurate information. Townsend v Burke, 334 US 736; 68 SCt. 1252; 92 L.Ed.2d 1690 (1984). US Const Fifth Amendment and Fourteenth; Mich Const. 1963 Art 1, 17. Defendant is entitled to resentencing and have his PSIR corrected as it contains inaccurate and irrelevant information.

The purpose of the PSIR is to provide the trial court with relevant and accurate information relating to the offender and the offense" MDOC PD 06.01.140. All statements contained within the PSIR must be "clear and concise and accurate. The contents of PSIR can be challenged for containing inaccurate or irrelevant information. MCL 777.14(6) "Shall be stricken accordingly before the report is transmitted to the MDOC. Defendant requests that the under evaluation and plan of the PSIR be amended to

46

RECEIVED by MCOA 11/9/2022 3:25:00 PM

remove the drafter of the report's subjective and inflammatory comments about Defendant's behavior. (See Defendant's PSIR Pg. 1, paragraph 7 and First paragraph on page 2.

In People v Dixon-Bey, 321 Mich App 490, 525 (2017), The Court said the "relevant factors for determining whether a departure sentence is more proportionate than a sentence within the guideline range continue include:
1) Whether the guideline accurately reflect the seriousness of the crime
2) Factors not considered by the guideline and
3) Factors considered by the guidelines but given inadequate weight. When making this determination and sentencing... A trial court must "justify the sentence imposed in order to facilitate appellate review, "which includes an explanation of why the sentence imposed is more proportionate to the offense and the offender than a different sentence would have been"
The alleged conduct was always deserving of a guideline sentence, which would be presumptively reasonable.

The Court clearly erred in scoring offense variables 10 and 13.

The proper interpretation and application of the sentence guidelines is a legal question that this court reviews de Novo. People v Morson, 471 Mich 248, 255 (2004). "Under the sentencing guideline, the Circuit Court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." People v Hardy, 494 Mich 430, 438 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., The application of the facts to the law, is a question of statutory interpretation, which an Appellate Court reviews de novo."

Since Defendant's original trial counsel was removed from the cases due to mental incapacitation before the sentencing. A substitute Attorney was assigned for sentencing to the Defendant. So any issues with sentencing had to be preserved by the Defendant not the substitute counsel due to him not being involved with the case at all.

47

RECEIVED by MCOA 11/9/2022 3:25:00 PM

Court must vacate the sentences and remand to the trial court with instructions at 0 points.

IF OV 13 is scored at 0 points, the minimum guideline range is reduced below 130-225 Months to 57 to 95 Months in conjunction with the OV 10 correction and a resentencing is required. Francisco, supra.

Relief Requested

Tunc Uraz respectfully asks this Court to vacate his convictions based on the due process arguments presented and grant him a new trial in the alternative, he asks that the Court order corrections to the guideline and hold that the imposition of separate scoring sentencing on a joined single trial was an abused of discretion and remand this case to the trial court.

48

RECEIVED by MCOA 11/9/2022 3:25:00 PM

PSIR CORRECTIONS

CORRECTIONS TO INFORMATION (pg.3 of PSI, form CFJ-284) OBTAINED BY PAROLE AGENT (only wrote bits and pieces  FROM LANSING POLICE DEPARTMENT INCIDENT REPORT # LLA161027011556

THE ELEMENTS OF THE CRIME SOLICITATION TO MURDER ARE;
SOLICITOR:
1) "PURPOSELY SEEKS" TO HAVE SOMEONE KILLED OR
2) TRIES TO "ENGAGE SOMEONE TO DO THE KILLING"


CORRECTION #1

Home Invasion charge (05/26/2016) was dropped per plea agreement (see attached First PSI (plea agreement) "not authorized charges going back"

CORRECTION #2

Mr. Uraz was already in jail by
08/31/2016 where he turned himself to start his presumed jail sentence per plea agreement. (see Ingham County Jail records)

CORRECTION #3

from PSI pg.3
On10/26/2016," the detective was notified of a possible murder for hire plot"
THIS IS A WRONG STATEMENT EVEN ON THE POLICE REPORT :
pg. 3 of police report ending #556: "R/O presented this investigation to ICPO on  10/26/2016 and a Felony warrant for Stalking (second).

SECOND STALKING CHARGE
The date was 09/26/2016 not 10/26/2016 (see attached warrant date signed by Magistrate Millmore on 09/27/2016)

THIS SEARCH WARRANT WAS ABOUT IP ADDRESSES ALLEGEDLY BELONG TO THE APARTMENT WHERE MR. URAZ WAS ACCUSED OF CREATING A  FAKE INSTAGRAM ACCOUNT AND POSTING PICS UNDER MS.MELKE'S NAME ON 08/27/2016
(see attached expired IP addresses)

MR. URAZ WAS ALSO ACCUSED OF ALLEGEDLY CHANGING THE PASSWORD OF FACEBOOK PAGE BELONGED TO ERIKA MELKE ON 08/31/2016

MR. URAZ WAS  ACCUSED OF ALLEGEDLY SENDING A MESSAGE TO ERIKA MELKE WITH FAKE E-MAIL ACCOUNT CREATED BY HIM.
emelke20@gmail.com
(see attached documents)

RECEIVED by MCOA 11/9/2022 3:25:00 PM

49

CORRECTION #4

Two inmates extorted and solicited Mr. Uraz not the other way around.
The information provided to jailhouse informant allegedly by Mr. Uraz (victim's name ,address, vehicle information, map of the residence and victim's past boyfriend who the defendant also wanted to kill)
ALL ABOVE STATEMENTS ARE INCORRECT BECAUSE DEFENDANT'S JOURNAL WAS STOLEN WHICH HE WROTE PART OF HIS A.A (alcoholic anonymous) meetings, therapy.
 (see attached Jail substance abuse therapist notes/reports by Tim Held dated  09/27/2016, 10/02/2016)***
ALL OTHER INFORMATION WAS FABRICATED BY JAILHOUSE INFORMANTS.

CORRECTION #5

THE FIREARM MR. URAZ WANTED TO BUY FROM HIS CO-WORKER WAS TO COMMIT SUICIDE. (see MSU HR investigation report)

CORRECTION #6

THE MONEY DEPOSITED TO JAILHOUSE INFORMANT'S (REGINALD CLOSE)  JAIL ACCOUNT WAS TO "APPEASE" HIM, BECAUSE MR. URAZ WAS IN FEAR OF MS. MELKE'S AND HIS LIFE AND HE WAS EXTORTED BY INFORMANTS.
(see Reginald Close's criminal history and his charges at that time , home invasion, felony firearm, domestic violence, parole violation) the victim who testified at a preliminary hearing did not show up to trial therefore he was only found guilty of a domestic violence again NO HABITUAL SENTENCING, TIME SERVED IN JAIL,

CORRECTION #6

THE OTHER JAILHOUSE INFORMANT CHARLES ALLEN WHO IS PRISON NOW WITH 10 PAGE CRIMINAL HISTORY GOING BACK TO HIS JUVENILE YEARS WAS ONLY GIVEN 9.5 YEAR UNARMED ROBBERY (IT WAS ARMED ROBBERY) WITH NO HABITUAL SENTENCE
ENHANCEMENT.
ALLEN WAS JUST AN ACCOMPLICE/COLLABORATOR TO SUPPORT REGINALD CLOSE'S STORY
SO CHARLES ALLEN FABRICATED HIS OWN STORY AS WELL SO THAT HE CAN GET OF JAIL EARLY (SEE HIS  JAILHOUSE INTERVIEW DATED 10/24/2016****attached

CORRECTION #7

UNDER COVER DETECTIVE ENGAGED, PURPOSEFULLY SOUGHT MR. URAZ
HE IS THE ONE THE ONE WHO SET UP THE VIDEO VISIT HE IS THE ONE ASKED ALL THE QUESTIONS, HE IS THE ONE WHO "ENGAGED" AND "PURPOSEFULLY SOUGHT" MR. URAZ.
see pg 10-11 of police report by U/C Mobley  "I ASKED" URAZ 25 TIMES, AND HE IS THE ONE TOLD MR. URAZ REGINALD CLOSE'S NICK NAME AS "RUFF" WHICH IS VERY DIFFERENT THAN HIS TRIAL TESTIMONY OF "ROUGH".
MR. URAZ DID NOT DISCUSS ANY PRICES NOR WHAT TO DO WITH THE TRASH . MR. URAZ DID NOT REQUEST ANY VIDEOTAPING OF TRASH BEING "BEATEN".
(see the attached transcript of the video call initiated by Detective Mobley)

RECEIVED by MCOA 11/9/2022 3:25:00 PM

50

**Court of Appeals, State of Michigan**

**ORDER**

People of MI v Tunc Uraz

Docket No.    343695; 343696

LC No.    16-001064-FH; 16-001065-FC

Thomas C. Cameron
Presiding Judge

Douglas B. Shapiro

Anica Letica
Judges

The Court orders that the motion for immediate consideration is GRANTED.

The motion to allow adjournment of the *Ginther* hearing currently scheduled for August 3, 2020, pursuant to MCR 7.216(B) is GRANTED.  The trial court shall hear and decide the matter within 60 days of the date that the MDOC resumes transporting inmates to state courts and shall make an appropriate determination on the record.

Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

July 9, 2020
Date

Chief Clerk

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN

Plaintiff-Appellee

Lower Court No. 16-1064 FH & 16-1065 FC
Court of Appeals No. 343695 & 343696

-vs-

**TUNC URAZ,**

Defendant-Appellant.

_____/

INGHAM COUNTY PROSECUTOR
Attorney for Plaintiff-Appellee

_____

SUSAN K. WALSH (40447)
Attorney for Defendant-Appellant

_____

**MOTION TO ALLOW AN ADJOURNMENT OF THE CURRENTLY SCHEDULED *GINTHER* HEARING
PURSUANT TO MCR 7.216(B)**

**NOW COMES** Defendant, **TUNC URAZ**, by and through his attorney, Susan K. Walsh, and

moves this Honorable Court to grant an adjournment of the currently scheduled *Ginther* hearing

and says in support thereof that:

1.      Defendant-Appellant, Mr. Uraz, was convicted after a jury trial and sentenced to

prison.

2.      After briefs had been filed and this Court heard oral arguments, this Court entered

an order on March 6, 2020, that provided:

RECEIVED by MCOA 7/3/2020 11:47:27 AM

> The Court orders that the motion to remand is GRANTED. This case is REMANDED to the trial court for an evidentiary hearing and decision whether defendant was denied the effective assistance of counsel. People v Ginther, 390 Mich 436 (1993). Proceedings on remand are limited to the issues raised in the motion to remand. This Court retains jurisdiction. Defendant shall initiate the proceedings on remand within 14 days of the date of this order. However, if defendant fails to file a motion to initiate the proceedings within the time provided, the time for further proceedings in this appeal shall begin to run at the conclusion of that 14-day period. Defendant shall file with this Court a copy of any motion and supporting brief filed in the trial court, and defendant shall file a copy of any order entered within 14 days after entry. The trial court shall hear and decide the matter within 56 days of the date of this order and shall make an appropriate determination on the record.

3. Within a few weeks of this order a state of emergency had been declared and this State was under a shutdown/stay-at-home order due to the COVID-19 pandemic.

4. Mr. Uraz initiated proceedings in the trial court, but subsequently requested an adjournment of the hearing due to the fact that the MDOC would not allow Mr. Uraz to attend the hearing in person, see Defendant's motion attached as Appendix A hereto. On June 3, 2020, the trial court allowed for an adjournment of the hearing but denied Mr. Uraz' request to postpone the hearing until MDOC was transporting inmates. On July 1, 2020, the trial court set the *Ginther* hearing for August 3, 2020.

5. Mr. Uraz has not and does not waive his right to be present at the *Ginther* hearing. A person accused of a crime requires the guiding hand of counsel at every step in the proceedings, and that constitutional principle is not limited to the presence of counsel at trial. *Powell v. Alabama*, 399 U.S. 1 (1970). The defendant has the right to be personally present at every stage of the trial where his or her substantial rights may be affected and where his or her presence relates to the

RECEIVED by MCOA 7/3/2020 11:47:27 AM

fullness of his or her opportunity to defend against the charge. *People v. Medcoff*, 344 Mich. 108 (1955); *overruled on other grds by, People v. Morgan*, 400 Mich. 527 (1977).

8.      An evidentiary hearing is an example of a critical stage where a defendant has the right to counsel and the right to be present, *People v. Thomas*, 46 Mich. App. 312 (1973).  This right is guaranteed by the due process clause of the Fourteenth Amendment. *Illinois v. Allen*, 397 U.S. 337 (1970); *People v. Gross*, 118 Mich. App. 161 (1982).

9.      Along with being a violation of due process, having the hearing via Polycom will be a violation of Mr. Uraz' right to counsel.  A criminal defendant is entitled to the assistance of counsel at every stage of the proceedings where his substantial rights may be affected. *Coleman v. Alabama*, 399 U.S. 1 (1970); *People v. Hammerquist*, 107 Mich. App. 771 (1981).  If Mr. Uraz hears testimony that brings up an issue that he needs to discuss with his attorney, he will not be able to do so because he will not be at counsel table.  Requiring Mr. Uraz to stop the hearing so that he can discuss an issue with his attorney will be a cumbersome and laborious process and will ultimately result in a lack of proper communication between Mr. Uraz and his counsel.  This is especially true where English is not Mr. Uraz' native language as he is from Turkey.

10.      In a recent case from the Michigan Supreme Court, the Court held that the trial court denied defendant's right of confrontation when it allowed the prosecution's DNA expert's to testify via video at the trial.  Significantly, the Supreme Court held that the Court of Appeals erred when it found that cost-savings was a sufficient reason to extend the ruling in *Maryland v Craig*, 497 US 836 (1990), because expense is not a sufficient justification to avoid face-to-face confrontation. *People v. Jemison*; __Mich.__ (#157812 06-22-20).  Mr. Uraz contends that this ruling emphasizes the

RECEIVED by MCOA 7/3/2020 11:47:27 AM

importance of face to face confrontation. Likewise, docket congestion should not be used as a reason to rush this hearing and to require that it be handled via Zoom technology.

11. Lastly, and most importantly, there is no reason to rush to have this hearing. The reasons to allow adjournment of the hearing include, but are not limited to the following:

a) Mr. Uraz wants to adjourn the hearing.

b) English is not Mr. Uraz' first language and this will make the Zoom hearing format even more difficult.

c) The parties have agreed that at least 6 witnesses will need to testify at the hearing which will make it a long hearing and dangerous for court personnel who need to be present to run the hearing.

d) Rushing to conduct this hearing will most likely result in further appeals and a gross waste of judicial resources.

e) If Mr. Uraz is granted a new trial at the hearing, this will also need to be adjourned.

12. Pursuant to MCR 7.216(B):

(B) Allowing Act After Expiration of Time. When any nonjurisdictional act is required to be done within a designated time, the Court of Appeals may permit it to be done after expiration of the period on motion showing that there was good cause for delay or that it was not due to the culpable negligence of the party or attorney.

13. Mr. Uraz has shown, above, that there is good cause for delay of the *Ginther* hearing.

14. Also, pursuant to MCR 7.216(A)(7), this Court may, "enter any judgment or order or grant further or different relief as the case may require."

RECEIVED by MCOA 7/3/2020 11:47:27 AM

**WHEREFORE**, Defendant respectfully requests that this Honorable Court grant an adjournment of the *Ginther* hearing currently schedule for August 3, 2020, at least until the MDOC begins transferring inmates or until such time as this Court deems just.

Respectfully submitted,

BY: _____
SUSAN K. WALSH P40447

Date: July 2, 2020

RECEIVED by MCOA 7/3/2020 11:47:27 AM

APPENDIX A

RECEIVED by MCOA 7/3/2020 11:47:27 AM

**STATE OF MICHIGAN**

**IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM**

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

                                Circuit Court No. 16-1064 FH & 16-1065 FC
                                Hon. Clinton Canady, III

-vs-

TUNC URAZ,

        Defendant-Appellant.

_____/

INGHAM COUNTY PROSECUTOR
Attorney for Plaintiff-Appellee

_____

SUSAN K. WALSH (P40447)
Attorney for Defendant-Appellant

_____

**MOTION TO ADJOURN GINTHER HEARING UNTIL THE MDOC BEGINS
TRANSPORTING INMATES TO COURT**

        NOW COMES Defendant, TUNC URAZ, through his attorney, SUSAN K. WALSH, and moves this Court to grant the within motion based on the following:

1.      Defendant was convicted by jury of aggravated stalking and solicitation to murder, in the Ingham County Circuit Court, the Honorable Clinton Canady, III presiding and Defendant is appealing these convictions as of right.

2.      On March 6, 2020, the Michigan Court of Appeals remanded to this court for a *Ginther* hearing.

3.      On May 19, 2020, this court emailed undersigned counsel stating:

> The Judge will NOT allow Mr. Uraz to attend in person. Ginther hearings are usually accomplished, even without COVID-19, via Polycom. At this time,

RECEIVED by MCOA 7/3/2020 11:47:27 AM

family members can observe the hearing via YouTube stream pursuant to Supreme Court order. No more than 10 people are allowed in the Courtroom at any given time. Given the restrictive protocols ordered by the Supreme Court, our Court prefers for ALL parties to observe the hearing via YouTube (https://www.youtube.com/channel/UC96SnSZVmZty1fdVDg6LBFw).

4.  Defendant, Mr. Uraz, objects to proceeding with the *Ginther* hearing without his presence. Mr. Uraz agrees to adjourning the hearing until the MDOC begins transporting inmates to courts.

5.  The Michigan Supreme Court has tolled all deadlines for the Michigan Courts due to Covid-19. These tolling provisions will last at least as long as the Governor's stay at home order which is scheduled to end on May 28, 2020.

6.  Proceeding with the hearing with Mr. Uraz' participation via Polycom would be a violation of MCR 6.006 which provides:

> Rule 6.006 Video and Audio Proceedings
> (A) Defendant in the Courtroom or at a Separate Location. District and circuit courts may use two-way interactive video technology to conduct the following proceedings between a courtroom and a prison, jail, or other location: initial arraignments on the warrant or complaint, probable cause conferences, arraignments on the information, pretrial conferences, pleas, sentencings for misdemeanor offenses, show cause hearings, waivers and adjournments of extradition, referrals for forensic determination of competency, waivers and adjournments of preliminary examinations, and hearings on postjudgment motions to amend restitution.
> (B) Defendant in the Courtroom - Preliminary Examinations. As long as the defendant is either present in the courtroom or has waived the right to be present, on motion of either party, district courts may use telephonic, voice, or video conferencing, including two-way interactive video technology, to take testimony from an expert witness or, upon a showing of good cause, any person at another location in a preliminary examination.
> (C) Defendant in the Courtroom - Other Proceedings. As long as the defendant is either present in the courtroom *or has waived the right to be present*, upon a showing of good cause, district and circuit courts may use videoconferencing technology to take testimony from a person at another location in the following proceedings:
> (1) evidentiary hearings, competency hearings, sentencings, probation revocation proceedings, and proceedings to revoke a sentence that does not entail an adjudication of guilt, such as youthful trainee status;

RECEIVED by MCOA 7/3/2020 11:47:27 AM

(2) with the consent of the parties, trials. A party who does not consent to the use of videoconferencing technology to take testimony from a person at trial shall not be required to articulate any reason for not consenting. (emphasis added)

7.     Mr. Uraz has not and does not waive his right to be present at the *Ginther* hearing. A person accused of a crime requires the guiding hand of counsel at every step in the proceedings, and that constitutional principle is not limited to the presence of counsel at trial. *Powell v. Alabama*, 399 U.S. 1 (1970). The defendant has the right to be personally present at every stage of the trial where his or her substantial rights may be affected and where his or her presence relates to the fullness of his or her opportunity to defend against the charge. *People v. Medcoff*, 344 Mich. 108 (1955); *overruled on other grds by, People v. Morgan*, 400 Mich. 527 (1977).

8.     An evidentiary hearing is an example of a critical stage where a defendant has the right to counsel and the right to be present, *People v. Thomas*, 46 Mich. App. 312 (1973).  This right is guaranteed by the due process clause of the Fourteenth Amendment. *Illinois v. Allen*, 397 U.S. 337 (1970); *People v. Gross*, 118 Mich. App. 161 (1982).

9.     Along with being a violation of due process, having the hearing via Polycom will be a violation of Mr. Uraz' right to counsel.  A criminal defendant is entitled to the assistance of counsel at every stage of the proceedings where his substantial rights may be affected.  *Coleman v. Alabama*, 399 U.S. 1 (1970); *People v. Hammerquist*, 107 Mich. App. 771 (1981).  If Mr. Uraz hears testimony that brings up an issue that he needs to discuss with his attorney, he will not be able to do so because he will not be at counsel table.  Requiring Mr. Uraz to stop the hearing so that he can discuss an issue with his attorney will be a cumbersome and laborious process and will ultimately result in a lack of proper communication between Mr. Uraz and his counsel.

10.     Lastly, and most importantly, there is no reason to rush to have this hearing.  All deadlines have been tolled.  Court administrators around this State are working on procedures that

RECEIVED by MCOA 7/3/2020 11:47:27 AM

will protect the constitutional rights of criminal defendants. It would certainly be prudent to wait and see what procedures are put in place. Rushing to conduct this hearing will most likely result in appeals and a gross waste of judicial resources.

WHEREFORE, Defendant respectfully requests that this Honorable Court grant this motion to adjourn the *Ginther* hearing until after the MDOC has begun transporting inmates to courts.

Respectfully submitted,

BY:_____
SUSAN K. WALSH (P 40447)
 P.O. Box 157
Northville, MI 48167

Dated: May 22, 2020

RECEIVED by MCOA 7/3/2020 11:47:27 AM

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN

Plaintiff-Appellee

Lower Court No. 16-1064 FH & 16-1065 FC
Court of Appeals No. 343695 & 343696

-vs-

**TUNC URAZ,**

Defendant-Appellant.

_____/

INGHAM COUNTY PROSECUTOR
Attorney for Plaintiff-Appellee

_____

SUSAN K. WALSH (40447)
Attorney for Defendant-Appellant

_____

MOTION FOR IMMEDIATE CONSIDERATION

NOW COMES Defendant, **TUNC URAZ**, through his attorney, SUSAN K. WALSH, and moves

this Honorable Court to grant this motion stating:

1) The issue raised in Defendant's motion to adjourn the *Ginther* hearing filed herewith

   requires immediate consideration due to the fact that the *Ginther* hearing is currently

   scheduled for August 3, 2020.

2) Because of the unique circumstances caused by the Covid-19 pandemic, Defendant

   requests that this Court give his motion immediate consideration under MCR 7.211(C)(6),

RECEIVED by MCOA 7/3/2020 11:47:27 AM

see Defendant's Motion to Allow Adjournment of the Currently Scheduled Ginther

Hearing Pursuant to MCR 7.216(B) and related Appendices.

WHEREFORE, Defendant respectfully requests that this Honorable Court grant this

motion and give his motion to adjourn immediate consideration.

Respectfully submitted,

BY: _____

SUSAN K. WALSH (P40447)
P.O. Box 157
Northville, MI 48382

Dated:  July 2, 2020

RECEIVED by MCOA 7/3/2020 11:47:27 AM

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

V

      Court of Appeals Nos.  343695
      343696

      Circuit Court Nos. 16-1064-FH
      16-1065-FH

TUNC URAZ,

      Defendant-Appellant.

_____/


**PEOPLE'S RESPONSE TO DEFENDANT'S MOTIONS
TO ADJOURN *GINTHER* HEARING**


CAROL A. SIEMON
      INGHAM COUNTY PROSECUTING ATTORNEY

KAHLA D. CRINO
      APPELLATE DIVISION CHIEF

BUSINESS ADDRESS:
      303 W. Kalamazoo Street, 4th Floor
      Lansing, Michigan 48933
      Lansing, MI 48933

RECEIVED by MCOA 7/7/2020 6:13:50 AM

The People of the State of Michigan, through Ingham County Prosecutor, Carol A. Siemon and Assistant Prosecuting Attorney, Kahla D. Crino, state as follows in response to Defendant's two motions to adjourn[1]:

1.   Due to COVID-19, the Michigan Department of Corrections is not *presently* transporting inmates out of their facilities to be physically present for court hearings.

2.   Upon information and belief, transportations are scheduled to begin again on July 13, 2020, however, there may soon be additional orders or policy directives that will impact this date and continue to prohibit transport.

3. Defendant's *Ginther* hearing will require testimony from several witnesses and that Defendant be able to adequately communicate with his attorney during the course of the hearing.

4. The People have no objection to adjourning Defendant's August 3, 2020 *Ginther* hearing until the Michigan Department of Corrections resumes transporting inmates to be physically present in court.

5. Defendant is presently scheduled to participate in the August 3, 2020 hearing via Zoom.

6. If Defendant's August 3, 2020 *Ginther* hearing is adjourned, the People would request that hearing date be held and treated as a status conference

---

[1] One of Defendant's motions was titled "MOTION TO ALLOW AN ADJOURNMENT OF THE CURRENTLY SCHEDULED GINTHER HEARING PURSUANT TO MCR 7.216(B)" and the other was titled "MOTION TO ADJOURN GINTHER HEARING UNTIL THE MDOC BEGINS TRANSPORTING INMATES TO COURT."

RECEIVED by MCOA 7/7/2020 6:13:50 AM

to discuss with the court when Defendant's *Ginther* hearing can be scheduled to allow for Defendant's physical presence.

/S/ Kahla D. Crino

Dated: July 7, 2020

_____

Kahla D. Crino (P71012)
Appellate Division Chief

RECEIVED by MCOA 7/7/2020 6:13:50 AM

3

# Court of Appeals, State of Michigan

## ORDER

People of MI v Tunc Uraz

Docket No.    343695; 343696

LC No.    16-001064-FH; 16-001065-FC

Thomas C. Cameron
Presiding Judge

Douglas B. Shapiro

Anica Letica
Judges

The Court orders that the motion to remand is GRANTED.  This case is REMANDED to the trial court for an evidentiary hearing and decision whether defendant was denied the effective assistance of counsel. *People v Ginther*, 390 Mich 436 (1993).  Proceedings on remand are limited to the issues raised in the motion to remand.  This Court retains jurisdiction.

Defendant shall initiate the proceedings on remand within 14 days of the date of this order.  However, if defendant fails to file a motion to initiate the proceedings within the time provided, the time for further proceedings in this appeal shall begin to run at the conclusion of that 14-day period.  Defendant shall file with this Court a copy of any motion and supporting brief filed in the trial court, and defendant shall file a copy of any order entered within 14 days after entry.

The trial court shall hear and decide the matter within 56 days of the date of this order and shall make an appropriate determination on the record.  The trial court shall order a transcript of any hearing on remand to be prepared at public expense and filed within 21 days after completion of the proceedings.

Defendant may file a supplemental brief addressing the issues raised on remand within 21 days after the date of entry of the trial court's order deciding the matter or the date the transcript is filed, whichever is later.  Plaintiff may file a supplemental brief in response.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

MAR 0 6 2020

Date

Chief Clerk

**STATE OF MICHIGAN**

**IN THE COURT OF APPEALS**

**PEOPLE OF THE STATE OF MICHIGAN**

                             **Lower Court No.s** 16-1064 FH & 16-1065 FC

          Plaintiff-Appellee

                             **Honorable Clinton Canady III**
                             COA# 343695 & 343696

-vs-

**TUNC URAZ,**

          Defendant-Appellant.

                                      /

**INGHAM COUNTY PROSECUTOR**
Attorney for Plaintiff-Appellee

**SUSAN K. WALSH (P40447)**
Attorney for Defendant-Appellant

**MOTION FOR REMAND FOR A *GINTHER* HEARING**

NOW COMES Defendant, **TUNC URAZ,** through his attorney, SUSAN K. WALSH, and moves this Honorable Court to grant this motion stating:

1) On February 22, 2019, Mr. Uraz moved for remand for a *Ginther* hearing on the issue of his attorney's competence to represent him at trial when he was nearing a mental breakdown that occurred just days after the trial ended.

2) On April 5, 2019, the motion to remand was denied with Judge Ronayne Krause finding that the motion to remand should be granted "as the statements about defendant's trial counsel are troubling and should be sorted out in the trial court." See this Court's Order dated April 5, 2019.

RECEIVED by MCOA 2/13/2020 2:17:36 PM

3) Remand was denied "without prejudice to a case call panel of this Court determining that remand is necessary once the case is submitted on a session calendar." See this Court's Order dated April 5, 2019.

4) Defendant's trial attorney was ineffective. He failed to properly challenge the prosecutor's evidence and failed to move for a continuance when he was no longer capable of handling the trial. Mr. Uraz contends that Judge Ronayne Kraus properly determined that this matter should be remanded to the trial court for a Ginther hearing. Please see Defendant-Appellant's Brief in Support of Motion for Remand and Brief on Appeal previously filed with this Court on February 22, 2019.

WHEREFORE, Defendant respectfully requests that this Honorable Court grant this motion and order a remand for a *Ginther* hearing.

Respectfully submitted,

BY:

SUSAN K. WALSH (P 40447)
P.O. Box 157
Northville, MI 48167

Dated: February 13, 2020

# Court of Appeals, State of Michigan

# ORDER

**People of MI v Tunc Uraz**

Docket Nos.   **343695; 343696**

LC Nos.      **16-001064-FH; 16-001065-FC**

---

Michael F. Gadola, Judge, acting under MCR 7.211(E)(2), orders:

The motion to extend time to file appellee's brief is GRANTED TO THE EXTENT that the time for filing appellee's brief is extended until May 24, 2019, which constitutes an extension to the end of the 56-day standard extension period. Appellee has not articulated specific good cause for an extension beyond the standard extension period.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

MAY 0 1 2019
_____
Date

_____
Chief Clerk

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

                                      Court of Appeals Nos. 343695
V                                                  343696

                                      Circuit Court Nos. 16-1064-FH
                                                  16-1065-FH

TUNC URAZ,

       Defendant-Appellant.

_____/

**MOTION TO EXTEND TIME TO FILE APPELLEE'S BRIEF**

1.   Defendant was convicted by jury of one count of Aggravated Stalking and three counts of Solicitation to Commit Murder on November 9, 2017.

2.   Defendant filed a claim of appeal on May 3, 2018.

3.   Defendant first moved for additional time to file his brief because all transcripts and the stenographer's certificate had not been filed. Defendant's deadline was extended to July 16, 2018.

4.   All transcripts and stenographer's certificates were not filed until November 2, 2018.

5.   Defendant again moved for additional time to file his brief. Defendant's deadline was extended to February 22, 2019.

6.   Defendant's Brief on Appeal was filed and served on February 22, 2019.

RECEIVED by MCOA 4/25/2019 9:59:25 AM

7. On March 25, 2019, the parties stipulated to extend the time for Plaintiff to file its brief on appeal by an additional 28 days to April 26, 2019.

8. Plaintiff is unable, due to an extensive appeals caseload, to comply with the April 26, 2019 deadline for filing its brief in this case.

9. Plaintiff has not previously moved for an extension of time in this case.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests, pursuant to MCR 7.212(A)(2)(a)(ii), that the time for filing its responsive brief on appeal be extended an additional 42 days to June 7, 2019.

Respectfully submitted,

CAROL A. SIEMON
INGHAM COUNTY PROSECUTOR

April 25, 2019

Kahla Crino
P71012

_____
Kahla D. Crino (P71012)
Appellate Division Chief
303 W. Kalamazoo St., 4th Floor
Lansing, Michigan 48933

RECEIVED by MCOA 4/25/2019 9:59:25 AM

# Court of Appeals, State of Michigan

## ORDER

| | |
|---|---|
| People of MI v Tunc Uraz | Amy Ronayne Krause<br>Presiding Judge |
| Docket No.   343695; 343696 | Stephen L. Borrello |
| LC No.   16-001064-FH; 16-001065-FC | Michael J. Kelly<br>Judges |

The Court orders that the motion to remand is DENIED for failure to persuade the Court of the necessity of a remand at this time.  Denial of remand is without prejudice to a case call panel of this Court determining that remand is necessary once the case is submitted on a session calendar.

Ronayne Krause, J., would grant the motion to remand as the statements about defandant's trial counsel are troubling and should be sorted out in the trial court.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

APR 0 5 2019

Date

Chief Clerk

# STATE OF MICHIGAN

# IN THE COURT OF APPEALS

**PEOPLE OF THE STATE OF MICHIGAN**

<table>
<tr><td>Plaintiff-Appellee</td><td>**Lower Court No.s** 16-1064 FH & 16-1065 FC</td></tr>
<tr><td></td><td>**Honorable Clinton Canady III**<br>COA# 343695 & 343696</td></tr>
</table>

-vs-

**TUNC URAZ,**

Defendant-Appellant.

_____/

**INGHAM COUNTY PROSECUTOR**
Attorney for Plaintiff-Appellee

_____

**SUSAN K. WALSH (P40447)**
Attorney for Defendant-Appellant

_____

### MOTION FOR REMAND FOR A *GINTHER* HEARING

NOW COMES Defendant, **TUNC URAZ,** through his attorney, SUSAN K. WALSH, and moves this Honorable Court to grant this motion stating:

1) Defendant's trial attorney was ineffective. He failed to properly challenge the prosecutor's evidence and failed to move for a continuance when he was no longer capable of handling the trial. See Defendant-Appellant's Brief in Support of Motion for Remand and Brief on Appeal.

WHEREFORE, Defendant respectfully requests that this Honorable Court grant this motion and order a remand for a *Ginther* hearing or resentencing.

RECEIVED by MCOA 2/22/2019 2:58:07 PM

Respectfully submitted,

BY:_____

SUSAN K. WALSH (P 40447)
P.O. Box 157
Northville, MI 48167

Dated: February 22, 2019

RECEIVED by MCOA 2/22/2019 2:58:07 PM

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN

                **Lower Court No.s** 16-1064 FH & 16-1065 FC

       Plaintiff-Appellee

                **Honorable Clinton Canady III**
                COA# 343695 & 343696

-vs-

**TUNC URAZ,**

       Defendant-Appellant.

                            /

**INGHAM COUNTY PROSECUTOR**
Attorney for Plaintiff-Appellee

**SUSAN K. WALSH (P40447)**
Attorney for Defendant-Appellant

BRIEF ON APPEAL AND IN SUPPORT OF MOTION TO REMAND
(ORAL ARGUMENT REQUESTED)

BY:   SUSAN K. WALSH (P40447)
       PO Box 157
       Northville, MI 48167
       248-563-9149

RECEIVED by MCOA 2/22/2019 10:54:50 AM

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF JURISDICTION ................................................................................... v

STATEMENT OF QUESTIONS PRESENTED .............................................................. vi

STATEMENT OF FACTS ................................................................................................ 1

I. Mr. Uraz was denied a fair trial and his state and federal constitutional rights by the trial court's decision denying his motion for severance where the sheer number of prior bad act evidence resulted in unfair prejudice ...................................................................................... 12

II. Mr. Uraz was denied a fair trial and his state and federal constitutional rights by the introduction of unduly prejudicial evidence concerning prior bad acts ..……………………17

III. Mr. Uraz was denied his state and federal constitutional rights to discovery, due process, to confront witnesses and to present a defense by the prosecution's failure to disclose the handwritten notes between one of its key witnesses and another inmate ..………………….……21

IV. The trial court erred when it denied Mr. Uraz's motion to dismiss based on entrapment ..25

V. Mr. Uraz was denied his state and federal constitutional right to the effective assistance of counsel where his trial counsel failed to ask for a continuance when he was nearing a mental breakdown during the trial and was not able to effectively try the case and where trial defense counsel failed to properly cross-examine the states key witnesses regarding their prior theft related convictions and failed to properly examine defense witnesses ..…………..27

VI. The prosecution's misconduct, which consisted of denigrating defense counsel in front of the jury, deprived Mr. Uraz of his due process right to a fair trial ..………………………..30

SUMMARY AND RELIEF ......................................................................................... 33

APPENDICES

RECEIVED by MCOA 2/22/2019 10:54:50 AM

## TABLE OF AUTHORITIES

**Cases**

*Berger v California*, 393 US 314, 315 (1969); ............................................................. 25

*Berger v United States*, 295 US 78, 88-89, 55 S Ct 629; 79 L Ed 1314 (1935); ........................... 34

*Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963), ................................. 23

*Davis v Alaska*, 415 US 308, 316, (1974). ................................................................. 25

*Delaware v Van Arsdall*, 475 US 673, 680 (1986). ........................................................ 25

*Harris v New York*, 401 US 222, 225 (1971); .............................................................. 25

*Lisenba v California*, 314 US 219; 62 S Ct 280; 86 L Ed 166 (1941) ....................................... 19

*People v Aikin*, 66 Mich 460, 472 (1887). ................................................................ 17

*People v Akhmedov*, 297 Mich App 745, 752-753; 825 NW2d 688 (2012). ...................................... 28

*People v. Allen*, 429 Mich. 558 (1988). ................................................................... 32

*People v Blackston*, 481 Mich 451, 462 (2008). ........................................................... 19

*People v Cameron*, 291 Mich App 599 (2010). .............................................................. 19

*People v Carines*, 460 Mich 750, 763, 774; 597 NW2d 130 (1999). ...................................... 34, 35

*People v Carpentier*, 446 Mich 19, 60 n19 (1994) ......................................................... 22

*People v Crawford*, 458 Mich 376; 582 NW2d 782 (1998) ................................................. 20, 21

*People v Crawford*, 458 Mich 376; 582 NW2d 782 (1998). ................................................... 18

*People v Daughenbaugh*, 193 Mich App 506, 511 (1992). .................................................... 15

*People v Dalessandro*, 165 Mich App 569, 577-588; 419 NW2d 609 (1988) ................................ 31, 35

*People v Duncan*, 402 Mich 1, 16; 260 NW2d 58 (1977) ..................................................... 33

*People v Fox (After Remand)*, 232 Mich App 541, 549; 591 NW2d 384 (1998) ................................. 24

ii

RECEIVED by MCOA 2/22/2019 10:54:50 AM

*People v Fyda*, 288 Mich app 446, 456; 793 NW2d 712 (2010)............................28, 29

*People v Jamieson*, 436 Mich 61, 68; 461 NW2d 884 (1990),...............................28

*People v Johnson*, 466 Mich 491, 497; 647 NW2d 480 (2002); ........................26, 28

*People v Juillet*, 439 Mich 34, 61; 475 NW2d 786 (1991)..................................26

*People v Kelly*, 186 Mich App 524, 526 (1990). ..............................................32

People v LeBlanc, 465 Mich 575 , 579; 640 NW2d 246 (2002) ...........................30

*People v Lukity*, 460 Mich 484 (1999)............................................................21

*People v Maranian*, 359 Mich 361, 368-369 (1960). ........................................23

*People v Nickson*, 120 Mich App 681, 685 (1982).............................................33

*People v Nickson,* 120 Mich App 681; 327 NW2d 333 (1982) .............................30

*People v Pace*, 102 Mich App 522, 530-531 (1980). .........................................23

*People v Pattison*, 276 Mich App 613 (2007); .................................................19

*People v Snyder*, 462 Mich 38, 45 (2000).......................................................22

*People v Stubli,* 163 Mich App 376, 380; 413 NW2d 804 (1987)......................30, 31

*People v. Tobey*, 401 Mich 141, 150-151 (1977)...............................................17

*People v Tommolino*, 187 Mich App 14; 466 NW2d 315 (1991); Blackburn v Foltz, 828 F2d 1177 (CA 6, 1987)....................................................................................31

*People v Walker*, 265 Mich App 530, 542; 697 NW2d 159 (2005), vacated in part and remanded in part 477 Mich 856; 720 NW2d 754 (2006).......................................................33

*People v Walton*, 71 Mich App 478, 481–82 (1976), ........................................24

*People v Watson*, 245 Mich App 572, 593, 629 NW2d 411 (2001). .....................34

*People v Williams*, 483 Mich 226, 231; 769 NW2d 605 (2009)............................12

RECEIVED by MCOA 2/22/2019 10:54:50 AM

*People v Wilson*, 265 Mich App 386, 393; 695 NW2d 351 (2005);................................................ 33

*People v Winans,* 187 Mich 294; 466 NW2d 731 (1991).............................................................. 30

*People v Woods*, 241 Mich App 545, 554; 616 NW2d 211 (2000). ............................................ 27

*Sorrells v United States*, 287 US 435, 454; 53 S Ct 210; 77 L Ed 413 (1932)........................... 28

*Strickler v Greene*, 527 US 263, 281-282 (1999). ..................................................................... 24

*United States v Tavera*, 719 F3d 705, 708 (CA 6, 2013)............................................................. 24

*Wildman v Johnson*, 261 F3d 832, 840-841 (CA 9, 2001), ........................................................ 13

**Statutes**

MCL 768.27 .................................................................................................................................. 13

**Rules**

MCR 6.120.................................................................................................................................... 12

MCR 6.201.................................................................................................................................... 22

MRE 403 ................................................................................................................................. 14, 19

MRE 404(b) ................................................................................................................................. 14

MRE 609...................................................................................................................................... 32

**Constitutional Provisions**

Const 1963, art 1, §§17, 20 ................................................................................................... 26, 35

US Const, Am V, VI, XIV.............................................................................................................. 34

US Const, Am XI and XIV ............................................................................................................ 33

US Const, Ams VI, XIV ................................................................................................................ 26

RECEIVED by MCOA 2/22/2019 10:54:50 AM

## STATEMENT OF JURISDICTION

The judgment of conviction was entered on November 9, 2017; the judgment of sentence was entered on January 24, 2018; Defendant requested counsel on January 31, 2018; the claim of appeal was filed on February 26, 2018.  Susan K. Walsh was appointed as appellate counsel on February 26, 2018.

Jurisdiction is conferred on this Court by Const 1963, art 1, §20; MCL 600.308(1), MSA 27A.308(1); MCL 770.3, MSA 28.1100; MCR 6.425(F)(3); MCR 7.203(A); and MCR 7.204.

v

RECEIVED by MCOA 2/22/2019 10:54:50 AM

## STATEMENT OF QUESTIONS PRESENTED

**I. Was Mr. Uraz denied a fair trial and his state and federal constitutional rights by the trial court's decision denying his motion for severance where the sheer number of prior bad act evidence resulted in unfair prejudice?**

The trial court answered "no".

Defendant-Appellant answers "yes".

**II. Was Mr. Uraz denied a fair trial and his state and federal constitutional rights by the introduction of unduly prejudicial evidence concerning prior bad acts?**

The trial court answered "no".

Defendant-Appellant answers "yes".

**III. Was Mr. Uraz denied his state and federal constitutional rights to discovery, due process, to confront witnesses and to present a defense by the prosecution's failure to disclose the handwritten notes between one of its key witnesses and another inmate?**

The trial court made answered "no".

Defendant-Appellant answers "yes".

**IV. Did the trial court erred when it denied Mr. Uraz's motion to dismiss based on entrapment?**

The trial court answered "no".

Defendant-Appellant answers "yes".

**V. Was Mr. Uraz denied his state and federal constitutional right to the effective assistance of counsel where his trial counsel failed to ask for a continuance when he was nearing a mental breakdown during the trial and was not able to effectively try the case and where trial defense counsel failed to properly cross-examine the states key witnesses regarding their prior theft related convictions and failed to properly examine defense witnesses?**

RECEIVED by MCOA 2/22/2019 10:54:50 AM

The trial court made no answer.

Defendant-Appellant answers "yes".

**VI.  Did the prosecution's misconduct, which consisted of denigrating defense counsel in front of the jury, deprive Mr. Uraz of his due process right to a fair trial?**

The trial court made no answer.

Defendant-Appellant answers "yes".

vii

RECEIVED by MCOA 2/22/2019 10:54:50 AM

## STATEMENT OF FACTS

The present case involves a situation where a man in his late 40s, a husband and a father with no contacts with the criminal justice system, experienced his life crumbling before his eyes. Due to the strain of the events, Defendant, Tunc Uraz, made grave errors of judgment that led to charges of aggravated stalking to which he pled guilty and was ready to pay his debt to society. However, during his incarceration, inmates in the Ingham County Jail took advantage of his naivete. Mr. Uraz contends that these inmates twisted his statements and used them in an effort to win favor with the prosecutor's office by contending that Mr. Uraz was attempting to hire someone to kill the woman he was charged with stalking. Once these inmates made these allegations, his stalking case and his solicitation case were joined and any chance for Mr. Uraz to have a fair trial was extinguished.

Mr. Uraz is of Turkish descent and all of his family now lives in Turkey. Mr. Uraz was born in the United States, but his family moved back to Turkey when he was one year old. Mr. Uraz moved back to the United States at college age to attend college and has a master's degree in hospitality management from Michigan State University. Mr. Uraz worked for MSU for 25 years and had never been in jail or had any contact with the criminal justice system before the events that led to this case. At an entrapment hearing held before trial, Mr. Uraz explained that his marriage started to break up in 2015 and that his wife had bi-polar disorder and left for Turkey, Evidentiary Hearing (ET) 10-20-17 at 9-12. During this time Mr. Uraz began abusing alcohol and Xanax, ET 11. Mr. Uraz has been diagnosed with PTSD, manic depression and substance abuse, ET 11. In April of 2015 he was fired from his job, ET 9-10. In June 2015, Erika Melke, the complainant, broke off the relationship she had with Mr. Uraz, ET 12.

Mr. Uraz was distraught about his life and the breakup with Ms. Melke and he endeavored to contact her against her will and she ultimately obtained a personal protection order (PPO). Mr. Uraz

1

RECEIVED by MCOA 2/22/2019 10:54:50 AM

violated the PPO and was charged with aggravated stalking. He pled guilty to these charges and turned himself in to the jail, Ingham County docket no. 16-534 FH. While he was in the jail, Mr. Uraz was withdrawing from his medications and alcohol and drug addictions and he was placed in segregation where he was not allowed to make phone calls, ET 13. He also was not being medicated for his ongoing mental health issues. During this time period he met the two inmates (Charles Allen and Reginald Close) who would ultimately testify against him at trial. These inmates were excessively interested in his case and told him that they would help him with his case, ET 14. Mr. Uraz testified that he did not know that he should not discuss his case with other inmates who may try to take advantage of him, ET 14.

At the entrapment hearing Mr. Uraz denied that he ever was serious about trying to kill Ms. Melke, ET 23, 33. He claimed that Mr. Allen and Mr. Close were trying to get money from him and took advantage of him in an attempt to win favor with the prosecutor's office, ET 28. Mr. Uraz denied the statements Mr. Close and Mr. Allen alleged he made to them about trying to hire someone to kill Ms. Melke, ET 62, 64. The trial court denied Mr. Uraz's entrapment motion, ET 107-114.

Over objection by the defense, the court also allowed the introduction of numerous prior bad acts, Similar Acts Motion Hearing 10-11-17, at 18-25. The trial court also allowed the inmates to provide testimony regarding alleged statements by Mr. Uraz to support the prior bad acts. The trial court joined the cases for trial pursuant to MCR 6.120(B)(1)(c), Joinder Motion Hearing 2-28-17 at 17-19.

The prosecutor started the trial by presenting numerous witnesses to testify as to the prior bad acts of stalking alleged to have been perpetrated by Mr. Uraz. Meridian Township officer Daniel King testified that he was called to investigate an alleged PPO violation on March 26, 2016, JTII 129-130. He was directed to a Best Buy parking lot where he spoke with the complainant, Erika Melke.

2

RECEIVED by MCOA 2/22/2019 10:54:50 AM

He saw a man in a Pontiac who left right away when he arrived, JTII 131. He testified that Ms. Melke was upset and showed him pictures on her phone of Mr. Uraz, JTII 133. He was 60-70% sure that the man he saw in the Pontiac was Mr. Uraz, JTII 135.

Ms. Melke's roommate next testified that on July 17, 2016, she saw Mr. Uraz in the parking lot of their apartment complex, JTII 146-148.

Noell Vanslembrouck testified that Ms. Melke was her best friend and that they had lived together from 2011 to 2015, JTII 160. She moved out right at the time that Ms. Melke ended her relationship with Mr. Uraz, JTII 161. She testified that on 12-31-15 she was in Utica at the Dave & Busters with Ms. Melke and Stan White and her boyfriend, Zeb, JTII 162-163. She stated that Mr. Uraz showed up and began confronting them and he would not leave. He called Ms. Melke a slut and a liar and management had to intervene and escort Mr. Uraz from the premises, JTII 164-167. On cross-examination, Ms. Vanslembrouck admitted that she never heard Mr. Uraz threaten to kill or harm Ms. Melke and that in all the time Ms. Melke and Mr. Uraz were together she never heard them arguing or heard or witnessed any domestic violence between them, JTII 170-171.

Mr. Stan White testified that he met Ms. Melke in an x-ray class at Lansing Community College and that he had a past dating relationship with Ms. Melke from the middle of 2015 until 2016, JTII 174-175. He testified about the incident at Dave & Busters and claimed that Mr. Uraz would not stop talking to Ms. Melke, JTII 176-177. He testified that they needed to get an Uber home from Dave & Busters and that when he went to get his car there the next day, he had a flat tire from a side puncture, JTII 178-179. He claimed that he received random messages asking if he was dating anyone and that he had to block 4 different numbers from calling him, JTII 179-180. He testified that his tires were punctured three times and that Ms. Melke's vehicle was egged in his driveway, JTII 183. Mr. White then read from a text message thread that he exchanged with Mr. Uraz where they discussed

3

RECEIVED by MCOA 2/22/2019 10:54:50 AM

the possibility of meeting, JTII 184-189. Mr. White testified that Mr. Uraz made him nervous but admitted that the only time he ever saw Mr. Uraz was at Dave & Busters, JTII 198.

On the second day of testimony the trial court indicated that it had received word that one of the jurors had stated that he had a bias against people from Turkey and that he did not believe he could be a fair and impartial juror. The trial court indicated that it was going to strike this juror at the close of proofs and denied the defense request to question the juror, JTIII 4-6.

Erika Melke then testified that she is 25 years old and met Mr. Uraz at an MSU cafeteria, JTIII 8. First she was a student dining at the cafeteria and then she worked there, JTIII 9. She first had a friendship with Mr. Uraz and then she started dating him in late 2012, early 2013, JTIII 10.

She testified that in July of 2015 she moved to College Town apartments and that Mr. Uraz helped her move, JTIII 12-14. She claimed that her car was keyed and her license plate tabs were removed in August of 2015, JTIII 15. She testified that on September 29, 2015, Mr. Uraz approached her at a grocery store and started asking her questions about her dating relationships, JTIII 18-20. She was scared so she filed for and received a PPO, JTIII 21-22. She testified about the Dave & Busters incident and claimed that on February 13, 2016, she received a text message that stated only, "Ho." JTIII 20-22, 24. She believed that in March of 2016, Mr. Uraz followed her to Best Buy, JTIII 25-26. In April of 2016, she was in Petosky visiting her mother. Her mother received a phone call from the phone of Mr. Uraz's mother, JTIII 27-28. In May of 2016, her car was egged when it was parked at Mr. White's home, JTIII 29.

Also, in May of 2016, she began noticing that things were missing from her bedroom. She bought a camera and set it up in her room. On May 25, 2016, she captured footage of Mr. Uraz in her room while she was at work, JTIII 31-34. On July 17, 2016, she claimed that she saw Mr. Uraz in her apartment parking lot, JTIII 36.

4

RECEIVED by MCOA 2/22/2019 10:54:50 AM

At one point her Facebook password was changed and an Instagram account was created in her name, JTIII 38-39. A photograph from her phone that she claimed she did not give Mr. Uraz was on the Instagram page, JTIII 37-40. There was also a picture from her Facebook account on the Instagram, JTIII 38-40. On August 27, 2016, and August 31, 2016, someone was trying to change her Facebook password, JTIII 42. When Mr. Uraz was in her apartment there were tickets for a Drake concert in her room and on the night of the concert all of her tires were slashed, JTIII 48. She claimed that her tires were punctured on three other occasions, JTIII 49-50. At the end of August she received a phone call from the Ingham County Jail and in the part of the call where the inmate is supposed to record his name it stated "I hope you're happy," JTIII 46-47.

Next, Mr. Uraz's prior attorney for his prior stalking case, Chris Bergstrom, was allowed to testify as to the details of that case, JTIII 65-74. He testified that Mr. Uraz denied using illegal substances in his PSIR and stated that he only used alcohol, JTIII 70-72. He also testified about a letter that Mr. Uraz gave to him on August 31, 2016, that Mr. Uraz asked Mr. Bergstrom to give to the prosecutor, JTIII 72. The letter was from Mr. Uraz to Ms. Melke, JTIII 73. Ms. Melke also received an anonymous email from EMELKE20@gmail.com which was the identical letter. Ms. Melke did not create the Gmail address that she got the letter from, JTIII 73-74. On cross-examination Mr. Bergstrom admitted that Mr. Uraz filed a grievance against him alleging unprofessional conduct, JTIII 76.

Richard Laing testified that he is the founder of Spartan Net which is the internet provider for apartments in the Lansing area, JTIII 81. He testified that IP addresses linked to the evidence presented about attempted changes to Ms. Melke's Facebook password were from apartments in the Northpointe Apartment complex building C, JTIII 91. He admitted that he was not able to identify

RECEIVED by MCOA 2/22/2019 10:54:50 AM

5

the exact apartment but that the IP addresses would encompass August 27 and 31 of 2016, JTIII 96, 101.

Heather Heitman testified that she is the DTN Management property manager, JTIII 103. She testified regarding a 2016 lease with Burak Atamer for Northpointe Apartments unit C10 from building C, JTIII 108. She claimed that Mr. Atamer still lived there and that Mr. Uraz used to live in the complex in building B, JTIII 109. She claimed that Mr. Uraz brought Mr. Atamer to them to rent an apartment, JTIII 110.

Bernard Brown of Sentinal Offender Services testified that he is the branch manager of Ingham County Jail running the GPS tether program, JTIII 115-116. He testified that the GPS data from Mr. Uraz placed him at 4869 Dunkel Rd., in Lansing on August 17, 2016, and at 1240 Haslett on August 31, 2016, JTIII 122-124.

Not until the last witness on the third day of the trial was there any testimony on the solicitation of murder charges. Reginald Close testified that he met Mr. Uraz while housed in the Ingham County Jail, JTIII 133. For one night he was housed in the medical dorm with Mr. Uraz and Charles Allen, JTIII 135-136. He claimed that Mr. Uraz told him that Ms. Melke ruined his life and he wanted to get rid of her, JTIII 138. Mr. Close claimed that Mr. Uraz admitted to him that he stalked Ms. Melke and that he went to her house and slashed her tires on the day of the Drake concert, JTIII 138-140. Mr. Uraz allegedly told him that he lost his job because he asked a coworker about getting a gun and that he wanted to kill Ms. Melke, JTIII 139. Mr. Close claimed that while he was in the medical dorm with Mr. Uraz, Mr. Uraz asked him if he knew anyone who could kill Ms. Melke, JTIII 143.

Mr. Close testified that he told Mr. Uraz to write notes to him about it and that he sent the notes to his attorney and was given immunity for his testimony at this trial, JTIII 145-146. He admitted to telling Mr. Uraz that he knew someone who would do it for $1,000.00. The People

6

RECEIVED by MCOA 2/22/2019 10:54:50 AM

admitted three pages of notes between Mr. Uraz and Mr. Close, JTIII 149-153. In the letters there was reference to Stan White and Mark Tovez as people that Ms. Melke had dated and the vehicles they drove and Mr. White's address, JTIII 152-153. The notes also contained a map of where Ms. Melke lived, JTIII 154-155. He testified that Mr. Uraz's roommate put money in his jail account and that this was a down payment, JTIII 157.

While Mr. Close testified that he received no plea offers or reduced charges for his testimony in this case, he did admit that he proffered on two other cases previous to this case, JTIII 160-161, JTIV 80-81..

At the close of the day, defense counsel indicated that he was going to bring a motion for a mistrial due to a *Brady* violation in the late production of the notes between Mr. Close and another jail inmate, John Pierce, JTIII 170-172. These notes were regarding another proffer by Mr. Close and supported the defense theory that Mr. Close was merely trying to garner favor from the prosecutor.

Mr. Close was cross-examined on the fourth day of trial and admitted that he was talking to his attorney about a 2011 murder with John Pierce and Chris Shinberger, JTIV 7. As for the handwritten notes that were the subject of the *Brady* issue, Mr. Close admitted that he probably wrote in those notes that he was a good liar, JTIV 39. The notes contain a statement that the author was such a good liar he could pass a polygraph. It should also be noted that at the preliminary examination held in this case, the prosecution moved to amend the information, PE 12-1-16 at 191. The original information contained only two counts of solicitation of murder with the Mobley and Close allegations combined in one count. The prosecutor moved to separate this count into two counts with a third count regarding only Mobley. The district court granted the motion but stated the following about the Mobley count:

> I think there is definitely a reasonable doubt about what that conversation means
> (the jail call between Mr. Uraz and Mr. Mobley). You know, that is not proof

7

RECEIVED by MCOA 2/22/2019 10:54:50 AM

beyond a reasonable doubt. I wish the prosecution good luck as it related to that individual claim. PE at 208.

Patrick Burnett, an MSU culinary platform attendant, testified that he previously worked with Mr. Uraz, JTIV 90-91. He claimed that in April of 2016, Mr. Uraz asked him if he could get him a gun and bullets, JTIV 93. Mr. Uraz allegedly told him that he did not want to get the gun legally, JTIV 96. When Mr. Uraz continued to question him about the gun he told his supervisor and Mr. Uraz was fired, JTIV 97-99. Mr. Burnett admitted that Mr. Uraz never stated why he wanted the gun, JTIV 100.

Detective Andrew Hogan of the Lansing Police Department testified that he interviewed Mr. Close on October 17, 2016, JTIV 106. He confirmed that $160 was put on Mr. Close's jail account, JTIV 113. He did admit that he met with Mr. Close on August 24, 2016, regarding a different case and that he did give Mr. Close a proffer agreement as to that case, JTIV 114.

Frank Mobley of the Lansing Police Department testified that he works as an undercover officer and that in that capacity he called Mr. Uraz and spoke to him on a video call at the jail on October 24, 2016, JTIV 117, 122. The video was played for the jury and the jury was also allowed to view a transcript of the phone conversation. Defense counsel objected to the jury being allowed to have a transcript of the conversation, JTIV 125-126. In the video Mr. Uraz can be seen discussing getting rid of some trash, see People's exhibit 44. The officer attempts several times to get an address or other information from Mr. Uraz about Ms. Melke and Mr. Uraz does not give the information, JTIV 145. Officer Mobley admitted that he attempted to call Mr. Uraz back and that Mr. Uraz hung up the phone and walked away, JTIV 148.

Sergeant Kevin Jewell testified that he received a kite on October 24, 2016, from Charles Allen about a possible solicitation to murder and he sent it to the prosecutor's office, JTIV 153-154.

RECEIVED by MCOA 2/22/2019 10:54:50 AM

8

Charles Allen testified that he is 24 years old and he was released from jail on January 23, 2017, JTV 5.  He met Mr. Uraz in August and September of 2016.  As they talked about their girlfriends Mr. Uraz would say "this bitch got to pay," JTV 13.  Mr. Allen claimed that Mr. Uraz wanted Ms. Melke to be beaten with a bat and that he wanted proof that it was done, JTV 14.  He claimed that Mr. Uraz asked him to kill Ms. Melke, discussed payment, told him where she lived and worked, what kind of car she drove, her address and apartment number, JTV 16-17, 19.  He further claimed that Mr. Uraz asked him for a gun for Ms. Melke's boyfriends, JTV 21-22.

Mr. Allen claimed that he decided to tell a deputy and was ultimately granted immunity for his testimony in this trial, JTV 22-23.  He claimed that he sent one kite and received no response.  He then sent a second kite and was ultimately interviewed by Det. Matt Krumbach, JTV 27.  He immediately asked Det. Krumbach if he could get out of jail and the Detective told him that he would tell his probation agent that he was helpful, JTV 27-28.  Mr. Allen claimed that he received nothing for his testimony, JTV 28-29.

On cross-examination, Mr. Allen admitted that he was on restriction in the jail because he was not following the rules and that he was in jail because of what he did to his ex-girlfriend, JTV 31.  He testified that he had a child on the way when he sent the kites, JTV 50.  He explained that Mr. Uraz appeared very lost when he first arrived at the jail and he believed that it would be easy for Mr. Uraz to be taken advantage of, JTV 39, 47.  He admitted that he tried to use the situation to get out of jail early and that Det. Krumbach told him he would speak to the judge, JTIV 51.  He also admitted that he would initiate contact with Mr. Uraz, JTV 56.

At this point in the proceedings the prosecutor stated in front of the jury:

> MR. ROTH: "Your Honor, I am going to object. This is three minutes between questions. This cross-examination rambles on for hours.
> THE COURT: I can't help that.
> MR. ROTH: We took a break so he would gather his thoughts.

9

RECEIVED by MCOA 2/22/2019 10:54:50 AM

THE COURT: I can't press that.

MR. ROTH: Thank you, Your Honor.

THE COURT: This is a serious matter. So he can utilize whatever strategy he so desires. JTV 60-61.

Jail Deputy Sandra Douse was called to go over the movement records from the jail. These records indicated that Mr. Uraz, Mr. Close and Mr. Allen were all in the medical dorm on September 27, 2016, JTV 75-87. Mr. Uraz and Mr. Close were in the medical dorm together until October 5, 2016, JTV 84, 87.

Det. Matt Krumback testified that he got a search warrant for the IP addresses related to the attempts to change Ms. Melke's Facebook password, JTV 118. The IP addresses were near North Pointe apartments building C and through GPS tether he found that Mr. Uraz was in the area of apartment C10 on August 27 and August 31, 2016, JTV 119-123. He discovered that Barak Atamer resided in apartment C10. After making these discovers he learned about allegations of solicitation of murder and he had an interview with Mr. Close, JTV 127-129. He claimed that his interviews with Mr. Close and Mr. Allen were not proffer interviews, JTV 130, 136. He reviewed video chats between Mr. Uraz and Mr. Atamer. He saw that Mr. Atamer had a video chat with Mr. Uraz on the same day that Mr. Atamer put $160 on Mr. Close's account, JTV 1138, 140-141. Mr. Krumbach also admitted that he knew prior to interviewing Mr. Close that Mr. Close had made another proffer but he did not know the details of that proffer, JTV 156-157.

At the close of the prosecution's proofs the defense made a motion for directed verdict on the solicitation of murder charges arguing that the witnesses against Mr. Uraz were not credible and that Mr. Uraz was entrapped, JTVI 52-55. The trial court denied the motion, JTVI 55-58.

10

RECEIVED by MCOA 2/22/2019 10:54:50 AM

Mr. Uraz waived his right to testify. The defense first called MDOC inmate John Pierce. Mr. Pierce testified that he met up with Mr. Close in segregation and that he observed Mr. Close and Mr. Uraz talking often, JTVI 61-64.

MDOC inmate Fateen Muhammad testified that he was in segregation with Mr. Allen, JTVI 68. He testified that in the jail inmates are trying to find a way to get out of trouble, JTVI 75. He stated that he found Mr. Uraz to be kind and caring and opined that Mr. Uraz should not have shared about his case, JTVI 77.

During his closing argument, the prosecutor began by emphasizing how strong the evidence was in the aggravated stalking case, JTVI 103-104. Then the prosecutor stated regarding Mr. Close and Mr. Allen, "Neither of these men had any incentive to disclose this information to the police." JTVI 105.

A few days after the trial, trial defense counsel who suffers from bi-polar disorder, had a mental breakdown and was hospitalized, see hearing transcript 12-12-17. Defense counsel was removed from his cases for the months of December and January 2016-2017 and was unable to represent Mr. Uraz at his sentencing. Attached as Appendix A is a copy of an email sent by defense counsel to Mr. Uraz's sister on the fifth day of the trial. This email was included as an exhibit during the sentencing phase of the trial. Mr. Uraz was sentenced to 200 to 360 months in prison.

Further facts will be set forth in the Issues where necessary.

RECEIVED by MCOA 2/22/2019 10:54:50 AM

11

**ARGUMENT**

**I. Mr. Uraz was denied a fair trial and his state and federal constitutional rights by the trial court's decision denying his motion for severance where the sheer number of prior bad act evidence resulted in unfair prejudice.**

**Standard of review and issue preservation**: A determination of whether charges are sufficiently related to warrant joinder is reviewed de novo. *People v Williams*, 483 Mich 226, 231; 769 NW2d 605 (2009). This issue was preserved when defense counsel filed a motion for severance.

At a pretrial hearing the trial court ruled that the prosecutor could join the aggravated stalking charge and the three solicitation of murder charges in one trial, Motion transcript 02-28-17 at 17-20. The trial court found that the offenses were related because they constituted parts of an overall scheme or plan and that joinder did not restrict Mr. Uraz's ability to present a defense, MT 19. Mr. Uraz contends that once the cases were joined, his chance for due process and a fair trial was extinguished. The testimony regarding prior bad acts took up almost two days of the trial, see JTII and JTIII transcripts and Issue II. The sheer volume of stalking acts admitted at trial extremely prejudiced Mr. Uraz requiring a new trial.

MCR 6.120 provides in pertinent part as follows:

> (B) Postcharging Permissive Joinder or Severance. On its own initiative, the motion of a party, or the stipulation of all parties, except as provided in subrule (C), the court may join offenses charged in two or more informations or indictments against a single defendant, or sever offenses charged in a single information or indictment against a single defendant, when appropriate to promote fairness to the parties and a fair determination of the defendant's guilt or innocence of each offense.
>
> (1) Joinder is appropriate if the offenses are related. For purposes of this rule, offenses are related if they are based on
>
> (a) the same conduct or transaction, or
>
> (b) a series of connected acts, or

12

RECEIVED by MCOA 2/22/2019 10:54:50 AM

(c) a series of acts constituting parts of a single scheme or plan.

(2) Other relevant factors include the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of charges or the complexity or nature of the evidence, the potential for harassment, the convenience of witnesses, and the parties' readiness for trial.

\*\*\*

(C) Right of Severance; Unrelated Offenses. On the defendant's motion, the court must sever for separate trials offenses that are not related as defined in subrule (B)(1).

In *Wildman v Johnson*, 261 F3d 832, 840-841 (CA 9, 2001), the Court explained that in certain circumstances, the joinder of offenses for trial may violate a defendant's due process rights under US Const, Am XIV:

> In *Sandoval v Calderon*, 241 F3d 765, 772 (CA 9, 2000), we held that joinder does not violate due process "unless simultaneous trial of more than one offense actually rendered petitioner's state trial fundamentally unfair" so as to be prejudicial. Prejudice is shown when "the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict." Id. In *Sandoval*, we recognized that such prejudice arises when joinder allows otherwise inadmissable [sic] evidence of other crimes to be introduced in a trial, *or when a strong evidentiary case is joined with a weaker one*. (emphasis added).

In *People v Williams*, supra, the Supreme Court held that joinder did not violate the court rule where evidence of each separate offense would have been admissible as similar acts in separate trials. MCL 768.27 governs the admissibility of similar acts in separate trials, and provides:

> In any criminal case where the defendant's motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing the act, in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto; notwithstanding that such proof may show or tend to

13

RECEIVED by MCOA 2/22/2019 10:54:50 AM

show the commission of another or prior or subsequent crime by the defendant.

Similarly, MRE 404(b)(1) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

MRE 403 provides a limitation on otherwise relevant, but prejudicial evidence:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury....

The Supreme Court has also observed:

Other acts evidence is not admissible simply because it does not violate Rule 404(b) [MRE 404(b)]. Rather, a "determination must be made whether the danger of undue prejudice [substantially] outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision of this kind under Rule 403." 28 USCA, p 196, advisory committee notes to FRE 404(b). People v *VanderVliet*, 444 Mich 52, 74-75; 508 NW2d 114 (1993).

The rule permitting joinder also states that consideration of other relevant factors is proper, and it lists "the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of charges or the complexity or nature of the evidence, the potential for harassment, the convenience of witnesses, and the parties' readiness for trial" as the other relevant factors. MCR 6.120(B). These additional considerations further

14

RECEIVED by MCOA 2/22/2019 10:54:50 AM

support a finding that joinder was impermissible here. For one, given the nature of the evidence and the manner in which the cases were tried, the witnesses would not have been inconvenienced had the charges been severed.

In addition, the number of charges was potentially confusing to the jury and undoubtedly prejudicial to Mr. Uraz. The risk of prejudice is undeniably amplified when there are so many charges. The joinder of multiple charges acts as propensity evidence. MRE 404(b)(1) provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." This concern is heightened when considering joinder of charges. As recognized by the Michigan Court of Appeals, "[t]he fact that a defendant is formally faced in the same trial with additional charges does have an effect greater than if evidence of other (uncharged) offenses are presented. The defendant is cast as a bad person by the sheer number of counts in the information." *People v Daughenbaugh*, 193 Mich App 506, 511 (1992).

The aggravated stalking testimony presented on the first two days of trial was highly prejudicial as it portrayed Mr. Uraz as an obsessed stalker. Moreover, parts of the prior bad acts testimony that provided only circumstantial proof that Mr. Uraz was the perpetrator were buttressed by the testimony of the solicitation of murder witnesses. Specifically, Mr. Close testified that Mr. Uraz told him that he slashed Ms. Melke's tires on the night of the Drake concert and that Mr. Uraz was trying to get a gun to kill Ms. Melke, JTIII 138-140. This testimony that buttressed the stalking charges came from an inmate who candidly admitted at trial that he was a good liar, JTIV 39. In the eyes of the jury, the cumulative weight of prior bad acts testimony from numerous witnesses likely constituted an insurmountable hurdle of bad character for Mr. Uraz to overcome.

RECEIVED by MCOA 2/22/2019 10:54:50 AM

The greater the quantity of victims testifying to similar charges before the jury, the more difficult it becomes for the jury to discern the quality of evidence with regard to each individual charge and the credibility of each individual witness. The more similar charges before the jury, the greater the potential for confusion as to which evidence pertains to which charge. More importantly, because the charges are so similar, evidence tending to prove one charge may lead the jury to assume guilt on the other charges, even if the prosecution has not met its burden on those charges.

In *Wildman*, supra, the court stated that prejudice arises when a case with strong evidentiary support is joined with a weaker case. Such is the situation here where the aggravated stalking charges had strong evidentiary support. Mr. Uraz had already pled guilty to the vast majority of this behavior and was paying his debt to society. To the contrary, the solicitation of murder charges had very weak evidence from jail house snitches, one of which candidly admitted that he was a good liar. Because of all the testimony regarding stalking it was impossible for the jury to focus in on the weak aspects of the solicitation case.

Even if the charges here were deemed part of a "single plan," the prejudice of so many witnesses corroborating and bolstering each other by merely enunciating similar bad acts, would make severance necessary to "promote a fair determination of the defendant's guilt or innocence of each offense." *People v. Tobey*, 401 Mich 141, 150-151 (1977). In a case like this one, "the evidence of each [charge] becomes confounded as a whole and used indiscriminately to convict [the defendant]" of all charges. *People v Aikin*, 66 Mich 460, 472 (1887). "Such a proceeding violates every principle of justice, and places [the defendant] at the mercy of the prosecutor." Evidence "not competent to prove one of the offenses, but admissible as to the other, is used to establish both crimes. Such a trial must necessarily be an unfair and illegal one." Id.

16

RECEIVED by MCOA 2/22/2019 10:54:50 AM

It would be of no consequence that evidence of the improperly joined offenses might be admissible under MRE 404(b) in separate trials.

> "The fact that a defendant is formally faced in the same trial with additional charges does have an effect greater than if evidence of other (uncharged) offenses are presented. The defendant is cast as a bad person by the sheer number of counts in the information. The jurors are afforded greater room for compromise by the larger number of counts (i.e., they might agree to convict on some counts and acquit on others, an option not readily available when fewer counts are presented for the jury's consideration). Finally, the amount of evidence that the prosecutor would be permitted to introduce may well be greater if the prosecutor is attempting to prove the defendant's guilt of the additional charge than if merely trying to show that the defendant committed the other (uncharged) bad act." *People v Daughenbaugh*, 193 Mich App 506, 511, modified on other grounds, 441 Mich 867 (1992).

The trial court's failure to grant severance caused Mr. Uraz significant prejudice. The case for reversal becomes clear in light of the unfair advantage the prosecution took of this situation. During closing argument, the prosecutor tied both cases together and buttressed the credibility of each witness by relying on the similar charges in the other case. Mr. Uraz is entitled to a new trial.

**II. Mr. Uraz was denied a fair trial and his state and federal constitutional rights by the introduction of unduly prejudicial evidence concerning prior bad acts.**

**Standard of Review and Issue Preservation:** This Court reviews the admission of evidence of other bad acts for abuse of discretion by the trial court. *People v Crawford*, 458 Mich 376; 582 NW2d 782 (1998). Mr. Uraz opposed the admission of this testimony and made several objections.

Mr. Uraz contends that the sheer volume of prior bad acts evidence that was presented at trial denied him a fair trial. The stalking charges in this case involved alleged activities in violation

17

RECEIVED by MCOA 2/22/2019 10:54:50 AM

of the PPO that occurred in the last half of the month of August 2016.  However, in a pretrial motion to admit similar acts evidence the prosecutor requested the admission of 17 different prior bad acts going back to August of 2015, see Prosecution's Motion to Admit Other Acts Evidence at pp 6-10.  The trial court granted the prosecution's motion except for one incident where Mr. Uraz allegedly sent Ms. Melke's mother a letter, Motion Hearing transcript 10-11-17 at 18-23. The trial court originally denied the prosecution's request to admit testimony regarding Mr. Uraz's alleged attempt to buy a gun, but the prosecution filed a motion to reconsider this ruling and the trial court granted the motion.  The trial court also allowed the solicitation of murder witnesses to buttress the stalking testimony.  Mr. Uraz further contends that the prosecution pushed so hard for this evidence because it knew that its solicitation of murder case was weak as it was based on incredible testimony from jail house snitches and vague statements by Mr. Uraz in a poor quality video call.  Mr. Uraz contends that these rulings denied him a fair trial.

A new trial is required due to the error in admitting prior episodes of stalking which should have been excluded by MRE 403 due to the sheer volume of unfair prejudice. Both the due process guarantees of the Michigan and United States constitutions require fundamental fairness in the use of evidence against a criminal defendant. Const 1963, art 1, § 17; US Const, Am XIV. See generally, *Lisenba v California*, 314 US 219; 62 S Ct 280; 86 L Ed 166 (1941).

Per MRE 403, evidence is not admissible if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." "Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Blackston*, 481 Mich 451, 462 (2008). In Mr. Uraz's case, the prosecution regaled the jury with so

RECEIVED by MCOA 2/22/2019 10:54:50 AM

18

many alleged episodes of stalking, independent from the actual incident, that unfair prejudice outweighed any probative value.

In the similar area of domestic violence cases, this Court has found that evidence of other domestic assaults is relevant per MCL 768.27b to portray a full and complete history of domestic violence. *People v Pattison*, 276 Mich App 613 (2007); *People v Cameron*, 291 Mich App 599 (2010). However, in discussing MRE 403, the Court issued a cautionary statement to "… caution trial courts to take seriously their responsibility to weigh the evidence's probative value against its undue prejudice in each case before admitting the evidence. See MRE 403." Id., at 621.

"Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or pre-emptive weight by the jury.  In the context of prior bad acts, that danger is prevalent. When a juror learns that a defendant has previously committed the same crime as that for which he is on trial, the risk is severe." *People v Crawford*, 458 Mich 376, 398 (1998).  Several considerations are relevant including:

> "(1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony." *People v Watkins, supra*, 487-488, citing *United States v LeMay*, 260 F3d 1018, 1032 (CA 9, 2001); *United States v Guardia*, 135 F3d 1326, 1331 (CA 10, 1998).

In *Cameron, supra*, this Court explained the balancing test needed to evaluate the probative value and prejudice of prior evidence of bad acts:

> Accordingly, this Court must make two distinct inquires under the MRE 403 balancing test. First, this Court must decide whether introduction of Cameron's prior-bad-acts evidence at trial was unfairly prejudicial. Then, this Court must apply the balancing test and "weigh the probativeness or

19

RECEIVED by MCOA 2/22/2019 10:54:50 AM

relevance of the evidence" against the unfair prejudice. Upon completion of this second inquiry, this Court can determine whether the trial court abused its discretion in allowing Cameron's prior bad acts into evidence. *Cameron, supra*, 611. (internal citations omitted).

As to the initial inquiry, the evidence of prior stalking was unfairly prejudicial through its unnecessarily cumulative nature. Indeed, evidence of Mr. Uraz's other acts of stalking dominated the trial. The first two days of trial were almost all prior bad acts testimony from numerous witnesses. The witnesses for the solicitation of murder charges were also allowed to give testimony that buttressed the testimony of the stalking witnesses.

Although perhaps relevant, the description of several episodes warped the jury. The result was a trial where the prior incidents of stalking overshadowed the actual facts of the solicitation of murder charges. This inequitable presentation of evidence misled the jury and placed undue weight on the impact of these other acts. *See Blackston, supra; Crawford, supra*. The result is evidence that should have been excluded under MRE 403.

In applying the balancing test set out by *Cameron, supra*, the minimally relevant nature of the evidence of other acts did not outweigh the unfair prejudice. The evidence of Mr. Uraz's other acts should have been excluded. In *Cameron*, this Court applied the test to find that "the prejudicial effect of other acts evidence did not stir such passion as to divert the jury from rational consideration of Cameron's guilt or innocence of the charged offenses." *Id.* at 378. In contrast, in Mr. Uraz's case, the sheer volume of evidence guaranteed that the jury would be diverted from a rational consideration of the jail snitch testimony.

The solicitation case presented a credibility contest between Mr. Uraz and the jail house snitches. The overwhelming prejudicial evidence of Mr. Uraz's alleged other acts of stalking thus

RECEIVED by MCOA 2/22/2019 10:54:50 AM

20

established outcome determinative error. *People v Lukity*, 460 Mich 484 (1999). Reversal is required. Evidence was excluded in *People v Crawford*, 458 Mich 376; 582 NW2d 782 (1998), for precisely this reason.

Reversal is warranted because it is more probable than not that the erroneous admission of this evidence undermined the reliability of the verdict, i.e. that it was outcome determinative error. See *People v Snyder*, 462 Mich 38, 45 (2000). Without this evidence it is probable that Mr. Uraz would have been acquitted of the solicitation of murder charges as the jail house witnesses were not credible and the video chat was vague and of poor quality and Mr. Uraz cut off communication with Mobley.

**III. Mr. Uraz was denied his state and federal constitutional rights to discovery, due process, to confront witnesses and to present a defense by the prosecution's failure to disclose the handwritten notes between one of its key witnesses and another inmate.**

**Standard of Review and Issue Preservation**: *Brady* claims ultimately present a question of law reviewed de novo. See *People v Carpentier*, 446 Mich 19, 60 n19 (1994); Defendant objected to the late production of this evidence, JTIII 170.

On the first day of trial defense counsel was presented with handwritten notes given to the police by Mr. Close. In these notes Mr. Close states that he is an excellent liar and could pass a polygraph, JTII 4-11. Mr. Uraz contends that the late presentation of this evidence prejudiced his case as defense counsel was unable to properly defend the case against Mr. Uraz. Mr. Uraz contends that had he been presented with these notes in a timely manner he would have used them as support for a motion to dismiss the solicitation of murder charges as based upon testimony from a witness who was an admitted liar.

21

RECEIVED by MCOA 2/22/2019 10:54:50 AM

To begin with, the prosecutor's failure to provide the reports to the defense violated Mr.

Uraz's right to discovery. The prosecutor in this case was bound by the rules of discovery, MCR

6.201:

> Rule 6.201 Discovery
>
> (A) Mandatory Disclosure. In addition to disclosures required by provisions of law other than MCL 767.94a, a party upon request must provide all other parties:
>
> (1) the names and addresses of all lay and expert witnesses whom the party may call at trial; in the alternative, a party may provide the name of the witness and make the witness available to the other party for interview; the witness list may be amended without leave of the court no later than 28 days before trial;
>
> (2) any written or recorded statement, including electronically recorded statements, pertaining to the case by a lay witness whom the party may call at trial, except that a defendant is not obliged to provide the defendant's own statement;
>
> . . .
>
> (B) Discovery of Information Known to the Prosecuting Attorney. Upon request, the prosecuting attorney must provide each defendant:
>
> (1) any exculpatory information or evidence known to the prosecuting attorney;
>
> (2) any police report and interrogation records concerning the case, except so much of a report as concerns a continuing investigation…"

Michigan follows a policy of liberal discovery, which requires prosecutors to provide the

defense with all materials admissible at trial or essential to the preparation of a defense and a fair

trial. *People v Maranian*, 359 Mich 361, 368-369 (1960). In keeping with this general principle,

the Court of Appeals has held that a prosecutor's violation of a discovery order, "even if

inadvertently in good faith," requires reversal of the resulting conviction "unless it is clear that

failure to divulge was harmless beyond a reasonable doubt." *People v Pace*, 102 Mich App 522,

530-531 (1980). ;

22

RECEIVED by MCOA 2/22/2019 10:54:50 AM

Under *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963),, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The suppression of favorable impeachment evidence constitutes a *Brady* violation. *Strickler v Greene*, 527 US 263, 281-282 (1999). "So long as favorable evidence could very well affect the jury's decision, prosecutors must disclose it. And when they fail to do so, courts have a duty to order a retrial, allowing a jury to consider the previously concealed evidence." *United States v Tavera*, 719 F3d 705, 708 (CA 6, 2013).

To establish a *Brady* violation, a defendant must show:

> (1) that the state possessed evidence favorable to the defendant; (2) that he did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different [People v Fox (After Remand), 232 Mich App 541, 549; 591 NW2d 384 (1998)].

As the Court stated in *People v Walton*, 71 Mich App 478, 481–82 (1976), "discovery has not been limited exclusively to whether the information sought was admissible at trial. Rather, the focus has shifted to whether fundamental fairness to the defendant, in preparing his defense, requires that he have access to the requested information."

There is a clearly-established right under the Confrontation Clause to cross-examine a witness to probe that witness's reliability and bias. The Supreme Court's Sixth Amendment jurisprudence leaves no question about a criminal defendant's right under the Confrontation Clause to "impeach, i.e., discredit, the [state's] witness [es]." *Davis v Alaska*, 415 US 308, 316, (1974).

Mere physical confrontation is not constitutionally adequate, because "one of the important objects of the right of confrontation [is] to guarantee that the fact finder had an adequate

23

RECEIVED by MCOA 2/22/2019 10:54:50 AM

opportunity to assess the credibility of witnesses." *Berger v California*, 393 US 314, 315 (1969);. Constitutionally adequate confrontation must include the meaningful opportunity to challenge the state's witnesses for "prototypical form[s] of bias." *Delaware v Van Arsdall*, 475 US 673, 680 (1986). Such forms include "prejudices, or ulterior motives" from which "jurors ... could appropriately draw inferences relating to the reliability of the witness." *Davis*, supra 316. A witness's own inconsistent statements are among these "prototypical forms of bias" because they "undoubtedly provide[ ] valuable aid to the jury in assessing [witnesses'] credibility." *Harris v New York*, 401 US 222, 225 (1971); see also *Davis*, supra at 316–17 ("[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." (citing *Greene*, 360 US at 496).

In the present case, the first element of a *Brady* violation is clearly met, as the prosecutor possessed evidence at very favorable to Mr. Uraz. However, because Mr. Uraz was never given the notes it would be impossible for him to determine the exact nature of their materiality.

Turning to the second element of a *Brady* violation, Mr. Uraz asked for all evidence of this type in discovery.

As to the third prong of a *Brady* violation, the prosecutor suppressed the favorable evidence. The prosecutor could have easily provided the notes.

Turning to the fourth and final element of a *Brady* violation, there is a reasonable probability that the trial court would have dismissed the solicitation of murder charges against Mr. Uraz had the defense received the reports. Both inmates had prior convictions involving theft and were clearly seeking favorable treatment from the prosecution (see Issues IV and V). Even the district court indicated that the video chat did not meet the reasonable doubt standard, PE 208. "A reasonable probability [of a different result] is a probability sufficient to undermine confidence in

24

RECEIVED by MCOA 2/22/2019 10:54:50 AM

the outcome. This standard does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. The question is whether, in the absence of the suppressed evidence, the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

Here, it is impossible to have confidence in the verdict. A jury must be allowed to fairly evaluate the witnesses' credibility and assess the value of the exculpatory evidence that was suppressed. For all of these reasons, due process requires a new trial. Const 1963, art 1, § 17, 20; US Const, Ams VI, XIV.

**IV.  The trial court erred when it denied Mr. Uraz's motion to dismiss based on entrapment.**

**Standard of review and issue preservation:**  A trial court's finding of entrapment is reviewed for clear error. *People v Johnson*, 466 Mich 491, 497; 647 NW2d 480 (2002); *People v Juillet*, 439 Mich 34, 61; 475 NW2d 786 (1991). Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made. *Johnson*, supra, at 497-98. Mr. Uraz moved to dismiss based upon entrapment and a hearing was held.

Mr. Uraz contends that he was entrapped by officers and jail house snitches. Specifically, Mr. Uraz contends that the policy of offering proffers to inmates who give helpful information to the prosecution creates a situation where inmates like Mr. Uraz who are unfamiliar with the system, vulnerable and naïve are easy targets for entrapment and escalation of charges. Here, Mr. Uraz, who was raised in Turkey, was in a situation where he was blocked from any contact with the outside world, was withdrawing from his addictions to alcohol and Xanax, was totally naïve about jail inmate relations and was completely vulnerable to exploitation by people like Mr. Allen who testified that Mr. Uraz looked lost when he arrived in jail and seemed like the kind of person who could be taken advantage of, JTIII 39, 46. Mr. Uraz was immediately placed in segregation with

25

RECEIVED by MCOA 2/22/2019 10:54:50 AM

Mr. Allen and Mr. Close who immediately began working on Mr. Uraz in an effort to benefit their situations. Mr. Allen had a baby on the way and immediately asked for help for an early release. Mr. Close had already proffered on other cases and described himself as an excellent liar also moved in on Mr. Uraz immediately. Mr. Uraz was no match for these seasoned manipulators and is now looking at almost 20 years in prison. At least one juror was concerned about this issue. At the close of Mr. Close's testimony, a juror asked why Mr. Close would have conversations with Mr. Uraz about these issues, JTIV 82.

The defendant bears the burden of establishing entrapment by a preponderance of the evidence. *People v Woods,* 241 Mich App 545, 554; 616 NW2d 211 (2000). Entrapment is the conception and planning of an offense by an officer, and his procurement of its commission by one who would not have perpetrated it except for trickery, persuasion, or fraud of the officer. *People v Jamieson*, 436 Mich 61, 68; 461 NW2d 884 (1990), quoting *Sorrells v United States*, 287 US 435, 454; 53 S Ct 210; 77 L Ed 413 (1932). Entrapment occurs when an officer goes beyond "furnish[ing] an opportunity for the commission of a crime by one ready and willing to commit the activity." *Jamieson,* 436 Mich at 68. "Michigan has adopted a modified objective test when analyzing entrapment," which takes into consideration police conduct as well as the defendant's "vulnerabilities*." People v Akhmedov*, 297 Mich App 745, 752-753; 825 NW2d 688 (2012).

As repeatedly described by Michigan courts, "Entrapment occurs if (1) the police engage in impermissible conduct that would induce an otherwise law-abiding person to commit a crime in similar circumstances or (2) the police engage in conduct so reprehensible that the court cannot tolerate it." *People v Fyda,* 288 Mich app 446, 456; 793 NW2d 712 (2010). When determining whether the police engaged in impermissible conduct that would induce an otherwise law-abiding

RECEIVED by MCOA 2/22/2019 10:54:50 AM

26

citizen to commit a crime in similar circumstances, this court must consider several factors outlined in *People v Johnson*, 466 Mich 491, 498-499; 647 NW2d 480 (2002):

> (1) whether there existed appeals to the defendant's sympathy as a friend, (2) whether the defendant had been known to commit the crime with which he was charged, (3) whether there were any long time lapses between the investigation and the arrest, (4) whether there existed any inducements that would make the commission of a crime unusually attractive to a hypothetical law-abiding citizen, (5) whether there were offers of excessive consideration or other enticement, (6) whether there was a guarantee that the acts alleged as crimes were not illegal, (7) whether, and to what extent, any government pressure existed, (8) whether there existed sexual favors, (9) whether there were any threats of arrest, (10) whether there existed any government procedures that tended to escalate the criminal culpability of the defendant, (11) whether there was police control over any informant, and (12) whether the investigation was targeted.

"The circumstances of the particular defendant may be considered by the trial court in analyzing the ready and willing component of the objective entrapment test . . . ." People v Juillet, 439 Mich 34, 55; 475 NW2d 786 (1991).

The factors present here that support a finding of entrapment include, 1) Mr. Uraz's fragile state due to withdrawal from alcohol and drugs, 2) Mr. Uraz's vulnerability due to his segregation and inability to speak with his family, 3) Mr. Uraz's naivete regarding the jail atmosphere, 4) Mr. Uraz's mental health issues, 5) the use of jail house snitches looking for favorable treatment.

Mr. Uraz contends that this behavior should be impermissible and supports a finding that it was clear error for the trial court to deny his motion to dismiss based on entrapment. *People v Fyda*, 288 Mich app 446, 456; 793 NW2d 712 (2010).

**V. Mr. Uraz was denied his state and federal constitutional right to the effective assistance of counsel where his trial counsel failed to ask for a continuance when he was nearing a mental breakdown during the trial and was not able to effectively try the case and where trial defense counsel failed to properly cross-examine the states key witnesses regarding their prior theft related convictions and failed to properly examine defense witnesses.**

RECEIVED by MCOA 2/22/2019 10:54:50 AM

**Standard of review and issue preservation**: Whether a person has been denied the effective assistance of counsel is a mixed question of fact and constitutional law. Findings of fact are reviewed for clear error and questions of constitutional law are reviewed de novo. See , *People v LeBlanc*, 465 Mich 575 , 579; 640 NW2d 246 (2002).  Defendant seeks remand for a *Ginther* hearing.

Mr. Uraz contends that his state and federal right to effective assistance of counsel was violated when his trial counsel's mental ability to try his case declined during his trial.  While conceding that an individual with a mental health condition may properly try a case while in good health and/or properly medicated, the record supports the conclusion that trial defense counsel began having difficulties during Mr. Uraz's trial.  At the least, a *Ginther* hearing is required to determine whether Mr. Uraz was deprived of the effective assistance of counsel.

Failure to investigate, prepare, or present a substantial defense has been grounds for ineffective assistance. See, e.g., *People v Nickson*, 120 Mich App 681; 327 NW2d 333 (1982); *People v Winans*, 187 Mich 294; 466 NW2d 731 (1991).

The role of defense counsel is to challenge the prosecution's case - to present to the trier of fact through cross-examination, presentation of evidence, motions and argument that a reasonable doubt exists as to the accused's guilt.  Courts have recognized that an unreasonable or harmful tactic is not protected solely because it is termed "strategy." See *People v Stubli*, 163 Mich App 376, 380; 413 NW2d 804 (1987); *People v Dalessandro*, 165 Mich App 569, 577-588; 419 NW2d 609 (1988) (holding that *Strickland,* supra, requires that counsel engage in "*sound* trial strategy"); *People v Tommolino*, 187 Mich App 14; 466 NW2d 315 (1991); Blackburn v Foltz, 828 F2d 1177 (CA 6, 1987).

28

RECEIVED by MCOA 2/22/2019 10:54:50 AM

The solicitation cases against Mr. Uraz were far from unassailable. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by error than one with overwhelming record support." *Strickland,* 466 US at 696.  The only evidence against Mr. Uraz for these offenses were jail house snitches testimony and a vague phone conversation with an undercover officer.

Generally, to establish ineffective assistance of counsel, a defendant must show: (1) that counsel's performance was below an objective standard of reasonableness under prevailing professional norms; (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different; and (3) that the resultant proceedings were fundamentally unfair or unreliable.  US Const, Ams VI, XIV; Const 1963, art I, §20; *Strickland v Washington,* 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Pickens,* 446 Mich 298 (1994).

Here, trial defense counsel had a mental breakdown requiring hospitalization just days after Mr. Uraz's trial was completed, Hearing 12-13-17 at 3, In chambers conference 12-12-17.  During the fifth day of trial the prosecutor stated in front of the jury:

> MR. ROTH: "Your Honor, I am going to object. This is three minutes between questions. This cross-examination rambles on for hours.
> THE COURT: I can't help that.
> MR. ROTH: We took a break so he would gather his thoughts.
> THE COURT: I can't press that.
> MR. ROTH: Thank you, Your Honor.
> THE COURT: This is a serious matter. So he can utilize whatever strategy he so desires. JTV 60-61.

During this same time frame, defense counsel sent an email to Mr. Uraz's sister that supports a finding that defense counsel was nearing a breakdown, see Appendix A.  This email was entered into the record during the sentencing phase.  Defense counsel also failed to impeach

RECEIVED by MCOA 2/22/2019 10:54:50 AM

Mr. Allen and Mr. Close with their prior theft convictions.   Mr. Allen was convicted of misdemeanor larceny and Mr. Close was convicted of home invasion 3d, see Appendix B.   Under MRE 609 misdemeanors that contain an element of dishonesty or false statement may be used for impeachment. *People v. Allen*, 429 Mich. 558 (1988).   Furthermore, a review of defense counsel's examination of the defense witnesses and closing argument supports the conclusion that defense counsel was unable to properly represent Mr. Uraz.

An attorney's failure to present certain evidence constitutes ineffective assistance of counsel if it deprives the accused of a "substantial defense." *People v Kelly*, 186 Mich App 524, 526 (1990).   A substantial defense is one that might have made a difference in the outcome of the trial. Id.   Attorneys also have a duty to conduct adequate pretrial preparation. ABA STDS. CRIM. JUST. 4.4.1, *People v Nickson*, 120 Mich App 681, 685 (1982). Investigation related to the credibility of prosecution witnesses is included in this duty. Id.

Here, the credibility of the prosecution's star witnesses for the solicitation offenses was crucial.   Also, defense counsel's presentation to the jury at the end of the trial was rambling and inadequate and greatly prejudiced Mr. Uraz's case.

For all of these reasons, due process requires a new trial or at the least a *Ginther* hearing. Const 1963, art 1, § 17; US Const, Am XI and XIV.

**VI.  The prosecution's misconduct, which consisted of denigrating defense counsel in front of the jury, deprived Mr. Uraz of his due process right to a fair trial.**

**Issue preservation and standard of review:**   Claims of prosecutorial misconduct are constitutional issues reviewed de novo, *People v Wilson*, 265 Mich App 386, 393; 695 NW2d 351 (2005);, and on a case by case basis. *People v Walker*, 265 Mich App 530, 542; 697 NW2d 159 (2005), vacated in part and remanded in part 477 Mich 856; 720 NW2d 754 (2006).  Appellate

RECEIVED by MCOA 2/22/2019 10:54:50 AM

courts decide whether such misconduct denied the defendant a fair trial by evaluating each question in the context of a case's particular facts. *People v Duncan*, 402 Mich 1, 16; 260 NW2d 58 (1977). Because trial counsel failed to object, the errors are unpreserved and thus Mr. Uraz must show plain error that affected substantial rights, seriously affecting the fairness, integrity, or public reputation of the judicial proceedings. *People v Carines*, 460 Mich 750, 763, 774; 597 NW2d 130 (1999).

Lacking compelling evidence and credible witnesses, the prosecution resorted to misconduct to convince the jury of Mr. Uraz's guilt. In the name of securing a conviction, the prosecution denigrated defense counsel in front of the jury:

> MR. ROTH: "Your Honor, I am going to object. This is three minutes between questions. This cross-examination rambles on for hours.
> THE COURT: I can't help that.
> MR. ROTH: We took a break so he would gather his thoughts.
> THE COURT: I can't press that.
> MR. ROTH: Thank you, Your Honor.
> THE COURT: This is a serious matter. So he can utilize whatever strategy he so desires. JTV 60-61.

A prosecutor's primary obligation, however, is not to obtain convictions, but to ensure that justice is done. *Berger v United States*, 295 US 78, 88-89, 55 S Ct 629; 79 L Ed 1314 (1935);. The key test in evaluating claims of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial. *People v Watson*, 245 Mich App 572, 593, 629 NW2d 411 (2001). As a result of prosecutorial misconduct in this case, Mr. Uraz was denied his constitutional right to a fair trial. US Const, Am V, VI, XIV; Const 1963, art 1, §§17, 20.

A prosecutor "must avoid inflaming the prejudices of a jury." People v Marji, 180 Mich App 525, 538; 447 NW2d 835 (1989). It is improper for the prosecutor to engage in arguments that attack defense counsel. Such arguments undermine the defendant's presumption of innocence

RECEIVED by MCOA 2/22/2019 10:54:50 AM

31

and impermissibly shift the jury's focus from the evidence itself to the defense counsel's personality. *People v Dalessandro*, 165 Mich App 569, 580; 419 NW2d 609 (1988);.

In *Dalessandro*, this Court granted relief where the prosecutor stated that the defense was "a sham meant to mislead you." The prosecutor's remarks in Mr. Uraz's case were similarly improper and prejudicial. By chastising defense counsel for taking too long between questions and rambling on he improperly suggested to the jurors that defense counsel was deliberately attempting to mislead them or was incapable of defending Mr. Uraz.

This misconduct requires reversal even without an objection from the defense, because it was highly prejudicial and could not be cured by an instruction from the court, and therefore violated Mr. Uraz's right to a fair trial. See *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999); *Dalessandro*, supra at 578-579. Reversal is required.

32

RECEIVED by MCOA 2/22/2019 10:54:50 AM

## SUMMARY AND RELIEF

WHEREFORE, Mr. Uraz requests this Court reverse and vacate his convictions and sentences.

Respectfully submitted,

BY: _____

SUSAN K. WALSH (P40447)
PO Box 157
Northville, MI 48167
248-563-9149

Dated: February 22, 2019

33

RECEIVED by MCOA 2/22/2019 10:54:50 AM

**APPENDIX A**

RECEIVED by MCOA 2/22/2019 10:54:50 AM

16-1064-FH
16-1065-FC



A ✓

Jan 24, 2018

Hi Mr. Perrone,
Can I call you now if you are available?

**From:** Jacob A. Perrone [mailto:jacob@perronelawpc.com]
**Sent:** Wednesday, November 08, 2017 10:07 AM
**To:** Aysem Uraz <aysemu@yahoo.com>
**Cc:** Cenk Uraz <curaz@mfa.gov.tr>
**Subject:** Re: my brother will call u

You can call me now on my cell at (517) 719-4657. I have some very interesting updates. Cenk. Please also feel free to call. I have clients in Malaysia,Singapore, and China so I am used to the time change. I tried to explain to the Prosecutor that I work 120 hours a week but his little mind couple understand the implications. He spent all day today with his head down looking dejected.... in front of the jury... This doesn't leave us until Thursday when justice is served. I am anticipating a Not Guilty Verdict on all the major charges. They are bullshit. I think I may have hung the jury on the Aggravated Stalking case solely as a result of the prosecutor's ineptitude. If I don't answer send me an email with a phone number and I will attempt to call back. Thursday is judgment day. Either way I believe that I have thoroughly established that Tunc's rights were severely violated and if am able toI secure a Not Guilty Verdict as to the ("frankly complete bullshit") Solicitation Counts I will immediately file a lawsuit against the Lansing Police Department and the Ingham County Sheriff's Department and Prosecutor's office. The reason the prosecutor was so visibly dejected in front of the jury today (I've never seen this before.... You represent your client and you never lose face) was because I warned him that i was going to sue him in Federal Court.... He didn't believe me... Now he knows.... IF YOU TALK TO TUNC HE CANNOT TESTIFY... I THINK THE JIURY MAY COME BACK HUNG ON THE AGG STALKING CHARGE AND ARE ALMOST GUARANTEED TO COME BACK NOT GUILTY ON ALL THE SOLICITATION COUNTS. Tunc Got fucked. I will establish $10,000.000.00 in damages after securing the not guilty verdict. Tunc isn't crazy. The Amercian Justice System is.... Feel free to call. I will be working on a number of other projects as we get a day off tomorrow... or today... Like I said, international business doesn't sleep.

On Wed, Nov 8, 2017 at 1:09 AM, Aysem Uraz <aysemu@yahoo.com> wrote:

Dear Mr. Perrone

Thank you for your kind reply. We really wonder what's going on at Tunc's trial. My brother Cenk Uraz will call you today.

By the way Turkish Embassy in Washington made a press release on 6th November 2017. Please find enclosed .For your info. By the way, you informed Turkish Consulate in Chicago about Tunc's trial probably they will be there on thursday

We are hoping to get good news about Tunc

Kind regards
Aysem Uraz

FILED-30th CIRCUIT COURT

BY:

Deputy Clerk

RECEIVED by MCOA 2/22/2019 10:54:50 AM

**APPENDIX B**

RECEIVED by MCOA 2/22/2019 10:54:50 AM

9/15/2017         ICHAT : Printer friendly search results

**ICHAT**
Internet Criminal History Access Tool

MICHIGAN.GOV
Michigan's
Official
Website

Search Results - Printer Friendly Format

**Data Searched on:** [ Close ] [ Print ]

| Last Name | First Name | Middle Initial | DOB | Race | Sex | More Criteria |
|---|---|---|---|---|---|---|
| CLOSE | REGINALD | | 3/26/1982 | Black | Male | |

Based on the information provided, the following is a certified result of the search as of 9/15/2017 9:59 AM

### Important: Information Contained in this Record

THE RECORD RESULTS PROVIDED HERE ARE BASED ON A COMPUTER MATCH AS EXPLAINED ON THE ICHAT HOME PAGE. THE ICHAT SYSTEM HAS LIMITATIONS THAT MAY CAUSE FALSE POSITIVES OR FALSE NEGATIVES. PLEASE REVIEW THE RESULTS CAREFULLY AND DO NOT TAKE ADVERSE ACTION BASED SOLELY ON THIS RECORD. IF YOU CANNOT DETERMINE THAT THESE RESULTS DO NOT BELONG TO THIS INDIVIDUAL, AND THE INDIVIDUAL IS DISPUTING THE RECORD, PLEASE PROVIDE THAT INDIVIDUAL A COPY OF THIS REPORT AND OFFER THAT INDIVIDUAL THE OPPORTUNITY TO PERFORM A RECORD CHALLENGE BY SUBMITTING FINGERPRINTS. THIS IS EXPLAINED AT THE BOTTOM OF THIS PAGE. SINCE ARRESTS, CONVICTIONS, OR CRIMINAL RECORD DELETIONS MAY OCCUR AT ANY TIME, DO NOT USE THIS INFORMATION FOR FUTURE CLEARANCES.

```
MICHIGAN CRIMINAL HISTORY RECORD INFORMATION MEETING DISSEMINATION CRITERIA
FOR SID: 2280531X AS OF 09/15/2017

NAM: CLOSE,REGINALD GARFIELD
RAC: B        SEX: M       DOB: 03/26/1982      SID: 2280531X
HGT: 603      WGT: 200     HAI: BLK
EYE: BRO      POB: MI
                                             MNU:
CIZ:

SCAR/MARK/TATTOO:    TAT R ARM     TAT BACK

ADDITIONAL IDENTIFIERS AND COMMENTS:

NAM: CLOSE,REGINALD         CLOSE,REGINALD GARFIELD JR
```

https://apps.michigan.gov/ICHAT/PrinterFriendlyResults.aspx?id=17526700     1/7

---

9/15/2017         ICHAT : Printer friendly search results



```
CRIMINAL TRACKING NUMBER: 990232231401         INCIDENT DATE: 10/30/2002
ICN/OCA: A103499553P/022727
NAME USED: CLOSE,REGINALD GARFIELD
=======================================================================
ARREST SEGMENT        : CHARGE SEGMENT      : JUDICIAL SEGMENT
=======================================================================
DATE: 10/30/2002      : NO DATA RECEIVED    : DATE: 10/31/2002
MI6362800             :                     : MI630115J
OAK PARK DPS          :                     : 45B OAK PARK DISTRICT
OCA: 022727           :                     :    COURT
1 CNT OF 5400         :                     : CFN: 02321790POT
   ORDINANCE VIOL     :                     :
   TRAFFIC OFFENSE    :                     : CNT-1 MCL
DISP: CHGD BY PROSECUTOR :                  :    ORDINANCE VIOL
                      :                     : DISP: PLED GUILTY
                      :                     : SENT/REMARKS:
                      :                     : DROVE WHILE UNLIC OR
                      :                     :    NOT VALID CONF-10D
                      :                     :    F/C/R-$360
                      :                     :
                      :                     : CNT-2 MCL
                      :                     :    ORDINANCE VIOL
                      :                     : DISP: PLED GUILTY
                      :                     : SENT/REMARKS:
                      :                     : POSS CONTROLLED
                      :                     :    SUBSTANCES F/C/R-$125
=======================================================================
CRIMINAL TRACKING NUMBER: 820112299501         INCIDENT DATE: 04/24/2003
ICN/OCA: D103013635M/591674
NAME USED: CLOSE,REGINALD GARFIELD
=======================================================================
ARREST SEGMENT        : CHARGE SEGMENT      : JUDICIAL SEGMENT
=======================================================================
DATE: 04/24/2003      : DATE: 04/24/2003    : DATE: 07/01/2003
MI8234900             : MI820015A           : MI821095J
DETROIT POLICE        : WAYNE COUNTY        : 3RD CIRCUIT COURT
   DEPARTMENT         :    PROSECUTING ATT  :    CRIMINAL DIV DETROIT
OCA: 111111111111     : 1 CNT MCL 750.110A2 : CFN: 0300537001
1 CNT OF 5200         :    FELONY           :
   ATTEMPT-FELONY     :    HOME INVASION - 1ST : CNT-1 MCL 750.110A4
   WEAPONS OFFENSE    :    DEGREE           :    FELONY
DISP: CHGD BY PROSECUTOR :                  :    HOME INVASION - 3RD
                      :                     :    DEGREE
                      :                     : DISP: PLED GUILTY
                      :                     : SENT/REMARKS:
                      :                     : 1Y6MD TO 5YM
                      :                     :
                      :                     : CNT-2 MCL 750.110A4
                      :                     :    FELONY
                      :                     :    HOME INVASION - 3RD
                      :                     :    DEGREE
                      :                     : DISP: FOUND GUILTY
                      :                     : SENT/REMARKS:
                      :                     : CONFINEMENT 00YR 18MTH
                      :                     :    000DAY TO 05YR 00MTH
                      :                     :    000DAY PROB: 00YR
                      :                     :    00MTH 000DAY
```

https://apps.michigan.gov/ICHAT/PrinterFriendlyResults.aspx?id=17526700     2/7



RECEIVED by MCOA 2/22/2019 10:54:50 AM

Snitch #2



# ICHAT
## Internet Criminal History Access Tool

MICHIGAN.GOV

Michigan's Official Website

Search Results - Printer Friendly Format

**Data Searched on:**  [Close] [Print]

| Last Name | First Name | Middle Initial | DOB | Race | Sex | More Criteria |
|---|---|---|---|---|---|---|
| ALLEN | CHARLES | | 8/1/1993 | Black | Male | |

Based on the information provided, the following is a certified result of the search as of 9/15/2017 10:01 AM

**Important: Information Contained in this Record**

THE RECORD RESULTS PROVIDED HERE ARE BASED ON A COMPUTER MATCH AS EXPLAINED ON THE ICHAT HOME PAGE. THE ICHAT SYSTEM HAS LIMITATIONS THAT MAY CAUSE FALSE POSITIVES OR FALSE NEGATIVES. PLEASE REVIEW THE RESULTS CAREFULLY AND DO NOT TAKE ADVERSE ACTION BASED SOLELY ON THIS RECORD. IF YOU CANNOT DETERMINE THAT THESE RESULTS DO NOT BELONG TO THIS INDIVIDUAL, AND THE INDIVIDUAL IS DISPUTING THE RECORD, PLEASE PROVIDE THAT INDIVIDUAL WITH A COPY OF THIS REPORT AND OFFER THAT INDIVIDUAL THE OPPORTUNITY TO PERFORM A RECORD CHALLENGE BY SUBMITTING FINGERPRINTS. THIS IS EXPLAINED AT THE BOTTOM OF THIS PAGE. SINCE ARRESTS, CONVICTIONS, OR CRIMINAL RECORD DELETIONS MAY OCCUR AT ANY TIME, DO NOT USE THIS INFORMATION FOR FUTURE CLEARANCES.

MICHIGAN CRIMINAL HISTORY RECORD INFORMATION MEETING DISSEMINATION CRITERIA
FOR SID: 3518170J AS OF 09/15/2017

NAM: ALLEN,CHARLES MARICE           SID: 3518170J

RAC: B      SEX: M      DOB: 08/01/1993
HGT: 600    WGT: 188    HAI: BRO
EYE: BRO    POB: MI

                   MNU:

CIZ:

ADDITIONAL IDENTIFIERS AND COMMENTS:

NAM: ALLEN,CHARLES MAURICE

DOB: 08/19/1993

---

CRIMINAL TRACKING NUMBER: 331000779601      INCIDENT DATE: 09/07/2010
TCN/OCA: K811020593H/100907062209
NAME USED: ALLEN,CHARLES MARICE

| ARREST SEGMENT | CHARGE SEGMENT | JUDICIAL SEGMENT |
|---|---|---|
| DATE: 04/01/2011 | DATE: 09/07/2010 | DATE: 05/02/2011 |
| MI3351900 | MI330013A | MI330075J |
| LANSING POLICE | INGHAM COUNTY | 54A DISTRICT COURT |
|   DEPARTMENT |   PROSECUTING ATT |   LANSING |
| OCA: 100907062209 | 1 CNT MCL 750.3564A | CFN: 11-01251 |
| 1 CNT OF 2300 |   MISDEMEANOR | |
|   MISDEMEANOR |   LARCENY - $200 OR | CNT-1 MCL 750.3564A |
|   LARCENY |   MORE BUT LESS THAN |   MISDEMEANOR |
| DISP: CHGD BY PROSECUTOR |   $1,000 |   LARCENY - $200 OR |
| | |   MORE BUT LESS THAN |
| | |   $1,000 |
| | | DISP: PLED GUILTY |
| | | SENT/REMARKS: |
| | | F/C/R $908/PROB 6 MO |

CRIMINAL TRACKING NUMBER: 331200227301      INCIDENT DATE: 03/21/2012
TCN/OCA: I512123907H/12-C-2396
NAME USED: ALLEN,CHARLES MARICE

| ARREST SEGMENT | CHARGE SEGMENT | JUDICIAL SEGMENT |
|---|---|---|
| DATE: 03/21/2012 | DATE: 03/21/2012 | DATE: 05/14/2012 |
| MI3313300 | MI330013A | MI330085J |
| INGHAM COUNTY SHERIFF | INGHAM COUNTY | 55TH DISTRICT COURT |
|   DEPARTMENT |   PROSECUTING ATT |   MASON |
| OCA: 12-2396 | 1 CNT MCL 257.6251-A | CFN: 1200906 |
| 1 CNT OF 5400 |   MISDEMEANOR | |
|   MISDEMEANOR |   OPERATING WHILE | CNT-2 MCL 257.6251-A |
|   TRAFFIC OFFENSE |   INTOXICATED |   MISDEMEANOR |
| DISP: CHGD BY PROSECUTOR | 1 CNT MCL 257.6251C |   OPERATING WHILE |
| |   MISDEMEANOR |   INTOXICATED |
| |   OPERATING WITH A HIGH | DISP: PLED GUILTY |
| |   BAC | SENT/REMARKS: |
| | | F/C/R $1857/PROB 12 |
| | | MO/JAIL 93 DAYS |

CRIMINAL TRACKING NUMBER: 331200569901      INCIDENT DATE: 08/06/2012
TCN/OCA: K812062764H/120806008968
NAME USED: ALLEN,CHARLES MARICE

| ARREST SEGMENT | CHARGE SEGMENT | JUDICIAL SEGMENT |
|---|---|---|
| DATE: 06/14/2012 | DATE: 08/07/2012 | DATE: 10/02/2012 |
| MI3351900 | MI330013A | MI330075J |
| LANSING POLICE | INGHAM COUNTY | 54A DISTRICT COURT |
|   DEPARTMENT |   PROSECUTING ATT |   LANSING |
| OCA: 120806008968 | 1 CNT MCL 750.237 | CFN: 12-03596 |
| 2 CNT OF 5200 |   MISDEMEANOR | |
|   MISDEMEANOR |   WEAPONS - FIREARM - | CNT-2 MCL 750.237 |
|   WEAPONS OFFENSE |   POSSESSION UNDER THE |   MISDEMEANOR |
| DISP: CHGD BY PROSECUTOR |   INFLUENCE |   WEAPONS - FIREARM - |
| | 1 CNT MCL 752.862-A |   POSSESSION UNDER THE |
| |   MISDEMEANOR |   INFLUENCE |
| |   WEAPONS - FIREARMS - | DISP: PLED GUILTY |
| |   CARELESS | SENT/REMARKS: |
| |   DISCHARGE/PROPERTY | F/C/R $75/JAIL 90 DAYS |
| |   DAMAGE $50 OR LESS | |

# Court of Appeals, State of Michigan

## ORDER

**People of MI v Tunc Uraz**

Docket No.    **343695; 343696**

LC No.    **16-001064-FH; 16-001065-FC**

---

Christopher M. Murray, Chief Judge, acting under MCR 7.211(E)(2), orders:

The motion to extend time to file appellant's brief is GRANTED until February 22, 2019.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

JAN - 9 2019

Date

Chief Clerk

## STATE OF MICHIGAN

## IN THE COURT OF APPEALS

**PEOPLE OF THE STATE OF MICHIGAN**

Plaintiff-Appellee

> Lower Court No. 16-1064 FH & 16-1065 FC
> Court of Appeals No. 343695 & 343696

-vs-

**TUNC URAZ,**

Defendant-Appellant.

_____/

INGHAM COUNTY PROSECUTOR
Attorney for Plaintiff-Appellee

_____

SUSAN K. WALSH (40447)
Attorney for Defendant-Appellant

_____

### MOTION FOR EXTENSION OF TIME

**NOW COMES** Defendant, **TUNC URAZ,** by and through his attorney, Susan K. Walsh, and moves this Honorable Court to grant an extension of time within which to file Defendant-Appellant's brief on appeal and says in support thereof that:

RECEIVED by MCOA 12/22/2018 10:45:08 AM

1.    Defendant-Appellant was convicted after a jury trial and sentenced to prison.

3.    On February 26, 2018, the claim of appeal was filed and counsel was appointed.

4.    Counsel has been diligently attempting to complete Defendant's brief. However, due to counsel's large appellate caseload she requires additional time to complete Defendant's brief.

**WHEREFORE**, Defendant respectfully requests that this Honorable Court grant an extension to file his brief on appeal and possible motion to remand until February 22, 2019.

Respectfully submitted,

BY: _____
SUSAN K. WALSH P40447

Date: December 22, 2018

RECEIVED by MCOA 12/22/2018 10:45:08 AM

# Court of Appeals, State of Michigan

# ORDER

**People of MI v Tunc Uraz**

Docket Nos.   **343695; 343696**

LC Nos.        **16-001064-FH; 16-001065-FC**

---

Michael F. Gadola, Judge, acting under MCR 7.211(E)(2), orders:

The motion for extension of time is GRANTED.   The time for defendant-appellant to address the involuntary dismissal warning letters sent on June 4, 2018, is extended until July 16, 2018.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

JUL **09** 2018
_____
Date

Chief Clerk

# Susan K. Walsh
## Attorney and Counselor at Law

P.O. Box 96
Milford, Michigan 48381
Phone (248) 563-9149

June 21, 2018

Clerk
Michigan Court of Appeals
3020 W. Grand Blvd., Ste. 14-300
Detroit, MI 48202

        Re:    **People v Tunc Uraz**
                Lower Court No. 16-1064 FH & 16-1065 FC
                COA# 343695 & 343696

Dear Clerk:

    Enclosed are an original and four (4) copies of:

Motion to Extend
Certificate of Service

in the above captioned case which I request you file in your Court.

    Thank you for your cooperation.

                    Sincerely,

                    Susan K. Walsh

Enclosure
cc:    Ingham County Prosecutor
       Tunc Uraz
       file

RECEIVED
2018 JUN 22 PM 3:41
COURT OF APPEALS
DETROIT OFFICE

RECEIVED
2018 JUN 26 PM 2:32
LANSING OFFICE

# STATE OF MICHIGAN

# IN THE COURT OF APPEALS

## PEOPLE OF THE STATE OF MICHIGAN

Plaintiff-Appellee

Lower Court No. 16-1064 FH & 16-1065 FC
Court of Appeals No. 343695 & 343696

-vs-

## TUNC URAZ,

Defendant-Appellant.

_____/

INGHAM COUNTY PROSECUTOR
Attorney for Plaintiff-Appellee

_____

SUSAN K. WALSH (40447)
Attorney for Defendant-Appellant

_____

## MOTION FOR EXTENSION OF TIME

**NOW COMES** Defendant, **TUNC URAZ**, by and through his attorney, Susan K. Walsh,

and moves this Honorable Court to grant an extension of time within which to address the Involuntary

Dismissal letter regarding stenographer's certificate(s) and says in support thereof that:

1.      Defendant-Appellant was convicted after a jury trial and sentenced to prison.

2.      Counsel has been diligently attempting to complete the record.  However, due to the fact that counsel is moving her home and her office on June 22, 2018, and the next day leaving for a family reunion out of state she requires additional time to complete the file.

**WHEREFORE**, Defendant respectfully requests that this Honorable Court grant an extension to address the involuntary dismissal letters sent on June 4, 2018, to July 16, 2018.

Respectfully submitted,

BY:                               
SUSAN K. WALSH P40447

Date: June 21, 2018

RECEIVED
2018 JUN 22 PM 3:41
COURT OF APPEALS
DETROIT OFFICE

RECEIVED
2018 JUN 26 PM 2:32
LANSING OFFICE

# STATE OF MICHIGAN

## IN THE COURT OF APPEALS

**PEOPLE OF THE STATE OF MICHIGAN**

          Plaintiff-Appellee

**Lower Court No.** 16-1064 FH & 16-1065 FC

**COA# 343695 & 343696**

-vs-

**TUNC URAZ,**

          Defendant-Appellant.

_____/

**INGHAM COUNTY PROSECUTOR**
Attorney for Plaintiff-Appellee

_____

**SUSAN K. WALSH (P40447)**
Attorney for Defendant-Appellant

_____

## CERTIFICATE OF SERVICE

      **SUSAN K. WALSH**, certifies and says that on June 21, 2018, she filed with this Court the following:

**Motion to Extend**
CERTIFICATE OF SERVICE

and she mailed one (1) copy of same to:

    **INGHAM COUNTY PROSECUTOR**
    Appellate Division
    303 Kalamazoo St., 2nd Fl.
    Lansing, MI 48933

                        **SUSAN K. WALSH**

# Court of Appeals, State of Michigan

## ORDER

**People of MI v Tunc Iraz**

Docket No.    **343695; 343696**

LC No.        **16-001064-FH; 16-001065-FH**

Michael F. Gadola, Judge, acting under MCR 7.211(E)(2), orders:

These appeals are CONSOLIDATED to advance the efficient administration of the appellate process.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

JUN 7 - 2018
_____
Date

_____
Chief Clerk

CHRISTOPHER M. MURRAY
CHIEF JUDGE
JANE M. BECKERING
CHIEF JUDGE PRO TEM
DAVID H. SAWYER
WILLIAM B. MURPHY
MARK J. CAVANAGH
KATHLEEN JANSEN
JOEL P. HOEKSTRA
JANE E. MARKEY
PETER D. O'CONNELL
PATRICK M. METER
KIRSTEN FRANK KELLY
KAREN FORT HOOD
STEPHEN L. BORRELLO
DEBORAH A. SERVITTO

ELIZABETH L. GLEICHER
CYNTHIA DIANE STEPHENS
MICHAEL J. KELLY
DOUGLAS B. SHAPIRO
AMY RONAYNE KRAUSE
MARK T. BOONSTRA
MICHAEL J. RIORDAN
MICHAEL F. GADOLA
COLLEEN A. O'BRIEN
BROCK A. SWARTZLE
THOMAS C. CAMERON
JONATHAN TUKEL
JUDGES

JEROME W. ZIMMER JR.
CHIEF CLERK



State of Michigan

# Court of Appeals
## Lansing Office

May 8, 2018

Ingham Circuit Court Clerk's Office
Veterans Memorial Courthouse
313 W. Kalamazoo St.
Lansing MI  48901

    Re:  **People of MI v Tunc Uraz**
    Court of Appeals Nos.  **343695; 343696**
    Lower Court Nos.  **16-001064-FH; 16-001065-FC**

Dear Sir or Madam:

    This office has received the claims of appeal filed by the Ingham Circuit Court on behalf of defendant as to the above-indicated cases.  Unfortunately, the claims of appeal were not accompanied by copies of the January 24, 2018 judgments of sentence in the two circuit court cases, i.e., Ingham Circuit Court cases 16-001064-FH and 16-001065-FC.  Thus, I request that your office please provide copies of those judgments of sentence to this office within 21 days after the date of this letter.

    Thank you for your assistance.

                    Very truly yours,

                    Gary Chambon
                    Assistant Clerk

cc:  Ingham County Prosecutor
      Susan Walsh

| DETROIT OFFICE | TROY OFFICE | GRAND RAPIDS OFFICE | LANSING OFFICE |
|---|---|---|---|
| CADILLAC PLACE | COLUMBIA CENTER | STATE OF MICHIGAN OFFICE BUILDING | 925 W. OTTAWA ST. |
| 3020 W. GRAND BLVD. SUITE 14-300 | 201 W. BIG BEAVER RD. SUITE 800 | 350 OTTAWA, N.W. | P.O. BOX 30022 |
| DETROIT, MICHIGAN  48202-6020 | TROY, MICHIGAN  48084-4127 | GRAND RAPIDS, MICHIGAN  49503-2349 | LANSING, MICHIGAN  48909-7522 |
| (313) 972-5678 | (248) 524-8700 | (616) 456-1167 | (517) 373-0786 |

COURT OF APPEALS WEB SITE ~ http://courts.mi.gov/courts/coa/

STATE OF MICHIGAN
IN THE 30th CIRCUIT COURT FOR THE COUNTY OF INGHAM

THE PEOPLE OF THE
STATE OF MICHIGAN,

vs.                           Case No.:  16-534-FH
                         Hon. Clinton Canady, III

TUNC URAZ,

                    Defendant.
_____/
       REPORTER'S NOTICE OF FILING TRANSCRIPT

TO:    Court of Appeals Clerk's Office
       PO Box 30022
       Lansing, MI 48909

       30th Circuit Court - Ingham County
       Lansing, MI  48933
       Ingham Prosecuting Attorney's Office

       Susan Kaestner Walsh
       PO Box 96
       Milford, MI 48381

       PLEASE TAKE NOTICE That I have filed, on today's
date, in the 30th Circuit Court, in the above-entitled cause,
a true and correct transcript dated: August 31, 2016.

_____
Teresa J. Abraham, CSR-3445
Official Court Reporter
Ingham County Circuit Court

Date:   June 21, 2018

Approved, SCAO

Distribution of Form:
Original-Appellate court          3rd Copy – Appellant/Attorney
1st copy – Trial court            4th Copy - Reporter/Recorder
2nd copy – Appellee/Attorney      JIS Code: RRC

| STATE OF MICHIGAN 30th Judicial Circuit – Family Division INGHAM COUNTY | REPORTER/RECORDER CERTIFICATE OF ORDERING OF TRANSCRIPT ON APPEAL  Appeal to: ☒ Court of Appeals ☐ Circuit | CASE NO. 16-1064 FH 343695-L 16-1065 FC |
|---|---|---|

Court Address: 313 W. Kalamazoo Street, Lansing, MI 48933 — Court Telephone: (517) 483-6105

| Plaintiff/Petitioner name(s) and address(es) ☒ Appellant ☐ Appellee  TUNC URAZ | V | Defendant/Respondent name(s) and address(es) ☐ Appellant ☒ Appellee  PEOPLE OF THE STATE OF MICHIGAN |
|---|---|---|
| Attorney, bar no., address and telephone no.  SUSAN K. WALSH (P- 40447) ATTORNEY AT LAW P.O. BOX 96 MILFORD, MI 48381 (248) 563-9149 | | Attorney, bar no., address and telephone no.  PROSECUTING ATTORNEY INGHAM COUNTY 30TH JUDICIAL CIRCUIT COURT 303 WEST KALAMAZOO AVE. LANSING MI 48933 (517) 483-6108 |

☐ Probate    In the matter of:    **SEE ABOVE**

This certificate must be filed by appellant or reporter/recorder within 7 days on appeals to the Court of Appeals.
This certificate must be filed by appellant within 7 days on appeals to the Circuit Court.

I am a certified court reporter/recorder for the court designated above and I certify that:

1. On _____ 7-16-18 _____ ☐ a portion of the ☒ the complete transcript of proceedings, taken in this case
   Date

before Judge _____ CLINTON CANADY III _____ on _____ 3-22-17 _____ , was ordered by
                                                        Date(s)

☒ a. _____ SUSAN K. WALSH _____ , attorney for _____ TUNC URAZ _____
        Attorney name (type or print)                    Name (type or print)

☐ b. the appellant, _____
                    Name (type or print)

☐ c. the court.

☒ 2. Payment has been secured and the transcript will be furnished by me _____ 8-17-18 _____
                                                                          Estimated dates of completion

   Estimated number of pages is _____ 20 _____

☐ 3. The transcript has been filed with the court and furnished as requested. Date filed: _____

☐ 4. There is no record to be transcribed.

I declare that the statements above are true to the best of my information, knowledge and belief.

7-20-18
Date

Reporter/Recorder signature
RITA YVETTE NICHOLSON
Name (type or print)

CER 4732
Certification, designation and number
303 WEST KALAMAZOO STREET
Business address
LANSING MI 48933
City, state, zip

List names, certification designations and numbers, and dates or each proceedings or each reporter or recorder who reported or recorded or transcribed any part of the proceedings:

MCR 7.101©(3)©, MCR 7.210(B)(3)(a)

**MC 501 (3/05) REPORTER/RECORDER CERTIFICATE OF ORDERING OF TRANSCRIPT ON APPEAL**

Approved, SCAO

| Distribution of Form: | Original-Appellate court | 3rd Copy – Appellant/Attorney |
| | 1st copy – Trial court | 4th Copy - Reporter/Recorder |
| | 2nd copy – Appellee/Attorney | JIS Code: RRC |

| STATE OF MICHIGAN<br>30th Judicial Circuit – Family Division<br>INGHAM COUNTY | REPORTER/RECORDER CERTIFICATE<br>OF ORDERING OF<br>TRANSCRIPT ON APPEAL<br>Appeal to:  ☒ Court of Appeals  ☐ Circuit | CASE NO.<br>16-1064 FH  343695-L<br>16-1065 FC |

Court Address: 313 W. Kalamazoo Street, Lansing, MI 48933     Court Telephone: (517) 483-6105

| Plaintiff/Petitioner name(s) and address(es)  ☒ Appellant  ☐ Appellee<br><br>TUNC URAZ | V | Defendant/Respondent name(s) and address(es)  ☐ Appellant  ☒ Appellee<br><br>PEOPLE OF THE STATE OF MICHIGAN |
| Attorney, bar no., address and telephone no.<br><br>SUSAN K. WALSH  (P- 40447)<br>ATTORNEY AT LAW<br>P.O. BOX 96<br>MILFORD, MI  48381<br>(248) 563-9149 | | Attorney, bar no., address and telephone no.<br><br>PROSECUTING ATTORNEY<br>INGHAM COUNTY 30TH JUDICIAL CIRCUIT COURT<br>303 WEST KALAMAZOO AVE.<br>LANSING MI  48933<br>(517) 483-6108 |

☐ Probate    In the matter of:    **SEE ABOVE**

This certificate must be filed by appellant or reporter/recorder within 7 days on appeals to the Court of Appeals.
This certificate must be filed by appellant within 7 days on appeals to the Circuit Court.

I am a certified court reporter/recorder for the court designated above and I certify that:

1. On ____7-16-18____ ☐ a portion of the ☒ the complete transcript of proceedings, taken in this case
    Date

before Judge ____CLINTON CANADY III____ on ____3-22-17____ , was ordered by
                                                             Date(s)

☒ a. ____SUSAN K. WALSH____ , attorney for ____TUNC URAZ____
     Attorney name (type or print)                  Name (type or print)

☐ b. the appellant, _____
               Name (type or print)

☐ c. the court.

☒ 2. Payment has been secured and the transcript will be furnished by me ____8-17-18____
                                                        Estimated dates of completion

    Estimated number of pages is ____20____

☐ 3. The transcript has been filed with the court and furnished as requested.  Date filed: _____

☐ 4. There is no record to be transcribed.

I declare that the statements above are true to the best of my information, knowledge and belief.

7-20-18
Date

_Rita Yvette Nicholson_ (signature)
Reporter/Recorder signature
RITA YVETTE NICHOLSON
Name (type or print)

CER 4732
Certification, designation and number
303 WEST KALAMAZOO STREET
Business address
LANSING MI  48933
City, state, zip

List names, certification designations and numbers, and dates or each proceedings or each reporter or recorder who reported or recorded or transcribed any part of the proceedings:

MCR 7.101©(3)©, MCR 7.210(B)(3)(a)

**MC 501** (3/05) **REPORTER/RECORDER CERTIFICATE OF ORDERING OF TRANSCRIPT ON APPEAL**

STATE OF MICHIGAN
30th CIRCUIT COURT FOR THE COUNTY OF INGHAM
CRIMINAL DIVISION

THE PEOPLE OF THE
STATE OF MICHIGAN,

vs.                              Case No.:  16-1064-FH
                                           16-1065-FH

                    Hon. Clinton Canady, III

TUNC URAZ,

                    Defendant.
_____/
                CERTIFICATE OF APPEAL

        I, TERESA J. ABRAHAM, Official Court
Reporter for the above-named court, do hereby certify
that on March 26, 2018, I received a request to
produce the following transcripts:  January 25, 2018,
October 31, 2017, October 27, 2017, October 20, 2017,
October 11, 2017, August 15, 2017, May 2, 2017, March
22, 2017, March 8, 2017, February 28, 2017, January
31, 2017 and January 4, 2017.
        That upon order of the Court
heretofore entered, such petition has been granted,
that payment therefore has been so arranged, and that
said transcripts will be furnished by me no later
than July 3, 2018.

_____
Teresa J. Abraham, CSR-3445
Ingham County Circuit Court
313 W. Kalamazoo Street
PO Box 40771
Lansing, MI 48901-7971

Date:  April 3, 2018

cc:  Ingham County Circuit Court Clerk's Office
     Court of Appeals Clerk, Lansing
     Ingham Cty Prosecutor's Office, Appellate Div.
     Susan Kaestner Walsh

STATE OF MICHIGAN

IN THE 30th CIRCUIT COURT FOR THE COUNTY OF INGHAM

THE PEOPLE OF THE
STATE OF MICHIGAN,

vs.                              Case No.:   16-1064-FH
                                             16-1065-FC
                           Hon. Clinton Canady, III

TUNC URAZ,

                         Defendant.
_____/
            REPORTER'S NOTICE OF FILING TRANSCRIPT

TO:    Court of Appeals Clerk's Office
       PO Box 30022
       Lansing, MI 48909

       30th Circuit Court - Ingham County
       Lansing, MI  48933
       Ingham Prosecuting Attorney's Office

       Susan Kaestner Walsh
       PO Box 96

       Milford, MI 48381

            PLEASE TAKE NOTICE That I have filed, on today's
date, in the 30th Circuit Court, in the above-entitled cause,
a true and correct transcript dated: January 24, 2018.

_____
Teresa J. Abraham, CSR-3445
Official Court Reporter
Ingham County Circuit Court


Date:    June 4, 2018

STATE OF MICHIGAN
IN THE 30th CIRCUIT COURT FOR THE COUNTY OF INGHAM

THE PEOPLE OF THE
STATE OF MICHIGAN,

vs.                         Case No.:   16-1064-FH
                                        16-1065-FC
                        Hon. Clinton Canady, III

TUNC URAZ,

_____

                Defendant.
_____/
            REPORTER'S NOTICE OF FILING TRANSCRIPT

TO:    Court of Appeals Clerk's Office
       PO Box 30022
       Lansing, MI 48909

       30th Circuit Court - Ingham County
       Lansing, MI  48933
       Ingham Prosecuting Attorney's Office

       Susan Kaestner Walsh
       PO Box 96
       Milford, MI 48381

            PLEASE TAKE NOTICE That I have filed, on today's
date, in the 30th Circuit Court, in the above-entitled cause,
true and correct transcripts dated: October 31, 2017, November
2, 3, 6, 7 and 9 of 2017.

_____
Teresa J. Abraham, CSR-3445
Official Court Reporter
Ingham County Circuit Court


Date:   June 4, 2018

STATE OF MICHIGAN
IN THE 30th CIRCUIT COURT FOR THE COUNTY OF INGHAM

THE PEOPLE OF THE
STATE OF MICHIGAN,

vs.                              Case No.:   16-1064-FH
                                             16-1065-FC
                          Hon. Clinton Canady, III

TUNC URAZ,

                    Defendant.
_____/
            REPORTER'S NOTICE OF FILING TRANSCRIPT

TO:    Court of Appeals Clerk's Office
       PO Box 30022
       Lansing, MI 48909

       30th Circuit Court - Ingham County
       Lansing, MI  48933
       Ingham Prosecuting Attorney's Office

       Susan Kaestner Walsh
       PO Box 96
       Milford, MI 48381

           PLEASE TAKE NOTICE That I have filed, on
today's date, in the 30th Circuit Court, in the
above-entitled cause, true and correct transcripts
dated: October 11, 2017.  For the date of October 20,
2017, it was filed on November 1, 2017.

_____
Teresa J. Abraham, CSR-3445
Official Court Reporter
Ingham County Circuit Court


Date:    June 6, 2017

STATE OF MICHIGAN
IN THE 30th CIRCUIT COURT FOR THE COUNTY OF INGHAM

THE PEOPLE OF THE
STATE OF MICHIGAN,

vs.                                    Case No.:   16-1064-FH
                                                   16-1065-FC
                                Hon. Clinton Canady, III

TUNC URAZ,

                        Defendant.
_____/
            REPORTER'S NOTICE OF FILING TRANSCRIPT

TO:     Court of Appeals Clerk's Office
        PO Box 30022
        Lansing, MI 48909

        30th Circuit Court - Ingham County
        Lansing, MI  48933
        Ingham Prosecuting Attorney's Office

        Susan Kaestner Walsh
        PO Box 96
        Milford, MI 48381

        PLEASE TAKE NOTICE That I have filed, on
today's date, in the 30th Circuit Court, in the
above-entitled cause, true and correct transcripts
dated: October 11, 2017.  For the date of October 20,
2017, it was filed on November 1, 2017.

_____
Teresa J. Abraham, CSR-3445
Official Court Reporter
Ingham County Circuit Court


Date:     June 6, 2017

343695
c/343696

STATE OF MICHIGAN
IN THE 30th CIRCUIT COURT FOR THE COUNTY OF INGHAM

THE PEOPLE OF THE
STATE OF MICHIGAN,

vs.                           Case No.:   16-1064-FH
                                          16-1065-FC
                         Hon. Clinton Canady, III

TUNC URAZ,
                    Defendant.
_____/
         REPORTER'S NOTICE OF FILING TRANSCRIPT

TO:   Court of Appeals Clerk's Office
      PO Box 30022
      Lansing, MI 48909

      30th Circuit Court - Ingham County
      Lansing, MI   48933
      Ingham Prosecuting Attorney's Office

      Susan Kaestner Walsh
      PO Box 96
      Milford, MI 48381

          PLEASE TAKE NOTICE That the date of the 2-28-17
hearing will be prepared by Official Court Recorder Sheila
Burger (sburger@ingham.org).

          For the date of the 8-15-17 hearing will be
prepared by Official Court Recorder Susan Melton
(smelton@ingham.org).

          For the date of the 3-22-17 hearing will be
prepared by Official Court Recorder Yvette Nicholson
(ynicholson@ingham.org).

          For the requested dates of 10-27-17 and 1-25-18, I
cannot find anything that was held on the record, therefore, I
will not be filing a transcript for those dates.

_____
Teresa J. Abraham, CSR-3445
Ingham County Circuit Court

Date:   June 20, 2018

343695
c/343696

STATE OF MICHIGAN
IN THE 30th CIRCUIT COURT FOR THE COUNTY OF INGHAM

THE PEOPLE OF THE
STATE OF MICHIGAN,

vs.                           Case No.:   16-1064-FH
                                          16-1065-FC
                          Hon. Clinton Canady, III

TUNC URAZ,
                          Defendant.
_____/
          REPORTER'S NOTICE OF FILING TRANSCRIPT

TO:   Court of Appeals Clerk's Office
      PO Box 30022
      Lansing, MI 48909

      30th Circuit Court - Ingham County
      Lansing, MI  48933
      Ingham Prosecuting Attorney's Office

      Susan Kaestner Walsh
      PO Box 96
      Milford, MI 48381

          PLEASE TAKE NOTICE That the date of the 2-28-17
hearing will be prepared by Official Court Recorder Sheila
Burger (sburger@ingham.org).

          For the date of the 8-15-17 hearing will be
prepared by Official Court Recorder Susan Melton
(smelton@ingham.org).

          For the date of the 3-22-17 hearing will be
prepared by Official Court Recorder Yvette Nicholson
(ynicholson@ingham.org).

          For the requested dates of 10-27-17 and 1-25-18, I
cannot find anything that was held on the record, therefore, I
will not be filing a transcript for those dates.

_____
Teresa J. Abraham, CSR-3445
Ingham County Circuit Court

Date:   June 20, 2018

STATE OF MICHIGAN
IN THE 30th CIRCUIT COURT FOR THE COUNTY OF INGHAM

THE PEOPLE OF THE
STATE OF MICHIGAN,

vs.                                  Case No.:   16-1064-FH
                                                 16-1065-FC
                          Hon. Clinton Canady, III

TUNC URAZ,

              Defendant.
_____/
        REPORTER'S NOTICE OF FILING TRANSCRIPT

TO:   Court of Appeals Clerk's Office
      PO Box 30022
      Lansing, MI 48909

      30th Circuit Court - Ingham County
      Lansing, MI  48933
      Ingham Prosecuting Attorney's Office

      Susan Kaestner Walsh
      PO Box 96
      Milford, MI 48381

        PLEASE TAKE NOTICE That I have filed, on today's
date, in the 30th Circuit Court, in the above-entitled cause,
true and correct transcripts dated: May 2, 2017, March 8,
2017, January 31, 2017 and January 4, 2017.

_____
Teresa J. Abraham, CSR-3445
Official Court Reporter
Ingham County Circuit Court


Date:   June 20, 2018

STATE OF MICHIGAN
IN THE 30th CIRCUIT COURT FOR THE COUNTY OF INGHAM

THE PEOPLE OF THE
STATE OF MICHIGAN,

vs.                                Case No.:  16-1064-FH
                                             16-1065-FC
                         Hon. Clinton Canady, III

TUNC URAZ,
                         Defendant.
_____/

REPORTER'S NOTICE OF FILING TRANSCRIPT

TO:    Court of Appeals Clerk's Office
       PO Box 30022
       Lansing, MI 48909

       30th Circuit Court - Ingham County
       Lansing, MI  48933
       Ingham Prosecuting Attorney's Office

       Susan Kaestner Walsh
       PO Box 96
       Milford, MI 48381

         PLEASE TAKE NOTICE That for the COA memorandum
that I had received emailed today (via appellate atty) dated
June 4, 2018:

For the date of 8-31-16, that should be referred to the lower
court no 16-534-FH, not 16-1064-FH.  For the date of 10-19-16,
there was nothing held on the record.  For the dates of
8-25-15 and 12-20-17, I cannot find those hearings held under
16-1064-FH or 16-1064-FH.

For the dates of 11-2, 11-3, 11-6, 11-7, 11-9 and 1-24-18,
they were previously filed, and a Certificate of Filing was
sent to the Court of Appeals regarding those dates on 6-4-18.

For the date of 12-13-17, I will file that transcript as soon
as possible.

Teresa J. Abraham, CSR-3445
Ingham County Circuit Court
Date:   June 20, 2018

STATE OF MICHIGAN
IN THE 30th CIRCUIT COURT FOR THE COUNTY OF INGHAM

THE PEOPLE OF THE
STATE OF MICHIGAN,

vs.                          Case No.:  16-1064-FH
                                       16-1065-FC
                   Hon. Clinton Canady, III

TUNC URAZ,
                   Defendant.
_____/

REPORTER'S NOTICE OF FILING TRANSCRIPT

TO:    Court of Appeals Clerk's Office
       PO Box 30022
       Lansing, MI 48909

       30th Circuit Court - Ingham County
       Lansing, MI  48933
       Ingham Prosecuting Attorney's Office

       Susan Kaestner Walsh
       PO Box 96
       Milford, MI 48381

        PLEASE TAKE NOTICE That for the COA memorandum
that I had received emailed today (via appellate atty) dated
June 4, 2018:

For the date of 8-31-16, that should be referred to the lower
court no 16-534-FH, not 16-1064-FH.  For the date of 10-19-16,
there was nothing held on the record.  For the dates of
8-25-15 and 12-20-17, I cannot find those hearings held under
16-1064-FH or 16-1064-FH.

For the dates of 11-2, 11-3, 11-6, 11-7, 11-9 and 1-24-18,
they were previously filed, and a Certificate of Filing was
sent to the Court of Appeals regarding those dates on 6-4-18.

For the date of 12-13-17, I will file that transcript as soon
as possible.

Teresa J. Abraham, CSR-3445
Ingham County Circuit Court
Date:   June 20, 2018

STATE OF MICHIGAN

IN THE 30th CIRCUIT COURT FOR THE COUNTY OF INGHAM

THE PEOPLE OF THE
STATE OF MICHIGAN,

vs.                          Case No.:   16-1064-FH
                                         16-1065-FC
                          Hon. Clinton Canady, III

TUNC URAZ,

              Defendant.
_____/

REPORTER'S NOTICE OF FILING TRANSCRIPT

TO:   Court of Appeals Clerk's Office
      PO Box 30022
      Lansing, MI 48909

      30th Circuit Court - Ingham County
      Lansing, MI  48933
      Ingham Prosecuting Attorney's Office

      Susan Kaestner Walsh
      PO Box 96
      Milford, MI 48381

              PLEASE TAKE NOTICE That I have filed, on today's date, in the 30th Circuit Court, in the above-entitled cause, a true and correct transcript dated: December 13, 2017.

_____
Teresa J. Abraham, CSR-3445
Official Court Reporter
Ingham County Circuit Court


Date:    June 21, 2018

<table>
<tr><td></td><td>Distribution of Form:</td><td>Original-Appellate court</td><td>3rd Copy – Appellant/Attorney</td></tr>
</table>

| | Distribution of Form: | Original-Appellate court | 3rd Copy – Appellant/Attorney |
|---|---|---|---|
| Approved, SCAO | | 1st copy – Trial court | 4th Copy - Reporter/Recorder |
| | | 2nd copy – Appellee/Attorney | JIS Code: RRC |

| **STATE OF MICHIGAN**<br>**30th Judicial Circuit – Family Division**<br>**INGHAM COUNTY** | **REPORTER/RECORDER CERTIFICATE OF ORDERING OF TRANSCRIPT ON APPEAL**<br>Appeal to:  ☒ Court of Appeals  ☐ Circuit | **CASE NO.**<br>**16-1064 FH**  343696<br>**16-1065 FC**  343695 |
|---|---|---|

Court Address: 313 W. Kalamazoo Street, Lansing, MI 48933                    Court Telephone: (517) 483-6105

| Plaintiff/Petitioner name(s) and address(es)  ☒ Appellant  ☐ Appellee<br><br>TUNC URAZ | V | Defendant/Respondent name(s) and address(es)  ☐ Appellant  ☒ Appellee<br><br>PEOPLE OF THE STATE OF MICHIGAN |
|---|---|---|
| Attorney, bar no., address and telephone no.<br><br>SUSAN K. WALSH  (P- 40447)<br>ATTORNEY AT LAW<br>P.O. BOX 96<br>MILFORD, MI  48381<br>(248) 563-9149 | | Attorney, bar no., address and telephone no.<br><br>PROSECUTING ATTORNEY<br>INGHAM COUNTY 30TH JUDICIAL CIRCUIT COURT<br>303 WEST KALAMAZOO AVE.<br>LANSING MI  48933<br>(517) 483-6108 |

☐ Probate     In the matter of:     **SEE ABOVE**

---

This certificate must be filed by appellant or reporter/recorder within 7 days on appeals to the Court of Appeals.
This certificate must be filed by appellant within 7 days on appeals to the Circuit Court.

---

I am a certified court reporter/recorder for the court designated above and I certify that:

1. On _____6-20-18_____  ☐ a portion of the   ☒ the complete   transcript of proceedings, taken in this case
   Date

before Judge _____CLINTON CANADY III_____ on _3-22-17_ ____ was ordered by
                                                          Date(s)

☒ a. _____SUSAN K. WALSH_____ , attorney for _____TUNC URAZ_____
         Attorney name (type or print)                          Name (type or print)

☐ b. the appellant, _____
                    Name (type or print)

☐ c. the court.

☒ 2. Payment has been secured and the transcript will be furnished by me _____8-17-18_____
                                                                          Estimated dates of completion

    Estimated number of pages is _____20_____

☐ 3. The transcript has been filed with the court and furnished as requested.  Date filed: _____

☐ 4. There is no record to be transcribed.

I declare that the statements above are true to the best of my information, knowledge and belief.

6-26-18
Date
_Rita Yvette Nicholson_
Reporter/Recorder signature
RITA YVETTE NICHOLSON
Name (type or print)

CER 4732
Certification, designation and number
303 WEST KALAMAZOO STREET
Business address
LANSING MI  48933
City, state, zip

List names, certification designations and numbers, and dates or each proceedings or each reporter or recorder who reported or recorded or transcribed any part of the proceedings:

MCR 7.101©(3)©, MCR 7.210(B)(3)(a)

**MC 501** (3/05) REPORTER/RECORDER CERTIFICATE OF ORDERING OF TRANSCRIPT ON APPEAL

343696

STATE OF MICHIGAN
IN THE 30th CIRCUIT COURT FOR THE COUNTY OF INGHAM

THE PEOPLE OF THE
STATE OF MICHIGAN,

vs.                              Case No.:   16-1064-FH
                                             16-1065-FC
                          Hon. Clinton Canady, III

TUNC URAZ,

                   Defendant.
_____/
            REPORTER'S NOTICE OF FILING TRANSCRIPT

TO:   Court of Appeals Clerk's Office
      PO Box 30022
      Lansing, MI 48909

      30th Circuit Court - Ingham County
      Lansing, MI  48933
      Ingham Prosecuting Attorney's Office

      Susan Kaestner Walsh
      PO Box 96
      Milford, MI 48381

            PLEASE TAKE NOTICE That, through investigating my
steno notes, and through the docketed events from CourtView, I
do not find that there were any hearings held for either
August 25, 2017 or August 28, 2017.

_____
Teresa J. Abraham, CSR-3445
Official Court Reporter
Ingham County Circuit Court


Date:   July 16, 2018

| STATE OF MICHIGAN<br>30TH JUDICIAL COURT<br>INGHAM COUNTY | CLAIM OF APPEAL<br>ORDER APPOINTING COUNSEL<br>Order Amended | CASE NO. AND SUFFIX<br>16-1064 FH |
|---|---|---|

Amended Reason: Correcting transcripts for dates and reporters

**Court Address**

VETERANS MEMORIAL COURTHOUSE, 313 W. KALAMAZOO ST., LANSING, MI 48901

**Court Telephone**

(517) 483-6500

| THE PEOPLE OF THE STATE OF MICHIGAN | Address    Date of Birth: 10/2/1967    Inmate No.: 114653 |
|---|---|
| v | SAGINAW CORRECTIONAL FACILITY<br>9625 PIERCE ROAD<br>FREELAND, MI 48623 |

| Defendant's Name, Last | First | Middle |
|---|---|---|
| URAZ | TUNC | |

| Offense Information | | | | | | Terms of Sentence | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Minimum | | | Maximum | | | | | | Probation | |
| Description | PACC Code | H | C | A | S | Y | M | D | Y | M | D | K | P | J | Y | M | D |
| STALKING - AGGRAVATED | 750.411I | | | | | | 36 | | | 90 | | | | X | | | |

H=Habitual  C=Conspiracy  A=Attempt  S=Solicitation  Y=Year  M=Month  D=Day  K=Consecutive  P=Prison  J=Jail  TS=Time Served

The defendant claims an appeal from a final judgment or order entered on 1/24/2018 in the 30th Circuit Court, INGHAM County, Michigan by Judge CLINTON CANADY 23262. Copies of the final judgment or order being appealed and docket entries are attached for the Court of Appeals, appointed counsel, and Michigan Appellate Assigned Counsel System.

On 1/26/2018, the defendant filed a request for appointment of counsel and a declaration of indigency.

IT IS ORDERED:   SUSAN KAESTNER WALSH 40447       Phone: (248) 563-9149
                 P.O. Box 157
                 Northville, MI 48167

Is appointed counsel for the defendant in post-conviction proceedings. If appointed counsel can not or will not accept this appointment, he/she shall notify the court immediately. Copies of the final judgment or order being appealed and docket entries are attached for appointed counsel and Michigan Appellate Assigned Counsel System (MAACS).

The court reporter(s)/recorder(s) shall file with the trial court clerk the transcripts checked below and any other transcripts requested by counsel in this case not previously transcribed. Transcripts shall be filed within 28 days for pleas or 91 days for trials from the date ordered or requested [MCR 7.210(B)]. Reporter(s)/recorder(s) shall be paid as provided by law.

| Transcripts Ordered | | | Previously | | Court Reporter/Recorder | |
|---|---|---|---|---|---|---|
| Proceeding | Date | Description | Ordered | Filed | Name | Number |
| Hearing | 8/31/2016 | District Court | X | X | AUDIO RECORDING | |
| Hearing | 10/19/2016 | District Court | X | X | AUDIO RECORDING | |
| Arraignment | 1/4/2017 | | X | X | Teresa Abraham | 3445 |
| Pretrial | 1/31/2017 | | | X | Teresa Abraham | 3445 |
| Motion | 2/28/2017 | | | | Sheila Burger | 6651 |
| Pretrial | 3/8/2017 | | X | X | Teresa Abraham | 3445 |
| Pretrial | 3/22/2017 | | | | Yvette Nicholson | 4732 |
| Pretrial | 5/2/2017 | | X | X | Teresa Abraham | 3445 |
| Hearing | 8/15/2017 | | | | Susan Melton | 7548 |
| Motion | 10/11/2017 | | X | X | Teresa Abraham | 3445 |
| Motion | 10/20/2017 | | X | X | Teresa Abraham | 3445 |
| Hearing | 10/31/2017 | | X | X | Teresa Abraham | 3445 |
| Jury Trial | 11/2/2017 | | X | X | Teresa Abraham | 3445 |
| Jury Trial | 11/3/2017 | | X | X | Teresa Abraham | 3445 |
| Jury Trial | 11/6/2017 | | X | X | Teresa Abraham | 3445 |
| Jury Trial | 11/7/2017 | | X | X | Teresa Abraham | 3445 |

CC403 (3/13)                    Page 1 of 2                    MCR 6.425(G), MCR 6.433, MCR 7.210(B)(3)

| | | | | | | |
|---|---|---|---|---|---|---|
| Jury Trial | 11/9/2017 | | X | X | Teresa Abraham | 3445 |
| Status Conference | 12/13/2017 | | X | X | Teresa Abraham | 3445 |
| Sentence | 12/20/2017 | Adjourned | X | | Teresa Abraham | 3445 |
| Sentence | 1/24/2018 | | X | X | Teresa Abraham | 3445 |

The clerk shall immediately send to counsel a copy of the transcripts ordered above or requested by counsel as they become available. The clerk shall forward documents upon request by counsel [MCR 6.433].

7/16/2018                          /S/ Joyce Draganchuk
_____              _____
Date                              Judge   JOYCE A. DRAGANCHUK                        Bar No. 39417

## CERTIFICATE OF SERVICE

I certify that on this date I served a copy of this claim of appeal to appointed counsel, defendant, court reporter(s)/recorder(s), prosecutor, Court of Appeals, and the Michigan Appellate Assigned Counsel System (MAACS). I also served a copy of the final judgment or order being appealed and the docket entries to appointed counsel, the Court of Appeals, and MAACS. I also served a copy of the defendant's request for appointment of counsel to appointed counsel, the prosecutor, and MAACS.

MAACS and appointed counsel have agreed to accept electronic service of this order and related documents through the MAACS electronic case assignment system.

7/17/2018                          /S/ Kristina Brokenshire
_____              _____
Date                              Signature

| STATE OF MICHIGAN<br>30TH JUDICIAL COURT<br>INGHAM COUNTY | CLAIM OF APPEAL<br>ORDER APPOINTING COUNSEL<br>Order Amended | CASE NO. AND SUFFIX<br>16-1064 FH |
|---|---|---|

Amended Reason: Correcting transcripts for dates and reporters

**Court Address**

VETERANS MEMORIAL COURTHOUSE, 313 W. KALAMAZOO ST., LANSING, MI 48901

**Court Telephone**

(517) 483-6500

| **THE PEOPLE OF THE STATE OF MICHIGAN** | Address    Date of Birth: 10/2/1967    Inmate No.: 114653 |
|---|---|
| v | SAGINAW CORRECTIONAL FACILITY<br>9625 PIERCE ROAD<br>FREELAND, MI 48623 |

| Defendant's Name, Last | First | Middle |
|---|---|---|
| URAZ | TUNC | |

| Offense Information | | | | | | Terms of Sentence | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Minimum | | | Maximum | | | | | | Probation | | |
| Description | PACC Code | H | C | A | S | Y | M | D | Y | M | D | K | P | J | Y | M | D |
| STALKING - AGGRAVATED | 750.411I | | | | | | 36 | | | 90 | | | | X | | | |

H=Habitual C=Conspiracy A=Attempt S=Solicitation Y=Year M=Month D=Day K=Consecutive P=Prison J=Jail TS=Time Served

The defendant claims an appeal from a final judgment or order entered on 1/24/2018 in the 30th Circuit Court, INGHAM County, Michigan by Judge CLINTON CANADY 23262. Copies of the final judgment or order being appealed and docket entries are attached for the Court of Appeals, appointed counsel, and Michigan Appellate Assigned Counsel System.

On 1/26/2018, the defendant filed a request for appointment of counsel and a declaration of indigency.

IT IS ORDERED:     SUSAN KAESTNER WALSH 40447        Phone: (248) 563-9149
P.O. Box 157
Northville, MI 48167

Is appointed counsel for the defendant in post-conviction proceedings. If appointed counsel can not or will not accept this appointment, he/she shall notify the court immediately. Copies of the final judgment or order being appealed and docket entries are attached for appointed counsel and Michigan Appellate Assigned Counsel System (MAACS).

The court reporter(s)/recorder(s) shall file with the trial court clerk the transcripts checked below and any other transcripts requested by counsel in this case not previously transcribed. Transcripts shall be filed within 28 days for pleas or 91 days for trials from the date ordered or requested [MCR 7.210(B)]. Reporter(s)/recorder(s) shall be paid as provided by law.

| Transcripts Ordered | | | Previously | | Court Reporter/Recorder | |
|---|---|---|---|---|---|---|
| Proceeding | Date | Description | Ordered | Filed | Name | Number |
| Hearing | 8/31/2016 | District Court | X | X | AUDIO RECORDING | |
| Hearing | 10/19/2016 | District Court | X | X | AUDIO RECORDING | |
| Arraignment | 1/4/2017 | | X | X | Teresa Abraham | 3445 |
| Pretrial | 1/31/2017 | | | X | Teresa Abraham | 3445 |
| Motion | 2/28/2017 | | | | Sheila Burger | 6651 |
| Pretrial | 3/8/2017 | | X | X | Teresa Abraham | 3445 |
| Pretrial | 3/22/2017 | | | | Yvette Nicholson | 4732 |
| Pretrial | 5/2/2017 | | X | X | Teresa Abraham | 3445 |
| Hearing | 8/15/2017 | | | | Susan Melton | 7548 |
| Motion | 10/11/2017 | | X | X | Teresa Abraham | 3445 |
| Motion | 10/20/2017 | | X | X | Teresa Abraham | 3445 |
| Hearing | 10/31/2017 | | X | X | Teresa Abraham | 3445 |
| Jury Trial | 11/2/2017 | | X | X | Teresa Abraham | 3445 |
| Jury Trial | 11/3/2017 | | X | X | Teresa Abraham | 3445 |
| Jury Trial | 11/6/2017 | | X | X | Teresa Abraham | 3445 |
| Jury Trial | 11/7/2017 | | X | X | Teresa Abraham | 3445 |

CC403 (3/13)                    Page 1 of 2                    MCR 6.425(G), MCR 6.433, MCR 7.210(B)(3)

| Jury Trial | 11/9/2017 | | X | X | Teresa Abraham | 3445 |
|---|---|---|---|---|---|---|
| Status Conference | 12/13/2017 | | X | X | Teresa Abraham | 3445 |
| Sentence | 12/20/2017 | Adjourned | X | | Teresa Abraham | 3445 |
| Sentence | 1/24/2018 | | X | X | Teresa Abraham | 3445 |

The clerk shall immediately send to counsel a copy of the transcripts ordered above or requested by counsel as they become available. The clerk shall forward documents upon request by counsel [MCR 6.433].

| 7/16/2018 | /S/ Joyce Draganchuk | |
|---|---|---|
| Date | Judge   JOYCE A. DRAGANCHUK | Bar No.  39417 |

## CERTIFICATE OF SERVICE

I certify that on this date I served a copy of this claim of appeal to appointed counsel, defendant, court reporter(s)/recorder(s), prosecutor, Court of Appeals, and the Michigan Appellate Assigned Counsel System (MAACS). I also served a copy of the final judgment or order being appealed and the docket entries to appointed counsel, the Court of Appeals, and MAACS. I also served a copy of the defendant's request for appointment of counsel to appointed counsel, the prosecutor, and MAACS.

MAACS and appointed counsel have agreed to accept electronic service of this order and related documents through the MAACS electronic case assignment system.

| 7/17/2018 | /S/ Kristina Brokenshire |
|---|---|
| Date | Signature |

CC403 (3/13)                           Page 2 of 2                    MCR 6.425(G), MCR 6.433, MCR 7.210(B)(3)

| STATE OF MICHIGAN<br>30TH JUDICIAL COURT<br>INGHAM COUNTY | CLAIM OF APPEAL<br>ORDER APPOINTING COUNSEL<br>Order Amended | CASE NO. AND SUFFIX<br>16-1064 FH |
|---|---|---|

Amended Reason: Correcting transcripts for dates and reporters

| Court Address | Court Telephone |
|---|---|
| VETERANS MEMORIAL COURTHOUSE, 313 W. KALAMAZOO ST., LANSING, MI 48901 | (517) 483-6500 |

| THE PEOPLE OF THE STATE OF MICHIGAN | Address   Date of Birth: 10/2/1967   Inmate No.: 114653 |
|---|---|
| v | SAGINAW CORRECTIONAL FACILITY<br>9625 PIERCE ROAD<br>FREELAND, MI 48623 |

| Defendant's Name, Last | First | Middle |
|---|---|---|
| URAZ | TUNC | |

| | | | | | | | Terms of Sentence | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Offense Information | | | | | | Minimum | | | Maximum | | | | | Probation | |
| Description | PACC Code | H | C | A | S | Y | M | D | Y | M | D | K | P | J | Y | M | D |
| STALKING - AGGRAVATED | 750.411I | | | | | | 36 | | | 90 | | | X | | | |

H=Habitual C=Conspiracy A=Attempt S=Solicitation Y=Year M=Month D=Day K=Consecutive P=Prison J=Jail TS=Time Served

The defendant claims an appeal from a final judgment or order entered on 1/24/2018 in the 30th Circuit Court, INGHAM County, Michigan by Judge CLINTON CANADY 23262. Copies of the final judgment or order being appealed and docket entries are attached for the Court of Appeals, appointed counsel, and Michigan Appellate Assigned Counsel System.

On 1/26/2018, the defendant filed a request for appointment of counsel and a declaration of indigency.

IT IS ORDERED:   SUSAN KAESTNER WALSH 40447         Phone: (248) 563-9149
                  P.O. Box 157
                  Northville, MI 48167

Is appointed counsel for the defendant in post-conviction proceedings. If appointed counsel can not or will not accept this appointment, he/she shall notify the court immediately. Copies of the final judgment or order being appealed and docket entries are attached for appointed counsel and Michigan Appellate Assigned Counsel System (MAACS).

The court reporter(s)/recorder(s) shall file with the trial court clerk the transcripts checked below and any other transcripts requested by counsel in this case not previously transcribed. Transcripts shall be filed within 28 days for pleas or 91 days for trials from the date ordered or requested [MCR 7.210(B)]. Reporter(s)/recorder(s) shall be paid as provided by law.

| Transcripts Ordered | | | Previously | | Court Reporter/Recorder | |
|---|---|---|---|---|---|---|
| Proceeding | Date | Description | Ordered | Filed | Name | Number |
| Hearing | 8/31/2016 | District Court | X | X | AUDIO RECORDING | |
| Hearing | 10/19/2016 | District Court | X | X | AUDIO RECORDING | |
| Arraignment | 1/4/2017 | | X | X | Teresa Abraham | 3445 |
| Pretrial | 1/31/2017 | | | X | Teresa Abraham | 3445 |
| Motion | 2/28/2017 | | | | Sheila Burger | 6651 |
| Pretrial | 3/8/2017 | | X | X | Teresa Abraham | 3445 |
| Pretrial | 3/22/2017 | | | | Yvette Nicholson | 4732 |
| Pretrial | 5/2/2017 | | X | X | Teresa Abraham | 3445 |
| Hearing | 8/15/2017 | | | | Susan Melton | 7548 |
| Motion | 10/11/2017 | | X | X | Teresa Abraham | 3445 |
| Motion | 10/20/2017 | | X | X | Teresa Abraham | 3445 |
| Hearing | 10/31/2017 | | X | X | Teresa Abraham | 3445 |
| Jury Trial | 11/2/2017 | | X | X | Teresa Abraham | 3445 |
| Jury Trial | 11/3/2017 | | X | X | Teresa Abraham | 3445 |
| Jury Trial | 11/6/2017 | | X | X | Teresa Abraham | 3445 |
| Jury Trial | 11/7/2017 | | X | X | Teresa Abraham | 3445 |

| CC403 (3/13) | Page 1 of 2 | MCR 6.425(G), MCR 6.433, MCR 7.210(B)(3) |
|---|---|---|

| Jury Trial | 11/9/2017 | | | X | X | Teresa Abraham | 3445 |
|---|---|---|---|---|---|---|---|
| Status Conference | 12/13/2017 | | | X | X | Teresa Abraham | 3445 |
| Sentence | 12/20/2017 | Adjourned | | X | | Teresa Abraham | 3445 |
| Sentence | 1/24/2018 | | | X | X | Teresa Abraham | 3445 |

The clerk shall immediately send to counsel a copy of the transcripts ordered above or requested by counsel as they become available. The clerk shall forward documents upon request by counsel [MCR 6.433].

7/16/2018                           /S/ Joyce Draganchuk
_____          _____
Date                              Judge   JOYCE A. DRAGANCHUK                    Bar No.  39417

## CERTIFICATE OF SERVICE

I certify that on this date I served a copy of this claim of appeal to appointed counsel, defendant, court reporter(s)/recorder(s), prosecutor, Court of Appeals, and the Michigan Appellate Assigned Counsel System (MAACS). I also served a copy of the final judgment or order being appealed and the docket entries to appointed counsel, the Court of Appeals, and MAACS. I also served a copy of the defendant's request for appointment of counsel to appointed counsel, the prosecutor, and MAACS.

MAACS and appointed counsel have agreed to accept electronic service of this order and related documents through the MAACS electronic case assignment system.

7/17/2018                           /S/ Kristina Brokenshire
_____          _____
Date                              Signature

STATE OF MICHIGAN

THIRTIETH CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN

vs

                                        File No. 16-1064-FH
                                        File No. 16-1065-FH
                                        Hon. CLINTON CANADY III

TUNC URAZ

                      Defendant.
_____/

NOTICE OF FILING TRANSCRIPT

TO:   Clerk Court of Appeals         Ingham County Prosecutor's Office
      Po Box 30022                   Appellate Division
      Lansing, MI 48909              303 W. Kalamazoo St.
                                     Lansing, MI 48933

      Ingham County Circuit Court    Susan Kaestner Walsh
      Clerk's Office                 Appellate Attorney for Defendant
      313 W. Kalamazoo St., 1st Fl.  PO Box 96
      Lansing, MI 48933              Milford, MI 48381

     PLEASE TAKE NOTICE THAT on July 17, 2018, I filed the 2/28/17
hearing transcript in the above-entitled cause with the Thirtieth Circuit
Court Clerk's Office for the County of Ingham, State of Michigan.

_____
Sheila Burger, CER 6651
Veteran's Memorial Courthouse
313 West Kalamazoo Avenue
Lansing, Michigan 48933
517-483-6300 ext 6310

Approved, SCAO

Distribution of Form:   Original-Appellate court          3rd Copy – Appellant/Attorney
1st copy – Trial court                 4th Copy - Reporter/Recorder
2nd copy – Appellee/Attorney      OSM Code: NFT

| STATE OF MICHIGAN<br>30th Judicial Circuit - Family Division<br>INGHAM COUNTY | NOTICE OF FILING OF TRANSCRIPT<br>AND AFFIDAVIT OF MAILING | CASE NO.<br>16-1065-FC<br>16-1064-FH   343695<br>343696 |
|---|---|---|

Court Address: 313 W. Kalamazoo Street, Lansing, MI 48933 | Court Telephone: (517) 483-6105

| Plaintiff/Petitioner name(s) and address(es)  ☒ Appellant<br>☐ Appellee<br><br>TUNC URAZ | **V** | Defendant/Respondent name(s) and address(es)  ☐ Appellant<br>☒ Appellee<br><br>PEOPLE OF THE STATE OF MICHIGAN |
|---|---|---|
| Attorney, bar no., address and telephone no.<br><br>SUSAN K WALSH (P-40447)<br>ATTORNEY AT LAW<br>P.O. BOX 157<br>NORTHVILLE  MI  48167<br>(248) 563-9149 | | Attorney, bar no., address and telephone no.<br>INGHAM COUNTY CIRCUIT COURT<br>PROSECUTING ATTORNEY<br>303 W. KALAMAZOO AVE.<br>LANSING  MI  48933<br>(517) 483-6108 |

☐ Probate      In the matter of:   **TUNC URAZ**

Instruction: Do not duplicate below the attorney names and addresses provided above.  Use only when there are more than two attorneys.

Attorney name and address

Representing: _____

Attorney name and address

Representing: _____

**NOTE:** A separate notice of filing must be completed by each court reporter or recorder who is filing in this case.

1. On this date I filed in the trial court.

   ☒ a. a portion of the total proceedings taken in this case before   HONORABLE CLINTON CANADY III
   
   Judge

   on   3-22-17
   
   on   _____
   
   Date(s)

   ☐ b. a complete transcript of the proceedings taken in this case.

2. I have notified all above stated parties that the transcript has been filed.

| JULY 27, 2018 | CER 4732 |
|---|---|
| Date | Certification designation and number |
| *Rita Yvette Nicholson* | 303 W. KALAMAZOO AVE. |
| Reporter/Recorder Signature | Business address |
| RITA YVETTE NICHOLSON | LANSING  MI  48933 |
| Name (type or print) | City, state, zip |

**(see other side for Affidavit of Mailing)**

MC 502 (6/04) **NOTICE OF FILING OF TRANSCRIPT AND AFFIDAVIT OF MAILING**          MCR 7.210(B)(3)(e)

**TUNC URAZ 114653 SRF Lock:1200126BOTC  ID:466614347  [P 1/2]**



| You have received a **jpay** letter, the fastest way to get mail |

From   : TUNC URAZ, ID: 114653
To :  aysem uraz, CustomerID: 20469429
Date :  8/22/2018 7:23:16 PM EST,    Letter ID: 466614347   Parent Letter ID: 463260359
Location : SRF
Housing : 1200126BOTC

*09/12/18*

1Motion for Bond  Pending Appeal
State of Michigan
Michigan Court of Appeals Lansing Hall of Justice

People of the State of Michigan
Plaintiff

Lower court Case # 16-001064-FH & 16-001065-FC
Honorable Clinton Canady III
Court of Appeals Docket # 343695 and 343696

VS.

Defendant
Tunc Uraz
#114653

### RETURNED

### SEP 1 8 2018

COURT OF APPEALS
FOURTH DISTRICT
CHIEF CLERK

MOTION FOR BOND PENDING APPEAL

Defendant-Appellant Tunc Uraz moves this court to reduce his bail (never had one, it was cancelled by Judge Canady on  01/04/2017 see the attached #1) and modify his bail for these reasons:
1) On 01/24/2018 , Defendant Tunc Uraz was convicted by jury before Honorable Clinton Canady , judge of Ingham County 30th. Circuit Court, of Aggravated Stalking (MCLS.750.411i) and Solicitation to Murder (MCLS 750.157b)in joined cases before jury trial.
2) Defendant-Appellant is presently incarcerated with the Department of Corrections,pursuant to Court's sentence.
3) The Defendant-Appeal will appeal his conviction to the Court of Appeals by his appeal Lawyer Susan K. Walsh. under the  Court of Appeals dockets numbers 343695 and 343696
4) Under Mich Ct. R. 7.209(B)(2), the  court has the authority to grant bond pending appeal, subject to"applicable law and rules"
5) The Standards for setting bond pending appeal in a criminal matter are set forth in M.C.L. 770.8, which states that "During the time between the trial court judgement and the decision of the court to which an appeal is taken, the court judge may admit the defendant to bail, if the offense charged is bailable and if the offense is not an assaultive crime as defined M.C.L. 770.9a.(see attached #2). The offense at issue here, Solicitation to Murder (MCLS 750.157b) , is not one of the enumerated assultive crimes listed in M.C.L 770.9a. However Aggravated stalking charge (non physical , non- capital crime,.E.class crime ) (MCLS 750.411i) is under M.C.L. 770.8, which he has been locked up for it since August 31st. 2016, he has spent 17 months in Ingham jail and since 01/24/2018 he has been in custody of MDOC total of 24 months.
6) The lower 54 District court has given him  a very high cash assurity bond of $750.000.00 and 2 months later  it was cancelled by Judge Canady (see attached document#1) and he denied a resonable bail completely with two major flaws 1) he failed to determine whether or not the alleged crime (solicitation to murder) is a violent felony for the purposes of the court rule on setting bond MCR 6.106; and 2) the judge did not determine what conditions could be imposed that would assure your appearance to court or the protection of a member of the public. This was an abuse of discretion by the judge. Mr.Uraz  was already lodged in Ingham County Jail at the time of the alleged crime. He always showed up to his court dates and his  passports are still under the custody of Lansing police Department quartermaster.(see the attached police reports #4.) Stalking is a E class crime, non-capital charge MCL 750.411i and solicitation is a( 750.157b)  non-assaultive charge . When lower court  judge Canady  cancelled my very high and unusual bond which is called a "judiciary law making" , "absurd results" doctrine". ( see attached case ppl vs Javens 469 Mich.1032,  2004 #5) Since solicitation to murder is not a violent crime it deserves a PR bond.
6) The general standards for a trial judge's exercise of discretion to grant bond pending appeal are set out Ppl. v. Giacalone, 16 Mich App. 352, 355-57 (1969). Those standards are : Those standards are: (1) the likelihood that defendant will appear when required in response to an order of the court2) the potential of harm to.the community if the defendant is released on bond; 3) the substantiality of the grounds for the appeal; and 4) any risk to the proper administration of justice.
7) Application of these factors to the case at bar should call for the setting of a fair and appropriate bond pending the decision on his appeal:
1) The likelihood that the Defendant-Appellant appear when required is high:

**You have received a jpay letter, the fastest way to get mail**

From   : TUNC URAZ, ID: 114653
To :  aysem uraz, CustomerID: 20469429
Date :  8/22/2018 7:23:16 PM EST,    Letter ID: 466614347   Parent Letter ID: 463260359
Location : SRF
Housing :  1200126BOTC

a) Mr..Uraz is 50 years old. He has lived in the area for 30 years. He has been married for 18 years and he has a 12 year old son .
b) Mr.Uraz  has showed up every court appearance since April of 2016 when this ordeal started never missed a day in court and turned himself to police anytime they were looking for him. He remanded himself to jail voluntarily.
c) Before the aggravated stalking matter in 16-000534 with the complainant in this case, Mr.Uraz had no criminal history. (he only had 2 speeding tickets)
d) Mr.Uraz owned a family home in East Lansing for 15 years and worked gainfully for Michigan State University for 25 years as a full time food service manager and he worked for Lansing Community College for 10 years as a adjunct instructor at Department of Business teaching Hospitality classes.
e)If released Mr.Uraz :
1)He is  willing to wear ankle GPS monitoring at all times and he has worn one voluntarily in August 2016.
2)  home confinement, if necessary live with an acquaintance who can vouch for his where abouts at all times.
3) If court determines a half way house with a work release program with no social passes,  Mr.Uraz is very willing to payback his court costs, fines, fees and restitution to the imposed by the courts  and send money to his family in Turkey for his son's needs.  Mr.Uraz would seek and maintain employment at all times once released.
4) If necessary Mr.Uraz is willing to. live in another location (city or town) if the court chooses and  if the court determines for the safety of the  complainant.
5)His passports are already at Lansing Police Department Quartermaster since July of 2016. (see judges orders # 6)
6) That if necessary Mr. Uraz would report to Pretrial services and his probation officer weekly and be placed weekly drug and alcohol monitoring program. (Mr.Uraz never used any illicit, illegal  drugs in his life time)

RE

SEP 1 8 2018

COURT OF APPEALS
FOURTH DISTRICT
CHIEF CLERK

**jpay** Tell your friends and family to visit www.jpay.com to write letters and send money!

TUNC URAZ 114653 SRF Lock:1200126BOTC  ID:466614343  [P 1/2]

---

**You have received a *jpay* letter, the fastest way to get mail**

From   : TUNC URAZ, ID: 114653
To : aysem uraz, CustomerID: 20469429
Date : 8/22/2018 7:23:16 PM EST,    Letter ID: 466614343
Location : SRF
Housing : 1200126BOTC

**RETURNED**

SEP 1 8 2018

COURT OF APPEALS
FOURTH DISTRICT
CHIEF CLERK

2Motion for bond Pending on appeal

7) Although Mr.Uraz completed 6 months of Correctional Assessment Treatment Services program (CATS) completed Substance Abuse classes (see attached certificate #7) at the county jail through Center for Mental Health in Ingham County. He is willing to continue to receive mental health therapy for his substance. He continues to see a mental health consular at MDOC  since he has been incarcerated. (see attached notes#8).

8) Mr. Uraz attended A.A. (Alcoholic Anonymous #9) meeting for a full year every week and N.A. classes (Narcotic Anonymous #10) for a full year every week. Please see the attached singed sheets while incarcerated in jail for 17 months.

9) Mr. Uraz completed Anger Management and Parenting programs at jail for 6 months(please see the attached.certificates. #11,#12)

10).Mr.Uraz believes in community service once he is released he will volunteer his time with community service and/or church volunteer events to help the needy, poor and sick.

11) Mr.Uraz is also became  Block Representative for his unit where he meets with warden once month to discuss issues and suggestions. (see the attached sample program #13).

12) Mr. Uraz would like. to meet to his appeal attorney regularly to effectively prepare for his appeal, because of the cruel and unusual punishments,  restrictions he received as a "pretrial detainee" during incarceration at the county jail.Please read below:

 Mr. Uraz was put on administrative segregation  by the magistrate of the Ingham County court to be cut off from the world completely, he was put on phone restrictions by the court when he was remanded to jail on alleged complainant which landed him in "solitary confinement" for the first 6  months (any solitary confinement more than 15 days is considered a torture by Human Rights Organization which U.S.A signed the declaration by United Nations)  of his incarceration, he had alcohol and xanax withdrawals and he was not allowed to purchase any jail commissary food items for 2 months  and where he had hunger withdrawals due to his diabetic type.II condition,  where the courts and my lawyers ignored his several requests for  mental forensic competency for criminal responsibility which was never done for him and he was not even allowed to call his lawyer because of the phone restrictions in jail and during his both court arraignments when he asked to.call his lawyer his request was denied by jail and police.

(he had to send letters and cards to reach out to his attorneys), he was forced to speak English only to his 12 year old son and his family who resides in Turkey on his once week 15 min. approved video visits which were monitored by jail deputies at all times and it was to be cancelled if spoken Turkish.His letters and cards which were received and sent were subjected to inspection and censorship if it was written in another language other than English.His family and friends  were forced to write in English so that he could receive their correspondence. When the Turkish embassy wanted to visit they were denied until the courts approved it and again every visit was accompanied by a deputy to made sure that we spoke English. This is against the Vienna Convention of Counsular Relations Article 36.

Any American Prisoner in Turkey are forced to speak "Turkish" to their family and friends in U.S.A.?  so that they don't conspire with them? or any letters or cards they write are censored?

Also his video visits were translated by Lansing Police department and it cost them $1400.00 because of costs reasons he was also told to speak English if not,  he was told that he would pay the cost of translations from Turkish to English.(see the attached court order). None of these stipulations fits the Turner standards

This "Hannibal Lector" treatment continued for 12 months in jail: when I was sentenced for my first ever felony I was not given an option for "earned early release" or release on tether option after 3 months or work for time off from one's sentence which all these options are given to any other in mater 6 months or less time.

 Finally Mr.Uraz's courts appointed attorney declared himself mentally incapacitated (Jacob A. Perrone) 4 days after the trial  bipolar disorder and schizophrenia (see the court documents and hospital records).Because of this Mr.Uraz did not receive an adequate representation before, during and after his trial. His sentencing attorney was a different one which was appointed by judge. (with all respect no one becomes mentally incapacitated overnight, it is a life time struggle).

Because of the latest Turkish currency took hard hit due to custom tariffs and regulations by U.S.and the crises over American Pastor who was just released to house arrest with a tether as well yet he is accused of treason and coup.attempt against Turkish government.

There is no risk to the administration of justice if the Defendant-Appellant is released on bond pending resolution of his appeal fails, he must return to prison and serve out the sentence ; bond pending appeal will provide the opportunity, in that eventuality, to make better provision for his U.S. born  son's and wifes's care, safety to be taken out of foster care, prepare effectively for appeal, get an gainful employment to pay back his court fines, fees costs and restitution.

Mr.Tunc Uraz meets the statutory and case law standards for bond pending appeal.

---

TUNC URAZ 114653 SRF Lock:1200126BOTC  ID:466614343  [P 2/2]

*You have received a jpay letter, the fastest way to get mail*

From : TUNC URAZ, ID: 114653
To : aysem uraz, CustomerID: 20469429
Date : 8/22/2018 7:23:16 PM EST,    Letter ID: 466614343
Location : SRF
Housing : 1200126BOTC

For these reasons, Defendant-Appellant  asks that this court grant his motion for Bond and, stay the remaining portion of his sentence, pending resolution of the appeal, this honorable court  enter an order to Michigan Department of Corrections providing for his immediate release on personal recognizance.

Respectfully Submitted
Pro Se
Tunc Uraz 114653
SRF
9625 Pierce Rd.
Freelannd, MI 48623

RETURNED

SEP 1 8 2018

COURT OF APPEALS
FOURTH DISTRICT
CHIEF CLERK

*jpay Tell your friends and family to visit www.jpay.com to write letters and send money!*

343695-L

STATE OF MICHIGAN
IN THE 30th CIRCUIT COURT FOR THE COUNTY OF INGHAM

THE PEOPLE OF THE
STATE OF MICHIGAN,

vs.                              Case No.:   16-1064-FH
                                             16-1065-FC
                          Hon. Clinton Canady, III

TUNC URAZ,

                         Defendant.
_____/
          REPORTER'S NOTICE OF FILING TRANSCRIPT

TO:    Court of Appeals Clerk's Office
       PO Box 30022
       Lansing, MI 48909

       30th Circuit Court - Ingham County
       Lansing, MI   48933
       Ingham Prosecuting Attorney's Office

       Susan Kaestner Walsh
       PO Box 96
       Milford, MI 48381

          PLEASE TAKE NOTICE That I have filed, on today's
date, in the 30th Circuit Court, in the above-entitled cause,
a true and correct amended transcript dated: May 2, 2017


_Teresa J. Abraham (ss)_____
Teresa J. Abraham, CSR-3445
Official Court Reporter
Ingham County Circuit Court


Date:    October 22, 2018

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,

                    Plaintiff,

vs.                       CASE NO:   16-1064-FH
                                     16-1065-FC

TUNC URAZ,

                    Defendant.
_____/

   HONORABLE CLINTON CANADY, III, CIRCUIT JUDGE
   LANSING, MICHIGAN -- TUESDAY, MAY 2, 2017

                    AMENDED
                    PRETRIAL

APPEARANCES:

FOR THE PEOPLE:

CHAZ T. KOOP, JD
Assistant Prosecuting Attorney
Prosecuting Attorney's Office
313 W. Kalamazoo
Grady Porter Building
Lansing, Michigan 48933


FOR THE DEFENDANT:

JACOB PERRONE, JD
Perrone Law, PC
221 W. Lake Lansing Road, Ste. 200
East Lansing, MI 48823

ERIC SCHROEDER, JD
BODWIN & ASSOCIATES PC
2970 E. Lake Lansing Rd.
East Lansing, MI 48823-7415


Reported by:  Teresa J. Abraham, CSR-3445
Phone:  (517)483-6404   e-Mail: tjabraham@msn.com

2

I  N  D  E  X

WITNESSES:

HALIME URAZ

Direct Examination by Mr. Perrone          20
Cross-Examination by Mr. Koop              26

EXHIBITS:

Exhibit #     Description      Received

None.

3

Lansing, Michigan

May 2, 2017

at about 2:44 a.m.

*********

THE COURT:  This is the time set for pretrial on behalf of Mr. Uraz.  Mr. Koop is here. Mr. Perrone.  On file 16-1064-FH and 16-1065-FC. And you are Tunc Uraz, sir?

THE DEFENDANT:  Uraz, yes.

THE COURT:  What are we doing today, Mr. Perrone?

MR. PERRONE:  I have a pretrial order for Your Honor.

THE COURT:  These are final pretrials, right?

MR. PERRONE:  Due to the fact that I was appointed at the last final pretrial.

THE COURT:  And he adjourned to this time. He's not going to kick it to the road.

So this is the final pretrial from me. That's why I adjourned it.  You've been with the case throughout, even though you may not have been with this portion of the case.  But you were here at every proceeding.  Mr. Nichols was here with every discussion.  So I won't be setting it

4

up for another pretrial.

MR. PERRONE:  That's correct, Your Honor. I got the file from Mr. Nichols.  It is about a foot tall, as far as reviewing.

THE COURT:  I'm not going to give another final pretrial.  We can set it for trial today and my final pretrial policy will be in effect.

MR. PERRONE:  I have a number of motions that are necessitated based upon my review of the file.

THE COURT:  You still can file the motions, but today is the final pretrial.  I'm not prohibiting you from filing motions.  I won't accept any pleas to reduced charges after today. That's where we stand.

MR. PERRONE:  I have spoken with Mr. Uraz, and he -- the nature of this being the final pretrial, I have conveyed the plea offer to him, and at this point in time it is his intention to exercise his right to trial.

THE COURT:  Okay.  For the record, why don't we just have Mr. Koop indicate what the final offer by the Prosecution is.

MR. KOOP:  Well, it's a final offer in the solicitation of murder case, 16-1065-FC.  The

Defendant would plead guilty to one count of solicitation of murder, with a Killebrew sentence agreement that the Defendant be scored at an A grid cell, C-3, which places him at an 81 to 135 months.

In exchange, the People would dismiss the balance of the Information, as well as the -- dismiss file 16-1064-FH, which is the aggravated stalking case.  That is the extent of the agreement at trial.

On a conservative estimate, I have him at 135 to 281 months.  But it could very well be higher, depending on how the OVs are scored.

THE COURT:  So, Mr. Uraz, what we have here is there really is no offer of a plea to a reduced charge today.  You are charged with several counts of solicitation of murder.  So there are no reduced charges.  But more importantly to you, there is a Killebrew proposal by the Prosecution that would have your guidelines be 81 to 135 months on the A grid, and a C-3 cell as part of the plea.

Now, without the Killebrew agreement, Mr. Koop, would you tell us what his guidelines would be again?

6

MR. KOOP:  Conservatively, 135 months to 281 months.  But I think it very well could be higher, depending on OVs.

THE COURT:  There is no plea to reduced charges, no reduced charges offered.  That's really not the issue.  The issue is the sentence bargaining.  So I would not participate in any sentence bargaining after today.  So that means you would be at the low end of the guidelines, 135 to 200 some odd months.  Versus if you accept this plea offer, you would have a guideline of 81 to 135.

I've already told Mr. Nichols I would probably be inclined to go to the low end of the guidelines.  Probably will be 81.  I think we had that discussion before.  At least I had that discussion with the attorneys.  That's where we are.

So today is the day, if you're going accept the plea or not.  After today we will go to trial.  I will not participate in any sentence bargaining after today.

THE DEFENDANT:  I understand.  I would like to go trial, Your Honor.

THE COURT:  All right.  I have been handed

7

this pretrial statement.  You're charged with solicitation of murder, three counts as an habitual second.  The People will file a witness list prior to trial.

Copies of reports have been provided.  No copies of confessions or intent to use 609, similar acts.  The Prosecution probably will attempt to introduce similar acts.  They have to file a motion to do that, set forth what these acts might be.  In this case it could be the prior conviction of stalking and soliciting Information, as to whether or not that's relevant or not to this case.  I would have to make that decision.  You could not do it by themselves. They would have to file the motion, give notice to everybody, and then we would have a hearing. I would make a determination on that. Understand?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  Also, they could file 404(B).  So that is other acts of a similar nature that may not have resulted in any charge or conviction.  So what that means is the Prosecution could, again, after filing a motion, attempt to introduce evidence of other similar acts that gave

8

rise to this charge, that did not result in any type of charges or conviction on your part.

Again, the Prosecution would have to file a motion, and they would have to have a hearing to determine whether or not I was going to allow that testimony.  Understand?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  You've heard the Killebrew agreement, or request of the Prosecution earlier this afternoon; is that correct?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  The matter is set for jury trial.  It's my understanding there's no competency or criminal responsibility issues.  I guess Mr. Perrone is still exploring if there are any special defenses, but it doesn't appear if there are.  He wants to file a pretrial motion.

How long do we think this trial will take?

MR. KOOP:  I would say about a week.

MR. PERRONE:  I would say closer to two, from my perspective.

THE COURT:  I already told Ms. Hoover that will be the case.  I have three capital cases in front of you already.  That means we would go to -- it's going to be at least five or six days?

9

MR. KOOP:  I think after all of that, I think Mr. Perrone is a little more accurate.

THE COURT:  Let me just make a record.  So far on our docket we have two, three, now three capital cases that are all scheduled to last longer than one week.  We're now at May 2nd, and we have a CSC trial, a capital offense.  We have four capital offenses that are going to trial on June 19th.

We have People v Williams, which is not a capital offense, but it's a case that is much older than this one.  The case involving People v Embry is going to trial in July.  We have a murder trial with People v Thomas, that's going on the 21st of August.  We have the murder trial on Grant Taylor that's expected to take three to four weeks, that's going on September 5th.  We have a capital offense of People v Derrick that's scheduled on October 23rd for about a week and a half.  Then we are into the holiday season.

This is going to take at least two weeks.  We are going to set this Thursday, November 2nd, commencing at 8:30.  All motions need to be heard before trial.  All right?  So we are going to set the matter for trial on November 2nd.

10

Pretrial is set for November 2nd, Mr. Uraz. See you there.

MR. PERRONE: Two things that I did not include in there, that we have a couple issues that he would like to address, the two things I did not include in there. And just to preserve the record adequately, from my perspective, in order to preserve the record, will file a 180-day motion. Also, a speedy trial motion. And also I am going to file a bond motion.

Understand, I'm not going to address the specifics of the cash bond today. But looking to file a motion associated with his bond in the near future to address that aspect, I would like to address the prior order regarding restrictions associated with his phone privileges.

As I understand it, currently, the last order he has -- his level in the Ingham County Jail has decreased since the last time we here, as he has comported his behavior to the expectations of the jail administrators and deputies. He is currently prohibited from speaking Turkish on the phone, and limited to visitation only with his sister and his son. His sister is in the courtroom today, and can attest

11

to the fact that she is not likely going to be a co-conspirator in any further allegations, if they're made.  We are not going to have her here. She is here from Turkey.  His brother is also here, who would also like to have the ability to visit.  He can attest to, again, his current standing, and the realistic unlikelihood of them being any type of co-conspirators, if they are to speak in Turkish.  It is their native language.

His son, he would also like the ability to speak with his son in Turkish.  I don't anticipate that there's going to be any issues with his son trying to perpetuate any further issues.  I'm hoping that we can potentially clear that order up a little bit.

He also, as I understand it, outside of that order, would qualify for four weekly visits. That would be done via the Securus system, based on what the jail has indicated to myself and also the Turkish Embassy.

As far as the visiting list is concerned, if that's something that Your Honor believes is appropriate to restrict, we would like to ensure that we have allowed for his sister and his brother and any representatives of the Turkish

12

Embassy to have the ability to have those visits

via Securus, either onsite or remotely.  And I

think if we can take advantage of this

opportunity, given that his sister has traveled

from Turkey in order for Your Honor to get a

better understanding --

THE COURT:  Didn't she meet with him today?

She had permission for them to meet today?

THE DEFENDANT:  Yes, thank you.

MR. PERRONE:  That's correct, Your Honor.

We are looking into November.  From my discussions

with Ms. Uraz, his son is experiencing some

behavioral issues back home.  And --

THE COURT:  Didn't he already have

authority to talk with his son and his sister?

MR. PERRONE:  He did.

THE COURT:  Then we already have them in

his list.

MR. PERRONE:  Sometimes they get into

heated family disputes.  The call gets cut off

because he reverts to his native tongue.  And due

to the current order continuing a visit that he

speaks in Turkish, if Ms. Uraz had the ability to

at least address the Court, that could potentially

sway your opinion on whether or not that's going

13

to attempt to perpetuate any further --

THE COURT:  Well, the difficulty is, how would we know.  We had that discussion when this was put to me before.  I tried to reach a reasonable compromise for Mr. Uraz.  I think I let him have everything but the laptop, all right, which all these things were elements in the offense, the alleged offense.

So we got the telephone, that's an element.  We got the laptop, that's an element.  So all those were elements.  There is no way we can monitor that.

Let's hear from Mr. Koop.

MR. KOOP:  Well, Your Honor, as I recall, the speaking Turkish, that was a stipulation that the Defense proposed he wouldn't do.  And he agreed to that.  And further agreed that if he -- these were things he presented so he could get privileges back.  But now he wants that not to be a condition anymore.

And he further stipulated before that if he spoke in Turkish, he was going to be the one that paid for it.  So he was making all these proposals to the Court about him not speaking in Turkish.  So I find it, I guess, disingenuous to

14

say it was a, number one, a prohibition.  But, number two -- I'm a little blindsided by this. Now that he doesn't want to speak in English, I would like a more full hearing on it than just shooting from the hip right now.

THE COURT:  Mr. Perrone?

MR. PERRONE:  In regards to addressing the issue into a full hearing, given the strength associated with Ms. Uraz and her travels, if we could preserve her testimony, at least minimally, so that Your Honor has the ability to gauge whether or not --

THE COURT:  We will have to come back.  I don't have any problem preserving her testimony. But we will have to come back to that.

MR. PERRONE:  Beyond that, just to articulate for the record, as I understand it, there are considerable issues associated with his son in Turkey, where there is potential that his ex-wife is not going to have the ability to retain custody.  And that his son may become a ward of the State given the allegations if, on the precipes that were occurring then, had this case occurred in the United States, generally he would have been entitled, and would have a right to have

some involvement in those proceedings.  Whereas, since he is in the United States now, and is pretty far away from Turkey, he would not have the same ability.  So I would try to facilitate active communication between the Turkish Embassy and --

THE COURT:  He already has the ability to communicate with his son.  We have not restricted that.  If he wants to participate in some type court proceedings in Turkey and pay for it, I don't have any problem with that.  I assume that probably would be in Turkish with the authorities there.  But I don't have any objections with the Consulate being involved.  The Consulate has been actively involved in the case.  I don't have any problems adding the brother to the list.  But for right now I'm going to stick with the English requirement.

MR. PERRONE:  Just to respond briefly to Mr. Uraz agreeing that he would not speak the native language, I think this is somewhat of a human nature issue.  This is something he was not actively trying to do.  But when getting in heated family arguments, again, human nature sometimes precipitates us reverting --

THE COURT:  He might, but I think they cut

16

him off.  That's what it was.

MR. PERRONE:  Any speaking that he did in the Turkish language was not done intentionally by him.  It was done in the heat of the moment, and --

THE COURT:  No one wrote him up.  Nobody accused him of anything.  Nobody made him lose his privileges.  It's my understanding that the call was cut off at that point.  So the next time he was still able to resume, but he didn't really suffer any consequence from his agreement.

I think we tried, with a bad situation, we tried to work to the best of our ability here. So even though I believe it was on one or two occasions where he spoke Turkish, they cut him off.  But they did not restrict him after that. He still could call, as long as he had spoken English.  There is just no way we can know what he's saying.  And this is the whole nature of this case, using the phone, allegedly, to solicit people.  So there is just no way that we can tell -- we don't have a person or officer on duty to speak Turkish.

MR. PERRONE:  More than understandable, Your Honor.  I wanted the Court to take his time,

17

and to thank you on behalf of the family for facilitating the visitation today. I think that that goes a long way in their minds as to how the proceedings are being handled, as this is a matter that is being looked at from a number of people in Turkey as to how this system works versus the Turkish system. So I think that that is a --

THE COURT: If they have some court hearing or something, if he wants to pay for it, I'm sure we aren't going to pay for it. If he wants to pay for it, we will allow him to participate.

MR. PERRONE: As far as preserving testimony?

THE COURT: We will do that later. I have other people waiting. We can do it today. But we are going to take these other cases first.

MR. PERRONE: Okay. Thank you, Your Honor.

THE COURT: All right.

THE DEFENDANT: Can I say something?

THE COURT: You can, but you have to check with Mr. Perrone to see if he wants you to say it first.

THE DEFENDANT: In regard to the order, since he is currently restricted, as far as visiting, we are making requests that the order be

18

added to allow for four weekly visits, instead of the restrictions that are currently in place.

THE COURT:  What are the restrictions?  I think he is eligible weekly, anyways.  I don't know if the restrictions are on the number.

THE DEFENDANT:  Once a week.

THE COURT:  That's what it is, once a week.  That's the jail policy, not mine.  Once a week, that's what any resident in jail would get.

THE DEFENDANT:  He gets four, Your Honor.

THE COURT:  I don't know.  I think it's once a week.

MR. PERRONE:  My understanding, the one visit is based upon what's included in the order.  The jail is acting in accordance with the order instead of their policy that allows for the additional visitation.  As long as it's appropriately scheduled.

MR. URAZ:  I know everybody gets one, everybody gets three visits when they come to the jail.

THE COURT:  Well, if they come to the jail, that's different.  The issue is we still have difficulty monitoring.  So you would have to speak in English.  If they come to the jail -- I mean,

19

they're here now.  How long are you going to be here?

THE DEFENDANT:  They are leaving tonight.

MR. PERRONE:  Leaving tonight?

THE COURT:  I can't get them out there today.  So we got the visit downstairs today.

MR. PERRONE:  I would like to thank the Sheriff's staff, also, to facilitate.

THE COURT:  Right.  We agreed to accommodate you.  We will come back to this and make a record.  We will come back to it.

THE DEFENDANT:  Thank you.

THE COURT:  All right.

MR. PERRONE:  Thank you, Your Honor.

THE COURT:  So, on the record, everybody knows the trial date is November 2nd.

THE CLERK:  At 8:30.

(Proceedings concluded at 3:07 p.m.)

(Back on the record at 3:25 p.m.)

THE COURT:  All right we are returning to the matter of People versus Uraz.  Two files. 16-1064-FH and 16-1065-FC.

Mr. Perrone wanted to call Mr. Uraz' sister for testimony?

MR. PERRONE:  That's correct, Your Honor.

The Defense calls Halime Uraz.

THE COURT:  Come over here for me, ma'am. Raise your right hand and be sworn by the clerk, please.

THE CLERK:  Do you swear or affirm to tell the truth, the whole truth, under penalty of perjury?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Have a seat.  We need you to spell both your first and last name for the Court Reporter, please.

THE WITNESS:  Halime Aysem Uraz.  Am I going to spell it for you?

THE COURT:  Spell it for her, yes.

THE WITNESS:  The first name is H-A-L-I-M-E and the second name is A-Y-S-E-M.  The last name is U-R-A-Z.

THE COURT:  Mr. Perrone?

HALIME URAZ,

a witness duly sworn to testify under oath as follows:

DIRECT EXAMINATION

BY MR. PERRONE:

Q   Ms. Uraz, where do you currently live?

A   I currently live in Turkey.  We are here for just

21

two days for this Court.

Q   Are there any issues that are going on with Tunc Uraz' son currently, that you're aware of?

A   Yes.  Actually the government authorities called from the Administrator's Family and Social Services.  And there is a complaint about his wife and son.  They are fighting or yelling at each other all the time.  And the neighbors are complaining about the voices.  And they are also afraid of that, and his wife is applying guidance to his son.  The government is thinking to take back son from the mother.  And they are going to put him to other places to protect his son.

Q   How did you become aware of those issues?

A   Actually, the building of the manager called me and warned about this issue.  And later the manager gave my phone number to the Social Services.  And they called me.  And they also asked me to come there and give some expiration(sic).

        THE COURT:  Explanation?

        THE WITNESS:  Explanation.  Yes.  On the situation.  And that's it.

        Actually, I'm not good with his wife, because she doesn't want to see me, or contact

22

with me.  And I am only dealing with his son's school businesses, and providing some -- helping for their monthly living standards.  I'm providing some money to pay for their invoices and other things.

THE COURT:  Paying their living expenses?

THE WITNESSES:  Yes.

Q    (MR. PERRONE) In regard to the education, are you involved with his schooling, or just with financial resources?

A    Yeah.  I'm also concerned with his school and paying the physician -- school fee, I'm paying. I am sorry.

Q    How often are you able to see him outside of the process associated with the State?

A    Actually two weeks.  Every two weeks I try to see his son.

Q    From your perspective, is his mother a -- is Mr. Uraz' son's mother a positive role model to him?

A    Actually, I don't think so.  She has some mental problems.  She doesn't go to any doctor or somewhere.  So we didn't prove that she has psychological problems.

Q    Has the government spoken with you about the

23

ability if his son were to become a ward of the State, whether or not you would be able to maintain some form of custody or another family member that you are aware of?

A   Actually, they didn't ask, because they're waiting for the Court decisions, because they are asking some mental reports from his wife.  And according to that, probably they are going to decide whether to take care of his son by myself or the government will take care of his son.

Q   But you're going to participate in those proceedings in an effort to attempt to gain custody of Mr. Uraz' son?

A   Yes.

Q   And have you been the primary contact for Mr. Uraz in regards to who's associated with his son?

A   Yes.

Q   What is your native language?

A   Turkish.

Q   When did you learn English?

A   In the university.

Q   How long ago?

A   Twenty years ago.

Q   How often, on a daily basis, do you use the English language?

24

A    Not very, actually.

Q    How would you classify your English for proficiency?

A    Intermediate, actually.  But not very fluent in it.  I mean, I can understand some of the things. But sometimes I have to specifically express myself.  I prefer to speak in my own language, because it's sometimes hard to find the legal word with what's going on regarding his son.

Q    Has that proved to you to be an impediment to communicating with Mr. Uraz?

            THE COURT:  Impediment means that you are not as good in communicating with him in English as you would be in Turkish.

            THE WITNESS:  Yes.  I prefer speaking in Turkish.  It's hard for me to speak in English to him.  Sometimes I'm unable to explain everything to him.

Q    (MR. PERRONE) In your communications with Mr. Uraz, has he, in any way, encouraged or requested that you take any actions in order to prevent any witnesses associated with this case from appearing?

A    No.

Q    Has he indicated to you or encouraged you to do

25

anything as to the individual that is the complaining witness in this case?

THE COURT:  That's the person who brought the case is the complaining witness.  He is asking if he has asked you to contact her in any way.

THE WITNESS:  No.

Q    (MR. PERRONE) What is your current job?

A    Actually I am working with as an assistant with the Turkish Cement Manufacturers Association.

THE COURT:  Where?  Turkish is a little faster than --

THE WITNESS:  There is an association regarding the Turkish Cement Manufacturers Association.

Q    (MR. PERRONE) And you don't have any intent in this matter attempting to intervene in these proceedings other than to provide support and communicating with Mr. Uraz as to the current status of his son's issues with the proceedings that are currently going on in Turkey?

THE WITNESS:  Um-hum.

THE COURT:  You have to say "yes" for the Court Reporter.

THE WITNESS:  Yes.

26

Q      (MR. PERRONE) Yes?

           THE COURT:  She said it.

           THE WITNESS:  Yes.

           MR. PERRONE:  I don't have any other
further questions.

           THE COURT:  Mr. Koop, do you have any
questions?

                    CROSS-EXAMINATION

BY MR. KOOP:

Q    At the -- Mr. Uraz talked about his prior case
where he was convicted of the aggravated stalking?

A    Before?

Q    Correct?

A    Entering the jail?

Q    Correct?

A    Actually, he didn't mention about his
relationship before.

Q    Okay.  Has he since talked to you about his
relationship?

A    Excuse me?

Q    Has he since talked to you about this
relationship?

           THE COURT:  He has been in jail.  Has he
told you about why he got there?

           THE WITNESS:  Actually, no.  I got the

27

information from the lawyer.

Q    (MR. KOOP) Has he talked to you about this case at all?

A    Yes.  We were talking about it, because we are just wondering what's going on.  But basically I couldn't have any chance to talk to him because he was restricted for months or six months or something.  So I'm getting all the information from his lawyer.

Q    Okay.  And in regards to the custody matter, have you also informed the Turkish Courts about Mr. Uraz currently being incarcerated?

THE COURT:  That he's in jail.  Have you told the Turkish family court that Mr. Uraz is in jail?

THE WITNESS:  Yes.  They know that.  I can ask for paper or something from them, if you would like?

MR. KOOP:  Nothing further.  Thank you.

THE COURT:  How old is Mr. Uraz' son?

THE WITNESS:  Eleven.

THE COURT:  So is he living at home now or he is living in state custody?

THE WITNESS:  Actually, he is living at home right now.

28

THE COURT: Under supervision with Family Services?

THE WITNESS: Yes.

THE COURT: While they're doing testing on the mother?

THE WITNESS: Um-hum.

THE COURT: And then they will make decisions as to whether or not she is going to be able to keep him at that point?

THE WITNESS: Yes.

THE COURT: Have they indicated to you that if she is unable to keep him, that he would be considered for placement?

THE WITNESS: Yes. They are calling his wife all the time. She did not ask for all the forms. And probably they will get the necessary action about that.

THE COURT: Okay. All right. I don't have any other questions.

THE WITNESS: Thank you.

THE COURT: Let me talk to the attorneys, please.

(Off the record discussion at the bench.)

THE COURT: Okay. We are resuming on Mr. Uraz, 16-1065-FC and 16-1064-FH.

So, Mr. Uraz, I had a conversation with the attorneys in this matter about this amount of time you're facing if you don't prevail.  So I'm just -- you know, I'm just a judge.  I try cases.  You can go to trial.  But sometimes I think parties have to look at the amount of time that they're looking at.  That's a lot of time.

You got a son that's 11 years old.  So, I mean, if you go to trial, it's not likely you're going to be able to see the son if you don't prevail.  Okay?  So that's one of the things I was talking about, trying to see if there was some instruction we could come with that you could live with.  We haven't been able to do that.  So that's where we are.  Okay?

THE DEFENDANT:  Okay.

THE COURT:  So I'm going to set this for a status conference.  So we will still keep the trial date that we have.  But we're going to set it for a status conference on August 15th at two.  So we will come back and see.  Maybe the parties can come up with some resolution that will benefit everyone.  Give you some opportunity to see your son before he grows up.  So under the current proposal, it's not likely.  Maybe there's some

other proposal.  Maybe you can -- well, I guess I don't want to say it.  Okay.  Thank you.  All right?

        MR. PERRONE:  We can talk about it later.

        (Proceedings concluded at 3:52 p.m.)

31

STATE OF MICHIGAN          )

COUNTY OF INGHAM          )

          I, TERESA J. ABRAHAM, Certified Shorthand Reporter in and for the County of Ingham, State of Michigan, Thirtieth Judicial Circuit Court, do hereby certify that the facts stated in the foregoing pages are true and correct, and comprise a complete, true and correct transcript of the proceedings taken in this matter on this the 2nd day of May, 2017.


_Teresa J. Abraham (SS)_
_____
Teresa J. Abraham, CSR-3445




Date:   October 19, 2018

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM**

People of the State of Michigan,

Plaintiff,

     VS.                                             Case No.: 16-1064-FH

Tunc Uraz,

Defendant.

_____/

TO:   Circuit Court File
       Michigan Court of Appeals
       Ingham County Prosecutor's Office

**RECORDER'S NOTICE OF FILING OF TRANSCRIPT-AMENDED**

I, Susan Melton, Certified Court Recorder, do hereby certify that I filed on September 07, 2018 with the Ingham County Circuit Court, a complete and accurate transcript of the proceedings taken in the above-cause entitled actions that were held before the Honorable Clinton Canady on the date of August 15, 2017. Please take notice that I notified the above listed parties the transcripts have been filed.

_Susan Melton_

Susan Melton-CER 7548
Ingham County Circuit Court
313 W. Kalamazoo St.
P.O. Box 40771
Lansing, Michigan  48901

Date:  October 25, 2018

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN

            Plaintiff-Appellee

-vs-

**TUNC URAZ,**

            Defendant-Appellant.

                               /

**Lower Court No.s** 16-1064 FH & 16-1065 FC

**Honorable Clinton Canady III**
COA# 343695 & 343696

**INGHAM COUNTY PROSECUTOR**
Attorney for Plaintiff-Appellee

**SUSAN K. WALSH (P40447)**
Attorney for Defendant-Appellant

**BRIEF ON APPEAL AND IN SUPPORT OF MOTION TO REMAND**
**(ORAL ARGUMENT REQUESTED)**

BY:    SUSAN K. WALSH (P40447)
         PO Box 157
         Northville, MI 48167
         248-563-9149

RECEIVED by MCOA 2/22/2019 10:54:50 AM

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF JURISDICTION..................................................................................... v

STATEMENT OF QUESTIONS PRESENTED ............................................................... vi

STATEMENT OF FACTS ................................................................................................. 1

**I. Mr. Uraz was denied a fair trial and his state and federal constitutional rights by the trial court's decision denying his motion for severance where the sheer number of prior bad act evidence resulted in unfair prejudice.**...................................................................................12

**II. Mr. Uraz was denied a fair trial and his state and federal constitutional rights by the introduction of unduly prejudicial evidence concerning prior bad acts**..........................17

**III. Mr. Uraz was denied his state and federal constitutional rights to discovery, due process, to confront witnesses and to present a defense by the prosecution's failure to disclose the handwritten notes between one of its key witnesses and another inmate**..........................21

**IV. The trial court erred when it denied Mr. Uraz's motion to dismiss based on entrapment.**..25

**V. Mr. Uraz was denied his state and federal constitutional right to the effective assistance of counsel where his trial counsel failed to ask for a continuance when he was nearing a mental breakdown during the trial and was not able to effectively try the case and where trial defense counsel failed to properly cross-examine the states key witnesses regarding their prior theft related convictions and failed to properly examine defense witnesses**..............27

**VI. The prosecution's misconduct, which consisted of denigrating defense counsel in front of the jury, deprived Mr. Uraz of his due process right to a fair trial**...........................30

SUMMARY AND RELIEF................................................................................................ 33

APPENDICES

RECEIVED by MCOA 2/22/2019 10:54:50 AM

# TABLE OF AUTHORITIES

**Cases**

*Berger v California*, 393 US 314, 315 (1969); .................................................. 25

*Berger v United States*, 295 US 78, 88-89, 55 S Ct 629; 79 L Ed 1314 (1935); ......................... 34

*Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963), ................................ 23

*Davis v Alaska*, 415 US 308, 316, (1974). ......................................................... 25

*Delaware v Van Arsdall*, 475 US 673, 680 (1986). .................................................. 25

*Harris v New York*, 401 US 222, 225 (1971); ....................................................... 25

*Lisenba v California*, 314 US 219; 62 S Ct 280; 86 L Ed 166 (1941) ................................. 19

*People v Aikin*, 66 Mich 460, 472 (1887). ......................................................... 17

*People v Akhmedov*, 297 Mich App 745, 752-753; 825 NW2d 688 (2012). .............................. 28

*People v. Allen*, 429 Mich. 558 (1988). ........................................................... 32

*People v Blackston*, 481 Mich 451, 462 (2008). .................................................... 19

*People v Cameron*, 291 Mich App 599 (2010). ....................................................... 19

*People v Carines*, 460 Mich 750, 763, 774; 597 NW2d 130 (1999). ............................... 34, 35

*People v Carpentier*, 446 Mich 19, 60 n19 (1994) .................................................. 22

*People v Crawford*, 458 Mich 376; 582 NW2d 782 (1998) ......................................... 20, 21

*People v Crawford*, 458 Mich 376; 582 NW2d 782 (1998). ............................................ 18

*People v Daughenbaugh*, 193 Mich App 506, 511 (1992). ............................................. 15

*People v Dalessandro*, 165 Mich App 569, 577-588; 419 NW2d 609 (1988) .......................... 31, 35

*People v Duncan*, 402 Mich 1, 16; 260 NW2d 58 (1977) .............................................. 33

*People v Fox (After Remand)*, 232 Mich App 541, 549; 591 NW2d 384 (1998) .......................... 24

RECEIVED by MCOA 2/22/2019 10:54:50 AM

*People v Fyda,* 288 Mich app 446, 456; 793 NW2d 712 (2010)............................................28, 29

*People v Jamieson,* 436 Mich 61, 68; 461 NW2d 884 (1990),.....................................................28

*People v Johnson,* 466 Mich 491, 497; 647 NW2d 480 (2002); .............................................26, 28

*People v Juillet,* 439 Mich 34, 61; 475 NW2d 786 (1991).............................................................26

*People v Kelly,* 186 Mich App 524, 526 (1990). ...........................................................................32

People v LeBlanc, 465 Mich 575 , 579; 640 NW2d 246 (2002) .....................................................30

*People v Lukity,* 460 Mich 484 (1999).............................................................................................21

*People v Maranian,* 359 Mich 361, 368-369 (1960). .....................................................................23

*People v Nickson,* 120 Mich App 681, 685 (1982)..........................................................................33

*People v Nickson,* 120 Mich App 681; 327 NW2d 333 (1982) .......................................................30

*People v Pace,* 102 Mich App 522, 530-531 (1980). ......................................................................23

*People v Pattison,* 276 Mich App 613 (2007); ...............................................................................19

*People v Snyder,* 462 Mich 38, 45 (2000)........................................................................................22

*People v Stubli,* 163 Mich App 376, 380; 413 NW2d 804 (1987)..............................................30, 31

*People v. Tobey,* 401 Mich 141, 150-151 (1977)..............................................................................17

*People v Tommolino,* 187 Mich App 14; 466 NW2d 315 (1991); Blackburn v Foltz, 828 F2d
    1177 (CA 6, 1987).....................................................................................................................31

*People v Walker,* 265 Mich App 530, 542; 697 NW2d 159 (2005), vacated in part and remanded
    in part 477 Mich 856; 720 NW2d 754 (2006)..........................................................................33

*People v Walton,* 71 Mich App 478, 481–82 (1976), ......................................................................24

*People v Watson,* 245 Mich App 572, 593, 629 NW2d 411 (2001). ..............................................34

*People v Williams,* 483 Mich 226, 231; 769 NW2d 605 (2009)......................................................12

RECEIVED by MCOA 2/22/2019 10:54:50 AM

*People v Wilson,* 265 Mich App 386, 393; 695 NW2d 351 (2005);..................................... 33

*People v Winans,* 187 Mich 294; 466 NW2d 731 (1991)....................................................... 30

*People v Woods,* 241 Mich App 545, 554; 616 NW2d 211 (2000)....................................... 27

*Sorrells v United States,* 287 US 435, 454; 53 S Ct 210; 77 L Ed 413 (1932)..................... 28

*Strickler v Greene,* 527 US 263, 281-282 (1999)................................................................ 24

*United States v Tavera,* 719 F3d 705, 708 (CA 6, 2013)..................................................... 24

*Wildman v Johnson,* 261 F3d 832, 840-841 (CA 9, 2001),.................................................. 13

**Statutes**

MCL 768.27 ........................................................................................................................ 13

**Rules**

MCR 6.120........................................................................................................................... 12

MCR 6.201........................................................................................................................... 22

MRE 403 ........................................................................................................................ 14, 19

MRE 404(b) ......................................................................................................................... 14

MRE 609.............................................................................................................................. 32

**Constitutional Provisions**

Const 1963, art 1, §§17, 20 ........................................................................................... 26, 35

US Const, Am V, VI, XIV .................................................................................................. 34

US Const, Am XI and XIV .................................................................................................. 33

US Const, Ams VI, XIV ..................................................................................................... 26

RECEIVED by MCOA 2/22/2019 10:54:50 AM

## STATEMENT OF JURISDICTION

The judgment of conviction was entered on November 9, 2017; the judgment of sentence was entered on January 24, 2018; Defendant requested counsel on January 31, 2018; the claim of appeal was filed on February 26, 2018. Susan K. Walsh was appointed as appellate counsel on February 26, 2018.

Jurisdiction is conferred on this Court by Const 1963, art 1, §20; MCL 600.308(1), MSA 27A.308(1); MCL 770.3, MSA 28.1100; MCR 6.425(F)(3); MCR 7.203(A); and MCR 7.204.

v

RECEIVED by MCOA 2/22/2019 10:54:50 AM

## STATEMENT OF QUESTIONS PRESENTED

**I. Was Mr. Uraz denied a fair trial and his state and federal constitutional rights by the trial court's decision denying his motion for severance where the sheer number of prior bad act evidence resulted in unfair prejudice?**

> The trial court answered "no".
>
> Defendant-Appellant answers "yes".

**II. Was Mr. Uraz denied a fair trial and his state and federal constitutional rights by the introduction of unduly prejudicial evidence concerning prior bad acts?**

> The trial court answered "no".
>
> Defendant-Appellant answers "yes".

**III. Was Mr. Uraz denied his state and federal constitutional rights to discovery, due process, to confront witnesses and to present a defense by the prosecution's failure to disclose the handwritten notes between one of its key witnesses and another inmate?**

> The trial court made answered "no".
>
> Defendant-Appellant answers "yes".

**IV. Did the trial court erred when it denied Mr. Uraz's motion to dismiss based on entrapment?**

> The trial court answered "no".
>
> Defendant-Appellant answers "yes".

**V. Was Mr. Uraz denied his state and federal constitutional right to the effective assistance of counsel where his trial counsel failed to ask for a continuance when he was nearing a mental breakdown during the trial and was not able to effectively try the case and where trial defense counsel failed to properly cross-examine the states key witnesses regarding their prior theft related convictions and failed to properly examine defense witnesses?**

vi

RECEIVED by MCOA 2/22/2019 10:54:50 AM

The trial court made no answer.

Defendant-Appellant answers "yes".

**VI.  Did the prosecution's misconduct, which consisted of denigrating defense counsel in front of the jury, deprive Mr. Uraz of his due process right to a fair trial?**

The trial court made no answer.

Defendant-Appellant answers "yes".

RECEIVED by MCOA 2/22/2019 10:54:50 AM

## STATEMENT OF FACTS

The present case involves a situation where a man in his late 40s, a husband and a father with no contacts with the criminal justice system, experienced his life crumbling before his eyes. Due to the strain of the events, Defendant, Tunc Uraz, made grave errors of judgment that led to charges of aggravated stalking to which he pled guilty and was ready to pay his debt to society. However, during his incarceration, inmates in the Ingham County Jail took advantage of his naivete. Mr. Uraz contends that these inmates twisted his statements and used them in an effort to win favor with the prosecutor's office by contending that Mr. Uraz was attempting to hire someone to kill the woman he was charged with stalking. Once these inmates made these allegations, his stalking case and his solicitation case were joined and any chance for Mr. Uraz to have a fair trial was extinguished.

Mr. Uraz is of Turkish descent and all of his family now lives in Turkey. Mr. Uraz was born in the United States, but his family moved back to Turkey when he was one year old. Mr. Uraz moved back to the United States at college age to attend college and has a master's degree in hospitality management from Michigan State University. Mr. Uraz worked for MSU for 25 years and had never been in jail or had any contact with the criminal justice system before the events that led to this case. At an entrapment hearing held before trial, Mr. Uraz explained that his marriage started to break up in 2015 and that his wife had bi-polar disorder and left for Turkey, Evidentiary Hearing (ET) 10-20-17 at 9-12. During this time Mr. Uraz began abusing alcohol and Xanax, ET 11. Mr. Uraz has been diagnosed with PTSD, manic depression and substance abuse, ET 11. In April of 2015 he was fired from his job, ET 9-10. In June 2015, Erika Melke, the complainant, broke off the relationship she had with Mr. Uraz, ET 12.

Mr. Uraz was distraught about his life and the breakup with Ms. Melke and he endeavored to contact her against her will and she ultimately obtained a personal protection order (PPO). Mr. Uraz

1

RECEIVED by MCOA 2/22/2019 10:54:50 AM

violated the PPO and was charged with aggravated stalking. He pled guilty to these charges and turned himself in to the jail, Ingham County docket no. 16-534 FH. While he was in the jail, Mr. Uraz was withdrawing from his medications and alcohol and drug addictions and he was placed in segregation where he was not allowed to make phone calls, ET 13. He also was not being medicated for his ongoing mental health issues. During this time period he met the two inmates (Charles Allen and Reginald Close) who would ultimately testify against him at trial. These inmates were excessively interested in his case and told him that they would help him with his case, ET 14. Mr. Uraz testified that he did not know that he should not discuss his case with other inmates who may try to take advantage of him, ET 14.

At the entrapment hearing Mr. Uraz denied that he ever was serious about trying to kill Ms. Melke, ET 23, 33. He claimed that Mr. Allen and Mr. Close were trying to get money from him and took advantage of him in an attempt to win favor with the prosecutor's office, ET 28. Mr. Uraz denied the statements Mr. Close and Mr. Allen alleged he made to them about trying to hire someone to kill Ms. Melke, ET 62, 64. The trial court denied Mr. Uraz's entrapment motion, ET 107-114.

Over objection by the defense, the court also allowed the introduction of numerous prior bad acts, Similar Acts Motion Hearing 10-11-17, at 18-25. The trial court also allowed the inmates to provide testimony regarding alleged statements by Mr. Uraz to support the prior bad acts. The trial court joined the cases for trial pursuant to MCR 6.120(B)(1)(c), Joinder Motion Hearing 2-28-17 at 17-19.

The prosecutor started the trial by presenting numerous witnesses to testify as to the prior bad acts of stalking alleged to have been perpetrated by Mr. Uraz. Meridian Township officer Daniel King testified that he was called to investigate an alleged PPO violation on March 26, 2016, JTII 129-130. He was directed to a Best Buy parking lot where he spoke with the complainant, Erika Melke.

RECEIVED by MCOA 2/22/2019 10:54:50 AM

He saw a man in a Pontiac who left right away when he arrived, JTII 131. He testified that Ms. Melke was upset and showed him pictures on her phone of Mr. Uraz, JTII 133. He was 60-70% sure that the man he saw in the Pontiac was Mr. Uraz, JTII 135.

Ms. Melke's roommate next testified that on July 17, 2016, she saw Mr. Uraz in the parking lot of their apartment complex, JTII 146-148.

Noell Vanslembrouck testified that Ms. Melke was her best friend and that they had lived together from 2011 to 2015, JTII 160. She moved out right at the time that Ms. Melke ended her relationship with Mr. Uraz, JTII 161. She testified that on 12-31-15 she was in Utica at the Dave & Busters with Ms. Melke and Stan White and her boyfriend, Zeb, JTII 162-163. She stated that Mr. Uraz showed up and began confronting them and he would not leave. He called Ms. Melke a slut and a liar and management had to intervene and escort Mr. Uraz from the premises, JTII 164-167. On cross-examination, Ms. Vanslembrouck admitted that she never heard Mr. Uraz threaten to kill or harm Ms. Melke and that in all the time Ms. Melke and Mr. Uraz were together she never heard them arguing or heard or witnessed any domestic violence between them, JTII 170-171.

Mr. Stan White testified that he met Ms. Melke in an x-ray class at Lansing Community College and that he had a past dating relationship with Ms. Melke from the middle of 2015 until 2016, JTII 174-175. He testified about the incident at Dave & Busters and claimed that Mr. Uraz would not stop talking to Ms. Melke, JTII 176-177. He testified that they needed to get an Uber home from Dave & Busters and that when he went to get his car there the next day, he had a flat tire from a side puncture, JTII 178-179. He claimed that he received random messages asking if he was dating anyone and that he had to block 4 different numbers from calling him, JTII 179-180. He testified that his tires were punctured three times and that Ms. Melke's vehicle was egged in his driveway, JTII 183. Mr. White then read from a text message thread that he exchanged with Mr. Uraz where they discussed

RECEIVED by MCOA 2/22/2019 10:54:50 AM

3

the possibility of meeting, JTII 184-189. Mr. White testified that Mr. Uraz made him nervous but admitted that the only time he ever saw Mr. Uraz was at Dave & Busters, JTII 198.

On the second day of testimony the trial court indicated that it had received word that one of the jurors had stated that he had a bias against people from Turkey and that he did not believe he could be a fair and impartial juror. The trial court indicated that it was going to strike this juror at the close of proofs and denied the defense request to question the juror, JTIII 4-6.

Erika Melke then testified that she is 25 years old and met Mr. Uraz at an MSU cafeteria, JTIII 8. First she was a student dining at the cafeteria and then she worked there, JTIII 9. She first had a friendship with Mr. Uraz and then she started dating him in late 2012, early 2013, JTIII 10.

She testified that in July of 2015 she moved to College Town apartments and that Mr. Uraz helped her move, JTIII 12-14. She claimed that her car was keyed and her license plate tabs were removed in August of 2015, JTIII 15. She testified that on September 29, 2015, Mr. Uraz approached her at a grocery store and started asking her questions about her dating relationships, JTIII 18-20. She was scared so she filed for and received a PPO, JTIII 21-22. She testified about the Dave & Busters incident and claimed that on February 13, 2016, she received a text message that stated only, "Ho." JTIII 20-22, 24. She believed that in March of 2016, Mr. Uraz followed her to Best Buy, JTIII 25-26. In April of 2016, she was in Petosky visiting her mother. Her mother received a phone call from the phone of Mr. Uraz's mother, JTIII 27-28. In May of 2016, her car was egged when it was parked at Mr. White's home, JTIII 29.

Also, in May of 2016, she began noticing that things were missing from her bedroom. She bought a camera and set it up in her room. On May 25, 2016, she captured footage of Mr. Uraz in her room while she was at work, JTIII 31-34. On July 17, 2016, she claimed that she saw Mr. Uraz in her apartment parking lot, JTIII 36.

4

RECEIVED by MCOA 2/22/2019 10:54:50 AM

At one point her Facebook password was changed and an Instagram account was created in her name, JTIII 38-39. A photograph from her phone that she claimed she did not give Mr. Uraz was on the Instagram page, JTIII 37-40. There was also a picture from her Facebook account on the Instagram, JTIII 38-40. On August 27, 2016, and August 31, 2016, someone was trying to change her Facebook password, JTIII 42. When Mr. Uraz was in her apartment there were tickets for a Drake concert in her room and on the night of the concert all of her tires were slashed, JTIII 48. She claimed that her tires were punctured on three other occasions, JTIII 49-50. At the end of August she received a phone call from the Ingham County Jail and in the part of the call where the inmate is supposed to record his name it stated "I hope you're happy," JTIII 46-47.

Next, Mr. Uraz's prior attorney for his prior stalking case, Chris Bergstrom, was allowed to testify as to the details of that case, JTIII 65-74. He testified that Mr. Uraz denied using illegal substances in his PSIR and stated that he only used alcohol, JTIII 70-72. He also testified about a letter that Mr. Uraz gave to him on August 31, 2016, that Mr. Uraz asked Mr. Bergstrom to give to the prosecutor, JTIII 72. The letter was from Mr. Uraz to Ms. Melke, JTIII 73. Ms. Melke also received an anonymous email from EMELKE20@gmail.com which was the identical letter. Ms. Melke did not create the Gmail address that she got the letter from, JTIII 73-74. On cross-examination Mr. Bergstrom admitted that Mr. Uraz filed a grievance against him alleging unprofessional conduct, JTIII 76.

Richard Laing testified that he is the founder of Spartan Net which is the internet provider for apartments in the Lansing area, JTIII 81. He testified that IP addresses linked to the evidence presented about attempted changes to Ms. Melke's Facebook password were from apartments in the Northpointe Apartment complex building C, JTIII 91. He admitted that he was not able to identify

RECEIVED by MCOA 2/22/2019 10:54:50 AM

5

the exact apartment but that the IP addresses would encompass August 27 and 31 of 2016, JTIII 96, 101.

Heather Heitman testified that she is the DTN Management property manager, JTIII 103. She testified regarding a 2016 lease with Burak Atamer for Northpointe Apartments unit C10 from building C, JTIII 108. She claimed that Mr. Atamer still lived there and that Mr. Uraz used to live in the complex in building B, JTIII 109. She claimed that Mr. Uraz brought Mr. Atamer to them to rent an apartment, JTIII 110.

Bernard Brown of Sentinal Offender Services testified that he is the branch manager of Ingham County Jail running the GPS tether program, JTIII 115-116. He testified that the GPS data from Mr. Uraz placed him at 4869 Dunkel Rd., in Lansing on August 17, 2016, and at 1240 Haslett on August 31, 2016, JTIII 122-124.

Not until the last witness on the third day of the trial was there any testimony on the solicitation of murder charges. Reginald Close testified that he met Mr. Uraz while housed in the Ingham County Jail, JTIII 133. For one night he was housed in the medical dorm with Mr. Uraz and Charles Allen, JTIII 135-136. He claimed that Mr. Uraz told him that Ms. Melke ruined his life and he wanted to get rid of her, JTIII 138. Mr. Close claimed that Mr. Uraz admitted to him that he stalked Ms. Melke and that he went to her house and slashed her tires on the day of the Drake concert, JTIII 138-140. Mr. Uraz allegedly told him that he lost his job because he asked a coworker about getting a gun and that he wanted to kill Ms. Melke, JTIII 139. Mr. Close claimed that while he was in the medical dorm with Mr. Uraz, Mr. Uraz asked him if he knew anyone who could kill Ms. Melke, JTIII 143.

Mr. Close testified that he told Mr. Uraz to write notes to him about it and that he sent the notes to his attorney and was given immunity for his testimony at this trial, JTIII 145-146. He admitted to telling Mr. Uraz that he knew someone who would do it for $1,000.00. The People

6

RECEIVED by MCOA 2/22/2019 10:54:50 AM

admitted three pages of notes between Mr. Uraz and Mr. Close, JTIII 149-153. In the letters there was reference to Stan White and Mark Tovez as people that Ms. Melke had dated and the vehicles they drove and Mr. White's address, JTIII 152-153. The notes also contained a map of where Ms. Melke lived, JTIII 154-155. He testified that Mr. Uraz's roommate put money in his jail account and that this was a down payment, JTIII 157.

While Mr. Close testified that he received no plea offers or reduced charges for his testimony in this case, he did admit that he proffered on two other cases previous to this case, JTIII 160-161, JTIV 80-81..

At the close of the day, defense counsel indicated that he was going to bring a motion for a mistrial due to a *Brady* violation in the late production of the notes between Mr. Close and another jail inmate, John Pierce, JTIII 170-172. These notes were regarding another proffer by Mr. Close and supported the defense theory that Mr. Close was merely trying to garner favor from the prosecutor.

Mr. Close was cross-examined on the fourth day of trial and admitted that he was talking to his attorney about a 2011 murder with John Pierce and Chris Shinberger, JTIV 7. As for the handwritten notes that were the subject of the *Brady* issue, Mr. Close admitted that he probably wrote in those notes that he was a good liar, JTIV 39. The notes contain a statement that the author was such a good liar he could pass a polygraph. It should also be noted that at the preliminary examination held in this case, the prosecution moved to amend the information, PE 12-1-16 at 191. The original information contained only two counts of solicitation of murder with the Mobley and Close allegations combined in one count. The prosecutor moved to separate this count into two counts with a third count regarding only Mobley. The district court granted the motion but stated the following about the Mobley count:

> I think there is definitely a reasonable doubt about what that conversation means
> (the jail call between Mr. Uraz and Mr. Mobley). You know, that is not proof

7

RECEIVED by MCOA 2/22/2019 10:54:50 AM

beyond a reasonable doubt. I wish the prosecution good luck as it related to that individual claim. PE at 208.

Patrick Burnett, an MSU culinary platform attendant, testified that he previously worked with Mr. Uraz, JTIV 90-91. He claimed that in April of 2016, Mr. Uraz asked him if he could get him a gun and bullets, JTIV 93. Mr. Uraz allegedly told him that he did not want to get the gun legally, JTIV 96. When Mr. Uraz continued to question him about the gun he told his supervisor and Mr. Uraz was fired, JTIV 97-99. Mr. Burnett admitted that Mr. Uraz never stated why he wanted the gun, JTIV 100.

Detective Andrew Hogan of the Lansing Police Department testified that he interviewed Mr. Close on October 17, 2016, JTIV 106. He confirmed that $160 was put on Mr. Close's jail account, JTIV 113. He did admit that he met with Mr. Close on August 24, 2016, regarding a different case and that he did give Mr. Close a proffer agreement as to that case, JTIV 114.

Frank Mobley of the Lansing Police Department testified that he works as an undercover officer and that in that capacity he called Mr. Uraz and spoke to him on a video call at the jail on October 24, 2016, JTIV 117, 122. The video was played for the jury and the jury was also allowed to view a transcript of the phone conversation. Defense counsel objected to the jury being allowed to have a transcript of the conversation, JTIV 125-126. In the video Mr. Uraz can be seen discussing getting rid of some trash, see People's exhibit 44. The officer attempts several times to get an address or other information from Mr. Uraz about Ms. Melke and Mr. Uraz does not give the information, JTIV 145. Officer Mobley admitted that he attempted to call Mr. Uraz back and that Mr. Uraz hung up the phone and walked away, JTIV 148.

Sergeant Kevin Jewell testified that he received a kite on October 24, 2016, from Charles Allen about a possible solicitation to murder and he sent it to the prosecutor's office, JTIV 153-154.

8

RECEIVED by MCOA 2/22/2019 10:54:50 AM

Charles Allen testified that he is 24 years old and he was released from jail on January 23, 2017, JTV 5. He met Mr. Uraz in August and September of 2016. As they talked about their girlfriends Mr. Uraz would say "this bitch got to pay," JTV 13. Mr. Allen claimed that Mr. Uraz wanted Ms. Melke to be beaten with a bat and that he wanted proof that it was done, JTV 14. He claimed that Mr. Uraz asked him to kill Ms. Melke, discussed payment, told him where she lived and worked, what kind of car she drove, her address and apartment number, JTV 16-17, 19. He further claimed that Mr. Uraz asked him for a gun for Ms. Melke's boyfriends, JTV 21-22.

Mr. Allen claimed that he decided to tell a deputy and was ultimately granted immunity for his testimony in this trial, JTV 22-23. He claimed that he sent one kite and received no response. He then sent a second kite and was ultimately interviewed by Det. Matt Krumbach, JTV 27. He immediately asked Det. Krumbach if he could get out of jail and the Detective told him that he would tell his probation agent that he was helpful, JTV 27-28. Mr. Allen claimed that he received nothing for his testimony, JTV 28-29.

On cross-examination, Mr. Allen admitted that he was on restriction in the jail because he was not following the rules and that he was in jail because of what he did to his ex-girlfriend, JTV 31. He testified that he had a child on the way when he sent the kites, JTV 50. He explained that Mr. Uraz appeared very lost when he first arrived at the jail and he believed that it would be easy for Mr. Uraz to be taken advantage of, JTV 39, 47. He admitted that he tried to use the situation to get out of jail early and that Det. Krumbach told him he would speak to the judge, JTIV 51. He also admitted that he would initiate contact with Mr. Uraz, JTV 56.

At this point in the proceedings the prosecutor stated in front of the jury:

> MR. ROTH: "Your Honor, I am going to object. This is three minutes between questions. This cross-examination rambles on for hours.
> THE COURT: I can't help that.
> MR. ROTH: We took a break so he would gather his thoughts.

9

RECEIVED by MCOA 2/22/2019 10:54:50 AM

THE COURT: I can't press that.

MR. ROTH: Thank you, Your Honor.

THE COURT: This is a serious matter. So he can utilize whatever strategy he so desires. JTV 60-61.

Jail Deputy Sandra Douse was called to go over the movement records from the jail. These records indicated that Mr. Uraz, Mr. Close and Mr. Allen were all in the medical dorm on September 27, 2016, JTV 75-87. Mr. Uraz and Mr. Close were in the medical dorm together until October 5, 2016, JTV 84, 87.

Det. Matt Krumback testified that he got a search warrant for the IP addresses related to the attempts to change Ms. Melke's Facebook password, JTV 118. The IP addresses were near North Pointe apartments building C and through GPS tether he found that Mr. Uraz was in the area of apartment C10 on August 27 and August 31, 2016, JTV 119-123. He discovered that Barak Atamer resided in apartment C10. After making these discovers he learned about allegations of solicitation of murder and he had an interview with Mr. Close, JTV 127-129. He claimed that his interviews with Mr. Close and Mr. Allen were not proffer interviews, JTV 130, 136. He reviewed video chats between Mr. Uraz and Mr. Atamer. He saw that Mr. Atamer had a video chat with Mr. Uraz on the same day that Mr. Atamer put $160 on Mr. Close's account, JTV 1138, 140-141. Mr. Krumbach also admitted that he knew prior to interviewing Mr. Close that Mr. Close had made another proffer but he did not know the details of that proffer, JTV 156-157.

At the close of the prosecution's proofs the defense made a motion for directed verdict on the solicitation of murder charges arguing that the witnesses against Mr. Uraz were not credible and that Mr. Uraz was entrapped, JTVI 52-55. The trial court denied the motion, JTVI 55-58.

10

RECEIVED by MCOA 2/22/2019 10:54:50 AM

Mr. Uraz waived his right to testify. The defense first called MDOC inmate John Pierce. Mr. Pierce testified that he met up with Mr. Close in segregation and that he observed Mr. Close and Mr. Uraz talking often, JTVI 61-64.

MDOC inmate Fateen Muhammad testified that he was in segregation with Mr. Allen, JTVI 68. He testified that in the jail inmates are trying to find a way to get out of trouble, JTVI 75. He stated that he found Mr. Uraz to be kind and caring and opined that Mr. Uraz should not have shared about his case, JTVI 77.

During his closing argument, the prosecutor began by emphasizing how strong the evidence was in the aggravated stalking case, JTVI 103-104. Then the prosecutor stated regarding Mr. Close and Mr. Allen, "Neither of these men had any incentive to disclose this information to the police." JTVI 105.

A few days after the trial, trial defense counsel who suffers from bi-polar disorder, had a mental breakdown and was hospitalized, see hearing transcript 12-12-17. Defense counsel was removed from his cases for the months of December and January 2016-2017 and was unable to represent Mr. Uraz at his sentencing. Attached as Appendix A is a copy of an email sent by defense counsel to Mr. Uraz's sister on the fifth day of the trial. This email was included as an exhibit during the sentencing phase of the trial. Mr. Uraz was sentenced to 200 to 360 months in prison.

Further facts will be set forth in the Issues where necessary.

RECEIVED by MCOA 2/22/2019 10:54:50 AM

## ARGUMENT

**I. Mr. Uraz was denied a fair trial and his state and federal constitutional rights by the trial court's decision denying his motion for severance where the sheer number of prior bad act evidence resulted in unfair prejudice.**

**Standard of review and issue preservation**: A determination of whether charges are sufficiently related to warrant joinder is reviewed de novo. *People v Williams*, 483 Mich 226, 231; 769 NW2d 605 (2009). This issue was preserved when defense counsel filed a motion for severance.

At a pretrial hearing the trial court ruled that the prosecutor could join the aggravated stalking charge and the three solicitation of murder charges in one trial, Motion transcript 02-28-17 at 17-20. The trial court found that the offenses were related because they constituted parts of an overall scheme or plan and that joinder did not restrict Mr. Uraz's ability to present a defense, MT 19. Mr. Uraz contends that once the cases were joined, his chance for due process and a fair trial was extinguished. The testimony regarding prior bad acts took up almost two days of the trial, see JTII and JTIII transcripts and Issue II. The sheer volume of stalking acts admitted at trial extremely prejudiced Mr. Uraz requiring a new trial.

MCR 6.120 provides in pertinent part as follows:

> (B) Postcharging Permissive Joinder or Severance. On its own initiative, the motion of a party, or the stipulation of all parties, except as provided in subrule (C), the court may join offenses charged in two or more informations or indictments against a single defendant, or sever offenses charged in a single information or indictment against a single defendant, when appropriate to promote fairness to the parties and a fair determination of the defendant's guilt or innocence of each offense.

> (1) Joinder is appropriate if the offenses are related. For purposes of this rule, offenses are related if they are based on

> (a) the same conduct or transaction, or

> (b) a series of connected acts, or

12

RECEIVED by MCOA 2/22/2019 10:54:50 AM

(c) a series of acts constituting parts of a single scheme or plan.

(2) Other relevant factors include the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of charges or the complexity or nature of the evidence, the potential for harassment, the convenience of witnesses, and the parties' readiness for trial.

\*\*\*

(C) Right of Severance; Unrelated Offenses. On the defendant's motion, the court must sever for separate trials offenses that are not related as defined in subrule (B)(1).

In *Wildman v Johnson*, 261 F3d 832, 840-841 (CA 9, 2001), the Court explained that in certain circumstances, the joinder of offenses for trial may violate a defendant's due process rights under US Const, Am XIV:

In *Sandoval v Calderon*, 241 F3d 765, 772 (CA 9, 2000), we held that joinder does not violate due process "unless simultaneous trial of more than one offense actually rendered petitioner's state trial fundamentally unfair" so as to be prejudicial. Prejudice is shown when "the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict." Id. In *Sandoval*, we recognized that such prejudice arises when joinder allows otherwise inadmissable [sic] evidence of other crimes to be introduced in a trial, *or when a strong evidentiary case is joined with a weaker one*. (emphasis added).

In *People v Williams*, supra, the Supreme Court held that joinder did not violate the court rule where evidence of each separate offense would have been admissible as similar acts in separate trials. MCL 768.27 governs the admissibility of similar acts in separate trials, and provides:

In any criminal case where the defendant's motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing the act, in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto; notwithstanding that such proof may show or tend to

13

RECEIVED by MCOA 2/22/2019 10:54:50 AM

show the commission of another or prior or subsequent crime by the defendant.

Similarly, MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

MRE 403 provides a limitation on otherwise relevant, but prejudicial evidence:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury....

The Supreme Court has also observed:

> Other acts evidence is not admissible simply because it does not violate Rule 404(b) [MRE 404(b)]. Rather, a "determination must be made whether the danger of undue prejudice [substantially] outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision of this kind under Rule 403." 28 USCA, p 196, advisory committee notes to FRE 404(b). People v *VanderVliet*, 444 Mich 52, 74-75; 508 NW2d 114 (1993).

The rule permitting joinder also states that consideration of other relevant factors is proper, and it lists "the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of charges or the complexity or nature of the evidence, the potential for harassment, the convenience of witnesses, and the parties' readiness for trial" as the other relevant factors. MCR 6.120(B). These additional considerations further

14

RECEIVED by MCOA 2/22/2019 10:54:50 AM

support a finding that joinder was impermissible here. For one, given the nature of the evidence and the manner in which the cases were tried, the witnesses would not have been inconvenienced had the charges been severed.

In addition, the number of charges was potentially confusing to the jury and undoubtedly prejudicial to Mr. Uraz. The risk of prejudice is undeniably amplified when there are so many charges. The joinder of multiple charges acts as propensity evidence. MRE 404(b)(1) provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." This concern is heightened when considering joinder of charges. As recognized by the Michigan Court of Appeals, "[t]he fact that a defendant is formally faced in the same trial with additional charges does have an effect greater than if evidence of other (uncharged) offenses are presented. The defendant is cast as a bad person by the sheer number of counts in the information." *People v Daughenbaugh*, 193 Mich App 506, 511 (1992).

The aggravated stalking testimony presented on the first two days of trial was highly prejudicial as it portrayed Mr. Uraz as an obsessed stalker. Moreover, parts of the prior bad acts testimony that provided only circumstantial proof that Mr. Uraz was the perpetrator were buttressed by the testimony of the solicitation of murder witnesses. Specifically, Mr. Close testified that Mr. Uraz told him that he slashed Ms. Melke's tires on the night of the Drake concert and that Mr. Uraz was trying to get a gun to kill Ms. Melke, JTIII 138-140. This testimony that buttressed the stalking charges came from an inmate who candidly admitted at trial that he was a good liar, JTIV 39. In the eyes of the jury, the cumulative weight of prior bad acts testimony from numerous witnesses likely constituted an insurmountable hurdle of bad character for Mr. Uraz to overcome.

RECEIVED by MCOA 2/22/2019 10:54:50 AM

The greater the quantity of victims testifying to similar charges before the jury, the more difficult it becomes for the jury to discern the quality of evidence with regard to each individual charge and the credibility of each individual witness. The more similar charges before the jury, the greater the potential for confusion as to which evidence pertains to which charge. More importantly, because the charges are so similar, evidence tending to prove one charge may lead the jury to assume guilt on the other charges, even if the prosecution has not met its burden on those charges.

In *Wildman*, supra, the court stated that prejudice arises when a case with strong evidentiary support is joined with a weaker case. Such is the situation here where the aggravated stalking charges had strong evidentiary support. Mr. Uraz had already pled guilty to the vast majority of this behavior and was paying his debt to society. To the contrary, the solicitation of murder charges had very weak evidence from jail house snitches, one of which candidly admitted that he was a good liar. Because of all the testimony regarding stalking it was impossible for the jury to focus in on the weak aspects of the solicitation case.

Even if the charges here were deemed part of a "single plan," the prejudice of so many witnesses corroborating and bolstering each other by merely enunciating similar bad acts, would make severance necessary to "promote a fair determination of the defendant's guilt or innocence of each offense." *People v. Tobey*, 401 Mich 141, 150-151 (1977). In a case like this one, "the evidence of each [charge] becomes confounded as a whole and used indiscriminately to convict [the defendant]" of all charges. *People v Aikin*, 66 Mich 460, 472 (1887). "Such a proceeding violates every principle of justice, and places [the defendant] at the mercy of the prosecutor." Evidence "not competent to prove one of the offenses, but admissible as to the other, is used to establish both crimes. Such a trial must necessarily be an unfair and illegal one." Id.

16

RECEIVED by MCOA 2/22/2019 10:54:50 AM

It would be of no consequence that evidence of the improperly joined offenses might be admissible under MRE 404(b) in separate trials.

> "The fact that a defendant is formally faced in the same trial with additional charges does have an effect greater than if evidence of other (uncharged) offenses are presented. The defendant is cast as a bad person by the sheer number of counts in the information. The jurors are afforded greater room for compromise by the larger number of counts (i.e., they might agree to convict on some counts and acquit on others, an option not readily available when fewer counts are presented for the jury's consideration). Finally, the amount of evidence that the prosecutor would be permitted to introduce may well be greater if the prosecutor is attempting to prove the defendant's guilt of the additional charge than if merely trying to show that the defendant committed the other (uncharged) bad act." *People v Daughenbaugh*, 193 Mich App 506, 511, modified on other grounds, 441 Mich 867 (1992).

The trial court's failure to grant severance caused Mr. Uraz significant prejudice. The case for reversal becomes clear in light of the unfair advantage the prosecution took of this situation. During closing argument, the prosecutor tied both cases together and buttressed the credibility of each witness by relying on the similar charges in the other case. Mr. Uraz is entitled to a new trial.

**II. Mr. Uraz was denied a fair trial and his state and federal constitutional rights by the introduction of unduly prejudicial evidence concerning prior bad acts.**

**Standard of Review and Issue Preservation:** This Court reviews the admission of evidence of other bad acts for abuse of discretion by the trial court. *People v Crawford*, 458 Mich 376; 582 NW2d 782 (1998). Mr. Uraz opposed the admission of this testimony and made several objections.

Mr. Uraz contends that the sheer volume of prior bad acts evidence that was presented at trial denied him a fair trial. The stalking charges in this case involved alleged activities in violation

RECEIVED by MCOA 2/22/2019 10:54:50 AM

17

of the PPO that occurred in the last half of the month of August 2016. However, in a pretrial motion to admit similar acts evidence the prosecutor requested the admission of 17 different prior bad acts going back to August of 2015, see Prosecution's Motion to Admit Other Acts Evidence at pp 6-10. The trial court granted the prosecution's motion except for one incident where Mr. Uraz allegedly sent Ms. Melke's mother a letter, Motion Hearing transcript 10-11-17 at 18-23. The trial court originally denied the prosecution's request to admit testimony regarding Mr. Uraz's alleged attempt to buy a gun, but the prosecution filed a motion to reconsider this ruling and the trial court granted the motion. The trial court also allowed the solicitation of murder witnesses to buttress the stalking testimony. Mr. Uraz further contends that the prosecution pushed so hard for this evidence because it knew that its solicitation of murder case was weak as it was based on incredible testimony from jail house snitches and vague statements by Mr. Uraz in a poor quality video call. Mr. Uraz contends that these rulings denied him a fair trial.

A new trial is required due to the error in admitting prior episodes of stalking which should have been excluded by MRE 403 due to the sheer volume of unfair prejudice. Both the due process guarantees of the Michigan and United States constitutions require fundamental fairness in the use of evidence against a criminal defendant. Const 1963, art 1, § 17; US Const, Am XIV. See generally, *Lisenba v California*, 314 US 219; 62 S Ct 280; 86 L Ed 166 (1941).

Per MRE 403, evidence is not admissible if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." "Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Blackston*, 481 Mich 451, 462 (2008). In Mr. Uraz's case, the prosecution regaled the jury with so

RECEIVED by MCOA 2/22/2019 10:54:50 AM

18

many alleged episodes of stalking, independent from the actual incident, that unfair prejudice outweighed any probative value.

In the similar area of domestic violence cases, this Court has found that evidence of other domestic assaults is relevant per MCL 768.27b to portray a full and complete history of domestic violence. *People v Pattison*, 276 Mich App 613 (2007); *People v Cameron*, 291 Mich App 599 (2010). However, in discussing MRE 403, the Court issued a cautionary statement to "… caution trial courts to take seriously their responsibility to weigh the evidence's probative value against its undue prejudice in each case before admitting the evidence. See MRE 403." Id., at 621.

"Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or pre-emptive weight by the jury. In the context of prior bad acts, that danger is prevalent. When a juror learns that a defendant has previously committed the same crime as that for which he is on trial, the risk is severe." *People v Crawford*, 458 Mich 376, 398 (1998). Several considerations are relevant including:

> "(1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony." *People v Watkins, supra*, 487-488, citing *United States v LeMay*, 260 F3d 1018, 1032 (CA 9, 2001); *United States v Guardia*, 135 F3d 1326, 1331 (CA 10, 1998).

In *Cameron, supra*, this Court explained the balancing test needed to evaluate the probative value and prejudice of prior evidence of bad acts:

> Accordingly, this Court must make two distinct inquires under the MRE 403 balancing test. First, this Court must decide whether introduction of Cameron's prior-bad-acts evidence at trial was unfairly prejudicial. Then, this Court must apply the balancing test and "weigh the probativeness or

19

RECEIVED by MCOA 2/22/2019 10:54:50 AM

relevance of the evidence" against the unfair prejudice. Upon completion of this second inquiry, this Court can determine whether the trial court abused its discretion in allowing Cameron's prior bad acts into evidence. *Cameron, supra*, 611. (internal citations omitted).

As to the initial inquiry, the evidence of prior stalking was unfairly prejudicial through its unnecessarily cumulative nature. Indeed, evidence of Mr. Uraz's other acts of stalking dominated the trial. The first two days of trial were almost all prior bad acts testimony from numerous witnesses. The witnesses for the solicitation of murder charges were also allowed to give testimony that buttressed the testimony of the stalking witnesses.

Although perhaps relevant, the description of several episodes warped the jury. The result was a trial where the prior incidents of stalking overshadowed the actual facts of the solicitation of murder charges. This inequitable presentation of evidence misled the jury and placed undue weight on the impact of these other acts. *See Blackston, supra; Crawford, supra*. The result is evidence that should have been excluded under MRE 403.

In applying the balancing test set out by *Cameron, supra*, the minimally relevant nature of the evidence of other acts did not outweigh the unfair prejudice. The evidence of Mr. Uraz's other acts should have been excluded. In *Cameron,* this Court applied the test to find that "the prejudicial effect of other acts evidence did not stir such passion as to divert the jury from rational consideration of Cameron's guilt or innocence of the charged offenses." *Id.* at 378. In contrast, in Mr. Uraz's case, the sheer volume of evidence guaranteed that the jury would be diverted from a rational consideration of the jail snitch testimony.

The solicitation case presented a credibility contest between Mr. Uraz and the jail house snitches. The overwhelming prejudicial evidence of Mr. Uraz's alleged other acts of stalking thus

20

RECEIVED by MCOA 2/22/2019 10:54:50 AM

established outcome determinative error. *People v Lukity*, 460 Mich 484 (1999). Reversal is required. Evidence was excluded in *People v Crawford*, 458 Mich 376; 582 NW2d 782 (1998), for precisely this reason.

Reversal is warranted because it is more probable than not that the erroneous admission of this evidence undermined the reliability of the verdict, i.e. that it was outcome determinative error. See *People v Snyder*, 462 Mich 38, 45 (2000). Without this evidence it is probable that Mr. Uraz would have been acquitted of the solicitation of murder charges as the jail house witnesses were not credible and the video chat was vague and of poor quality and Mr. Uraz cut off communication with Mobley.

**III. Mr. Uraz was denied his state and federal constitutional rights to discovery, due process, to confront witnesses and to present a defense by the prosecution's failure to disclose the handwritten notes between one of its key witnesses and another inmate.**

**Standard of Review and Issue Preservation**: *Brady* claims ultimately present a question of law reviewed de novo. See *People v Carpentier*, 446 Mich 19, 60 n19 (1994); Defendant objected to the late production of this evidence, JTIII 170.

On the first day of trial defense counsel was presented with handwritten notes given to the police by Mr. Close. In these notes Mr. Close states that he is an excellent liar and could pass a polygraph, JTII 4-11. Mr. Uraz contends that the late presentation of this evidence prejudiced his case as defense counsel was unable to properly defend the case against Mr. Uraz. Mr. Uraz contends that had he been presented with these notes in a timely manner he would have used them as support for a motion to dismiss the solicitation of murder charges as based upon testimony from a witness who was an admitted liar.

21

RECEIVED by MCOA 2/22/2019 10:54:50 AM

To begin with, the prosecutor's failure to provide the reports to the defense violated Mr. Uraz's right to discovery. The prosecutor in this case was bound by the rules of discovery, MCR 6.201:

> Rule 6.201 Discovery
>
> (A) Mandatory Disclosure. In addition to disclosures required by provisions of law other than MCL 767.94a, a party upon request must provide all other parties:
>
> (1) the names and addresses of all lay and expert witnesses whom the party may call at trial; in the alternative, a party may provide the name of the witness and make the witness available to the other party for interview; the witness list may be amended without leave of the court no later than 28 days before trial;
>
> (2) any written or recorded statement, including electronically recorded statements, pertaining to the case by a lay witness whom the party may call at trial, except that a defendant is not obliged to provide the defendant's own statement;
>
> . . .
>
> (B) Discovery of Information Known to the Prosecuting Attorney. Upon request, the prosecuting attorney must provide each defendant:
>
> (1) any exculpatory information or evidence known to the prosecuting attorney;
>
> (2) any police report and interrogation records concerning the case, except so much of a report as concerns a continuing investigation…"

Michigan follows a policy of liberal discovery, which requires prosecutors to provide the defense with all materials admissible at trial or essential to the preparation of a defense and a fair trial. *People v Maranian*, 359 Mich 361, 368-369 (1960). In keeping with this general principle, the Court of Appeals has held that a prosecutor's violation of a discovery order, "even if inadvertently in good faith," requires reversal of the resulting conviction "unless it is clear that failure to divulge was harmless beyond a reasonable doubt." *People v Pace*, 102 Mich App 522, 530-531 (1980). ;

22

RECEIVED by MCOA 2/22/2019 10:54:50 AM

Under *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963),, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The suppression of favorable impeachment evidence constitutes a *Brady* violation. *Strickler v Greene*, 527 US 263, 281-282 (1999). "So long as favorable evidence could very well affect the jury's decision, prosecutors must disclose it. And when they fail to do so, courts have a duty to order a retrial, allowing a jury to consider the previously concealed evidence." *United States v Tavera*, 719 F3d 705, 708 (CA 6, 2013).

To establish a *Brady* violation, a defendant must show:

> (1) that the state possessed evidence favorable to the defendant; (2) that he did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different [People v Fox (After Remand), 232 Mich App 541, 549; 591 NW2d 384 (1998)].

As the Court stated in *People v Walton*, 71 Mich App 478, 481–82 (1976), "discovery has not been limited exclusively to whether the information sought was admissible at trial. Rather, the focus has shifted to whether fundamental fairness to the defendant, in preparing his defense, requires that he have access to the requested information."

There is a clearly-established right under the Confrontation Clause to cross-examine a witness to probe that witness's reliability and bias. The Supreme Court's Sixth Amendment jurisprudence leaves no question about a criminal defendant's right under the Confrontation Clause to "impeach, i.e., discredit, the [state's] witness [es]." *Davis v Alaska*, 415 US 308, 316, (1974).

Mere physical confrontation is not constitutionally adequate, because "one of the important objects of the right of confrontation [is] to guarantee that the fact finder had an adequate

23

RECEIVED by MCOA 2/22/2019 10:54:50 AM

opportunity to assess the credibility of witnesses." *Berger v California*, 393 US 314, 315 (1969);.

Constitutionally adequate confrontation must include the meaningful opportunity to challenge the

state's witnesses for "prototypical form[s] of bias." *Delaware v Van Arsdall*, 475 US 673, 680

(1986).   Such forms include "prejudices, or ulterior motives" from which "jurors ... could

appropriately draw inferences relating to the reliability of the witness." *Davis*, supra 316.   A

witness's own inconsistent statements are among these "prototypical forms of bias" because they

"undoubtedly provide[ ] valuable aid to the jury in assessing [witnesses'] credibility." *Harris v*

*New York*, 401 US 222, 225 (1971); see also *Davis*, supra at 316–17 ("[T]he exposure of a witness'

motivation in testifying is a proper and important function of the constitutionally protected right

of cross-examination." (citing *Greene*, 360 US at 496).

In the present case, the first element of a *Brady* violation is clearly met, as the prosecutor

possessed evidence at very favorable to Mr. Uraz.   However, because Mr. Uraz was never given

the notes it would be impossible for him to determine the exact nature of their materiality.

Turning to the second element of a *Brady* violation, Mr. Uraz asked for all evidence of this

type in discovery.

As to the third prong of a *Brady* violation, the prosecutor suppressed the favorable evidence.

The prosecutor could have easily provided the notes.

Turning to the fourth and final element of a *Brady* violation, there is a reasonable probability

that the trial court would have dismissed the solicitation of murder charges against Mr. Uraz had

the defense received the reports.   Both inmates had prior convictions involving theft and were

clearly seeking favorable treatment from the prosecution (see Issues IV and V).   Even the district

court indicated that the video chat did not meet the reasonable doubt standard, PE 208.   "A

reasonable probability [of a different result] is a probability sufficient to undermine confidence in

RECEIVED by MCOA 2/22/2019 10:54:50 AM

the outcome. This standard does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. The question is whether, in the absence of the suppressed evidence, the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

Here, it is impossible to have confidence in the verdict. A jury must be allowed to fairly evaluate the witnesses' credibility and assess the value of the exculpatory evidence that was suppressed. For all of these reasons, due process requires a new trial. Const 1963, art 1, § 17, 20; US Const, Ams VI, XIV.

**IV.  The trial court erred when it denied Mr. Uraz's motion to dismiss based on entrapment.**

**Standard of review and issue preservation:**  A trial court's finding of entrapment is reviewed for clear error. *People v Johnson*, 466 Mich 491, 497; 647 NW2d 480 (2002); *People v Juillet*, 439 Mich 34, 61; 475 NW2d 786 (1991). Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made. *Johnson*, supra, at 497-98.  Mr. Uraz moved to dismiss based upon entrapment and a hearing was held.

Mr. Uraz contends that he was entrapped by officers and jail house snitches.  Specifically, Mr. Uraz contends that the policy of offering proffers to inmates who give helpful information to the prosecution creates a situation where inmates like Mr. Uraz who are unfamiliar with the system, vulnerable and naïve are easy targets for entrapment and escalation of charges.  Here, Mr. Uraz, who was raised in Turkey, was in a situation where he was blocked from any contact with the outside world, was withdrawing from his addictions to alcohol and Xanax, was totally naïve about jail inmate relations and was completely vulnerable to exploitation by people like Mr. Allen who testified that Mr. Uraz looked lost when he arrived in jail and seemed like the kind of person who could be taken advantage of, JTIII 39, 46.  Mr. Uraz was immediately placed in segregation with

25

RECEIVED by MCOA 2/22/2019 10:54:50 AM

Mr. Allen and Mr. Close who immediately began working on Mr. Uraz in an effort to benefit their situations. Mr. Allen had a baby on the way and immediately asked for help for an early release. Mr. Close had already proffered on other cases and described himself as an excellent liar also moved in on Mr. Uraz immediately. Mr. Uraz was no match for these seasoned manipulators and is now looking at almost 20 years in prison. At least one juror was concerned about this issue. At the close of Mr. Close's testimony, a juror asked why Mr. Close would have conversations with Mr. Uraz about these issues, JTIV 82.

The defendant bears the burden of establishing entrapment by a preponderance of the evidence. *People v Woods*, 241 Mich App 545, 554; 616 NW2d 211 (2000). Entrapment is the conception and planning of an offense by an officer, and his procurement of its commission by one who would not have perpetrated it except for trickery, persuasion, or fraud of the officer. *People v Jamieson*, 436 Mich 61, 68; 461 NW2d 884 (1990), quoting *Sorrells v United States*, 287 US 435, 454; 53 S Ct 210; 77 L Ed 413 (1932). Entrapment occurs when an officer goes beyond "furnish[ing] an opportunity for the commission of a crime by one ready and willing to commit the activity." *Jamieson*, 436 Mich at 68. "Michigan has adopted a modified objective test when analyzing entrapment," which takes into consideration police conduct as well as the defendant's "vulnerabilities." *People v Akhmedov*, 297 Mich App 745, 752-753; 825 NW2d 688 (2012).

As repeatedly described by Michigan courts, "Entrapment occurs if (1) the police engage in impermissible conduct that would induce an otherwise law-abiding person to commit a crime in similar circumstances or (2) the police engage in conduct so reprehensible that the court cannot tolerate it." *People v Fyda*, 288 Mich app 446, 456; 793 NW2d 712 (2010). When determining whether the police engaged in impermissible conduct that would induce an otherwise law-abiding

26

RECEIVED by MCOA 2/22/2019 10:54:50 AM

citizen to commit a crime in similar circumstances, this court must consider several factors outlined in *People v Johnson*, 466 Mich 491, 498-499; 647 NW2d 480 (2002):

> (1) whether there existed appeals to the defendant's sympathy as a friend, (2) whether the defendant had been known to commit the crime with which he was charged, (3) whether there were any long time lapses between the investigation and the arrest, (4) whether there existed any inducements that would make the commission of a crime unusually attractive to a hypothetical law-abiding citizen, (5) whether there were offers of excessive consideration or other enticement, (6) whether there was a guarantee that the acts alleged as crimes were not illegal, (7) whether, and to what extent, any government pressure existed, (8) whether there existed sexual favors, (9) whether there were any threats of arrest, (10) whether there existed any government procedures that tended to escalate the criminal culpability of the defendant, (11) whether there was police control over any informant, and (12) whether the investigation was targeted.

"The circumstances of the particular defendant may be considered by the trial court in analyzing the ready and willing component of the objective entrapment test . . . ." People v Juillet, 439 Mich 34, 55; 475 NW2d 786 (1991).

The factors present here that support a finding of entrapment include, 1) Mr. Uraz's fragile state due to withdrawal from alcohol and drugs, 2) Mr. Uraz's vulnerability due to his segregation and inability to speak with his family, 3) Mr. Uraz's naivete regarding the jail atmosphere, 4) Mr. Uraz's mental health issues, 5) the use of jail house snitches looking for favorable treatment.

Mr. Uraz contends that this behavior should be impermissible and supports a finding that it was clear error for the trial court to deny his motion to dismiss based on entrapment. *People v Fyda*, 288 Mich app 446, 456; 793 NW2d 712 (2010).

**V.  Mr. Uraz was denied his state and federal constitutional right to the effective assistance of counsel where his trial counsel failed to ask for a continuance when he was nearing a mental breakdown during the trial and was not able to effectively try the case and where trial defense counsel failed to properly cross-examine the states key witnesses regarding their prior theft related convictions and failed to properly examine defense witnesses.**

RECEIVED by MCOA 2/22/2019 10:54:50 AM

**Standard of review and issue preservation**: Whether a person has been denied the effective assistance of counsel is a mixed question of fact and constitutional law. Findings of fact are reviewed for clear error and questions of constitutional law are reviewed de novo. See , *People v LeBlanc*, 465 Mich 575 , 579; 640 NW2d 246 (2002).  Defendant seeks remand for a *Ginther* hearing.

Mr. Uraz contends that his state and federal right to effective assistance of counsel was violated when his trial counsel's mental ability to try his case declined during his trial.  While conceding that an individual with a mental health condition may properly try a case while in good health and/or properly medicated, the record supports the conclusion that trial defense counsel began having difficulties during Mr. Uraz's trial.  At the least, a *Ginther* hearing is required to determine whether Mr. Uraz was deprived of the effective assistance of counsel.

Failure to investigate, prepare, or present a substantial defense has been grounds for ineffective assistance. See, e.g., *People v Nickson*, 120 Mich App 681; 327 NW2d 333 (1982); *People v Winans*, 187 Mich 294; 466 NW2d 731 (1991).

The role of defense counsel is to challenge the prosecution's case - to present to the trier of fact through cross-examination, presentation of evidence, motions and argument that a reasonable doubt exists as to the accused's guilt.  Courts have recognized that an unreasonable or harmful tactic is not protected solely because it is termed "strategy." See *People v Stubli*, 163 Mich App 376, 380; 413 NW2d 804 (1987); *People v Dalessandro*, 165 Mich App 569, 577-588; 419 NW2d 609 (1988) (holding that *Strickland,* supra, requires that counsel engage in "*sound* trial strategy"); *People v Tommolino*, 187 Mich App 14; 466 NW2d 315 (1991); Blackburn v Foltz, 828 F2d 1177 (CA 6, 1987).

RECEIVED by MCOA 2/22/2019 10:54:50 AM

The solicitation cases against Mr. Uraz were far from unassailable. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by error than one with overwhelming record support." *Strickland,* 466 US at 696. The only evidence against Mr. Uraz for these offenses were jail house snitches testimony and a vague phone conversation with an undercover officer.

Generally, to establish ineffective assistance of counsel, a defendant must show: (1) that counsel's performance was below an objective standard of reasonableness under prevailing professional norms; (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different; and (3) that the resultant proceedings were fundamentally unfair or unreliable. US Const, Ams VI, XIV; Const 1963, art I, §20; *Strickland v Washington,* 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Pickens,* 446 Mich 298 (1994).

Here, trial defense counsel had a mental breakdown requiring hospitalization just days after Mr. Uraz's trial was completed, Hearing 12-13-17 at 3, In chambers conference 12-12-17. During the fifth day of trial the prosecutor stated in front of the jury:

> MR. ROTH: "Your Honor, I am going to object. This is three minutes between questions. This cross-examination rambles on for hours.
> THE COURT: I can't help that.
> MR. ROTH: We took a break so he would gather his thoughts.
> THE COURT: I can't press that.
> MR. ROTH: Thank you, Your Honor.
> THE COURT: This is a serious matter. So he can utilize whatever strategy he so desires. JTV 60-61.

During this same time frame, defense counsel sent an email to Mr. Uraz's sister that supports a finding that defense counsel was nearing a breakdown, see Appendix A. This email was entered into the record during the sentencing phase. Defense counsel also failed to impeach

RECEIVED by MCOA 2/22/2019 10:54:50 AM

29

Mr. Allen and Mr. Close with their prior theft convictions.   Mr. Allen was convicted of misdemeanor larceny and Mr. Close was convicted of home invasion 3d, see Appendix B.  Under MRE 609 misdemeanors that contain an element of dishonesty or false statement may be used for impeachment. *People v. Allen*, 429 Mich. 558 (1988).  Furthermore, a review of defense counsel's examination of the defense witnesses and closing argument supports the conclusion that defense counsel was unable to properly represent Mr. Uraz.

An attorney's failure to present certain evidence constitutes ineffective assistance of counsel if it deprives the accused of a "substantial defense." *People v Kelly*, 186 Mich App 524, 526 (1990).  A substantial defense is one that might have made a difference in the outcome of the trial. Id.  Attorneys also have a duty to conduct adequate pretrial preparation. ABA STDS. CRIM. JUST. 4.4.1, *People v Nickson*, 120 Mich App 681, 685 (1982). Investigation related to the credibility of prosecution witnesses is included in this duty. Id.

Here, the credibility of the prosecution's star witnesses for the solicitation offenses was crucial.  Also, defense counsel's presentation to the jury at the end of the trial was rambling and inadequate and greatly prejudiced Mr. Uraz's case.

For all of these reasons, due process requires a new trial or at the least a *Ginther* hearing. Const 1963, art 1, § 17; US Const, Am XI and XIV.

**VI.  The prosecution's misconduct, which consisted of denigrating defense counsel in front of the jury, deprived Mr. Uraz of his due process right to a fair trial.**

**Issue preservation and standard of review:**   Claims of prosecutorial misconduct are constitutional issues reviewed de novo, *People v Wilson*, 265 Mich App 386, 393; 695 NW2d 351 (2005);, and on a case by case basis. *People v Walker*, 265 Mich App 530, 542; 697 NW2d 159 (2005), vacated in part and remanded in part 477 Mich 856; 720 NW2d 754 (2006).  Appellate

RECEIVED by MCOA 2/22/2019 10:54:50 AM

courts decide whether such misconduct denied the defendant a fair trial by evaluating each question in the context of a case's particular facts. *People v Duncan,* 402 Mich 1, 16; 260 NW2d 58 (1977). Because trial counsel failed to object, the errors are unpreserved and thus Mr. Uraz must show plain error that affected substantial rights, seriously affecting the fairness, integrity, or public reputation of the judicial proceedings. *People v Carines,* 460 Mich 750, 763, 774; 597 NW2d 130 (1999).

Lacking compelling evidence and credible witnesses, the prosecution resorted to misconduct to convince the jury of Mr. Uraz's guilt. In the name of securing a conviction, the prosecution denigrated defense counsel in front of the jury:

> MR. ROTH: "Your Honor, I am going to object. This is three minutes between questions. This cross-examination rambles on for hours.
> THE COURT: I can't help that.
> MR. ROTH: We took a break so he would gather his thoughts.
> THE COURT: I can't press that.
> MR. ROTH: Thank you, Your Honor.
> THE COURT: This is a serious matter. So he can utilize whatever strategy he so desires. JTV 60-61.

A prosecutor's primary obligation, however, is not to obtain convictions, but to ensure that justice is done. *Berger v United States,* 295 US 78, 88-89, 55 S Ct 629; 79 L Ed 1314 (1935);. The key test in evaluating claims of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial. *People v Watson,* 245 Mich App 572, 593, 629 NW2d 411 (2001). As a result of prosecutorial misconduct in this case, Mr. Uraz was denied his constitutional right to a fair trial. US Const, Am V, VI, XIV; Const 1963, art 1, §§17, 20.

A prosecutor "must avoid inflaming the prejudices of a jury." People v Marji, 180 Mich App 525, 538; 447 NW2d 835 (1989). It is improper for the prosecutor to engage in arguments that attack defense counsel. Such arguments undermine the defendant's presumption of innocence

RECEIVED by MCOA 2/22/2019 10:54:50 AM

31

and impermissibly shift the jury's focus from the evidence itself to the defense counsel's personality. *People v Dalessandro*, 165 Mich App 569, 580; 419 NW2d 609 (1988);.

In *Dalessandro*, this Court granted relief where the prosecutor stated that the defense was "a sham meant to mislead you." The prosecutor's remarks in Mr. Uraz's case were similarly improper and prejudicial. By chastising defense counsel for taking too long between questions and rambling on he improperly suggested to the jurors that defense counsel was deliberately attempting to mislead them or was incapable of defending Mr. Uraz.

This misconduct requires reversal even without an objection from the defense, because it was highly prejudicial and could not be cured by an instruction from the court, and therefore violated Mr. Uraz's right to a fair trial. See *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999); *Dalessandro*, supra at 578-579. Reversal is required.

32

RECEIVED by MCOA 2/22/2019 10:54:50 AM

## SUMMARY AND RELIEF

WHEREFORE, Mr. Uraz requests this Court reverse and vacate his convictions and sentences.

Respectfully submitted,

BY: _____

SUSAN K. WALSH (P40447)
PO Box 157
Northville, MI 48167
248-563-9149

Dated: February 22, 2019

33

RECEIVED by MCOA 2/22/2019 10:54:50 AM

**APPENDIX A**

RECEIVED by MCOA 2/22/2019 10:54:50 AM

16-1064-FH
16-1065-FC

**DEFENDANT'S EXHIBIT**

A

Jan 24, 2018

Hi Mr. Perrone,
Can I call you now if you are available?

**From:** Jacob A. Perrone [mailto:jacob@perronelawpc.com]
**Sent:** Wednesday, November 08, 2017 10:07 AM
**To:** Aysem Uraz <aysemu@yahoo.com>
**Cc:** Cenk Uraz <curaz@mfa.gov.tr>
**Subject:** Re: my brother will call u

You can call me now on my cell at (517) 719-4657. I have some very interesting updates. Cenk. Please also feel free to call. I have clients in Malaysia, Singapore, and China so I am used to the time change. I tried to explain to the Prosecutor that I work 120 hours a week but his little mind couple understand the implications. He spent all day today with his head down looking dejected.... in front of the jury... This doesn't leave us until Thursday when justice is served. I am anticipating a Not Guilty Verdict on all the major charges. They are bullshit. I think I may have hung the jury on the Aggravated Stalking case solely as a result of the prosecutor's ineptitude. If I don't answer send me an email with a phone number and I will attempt to call back. Thursday is judgment day. Either way I believe that I have thoroughly established that Tunc's rights were severely violated and if am able toI secure a Not Guilty Verdict as to the ("frankly complete bullshit") Solicitation Counts I will immediately file a lawsuit against the Lansing Police Department and the Ingham County Sheriff's Department and Prosecutor's office. The reason the prosecutor was so visibly dejected in front of the jury today (I've never seen this before.... You represent your client and you never lose face) was because I warned him that i was going to sue him in Federal Court.... He didn't believe me... Now he knows.... IF YOU TALK TO TUNC HE CANNOT TESTIFY... I THINK THE JIURY MAY COME BACK HUNG ON THE AGG STALKING CHARGE AND ARE ALMOST GUARANTEED TO COME BACK NOT GUILTY ON ALL THE SOLICITATION COUNTS. Tunc Got fucked. I will establish $10,000.000.00 in damages after securing the not guilty verdict. Tunc isn't crazy. The Amercian Justice System is.... Feel free to call. I will be working on a number of other projects as we get a day off tomorrow... or today... Like I said, international business doesn't sleep.

On Wed, Nov 8, 2017 at 1:09 AM, Aysem Uraz <aysemu@yahoo.com> wrote:

Dear Mr. Perrone

Thank you for your kind reply. We really wonder what's going on at Tunc's trial. My brother Cenk Uraz will call you today.

By the way Turkish Embassy in Washington made a press release on 6th November 2017. Please find enclosed .For your info. By the way, you informed Turkish Consulate in Chicago about Tunc's trial probably they will be there on thursday

We are hoping to get good news about Tunc

Kind regards
Aysem Uraz

FILED-30th CIRCUIT COURT

BY:

Deputy Clerk

RECEIVED by MCOA 2/22/2019 10:54:50 AM

**APPENDIX B**

RECEIVED by MCOA 2/22/2019 10:54:50 AM

# ICHAT
### Internet Criminal History Access Tool

Michigan's Official Website

Search Results - Printer Friendly Format

Data Searched on:   [Close] [Print]

| Last Name | First Name | Middle Initial | DOB | Race | Sex | More Criteria |
|---|---|---|---|---|---|---|
| CLOSE | REGINALD | | 3/26/1982 | Black | Male | |

Based on the information provided, the following is a certified result of the search as of 9/15/2017 9:59 AM

## Important: Information Contained in this Record

THE RECORD RESULTS PROVIDED HERE ARE BASED ON A COMPUTER MATCH AS EXPLAINED ON THE ICHAT HOME PAGE. THE ICHAT SYSTEM HAS LIMITATIONS THAT MAY CAUSE FALSE POSITIVES OR FALSE NEGATIVES. PLEASE REVIEW THE RESULTS CAREFULLY AND DO NOT TAKE ADVERSE ACTION BASED SOLELY ON THIS RECORD. IF YOU CANNOT DETERMINE THAT THESE RESULTS DO NOT BELONG TO THIS INDIVIDUAL, AND THE INDIVIDUAL IS DISPUTING THE RECORD, PLEASE PROVIDE THAT INDIVIDUAL A COPY OF THIS REPORT AND OFFER THAT INDIVIDUAL THE OPPORTUNITY TO PERFORM A RECORD CHALLENGE BY SUBMITTING FINGERPRINTS. THIS IS EXPLAINED AT THE BOTTOM OF THIS PAGE. SINCE ARRESTS, CONVICTIONS, OR CRIMINAL RECORD DELETIONS MAY OCCUR AT ANY TIME, DO NOT USE THIS INFORMATION FOR FUTURE CLEARANCES.

```
MICHIGAN CRIMINAL HISTORY RECORD INFORMATION MEETING DISSEMINATION CRITERIA
FOR SID: 2280531X AS OF 09/15/2017

    NAM: CLOSE,REGINALD GARFIELD
    RAC: B        SEX: M        DOB: 03/26/1982          SID: 2280531X
    HGT: 603      WGT: 200      HAI: BLK
    EYE: BRO      POB: MI
                                                 MNU:
    CIZ:


    SCAR/MARK/TATTOO:     TAT R ARM      TAT BACK

    ADDITIONAL IDENTIFIERS AND COMMENTS:

    NAM: CLOSE,REGINALD            CLOSE,REGINALD GARFIELD JR
```

---



```
CRIMINAL TRACKING NUMBER: 990232231401          INCIDENT DATE: 10/30/2002
TCN/OCA: A103499553P/022727
NAME USED: CLOSE,REGINALD GARFIELD
===============================================================================
ARREST SEGMENT         : CHARGE SEGMENT      : JUDICIAL SEGMENT
=====================  : ==================  : ============================
DATE: 10/30/2002       : NO DATA RECEIVED    : DATE: 10/31/2002
MI6362800              :                     : MI6301153
OAK PARK DPS           :                     : 45B OAK PARK DISTRICT
OCA: 022727            :                     :   COURT
1 CNT OF 5400          :                     : CFN: 02321790POT
  ORDINANCE VIOL       :                     :
   TRAFFIC OFFENSE     :                     : CNT-1 MCL
DISP: CHGD BY PROSECUTOR :                   :   ORDINANCE VIOL
                       :                     : DISP: PLED GUILTY
                       :                     : SENT/REMARKS:
                       :                     : DROVE WHILE UNLIC OR
                       :                     :   NOT VALID CONF-10D
                       :                     :   F/C/R-$360
                       :                     :
                       :                     : CNT-2 MCL
                       :                     :   ORDINANCE VIOL
                       :                     : DISP: PLED GUILTY
                       :                     : SENT/REMARKS:
                       :                     : POSS CONTROLLED
                       :                     :   SUBSTANCES F/C/R-$125
===============================================================================
CRIMINAL TRACKING NUMBER: 820112299501          INCIDENT DATE: 04/24/2003
TCN/OCA: D103013635M/591674
NAME USED: CLOSE,REGINALD GARFIELD
===============================================================================
ARREST SEGMENT         : CHARGE SEGMENT      : JUDICIAL SEGMENT
=====================  : ==================  : ============================
DATE: 04/24/2003       : DATE: 04/24/2003    : DATE: 07/01/2003
MI8234900              : MI820013A           : MI821095J
DETROIT POLICE         : WAYNE COUNTY        : 3RD CIRCUIT COURT
  DEPARTMENT           :   PROSECUTING ATT   :   CRIMINAL DIV DETROIT
OCA: 111111111111      : 1 CNT MCL 750.110A2 : CFN: 0300537001
1 CNT OF 5200          :   FELONY            :
  ATTEMPT-FELONY       :   HOME INVASION - 1ST : CNT-1 MCL 750.110A4
  WEAPONS OFFENSE      :   DEGREE            :   FELONY
DISP: CHGD BY PROSECUTOR :                   :   HOME INVASION - 3RD
                       :                     :   DEGREE
                       :                     : DISP: PLED GUILTY
                       :                     : SENT/REMARKS:
                       :                     : 1Y6MD TO 5YM
                       :                     :
                       :                     : CNT-2 MCL 750.110A4
                       :                     :   FELONY
                       :                     :   HOME INVASION - 3RD
                       :                     :   DEGREE
                       :                     : DISP: FOUND GUILTY
                       :                     : SENT/REMARKS:
                       :                     : CONFINEMENT 00YR 18MTH
                       :                     :   000DAY TO 05YR 00MTH
                       :                     :   000DAY PROB: 00YR
                       :                     :   00MTH 000DAY
```

RECEIVED by MCOA 2/22/2019 10:54:50 AM

*Snitch #2*



9/15/2017                    ICHAT : Printer friendly search results





### ICHAT
**Internet Criminal History Access Tool**

MICHIGAN.GOV

Michigan's
Official
Website

Search Results - Printer Friendly Format

**Data Searched on:**   [Close] [Print]

| Last Name | First Name | Middle Initial | DOB | Race | Sex | More Criteria |
|-----------|-----------|----------------|-----|------|-----|---------------|
| ALLEN | CHARLES | | 8/1/1993 | Black | Male | |

Based on the information provided, the following is a certified result of the search as of 9/15/2017 10:01 AM

---

#### Important: Information Contained in this Record

THE RECORD RESULTS PROVIDED HERE ARE BASED ON A COMPUTER MATCH AS EXPLAINED ON THE ICHAT HOME PAGE.  THE ICHAT SYSTEM HAS LIMITATIONS THAT MAY CAUSE FALSE POSITIVES OR FALSE NEGATIVES.  PLEASE REVIEW THE RESULTS CAREFULLY AND DO NOT TAKE ADVERSE ACTION BASED SOLELY ON THIS RECORD.  IF YOU CANNOT DETERMINE THAT THESE RESULTS DO NOT BELONG TO THIS INDIVIDUAL, AND THE INDIVIDUAL IS DISPUTING THE RECORD, PLEASE PROVIDE THAT INDIVIDUAL WITH A COPY OF THIS REPORT AND OFFER THAT INDIVIDUAL THE OPPORTUNITY TO PERFORM A RECORD CHALLENGE BY SUBMITTING FINGERPRINTS.  THIS IS EXPLAINED AT THE BOTTOM OF THIS PAGE.  SINCE ARRESTS, CONVICTIONS, OR CRIMINAL RECORD DELETIONS MAY OCCUR AT ANY TIME, DO NOT USE THIS INFORMATION FOR FUTURE CLEARANCES.

---

MICHIGAN CRIMINAL HISTORY RECORD INFORMATION MEETING DISSEMINATION CRITERIA
FOR SID: 3518170J AS OF 09/15/2017

NAM: ALLEN,CHARLES MARICE                          SID: 3518170J
RAC: B          SEX: M          DOB: 08/01/1993
HGT: 600        WGT: 188        HAI: BRO
EYE: BRO        POB: MI
                                                   MNU:

CIZ:

ADDITIONAL IDENTIFIERS AND COMMENTS:

NAM: ALLEN,CHARLES MAURICE

DOB: 08/19/1993

https://apps.michigan.gov/ICHAT/PrinterFriendlyResults.aspx?id=17526746                 1/5

---

9/15/2017                    ICHAT : Printer friendly search results

```
CRIMINAL TRACKING NUMBER: 331000779601            INCIDENT DATE: 09/07/2010
TCN/OCA: K811020593H/100907062209
NAME USED: ALLEN,CHARLES MARICE
=========================================================================
ARREST SEGMENT        : CHARGE SEGMENT         : JUDICIAL SEGMENT
=========================================================================
DATE: 04/01/2011      : DATE: 09/07/2010       : DATE: 05/02/2011
MI3351900             : MI330013A              : MI330075J
LANSING POLICE        : INGHAM COUNTY          : 54A DISTRICT COURT
  DEPARTMENT          :   PROSECUTING ATT      :   LANSING
OCA: 100907062209     : 1 CNT MCL 750.3564A    : CFN: 11-01251
1 CNT OF 2300         :   MISDEMEANOR          :
  MISDEMEANOR         :   LARCENY - $200 OR    : CNT-1 MCL 750.3564A
  LARCENY             :   MORE BUT LESS THAN   :   MISDEMEANOR
DISP: CHGD BY PROSECUTOR :   $1,000            :   LARCENY - $200 OR
                      :                        :   MORE BUT LESS THAN
                      :                        :   $1,000
                      :                        : DISP: PLED GUILTY
                      :                        : SENT/REMARKS:
                      :                        : F/C/R $908/PROB 6 MO
=========================================================================
CRIMINAL TRACKING NUMBER: 331200227301            INCIDENT DATE: 03/21/2012
TCN/OCA: I512123907H/12-C-2396
NAME USED: ALLEN,CHARLES MARICE
=========================================================================
ARREST SEGMENT        : CHARGE SEGMENT         : JUDICIAL SEGMENT
=========================================================================
DATE: 03/21/2012      : DATE: 03/21/2012       : DATE: 05/14/2012
MI3313300             : MI330013A              : MI330085J
INGHAM COUNTY SHERIFF : INGHAM COUNTY          : 55TH DISTRICT COURT
  DEPARTMENT          :   PROSECUTING ATT      :   MASON
OCA: 12-2396          : 1 CNT MCL 257.6251-A   : CFN: 1200906
1 CNT OF 5400         :   MISDEMEANOR          :
  MISDEMEANOR         :   OPERATING WHILE      : CNT-2 MCL 257.6251-A
  TRAFFIC OFFENSE     :   INTOXICATED          :   MISDEMEANOR
DISP: CHGD BY PROSECUTOR : 1 CNT MCL 257.6251C :   OPERATING WHILE
                      :   MISDEMEANOR          :   INTOXICATED
                      :   OPERATING WITH A HIGH : DISP: PLED GUILTY
                      :   BAC                  : SENT/REMARKS:
                      :                        : F/C/R $1857/PROB 12
                      :                        : MO/JAIL 93 DAYS
=========================================================================
CRIMINAL TRACKING NUMBER: 331200569901            INCIDENT DATE: 08/06/2012
TCN/OCA: K812062764H/120806008968
NAME USED: ALLEN,CHARLES MARICE
=========================================================================
ARREST SEGMENT        : CHARGE SEGMENT         : JUDICIAL SEGMENT
=========================================================================
DATE: 06/14/2012      : DATE: 08/07/2012       : DATE: 10/02/2012
MI3351900             : MI330013A              : MI330075J
LANSING POLICE        : INGHAM COUNTY          : 54A DISTRICT COURT
  DEPARTMENT          :   PROSECUTING ATT      :   LANSING
OCA: 120806008968     : 1 CNT MCL 750.237      : CFN: 12-03596
2 CNT OF 5200         :   MISDEMEANOR          :
  MISDEMEANOR         :   WEAPONS - FIREARM -  : CNT-2 MCL 750.237
  WEAPONS OFFENSE     :   POSSESSION UNDER THE :   MISDEMEANOR
DISP: CHGD BY PROSECUTOR :   INFLUENCE         :   WEAPONS - FIREARM -
                      : 1 CNT MCL 752.862-A    :   POSSESSION UNDER THE
                      :   MISDEMEANOR          :   INFLUENCE
                      :   WEAPONS - FIREARMS - : DISP: PLED GUILTY
                      :   CARELESS             : SENT/REMARKS:
                      :   DISCHARGE/PROPERTY   : F/C/R $75/JAIL 90 DAYS
                      :   DAMAGE $50 OR LESS   :
```

https://apps.michigan.gov/ICHAT/PrinterFriendlyResults.aspx?id=17526746                 2/5

RECEIVED by MCOA 2/22/2019 10:54:50 AM

STATE OF MICHIGAN
IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,
    Plaintiff-Appellee,

STIPULATION

Court of Appeals Nos.: 343695 & 343696

v

Circuit Nos.: 16-1064-FH & 16-1065-FC

TUNC URAZ,
    Defendant-Appellant.

It is hereby stipulated and agreed by the parties hereto, by and through their respective attorneys of record, that the Plaintiff-Appellee shall have an additional 28 days in which to file their brief. It is hereby understood that the time for filing Plaintiff-Appellee's brief on appeal originally set for March 29, 2019 is now April 26, 2019.

Dated: March 25, 2019

Kahla D. Crino (P71012)
Appellate Division Unit Chief
Ingham County Prosecutor's Office
303 W. Kalamazoo St., 4th Floor
Lansing, Michigan 48933

Dated: March 25, 2019

Signed with permission
Susan K. Walsh (P40447)
Attorney for Defendant Appellant
PO Box 157
Northville, Michigan 48167-0157

RECEIVED by MCOA 3/25/2019 2:42:43 PM

STATE OF MICHIGAN
        IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,
            PLAINTIFF - APPELLEE

                    Judge Clinton Canady III
                    Circuit Ct#'s 16-1064-FH
VS.                              16-1065-FC
                    COA#'s: 343695, 343696

TUNC URAZ
            DEFENDANT-APPELLANT
----------------------------------------------------------/

30TH. CIRCUIT COURT
INGHAM COUNTY PROSECUTOR'S OFFICE
ATTORNEY FOR PLAINTIFF
313 W. KALAMAZOO ST
PO BOX 40771
LANSING, MI 48901
---------------------------------------------------------
MS. SUSAN K. WALSH (P40447)
ATTORNEY FOR DEFENDANT
PO BOX 157
NORTHVILLE, MI 48167

                PRO SE
        STANDARD 4 SUPPLEMENTAL BRIEF


TUNC URAZ #114653. IN PRO SE
SAGINAW CORRECTIONAL FACILITY
9625 PIERCE RD.
FREELAND, MI 48623

                DATED: 4/18  2019

RECEIVED by MCOA 5/6/2019 3:23:56 PM

STATE OF MICHIGAN
IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,
PLAINTIFF - APPELLEE

.                          Judge Clinton Canady III
                           Circuit Ct#'s 16-1064-FH
VS.                                       16-1065-FC
                           COA#'s: 343695, 343696

TUNC URAZ
            DEFENDANT-APPELLANT
--------------------------------------------------------------/

30TH. CIRCUIT COURT
INGHAM COUNTY PROSECUTOR'S OFFICE
ATTORNEY FOR PLAINTIFF
313 W. KALAMAZOO ST
PO BOX 40771
LANSING, MI 48901
-----------------------------------------------------------

MS. SUSAN K. WALSH (P40447)
ATTORNEY FOR DEFENDANT
PO BOX 157
NORTHVILLE, MI 48167
-----------------------------------------------------------

PROOF OF SERVICE
-----------------------------------------------------------
TUNC URAZ #114653
SAGINAW CORRECTIONAL FACILITY
9625 PIERCE RD.
FREELAND, MI 48623
-----------------------------------------------------------

I , TUNC URAZ, DOES HERE BY SWEAR UNDER PENALTY OF PERJURY THAT I DID SERVE UPON THE INGHAM COUNTY PROSECUTOR'S OFFICE ONE (1) COPY OF DEFENDANT'S PRO STANDARD 4 BRIEF, AND ALSO SERVED UPON MY ATTORNEY ONE (1) COPY OF DEFENDANT'S PRO SE STANDARD 4 BRIEF WITH THE REQUEST THAT SHE FORWARD ONE (1) COPY TO THE COURT OF APPEALS IN ACCORDANCE WITH FILING PROCEDURES BY SENDING SAID DOCUMENTS THROUGH THE MICHIGAN DEPARTMENT OF CORRECTIONS LEGAL MAIL EXPEDITING PROCESS.
ON          ,2019  TO THE ABOVE STATED ADDRESSES.

_Tunc Uraz_

TUNC URAZ -IN PRO SE.
                        DATED: 4/18 2019

RECEIVED by MCOA 5/6/2019 3:23:56 PM

TABLE OF CONTENTS

1) TABLE OF AUTHORITIES......................i

2)TABLE OF JURISDICTION......................iii

3)STATEMENT OF QUESTIONS PRESENTED.........................................iv
ARGUMENTS (with applicable standard of review)
MCR 7.212 (C)(7).................Pgs.1-19

REQUEST FOR RELIEF

---------------------------------------------------------

1)
THE DEFENDANT WAS DENIED HIS STATE AND FEDERAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, WHERE COUNSEL FAILED TO OBJECT TO THE USE OF INCRIMINATING STATEMENTS OBTAINED IN VIOLATION OF THE DEFENDANT'S SIXTH AMENDMENT RIGHT TO COUNSEL................................................Pg.1

2)
COUNSEL WAS ALSO CONSTITUTIONALLY DEFICIENT WHEN HE FAILED TO INVESTIGATE, PRESENT EVIDENCE OR CONSULT AN EXPERT AFTER ASSERTING THAT THE DEFENDANT'S DIMINISHED STATE OF MIND AT THE TIME OF THE OFFENSE WOULD UNDERMINE THE SPECIFIC INTENT NECESSARY TO COMMIT SOLICITATION OF MURDER AND WHERE HE FAILED TO REQUEST A.CONTINUANCE IN ORDER TO HAVE THE NECESSARY PSYCHIATRIC EVALUATION DONE..............................Pg.2

3)
DID TRIAL.COUNSEL MENTAL ILLNESS EFFECT HIS ABILITY TO ADEQUATELY REPRESENT HIS CLIENT DURING THE PRETRIAL AND TRIAL PHASES OF THE PROCEEDINGS, WHEN IT WAS DISCOVERED THAT COUNSEL WAS HOSPITALIZED DUE TO A SEVERE BIPOLAR BREAKDOWN PRIOR TO SENTENCING AND WAS REMOVED FROM THE CASE....................................Pg.4

4)
WAS COUNSEL CONSTITUTIONALLY INEFFECTIVE WHEN HE FAILED TO INVESTIGATE, INTERVIEW, OR CALL RELEVANT AND MATERIAL WITNESSES CRUCIAL TO THE DEFENSE THEORY AND FACTS CLAIMING HE WASN'T BEING REIMBURSED FOR PRIOR WITNESS INVESTIGATIONS, IN VIOLATION OF DEFENDANT'S SIXTH FOURTEENTH AMENDMENT RIGHTS........................Pg. 5

5)
THE TRIAL COURTS BASIS FOR DENYING DEFENSES MOTION TO DISMISS DUE TO ENTRAPMENT IS IN ERR. WHERE THE COURT FAILED TO APPLY OBJECTIVE TEST OF ENTRAPMENT IN IT'S DECISION MAKING PROCESS...............................Pg.7

6)
THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ADMITTED INTO EVIDENCE A VIDEO TAPED AND TRANSCRIBED CONVERSATION, WHERE THE DEFENDANT ALLEGEDLY SOLICITED AN UNDERCOVER POLICE AGENT TO COMMIT MURDER, WHERE THE EVIDENCE WAS OBTAINED IN VIOLATION OF DEFENDANT'S SIXTH AMENDMENT RIGHT TO COUNSEL................................................ Pg 10

7)
THE CIRCUIT COURT JUDGE COMMITTED REVERSIBLE ERROR, WHEN HE ALLOWED A JUROR BIAS TO THE DEFENDANT'S ETHNICITY TO REMAIN ON THE JURY PANEL UNTIL THE CLOSING OF PROOFS AND WHERE HE FAILED TO HOLD A HEARING OR INQUIRY INTO THE MATTER TO ENSURE AN IMPARTIAL JURY. IN VIOLATION OF THE DEFENDANT'S SIXTH AMENDMENT RIGHTS..........Pg 11

8)
THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT GRANTED RECONSIDERATION OF THE PROSECUTOR'S MOTION TO ADMIT OTHER BAD ACTS EVIDENCE ON THE GROUNDS THAT THE DEFENDANT'S TESTIMONY AT HIS ENTRAPMENT HEARING QUALIFIED THE EVIDENCE TO BE ADMITTED AT TRIAL. IN VIOLATION OF HIS RIGHTS TO DUE PROCESS. .................Pg. 12

RECEIVED by MCOA 5/6/2019 3:23:56 PM

9) DID THE TRIAL COURTS ASSESSMENT OF 50 POINTS UNDER OFFENSE VARIABLE (6) MCL. 777.36 (1) VIOLATE THE DEFENDANTS RIGHTS AGAINST CRUAL AND UNUSUAL PUNISHMENT, AND WHERE THE COURT FAILED TO CONSIDER A LESSER VARIABLE AND/OR "SUA SPONTE " INSTRUCT THE JURY OF ANY SPECIFIC DEGREE OF SOLICITATION OF MURDER IN VIOLATION OF THE DEFENDANTS RIGHT TO DUE PROCESS..........Pg 13

10)
THE DISTRICT COURT JUDGE ABUSE HIS DISCRETION WHEN HE BOUND THE DEFENDANT OVER ON A THIRD SOLICITATION OF MURDER CHARGE.................................................Pg.14

11)
THE CIRCUIT COURT JUDGE ABUSED HIS DISCRETION WHEN HE ALLOWED THE ADMITTANCE OF OTHER BAD ACTS EVIDENCE THAT WAS MORE PREJUDICIAL AND CONFUSING THAN PROBATIVE AND WHERE HE GRANTED RECONSIDERATION OF THE PROSECUTIONS MOTION TO ADMIT OTHER BAD ACTS EVIDENCE AS IT PERTAINS TO ITEM (7) SEVEN WHICH HAD PREVIOUSLY DISALLOWED.......Pg15

12) THE TRIAL COURT ERRED BY ORDERING DEFENDANT MR. URAZ TO PAY RESTITUTION IN THE AMOUNT OF $2273.00 FOR UNCHARGED CONDUCT AND WHERE HE WAS ASSESSED, CHARGED TWICE FOR COURT COSTS, FEES, ATTORNEY FEES, CRIME VICTIM RIGHTS FEES AND DNA FEES, IN VIOLATION OF HIS 8TH. AMENDMENT RIGHTS...............Pg. 16

13)THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT SCORED OFFENSE VAIABLES OV4 AND OV 10, BASED ON FACTS NOT FOUND BY THE TRIER OF FACT BEYOND A REASONIBLE DOUBT OR ADMITTED TO BY THE DEFENDANT IN VIOLATION OF HIS SIXTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION.
........................Pg.18

14)
THE DEFENDANT WAS DENIED HIS FIFTH AMENDMENT RIGHTS. WHEN POLICE FAILED TO READ THE DEFENDANT HIS MIRANDA WARNING AT ANYTIME PRIOR TO OR AFTER HIS ARREST, WARRANTING REVERSAL OF HIS CONVICTION AND SUPPRESSION OF HIS STATEMENTS TO POLICE INVESTIGATORS AND THEIR
AGENTS................................................Pg 19

SUMMARY AND RELIEF REQUEST
            FOR RELIEF

WHEREFORE, FOR THE AFORE MENTIONED REASONS, DEFENDANT APPELLANT ASKS THIS HONORABLE COURF TO GRANT ISSUE RAISED SOUGHT AT THE CONCLUSION NOF EACH ISSUE RAISED, VACATE HIS CONVICTION AND/OR THAT A REMAND TO THE TRIAL COURT BE GRANTED FOR EVIDENTIARY HEARING, PURSUANT TO PEOPLE V. GINTHER, 390 MICH 436: 212 NW2d. 922 (1973) TO ALLOW FOR EXPANSION OF THE RECORD TO THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS HEREIN.

Respectfully submitted

_Tunc Uraz_      Dated, April, 10,2019
-------------------------------------------
Tunc Uraz, #114653
Saginaw Correctional Facility
9625 Pierce Rd.
Freeland, MI 48623

RECEIVED by MCOA 5/6/2019 3:23:56 PM

TABLE OF AUTHORITIES.            PG. NO:

AYERS V HUDSON,623 F.3d, 301(2010)..1

BERGHUIS V THOMPKINS, 560 US 387; 401; 97 S. Ct. 1232 (1977)........................19

BREWER V WILLIAMS, 430 US 387; 401; 97 S Ct. 1232 (1977)............................1,10

PPL V CANNON, 481 MICH 152; 749 NW 2d 257 (2008)........................................18

DANDO V YUKINS, 461F.3d 791(2006)...3

DEMSEY V BOBBY, 412 F. SUPP 2d. 720 (2005)....................................................6

FELLERS V UNITED STATEZ , 2004 U.S. LEXIS 825.......................................1,2,10

FRANKLIN V ANDERSON, 2002 U.S DIST. LEXIS 26814....................................12

FRANKLIN V BETO, 1965...........................1

MAINE V MOULTEN, 474 U.S. 159; 106 S. Ct. 477 (1985)..............................1,10

MASSIAH V UNITED STATES, 377 U.S. 201;84 S. Ct. 1199 (1964)............1,4,10,11

MBUGUA V THALER, 2012 U.S. DIST. LEXIS 38245.........................................19

MIRANDA V ARIZONA, 384 U.S. 436, 444, 86S.Ct.1602,1612;16LE2d.694(1966)...19

MORAN V BURBINE, 475 U.S. 412 (1986)......................................................19

NORTH CAROLINA V BUTLER, 441U.S. 369, 99 S.Ct. 1755.................................19

PPL V ADAIR, 452 MICH 473 (1996)......15

PPL V ADAMS, 232 MICH. APP. 128 (1988)......................................................8

PPL V ARMSTRONG, 490 MICH. 281;289; 806 NW2d. 676 (2011)......1,2,4,6

PPL V CONNOLLY, 232 MICH APP 425 (1980)....................................................8

PPL V CRAWFORD, 458 MICH 376; 385; 582 NW 2d. 785 (1992)...........................16

PPL V D'ANGELO, 401 MICH 167
(1977)....................................7,8,12,16

PPL V GODDARD,429MICH505(1933)..16

PPL V GONYA, 421MICH.462 (1984).....19

PPL V GUBACHY, 222 MICH APP 706; 708 NW2d. 891 (2006).............................17

PPL V HAWTHORN, 474 MICH, APP 174 (2006)..............................................13

PPL V HOWARD, 2017 MICH APP LEXIS 575.................................................3

PPL V HUSTON, 489 MICH 451;802 NW 2d 261 (2011).....................................18

PPL V HUTCHINSON, 308 MICH APP 10 ; 865 NW 2d. 44 (2014)..........................13

PPL V JONES, 48; MICH APP 334 (1974)....................................................8

PPL V JULLIET, 439 MICH 34 (1991).......8

PPL V KING, 412; MICH 145, 152-153; 312 NW 2d. 629 (1981)...........................14

PPL V KNASIAK, 199 MICH APP LEXIS 1203......................................................14

PPL V LAPLAUNT, 217 MICH APP LEXIS 783 (1999)............................................7

PPL V LEWIS, 2017 MICH APP LEXIS
351..................8

PPL V LOCKETT, 295 MICH APP 165 ; 814 NW 2d 295 (2012)...........................18

PPL V LOCKRIDGE, 698 MICH 358; 870 NW 2d. 502 (2015)........................14,18,19

PPL V MARTIN, 271 MICH APP 280 (2006)...................................................7,12

PPL V MATUSZAK, 263 MICH APP 42 (2004)...................................................7,12

PPL V MCKINEY, 496 MICH 410
(2014) ......................17

PPL V MCPHERSON, 263 MICH APP 124 (2004).............................................1,11

PPL V MILLER, 2015 MICH APP LEXIS 209, 2015 WL 558001.................................8

PPL V MILLER, 482 MICH 540, 558-559; 759 NW2d. 850 (2003).............................12

PPL V MOORE, (ON REMAND) 180 MICH APP 301 (1989)....................................7

PPL V OWENS, 131 MICH APP 76; 345 NW 2d. 904 (1983), 430 MICH 876: 423 NW 2d. 39
(1988).....................14

PPL V OUELLETTE, 2016 MICH APP LEXIS 1316.............................................19

PPL V PICKENS, 446 MICH 298(1994)...3

PPL V REHKOPF, 442 MICH 198; 205 NW 2d 296 (1985)...................................14

PPL V RICHENDOLLAR, 85 MICH APP 74; 270 NW 2d. 530 (1988)...........................14

PPL V SIMMONS, 191 MICH APP 351 (1991).....................................................8

PPL V SHELINE  64 MICH APP 193 (1975)....................................................9

PPL V TALLEY, 410 MICH 378; 301 NW2d 809 (1981)....................................14

PPL V TRAKTENBERG, 493 MICH 38 (2012)...................................................3,6

PPL V TURNER, 390 MICH APP (1973)...8

PPL V VANDERLINDER, 192 MICH APP 447 (1992)............................................15

PPL V WHITE, 411MICH366(1980)....8,10

PPL V WHITE, 501 MICH 160; 905 NW 2d 228 (2017).....................................18

PPL V YOST, 278 MICH APP 341
(2008)..................................16

RECEIVED by MCOA 5/6/2019 3:23:56 PM

2)TABLE OF AUTHORITIES.      PG. NO:

PILCHER V CAMPER, 935 F.2d. 149 (8th. Cir. 1991)...................................................4

POWELL V ALABAMA, 287 U.S. 45; 53 S. Ct. 55 (1992)...........................................2

RAMONEZ V BERGHUIS, 490 F3d. 482 (CA 6 2007).................................................6

SAUNDERS V PEOPLE, 38 MICH 218, 221-223 (1878).............................................10

SILVERTHORN V UNITED STATES, 251 U.S. 385 ; 40 S. Ct. 182 (1920)..............11

SMITH V YOST, 826 F2d. 872, 376 (9th. Cir. 1982)..............................................4,16

STATE V ARAVE, 268 P. 3d. (UTAH 2016).............................................................15

STATE V CALDWELL, 780 A 2d. 103......12

STATE V LOPEZ, 190 WN 2d. 104 (2018)...........................................................4,5

STATE V MARSHALL, 882 NW 2d. 68 (2016)..................................................1,10,11

STATE V WILBOURNE, 2018 WASH. APP LEXIS 442..............................................12

STRICKLAND V WASHINGTON, 466 U.S. 668;104 S. Ct. 2052 80 L Ed. 2d 674 (1984)..............................................1,3,4,6

TEXAS V COBB, 532 U.S.162(2011)....2,11

TOWNSEND V BURKE, 344 U.S. 736; 68 S. Ct. 1292; 92 L.Ed. 1690 (1948)............19

TOWNSEND V SMITH, 395 F 3d. 251; 258 (6 Cir. 2005)..........................................6

UNITED COIN METER CO. V SEABOARD COASTLINE R.R. 705 F2d. 839, 846 (6 Cir. 1983)................................................5

UNITED STATES V CRONIC, 466 U.S. 648 104 S. Ct. 2039 (1984)..................................2

UNITED STATES V DAVIS,, 177 F3d. 522 (CA 6 1999)...........................................12

UNITED STATES V HENRY, 477 U.S. 264 (1980)..........................................1,10,11

UNITED STATES V ICEMAN, 2014 U.S. DIST LEXIS 23811.......................................19

UNITED STATES V LOPEZ, 988 F. Supp. 1424, 1997 US DIST LEXIS 21126..........19

UNITED STATE V MERRIWEATHER, 78, F 3d. 1070-1074 (1996).............................15

UNITED STATES V MOORE, 2015 U.S. DIST LEXIS 45931.......................................19

UNITED STATES V RUSSELL, 411 U.S. 423 (1973)................................................8,9

UNITED STATES V TERRADO -MADRUGA, 897 F 2d. 1099 (11th. Cir. 1990)...............................................10

VALVOLINE INST. OIL CHANGE V AUTO CARE ASSC.199 U.S. APP LEXIS 1227....5

WIGGINS V SMITH, 539 U.S. 510, 521; 123 S. Ct. 2557 (2003)..............................1,6


MCL 750.157 (1).......................................14,18

MCL 768.20a (2)(5)(c)................................3

MCL 768.36(c)..............................................7

MCL 777.36...............................................13,14

MCL 780.766...............................................17

MCL 750.411i................................................18

MCL 777.40.................................................18

MCL 777.34.................................................18


U.S. CONSTITUTION AMEND. V, 1963 ART. 1 € 20..................................................19

U.S. CONSTITUTION AMEND. VI, 1963 ART. 1 € 20..................................1,2,4,6,11,19

U.S. CONSTITUTION AMEND. VIII, 1963 ART. 1 € 20..............................................5,7,25

U.S. CONSTITUTION AMEND. XIV, 1963 ART. 1 € 20.................................................2,6

OTHER:

1) ARTICLE: ABOLISHING JAILHOUSE SNITCH TESTIMONY, 49 WAKE FOREST L. REV. 1375 (WINTER, 2014) AUTHOR: RUSSELL D. COVEY, PH.D. GEORGIA STATE UNIVERSITY

2) GOVERNMENT SNITCHES, INCENTIVIZED WITNESSES ARE THE LEADING CAUSE OF WRONGFUL CONVICTIONS, BY DALE CHAPPELL (Criminal Legal News, March 2019 Volume:2 No:3, published by the Human Rights defense center, sources: snitching. org

3) ARE STALKING LAWS ARE UNCONSTITUTIONALLY VAUGE OR OVERBOARD? 88 NW. REV. 769 (WINTER 1994) AUTHOR: M. KATHERINE BOYCHUK

4) APPELLANT URAZ'S SOLITARY CONFINEMENT EXPERIENCES: "LEGALIZED TORTURE"

RECEIVED by MCOA 5/6/2019 3:23:56 PM

STATEMENT OF JURISDICTION

The judgement of conviction was entered on November 9th. 2017; The judgement of sentence was entered on January 24th., 2018; Defendant requested appointment of counsel on January 31st., 2018; The claim of appeal was filed on February 26th., 2018,   Susan K. Walsh was appointed as an appellate counsel on February 26th.,2018
A brief on appeal and motion to remand was filed in the court of appeals on February 22nd., 2019.
This court has jurisdiction to review the defendant's timely filed Standard 4 Supplemental brief on appeal, under administrative order 2004-6 Standard 4. by and through his appointed counsel
Susan K. Walsh.

RECEIVED by MCOA 5/6/2019 3:23:56 PM

iii

STATEMENT OF QUESTIONS PRESENTED

1)
THE DEFENDANT WAS DENIED HIS STATE AND FEDERAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, WHERE COUNSEL FAILED TO OBJECT TO THE USE OF INCRIMINATING STATEMENTS OBTAINED IN VIOLATION OF THE DEFENDANT'S SIXTH AMENDMENT RIGHT TO COUNSEL.

The trial court was not presented with this question.
The Plaintiff-Appellee answers: NO
The Defendant-Appellant answers: YES
The trial court answered :

2)
COUNSEL WAS ALSO CONSTITUTIONALLY DEFICIENT WHEN HE FAILED TO INVESTIGATE, PRESENT EVIDENCE OR CONSULT AN EXPERT AFTER ASSERTING THAT THE DEFENDANT'S DIMINISHED STATE OF MIND AT THE TIME OF THE OFFENSE WOULD UNDERMINE THE SPECIFIC INTENT NECESSARY TO COMMIT SOLICITATION OF MURDER AND WHERE HE FAILED TO REQUEST A.CONTINUANCE IN ORDER TO HAVE THE NECESSARY PSYCHIATRIC EVALUATION DONE.

The trial court was not presented with this question.
The Plaintiff-Appellee answers: NO
The Defendant-Appellant answers: YES
The trial court answered

3)
DID TRIAL.COUNSEL MENTAL ILLNESS EFFECT HIS ABILITY TO ADEQUATELY REPRESENT HIS CLIENT DURING THE PRETRIAL AND TRIAL PHASES OF THE PROCEEDINGS, WHEN IT WAS DISCOVERED THAT COUNSEL WAS HOSPITALIZED DUE TO A SEVERE  BIPOLAR BREAKDOWN PRIOR TO SENTENCING AND WAS REMOVED FROM THE CASE

The trial court was not presented with this question.
The Plaintiff-Appellee answers: NO
The Defendant-Appellant answers: YES
The trial court answered

4) WAS COUNSEL CONSTITUTIONALLY INEFFECTIVE WHEN HE FAILED TO INVESTIGATE, INTERVIEW, OR CALL RELEVANT AND MATERIAL WITNESSES CRUCIAL TO THE DEFENSE THEORY AND FACTS CLAIMING HE WASN'T BEING REIMBURSED FOR PRIOR WITNESS INVESTIGATIONS.  IN VIOLATION OF DEFENDANT'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS.

The trial court was not presented with this question.
The Plaintiff-Appellee answers: NO
The Defendant-Appellant answers: YES
The trial court answered .

5)
THE TRIAL COURTS BASIS FOR DENYING DEFENSES MOTION TO DISMISS DUE TO ENTRAPMENT IS IN ERR. WHERE THE COURT FAILED TO APPLY OBJECTIVE TEST OF ENTRAPMENT IN IT'S DECISION MAKING PROCESS.

The trial court was not presented with this question.
The Plaintiff-Appellee answers: NO
The Defendant-Appellant answers: YES
The trial court answered

6)
THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ADMITTED INTO EVIDENCE A VIDEO TAPED AND TRANSCRIBED CONVERSATION, WHERE THE DEFENDANT ALLEGEDLY SOLICITED AN UNDERCOVER POLICE AGENT TO COMMIT MURDER, WHERE THE EVIDENCE WAS OBTAINED IN VIOLATION OF DEFENDANT'S SIXTH AMENDMENT RIGHT TO COUNSEL.

The trial court was not presented with this question.
The Plaintiff-Appellee answers: NO
The Defendant-Appellant answers: YES
The trial court answered

RECEIVED by MCOA 5/6/2019 3:23:56 PM

iv

7)
THE CIRCUIT COURT JUDGE COMMITTED REVERSIBLE ERROR, WHEN HE ALLOWED A JUROR BIAS TO THE DEFENDANT'S ETHNICITY TO REMAIN ON THE JURY PANEL UNTIL THE CLOSING OF PROOFS AND WHERE HE FAILED TO HOLD A HEARING OR INQUIRY INTO THE MATTER TO ENSURE AN IMPARTIAL JURY. IN VIOLATION OF THE DEFENDANT'S SIXTH AMENDMENT RIGHTS.

The trial court was not presented with this question.
The Plaintiff-Appellee answers: NO
The Defendant-Appellant answers: YES
The trial court answered

8)
THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT GRANTED RECONSIDERATION OF THE PROSECUTOR'S MOTION TO ADMIT OTHER BAD ACTS EVIDENCE ON THE GROUNDS THAT THE DEFENDANT'S TESTIMONY AT HIS ENTRAPMENT HEARING QUALIFIED THE EVIDENCE TO BE ADMITTED AT TRIAL. IN VIOLATION OF HIS RIGHTS TO DUE PROCESS.

The trial court was not presented with this question.
The Plaintiff-Appellee answers: NO
The Defendant-Appellant answers: YES
The trial court answered

9) DID THE TRIAL COURTS ASSESSMENT OF 50 POINTS UNDER OFFENSE VARIABLE (6) MCL. 777.36 (1) VIOLATE THE DEFENDANTS RIGHTS AGAINST CRUAL AND UNUSUAL PUNISHMENT, AND WHERE THE COURT FAILED TO CONSIDER A LESSER VARIABLE AND/OR "SUA SPONTE " INSTRUCT THE JURY OF ANY SPECIFIC DEGREE OF SOLICITATION OF MURDER IN VIOLATION OF THE DEFENDANTS RIGHT TO DUE PROCESS.

The trial court was not presented with this question.
The Plaintiff-Appellee answers: NO
The Defendant-Appellant answers: YES
The trial court answered

10)
THE DISTRICT COURT JUDGE ABUSE HIS DISCRETION WHEN HE BOUND THE DEFENDANT OVER ON A THIRD SOLICITATION OF MURDER CHARGE.

The trial court was not presented with this question.
The Plaintiff-Appellee answers: NO
The Defendant-Appellant answers: YES
The trial court answered :

11)
THE CIRCUIT COURT JUDGE ABUSED HIS DISCRETION WHEN HE ALLOWED THE ADMITTANCE OF OTHER
BAD ACTS EVIDENCE THAT WAS MORE PREJUDICIAL AND CONFUSING THAN PROBATIVE AND WHERE HE GRANTED RECONSIDERATION OF THE PROSECUTIONS MOTION TO ADMIT OTHER BAD ACTS EVIDENCE AS IT PERTAINS TO ITEM (7) SEVEN WHICH HAD PREVIOUSLY DISALLOWED.

The trial court was not presented with this question.
The Plaintiff-Appellee answers: NO
The Defendant-Appellant answers: YES
The trial court answered

12)
THE TRIAL COURT ERRED BY ORDERING DEFENDANT MR. URAZ TO PAY RESTITUTION IN THE AMOUNT OF $2273.00 FOR UNCHARGED CONDUCT AND WHERE HE WAS ASSESSED, CHARGED TWICE FOR COURT COSTS, FEES, ATTORNEY FEES, CRIME VICTIM RIGHTS FEES AND DNA FEES. IN VIOLATION OF DEFENDANT'S 6TH. 8TH. 14TH. AMENDMENT RIGHTS.

The trial court was not presented with this question.
The Plaintiff-Appellee answers: NO
The Defendant-Appellant answers: YES
The trial court answered

RECEIVED by MCOA 5/6/2019 3:23:56 PM

13) THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT SCORED OFFENSE VAIABLES OV4 AND OV 10, BASED ON FACTS NOT FOUND BY THE TRIER OF FACT BEYOND A REASONIBLE DOUBT OR ADMITTED TO BY THE DEFENDANT IN VIOLATION OF HIS SIXTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION.

The trial court was not presented with this question.
The Plaintiff-Appellee answers: NO
The Defendant-Appellant answers: YES
The trial court answered :

THE DEFENDANT WAS DENIED HIS FIFTH AMENDMENT RIGHTS. WHEN POLICE FAILED TO READ THE DEFENDANT HIS MIRANDA WARNING AT ANYTIME PRIOR TO OR AFTER HIS ARREST, WARRANTING REVERSAL OF HIS CONVICTION AND SUPPRESSION OF HIS STATEMENTS TO POLICE INVESTIGATORS AND THEIR AGENTS.

The trial court was not presented with this question.
The Plaintiff-Appellee answers: NO
The Defendant-Appellant answers: YES
The trial court answered

RECEIVED by MCOA 5/6/2019 3:23:56 PM

THE DEFENDANT WAS DENIED HIS STATE AND FEDERAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, WHERE COUNSEL FAILED TO OBJECT TO THE USE OF INCRIMINATING STATEMENTS OBTAINED IN VIOLATION OF THE DEFENDANT'S SIXTH AMENDMENT RIGHT TO COUNSEL.

STANDARD OF REVIEW

A claim of ineffective assistance of counsel presents a mixed question of law and facts. Ppl v Armstrong 490 Mich 281, 289, 806 NW 2d. 676 (2011).
Any finding of fact are reviewed de novo. A claim of constitutional error is reviewed de novo. Ppl v McPherson, 263 Mich App. 124 (2004).

DISCUSSION

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that counsel's performance fell below an objective standard of reasonableness, and as a result. Wiggins v Smith 539 U.S. 510, 521, 123 S. Ct. 2557 (2003),
Strickland v Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 LED 2d. 674 (1984) to establish prejudice the defendant must show that there is a reasonable probability that, but counsel's unprofessional errors, the result of the proceeding would have been different.
Strickland v Washington, 466 U.S. at 694.
In this matter defendant was incarcerated in the Ingham County Jail awaiting sentencing on stalking charge. While waiting to be sentenced, he was arraigned on a second stalking charge against the same alleged complainant, defendant was represented by retained counsel (Christopher Bergstrom). During this time undercover investigators in concert with two (2) jailhouse informants whom deliberately elicited incriminating statements from the defendant through the guise of murder for hire, subsequently defendant was then charged with multiple counts of solicitation to commit murder.

THE SIXTH AMENDMENT right to counsel ensures that an accused receives the assistance of counsel when confronted with "the intricacies" of the law and the advocacy of the public defender.
In the Sixth Amendment right to counsel pursuant to Massiah v United States, 377 U.S. 201, 84 S. Ct. 1199 (1964). While Massiah was awaiting trial he became subjected to a completely extra judiciary orchestrated proceeding designed to obtain incriminating statements. The court found that the agents deliberately elicit the statements from the defendant " in the absence of counsel", and the statements where inadmissible.
Also see; Maine v Moulten 474 U.S. 159; 106 S. Ct. 477 (1985).
Lyles v Beto 1965 Lexis 2018.
Fellers v United States, 2004 U.S. Lexis 825.
Although this ruling left some questions to its viability thereafter, the issue was resolved in: Brewer v Williams, 430 U.S. 387; 401; 97 S. Ct. 1232 (1977), in which Supreme court held, that defendant's Sixth Amendment right to counsel was violated when police, post arraignment elicited incriminating information in the absence of counsel.
This instant case is a carbon copy of the Sixth amendment violation found in both Massiah and Brewer. In that, by intentionally creating a situation likely of inducing the defendant to make incriminating statements without the assistance of counsel, the government violated the defendant's Sixth Amendment right, also see U.S. v Henry, 447 U.S. 264 (1980).
In this instant matter undercover police investigator (Mobley) arranged a video visit with the Ingham County Jail, where he met with defendant (Mr. Uraz) portraying a killer for hire (Hitman). It is evident by the video and video transcripts that the defendant (Mr. Uraz) had no idea who this person was or why was he there (see video transcripts, attached, Exhibit A). EVEN TELLING HIM, "I CAN'T TALK TO YOU" PG 3 OF 7 )
The undercover officer deliberately elicited the defendant into making incriminating statements / inferences which were used as the basis for the indictments against the defendant, three counts of solicitation to commit murder.
Additionally the "deliberately elicit" standard must extend to the jailhouse informants as it pertains to the incriminating statements whom they testified against the defendant.
The Supreme court in U.S. v Henry, ruled that the defendant's rights are attached to the informants as well due to the commencement of formal proceedings.
In State v Marshall, 882 NW2d.68 (2016),

the court's further defined the attachment of jailhouse informants acting as "implied agency" quoting:
Ayers v Hudson, 623 F3d. 301 (2010).
In this instant matter there was no written agreement with the informants other than immunity for their testimony.
However their agency can easily be implied, by their actions, and the record a whole when:
1) The informants original motive for coming forward was to try and lessen their own penalties, in exchange for cooperation.
2) They admitted to deliberately eliciting incriminating statements from the defendant while acting as confidants, who were aiding in the planning and carrying out of the alleged murder plot.
3) After their initial contact with investigators they were both placed back into the same cell block with the defendant, where they initiated, induced, and gathered more incriminating information to aid the police and prosecution in their pursuit of charging the defendant with solicitation of murder.

RECEIVED by MCOA 5/6/2019 3:23:56 PM

4) They were both known to have acted as jailhouse informants in the past and were each actively involved and/or seeking opportunity to "jump" on other cases in the Ingham County Jail, at the same time they involved themselves in this matter.

Because of these listed facts, "implied agency" is applicable in determining that the informants were in fact intimately attached to the investigation.

See: State v Marshall at 91-95.

Further the "deliberately elicited standard" is applicable to this instant case under the defendant's Sixth amendment right to counsel, and is distinguishable from the Fifth amendment's "custodial interrogation" standard as defined in : Fellers v United States, 540 US 519 (2004).

In this matter the defendant was not being questioned by investigators, he was the target of an undercover investigation designed to elicit incriminating evidence of an alleged escalation of a stalking indictment for whom he had retained counsel.

Lastly in Texas v Cobb, 532 U.S. 162 (2001), the court wrote; The Sixth amendment's protection cannot be used in futuro or viewed as a prophylactic protection for suspects, " not withstanding a close factual relationship to the charged crime, for which the defendant had counsel".

In the case at bar, there is a definite "close factual relationship" to the charged offense(s). The defendant, (Mr. Uraz) had been arraigned on a new stalking charge while awaiting sentencing on anorher. Then, while incarcerated in the Ingham County Jail the matter escalated to 3 counts of solicitation of murder, against the same alleged complainant Erika Melke. These matters were so closely related (reason based on being the same complainant but not based on different conducts or transactions) that the trial court joined the second stalking charge with the solicitation to commit murder into (1) one trial, using their relation as grounds to do so.

Counsels failure to contest the illegally obtained statements on these grounds has prejudiced the defendant, depriving him of a substantial constitutional right. But for counsel's error there is a reasonable probability that the outcome would be different had those "deliberately elicited" statements been suppressed. The defendant's convictions should be reversed and he should be granted new trial.

COUNSEL WAS ALSO CONSTITUTIONALLY DEFICIENT WHEN HE FAILED TO INVESTIGATE, PRESENT EVIDENCE OR CONSULT AN EXPERT AFTER ASSERTING THAT THE DEFENDANT'S DIMINISHED STATE OF MIND AT THE TIME OF THE OFFENSE WOULD UNDERMINE THE SPECIFIC INTENT NECESSARY TO COMMIT SOLICITATION OF MURDER AND WHERE HE FAILED TO REQUEST A.CONTINUANCE IN ORDER TO HAVE THE NECESSARY PSYCHIATRIC EVALUATION DONE.

STANDARD OF REVIEW

A claim of ineffective assistance of counsel presents a mixed question of law and facts. Ppl v Armstrong, 490 Mich 281, 289; 806 NW 2d 676 (2011). Any finding of facts are reviewed for clear error, while questions of law are reviewed de novo.

The right to effective assistance of counsel is enshrined in our state and federal constitutions and "is" a fundamental component of our criminal justice system, U.S. v Cronic, 466 U.S. 648; 104 S. Ct. 2039 (1984) and U.S. Const. Amend. VI, XIV Const. art. 1€ 20.

The right to counsel applies to all critical stages of criminal proceedings. Perhaps the most critical period is the time of arraignment until the beginning of trial.

Powell v Alabama, 287 U.S.45;53 S.Ct.55.

In this instant matter the Evidentiary hearing on 10/20/2017 set the stage for the rest if the proceedings. Defense counsel had filed a motion to dismiss, due to entrapment and in that motion, defendant's mental state as a factor in support. (See attached Exhibit B pig 1-4) additionally, at the October 20, 2017 evidentiary hearing defense counsel furthered the assertion that defendant's mental state supported to dismiss.

(See E.H. transcript 10/20/2017)

Pg. 13 Defendant describes his diminished state of mind during the time of alleged offenses.

Pg.106: Defense counsel argues mental capacity is an issue during the time of alleged offenses.

Pg. 152 : The prosecution points out that "no" forensics evaluation has been conducted and that the defense was asserting that the mental state of defendant was in question.

Pg.154 -155: Defense counsel argues mental that he is trying to "provide evidence to the jury" that will undermine specific intent, calling the defendant's mental state diminished due to his circumstances.

Pg. 155-156: The presiding judge is attempting to clarify defense counsel's argument of diminished capacity versus specific intent. Defense counsel's reply was : "we'll figure it out".

RECEIVED by MCOA 5/6/2019 3:23:56 PM

2.

Defendant also provided his counsel documents and correspondences from Dr. Sharon Hobbs, a therapist the defendant was seeing prior to his arrest (for a year) on the solicitation and second stalking charges, which clearly pointed to his impaired mental state, with deterioration chaotic emotional state, depression, anxiety, suicidal thoughts, (MMPI test results) as well as psychosis features.

(see attachments Exhibit C).
In January of 2017 the defendant sent letters to his attorneys Mr. Nichols and Mr. Perrone requesting per MCR 768.20a, that he would be sent to forensics center for a mental evaluation, and also requesting and independent exam be performed to support his defense.
(See Exhibit D).
In the case at bar, there was enough evidence presented to defense counsel that his client's mental state prior to, and at the time of the offense was an issue in question. Counsel clearly advanced this argument in his motion and the evidentiary hearing without the benefit of a mental forensics evaluation, available documentation, or an expert witness to support his assertions that the defendant lacked specific intent or criminal responsibility due to his mental state at the time of the offenses. Further, a foundation has been laid so that in the very least a continuance should have been requested in order to conduct the proper forensics evaluations.
The XIV amendment due process clause entitles a defendant to an adjudication to determine his or her mental state. It also entitles a defendant to a competent psychologist who will conduct an appropriate examination to assist the defense.
MCLA 768.20(2)(5)(c) and MCLA 768.36(c) provide for defendant's diminished who lack the appreciation for the wrongfulness of their actions due to mental conditions either permanent or temporary. Had the counsel in this case presented actual and/or available evidence in conjunction with expert testimony there is a reasonable probability that the results of the proceedings could have been different.

See Strickland v Washington, 466 Mich 298 at HN16..Counsel's scope of ineffectiveness goes beyond the evidentiary hearing as on (Pg. 154-155 of of the evidentiary hearing) counsel states: "there is high intent to provide the jury with evidence that would undermine specific intent", that the defendant's will was "overborn" due to his circumstances, yet still did not request that proper forensics testing be conducted prior to trial. Counsel had the duty to make a reasonable decision that makes a particular investigation unnecessary Strickland at HN9.
Whether or not an insanity defense was asserted at trial, counsel, in this case, had grounds to conduct further investigation by his own admission. Counsel's decision to forgo any investigation into the validity of his client's mental conditions or to consult an expert cannot be considered sound trial strategy. In the very last a forensics evaluation was warranted.
In Ppl v Trakhtenberg, 493 Mich 38 (2012), the court stated; a defense attorney may be deemed ineffective for failing to consult an expert when counsel had neither the education nor experience necessary to evaluate the evidence for reasonably informed determination as to whether an expert should be consulted and called to stand.

In Dando v Yunkins, 461 F.3d 791 (2006).
The Sixth circuit court reversed the plea based conviction due to ineffective assistance of counsel when counsel failed to consult an expert or investigate the defendant's assertions of duress and other mental issues.

In this instant matter counsel's representation must fall below the standards set forth in :
Strickland v Washington, 466 U.S. 668,
Ppl v Pickens, 446 Mich 298 and
Ppl Howard 2017 Mich App, Lexis 575. Not only did counsel failed to investigate or consult an expert, he advanced the use of the defendant's mental state as grounds to dismiss without any supporting evidence.
Accordingly, the defendant's convictions should be reversed and a new trial be granted.

3

RECEIVED by MCOA 5/6/2019 3:23:56 PM

DID TRIAL COUNSEL'S MENTAL ILLNESS EFFECT HIS ABILITIES TO ADEQUATELY REPRESENT HIS CLIENT DURING THE PRETRIAL AND TRIAL PHASES OF THE PROCEEDINGS. WHEN IT WAS DISCOVERED THAT COUNSEL WAS HOSPITALIZED DUE TO A SEVERE BIPOLAR BREAKDOWN PRIOR TO SENTENCING AND WAS REMOVED FROM THE CASE?

STANDARD OF REVIEW

A claim of ineffective assistance of counsel presents a mixed question of law and fact. People v Armstrong 490 Mich 281, 289, 806 NW 2d 676 (2011). Any finding of fact are reviewed for clear error, while questions of law reviewed de novo.

When counsels ability to adequately investigate, prepare, communicate or present a clients case is impared by a disability, counsels performance might well be deficient. Further, if counsels performance was deficient, sometimes factual data involves evidence of defense counsels health. See State v Lopez, 190 WN 2d 104 (2018) at HN8-12. When evaluating the effect of a disability on an attorney's performance- the same test for ineffective assistance applies as under Strickland v Washington 466 U.S 668 104 S Ct. 2052 (1984). while evaluating the attorney's conduct in light of trial, in light of allegations of mental illness, Lopez at HN8-12.

Pilcher v Camper, 935 F.2d 149(8th. Cir.1991), Smith v Yost, 826 F2d 872,876(9th. Cir. 1987).

In Lopez, a defendant was denied the U.S. Const. Amendment VI and Wash. Const. art 1 22, the right to effective assistance of counsel when defense counsels severe depression during pretrial and trial phases of the defendant's case prevented him from performing basic tasks of representation, and the defendant was prejudiced as a result.

In this instant matter, it was discovered 4 days after the trial, but prior to sentencing that defense counsel suffered a severe mental breakdown as a result of his bipolar disorder which resulted in his hospitalization.

Then on December 6th, 2017) without the knowledge of the defendant, new counsel was appointed. (See December13th, 2017 conference hearing pg.3)

On December 12, 2017 the trial court held a conference (again without the defendant's knowledge or presence) where the Ingham County prosecutor's requested that defense counsel be removed from the case. While noting that counsel had been removed from several cases within the Ingham County Court system.

Then on December 13th, 2017, the court held another conference, this time with the defendant being present, to inform him that he was being appointed new counsel for sentencing, which the defendant agreed to (see December13th. conference).

The effective assistance of counsel includes many things. It is impossible to exhaustively define the obligations of counsel or form a checklist for judicial evaluation of an attorney's performance. Nevertheless, effective representation entails certain basic duties, such as loyalty, a duty to avoid conflict of interest the overcharging duty to advocate the defendant's cause and more particular duties to consult with the defendant on important decisions, and keep the defendant informed of import. development in the case.

When reviewing the case at bar, with a spotlight on defense counsel's performance it is evident that as the case became more complex, his performance faltered, becoming confusion, ineffective, and without direction.

During pretrial proceedings on October 20th, 2017 evidentiary hearing after his unsuccessful challenging of entrapment the court shifted to the late filing of witnesses for defense, Mr. Perrone was challenged to validate and offer proofs to each witness on his list. He assured the court that he could, however after some question and answer by the circuit court judge, it was discovered that he could not, offer any substantive proofs, as he had not contacted a single witness, nor had he begun investigations into the listed witnesses. By the transcribed record Mr. Perrone began to justify his inability to offer proofs by stating that he has difficulties with reimbursement for his time when conducting witness investigations (see pg. 129-132). The court then recognizing defense counsel's unprofessionalism began to admonish him for that conduct, then even after the court offering him assistance to make contact with these 30 plus witnesses, he contacted but two (2). Counsel neglected to address key points of his clients defense such as, timely filings, witness investigation, challenging the statements made to uncover agents, under the defendant's 6th. amendment right to counsel pursuant to Massiah v U.S., failed to request a continuance to have a psychiatric evaluation performed, after advancing to the court that the defendant's mental deteriorated state not mind at the time of the alleged offenses could undermine specific intent. He further failed to present or investigate available documented professional evidence from a Dr. Sharon Hobbs in support of this assertion to the court.

Next we move to the trial, the transcribed record during jury selections will again reflect conduct which would question defense counsel's professionalism and mental stability when he asked senseless questions to potential jurors and in some instances was disrespectful and condescending with degrading innuendos that would inflame most people. (see 10/31/2017 and 11/02/2017 jury voir dire by Perrone transcripts).

4.

RECEIVED by MCOA 5/6/2019 3:23:56 PM

During the trial itself he presented virtually no defense on behalf of his client, his cross examinations were meaningless and confusing it was as if he was on a different planet as everyone else, delusional and even incoherent at times. He became so disengaged that his assistant, who was not an attorney of record, took over the cross examination of one of the prosecutions star witness. It was as though Mr. Perrone had "checked out" so to speak. His approach to every aspect of this case was as though his superior abilities alone would prevail without any actual research or foundation. A common trait of bipolar disorder. (ALSO SEE EXHIBIT E)

It seems very probable that he was experiencing effects of his disorder during these proceedings. Mental breakdowns due to medication complications don't just happen overnight, and because he was the one experiencing these complications he, as a professional advocate, had the duty to inform the defendant and the court. Instead he maintained a state of denial that prejudiced the defense with substandard and abominable representation.

There can be no tactical reasoning as to counsels lack of investigations, his in- applications of law, his conduct or his over all professionalism towards his client, the court, or the jury.

In Lopez at HN10 in pertinent part:
Evidence of counsel's failure to act because he/she "checked out" of the case for what ever reasoning (e.g. sleeping, mental health, drug use, etc....) is certainly relevant to rebut the presumption that counsel had a tactical reason for failing to act.

The issue of an attorney's effectiveness due to unstable mental conditions was also addressed in : Valvoline Instant Oil change Franchise vs Auto Care Assc. 1999 US App Lexis 1227; quoting United Coin Meter Co. vs Seaboard coastline R.R., 705 F2d 839,846(6th.Cir. 1983) adopting what is refered to as the "United Coin Meter Test", where one must show exceptional or extraordinary circumstances exits that would justify relief, and in doing so, show counsel's gross negligence as a basis for. relief from judgement, this court should focus on neglect of counsel. Also see Pioneer Investment Service Co..507 US at 397.

In this instant case details of Mr. Perrone's mental illness were not brought to light until he responded to an attorney grievance filed by the defendant in 2018. It was revealed that Mr. Perrone did in fact suffer a mental breakdown, just days after the trial because of a medication imbalance, compounded with family issues.

The court, on December 12th. and 13th, 2017, never specified details as to why he was being removed from the case, nor did the prosecution explain why they were requesting his removal.

When reviewing the record as a whole including post trial correspondences from Mr. Perrone to the Uraz family there is a real likelihood that he was suffering from complications of his illness prior to his hospitalization and throughout most of the proceedings.(See exhibit E).

Bipolar disorder is recognized by the American Psychiatric Association and is listed in the American Psychiatric Association diagnostic and statistical manual of mental disorders.

The disorder is biochemically in nature and involves abnormal levels of neurotransmitters in the brain which involves trigger cycles between manic and depressive phases of the illness.

Symptoms of bipolar disorder are often displayed in erratic behavior, instability, depression inflated self esteem, decreased sleep, distractibility, flights of fancy, agitation, or engaging in dangerous activities. In extreme cases the disorder can cause manic depression and even psychosis requiring immediate hospitalization which is what transpired in this instant case.

Additionally, the rate in which person swings from one extent to another can vary between a few hours to several months, a typical phase lasts two to three weeks.

In the case at bar there has been no in depth inquiry into counsel's conduct or the effects of his illness as it pertains to his ability to effectively represent his client. (Mr. Uraz).

We do know that his disorder reached a level that required him to be removed from multiple cases in the Ingham County court system, including this case, and that his representation falls short of the mark in many regards.

Attorneys and judges may have disabilities of all kinds, mental as well as physical but that alone does not disable them from practicing law or adjudicating cases. The ability to be effectively professional depends instead on actual effect of the disability. Lopez at HN8-12.

When connecting the dots (so to speak), in this instant matter, counsel's failures and unprofessional demeanors, thusly, become explainable.

Defendant Uraz contends that he was denied the effective assistance of counsel as guaranteed by the Sixth and fourteenth amendments of the United States Constitution.

Accordingly his convictions should be reversed and a new trial be granted, or in the very least a Ginther hearing should be held to establish further record.

4) WAS COUNSEL CONSTITUTIONALLY INEFFECTIVE WHEN HE FAILED TO INVESTIGATE, INTERVIEW, OR CALL RELEVANT AND MATERIAL WITNESSES CRUCIAL TO THE DEFENSE THEORY AND FACTS CLAIMING HE WASN'T BEING REIMBURSED FOR PRIOR WITNESS INVESTIGATIONS, IN VIOLATION OF DEFENDANT'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS.

RECEIVED by MCOA 5/6/2019 3:23:56 PM

5.

## STANDARD OF REVIEW

A claim of ineffective assistance of counsel presents a mixed question of law and facts. People v Armstrong, 490 Mich 281,289;806 NW 2d 676 (2014), any finding of fact is reviewed for clear error, while questions of law are reviewed de novo. People v Thrakhtenberg 493 Mich 38, 47 (2012).

The right to the effective assistance of counsel is well established in both Michigan and Federal jurisprudence, U.S. Const. Ams. VI and XIV. Strickland v Washington, 466 US 668, 686 (1984); Const. 1963 art 1 20.

To prevail on a claim of ineffective assistance of counsel a criminal defendant must first show that counsel performance fell below an objective standard of reasonableness, and that the defendant was prejudiced as a result.Wiggins v Smith, 439 U.S., 510, 521 (2003).

As a matter of Law, an incomplete investigation can be unreasonable, just as well as a completely absent investigation.

In Ramonez v Berghuis, 430 F3d 482 (CA6.2007), counsel was found to be constitutionally deficient for not making reasonable efforts to interview witnesses before coming to his ultimate choices at trial.

In the case at bar, defense counsel's sole reasoning for failing to investigate the 30 plus witnesses named on the defense witness list, was because of his past difficulties being reimbursed for his time when conducting witness investigations. ( see transcripts Evidentiary Hearing pg. 129-132). OCT 20, 2017.

It is well established that counsel has a duty to make reasonable investigations or to make reasonable decisions that make a particular investigation unnecessary- Townsend v Smith, 395 F.3d 251,258(6th. Cir. 2005)(quoting Strickland,.466 US at 691). The duty encompasses the obligation to investigate all.witnesses who may have information concerning his or her client's guilt or innocence and although a particular decision to investigate must be directly assessed for reasonableness in all circumstances,.applying a heavy measure of deference to counsel's judgements ( Strickland 466 US at 691) courts have not hesitated to find ineffective assistance in violation of the sixth amendment when counsel fails to conduct a reasonable investigation . Also see Dempsey v Bobby,412 F.Supp 2d 720(2005).

In the instant case the defense's theories were:

1) That the two jailhouse informants, Mr. Close and Mr. Allen,.instigated and escalating scenario in hopes of benefiting from their cooperation, which resulted in an extra judiciary orchestrated proceeding designed to obtain (elicit) incriminating statements from the defendant.

2) That the defendant was being extorted by Reginald Close.

3) That the defendant's language barrier was a key factor in his misunderstandings of the references used by police investigator Mobley.

4) That the defendant was suffering from mental conditions that inhibited his ability to have the specific intent necessary to commit the charged offenses.

AT THE OCTOBER 20TH HEARING, THE FOLLOWING TRANSPIRED:

Pg. 124 The prosecution challenges the defense witness list of over 30 people.

Pg. 127 Defense counsel states he can offer proofs as to.people on the list.

Pg. 127 The court inquiries as to why the defense was late filing the 30 plus witness list.

Pg. 129 Counsel states that he has had difficulty in the past being reimbursed for witness investigations, in an attempt at reasoning as to why he has not put any effort into investigating or contacting anyone on the list.

Pg. 129-130 The trial judge states: Let me get this on the record, so that there won't be any dispute with the court of Appeals, you do not feel you were adequately compensated for your services on some other case?....

Pg. 130-133 The court then provides defense counsel with the means to contact and interview his witnesses

Pg. 152 The prosecutor predicts that most of the defense witnesses will fall off anyway

(SEE EX. HEARING, OCT. 20, 2017)

It is clear that a review of the hearing transcripts from pages 128 - 158- solidifies a mockery of justice and counsels complete failure in professional conduct and the effective assistance of counsel.

## OTHER FACTS

1) By the time of trial, defense counsel had contact but three potential witnesses and called to the stand two witnesses on behalf of the defense

2) Counsel did not begin witness investigations until two days before trial

Witnesses Not Contacted and their relevance for investigation

1) Kathy Edmonds: Defendants next door neighbor, knew he had abundance of garbage/trash,.that needed to be disposed of, from defendant's forclosed home.

2) Sean Moon: was an Ingham County jail inmate worker (Trustee) who witnessed the interactions between defendant and the two jailhouse informants at the time of the solicitations,.communications, extortion tactics by Reginald Close.

3) Johnathan Foster :was an Ingham County jail inmate worker (Trustee) who witnessed the interactions between defendant and the two jailhouse informants at the time of the solicitations,.communications, extortion tactics by Reginald Close and Charles Allen.

4) Chris Shimberger: was also subjected to Reginald Closer's "case jumping" scheme at or around the same time of defendant.

6.

RECEIVED by MCOA 5/6/2019 3:23:56 PM

5) Kenneth E. McDaniels- subjected witnessed to Reginald Close's "case jumping"
6) Gregory Taylor : subjected witnessed to Charles Allen's "case jumping"
7) Tava Jacobs: was also subjected to Reginald Closer's "case jumping" scheme at or around the same time of defendant.
8) Douglas Smith: Michigan State University Police , character witness for the defendant.
9)Mr.Cihat Oz: was with the defendant on 12/31/15 Dave & Buster incident
10) Mr. Saad Quhaidi : Character witness for defendant
11) Mr. Burak Atamer: Defendant's roommate who deposited money in Reginald Closes jail account.
12) Tim Horan - Private investigator who researched Reginald Close's shady background.
13) Dr. Sharon Hobbs : therapist who was treating defendant just prior to alleged offenses from.January 2016 till August 2016.

The above named witnesses were all potentially relevant to defense theory and facts. The record is quite clear that defense counsel neglected his duties because of reimbursement difficulties in the past. His late filing and unprofessional readiness to make good on his statement to the court, "that he can offer proofs" as to the witnesses listed, is another confirmation of his deficient representation. (SEE OCT 20 HEARING, PG 127-132)

The following is a brief case and point to a few of the listed witnesses:

The.prosecution's solicitation case, hinged on whether or not the defendant (Mr. Uraz) understood or knew that the undercover investigators use of the word(s) "trash" or "take out the trash" meant "bodies" or "dispose of bodies"
+++ It Should Be Noted: that the defendant's second language is English, to assume he understood the reference of "trash" to mean anything other than "trash"/ garbage in the literal sense is "material" to the prosecution's case.
Defense counsel was provided with information from defendant's next door neighbor Ms. Kathy Edmonds, that defendant had recently foreclosed on his home (June 2016), and did in fact have a lot of garbage/trash in his garage that needed to be disposed of. This witness was relevant she on the witness list and at the courthouse willing to testify to the facts but was never called by defense counsel. The information was material and the nexus between the facts of the case and her need to testify was established. The inference by the prosecutor that defendant understood the references of the undercover agent was left unchallenged.
Next, counsel was aware that the prosecution witness Mr. Close, the jailhouse informant was known to be a "case jumper", meaning, this was not the first or only case Mr. Close was involved with, in fact , counsel was.provided with both verbal and documented information that Mr. Close had been involved in as many as (5) five other cases and attempted to case jump at least (2) two other cases at or around the time he became involved with this instant matter (see John Pierce statement Exhibit F).
Counsel had knowledge that Mr. Close was known to fabricate information, while grooming others into escalating investigative situations, while laying the ground work for his good Samaritan facade, in hopes of softening the blow against his own criminal legal woes.
The court made every effort in providing counsel with the means in which to contact these 5 plus potential witnesses listed, counsel contacted but (1) one.
Additionally a defense theory was that Mr. Close had extorted money from the defendant, taking advantage of his vulnerable state of mind and conditions. The witness, Sean Moon, was an Ingham County jail trustee, who witnessed Mr. Close's and Mr..Allen's interaction with the defendant at and around the time of the alleged offense.

He also was familiar with Mr. Close's extortion tactics, a common jailhouse scheme. Counsel never contacted Mr. Moon.
Lastly, Dr. Sharon Hobbs, is witness to the defendants deteriorated mental condition, which initially intended to show the extreme vulnerable state of the defendant, which he insisted upon at the 10/20/2017 evidentiary hearing.
The record indicates that counsel had 6 months to prepare for trial, yet waited till the final hours to begin his preparation and investigation of witnesses. His late filing, his dissatisfaction with reimbursement for his investigative duties, his unwillingness to call witnesses, or mount a meaningful defense or protect his clients rights, can only result in ineffective assistance warranting reversal.

THE TRIAL COURT'S BASIS FOR DENYING DEFENSES MOTION TO DISMISS DUE TO ENTRAPMENT IS IN ERR. , WHERE THE COURT FAILED TO APPLY THE OBJECTIVE TEST OF ENTRAPMENT IN IT DECISION MAKING PROCESS.

STANDARD OF REVIEW

A courts evidentiary decisions are reviewed for abuse of discretion. The question of whether a rule or statute precludes admission of evidence is a matter of law and is reviewed de novo.
Ppl vs Martin, 271 Mich App 280 (2006), Ppl vs Matuszak, 263 Mich App 42 (2004). Entrapment claims are reviewed for clear error. People vs. D'angelo 401 Mich 167 (1977) .Ppl vs. Moore (on remand) 180 Mich App 301 (1989), Ppl vs LaPlaunt, 217 Mich App 733 (1999).

RECEIVED by MCOA 5/6/2019 3:23:56 PM

7.

When a.defendant raises the issue of entrapment, whether before or during trial the appropriate procedure will require the trial court to conduct an evidentiary hearing in the juries absence.The Defendant " will NOT" be required to admit the criminal act in order to raise the entrapment issue. People vs. D'angelo 401 Mich 167 (1977);1977 Mich Lexis 165 at (HN 8). It further states: the defense of entrapment "in this state" does not require an assessment of guilt or innocence and does not focus on the susceptibility attributed to the accused. ID an HN 14.

In People vs Simmons, 191 Mich App 351 (1991) states : guilt or innocence is irrelevant-entrapment is determined by the courts' evaluation of the government's conduct, not the " predisposition" of the defendant.

Further, in Ppl vs White, 411 Mich 366 (1980) at HN 8 it states; when an accused claims entrapment he is asserting in essence, entitlement to the benefit of judicial policy that his claim, if true, is bar to the prosecution of his case, His claim does not involve the assessment of guilt or innocence, in fact, it is irrelevant, also see Ppl. vs Miller 2015 Mich App Lexis (2015).

In this instant case, the trial judge "erroneously" relied on People vs Jones 48 Mich App 334 (1974) stating that the defendant (Mr. Uraz) can not simultaneously claim innocence and entrapment (in the Jones case during the trial defense counsel asked for a "directed verdict" under the entrapment defense and judge denied the request, stating that defendant can not claim entrapment and not guilty at the same time during the trial). The Jones ruling is inapplicable to the case at bar as the hearing was held outside the presence of the jury, in a pretrial proceeding. Further,

the court in its decision, relied heavily on the defendant's predisposition and pretrial claim of "not guilty" while giving very little focus or weight to the objective standard of review into the conduct of the undercover police investigators.

At the October 20, 2017 Entrapment hearing the trial judge stated in pertaining part:

Pg. 106 Line 13-15 He is saying he didn't do it, right?

pg 106 Line 18-19 Let me go back to his position at the trial is he didn't do it, correct?

Pg 106 Line 21-23- Are you r

trying to make a nuance? you might say, it may have happened but it wasn't my intent is that what you are saying?

Pg.114- I don't need to go beyond the "Jones" case to enumerate why I'm going to deny this motion because it clearly states "

Defendant cannot simultaneously deny the commission of a crime and assert the defense of entrapment, which is what the court concludes we have here."

It is evident from the record that the court gave great weight to the misconception that the defendant's guilt or innocence was relevant in its ruling, "it is not", and is well established to be just the opposite. As stated in mentioned case law, as recently as People vs. Miller supra in 2015

Additionally, the trial courts focus on the predisposition of the defendant is also in contrast to the objective test standard that has been adopted by Michigan to determine if an entrapment exists. Ppl vs Julliet, 439 Mich 34 (1991) clearly states : "that Michigan" follows the objective test. Also see People vs Lewis 2017 Mich App 351.

Ppl. vs. D'Angelo, supra states; entrapment is determined by the courts evaluating the governments conduct, not the predisposition of the defendant. Further in United States vs. Russell, 411 U.S. 423 (1973), People vs. Turner, 390 Mich 7 (1973), says; the objective standard dispenses with the element concerning the defendant's criminal disposition and focuses on the conduct of the involved police, whether their acts have gone beyond the simple offering of a chance to commit crime.

People vs. Adams,232 Mich App 128 (1988) Describes a defendant's predisposition as "subjective" while confirming the "objective" test as police involvement or conduct and that the latter should be the focus of the hearing, not the predisposition of the defendant.

Predisposition has also been described as defendant's "readiness" to commit a crime.

In this case at bar the circuit court judges ruling focused on the "subjective" predisposition of the defendant as grounds to deny the motion in Lieu of the (2) prong "objective" test as defined in: Ppl vs. Connolly, 232 Mich App 425 (1988). The two prong test (Adobted by Michigan) focuses on the assessment of the government agents conduct by;

1) Did the police "engage" in impermissible conduct that would induce a law biding person to commit a crime in similar circumstances, and (2) the police engaged in conduct so reprehensible that it cannot be tolerated.

In this instant case the court failed to apply the objective test and relied primarily on the defendant's "predisposition" and his claim of innocence/not guilty while applying "subjective" test in its ruling.

Again at the October 20th, 2017 Evidentiary hearing the trial judge stated in pertaining part:

Pg 108 - the first prong, what we have here is the continued escalation of activities on behalf of the defendant, Mr. Uraz, to the danger of the victim, Ms. Melke.

Pg. 109- we have all these things leading up to this situation. Mr. Uraz is awaiting sentencing on a stalking charge, we have a conviction for stalking this very same victim.

Pg.110- we have conduct to indicate he would do this...

Pg. 112- whether the defendant was known to commit the crime with which he was charged not necessarily the solicitation, but the aggravated stalking.

Pg. 113- Doesn't appear to be a targeted investigation it appears that based on Mr. Uraz's escalating history...

Pg. 114 For all the reasons, I don't need to go beyond the Jones case, to enumerate why I 'm going to deny this motion.

RECEIVED by MCOA 5/6/2019 3:23:56 PM

8.

In this case at bar the court's analysis and decision was erroneously based on the defendant's pretrial position of "not guilty" and his "conduct" leading up to the undercover sting operation. There is nothing in the courts ruling that even alludes to the "objective test" standard of review, and because entrapment is a claim of government agents acting inappropriately, it makes perfect sense that the focus of the hearing and decision making process should be on their "actions". Further, in Ppl vs. Sheline, 64 Mich App 193 (1975). The objective test is again outlined, stating: whether government agents acted in such a way as to likely instigate or create a criminal offense, regardless of the predisposition to the crime of a particular defendant involved, also see United States vs. Russell Supra.

In this instant matter, police investigators acted as instigators. They "did not" merely provide the opportunity for the defendant to incriminate himself. They actually interjected the details and the references to murder and payment. A review of (Exhibit A) the video transcripts will show that officer Mobley instigated the solicitation in court three (3) of the indictment.

At trial on November 6th, 2017, officer Mobley stated;

Pg.135 - Basically, I was trying to get him to incriminate himself, it was easy

This testimony confirms that officer Mobley wasn't just there to obtain evidence, but that he "purposely sought" to induce, and instigate a situation likely to create a criminal act or inference that a criminal act had occurred, which is what transpired in this case.

During the undercover video visit with the defendant the record is clear that officer Mobley was the one who created references to murder and money by interjecting references to trash or take out the trash to infer kill and dispose of the bodies and also the reference to the numbers 2 and 5 to be construed as $2000 and $500 dollars. Also undercover

police Mobley mentioned Close's nick name "Ruff" first.

Further the record nis abundantly clear that the defendant did not initiate the contact or seek assistance of the undercover "hitman". Defendant did not initiate the conversation, nor did he reference payment of any kind. These inferences were based on circumstance and the notion that the defendant understood the analogies/code words used by the undercover agent.

Lastly, the jailhouse informants (Close and Allen), both, after their initial contact with authorities, were sent back to the same cell block, where they remained iN close proximity of the defendant, where they continued to elicit incriminating evidence from the defendant,

and although there is no written agreement of testimony that police investigators asked or told them to try and obtain more incriminating information their actions and individual mind sets were to do just that.

November 6, 2017 Trial transcripts:
Pg. 31-32 - Reginald Close:
Q : were you still discussing these issues with him after speaking with the prosecutor
A: Yes
Q: So after you speak with Lansing Police
A: Yes
Q: You are continuing to talk to him
A: Yes
Q: About the plot
A : Yes

Charles Allen cross examination
November 7th, 2017 Trial Transcripts
Pg 69 being questioned by Mr. Roth Prosecutor
Q : After you were removed for issues with Muhammad, you're put back on post Mr. Uraz
A: Yes
Q: Is that before you wrote the first letter?
A : That's after
Q: when you wrote the second kite on October 24th, 2016 Are you still on Post with Mr.Uraz?
A: Yes
Q: Who initiated the conversation as to bitch gotta pay, did you initiate the conversation?
A: I would say so, Probably
Q: The Bitch gotta pay? the time you sent the first kite, what's going on in those few weeks that you didn't send it (the second kite) right away?
A: I was gathering information

In this instant matter, the (2) two jailhouse informants intent was to obtain incriminating information that they could then forward to police investigators. They both induced and instigated conversation, developed plans and encouraged the defendant to move forward with the plot. They were granted immunity for their participation in the solicitation and, although unspoken, police investigators knew exactly what they had. Two overzealous inmates who were willing to assist them in obtaining a conviction.

RECEIVED by MCOA 5/6/2019 3:23:56 PM

9.

Wherefore their agency (informants and the police) can be inferred by the circumstances and record as a whole. See : State vs. Marshall, 882 NW 2d 68 (2016).

Michigan has been at the forefront of protecting persons from being convicted of crime that was intigated, induced, or manufactured by government agents. PEOPLE VS WHITE, AT 411, ,additionally in Saunders vs. People, 38 Mich 218, 221-223 (1878) Justice Campell wrote: "The encouragement of criminals to induce them to commit crimes in order to get a prosecution against them is scandalous and reprehensible."

In the case at bar, first the court's application of Michigan's standard of review under "the objective test" for entrapment was never applied THUS rendering the decision erroneous.

Next, the correctly applied objective test standard to the case in chief will confirm that police investigator Mobley went beyond the simple offering of a chance to commit crime and that the informants can be considered "inferred agency". Wherefore the defendant's convictions must be reversed and he is entitled to an evidentiary hearing which focuses on the government's conduct and not the guilt or innocence or predisposition of the defendant.

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ADMITTED INTO EVIDENCE A VIDEO TAPED AND TRANSCRIBED CONVERSATION WHERE THE DEFENDANT ALLEGEDLY SOLICITED AN UNDERCOVER POLICE AGENT TO COMMIT MURDER, WHERE THE EVIDENCE WAS OBTAINED IN VIOLATION OF DEFENDANT'S SIXTH AMENDMENT RIGHT TO COUNSEL.

STANDARD OF REVIEW

A claim of constitutional error is reviewes de novo : Ppl vs McPherson, 263 Mich App 124 (2004).

The sixth amendment right to counsel ensures that an accused receives the assistance of counsel when confronted with the "intricacies" of the law and the advocacy of the public defender. Massiah vs United States, 377 U.S. 201; 84 S. Ct. 1199 (1964).

In Massiah, while a waiting trial, he became subjected to a completely extra judiciary orchestrated proceeding designed to obtain incriminating statements. The court found that the agents deliberately elicited the statements from the defendant in absence of counsel, and the statements were ruled inadmissible.

Also see Brewer vs Williams, 430 U.S. 387-401; 97 S. Ct. 1233 (1977), Main vs Moulton 474 U.S. 159, 106 S. Ct. 477 (1985). Fellers vs United States, 2004 Lexis 825,

More recently in Sosnowsky vs state, 989 So. 2d. 686 (2008), while the defendant was an inmate following his arrest for attempted second degree murder, he tried to arrange through a cellmate, to have the victim and witness killed. Through the cellmate,.defendant was placed in touch with an undercover officer who was represented to be a "hitman", and solicited the officer to commit murder.

Although solicitation was not the charged offense in this case, the trial court over defense objection admitted taped conversations involving the solicitation and alleged killings of the victim and witness by the hitman.

The appellate courts found that because defendant was represented by counsel, his statements to the undercover officer were not admissible. The judgement was reversed for a new trial.

In this case the defendant was being held in Ingham County Jail awaiting sentencing on a stalking charge against the complainant Erika Melke, while waiting to be sentenced, he was arraigned on a second stalking charge against the same alleged complainant.

The defendant was represented by retained counsel Chris Bergstrom . During this time undercover investigators in concert with the Ingham County Prosecutor's office , Ingham County Jail, and two (2) jailhouse informants deliberately elicited incriminating statements from the defendant through the guise of murder for hire. Defendant was subsequently charged with three counts of solicitation to commit murder against the complainant Erika Melke.

The trial court admitted the video recording and transcription into evidence despite the defenses continued objections on the other grounds.

In addition, in United States vs. Henry, 477 U.S. 264; 100 S. Ct. 2183, 65 L.Ed. 2d. 115 (1980) : interpreted Massiah to require suppression of statements made to a jail-house informant who was placed by the state,

in the same cell as the defendant and instructed to be alert to any incriminating statements by the defendant also see United States vs. Terzado- Madruga, 897 F. 2d 1099(11th. circuit 1990).

In this instant matter the cellmates Charles Allen and Reginald Close were kept in close proximity of the defendant. After they had informed investigators that the defendant wanted to have his ex girlfriend killed.

In the case of cellmate Reginald Close, he was sent back to be in close proximity of the defendant after informing police investigators of the solicitation,  see (November 6th. transcripts pgs 31-32)

RECEIVED by MCOA 5/6/2019 3:23:56 PM

10.

Q: Were you still discussing these issues with him (defendant) after speaking with the Lansing Police Department
A: Yeah
Q: Your put back with Mr. Uraz
A: Yes
Q: You're continuing to talk to him
A: Yes
Q: About the plot?
A : Yes

It is also evident that Reginald Close was actively offering suggestions and giving feedback, while gathering incriminating statements and documentation.
In the case of Charles Allen, he too was returned to the same cell block as Mr. Uraz after sending informative correspondences (kites) to the jail authorities and speaking with investigators. He consistently states that he was initiating conversations with the defendant in regards to the murder for hire. (See November 07, 2017 transcripts pgs. 44, 54, 55, 61, and 69)
Pg. 44
Q: After your removed for the issues with Muhammad you're put back on Post with Mr. Uraz?
A: Yes I believe so
Q: Is that before or after you wrote the first letter
A: That's after
Q: When you wrote the second letter on 10/24/2016. Are you still on the same post with Mr. Uraz?
A: Yes
Pgs 54-55: Allen states he questioned the defendant about his intent, because he wanted to know
Pg. 61: Again, he states he initiated the conversation
Pg 69: He states: He was gathering information (prior to his second kite to Authorities).

Because the two jailhouse informants were actively involved, the defendant's sixth amendment rights must attach to them as well as the police investigators. See Henry Supra - Also see State vs Marshall 882 NW2d 68 (2016), were that court determined that jailhouse informants acting as agents without an expressed agreement can be an "inferred agency" through their action involvement
Lastly, in Texas vs. Cobb 522 U.S. 162 (2001), that court wrote: the sixth amendment protection can not be used in "Futuro" or viewed as a prophylactic protection for suspects " not with-standing a close factual relationship in the defendant had counsel"
In this instant case, there was most certainly a close factual relationship in the charged offenses in so much that the trial court joined the second stalking charge with the solicitation charges into trial, using their close relationship as grounds to do so (see motion for joinder - motion for severance hearing- Feb.28, 2017).(same complainant judge's reason)

Once police impermissible action is discovered and proven, the exclusionary rule will apply and will operate to suppress the primary evidence as well as all derivative evidence obtained as "Fruit of the poisonous tree" see Silverthorn vs. United States, 251 U.S. 385 ; 40 S. Ct. 182 (1920)

In conclusion, in the case at bar, police and prosecution knew that the defendant was represented by counsel at the time of the undercover police video visit. Police deliberately elicited incriminating statements, in violation of the defendant's Sixth amendment right to counsel, as outlined in Massiah vs. U.S. Supra.

Defendant is therefore entitled to reversal of his conviction, suppression of his statements to police investigators and the jailhouse informants, and a new trial must be granted.

THE CIRCUIT COURT JUDGE COMMITTED REVERSIBLE ERROR, WHEN HE ALLOWED A JUROR BIAS TO THE DEFENDANT'S ETHNICITY, TO REMAIN ON THE JURY PANEL UNTIL THE CLOSING OF PROOFS AND WHERE HE FAILED TO HOLD A HEARING OR INQUIRY INTO THE MATTER TO ENSURE AN IMPARTIAL JURY. IN VIOLATION OF THE DEFENDANT'S SIXTH AMENDMENT RIGHTS.

STANDARD OF REVIEW

A claim of constitutional error is reviewed de novo - People vs McPherson, 263 Mich App 124 (2004)

The Sixth amendment of the United States constitution guarantees a criminal defendant will receive a fair trial by an impartial jury. U.S. Const. Amend. VI Const. 1963 Art 1 20.

The tiral court "must" take appropriate steps to ensure that jurors will not be exposed to information or influences that could effect their ability to render an impartial verdict, based on the evidence admitted in court.

In this is instant case on the third day (11/03/2017) of trial proceedings juror (#1) one Larry R. Nishon informed the court clerk of a bias he may have towards the defendant, if, he was in fact, of Turkish decent.

RECEIVED by MCOA 5/6/2019 3:23:56 PM

11,

Mr. Perrone,.the attorney for the defendant requested that an inquiry be conducted (see trial transcripts November 3rd. 2017 pg 5).

However the presiding judge, without further inquiry made an assumption that this juror was looking for a way to be excused, based on his experience in other cases. (see trial transcripts, 11/03/017 pages 4-3). The courts only remedy was to strike that juror (Mr. Nishon) after the closing of arguments, proofs, three (3) days later.

Furthermore, during jury selections prospective jurors were advised by Mr. Perrone that the issue of race was going to become a topic " the issue that is at focal point of our nation" (see trial transcripts 10/31/2017 pg.96) additionally jurors were ask by defense counsel if anyone associated with the international nature of this case that would provide any type of inability to be fair and impartial...(see trial transcripts October 31st, 2017 pg. 140). Again on November 2nd, 2017, The presiding judge addressed the entire jury panel about the issue of bias (see trial transcripts November 2nd, 2017 pg 15)

The defendant in this matter (Mr. Uraz) is in fact a Turkish/American Muslim, there is no secret as to the climate this issue creates among many Americans, and to knowingly allow an ethnically bias person to remain on a jury panel for the better part of six (6) days without an inquiry, hearing or cautionary instruction is a miscarriage of justice, the court failed to protect the defendant's constitutional right to a fair trial by an impartial jury. As there is "now" no way of determining how or if this juror's presence affected the others opinions, inferences, discussions, biases or decision making process.

In United States vs. Davis, 177 F.3d 522 (CA6 1999). The Sixth circuit court of appeals ruled that the lower court erred when it failed to question the jury about the effects of prejudicial extraneous information, when a juror asked to be excused because of fear of retaliation which he discussed with other jurors. That court also excused the juror, but failed to. hold a hearing on the effect on the remaining jurors or give a cautionary instruction..The Sixth circuit court determined that an inquiry into the matter was necessary to ensure an impartial jury.

In this instant case, there was no inquiry done what so ever. We have no way of knowing if juror (#1) one's personal bias was exposed to any other juror, nor to what extent his prejudice lies.

In People vs Miller, 482 Mich 540, 558 -559; 759 NW 2d 850 (2008). That court determined that unpreserved claim of irregularity regarding the jury, does not entitle a defendant to a new trial "unless" the defendant was denied the right to an impartial jury.

In the case at bar, because there was no meaningful inquiry into the matter. We have no record in which to gage this juror's bias or the influence he may have had on the rest of the jurors.

A good example of appropriate steps the (Uraz) court should have taken to ensure an impartial jury, can be found in People vs Jackson, 292 Mich App 583 (2011). Where that court did not commit error, because it questioned the dismissed juror which did not reveal anything suggesting that the other jurors had been exposed to improper influences.

In this instant case, Mr. Uraz was not afforded that same protection against an impartial jury where a simple inquiry could have remedied the error.

A bias juror constitutes a structural error Franklin vs Anderson 2002 U.S. District Lexis 26814. Jurors are treated as partial judges. Id at HN23.

Further in State vs Wilbourne 2018 Wash App Lexis 1442. That court determined that an actual bias juror sitting on a criminal case can not be "harmless". it requires a new trial without having to show prejudice also in Caldwell vs State 780 A.2d 103 at HN 27-29, says that a juror's potential bias discovered during trial, this juror's bias will taint the jury's verdict.

In this instant case, the court's decision to allow an ethnically bias juror to remain on the jury panel for an additional (3) three days after being notified of the bias, then to forgo any meaningful inquiry has created a structural error, warranting reversal of the defendant's convictions and a new trial must be granted.

THE TRIAL COURT ABUSED ITS DISCRETION WHEN GRANTED RECONSIDERATION OF THE PROSECUTOR'S MOTION TO ADMIT OTHER BAD ACTS EVIDENCE ON THE GROUNDS THAT THE DEFENDANT'S TESTIMONY AT HIS ENTRAPMENT HEARING QUALIFIED THE EVIDENCE TO BE ADMITTED AT TRIAL. IN VIOLATION OF HIS RIGHT TO DUE PROCESS.

STANDARD OF REVIEW

A courts evidentiary decisions are reviewed for an abuse of discretion, but the question of whether a rule or statute precludes admission of evidence is a matter of law and is reviewed de novo.
People v Martin, 271 Mich App 280 (2006), People v Matuszak, 263 Mich App 42 (2004).

People v D'Angelo, 1977 Mich Lexis 165 at HN8: When a defendant raises the issue of entrapment, whether before or during trial, the appropriate procedure will require the trial court to conduct an evidentiary hearing in in the jury's absence.... The defendant will not be required to admit the criminal act in order to raise the entrapment issue....

RECEIVED by MCOA 5/6/2019 3:23:56 PM

12.

"ANY TESTIMONY HE GIVES AT THE HEARING WILL NOT BE ADMISSIBLE AGAINST HIM IN THE CASE IN CHIEF FOR SUBSTANTIVE PURPOSES."

In the instant case, at the October 11th, 2017 motion to admit other bad acts evidence pursuant to MRE 404B, the court ruled, granting in part and denying in the part the admission of other bad acts evidence, in particular the court denied item seven #(7)of the prosecutors motion, starting it was more prejudicial than probative.
Item # (7) seven, was an incident that transpired at the defendant's long time place of employment Michigan State University, where he was terminated for asking a co-worker to help him purchase an illegal firearm for "no" specified reason.

On October 20th, 2017, at the entrapment hearing the defendant testified in support of the motion on his own behalf. The defense briefly touched upon the defendant's termination from MSU, as source of his depression and mental issues he was experiencing at the time of the alleged offenses. The prosecution on cross examination exploited the MSU incident for the better part of 30 transcribed pages of question and answer in an attempt to link the incident to the solicitation of murder charges. (SEE OCT 20. 2017 TRANS P.9-13, 33-75)
On October 31st., 2017, just prior to jury selections the prosecutor moved the court for reconsideration to admit this incident and testimony of the co-worker Patrick Burnett into evidence.
The court granted the motion, stating that the testimony by the defendant at the entrapment hearing qualified this evidence to be admitted at trial. (OCT-31,2017 TT P 11-14)
In this regard, the defendant testimony at his entrapment hearing was use to substantiate the admission of other bad acts evidence, which would have been excluded had defendant not testified, thus his testimony was used against him in the case in chief, which is not allowed.

The evidence allowed, unfairly prejudiced the defense, as it inferred a link between the attempted purchase of a gun, and an intent to kill Erika Melke which had never been established. This evidence was more prejudicial than probative and should not have been allowed accordingly, the defendant's conviction must be reversed.

DID THE TRIAL COURTS ASSESSMENT OF 50 POINTS UNDER OFFENSE VARIABLE (6) MCL. 777.36 (1) VIOLATE THE DEFENDANTS RIGHTS AGAINST CRUAL AND UNUSUAL PUNISHMENT, AND WHERE THE COURT FAILED TO CONSIDER A LESSER VARIABLE AND/OR "SUA SPONTE " INSTRUCT THE JURY OF ANY SPECIFIC DEGREE OF SOLICITATION OF MURDER IN VIOLATION OF THE DEFENDANTS RIGHT TO DUE PROCESS.

STANDARD OF REVIEW

A claim that a scoring sentencing guideline is in erroneous, a trial courts   findings of fact are reviewed for clear error, and must be supported by a preponderance of the evidence. People vs Hutchenson, 308 Mich. App. 10, 12-13; 865 NW2d 44 (2014).
Instructional errors are generally reviewed due novo, and are subject to harmless error review. But the trial courts determination of whether a jury instruction is applicable to the facts of a particular case is reviewed for an abuse of discretion. People vs Hawthorne, 474 Mich. 174 (2006).

MCL. 777.36 (1)(2), defines OV variables for consideration based on a jury's findings, as follows:
(1) A. 50 points for premeditation
    B. 25 points for unpremedated
    C. 10 points for emotional duress factors associated with the defendant.
    D. 0 points, no intent to kill
(2) The trial judge shall score these variables consistent with the jury's verdict, unless the judge has information that was not presented to the jury.
In this instant matter the court assessed on its own accord that there was sufficient evidence to assess 50 points for premeditation. (sent. trans. pg. 14).   The other possible variables in MCL 777.36(1)(b)(c)(d) were not given any consideration, nor presented to the jury.

PRESERVATION OF ISSUE:

When the issue of OV 6 was brought to the courts attention at sentencing, stand in counsel presented no argument claiming he did not conduct the trial, so he did'nt know how the evidence fell. He never the less objected to ov 6 on behalf of the defendant. (sent. trans. pg. 9-10).

13.

RECEIVED by MCOA 5/6/2019 3:23:56 PM

Prior to the 1986 amendment of MCL 750.157(1) a trial court was required to instruct "sua sponte" on inciting second degree murder in every case where the defendant is charged with inciting first degree murder. People vs Richendollar, 85 Mich App. 74; 270 NW2d 530 (1978).

Further, the Richendollar courts conclusion was partially based on an anomaly in the solicitation statute, MCL 750.157b; MSA 28.354(2), as the statue was written. The version of this statute then in effect required that a person convicted of solicitation of murder be punished as though he had committed first degree murder, regardless of whether the murder took place. Id. 77, 80 & n3.

However following the Supreme court decision in People vs Rehkopf, 422 Mich. 198, 205; 370 NW2d 296 (1985) and the legislative amendment, 1986 PA 124, since authorized the trial court to sentence a person convicted of soliciting murder to life or any term of years. MCL 750.157b (2); MSA 28.354(2)(2). Hence there is no longer any reason to issue a solicitation of second degree murder instruction in order to avoid a first degree murder sentence for a defendant where no murder was actually committed. People vs Knasiak, 1999 Mich App. Lexis 1203 at 11.

Yet a defendant who has been found guilty of solicitation of murder is still being subjected to sentencing guideline scoring pursuant to OV 6,  MCL 777.36.(1)(a) by default,  and assessed 50 points for premeditated murder. Leaving MCL 777.36(1)(b)(c)or(d) inapplicable to a solicitation of murder conviction.

In this instant matter the defendant, Mr. Uraz was found guilty by a jury of (3) three counts of solicitation of murder and (1) count of Aggravated Stalking.  He was assessed 50 points pursuant to MCL 777.36(1)(a) Which raised his sentencing guidelines exponentially.

Throughout these instant proceedings the trial court heard testimony that could have supported any one of the variables mentioned in MCL 777.36(1)(a)(b)(c)(d)(2),  but only allowed the jury to consider premeditation.

First,  there was evidence that the defendant had abandon the idea of killing his estranged girlfriend when he refused to speak with the undercover (hitman) twice after their initial video visit. He also never forwarded any detailed information or money to this agent. MCL 777.36(1)(d)- 0 points if there was no intent to kill.

Secondly,  there was also evidence presented throughout the proceedings that the defendant was experiencing

great emotional duress at the time of the alleged solicitation.  These documented mental conditions dated back as far as 6 months prior to the aggrivated stalking allegations that triggered this entire matter. MCL 777.36(1)(b)(c) assesses 25 points if there was no premeditation and only 10 points if there was emotional duress aspects associated with the defendant. ( SEE EXHIBIT D)

If a trial court is no longer obligated to instruct a jury on any optional or lesser degree of murder within the solicitation statute,   then it would seem that offense variable (ov6) MCL 777.36 (1)(b)(c) or(d) would forever be inapplicable to any solicitation of murder conviction, because there is no variable degree of the crime.

Wherefore,  if OV 6 MCL 777.36(1)(a) is going to remain applicable to solicitation of murder convictions,  then so must MCL 777.36(b)(c) and (d), and accordingly,  the possibility of a lesser charge must be made available to a jury for consideration. MCL 777.36(2).

The defendant should be entitled to a reversal of his conviction and granted a new trial,  or in the very least, if subtraction of the 50 points assessed in OV 6 is warranted it would result in a reduction of the defendants minimum sentence range from 200 months to 81 months and he would be entitled to a remand to the trial court for further proceedings,  pursuant to People vs Lockridge, 698 Mich. 358; 870 NW2d 502 (2015).

THE DISTRICT COURT JUDGE ABUSED HIS DISCRETION WHEN HE BOUND THE DEFENDANT ON A THIRD SOLICITATION OF MURDER CHARGE.

STANDARD OF REVIEW

The decision to bind a defendant over is reviewed for an abuse of discretion.
People v King, 412 Mich 145, 152-153; 312 NW 2d 629 (1981).
People v Talley, 410 Mich 378, 301 NW 2d 809 (1981)

At the preliminary examination on December 13th. 2016 at the closing of proof, the prosecution moved for separation of count one (#1) one of the indictment, (See preliminary examination transcript pg.191), claiming that there was a completely separate solicitation by the defendant in regards to the undercover investigator detective Frank Mobley. The defense objected to the separation (see preliminary examination transcript pg.192-193)

Count #1 of the indictment originally combined Reginald Close, (AKA Ruff, the jail house informant) and detective Mobley into a single charge as the record showed and will continue to show that they essentially were inchoate with one and other.

After consideration of the totality of facts the court stated: I think there is definitely a reasonable doubt about what that conversation means (referring to the undercover interview with Mobley), " you know, that is not proof beyond a reasonable doubt, I wish the prosecutor luck as it relates to that individual claim..However People v Hudson, 241 Mich App 268 tells us if evidence introduced at a preliminary exam conflicts or raises reasonable doubt about the defendant's guilt a magistrate must let the fact finder at trial resolve those questions of fact. (pg. 208 preliminary examination transcript)

In granting separation of count one the district court judge abused his discretion and subjected the defendant to be twice charged  for the same crime , as the facts of the case are clear the defendant allegedly solicited Reginald Close (jailhouse informant, AKA Ruff) who then told the defendant, he has a friend who was going to do the killing as a favor (see pg.155 preliminary examination transcript)

14.

RECEIVED by MCOA 5/6/2019 3:23:56 PM

Q: Okay you have a friend who owes you money
A: Yes
Q: And did you tell Mr. Uraz this friend was going to do the killing.
A: He was going to do it for me.
Q: Because he owes you a favor
A: Yes
Q: And Mr.Uraz was going to pay you $1000.0
A: Yes

Detective Mobley than portrayed the friend sent by Close (AKA Ruff), essentially attaching Mobely to the solicitation in Count (#1) one. The defendant did not seek the alleged friend of Reginald Close, it was detective Mobley who sought out the defendant.
In People vs Vanderlinder, 192 Mich App 447, it states, " a solicitation to commit murder occurs when (1) the solicitor "purposely seeks" to have someone killled, and (2) tries to " engage" someone to do the killing.
In State Arave, 268 p 3d (Utah 2011) factors considered requires the solicitor to ask the solicitee to partake in the crime, also requires the invitation by the solicitor.
First, addressing the (2) two key factors in Vandelinder (1) Purposely seeks and (2) tries to engage
In the instant matter you can certainly apply that test to Reginald Close (AKA Ruff) and Charles Allen, based on their testimony if believed, for counts 1 and 2.
However, as it pertains to count (3), it was detective Mobley who engaged the defendant not vice a versa.
Secondly, Mr.Uraz, the defendant did not invite the alleged hitman (Detective Mobley) this was done by Reginald Close (AKA Ruff) nor at anytime did Mr.Uraz "ask" Mobley to kill anyone. This was inferred.
It was also inferred that the defendant understood the references of code words used during the extra judiciary operation that "trash" meant dead bodies and two for the first bag and five for each additional bag actually meant $2000.00 and $500.00 (see video transcripts). This in itself is a triple stacked of inferences which should be legally impermissible to show probable cause. Regardless of the inferences or codes, detective Mobley was called upon by Reginald Close (AKA Ruff). The defendant had allegedly already agreed to pay Reginald Close $1000.00, and that the killing would be done as a favor owed to Reginald Close. There is no reason to believe the defendant intended to additionally pay $2000.00 and $500.00 to the hitman (Mobley). Based on Mobley's references to the number 2 and the number 5.
It is a matter of law that count III of the indictment should not have been bound over, not a question of reasonable doubt for a jury to consider. The facts presented at the preliminary hearing do not support that a separate and independent crime was committed. The facts do support that the jailhouse informant (snitch) Reginald Close, and detective Frank Mobley were part of the same transaction.
Accordingly the defendant's conviction of count III solicitation to commit murder must be reversed.

THE CIRCUIT COURT JUDGE ABUSED HIS DISCRETION WHEN HE ALLOWED ADMITTANCE OF OTHER BAD ACTS EVIDENCE THAT WAS MORE PREJUDICIAL AND CONFUSING THAN PROBATIVE, AND WHERE HE GRANTED RECONSIDERATION OF THE  PROSECUTION'S MOTION TO ADMIT OTHER BAD ACTS EVIDENCE AS IT PERTAINED TO ITEM SEVEN (7) WHICH HAD PREVIOUSLY BEEN DISALLOWED.

STANDARD OF REVIEW

In general, a trial courts determination of evidentiary issues are reviewed for an abuse of discretion. People v Adair 452 Mich 473 (1996).
However, the sixth circuit court of appeals has said that for similar acts evidence, an appellate court reviews for clear error the factual determination that the other acts did occur,.review de novo.
The legal determination that the evidence was admissible for legitimate purposes and reviews for abuse of discretion the lower courts determination that the probative value was not substantially out weighed by unfair prejudicem United States vs Merriweather, 78 F 3d 1070, 1074 (1996).

In this instant matter, at an evidentiary hearing on October 20, 2017, the prosecutor sought to admit other bad acts evidence pursuant to MRE404(b).
In the motion there was an itemized list of seventeen (17) proposed bad acts and alleged bad acts to be induced in order to show motive, intent, common plan or scheme. (See prosecution motion was filed on 10/03/2017 and hearing was on 10/11/2017)
The court ruled granting in part items 1,2,3,5,6,8,9,10,12,13,14,15 and 17, while denying, items 4,7,11, and 16. (See October 20, 2017 transcripts page 20)
It was the courts position that the other bad acts evidence unrelated to Erika Melke complainant "would not be allowed" (see October 20th., 2017 transcripts page 20).
In the case at Barz.the prosecutions case for solicitation to murder was questionable, relying on information from two (2) jailhouse snitches motivated by the possibility of lessening their criminal punishment, and an undercover police operation that produced inferences of murder, based on the investigators references numbers 2 and 5. As a matter of fact, the only people that use the term kill or reference trash are the snitches and the police detective Mobley.
Absent the admission of other bad acts evidence, the defendant, Mr. Uraz would not have been found guilty of solicitation of murder.

RECEIVED by MCOA 5/6/2019 3:23:56 PM

15.

First, to admit other bad acts evidence there must be "substantial evidence" that the defendant actually perpetrated the bad act sought to be induced.. People vs Goddard, 429 Mich 505 (1988).

In this instant matter, the prosecution's items 1,2,9,10 and 15 are incidents where some sort of damages were discovered at various times and locations to Erika Melke's and Stan White's vehicles. Reports were filed, and it was assumed that the defendant may have been responsible, however, no charges were filed, there was no physical evidence implicating the defendant and no eye witnesses saying they saw the defendant cause these damages. Here the prosecution relied on circumstantial and heresay evidence by the two (2) jailhouse snitches claiming the defendant told them he did the damage to the vehicles, but were non specific as to what damage or when, the damage was done.

Items 2,5,10 and 11 relate to Facebook and text messages from unknown sources, again assuming the defendant sent them based on content and circumstances.

The overwhelming confusion in admitting 14 other bad acts seemed to even confuse the judge, when he allowed item two (2), a Facebook message sent to Stan White from an unknown source, but disallowed item four (4) a Facebook message sent to Stan White from an unknown source. He disallowed item (11) a text message to Erika Melke from an unknown source, but allowed item five (5) a text message to Melke from an unknown source.

The admittance of other bad acts evidence in this case should have been limited to incidents that held more water than the defendant may have done these things or we think it is him, in addition to the weighing of probativeness verses unfair prejudice.

Lastly, item seven (7), the judge abused his discretion in granting reconsideration. Item 7 (seven) was originally disallowed due to unfair prejudice on October 20th, 2017(See transcripts page 21). Then on October 30th, 2017 the prosecutor move for reconsideration of item seven (7) were Patrick Burnett an ex-coworker of Mr. Uraz at Michigan State University claimed the defendant, some time in April

2016 asked for his assistance in obtaining an illegal firearm, which resulted in an investigation by M.S.U. police and eventually termination of the defendant from his job of over 25 years. (no criminal charges were filed).

It was determined by M.S.U. that there was a P.P.O. filed by Erika Melke against the defendant prior to this incident. It was noted that P.P.O's phrobit the carrying or purchasing of a firearm.

The investigation produced "no" substantiating evidence that the defendant sought to purchase a firearm to kill Erika Melke.

The court, in determination, granted reconsideration to admit item seven (7) because of the defendant's testimony at the October 20th, 2017 Entrapment hearing, where the defendant affirmed he was fired M.S.U. and that this testimony qualified the evidence to be brought before the jury.

People v D'Angelo, 401 Mich 167(1977). It states in pertaining part:...."any testimony he gives at the entrapment hearing will not be admissible against him in the case in chief, ID at HN 8. If this is the standard for a defendant's testimony at an entrapment hearing, then clearly the court erred. when it use defendant Uraz's testimony from his entrapment hearing as grounds to admit other bad acts evidence

Further, there is nothing in Patrick Burnett's statements that link Erika Melke to the M.S.U. incident. A prerequisite the trial court made on October 20th, 2017(pg.20).

When asked by M.S.U. police why the defendant wanted to purchase a gun, the defendant said he would need to speak with his attorney first. The M.S.U. matter was far more prejudicial than probative and should not have been allowed.

It should be noted that no time did the defendant verbally threaten Erika Melke, and the one constant theme apparent, is that he just wanted to talk to her for closer of their long standing relationship.

Conclusion:

In allowing the overwhelming amount of other bad acts evidence the defendant was denied fair trial.

The use of these prior allegations were used to convince the jury that Mr. Uraz was capable of solicitation of murder. He was unfairly prejudiced by having to defend himself against as many a nine (9) additional criminal for which he was never indicted. There is no way his character could have survived such an onslaught. See People v Yost, 278 Mich App 341 (2008) were similar admissions were determined to be more prejudicial than probative, swaying towards character evidence and/or a propensity to commit the charged crime.

People v Crawford, 458 Mich 376, 385; 582 NW2d 785 (1998) ID at 387, the evidence must be excluded.

Accordingly the defendant's convictions must be reversed.


THE TRIAL COURT ERRED BY ORDERING DEFENDANT MR. URAZ TO PAY RESTITUTION IN THE AMOUNT OF $2273.00 FOR UNCHARGED CONDUCT AND WHERE HE WAS ASSESSED, CHARGED TWICE FOR COURT COSTS, FEES, ATTORNEY FEES, CRIME VICTIM RIGHTS FEES AND DNA FEES. IN VIOLATION OF HIS 8TH. AMENDMENT RIGHTS.

STANDARD OF REVIEW

Generally a trial courts order of restitution is reviewed for an abuse of discretion , and its factual findings for clear error.

16.

RECEIVED by MCOA 5/6/2019 3:23:56 PM

Ppl v Gubachy, 222 Mich App 706; 708 NW2d. 891 (2006).
However the application of
MCL 780.766(2) and other statutes authorizing assessment of restitution at sentencing is a matter of statutory interpretation which is reviewed DE NOVO, Ppl v McKinely, 496 Mich 410, 415-415; 852; NW2d 770 (2014).
Pursuant to MCL 780.766(2), the restitution statue does not authorize trial courts to impose restitution based solely on uncharged conduct, the statutory language authorizing full restitution for "course of conduct that gives rise to the conviction" necessarily means that conduct for which the defendant is not criminally charged and convicted cannot be the basis of a restitution award.
Ppl v McKinley, 496 Mich 410; 852 NW 2d 770 (2014).
While the conduct for which the defendant is criminally charged and convicted is necessarily part of the course of conduct that gives rise to conviction...the opposite is also true: conduct for which the defendant is not criminally charged and convicted in necessarily "not" part of a course of conduct that gives rise to conviction. McKinley, 496 at 420.
Further the crime victims right act permits awards only for losses factually and proximately caused by the defendant's offenses. It does not permit restitution for speculative and conjectural losses.
In the instant case Mr. Uraz was charged restitution in the amount of $2,273.00,on the basis of allegations that he was somehow responsible for damages to the complainant's vehicle. The complainant's vehicle was alleged to have been vandalized over a period of several months, reports were filed, and although the defendant was named suspect, he was never charged or convicted of these acts. Yet, Mr. Uraz has been ordered to pay for these damages in the amount of $2,273.00 (see Exhibits F-1,F-2, F-3, F-4, F-5 ) and, because there was no physical evidence or eye witness to these allegations and defendant was lodged in jail when solicitation charges were brought) , the awarded restitution was based solely on speculation.
Again,.MCL 780.766(2) does not authorize the assessment of restitution based on uncharged conduct, and the trial court erred by ordering the defendant to pay.
Next, defendant contends that the court costs, fees, fines, crime victims rights fees, attorney fees and DNA costs assessed for reimbursement is in err.

Mr. Uraz was originally pled guilty to first aggravated stalking on 11/02/2016 case #(16-534 FH) of his estranged girlfriend Erika Melke, as a result of violating P.P.O and at the time of sentencing he was charged, assessed $60.00 for DNA
$130.00 for Crime victim's rights assessment, court costs and fines $1368.00. They were all paid from a posted $2000.00 bond at that time. (see attached exhibit F-1).

Defendant Mr. Uraz was also assessed and charged twice for joined cases MCR 6.120: solicitation to murder 3 counts case # (16-1065-FC-C30) (see attachment F-2) court costs, fees, fines total : $1004.00 attorney fees $600, DNA fees 60.00 , Crime victims's rights assessment $130.00 (for the same complainant) and Restitution of $2273.00 , grand total of: $4,067.00 on 01/24/2018, AND,

For the second aggravated stalking case # (16-1064-FH-C30)( see attachment F-3) again for the joined cases, defendant Mr. Uraz was assessed and charged :
DNA fee $60.00, attorney fees $600.00
Crime victim's rights assessment $130.00 (for the same complainant), court costs, fines and fees total: $868.00
grand total of: $1658.00, on 01/24/2018.
Unfortunately defendant's stand by, fill in sentencing attorney Duane Silverthorn did not object any of these excessive monetary charges by the court because as he stated several times during sentencing that he was not at the trial nor did he meet with defendant's trial attorney Jacob Perrone, who was removed from defendant's joined cases due to his mental incapacitation.
However, because these matters were consolidated into one (1) proceeding, Mr. Uraz contends that there must be a consolidation of all court costs, fees, fines, DNA , crime victim's rights assessment (CVRA) and attorney fees as well.
In People vs Cameron, 319 Mich. App. 215; 900 NW2d 658 (2017), MCL 769.1K(i)(b)(iii) defines the legislative intent behind imposing costs on a convicted defendant. 1. A trial court had to establish a factual basis for assessing costs to ensure costs were reasonably related to those incurred by the court cases of the same nature, and 2. was a legislative effort to let the court impose costs reflecting the courts actual operational costs in connection with criminal cases.
Again, the consolidation of case 16-1064 FH and 16-1065 FC in to one proceeding should reflect a consolidation of costs and fees associated with this matter, and the defendants inability to pay.
Currently Michigan Department of Corrections(MDOC) is also charging defendant two (2) separate charges of $25.00 for restitution and $25.00 for other courts costs for any amount over $50.00 deposits to Mr. Uraz's prison account (see attached Exhibits F-4 and F-5).
Accordingly, Defendant request that this matter be remanded to the trial court and that his judgement of sentence be corrected to reflect that the previously awarded restitution in the amount of $2,273.00 for uncharged conducts be cancelled, and that he be assessed for consolidated court costs, fines, fees that reflect:
(1) court fee, fine, cost
(1) Crime victim's rights fee
(1) attorney fee,
(1) No charge for DNA fee which was already paid for the case # 16-534-FH-C30(see exhibit F-1)

RECEIVED by MCOA 5/6/2019 3:23:56 PM

17

THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT SCORED OFFENSE VAIABLES OV4 AND OV 10, BASED ON FACTS NOT FOUND BY THE TRIER OF FACT BEYOND A REASONIBLE DOUBT OR ADMITTED TO BY THE DEFENDANT IN VIOLATION OF HIS SIXTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION.

STANDARD OF REVIEW

Unpreserved claims of scoring guideline errors are reviewed for plain error - People vs Lockridge, 498 Mich. 358, 392-393; 870 NW2d 502 (2015).

To establish entitlement to relief under plain error review, the defendant must establish that an error occurred, that the error was plain, ie. clear or obvious and that the plain error affected a substantial right. Id. Substantial rights are affected when prejudice - "the error affected the outcome of the lower courts proceedings." Lockridge, at 393.

Furthermore, if all these elements are satisfied, " an appellate court must exercise its discretion in deciding whether to reverse." Reversal is warranted only when the error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings independent of the defendants innocence. id.

Cases in which facts admitted by the defendant or found by the jury verdict were insufficient to assess the minimum number of OV points necessary for the defendants score to fall in a cell of the sentence grid under which he/she was sentenced involve an unconstitutional constraint that impairs the defendants Sixth Amendment Rights. id. at 395. Thus, all defendants (1) who can demonstrait that their guidelines minimum sentence range was actually constrained by violation of the Sixth Amendment and (2) who's sentence were not subjected to an upward departure can establish a threshold showing of the potential for Plain Error sufficient to warrant a remand to the trial court for further inquiry. id. and, if remanded the trial court must consider whether it would have imposed a materially different sentence but for the constitutional error.

In this instant matter, on November 9, 2017, the defendant (Mr. Uraz) was found guilty of (1) one count of Aggrivated Stalking MCL 750.411(i) and (3) three counts of Solicitation of murder MCL 750.157(b) by jury trial.

On January 24, 2018, he was sentenced to concurrent terms of 180 to 360 months for solicitation to murder and 36 to 84 months for aggravated stalking, second habitual.

It should be noted, that defendants trial counsel Jacob Perrone was removed from the case prior to sentencing on December 13, 2017 due to a mental incapacitation. Defendant was then assigned stand in counsel Duane Silverthorn to represent him at sentencing.

At sentencing, counsel would only object to OV 6 stating: "He was not familiar with the facts of the case" and was objecting upon the request of the defendant. (see sent. trans. 1-24-18 pg.   )

In this case, OV 4 and OV 10 were assessed based on facts not found by a trier of fact beyond a reasonible doubt or admitted to by the defendant.

OV 4
The defendant was improperly scored 10 points for ov 4 (MCL 777.34)

For the sentencing court to properly assess 10 points under OV 4 " there must be some evidence of actual injury to support this variable. People vs Lockett, 295 Mich App. 165, 182-183; 814 NW2d 295 (2012). A trial court may not zi.ally assume that someone in the complaints position would have suffered psychological harm. MCL 777.34 requires that serious psychological injury occurred to a complaitant, not that a reasonable person in that situation would have suffered serious psychological injury. People vs White, 501 Mich 160, 163; 905 NW2d 228 (2017).

In this instant matter the record in void of evidence of serious psychological injury caused by the defendant, and therefore it was error to assess 10 points in each of the charges.

Furthermore, neitber the jury instructions or the jurys verdict included psychological injury to the complaintant.

Accordingly, the defendants OV 4 score must be changed to 0.

OV 10
The defendant was improperly scored 15 points for predatory conduct pursuant to OV 10 (MCL 777.40(1)(a).

predatory conduct means conduct that occurred before the commission of the alleged offense and that it was directed at the complaintant for the primary purpose of victimization. MCL 777.40(3)(a), People vs Cannon, 481 Mich 152, 160-161; 749 NW2d 257 (2008). Predatory conduct encompasses only "those forms of pre-offense conduct" that are commonly understood as being predatory nature. eg. lying in wait, and stalking as opposed to purely opportunistic criminal conduct or pre-offense conduct involving more than "run of the mill" planning to effect a crime or subsequent escape without detection. People vs Huston, 489 Mich. 451, 462; 802 NW2d 261 (2011). quoting Cannon, 481 at 162.

The defendants conduct did not involve the predatory conduct described in the Huston, supra, that could Justify 15 points under OV 10. On the contrary, the defendants conduct appears on the record to be purely opportunistic and consisting of the conduct that created the basis for the crime.

The defendants OV 10 score must therefore be corrected to reflect 0 points for the solicitation, and 0 points for the aggravated stalking charge.

18

RECEIVED by MCOA 5/6/2019 3:23:56 PM

Even if the court determines that 15 points could be assessed for the Aggravated stalking charge, it must be deemed inapplicable to the solicitation of murder charges, as the defendant was incarcerated in the Ingham county jail at the time of the alleged solicitation, and he was neither lying in wait nor physically stalking the complainant at that time.

Furthermore, the defendant did not admit to the conduct, nor did the trier of fact find him guilty of predatory conduct.

With a deduction of 25 total points from Offense Variables 4 and 10, the defendants minimun sentencing guidelines would decrease from 180 to 120 months.

The defendant has a Due Process right to be sentenced on the basis of accurate information, Townsend vs Burke, 344 U.S. 736; 68 S.Ct. 1292; 92 L.Ed 1690 (1948), U.S. Const. Ams. VI, XIV, Mich. Const. 1963 art 1 *17.

Defendant is entitled to a remand to the trial court in accordance with People vs Ouelette, 2016 Mich App. Lexis 1316: People vs Lockridge, Supra. Where a determination can be made as to a reduction in his sentence in acccodance with properly scored Offense Variables.

THE DEFENDANT WAS DENIED HIS FIFTH AMENDMENT RIGHTS. WHEN POLICE FAILED TO READ THE DEFENDANT HIS MIRANDA WARNING AT ANYTIME PRIOR TO OR AFTER HIS ARREST, WARRANTING REVERSAL OF HIS CONVICTION AND SUPPRESSION OF HIS STATEMENTS TO POLICE INVESTIGATORS AND THEIR AGENTS.

STANDARD OF REVIEW
Miranda claims are reviewed de novo.
Berghuis vs. Thompkins 560 U.S. 370 (2010)

Where the police activity at issue violated not only the defendant's Miranda/Fifth amendment right to counsel but his Sixth amendment right as well. The defendant's statements may not be used substantively or for impeachment.
Ppl v Gonya, 421 Mich. 462 (1984)
In North Carolina vs Butler, 411 U.S. 369, 99 S. Ct. 1755. That court stated : even absent the accused invocation of the right to remain silent, the accused's statements during a "custodial interrogation" is inadmissible at trial unless the prosecutor can establish that accused in fact knowingly and voluntarily waived his Miranda right. Id. at 373.
1) The waiver must be voluntary, in the sense that it was the product of a free and deliberate choice, rather than "coercion or deception" and 2) made with full awareness of both the nature and the right being abandon and the consequences of that decision to abandon it. Moran v Burbine, 475 U.S. 412 (1986).

In the instant matter, not only defendant Mr. Uraz, never read or made aware of his Miranda rights, he was also represented by counsel (Chris Bergstrom) at the time of his arrest on a related matter, when police investigators acting on a tip from two jailhouse snitches, conducted an extra judicial orchestrated investigation that elicited incriminating statements from the defendant which prosecution relied on to charge the defendant with additional crimes relative to charge for which he had been in custody.
According to Miranda vs. Arizona 384 U.S. 436, 444, 445; 86 S.Ct. 1602, 1612; 16 LED 2d 694(1966) and the Fifth amendment to the constitution, a defendant is protected against self incrimination. In Fifth amendment cases involuntary "custodial interrogations" of a suspect will not be admissible unless the suspect has been advised of the four (4) warnings/safeguards, which must be observed. United States v. Lopez, 988 F. Supp. 1424, 1997 US DIST.LEXIS 21126.

In the case at bar there is no documented coarse of conduct that indicates that defendant Mr. Uraz waived his rights pursuant to Miranda, and the Fifth amendment. The Miranda court formulated name warning that must be given to suspects before they can be subjected to "custodial interrogation".
The substance of the waiver, prior to any questioning is that: 1) He has the right to remain silent 2) that anything he says can be used against him in a court of law. 3)that he has the right to an attorney and 4) that if he can not afford one, one will be appointed to him. Also see Berqhuis vs. Thompkins, 560 U.S. 370 (2010). Mbugua vs. Thaler, 2012 U.S. Dist. Lexis 38245, United States vs. Moore, 2015 U.S. Dist. Lexis 45931.

Again Miranda warnings must be given to suspects before they are subjected to "custodial interrogation". Once warnings have been given, the subsequent procedure is clear. United States vs. Iceman, 2014 U.S. Dist. Lexis 23811.
In this instant case, the defendant Mr. Uraz, through a "deception" tactic by the police investigators and their agents, made incriminating statements which layed the foundation for the Ingham County prosecutors to charge him with (3) three counts of solicitation of murder. This was in addition to the charge of aggravated stalking for which defendant was in custody. (The trial court joined the both charges into one(1) case). The defendant contends that at no time prior to, during or after his arrests on aggravated stalking and/or solicitation of murder, was he advised of his rights to remain silent. There is nothing in any transcribed record that indicates a waiver of his Fifth amendment rights pursuant to Miranda, and nothing in police report to indicate, he was advised of these rights. The defendant's statements to police investigators and to their agents, also at his evidentiary hearing on 10/20/2017 to the court are accordingly inadmissible and should have been suppressed. Further defendant has been deprived of the opportunity to make a knowingly, intelligently and voluntary waiver. Accordingly his coerced statements which were obtained through deception are inadmissible as direct evidence against him. However, this evidence was used against him at trial to substantiate the prosecution's case. Without it they had only the testimony of two jailhouse snitches, informants, police agents in which to convict of solicitation to commit murder must be reversed. His statements suppressed and a new trial granted. (SEE EXHUBIT A pg 3 of 7)

19

RECEIVED by MCOA 5/6/2019 3:23:56 PM

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

                                           Court of Appeals Nos. 343695

V                                              343696

                                         Circuit Court Nos. 16-1064-FH

                                              16-1065-FH

TUNC URAZ,

      Defendant-Appellant.

_____/

**PEOPLE'S BRIEF ON APPEAL**

**ORAL ARGUMENT NOT REQUESTED**

CAROL A. SIEMON
      INGHAM COUNTY PROSECUTING ATTORNEY

KAHLA D. CRINO
      APPELLATE DIVISION CHIEF

BUSINESS ADDRESS
      303 W. Kalamazoo Street, 4th Floor
      Lansing, Michigan 48933

RECEIVED by MCOA 7/10/2019 9:33:24 AM

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................................iii

COUNTER STATEMENT OF QUESTIONS PRESENTED ........................................... v

STATEMENT OF APPELLATE JURISDICTION.......................................................vii

COUNTER STATEMENT OF FACTS ......................................................................... 1

ARGUMENT

    I. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY ADMITTING DEFENDANT'S PREVIOUS ACTS OF STALKING PURSUANT TO MRE 404(B) TO SHOW INTENT, SCHEME, AND SYSTEM IN DOING AN ACT. ................... 12

    II. THE TRIAL COURT DID NOT ERR BY DENYING DEFENDANT'S MOTION FOR SEVERANCE, BECAUSE THE CHARGES WERE A SERIES OF CONNECTED  ACTS OR A SERIES OF ACTS CONSTITUTING PARTS OF A SINGLE SCHEME OR PLAN ..................................................................... 21

    III. BECAUSE THE NOTES BETWEEN CLOSE AND PIERCE WERE DISCLOSED TO THE DEFENSE THE WEEK BEFORE TRIAL AND WERE UTILIZED BY DEFENDANT AT TRIAL, THERE WAS NO *BRADY* VIOLATION AND DEFENDANT WAS NOT DENIED A FAIR TRIAL........................................ 26

    IV. BECAUSE DEFENDANT DID NOT MEET HIS BURDEN OF SHOWING THAT HE WAS ENTRAPPED, THE TRIAL COURT PROPERLY DENIED DEFENDANT'S MOTION TO DISMISS BASED ON ENTRAPMENT................... 29

    V. DEFENDANT DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL MERELY BECAUSE TRIAL COUNSEL WAS A PERSON PREVIOUSLY DIAGNOSED WITH A MENTAL ILLNESS WHO RECEIVED TREATMENT FOR HIS MENTAL ILLNESS AFTER THE CONCLUSION OF DEFENDANT'S TRIAL. ....................................................................... 33

    VI. THE TRIAL PROSECUTOR DID NOT COMMIT PROSECUTORIAL MISCONDUCT AND DENY DEFENDANT A FAIR TRIAL BY STATING THAT THERE WAS A THREE-MINUTE DELAY BETWEEN QUESTIONS AND THAT DEFENSE COUNSEL RECEIVED A BREAK TO GATHER HIS THOUGHTS. .... 41

RELIEF REQUESTED ...................................................................... 44

RECEIVED by MCOA 7/10/2019 9:33:24 AM

# TABLE OF AUTHORITIES

**Cases**

*Harrington v Richter,* 562 US 86; 131 S Ct 770; 178 L Ed 2d 624 (2011) ..................... 35

*Huddleston* v *US*, 485 US 681 (1988) ................................................................. 15

*In re Ayres,* 239 Mich App 8 (1999) ................................................................ 36

*People v Ali Elatrache*, unpublished per curiam opinion of the Court of Appeals, issued April 19, 2016 (Docket No. 324918) .................................................... 24, 25

*People v Babcock,* 469 Mich 247 (2003) ............................................................ 12

*People v Bynum,* 496 Mich 610 (2014) .............................................................. 12

*People v Carbin,* 463 Mich 590 (2001) .............................................................. 34

*People v Chenault*, 495 Mich 142 (2014) ....................................................... 26, 27

*People v Cooper*, 309 Mich App 74 (2015) ..................................................... 41, 42

*People v Dalessandro*, 165 Mich App 569 (1988) .................................................. 43

*People v Dendel,* 481 Mich 114 (2008) .............................................................. 34

*People v Fyda,* 288 Mich App 446 (2010) ........................................................... 29

*People v Gioglio*, 296 Mich App 12 (2012) .......................................................... 34

*People v Goree,* 132 Mich App 693 (1984) .......................................................... 18

*People v Hopson,* 178 Mich App 406 (1989) ........................................................ 36

*People v LeBlanc*, 465 Mich 575 (2002) ............................................................. 33

*People v Lockett,* 295 Mich App 165 (2012) ........................................................ 34

*People v Lukity,* 460 Mich 484 (1999) ............................................................... 12

*People v Mardlin,* 487 Mich 609 (2010) ............................................................. 14

*People v McLaughlin,* 258 Mich App 635 (2003) ................................................... 41

*People v Meadows,* 175 Mich App 355 (1989) ...................................................... 18

*People v Mills*, 450 Mich 61 (1995) .................................................................. 18

*People v Nix,* 301 Mich App 195 (2013) ............................................................. 33

*People v Ortiz,* 249 Mich App 297 (2001) ........................................................... 18

*People v Roscoe,* 303 Mich App 633 (2014) ......................................................... 13

*People v Sexton*, 250 Mich App 211 (2002) ......................................................... 30

*People v Stewart* (On Remand), 219 Mich App 38 (1996) .......................................... 35

*People v Stokes,* 312 Mich App 181 (2015) .......................................................... 26

*People v Unger,* 278 Mich App 210 (2008) .......................................................... 42

*People* v *Vandervliet*, 444 Mich 52 (1993) .......................................................... 15

*People v Williams*, 483 Mich 226 (2009) ......................................................... 21, 24

*Strickland v Washington,* 466 US 668 (1984) ........................................................ 35

*United States v Bagley,* 473 US 667; 105 S Ct  3375; 87 L Ed 2d 481 (1985) .................. 27

*Wiggins v Smith,* 539 US 510; 123 S Ct 2527; 156 L Ed 2d 471 (2003) ........................ 35

*Wilson v Taylor,* 457 Mich 232 (1998) .............................................................. 39

**Other Authorities**

SJI 4.11 ................................................................................................... 20

RECEIVED by MCOA 7/10/2019 9:33:24 AM

**Rules**

MCR 6.120(B)(1) ...............................................................................22, 25
MCR 6.120(C) ........................................................................................ 21
MCR 7.215(C) ........................................................................................ 24
MRE 104(b) ........................................................................................... 15
MRE 401................................................................................................. 16
MRE 402........................................................................................... 15, 16
MRE 404(b) ............................................... 12, 13, 14, 15, 23, 24, 38
MRE 404(b)(1) ...................................................................................... 14

RECEIVED by MCOA 7/10/2019 9:33:24 AM

**COUNTER STATEMENT OF QUESTIONS PRESENTED**

I.   DID THE TRIAL COURT ABUSE ITS DISCRETION BY ADMITTING DEFENDANT'S PREVIOUS ACTS OF STALKING PURSUANT TO MRE 404B TO SHOW INTENT, SCHEME, AND SYSTEM IN DOING AN ACT?

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

II.  DID THE TRIAL COURT ERR BY DENYING DEFENDANT'S MOTION FOR SEVERANCE, WHEN THE CHARGES WERE A SERIES OF CONNECTED  ACTS OR A SERIES OF ACTS CONSTITUTING PARTS OF A SINGLE SCHEME OR PLAN?

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

III. WAS THERE A *BRADY* VIOLATION THAT DENIED DEFENDANT A FAIR TRIAL EVEN THOUGH THE NOTES BETWEEN CLOSE AND PIERCE WERE DISCLOSED TO THE DEFENSE THE WEEK BEFORE TRIAL AND WERE UTILIZED BY DEFENDANT AT TRIAL?

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

IV.  DID THE TRIAL COURT ERR BY DENYING DEFENDANT'S MOTION TO DISMISS BASED ON ENTRAPMENT WHEN DEFENDANT DID NOT MEET HIS BURDEN OF SHOWING THAT HE WAS ENTRAPPED?

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

V.   WAS DEFENDANT DENIED EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE TRIAL COUNSEL WAS A PERSON PREVIOUSLY DIAGNOSED WITH A MENTAL ILLNESS WHO RECEIVED TREATMENT FOR HIS MENTAL ILLNESS AFTER THE CONCLUSION OF DEFENDANT'S TRIAL?

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

RECEIVED by MCOA 7/10/2019 9:33:24 AM

VI. DID THE TRIAL PROSECUTOR COMMIT PROSECUTORIAL MISCONDUCT AND DENY DEFENDANT A FAIR TRIAL BY STATING THAT THERE WAS A THREE-MINUTE DELAY BETWEEN QUESTIONS AND THAT DEFENSE COUNSEL RECEIVED A BREAK TO GATHER HIS THOUGHTS?

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

RECEIVED by MCOA 7/10/2019 9:33:24 AM

# STATEMENT OF APPELLATE JURISDICTION

The People agree with Defendant's Statement of Jurisdiction.

RECEIVED by MCOA 7/10/2019 9:33:24 AM

## COUNTER STATEMENT OF FACTS

Charges against Defendant Tunc Uraz arose because he stalked Erika Melke and solicited two jail inmates and an undercover officer to murder her after she ended a romantic relationship with him.

Defendant and Melke were in a dating relationship from the end of 2012 or beginning of 2013 until June 2015. (11/3/17, 10). They met when Defendant worked at the Michigan State University Cafeteria and Melke was a student. (11/3/17, 9). During the relationship, Defendant and Melke communicated in English, and Defendant taught a culinary arts management class in English. (11/3/17, 10-11).

When Melke ended the relationship, Defendant was not happy. (11/3/17, 11). After the relationship ended, Defendant still tried to communicate with Melke and work on their issues. (11/3/17, 11-12). Melke asked Defendant to leave her alone, but he refused. (11/3/17, 12). In July of 2015, Melke moved from one unit in her apartment complex to another unit, and Defendant helped her move. (11/3/17, 12-15). Defendant did not have a key to Melke's apartment. (11/3/17, 14-15).

During the evening on August 24, 2015, someone peeled Melke's registration tag off of her car, and damaged her car by keying it. (11/3/17, 15-17). On September 29, 2015, Defendant confronted Melke while she was grocery shopping at Kroger. Defendant asked Melke about a man that she was dating. Melke asked Defendant to leave her alone and left the store. Defendant also left without buying anything. (11/3/17, 18-19). During this time, Defendant was still trying to communicate with Melke by text message. (11/3/17, 20).

1

RECEIVED by MCOA 7/10/2019 9:33:24 AM

On December 31, 2015, Defendant confronted Melke while she was celebrating New Year's Eve at Dave and Busters with her then boyfriend, Stan White, and their friends Noelle VanSlembrouck and Zeb Baldwin. (11/3/17, 20). Defendant tried to make Melke come outside to talk to him. (11/3/17, 20). When she refused, he began slandering her, calling her a slut, and trying to talk to White. (11/3/17, 20). Melke felt scared and unsafe. (11/3/17, 21). Management had to escort Defendant out of the restaurant. (11/3/17, 22). That evening, when Melke and White left Dave and Busters, the tires on White's vehicle had been punctured on their side walls. (11/2/17, 178-179).

Melke obtained a Personal Protection Order and served Defendant on January 21, 2016. (11/3/17, 21). On February 13, 2016, Defendant texted Melke and called her a "Ho." (11/3/17, 24). On March 26, 2016, Defendant confronted Melke in the parking lot of Bust Buy in Okemos. (11/3/17, 25). As Melke was pulling into the parking lot, she noticed Defendant's vehicle behind her. (11/3/17, 25). Defendant pulled up next to Melke, rolled down his window, and tried to talk to her. (11/3/17, 25). Melke took pictures of Defendant using her phone, stayed inside her car, and called the police. (11/3/17, 26-27). Defendant only left the parking lot when police arrived. (11/2/17, 131). Melke was upset, crying, and distraught. (11/3/17, 132).

On April 8, 2016, Melke was in Petoskey at her mother's home. (11/3/17, 27). Defendant called Melke from his mother's phone. His mother's name appeared on Melke's mother's caller ID, and Melke did not answer the call. (11/3/17, 28). Melke had not informed Defendant that she was going to Petoskey. (11/3/17, 28). On May 16, 2016, Melke stayed at White's house. During the night, Defendant egged Melke's vehicle and

RECEIVED by MCOA 7/10/2019 9:33:24 AM

2

punctured the tires on White's vehicle again. (11/3/17, 29; 11/2/17, 183). After this, Defendant also began texting White. Defendant did not identify himself in the text messages, but asked White to meet with him to work out their differences. White responded by calling the sender by Defendant's name, confronting him about damaging his vehicle and Melke's vehicle, and declining to meet with him. The sender did not express confusion and responded in a manner that made it clear he was Defendant. (11/2/17, 185-189). After this, Melke ended her relationship with White because she did not want to put him in continued danger. (11/3/17, 30-31).

Also in April 2016, Defendant attempted to obtain a gun and ammunition. Defendant stated that he could not do it the "legal way." (11/6/17, 96). Defendant asked Patrick Burnett, his co-worker at the Michigan State University, to get him a gun and bullets. Defendant asked Burnett, "Do you trust me?" (11/6/17, 92). Defendant stated that he really needed it, appeared to be serious, and stated that did not want to get a gun the legal way. (11/6/17, 94-96). The day after asking Burnett to get a gun and bullets for him, Defendant again approached Burnett, and made the same request again. (11/6/17, 97). Burnett knew it was not a joke, and reported the conversation to his supervisor. Defendant was terminated from his employment at Michigan State University for making this request. (11/6/17, 99).

In May 2016, Melke placed a security camera in her bedroom because she was concerned that Defendant had entered her apartment without her knowledge or consent. Melke was correct. On May 25, 2016, Defendant was caught on camera looking around inside Melke's room. Defendant appeared to be looking in an area where Melke had

3

RECEIVED by MCOA 7/10/2019 9:33:24 AM

placed tickets for an upcoming Drake concert. A bra, underwear, and a pair of shoes also went missing from Melke's bedroom. (11/3/17, 31-35).

On July 17, 2016, Carmen Elias, Melke's roommate and Melke saw Defendant parked outside of Melke's bedroom. (11/3/17, 35-36; 11/2/17, 146-148). Elias went to the parking lot, and Defendant drove away. Defendant then texted Elias and stated that he was in Turkey. (11/2/17, 147-148). A few weeks later, Elias found that the lug nuts on her tires had been loosened while it was parked outside her apartment. (11/2/17, 155).

On July 13, 2016, Melke obtained another Personal Protection Order. (11/3/17, 36). On August 15, 2016, Defendant began trying to access and change the password on Melke's Facebook account (11/3/17, 37). Defendant also created an Instagram account in Melke's name. He used pictures from Melke's actual Facebook account, and pictures of a dildo and posted them on the fake Instagram account. He also posted various pictures and messages that pertained to "cheating." (11/3/17, 37-42). This activity was linked to the apartment complex where Defendant and Defendant's associate Burak Atamar lived through search warrants for the IP addresses associated with the activity. (11/3/17, 83, 102-110). On August 16, 2016, Melke attended the Drake concert associated with the tickets Defendant appeared to look at when he broke into her bedroom in May of 2016. (11/3/17, 48). When she returned to her vehicle, her tires were again punctured by stabs to the side walls. (11/48-50).

Defendant was charged with Home Invasion Second Degree and Aggravated Stalking in file 16-534-FH and placed in the Ingham County Jail. (Information, *Attachment 1*). Defendant called Melke two times from the Ingham County jail.

4

RECEIVED by MCOA 7/10/2019 9:33:24 AM

Defendant had prerecorded a message that said, "I hope you're happy." (11/3/17, 46-48). Defendant wrote a letter for Melke and gave it to his former attorney Chris Bergstrom, to give to the prosecutor for Melke. The letter contained various demands, questions, and statements regarding their relationship. Defendant pleaded guilty to Aggravated Stalking on August 23, 2016, for his stalking conduct from before that date. Defendant admitted that his conduct was designed to scare or intimidate Melke. (11/3/17, 69).

On August 31, 2016 Defendant created a fake email account using Melke's name. He sent Melke a copy of the same letter he had provided to Bergstrom. This was a violation of the PPO and no contact order. (11/3/17, 44, 74-75). On August 27 and 31, 2016, Melke received notifications regarding changes to her Facebook password. This activity was linked to the apartment complex where Defendant lived through search warrants for the IP addresses associated with the activity. (11/3/17, 83, 102-110). Defendant's GPS tether also showed that he was present at the physical location associated with the IP address on August 27, 2017 and August 31, 2017 when the activity occurred. (11/2/17, 115-119). Before Defendant was sentenced on his first aggravated stalking case, he was charged with aggravated stalking in file 16-1064-FH for his stalking conduct between the dates of August 23, 2017 and September 26, 2017. (Information, *Attachment 2*). Defendant's sentencing in his first aggravated stalking file was on November 2, 2017. At that hearing, Defendant admitted to using alcohol since 1985, but denied ever abusing controlled substances. (11/3/17, 70-72). Defendant was sentenced to six months in the Ingham County Jail in file 16-534-FH.

5

RECEIVED by MCOA 7/10/2019 9:33:24 AM

While serving his sentence, Defendant began soliciting other inmates to murder Melke. Defendant wanted Melke to die because he believed she had ruined his life, lied to him, and cheated on him. Because of this, Defendant wanted to "get rid of her" (11/3/17, 138) and stated "this bitch got to pay." (11/7/17, 13). Defendant was charged in file 16-1065-FC with three counts of solicitation to murder. (Information, *Attachment 3*).

The first person Defendant solicited to murder Melke was Charles Allen. Defendant and Allen were housed together for a period of time in a medical unit. They became friendly and Defendant began to talk to Allen about Melke. Defendant told Allen that he was in jail for stalking Melke. (11/7/17, 10-11). Defendant told Allen that he wanted to get back at Melke, and stated "this bitch got to pay." (11/7/17, 13). Defendant then made numerous, specific solicitations of Allen. Defendant asked Allen to beat Melke with a baseball bat. He stated that he wanted her "fucked up" and that he wanted pictures of it. (11/7/17, 14). Defendant then asked Allen to kill Ms. Melke. He specified that he wanted her beaten beyond recognition with a bat and that he wanted it to be recorded so that he could masturbate to it. Defendant also requested Melke's ID. (11/7/17, 20-21). Defendant specified that he wanted Melke's body to be dumped where no one would find her. (11/7/17, 16). Defendant agreed to pay Allen $2,500 in exchange for killing Melke. (11/7/17, 16-18). Defendant told Allen where Melke lived, what type of car she drove, and warned him that she has a camera in her house. Defendant also requested a gun so that he could go after the guy Melke "cheated" with. (11/7/17, 21-22). Allen went along with the conversations, but had no intentions of doing anything Defendant asked. (11/7/17, 22).

6

RECEIVED by MCOA 7/10/2019 9:33:24 AM

Allen notified a jail deputy about what Defendant had requested. (11/7/17, 24-25). Allen was interviewed by Detective Matt Krumbach, and during the interview, Allen asked if he could get out of jail. Detective Krumback told Defendant no, but that he could tell Mr. Allen's probation officer that Allen was helpful. (11/7/17, 27-28). Allen stated that no one took advantage of Defendant or hurt him while he was in jail. (11/7/17, 39, 68). Allen cooperated with law enforcement for the sake of Melke's life, and because it was the right thing to do. (11/7/17, 28, 69-70).

The second person Defendant solicited to murder Melke was Reginald Close. Close's nickname was "Rough." (11/3/17, 131). Defendant, Allen, and Close were assigned to the medical unit at the same time, and that is where Defendant and Close met. (11/3/17, 134-135). Defendant began talking to Close about Melke within 48 hours of meeting him. (11/3/17, 136-138). Defendant told Close that Melke ruined his life, lied to him, and cheated on him. Defendant told Close that he had stalked her, entered her house, and that it was her fault that he was in jail. (11/3/17, 138). Defendant stated that he was going to get rid of her. (11/3/17, 138). Defendant stated that he had lost his job at MSU because he tried to get a gun from a coworker in order to kill Melke. (11/3/17, 139). Defendant stated that he sliced Melke's tires while she was at a Drake concert and that he was able to access her phone through her iCloud. (11/3/17, 140-141).

Defendant asked Close if he knew anyone who could have Melke killed and make it look like a robbery. (11/3/17, 143). By the time this conversation took place, Allen had been moved to another location in the jail. (11/3/17, 143-144). Defendant asked Close if he could help by killing Melke. (11/3/17, 145). Close notified his lawyer after he realized

7

RECEIVED by MCOA 7/10/2019 9:33:24 AM

that Defendant was serious about killing Melke. (11/3/17, 145). Close agreed to help Defendant kill Melke. Defendant provided Melke's address, White's address, Melke's Facebook information, a map to Melke's apartment, Melke's car information, and Melke's job information. (11/3/17, 153-156). Defendant agreed to pay $1,000 for Melke's murder. (11/3/17, 147). Defendant made arrangements for his associate, to place some money in Close's jail account. (11/3/17, 157).

Detective Andrew Hogan, interviewed Close. (11/6/17, 106). Close did not receive anything in exchange for his statement or testimony. He was provided with immunity for agreeing to help Defendant kill Melke. (11/3/17, 146, 160-161). Detective Hogan checked Close's jail account, and verified that someone made a deposit $133.59 on October 13, 2016. (11/6/17, 108-109). Detective Hogan obtained a picture of the person who made the deposit. (11/6/17, 109-110). Detective Hogan verified that Defendant never complained of threats, assaults, or promises from other inmates. (11/6/17, 110-111).

The third person Defendant solicited to murder Melke was Officer Frank Mobley. Officer Mobley made contact with Defendant in an undercover capacity and pretended to be a "hit man." (11/6/17, 117). He was provided with basic information regarding Defendant's previous solicitations, and was pretending that he was Close's friend from Detroit. (11/6/17, 117-119). Officer Mobley called Defendant for the first time on October 18, 2016, using a video chat option for jail calls. The call was not successful. (11/6/17, 121). Officer Mobley called again on October 24, 2016. Defendant answered, and the entire call was recorded. (11/6/17, 121). Officer Mobley told Defendant that

8

RECEIVED by MCOA 7/10/2019 9:33:24 AM

"Rough" had told him that Defendant needed someone to "take out the trash." (11/6/17, 123). Throughout the call, Officer Mobley referred to Melke as the "trash," however, he made it clear that this was code for Melke, the person Defendant wanted to have killed. They discussed whether Defendant wanted Officer Mobley to "beat" the trash, whether he should "spill" the trash all over the house, whether he should beat the trash with a bat, whether he would want the scene to be cleaned up afterward, what color hair the trash had. Defendant stated that he wanted it done quickly, throw it out clean. (11/6/17, 123-127). They discussed the address where the trash would be, and Defendant stated that Rough would have that information because he had written it all down. (11/6/17, 126-127). Defendant stated that he was certain that he wanted it done. They discussed how completion would be verified, and that Defendant would pay Officer Mobley $2,000 for the first "bag" and $500 for any others. Defendant specified that he wanted the "trash" taken care of before November 2, which was his sentencing date.

Approximately a week before Defendant's trial began, the prosecutor provided Perrone with handwritten notes that were exchanged between Reginald Close and another inmate named John Pierce. (11/2/17, 6; *Attachment 4*). The notes did not pertain to Defendant's case. (11/6/17, 7). The notes were written before Close contacted his attorney about Defendant's case. (11/6/17, 23). Perrone utilized the notes as a part of his defense to show that Close had a habit of communicating with other inmates in an attempt to help his own case. One of the notes also stated that the author was a good liar, however, it was Pierce, not Close, who wrote that portion of the note. (11/9/17, 65-66).

9

RECEIVED by MCOA 7/10/2019 9:33:24 AM

One of the notes also stated that the author could pass a polygraph. Perrone at one point stated that he believed it was Close who had written that statement. (11/3/17, 6-7).

Perrone filed a motion to sever and an entrapment motion on Defendant's behalf. (2/28/17, 3-19; 10/20/17, 8-105). Both were denied before trial after extensive hearings. Perrone also responded and argued against the prosecutor's motion to admit evidence pursuant to MRE 404b. (10/11/17, 3-22). Perrone's defense included arguing that the jury should keep an open mind, that Defendant was presumed innocent, that the Defendant does not have to do anything, and that the prosecutor must prove beyond a reasonable doubt that Defendant is guilty. (11/2/17, 114-120; 11/9/17, 135). Perrone also argued that the evidence against Defendant was manufactured, and that Allen and Close took advantage of Defendant and provided testimony in an attempt to benefit their own situations. (11/2/17, 121-127; 11/9/17, 138-139). Perrone also argued that the evidence that was admitted pursuant to MRE 404b was not a part of the charged conduct in the case. (11/9/17, 137-138, 145). Throughout the trial, Perrone cross-examined witnesses and attempted to elicit testimony consistent with Defendant's theory of the case. Also throughout trial, Defendant was represented by two attorneys—Perrone, and Eric Schroeder.

Defendant was convicted of three counts of Solicitation to Commit Murder and one count of Aggravated Stalking. (11/9/17, 186). On December 12, 2017, Perrone informed the Court of several things: first, that he has bipolar disorder, which he takes medication for. (12/12/17, 6-7); second that he *did not* have an active episode during the trial (12/12/17, 7); third, that his diagnosis did not impact his representation of

10

RECEIVED by MCOA 7/10/2019 9:33:24 AM

Defendant. (12/12/17, 5). On December 13, 2017, a hearing was held regarding the information Perrone provided. The trial Court informed Defendant that Perrone had an illness "*after the completion of the trial*, but before the time of sentencing." (12/13/17, 3). The court appointed another attorney, Duane Silverthorn to represent Defendant, however, *Defendant requested that Perrone continue representing him* along with Mr. Silverthorn. (12/13/17, 4). Defendant agreed that this arrangement was fine with him and that it was what he wanted. (12/13/17, 4). Defendant's sentencing was adjourned from December 20, 2017 to January 24, 2018 so that Silverthorn could prepare. (12/13/17, 5-6). Defendant was sentenced to 200-360 months for each count of Solicitation of Murder, and 36-90 months for Aggravated Stalking, with credit for 443 days. (1/24/18, 37).

RECEIVED by MCOA 7/10/2019 9:33:24 AM

11

## ARGUMENT

### I.  THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY ADMITTING DEFENDANT'S PREVIOUS ACTS OF STALKING PURSUANT TO MRE 404(B) TO SHOW INTENT, SCHEME, AND SYSTEM IN DOING AN ACT.

#### Defendant's Argument

Defendant argues the trial court abused its discretion by admitting Defendant's previous acts of stalking Melke pursuant to MRE 404(b). Defendant argues that the probative value of the other acts evidence was outweighed by the risk of unfair prejudice. Defendant argues that he was denied a fair trial based on the number of other acts that were admitted pursuant to MRE 404(b).

#### Issue Preservation

Defendant objected to the admission of Defendant's previous acts of stalking the victim. This argument is preserved.

#### Standard of Review

This Court reviews a trial court's decision regarding whether to admit evidence for an abuse of discretion.  *People v Lukity,* 460 Mich 484, 488 (1999).  An abuse of discretion occurs "when the trial court chooses an outcome falling outside [the] principled range of outcomes."  *People v Babcock,* 469 Mich 247, 269 (2003). When the decision whether to admit evidence involves a preliminary question of law, e.g. whether a rule of evidence or statute precludes admission of the evidence, this Court reviews the issue de novo.  *Lukity, supra* at 488.  "[I]t is an abuse of discretion to admit evidence that is inadmissible as a matter of law."  *People v Bynum,* 496 Mich 610, 623 (2014).

12

RECEIVED by MCOA 7/10/2019 9:33:24 AM

"A preserved error in the admission of evidence does not warrant reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *People v Roscoe,* 303 Mich App 633, 639 (2014).

## People's Argument

Files 16-1064-FH and 16-1065-FC were joined for trial. Defendant's three solicitations of murder were a culmination of Defendant's increasingly dangerous, two-year fixation on Melke. The prosecutor argued that Defendant's stalking behavior between August 2015 and July 2017 should be admitted to show motive, intent, and common plan or scheme. The prosecutor filed a timely motion to admit other acts pursuant to MRE 404(b), specifically:

1. Defendant's damage to Melke's vehicle, August 2015;
2. Defendant's messages to White asking to meet, and uninvited harassment at Dave and Busters on New Year's Eve, December 2015-January 2016;
3. Defendant's notice of Melke's January 20, 2016 Personal Protection Order;
4. Defendant's messages to White asking to meet, January 30, 2016;
5. Defendant's message to Melke calling her a "Ho," January 30, 2016;
6. Defendant's confrontation of Melke at Best Buy, March 26, 2016;
7. Defendant's two attempts illegally purchase a gun and ammunition from Burnett, April 5 and 7, 2016;
8. Defendant's phone calls to Melke at her mother's house, April 8, 2016;
9. Defendant's damage to Melke's vehicle at White's house, May 2016;
10. Defendant's damage to White's vehicle, May 2016;
11. Defendant's messages to White asking to meet, May 2016;
12. Defendant's messages to Melke asking to make amends, May 2016;
13. Defendant's home invasion at Melke's apartment, May 25, 2016;
14. Defendant appears in Melke's parking lot and texts Melke's roommate that he is in Turkey, July 17, 2016;
15. Defendant's notice that Melke's Personal Protection Order was extended another year, July 22, 2016;
16. Defendant slashes Melke's tires, August 15, 2016;

RECEIVED by MCOA 7/10/2019 9:33:24 AM

13

17. Defendant sends a letter to Melke's mother asking her to write him, September 2016;

18. Defendant's notice that Melke's Personal Protection order was extended five years, July 22, 2017.[Prosecutor's Motion to Admit Other Acts Evidence Pursuant to MRE 404b, *Attachment 5*]

The prosecutor argued that the proposed other acts evidence fit into three different categories: 1. Damage to property, 2. Appearance at location, and 3. Unwanted communications. In addition to these categories, was the Defendant's attempt to illegally buy a firearm and ammunition. (10/11/17, 3-4).[1]   The prosecutor argued that the other acts evidence was offered to show Defendant's common plan or system in stalking Melke, as well as his motive and intent in subsequently soliciting three people to kill Melke. The prosecutor argued that Defendant repeatedly contacted Melke after their breakup, and when this failed, he expanded the scope of his behavior to her friends and family. Once he was incarcerated and he could no longer see or contact her, he solicited three people to kill her because he believed she had ruined his life by breaking up with him and dating someone else or "cheating" as Defendant viewed it.

MRE 404(b) "is not exclusionary, but is inclusionary, because it provides a nonexhaustive list of reasons to properly admit evidence that may nonetheless also give rise to an inference about the defendant's character." *People v Mardlin,* 487 Mich. 609, 616 (2010).

MRE 404(b)(1) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It

RECEIVED by MCOA 7/10/2019 9:33:24 AM

---

[1] The trial court initially found that this would not be admitted pursuant to MRE 404(b), however after Defendant admitted to this conduct, the court reconsidered its ruling and allowed it to be admitted pursuant to MRE 404(b).

14

may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

According to *People* v *Vandervliet*, 444 Mich 52 (1993) and *Huddleston* v *US*, 485 US 681 (1988), other acts evidence is admissible if it satisfies the following four-pronged test:

1. The evidence must be offered for a proper purpose under 404(b);
2. The evidence must be relevant under MRE 402 as enforced through MRE 104(b);
3. The probative value of the evidence must not be substantially outweighed by unfair prejudice;
4. The trial court may, upon request, provide a limiting instruction.

### 1. The evidence was offered for a proper purpose under MRE 404(b).

The prosecutor offered the other acts evidence to prove motive, intent and common system or plan in doing an act. Defendant's motive and intent was to stalk and kill Melke because she broke up with him and he believed that she was responsible for ruining his life. By stalking her, he intended to frighten and intimidate her, as he had previously admitted. By attempting to have her killed, he was motivated by a desire to get back at Melke for ruining his life. Motive and intent are proper purposes pursuant to MRE 404(b). Defendant's stalking charge in 16-1064-FH was merely a continuation and escalation of the previous two years that he stalked Melke. It was an ongoing course of conduct. In order for the jury to properly evaluate this conduct it was necessary for them to hear about the context in which it occurred, that it was a part of Defendant's ongoing behavior. Similarly, in order to understand Defendant's solicitation of Melke's murder, it

RECEIVED by MCOA 7/10/2019 9:33:24 AM

15

was also necessary for the jury to understand the reason, motivation, and intent behind it. The solicitations to murder Melke were the final culmination of Defendant's plan. System or plan in doing an act are also proper purposes pursuant to MRE 404(b).

### 2. The evidence was relevant under MRE 402.

MRE 401 states: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

MRE 402 states: "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Michigan, these rules, or other rules adopted by the Supreme Court. Evidence which is not relevant is not admissible."

Defendant had been continually stalking Melke in various ways during the two years leading up to the charged stalking conduct in 16-1064-FH and 16-1065-FC. Defendant had also previously admitted that his intent in stalking Melke was to intimidate or frighten Melke. This is highly relevant to whether by continuing the same type of stalking conduct, Defendant's intent continued to be what he had previously admitted to. Defendant's previous acts of stalking Melke are certainly relevant to whether he factually continued to engage in the same type of conduct and whether it was his continued intent to frighten and intimidate her.

Similarly, Defendant's prolonged and escalated stalking of Melke, beginning with their breakup, is relevant to why Defendant would want to kill her. From Defendant's perspective based on his own admissions, Melke cheated on him and caused him to lose

16

RECEIVED by MCOA 7/10/2019 9:33:24 AM