his job. Defendant believed that Melke deserved to die a violent death simply because she ended their relationship and persisted in not wanting to have a relationship with him. As the prosecutor argued, Defendant believed that if he could not have Melke, then no one would. Defendant's own statements to Close and Allen give further insight into how Defendant's stalking behavior culminated with his attempts to have her killed. Defendant told Close that Melke ruined his life, lied to him, and cheated on him. Defendant told Close that he had stalked her, entered her house, and that it was her fault that he was in jail. (11/3/17, 138). Defendant told Allen that he was in jail for stalking Melke, that he wanted to get back at Melke, and stated "this bitch got to pay." (11/7/17, 10-11, 13). Defendants own statements explain the relevance of the other acts evidence. Defendant wanted to kill Melke as revenge for the fact that she left him and didn't want to be with him.

Defendant's attempts to obtain an illegal gun and ammunition are also relevant to his later attempts to have Melke killed. Defendant made it clear that he could not do it the "legal way." (11/6/17, 96). Defendant stated that he really needed it, appeared to be serious, and reiterated that did not want to get a gun the legal way. (11/6/17, 94-96). This all occurred in the spring of 2016, in the midst of a time when Defendant's instances of stalking Melke were especially repetitive. The other acts evidence was relevant to Defendant's stalking and solicitation of murder charges in files 16-1064-FH and 16-1065-FC.

RECEIVED by MCOA 7/10/2019 9:33:24 AM

### 3.  The probative value of the evidence was not substantially outweighed by unfair prejudice.

The probative value of the evidence was not substantially outweighed by unfair prejudice. "[U]nfair prejudice refers to the tendency of the proposed evidence to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *People v Goree,* 132 Mich App 693, 702–703 (1984). Evidence is unfairly prejudicial if there is a danger that marginally probative evidence will be given undue weight by the jury or cause the jury to decide the case on an improper basis such as emotion. *People v Ortiz,* 249 Mich App 297, 306 (2001), *People v Meadows,* 175 Mich App 355, 361 (1989). Unfair prejudice does not mean that the evidence will merely be damaging to the defendant's case. *See People v Mills*, 450 Mich 61, 75 (1995).

It is highly unlikely that Defendant's previous stalking behavior would cause a jury to react with bias, sympathy, anger, shock, or a similar emotion. While Defendant's previous stalking behavior certainly tends to show that Defendant's stalking behavior continued and that Defendant's desire to kill Melke was motivated by revenge, the incidents themselves are not such that a jury would react with bias, sympathy, anger, or shock, and thus make a decision on an inappropriate basis. The conduct was not overtly violent or sexual. Rather, it consisted largely of attempts to contact Melke, either directly or through friends and family, damage to Melke or White's property, and appearing various time's at Melke's location.

RECEIVED by MCOA 7/10/2019 9:33:24 AM

Defendant argues that the other acts evidence was unfairly prejudicial because it portrayed Defendant as an obsessed stalker. However, that was precisely the People's position at trial. Defendant argues that the large number of instances of stalking unfairly buttressed the charges for solicitation of murder. This is however incorrect. There was no room for confusion on this point. Instructions from the court, arguments by the prosecutor, and arguments by the defense made it clear that the prosecutor had to prove the elements of each offense beyond a reasonable doubt and that the other acts evidence could only be considered for a limited purpose. Defendant's argument that the large number of witnesses led to confusion is similarly incorrect. The jury did not express any confusion on this point.

Unfair prejudice does not mean the evidence will merely be damaging to Defendant's case. There is no question that the other acts evidence was damaging to Defendant's case. Without the other acts evidence, the jury would have heard, with no context whatsoever, about two instances of stalking conduct followed by three attempts to solicit Melke's murder. In the absence of the context provided by the other acts evidence, this simply would not have been a complete or accurate picture of what occurred, and the jury would have been left with no true way to determine Defendant's motive, intent, and plan. While this makes the other acts evidence highly relevant it, does not then also make the other acts evidence unfairly prejudicial, but instead merely a component of Defendant's case based exclusively on Defendant's own conduct.

Defendant argues that the other acts evidence was damaging to his case, and he is certainly correct, but it did not cause the jury to decide the case on an improper basis.

RECEIVED by MCOA 7/10/2019 9:33:24 AM

Instead, it showed the jury how after Melke ended the relationship, Defendant did become an obsessed and dangerous stalker. It showed how his conduct in stalking Melke continued and escalated, and ultimately how based on a desire for revenge for all of Melke's perceived slights, Defendant tried to have Melke murdered.

### 4.  The trial court provided a limiting instruction.

The trial court also provided a limiting instruction based on Michigan Standard Criminal Jury Instruction 4.11. The instruction was customized to only include the relevant purposes that the jury could consider the other acts evidence for. It stated:

> You have heard evidence that was introduced to show that the Defendant committed other acts for which he is not on trial. If you believe this evidence, you must be very careful and only to consider it for certain purposes. You may only think only about whether this evidence tends to show, one, that the defendant had a reason to commit the crimes. Two, that the defendant specifically meant to repeatedly contact Erika Melke against her wishes, and/or that the Defendant used a plan, system, or characteristic scheme that he had used before or since. You must not consider this evidence for any other purpose. For example, you must not decide that it shows that the Defendant is a bad person or that he is likely to commit crimes. You must not convict here because you think he is guilty of other bad conduct. All the evidence must convince you, beyond a reasonable doubt, that the Defendant committed the alleged crime, or you must find him not guilty. [(11/9/17, 175-176).]

Thus the jury was properly instructed to only consider the other acts evidence for proper and relevant purposes.

RECEIVED by MCOA 7/10/2019 9:33:24 AM

## II.   THE TRIAL COURT DID NOT ERR BY DENYING DEFENDANT'S MOTION FOR SEVERANCE, BECAUSE THE CHARGES WERE A SERIES OF CONNECTED  ACTS OR A SERIES OF ACTS CONSTITUTING PARTS OF A SINGLE SCHEME OR PLAN

### Defendant's Argument

Defendant argues that his multiple charges and the other acts evidence were too confusing for the jury and cast Defendant as an obsessed stalker. Defendant argues that severance of Defendant's files would have alleviated the jury's confusion and the perception that he was an obsessed stalker.

### Issue Preservation

Defendant filed a motion to sever trial for his files and the individual counts of Solicitation of Murder. This argument is preserved.

### Standard of Review

"To determine whether joinder is permissible, a trial court must first find the relevant facts and then must decide whether those facts constitute 'related' offenses for which joinder is appropriate. Because this case presents a mixed question of fact and law, it is subject to both a clear error and a de novo standard of review." *People v Williams*, 483 Mich 226, 231 (2009).

### People's Argument

Defendant's charges were properly joined because they were a series of connected acts or a series of acts constituting part of a single scheme or plan. MCR 6.120(C) states that the trial court "must sever for separate trials offenses that are not related as defined in

21

RECEIVED by MCOA 7/10/2019 9:33:24 AM

subrule (B)(1)." Offenses are related if they are based on "(a) the same conduct or transaction, or (b) a series of connected acts, or (c) a series of acts constituting parts of a single scheme or plan." MCR 6.120(B)(1).

Here, Defendant began stalking Melke after she ended their relationship. Defendant continued stalking Melke for approximately two years and culminated his stalking behavior with three attempts to have Melke killed. Defendant's own reasons for soliciting Melke's murder were that he wanted her to pay. This series of connected acts or series of acts constituting parts of a single scheme or plan consisted of numerous instances of unwanted contact. Defendant was charged with Home Invasion Second Degree and Aggravated Stalking in file 16-534-FH and placed in the Ingham County Jail. (Information, *Attachment 1*). Defendant called Melke two times from the Ingham County jail. Defendant had prerecorded a message that said, "I hope you're happy." (11/3/17, 46-48). Defendant wrote a letter for Melke and gave it to his former attorney Chris Bergstrom, to give to the prosecutor for Melke. The letter contained various demands, questions, and statements regarding their relationship. Defendant pleaded guilty to Aggravated Stalking on August 23, 2016 for his stalking conduct from before that date. Defendant admitted that his conduct was designed to scare or intimidate Melke. (11/3/17, 69).

On August 31, 2016 Defendant created a fake email account using Melke's name. He sent Melke a copy of the same letter he had provided to Bergstrom. This was a violation of the PPO and no contact order. (11/3/17, 44, 74-75). On August 27 and 31, 2016, Melke received notifications regarding changes to her Facebook password. This

RECEIVED by MCOA 7/10/2019 9:33:24 AM

activity was linked to the apartment complex where Defendant lived through search warrants for the IP addresses associated with the activity. (11/3/17, 83, 102-110). Defendant's GPS tether also showed that he was present at the physical location associated with the IP address on August 27, 2017 and August 31, 2017 when the activity occurred. (11/2/17, 115-119). Before Defendant was sentenced on his first aggravated stalking case, he was charged with aggravated stalking in file 16-1064-FH for his stalking conduct between the dates of August 23, 2017 and September 26, 2017. (Information, *Attachment 2*). Defendant's sentencing in his first aggravated stalking file was on November 2, 2017.  Defendant was sentenced to six months in the Ingham County Jail in file 16-534-FH.

While serving his sentence, Defendant began soliciting other inmates to murder Melke. Defendant wanted Melke to die because he believed she had ruined his life, lied to him, and cheated on him. Because of this, Defendant wanted to "get rid of her" (11/3/17, 138) and stated "this bitch got to pay." (11/7/17, 13). Defendant was charged in file 16-1065-FC with three counts of solicitation to murder. (Information, *Attachment 3*).

Before Defendant was even sentenced, he continued to persist in harassing Melke with continued stalking between the dates of August 23, 2017 and September 26, 2017, culminating with his three solicitations to murder Melke. Though Defendant pleaded guilty in file 16-534-FH, his plan of stalking and intimidating Melke not only continued, it escalated.

It is also appropriate to consider that evidence of Defendant stalking Melke would have been admitted at trial pursuant to MRE 404(b) even if severance of his stalking

RECEIVED by MCOA 7/10/2019 9:33:24 AM

charge and solicitation of murder charges were granted. Correspondingly, had each individual count of solicitation to murder been tried separately, evidence of the other two would have also been admitted pursuant to MRE 404(b).  Our Supreme Court reached a similar conclusion in *People v Williams*, 483 Mich 226, 237 (2009), where the Court stated, "[h]ere, even if the charges were tried separately, evidence from each crime would have been admissible in the trial of the other because of the common scheme or plan." *Id*. The admissibility of evidence in other trials is an important consideration because "[j]oinder of ... other crimes cannot prejudice the defendant more than he would have been by the admissibility of the other evidence in a separate trial."

This Court also reached a similar conclusion in *People v Ali Elatrache*, unpublished per curiam opinion of the Court of Appeals, issued April 19, 2016 (Docket No. 324918) (*Attachment 6*).[2] In *Elatrache*, the defendant relentlessly stalked and harassed the victim "S" after she ended a romantic relationship with him. His stalking and harassment ultimately culminated when he murdered S's father. The defendant argued that the stalking proofs were merely being used to bolster the murder proofs, that the crimes were unrelated, and that they should be severed. *Id*. at 15. The prosecutor argued that S's father's murder was the ultimate harassment that S suffered in that "defendant killed her father, he did what he knew would hurt her the most. The ultimate aggravated stalking…." *Id*. The trial court denied the defendant's motion to sever, and found that the crimes were "intertwined," and relevant to premeditation and deliberation.

---

[2] Pursuant to MCR 7.215(C), this unpublished case is not cited for a proposition of law, but rather to show how this Court has previously viewed a case where stalking served as motivation for another crime, and the trial court appropriately refused to sever charges.

RECEIVED by MCOA 7/10/2019 9:33:24 AM

Defendant later pleaded guilty to aggravated stalking and proceeded to trial for murdering S's father. Notably, this Court also upheld the use of the defendant's stalking behavior toward S as MRE 404(b) evidence in the defendant's murder trial. *Id*. at 17-19.

Like the defendant in *Elatrache*, here, Defendant relentlessly stalked and harassed the victim after she ended their relationship. In both cases, the stalking escalated, until finally, the Defendant here attempted to have Melke murdered three times, and Elatrache successfully murdered S's father. In both cases, the end of the relationships, the anger and unwillingness to accept the end of the relationships, and a continued desire to control their victims ultimately led to the commission of other crimes. Just as the stalking in *Elatrache* was entwined with the defendant's murder of S's father, Defendant's stalking of Melke is entwined with Defendant's attempts to have Melke killed.  Defendant's actions in stalking and attempting to have Melke killed were a series of connected acts or a series of acts constituting parts of a single scheme or plan pursuant to MCR 6.120(B)(1), and joinder was appropriate.

RECEIVED by MCOA 7/10/2019 9:33:24 AM

25

**III. BECAUSE THE NOTES BETWEEN CLOSE AND PIERCE WERE DISCLOSED TO THE DEFENSE THE WEEK BEFORE TRIAL AND WERE UTILIZED BY DEFENDANT AT TRIAL, THERE WAS NO *BRADY* VIOLATION AND DEFENDANT WAS NOT DENIED A FAIR TRIAL.**

### Defendant's Argument

Defendant argues that the notes between Close and Pierce were disclosed the first day of trial, and thus defense counsel could not properly defend against the charges. Defendant argues that he could have used the notes as a part of his entrapment motion and that the late disclosure was a *Brady* violation.

### Issue Preservation

Defendant stated that he might move to dismiss based on the timing of when he was provided the notes. Ultimately, Defendant did not raise this argument.[3]

### Standard of Review

"This Court reviews due process claims, such as allegations of a *Brady* violation, de novo." *People v Stokes,* 312 Mich App 181, 189 (2015).

### People's Argument

"[T]he components of a '*true Brady* violation,' are that: (1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150 (2014)(emphasis added). To establish materiality, a defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A

---

[3] On November 6, 2017, the trial court referenced the notes, stated that he reviewed them, and found that they were not exculpatory. It is unclear as to whether this was associated with a motion. (11/6/17, 62-63).

RECEIVED by MCOA 7/10/2019 9:33:24 AM

'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id*.; *United States v Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). There is no *Brady* violation here because the evidence was provided to Defendant, and though only marginally favorable to Defendant, was admitted at trial, and used as a part of his defense.

### 1. The prosecutor did not suppress the notes.

Defendant incorrectly asserts that the notes were not provided to Defendant. However, approximately a week before Defendant's trial began, the prosecutor provided Perrone with the handwritten notes that were exchanged between Reginald Close and another inmate named John Pierce. (11/2/17, 6; *Attachment 4*). Thus, this element is not met.

### 2. The notes were not favorable to the defense.

First, the notes did not pertain to Defendant's case. (11/6/17, 7). The notes were written before Close contacted his attorney about Defendant's case. (11/6/17, 23). One of the notes also stated that the author was a good liar, however, it was Pierce, not Close, who wrote that portion of the note. (11/9/17, 65-66).  Perrone attempted to utilize the notes as a part of his defense to show that Close had a habit of communicating with other inmates in an attempt to help his own case, but he was not able to establish that it was Close who claimed to be a good liar. One of the notes also stated that the author could pass a polygraph. Perrone at one point stated that he believed it was Close who had written that statement. (11/3/17, 6-7). Thus, the notes were not favorable to the defense because Close did not write the statements that Defendant wished to attribute to him.

RECEIVED by MCOA 7/10/2019 9:33:24 AM

John Peirce testified as a witness for the defense and confirmed that he wrote the portion of the note where the author claimed to be a good liar.

### 3.  The notes were not material.

While materiality is typically established where there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different, this analysis is inapplicable here because the notes were both disclosed and utilized as a part of Defendant's strategy. Defendant attempts to meet this element by arguing that the outcome of his motion for severance would have been different if the notes had been disclosed earlier, but this is incorrect. As previously discussed, severance pertains to whether the offenses are related. The notes between Close and Peirce have absolutely nothing to do with whether Defendant was an obsessed stalker for a period of two years, culminating with attempts to have Melke killed and whether Defendant's act of stalking Melke was related to his attempts to have her killed for breaking up with him and rebuffing his advances.

RECEIVED by MCOA 7/10/2019 9:33:24 AM

## IV. BECAUSE DEFENDANT DID NOT MEET HIS BURDEN OF SHOWING THAT HE WAS ENTRAPPED, THE TRIAL COURT PROPERLY DENIED DEFENDANT'S MOTION TO DISMISS BASED ON ENTRAPMENT.

### Defendant's Argument

Defendant argues that the trial court erred by denying his entrapment motion because while he was in jail he was withdrawing from alcohol and drugs, he was vulnerable due to his placement in segregation, he had "mental health issues," and he was generally naive regarding jail. Defendant also argues that his motion should have been granted based on "the use of jailhouse snitches looking for favorable treatment."

### Issue Preservation

Defendant filed a motion alleging that Defendant was entrapped. This argument is preserved.

### Standard of Review

Whether entrapment occurred is determined by considering the facts of each case and is a question of law for this Court to decide de novo. The trial court must make specific findings regarding entrapment, and this Court reviews its findings under the clearly erroneous standard. The findings are clearly erroneous if this Court is left with a firm conviction that a mistake was made. [*People v Fyda,* 288 Mich App 446, 456 (2010) (citations omitted).]

### People's Argument

Entrapment occurs if (1) the police engage in impermissible conduct that would induce an otherwise law-abiding person to commit a crime in similar circumstances, or (2) the police engage in conduct so reprehensible that it cannot be tolerated by the court. The defendant bears the burden of proving entrapment by a preponderance of the evidence. The test for entrapment is objective and focuses on the propriety of the government's conduct that resulted in the charges against the defendant rather than on the defendant's predisposition to commit the crime. Entrapment will not be found where the

RECEIVED by MCOA 7/10/2019 9:33:24 AM

police did nothing more than present the defendant with the opportunity to commit the crime of which he was convicted. [*People v Sexton*, 250 Mich App 211 (2002)(internal quotations and citations omitted).]

Here, Perrone filed a pretrial motion and brief alleging that Defendant was entrapped. The trial court held a hearing on Defendant's arguments. Defendant took the stand and testified that he has PTSD, substance abuse problems, and is manic depressive. (10/20/17, 11). Defendant testified that that he has abused alcohol and benzodiazepines for 30 years. (10/20/17, 12).[4] Defendant stated that while he was on the medical unit, he was inside 24 hours per day. (10/20/17, 10-11). Defendant stated that Allen offered to help with his case and that Allen did this with everyone. Defendant testified that he and Close wrote notes to one another about his case, but that it was Close's idea and that it was just talk. (10/20/17, 23). Defendant stated that Close offered to help Defendant beat his case. (10/20/17, 25). Defendant stated that he was being "extorted" by Close and Allen, but did not explain what this meant. (10/20/17, 32). Defendant testified that when he received Officer Mobley's call, he was not expecting a call about killing Melke. (10/20/17, 26-27). Defendant admitted to nearly every instance of stalking conduct, including his attempts to illegally obtain a handgun from a coworker at Michigan State University.

Also at the entrapment hearing, Detective Krumbach testified that Allen and Close were not working under police direction on anything and were never asked to gather information. (10/20/17, 94). Allen and Close did not have proffer agreements regarding their statements or testimony. (10/20/17, 93-94).

---

[4] Defendant did not report this at his previous sentencing.

RECEIVED by MCOA 7/10/2019 9:33:24 AM

The trial court denied Defendant's entrapment motion. The trial court stated that as to the first prong of the test, it found that Defendant had engaged in an escalation of activities that endangered Melke. The trial court found that "the police didn't really do anything. Close or Allen were not the agents. They were in the cell…And Close and Allen were not agents of the police. And they took the information about Mr. Uraz discussing solicitation of the victim in this matter to authorities. Authorities got it, they investigated it. And then they had the undercover agent make the call." (10/20/17, 109-110). The trial court also stated that in the video call with Officer Mobley, Defendant referenced "Rough" and told Officer Mobley that Rough would have all of the victim/intended target's information. The trial court found that as to Close and Allen, the police didn't do anything and that Close and Allen were not agents. As to Mobley, the trial court watched the video of the call, and found that Defendant did not express confusion, and participated in the conversation by talking about what he wanted to happen and explaining that "Rough" would have additional details. (10/20/17, 109-110).

Though it was not specifically discussed by the court, it is also significant that because Close and Allen were not agents of the police, and Defendant freely solicited each of them to murder Melke, he was not an otherwise law abiding citizen who was induced to commit a crime. Instead, when given a third opportunity to solicit an undercover officer to murder Melke, Defendant did so freely, as he had already done two times before with individuals who were not acting at the direction of law enforcement. Thus, the trial court properly denied Defendant's entrapment motion because the police did not engage in impermissible conduct that would induce an otherwise law abiding

31

RECEIVED by MCOA 7/10/2019 9:33:24 AM

citizen to commit a crime under similar circumstances. Defendant had been stalking Melke for two years—he was certainly not law abiding. Defendant solicited Melke's murder on multiple occasions with Close and Allen before officers were ever involved in his case. Once Officer Mobley called Defendant, Defendant merely continued to solicit Melke's murder as he had already done through several conversations with Close and Allen.

RECEIVED by MCOA 7/10/2019 9:33:24 AM

**V. DEFENDANT DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL MERELY BECAUSE TRIAL COUNSEL WAS A PERSON PREVIOUSLY DIAGNOSED WITH A MENTAL ILLNESS WHO RECEIVED TREATMENT FOR HIS MENTAL ILLNESS AFTER THE CONCLUSION OF DEFENDANT'S TRIAL.**

### Defendant's Argument

Defendant argues that one of his attorneys, Perrone, had a mental breakdown during trial and provided ineffective assistance of counsel by: 1) failing to impeach witnesses with prior theft convictions, 2) giving an inadequate closing argument, 3) sending a particular email to Defendant's sister during the trial, and 4) an alleged delay between questions while cross examining a witness.

### Issue Preservation

Defendant did not move for a new trial in the trial court. In fact, after his conviction, he continued to request and receive Perrone's assistance. This argument is not preserved.

### Standard of Review

Whether a defendant has been denied effective assistance of counsel is a mixed question of law and fact. *People v LeBlanc*, 465 Mich 575, 579 (2002). "A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *Id.*. The trial court's findings of fact are reviewed for clear error. *Id.* Issues of law are reviewed de novo. *Id.*

Defendant did not preserve this claim by moving for the new trial in the trial court. *People v Nix*, 301 Mich App 195, 207 (2013). "Unpreserved issues concerning

RECEIVED by MCOA 7/10/2019 9:33:24 AM

33

ineffective assistance of counsel are reviewed for errors apparent on the record." *People*

*v Lockett,* 295 Mich App 165, 186 (2012).

### People's Argument

A defendant seeking a new trial on the ground that trial counsel was ineffective bears a heavy burden. To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy the two-part test articulated by the United States Supreme Court in *Strickland v Washington,* 466 U S 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). See *People v Pickens,* 446 Mich 298, 302-303; 521 NW2d 797 (1994). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment." *Strickland,* supra at 687. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *Id.* at 690.[5] "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. [*People v Dendel,* 481 Mich 114, 124-125 (2008), quoting *People v Carbin,* 463 Mich 590, 599-600 (2001).]

---

[5] Reviewing courts are not only required to give counsel the benefit of the doubt with this presumption, they are required to "affirmatively entertain the range of possible reasons" that counsel may have had for proceeding as he or she did. *Cullen v Pinholster*, 563 US [170]; 131 S Ct 1388, 1407; 179 L Ed 2d 557 (2011). That inquiry is objective; although the reviewing court may not engage in a *post hoc* rationalization of the counsel's decision-making that contradicts the available evidence, neither may courts insist that counsel confirm every aspect of the strategic basis for his or her actions. *Harrington v Richter*, 562 US [86]; 131 S Ct 770, 790; 178 L Ed 2d 624 (2011). Accordingly, a reviewing court must conclude that the defendant's trial counsel's act or omission fell within the range of reasonable professional conduct if, after affirmatively entertaining the range of possible reasons for the act or omission under the facts known to the reviewing court, there might have been a legitimate strategic reason for the act or omission. *Pinholster*, 131 S Ct at 1407. [*People v Gioglio*, 296 Mich App 12, 22-23; 815 NW2d 589, vacated in part on other grounds 493 Mich 864; 820 NW2d 922 (2012).]

RECEIVED by MCOA 7/10/2019 9:33:24 AM

"The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v Richter,* 562 US 86; 131 S Ct 770, 788; 178 L Ed 2d 624 (2011), quoting *Strickland v Washington,* 466 US 668, 690 (1984). "Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Harrington, supra* at 789, quoting *Strickland, supra* at 689. "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington, supra* at 789. "There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Harrington, supra* at 790, quoting *Wiggins v Smith,* 539 US 510, 525; 123 S Ct 2527; 156 L Ed 2d 471 (2003). Counsel's performance must be viewed from an objective standard, not from "counsel's subjective state of mind." *Harrington, supra* at 790. "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Id. at* 791. "The fact that defense counsel's strategy may not have worked does not constitute ineffective assistance of counsel." *People v Stewart* (On Remand), 219 Mich App 38, 42 (1996).

On December 12, 2017, Perrone informed the Court of several things: first, that he has bipolar disorder, which he takes medication for. (12/12/17, 6-7); second that he *did not* have an active episode during the trial (12/12/17, 7); third, that his diagnosis did not

RECEIVED by MCOA 7/10/2019 9:33:24 AM

35

impact his representation of Defendant. (12/12/17, 5). On December 13, 2017, a hearing was held regarding the information Perrone provided. The trial Court informed Defendant that Perrone had an illness "*after the completion of the trial*, but before the time of sentencing." (12/13/17, 3). The court appointed another attorney, Duane Silverthorn to represent Defendant, however, *Defendant requested that Perrone continue representing him* along with Silverthorn. (12/13/17, 4). Defendant agreed that this arrangement was fine with him and that it was what he wanted. (12/13/17, 4). Defendant's sentencing was adjourned from December 20, 2017 to January 24, 2018 so that Silverthorn could prepare. (12/13/17, 5-6). Nonetheless, Defendant argues that trial counsel's mental illness manifested as ineffective assistance in the following ways:

### 1. Failure to impeach Close and Allen with prior convictions

Defendant asserts that trial counsel should have impeached Close and Allen with their prior theft related convictions. The decisions whether and how to cross-examine witnesses are matters of trial strategy. *In re Ayres,* 239 Mich App 8, 23 (1999); *People v Hopson,* 178 Mich App 406, 412 (1989). Ineffective assistance of counsel can take the form of a failure to cross-examine witnesses only if the failure deprives the defendant of a substantial defense. *Hopson, supra.*

Here, Perrone did not impeach Allen or Close with previous theft related convictions, however, the jury would have known that they were each in jail because that is how they met Defendant. Thus the failure to cross-examine on this point did not deprive Defendant of a substantial defense. The jury knew that Close and Allen were Ingham County Jail inmates. The jury also knew that when he testified, Close was

RECEIVED by MCOA 7/10/2019 9:33:24 AM

36

incarcerated with the Michigan Department of Corrections (11/3/17, 131). Perrone also attacked Close's and Allen's credibility in numerous other ways. Perrone cross examined Close regarding the fact that he tried to help other inmates with their cases, and that he had tried to help John Pierce. (11/6/17, 6-7). Perrone elicited testimony that Close had proffered on other cases and that his original trial date for his own case was adjourned. (11/6/17, 9-13). Perrone also elicited testimony that Close was worried that Defendant was setting him up (11/6/17, 17). Perrone even elicited testimony from Close that Close and Allen had a conversation about Defendant's attempts to have Melke killed. (11/6/17, 49).

As to Allen, Perrone elicited testimony that Allen was placed on phone restrictions because he wasn't following instructions in the jail. (11/6/17, 31). Perrone elicited testimony from Allen that he tried to help Defendant be more comfortable in jail, and that Defendant seemed scared. (11/6/17, 39). Perrone elicited testimony from Allen that Allen believed it would be easy for someone to take advantage of Defendant. (11/6/17, 47). Perrone also elicited testimony that Allen initially came forward with information about Defendant to try to get out of jail early. (11/6/17, 51).

Thus the failure to impeach Close and Allen with prior theft related convictions did not deny Defendant a substantial defense, and in fact, Perrone elicited other information during cross examination that he was able to use to attack Close's and Allen's credibility, or lend support to his theory of the case. It is not reasonable to assert that had the jury been aware of their prior convictions, that they would have then disregarded their testimony.

RECEIVED by MCOA 7/10/2019 9:33:24 AM

### 2) Perrone's closing argument

Defendant asserts that Perrone was ineffective because he gave an inadequate closing argument. This is simply incorrect. During pretrial motions, opening statements, cross-examination of witnesses, and closing arguments, Perrone presented Defendant's theory of the case.

Perrone filed a motion to sever and an entrapment motion on Defendant's behalf. (2/28/17, 3-19; 10/20/17, 8-105). Both were denied before trial after extensive hearings. Perrone also responded and argued against the prosecutor's motion to admit evidence pursuant to MRE 404b. (10/11/17, 3-22). Perrone's defense included arguing that the jury should keep an open mind, that Defendant was presumed innocent, that the Defendant does not have to do anything, and that the prosecutor must prove beyond a reasonable doubt that Defendant is guilty. (11/2/17, 114-120; 11/9/17, 135). Perrone also argued that the evidence against Defendant was manufactured, and that Allen and Close took advantage of Defendant and provided testimony in an attempt to benefit their own situations. (11/2/17, 121-127; 11/9/17, 138-139). Perrone also argued that the evidence that was admitted pursuant to MRE 404(b) was not a part of the charged conduct in the case. (11/9/17, 137-138, 145). Throughout the trial, Perrone cross-examined witnesses and attempted to elicit testimony consistent with Defendant's theory of the case. Also throughout trial, Defendant was represented by two attorneys—Perrone, and Eric Schroeder. Though Defendant asserts that Perrone's closing argument was an example of ineffective assistance of counsel, he fails to explain what was wrong with it, or what should have instead been presented. "It is not sufficient for a party simply to announce a

RECEIVED by MCOA 7/10/2019 9:33:24 AM

position ... and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Wilson v Taylor,* 457 Mich 232, 243 (1998) (quotations and citations omitted).

### 3) Email to Defendant's sister

Defendant has attached what purports to be an email that Perrone sent to Defendant's sister during the trial as evidence of ineffective assistance of counsel. Though some of the statements contained in the email are certainly odd, Defendant has not articulated how this email impacted Perrone's representation of Defendant. *See Id.*

### 4) Alleged delay between questions while cross examining Allen

Defendant argues that a statement by the prosecutor regarding Defendant's cross examination of Allen is an example of ineffective assistance of counsel. Again, Defendant has not explained how any prolonged delay between questions, even if it did occur was ineffective assistance of counsel. While cross examining Allen, Perrone elicited testimony that Allen was placed on phone restrictions because he wasn't following instructions in the jail. (11/6/17, 31). Perrone elicited testimony from Allen that he tried to help Defendant be more comfortable in jail, and that Defendant seemed scared. (11/6/17, 39). Perrone elicited testimony from Allen that Allen believed it would be easy for someone to take advantage of Defendant. (11/6/17, 47). Perrone also elicited testimony that Allen initially came forward with information about Defendant to try to get out of jail early. (11/6/17, 51). Thus it is unclear why a delay in questions, if it occurred, was evidence of ineffective assistance of counsel. *See Id.*

RECEIVED by MCOA 7/10/2019 9:33:24 AM

Finally, even if these alleged errors were so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment," Defendant cannot establish prejudice. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. This is a burden Defendant cannot meet. The jury heard overwhelming evidence of Defendant's guilt from Melke, White, and other witnesses who experienced Defendant's stalking behavior first-hand. The jury heard from three witnesses, Close, Allen, and Officer Mobley, all of whom described how Defendant solicited them to murder Melke. The jury watched a video of Defendant soliciting Officer Mobley. Also of note is the fact that during his entrapment hearing and his previous stalking plea, Defendant admitted to nearly every component of the evidence against him. Therefore, Defendant cannot establish that but for counsel's errors, the result of the proceeding would have been different. Defendant did not receive ineffective assistance of counsel.

RECEIVED by MCOA 7/10/2019 9:33:24 AM

## VI. THE TRIAL PROSECUTOR DID NOT COMMIT PROSECUTORIAL MISCONDUCT AND DENY DEFENDANT A FAIR TRIAL BY STATING THAT THERE WAS A THREE-MINUTE DELAY BETWEEN QUESTIONS AND THAT DEFENSE COUNSEL RECEIVED A BREAK TO GATHER HIS THOUGHTS.

### Defendant's Argument

Defendant argues that the trial prosecutor committed prosecutorial misconduct and denied Defendant a fair trial by stating that there was a three-minute break between defense counsel's questions and that defense counsel received a break to gather his thoughts. Defendant asserts that these comments were made "in the name of securing a conviction" and to "inflame prejudice."

### Issue Preservation

Defense counsel did not object to the trial prosecutor's comments. This argument is not preserved.

### Standard of Review

Where a defendant fails to object to an alleged prosecutorial impropriety, the issue is reviewed for plain error. A plain error is one that is "clear or obvious," and the error must affect the defendant's "substantial rights." That is, the defendant must have been prejudiced by the plain error. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of defendant's innocence." [*People v Cooper*, 309 Mich App 74, 88 (2015)(citations and quotation marks omitted).]

### People's Argument

It is well settled that a prosecutor may not personally attack defense counsel, *People v McLaughlin,* 258 Mich App 635, 646 (2003), or "suggest that defense counsel is intentionally attempting to mislead the jury," *People v Unger,* 278 Mich App 210, 236

RECEIVED by MCOA 7/10/2019 9:33:24 AM

(2008). This Court has distinguished between prosecutor "error" and prosecutor "misconduct" as follows:

> Although we recognize that the phrase "prosecutorial misconduct" has become a term of art in criminal appeals, we agree that the term "misconduct" is more appropriately applied to those extreme—and thankfully rare—instances where a prosecutor's *88 conduct violates the rules of professional conduct or constitutes illegal conduct. See, e.g., MRPC 8.4. In the vast majority of cases, the conduct about which a defendant complains is premised on the contention that the prosecutor made a technical or inadvertent error at trial—which is not the kind of conduct that would warrant discipline under our code of professional conduct. Therefore, we agree that these claims of error might be better and more fairly presented as claims of "prosecutorial error," with only the most extreme cases rising to the level of "prosecutorial misconduct." No matter what operative phrase is used, we must look to see whether the prosecutor committed errors during the course of trial that deprived defendant of a fair and impartial trial. [*Cooper*, 309 Mich App at 87-88.]

During Perrone's cross examination of Allen, the prosecutor stated, "Your honor, I am going to object. This is three minutes between questions. This cross-examination rambles on for hours." (11/7/17, 60). The court responded, "I can't help that." (11/7/17, 60). The prosecutor responded, "We took a break so he could gather his thoughts." (11/7/17, 60). The court responded, "This is a serious matter. So he can utilize whatever strategy he so desires." (11/7/17, 61). Defendant argues that the prosecutor made these comments to convince the jury of Defendant's guilt because he did not have sufficient evidence. (Defendant's Brief on Appeal, 31).

Though the prosecutor's comments were certainly not necessary, and may have been better addressed off the record, the comments regarding delay between questions and taking a break did not deny Defendant a fair trial. *See Id*. Defendant asserts that the prosecutor's comments regarding delay and taking a break are comparable to the

RECEIVED by MCOA 7/10/2019 9:33:24 AM

prosecutor's comments in *People v Dalessandro*, 165 Mich App 569 (1988), but does not provide a complete discussion of the comments at issue in *Dalessandro*. In *Dalessandro*, the prosecutor gave a closing argument rife with personal attacks on defense counsel, including arguments that he was intentionally misleading the jury, and that he fabricated evidence with the intention to mislead and presented perjured testimony. The prosecutor in *Dalessandor* also made extensive appeals for the jury to sympathize with the victim. This Court found that these comments collectively denied the defendant a fair trial.

Such comments are not present here. While the prosecutor's comments were unnecessary, they were also isolated, did not pertain to the evidence or directly denigrate defense counsel. Additionally, they were not incorporated into the prosecutor's closing arguments. The jury was also appropriately instructed that the lawyer's statements and arguments are not evidence, and juries are presumed to follow their instructions. (11/9/17, 166-167). The prosecutor's comments did not deny Defendant a fair trial.

RECEIVED by MCOA 7/10/2019 9:33:24 AM

## RELIEF REQUESTED

WHEREFORE, the People respectfully request that this court affirm Defendant's

convictions and sentence.

Respectfully submitted,
CAROL A. SIEMON
INGHAM COUNTY PROSECUTOR


/s/ Kahla D. Crino
_____

Kahla D. Crino (P71012)
Dated: July 10, 2019              Appellate Division Chief

RECEIVED by MCOA 7/10/2019 9:33:24 AM

**Attachment 1**

CTN: 33-16003717-01 EG ICD

| STATE OF MICHIGAN<br>**54A JUDICIAL DISTRICT**<br>**30L JUDICIAL CIRCUIT** | **AMENDED<br>INFORMATION** | **DISTRICT: 16-02505-FY-D54A**<br>**CIRCUIT: 16-000534-FH-C30** |
|---|---|---|

| District Court ORI: MI-  MI330075J<br>124 W. MICHIGAN AVE.  LANSING, MI 48933  517-483-4433 | Circuit Court ORI: MI- 30L<br>313 W. KALAMAZOO P.O. BOX 40771 LANSING, MI 48901 517-483-6500 |
|---|---|

| **THE PEOPLE OF THE<br>STATE OF MICHIGAN** | Defendant's name and address<br>V  **Tunc Uraz**<br>**6039 Hart St**<br>**East Lansing, MI, 48823**<br>**Sex: M   Race: White** | Victim or complainant<br>**ERIKA L MELKE** |
|---|---|---|
| | | Complaining Witness<br>**DET MATT KRUMBACH** |

| Co-defendant(s) | | | Date: On or about<br>**05/25/2016** | |
|---|---|---|---|---|

| City/Twp./Village<br>**City of Lansing** | County in Michigan<br>**INGHAM** | Defendant TCN<br>**K816751819P** | Defendant CTN<br>**33-16003717-01** | Defendant SID<br>**5235046K** | Defendant DOB<br>**10/02/1967** |
|---|---|---|---|---|---|
| Police agency report no.<br>**33LLA  160526005269** | Charge<br>**See below** | DLN Type: | Vehicle Type | Defendant DLN<br>**U620805014760** | |

[ ] A sample for chemical testing for DNA identification profiling is on file with the Michigan State Police from a previous case.

Witnesses

| **Erika L Melke** | **Det Matt Krumbach** | **Ofc Dalton Reust** |
|---|---|---|

**STATE OF MICHIGAN, COUNTY OF INGHAM**
**IN THE NAME OF THE PEOPLE OF THE STATE OF MICHIGAN:** The prosecuting attorney for this County appears before the court and informs the court that on or about 05/25/2016 at 4925 Dunckel Rd #1-308, City of Lansing ,Ingham,  County,  the defendant:

**COUNT 1:**  HOME INVASION - 2ND DEGREE
did break and enter, or did enter without permission a dwelling located at 4925 Dunckel Road, Apt. 1-308, with the intent to commit a larceny, and/or while entering, present in, or exiting the dwelling, did commit a larceny therein; contrary to MCL 750.110a(3). [750.110A3]
FELONY: 15 Years and/or $3,000.00

**COUNT 2:**  STALKING - AGGRAVATED
did engage in a willful course of conduct involving repeated or continuous harassment of Erika Melke, the conduct being such that would cause a reasonable person to feel terrorized, or frightened, or intimidated, or threatened, or harassed, or molested, said conduct actually causing Erika Melke to feel terrorized, or frightened, or intimidated, or threatened, or harassed, or molested, and at least one of the actions constituting the offense is in violation of a restraining order the defendant has received actual notice of, or a condition of pretrial release; contrary to MCL 750.411i. [750.411I]
FELONY: 5 Years and/or $10,000.00; probation for any term of years, not less than 5

Upon conviction of a felony or an attempted felony court shall order law enforcement to collect DNA identification profiling samples.

and against the peace and dignity of the State of Michigan.

Prosecuting Attorney

By: _____          09/29/2016
                                      4:17 PM
| JOHN DEWANE P56247<br>DEPUTY CHIEF ASSISTANT |

_____
Date

**MC 200  (3615)  FELONY SET, Information**          MCL 764.1  et seq., MCL 766.1  et seq., MCL 767.1  et seq., MCR 6.110

RECEIVED by MCOA 7/10/2019 9:33:28 AM

RECEIVED by MCOA 7/10/2019 9:33:28 AM

**Attachment 2**

CTN: 33-16007405-01 DC ICD

| STATE OF MICHIGAN<br>54A JUDICIAL DISTRICT<br>30L JUDICIAL CIRCUIT | AMENDED<br>INFORMATION | DISTRICT: 16-04775-FY-D54A<br>CIRCUIT: 16-001064-FH-C30 |
|---|---|---|

District Court ORI: MI- MI330075J
124 W. MICHIGAN AVE. LANSING, MI 48933  517-483-4433

Circuit Court ORI: MI- 30L
313 W. KALAMAZOO P.O. BOX 40771 LANSING, MI 48901 517-483-6500

| THE PEOPLE OF THE<br>STATE OF MICHIGAN | Defendant's name and address<br>V  Tunc Uraz<br>    1250 Haslett Rd #10<br>    HASLETT, MI, 48840<br>    Sex: M   Race:  White | Victim or complainant<br>**ERIKA L MELKE**<br>Complaining Witness<br>**DET MATTHEW KRUMBACH** |
|---|---|---|

Co-defendant(s)

Date: On or about
08/23/16 - 09/26/16

| City/Twp./Village<br>**City of Lansing** | County in Michigan<br>**INGHAM** | Defendant TCN | Defendant CTN<br>33-16007405-01 | Defendant SID<br>5235046K | Defendant DOB<br>10/02/1967 |
|---|---|---|---|---|---|
| Police agency report no.<br>**33LLA  161024011444** | Charge<br>**See below** | DLN Type: | Vehicle Type | Defendant DLN<br>U620805014760 | |

[ ] A sample for chemical testing for DNA identification profiling is on file with the Michigan State Police from a previous case.

Witnesses

| Erika L Melke<br>Richard Laing<br>Chris Bergstrom | Det Matthew Krumbach<br>Heather Heitman | Bernard Brown<br>Kathryn Beckett |
|---|---|---|

**STATE OF MICHIGAN, COUNTY OF INGHAM**
**IN THE NAME OF THE PEOPLE OF THE STATE OF MICHIGAN:** The prosecuting attorney for this County appears before the court and informs the court that on or about 08/23/16 - 09/26/16 at 4925 Dunckel Rd #202, City of Lansing ,Ingham,  County,  the defendant:

**COUNT 1:**  STALKING - AGGRAVATED
did engage in a willful course of conduct involving repeated or continuous harassment of Erika Melke, the conduct being such that would cause a reasonable person to feel terrorized,and/or frightened, and/or intimidated, and/or threatened, and/or harassed, and/or molested, said conduct actually causing Erika Melke to feel terrorized, and/or frightened, and/or intimidated, and/or threatened, and/or harassed, and/or molested, and at least one of the actions constituting the offense is in violation of a restraining order and/or a condition of pretrial release; contrary to MCL 750.411i. [750.411I]
FELONY:  5 Years and/or $10,000.00; probation for any term of years, not less than 5

**HABITUAL OFFENDER - SECOND OFFENSE NOTICE**
    Take notice that the defendant was previously convicted of a felony or an attempt to commit a felony in that on or about 8/23/2016, he or she was convicted of the offense of Aggravated Stalking in violation of MCL 750.411i in the 30th Circuit Court for Ingham County, State of Michigan;
    Therefore, defendant is subject to the penalties provided  by MCL 769.10. [769.10]
One and one-half times the maximum sentence on primary offense or a lesser term.  The maximum penalty cannot be less than the maximum term for a first conviction.

Upon conviction of a felony or an attempted felony court shall order law enforcement to collect DNA identification profiling samples.

and against the peace and dignity of the State of Michigan.

Prosecuting Attorney

By: _____

01/20/2017
11:27 AM

JOHN DEWANE P56247
DEPUTY CHIEF ASSISTANT

_____
Date

**MC 200  (3615)  FELONY SET, Information**

MCL 764.1 *et seq.*, MCL 766.1 *et seq.*, MCL 767.1 *et seq.*, MCR6.110

RECEIVED by MCOA 7/10/2019 9:33:28 AM

RECEIVED by MCOA 7/10/2019 9:33:28 AM

# Attachment 3

CTN: 33-16007836-01 EG INA

| STATE OF MICHIGAN<br>55th JUDICIAL DISTRICT<br>30L JUDICIAL CIRCUIT | INFORMATION<br>FELONY | DISTRICT: 16-02960-FY-D55<br>CIRCUIT: 16-001065-FC-C30 |
|---|---|---|
| District Court ORI: MI- MI330085J<br>700 BUHL DRIVE MASON, MI 48854 517-676-8426 | Circuit Court ORI: MI- 30L<br>313 W. KALAMAZOO P.O. BOX 40771 LANSING, MI 48901 517-483-6500 | |

| THE PEOPLE OF THE<br>STATE OF MICHIGAN | Defendant's name and address<br>V Tunc Uraz<br>1250 Haslett Rd #10<br>HASLETT, MI, 48840<br>Sex: M Race: White | Victim or complainant<br>ERIKA MELKE<br>Complaining Witness<br>DET MATTHEW KRUMBACH |
|---|---|---|
| Co-defendant(s) | | Date: On or about<br>08-31-2016-10/31/16 |

| City/Twp./Village<br>City of Mason | County in Michigan<br>INGHAM | Defendant TCN | Defendant CTN<br>33-16007836-01 | Defendant SID<br>5235046K | Defendant DOB<br>10/02/1967 |
|---|---|---|---|---|---|
| Police agency report no.<br>33LLA 161027011556 | Charge<br>See below | DLN Type: | Vehicle Type | Defendant DLN<br>U620805014760 | |

☐ A sample for chemical testing for DNA identification profiling is on file with the Michigan State Police from a previous case.

Witnesses

Kevin Jewell
Stanley White
  Det Matthew Krumbach

Charles M Allen
Ofc Frank Mobley
Erika Melke

Reginald G Close Jr
Det Andrew Hogan

STATE OF MICHIGAN, COUNTY OF INGHAM

IN THE NAME OF THE PEOPLE OF THE STATE OF MICHIGAN: The prosecuting attorney for this County appears before the court and informs the court that on 08-31-2016-10/31/16 at 630 N. Cedar, the defendant:

COUNT 1: HOMICIDE - SOLICITATION OF MURDER
did solicit another person, Reginald Close, to commit murder; contrary to MCL 750.157b(2). [750.157B2]
FELONY: Life or any term of years.

COUNT 2: HOMICIDE - SOLICITATION OF MURDER
did solicit another person, Charles Allen, to commit murder; contrary to MCL 750.157b(2). [750.157B2] FELONY: Life or any term of years.

COUNT 3: HOMICIDE - SOLICITATION OF MURDER
did solicit another person, Frank Mobley, to commit murder; contrary to MCL 750.157b(2). [750.157B2] FELONY: Life or any term of years

HABITUAL OFFENDER - SECOND OFFENSE NOTICE
    Take notice that the defendant was previously convicted of a felony or an attempt to commit a felony in that on or about 8/23/16, he or she was convicted of the offense of Aggravated Stalking in violation of MCL 750.411I in the 30th Circuit Court for Ingham County, State of Michigan;
    Therefore, defendant is subject to the penalties provided by MCL 769.10. [769.10]
One and one-half times the maximum sentence on primary offense or a lesser term. The maximum penalty cannot be less than the maximum term for a first conviction.

RECEIVED by MCOA 7/10/2019 9:33:28 AM

Upon conviction of a felony or an attempted felony court shall order law enforcement to collect DNA identification profiling samples.

and against the peace and dignity of the State of Michigan.

Prosecuting Attorney

By: _____

01/03/2017
10:18 AM

JOHN DEWANE P56247
DEPUTY CHIEF ASSISTANT

_____
Date

MC 200   (3615)   FELONY SET, Information

MCL 764.1   *et seq.*,   MCL 766.1   *et seq.*,  MCL 767.1   *et seq.*, MCR6.110

RECEIVED by MCOA 7/10/2019 9:33:28 AM

Attachment 3

_This ___ ___ ___ ___ ___
___ ___ ___ ___ ___ ___
___ ___ ___ ___ ___ ___
___ ___ ___ ___ ___ ___
___ ___ ___ I still dont
see where you said anything wrong
to her. So are your Mom & family
trying to take your property?_

____ ___ ___ ___ ___ ___
___ ___ ___ ___ ___ ___
___ ___ ___ ___ ___ ____

RECEIVED by MCOA 7/10/2019 9:33:28 AM


PEOPLE'S
EXHIBIT

So is he letting her.
Ceasin... It seem like your
Mom don't like her at all

RECEIVED by MCOA 7/10/2019 9:33:28 AM

They dont Have no blood They did no
real Police work. I had a witness
who was there They didnt even talk to him.
They chances of getting the book acthally

RECEIVED by MCOA 7/10/2019 9:33:28 AM



PEOPLE'S
EXHIBIT
62

Attachment 4

STATE OF MICHIGAN

IN THE 30th CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,
                        Plaintiff,

                                                    HON. CLINTON CANADY III

v.

                                                    Docket No. 16-1065-FC
TUNC URAZ,                                           Docket No. 16-1064-FH
                        Defendant.

| | |
|---|---|
| Carol Siemon (P32946) | Jacob Perrone (P71915) |
| Ingham County Prosecutor | Attorney for Defendant |
| By: Chas. T. Koop, II (P75188) | 221 W. Lake Lansing Road |
| 303 W. Kalamazoo Street | East Lansing, MI 48823 |
| Lansing, MI 48933 | (517) 351-0332 |
| (517) 483-6517 | |

### PEOPLE'S MOTION TO ADMIT OTHER ACTS EVIDENCE PURSUANT TO MRE 404(B)

Defendant has two pending files that, by order of this Court, have been joined for trial on November 2, 2017.  In file number 16-1064-FH, Defendant is charged with one count of Aggravated Stalking, contrary to MCL 750.411i, with an Habitual Offender Second Offense Notice.  In file number 16-1065-FC Defendant is charged with three counts of Solicitation of Murder, contrary to MCL 750.157b(2), with an Habitual Offender Second Offense Notice.  In support of these charges, the People intend to introduce other acts evidence pursuant to MRE 404(b) regarding Defendant's motive, intent and common plan or scheme.  At trial, it will be the People's position that the charged offenses are the culmination of defendant's increasingly dangerous fixation with the victim, with incidents that span more than two years and began when their romantic relationship ended.

RECEIVED by MCOA 7/10/2019 9:33:28 AM

## *Summary of Charged Offenses*

*i.*   <u>*Aggravated Stalking File Number 16-1064-FH*</u>

A no contact order or personal protection order protecting the victim from the defendant has been in place since January 20, 2016 and remains valid and inforce.  Beginning on August 27, 2016 at 8:27 p.m., Erika Melke received an alert from Facebook that her account password had been changed.  The Facebook alert provided, among other things, the IP address of 72.44.103.178 as the originating location where her Facebook account was accessed and password changed.  On August 31, 2016, Erika Melke received another notice from Facebook that her password had been reset.  This noticed was received at 12:20 p.m. and provided the IP address of 72.44.103.166 as the originating location where her Facebook account was accessed and password reset.

A search warrant was then obtained for the above identified IP addresses.  Further investigation revealed the IP addresses were associated with a network servicing the North Pointe Apartments, located at 1242 Haslett Road, East Lansing, MI.  The IP addresses were specific to apartments C1 through C24.  Detective Matt Krumbach made contact with the property management company for this address and learned that a close friend of the defendant's, Burak Atamer, lived at 1242 Haslett Road, building C, apartment C10.  Moreover, at the time the email was sent, the defendant had an electronic tether fixed to his person.  The GPS tracking records indicated that the defendant was at the 1242 Haslett Road location at the same times when the victim's Facebook accounts were accessed and her passwords changed.

Between August 23, 2016 and August 30, 2016, Erika Melke was notified by friends that an Instagram account had been created in her name.  By all outward appearances, this account seemed to belong to Erike Melke:  the account bore the username "melkeerikalynee"; pictures of Erika were posted to the account for others to see; and the person having control over the

2

RECEIVED by MCOA 7/10/2019 9:33:28 AM

account then "followed" or connected with friends and co-workers of Melke. However, this account was not one that Erika Melke had created herself nor did she authorize anyone to use her likeness. The account contained a picture of a dildo sex toy, photos of Melke and another male that were captioned "Here is how I play behind the scenes" and "Better late to cheat than never"; and one photo of Melke with the caption "I love playing innocent."

Melke then signed into her own Instagram account and messaged the user "melkeerikalynee". In that exchange the user "melkeerikalynee" states, among other things, "Are you reporting this convo too?" and "I have letter that I wrote to you but don't know how to send it to you w [sic] out any issues" as well as "My son and sister allmost [sic] got killed last month during bombings". From the exchange, Melke knew that the defendant had created the account to further harass, embarrass and terrorize Melke.

Additionally, on August 31, 2016, Melke received an email to her personal account that had the subject line "letter for a closure"; the correspondence was sent from the email address "emelke20@gmail.com". The "emelke20@gmail.com" email address is not an account that belongs to Erika Melke. In the email the sender states "All I wanted was to have one last conversation to answer some questions and allow closure on our three year relationship." The email goes on to note how the sender aided Melke in her education, provided general economic support and helped her find a job. The email goes on to state how the sender "lost my son because of this" and "lost my job because of this." This email was sent at 3:20 p.m. on August 31, 2016; later that afternoon and following a show-cause hearing before this Court, the defendant's bond was revoked in file 16-000534-FH and he was taken into custody. The show-cause hearing and subsequent revocation of bond were due to the defendant's repeated attempts to contact the victim. In the evening hours of August 31, 2016, and after the defendant was

3

RECEIVED by MCOA 7/10/2019 9:33:28 AM

lodged at the Ingham County Jail, Erika Melke received two calls from the defendant within the jail. The jail phone system has a pre-recorded message where the caller identifies themselves by name. Where the caller would otherwise state their name, the defendant stated "I hope you are happy."

Defendant committed all of these acts while a valid PPO was in place, of which he had knowledge.

ii.     *Solicitation of Murder Aggravated Stalking File Number 16-1065-FC*

Between August 31, 2016 and October 31, 2016, the People allege that the defendant, while incarcerated at the Ingham County Jail, solicited three people to have Erika Melke murdered. Specifically, the defendant individually solicited fellow inmates Reginald Close and Charles Allen, and then undercover officer Frank Mobley via a video visit. None of the individuals the defendant solicited knew or had any sort of connection to the defendant or victim prior to defendant's incarceration that began on August 31, 2016.

During the dates alleged both Close and Allen were at times housed in the same dorm with the defendant. As a natural consequence of the jail's confined living quarters, the defendant detailed to Close and Allen the reason for his incarceration which involved details of his relationship with Melke. The defendant provided Close intimate details of things he had done to Melke and her and her friends' property. Specifically, defendant stated he: slashed Melke's tires the day she was to go to a concert; vandalized the cars of other males defendant believed Melke was seeing; and stole keys to Melke's residence and was entering her apartment when no one was home to steal her underwear. [P.E. Tran. Pg. 120 -123]. The defendant also told Close how he had been fired from his job at MSU because he asked a co-worker to obtain a gun for him. [*Id*. 122.17-123.4]. Based on their conversation Close understood defendant's intent in obtaining a gun was so he could kill Melke. [*Id*].

4

RECEIVED by MCOA 7/10/2019 9:33:28 AM

The defendant expressed to both Close and Allen anger towards other males in Melke's life who defendant perceived as having damaged his relationship with Melke. [*Id*. 24.24-25; 123.13]. The defendant told both Close and Allen he wanted these other men killed or harmed as well. [*Id*.]. For their assistance in carrying out the murder[s], defendant offered Close $1,000.00 and Allen $2,500.00. [*Id*. at 22.15-24; 133.22-25]

To effectuate the murder of Erika Melke, the defendant provided pertinent information about her to both men. Specifically, the defendant furnished both Close and Allen with Melke's address as well as the make, model and license number for the car she drove. [*Id*. at 24.11; 127-128]. In the case of Close, the defendant drew out a map of her residence as well as names and partial addresses of males with whom the defendant believed Melke was intimately involved. [*Id*. at 125.14-126.1].

Once officers became aware of the defendant's efforts to hire someone to kill Melke, they arranged for an undercover officer, Frank Mobley, to contact the defendant via Securus video visitation. During that video visit, Officer Mobley asked defendant for details about where the "trash" was at. The defendant said he could not discuss that over the phone and that "Ruff" [Reginald Close] should have told him this information. The defendant then agreed to pay Officer Mobley $2,000.00 for the first "bag of trash" and $500.00 for each "bag" thereafter.

### Proposed Other Acts Evidence

In June of 2015, victim Erika Melke ended her dating relationship with the defendant. The defendant reacted negatively to the breakup and began contacting Melke repeatedly in person and by telephone, text message, and other digital media. Melke asked him to stop these contacts and blocked his number on her phone. Over the subsequent months, the defendant escalated his attempts to contact her against her will, including various harassing, threatening, and destructive acts against her and her friends and family.

5

RECEIVED by MCOA 7/10/2019 9:33:28 AM

The People intend to introduce evidence at trial of those acts, and highlight the following specific instances that were reported to police and courts[1]:

1.     *August 24 to August 25, 2015 (LPD Report LLA150826026957)*

Between August 24, 2015 and August 25, 2015, the victim's green Toyota Rav 4 was vandalized. Specifically, the victim's front driver's side door was "keyed" or scratched by some object and the license plate registration sticker was also scratched off.

Because of the timing relative to the breakup, Melke believed that the defendant was the one that damaged her vehicle. This was later confirmed when the defendant told Reginald Close and/or Charles Allen that he had damaged Melke and her boyfriends' vehicles.

2.     *December 31, 2015 to January 1, 2016 (Statement of Stan White)*

Stan White and Erika Melke began a friendship in 2013 when they were both students at Lansing Community College. On December 31, 2015, at 4:45 p.m. the defendant sent a Facebook message to White that read, "You can block me but we need to talk man to man let me know when you are ready." On January 1, 2016, White and Melke were at Dave and Buster's restaurant in Auburn Hills when the defendant appeared, uninvited, and attempted to force Melke to talk to him. Melke became very upset; restaurant management ultimately escorted defendant off the premises.

Also on January 1, 2016, the contents of Melke's cellular phone, which included photos of Melke and White, had been remotely deleted by someone other than Melke and without her permission.

3.     *January 20, 2016 (Personal Protection Order, file 16-139-PP)*

On January 20, 2016, Judge Richard Garcia signed a personal protection order protecting the victim from the defendant. The defendant received notice of the personal protection order on January 21, 2016; the order was to expire on July 22, 2016.

4.     *January 30, 2016 (Statement of Stan White)*

---

[1] Further details of each of the incidents stated below are contained in police reports and court paperwork that have been provided to Defendant's attorney and are incorporated by reference.

RECEIVED by MCOA 7/10/2019 9:33:28 AM

On January 30, 2016, at 1:20 a.m., the defendant sent a Facebook message to White that read "Meet me anytime anywhere if you have the courage."

5.    _February 13, 2016 (LPD Report LLA160215001566)_

On February 13, 2016, the defendant sent a text message to the victim that just read "Ho" with a following text that said "I am sorry it was not for u pls don't".[2]

6.    _March 26, 2016 (Meridian Township Police Department Report 1692602458)_

On March 26, 2016, Melke drove to the Best Buy in Meridian Township to purchase a camera. Her motivation for buying the camera was so that she could take pictures of the defendant due to the defendant repeatedly following her. Once at the Best Buy parking lot and while still in her vehicle, the defendant pulled up next to her in his vehicle and attempted to say something to her, though she could not hear what as her windows were up. Using her camera on her cellular phone, Melke took photographs of the defendant as he sat in his vehicle next to her. Melke then called police.

7.    _April 5, 2016 to April 7, 2016 (MSU PD report no 1658101164_

In April of 2016, the defendant was employed by Michigan State University. While at his place of work on April 5, 2016, defendant twice solicited his co-worker, Patrick Burnett, to purchase a gun and ammunition for defendant, with the defendant telling Burnett that he did "not want to go about it the legal way." The following day Uraz again asked of Burnett about purchasing a gun for the defendant. On all occasions Burnett denied the defendant's request and when interviewed by police, Burnett stated "I don't know what's going on with him, but something's wrong and I don't want anything to do with gettin him a gun. He shouldn't have a gun the way he's actin."

The defendant later told Reginald Close that he intended to provide this gun to someone to kill Melke.

8.    _April 8, 2016 (Personal Protection Order, file 16-139-PP)_

On April 8, 2016, Melke was visiting her mother, Kathryn Beckett, in Petoskey. Using the telephone number that belonged to his deceased mother, the Defendant called Ms. Beckett's

---

[2] While a number of the calls and texts discussed in this motion were from unknown or restricted phone numbers, the contents and timing indicated that the defendant was responsible. The defendant also later admitted these acts to Reginald Close and/or Charles Allen.

RECEIVED by MCOA 7/10/2019 9:33:28 AM

landline phone. Approximately thirty minutes later, defendant then called the victim's cellular phone from the same number.

9.    _Early May 2016 (Statement of Stan White)_

In early May, 2016, Melke spent the night Stan White's residence, leaving her car parked outside in his driveway. Melke later discovered that it had numerous broken eggs on it. When she found this, she began to receive multiple calls on her cellular phone from a restricted number.

10.    _May 20, 2016 thru May 27, 2016 (Statement of Stan White)_

Prior to May 20, 2016, Stan White found that his car tires were punctured. The defendant later admitted slashing White's tires to Reginald Close.

On May 20, 2016 at approximately 4:20 p.m., Stan White began to receive text messages from a number he did not recognize. Based on the content of the ensuing messages, White learned that the defendant was the person texting him.

The messages began with the text from the unknown sender that said "I think it is time for us to meet to solve our differences". The text messages continue with the defendant trying to convince White to meet face to face. At one point, White stated, "Maybe if you give me the money for all I had to spend on new tires, then I'd be more willing to talk. That's when I lost my desire to be friendly." The defendant responded, "Lets talk first We are both adults and we both have boys so.lets.talk and come up. w a solution I am. willing to negotiate" (grammatical and spelling errors in original). The defendant then invited White to "Meet me at buddies by you." In response, White stated in relevant part, "The fact that you even know where I live bothers me. I don't know how you know where Erika is at all times…" On May 25, 2016, the defendant again text messaged White for the purpose of asking White to meet the defendant face to face. White did not respond until May 27, 2016, when he stated in part, "If you don't have about $1500 to give me and Erika for the damages you caused from vandalizing our vehicles, then we REALLY have nothing to talk about!" White then stated, "I didn't even know who you were until you unexpectedly showed up to Dave and Busters on New Years. Now you somehow know where I live and have my phone number, and I didn't give you that information." The defendant replied, in part, "I am sorry for the Dave and Busters incident I am sure you got what you wanted that night…"

RECEIVED by MCOA 7/10/2019 9:33:28 AM

8

11.   _May 17, 2016 to May 25, 2016 (Personal Protection Order, file 16-139-PP)_

Beginning May 17, 2016 thru May 26, 2016, Melke began to receive text messages from an unknown number. There were more than five messages all asking in some form as to "What would it take...to make amends." Based on the content, Melke believed that the messages were from the defendant.

12.   _May 25, 2016 (LPD Report LLA160526005269)_

For several months Melke noticed personal items missing from her apartment, these items included bathing suits, underwear, and her bras. In response, Melke hid a trail camera in her bedroom. On May 25, 2016, Melke left for work at approximately 9:00 a.m. and returned home around 9:15 p.m. that same day. Upon returning home, she checked the trail camera which showed the defendant in her room, going through her belongings. Melke had never given the Defendant a key to her home, nor did she invite him over.

As a result, Defendant was charged with Home Invasion 2nd degree[3] and arraigned on August 3, 2016, in the 54a District. At the time of his arraignment, an additional no contact order was put in place protecting Melke from the defendant.

13.   _July 17, 2016 (LPD Report LLA160716007411)_

In the evening hours of July 17, 2016, while Melke was at her residence at 4295 Dunckel Road, Lansing, MI, she looked out her apartment window and saw the defendant sitting in a white vehicle. The defendant then drove off. Melke and her roommate, Carmen Elias, went to see if there was any damage done to Melke's vehicle. As Melke and Elias were looking at her vehicle, the defendant returned and drove within twenty feet of them. Both Melke and Elias were able to positively identify the defendant. Following this incident, Elias received a text message from the defendant that said, "I'm in Turkey." Police determined that this was false; Defendant was still in the Lansing area.

14.   _July 22, 2016 (Personal Protection Order, file 16-139-PP)_

On July 22, 2016, Melke's original personal protection order was extended with the new order protecting the victim from defendant until July 22, 2017. The defendant received notice of the personal protection order on July 27, 2016.

---

[3] Defendant ultimately pled to a reduced charge of aggravated stalking and was sentenced on November 2, 2016. (File 16-000534-FH).

RECEIVED by MCOA 7/10/2019 9:33:28 AM

15. _August 15, 2016 to August 16, 2016 (LPD Report LLA160816008705)_

On August 15, 2016, at approximately 9:20 p.m., Melke had parked her vehicle outside of her residence at 4295 Dunckel Road. When Melke returned to her vehicle on August 16, 2016, at approximately 11:30 a.m., she discovered all four of her tires were flat, having been slashed/punctured. The defendant later admitted to damaging Melke's car.

16. _September 2016_

In September 2016, Melke's mother received a letter from the defendant. In the letter, the defendant discussed Melke and asked her mother to write him back.

17. _July 22, 2017 (Personal Protection Order, file 16-139-PP)_

On July 22, 2017, Melke's original personal protection order was extended with the new order protecting the victim from defendant until July 22, 2022. The defendant received notice of the personal protection order on July 27, 2017.

### Law and Analysis

MRE 404(b)(1) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

The Michigan Supreme Court has previously held that MRE 404(b) is not a rule of general exclusion, but one of inclusion. _People v VanderVliet_, 444 Mich 52, 65 (1993). Other acts evidence is admissible if it satisfies the following test: "(1) the evidence is offered for a proper purpose under MRE 404(b), (2) the evidence is relevant under MRE 402 as enforced through MRE 104(b), (3) the probative value of the evidence is not substantially outweighed by unfair prejudice, and (4) the trial court may, upon request, provide a limiting instruction to the jury." _People v Vandervliet_, 444 Mich 52, 74-75 (1993).

RECEIVED by MCOA 7/10/2019 9:33:28 AM

10

The proposed other acts evidence is offered for the permissible purpose of establishing Defendant's common plan or system in stalking Melke, as well as his motive and intent in subsequently soliciting several people to kill her. The proposed "other acts" evidence demonstrates that the defendant repeatedly contacted and harassed Melke, in person and through digital media, after their breakup. When this failed, he expanded the scope of his harassment to include her friends and family as well. Finally, after being charged and incarcerated for his continued harassment, when he could no longer see or contact her, Defendant solicited two jail inmates and an undercover police officer to kill Melke.

Michigan appellate courts have repeatedly upheld this "course of conduct" theory of admissibility under MRE 404(b), therefore satisfying the first prong of the VanderVliet analysis. With regard to relevance, in *People v Orr*, 275 Mich App 587, 590 (2007), the Michigan Court of Appeals found that "evidence of [a] prior shooting of the same person who was killed in the case at bar was logically relevant to show motive, premeditated intent, and the absence of mistake." By analogy, in the present case, the defendant made a number of prior attempts to contact, harass, and intimidate Melke. These efforts escalated from phone calls and texts to property damage to breaking into her house. All of these efforts were part of a continued course of conduct targeted at Melke, initially trying to reconcile with her, then as retaliation for their breakup.

The People's proposed other acts evidence also meets the second prong of *Vandervliet*. That is, the evidence is relevant under MRE 402 as enforced through MRE 104(b). Relevant evidence means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. "Pursuant to MRE 401, evidence is relevant if two components

11

RECEIVED by MCOA 7/10/2019 9:33:28 AM

are present, materiality and probative value. Materiality is the requirement that the proffered evidence be related to 'any fact that is of consequence' to the action." *People v Crawford*, 458 Mich 376, 388 (1998) (citation omitted). The probative force inquiry asks whether the proffered evidence tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The threshold is minimal: "any" tendency is sufficient probative force. *Crawford*, 458 Mich at 389-90 (citing MRE 401).

Defendant is charged in the present case with Aggravated Stalking and three counts of Solicitation of Murder. Each of these offenses requires a showing that the defendant's actions were intentional. Because the prosecution must carry the burden of proving every element beyond a reasonable doubt, regardless of whether the defendant specifically disputes or offers to stipulate any of the elements, the elements of the offense are always 'in issue' and, thus, material." *Crawford, 458 Mich* at 389. Without evidence of these acts, the jury would not have the necessary context to understand these acts. The acts underlying the current charges would appear unrelated, unprompted, and isolated incidents. The proffered "other acts" are relevant to show that Defendant's actions were intentional and motivated by their former relationship, and that they are part of a larger plan or system against Melke.

Under the third prong of *Vandervliet,* and in accord with MRE 403, evidence, although relevant, may nevertheless be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." MRE 403; see also *VanderVliet,* 444 Mich at 75. Consistent with the well-understood proposition that MRE 404(b) is a rule of inclusion, not exclusion, *VanderVliet,* 444 Mich at 65, Michigan courts have emphasized that a proper application of MRE 403 in this context permits exclusion "only when the probative value is *substantially*

RECEIVED by MCOA 7/10/2019 9:33:28 AM

12

*outweighed* by the danger of unfair prejudice that evidence is excluded." *People v Mills*, 450 Mich 61, 75 (1995), mod on other grounds 450 Mich 1212 (1995) (emphasis in original). "Rule 403 does not prohibit prejudicial evidence; only evidence that is unfairly so." *Crawford*, 458 Mich at 398. "Unfair prejudice exists when there is a tendency that evidence with little probative value will be given too much weight by the jury." *People v McGhee,* 268 Mich App 600, 614 (2005).

In engaging in the MRE 403 balancing analysis, courts acknowledge that "[a]ll evidence offered by the parties is 'prejudicial' to some extent." *Mills*, 450 Mich at 75. The probative value of the proposed other acts evidence in this case is not substantially outweighed by any potential unfair prejudice. The Court of Appeals has ruled that "evidence of prior assaults of a victim is probative of the issue of intent in a later-charged murder of the same victim and, therefore, is not unduly prejudicial." *Orr*, 275 Mich App at 592. "[E]vidence of [a] defendant's prior threats against the victim [are] highly probative evidence of his motive and identity . . ." *People v Armentero*, 148 Mich App 120, 133 (1986). The probative value of such specific threats against the victim certainly outweighs any prejudicial effect of admitting this evidence." *Id*. Again, by analogy, the defendant's escalating acts of stalking targeted at Melke, and those adjacent to Melke, are extremely probative and pose little risk of unfair prejudice.

Finally, the People have no objection to a limiting instruction, advising the jury of the limited purposes for which the proposed "other acts" evidence is offered. The proposed other acts evidence in this case satisfies every prong of the analysis that the Michigan Supreme Court established in *VanderVliet*, and therefore should be admissible at trial.

WHEREFORE, the People respectfully request that this Court grant the present Motion to Admit Other Acts Evidence Pursuant to MRE 404(b).

13

RECEIVED by MCOA 7/10/2019 9:33:28 AM

**WHEREFORE,** the People the People respectfully request that this Court grant the present Motion to Admit Other Acts Evidence Pursuant to MRE 404(b).

Respectfully Submitted,

Dated: _10-3-17_

Chas. T. Koop, II (P75188)
Assistant Prosecuting Attorney

RECEIVED by MCOA 7/10/2019 9:33:28 AM

14

STATE OF MICHIGAN

IN THE 30th CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHIGAN,
                    Plaintiff,

v.                                                    HON. CLINTON CANADY III

TUNC URAZ,                                            Docket No. 16-1065-FC
                    Defendant.                        Docket No. 16-1064-FH

---

Carol Siemon (P32946)                    Jacob Perrone (P71915)
Ingham County Prosecutor                 Attorney for Defendant
By: Chas. T. Koop, II (P75188)           221 W. Lake Lansing Road
303 W. Kalamazoo Street                  East Lansing, MI 48823
Lansing, MI 48933                        (517) 351-0332
(517) 483-6517

---

## CERTIFICATE OF SERVICE

On October 3, 2017, I hereby certify that a copy of PEOPLE'S MOTION TO ADMIT OTHER ACTS PURSUANT TO 404(b) and NOTICE OF HEARING was served on:

> Jacob Perrone (P71915)
> Attorney for Defendant
> 221 W. Lake Lansing Road
> East Lansing, MI 48823
> (by electronic mail, per stipulation: JACOB@PERRONELAWPC.COM)

An original copy of this document was also served on the Ingham County Circuit Court Clerk's Office, via hand delivery.

I declare that the statements above are true to the best of my knowledge, information, and belief.

Chas. T. Koop, II (P75188)
Assistant Prosecutor

15

RECEIVED by MCOA 7/10/2019 9:33:28 AM

OB

STATE OF MICHIGAN
IN THE 30th CIRCUIT COURT

16-7405
16-7836

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff,

Hon. Clinton Canady, III

v

TUNC URAZ,

Circuit Court No.  16-1064-FH
16-1065-FC

      Defendant.

_____/

Charles T. Koop (P75188)
Jonathan Roth (P72030)
Assistant Prosecuting Attorney
303 W. Kalamazoo Street
Lansing, MI 48933

Jacob A. Perrone (P71915)
Attorney for Defendant
221 W. Lake Lansing Road, Ste 200
East Lansing, MI 48823

_____/

## PEOPLE'S MOTION TO RECONSIDER PRIOR MRE 404(B) RULING

      Defendant was bound over to Circuit Court on one count of Aggravated Stalking and three counts of Solicitation of Murder with an Habitual Second Offense Notice. The People previously moved this Court to admit evidence regarding a series of other acts. The People now move this Court to reconsider its ruling as to one specific act – Defendant's prior attempt to purchase a firearm in April 2016.

      On April 5, 2016, Defendant approached his coworker, Patrick Burnett, and asked, "Do you trust me? I trust you." Defendant then went on to tell Burnett, "I want to get a gun and some bullets. Can you do that? I don't want to go about it the legal way." Burnett was alarmed by this conversation and reported it to his management and police. In September or October 2016, Defendant described this conversation to Reginald

RECEIVED by MCOA 7/10/2019 9:33:28 AM

Close in the context of explaining his previous plan to kill Melke before her birthday, then flee to Mexico, then return to Turkey.

In denying the People's motion to admit evidence of Defendant's attempt to buy an illegal gun, the Court found that it was unfairly prejudicial.

MCR 2.119(F)(3)[1] provides, in relevant part:

[A] motion for rehearing or reconsideration which merely presents the same issues ruled on by the court, either expressly or by reasonable implication, will not be granted. The moving party must demonstrate a palpable error by which the court and the parties have been misled and show that a different disposition of the motion must result from correction of the error.

During a hearing subsequent to the Other Acts motion, defense counsel disclosed that he intends to assert that Defendant was coerced into having conversations about killing Melke by Reginald Close and Charles Allen and that Defendant had no preexisting desire to kill Melke. This argument drastically increases the probative value of the proposed other act. Evidence that Defendant attempted to purchase an illegal firearm approximately six months before meeting Allen and Close completely belies Defendant's assertion that they induced him to want to kill Melke. The People and the Court were obviously unaware of this relevance at the time of the prior ruling.

The People now move this Court to allow testimony regarding this transaction to rebut testimony or argument by Defendant asserting that Defendant's desire to kill Melke originated only after speaking to Close and Allen while at the Ingham County Jail.

### RELIEF REQUESTED

WHEREFORE, the People respectfully request that this Court grant the People's Motion to Reconsider Prior MRE 404(b) Ruling.

---

[1] "No response to the motion may be filed, and there is no oral argument, unless the court otherwise directs." MCR 2.119(F)(2).

RECEIVED by MCOA 7/10/2019 9:33:28 AM

Respectfully Submitted,
CAROL A. SIEMON
INGHAM COUNTY PROSECUTOR

Date: 10 · 23 · 17

Jonathan Roth (P72030)
Assistant Prosecuting Attorney
303 W. Kalamazoo St., 4th Floor
Lansing, Michigan 48933

## CERTIFICATE OF SERVICE

On October 23, 2017, I served a copy of the People's Motion to Reconsider Prior MRE 404(b) Ruling on all parties, by email addressed to:

Jacob Perrone
Jacob@perronelawpc.com

I declare that the statements above are true to the best of my knowledge, information, and belief.

Jonathan Roth

RECEIVED by MCOA 7/10/2019 9:33:28 AM

Attachment 5

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ALI MOHAMED ELATRACHE,

        Defendant-Appellant.

UNPUBLISHED
April 19, 2016

No.  324918
Wayne Circuit Court
LC No.  14-000096-01-FC

Before: BECKERING , P.J., and OWENS and K. F. KELLY, JJ.

PER CURIAM.

    The prosecution alleged that defendant harassed his girlfriend, whom we will refer to as "S," and ultimately killed her father, Mohammed Aljbaili (the victim).  Defendant was originally charged with first-degree premeditated murder, MCL 750.316(1)(a), first-degree felony murder, MCL 750.316(1)(b), first-degree home invasion, MCL 750.110a(2)(b), and aggravated stalking, MCL 750.411i(2)(c).  Defendant pleaded guilty to the stalking charge just prior to trial.  A jury found defendant guilty of second-degree murder, MCL 750.317, as a lesser offense of premeditated murder, guilty of felony murder, and not guilty of home invasion.  The court sentenced defendant to three to five years' imprisonment for his stalking conviction and life in prison without the possibility of parole for the felony murder conviction.  The trial court vacated defendant's second-degree murder conviction.  Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS

    S and the 72-year-old victim lived together in an apartment.  The victim had heart problems, having had bypass and quadruple bypass surgery.  He was a retired international lawyer and spent a lot of his time reading articles.  Syrian born, the victim was a human rights activist and wrote articles and sometimes appeared on television, advocating that the Syrian people be free.

    S testified that she met defendant when he came to the Verizon store where she worked in late February 2013.  Defendant seemed normal, nice and friendly and they started dating that month.  Defendant told her that his wife and child were killed in a war.  He also talked about his ex-girlfriend, Marwa, all the time.  He told S that Marwa had cheated on him and "screwed him over."

    Within two or three weeks of their relationship, defendant began to change.  He would get very jealous of little things.  Defendant would question S about her past and ask her about her coworkers.  He would randomly show up at her work.  Defendant would circle the parking lot all of the time and his

RECEIVED by MCOA 7/10/2019 9:33:28 AM

behavior caused problems for S. at work. There were at least three separate instances when defendant took S's cell phone and only returned it after she begged. Within a month of their relationship, S knew she needed a "break" and defendant's behavior caused her concern, but defendant would make her feel sorry for him, reminding her that he had lost his wife and child and that his old girlfriend treated him badly. She was also afraid of him because he had pulled her hair and twisted her arm. S stayed with defendant because she was scared but she also thought she could "handle" him.

Defendant once came to S's work and asked for her keys because he had run out of gas and needed to run some errands. S was suspicious and did not want to give defendant her keys, but he was starting to cause a scene so she handed them over. The keys included her apartment key. Defendant returned her keys after an hour. After this, there were a number of events at S's apartment that caused her concern.

On March 27, 2013, S came home and found that her laptop was missing, along with a couple of phones. S called defendant to let him know what happened, but she did not call police. Defendant told S that he received a phone call from someone who said "I have the girl's phones. I have her stuff." S felt that defendant was somehow involved but he acted as though he was trying to help. S continued to date defendant even though she was scared and confused. She ultimately received her laptop and three cell phones back.

On April 3, 2013, S's father awoke to discover that his laptop was missing. This time S called the police. S also told police about the prior break in and named her ex-boyfriend, Ali Makki, as a possible suspect. Defendant was the one that suggested it was Makki. S no longer suspected defendant because she thought he was trying to help. The apartment management changed the apartment locks.

After the second break-in, S came home one day to see defendant in the apartment with her father. Defendant was telling her father that he believed "something else was going on" and that "there were people after my dad." Defendant indicated that he would protect them.

Another incident occurred on April 19, 2013 when S woke up to find the front door to their apartment on fire. She doused the fire with water. Once again, S and her father told the police that there were people after her father. They did not suspect defendant because he was working on getting her father's laptop returned and she believed that there were people after her father because of his politics. At one point, defendant actually went to Lebanon in April 2013 and told her it was to fight the people who were after her father. Defendant returned with her father's laptop.

S was not certain of exactly when, but at some point she began to hear a voice when she was speaking to defendant on the phone. During their conversation, a voice would come in and say, "'I'm going to kill you. I'm going to kill your dad. I'm going to burn you. I'm going to burn your house.'" S was afraid that maybe someone was tapping her phone. She began to record the conversations to see whether someone was trying to get her father. S told defendant about the voice. Defendant said he could hear clicking, but that he did not hear the voice. Again, defendant promised to protect S and her father. S never heard the voice when she was on the phone with anyone else other than defendant. Defendant told S to not let her father go on the internet. He also advised her not to contact police again because the individuals who were after her father would find out. She never reported the phone calls to police. S admitted that her fear of defendant had "morphed" into dependency.

-2-

RECEIVED by MCOA 7/10/2019 9:33:28 AM

S's car was also vandalized in April 2013 when someone put chemicals in the gas tank. Defendant told her that he would handle it.  Upon returning from the mechanic, S and her father discovered that their apartment had been broken into. This time there was obvious forced entry because the door was damaged.  Her father's briefcase was stolen and there were some items missing.  S called the police.  Once again, S told police she suspected someone was after her father.  Management later fixed or replaced the door.

At that time, S became suspicious of defendant because he was the only person who knew she and her father were going to be at the mechanic's.  She decided to contact defendant's brother, Mazen Elatrache (Mazen), because she did not know what else to do.  Defendant's family came to her apartment and asked her not to go to the police.  They also brought someone who was allegedly from the FBI.  S testified that "They said they will take care of it.  They begged me not to go to the police."  The family promised to send defendant to Lebanon.

After all of the break-ins, S discovered that a Chase debit card was missing.  It was a replacement card that she had received in the mail but had not activated.  She only learned it was missing when she called the bank to see why she had not received a replacement card.  S discovered that "the whole account was wiped clean" of approximately $2,000.  Some of the charges were from Frankfurt, Germany, Beirut, Lebanon, and London, England.  The charges were from late April/mid May 2013.  S knew defendant had been in Lebanon and accused him, but he initially denied it.  He later said he found the card on his doorstep and apologized.

Defendant called her from an airplane and admitted to everything.  S recorded the conversation. In the phone call, defendant admitted, "I did everything . . . Ali Makki never did anything to you. . . . In one phone call you'll see your father die in front of your eyes. . . .You know what's going to happen to you and your father later."  In a separate recording, defendant told S he can see her from where he was standing.  He said, "I'm going to kill your dad.  When this time comes, I'm going to kill him . . .If you hang up your phone, you will see what will happen to your dad . . .He is a traitor.  He has no pride, and I'm the one who called him from Lebanon. . . .In one phone call I will have your dad dead."  In another recording, he said, "Do you know what I'm going to do to your dad?  . . .Maybe I will do something now.  Maybe I'll do something in a year."

Defendant was suddenly back in the States in May 2013.  S started to keep track of text messages.  She began to receive text messages in May 2013 from a different number.  The texts were "creepy," with messages like "turn off your bedroom light."  S suspected defendant because no one else talked to her that way.

S felt terrorized from May to June 2013 with defendant telling her she had to cooperate with his family and not go to police.  Nevertheless, she continued to have contact with defendant.  She explained that she "kept things nice with him to calm him down, and I did what he wanted, and then we didn't have any issue.  As long as I was nice to him, everything was fine."  She was trying to find a way to slowly pull away from defendant.  By June 2013 she was "in complete misery."  By the end of the month, defendant was "like a maniac again."

S discussed text messages from defendant in July 2013:

"You're a f***ing slut.  F*** off and go watch yourself."

-3-

RECEIVED by MCOA 7/10/2019 9:33:28 AM

"Watch yourself or leave Michigan."

"Filthy c*** sucker slut, whore, sharmoota [slut]."

[S] should go "shoot yourself, slut, and watch yourself and leave Michigan.  You're going to become famous today."

"You were out.  Your car moved."

On July 12, 2013 defendant texted:

"You played the wrong guy.  You will see."

"Welcome to hell.  Now f*** off."

On July 13, 2013:

"You made me fucking hate you.  I hope God punishes you."

"Just prepare.  I really mean it."

"Run, run, you barely have time."

Texts from July 14th to July17th, 2013 indicate that defendant got even more aggressive.  Ironically, S writes: "My dad is ill.  You will give him a heart attack."  Defendant texted:

"Take my word.  I'll take your soul."

"You can make me be an angel or a devil."

"I will put a bullet in your head or choke you or chop it off.  You choose.  And if you put a thousand police officers in front of your door, I will do that."

"Keep making me upset and angry."  "I'm not going to let you go [S] . . . Until I'm dead."

On July 17, 2013, she got a message "I talked to your dad.  I sat with him."  S told defendant she did not want them to be enemies and begged him to think about his future.  He responded that she was "worse than Marwa."  S saw her father that day and he was fine, although confused about defendant's visit.  S admonished her father not to open the door for defendant in the future and he agreed.  S did not believe that her father would voluntarily open the door to defendant.

S once again called Mazen on July 18, 2013 and told him that she needed his help.  Defendant sent her a text, "why the f*** are you calling my brother.  Leave me and my family alone.  I don't want anything from you."  When S returned home from work that evening, she found the door to their apartment open.  That was unusual because her father generally kept the door closed and locked.  She found her father dead on the floor of his bedroom.

After the murder, S looked at her father's phone and found threats defendant sent directly to her father:

RECEIVED by MCOA 7/10/2019 9:33:28 AM

"And the laptop I took it to Syria, and I'll make sure you die. Don't worry. Just wait."

"I have copies of your driver's license, your passport, your birth certificate, and wherever you go, I will find you."

"[A] f***ing traitor like you needs to be dead."

Defendant was apprehended in Canada after he tried calling S.

S's downstairs neighbor, Sallam Baker testified that when she came home from work at 6:30 p.m. that night, she observed two men in a red Blazer that was not usually in the complex's parking lot. She thought that they might have been Middle Eastern or Hispanic. Upon entering the unit, Baker observed that the upstairs apartment door was open. She could hear "loud voices upstairs," but could not make out what was being said. The voices seemed to be coming from the kitchen and living room area. Baker later revised her testimony and indicated that, in fact, she heard only one voice. Baker believed the victim was on the phone with someone. It was not unusual to hear the victim "being loud" so Baker just ignored it. Baker then heard "sort of like things falling over, like a loud bang and like something tipping over." Baker debated about going upstairs to see if all was well, but decided not to. She then heard "a scream, a muffled, it sounded very muffled like he was screaming into a pillow, that muffled sound."

Officers observed pry marks and missing pieces of wood on the front door when they responded to the murder scene. The apartment appeared to be in some disarray and S's room was ransacked. One officer could smell pepper spray or mace upon entering the apartment. The victim was lying on the floor on his back. There was dried blood on his mouth and visible bruising on his face. There was a belt resting on his neck, but not around it. The pillows and sheets on the bed had blood on them, as well as the base of the door by the dresser. There was a medallion next to the victim's body. A can of mace was found under a chair in the living room. No finger prints of comparison value were lifted from the mace spray can or the medallion. Hair on the chain of the medallion was never tested. DNA on the mace dispenser swab was too limited for a DNA comparison. There were two donors on the leather belt – and the major donor was the victim and defendant was excluded as a donor. For the blood on the bedroom door knob – neither the victim nor defendant could be excluded. There was no foreign DNA in the victim's fingernail clippings. Defendant's DNA was excluded from the medallion.

Deputy Chief Medical Examiner for Wayne County Leigh Hlavaty testified that the manner of death was homicide and the cause of death was manual strangulation. Defendant offered his own experts who testified that it was not strangulation that killed the victim, but the victim's bad heart.

At the close of proofs, the trial court declined to instruct the jury on the lesser included offenses of voluntary and involuntary manslaughter. The jury was instructed on first-degree premeditated murder, first-degree felony murder, second-degree murder, and first-degree home invasion. The jury found defendant guilty of second-degree murder as a lesser offense of first-degree premeditated murder. It further found defendant guilty of first-degree felony murder. It found defendant not guilty of first-degree home invasion.     Defendant was sentenced to three to five years' imprisonment for his stalking conviction that was the result of a prior plea and life in prison without the possibility of parole for the felony murder conviction. Defendant now appeals as of right.

## II. ANALYSIS

-5-

RECEIVED by MCOA 7/10/2019 9:33:28 AM

## A. JURY INSTRUCTIONS

Defendant argues that the trial court erred in failing to instruct the jury on voluntary and involuntary manslaughter where the evidence revealed that the victim suffered from a bad heart. We disagree.

"[J]ury instructions that involve questions of law are [] reviewed de novo. But a trial court's determination whether a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006) (internal quotation marks and citation omitted).

"Challenges to jury instructions are considered in their entirety to determine whether the trial court committed error requiring reversal." *People v Eisen*, 296 Mich App 326, 330; 820 NW2d 229 (2012). "Jury instructions must clearly present the case and the applicable law to the jury. The instructions must include all elements of the charged offenses and any material issues, defenses, and theories *if supported by the evidence*." *People v McGhee*, 268 Mich App 600, 606; 709 NW2d 595 (2005) (emphasis added, internal citation omitted). Therefore, "when a jury instruction is requested on any theories or defenses and is supported by evidence, it must be given to the jury by the trial judge." *People v Mills*, 450 Mich 61, 80-81; 537 NW2d 909, modified on other grounds 450 Mich 1212 (1995). However, a trial court is not required to give a requested instruction "where the theory is not supported by evidence." *Id.* In the event of an instructional error, a defendant must "demonstrate that it is more probable than not that the failure to give the requested lesser included misdemeanor instruction undermined reliability in the verdict." *People v Cornell*, 466 Mich 335, 364; 646 NW2d 127 (2002).

At the close of proofs, defense counsel asked the trial court to instruct on the lesser included offenses of second-degree murder, as well as voluntary and involuntary manslaughter.

[T]he elements of voluntary and involuntary manslaughter are included in the elements of murder. Thus, both forms of manslaughter are necessarily included lesser offenses of murder. Because voluntary and involuntary manslaughter are necessarily included lesser offenses, they are also "inferior" offenses within the scope of MCL § 768.32. Consequently, when a defendant is charged with murder, an instruction for voluntary and involuntary manslaughter must be given if supported by a rational view of the evidence. [*People v Mendoza*, 468 Mich 527, 541; 664 NW2d 685 (2003).]

### 1. VOLUNTARY MANSLAUGHTER

In requesting a voluntary manslaughter instruction, defense counsel argued:

For voluntary manslaughter we know that some type of altercation occurred from two sources, one being from Sallam Baker [the downstairs neighbor], which it may be not entirely conclusive, and the other from the crime scene photographs.

If there was an altercation – we also know that there was some pre-existing possible ill feelings between the deceased and the defendant that could lead a rational jury to come to the conclusion that a fight ensued.

RECEIVED by MCOA 7/10/2019 9:33:28 AM

However, when pressed by the court as to what would cause an "emotional disturbance," defense counsel responded: "Your Honor, I don't have further argument on that. So I would rather turn to involuntary manslaughter." When the matter continued, co-counsel renewed the request for both voluntary and involuntary manslaughter. However, while counsel argued why involuntary manslaughter was appropriate, she did not argue voluntary manslaughter.

The trial court declined to give a voluntary manslaughter instruction, explaining:

> With regards to the voluntary manslaughter instruction, that does require that there be an adequate and reasonable provocation that mitigates murder down to the crime of manslaughter.

> And ordinarily that is a question of fact with regards to the jury's determination as to whether or not it has been sufficiently mitigating conduct that reduces it from murder to manslaughter.

> &ast;&ast;&ast;

> But the Michigan Supreme Court has also stated that the provocation has to be adequate and one that would cause a reasonable person to lose control.

> &ast;&ast;&ast;

> [T]he provocation has to be one that would cause a reasonable person to lose control. And there is no evidence in this case introduced to show what kind of provocation there might have been. That there was an argument. There may have been an argument.

> Looking at that in the light most favorable to the defense, there is nothing to indicate what that argument was about, whether it was about something serious, whether it was about something trivial. There is no evidence to indicate that, and there is nothing that would appear on this record that would indicate that an objective, reasonable person would conclude that there was a basis to lose control, that there's a reasonable basis for doing so.

> So I find that there is insufficient evidence to justify an instruction for voluntary manslaughter.

The trial court properly declined to give a voluntary manslaughter instruction given the facts of this case.

[T]o show voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions. Significantly, provocation is not an element of voluntary manslaughter. Rather, provocation is the circumstance that negates the presence of malice. [*People v Reese*, 491 Mich 127, 143-44; 815 NW2d 85 (2012), quoting *Mendoza*, 468 Mich at 535-536.]

RECEIVED by MCOA 7/10/2019 9:33:28 AM

Therefore, to support a jury instruction for voluntary manslaughter, the evidence must show that defendant killed in the heat of passion caused by adequate provocation and there was not a lapse of time during which a reasonable person could control his passions.   There was no evidence to support defendant's contention that he was adequately provoked such that malice was negated.   Additionally, based on the victim's numerous injuries, it appears that there was a lengthy struggle during which time defendant could have re-examined and controlled his passions.   Although defendant argues at great length that the cause of death was not strangulation but a heart attack, the fact of the matter is that each of the three medical examiners who testified at trial categorized the victim's death as a homicide, even though they may have disagreed as to the actual mechanism of death.[1]   Defendant did not kill the victim in the heat of passion after adequate provocation.   That defense counsel had difficulty mustering up an argument to support giving such an instruction in the trial court buttresses the trial court's decision.

## 2. INVOLUNTARY MANSLAUGHTER

The trial court summarized defense counsel's argument regarding involuntary manslaughter:

> [I]s your theory of involuntary manslaughter essentially that it's what we would maybe euphemistically refer to as the misdemeanor manslaughter kind of rule, where there is something that would be described as a simple assault that results in a death, where the assault in and of itself was not deemed to be deadly, but it results in a death, that that's considered manslaughter?

> Kind of like the notion of somebody getting in an argument in a bar and punches somebody in the nose, and they fall over backward and hit their head on the edge of a table and die as a result of that.

Counsel indicated that it was a "fair categorization" of his argument.   The trial court declined to give an involuntary manslaughter instruction, explaining:

> We have a situation where looking at the other injuries to the victim, Mr. Aljbaili, certainly there are multiple injuries to the head, including a laceration to the top of the head.

> There are abrasions and bruises, multiple bruises to the face, and certainly injuries to the throat or neck muscles that are consistent with an attempt to strangle the deceased.

> The injuries, particularly the laceration to the top of the head, there is testimony from multiple doctors in this case, that the injuries, particularly the laceration to the top of the head, was consistent with a blunt force and the other injuries reflect more than the type of one strike incident that we see in the Rogers case.

---

[1] At trial, defense counsel conceded during closing arguments that the cause of death was really only relevant to "negate premeditation" because "it's very difficult to premeditate killing somebody by giving them a heart attack."

-8-

RECEIVED by MCOA 7/10/2019 9:33:28 AM

I think the evidence presented in the case before the jury does not set forth the kind of involuntary manslaughter factual scenario that fits the legal requirements for that offense.

So I am going to deny the requested instruction for involuntary manslaughter.

The trial court properly declined to give an instruction on involuntary manslaughter based on the facts of this case. "Involuntary manslaughter is the unintentional killing of another, without malice, during the commission of an unlawful act not amounting to a felony and not naturally tending to cause great bodily harm; or during the commission of some lawful act, negligently performed; or in the negligent omission to perform a legal duty." *Mendoza*, 468 Mich at 536. No evidence was presented that the death was caused by an unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some lawful act. Defendant struck the victim on the head numerous times and strangled him with his hands. This evidence clearly showed either an intent to kill or intent to cause great bodily harm, and an involuntary manslaughter instruction was not supported by a rational view of the evidence.

## B. UNANIMOUS JURY

Defendant points out that the felony information in this case did not provide alternate theories for first-degree home invasion. The information provided that defendant "did break and enter *and* enter without permission." Defendant argues that, under those circumstances, the jurors had to find both a break-in *and* an entry without owner's permission, beyond a reasonable doubt and the trial court's instruction otherwise was erroneous. We disagree.

"[J]ury instructions that involve questions of law are reviewed de novo." *Gillis*, 474 Mich at 113.

At a pretrial motion to quash in which defense counsel asked the trial court to dismiss the felony-murder charge because there was no evidence of an underlying felony, the prosecutor noted: "Counsel argues that I have to prove that there was a breaking and entering to establish a home invasion first degree. Sometimes I do. But a home invasion first degree can also be based on an entering without permission." Defense counsel conceded that the prosecution could pursue an alternate theory but it still had to prove that the person was there unwanted.

During preliminary instructions, the trial court told the jury:

Now as I indicated to you, ladies and gentlemen, for first degree felony murder you have to find that the murder took place during the perpetration or attempted perpetration of a home invasion in the first degree.

And there are two different manners in which home invasion in the first degree can occur and have been alleged by the prosecutor's office. I'm going to give you those two different theories.

The trial court proceeded to instruct the jury that a defendant could be found guilty of first-degree home invasion by either entering without permission *or* breaking into the home. Defense counsel did not object.

-9-

RECEIVED by MCOA 7/10/2019 9:33:28 AM

During closing arguments, the prosecutor told the jury, "What I['ve] got to prove to you is that Mr. Elatrache broke and entered *or* entered without permission the Aljbaili apartment . . ." During his argument, defense counsel noted: "That felony murder rests on a theory that Ali Elatrache on July 18th, either broke into that house or that apartment, *or* somehow got in there against the wishes of Mr. Aljbaili." Counsel then said that the prosecutor had only pursued the forced entry approach by arguing that there were fresh pry marks. "If the door hasn't been broken in, how do [we] get to this home invasion? Well, then I guess the theory goes back to, well, Mr. Aljbaili would have never let him in. Mr. Aljbaili let Ali Elatrache into the house 24 hours before that on the 17th. Did anything bad happen? Even [S] tells you no."

While instructing the jury on first-degree felony murder with home invasion as the underlying felony, the trial court noted:

> Now, ladies and gentlemen, let me make this remark to you with regards to the crime of home invasion in the first degree.

> There are two different theories. For this particular Count you as a jury do not have to all agree whether or not the defendant entered without permission or whether it was a breaking and entering.

> You have to be convinced beyond a reasonable doubt, however, it has to be proven to you beyond a reasonable doubt, that the defendant did one or the other.

> You all must be unanimous in that the defendant entered or while he was present or was leaving the dwelling, committed the crime of murder, and that while he entered, was present in or leaving another person, Mr. Mohammed Aljbaili, was lawfully present in the premises.

> With the remaining element though whether the defendant entered without permission or whether he broke and entered, you do not all have to agree on whether he did one or both.

> Put another way, if you are all persuaded beyond a reasonable doubt about the other two elements, and let's say, for example, seven of you are convinced beyond a reasonable doubt there this was an entry without permission, and the other five are persuaded beyond a reasonable doubt that it was a breaking and entering, that's sufficient for a guilty verdict.

> Everybody understand that? That's the one you got two different theories on that particular element. You don't have to be unanimous. You may be, but you don't have to be.

Defense counsel did not object and, other than the preserved arguments regarding voluntary and involuntary manslaughter, defense counsel indicated that "the instructions are fine."

During deliberations, the jury sent a note asking, "While the theories of home invasion can be split, does the overall verdict of home invasion have to be unanimous?" The trial court responded:

-10-

RECEIVED by MCOA 7/10/2019 9:33:28 AM

The answer to that is yes in this regard.  Okay.  I set out what the elements are for home invasion in the first degree.  They have a number of similar elements to them, but they sort of split apart in the sense that obviously the elements of entering without permission or breaking and entering are different.

Now in order to find the defendant guilty, you have to find, you know, that the common elements, you have to find that they were proven beyond a reasonable doubt.

Then with regards to entering without permission or breaking and entering, the two different theories, you have to unanimously agree that one or the other theory has been proven beyond a reasonable doubt.

Is that clear?

I mean that if, for example, someone, if a juror were to think that it was breaking and entering, you have to be convinced beyond a reasonable doubt that it was breaking and entering.

Someone who thinks that it was entering without permission, they have to be persuaded beyond a reasonable doubt that it was without permission.

What it doesn't require is that all 12 of you agree on the same one theory.

Once again, defense counsel had no objection.

Based on the above excerpts from trial, defendant has waived the issue.  "[I]n general, an appellant may not benefit from an alleged error that the appellant contributed to by plan or negligence." *People v Witherspoon*, 257 Mich App 329, 333; 670 NW2d 434 (2003).  Defense counsel seems to have "undoubtedly inadvertently, created the very error that it wishes to correct on appeal." *People v Szalma*, 487 Mich 708, 726; 790 NW2d 662 (2010).  But "a party may not harbor error at trial and then use that error as an appellate parachute." *Id.*  In any event, while a defendant has a right to a unanimous jury verdict, Const 1963, art 1, § 14, "[w]hen a statute lists alternative means of committing an offense which in and of themselves do not constitute separate and distinct offenses, jury unanimity is not required with regard to the alternate theory." *People v Johnson*, 187 Mich App 621, 629–630; 468 NW2d 307 (1991).  Accordingly, defendant could have been properly convicted of felony murder even if some jurors believed that he broke into the apartment while others believed he simply entered without permission.

## C. PRESENTENCE INVESTIGATION REPORTS

Defendant next argues that he was denied the right to confront the witnesses against him when the trial court denied his request to produce the presentence investigation reports (PSIR) of its so-called jailhouse informant, Mark Joseph Fragel.  We disagree.

Constitutional issues are questions of law that are reviewed de novo on appeal.  *People v King*, 297 Mich App 465, 472; 824 NW2d 258 (2012).

MCL 791.229 provides:

RECEIVED by MCOA 7/10/2019 9:33:28 AM

> Except as otherwise provided by law, all records and reports of investigations made by a probation officer, and all case histories of probationers shall be privileged or confidential communications not open to public inspection. Judges and probation officers shall have access to the records, reports, and case histories. The probation officer, the assistant director of probation, or the assistant director's representative shall permit the attorney general, the auditor general, and law enforcement agencies to have access to the records, reports, and case histories and shall permit designated representatives of a private contractor that operates a facility or institution that houses prisoners under the jurisdiction of the department to have access to the records, reports, and case histories pertaining to prisoners assigned to that facility. The relation of confidence between the probation officer and probationer or defendant under investigation shall remain inviolate.

Citing this court rule our Court has nevertheless held:

> [W]e must conclude that the need for impeachment of criminal accusations outweighs any need for confidentiality of presentence reports. This does not mean that defendants should receive wholesale access to the confidential records of others. We hold only that when records of prior inconsistent statements of witnesses are necessary for effective cross-examination, they should be made available to the defendant. An in camera inspection procedure should be utilized by the court to limit disclosure to those statements materially inconsistent with the witness's testimony. [*People v Rohn*, 98 Mich App 593, 600; 296 NW2d 315 (1980), overruled on other grounds *People v Perry*, 460 Mich 55, 64; 594 NW2d 477 (1999).]

In *People v Stanaway*, 446 Mich 643, 650; 521 NW2d 557 (1994), our Supreme Court acknowledged the difficulty in protecting confidential records with a defendant's right to obtain evidence relevant to his defense. Ultimately, the Court held "that where a defendant can establish a reasonable probability that the privileged records are likely to contain material information necessary to his defense, an in camera review of those records must be conducted to ascertain whether they contain evidence that is reasonably necessary, and therefore essential, to the defense. Only when the trial court finds such evidence, should it be provided to the defendant." *Id.*

At trial, Fragel testified that he and defendant were together in an eight-member "pod" at the Wayne County jail for approximately two months. They were friendly and had shared interests. Defendant told Fragel that the victim did not approve of his relationship with S. Defendant referred to S's father as "piece of s***, dog, swine." When they talked about defendant's case, Fragel told defendant he needed an alibi. Defendant seemed unfamiliar with the term and said, "What do you mean? It was me. I did it." Defendant told Fragel that he used gloves and there would be no DNA evidence. Defendant indicated that "things got out of hand." He told Fragel that the victim "went down quick" and that he "finished him off with a belt." Fragel testified that "[i]t was all done with fists, pretty vague, just beat his a** was the way it was worded. Put his hands around his neck."

Defendant told Fragel that he went to Canada and bought tickets to go to Lebanon but then changed his mind and decided to stay at a hotel because he did not want to leave his family and he was sure there was nothing to link him to the crime. Defendant told Fragel that he was "pretty sure that he was going to get it knocked down to manslaughter, get a bond and then take it from there." Defendant intended to "split" if he got out on bond. Fragel testified that defendant "[s]tarted making just like

-12-

RECEIVED by MCOA 7/10/2019 9:33:28 AM

threats toward you, [the prosecutors], as well as Detective Delgreco . . .When he got out of there, when he was back in the Middle East, he was going to take a picture of his member and send it back to them like as a ha, ha type thing" and "I'm going to have them killed type stuff."

At the time of trial, Fragel was a prisoner in Jackson. He had a history of drug use, including cocaine and Xanax. Fragel admitted that he had an extensive history involving property crimes, drug offenses, and "a couple of domestic violences." He testified that he had 12 felonies and "like 16 misdemeanors." These crimes occurred in Wayne, Washtenaw and Saginaw counties. In exchange for testifying against defendant, Fragel was able to plead to larceny from an automobile when the original charge was first-degree home invasion; he was an habitual fourth offender. Fragel was the one who came forward because "I thought the deal I had on the table sucked, and it also seemed like the right thing to do."

In a pretrial motion, defense counsel requested that the trial court order the prosecutor to produce all of Fragel's past PSIR's because, while defense counsel knew Fragel had a number of prior felonies in Washtenaw, Saginaw and Wayne Counties, Fragel may have had other convictions in other states and federal court. PSIR's would also reveal misdemeanor and juvenile convictions, as well as psychiatric history. The trial court told counsel that it "[s]ounds like you're fishing." Defense counsel suggested an in camera review. The trial court denied the motion:

> In this particular case given great [deference] certainly to [defense counsel's] expertise and as a criminal defense lawyer, this Court concludes that it doesn't meet the Stanoway [sic] requirement of establishing a reasonable probability that privileged records are likely to contain material information necessary to the defense.

> Now certainly that doesn't exempt the prosecution's office from highly disclosing any Brady material, and that certainly with sanctions could be severe. But at this particular point there is speculation and supposition about what might exist in some other location or what records might contain.

> But it doesn't meet the threshold as set forth in Stanoway [sic].

> This case is different from the Rohn case. Where the Rohn case it was a co-defendant who was in fact the subject of the Presentence Report interview and giving a statement in a case in which he was going to testify against Mr. Rohn.

> Certainly there was reason at that point to find out what the defendant said in his Presentence Report interview because it might very well provide possible impeachment that could be used when the co-defendant took the stand.

> That is not the case here. Mr. Fragel was an inmate. He's not a co-defendant of Mr. Elatrache, and would not be giving any kind of information that this Court could reasonably conclude that would be related to this particular homicide.

The trial court's conclusion was correct. As a preliminary matter, there is absolutely no evidence that the prosecutor had any of the alleged documents in his possession. Additionally, defendant failed to indicate how Fragel's PSIR's would contain relevant information to his case. Defendant's "generalized assertion of a need to attack the credibility of his accuser [does] not establish the threshold showing of a

-13-

RECEIVED by MCOA 7/10/2019 9:33:28 AM

reasonable probability that the records contain information material to his defense sufficient to overcome the various statutory privileges." *Stanaway*, 446 Mich at 650.

### D. THE PROSECUTION'S OPENING STATEMENT

Defendant argues that the prosecutor committed misconduct when he made an inflammatory opening statement regarding defendant's relationship with S and the allegation that defendant intended to have the prosecutors and investigation officer killed. We disagree.

"This Court reviews claims of prosecutorial misconduct case by case, examining the remarks in context, to determine whether the defendant received a fair and impartial trial." *People v Aldrich*, 246 Mich App 101, 110; 631 NW2d 67 (2001).

In *People v Bahoda*, 448 Mich 261, 266-67; 531 NW2d 659 (1995), our Supreme Court admonished that any remarks made by a prosecutor simply to "arouse the prejudice of jurors" are improper because it could "lead to a decision based on prejudice rather than on the guilt or innocence of the accused." It added that courts will "not hesitate to reverse where potentially inflammatory references are intentionally injected, with no apparent justification except to arouse prejudice." *Id.* In order to review such a claim, an appellate court "examines the remarks in context to determine whether they denied defendant a fair trial." *Id.*

During the prosecutor's opening statement, he repeatedly used the phrase "[w]elcome to hell. F*** off." The prosecutor also used the term "sharmoota," which is Arabic for slut. The prosecutor called defendant the "psychotic sociopathic jealous boyfriend from hell." In contrast, the prosecutor referred to S and her father as a "[n]ice young lady and her elderly father." The prosecutor cited from defendant's texts that used the terms "b****, slut, whore, c*** sucker." Claiming that defendant murdered the victim as a means of punishing and controlling S, the prosecutor referenced the prior break ins, phone calls, use of credit cards. When talking about Fragel's testimony, the prosecutor indicated:

> You'll hear that Mr. Elatrache had a little plan that he shared with Mr. Fragel. He thought he was going to get the previous Judge, Judge Bill, to reduce his charges down to like manslaughter, murder two.

> Then he was confident he could get out on bond, contact somebody from the Homeland Security to get him a bogus passport, and then he was going to take a trip back to Lebanon as soon as he killed Trisha, killed me and killed the detective.

Once opening statements concluded, defense counsel moved for a mistrial based on the fact that the prosecution's opening "was totally argumentative, went completely over the top. And because it concentrated so much on the evidence as to what Ali Elatrache may have done to [S], which is a completely side issue in this case . . ."[2] The trial court denied defendant's motion:

---

[2] Counsel explained that he did not object because it was "very difficult to pick a point where you could have objected. The harm had been done. It merely escalated. That's why I didn't object, and because I couldn't have done any good, only call it to the jury's attention what was going on." (9/23/14, p 95.)

RECEIVED by MCOA 7/10/2019 9:33:28 AM

Well, in this particular case I think certainly [the prosecutor] used big, not only graphic but at times dramatic expressions, in terms of explaining what he believed that the jury was going to hear.

I think there is no question that there was some considerable portion of the opening statement that was devoted to the relationship between Mr. Elatrache and Ms. Aljbaili.

But I do think that as the opening statement indicated, that the threats and the communications to Ms. Aljbaili were inextricably linked to the People's theory of the killing of [S's] father.

Many of the communications to [S] by the defendant were expressions that he was going to kill the deceased in this particular case. They were repeated comments. They were said in advance, months in advance of this particular date of the deceased death.

That certainly, I think, goes in fairly graphic form. It is the defendant's own words on . . .recorded telephone conversations or text messages that set forth what could be the element of deliberation with regard to premeditation and deliberation.

Defendant was not denied a fair trial. The prosecutor did nothing more than repeat defendant's own words. Additionally, the prosecutor did not make any statements that were not subsequently supported by the evidence presented during trial. As will be discussed further below, defendant's conduct towards S was highly relevant to the crime and formed the foundation of the case against defendant. The prosecutor did nothing improper.

## E. EVIDENCE OF DEFENDANT'S BEHAVIOR TOWARDS S

Defendant argues that the trial court erred when it permitted the prosecution to present evidence of other acts defendant committed, including aggravating stalking, several break-ins and credit card fraud because the behavior was directed toward S, not the victim. Defendant further argues that the trial court should have granted a severance of the stalking charge and should have allowed defendant to plead no contest to the charge. We disagree with each of defendant's contentions.

This Court reviews for an abuse of discretion a trial court's decision to admit so-called bad acts evidence. *People v McGhee*, 268 Mich App 600, 636; 709 NW2d 595(2005). A trial court does not abuse its discretion when it chooses an outcome within the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

### 1. DEFENDANT'S MOTION TO SEVER

Prior to trial, defense counsel moved to sever the aggravated stalking charge from the other charges. Defense counsel argued that the prosecution was using the evidence of defendant's conduct toward S to bolster its murder case, which was unrelated. The prosecutor responded that the victim's murder was simply the ultimate harassment that S suffered in that defendant "killed her father, he did what he knew would hurt her, the most. The ultimate aggravated stalking, your Honor, he murdered her father." The trial court denied defendant's motion to sever: "I think they are intertwined. The court

-15-

RECEIVED by MCOA 7/10/2019 9:33:28 AM

rule mandates, especially in the light of the efficient administration of justice that joinder is proper and required in this case."

Pursuant to MRC 6.120(C), "[o]n the defendant's motion, the court must sever for separate trials offenses that are not related as defined in subrule (B)(1)." MCR 6.120(B)(1) provides:

Joinder is appropriate if the offenses are related. For purposes of this rule, offenses are related if they are based on:

(a) the same conduct or transaction, or

(b) a series of connected acts, or

(c) a series of acts constituting parts of a single scheme or plan.

"To determine whether joinder is permissible, a trial court must first find the relevant facts and then must decide whether those facts constitute 'related' offenses for which joinder is appropriate." *People v Williams*, 483 Mich 226, 231; 769 NW2d 605 (2009). So-called "misjoinder" rises to the level of a constitutional violation if it results in the deprivation of a fair trial. *People v Williams*, 483 Mich 226, 246; 769 NW2d 605 (2009).

Although the jury ultimately acquitted defendant of first-degree premeditated murder, defendant's actions prior to the murder –whether aimed at S or aimed at the victim – were relevant to premeditation and deliberation. The trial court did not err in denying defendant's motion to sever where the complained-of actions were related to the homicide.

## 2. DEFENDANT'S REQUEST TO PLEAD NO CONTEST

At another pretrial hearing, defendant indicated a desire to plead no contest to the aggravated stalking charge. The new trial judge noted that defendant appeared to be trying to "back door" the previous severance ruling. It denied defendant's request to enter a no contest plea to aggravating stalking:

I think when one looks at the fact that no-contest pleas are at the discretion of the Court, that I think solidifies the notion that there is the presumption that there is to be some inculpatory consequence or sanction for any kind of plea, that there is a presumption that the defendant is going to plead guilty.

That no-contest pleas there needs to be some sort of articulable basis for that particular no contest, and most often that occurs because either defendant doesn't have any firm memory of the particular offense, maybe because of an injury.

Sometimes defendants don't have a memory of a particular type of offense, such as a home invasion because they've done so many of them that they can't exactly remember the details of each and every one.

Or there are instances in which civil liability may be an overwhelming or a compelling circumstance that would justify a guilty plea or a no-contest plea.

-16-

RECEIVED by MCOA 7/10/2019 9:33:28 AM

In this particular case in terms of the justification for permitting Mr. Elatrache to enter a no-contest plea, I don't find are there. I don't see any reason that convinces this Court that it justifies taking anything other than a guilty plea with regards to the charge of aggravated stalking, or to let the matter go forward and let the proofs be what the proofs are and let the jury decide this particular matter.

But I'll certainly let the defense objection be noted, and it's preserved. But the exercise of my discretion I don't find the justification for a sufficient reason for permitting a no-contest plea.

Defendant then pleaded guilty to aggravated stalking. In particular, he admitted that he sent S more than one text message threatening that he would kill her or do her great bodily harm and that S took those messages seriously. The prosecutor moved to enter into evidence a certified copy of defendant's plea into evidence. The trial court denied the motion because there had already been "volumes of evidence" regarding the issue and it would be cumulative and potentially confusing to the jury.

"A defendant may enter a plea of nolo contendere only with the consent of the court." MCR 6.301(B). Therefore, "[a]cceptance of a nolo contendere plea is a matter of grace, not of right." *People v Sammons*, 191 Mich App 351, 369; 478 NW2d 901 (1991). There is simply no reason for defendant to argue that he was entitled, as a matter of law, to enter a no contest plea.

### 3. 404(b) EVIDENCE

Immediately following defendant's guilty plea, the trial court addressed whether the other acts evidence should be admitted under MRE 404(b). The prosecutor argued that the evidence was proper because it was probative of motive, identity, premeditation, and lack of accident. The trial court ruled as follows:

In this particular case the prosecution has made reference with regards to voice mail messages and text messages and other alleged admissions by the defendant of an ongoing, deep animosity toward [S] that particularly manifested itself when there was an inability on the part of the defendant to control Ms. Aljbaili.

The effort to control, which, as the prosecutor set forth, vacillates between gifts and efforts to win over the affection and favor of Ms. Aljbaili to the issue of threats, not only of harm but threats of death, not only toward Ms. Aljbaili but also toward her mother and father.

The number of communications that involved threats to both certainly reflect, when I say both, I mean Ms. Aljbaili and her family, indicate to this Court that the threats to Ms. Aljbaili and the relationship to this particular homicide are very closely intertwined and that they cannot be separated one from another.

Certainly in this Court's view the threats toward Ms. Aljbaili go toward the motive for the homicide in this particular case. I think it also does go toward the issue of a premeditated intent to kill, indicating that as Mr. Reynolds has set forth in his offer of proof, that the defendant communicates with [S] that he was meeting with her father.

-17-

RECEIVED by MCOA 7/10/2019 9:33:28 AM

That's shortly before the homicide, and an intervening fact after that communication, the homicide, [S] is in communication with the defendant's brother in an effort to get the defendant to just leave her alone.

The jury I think is entitled to know whether or not that's fuel, the issue that fueled the issue of Mr. Elatrache's anger at Ms. Aljbaili asserting herself and trying to separate and end a relationship over what is offered as a very controlling individual.

And I do think that the threats directed toward Ms. Aljbaili and her family repeatedly directed toward the notion of I will kill you, and I will kill your father. I will kill your mother, and I will kill your father also goes to the notion of whether or not this was an accidental death, whether Mr. Aljbaili passed away as a result of a heart attack during some minor tussle or whether or not it was in fact a premeditated murder.

It does seem to this Court that the <u>VanderVliet</u> criteria have been met. That this evidence is not being just introduced to show that Mr. Elatrache is a bad person or that he has a propensity to commit crime.

Certainly the issue of motive and intent and the lack of accident are relevant under Michigan Rule of Evidence 402 as to a fact of consequence in this trial.

Certainly I take the defense's point that there certainly is a huge volume of communications and evidence that demonstrates these other acts, but I don't think the volume of evidence, as long as it is relevant, makes it so unduly prejudicial that it substantially outweighs the probative value of the evidence.

The evidence as proffered by the People I think demonstrates that the persistence and the intensity and volume of the communications to [S] demonstrate the motive and the premeditated intent and offers evidence of a lack of accident.[3]

During S's testimony, when she was just about to testify regarding the prior break-ins, the trial court instructed the jury that it must be careful to consider the evidence for its limited purpose. The other acts evidence was presented as set forth in the statement of facts.

During the prosecutor's closing arguments, she noted: "The defense would like you to think this case has absolutely nothing to do with [S], but that's ludicrous. This case has everything to do with her. But for that relationship, we wouldn't be here." She added that defendant "sadistically" went after the individual most precious to S in order to have her rely on him and need him for protection.

Generally, character evidence cannot be used to show that a defendant acted in conformity therewith because there is a danger that a defendant will be convicted solely upon his history of

---

[3] The trial court further found that the evidence did not meet the criteria for being admitted as evidence of identity.

-18-

RECEIVED by MCOA 7/10/2019 9:33:28 AM

misconduct rather than on his conduct in a particular case. *People v Starr*, 457 Mich 490, 495; 577 NW2d 673 (1998). MRE 404(b) therefore provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

However, MRE 404(b) does not prohibit all other-acts evidence that may give rise to an inference about the defendant's character, but only that which is relevant *solely* to the defendant's character or criminal propensity." *People v Jackson*, 498 Mich 246, 276; 869 NW2d 253, *reh den* 498 Mich 879 (2015) (internal quotation marks omitted).

Generally, to be admissible under MRE 404(b), bad acts evidence (1) must be offered for a proper purpose, (2) must be relevant, and (3) must not have a probative value substantially outweighed by its potential for unfair prejudice. *People v Knox*, 469 Mich 502, 509; 674 NW2d 366 (2004). A proper purpose is one other than establishing the defendant's character to show her propensity to commit the offense. *People v Johnigan*, 265 Mich App 463, 465; 696 NW2d 725 (2005).

"Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the action more probable or less probable than it would be without the evidence." *People v Aldrich*, 246 Mich App 101, 114; 631 NW2d 67 (2001). Under this broad definition, evidence that is useful in shedding light on any material point is admissible. *Id.* at 114. However, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. MRE 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The trial court did not abuse its discretion when it permitted the prosecution to present other acts evidence. The evidence was offered for a proper purpose and was highly relevant. It was not offered for the sole purpose of showing that defendant was a bad person. Instead, it was offered to give context to the crime itself. Defendant's behavior demonstrated motive, and was especially relevant to premeditation. While the evidence was undoubtedly prejudicial in that the jury heard what horrible things defendant said and did before the murder, it cannot be said that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

## F. EFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he was denied the effective assistance of counsel at trial because counsel failed to object to Fragel's testimony that defendant told him he was going to have the prosecutors and the lead detective on the case killed. Defendant further argues that counsel was deficient in failing to request an accident instruction. We disagree.

"[A] defendant must move in the trial court for a new trial or an evidentiary hearing to preserve the defendant's claim that his or her counsel was ineffective." Because defendant did not move for a

RECEIVED by MCOA 7/10/2019 9:33:28 AM

Ginther[4] hearing, our review is limited to "mistakes apparent from the record." *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

> A criminal defendant has the fundamental right to effective assistance of counsel. However, it is the defendant's burden to prove that counsel did not provide effective assistance. To prove that defense counsel was not effective, the defendant must show that (1) defense counsel's performance was so deficient that it fell below an objective standard of reasonableness and (2) there is a reasonable probability that defense counsel's deficient performance prejudiced the defendant. The defendant was prejudiced if, but for defense counsel's errors, the result of the proceeding would have been different.  [*Id.* (internal footnotes omitted).]

"A defense attorney must enjoy great discretion in the trying of a case – especially with regard to trial strategy and tactics." *People v Pickens*, 446 Mich 298, 330; 521 NW2d 797 (1994). "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004).  "Decisions regarding what evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy." *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008).

Because there was no *Ginther* hearing, we are left to guess defense counsel's thoughts.  It is very likely, as the prosecutor points out, that defense counsel decided not to object to Fragel's testimony as a tactical matter in order to avoid drawing additional attention to it.  As for the accident instruction, Section II(A) of this opinion addressed the lesser included offenses of voluntary and involuntary manslaughter.  The record did not support an accident instruction for the same reason the record did not support manslaughter instructions.  "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120, 125 (2010).[5]

Affirmed.

/s/ Jane M. Beckering
/s/ Donald S. Owens
/s/ Kirsten Frank Kelly

---

[4] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[5] We note that defendant received zealous representation over the course of this two-week trial.  When sentencing defendant, the trial court noted: "I think that Mr. Elatrache was very fortunate.  I don't think he could have had any better representation in this case than he had from Mr. Howarth in particular, as well as Ms. Silver and Mr. Paglia."

RECEIVED by MCOA 7/10/2019 9:33:28 AM

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

|  | Court of Appeals Nos.  343695 |
|---|---|
| V | 343696 |
|  | Circuit Court Nos. 16-1064-FH |
|  | 16-1065-FH |

TUNC URAZ,

      Defendant-Appellant.

_____/

**PEOPLE'S RESPONSE TO DEFENDANT'S
STANDARD-4 SUPPLEMENTAL BRIEF
ORAL ARGUMENT NOT REQUESTED**

CAROL A. SIEMON
      INGHAM COUNTY PROSECUTING ATTORNEY

KAHLA D. CRINO
      APPELLATE DIVISION CHIEF

PREPARED BY:
      JAMES HARRIES
      STUDENT INTERN

BUSINESS ADDRESS
      303 W. Kalamazoo Street, 4th Floor
      Lansing, Michigan 48933

RECEIVED by MCOA 2/10/2020 3:14:13 PM

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................ii

TABLE OF AUTHORITIES.............................................................iii

COUNTER STATEMENT OF QUESTIONS PRESENTED...............................iv

STATEMENT OF APPELLATE JURISDICTION ...................................... v

INTRODUCTION ......................................................................... vi

COUNTER STATEMENT OF FACTS .............................................. vii

ARGUMENT .............................................................................. 1

I. BECAUSE DEFENDANT WAS CONVICTED AT TRIAL BASED ON SUFFICIENT EVIDENCE OF GUILT HE CANNOT RAISE THE ARGUMENT THAT THE DISTRICT COURT'S BIND OVER DECISION WAS ERRONIOUS .......................................................................... 1

II. DEFENDANT DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL MERELY BECAUSE TRIAL COUNSEL WAS A PERSON PREVIOUSLY DIAGNOSED WITH A MENTAL ILLNESS WHO RECEIVED TREATMENT FOR HIS MENTAL ILLNESS AFTER THE CONCLUSION OF DEFENDANT'S TRIAL. ...................................................... 6

III. TRIAL COUNSEL WAS NOT INEFECTIVE FOR FAILING TO OBJECT TO THE ADMISSION OF DEFENDANT'S STATEMENTS, FAILING TO PRESENT A DIMINISHED CAPACITY DEFENSE, AND FAILING TO CALL CERTAIN WITNESSES. .................................................. 7

IV. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S ENTRAPMENT MOTION, ADMITTING EVIDENCE OF DEFENDANT'S STATEMENTS, ADMITTING MRE 404(B) EVIDENCE, AND ALLOWING A JUROR WHO COMMENTED ON DEFENDANT'S RACE TO REMAIN ON THE JURY UNTIL THE CLOSE OF PROOFS. ............................................................................ 23

V. THE TRIAL COURT DID NOT ERR BY SCORING OV 4, 6, AND 10, AND BY ORDERING RESTITUTION, COSTS AND FINES IN BOTH OF DEFENDANT'S FILES. ....................................................................... 30

RELIEF REQUESTED ............................................................... 37

RECEIVED by MCOA 2/10/2020 3:14:13 PM

# TABLE OF AUTHORITIES

RECEIVED by MCOA 2/10/2020 3:14:13 PM

## COUNTER STATEMENT OF QUESTIONS PRESENTED

I.      DEFENDANT WAS CONVICTED AT TRIAL BASED ON SUFFICIENT EVIDENCE OF GUILT. CAN THIS COURT ADDRESS DEFENDANT'S CLAIM THAT THE DISTRICT COURT'S BINDOVER DECISION WAS ERRONIOUS?

II.      DID DEFENDANT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL MERELY BECAUSE TRIAL COUNSEL WAS A PERSON PREVIOUSLY DIAGNOSED WITH A MENTAL ILLNESS WHO RECEIVED TREATMENT FOR HIS MENTAL ILLNESS AFTER THE CONCLUSION OF DEFENDANT'S TRIAL?

III.      WAS TRIAL COUNSEL INEFECTIVE FOR FAILING TO OBJECT TO THE ADMISSION OF DEFENDANT'S STATEMENTS, FAILING TO PRESENT A DIMINISHED CAPACITY DEFENSE, AND FAILING TO CALL CERTAIN WITNESSES?

IV.      DID THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S ENTRAPMENT MOTION, ADMITTING EVIDENCE OF DEFENDANT'S STATEMENTS, ADMITTING MRE 404(B) EVIDENCE, AND ALLOWING A JUROR WHO COMMENTED ON DEFENDANT'S RACE TO REMAIN ON THE JURY UNTIL THE CLOSE OF PROOFS?

V.      DID THE TRIAL COURT ERR BY SCORING OV 4, 6, AND 10, AND BY ORDERING RESTITUTION, COSTS AND FINES IN BOTH OF DEFENDANT'S FILES?

RECEIVED by MCOA 2/10/2020 3:14:13 PM

## STATEMENT OF APPELLATE JURISDICTION

Defendant may file a supplemental brief in propria persona pursuant to Administrative Order 2004-6, Standard 4. Because Defendant's propria persona brief was received within 84 days of February 22, 2019, this Court has jurisdiction.

RECEIVED by MCOA 2/10/2020 3:14:13 PM

# INTRODUCTION

Defendant filed a Standard 4 Brief raising fourteen different arguments that do not appear to be in any particular order. The People have rearranged and organized these arguments to facilitate both responding and the appellate review of Defendant's arguments. The People's response will address Defendant's fourteen arguments in the following manner:

I.     District court bind over decision (Defendant's Argument 10)
II.    Trial counsel's mental illness (Defendant's Argument 3)
III.   Ineffective assistance of counsel arguments
- Trial counsel should have objected to Defendant's statements on the basis of the Fifth Amendment and Sixth Amendment (Defendant's Argument 1 and 14)
- Trial counsel failed to investigate/present diminished capacity, criminal responsibility, competency (Defendant's Argument 2)
- Trial counsel failed to investigate and call witnesses (Defendant's Argument 4)
IV.    Trial Court abuse of discretion arguments
- The trial court should have granted Defendant's entrapment motion (Defendant's Argument 5)
- The trial court shouldn't have admitted recordings of Defendant's statements because they were obtained in violation of his Fifth and Sixth Amendment right to counsel (Defendant's Argument 6)
- Juror with bias remained until close of proofs (Defendant's Argument 7)
- Admitting MRE 404(b) evidence (Defendant's Argument 11)
- Granting MRE 404(b) motion for reconsideration (Defendant's Argument 8)
V.     Sentencing arguments
- Scoring OV 6 at 50 points was a cruel and unusual punishment and the jury was not instructed on degrees of solicitation (Defendant's Argument 9)
- OV 4 and OV 10 were improperly scored based on facts that were not proven beyond a reasonable doubt (Defendant's Argument 13)
- Restitution, fines, costs and assessments should not have been charged in both files (Defendant's Argument )

RECEIVED by MCOA 2/10/2020 3:14:13 PM

## COUNTER STATEMENT OF FACTS

The People incorporate the counterstatement of facts from their brief on appeal by reference.

RECEIVED by MCOA 2/10/2020 3:14:13 PM

RECEIVED by MCOA 2/10/2020 3:14:13 PM

# ARGUMENT

## I. BECAUSE DEFENDANT WAS CONVICTED AT TRIAL BASED ON SUFFICIENT EVIDENCE OF GUILT HE CANNOT RAISE THE ARGUMENT THAT THE DISTRICT COURT'S BIND OVER DECISION WAS ERRONIOUS.

### Defendant's Argument

Defendant argues that the district court should not have bound him over for trial in on a third count of solicitation of murder. (Defendant's Argument 10)

### Issue Preservation

Defendant did not file a motion to quash bind over. This argument is not preserved.

### Standard of Review

The circuit court reviews the district court's decision regarding a motion to bind over for an abuse of discretion. *People v Perkins,* 468 Mich 448, 452 (2003). This Court reviews de novo the circuit court's decision regarding whether the district court abused its discretion. *People v McKinley,* 255 Mich App 20, 25 (2003).

### People's Argument

Because Defendant was convicted based on sufficient evidence of guilt, Defendant cannot challenge the district court's bind over decision. "If a defendant is fairly convicted at trial, no appeal lies regarding whether the evidence at the preliminary examination was sufficient to warrant a bindover." *People v Wilson*, 469 Mich 1018 (2004); *People v Hall,* 435 Mich 599, 601-603 (1990); *People v Yost,* 468 Mich 122, 124 n. 2 (2003).

Defendant has not raised the argument that he was convicted based on insufficient evidence. Still, the evidence of Defendant's guilt was overwhelming.

RECEIVED by MCOA 2/10/2020 3:14:13 PM

Defendant persistently stalked Melke and broke into her home. While he was awaiting sentencing, he continued to engage in stalking behavior. While serving his sentence, Defendant began soliciting other inmates to murder Melke. Defendant wanted Melke to die because he believed she had ruined his life, lied to him, and cheated on him. Because of this, Defendant wanted to "get rid of her" (11/3/17, 138) and stated "this bitch got to pay." (11/7/17, 13). Defendant was charged in file 16-1065-FC with three counts of solicitation to murder.

The first person Defendant solicited to murder Melke was Charles Allen. Defendant and Allen were housed together for a period of time in a medical unit. They became friendly and Defendant began to talk to Allen about Melke. Defendant told Allen that he was in jail for stalking Melke. (11/7/17, 10-11). Defendant told Allen that he wanted to get back at Melke, and stated "this bitch got to pay." (11/7/17, 13). Defendant then made numerous, specific solicitations of Allen. Defendant asked Allen to beat Melke with a baseball bat. He stated that he wanted her "fucked up" and that he wanted pictures of it. (11/7/17, 14). Defendant then asked Allen to kill Melke. He specified that he wanted her beaten beyond recognition with a bat and that he wanted it to be recorded so that he could masturbate to it. Defendant also requested Melke's ID. (11/7/17, 20-21). Defendant specified that he wanted Melke's body to be dumped where no one would find her. (11/7/17, 16). Defendant agreed to pay Allen $2,500 in exchange for killing Melke. (11/7/17, 16-18). Defendant told Allen where Melke lived, what type of car she drove, and warned him that she has a camera in her house. Defendant also requested a gun so that he could go after the guy Melke

RECEIVED by MCOA 2/10/2020 3:14:13 PM

"cheated" with. (11/7/17, 21-22). Allen went along with the conversations, but had no intentions of doing anything Defendant asked. (11/7/17, 22).

Allen notified a jail deputy about what Defendant had requested. (11/7/17, 24-25). Allen was interviewed by Detective Matt Krumbach, and during the interview, Allen asked if he could get out of jail. Detective Krumback told Defendant no, but that he could tell Allen's probation officer that Allen was helpful. (11/7/17, 27-28). Allen stated that no one took advantage of Defendant or hurt him while he was in jail. (11/7/17, 39, 68). Allen cooperated with law enforcement for the sake of Melke's life, and because it was the right thing to do. (11/7/17, 28, 69-70).

The second person Defendant solicited to murder Melke was Reginald Close. Close's nickname was "Rough." (11/3/17, 131). Defendant, Allen, and Close were assigned to the medical unit at the same time, and that is where Defendant and Close met. (11/3/17, 134-135). Defendant began talking to Close about Melke within 48 hours of meeting him. (11/3/17, 136-138). Defendant told Close that Melke ruined his life, lied to him, and cheated on him. Defendant told Close that he had stalked her, entered her house, and that it was her fault that he was in jail. (11/3/17, 138). Defendant stated that he was going to get rid of her. (11/3/17, 138). Defendant stated that he had lost his job at MSU because he tried to get a gun from a coworker in order to kill Melke. (11/3/17, 139). Defendant stated that he sliced Melke's tires while she was at a Drake concert and that he was able to access her phone through her iCloud. (11/3/17, 140-141).

RECEIVED by MCOA 2/10/2020 3:14:13 PM

Defendant asked Close if he knew anyone who could have Melke killed and make it look like a robbery. (11/3/17, 143). By the time this conversation took place, Allen had been moved to another location in the jail. (11/3/17, 143-144). Defendant asked Close if he could help by killing Melke. (11/3/17, 145). Close notified his lawyer after he realized that Defendant was serious about killing Melke. (11/3/17, 145). Close agreed to help Defendant kill Melke. Defendant provided Melke's address, White's address, Melke's Facebook information, a map to Melke's apartment, Melke's car information, and Melke's job information. (11/3/17, 153-156). Defendant agreed to pay $1,000 for Melke's murder. (11/3/17, 147). Defendant made arrangements for his associate, to place some money in Close's jail account. (11/3/17, 157).

Detective Andrew Hogan, interviewed Close. (11/6/17, 106). Close did not receive anything in exchange for his statement or testimony. He was provided with immunity for agreeing to help Defendant kill Melke. (11/3/17, 146, 160-161). Detective Hogan checked Close's jail account, and verified that someone made a deposit $133.59 on October 13, 2016. (11/6/17, 108-109). Detective Hogan obtained a picture of the person who made the deposit. (11/6/17, 109-110). Detective Hogan verified that Defendant never complained of threats, assaults, or promises from other inmates. (11/6/17, 110-111).

The third person Defendant solicited to murder Melke was Officer Frank Mobley. Officer Mobley made contact with Defendant in an undercover capacity and pretended to be a "hit man." (11/6/17, 117). He was provided with basic information regarding Defendant's previous solicitations, and was pretending that he was Close's

RECEIVED by MCOA 2/10/2020 3:14:13 PM

friend from Detroit. (11/6/17, 117-119). Officer Mobley called Defendant for the first time on October 18, 2016, using a video chat option for jail calls. The call was not successful. (11/6/17, 121). Officer Mobley called again on October 24, 2016. Defendant answered, and the entire call was recorded. (11/6/17, 121). Officer Mobley told Defendant that "Rough" had told him that Defendant needed someone to "take out the trash." (11/6/17, 123). Throughout the call, Officer Mobley referred to Melke as the "trash," however, he made it clear that this was code for Melke, the person Defendant wanted to have killed. They discussed whether Defendant wanted Officer Mobley to "beat" the trash, whether he should "spill" the trash all over the house, whether he should beat the trash with a bat, whether he would want the scene to be cleaned up afterward, what color hair the trash had. Defendant stated that he wanted it done quickly, throw it out clean. (11/6/17, 123-127). They discussed the address where the trash would be, and Defendant stated that Rough would have that information because he had written it all down. (11/6/17, 126-127). Defendant stated that he was certain that he wanted it done. They discussed how completion would be verified, and that Defendant would pay Officer Mobley $2,000 for the first "bag" and $500 for any others. Defendant specified that he wanted the "trash" taken care of before November 2, which was his sentencing date.

Based on all of this, there was sufficient evidence to convict Defendant of three counts of solicitation to commit murder, and Defendant cannot challenge the district court's bind over decision on appeal.

RECEIVED by MCOA 2/10/2020 3:14:13 PM

## II.  DEFENDANT  DID  NOT  RECEIVE  INEFFECTIVE ASSISTANCE  OF  COUNSEL  MERELY  BECAUSE  TRIAL COUNSEL WAS A PERSON PREVIOUSLY DIAGNOSED WITH A MENTAL ILLNESS WHO RECEIVED TREATMENT FOR HIS MENTAL  ILLNESS  AFTER  THE  CONCLUSION  OF DEFENDANT'S TRIAL.

### Defendant's Argument

Defendant argues that one of his attorneys, Perrone, had a mental breakdown during trial and provided ineffective assistance of counsel by: 1) failing to impeach witnesses with prior theft convictions, 2) giving an inadequate closing argument, 3) sending a particular email to Defendant's sister during the trial, and 4) an alleged delay between questions while cross examining a witness. (Defendant's Argument 3)

### Issue Preservation

Defendant did not move for a new trial in the trial court. In fact, after his conviction, he continued to request and receive Perrone's assistance. This argument is not preserved.

### Standard of Review

Whether a defendant has been denied effective assistance of counsel is a mixed question of law and fact. *People v LeBlanc*, 465 Mich 575, 579 (2002). "A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *Id.* The trial court's findings of fact are reviewed for clear error. *Id.* Issues of law are reviewed de novo. *Id.*

Defendant did not preserve this claim by moving for the new trial in the trial court. *People v Nix,* 301 Mich App 195, 207 (2013). "Unpreserved issues concerning

6

ineffective assistance of counsel are reviewed for errors apparent on the record."
*People v Lockett,* 295 Mich App 165, 186 (2012).

### People's Argument

This argument was thoroughly addressed by the People in their Brief on Appeal. The People incorporate their Argument V from their Brief on Appeal by reference.

**III. TRIAL COUNSEL WAS NOT INEFECTIVE FOR FAILING TO OBJECT TO THE ADMISSION OF DEFENDANT'S STATEMENTS, FAILING TO PRESENT A DIMINISHED CAPACITY DEFENSE, AND FAILING TO CALL CERTAIN WITNESSES.**

### Defendant's Argument

Defendant argues that trial counsel was ineffective for the following reasons:

1) trial counsel should have objected to the admission of Defendant's statements on the basis of the Fifth Amendment and Sixth Amendment (Defendant's Argument 1 and 14);

2) Trial counsel failed to investigate/present diminished capacity, criminal responsibility, competency (Defendant's Argument 2); and

3) Trial counsel failed to investigate and call witnesses. (Defendant's Argument 4)

### Issue Preservation

Defendant did not move for a new trial in the trial court. After his conviction, he continued to request and receive Perrone's assistance. This argument is not preserved.

### Standard of Review

Whether a defendant has been denied effective assistance of counsel is a mixed question of law and fact. *People v LeBlanc*, 465 Mich 575, 579 (2002). "A judge first

RECEIVED by MCOA 2/10/2020 3:14:13 PM

must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *Id.*. The trial court's findings of fact are reviewed for clear error. *Id.* Issues of law are reviewed de novo. *Id.*

Defendant did not preserve this claim by moving for the new trial in the trial court. *People v Nix,* 301 Mich App 195, 207 (2013). "Unpreserved issues concerning ineffective assistance of counsel are reviewed for errors apparent on the record." *People v Lockett,* 295 Mich App 165, 186 (2012).

## People's Argument

Trial counsel was not ineffective for failing to object to the admission of Defendant's statements on the basis of the Fifth or Sixth Amendment because Defendant was not subjected to custodial interrogation and his jailhouse conversations were not critical stages of the proceedings. Trial counsel was not ineffective for failing to investigate and pursue a diminished capacity defense because that defense is not legally available. Trial counsel was not ineffective for failing to pursue competency and criminal responsibility because there is no credible evidence that Defendant was incompetent or not criminally responsible. Finally, trial counsel was not ineffective for failing to call the witnesses suggested by Defendant on appeal because their absence did not deny Defendant a substantial defense.

> A defendant seeking a new trial on the ground that trial counsel was ineffective bears a heavy burden. To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy the two-part test articulated by the United States Supreme Court in *Strickland v Washington,* 466 U S 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). See *People v Pickens,* 446 Mich 298, 302-303; 521 NW2d 797

RECEIVED by MCOA 2/10/2020 3:14:13 PM

(1994). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment." *Strickland,* supra at 687. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *Id.* at 690. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. [*People v Dendel,* 481 Mich 114, 124-125 (2008), quoting *People v Carbin,* 463 Mich 590, 599-600 (2001).]

"The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v Richter,* 562 US 86; 131 S Ct 770, 788; 178 L Ed 2d 624 (2011), quoting *Strickland v Washington,* 466 US 668, 690 (1984). "Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Harrington, supra* at 789, quoting *Strickland, supra* at 689. "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington, supra* at 789. "There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Harrington, supra* at 790, quoting *Wiggins v Smith,* 539 US 510, 525; 123 S Ct 2527; 156 L Ed 2d 471 (2003). Counsel's performance must be viewed from an objective standard, not from "counsel's subjective state of mind." *Harrington, supra* at 790. "Just as there is no

RECEIVED by MCOA 2/10/2020 3:14:13 PM

expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Id.* at 791. "The fact that defense counsel's strategy may not have worked does not constitute ineffective assistance of counsel." *People v Stewart* (On Remand), 219 Mich App 38, 42 (1996).

**Trial counsel was not ineffective for failing to object to the admission of Defendant's statements on the basis of the Fifth and Sixth Amendment because Defendant was not subjected to custodial interrogation and his jailhouse conversations were not critical stages of the proceedings.**

The right to counsel is guaranteed under both the Fifth and Sixth Amendments of the United States Constitution and Michigan's Constitution. US Const, Am V, Am VI; Const 1963, art 1, §§ 17, 20. This right to counsel "extends to all 'critical' stages of the proceedings where counsel's absence might harm defendant's right to a fair trial." *People v Burhans*, 166 Mich App 758, 764, 421 NW2d 285 (1988), citing *United States v Wade*, 388 US 218, 228, 87 S Ct 1926, 18 LEd2d 1149 (1967). The Sixth Amendment right to counsel attaches once criminal proceedings have been initiated. *Moore v Illinois*, 434 US 220, 231; 98 S Ct 458; 54 LEd2d 424 (1977). "The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." *People v Harrington*, 258 Mich App 703, 706 (2003), quoting US Const, Am VI. The Sixth Amendment affords an accused the right to rely on counsel as an intermediary between him and the state. *Harrington*, *supra* at 706.

Once the Sixth Amendment right to counsel has attached, it may still be waived. *Montejo v Louisiana*, 556 US 778, 786–787; 129 S Ct 2079; 173 LEd2d 955

RECEIVED by MCOA 2/10/2020 3:14:13 PM

(2009). "When a defendant invokes the Sixth Amendment right to counsel, any subsequent waiver of this right in a *police-initiated custodial interview* is ineffective with respect to the charges filed against the defendant.  An exception to this rule exists where the defendant initiates the contact and makes a valid waiver of his rights." *Leonard*, *supra* at 759. "The State must show that the defendant *intelligently and knowingly* relinquished his right not to be questioned in the absence of counsel. The State can establish a waiver only by proving ' "an intentional relinquishment or abandonment" ' of the right to have counsel present." *Leonard*, *supra* at 221 (citations omitted).

Close and Allen are not police officers or agents of the police. The conversations Defendant chose to have with Close and Allen cannot be characterized as custodial interrogations, but rather, conversations Defendant wanted to have because he had decided to have Melke killed. Thus it was not necessary for the jail inmates or the officer posing as a hit man to advise Defendant of his Miranda rights. The Sixth Amendment right to counsel extends to "critical" stages of Defendant's proceedings. As such, Defendant was not entitled to have counsel present with him in custody for every voluntary conversation that he chose to have with another inmate. The time Defendant spent in custody cannot be characterized as a "critical" stage for purposes of the Sixth Amendment right to counsel. The same is true for Defendant's phone call with Officer Mobley while Officer Mobley pretended to be a hit man. Defendant sought a conversation with Officer Mobley because he believed that he was a hit man. During that conversation, he believed that Officer Mobley was a friend of Close's

RECEIVED by MCOA 2/10/2020 3:14:13 PM

whom Close had put Defendant in contact with for the purpose of having Melke killed. This is a conversation Defendant voluntarily participated in, it cannot be characterized as custodial interrogation or a critical phase of proceedings. Voluntary conversations with inmates are not custodial interrogations for purposes of Miranda warnings and Defendant's Fifth Amendment rights and they are not critical phases of proceedings for purposes of the Sixth Amendment right to counsel.

Defendant argues his rights were violated because the police officers and their "agents" made statements that were deliberately intended to elicit incriminating evidence from him in violation of his Sixth Amendment right to counsel. In support, Defendant points to *Brewer v. Williams*, 430 US 387, 401 (1977). However, *Brewer* is distinguishable. The defendant in *Brewer* was transported by police to Des Moines and the police had agreed with the defendant's counsel not to interrogate the defendant during the trip. *Id.* at 387. One of the officers asked a question that seemed deliberately intended to elicit an incriminating statement from the defendant. The Supreme Court in *Brewer* held that the question and the answer that resulted were a violation of the defendant's rights. In the instant case however, Defendant's counsel had no such agreement with the police and Defendant was not subjected to custodial interrogation.

Defendant also argues that this "deliberate elicitation of incriminating statements" standard from *Brewer* should also apply to the statements he made to Close and Allen because they were part a plot to trick Defendant and because they acted as agents of the police when they discussed the murder plot with Defendant.

12

RECEIVED by MCOA 2/10/2020 3:14:13 PM

Defendant claims these men were agents of the police because their motive for telling the police about Defendant was to lessen their own penalties. However, only one of the two men stated that his initial intent in coming forwards was to potentially receive a lower sentence. Additionally, neither Close nor Allen received any kind of benefit for giving the information to the police. (10/20/17, 93-94). Defendant also claims that the two men were agents because they initiated contact with the Defendant and aided in planning and gathering more information about Defendant.

However, evidence on the record indicates that Defendant was the one who approached both men regarding the murder plot and, while Allen did approach Defendant first, it was only to ask why Defendant was in jail. Additionally, the police only became involved after they received reports from Close and Allen stating that Defendant had approached them and solicited them to murder Melke—meaning that Close and Allen could not have been acting as "agents of the police" as Defendant claims when he made these incriminating statements to Close and Allen. Defendant also argues that an agency relationship can be implied between the police and Close and Allen because the two men admitted to "deliberately eliciting incriminating information while acting as confidants of the Defendant. First, that would only be of concern if the two men were already agents, and second, Close and Allen testified they "played along" with Defendant when he was asking if they knew anyone who could murder Melke because they wanted to know how serious he was.[1] Trial counsel was not ineffective for failing to object on the basis of the Fifth or Sixth Amendment.

---

[1] (11/3/17, p 143-144; 11/7/17, p 17-24).

RECEIVED by MCOA 2/10/2020 3:14:13 PM

**Trial counsel was not ineffective for failing to investigate and pursue a diminished capacity defense because that defense is not legally available. Trial counsel was not ineffective for failing to pursue competency and criminal responsibility because there is no credible evidence that Defendant was incompetent or not criminally responsible.**

Defendant argues that his trial counsel was ineffective because he failed to present evidence or consult an expert regarding whether Defendant's diminished state of mind that undermined the specific intent required for his solicitation of intent to commit murder charges. Defendant argues that his counsel should have consulted an expert regarding Defendant's state of mind or requested a continuance to have a psychiatric evaluation done because it would allegedly show that Defendant had a diminished state of mind that would have undermined the specific intent requirement.

Defendant's own description of his "diminished state of mind" at a motion regarding the proposed defense of entrapment was:

> Being in jail for the first time in my life. Put into solitary confinement was a surprise the next day. I wasn't expecting that. And it's the loneliness. You start hallucinating. I had high blood pressure, hypertension, manic depressive situations. We got through every little thing that solitary confinement can do to you. Your focus changes. You start thinking over and over and over many times every little detail in your life, what happened then. You start getting frustrated most of the time. I also had experienced – like I would read a book and I would not remember what I read after a while. Then I would read over it again because – the scarcity of items, you beg for a book. I wasn't allowed to buy any commissary for the first month. Of course, no phone calls, whatsoever, you, taken away. (10/20/17, p 13).

Defendant also described being "held for 23 hours" and being in "withdrawal" due to benzoids and alcohol, as well as potentially suffering from depression. (*Id.* at 152-56). Regardless of how Defendant was feeling, trial counsel was not ineffective

14

RECEIVED by MCOA 2/10/2020 3:14:13 PM

for failing to pursue a diminished capacity defense because diminished capacity was abolished by *People v Carpenter*, 464 Mich 223 (2001).

Defendant asserts that trial counsel was not effective for failing to pursue a competency evaluation. Defendants facing criminal charges are presumed competent to stand trial. MCL 330.2020(1) states:

> A defendant to a criminal charge shall be presumed competent to stand trial. He shall be determined incompetent to stand trial only if he is incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner. The court shall determine the capacity of a defendant to assist in his defense by his ability to perform the tasks reasonably necessary for him to perform in the preparation of his defense and during his trial.

The issue of a defendant's competence to stand trial may be raised at any time during proceedings against the defendant by the court or the parties. MCR 6.125(B) states:

> The issue of the defendant's competence to stand trial or to participate in other criminal proceedings may be raised at any time during the proceedings against the defendant. The issue may be raised by the court before which such proceedings are pending or being held, or by motion of a party….

In *People v Harris,* 185 Mich App 100 (1990), the Court of Appeals stated: "Although the determination of a defendant's competence is within the trial court's discretion, a trial court has the duty of raising the issue of incompetence where facts are brought to its attention which raise a "bona fide doubt" as to the defendant's competence." *Harris*, 185 Mich App at 102.

> "[T]he test for such a bona fide doubt is whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Maxwell v Roe,* 606 F 3d 561, 568 (9th Cir 2010) (citation and quotation marks omitted). Evidence of

RECEIVED by MCOA 2/10/2020 3:14:13 PM

15

a defendant's irrational behavior, a defendant's demeanor, and a defendant's prior medical record relative to competence are all relevant in determining whether further inquiry in regard to competency is required. *Drope v Missouri,* 420 US 162, 180, 95 S Ct 896, 43 L Ed 2d 103 (1975). "There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Id.* [*People v Kammeraad*, 307 Mich App 98, 138-39 (2014) *app den* 497 Mich 1014 (2015).]

Here, Defendant displayed no irrational behaviors and there was no indication whatsoever that he may be incompetent. Defendant took the stand at his own entrapment hearing and testified as to why he believed he was entrapped. At Defendant's sentencing, Defendant requested that Perrone continue to assist in his representation. Defendant requested that OV 6 be challenged and provided information about this to his attorney. Defendant argued with the court regarding various facts from his case. On appeal, Defendant has continued to demonstrate his competence by learning that he could file a Standard 4 brief and addressing arguments to this Court.

On appeal, Defendant argues that because he was diagnosed with having depression, anxiety, suicidal thoughts, and chaotic emotions, that he was not competent. Even if we take this assertion as being true, it does not establish that Defendant did not understand the nature and object of the proceedings against him or that he was incapable of assisting in his defense in a rational manner. In fact, the record demonstrates that Defendant assisted with his defense in a rational manner by testifying at a pretrial motion and expressing his opinion at sentencing.

RECEIVED by MCOA 2/10/2020 3:14:13 PM

Defendant asserts that trial counsel was ineffective for failing to pursue an evaluation for criminal responsibility. A Defendant is not criminally responsible if at the time of the offense he was legally insane. MCL 768.21a states:

> It is and affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense. An individual is legally insane if, as a result of mental illness as defined in section 400 of the mental health code, 1974 PA 258, MCL 330.1400, or as a result of having an intellectual disability as defined in section 100b of the mental health code, 1974 PA 258, MCL 330.1100b, that person lacks substantial capacity either to appreciate the nature and quality or wrongfulness of his or her conduct or to conform his or her conduct to the requirements of law. Mental illness or otherwise having an intellectual disability does not otherwise constitute a defense of legal insanity.

Again, even if we assume that Defendant was mentally ill, his mental illness, Defendant still had the substantial capacity to appreciate the nature and quality or wrongfulness of his actions and the ability to conform his conduct to the requirements of law. All of Defendant's actions in committing these offenses demonstrate that he understood what he was doing, and did it because he wanted to. Defendant was motivated by jealousy and rage that Melke had left him. When he solicited her murder, he stated that he wanted Melke to die because he believed she had ruined his life, lied to him, and cheated on him. Because of this, Defendant wanted to "get rid of her" (11/3/17, 138) and stated "this bitch got to pay." (11/7/17, 13). He stated that he wanted her "fucked up" and that he wanted pictures of it. (11/7/17, 14). Defendant then asked Allen to kill Melke. He specified that he wanted her beaten beyond recognition with a bat and that he wanted it to be recorded so that he could masturbate to it. Defendant also requested Melke's ID. (11/7/17, 20-21).  Defendant

RECEIVED by MCOA 2/10/2020 3:14:13 PM

17

specified that he wanted Melke's body to be dumped where no one would find her. (11/7/17, 16). Defendant told Close that Melke ruined his life, lied to him, and cheated on him. Defendant told Close that he had stalked her, entered her house, and that it was her fault that he was in jail. (11/3/17, 138). Defendant stated that he was going to get rid of her. (11/3/17, 138).

Defendant took further, intentional actions as a part of his plan. Defendant provided Melke's address, White's address, Melke's Facebook information, a map to Melke's apartment, Melke's car information, and Melke's job information to Close. (11/3/17, 153-156). Defendant agreed to pay $1,000 for Melke's murder. (11/3/17, 147). Defendant made arrangements for his associate, to place some money in Close's jail account. (11/3/17, 157).   When Defendant talked to Officer Mobley, he made the assumption that all of this information was already provided to Officer Mobley by Rough. Additionally, Defendant's evasiveness during his conversation with Officer Mobley further confirms that he understood the wrongfulness of his conduct and that he wanted to be careful of what he said. Defendant knew what he was doing was wrong, but he wanted to kill Melke so badly, that he ultimately did not care.  For all of these reasons, trial counsel was not incompetent for failing to pursue competency or criminal responsibility evaluations.

**Trial counsel was not ineffective for failing to call the witnesses suggested by Defendant on appeal because their absence did not deny Defendant a substantial defense.**

Decisions regarding what evidence to present and whether to call or question

18

RECEIVED by MCOA 2/10/2020 3:14:13 PM

witnesses are presumed to be matters of trial strategy. *People v Rockey,* 237 Mich App 74, 76 (1999). Ineffective assistance of counsel may be established by the failure to call witnesses only if the failure deprives defendant of a substantial defense. *People v Julian,* 171 Mich App 153 (1988). A substantial defense is one that might have made a difference in the outcome of the trial. *People v Kelly,* 186 Mich App 524, 526 (1990).

Defendant argues that his trial counsel was ineffective because he failed to investigate or call any relevant witnesses that would have had a material impact on Defendant's case in chief. Defendant claims that his counsel was unprofessional when he provided a list of 30 witnesses that he failed to properly investigate and that Defendant's rights and ability to put on a defense were substantially affected when his counsel failed to call several witnesses during the trial that Defendant believes would have given materially relevant testimony. However, not a single one of these witnesses had any testimony that would have had any effect on Defendant's trial.

Defendant argues that, Kathy Edmonds should have testified and argues that Edmonds would have testified about an abundance of trash at Defendant's house to give credence to the argument that Defendant though Officer Mobley was contacting him to take out "literal" trash rather than a hit. However, given that Officer Mobley was asking Defendant "what color hair the 'trash' had" and "whether he wanted the trash beaten with a bat" or whether he "wanted the trash spread all over" it's unlikely this testimony from Edmonds would have been persuasive. (*Id.* at 70-75).

RECEIVED by MCOA 2/10/2020 3:14:13 PM

Defendant argues that two inmate workers from the Ingham County jail should have testified. According to Defendant, these two men would be able to testify about the interactions, communications, and solicitations between Defendant, Close, and Allen. Such testimony would have been inadmissible as hearsay.

Defendant argues that four witnesses should have been called to testify about how Close and Allen became involved in their own cases. Such testimony would also be inadmissible as hearsay and would not be relevant to Defendant's case.

Defendant argues that two character witnesses should have been called, however, Defendant provides no information regarding what these witness would have said. Thus it is impossible to determine if their testimony would have been admissible and whether their absence denied Defendant a substantial defense.

Defendant argues that a man was with him when he stalked Melke at Dave and Busters in 2015 and that that person should have been called as a witness. The substance of this individual's proposed testimony is not specified. However, because Defendant was stalking Melke on this occasion, this individual may be an aider and abettor in Defendant's stalking behavior. It is also unclear as to whether it would be admissible. The incident in 2015 was part of the admitted MRE 404(b) evidence. Melke and Stan White testified about the Dave and Buster's incident. There was no mention of anyone being with Defendant when he started harassing Melke at the Dave and Buster's or when he was escorted out so it is unclear what this witness would testify to and whether it would be credible. Regardless, it is unclear how the absence of this witness denied Defendant a substantial defense.

RECEIVED by MCOA 2/10/2020 3:14:13 PM

Defendant argues that his friend Burak Atamer should have been called to testify regarding how he deposited money in Reginald Close's jail account. However, Close himself testified about this and Defendant offers no argument how Atamer's testimony would be different. Defendant also argues that a private investigator who investigated Close's "shady background" should have been called. Defendant makes no argument about what this background is, why it would have been important at his trial, or how it would have been admissible.

Finally, Defendant argues that Dr. Sharon Hobbs should have been called to testify regarding her treatment of Defendant prior to the alleged offenses. It is unclear how this testimony would be admissible.

The absence of testimony from these witnesses did not deny Defendant a substantial defense. In fact, Perrone and Schroeder provided Defendant with effective representation and a substantial defense without all of the witnesses suggested by Defendant on appeal. Perrone engaged in pretrial motion practice on behalf of Defendant by filing a motion to sever and an entrapment motion. (2/28/17, 3-19; 10/20/17, 8-105). Both were denied before trial after extensive hearings. Perrone also responded and argued against the prosecutor's motion to admit evidence pursuant to MRE 404b. (10/11/17, 3-22). Perrone's defense included arguing that the jury should keep an open mind, that Defendant was presumed innocent, that the Defendant does not have to do anything, and that the prosecutor must prove beyond a reasonable doubt that Defendant is guilty. (11/2/17, 114-120; 11/9/17, 135). Perrone also argued that the evidence against Defendant was manufactured, and that Allen and Close took advantage of Defendant and

RECEIVED by MCOA 2/10/2020 3:14:13 PM

21

provided testimony in an attempt to benefit their own situations. (11/2/17, 121-127; 11/9/17, 138-139). Perrone also argued that the evidence that was admitted pursuant to MRE 404b was not a part of the charged conduct in the case. (11/9/17, 137-138, 145). Throughout the trial, Perrone cross-examined witnesses and attempted to elicit testimony consistent with Defendant's theory of the case. Throughout trial, Defendant was represented by both of his attorneys—Perrone, and Eric Schroeder.

Finally, even if these alleged errors were so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment," Defendant cannot establish prejudice. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. This is a burden Defendant cannot meet. The jury heard overwhelming evidence of Defendant's guilt from Melke, White, and other witnesses who experienced Defendant's stalking behavior first-hand. The jury heard from three witnesses, Close, Allen, and Officer Mobley, all of whom described how Defendant solicited them to murder Melke. The jury watched a video of Defendant soliciting Officer Mobley. Also of note is the fact that during his entrapment hearing and his previous stalking plea, Defendant admitted to nearly every component of the evidence against him. Therefore, Defendant cannot establish that but for counsel's errors, the result of the proceeding would have been different. Defendant did not receive ineffective assistance of counsel.

RECEIVED by MCOA 2/10/2020 3:14:13 PM

**IV. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S ENTRAPMENT MOTION, ADMITTING EVIDENCE OF DEFENDANT'S STATEMENTS, ADMITTING MRE 404(B) EVIDENCE, AND ALLOWING A JUROR WHO COMMENTED ON DEFENDANT'S RACE TO REMAIN ON THE JURY UNTIL THE CLOSE OF PROOFS.**

**Defendant's Arguments**

**1.  Entrapment**

Defendant argues the trial court erred by denying his entrapment motion (Defendant's Argument 5) because while he was in jail, he was withdrawing from alcohol and drugs, he was vulnerable due to his placement in segregation, he had "mental health issues," and he was generally naive regarding jail. Defendant also argues that his motion should have been granted based on "the use of jailhouse snitches looking for favorable treatment."

**2.  Defendant's Statements**

Defendant argues the trial court erred by admitting recordings of Defendant's statements because they were obtained in violation of his Fifth Amendment rights and his Sixth Amendment right to counsel. (Defendant's Argument 6).

**3.  Juror**

Defendant argues that the trial court erred because it did not immediately excuse one of the jury members who claimed he may potentially have a bias against Defendant if Defendant was of Turkish descent. Defendant argues that allowing the jury member to remain on the jury until the end of closing arguments allowed the juror's bias to taint the jury against him in violation of Defendant's rights. (Defendant's Argument 7).

RECEIVED by MCOA 2/10/2020 3:14:13 PM

23

#### 4. MRE 404(b)

Defendant argues that the trial court erred by admitting the proposed MRE 404(b) evidence. (Defendant's Argument 11). Defendant also argues that the trial court should not have granted the People's motion for reconsideration as to MRE 404(b) evidence of Defendant's attempts to buy a firearm. (Defendant's Argument 8).

### Issue Preservation

#### 1. Entrapment

Defendant filed a motion alleging that Defendant was entrapped. This argument is preserved for appellate review.

#### 2. Defendant's Statements

Defendant did not object to the admission of his statements on the basis of the Fifth or Sixth Amendment. This argument is not preserved.

#### 3. Juror

Though Defendant requested that the trial court voir dire the juror, Defendant did not object to the trial court's proposal to excuse the juror at the close of proofs. This argument is not preserved.

#### 4. MRE 404(b)

Defendant objected to the admission of the other acts evidence at both the hearing to admit the motion and his trial, therefore, this issue would be preserved for appellate review.

RECEIVED by MCOA 2/10/2020 3:14:13 PM

RECEIVED by MCOA 2/10/2020 3:14:13 PM

## Standard of Review

**1. Entrapment**

Whether entrapment occurred is determined by considering the facts of each case and is a question of law for this Court to decide de novo. The trial court must make specific findings regarding entrapment, and this Court reviews its findings under the clearly erroneous standard. The findings are clearly erroneous if this Court is left with a firm conviction that a mistake was made. [*People v Fyda,* 288 Mich App 446, 456 (2010) (citations omitted).]

**2. Defendant's Statements and MRE 404(b)**

This Court reviews a trial court's decision regarding whether to admit evidence for an abuse of discretion. *People v Lukity*, 460 Mich 484, 488 (1999). An abuse of discretion occurs "when the trial court chooses an outcome falling outside [the] principled range of outcomes." *People v Babcock*, 469 Mich 247, 269 (2003). When the decision whether to admit evidence involves a preliminary question of law, e.g. whether a rule of evidence or statute precludes admission of the evidence, this Court reviews the issue de novo. *Lukity*, supra at 488. "[I]t is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *People v Bynum*, 496 Mich 610, 623 (2014).

**3. Juror**

"[A] trial court's decision to remove a juror will be reversed only when there has been a clear abuse of discretion. *People v Dry Land Marina, Inc.,* 175 Mich App 322, 325 (1989). An abuse of discretion will be found only when an unprejudiced person, considering the facts on which the trial court acted, would conclude that there was no justification or excuse for the ruling made. *People v Ullah,* 216 Mich

App. 669, 673 (1996)." *People v Tate*, 244 Mich App 553, 559 (2001)(parallel citations removed).

**People's Argument**

### 1. Entrapment

This argument was thoroughly addressed by the People in their Brief on Appeal. The People incorporate their argument from Question Presented IV in the People's Brief on Appeal in response to this argument.

### 2. Defendant's Statements

Just as trial counsel was not ineffective for failing to object to the admission of Defendant's statements on the basis of the Fifth and Sixth Amendments, the trial court did not abuse its discretion by admitting these statements. Defendant was not subjected to custodial interrogation and his voluntary conversations with those he came into contact with in the Ingham County Jail are not "critical" proceedings for purposes of the Sixth Amendment.

Defendant argues that his Fifth Amendment rights were violated because he was tricked into making incriminating statements to inmates and an undercover police officer without being made aware of his *Miranda* rights first. Defendant argues that because of this alleged failure, any and all statements he made to Reginald Close, Charles Allen, and Officer Mobley, as well as all statements he made at the evidentiary hearing on October 20, 2017 must be suppressed because these statements were allegedly obtained in violation of his rights.

Defendant's claims that his statements should be suppressed because he was not advised of his *Miranda* rights are baseless and incorrect and there was no need

RECEIVED by MCOA 2/10/2020 3:14:13 PM

to advise Defendant of his *Miranda* rights since he was never subjected to a custodial interrogation. Defendant could have ended his phone call with Officer Mobley at any time, and Defendant was not being questioned or interrogated, he was voluntarily talking to someone he believed was a hit man to set up a murder for hire. Therefore, as Defendant was not the subject of a custodial interrogation when he spoke to Officer Mobley, there was no need to advise him of his *Miranda* rights.[2]

Defendant claims that his statements to Close and Allen should also be suppressed because they were in violation of his *Miranda* rights. Defendant claims that they were acting as "agents" of the police. However neither Close nor Allen were acting as agents of the police in this case as the majority of their discussions with Defendant regarding the solicitations took place before the police got involved, only one of the two men stated that he came forwards initially in hopes of getting a reduced sentence, and because neither of the men actually received any kind of special treatment in return for the information on Defendant. Since neither of the men were acting as agents of the police, they were not required to advise Defendant of his *Miranda* rights. Additionally, none of the statements that Defendant made to either Close or Allen were involuntary, and there is no indication that Defendant was unable to terminate his conversations with Close and Allen. Defendant was not subjected to a "custodial interrogation" by either of the men for the purposes of *Miranda*.

---

[2] Furthermore, it would make no sense from a policy standpoint to require undercover officers to read suspects their *Miranda* rights anytime they spoke as it would completely defeat the purpose of being "undercover."

RECEIVED by MCOA 2/10/2020 3:14:13 PM

For all of these reasons, Defendant's Fifth and Sixth Amendment rights were not violated and the trial court did not abuse its discretion by admitting Defendant's statements.

### 3. Juror

The trial court did not abuse its discretion by excusing the juror who expressed they may have a bias if Defendant is Turkish. The trial court excused this juror before deliberations began, so it is not possible that the juror's perspective or bias influenced the jury. Defendant argues speculatively that it did, but there is no evidence to support this.

> In order to establish that the extrinsic influence was error requiring reversal, the defendant must initially prove two points. First, the defendant must prove that the jury was exposed to extraneous influences. Second, the defendant must establish that these extraneous influences created a real and substantial possibility that they could have affected the jury's verdict. Generally, in proving this second point, the defendant will demonstrate that the extraneous influence is substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict. [*People v Budzyn*, 456 Mich 77, 88–89 (1997)(internal citations and footnotes removed).]

Here, Defendant's claim fails at each step. Defendant first cannot establish that the jury was exposed to the excused juror's bias. Second, even if they were, Defendant cannot establish a real and substantial possibility that it could have affected the jury's verdict. This is akin to claiming that if a person shares their opinion on something with another person, that person would then adopt the opinion as their own. This is not reasonable. Even if we were to assume that the juror told someone else on the jury about their bias, it would not be reasonable to

RECEIVED by MCOA 2/10/2020 3:14:13 PM

claim the bias would be adopted by anyone who heard about it. Finally, the alleged bias is not related to a material aspect of the case, and there is no direct connection between the excused juror's bias and the verdict. This is because the juror who expressed a bias did not even participate in deliberations. For all of these reasons, the trial court did not abuse its discretion by excusing the juror before deliberations began.

**4. Admission of MRE 404(B) Evidence and motion for reconsideration of MRE 404(b) evidence.**

Defendant's argument as to the initial MRE 404(b) decision was thoroughly addressed in the People's Brief on Appeal in Question Presented I and the associated argument. The People incorporate that component of their brief on appeal by reference.

Defendant raises a related argument in his assertion that the trial court abused its discretion by considering his testimony at his entrapment hearing to reconsider its ruling regarding Defendant's attempts to buy a gun. Defendant argues that this amounts to using his statements from his entrapment hearing substantively at his trial. However, Defendant's testimony at his entrapment hearing was not used substantively at his trial. His testimony merely caused the trial court to appropriately reconsider its MRE 404b ruling as to Defendant's attempts to buy a gun. Defendant points to *People v. D'Angelo*, 401 Mich 167, 178 (1977) in support of his argument. In *D'Angelo*, the Supreme Court of Michigan stated that:

> When the defendant raises the issue of entrapment, whether before or during trial, the appropriate procedure will require the trial court to conduct an evidentiary hearing in the jury's absence . . . Any testimony

RECEIVED by MCOA 2/10/2020 3:14:13 PM

the defendant gives at the entrapment hearing, including his possible admission of the crime charged or some aspect of it, will not be admissible against him in the case in chief for substantive purposes as an admission, but should the defendant give testimony before the jury in the case in chief on a material matter inconsistent with his entrapment hearing testimony, the prior inconsistent testimony may be admitted in the court's discretion to impeach his credibility. *D'Angelo*, 401 Mich at 177-78.

*D'Angelo* does not address what happened at Defendant's trial because Defendant's statements were not used against him. In all other respects the trial court's ruling as to the admissibility of evidence pursuant to MRE 404(b) was appropriate. The People thoroughly addressed the trial court's ruling in Question Presented I of the People's Brief on Appeal. The People incorporate their argument from Question Presented I by reference.

### V. THE TRIAL COURT DID NOT ERR BY SCORING OV 4, 6, AND 10, AND BY ORDERING RESTITUTION, COSTS AND FINES IN BOTH OF DEFENDANT'S FILES.

### Defendant's Arguments

#### 1. OV 4 and OV 10

Defendant argues that OV 4 and OV 10 were improperly scored in that the facts did not support scoring them and because the jury did not find Defendant guilty of causing psychological injury or predatory conduct. (Defendant's Argument 13)

#### 2. OV6

Defendant argues that OV 6 was improperly scored because he did not intend to kill Melke and the jury was not instructed regarding the varying degrees of murder that one could solicit. (Defendant's Argument 9). Defendant argues that scoring OV 6 was a cruel and unusual punishment, but does not elaborate on this argument.

RECEIVED by MCOA 2/10/2020 3:14:13 PM

### 3. Restitution

Defendant argues that he was improperly ordered to pay restitution for uncharged conduct.

### 4. Fines and Costs

Defendant argues that he should not have been assessed fines and costs in each of his cases because16-1064-FH and 16-1065-FC were joined for trial.

## Issue Preservation

### 1. OV 4 and OV 10

The trial court heard from the prosecutor regarding OV 4 and OV 10, but Defendant did not object to the scoring of OV 4 or OV 10.

### 2. OV 6

Defendant's counsel objected to the scoring of OV 6 at 50 points at Defendant's sentencing hearing. (1/24/18, 9). The argument that OV 6 should not have been scored is preserved. The argument that scoring OV 6 is a cruel and unusual punishment is not preserved.

### 3. Restitution, Fines, and Costs

Defendant did not object to restitution, court costs, or fees at sentencing. These arguments are not preserved. To preserve a challenge regarding a trial court's imposition of court costs, a defendant must object when the trial court orders him to pay the contested court costs. *People v Johnson*, 315 Mich App 163, 197(2016).

RECEIVED by MCOA 2/10/2020 3:14:13 PM

## Standard of Review

### 1. OV 4 OV 6, and OV 10

To preserve a challenge to the guidelines scoring, the defendant must raise the issue at sentencing, in a motion for resentencing, or in a proper motion to remand. *People v Kimble*, 470 Mich 305, 309 (2004). Unpreserved scoring errors are reviewable on appeal if the error has resulted in a sentence that is outside the appropriate guidelines range. *Id.* at 310-311. This Court reviews unpreserved scoring challenges for plain error that affected the defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764 (1999). However, if the Defendant advises the sentencing court that he or she agrees with the guidelines as scored, any claim of error is waived for appellate review. *People v Loper*, 299 Mich App 451, 472 (2013).

"Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *People v Hardy*, 494 Mich 430, 438 (2013).

### 2. Restitution

The trial court's decision regarding the amount of restitution ordered is reviewed for an abuse of discretion. *People v Cross,* 281 Mich App 737, 739 (2008).

RECEIVED by MCOA 2/10/2020 3:14:13 PM

### 3. Fines and Costs

This Court reviews unpreserved issues regarding the trial court's decision to order a defendant to pay court costs for plain error affecting substantial rights. *Id.*, citing *People v Carines*, 460 Mich 750, 763 (1999). To avoid forfeiture under the plain-error standard, the defendant must satisfy three elements: "1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Carines*, 460 Mich at 763. Generally, the third element requires the defendant to demonstrate prejudice, "i.e., that the error affected the outcome of the lower court proceedings." *Id.* Even if the defendant has demonstrated all three elements, reversal is appropriate "only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* at 763-764 (citation and quotation marks omitted).

### People's Argument

### 1. OV 4 and OV 10

Offense Variable 4 is scored at 10 points when "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.34. The trial court heard evidence that after Defendant and Melke broke up, Melke was "anxious, scared, and upset" any time she was asked about Defendant (11/2/17, p 161); Melke felt she needed to break up with Stan White because she did not want to "put him and his family in danger" due to Defendant's escalating harassments (11/3/17, p 30);

RECEIVED by MCOA 2/10/2020 3:14:13 PM

Melke felt she was being watched and needed to seclude herself from others much more than she should. (1/24/18, p 15). Based on this, the trial court correctly concluded that Melke suffered serious psychological injury requiring medical treatment.

"Offense variable 10 is exploitation of a vulnerable victim." MCL 777.40. Offense Variable 10 is scored at 15 points when predatory conduct was involved. "Vulnerability" means the readily apparent susceptibility of a victim to injury, physical restraint, persuasion, or temptation. *Id*. "Predatory conduct" means pre offense conduct directed at a victim, or a law enforcement officer posing as a potential victim, for the primary purpose of victimization. *Id*. The trial court specifically addressed whether Defendant's conduct was predatory. In concluding that OV 10 was properly scored, Defendant considered the totality of Defendant's stalking behavior toward Melke. This included his prior convictions for home invasion and aggravated stalking. (1/24/18, 10). The trial court also addressed Defendant's action of drawing a map with Melke's personal information on it and providing that map to inmates at the Ingham County Jail so that they could murder her. (1/24/18, 10-13). The testimony from Melke, White, Melke's friends, the police, Close, and Allen established Defendant's constant and escalating harassment and stalking of Melke. Defendant's prior domestic relationship and intimate knowledge of Melke made her vulnerable to injury and harassment by Defendant, and Defendant's action of persistently soliciting Melke's murder was predatory. OV 10 was appropriately scored at 15 points.

## 2. OV 6

Offense Variable 6 is scored when the sentencing offense is solicitation to commit homicide. MCL 777.22(1). OV 6 is scored at 50 points if:

The offender had premeditated intent to kill or the killing was committed while committing or attempting to commit arson, criminal sexual conduct in the first or third degree, child abuse in the first degree, a major controlled substance offense, robbery, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, or kidnapping or the killing was the murder of a peace officer or a corrections officer. MCL 777.36.

Here, Defendant solicited three different people to murder Melke. Defendant was specific regarding what he wanted to have happen, and made it clear that he wanted her to die a violent death. The trial court correctly found that Defendant had the premeditated intent to kill when he solicited Melke's murder on three occasions. (1/24/18, 12-14).

## 3. Restitution

Defendant waived the right to challenge the amount of restitution ordered when he failed to object to the amount of restitution. *People v Grant*, 455 Mich 221; 224 (1997). If Defendant's waiver is overlooked, Defendant is not entitled to a reduction in the restitution he currently owes because he cannot establish plain error.

Defendant argues that his court order to pay $2273.00 in restitution was improper because it was based on "uncharged conduct" Defendant claims that the acts of property damage done to Melke and Stan White's vehicles should not be

RECEIVED by MCOA 2/10/2020 3:14:13 PM

attributed to him and he should not be ordered to pay restitution because, though he was the primary suspect, he was never charged or convicted of these crimes. However, what Defendant fails to mention is that three separate witnesses testified at the trial that Defendant was the most likely person who could have perpetrated the acts of property damage. When asked about the property damage, Defendant did not deny it. Close testified that Defendant told him he was the one who damaged to Melke and Stan White's vehicles. (10/20/17, 43; 11/2/17, 183; 11/3/17, 51, 140). The trial court did not abuse its discretion by ordering restitution because these acts were part of Defendant's course of conduct in stalking Melke. As such, these acts of property damage are part of the "conduct which gives rise to the conviction."

### 4. Fines and Costs

MCL 769.1k(1)(b)(*iii* ) states:

> Until October 17, 2020, any cost reasonably related to the actual costs incurred by the trial court without separately calculating those costs involved in the particular case, including, but not limited to, the following:
> (A) Salaries and benefits for relevant court personnel.
> (B) Goods and services necessary for the operation of the court.
> (C) Necessary expenses for the operation and maintenance of court buildings and facilities.

Courts are not required to separately calculate the costs incurred for each trial, but a trial court must "establish a factual basis" for the costs imposed pursuant MCL 769.1k(1)(b)(*iii* ). *People v Konopka*, 309 Mich App 354, 359 (2015).

Defendant does not argue that the court was not authorized to impose costs or that the costs imposed were not authorized by statute. Instead, he argues that costs should not have been imposed in each of his files. Defendant has failed to present any

RECEIVED by MCOA 2/10/2020 3:14:13 PM

statutes, case law, or other legal basis in support of this claim and only provides a definition of the legislative intent behind imposing costs on a defendant. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis of his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly,* 231 Mich App 627, 640-641 (1998).

It should however be noted that Defendant was not ordered to pay restitution twice. The judgment of sentence for file 16-1065-FC states that restitution is ordered in the amount of $2,273, and the judgment of sentence for file 16-1064-FH states that no restitution was ordered.

### RELIEF REQUESTED

WHEREFORE, the People respectfully request that this court affirm Defendant's convictions and sentence.

Respectfully submitted,

CAROL A. SIEMON
INGHAM COUNTY PROSECUTOR

Dated: February 10, 2020

/s/ Kahla D. Crino
Kahla D. Crino (P71012)
Appellate Division Chief

RECEIVED by MCOA 2/10/2020 3:14:13 PM

**CERTIFICATE OF SERVICE**

On February 10, 2020, I served a copy of the People's Response to Defendant's Standard 4 Brief on Defendant by first-class mail addressed to:

Tunc Uraz
MDOC #114653
Alger Correctional Facility
N6141 Industrial Park Drive
Munising, MI 49862

I declare that the statements above are true to the best of my knowledge, information, and belief.

/s/ Kahla D. Crino
Kahla D. Crino

RECEIVED by MCOA 2/10/2020 3:14:13 PM

CHRISTOPHER M. MURRAY
CHIEF JUDGE
JANE M. BECKERING
CHIEF JUDGE PRO TEM
DAVID H. SAWYER
MARK J. CAVANAGH
KATHLEEN JANSEN
JANE E. MARKEY
PATRICK M. METER
KIRSTEN FRANK KELLY
KAREN FORT HOOD
STEPHEN L. BORRELLO
DEBORAH A. SERVITTO
ELIZABETH L. GLEICHER
CYNTHIA DIANE STEPHENS



MICHAEL J. KELLY
DOUGLAS B. SHAPIRO
AMY RONAYNE KRAUSE
MARK T. BOONSTRA
MICHAEL J. RIORDAN
MICHAEL F. GADOLA
COLLEEN A. O'BRIEN
BROCK A. SWARTZLE
THOMAS C. CAMERON
JONATHAN TUKEL
ANICA LETICA
JAMES ROBERT REDFORD
JUDGES

JEROME W. ZIMMER JR.
CHIEF CLERK

## State of Michigan
## Court of Appeals
### Lansing Office

February 11, 2020

Kahla D. Crino
303 W. Kalamazoo Street
Lansing, MI 48933

Re:  **People of MI v Tunc Uraz**
Court of Appeals No.  **343695; 343696**
Lower Court No.  **16-001064-FH; 16-001065-FC**

Dear Kahla Crino:

The appellee's response to defendant's standard-4 supplemental brief that you submitted in this matter is defective for the following reason(s):

MCR 7.212(C)(3), through MCR 7.212(D)(1), requires inclusion of an *index of authorities* with the page numbers of where the citations appear in the brief.  Your brief does not contain an index of authorities.

Within 14 days of the date of this letter, please file the additional copies of an amended brief which cures the defect(s) above.  If you choose to e-file, only a single copy of the *affected document* is required.  You must also supply this Court with a proof of service showing that you sent a copy of the document(s) to opposing counsel.  *Failure to correct the specified defect(s) within the time provided will result in the brief being stricken.*

**NOTE:**  Unless otherwise specified above, the defect(s) in the appellee brief do not have any effect on the due date of reply brief.

If you have any questions about this matter, please contact the Lansing Clerk's Office.

Very truly yours,

Gary L. Chambon Jr.
District Clerk

By: _____
Morgan Adams

GLC/MA

cc:  Susan K. Walsh

DETROIT OFFICE
CADILLAC PLACE
3020 W. GRAND BLVD. SUITE 14-300
DETROIT, MICHIGAN  48202-6020
(313) 972-5678

TROY OFFICE
COLUMBIA CENTER
201 W. BIG BEAVER RD. SUITE 800
TROY, MICHIGAN  48084-4127
(248) 524-8700

GRAND RAPIDS OFFICE
STATE OF MICHIGAN OFFICE BUILDING
350 OTTAWA, N.W.
GRAND RAPIDS, MICHIGAN  49503-2349
(616) 456-1167

LANSING OFFICE
925 W. OTTAWA ST.
P.O. BOX 30022
LANSING, MICHIGAN  48909-7522
(517) 373-0786

COURT OF APPEALS WEB SITE ~ http://courts.mi.gov/courts/coa/

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

|  |  |
|---|---|
| | Court of Appeals Nos.  343695 |
| V | 343696 |
| | Circuit Court Nos. 16-1064-FH |
| | 16-1065-FH |

TUNC URAZ,

      Defendant-Appellant.

_____/

**PEOPLE'S RESPONSE TO DEFENDANT'S
STANDARD-4 SUPPLEMENTAL BRIEF
ORAL ARGUMENT NOT REQUESTED**

CAROL A. SIEMON
      INGHAM COUNTY PROSECUTING ATTORNEY

KAHLA D. CRINO
      APPELLATE DIVISION CHIEF

PREPARED BY:
      JAMES HARRIES
      STUDENT INTERN

BUSINESS ADDRESS
      303 W. Kalamazoo Street, 4th Floor
      Lansing, Michigan 48933

RECEIVED by MCOA 2/19/2020 9:03:45 AM

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

COUNTER STATEMENT OF QUESTIONS PRESENTED ................................ v

STATEMENT OF APPELLATE JURISDICTION .................................................. vi

INTRODUCTION .......................................................................................... 1

COUNTER STATEMENT OF FACTS ....................................................... 2

ARGUMENT ............................................................................................... 1

   I. BECAUSE DEFENDANT WAS CONVICTED AT TRIAL BASED ON SUFFICIENT EVIDENCE OF GUILT HE CANNOT RAISE THE ARGUMENT THAT THE DISTRICT COURT'S BIND OVER DECISION WAS ERRONIOUS. ... 1

   II. DEFENDANT DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL MERELY BECAUSE TRIAL COUNSEL WAS A PERSON PREVIOUSLY DIAGNOSED WITH A MENTAL ILLNESS WHO RECEIVED TREATMENT FOR HIS MENTAL ILLNESS AFTER THE CONCLUSION OF DEFENDANT'S TRIAL. ...................................................... 6

   III. TRIAL COUNSEL WAS NOT INEFECTIVE FOR FAILING TO OBJECT TO THE ADMISSION OF DEFENDANT'S STATEMENTS, FAILING TO PRESENT A DIMINISHED CAPACITY DEFENSE, AND FAILING TO CALL CERTAIN WITNESSES. .................................................... 8

   IV. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S ENTRAPMENT MOTION, ADMITTING EVIDENCE OF DEFENDANT'S STATEMENTS, ADMITTING MRE 404(B) EVIDENCE, AND ALLOWING A JUROR WHO COMMENTED ON DEFENDANT'S RACE TO REMAIN ON THE JURY UNTIL THE CLOSE OF PROOFS. ................................................................................... 24

   V. THE TRIAL COURT DID NOT ERR BY SCORING OV 4, 6, AND 10, AND BY ORDERING RESTITUTION, COSTS AND FINES IN BOTH OF DEFENDANT'S FILES. ........................................................................ 32

RELIEF REQUESTED ................................................................................ 39

RECEIVED by MCOA 2/19/2020 9:03:45 AM

# TABLE OF AUTHORITIES

## Cases

*Brewer v Williams*, 430 US 387 (1977) ...................................................... 14

*Harrington v Richter,* 562 US 86; 131 S Ct 770; 178 L Ed 2d 624 (2011).. 10, 11

*Montejo v Louisiana*, 556 US 778; 129 S Ct 2079; 173 LEd2d 955 (2009) ....... 12

*Moore v Illinois*, 434 US 220; 98 S Ct 458; 54 LEd2d 424 (1977) ..................... 12

*People v Babcock*, 469 Mich 247 (2003) ............................................................. 28

*People v Budzyn*, 456 Mich 77 (1997) ................................................................ 32

*People v Burhans*, 166 Mich App 758 (1988) .................................................... 11

*People v Bynum*, 496 Mich 610 (2014) .............................................................. 28

*People v Carbin,* 463 Mich 590 (2001) ............................................................... 10

*People v Carines*, 460 Mich 750 (1999) ................................................. 36, 37, 38

*People v Carpenter*, 464 Mich 223 (2001) ......................................................... 17

*People v Cross,* 281 Mich App 737 (2008) .......................................................... 37

*People v D'Angelo*, 401 Mich 167 (1977) ...................................................... 33, 34

*People v Dendel,* 481 Mich 114 (2008) ............................................................... 10

*People v Fyda,* 288 Mich App 446 (2010) .......................................................... 28

*People v Grant*, 455 Mich 221 (1997) ................................................................ 41

*People v Hall,* 435 Mich 599 (1990) ..................................................................... 2

*People v Hardy*, 494 Mich 430 (2013) ............................................................... 37

*People v Harrington*, 258 Mich App 703 (2003) ........................................... 12, 13

*People v Harris,* 185 Mich App 100 (1990) ................................................... 17, 18

*People v Johnson*, 315 Mich App 163 (2016) ..................................................... 36

*People v Julian,* 171 Mich App 153 (1988) ........................................................ 21

*People v Kammeraad*, 307 Mich App 98 (2014) ................................................ 18

*People v Kelly,* 186 Mich App 524 (1990) ..................................................... 21, 42

*People v Kimble*, 470 Mich 305 (2004) .............................................................. 36

*People v Konopka*, 309 Mich App 354 (2015) ................................................... 42

*People v LeBlanc*, 465 Mich 575 (2002) .......................................................... 6, 7, 8

*People v Lockett,* 295 Mich App 165 (2012) ..................................................... 7, 9

*People v Loper*, 299 Mich App 451 (2013) ......................................................... 37

*People v Lukity*, 460 Mich 484 (1999) ............................................................... 28

*People v McKinley,* 255 Mich App 20 (2003) ...................................................... 1

*People v Nix,* 301 Mich App 195 (2013) ........................................................... 7, 9

*People v Perkins,* 468 Mich 448 (2003) ............................................................... 1

*People v Rockey,* 237 Mich App 74 (1999) ......................................................... 21

*People v Stewart* (On Remand), 219 Mich App 38 (1996) ................................. 11

*People v Tate*, 244 Mich App 553 (2001) ........................................................... 29

*People v Wilson*, 469 Mich 1018 (2004) .............................................................. 1

*People v Yost,* 468 Mich 122 (2003) ..................................................................... 2

*Strickland v Washington,* 466 US 668 (1984) .................................................... 10

RECEIVED by MCOA 2/19/2020 9:03:45 AM

*United States v Wade*, 388 US 218, 228, 87 S Ct 1926, 18 LEd2d 1149 (1967) ............................................................................................................... 12

*Wiggins v Smith,* 539 US 510; 123 S Ct 2527; 156 L Ed 2d 471 (2003)............ 11

Statutes

MCL 330.2020(1) ............................................................................... 17

MCL 768.21a ...................................................................................... 19

MCL 769.1k(1)(b)(*iii*) .................................................................... 41, 42

MCL 777.22(1) .................................................................................... 39

MCL 777.34.......................................................................................... 38

MCL 777.36.......................................................................................... 40

MCL 777.40.......................................................................................... 38

Rules

MCR 6.125(B) ...................................................................................... 17

MRE 404(b) .............................................................................. 23, 27, 33, 34

Constitutional Provisions

Const 1963, art 1, §17......................................................................... 11

Const 1963, art 1, §20......................................................................... 11

US Const, Am V .................................................................................... 11

US Const, Am VI ............................................................................. 11, 12

RECEIVED by MCOA 2/19/2020 9:03:45 AM

## COUNTER STATEMENT OF QUESTIONS PRESENTED

**I.  DEFENDANT WAS CONVICTED AT TRIAL BASED ON SUFFICIENT EVIDENCE OF GUILT. CAN THIS COURT ADDRESS DEFENDANT'S CLAIM THAT THE DISTRICT COURT'S BINDOVER DECISION WAS ERRONIOUS?**

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

**II.  DID DEFENDANT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL MERELY BECAUSE TRIAL COUNSEL WAS A PERSON PREVIOUSLY DIAGNOSED WITH A MENTAL ILLNESS WHO RECEIVED TREATMENT FOR HIS MENTAL ILLNESS AFTER THE CONCLUSION OF DEFENDANT'S TRIAL?**

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

**III.  WAS TRIAL COUNSEL INEFECTIVE FOR FAILING TO OBJECT TO THE ADMISSION OF DEFENDANT'S STATEMENTS, FAILING TO PRESENT A DIMINISHED CAPACITY DEFENSE, AND FAILING TO CALL CERTAIN WITNESSES?**

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

**IV.  DID THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S ENTRAPMENT MOTION, ADMITTING EVIDENCE OF DEFENDANT'S STATEMENTS, ADMITTING MRE 404(B) EVIDENCE, AND ALLOWING A JUROR WHO COMMENTED ON DEFENDANT'S RACE TO REMAIN ON THE JURY UNTIL THE CLOSE OF PROOFS?**

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

**V.  DID THE TRIAL COURT ERR BY SCORING OV 4, 6, AND 10, AND BY ORDERING RESTITUTION, COSTS AND FINES IN BOTH OF DEFENDANT'S FILES?**

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

RECEIVED by MCOA 2/19/2020 9:03:45 AM

## STATEMENT OF APPELLATE JURISDICTION

Defendant may file a supplemental brief in propria persona pursuant to Administrative Order 2004-6, Standard 4. Because Defendant's propria persona brief was received within 84 days of February 22, 2019, this Court has jurisdiction.

RECEIVED by MCOA 2/19/2020 9:03:45 AM

# INTRODUCTION

Defendant filed a Standard 4 Brief raising fourteen different arguments that do not appear to be in any particular order. The People have rearranged and organized these arguments to facilitate both responding and the appellate review of Defendant's arguments. The People's response will address Defendant's fourteen arguments in the following manner:

I.    District court bind over decision (Defendant's Argument 10)
II.   Trial counsel's mental illness (Defendant's Argument 3)
III.  Ineffective assistance of counsel arguments
- Trial counsel should have objected to Defendant's statements on the basis of the Fifth Amendment and Sixth Amendment (Defendant's Argument 1 and 14)
- Trial counsel failed to investigate/present diminished capacity, criminal responsibility, competency (Defendant's Argument 2)
- Trial counsel failed to investigate and call witnesses (Defendant's Argument 4)
IV.  Trial Court abuse of discretion arguments
- The trial court should have granted Defendant's entrapment motion (Defendant's Argument 5)
- The trial court shouldn't have admitted recordings of Defendant's statements because they were obtained in violation of his Fifth and Sixth Amendment right to counsel (Defendant's Argument 6)
- Juror with bias remained until close of proofs (Defendant's Argument 7)
- Admitting MRE 404(b) evidence (Defendant's Argument 11)
- Granting MRE 404(b) motion for reconsideration (Defendant's Argument 8)
V.   Sentencing arguments
- Scoring OV 6 at 50 points was a cruel and unusual punishment and the jury was not instructed on degrees of solicitation (Defendant's Argument 9)
- OV 4 and OV 10 were improperly scored based on facts that were not proven beyond a reasonable doubt (Defendant's Argument 13)
- Restitution, fines, costs and assessments should not have been charged in both files (Defendant's Argument )

RECEIVED by MCOA 2/19/2020 9:03:45 AM

## COUNTER STATEMENT OF FACTS

The People incorporate the counterstatement of facts from their brief on appeal by reference.

RECEIVED by MCOA 2/19/2020 9:03:45 AM

# ARGUMENT

## I. BECAUSE DEFENDANT WAS CONVICTED AT TRIAL BASED ON SUFFICIENT EVIDENCE OF GUILT HE CANNOT RAISE THE ARGUMENT THAT THE DISTRICT COURT'S BIND OVER DECISION WAS ERRONIOUS.

### Defendant's Argument

Defendant argues that the district court should not have bound him over for trial in on a third count of solicitation of murder. (Defendant's Argument 10)

### Issue Preservation

Defendant did not file a motion to quash bind over. This argument is not preserved.

### Standard of Review

The circuit court reviews the district court's decision regarding a motion to bind over for an abuse of discretion. *People v Perkins,* 468 Mich 448, 452 (2003). This Court reviews de novo the circuit court's decision regarding whether the district court abused its discretion. *People v McKinley,* 255 Mich App 20, 25 (2003).

### People's Argument

Because Defendant was convicted based on sufficient evidence of guilt, Defendant cannot challenge the district court's bind over decision. "If a defendant is fairly convicted at trial, no appeal lies regarding whether the evidence at the preliminary examination was sufficient to warrant a bindover." *People v Wilson*, 469 Mich 1018 (2004); *People v Hall,* 435 Mich 599, 601-603 (1990); *People v Yost,* 468 Mich 122, 124 n. 2 (2003).

RECEIVED by MCOA 2/19/2020 9:03:45 AM

Defendant has not raised the argument that he was convicted based on insufficient evidence. Still, the evidence of Defendant's guilt was overwhelming. Defendant persistently stalked Melke and broke into her home. While he was awaiting sentencing, he continued to engage in stalking behavior. While serving his sentence, Defendant began soliciting other inmates to murder Melke. Defendant wanted Melke to die because he believed she had ruined his life, lied to him, and cheated on him. Because of this, Defendant wanted to "get rid of her" (11/3/17, 138) and stated "this bitch got to pay." (11/7/17, 13). Defendant was charged in file 16-1065-FC with three counts of solicitation to murder.

The first person Defendant solicited to murder Melke was Charles Allen. Defendant and Allen were housed together for a period of time in a medical unit. They became friendly and Defendant began to talk to Allen about Melke. Defendant told Allen that he was in jail for stalking Melke. (11/7/17, 10-11). Defendant told Allen that he wanted to get back at Melke, and stated "this bitch got to pay." (11/7/17, 13). Defendant then made numerous, specific solicitations of Allen. Defendant asked Allen to beat Melke with a baseball bat. He stated that he wanted her "fucked up" and that he wanted pictures of it. (11/7/17, 14). Defendant then asked Allen to kill Melke. He specified that he wanted her beaten beyond recognition with a bat and that he wanted it to be recorded so that he could masturbate to it. Defendant also requested Melke's ID. (11/7/17, 20-21). Defendant specified that he wanted Melke's body to be dumped where no one would find her. (11/7/17, 16). Defendant agreed to pay Allen $2,500 in exchange for killing Melke. (11/7/17, 16-18). Defendant told Allen

RECEIVED by MCOA 2/19/2020 9:03:45 AM

where Melke lived, what type of car she drove, and warned him that she has a camera in her house. Defendant also requested a gun so that he could go after the guy Melke "cheated" with. (11/7/17, 21-22). Allen went along with the conversations, but had no intentions of doing anything Defendant asked. (11/7/17, 22).

Allen notified a jail deputy about what Defendant had requested. (11/7/17, 24-25). Allen was interviewed by Detective Matt Krumbach, and during the interview, Allen asked if he could get out of jail. Detective Krumback told Defendant no, but that he could tell Allen's probation officer that Allen was helpful. (11/7/17, 27-28). Allen stated that no one took advantage of Defendant or hurt him while he was in jail. (11/7/17, 39, 68). Allen cooperated with law enforcement for the sake of Melke's life, and because it was the right thing to do. (11/7/17, 28, 69-70).

The second person Defendant solicited to murder Melke was Reginald Close. Close's nickname was "Rough." (11/3/17, 131). Defendant, Allen, and Close were assigned to the medical unit at the same time, and that is where Defendant and Close met. (11/3/17, 134-135). Defendant began talking to Close about Melke within 48 hours of meeting him. (11/3/17, 136-138). Defendant told Close that Melke ruined his life, lied to him, and cheated on him. Defendant told Close that he had stalked her, entered her house, and that it was her fault that he was in jail. (11/3/17, 138). Defendant stated that he was going to get rid of her. (11/3/17, 138). Defendant stated that he had lost his job at MSU because he tried to get a gun from a coworker in order to kill Melke. (11/3/17, 139). Defendant stated that he sliced Melke's tires while she

RECEIVED by MCOA 2/19/2020 9:03:45 AM

was at a Drake concert and that he was able to access her phone through her iCloud. (11/3/17, 140-141).

Defendant asked Close if he knew anyone who could have Melke killed and make it look like a robbery. (11/3/17, 143). By the time this conversation took place, Allen had been moved to another location in the jail. (11/3/17, 143-144). Defendant asked Close if he could help by killing Melke. (11/3/17, 145). Close notified his lawyer after he realized that Defendant was serious about killing Melke. (11/3/17, 145). Close agreed to help Defendant kill Melke. Defendant provided Melke's address, White's address, Melke's Facebook information, a map to Melke's apartment, Melke's car information, and Melke's job information. (11/3/17, 153-156). Defendant agreed to pay $1,000 for Melke's murder. (11/3/17, 147). Defendant made arrangements for his associate, to place some money in Close's jail account. (11/3/17, 157).

Detective Andrew Hogan, interviewed Close. (11/6/17, 106). Close did not receive anything in exchange for his statement or testimony. He was provided with immunity for agreeing to help Defendant kill Melke. (11/3/17, 146, 160-161). Detective Hogan checked Close's jail account, and verified that someone made a deposit $133.59 on October 13, 2016. (11/6/17, 108-109). Detective Hogan obtained a picture of the person who made the deposit. (11/6/17, 109-110). Detective Hogan verified that Defendant never complained of threats, assaults, or promises from other inmates. (11/6/17, 110-111).

The third person Defendant solicited to murder Melke was Officer Frank Mobley. Officer Mobley made contact with Defendant in an undercover capacity and

RECEIVED by MCOA 2/19/2020 9:03:45 AM

pretended to be a "hit man." (11/6/17, 117). He was provided with basic information regarding Defendant's previous solicitations, and was pretending that he was Close's friend from Detroit. (11/6/17, 117-119). Officer Mobley called Defendant for the first time on October 18, 2016, using a video chat option for jail calls. The call was not successful. (11/6/17, 121). Officer Mobley called again on October 24, 2016. Defendant answered, and the entire call was recorded. (11/6/17, 121). Officer Mobley told Defendant that "Rough" had told him that Defendant needed someone to "take out the trash." (11/6/17, 123). Throughout the call, Officer Mobley referred to Melke as the "trash," however, he made it clear that this was code for Melke, the person Defendant wanted to have killed. They discussed whether Defendant wanted Officer Mobley to "beat" the trash, whether he should "spill" the trash all over the house, whether he should beat the trash with a bat, whether he would want the scene to be cleaned up afterward, what color hair the trash had. Defendant stated that he wanted it done quickly, throw it out clean. (11/6/17, 123-127). They discussed the address where the trash would be, and Defendant stated that Rough would have that information because he had written it all down. (11/6/17, 126-127). Defendant stated that he was certain that he wanted it done. They discussed how completion would be verified, and that Defendant would pay Officer Mobley $2,000 for the first "bag" and $500 for any others. Defendant specified that he wanted the "trash" taken care of before November 2, which was his sentencing date.

RECEIVED by MCOA 2/19/2020 9:03:45 AM

Based on all of this, there was sufficient evidence to convict Defendant of three counts of solicitation to commit murder, and Defendant cannot challenge the district court's bind over decision on appeal.

## II. DEFENDANT DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL MERELY BECAUSE TRIAL COUNSEL WAS A PERSON PREVIOUSLY DIAGNOSED WITH A MENTAL ILLNESS WHO RECEIVED TREATMENT FOR HIS MENTAL ILLNESS AFTER THE CONCLUSION OF DEFENDANT'S TRIAL.

### Defendant's Argument

Defendant argues that one of his attorneys, Perrone, had a mental breakdown during trial and provided ineffective assistance of counsel by: 1) failing to impeach witnesses with prior theft convictions, 2) giving an inadequate closing argument, 3) sending a particular email to Defendant's sister during the trial, and 4) an alleged delay between questions while cross examining a witness. (Defendant's Argument 3)

### Issue Preservation

Defendant did not move for a new trial in the trial court. In fact, after his conviction, he continued to request and receive Perrone's assistance. This argument is not preserved.

### Standard of Review

Whether a defendant has been denied effective assistance of counsel is a mixed question of law and fact. *People v LeBlanc*, 465 Mich 575, 579 (2002). "A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *Id.* The trial

RECEIVED by MCOA 2/19/2020 9:03:45 AM

court's findings of fact are reviewed for clear error.  *Id.*  Issues of law are reviewed de novo.  *Id.*

Defendant did not preserve this claim by moving for the new trial in the trial court.  *People v Nix,* 301 Mich App 195, 207 (2013).  "Unpreserved issues concerning ineffective assistance of counsel are reviewed for errors apparent on the record." *People v Lockett,* 295 Mich App 165, 186 (2012).

## People's Argument

This argument was thoroughly addressed by the People in their Brief on Appeal. The People incorporate their Argument V from their Brief on Appeal by reference.

RECEIVED by MCOA 2/19/2020 9:03:45 AM

### III. TRIAL COUNSEL WAS NOT INEFECTIVE FOR FAILING TO OBJECT TO THE ADMISSION OF DEFENDANT'S STATEMENTS, FAILING TO PRESENT A DIMINISHED CAPACITY DEFENSE, AND FAILING TO CALL CERTAIN WITNESSES.

#### Defendant's Argument

Defendant argues that trial counsel was ineffective for the following reasons:

1) trial counsel should have objected to the admission of Defendant's statements on the basis of the Fifth Amendment and Sixth Amendment (Defendant's Argument 1 and 14);

2) Trial counsel failed to investigate/present diminished capacity, criminal responsibility, competency (Defendant's Argument 2); and

3) Trial counsel failed to investigate and call witnesses. (Defendant's Argument 4)

#### Issue Preservation

Defendant did not move for a new trial in the trial court. After his conviction, he continued to request and receive Perrone's assistance. This argument is not preserved.

#### Standard of Review

Whether a defendant has been denied effective assistance of counsel is a mixed question of law and fact. *People v LeBlanc*, 465 Mich 575, 579 (2002). "A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *Id.*. The trial court's findings of fact are reviewed for clear error. *Id.* Issues of law are reviewed de novo. *Id.*

Defendant did not preserve this claim by moving for the new trial in the trial court. *People v Nix,* 301 Mich App 195, 207 (2013). "Unpreserved issues concerning

RECEIVED by MCOA 2/19/2020 9:03:45 AM

ineffective assistance of counsel are reviewed for errors apparent on the record."
*People v Lockett,* 295 Mich App 165, 186 (2012).

### People's Argument

Trial counsel was not ineffective for failing to object to the admission of Defendant's statements on the basis of the Fifth or Sixth Amendment because Defendant was not subjected to custodial interrogation and his jailhouse conversations were not critical stages of the proceedings. Trial counsel was not ineffective for failing to investigate and pursue a diminished capacity defense because that defense is not legally available. Trial counsel was not ineffective for failing to pursue competency and criminal responsibility because there is no credible evidence that Defendant was incompetent or not criminally responsible. Finally, trial counsel was not ineffective for failing to call the witnesses suggested by Defendant on appeal because their absence did not deny Defendant a substantial defense.

> A defendant seeking a new trial on the ground that trial counsel was ineffective bears a heavy burden. To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy the two-part test articulated by the United States Supreme Court in *Strickland v Washington,* 466 U S 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). See *People v Pickens,* 446 Mich 298, 302-303; 521 NW2d 797 (1994). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment." *Strickland,* supra at 687. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *Id.* at 690. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because the defendant bears the burden of demonstrating

RECEIVED by MCOA 2/19/2020 9:03:45 AM

both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. [*People v Dendel,* 481 Mich 114, 124-125 (2008), quoting *People v Carbin,* 463 Mich 590, 599-600 (2001).]

"The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v Richter,* 562 US 86; 131 S Ct 770, 788; 178 L Ed 2d 624 (2011), quoting *Strickland v Washington,* 466 US 668, 690 (1984). "Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Harrington, supra* at 789, quoting *Strickland, supra* at 689. "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington, supra* at 789. "There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Harrington, supra* at 790, quoting *Wiggins v Smith,* 539 US 510, 525; 123 S Ct 2527; 156 L Ed 2d 471 (2003). Counsel's performance must be viewed from an objective standard, not from "counsel's subjective state of mind." *Harrington, supra* at 790. "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Id. at* 791. "The fact that defense counsel's strategy may not have worked does not constitute ineffective assistance of counsel." *People v Stewart* (On Remand), 219 Mich App 38, 42 (1996).

RECEIVED by MCOA 2/19/2020 9:03:45 AM

**Trial counsel was not ineffective for failing to object to the admission of Defendant's statements on the basis of the Fifth and Sixth Amendment because Defendant was not subjected to custodial interrogation and his jailhouse conversations were not critical stages of the proceedings.**

The right to counsel is guaranteed under both the Fifth and Sixth Amendments of the United States Constitution and Michigan's Constitution. US Const, Am V, Am VI; Const 1963, art 1, §17, Const 1963, art 1, §20.  This right to counsel "extends to all 'critical' stages of the proceedings where counsel's absence might harm defendant's right to a fair trial." *People v Burhans*, 166 Mich App 758, 764 (1988), citing *United States v Wade*, 388 US 218, 228, 87 S Ct 1926, 18 LEd2d 1149 (1967).  The Sixth Amendment right to counsel attaches once criminal proceedings have been initiated. *Moore v Illinois*, 434 US 220, 231; 98 S Ct 458; 54 LEd2d 424 (1977).  "The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." *People v Harrington*, 258 Mich App 703, 706 (2003), quoting US Const, Am VI.  The Sixth Amendment affords an accused the right to rely on counsel as an intermediary between him and the state. *Harrington*, *supra* at 706.

Once the Sixth Amendment right to counsel has attached, it may still be waived.  *Montejo v Louisiana*, 556 US 778, 786–787; 129 S Ct 2079; 173 LEd2d 955 (2009).

Once the Sixth Amendment right to counsel has attached, it may still be waived.  *Montejo v Louisiana*, 556 US 778, 786–787; 129 S Ct 2079; 173 LEd2d 955 (2009). "When a defendant invokes the Sixth Amendment right to counsel, any subsequent waiver of this right in a *police-initiated custodial interview* is ineffective

RECEIVED by MCOA 2/19/2020 9:03:45 AM

with respect to the charges filed against the defendant. An exception to this rule exists where the defendant initiates the contact and makes a valid waiver of his rights." *People v Harrington*, 258 Mich App 703, 706 (2003).

Close and Allen are not police officers or agents of the police. The conversations Defendant chose to have with Close and Allen cannot be characterized as custodial interrogations, but rather, conversations Defendant wanted to have because he had decided to have Melke killed. Thus it was not necessary for the jail inmates or the officer posing as a hit man to advise Defendant of his Miranda rights. The Sixth Amendment right to counsel extends to "critical" stages of Defendant's proceedings. As such, Defendant was not entitled to have counsel present with him in custody for every voluntary conversation that he chose to have with another inmate. The time Defendant spent in custody cannot be characterized as a "critical" stage for purposes of the Sixth Amendment right to counsel. The same is true for Defendant's phone call with Officer Mobley while Officer Mobley pretended to be a hit man. Defendant sought a conversation with Officer Mobley because he believed that he was a hit man. During that conversation, he believed that Officer Mobley was a friend of Close's whom Close had put Defendant in contact with for the purpose of having Melke killed. This is a conversation Defendant voluntarily participated in, it cannot be characterized as custodial interrogation or a critical phase of proceedings. Voluntary conversations with inmates are not custodial interrogations for purposes of Miranda warnings and Defendant's Fifth Amendment rights and they are not critical phases of proceedings for purposes of the Sixth Amendment right to counsel.

RECEIVED by MCOA 2/19/2020 9:03:45 AM

Defendant argues his rights were violated because the police officers and their "agents" made statements that were deliberately intended to elicit incriminating evidence from him in violation of his Sixth Amendment right to counsel. In support, Defendant points to *Brewer v Williams*, 430 US 387, 401 (1977). However, *Brewer* is distinguishable. The defendant in *Brewer* was transported by police to Des Moines and the police had agreed with the defendant's counsel not to interrogate the defendant during the trip. *Id.* at 387. One of the officers asked a question that seemed deliberately intended to elicit an incriminating statement from the defendant. The Supreme Court in *Brewer* held that the question and the answer that resulted were a violation of the defendant's rights. In the instant case however, Defendant's counsel had no such agreement with the police and Defendant was not subjected to custodial interrogation.

Defendant also argues that this "deliberate elicitation of incriminating statements" standard from *Brewer* should also apply to the statements he made to Close and Allen because they were part a plot to trick Defendant and because they acted as agents of the police when they discussed the murder plot with Defendant. Defendant claims these men were agents of the police because their motive for telling the police about Defendant was to lessen their own penalties. However, only one of the two men stated that his initial intent in coming forwards was to potentially receive a lower sentence. Additionally, neither Close nor Allen received any kind of benefit for giving the information to the police. (10/20/17, 93-94). Defendant also

RECEIVED by MCOA 2/19/2020 9:03:45 AM

claims that the two men were agents because they initiated contact with the Defendant and aided in planning and gathering more information about Defendant.

However, evidence on the record indicates that Defendant was the one who approached both men regarding the murder plot and, while Allen did approach Defendant first, it was only to ask why Defendant was in jail. Additionally, the police only became involved after they received reports from Close and Allen stating that Defendant had approached them and solicited them to murder Melke—meaning that Close and Allen could not have been acting as "agents of the police" as Defendant claims when he made these incriminating statements to Close and Allen. Defendant also argues that an agency relationship can be implied between the police and Close and Allen because the two men admitted to "deliberately eliciting incriminating information while acting as confidants of the Defendant. First, that would only be of concern if the two men were already agents, and second, Close and Allen testified they "played along" with Defendant when he was asking if they knew anyone who could murder Melke because they wanted to know how serious he was.[1] Trial counsel was not ineffective for failing to object on the basis of the Fifth or Sixth Amendment.

---

[1] (11/3/17, p 143-144; 11/7/17, p 17-24).

14

RECEIVED by MCOA 2/19/2020 9:03:45 AM

**Trial counsel was not ineffective for failing to investigate and pursue a diminished capacity defense because that defense is not legally available. Trial counsel was not ineffective for failing to pursue competency and criminal responsibility because there is no credible evidence that Defendant was incompetent or not criminally responsible.**

Defendant argues that his trial counsel was ineffective because he failed to present evidence or consult an expert regarding whether Defendant's diminished state of mind that undermined the specific intent required for his solicitation of intent to commit murder charges. Defendant argues that his counsel should have consulted an expert regarding Defendant's state of mind or requested a continuance to have a psychiatric evaluation done because it would allegedly show that Defendant had a diminished state of mind that would have undermined the specific intent requirement.

Defendant's own description of his "diminished state of mind" at a motion regarding the proposed defense of entrapment was:

> Being in jail for the first time in my life. Put into solitary confinement was a surprise the next day. I wasn't expecting that. And it's the loneliness. You start hallucinating. I had high blood pressure, hypertension, manic depressive situations. We got through every little thing that solitary confinement can do to you. Your focus changes. You start thinking over and over and over many times every little detail in your life, what happened then. You start getting frustrated most of the time. I also had experienced – like I would read a book and I would not remember what I read after a while. Then I would read over it again because – the scarcity of items, you beg for a book. I wasn't allowed to buy any commissary for the first month. Of course, no phone calls, whatsoever, you, taken away. (10/20/17, p 13).

Defendant also described being "held for 23 hours" and being in "withdrawal" due to benzoids and alcohol, as well as potentially suffering from depression. (*Id.* at 152-56). Regardless of how Defendant was feeling, trial counsel was not ineffective

RECEIVED by MCOA 2/19/2020 9:03:45 AM

for failing to pursue a diminished capacity defense because diminished capacity was abolished by *People v Carpenter*, 464 Mich 223 (2001).

Defendant asserts that trial counsel was not effective for failing to pursue a competency evaluation. Defendants facing criminal charges are presumed competent to stand trial. MCL 330.2020(1) states:

> A defendant to a criminal charge shall be presumed competent to stand trial. He shall be determined incompetent to stand trial only if he is incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner. The court shall determine the capacity of a defendant to assist in his defense by his ability to perform the tasks reasonably necessary for him to perform in the preparation of his defense and during his trial.

The issue of a defendant's competence to stand trial may be raised at any time during proceedings against the defendant by the court or the parties. MCR 6.125(B) states:

> The issue of the defendant's competence to stand trial or to participate in other criminal proceedings may be raised at any time during the proceedings against the defendant. The issue may be raised by the court before which such proceedings are pending or being held, or by motion of a party….

In *People v Harris,* 185 Mich App 100 (1990), the Court of Appeals stated: "Although the determination of a defendant's competence is within the trial court's discretion, a trial court has the duty of raising the issue of incompetence where facts are brought to its attention which raise a "bona fide doubt" as to the defendant's competence." *Harris*, 185 Mich App at 102.

> "[T]he test for such a bona fide doubt is whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Maxwell v Roe,* 606 F 3d 561, 568 (9th Cir 2010) (citation and quotation marks omitted). Evidence of

RECEIVED by MCOA 2/19/2020 9:03:45 AM

> a defendant's irrational behavior, a defendant's demeanor, and a
> defendant's prior medical record relative to competence are all relevant
> in determining whether further inquiry in regard to competency is
> required. *Drope v Missouri,* 420 US 162, 180, 95 S Ct 896, 43 L Ed 2d
> 103 (1975). "There are, of course, no fixed or immutable signs which
> invariably indicate the need for further inquiry to determine fitness to
> proceed; the question is often a difficult one in which a wide range of
> manifestations and subtle nuances are implicated." *Id.* [*People v
> Kammeraad*, 307 Mich App 98, 138-39 (2014) *app den* 497 Mich 1014
> (2015).]

Here, Defendant displayed no irrational behaviors and there was no indication whatsoever that he may be incompetent. Defendant took the stand at his own entrapment hearing and testified as to why he believed he was entrapped. At Defendant's sentencing, Defendant requested that Perrone continue to assist in his representation. Defendant requested that OV 6 be challenged and provided information about this to his attorney. Defendant argued with the court regarding various facts from his case. On appeal, Defendant has continued to demonstrate his competence by learning that he could file a Standard 4 brief and addressing arguments to this Court.

On appeal, Defendant argues that because he was diagnosed with having depression, anxiety, suicidal thoughts, and chaotic emotions, that he was not competent. Even if we take this assertion as being true, it does not establish that Defendant did not understand the nature and object of the proceedings against him or that he was incapable of assisting in his defense in a rational manner. In fact, the record demonstrates that Defendant assisted with his defense in a rational manner by testifying at a pretrial motion and expressing his opinion at sentencing.

RECEIVED by MCOA 2/19/2020 9:03:45 AM

17

Defendant asserts that trial counsel was ineffective for failing to pursue an evaluation for criminal responsibility. A Defendant is not criminally responsible if at the time of the offense he was legally insane. MCL 768.21a states:

> It is and affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense. An individual is legally insane if, as a result of mental illness as defined in section 400 of the mental health code, 1974 PA 258, MCL 330.1400, or as a result of having an intellectual disability as defined in section 100b of the mental health code, 1974 PA 258, MCL 330.1100b, that person lacks substantial capacity either to appreciate the nature and quality or wrongfulness of his or her conduct or to conform his or her conduct to the requirements of law. Mental illness or otherwise having an intellectual disability does not otherwise constitute a defense of legal insanity.

Again, even if we assume that Defendant was mentally ill, his mental illness, Defendant still had the substantial capacity to appreciate the nature and quality or wrongfulness of his actions and the ability to conform his conduct to the requirements of law. All of Defendant's actions in committing these offenses demonstrate that he understood what he was doing, and did it because he wanted to. Defendant was motivated by jealousy and rage that Melke had left him. When he solicited her murder, he stated that he wanted Melke to die because he believed she had ruined his life, lied to him, and cheated on him. Because of this, Defendant wanted to "get rid of her" (11/3/17, 138) and stated "this bitch got to pay." (11/7/17, 13). He stated that he wanted her "fucked up" and that he wanted pictures of it. (11/7/17, 14). Defendant then asked Allen to kill Melke. He specified that he wanted her beaten beyond recognition with a bat and that he wanted it to be recorded so that he could masturbate to it. Defendant also requested Melke's ID. (11/7/17, 20-21).  Defendant

18

RECEIVED by MCOA 2/19/2020 9:03:45 AM

specified that he wanted Melke's body to be dumped where no one would find her. (11/7/17, 16). Defendant told Close that Melke ruined his life, lied to him, and cheated on him. Defendant told Close that he had stalked her, entered her house, and that it was her fault that he was in jail. (11/3/17, 138). Defendant stated that he was going to get rid of her. (11/3/17, 138).

Defendant took further, intentional actions as a part of his plan. Defendant provided Melke's address, White's address, Melke's Facebook information, a map to Melke's apartment, Melke's car information, and Melke's job information to Close. (11/3/17, 153-156). Defendant agreed to pay $1,000 for Melke's murder. (11/3/17, 147). Defendant made arrangements for his associate, to place some money in Close's jail account. (11/3/17, 157). When Defendant talked to Officer Mobley, he made the assumption that all of this information was already provided to Officer Mobley by Rough. Additionally, Defendant's evasiveness during his conversation with Officer Mobley further confirms that he understood the wrongfulness of his conduct and that he wanted to be careful of what he said. Defendant knew what he was doing was wrong, but he wanted to kill Melke so badly, that he ultimately did not care. For all of these reasons, trial counsel was not incompetent for failing to pursue competency or criminal responsibility evaluations.

**Trial counsel was not ineffective for failing to call the witnesses suggested by Defendant on appeal because their absence did not deny Defendant a substantial defense.**

Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy. *People v Rockey,* 237 Mich

RECEIVED by MCOA 2/19/2020 9:03:45 AM

19

App 74, 76 (1999).  Ineffective assistance of counsel may be established by the failure to call witnesses only if the failure deprives defendant of a substantial defense.  *People v Julian,* 171 Mich App 153 (1988).  A substantial defense is one that might have made a difference in the outcome of the trial.  *People v Kelly,* 186 Mich App 524, 526 (1990).

Defendant argues that his trial counsel was ineffective because he failed to investigate or call any relevant witnesses that would have had a material impact on Defendant's case in chief. Defendant claims that his counsel was unprofessional when he provided a list of 30 witnesses that he failed to properly investigate and that Defendant's rights and ability to put on a defense were substantially affected when his counsel failed to call several witnesses during the trial that Defendant believes would have given materially relevant testimony. However, not a single one of these witnesses had any testimony that would have had any effect on Defendant's trial.

Defendant argues that, Kathy Edmonds should have testified and argues that Edmonds would have testified about an abundance of trash at Defendant's house to give credence to the argument that Defendant though Officer Mobley was contacting him to take out "literal" trash rather than a hit. However, given that Officer Mobley was asking Defendant "what color hair the 'trash' had" and "whether he wanted the trash beaten with a bat" or whether he "wanted the trash spread all over" it's unlikely this testimony from Edmonds would have been persuasive. (*Id.* at 70-75).

Defendant argues that two inmate workers from the Ingham County jail should have testified. According to Defendant, these two men would be able to testify

RECEIVED by MCOA 2/19/2020 9:03:45 AM