about the interactions, communications, and solicitations between Defendant, Close, and Allen. Such testimony would have been inadmissible as hearsay.

Defendant argues that four witnesses should have been called to testify about how Close and Allen became involved in their own cases. Such testimony would also be inadmissible as hearsay and would not be relevant to Defendant's case.

Defendant argues that two character witnesses should have been called, however, Defendant provides no information regarding what these witness would have said. Thus it is impossible to determine if their testimony would have been admissible and whether their absence denied Defendant a substantial defense.

Defendant argues that a man was with him when he stalked Melke at Dave and Busters in 2015 and that that person should have been called as a witness. The substance of this individual's proposed testimony is not specified. However, because Defendant was stalking Melke on this occasion, this individual may be an aider and abettor in Defendant's stalking behavior. It is also unclear as to whether it would be admissible. The incident in 2015 was part of the admitted MRE 404(b) evidence. Melke and Stan White testified about the Dave and Buster's incident. There was no mention of anyone being with Defendant when he started harassing Melke at the Dave and Buster's or when he was escorted out so it is unclear what this witness would testify to and whether it would be credible. Regardless, it is unclear how the absence of this witness denied Defendant a substantial defense.

Defendant argues that his friend Burak Atamer should have been called to testify regarding how he deposited money in Reginald Close's jail account. However,

RECEIVED by MCOA 2/19/2020 9:03:45 AM

Close himself testified about this and Defendant offers no argument how Atamer's testimony would be different. Defendant also argues that a private investigator who investigated Close's "shady background" should have been called. Defendant makes no argument about what this background is, why it would have been important at his trial, or how it would have been admissible.

Finally, Defendant argues that Dr. Sharon Hobbs should have been called to testify regarding her treatment of Defendant prior to the alleged offenses. It is unclear how this testimony would be admissible.

The absence of testimony from these witnesses did not deny Defendant a substantial defense. In fact, Perrone and Schroeder provided Defendant with effective representation and a substantial defense without all of the witnesses suggested by Defendant on appeal. Perrone engaged in pretrial motion practice on behalf of Defendant by filing a motion to sever and an entrapment motion. (2/28/17, 3-19; 10/20/17, 8-105). Both were denied before trial after extensive hearings. Perrone also responded and argued against the prosecutor's motion to admit evidence pursuant to MRE 404b. (10/11/17, 3-22). Perrone's defense included arguing that the jury should keep an open mind, that Defendant was presumed innocent, that the Defendant does not have to do anything, and that the prosecutor must prove beyond a reasonable doubt that Defendant is guilty. (11/2/17, 114-120; 11/9/17, 135). Perrone also argued that the evidence against Defendant was manufactured, and that Allen and Close took advantage of Defendant and provided testimony in an attempt to benefit their own situations. (11/2/17, 121-127; 11/9/17, 138-139). Perrone also argued that the evidence that was admitted pursuant to

RECEIVED by MCOA 2/19/2020 9:03:45 AM

MRE 404b was not a part of the charged conduct in the case. (11/9/17, 137-138, 145). Throughout the trial, Perrone cross-examined witnesses and attempted to elicit testimony consistent with Defendant's theory of the case. Throughout trial, Defendant was represented by both of his attorneys—Perrone, and Eric Schroeder.

Finally, even if these alleged errors were so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment," Defendant cannot establish prejudice. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. This is a burden Defendant cannot meet. The jury heard overwhelming evidence of Defendant's guilt from Melke, White, and other witnesses who experienced Defendant's stalking behavior first-hand. The jury heard from three witnesses, Close, Allen, and Officer Mobley, all of whom described how Defendant solicited them to murder Melke. The jury watched a video of Defendant soliciting Officer Mobley. Also of note is the fact that during his entrapment hearing and his previous stalking plea, Defendant admitted to nearly every component of the evidence against him. Therefore, Defendant cannot establish that but for counsel's errors, the result of the proceeding would have been different. Defendant did not receive ineffective assistance of counsel.

RECEIVED by MCOA 2/19/2020 9:03:45 AM

**IV. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S ENTRAPMENT MOTION, ADMITTING EVIDENCE OF DEFENDANT'S STATEMENTS, ADMITTING MRE 404(B) EVIDENCE, AND ALLOWING A JUROR WHO COMMENTED ON DEFENDANT'S RACE TO REMAIN ON THE JURY UNTIL THE CLOSE OF PROOFS.**

**Defendant's Arguments**

**1. Entrapment**

Defendant argues the trial court erred by denying his entrapment motion (Defendant's Argument 5) because while he was in jail, he was withdrawing from alcohol and drugs, he was vulnerable due to his placement in segregation, he had "mental health issues," and he was generally naive regarding jail. Defendant also argues that his motion should have been granted based on "the use of jailhouse snitches looking for favorable treatment."

**2. Defendant's Statements**

Defendant argues the trial court erred by admitting recordings of Defendant's statements because they were obtained in violation of his Fifth Amendment rights and his Sixth Amendment right to counsel. (Defendant's Argument 6).

**3. Juror**

Defendant argues that the trial court erred because it did not immediately excuse one of the jury members who claimed he may potentially have a bias against Defendant if Defendant was of Turkish descent. Defendant argues that allowing the jury member to remain on the jury until the end of closing arguments allowed the juror's bias to taint the jury against him in violation of Defendant's rights. (Defendant's Argument 7).

RECEIVED by MCOA 2/19/2020 9:03:45 AM

### 4. MRE 404(b)

Defendant argues that the trial court erred by admitting the proposed MRE 404(b) evidence. (Defendant's Argument 11). Defendant also argues that the trial court should not have granted the People's motion for reconsideration as to MRE 404(b) evidence of Defendant's attempts to buy a firearm. (Defendant's Argument 8).

### Issue Preservation

### 1. Entrapment

Defendant filed a motion alleging that Defendant was entrapped. This argument is preserved for appellate review.

### 2. Defendant's Statements

Defendant did not object to the admission of his statements on the basis of the Fifth or Sixth Amendment. This argument is not preserved.

### 3. Juror

Though Defendant requested that the trial court voir dire the juror, Defendant did not object to the trial court's proposal to excuse the juror at the close of proofs. This argument is not preserved.

### 4. MRE 404(b)

Defendant objected to the admission of the other acts evidence at both the hearing to admit the motion and his trial, therefore, this issue would be preserved for appellate review.

RECEIVED by MCOA 2/19/2020 9:03:45 AM

25

RECEIVED by MCOA 2/19/2020 9:03:45 AM

## Standard of Review

### 1. Entrapment

Whether entrapment occurred is determined by considering the facts of each case and is a question of law for this Court to decide de novo. The trial court must make specific findings regarding entrapment, and this Court reviews its findings under the clearly erroneous standard. The findings are clearly erroneous if this Court is left with a firm conviction that a mistake was made. [*People v Fyda,* 288 Mich App 446, 456 (2010) (citations omitted).]

### 2. Defendant's Statements and MRE 404(b)

This Court reviews a trial court's decision regarding whether to admit evidence for an abuse of discretion. *People v Lukity*, 460 Mich 484, 488 (1999). An abuse of discretion occurs "when the trial court chooses an outcome falling outside [the] principled range of outcomes." *People v Babcock*, 469 Mich 247, 269 (2003). When the decision whether to admit evidence involves a preliminary question of law, e.g. whether a rule of evidence or statute precludes admission of the evidence, this Court reviews the issue de novo. *Lukity*, supra at 488. "[I]t is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *People v Bynum*, 496 Mich 610, 623 (2014).

### 3. Juror

"[A] trial court's decision to remove a juror will be reversed only when there has been a clear abuse of discretion. *People v Dry Land Marina, Inc.,* 175 Mich App 322, 325 (1989). An abuse of discretion will be found only when an unprejudiced person, considering the facts on which the trial court acted, would conclude that there was no justification or excuse for the ruling made. *People v Ullah,* 216 Mich App. 669, 673 (1996)." *People v Tate*, 244 Mich App 553, 559 (2001)(parallel citations removed).

**People's Argument**

### 1. Entrapment

This argument was thoroughly addressed by the People in their Brief on Appeal. The People incorporate their argument from Question Presented IV in the People's Brief on Appeal in response to this argument.

### 2. Defendant's Statements

Just as trial counsel was not ineffective for failing to object to the admission of Defendant's statements on the basis of the Fifth and Sixth Amendments, the trial court did not abuse its discretion by admitting these statements. Defendant was not subjected to custodial interrogation and his voluntary conversations with those he came into contact with in the Ingham County Jail are not "critical" proceedings for purposes of the Sixth Amendment.

Defendant argues that his Fifth Amendment rights were violated because he was tricked into making incriminating statements to inmates and an undercover police officer without being made aware of his *Miranda* rights first. Defendant argues that because of this alleged failure, any and all statements he made to Reginald Close, Charles Allen, and Officer Mobley, as well as all statements he made at the evidentiary hearing on October 20, 2017 must be suppressed because these statements were allegedly obtained in violation of his rights.

Defendant's claims that his statements should be suppressed because he was not advised of his *Miranda* rights are baseless and incorrect and there was no need to advise Defendant of his *Miranda* rights since he was never subjected to a custodial interrogation. Defendant could have ended his phone call with Officer Mobley at any

RECEIVED by MCOA 2/19/2020 9:03:45 AM

time, and Defendant was not being questioned or interrogated, he was voluntarily talking to someone he believed was a hit man to set up a murder for hire. Therefore, as Defendant was not the subject of a custodial interrogation when he spoke to Officer Mobley, there was no need to advise him of his *Miranda* rights.[2]

Defendant claims that his statements to Close and Allen should also be suppressed because they were in violation of his *Miranda* rights. Defendant claims that they were acting as "agents" of the police. However neither Close nor Allen were acting as agents of the police in this case as the majority of their discussions with Defendant regarding the solicitations took place before the police got involved, only one of the two men stated that he came forwards initially in hopes of getting a reduced sentence, and because neither of the men actually received any kind of special treatment in return for the information on Defendant. Since neither of the men were acting as agents of the police, they were not required to advise Defendant of his *Miranda* rights. Additionally, none of the statements that Defendant made to either Close or Allen were involuntary, and there is no indication that Defendant was unable to terminate his conversations with Close and Allen. Defendant was not subjected to a "custodial interrogation" by either of the men for the purposes of *Miranda*.

For all of these reasons, Defendant's Fifth and Sixth Amendment rights were not violated and the trial court did not abuse its discretion by admitting Defendant's statements.

---

[2] Furthermore, it would make no sense from a policy standpoint to require undercover officers to read suspects their *Miranda* rights anytime they spoke as it would completely defeat the purpose of being "undercover."

RECEIVED by MCOA 2/19/2020 9:03:45 AM

### 3. Juror

The trial court did not abuse its discretion by excusing the juror who expressed they may have a bias if Defendant is Turkish. The trial court excused this juror before deliberations began, so it is not possible that the juror's perspective or bias influenced the jury. Defendant argues speculatively that it did, but there is no evidence to support this.

> In order to establish that the extrinsic influence was error requiring reversal, the defendant must initially prove two points. First, the defendant must prove that the jury was exposed to extraneous influences. Second, the defendant must establish that these extraneous influences created a real and substantial possibility that they could have affected the jury's verdict. Generally, in proving this second point, the defendant will demonstrate that the extraneous influence is substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict. [*People v Budzyn*, 456 Mich 77, 88–89 (1997)(internal citations and footnotes removed).]

Here, Defendant's claim fails at each step. Defendant first cannot establish that the jury was exposed to the excused juror's bias. Second, even if they were, Defendant cannot establish a real and substantial possibility that it could have affected the jury's verdict. This is akin to claiming that if a person shares their opinion on something with another person, that person would then adopt the opinion as their own. This is not reasonable. Even if we were to assume that the juror told someone else on the jury about their bias, it would not be reasonable to claim the bias would be adopted by anyone who heard about it. Finally, the alleged bias is not related to a material aspect of the case, and there is no direct connection between the excused juror's bias and the verdict. This is because the juror who expressed a bias

RECEIVED by MCOA 2/19/2020 9:03:45 AM

did not even participate in deliberations. For all of these reasons, the trial court did not abuse its discretion by excusing the juror before deliberations began.

### 4. Admission of MRE 404(B) Evidence and motion for reconsideration of MRE 404(b) evidence.

Defendant's argument as to the initial MRE 404(b) decision was thoroughly addressed in the People's Brief on Appeal in Question Presented I and the associated argument. The People incorporate that component of their brief on appeal by reference.

Defendant raises a related argument in his assertion that the trial court abused its discretion by considering his testimony at his entrapment hearing to reconsider its ruling regarding Defendant's attempts to buy a gun. Defendant argues that this amounts to using his statements from his entrapment hearing substantively at his trial. However, Defendant's testimony at his entrapment hearing was not used substantively at his trial. His testimony merely caused the trial court to appropriately reconsider its MRE 404(b) ruling as to Defendant's attempts to buy a gun. Defendant points to *People v D'Angelo*, 401 Mich 167, 178 (1977) in support of his argument. In *D'Angelo*, the Supreme Court of Michigan stated that:

> When the defendant raises the issue of entrapment, whether before or during trial, the appropriate procedure will require the trial court to conduct an evidentiary hearing in the jury's absence . . . Any testimony the defendant gives at the entrapment hearing, including his possible admission of the crime charged or some aspect of it, will not be admissible against him in the case in chief for substantive purposes as an admission, but should the defendant give testimony before the jury in the case in chief on a material matter inconsistent with his entrapment hearing testimony, the prior inconsistent testimony may be admitted in the court's discretion to impeach his credibility. *D'Angelo*, 401 Mich at 177-78.

30

*D'Angelo* does not address what happened at Defendant's trial because Defendant's statements were not used against him. In all other respects the trial court's ruling as to the admissibility of evidence pursuant to MRE 404(b) was appropriate. The People thoroughly addressed the trial court's ruling in Question Presented I of the People's Brief on Appeal. The People incorporate their argument from Question Presented I by reference.

RECEIVED by MCOA 2/19/2020 9:03:45 AM

**V. THE TRIAL COURT DID NOT ERR BY SCORING OV 4, 6, AND 10, AND BY ORDERING RESTITUTION, COSTS AND FINES IN BOTH OF DEFENDANT'S FILES.**

<div align="center">

**Defendant's Arguments**

</div>

**1.  OV 4 and OV 10**

Defendant argues that OV 4 and OV 10 were improperly scored in that the facts did not support scoring them and because the jury did not find Defendant guilty of causing psychological injury or predatory conduct. (Defendant's Argument 13)

**2.  OV6**

Defendant argues that OV 6 was improperly scored because he did not intend to kill Melke and the jury was not instructed regarding the varying degrees of murder that one could solicit. (Defendant's Argument 9). Defendant argues that scoring OV 6 was a cruel and unusual punishment, but does not elaborate on this argument.

**3.  Restitution**

Defendant argues that he was improperly ordered to pay restitution for uncharged conduct.

**4.  Fines and Costs**

Defendant argues that he should not have been assessed fines and costs in each of his cases because16-1064-FH and 16-1065-FC were joined for trial.

<div align="center">

**Issue Preservation**

</div>

**1.  OV 4 and OV 10**

The trial court heard from the prosecutor regarding OV 4 and OV 10, but Defendant did not object to the scoring of OV 4 or OV 10.

RECEIVED by MCOA 2/19/2020 9:03:45 AM

### 2. OV 6

Defendant's counsel objected to the scoring of OV 6 at 50 points at Defendant's sentencing hearing. (1/24/18, 9). The argument that OV 6 should not have been scored is preserved. The argument that scoring OV 6 is a cruel and unusual punishment is not preserved.

### 3. Restitution, Fines, and Costs

Defendant did not object to restitution, court costs, or fees at sentencing. These arguments are not preserved. To preserve a challenge regarding a trial court's imposition of court costs, a defendant must object when the trial court orders him to pay the contested court costs. *People v Johnson*, 315 Mich App 163, 197(2016).

## Standard of Review

### 1. OV 4 OV 6, and OV 10

To preserve a challenge to the guidelines scoring, the defendant must raise the issue at sentencing, in a motion for resentencing, or in a proper motion to remand. *People v Kimble*, 470 Mich 305, 309 (2004).   Unpreserved scoring errors are reviewable on appeal if the error has resulted in a sentence that is outside the appropriate guidelines range.   *Id.* at 310-311.   This Court reviews unpreserved scoring challenges for plain error that affected the defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764 (1999).   However, if the Defendant advises the sentencing court that he or she agrees with the guidelines as scored, any claim of error is waived for appellate review.   *People v Loper*, 299 Mich App 451, 472 (2013).

RECEIVED by MCOA 2/19/2020 9:03:45 AM

"Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *People v Hardy*, 494 Mich 430, 438 (2013).

## 2.  Restitution

The trial court's decision regarding the amount of restitution ordered is reviewed for an abuse of discretion. *People v Cross,* 281 Mich App 737, 739 (2008).

## 3.  Fines and Costs

This Court reviews unpreserved issues regarding the trial court's decision to order a defendant to pay court costs for plain error affecting substantial rights. *Id.*, citing *People v Carines*, 460 Mich 750, 763 (1999). To avoid forfeiture under the plain-error standard, the defendant must satisfy three elements: "1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Carines*, 460 Mich at 763. Generally, the third element requires the defendant to demonstrate prejudice, "i.e., that the error affected the outcome of the lower court proceedings." *Id.* Even if the defendant has demonstrated all three elements, reversal is appropriate "only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* at 763-764 (citation and quotation marks omitted).

34

RECEIVED by MCOA 2/19/2020 9:03:45 AM

## People's Argument

### 1. OV 4 and OV 10

Offense Variable 4 is scored at 10 points when "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.34. The trial court heard evidence that after Defendant and Melke broke up, Melke was "anxious, scared, and upset" any time she was asked about Defendant (11/2/17, p 161); Melke felt she needed to break up with Stan White because she did not want to "put him and his family in danger" due to Defendant's escalating harassments (11/3/17, p 30); Melke felt she was being watched and needed to seclude herself from others much more than she should. (1/24/18, p 15). Based on this, the trial court correctly concluded that Melke suffered serious psychological injury requiring medical treatment.

"Offense variable 10 is exploitation of a vulnerable victim." MCL 777.40. Offense Variable 10 is scored at 15 points when predatory conduct was involved. "Vulnerability" means the readily apparent susceptibility of a victim to injury, physical restraint, persuasion, or temptation. *Id*. "Predatory conduct" means pre offense conduct directed at a victim, or a law enforcement officer posing as a potential victim, for the primary purpose of victimization. *Id*. The trial court specifically addressed whether Defendant's conduct was predatory. In concluding that OV 10 was properly scored, Defendant considered the totality of Defendant's stalking behavior toward Melke. This included his prior convictions for home invasion and aggravated stalking. (1/24/18, 10). The trial court also addressed Defendant's action of drawing a

35

RECEIVED by MCOA 2/19/2020 9:03:45 AM

map with Melke's personal information on it and providing that map to inmates at the Ingham County Jail so that they could murder her. (1/24/18, 10-13). The testimony from Melke, White, Melke's friends, the police, Close, and Allen established Defendant's constant and escalating harassment and stalking of Melke. Defendant's prior domestic relationship and intimate knowledge of Melke made her vulnerable to injury and harassment by Defendant, and Defendant's action of persistently soliciting Melke's murder was predatory. OV 10 was appropriately scored at 15 points.

## 2. OV 6

Offense Variable 6 is scored when the sentencing offense is solicitation to commit homicide. MCL 777.22(1). OV 6 is scored at 50 points if:

The offender had premeditated intent to kill or the killing was committed while committing or attempting to commit arson, criminal sexual conduct in the first or third degree, child abuse in the first degree, a major controlled substance offense, robbery, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, or kidnapping or the killing was the murder of a peace officer or a corrections officer. MCL 777.36.

Here, Defendant solicited three different people to murder Melke. Defendant was specific regarding what he wanted to have happen, and made it clear that he wanted her to die a violent death. The trial court correctly found that Defendant had the premeditated intent to kill when he solicited Melke's murder on three occasions. (1/24/18, 12-14).

RECEIVED by MCOA 2/19/2020 9:03:45 AM

### 3. Restitution

Defendant waived the right to challenge the amount of restitution ordered when he failed to object to the amount of restitution. *People v Grant*, 455 Mich 221, 224 (1997). If Defendant's waiver is overlooked, Defendant is not entitled to a reduction in the restitution he currently owes because he cannot establish plain error.

Defendant argues that his court order to pay $2273.00 in restitution was improper because it was based on "uncharged conduct" Defendant claims that the acts of property damage done to Melke and Stan White's vehicles should not be attributed to him and he should not be ordered to pay restitution because, though he was the primary suspect, he was never charged or convicted of these crimes. However, what Defendant fails to mention is that three separate witnesses testified at the trial that Defendant was the most likely person who could have perpetrated the acts of property damage. When asked about the property damage, Defendant did not deny it. Close testified that Defendant told him he was the one who damaged to Melke and Stan White's vehicles. (10/20/17, 43; 11/2/17, 183; 11/3/17, 51, 140). The trial court did not abuse its discretion by ordering restitution because these acts were part of Defendant's course of conduct in stalking Melke. As such, these acts of property damage are part of the "conduct which gives rise to the conviction."

### 4. Fines and Costs

MCL 769.1k(1)(b)(*iii*) states:

Until October 17, 2020, any cost reasonably related to the actual costs incurred by the trial court without separately calculating those costs involved in the particular case, including, but not limited to, the following:

37

RECEIVED by MCOA 2/19/2020 9:03:45 AM

(A) Salaries and benefits for relevant court personnel.
(B) Goods and services necessary for the operation of the court.
(C) Necessary expenses for the operation and maintenance of court buildings and facilities.

Courts are not required to separately calculate the costs incurred for each trial, but a trial court must "establish a factual basis" for the costs imposed pursuant MCL 769.1k(1)(b)(*iii*) . *People v Konopka*, 309 Mich App 354, 359 (2015).

Defendant does not argue that the court was not authorized to impose costs or that the costs imposed were not authorized by statute. Instead, he argues that costs should not have been imposed in each of his files. Defendant has failed to present any statutes, case law, or other legal basis in support of this claim and only provides a definition of the legislative intent behind imposing costs on a defendant. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis of his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly,* 231 Mich App 627, 640-641 (1998).

It should however be noted that Defendant was not ordered to pay restitution twice. The judgment of sentence for file 16-1065-FC states that restitution is ordered in the amount of $2,273, and the judgment of sentence for file 16-1064-FH states that no restitution was ordered.

RECEIVED by MCOA 2/19/2020 9:03:45 AM

**RELIEF REQUESTED**

WHEREFORE, the People respectfully request that this court affirm Defendant's convictions and sentence.

Respectfully submitted,

CAROL A. SIEMON
INGHAM COUNTY PROSECUTOR

Dated: February 19, 2020

/s/ Kahla D. Crino
Kahla D. Crino (P71012)
Appellate Division Chief

**CERTIFICATE OF SERVICE**

On February 19, 2020, I served a copy of the People's Response to Defendant's Standard 4 Brief on Defendant by first-class mail addressed to:

Tunc Uraz
MDOC #114653
Alger Correctional Facility
N6141 Industrial Park Drive
Munising, MI 49862

I declare that the statements above are true to the best of my knowledge, information, and belief.

/s/ Lisa Renee Davis
Lisa Renee Davis

RECEIVED by MCOA 2/19/2020 9:03:45 AM

343696

4/28/20

To: Court of Appeals
925 W. Ottawa St.
PoBox 30022
Lansing, MI 48909

RECEIVED
2020 APR 34 PM 2:37
COURT OF APPEALS
LANSING OFFICE

From TUNC URAZ 114653
Alger Correctional facility
N6141 Industrial way
Munising MI 49862

2020 MAY 14
COURT OF
LANSING
WHATALE
OFFICE
PM 3:22

Re: Post Judgement Motion to Amend
Restitution per MCR 6.430

Dear Clerk.
The attached Motion send to this honorable
court per MCR 6.430(B) "If the appeal is
Pending when the motion is filed, the moving
party must serve copy to Appellate court "
Please see the attached Motion which was
served to 30th circuit court and the prosecuting
attorneys office on 3/30/20 via MDOC
Legal Mail.
       This letter is sent to you per MCR6430(B)

Respectfully Submitted.
       Tunc Uraz 114653

P.S. Appellant Defendant has a Ginther hearing scheduled on
06/03/20 11:00 am at 30th circuit Court Ingham center.

3/30/20

STATE OF MICHIGAN
   IN THE JUDICIAL  30TH. JUDICIAL
   CIRCUIT COURT OF INGHAM COUNTY

STATE OF MICHIGAN
PLAINTIFF
      Hon. Judge Canady
V.     LC#'s16-001064FH,16-001065FC
      COA#'s 343695, 343696


TUNC URAZ
DEFENDANT
----------------------------------------------------------/
POST JUDGEMENT MOTION TO AMEND RESTITUTION PER MCR 6.430

"ORAL ARGUMENT IS REQUESTED PER MCR 7.214"

HERE COMES, MR.TUNC URAZ, PRO SE MOVES THIS HONORABLE COURF TO AMEND RESTITUTION GIVEN BY THIS COURT ON 01/24/2018 HIS SENTENCING DAY.

ON 03/06/2020, COURT OF APPEALS REMANDED MR. URAZ'S APPEAL FOR A GINTHER HEARING (People v Uraz 2020 Mich App Lexis 1740) Decided , March 6th. 2020.  Docket NO: 343695, 343696.

PURSUANT TO MCL 780.766(2) , THE RESTITUTION STATUE DOES NOT AUTHORIZE TRIAL COURTS TO IMPOSE RESTITUTION BASED ON UNCHARGED CONDUCT THE STATUARY LANGUAGE AUTHORIZING FULL RESTITUTION FOR "COURSE OF CONDUCT THAT GIVES RISE TO THE CONVICTION" NECESSARILY MEANS THAT CONDUCT FOR WHICH THE DEFENDANT IS NOT CRIMINALLY CHARGED AND CONVICTED AND/OR NOT FOUND GUILTY BY JURY CANNOT BE THE BASIS OF RESTITUTION AWARD. PEOPLE V MCKINLEY, 496 MICH 410;852 NW 2D 770 (2014).

THIS RESTITUTION WAS ASSESSED BASED ON FACTS NOT FOUND BY THE TRIER OF FACT BEYOND A REASONABLE DOUBT OR ADMITTED BY DEFENDANT.

THE TRIAL COURT ERRED BY ORDERING DEFENDANT MR.URAZ TO PAY RESTITUTION IN THE AMOUNT OF $2273.00 (TWO THOUSAND TWO HUNDRED AND SEVENTY THREE) FOR UNCHARGED CONDUCTS AND WHERE HE WAS ASSESSED, CHARGED TWICE FOR CRIME VICTIMS RIGHT IN A JOINED TRIAL. FURTHERMORE THE CRIME VICTIMS RIGHT ACT PERMITS AWARDS ONLY FOR LOSES "FACTUALLY" AND "PROXIMATELY" CAUSED BY THE DEFENDANT'S OFFENSES. IT DOES NOT PERMIT RESTITUTION FOR SPECULATIVE AND CONJECTURAL LIKE LOSES.

IN THE INSTANT CASE MR. URAZ WAS CHARGED RESTITUTION IN THE AMOUNT OF $ 2273.00 ON THE BASIS  OF ALLEGATIONS THAT HE WAS SOMEHOW RESPONSIBLE FOR DAMAGES TO COMPLAINANT'S VEHICLE.

HIS SENTENCING ATTORNEY MR. DUANE SILVERTHORN DID NOT OBJECT
(SEE TT 01/24/2018 PG. 13 LINE 13-24) THIS SINCE HE WAS NOT PART OF THE ORIGINAL TRIAL WHERE MR. SILVERTHORN REPLACED MR. JACOB PERRONE DUE MR. PERRONE'S INCAPACITATION AFTER THE TRIAL. MR. PERRONE DID NOT ASSITED MR. SILVERTHORN WITH SENTENCING ALTHOUGH HE WAS REQUIRED TO DO SO PER MRPC 1.16 (C) and MCR 2.117 (C)(2), MCL 780.991(D).

DEFENDANT WAS IN JAIL FOR 17 MONTHS (SEPTEMBER 2016 TILL JANUARY 2018),  AND HE HAD A GPS TETHER ON (AUGUST 2016) WHEN THESE ALLEGED VANDALISMS HAPPENED AND ACCORDING TO MS. ERIKA MELKE'S TESTIMONY SHE CHANGED CARS BY MID 2017. (SEE 11/03/2017 TT PG.18 LINES 13-16). WHEN DEFENDANT WAS INCARCERATED.

MS. ERIKA MELKE'S VEHICLE WAS ALLEGEDLY DAMAGED BY THE DEFENDANT AS MS. MELKE CLAIMS (TT 11/03/2017 ,PG. 16 LINES 8-11) AUGUST 24TH AND 25TH OF 2015. AGAIN DEFENDANT WAS NOT CHARGED.

ON 01/24/2018 SENTENCING DAY SEE (TT PG.16 ) PROSECUTION DEMANDED A RESTITUTION AMOUNT OF $2,273 (SEE PG.16 LINES 1-6) FOR A CAR THAT DOES NOT EXIST NOR HAVE ANY DOCUMENTED INSURANCE CLAIMS FOR IT AND AGAIN MR. SILVERTON DID NOT OBJECT IT ALTHOUGH HE HAD OVER MONTH TO PREPARE FOR THIS SENTENCING.

THEREFORE DEFENDANT REQUESTS FROM THIS HONORABLE COURT TO CANCEL THIS ARBITRARY RESTITUTION AMOUNT OF $ 2,273 AND ISSUE A REFUND TO DEFENDANT WITH THE AMOUNT ALREADY PAID TO MS. MELKE UP TO THIS POINT ($156.26, ONE HUNDRED FIFTYSIX AND TWENTY SIX CENTS).

RESPECTFULLY SUBMITTED



TUNC URAZ #114653
ALGER CORRECTIONAL FACILITY
N6141 INDUSTRIAL PARK WAY DR.
MUNISING, MI 49862


PROOF OF SERVICE :
THIS MOTION WAS SERVED TO INGHAM COUNTY PROSECUTOR'S OFFICE ON 3/30/2020. VIA MDOC LEGAL MAIL PER MCR 6.430 (C).

TUNC URAZ #114653

Date: 03/13/2020 09:30:03

# Michigan Department Of Corrections

Page 2 of 3

## Trust Account Statement

### For the period 02/14/2020 to 03/13/2020

| | | | | |
|---|---|---|---|---|
| MDOC Nbr.: 114653 | Name: Uraz, Tunc | | Current Lock Loc.: S:239:Top:D | |
| Birth Date: 10/02/1967 | Location: ALGER CORRECTIONAL FACI | Jurisdiction Dates: 08/24/2016 | | Active: Yes |
| Current Balance: 5.40 | Hold Balance: .00 | Account Dates: 11/26/2019 | | A/C Status: Active |

| Deduction Type | | Information No. | Effective Date | Original Amount | Amount Paid | Amount Owed |
|---|---|---|---|---|---|---|
| *Trust-Saginaw Regional Caseload* | | | | | | |
| OLPPB | Legal Postage (PBF) | 90239899 | 09/03/2019 | 0.50 | 0.00 | 0.50 |
| OLPPB | Legal Postage (PBF) | 90324489 | 09/12/2019 | 0.50 | 0.00 | 0.50 |
| OLPPB | Legal Postage (PBF) | 90613533 | 09/23/2019 | 0.65 | 0.00 | 0.65 |
| OLPPB | Legal Postage (PBF) | 90613534 | 09/23/2019 | 0.80 | 0.00 | 0.80 |
| OLPPB | Legal Postage (PBF) | 90731458 | 10/07/2019 | 7.35 | 0.00 | 7.35 |
| OLPPB | Legal Postage (PBF) | 91021059 | 10/17/2019 | 0.15 | 0.00 | 0.15 |
| OLPPB | Legal Postage (PBF) | 91186661 | 11/06/2019 | 1.30 | 0.00 | 1.30 |
| OLPPB | Legal Postage (PBF) | 91186662 | 11/06/2019 | 2.20 | 0.00 | 2.20 |
| OLPPB | Legal Postage (PBF) | 91501488 | 11/19/2019 | 6.70 | 0.00 | 6.70 |
| OLPPB | Legal Postage (PBF) | 91501489 | 11/19/2019 | 8.35 | 0.00 | 8.35 |
| OLPPB | Legal Postage (PBF) | 91501490 | 11/19/2019 | 8.35 | 0.00 | 8.35 |
| OLPPB | Legal Postage (PBF) | 91501491 | 11/19/2019 | 8.35 | 0.00 | 8.35 |
| OLPPB | Legal Postage (PBF) | 91501492 | 11/19/2019 | 8.35 | 0.00 | 8.35 |
| *Trust-SMR Jackson Caseload* | | | | | | |
| COC | Court Ordered Charges Obligation | 16-001064-FH | 02/01/2018 | 1,658.00 | 156.21 | 1,501.79 |
| COC | Court Ordered Charges Obligation | 16-001065-FC | 02/01/2018 | 1,794.00 | 0.00 | 1,794.00 |
| OCW | Federal Filing Fee (Western District) | 1:19-CV-223 | 03/28/2019 | 338.40 | 130.05 | 208.35 |
| OSFF | State Filing Fee Obligation | 349487 | 10/09/2019 | 344.00 | 85.43 | 258.57 |
| OSFF | State Filing Fee Obligation | 19-750-CL | 10/15/2019 | 175.00 | 0.00 | 175.00 |
| VR | Victim Restitution | 16-001065-FC | 02/01/2018 | 2,273.00 | 156.26 | 2,116.74 |

## *Transaction Details*

| GJ No. | Date | Description | Debit | Credit |
|---|---|---|---|---|
| *Trust-Alger Facility Caseload* | | | | |
| 92815600 | 02/14/2020 | *PR Payroll Receipt* | 51.35 | |
| | | 1116 Payroll Receipts | | 51.35 |
| | | 2552 Victim Restitution Payable | | 0.68 |
| | | 2568 Court Ordered Charges Payable | | 0.67 |
| | | 2554 Federal Filing Fee(s) Payable | | 10.27 |
| | | 2554 Federal Filing Fee(s) Payable | | 10.27 |
| | | 2556 State Filing Fee(s) Payable | | 18.46 |
| | | 2513 Padlock Payable | | 5.70 |
| | | 2101 Offender Funds | | 5.30 |
| | *Narration:* | Batch: 2573759, Ref:LMF JANUARY 2020 PAYROLL | | |
| 92883444 | 02/16/2020 | *JPAYJD JPay Media Credit Payable* | .70 | |
| | | 2101 Offender Funds | 0.70 | |
| | | 2600 JPay Media Credit Payable | | 0.70 |
| | *Narration:* | Batch: 2575124, Ref:0064427531-JPAY E-STAMP - | | |
| 92914300 | 02/19/2020 | *LPOSPBF Legal Postage Disbursement (PBF)* | 2.60 | |
| | | 2101 Offender Funds | 2.60 | |
| | | 2582 Postage (PBF) Payable - Direct | | 2.60 |
| | *Narration:* | Batch: 2575973, Ref:lmf exp leg agse serean sponli - | | |
| 92920772 | 02/19/2020 | *JPAYJD JPay Media Credit Payable* | .50 | |
| | | 2101 Offender Funds | 0.50 | |
| | | 2600 JPay Media Credit Payable | | 0.50 |
| | *Narration:* | Batch: 2576348, Ref:0064541828-JPAY E-STAMP - | | |
| 92931551 | 02/20/2020 | *JPAYJD JPay Media Credit Payable* | .50 | |

CHRISTOPHER M. MURRAY
*CHIEF JUDGE*
JANE M. BECKERING
*CHIEF JUDGE PRO TEM*
DAVID H. SAWYER
MARK J. CAVANAGH
KATHLEEN JANSEN
JANE E. MARKEY
PATRICK M. METER
KIRSTEN FRANK KELLY
KAREN FORT HOOD
STEPHEN L. BORRELLO
DEBORAH A. SERVITTO
ELIZABETH L. GLEICHER
CYNTHIA DIANE STEPHENS

MICHAEL J. KELLY
DOUGLAS B. SHAPIRO
AMY RONAYNE KRAUSE
MARK T. BOONSTRA
MICHAEL J. RIORDAN
MICHAEL F. GADOLA
COLLEEN A. O'BRIEN
BROCK A. SWARTZLE
THOMAS C. CAMERON
JONATHAN TUKEL
ANICA LETICA
JAMES ROBERT REDFORD
*JUDGES*

JEROME W. ZIMMER JR.
*CHIEF CLERK*



*State of Michigan*

# Court of Appeals
## Lansing Office

June 18, 2020

Tunc Uraz #114653
Alger Correctional Facility
N6141 Industrial Park Dr.
Munising MI  49862

      Re:  **People of MI v Tunc Uraz**
      Court of Appeals Nos.  **343695; 343696**
      Lower Court Nos.  **16-001064-FH; 16-001065-FC**

Dear Mr. Uraz:

      With this letter I am returning, without accepting for filing, the motion you recently submitted that is captioned as a motion for adjournment of *Ginther* hearing and to order the circuit court not to have the hearing via videoconferencing.  Because you are represented by an attorney in this appeal motions on your behalf in this appeal would need to be filed by your attorney.

                                       Very truly yours,

                                       Gary L. Chambon Jr.
                                       District Clerk

cc:  Kahla D. Crino
     Susan K. Walsh

Enclosure

DETROIT OFFICE
CADILLAC PLACE
3020 W. GRAND BLVD. SUITE 14-300
DETROIT, MICHIGAN  48202-6020
(313) 972-5678

TROY OFFICE
COLUMBIA CENTER
201 W. BIG BEAVER RD. SUITE 800
TROY, MICHIGAN  48084-4127
(248) 524-8700

GRAND RAPIDS OFFICE
STATE OF MICHIGAN OFFICE BUILDING
350 OTTAWA, N.W.
GRAND RAPIDS, MICHIGAN  49503-2349
(616) 456-1167

LANSING OFFICE
925 W. OTTAWA ST
P.O. BOX 30022
LANSING, MICHIGAN  48909-7522
(517) 373-0786

COURT OF APPEALS WEB SITE ~ http://courts.mi.gov/courts/coa/

IN THE COURT OF APPEALS

STATE OF MICHIGAN
PLAINTIFF

        Hon. Judge Canady
V.      LC#'s16-001064FH,16-001065FC
        COA #'s 343695, 343696   ~ L

**RETURNED**

JUN 1 8 2020

COURT OF APPEALS
FOURTH DISTRICT
CHIEF CLERK

RECEIVED

2020 JUN 11  PM 2:06

COURT OF APPEALS
LANSING OFFICE

TUNC URAZ
DEFENDANT

----------------------------------------------------------

EMERGENCY MOTION FOR ADJOURNMENT OF GINTHER HEARING UNTIL MDOC BEGINS TRANSPORTING INMATES TO COURTS AND ORDER 30TH. CIRCUIT COURT NOT TO HAVE THIS HEARING VIA VIDEOCONFERENCING.

HERE COMES, MR.TUNC URAZ, PRO SE MOVES THIS HONORABLE COURT TO CONSIDER POSTPONEMENT OF GINTHER HEARING PER REMAND ORDER FROM COURT OF APPEALS (People v Uraz 2020 Mich App Lexis 1740) Decided , March 6th. 2020. Docket NO: 343695, 343696. AND ORDER 30th. CIRCUIT COURT NOT TO HELD THIS HEARING VIA VIDEOCONFERENCING. PER MCR 2.407 (C) (2)(4)(5)(6)(7)(8)(9)(10)(11)(12)(13)
AND
PER MCR 6.006 (C)(1)(2)

MR. URAZ DEFENDANT DID "NOT" AND DOES "NOT" WAIVE HIS RIGHT TO BE PRESENT AT THE GINTHER HEARING IN PERSON.

ON JUNE 3rd. 2020 at 11:00 am after a online videoconferencing with 30th. circuit Court (after many technical difficulties hearing started 11:30 am) judge Canady denied the motion TO ADJOURN GINTHER HEARING UNTIL THE MDOC BEGINS TRANSPORTING INMATES TO COURT.

HERE ARE THE REASONS JUDGE DENIED THIS REQUEST:

1) A DATE SET BY COURT OF APPEALS (JULY 9TH. 2020) TO HAVE THIS GINTHER HEARING COMPLETED WHICH CAN BE POSTPONED DUE TO THIS PANDEMIC SINCE MICHIGAN SUPREME COURT TOLLING PROVISIONS.

2) DUE TO CORONAVIRUS (COVID-19) PANDEMIC

3) JUDGE CLAIMED THAT MDOC IS NOT TRANSPORTING ANY INMATES UNTIL THE STATE WIDE BAN LIFTED EVEN IF COURTS ORDER MDOC TO BRING INMATES TO COURT AND EVEN IF AN INMATE GETS TRANSPORTED HE MAY GET STUCK IN A COUNTY JAIL FOR AN UNKNOWN TIME BECAUSE MDOC DOES NOT WANT THE PRISONER BACK DUE TO POSSIBLE EXPOSURE. (SEE ATTACHED TRANSCRIPTS JUNE 3RD 2020)

HERE ARE THE REASONS MR. URAZ NEEDS THIS HEARING IN PERSON IN A COURTROOM

1) MR. URAZ DID NOT WAIVE HIS RIGHT TO HAVE THIS HEARING VIA VIDEOCONFERENCING

2) MR. URAZ CANNOT CONFER WITH HIS ATTORNEY AND FOLLOW THE HEARING AT THE SAME TIME SIMULTANEOUSLY WHICH IS AGAINST THE DUE PROCESS RIGHTS

3) THERE ARE 5-7 ATTORNEYS NEEDS TO TESTIFY AT THE SAME TIME WHICH WOULD BE A NIGHTMARE TO COORDINATE VIA ONLINE VIDEOCONFERENCING

4) ENGLISH IS NOT MR. URAZ'S NATIVE TONGUE THEREFOR HE MAY NEED A INTERPRETER TO EXPEDITE

**jpay** Tell your friends and family to visit www.jpay.com to write letters and send money!

HIS TESTIMONY

5) MR. URAZ WILL HAVE LOTS OF DOCUMENTS AND EXHIBITS TO SHOW DURING THIS HEARING WHERE HE CANNOT SHOW ANY BECAUSE OF THE CURRENT TECHNOLOGY DOES NOT ALLOW THAT.

THEREFORE MR. TUNC URAZ IS REQUESTING :

1) SUBPOENA ALL THE ATTORNEYS NAMED BELOW FOR THIS HEARING:

Jacob A. Perrone  (P71915)
Perrone Law PC.

Eric Schroeder (P79518)
Bodwin & Associates PC

Andrew Vuckovich (P78819)
Perrone Law PC.

Nicholas Francis Fernandez
Associate Attorney
Perrone Law PC.

Duane D. Silverthorn, Esq (P36964)

Michael J. Nichols  (P59391)

Chris A. Bergstrom (P28459)

Charles Thomas Koop II (P 75188)

Jonathan Curtis Roth (P72030)

2) Since MR.TUNC URAZ IS going to testify, he is  requesting  a foreign language interpreter per MCR 1.111 (English-Turkish) due to his heavy accent and he does not want any of his words get lost in translation/interpretation.

3) MR. Uraz is requesting the items below to show ineffectiveness of Mr. Jacob A. Perrone.

Mr. Tunc Uraz is requesting :

A) CD's discs (or any other applicable medium audio, video, digital) recordings of court room security video footage (recording system, CCTV)  for the case numbers and dates below:

People v Tunc Uraz

Case #'s 16-1065 FC ve 16-1064 FH
(joined trial)

Judge Hon: Clinton Canady III

Court dates and times

10/31/2017,  Hearing held  from 8:30 am till 2:30 pm  (all day)

11/02/2107, Jury trial from 8:30am till 4:00pm (all day)

*jpay* Tell your friends and family to visit www.jpay.com to write letters and send money!

RECEIVED

2020 JUN 11 PM 2: 07

COURT OF APPEALS
LANSING OFFICE

12/13/2017 Status Conference
from 11:30 am till 12:00 Noon

01/24/2018   before 12:00 noon Sentencing day

B) Jury seating chart for the above joined  trial numbers as well.

WHEREFORE, DEFENDANT TUNC URAZ  RESPECTFULLY REQUESTS THAT THIS HONORABLE COURT
GRANT THIS MOTION TO ORDER INGHAM COUNTY 30TH. CIRCUIT TO ADJOURN THSI  GINTHER HEARING
UNTIL MDOC TRANSPORTS INMATES TO COURT AND NOT TO HAVE THIS GINTHER HEARING VIA
VIDEOCONFERENCING.

Respectfully Submitted

Tunc Uraz #114653
Alger Correctional Facility
N6141 Industrial Park Drive
Munising, MI 49862

RECEIVED
2020 JUN 11  PM 2: 07
COURT OF APPEALS
LANSING OFFICE

jpay Tell your friends and family to visit www.jpay.com to write letters and send money!

*Susan K. Walsh*
*Attorney and Counselor at Law*

*P.O. Box 157*
*Northville, Michigan 48167*
*Phone (248) 563-9149*

July 2, 2020

Court Reporter to:
Judge Clinton Canady, III
Ingham County Circuit Court
313 W. Kalamazoo St.
Lansing, MI 48933

      Re:   **People** v **Tunc Uraz**
             Lower Court No. 16-1064 FH & 16-1065 FC

Dear Sir or Ms.:

    I am the assigned appellate counsel in the above referenced case. I would like to order the transcripts of the hearing(s) held in this matter on:

      1)  hearing, June 3, 2020.

    Due to the fact that this matter is currently pending on appeal, could you please expedite this transcript and if possible, send me an electronic copy at skwalsh44@gmail.com. If you have any questions or concerns, please call me at the above number. Thank you for your kind attention to this matter.

                    Sincerely

                    Susan K. Walsh

cc: Michigan Court of Appeals
Ingham County Prosecutor
file

RECEIVED by MCOA 7/3/2020 11:47:27 AM

1/20/21

To: Court of Appeals
     925 W. Ottawa St.
     PO Box 30022
     Lansing MI 48909-7522

From: TUNC URAZ #114653
      Muskegon Correctional facility
      2400 S. Sheridan Rd.
      Muskegon, MI 49442

2021 JAN 22  AM 10:18
COURT OF APPEALS
LANSING OFFICE
RECEIVED

Re: Case # 343696, 343695-L
           349487, 354790

Dear Clerk.
for the cases 343696 and 349695 on  03/06/2020
I was granted a Ginther hearing by Court of Appeals
due to my attorney's mental incapacitation and Ineffective
Assistance of counsel. In June 3rd 2020 on Zoom video
hearing 30th circuit court Judge denied to have this hearing
in Person in a court room due to covid 19 pandemic. I did
NOT waive my right to have this hearing in person. Therefore
My appeal's attorney   Ms. SUSAN K. WALSH filed an emergency
brief with the court of appeals to cancel this Ginther via
Zoom video and ask for this court to grant this hearing in
Person. This honorable court approved the brief and ordered
30th circuit court to have this hearing in person within
60 days of MDOC starts transporting inmates (August 4th 2020)

Since then I have been moved, transported 3 times on 08/06/20 I was transported to Richard A. HANDLON Corr. facility In Ionia MI from Alger Correctional fac. Munising, MI (Above the Bridge) for CALVIN college program However on 10/23/2020 bunch of inmates were transported total of 130 to Muskegon Correctional facility due to Covid 19 pandemic at IONIA facility. On 11/06/2020 I was tested positive for Covid 19 virus and kept in quarantine for 90 days (See attachment 1).

I am asking this court to order 30th circuit court to have this further hearing in person Since I had this virus and I am safe. There are total of 10 attorneys needs to testify in this hearing and it would be impossible to have it VIA Zoom video hearing. (Please see the attached list of Lawyers) Attch #2 MDOC is keep transporting inmates from facility to facility since I have been here in Muskegon 10/23/20, there are total of 300 more inmates brought in and/or ridden out. Please Justice Delayed is Justice denied.

① issue I sent this court on 12/3/2020 letter about proving that I paid the filing fee for case #349487 and the rest was suppose to be paid by MDOC Court order dpt. because they Garnished the rest form my account. This court dismissed my other appeal# 354790 due to the other cases non payment issues. Would you please check the states of the case 349487 if the filing fees are paid or not and for the case 354790 do I need to refile it or has it been put Back on the docket? Thank you for your help.

Respectfully Submitted
Turc Oom 114653

Attach #2

Names of the Attorneys for Ginther Hearing

① Jacob A. Perrone (P71915)

② Eric Schroeder (P79518)

③ Nicholas Francis Fernandez Law Clerk for Jacob A. Perrone

④ Andrew Vuckovich (P78819)

⑤ Duane D. Silverton (P36964)

⑥ Michael J. Nichols (P59391)

⑦ Chris A. Bergstrom (P28459)

⑧ Charles T. Kaop II (P75188)

⑨ Jonathan C. Roth (P72030)

⑩ Alexander S. Rusek (P77581)

my Appeal Attorney
     Susan K. Walsh (P40447)

My trial Judge
     Hon. Clinton CANADY III (P23262)

George Strander 30th Circuit Court Admin who appointed
                              (Perrone) to me

COURT OF APPEALS
LANSING OFFICE
RECEIVED
2024 JAN 22  AM 10: 19

 CURATIVE LABS



Curative Labs Inc.
430 S Cataract Ave
San Dimas, CA 91773
support@curative.com

# Final Results Report

| | | | |
|---|---|---|---|
| **Patient Name:** | Uraz, Tunc | **Facility:** | Michigan Department of Corrections |
| **Patient MRN:** | 114653 | **Requisition:** | 13604340 |
| **Date of Birth:** | 1967-10-02 (53 years old) | **Kit ID:** | 856561582716 |
| **Sex:** | male | **Collected:** | 11/04/20 12:20:35 PM EST |
| **Address:** | 1728 West Bluewater Highway Ionia, MI 48846 | **Received:** | 11/06/20 02:31:17 AM EST |
| **Phone Number:** | | **Released:** | 11/06/20 11:43:00 AM EST |
| **Email:** | | **Specimen Type:** | Shallow nasal swab |
| **Physician:** | McIntyre, Carmen (1508807397) | **Reviewed By:** | Russell Martinez |

| Test | Result |
|---|---|
| Curative SARS-CoV-2 Assay (RNA Detection Test by RT-qPCR) | **Positive** |

**Interpretation:**

- Positive: SARS-CoV-2 RNA detected by RT-qPCR
- Negative: SARS-CoV-2 RNA not detected by RT-qPCR
- Indeterminate: Indeterminate for SARS-CoV-2 RNA by RT-qPCR.

The Curative SARS-CoV-2 Assay is a real-time reverse transcription polymerase chain reaction (RT-qPCR) test. Results are for the detection of SARS-CoV-2 RNA. The SARS-CoV-2 RNA is generally detectable in respiratory specimens during the acute phase of infection. Collection of oral fluid specimens is limited to patients with symptoms of COVID-19 and should be performed under the supervision of a trained healthcare worker at the specimen collection site.

Positive results are indicative of the presence of SARS-CoV-2 RNA; clinical correlation with patient history and other diagnostic information is necessary to determine patient infection status. Positive results do not rule out bacterial infection or co-infection with other viruses. The agent detected may not be the definite cause of disease. Laboratories within the United States and its territories are required to report all positive results to the appropriate public health authorities. Negative results do not preclude SARS-CoV-2 infection and should not be used as the sole basis for patient management decisions. Negative results must be combined with clinical observations, patient history, and epidemiological information. Negative results for SARS-CoV-2 RNA from oral fluid specimens should be confirmed by testing of an alternative specimen type if clinically indicated.

Indeterminate results may occur in the case of an inadequate specimen such as quantity not sufficient. Specimen must be recollected if test is still required.

Testing is only authorized at Curative Labs high-complexity CLIA certified laboratories.

The assay is intended for use under the Food and Drug Administration's Emergency Use Authorization.

**Disclaimer:**

The United States FDA has made this test available under an emergency access mechanism called an Emergency Use Authorization (EUA). The EUA is supported by the Secretary of Health and Human Service's (HHS's) declaration that circumstances exist to justify the emergency use of in vitro diagnostics (IVDs) for the detection and/or diagnosis of the virus that causes COVID-19. This EUA will be effective until the declaration that circumstances exist justifying the authorization of the emergency use of in vitro diagnostics for detection and/or diagnosis of COVID-19 is terminated under Section 564(b)(2) of the Act or the EUA is revoked under Section 564(g) of the Act.

This test was developed and its performance characteristics determined by Curative Labs, which is certified under the Clinical Laboratory Improvement Amendments of 1988 (CLIA) as qualified to perform high complexity clinical laboratory testing.

Lab director: Arthur Baca, MD PhD; CLIA # 05D2141174; Report generated at: 11/06/20 02:47:05 PM EST



CHRISTOPHER M. MURRAY
CHIEF JUDGE
JANE M. BECKERING
CHIEF JUDGE PRO TEM
DAVID H. SAWYER
MARK J. CAVANAGH
KATHLEEN JANSEN
JANE E. MARKEY
KIRSTEN FRANK KELLY
KAREN FORT HOOD
STEPHEN L. BORRELLO
DEBORAH A. SERVITTO
ELIZABETH L. GLEICHER
CYNTHIA DIANE STEPHENS
MICHAEL J. KELLY

DOUGLAS B. SHAPIRO
AMY RONAYNE KRAUSE
MARK T. BOONSTRA
MICHAEL J. RIORDAN
MICHAEL F. GADOLA
COLLEEN A. O'BRIEN
BROCK A. SWARTZLE
THOMAS C. CAMERON
JONATHAN TUKEL
ANICA LETICA
JAMES ROBERT REDFORD
MICHELLE M. RICK
JUDGES

JEROME W. ZIMMER JR.
CHIEF CLERK

*State of Michigan*

## Court of Appeals
### Lansing Office

January 27, 2021

Tunc Uraz #114653
Muskegon Correctional Facility
2400 S. Sheridan Dr.
Muskegon MI  49442

  Re: **People of MI v Tunc Uraz; People of MI v Tunc Uraz; Tunc Uraz v Michigan State University Board of Trustees**
  Court of Appeals Nos.  **343695; 343696; 354790**
  Lower Court Nos.  **16-001064-FH; 16-001065-FC; 19-000201-MZ**

Dear Mr. Uraz:

  This is in reply to your letter dated January 20, 2021.

  With regard to your request for this Court to order the trial court in the cases in *People of MI v Tunc Uraz*, Court of Appeals Docket Numbers 343695 and 343696, to hold an in-person hearing, you are represented by an attorney in those appeals.  Thus, your attorney would need to file a motion seeking such relief on your behalf if she determines it is appropriate to do so.

  With regard to *Tunc Uraz v Michigan State University Board of Trustees*, Court of Appeals Docket Number 354790, as indicated in my January 14, 2021 letter to you regarding that file, our records show that you owe an outstanding balance of $154.99 to this Court in *State Treasurer v Tunc Uraz*, Court of Appeals Docket Number 349487.  Further, your appeal in *Tunc Uraz v Michigan State University Board of Trustees*, Court of Appeals Docket Number 354790, was dismissed by this Court in a November 25, 2020 order and the 21-day period for filing a motion for reconsideration of that order has expired.  Accordingly, further pleadings cannot be accepted for filing in *Tunc Uraz v Michigan State University Board of Trustees*, Court of Appeals Docket Number 354790.

         Very truly yours,
         Gary L. Chambon Jr.
         District Clerk

cc: Kahla D. Crino
  Susan K. Walsh
  Brian T. Quinn

DETROIT OFFICE
CADILLAC PLACE
3020 W. GRAND BLVD. SUITE 14-300
DETROIT, MICHIGAN  48202-6020
(313) 972-5678

TROY OFFICE
COLUMBIA CENTER
201 W. BIG BEAVER RD. SUITE 800
TROY, MICHIGAN  48084-4127
(248) 524-8700

GRAND RAPIDS OFFICE
STATE OF MICHIGAN OFFICE BUILDING
350 OTTAWA, N.W.
GRAND RAPIDS, MICHIGAN  49503-2349
(616) 456-1167

LANSING OFFICE
925 W. OTTAWA ST.
P.O. BOX 30022
LANSING, MICHIGAN 48909-7522
(517) 373-0786

COURT OF APPEALS WEB SITE ~ http://courts.mi.gov/courts/coa/

STATE OF MICHIGAN

IN THE 30TH CIRCUIT COURT FOR THE COUNTY OF INGHAM

PEOPLE OF THE STATE OF MICHGAN,

      Plaintiff/Apellee,            **ORDER**

v                            HON. CLINTON CANADY III

**TUNC URAZ,**               **Case Nos.** 16-1064-FH
                                16-1065-FC

      Defendant/Appellant.

**At a session of said Court held in the City of
Lansing, County of Ingham, State of Michigan,
this 8 day of August of 2022.**

Tunc Uraz was a professor at Michigan State University teaching Culinary Arts
Management when he entered into a dating relationship with Melke, a student at
the university. After Melke ended the relationship, Uraz began to stalk her,
committing a series of escalating acts that culminated with soliciting her murder on
multiple occasions. Uraz was convicted of one count of aggravated stalking and
three counts of solicitation of murder. Uraz now argues his counsel, Jacob Perrone,
was ineffective and requests a new trial. After conducting a *Ginther* hearing, the
Court DENIES Uraz's motion for the reasons laid forth below.

FACTS

The issue before the Court is whether Uraz received ineffective assistance of
counsel under the state or federal constitutions. To prove Perrone provided
ineffective assistance of counsel, Uraz must show that Perrone's actions were
objectively unreasonable and that he was prejudiced. To prove prejudice, Uraz must
show that, had Perrones's performance not been deficient, there was a reasonable

RECEIVED by MCOA 8/25/2022 4:00:45 PM

possibility that the outcome of his trial would have been different.

### A. Background Facts

Uraz and Melke remained congenial immediately following their breakup in June. However, after learning Melke may have begun a new dating relationship, he became upset and confronted her in a grocery store. This resulted in Melke requesting that he stop contacting her. In August, she found someone had keyed her car and peeled off its registration tab.

On New Year's eve Uraz confronted Melke again, this time while she was celebrating at a local restaurant with White, her boyfriend at the time. Uraz was eventually escorted from the restaurant after yelling obscenities and indignities at Melke and White. When Melke and White went to leave the restaurant, they found that someone had punctured the side walls of White's vehicle tires.

Following these incidents, Melke obtained and served a personal protection order on Uraz. But this did not deter Uraz. He continued to text Melke and those close to her, often using thinly veiled aliases. On at least one occasion, he tailed her car and attempted to confront her after she parked, only leaving after she had taken a picture of him and called the police. Uraz also continued to damage her property and the property of her boyfriend. Uraz egged Melke's vehicle and, again, slashed the tires of White's vehicle while Melke stayed the night at his house. Eventually, Melke ended her relationship with White out of fear that Uraz may hurt him.

Uraz's actions again escalated when he asked a co-worker to assist him in illegally obtaining a firearm and ammunition because he could not get one the "legal way." The co-worker reported Uraz to the university after he became convinced of Uraz's seriousness. Uraz was subsequently fired. During his later incarceration, Uraz told a fellow inmate about the incident and admitted that he had planned to use the gun to kill Melke.

RECEIVED by MCOA 8/25/2022 4:00:45 PM

While it is not clear what lead to her uneasiness, Melke began to fear Uraz had entered into her apartment without her knowledge or consent. This led her to install a video camera in her room. Her concerns were validated when the camera caught Uraz entering and rummaging through her bedroom while she was out of her apartment. Following this intrusion, several of Melke's undergarments and a pair of her shoes went missing. On another occasion, Melke's roommate saw Uraz parked outside the apartment and confronted him. Subsequently, the roommate found the lug nuts on her car had been loosened.

Melke obtained another Personal Protection Order. Near the same time, Uraz increased his online harassment of Melke. Uraz attempted to gain access to Melke's social media accounts and change their passwords. Uraz also created fake social media accounts that mimicked Melke's real account. These fake accounts posted pictures that he had copied from her actual account, making it appear as if it were Melke's real account and that she was making the posts. Alongside these genuine seeming posts, Uraz then posted defamatory messages and obscene pictures. This information was gathered by the police, who were able to track the IP addresses associated with the above-mentioned activity back to Uraz's and his associate's residences. During this time Uraz did not stop his physical harassment of Melke. Following a concert, Melke found the walls of her tires had been punctured. Melke believed Uraz knew that she was going to attend the concert because he had seen the tickets on the day he snuck into her room.

Eventually, Uraz was charged with Aggravated Stalking and Second Degree Home Invasion. He took a plea to one count of Aggravated Stalking. But this did not stop Uraz, who, at this time, was subject to both a personal protective order and a no-contact order. Before sentencing, Uraz continued his attempts to contact Melke through phone and email including leaving her voice messages on her phone. Uraz

RECEIVED by MCOA 8/25/2022 4:00:45 PM

was sentenced six months for his first Aggravated Stalking.

While serving his sentence in the Ingham County Jail, Uraz again escalated his conduct towards Melke. Uraz told a fellow inmate that he wanted "to get rid of [Melke]" because she ruined his life and solicited to have Melke killed on three separate occasions.

Uraz first asked a fellow inmate, Charles Allen, to kill Melke. The two met while housed together. Uraz told Allen about his history with Melke and made numerous, specific, obscene requests that Allen kill Melke, including that she be beaten beyond recognition with a baseball bat and that it be recorded so he could masturbate to it. Eventually, Allen notified a deputy. In return, the deputy promised to tell Allen's probation officer that he had been helpful. Allen did not receive any other benefit.

Uraz then asked another inmate, Reginald Close, to kill Melke. Almost immediately after meeting Close, Uraz disclosed his history with Melke and told Close that she had ruined his life. He also disclosed facts related to his stalking, including losing his job for trying to buy a gun so that he could kill Melke, that he had gained access to her phone by hacking her iCloud account, and that he had slashed her tires while she was attending a concert. Close told his lawyer about the request when he realized Uraz was serious about his desire to have Melke killed. Close then agreed to help kill Melke, and Uraz provided Close with detailed information about Melke, including her place of employment, the location of her apartment, and other facts he believed would be useful for the task. Uraz agreed to pay Close $1,000 and made arrangements with an associate to put some of the money in Close's jail account. Close was interviewed by a detective, who did not offer Close anything in return for his testimony except immunity for agreeing to kill Melke.

RECEIVED by MCOA 8/25/2022 4:00:45 PM

Finally, Uraz asked an undercover officer, who was pretending to be a hitman and Close's friend, to kill Melke. During a recorded call, Uraz and the officer talked about "tak[ing] out the trash," "beating" the trash, and what color hair the trash had, along with other indiscreet language which indicated that Uraz wished to have Melke killed. Uraz agreed to pay the officer $2,000 to have Melke "taken out" and $500 for any other "bags" that were taken out in the process. Uraz indicated that he wanted the trash to be taken out before his sentencing date.

Uraz was charged in 16-1064-FH with Aggravated Stalking for his conduct following his August plea and sentencing. He was charged in 16-1065-FC with three counts of solicitation to murder.

### B. Uraz's Trial and Sentencing

Leading up to and during the trial, Uraz was represented by Jacob Perrone, a private defense attorney. It was Perrone's first capital case and, during trial, he was provided legal assistance by Eric Schroder. Prior to trial, Perrone attempted to obtain favorable evidentiary rulings. He filed a motion to sever and a motion arguing that the police entrapped Uraz into soliciting Melke's murder. Perrone also contested the State's 404(b) motion. After numerous hearings, Uraz's motions were denied and the State was permitted to bring in evidence of Uraz's previous acts. Perrone interviewed thirty potential witnesses, whose names Uraz provided, to determine who he should call during trial. He also did considerable research on Allen's and Close's criminal records.

At trial, Perrone's theory of the case was that the evidence against Uraz was manufactured and that the officer had entrapped Uraz into soliciting Melke's murder. Perrone argued that the evidence of Uraz's previous behavior, including his previous stalking conviction, was not charged in the present case and, therefore, should be given little consideration in the jury's deliberation.

RECEIVED by MCOA 8/25/2022 4:00:45 PM

The State called Allen and Close to testify. Both testified consistently with the facts laid forth above. Perrone worked to undermine their credibility on cross-examination in a number of ways. To begin, the jury was made aware that both were incarcerated. As to Allen's credibility, Perrone sought to undermine him on cross-examination by showing that he had a motive for testifying against Uraz. Allen stated that he reported Uraz's request because he hoped his cooperation would lead to a shorter stay in prison. Allen also admitted that he was subject to phone restrictions due to his misconduct while in prison.

Perrone impeached Close on cross-examination by showing that he had discussed Uraz's case with Allen (after testifying to the opposite on direct-examination). Perrone also elicited testimony showing that Close was overly curious about Uraz's case and that he had a history of proffering in cases to improve his own situation. Close also testified that he was worried that Uraz was trying to set him up. During his cross-examination, particularly during the examination of Allen, Perrone, at times, took several minutes between questions.

Before the verdict, Perrone sent an email to Uraz's sister. In the email, Perrone alleged he was working nearly 120 hours a week. The email stated that Perrone believed the jury would be hung on the aggravated stalking count and find Uraz not guilty on the solicitation counts.

In the end, the jury was unconvinced and convicted Uraz on all counts. Several weeks after trial, Perrone informed the Court that he had been diagnosed with bipolar disorder following an episode that occurred the week after trial. Perrone stated that he did not suffer from any symptoms during the trial. The Court informed Uraz that Perrone had suffered from an illness and appointed Duane Silverthorn, a public defender, to represent him at sentencing. Uraz, however, requested that Perrone stay on as his counsel along with Silverthorn. The Court sentenced Uraz

RECEIVED by MCOA 8/25/2022 4:00:45 PM

from 200 to 360 months for each count of Solicitation of Murder and 36 to 90 months for the count of Aggravated Stalking. Uraz appealed his conviction and made a motion to remand for a *Ginther* hearing on the basis that Perrone provided ineffective assistance of counsel. Specifically, Uraz alleged that Perrone failed to impeach Allen and Close with their prior theft-related offenses and that Perrone's cross-examination and closing argument were inadequate.

### C. Uraz's *Ginther* Hearing and Subsequent Briefing

Due to the COVID-19 Pandemic, the availability of witnesses, and Uraz's request that he attend the hearing in-person, the Court conducted the *Ginther* hearing over two days. The first hearing was held in October 2021 and the next in April 2022. At the hearing, the Court heard from seven witnesses in total. Testimony was received from Perrone, Schroder, and Silverthorn, the three lawyers who represented Uraz. The Court also heard from Nicholas Fernandez and Andrew Vukovich, two individuals who worked at the same firm as Perrone. The prosecutors, Jonathan Roth and Charles Koop, also testified. Uraz testified last.

Perrone testified first. He flatly denied that his subsequent diagnosis and breakdown negatively affected his representation of Uraz in any way. Stating that if he had had an episode, it would have been clear as he would have been "unintelligible." Perrone stood by his trial strategy given the circumstances of the case. While he could not recall if he had known about the theft-related convictions of Allen and Close, he testified that he did considerable investigation into their criminal records. His investigation focused on the benefit that each individual was attempting to obtain by testifying against Uraz, including monitoring one of Closes's existing cases to determine whether Close received a benefit from his testimony. Perrone testified that prior to trial he encouraged Uraz to take a plea as the weight of the evidence weighed heavily against him, but that Uraz appeared

RECEIVED by MCOA 8/25/2022 4:00:45 PM

out-of-touch with the reality of his circumstances and insisted on going to trial.

Perrone also testified regarding Uraz's specific claims that he was ineffective. Perrone stated any long breaks between his questions to Allen was because he had to consult with Uraz about what further issues Uraz wanted him to question the witness's about. Perrone stated that the prosecutor's remarks to the jury during closing arguments that Perrone had taken "three minutes between questions" and that his cross-examination "rambled on for hours" were exaggerations used to undermine his effectiveness in the eyes of the jury. Regarding the email he sent to Uraz's sister, Perrone testified that he was trying to be positive and that he believed he had done enough to get a not guilty verdict but admitted his claims were perhaps too "expansive" and that he embellished the number of hours a week he worked.

Finally, Perrone testified that he was hospitalized due to exhaustion following a trip to Dallas, which was cut short due to a family issue, and that his bipolar episode followed the hospitalization suddenly and without warning. Perrone believed these events following trial, combined with the natural exhaustion of going through a trial, led to his episode.

Next, Eric Schroder and Nicholas Fernandez testified; both had helped Perrone during trial. Schroder was the second chair attorney and Fernandez worked in an administrative capacity. Both testified that they believed Perrone was not negatively impacted during trial due to his mental state. Schroder testified that if he believed Perrone was unable to adequately represent Uraz, he would have reported it. Schroder testified that Perrone did not take too long between questions and that his cross-examination of Allen did not last for hours, stating that the prosecutor's statements otherwise were exaggerated. Fernandez testified that he knew Perrone since middle school and that Perrone's demeanor, such as raising his voice and being excitable, during trial were not out-of-character as Perrone is generally a

RECEIVED by MCOA 8/25/2022 4:00:45 PM

high-energy person.

The last person on Perrone's team to testify was Andrew Vukovich. Vukovich practically ended his job with Perrone before trial and maintained little communication with Perrone during the time of trial. Vukovich's role was also very limited for Perrone's felony cases, but he stated that he was not aware of Perrone having issues during trial.

Uraz's appointed attorney for sentencing, Silverthorn, testified as well. Because Silverthorn was not present during trial and was only appointed to handle Uraz's sentencing, he offered little testimony about Perrone's performance. Silverthorn stated that he first met Perrone after trial and observed that Perrone appeared to be agitated and had trouble focusing.

Both prosecutors, Charles Koop and Jonathan Roth, testified that they believed Perrone was not negatively affected by his condition, nor did he have a mental breakdown at any point during trial. Roth stated that he attended law school with Perrone and that they were in the same section during their first year. Roth stated he believed that Perrone's cross-examination went on for longer than it could have, but that he believed it was part of Perrone's trial strategy. Roth stated that by taking a significant amount of time to cross-examine a key witness, Perrone was hoping to dilute the witness's testimony by putting time between that testimony and the jury's deliberation. Finally, Roth stated that he believed it was not a good strategy to impeach a witness of minor, prior theft convictions when the jury already knew that the witness was in jail.

Uraz was the last person to testify. Uraz claimed that many of his family members have bipolar disorder which enabled him to be able to recognize the signs of a breakdown. Based on this knowledge, he believed Perrone was having an episode during his trial. Specifically, that Perrone made "subtle motions" indicative

Page 9

RECEIVED by MCOA 8/25/2022 4:00:45 PM

of bipolar disorder and that Perrone laughed and raised his voice at inappropriate times during trial. However, when asked why he did not raise any concerns about Perrone's condition during the numerous pretrial hearings, the trial, or any of the post-trial hearings, Uraz could only state that he did not believe it was appropriate at the time. He also could not provide a reason why, after his sentencing, he requested Perrone stay on as his attorney despite his later alleged belief knew Perrone was going through a mental breakdown. Following the hearing, the parties provided briefing on the issues.

## STANDARD OF REVIEW

Whether a defendant has been denied effective assistance of counsel is a mixed question of law and fact. *People v LeBlanc*, 465 Mich 575, 579 (2002). Meaning, the judge must first find the facts, and then, based on those facts, determine whether the defendant has been afforded effective assistance. *Id*.

## LAW & ANALYSIS

The Michigan and Federal constitutions guarantee a criminal defendant the effective assistance of counsel. Const 1963, art 1, § 20; US Const, Am VI; *People v Pickens*, 446 Mich 298 (1994) (holding that the Michigan Constitution provides no greater protection for ineffective assistance than its federal counterpart). The ultimate question in an ineffective assistance claim is whether trial counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *People v Hunter*, 141 Mich App 225, 229-230 (1986).

Michigan has adopted the federal, two-prong *Strickland* test for proving ineffective assistance. *Pickens*, 446 Mich at 325 (citing *Strickland v Washington*, 466 US 668 (1984)). First, a defendant must show that his trial counsel's performance was objectively deficient. *People v Randolph*, 502 Mich 1, 9 (2018).

RECEIVED by MCOA 8/25/2022 4:00:45 PM

Second, the defendant must show that, but for counsel's deficient performance, a different result would have been reasonably probable. *State v Armstrong*, 490 Mich 281, 290 (2011).

Uraz advances two main arguments that Perrone's representation constituted ineffective assistance of counsel under the State and Federal Constitutions. First, Uraz argues that Perrone was ineffective for failing to undermine Close's and Allen's credibility with their previous theft-related crimes. Second, that Perrone's cross-examination and closing argument were so inadequate as to be ineffective. The Court considers each argument in turn. Finally, the Court addresses Perrone's subsequent breakdown and whether it warrants granting Uraz relief.

## A. Uraz Failed to Demonstrate that Perrone's Representation was Objectively Unreasonable

A defendant must overcome the strong presumption that trial counsel's performance was born from a sound trial strategy. *People v Trakhtenberg*, 493 Mich 38, 52 (2012). Counsel has a duty to reasonably investigate his client's case, and what is reasonable must be considered in light of the circumstances of the case. *Id.* Counsel's decision not to investigate an avenue of defense may constitute ineffective assistance if the decision is not justified. *Id.* Counsel is given wide latitude in making tactical decisions. *Harrington v Richter*, 562 US 86 (2011). The ultimate question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or customs. *Harrington v Richter*, 562 US 86 (2011).

### i. Uraz has not Proven Perrone's Failure to Introduce Allen's and Close's Convictions was not Objectively Unreasonable

Uraz bears the burden of proving that Perrone's failure to undermine Allen's and Close's credibility was objectively unreasonable. Michigan Rule of Evidence

(MRE) 609 allows a lawyer to attack the credibility of a witness during cross-examination by introducing evidence of his conviction for a past theft-related offense. Here, the parties do not debate that Allen and Close had convictions that qualified under MRE 609, misdemeanor larceny and home invasion third respectively, and that Perrone did not attack their credibility with these convictions.

In determining that Perrone's failure to introduce these convictions to the jury was not unreasonable, the Court considers the surrounding facts and circumstances. Uraz has failed to prove that Perrone did not adequately investigate his case, specifically, that Perrone failed to uncover Allen's and Close's convictions. Perrone testified that he could not remember if he knew about the convictions, but that he conducted a thorough investigation of each inmate's criminal record. Perrone's assistants likewise testified to the thoroughness of his investigation.

Rather, the record indicates Perrone may have believed his trial strategy would not be materially benefitted by the MRE 609 evidence. Decisions surrounding how to cross-examine witnesses are matters of trial strategy. *In re Ayres*, 239 Mich App 8, 23 (1999). Here, Perrone stated that the convictions were immaterial to his trial strategy because the jury already knew each inmate was incarcerated, and his trial strategy was to focus on providing evidence of each inmate's motive for testifying against Uraz.

Uraz makes the related argument that if Perrone had known about the convictions, it was unreasonable for him not to raise them to the jury. Essentially, Uraz argues that a lawyer always acts unreasonably when he fails to attack an adverse witness's testimony with MRE 609 evidence. However this is not the case. The determination of whether to introduce MRE 609 evidence is a matter of trial strategy and, therefore, is strongly presumed to be constitutional. Here, Perrone

attempted to undermine both inmate's testimonies by introducing evidence that each had a motive for testifying against Uraz. Perrone also impeached Close regarding his statements that he had not discussed Uraz's case with Allen. Therefore, Perrone may have viewed the MRE 609 evidence as cumulative or as distracting from his primary strategy of showing each inmate's motive. Such decisions of trial strategy are within the wide discretion of the lawyer and, in this case, do not raise to the level of being objectively unreasonable.

Uraz analogizes his case to *Trakhtenberg*, 493 Mich 38 (2012), where the court held that a defense counsel acted unreasonably by failing to investigate his client's case. The court held that the attorney failed to investigate such that she was unable to sufficiently develop her defense strategy at trial. Here, no such concerns are present. Going into and throughout trial, Perrone developed his trial strategy by attempting to show that Uraz was being set up and that those testifying against him were doing so for their own personal benefit. The record indicates that Perrone went through substantial effort, including interviewing thirty witnesses named by Uraz, to develop this strategy. Accordingly, the Court finds Uraz has failed to show that Perrone acted unreasonably by not introducing evidence of Allen's and Close's prior theft-related convictions.

RECEIVED by MCOA 8/25/2022 4:00:45 PM

### ii. Perrone's Cross-Examination and Closing Argument were Reasonable

Uraz next argues that Perrone's delays during cross-examination and his closing argument were objectively unreasonable. However, Uraz provides little-to-no argument on the issue. In support of his contention that Perrone took too long between questions, Uraz does not cite to the record. Rather he cites to Prosecutor Roth's statement before the jury that Perrone took "three minutes between questions" and that Perrone "ramble[d] on for hours." Uraz does not state how Perrone's closing was ineffective

A party may not simply announce a position and leave it to this Court to make the party's arguments and search for authority to support the party's position. *Wilson v Taylor*, 457 Mich 232, 243 (1998). Failure to adequately brief an issue constitutes abandonment. *McIntosh v McIntosh*, 282 Mich App 471, 484 (2009). However, the Court does note that Perrone stated any delays in questioning were due to him conferring with Uraz about any additional lines of questioning Uraz desired. Accordingly, any unnecessary delay was likely attributable to Uraz and further dilutes his contention that Perrone acted unreasonably.

### iii. Uraz Failed to Prove Perrone Suffered a Breakdown Before or During Trial

Finally, Uraz states that Perrone had a mental breakdown during his trial that affected his ability to properly represent Uraz's interests. Uraz does not cite any support that a counsel's breakdown alone is adequate grounds to grant a new trial. Read generously, Uraz's claim may be understood that he was, in a sense, deprived of counsel if his lawyer was unable to adequately function despite any evidence that his lawyer lacked the ability to represent him.

The evidence in the record shows that Perrone was not suffering from a breakdown during the trial and that it occurred only after the trial had concluded.

Uraz offers his own, self-serving testimony in support of his argument that Perrone suffered a breakdown. Uraz stated that he knew the signs of a breakdown because he has family members that suffer from bipolar disorder. He stated that he recognized the "subtle motions" that Perrone made as consistent with a breakdown.

Whereas, Perrone, the lawyers he worked with, and the prosecutors all testified that they did not believe he was suffering from a breakdown. Perrone testified that his breakdown came as a result of his lack of sleep combined with family issues and having to travel after the trial ended. All of which led to him being hospitalized due to exhaustion. Likewise, those who knew Perrone stated that his actions and behavior throughout trial remained consistent with his normal demeanor.

Uraz also points to the email sent by Perrone to his sister near the end of his trial. But the email does not prove that Perrone suffered from a breakdown, while the email was admittedly overly optimistic and exaggerated it does not clearly signify a mental break. As a final point, Uraz was given numerous opportunities, before, during, and after trial to raise any issues he had with Perrone's representation, but he declined to do so. Instead, even after he was informed of Perrone's issue and granted a new lawyer, he requested that Perrone continue to represent him. Accordingly, the evidence in the record indicates that Perrone was not suffering from a psychological condition during Uraz's trial

## B. Uraz Has Failed to Prove Prejudice

To warrant relief, a defendant must also show that, but for his counsel's objectively unreasonable performance, there is a reasonable probability that the result of the trial would have been different. *Pickens*, 446 Mich 298, 303 (1994). A reasonable probability is a probability sufficient to undermine the confidence of the trial. *Id*. The more evidence there is of guilt, the less likely it is that the result of the trial would have been different had the lawyer's mistake not occurred.

RECEIVED by MCOA 8/25/2022 4:00:45 PM

While a determination of prejudice is not necessary because the Court holds Perrone acted reasonably, as a matter of prudence the Court considers the question anyway. Assuming arguendo that Perrone acted unreasonably, the Court holds, given the overwhelming evidence of Uraz's guilt, Uraz has not proven prejudice.

To prove prejudice, Uraz must prove that had Perrone introduced Allen's and Close's previous theft-related convictions, there is a probability he would not have been found guilty on all counts. As previously noted, Perrone elicited testimony by each inmate that they had a self-serving motive to testify against Uraz and that they were incarcerated. Accordingly, further reduction in their credibility through evidence of past offenses would be of marginal advantage.

This marginal advantage is not sufficient to overcome the immense evidence of Uraz's guilt. The record clearly establishes that Uraz believed that Melke had ruined his life. For months Uraz's actions escalated in series of acts designed to threaten and scare Melke and, ultimately, to kill her. The jury heard evidence that Uraz became upset after he learned that Melke had begun to date someone new. That this led him to take physical retribution against both Melke and her boyfriend by destroying their property on multiple occasions. The jury also heard that Uraz became preoccupied with Melke, following her around in violation of several PPO's against him, creating fake internet profiles to slander her, hacking into her social media accounts, and sneaking into her room and stealing her undergarments. And that these actions ultimately lead to Melke break up with her boyfriend out of fear for his physical safety. The jury learned that Uraz had attempted to purchase a firearm through means he believed to be illegal, which he later confided he had planned to use to kill Melke. Uraz contends that his conversation with the undercover officer about having Melke killed vague. However, in context of asking the officer, posing as a hit-man, to "take out" the "red-haired" "trash," Uraz's

RECEIVED by MCOA 8/25/2022 4:00:45 PM

intentions are clear. All-in-all, the evidence of Uraz's guilt was overwhelming and there is no reasonable possibility the outcome of the trial would have been different had the jury heard evidence that Allen and Close had previous theft-related convictions. Likewise, there is no reasonable possibility that, had Perrone taken less time between questions, the outcome of the trial would have been different.

### CONCLUSION

Perrone's representation of Uraz was not constitutionally deficient under the State or Federal Constitutions. The actions he took and trial strategy he adopted were reasonable and, even if they were not, Uraz has failed to prove that he suffered any prejudice. Accordingly, the Court DENIES Uraz's motion and request for a new trial.

**In accordance with MCR 2.602(A)(3), the Court finds that this Order disposes of the last pending claim, and closes this case.**

Hon. Clinton Canady III (P23262)

### PROOF OF SERVICE

I hereby certify that I provided a copy of the above ORDER to each attorney of record, or to the parties, by hand delivery, or by placing a true copy in a sealed envelope, addressed to each, with full postage prepaid and placing said envelope in the United States mail, on ___August 8___, 2022.

Samuel Kane
Law Clerk | Court Officer
Circuit Court Judge

Page 17

RECEIVED by MCOA 8/25/2022 4:00:45 PM

**STATE OF MICHIGAN**

**IN THE COURT OF APPEALS**

**PEOPLE OF THE STATE OF MICHIGAN**

|  |  |
|---|---|
| Plaintiff-Appellee | **Lower Court No.**s 16-1064 FH & 16-1065 FC |
|  | **Honorable Clinton Canady III**<br>COA# 343695 & 343696 |
| -vs- |  |

**TUNC URAZ,**

Defendant-Appellant.

_____/

**INGHAM COUNTY PROSECUTOR**
Attorney for Plaintiff-Appellee

_____

**SUSAN K. WALSH (P40447)**
Attorney for Defendant-Appellant

_____

**SUPPLEMENTAL BRIEF ON APPEAL REGARDING _GINTHER_ HEARING AND DENIAL OF NEW TRIAL**

BY:    SUSAN K. WALSH (P40447)
       PO Box 157
       Northville, MI 48167
       248-563-9149

RECEIVED by MCOA 8/26/2022 1:49:55 PM

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ii

STATEMENT OF QUESTIONS PRESENTED ........................................................iii

STATEMENT OF FACTS .......................................................................................... 4

**I.  Mr. Uraz was denied his state and federal constitutional right to the effective assistance of counsel where his trial counsel failed to ask for a continuance when he was nearing a mental breakdown during the trial and was not able to effectively try the case and where trial defense counsel failed to properly cross-examine the states key witnesses regarding their prior theft related convictions and failed to properly examine defense witnesses...........................................8**

SUMMARY AND RELIEF ........................................................................................ 14

APPENDIX A

RECEIVED by MCOA 8/26/2022 1:49:55 PM

## TABLE OF AUTHORITIES

**Cases**

*People v Dalessandro*, 165 Mich App 569, 577-588; 419 NW2d 609 (1988)................................. 9

*People v Kelly*, 186 Mich App 524, 526 (1990)............................................................. 12

*People v LeBlanc*, 465 Mich 575 , 579; 640 NW2d 246 (2002) ...................................... 8

*People v Nickson*, 120 Mich App 681, 685 (1982). ................................................. 9, 12

*People v Stubli,* 163 Mich App 376, 380; 413 NW2d 804 (1987).................................... 9

*People v Tommolino*, 187 Mich App 14; 466 NW2d 315 (1991); Blackburn v Foltz, 828 F2d 1177

(CA 6, 1987) .................................................................................................. 9

*People v Winans*, 187 Mich 294; 466 NW2d 731 (1991) ................................................ 9

*People v. Allen*, 429 Mich. 558 (1988). ....................................................................... 10

**Rules**

MRE 609 .......................................................................................................... 10

**Constitutional Provisions**

US Const, Am XI and XIV ..................................................................................... 13

RECEIVED by MCOA 8/26/2022 1:49:55 PM

**STATEMENT OF QUESTIONS PRESENTED**

**I.  Was Mr. Uraz denied his state and federal constitutional right to the effective assistance of counsel where his trial counsel failed to ask for a continuance when he was nearing a mental breakdown during the trial and was not able to effectively try the case and where trial defense counsel failed to properly cross-examine the states key witnesses regarding their prior theft related convictions and failed to properly examine defense witnesses?**

The trial court answered "no"..

Defendant-Appellant answers "yes".

iii

RECEIVED by MCOA 8/26/2022 1:49:55 PM

## **STATEMENT OF FACTS**

Defendant, Tunc Uraz, was convicted by jury of aggravated stalking and solicitation to murder, in the Ingham County Circuit Court, the Honorable Clinton Canady, III presiding and Defendant is appealing these convictions as of right.  On March 6, 2020, this Court remanded to the trial court for a *Ginther* hearing.  Due to the Pandemic, the *Ginther* hearing was adjourned so that Mr. Uraz could attend in person.

The issue determined by the trial court at the hearing was whether Mr. Uraz was denied his state and federal constitutional right to the effective assistance of counsel where his trial counsel failed to ask for a continuance when he was nearing a mental breakdown during the trial and was not able to effectively try the case and where trial defense counsel failed to properly cross-examine the states key witnesses regarding their prior theft related convictions and failed to properly examine defense witnesses and failed to give a cogent closing argument.

On October 4, 2021, the first half of the *Ginther* hearing was held.  The first witness to testify was Mr. Uraz's trial attorney, Jacob Perrone.  He testified that he had a good memory of the trial and that he did not think that his Bi-Polar condition affected his ability to represent Mr. Uraz or to make good decisions about trial strategy, EH 10/4/21 (EHI) 7-8.  He did not believe that any of his decisions during the trial prejudiced Mr. Uraz, EHI 8.

Mr. Perrone claimed that he did not recall whether the prosecution's two key witnesses had prior theft related convictions and admitted that using those convictions would have been one way to impeach these witnesses, but that he did not do so, EHI 10-11.  Mr. Perrone also admitted that

RECEIVED by MCOA 8/26/2022 1:49:55 PM

this case was one of the first capital cases that he tried and that his inexperience may have impacted his failure to make this investigation and present this evidence, EHI 11. Mr. Perrone stated that there may have been a delay in his questions to witnesses due to his consultation with Mr. Uraz, EHI 12.

On cross-examination Mr. Perrone gave detailed testimony about the trial and trial preparation and claimed that if he had an episode during the trial, it would have been obvious to everyone and he would have needed medical help, EHI 12-37, 38.

When Mr. Perrone was questioned about the email that he sent during trial to Mr. Uraz's family, he testified that he felt the trial had gone well and that there would be a not guilty verdict, EHI 38-39. Mr. Perrone claimed that his statements about the case and that he could get a $10 million dollar award in a civil unlawful imprisonment case were perhaps expansive but that he was trying to be positive, EHI 40. Mr. Perrone also admitted that he may have embellished when he said that he was working 120 hours a week at the time of trial and that this did not impact the trial, EHI 41.

Eric Schroeder then testified that he was working for Mr. Perrone at the time of the trial and that he assisted Mr. Perrone with the trial by doing any tasks that Mr. Perrone asked him to do, EHI 42-43. He testified that he did not see any issues with Mr. Perrone's mental state that impacted his ability to try the case or that prejudiced Mr. Uraz, EHI 44.

Nicholas Fernandez next testified that he has known Mr. Perrone since middle school and that he had an administrative role in the trial, EHI 52. He testified that Mr. Perrone is a high energy person and that he witnessed Mr. Perrone raise his voice to a detective during the trial and that this

5

RECEIVED by MCOA 8/26/2022 1:49:55 PM

was not out of character for Mr. Perrone, 53.  Mr. Fernandez testified that he did not believe that

Mr. Perrone's mental state negatively impacted the trial or that any of Mr. Perrone's decisions

prejudiced Mr. Uraz, EHI 53.

Charles Koop next testified that he was an assistant prosecutor for Ingham County at the

time of the trial and that he split the trial with Jonathon Roth, EHI 55.  He stated that he did not

notice any changes in Mr. Perrone's condition during the trial, EHI 55-56.

Duane Silverthorn then testified that he did the sentencing for Mr. Uraz and that he met

with Mr. Perrone after the trial, EHI 57-58.  He stated that Mr. Perrone was agitated and had

difficulty focusing, EHI 58.  He was not at the trial and did not know Mr. Perrone previously, EHI 58.

Andrew Vuckovich testified that he worked with Mr. Perrone at the time of the trial but that

his involvement in the trial was very limited, EHI 61-62.  He had limited contact with Mr. Perrone at

the time of the trial and did not notice any changes in Mr. Perrone's behavior, EHI 64.

The evidentiary hearing had to be continued due to the unavailability of the trial prosecutor.

At the second hearing (EHII), the trial prosecutor, Jonathan Roth, testified that he supervised Mr.

Koop and worked with him during the trial, EHII 5.  He stated that he did not believe that Mr.

Perrone's mental condition affected his ability to defend Mr. Uraz explaining that he went to law

school with Mr. Perrone and he had known him at the time of trial for about 10 years, EHII 6.

As to his comments during trial that Mr. Perrone was taking a long time cross examining

witnesses, Mr. Roth testified that he believed that Mr. Perrone was doing this on purpose to dilute

the testimony of the prosecution's most important witnesses, EHII 17.  He believed that

impeachment with Mr. Close's and Mr. Allen's prior theft-related convictions would not have helped

6

RECEIVED by MCOA 8/26/2022 1:49:55 PM

Mr. Uraz's case, EHII 20.  Mr. Roth contended that he did not think that it was a good strategy to impeach a witness with a prior theft-related conviction if that witness was already in jail, EHII 22-24.

Mr. Uraz testified as to his experience with Mr. Perrone.  He stated that he became concerned about Mr. Perrone's representation when he did not investigate or call the witnesses that he had requested, EHII 36-37.  He testified that during trial Mr. Perrone would laugh out of the blue and look around and smile, EHII 39.  He also stated that Mr. Perrone was getting confrontational with Mr. Roth, EHII 40.  He believes that Mr. Perrone tried to cram all of his investigation in during the two weeks before trial while in a manic episode, EHII 41.

On cross-examination, Mr. Uraz testified that he did not know prior to the trial that he had a right to complain about Mr. Perrone to the court, EHII 44-45, 47.  Mr. Uraz also explained that he has no criminal law training and new very little about the law at the time of trial, EHII 52.  He stated that with the stress of the trial he would not have been able to make an educated decision about whether or not his attorney was giving him effective assistance of counsel, EHII 52.

The trial court denied Mr. Uraz's request for a new trial in an opinion that has been previously filed with this Court.  Mr. Uraz contends that the trial court erred when it denied him a new trial.

Further facts will be set forth in the Issues where necessary.

RECEIVED by MCOA 8/26/2022 1:49:55 PM

**ARGUMENT**

**I.  Mr. Uraz was denied his state and federal constitutional right to the effective assistance of counsel where his trial counsel failed to ask for a continuance when he was nearing a mental breakdown during the trial and was not able to effectively try the case and where trial defense counsel failed to properly cross-examine the states key witnesses regarding their prior theft related convictions and failed to properly examine defense witnesses.**

**Standard of review and issue preservation**: Whether a person has been denied the effective assistance of counsel is a mixed question of fact and constitutional law. Findings of fact are reviewed for clear error and questions of constitutional law are reviewed de novo. See , *People v LeBlanc*, 465 Mich 575 , 579; 640 NW2d 246 (2002).  A *Ginther* hearing was held on remand.

Mr. Uraz contends that his state and federal right to effective assistance of counsel was violated when his trial counsel's mental ability to try his case declined prior to and during his trial. While conceding that an individual with a mental health condition may properly try a case while in good health and/or properly medicated, the record supports the conclusion that trial defense counsel was not properly medicated and did not have a diagnosis prior to trial.  Mr. Uraz contends that the record supports the conclusion that Mr. Perrone was a young attorney handling one of his first capital cases when his mental health started to decline prior to his diagnosis with Bi-Polar disorder.  Mr. Uraz asserts that Mr. Perrone's condition impeded his ability to properly prepare for trial and to do a thorough investigation of the prosecution's key witnesses in the solicitation case.   Specifically, Mr. Perrone failed to do a simple search of these witness's criminal backgrounds and therefore failed to impeach them with their prior theft related convictions.  Mr.

8

RECEIVED by MCOA 8/26/2022 1:49:55 PM

Uraz also contends that Mr. Perrone failed to provide effective assistance while cross-examining these key witnesses, while examining the defense witnesses and while giving his closing argument.

Failure to investigate, prepare, or present a substantial defense has been grounds for ineffective assistance. See, e.g., *People v Nickson*, 120 Mich App 681; 327 NW2d 333 (1982); *People v Winans*, 187 Mich 294; 466 NW2d 731 (1991).

The role of defense counsel is to challenge the prosecution's case - to present to the trier of fact through cross-examination, presentation of evidence, motions and argument that a reasonable doubt exists as to the accused's guilt.  Courts have recognized that an unreasonable or harmful tactic is not protected solely because it is termed "strategy." See *People v Stubli*, 163 Mich App 376, 380; 413 NW2d 804 (1987); *People v Dalessandro*, 165 Mich App 569, 577-588; 419 NW2d 609 (1988) (holding that *Strickland,* supra, requires that counsel engage in "*sound* trial strategy"); *People v Tommolino*, 187 Mich App 14; 466 NW2d 315 (1991); Blackburn v Foltz, 828 F2d 1177 (CA 6, 1987).

The solicitation cases against Mr. Uraz were far from unassailable. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by error than one with overwhelming record support." *Strickland,* 466 US at 696.  The only evidence against Mr. Uraz for these offenses were jail house snitches testimony and a vague phone conversation with an undercover officer.

Generally, to establish ineffective assistance of counsel, a defendant must show: (1) that counsel's performance was below an objective standard of reasonableness under prevailing

9

RECEIVED by MCOA 8/26/2022 1:49:55 PM

professional norms; (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different; and (3) that the resultant proceedings were fundamentally unfair or unreliable.  US Const, Ams VI, XIV; Const 1963, art I, §20; *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Pickens*, 446 Mich 298 (1994).

Here, trial defense counsel had a mental breakdown requiring hospitalization just days after Mr. Uraz's trial was completed, Hearing 12-13-17 at 3, In chambers conference 12-12-17. During the fifth day of trial the prosecutor stated in front of the jury:

> MR. ROTH: "Your Honor, I am going to object. This is three minutes between questions. This cross-examination rambles on for hours.
> THE COURT: I can't help that.
> MR. ROTH: We took a break so he would gather his thoughts.
> THE COURT: I can't press that.
> MR. ROTH: Thank you, Your Honor.
> THE COURT: This is a serious matter. So he can utilize whatever strategy he so desires. JTV 60-61.

During this same time frame, defense counsel sent an email to Mr. Uraz's sister that supports a finding that defense counsel was nearing a breakdown, see Appendix A attached to Brief on Appeal.  This email was entered into the record during the sentencing phase.  Defense counsel also failed to impeach Mr. Allen and Mr. Close with their prior theft convictions.  Mr. Allen was convicted of misdemeanor larceny and Mr. Close was convicted of home invasion 3d. Under MRE 609 misdemeanors that contain an element of dishonesty or false statement may be used for impeachment. *People v. Allen*, 429 Mich. 558 (1988).  Furthermore, a review of defense

10

RECEIVED by MCOA 8/26/2022 1:49:55 PM

counsel's examination of the defense witnesses and closing argument supports the conclusion that defense counsel was unable to properly represent Mr. Uraz.

Mr. Uraz contends that the record stands for itself regarding his arguments that Mr. Perrone's ability to effectively represent Mr. Uraz deteriorated by the end of the trial.  The prosecutor made it known on the record that Mr. Perrone was taking several minutes between questions during his cross-examination.  At the *Ginther* hearing, the prosecutor contended that this was some kind of a trial strategy.  Mr. Uraz argues that, to the contrary, this type of behavior would greatly undermine the jury's confidence in an attorney.  The jury is left to believe that the attorney is struggling to find questions to ask and to present his case.  This was not sound trial strategy.

This is also true of Mr. Perrone's closing argument which is attached as Appendix A.  Mr. Perrone starts the closing by stating:

> I'm rubber and you're glue. Whatever you say bounces off you and sticks to me.  Sorry about that. I am rubber and you're glue, whatever you say bounces off me and sticks to you. JTVI 135.

Mr. Perrone then went on to talk about an entirely different topic, never explaining the rubber/glue comment.  Mr. Perrone then continues to make disjointed comments about the case that make no cogent argument, see Appendix A.  Then at the end of his closing, and as an example, Mr. Perrone states:

> The testimony shows Reginald Close says that he talked to Charles Allen about it. He talked to him specifically about it. Charles Allen, we don't

11

RECEIVED by MCOA 8/26/2022 1:49:55 PM

know what he can commit to, or can't commit to. He says that he can't remember. He previously said he didn't. But, of course, you know, we can't hold him to that. Right after the preliminary examination he said I don't' think so. So, you know, that's how his character is rehabilitated.

Look at the map. Think about numbers. Think about addresses. Think about small details. If you look at this map here, you recall what the Prosecutor said that Allen told them. He had all of the information. 3925 Dunckel Road. You guys can determine what that number is in looking at it.

You can't make one without connecting all three. Thank you. JTVI 151-152.

These were defense counsel's last words to the jury and they do not make sense.  Mr. Uraz contends that Mr. Perrone's failing health towards the end of the trial resulted in him providing ineffective assistance and denied him  his constitutional right to a fair trial.

Although several friends and former co-workers of Mr. Perrone testified that they did not notice any issues with Mr. Perrone, the evidentiary hearing revealed that Mr. Perrone was inexperienced in capital cases and that he had not yet been diagnosed with Bi-Polar disorder and therefore was not medicated prior to or during the trial.  Mr. Uraz contends that Mr. Perrone's condition impeded his ability to spot issues, cross-examine witnesses, give an oral argument and properly represent him at trial.   Prosecutor Roth's opinions that using prior theft-related convictions is not a good way to impeach a witness and that Mr. Perrone was purposely trying to extend his cross-examination should be given little to no weight as he was the prosecutor in the case.

An attorney's failure to present certain evidence constitutes ineffective assistance of counsel if it deprives the accused of a "substantial defense." *People v Kelly*, 186 Mich App 524, 526 (1990).  A substantial defense is one that might have made a difference in the outcome of

12

RECEIVED by MCOA 8/26/2022 1:49:55 PM

the trial. Id.  Attorneys also have a duty to conduct adequate pretrial preparation. ABA STDS. CRIM. JUST. 4.4.1, *People v Nickson*, 120 Mich App 681, 685 (1982). Investigation related to the credibility of prosecution witnesses is included in this duty. Id.

Here, the credibility of the prosecution's star witnesses for the solicitation offenses was crucial.  Also, defense counsel's presentation to the jury at the end of the trial was rambling and inadequate and greatly prejudiced Mr. Uraz's case.  Therefore, Mr. Perrone's representation was below an objective standard of reasonableness under prevailing professional norms, there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different and the resultant proceedings were fundamentally unfair or unreliable

For all of these reasons, due process requires a new trial.  Const 1963, art 1, § 17; US Const, Am XI and XIV.

RECEIVED by MCOA 8/26/2022 1:49:55 PM

13

## SUMMARY AND RELIEF

WHEREFORE, Mr. Uraz requests this Court reverse and vacate his convictions and sentences.

Respectfully submitted,

BY:_____/s/ Susan K. Walsh_____
               SUSAN K. WALSH (P40447)
               PO Box 157
               Northville, MI 48167
               248-563-9149

Dated: August 26, 2022

14

RECEIVED by MCOA 8/26/2022 1:49:55 PM

Appendix A
(this appendix has been filed separately)

15

RECEIVED by MCOA 8/26/2022 1:49:55 PM

**133**

1  my objection to specific intent, but you want me
2  to use purposefully sought.  That's your
3  request.  So this is the request of the Defense
4  that the phrase purposefully sought be inserted
5  where intended is in the instruction.  But my
6  recollection is I said we would use the
7  instruction in the case.  I'm prepared to give
8  you this one, if that's what you like.
9       MR. PERRONE:  Purposefully sought is
10  acceptable to the Defense.
11       THE COURT:  That's fine.
12       MR. ROTH:  That's fine, Your Honor.
13       THE COURT:  That's what we'll use.
14       Second, that the Defendant purposefully
15  sought by his words or actions, that what he
16  said or did would cause Reginald Close, one, or
17  Charles Allen in the other, and Frank Mobley
18  as the third, or we can still use 4.16 about how
19  that could be established by using intent.
20  Okay?
21       And I, again, I think that is a
22  demonstrative aid.  So the actual instructions
23  haven't gone to the jury yet.  I guess if you
24  want to put up a modified one during your
25  closing, saying purposefully sought, that is

**134**

1  fine.
2       MR. PERRONE:  I might as well.
3       MR. ROTH:  Thank you, Your Honor.
4       MR. PERRONE:  Thank you, Your Honor.
5       THE COURT:  All right.  So the rest of the
6  instructions we distributed.  So look them over
7  during the break because it will be my intent to
8  go right into those instructions.  Did we have a
9  jury form?
10       THE CLERK:  It's attached.
11       MR. ROTH:  It was included and agreed upon.
12       THE COURT:  All right.  We will be in
13  recess.
14       MR. ROTH:  Thank you, Your Honor.
15  (Recess taken from 11:52 a.m. to 12:55 p.m.)
16       THE COURT:  Resuming on the matter of People
17  versus Uraz, file number 16-1064 and 65.  All
18  the parties are here.  Mr. Roth, Mr. Perrone.
19  Mr. Uraz.  Everybody can be seated.
20       Just as a preliminary matter, I will go
21  straight into instructions.  I want to confirm,
22  you had previously stipulated to strike Juror
23  number 1 as within the two jurors to be stricken
24  to get down to 12?
25       MR. ROTH:  Yes, Your Honor.

**135**

1       THE COURT:  Mr. Perrone?
2       MR. PERRONE:  Yes, Your Honor.
3       THE COURT:  Next juror will be randomly
4  selected in the usual process?
5       MR. ROTH:  Yes, Your Honor.
6       THE COURT:  Ready for the jury?
7       MR. ROTH:  Yes, Your Honor.
8       THE COURT:  Mr. Perrone, ready yet?
9       MR. PERRONE:  Just about, Your Honor.
10       THE COURT:  Let us know when you are ready.
11  I don't want to be waiting.
12  (Jury present in courtroom at 12:56 a.m.)
13       THE COURT:  Be seated.  On behalf of
14  Mr. Uraz.  Mr. Perrone?
15       MR. PERRONE:  Thank you, Your Honor.
16       Thank you ladies and gentlemen of the jury
17  for maintaining your attentiveness throughout
18  the trial.  We do appreciate that.
19       I'm rubber and you're glue.  Whatever you
20  say bounces off you and sticks to me.  Sorry
21  about that.  I am rubber and you're glue,
22  whatever you say bounces off me and sticks to
23  you.
24       Accountability is one of the aspects that I
25  would like you guys to look into.

**136**

Talked a little about the historical nature
of the process in my opening.  You seemed to be
very attentive at that point in time as to both
my opening and the State's opening.  You now
have had an opportunity to review all the
evidence.  The Prosecution has had an
opportunity to make a statement.  They are going
to be given an opportunity to make additional an
statement.  I get to make one statement.  They
get to make two.  They get an opportunity to be
heard last.  This is part of the process.
     Reasonable doubt.  That's going to be what
the Judge instructs you that you're going to
have to find.  Proof beyond a reasonable doubt
as to all of the charged offenses.  Reasonable
doubt is something that the Judge will instruct
you on.  But you're going to have to somewhat
use your own reasoning in order to determine
that.
     An analogy I like to use sometimes, I look
at WILX and they have What's Going Around.  They
tell you that bronchitis is going around or the
flu, and my child will have sniffles.  I assume
that they have whatever is on the What's Going
On section.  That's my reasoning for it.  It

RECEIVED by MCOA 8/26/2022 1:49:55 PM

137

1    seems like it will probably be attached to that,
2    or it could be.  What I'm looking at -- what
3    we're looking at is when you have a child, a
4    child starts to cough, you think they may have
5    whooping cough, so you take them in.  You don't
6    know.  They're coughing.  They may have a harsh
7    cough.  So they have a harsh cough.  It could be
8    whooping cough.  You draw that conclusion based
9    upon common sense.  And you are a parent
10   overall.  That's what you're being to be doing.
11        The Judge will instruct you as to the law,
12   as to the solicitation of murder, he is going to
13   instruct you that you will have to find that the
14   Prosecutor established his burden beyond a
15   reasonable doubt associated with all of those
16   counts.
17        My client purposely sought the aid of either
18   Close, Allen or Mobley.  Now, in looking at
19   that, we have to take all of those three
20   together.  Talk a little bit about the
21   aggravated stalking case, initially.
22        One of the aspects of the case here and the
23   Prosecutor represented, there is a large body of
24   stalking in this case.  I would ask that you
25   look at the dates that the Judge instructs you

138

1    on in making your determination in the evidence
2    that is presented by the Prosecutor.
3         One of the largest aspects of this entire
4    equation that the Prosecutor has used to tie
5    everything in, to connect the dots, is that in
6    April of 2016, the Defendant attempted to
7    purchase a firearm.  He made the assertion that
8    he bought that firearm to kill Ms. Melke.  You
9    guys had an opportunity to review all of the
10   information that was presented today.  That's an
11   inference the Prosecutor is making.  What I say,
12   what he says, that's not evidence.  The evidence
13   is what was put forward.  There was nothing on
14   the record.
15        Mr. Burnett testified that Mr. Uraz asked
16   him if he needed a gun, an illegal means.  Now,
17   what we have is there is obviously a PPO
18   outstanding.  So he couldn't get a gun legally.
19        MR. ROTH:  Your Honor, I am going to object
20   to that.  That was not what was testified
21   from Mr. Burnett, and was not in the PPO.
22        THE COURT:  Okay.
23        MR. PERRONE:  There is nothing --
24   Mr. Burnett testified -- I will withdraw that.
25        Again, the PPO, in and of itself, by its

139

1    very nature, shows, on the face of the PPO that
2    you can't hold a firearm.
3         THE COURT:  All right.  But Mr. Burnett
4    didn't say that.  Strike the portion that he
5    said about Mr. Burnett.
6         MR. PERRONE:  Mr. Burnett said that Mr. Uraz
7    appeared scared.  This is during a period of
8    time where there was the end of a three-year
9    relationship.  Ms. Melke testified that she
10   didn't want to talk to him anymore.  He did not
11   get the closure that he wanted.  He went to Dave
12   and Buster's in January.  You'll read, you'll
13   look at the PPO filing.  Look at all the filings
14   beforehand.  Look at what happened on
15   August 31st.  Look at the timing.  If you look
16   at the addresses, Mr. Uraz goes from court to
17   jail.  He ends up -- the last entry is at 3:05
18   p.m.  If we look at the timing, he would have
19   been -- had his tether off or in the jail at the
20   time the email was sent.  There are going to be
21   some significant logical jumps that you are
22   going to have to make as to that case.  There
23   was obviously an investigation that was somewhat
24   tainted overall.  It was not even based upon the
25   testimony that you saw.  There was a lot of

140

1    confusion even amongst the officers as to what
2    was going on.  It morphs into a solicitation of
3    murder investigation from the aggravated
4    stalking investigation.
5         Small details.  Dates and times.  It's not
6    my intention to mislead you.  I just want to try
7    to ensure that the record is accurate.  You have
8    all the dates and times associated with it.  The
9    Prosecutor, in this case, attempted to deflect
10   and defray all wrongdoing.  This is America.
11   This is not a third-world country.  We have
12   rights, the rights to be tried by a jury, and to
13   have a jury be the person who determines the
14   facts.  You determine the facts.  I don't
15   determine the facts.  The Prosecutor doesn't
16   determine the facts.  We give you a synopsis
17   of the summary of the evidence to a certain extent.
18        In this case there has been a significant
19   lack of evidence as it goes through the
20   solicitation of murder case.
21        The aggravated stalking case, the
22   investigation associated with that because of
23   the issues with the solicitation of murder case,
24   was somewhat rushed.  We have the police report
25   being filled out at the same point in time that

141

1   the call was being placed by Officer Mobley.
2           Purposefully sought.  One of the
3   aspects associated with -- purposefully sought.
4   That Mr. Close gave a phone number.  It wasn't
5   a real number, but he gave a phone number to
6   Mr. Uraz.  There wasn't any evidence that that
7   phone number was used, that he attempted to
8   contact somebody, that there was any follow-up
9   from him as to what Mr. Close described as
10  somewhat of an unrealistic plan.
11          A lot of absolutes in the State's case.
12  These are things that you guys are going to be
13  charged in making the determination of.  I want
14  to make sure you look at the evidence, look at
15  it carefully, thoroughly.  Compare different
16  pieces of evidence.  A couple pieces I'll look
17  at quickly.
18          When the Prosecutor is relying solely
19  on the incident from April -- April 7th, he
20  says four months.  September 27th is when the
21  testimony establishes that there was first any
22  communication regarding a plan from either
23  Allen or Close.
24          That's closer to five months, but the
25  Prosecutor says four because of the -- sounds

142

1   better.
2           And I'm not attempting to obscure the
3   issues.  It's the State's burden, it's the
4   State's case.  I do not have to present any
5   evidence.  I'm relying upon the Prosecutor to
6   provide that evidence.  However, I attempted to
7   bring some witnesses to give you somewhat of an
8   (inaudible) if possible.  The State did not
9   produce any recordings.  They did not produce
10  any audio, of the interactions between these
11  inmates in the jail.  Although they said they
12  had the capacity to, but, of course, they
13  minimize that also.  They're not of that much
14  value.  They're not the greatest recordings.
15  They didn't afford you guys the opportunity to
16  see those.  They don't have those.  They don't
17  have the necessary connections.
18          One of the aspects of this, as far as
19  the details are concerned, there isn't anything
20  between these three that you can connect the
21  dots to purposefully sought to kill.
22          The call was initiated by Officer
23  Mobley.  Officer Mobley testified that it was
24  expedited because they had this new information
25  from Allen, a new amazing witness that ties

143

1   everything in together.  Although they also
2   said that he was instructed by Lieutenant
3   Backus to initiate it.  But Lieutenant Backus'
4   testimony was inconsistent with that.
5           If you look at the testimony, we have
6   to weigh the testimony, the credibility
7   associated with the witnesses.  And Mr. -- the
8   Prosecutor went over all of the specifics
9   associated with it.  We talked about, in voir
10  dire, associated with jury informants, and
11  using the credibility standards.  I would ask
12  you to use the same credibility standards on
13  the opposite, with jail informants.  And you
14  guys can view the testimony if you want, but
15  there is a lot of jumping around.
16          There wasn't much definitive that you
17  heard from law enforcement.  You heard a lot of
18  jumping around, as far as investigation is
19  concerned.  And a lot of:  It's not my fault,
20  in placing blame in other places.
21  Accountability is what I ask ask you for today.
22          We look at the phone call.  We talk
23  about trash.  That's a euphemism.  They're
24  trying to use the phone call.  They want you to
25  focus on the second call to attempt to

144

1   establish that is all that they need to show
2   that Mr. Uraz purposefully sought to have
3   Ms. Melke killed through Mr. Close, Mr. Allen
4   or Mobley.  If you read the call, it talks
5   about trash.  There aren't any definitive
6   details that he gives.  Okay.  The name of
7   Rough is initially brought up by Officer
8   Mobley.  Officer Mobley said he was rushed.
9   He's using investigative techniques in order to
10  get affirmations from the Defendant, which
11  would be Officer Mobley purposefully seeking to
12  get something from Mr. Uraz.
13          The $160 on the account transaction.
14  They're going to use that as a payment, down
15  payment for murder.  Mr. Allen.  There was an
16  agreement.  No money exchanged.  And when you
17  talk about Mr. Close, this $160 is what they
18  have.  He initially testified that he just told
19  them:  I got a guy from Detroit.  We can get
20  this all set up for you.
21          We look at the letters, we look at the IPs.
22  The investigation associated with the IPs in
23  this matter.  They testified that had the
24  investigation gone quicker, they could have
25  potentially had a greater amount of detail

RECEIVED by MCOA 8/26/2022 1:49:55 PM

145

1  associated where it came from.  But they didn't
2  get that information soon enough.
3      We look at the letters.  We look at the
4  times that they're sent.  This is an email sent
5  at 3:32 PM, allegedly.  3:05 PM the tether
6  stops, the Sentinel tether stops.  And it shows
7  that my client is at the Ingham County Jail.
8      Now, if you look at all the evidence in the
9  large body of stalking evidence that the
10 Prosecutor talks about, this is all going to
11 come before that August 31st -- primarily, going
12 to come before the August 31st date.  And if you
13 read all of the letters, there was an indication
14 that there were any police reports that had been
15 previously filed.  There was an indication from
16 Ms. Elias that she had heard anything in living
17 with the Defendant.
18     Ms. VanSlembrouck lived in the room next to
19 Mr. Uraz, lived in the room next to Ms. Melke,
20 and she didn't appear anything, or witness any
21 type of incidents of physical violence, as her
22 testimony indicated.
23     If you look at the letters, there is no
24 indication here that this is an individual that
25 is attempting to set up a murder.  He remanded

146

1  himself to the Ingham County Jail on
2  August 31st.  He had a sentencing set for
3  October 19th.  Based upon the testimony of the
4  witnesses, he thought that he may be getting out
5  with time served.
6      This is a year ago.  These are the calls
7  from the Ingham County Jail that they are
8  attempting to use as additional contacts to
9  substantiate the aggravated stalking case.  It's
10 a call from the Ingham County Jail.  It is --
11 there is no indication, other than the
12 circumstances, that indicates that comes from
13 him.
14     The Prosecutor talks in his closing that
15 Mr. Uraz specifically intended for this to have
16 occurred.  He indicates that there was a
17 deliberate action on the part of my client.
18 It's my position that the deliberate action was
19 on the part of the police.  This was
20 manufactured by the police in order to escalate
21 the issues associated with this conduct.
22     The primary detective, you saw some of his
23 testimony today.  There wasn't much that he
24 could recall associated with the investigation.
25 And I would ask that you weigh his testimony as

147

1  instructed by the Judge in the same manner as
2  you would somebody else, as far as evasiveness.
3      So, as a logical conclusion, the Defendant's
4  purposefully seeking this, would have happened
5  after he had went to jail.  He remanded himself
6  to jail, and either he intended to find a hitman
7  by remanding himself to jail, or that intent
8  that the Prosecutor was trying to establish
9  occurred while he was incarcerated.
10     Now, we are going to, at a point -- the
11 Prosecution is going to point to the one letter
12 that has started off by Mr. Close.  Mr. Close
13 had three prior proffers.  His veracity was not
14 appropriately verified.  Doesn't seem many
15 people would talk with each other.  And what you
16 heard today, it's not that big of a deal.
17 Sometimes we just don't talk to each other.
18 They are in jail, separate entities.
19 Communication apparently isn't an issue.
20     Magistrate Blumer is the individual that
21 talked about separating the deputy from the
22 jail.  Said Magistrate Blumer told them to
23 separate these people.  We know they weren't
24 separated.  You know they weren't separated.  To
25 this day the prime detective just thinks they

148

1  were separated.  Has no reason or definitive
2  action on his behalf that he did.  But he has
3  excuses for why he didn't do that.  It's not the
4  way things are done.
5      These aren't small details.  We have a kite
6  from Allen.  No one knows where it's at.
7  Apparently he sent a kite.  You guys heard
8  Allen's testimony.  He couldn't be held to
9  anything.  He says that the specific
10 conversations that he had, there was no TV
11 around, but he acknowledged he previously
12 testified that there was a TV.
13     Mr. Allen testified that Mr. Uraz looked
14 like a new and lost puppy when he came to jail,
15 inexperienced.  Pretty much all of his testimony
16 had to be refreshed to get anything out of him.
17 He had to be refreshed as to the amount of money
18 that was involved.
19     And the Prosecution has made a very large
20 deal about neither of these individuals getting
21 any type of benefit out of this at all.  Their
22 testimony is completely voluntary.  They're just
23 doing the right things.  That's all it is.
24 That's not plausible.
25     Mr. Close acknowledged that prior to being

RECEIVED by MCOA 8/26/2022 1:49:55 PM

149

1  incarcerated he is on parole, he had a parole
2  hold.  He also acknowledged that there was an
3  adjournment of his trial date.  He was
4  eventually acquitted.  He has gone before the
5  parole board.  He is in the process of
6  reentering society.
7      The Mobley call.  We have a lot of different
8  indications here.  Is this murder?  We have
9  baseball bats.  Beatings.  There isn't anything
10 definitive on their side.  There is nothing
11 definitive on the State's side.  It's
12 speculative at best.  The hair color, the
13 indications from Mobley, the third call, lack of
14 documentation.
15     The Prosecutor uses a transcript of the
16 phone call overall to try to say something
17 definitive, but he can't even do it because
18 we're talking about trash.  Officer Mobley
19 testified that trash was a euphemism for
20 something.  There wasn't a connection associated
21 with the words or the investigation associated
22 with garbage cans as alleged.  That is something
23 that he came up with.
24     So what are we talking about here?  Are we
25 talking about beating with a baseball bat?  Are

150

1  we talking about murder?
2      Now, this was the logical conclusion of the
3  discussions that occurred on the medical post in
4  two days of Mr. Close coming in contact with
5  Mr. Uraz.  Conveniently.  He just apparently,
6  Mr. Uraz was -- saw Mr. Close and immediately
7  confided in him based on the testimony of
8  Mr. Close.
9      Mr. Close had an indigent pact previously.
10 Had been in jail since June.  If he played the
11 system, could he play Mr. Uraz?  Beyond that,
12 when we look at this, if this is the normal
13 conclusion, purposefully sought, you don't think
14 it would look better as a robbery?  Okay.  I
15 want it gone.  I beat on.  I could have him
16 carjacked, beat her ass, the gun, and shoot her
17 a few times.  Okay.  Where would he leave her?
18 Fantasy.  Not 100 sure.  But I am sure he knows
19 what he's doing.  He would kill her.  Leave her
20 in her car.  Okay.  Exclamation point.  You have
21 to draw a map.
22     The writing is in the handwriting of
23 Mr. Close.  This follows with the new and lost
24 puppy, Mr. Uraz, saying:  Wait for me to get out
25 and sentenced because they may try to keep me

151

1  here if something happens to me -- to her.  Look
2  at the writing.  The proof is in the details.
3  Mr. Close responds by saying:  You can't.
4  You're already in jail.  It looks bad if it
5  happens when you're out, trying to tell him move
6  forward.  You would be the number one suspect.
7  Coaching him.
8      And last, definitely not least, is the map.
9  Now, this is somewhat obscured here.  But if you
10 listen, Allen was fairly important for the state
11 here.  Apparently he is what expedited the
12 investigation.  They believed him.
13     The testimony shows Reginald Close says that
14 he talked to Charles Allen about it.  He talked
15 to him specifically about it.  Charles Allen, we
16 don't know what he can commit to, or can't
17 commit to.  He says that he can't remember.  He
18 previously said he didn't.  But, of course, you
19 know, we can't hold him to that.  Right after
20 the preliminary examination he said I don't
21 think so.  So, you know, that's how his
22 character is rehabilitated.
23     Look at the map.  Think about numbers.
24 Think about addresses.  Think about small
25 details.  If you look at this map here, you

152

1  recall what the Prosecutor said that Allen told
2  them.  He had all of the information.  3925
3  Dunckel Road.  You guys can determine what that
4  number is in looking at it.
5      You can't make one without connecting all
6  three.  Thank you.
7      THE COURT:  Mr. Roth?
8      MR. ROTH:  Thank you, Your Honor.
9      So Mr. Perrone makes a very good point at
10 the end.  I misspoke when I gave the address.
11 Look at your notes when you consider what
12 Mr. Allen actually said.  He testified.  I think
13 I gave the address wrong during my closing and I
14 apologize.
15     Mr. Perrone talked about confusion over the
16 word "trash," and he expressed confusion over
17 what that could possibly mean.  That's what it
18 looks like when somebody is acting like they
19 don't understand something, didn't act like
20 that, the Defendant, when the Defendant is on
21 the phone, having this conversation with
22 Mr. Close about trash.  There is not one hint of
23 confusion from the Defendant.  He knows exactly
24 what they're talking about.  They're talking
25 about killing and getting rid of Erika Melke's

STATE OF MICHIGAN
IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,     Court of Appeals Nos.
    Plaintiff-Appellee,     343695 & 343696

V     Circuit Court Nos.
         16-1065-FC & 16-1064-FH

TUNC URAZ,
    Defendant-Appellant.

_____/

**PEOPLE'S SUPPLEMENTAL BRIEF ON APPEAL (POST-REMAND)**
**ORAL ARGUMENT REQUESTED**

CAROL A. SIEMON (P32946)
    INGHAM COUNTY PROSECUTING ATTORNEY

KAHLA D. CRINO (P71012)
    APPELLATE DIVISION CHIEF

BUSINESS ADDRESS
    303 W. Kalamazoo Street, 4th Floor
    Lansing, MI 48933
    (517) 483-6228
    kcrino@ingham.org

RECEIVED by MCOA 9/12/2022 1:17:18 PM

## TABLE OF CONTENTS

Table of Authorities.................................................................................................iii

Statement of Appellate Jurisdiction and Judgment Subject to Appeal................iv

Counter-Statement of the Question Involved .......................................................v

Counter-Statement of Facts..................................................................................1

Argument.............................................................................................................13

    I.    Defendant's *Ginther* hearing revealed that: 1) Defendant's attorney, Mr. Perrone was diagnosed with a mental illness *after* Defendant's trial; 2) Mr. Perrone did not exhibit symptoms of his mental illness *during* Defendant's trial, and 3) Mr. Perrone provided effective assistance of counsel. Defendant did not establish the factual predicate for his ineffective assistance claim or actual prejudice. The trial court did not abuse its discretion by finding that Mr. Perrone provided effective assistance of counsel and denying Defendant's motion for new trial. ...................13

    Relief Requested ...................................................................................25

RECEIVED by MCOA 9/12/2022 1:17:18 PM

## TABLE OF AUTHORITIES

**Cases**

*Cullen v Pinholster*, 563 US 170; 131 S Ct 1388; 179 L Ed 2d 557 (2011) ............... 14

*Harrington v Richter,* 562 US 86; 131 S Ct 770; 178 L Ed 2d 624 (2011) .......... 14, 15

*In re Ayres,* 239 Mich App 8; 197 NW2d 106 (1999).................................................... 18

*People v Carbin,* 463 Mich 590; 623 NW2d 884 (2001) .............................................. 14

*People v Dendel,* 481 Mich 114; 748 NW2d 859 (2008) .............................................. 14

*People v Hopson,* 178 Mich App 406; 444 NW2d 167 (1989)...................................... 18

*People v LeBlanc*, 465 Mich 575; 640 NW2d 246 (2002) ..................................... 13, 14

*People v Orlewicz*, 293 Mich App 96; 809 NW2d 194 (2011).................................... 14

*People v Stewart* (On Remand), 219 Mich App 38; 555 NW2d 715 (1996) ............... 16

*Strickland v Washington,* 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984)... 15, 22

*Wiggins v Smith,* 539 US 510; 123 S Ct 2527; 156 L Ed 2d 471 (2003) ................... 15

**Rules**

MRE 404(b) ........................................................................................................ 21

RECEIVED by MCOA 9/12/2022 1:17:18 PM

**STATEMENT OF APPELLATE JURISDICTION AND JUDGMENT SUBJECT TO APPEAL**

On March 6, 2020, this Court remanded to the trial court for a *Ginther*.[1] In its order, this Court stated that it retained jurisdiction. On August 8, 2022, the trial court found that Defendant was not denied effective assistance of counsel.

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1993).

iv

RECEIVED by MCOA 9/12/2022 1:17:18 PM

**COUNTER-STATEMENT OF THE QUESTION INVOLVED**

**I.  Defendant's *Ginther* hearing revealed that: 1) Defendant's attorney, Mr. Perrone was diagnosed with a mental illness *after* Defendant's trial; 2) Mr. Perrone did not exhibit symptoms of his mental illness *during* Defendant's trial, and 3) Mr. Perrone provided effective assistance of counsel. Defendant did not establish the factual predicate for his ineffective assistance claim or actual prejudice. Did the trial court abuse its discretion by finding that Mr. Perrone provided effective assistance of counsel and denying Defendant's motion for new trial?**

Plaintiff-Appellee answers: No.

Defendant-Appellant answers: Yes.

Trial Court answered: No.

RECEIVED by MCOA 9/12/2022 1:17:18 PM

## COUNTER-STATEMENT OF FACTS

Defendant Tunc Uraz stalked his ex-girlfriend Erika Melke and solicited two jail inmates and an undercover officer to murder her after she ended a romantic relationship with him. As a result, a jury found him guilty of aggravated stalking and three counts of solicitation of murder.

Defendant and Ms. Melke were in a dating relationship from the end of 2012 or beginning of 2013 until June 2015. (11/3/17, 10). They met when Defendant worked at the Michigan State University Cafeteria and Ms. Melke was a student. (11/3/17, 9). During the relationship, Defendant and Ms. Melke communicated in English, and Defendant taught a culinary arts management class in English. (11/3/17, 10-11).

When Ms. Melke ended the relationship, Defendant was not happy. (11/3/17, 11). After the relationship ended, Defendant still tried to communicate with Ms. Melke and work on their issues. (11/3/17, 11-12). Ms. Melke asked Defendant to leave her alone, but he refused. (11/3/17, 12). In July of 2015, Ms. Melke moved from one unit in her apartment complex to another unit, and Defendant helped her move. (11/3/17, 12-15). Defendant did not have a key to Ms. Melke's apartment. (11/3/17, 14-15).

During the evening on August 24, 2015, someone peeled Ms. Melke's registration tag off of her car, and damaged her car by keying it. (11/3/17, 15-17). On September 29, 2015, Defendant confronted Ms. Melke while she was grocery shopping at Kroger. Defendant asked Ms. Melke about a man that she was dating. Ms. Melke asked Defendant to leave her alone and left the store. Defendant also left without

RECEIVED by MCOA 9/12/2022 1:17:18 PM

1

buying anything. (11/3/17, 18-19). During this time, Defendant was still trying to communicate with Ms. Melke by text message. (11/3/17, 20).

On December 31, 2015, Defendant confronted Ms. Melke while she was celebrating New Year's Eve at Dave and Busters with her then boyfriend, Stan White, and their friends Noelle VanSlembrouck and Zeb Baldwin. (11/3/17, 20). Defendant tried to make Ms. Melke come outside to talk to him. (11/3/17, 20). When she refused, he began slandering her, calling her a slut, and trying to talk to Mr. White. (11/3/17, 20). Ms. Melke felt scared and unsafe. (11/3/17, 21). Management had to escort Defendant out of the restaurant. (11/3/17, 22). That evening, when Ms. Melke and Mr. White left Dave and Busters, the tires on Mr. White's vehicle had been punctured on their side walls. (11/2/17, 178-179).

Ms. Melke obtained a Personal Protection Order and served Defendant on January 21, 2016. (11/3/17, 21). On February 13, 2016, Defendant texted Ms. Melke and called her a "Ho." (11/3/17, 24).  On March 26, 2016, Defendant confronted Ms. Melke in the parking lot of Best Buy in Okemos. (11/3/17, 25). As Ms. Melke was pulling into the parking lot, she noticed Defendant's vehicle behind her. (11/3/17, 25). Defendant pulled up next to Ms. Melke, rolled down his window, and tried to talk to her. (11/3/17, 25). Ms. Melke took pictures of Defendant using her phone, stayed inside her car, and called the police. (11/3/17, 26-27). Defendant only left the parking lot when police arrived. (11/2/17, 131). Ms. Melke was upset, crying, and distraught. (11/3/17, 132).

RECEIVED by MCOA 9/12/2022 1:17:18 PM

On April 8, 2016, Ms. Melke was in Petoskey at her mother's home. (11/3/17, 27). Defendant called Ms. Melke from his mother's phone. His mother's name appeared on Melke's mother's caller ID, and Ms. Melke did not answer the call. (11/3/17, 28). Ms. Melke did not inform Defendant that she was going to Petoskey. (11/3/17, 28). On May 16, 2016, Ms. Melke stayed at White's house. During the night, Defendant egged Ms. Melke's vehicle and punctured the tires on Mr. White's vehicle again. (11/3/17, 29; 11/2/17, 183). After this, Defendant also began texting Mr. White. Defendant did not identify himself in the text messages, but asked Mr. White to meet with him to work out their differences. Mr. White responded by calling the sender by Defendant's name, confronting him about damaging his vehicle and Ms. Melke's vehicle, and declining to meet with him. The sender did not express confusion and responded in a manner that made it clear he was Defendant. (11/2/17, 185-189). After this, Ms. Melke ended her relationship with Mr. White because she did not want to put him in continued danger. (11/3/17, 30-31).

Also in April 2016, Defendant attempted to obtain a gun and ammunition. Defendant stated that he could not do it the "legal way." (11/6/17, 96). Defendant asked Patrick Burnett, his co-worker at the Michigan State University, to get him a gun and bullets. Defendant asked Mr. Burnett, "Do you trust me?" (11/6/17, 92). Defendant stated that he really needed it, appeared to be serious, and stated that did not want to get a gun the legal way. (11/6/17, 94-96). The day after asking Mr. Burnett to get a gun and bullets for him, Defendant again approached Mr. Burnett, and made the same request again. (11/6/17, 97). Mr. Burnett knew it was not a joke, and

3

RECEIVED by MCOA 9/12/2022 1:17:18 PM

reported the conversation to his supervisor. Defendant was terminated from his employment at Michigan State University for making this request. (11/6/17, 99).

In May 2016, Ms. Melke placed a security camera in her bedroom because she was concerned that Defendant had entered her apartment without her knowledge or consent. Ms. Melke was correct. On May 25, 2016, Defendant was caught on camera looking around inside Ms. Melke's room. Defendant appeared to be looking in an area where Ms. Melke had placed tickets for an upcoming Drake concert. A bra, underwear, and a pair of shoes also went missing from Ms. Melke's bedroom. (11/3/17, 31-35).

On July 17, 2016, Carmen Elias, Ms. Melke's roommate and Ms. Melke saw Defendant parked outside of Ms. Melke's bedroom. (11/3/17, 35-36; 11/2/17, 146-148). Ms. Elias went to the parking lot, and Defendant drove away. Defendant then texted Ms. Elias and stated that he was in Turkey. (11/2/17, 147-148). A few weeks later, Ms. Elias found that the lug nuts on her tires had been loosened while it was parked outside her apartment. (11/2/17, 155).

On July 13, 2016, Ms. Melke obtained another Personal Protection Order. (11/3/17, 36). On August 15, 2016, Defendant began trying to access and change the password on Ms. Melke's Facebook account (11/3/17, 37). Defendant also created an Instagram account in Ms. Melke's name. He used pictures from Ms. Melke's actual Facebook account, and pictures of a dildo and posted them on the fake Instagram account. He also posted various pictures and messages that pertained to "cheating." (11/3/17, 37-42). This activity was linked to the apartment complex where Defendant

RECEIVED by MCOA 9/12/2022 1:17:18 PM

and Defendant's associate Burak Atamar lived through search warrants for the IP addresses associated with the activity. (11/3/17, 83, 102-110). On August 16, 2016, Ms. Melke attended the Drake concert associated with the tickets Defendant appeared to look at when he broke into her bedroom in May of 2016. (11/3/17, 48). When she returned to her vehicle, her tires were again punctured by stabs to the side walls. (11/48-50).

Defendant was charged with home invasion second degree and aggravated stalking in file 16-534-FH and placed in the Ingham County Jail. Defendant called Ms. Melke two times from the Ingham County jail. Defendant had prerecorded a message that said, "I hope you're happy." (11/3/17, 46-48). Defendant wrote a letter for Ms. Melke and gave it to his former attorney Chris Bergstrom, to give to the prosecutor for Ms. Melke. The letter contained various demands, questions, and statements regarding their relationship. Defendant pleaded guilty to Aggravated Stalking on August 23, 2016, for his stalking conduct from before that date. Defendant admitted that his conduct was designed to scare or intimidate Ms. Melke. (11/3/17, 69).

On August 31, 2016 Defendant created a fake email account using Ms. Melke's name. He sent Ms. Melke a copy of the same letter he had provided to Bergstrom. This was a violation of the PPO and no contact order. (11/3/17, 44, 74-75). On August 27 and 31, 2016, Melke received notifications regarding changes to her Facebook password. This activity was linked to the apartment complex where Defendant lived through search warrants for the IP addresses associated with the activity. (11/3/17,

5

RECEIVED by MCOA 9/12/2022 1:17:18 PM

83, 102-110). Defendant's GPS tether also showed that he was present at the physical location associated with the IP address on August 27, 2017 and August 31, 2017 when the activity occurred. (11/2/17, 115-119). Before Defendant was sentenced on his first aggravated stalking case, he was charged with aggravated stalking in file 16-1064-FH for his stalking conduct between the dates of August 23, 2017 and September 26, 2017. Defendant's sentencing in his first aggravated stalking file was on November 2, 2017. At that hearing, Defendant admitted to using alcohol since 1985, but denied ever abusing controlled substances. (11/3/17, 70-72). Defendant was sentenced to six months in the Ingham County Jail in file 16-534-FH.

While serving his sentence, Defendant began soliciting other inmates to murder Ms. Melke. Defendant wanted Ms. Melke to die because he believed she had ruined his life, lied to him, and cheated on him. Because of this, Defendant wanted to "get rid of her" (11/3/17, 138) and stated "this bitch got to pay." (11/7/17, 13). Defendant was charged in file 16-1065-FC with three counts of solicitation to murder.

The first person Defendant solicited to murder Ms. Melke was Charles Allen. Defendant and Mr. Allen were housed together for a period of time in a medical unit. They became friendly and Defendant began to talk to Allen about Melke. Defendant told Allen that he was in jail for stalking Ms. Melke. (11/7/17, 10-11). Defendant told Allen that he wanted to get back at Ms. Melke, and stated "this bitch got to pay." (11/7/17, 13). Defendant then made numerous, specific solicitations of Allen. Defendant asked Allen to beat Ms. Melke with a baseball bat. He stated that he wanted her "fucked up" and that he wanted pictures of it. (11/7/17, 14). Defendant

RECEIVED by MCOA 9/12/2022 1:17:18 PM

then asked Allen to kill Ms. Melke. He specified that he wanted her beaten beyond recognition with a bat and that he wanted it to be recorded so that he could masturbate to it. Defendant also requested Ms. Melke's ID. (11/7/17, 20-21). Defendant specified that he wanted Ms. Melke's body to be dumped where no one would find her. (11/7/17, 16). Defendant agreed to pay Allen $2,500 in exchange for killing Ms. Melke. (11/7/17, 16-18). Defendant told Mr. Allen where Ms. Melke lived, what type of car she drove, and warned him that she has a camera in her house. Defendant also requested a gun so that he could go after the guy Ms. Melke "cheated" with. (11/7/17, 21-22). Mr. Allen went along with the conversations, but had no intentions of doing anything Defendant asked. (11/7/17, 22).

Mr. Allen notified a jail deputy about what Defendant had requested. (11/7/17, 24-25). Mr. Allen was interviewed by Detective Matt Krumbach, and during the interview, Mr. Allen asked if he could get out of jail. Detective Krumback told Defendant no, but that he could tell Mr. Allen's probation officer that Mr. Allen was helpful. (11/7/17, 27-28). Mr. Allen stated that no one took advantage of Defendant or hurt him while he was in jail. (11/7/17, 39, 68). Mr. Allen cooperated with law enforcement for the sake of Ms. Melke's life, and because it was the right thing to do. (11/7/17, 28, 69-70).

The second person Defendant solicited to murder Ms. Melke was Reginald Close. Mr. Close's nickname was "Rough." (11/3/17, 131). Defendant, Mr. Allen, and Mr. Close were assigned to the medical unit at the same time, and that is where Defendant and Mr. Close met. (11/3/17, 134-135). Defendant began talking to Mr.

RECEIVED by MCOA 9/12/2022 1:17:18 PM

Close about Ms. Melke within 48 hours of meeting him. (11/3/17, 136-138). Defendant told Mr. Close that Ms. Melke ruined his life, lied to him, and cheated on him. Defendant told Mr. Close that he had stalked her, entered her house, and that it was her fault that he was in jail. (11/3/17, 138). Defendant stated that he was going to get rid of her. (11/3/17, 138). Defendant stated that he had lost his job at MSU because he tried to get a gun from a coworker in order to kill Ms. Melke. (11/3/17, 139). Defendant stated that he sliced Ms. Melke's tires while she was at a Drake concert and that he was able to access her phone through her iCloud. (11/3/17, 140-141).

Defendant asked Mr. Close if he knew anyone who could have Ms. Melke killed and make it look like a robbery. (11/3/17, 143). By the time this conversation took place, Mr. Allen had been moved to another location in the jail. (11/3/17, 143-144). Defendant asked Mr. Close if he could help by killing Ms. Melke. (11/3/17, 145). Mr. Close notified his lawyer after he realized that Defendant was serious about killing Ms. Melke. (11/3/17, 145). Mr. Close agreed to help Defendant kill Ms. Melke. Defendant provided Ms. Melke's address, Mr. White's address, Ms. Melke's Facebook information, a map to Ms. Melke's apartment, Ms. Melke's car information, and Ms. Melke's job information. (11/3/17, 153-156). Defendant agreed to pay $1,000 for Ms. Melke's murder. (11/3/17, 147). Defendant made arrangements for his associate to place some money in Mr. Close's jail account. (11/3/17, 157).

Detective Andrew Hogan, interviewed Mr. Close. (11/6/17, 106). Mr. Close did not receive anything in exchange for his statement or testimony. He was provided with immunity for agreeing to help Defendant kill Ms. Melke. (11/3/17, 146, 160-161).

RECEIVED by MCOA 9/12/2022 1:17:18 PM

Detective Hogan checked Mr. Close's jail account, and verified that someone made a deposit $133.59 on October 13, 2016. (11/6/17, 108-109). Detective Hogan obtained a picture of the person who made the deposit. (11/6/17, 109-110). Detective Hogan verified that Defendant never complained of threats, assaults, or promises from other inmates. (11/6/17, 110-111).

The third person Defendant solicited to murder Ms. Melke was Officer Frank Mobley. Officer Mobley made contact with Defendant in an undercover capacity and pretended to be a "hit man." (11/6/17, 117). He was provided with basic information regarding Defendant's previous solicitations, and was pretending that he was Mr. Close's friend from Detroit. (11/6/17, 117-119). Officer Mobley called Defendant for the first time on October 18, 2016, using a video chat option for jail calls. The call was not successful. (11/6/17, 121). Officer Mobley called again on October 24, 2016. Defendant answered, and the entire call was recorded. (11/6/17, 121). Officer Mobley told Defendant that "Rough" had told him that Defendant needed someone to "take out the trash." (11/6/17, 123). Throughout the call, Officer Mobley referred to Ms. Melke as the "trash," however, he made it clear that this was code for Ms. Melke, the person Defendant wanted to have killed. They discussed whether Defendant wanted Officer Mobley to "beat" the trash, whether he should "spill" the trash all over the house, whether he should beat the trash with a bat, whether he would want the scene to be cleaned up afterward, what color hair the trash had. Defendant stated that he wanted it done quickly, throw it out clean. (11/6/17, 123-127). They discussed the address where the trash would be, and Defendant stated that Rough would have that

9

RECEIVED by MCOA 9/12/2022 1:17:18 PM

information because he had written it all down. (11/6/17, 126-127). Defendant stated that he was certain that he wanted it done. They discussed how completion would be verified, and that Defendant would pay Officer Mobley $2,000 for the first "bag" and $500 for any others. Defendant specified that he wanted the "trash" taken care of before November 2, which was his sentencing date.

Approximately a week before Defendant's trial began, the prosecutor provided Mr. Perrone with handwritten notes that were exchanged between Reginald Close and another inmate named John Pierce. (11/2/17, 6). The notes did not pertain to Defendant's case. (11/6/17, 7). The notes were written before Mr. Close contacted his attorney about Defendant's case. (11/6/17, 23). Mr. Perrone utilized the notes as a part of his defense to show that Mr. Close had a habit of communicating with other inmates in an attempt to help his own case. One of the notes also stated that the author was a good liar, however, it was Mr. Pierce, not Mr. Close, who wrote that portion of the note. (11/9/17, 65-66). One of the notes also stated that the author could pass a polygraph. Mr. Perrone at one point stated that he believed it was Mr. Close who had written that statement. (11/3/17, 6-7).

Mr. Perrone filed a motion to sever and an entrapment motion on Defendant's behalf. (2/28/17, 3-19; 10/20/17, 8-105). Both were denied before trial after extensive hearings. Mr. Perrone also responded and argued against the prosecutor's motion to admit evidence pursuant to MRE 404b. (10/11/17, 3-22). Mr. Perrone's defense included arguing that the jury should keep an open mind, that Defendant was presumed innocent, that the Defendant does not have to do anything, and that the

10

prosecutor must prove beyond a reasonable doubt that Defendant is guilty. (11/2/17, 114-120; 11/9/17, 135). Mr. Perrone also argued that the evidence against Defendant was manufactured, and that Mr. Allen and Mr. Close took advantage of Defendant and provided testimony in an attempt to benefit their own situations. (11/2/17, 121-127; 11/9/17, 138-139). Mr. Perrone also argued that the evidence that was admitted pursuant to MRE 404b was not a part of the charged conduct in the case. (11/9/17, 137-138, 145). Throughout the trial, Mr. Perrone cross-examined witnesses and attempted to elicit testimony consistent with Defendant's theory of the case. Also throughout trial, Defendant was represented by two attorneys: Mr. Perrone, and Eric Schroeder.

The jury convicted Defendant of three counts of solicitation to commit murder and one count of aggravated stalking. (11/9/17, 186). On December 12, 2017, Perrone informed the trial court of several things: first, that he has bipolar disorder, which he takes medication for. (12/12/17, 6-7); second that he *did not* have an active episode during the trial (12/12/17, 7); third, that his diagnosis did not impact his representation of Defendant. (12/12/17, 5). On December 13, 2017, a hearing was held regarding the information Mr. Perrone provided. The trial court informed Defendant that Mr. Perrone had an illness "*after the completion of the trial*, but before the time of sentencing." (12/13/17, 3, emphasis added). The trial court appointed another attorney, Duane Silverthorn to represent Defendant, however, Defendant requested that Perrone continue representing him along with Mr. Silverthorn. (12/13/17, 4). Defendant agreed that this arrangement was fine with him and that it was what he

11

RECEIVED by MCOA 9/12/2022 1:17:18 PM

wanted. (12/13/17, 4). Defendant's sentencing was adjourned from December 20, 2017 to January 24, 2018 so that Mr. Silverthorn could prepare. (12/13/17, 5-6). Defendant was sentenced to 200-360 months for each count of solicitation of murder, and 36-90 months for aggravated stalking, with credit for 443 days. (1/24/18, 37).

Defendant appealed his convictions. His appeal included a motion to remand for a *Ginther* hearing. On March 6, 2020, this Court remanded to the trial court to hold a *Ginther* hearing on Defendant's claims of ineffective assistance of counsel. Defendant's ineffective assistance related arguments on appeal were that one of his attorneys, Mr. Perrone, had a mental breakdown during trial and provided ineffective assistance of counsel by: 1) failing to impeach witnesses with prior theft convictions, 2) giving an inadequate closing argument, 3) sending a particular email to Defendant's sister during the trial, and 4) an alleged delay between questions while cross examining a witness. Defendant continued to pursue these claims at his *Ginther* hearing. The *Ginther* hearing was delayed due to the COVID-19 pandemic and the necessity of holding the *Ginther* hearing with Defendant's in-person presence.

At the *Ginther* hearing, Defendant testified on his own behalf and called seven witnesses: 1) his trial counsel Mr. Perrone; 2) his trial counsel Eric Schroeder; 3) Mr. Perrone's trial assistant Nicholas Fernandez, 4) the second chair trial prosecutor, Charles Koop; 5) his attorney at sentencing, Mr. Silverthorn, 6) an employee from Mr. Perrone's office, Andrew Vuckovich. The relevant facts from the *Ginther* hearing will be set forth in the argument section.

On August 8, 2022, the trial court denied Defendant's motion for new trial.

RECEIVED by MCOA 9/12/2022 1:17:18 PM

## ARGUMENT

I.   **Defendant's *Ginther* hearing revealed that: 1) Defendant's attorney, Mr. Perrone was diagnosed with a mental illness *after* Defendant's trial; 2) Mr. Perrone did not exhibit symptoms of his mental illness *during* Defendant's trial, and 3) Mr. Perrone provided effective assistance of counsel. Defendant did not establish the factual predicate for his ineffective assistance claim or actual prejudice. The trial court did not abuse its discretion by finding that Mr. Perrone provided effective assistance of counsel and denying Defendant's motion for new trial.**

### Defendant's Argument

Defendant argues that Mr. Perrone was nearing a mental breakdown during trial. Defendant also argues that Mr. Perrone provided ineffective assistance of counsel by: 1) failing to impeach witnesses with prior theft convictions, 2) giving an inadequate closing argument, 3) sending a particular email to Defendant's sister during the trial, and 4) alleged delays between questions while cross examining a witness.

### Issue Preservation

Defendant raised these arguments in his motion to remand, motion for new trial, and during his *Ginther* hearing. These arguments are preserved.

### Standard of Review

Whether a defendant has been denied effective assistance of counsel is a mixed question of law and fact. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). "A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel."

13

RECEIVED by MCOA 9/12/2022 1:17:18 PM

*Id.* A trial court's findings of fact are reviewed for clear error. *Id.* Issues of law are reviewed de novo. *Id.* "A trial court's decision on a motion for a new trial is reviewed for an abuse of discretion." *People v Orlewicz*, 293 Mich App 96, 100; 809 NW2d 194, 200 (2011), app den, cause remanded 493 Mich 916; 823 NW2d 428 (2012).

## Discussion

A defendant seeking a new trial on the ground that trial counsel was ineffective bears a heavy burden. To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy the two-part test articulated by the United States Supreme Court in *Strickland v Washington,* 466 U S 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). See *People v Pickens,* 446 Mich 298, 302-303; 521 NW2d 797 (1994). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment." *Strickland,* supra at 687. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *Id.* at 690. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. [*People v Dendel,* 481 Mich 114, 124-125; 748 NW2d 859 (2008), quoting *People v Carbin,* 463 Mich 590, 599-600; 623 NW2d 884 (2001).]

"The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v Richter,* 562 US 86; 131 S Ct 770, 788; 178 L Ed 2d 624 (2011), quoting *Strickland v Washington,* 466 US 668, 690

14

RECEIVED by MCOA 9/12/2022 1:17:18 PM

(1984). "Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Harrington, supra* at 789, quoting *Strickland, supra* at 689. "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington, supra* at 789. "There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Harrington, supra* at 790, quoting *Wiggins v Smith,* 539 US 510, 525; 123 S Ct 2527; 156 L Ed 2d 471 (2003). Counsel's performance must be viewed from an objective standard, not from "counsel's subjective state of mind." *Harrington, supra* at 790. "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Id. at* 791. "The fact that defense counsel's strategy may not have worked does not constitute ineffective assistance of counsel." *People v Stewart* (On Remand), 219 Mich App 38, 42; 555 NW2d 715 (1996).

### 1.     Perrone did not have a mental breakdown during Defendant's trial.

Defendant's argument that he received ineffective assistance of counsel comes broadly from his insistence that Mr. Perrone had a mental breakdown during trial. Defendant did not establish the factual predicate for this claim. In fact, the credible testimony from the *Ginther* hearing established that Mr. Perrone's mental breakdown occurred after the trial. First, Mr. Perrone informed the trial court that

15

he did not have a mental health diagnosis before Defendant's trial and that from his perspective, he did not have symptoms during trial. (10/4/21, 14). Mr. Perrone informed this the trial court that he did not have any issues with his mental health on any day of Defendant's trial. (10/4/21, 22, 23, 24, 26, 29, 34-35). Mr. Perrone told the trial court that he had an issue with his mental health about a week after trial. (10/4/21, 35). This episode, approximately a week after trial, led to Mr. Perrone being diagnosed with bipolar disorder. (10/4/21, 35). The next time Mr. Perrone saw Defendant, Mr. Perrone informed Defendant of his mental health diagnosis and Defendant asked Mr. Perrone to continue to represent him. (10/4/21, 36-37). Mr. Perrone informed the trial court that if he had had a mental breakdown or bipolar episode in court it would have been obvious everyone, he would have been unintelligible, and those present would have been calling for help for him. (10/4/21, 37-38). Additionally, Mr. Perrone explained that he did not have any general mental decline during the trial. (10/4/21, 38). [2]

Second, Eric Schroder, who was present during trial as second chair attorney for Mr. Perrone, testified that he did not observe Mr. Perrone have any issues with his mental health during trial. Mr. Schroeder explained to the trial court that he understood his ethical obligations under Michigan Rules of Professional Conduct 1.1, and 8.3 and that he did not see anything regarding Mr. Perrone's representation that gave him pause based on his ethical obligations. (10/4/21, 46-47). As to Defendant's

---

[2] Perrone should be commended for his candor and willingness to publicly testify about these private and difficult matters at Defendant's *Ginther* hearing.

16

RECEIVED by MCOA 9/12/2022 1:17:18 PM

specific claims, Mr. Schroeder told the trial court that Mr. Perrone did not have a mental breakdown during trial. (10/4/21, 49). Mr. Schroeder told the trial court that "to his knowledge" Mr. Perrone did not have a mental decline during trial. (10/4/21, 50).

Third, Nick Fernandez testified that he did not see any "downturn" in Perrone's behavior during trial, however, Mr. Fernandez did recall an outburst that was directed at either the prosecutor or a detective. (10/4/21, 52).

Fourth, the second chair prosecutor, Mr. Koop, also agreed with the other witnesses that Mr. Perrone did not have a mental breakdown during trial (10/4/21, 55). Similarly, Andrew Vuckovich did not recall issues or changes in Perrone's behavior during the relevant timeframe. (10/4/21, 63-64).[3]

Last, the first chair trial prosecutor, Jonathan Roth, did not observe Mr. Perrone have a mental breakdown during the course of Defendant's trial. Mr. Roth's testimony was unique among the other witnesses in that he had known Mr. Perrone for 10-12 years before this trial. Mr. Roth and Mr. Perrone attended law school together. Mr. Roth did not notice anything different about Mr. Perrone during the trial than he had seen any other time before. (4/13/22, 6-7). Mr. Roth informed this Court that he did not observe Mr. Perrone have a mental breakdown or mental decline on any of Defendant's trial dates. (4/13/22, 11, 12, 14, 17, 20).

---

[3] Vuckovich characterized Perrone as a "jerk" and an "asshole," but not as related to Perrone's mental health. (10/4/21, 64).

17

Mr. Perrone simply did not experience mental decline or a mental breakdown during trial. With that understanding, we will move on to Defendant's more specific allegations of error.

**2.      Perrone was not ineffective for failing to impeach two witnesses with prior convictions.**

Defendant asserts that trial counsel should have impeached Mr. Close and Mr. Allen with their prior theft related convictions. The decisions whether and how to cross-examine witnesses are matters of trial strategy. *In re Ayres,* 239 Mich App 8, 23; 197 NW2d 106 (1999); *People v Hopson,* 178 Mich App 406, 412; 444 NW2d 167 (1989).

Here, Mr. Perrone did not impeach Mr. Allen or Mr. Close with previous theft related convictions, however, the jury knew they were both in jail because that is where they met Defendant. The jury knew that Mr. Close and Mr. Allen were Ingham County Jail inmates. The jury also knew that when he testified, Mr. Close was incarcerated with the Michigan Department of Corrections (11/3/17, 131). Mr. Perrone also attacked Mr. Close's and Mr. Allen's credibility in numerous other ways. Mr. Perrone cross examined Mr. Close regarding the fact that he tried to help other inmates with their cases, and that he had tried to help John Pierce. (11/6/17, 6-7). Perrone elicited testimony that Mr. Close had proffered on other cases and that his original trial date for his own case was adjourned. (11/6/17, 9-13). Mr. Perrone also elicited testimony that Mr. Close was worried that Defendant was setting him up (11/6/17, 17). Mr. Perrone even elicited testimony from Mr. Close that Mr. Close and

RECEIVED by MCOA 9/12/2022 1:17:18 PM

Mr. Allen had a conversation about Defendant's attempts to have Ms. Melke killed. (11/6/17, 49).

As to Mr. Allen, Mr. Perrone elicited testimony that Mr. Allen was placed on phone restrictions because he wasn't following instructions in the jail. (11/6/17, 31). Mr. Perrone elicited testimony from Mr. Allen that he tried to help Defendant be more comfortable in jail, and that Defendant seemed scared. (11/6/17, 39). Mr. Perrone elicited testimony from Mr. Allen that Mr. Allen believed it would be easy for someone to take advantage of Defendant. (11/6/17, 47).  Mr. Perrone also elicited testimony that Mr. Allen initially came forward with information about Defendant to try to get out of jail early. (11/6/17, 51).

At the *Ginther* hearing, Mr. Perrone explained that this was his first court appointed capital case, but that he felt that the other methods of impeachment that he utilized (as described above) were "very good" ways to impeach. (10/4/21, 11). Mr. Roth explained that nothing about his trial strategy (as the prosecutor) would have changed if Mr. Perrone had impeached Mr. Allen and Mr. Close with their misdemeanor convictions. (4/13/22, 19). Mr. Roth explained that Mr. Close and Mr. Allen's credibility was not dependent on convictions or misdemeanors because the jury was aware that they were in jail and had done bad things. He explained that their credibility came from the corroborating evidence of their claims. (4/13/22, 19, 22). Mr. Roth also explained that this type of impeachment would not have changed the substantial evidence of Defendant's guilt. (4/13/22, 20).

RECEIVED by MCOA 9/12/2022 1:17:18 PM

Thus, the failure to impeach Mr. Close and Mr. Allen with prior theft related convictions did not deny Defendant effective assistance of counsel, and in fact, Mr. Perrone elicited other information during cross examination that he was able to use to attack Mr. Close's and Mr. Allen's credibility, or lend support to his theory of the case. It is not reasonable to assert that had the jury been aware of their prior convictions, that they would have then disregarded their testimony and the other evidence of Defendant's guilt.

### 3.  Mr. Perrone's closing argument was appropriate and effective.

Defendant asserts that Mr. Perrone was ineffective because he gave an inadequate closing argument. This is simply incorrect. During pretrial motions, opening statements, cross-examination of witnesses, and closing arguments, Mr. Perrone presented Defendant's theory of the case.

Mr. Perrone's defense included arguing that the jury should keep an open mind, that Defendant was presumed innocent, that the Defendant does not have to do anything, and that the prosecutor must prove beyond a reasonable doubt that Defendant is guilty. (11/2/17, 114-120; 11/9/17, 135). Mr. Perrone also argued that the evidence against Defendant was manufactured, and that Mr. Allen and Mr. Close took advantage of Defendant and provided testimony in an attempt to benefit their own situations. (11/2/17, 121-127; 11/9/17, 138-139). Mr. Perrone also argued that the evidence that was admitted pursuant to MRE 404(b) was not a part of the charged conduct in the case. (11/9/17, 137-138, 145). Throughout the trial, Mr. Perrone cross-examined witnesses and attempted to elicit testimony consistent with Defendant's

RECEIVED by MCOA 9/12/2022 1:17:18 PM

theory of the case. Also throughout trial, Defendant was represented by two attorneys: Mr. Perrone and Mr. Schroeder.

At the *Ginther* hearing, Perrone testified that his closing argument was consistent with the trial strategy that he and Defendant agreed upon. (10/4/21, 33). Mr. Perrone agreed that he utilized the facts that he elicited during testimony as a part of his closing argument. (10/4/21, 33). Some of the facts and arguments from Mr. Perrone's closing argument were: 1) that Mr. Burnett thought Defendant looked scared during the conversation Mr. Burnett and Defendant had about the gun[4]; 2) that Defendant did not take any action toward committing the crimes; 3) that some conversations were initiated by other people; 4) that some of the language that Officer Mobley used was arguably ambiguous; 5) that certain witnesses were not credible; 6) that the police engaged in deliberate conduct, 7) and that there was reasonable doubt. (10/4/21, 33-34). Mr. Perrone also made arguments consistent with the jury instruction modification that he obtained. (10/4/21, 33).

Defendant points to two specific passages from Mr. Perrone's closing argument in support of his argument that Mr. Perrone provided ineffective assistance of counsel during his closing arguments. While these passages are odd, Mr. Schroeder testified that the only issue he observed during Mr. Perrone's closing argument was that he might have lost his train of thought on one occasion. (10/4/21, 48). It may be that

---

[4] The implication being that Defendant wanted the gun for his protection, not to scare, harm, or kill Ms. Melke.

21

RECEIVED by MCOA 9/12/2022 1:17:18 PM

these passages are what Mr. Schroeder referenced.[5] Mr. Roth testified that he did not observe any glaring issues with Mr. Perrone's closing argument. (4/13/22, 20). In the context of the entire closing argument and the strategy that Defendant agreed to, these two passages alone do not establish that "counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment." *Strickland,* supra at 687.

> ### 4.   Perrone's email to Defendant's sister has nothing to do with his representation of Defendant.

As a part of his *Ginther* hearing, Defendant submitted to the trial court what purported to be an email that Mr. Perrone sent to Defendant's sister during the trial. As to the content of the email, Mr. Perrone testified at the *Ginther* hearing that he thought they would receive a not guilty verdict and that ten million dollars would be a small award in an unlawful imprisonment case. He also testified that he may have been "a little bit expansive," but he "was trying to keep their moral up." (10/4/21, 40). Though some of the statements contained in the email are odd, Defendant has not articulated how this email impacted Mr. Perrone's representation of Defendant.

> ### 5.   Mr. Perrone's delay between questions while cross examining Mr. Allen was not ineffective assistance of counsel.

Defendant argues that a statement made by Mr. Roth at trial regarding Defendant's cross examination of Mr. Allen is an example of ineffective assistance of

---

[5] Defendant cited specific passages for the first time in his supplemental brief on appeal in this Court. Because of this, these passages were not a topic of testimony at the *Ginther* hearing.

RECEIVED by MCOA 9/12/2022 1:17:18 PM

counsel. Again, Defendant has not explained how any prolonged delay between questions, even if it did occur, was ineffective assistance of counsel. At the *Ginther* hearing, Mr. Perrone, Mr. Schroeder, and Mr. Roth testified regarding this portion of the transcripts and this allegation. Mr. Perrone testified that he did not believe the delay between questions was actually three minutes long. (10/4/21, 28). Mr. Perrone testified that the cross examination was not as Mr. Roth stated, rambling on for hours. Further, Mr. Perrone testified that in his view, Mr. Roth was trying to undermine Mr. Perrone's cross examination. Mr. Perrone testified that Mr. Roth's objections contained exaggerations that were not consistent with what happened in court. (10/4/21, 28). Similarly, Mr. Schroeder testified that there was not three minutes between each question, and that Mr. Perrone's cross examination of Mr. Allen was lengthy because there was a lot of material to cover. (10/4/21, 50). In contrast, Mr. Roth had a different view. Mr. Roth testified that by his estimate, it *was* literally minutes between questions. (4/13/22, 16). Mr. Roth also testified that Mr. Perrone's cross examination of Mr. Allen was longer than it needed to be. (4/13/22, 16). Mr. Roth's perception was that the delay was intentional, and that it was a part of a trial strategy. (4/13/22, 16-17). Mr. Roth testified that in his view, it was an attempt to dilute the testimony of the most important witnesses. (4/13/22, 17).

And it is possible that the truth is somewhere in the middle. It may be that as Mr. Roth testified, the delay was a part of an intentional trial strategy to dilute certain testimony. Correspondingly, Mr. Perrone and Mr. Schroeder might also be correct that the delay was not actually three minutes between each question.

23

Regardless, any delay, if it existed, does not establish ineffective assistance of counsel.

### 6.   Defendant was not prejudiced.

Finally, even if these alleged errors were so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment," Defendant cannot establish prejudice. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. This is a burden Defendant cannot meet. The jury heard overwhelming evidence of Defendant's guilt from Ms. Melke, Mr. White, and other witnesses who experienced Defendant's stalking behavior first-hand. The jury heard from three witnesses, Mr. Close, Mr. Allen, and Officer Mobley, all of whom described how Defendant solicited them to murder Ms. Melke. The jury watched a video of Defendant soliciting Officer Mobley. Additionally, during Defendant's entrapment hearing and his previous stalking plea, Defendant admitted to nearly every component of the evidence against him. Therefore, Defendant cannot establish that but for counsel's errors, the result of the proceeding would have been different. Defendant did not receive ineffective assistance of counsel.

RECEIVED by MCOA 9/12/2022 1:17:18 PM

**RELIEF REQUESTED**

WHEREFORE, the People respectfully request that this Court affirm Defendant's convictions.

Respectfully submitted,

*/S/ Kahla D. Crino*

Dated: September 12, 2022

Kahla D. Crino (P71012)
Appellate Division Chief
303 W. Kalamazoo Street
Lansing, MI 48823
(517) 483-6228
kcrino@ingham.org

**MCR 7.212(B)(3) STATEMENT**

There are 6,526 countable words in this brief.

*/S/ Kahla D. Crino*

Dated: September 12, 2022

Kahla D. Crino (P71012)

25

RECEIVED by MCOA 9/12/2022 1:17:18 PM

**Gary Chambon**

| | |
|---|---|
| **From:** | Gary Chambon |
| **Sent:** | Tuesday, September 13, 2022 11:39 AM |
| **To:** | Tony Ur |
| **Cc:** | kcrino@ingham.org; skwalsh44@gmail.com |
| **Subject:** | RE: case#'s 343695 & 343696, People V Tunc Uraz |

Dear Mr. Uraz,

Your appellate attorney timely filed a Standard 4 brief on your behalf on May 6, 2019.

If your inquiry is related to wishing to file a pro per supplemental brief to supplement the supplemental brief after remand filed by your appellate attorney on August 26, 2022 there is no right to file such an additional pro per supplemental brief under Standard 4.  Rather, your appellate attorney would need to file a motion to seek to file such a supplemental brief on your behalf.

You should discuss further concerns as to this appeal with your appellate attorney.

Gary L. Chambon, Jr.

*Gary L. Chambon, Jr.*

Lansing District Clerk
Michigan Court of Appeals
925 West Ottawa
P.O. Box 30022
Lansing, MI  48909
gchambon@courts.mi.gov
(517) 373-6846

*This message has been prepared on computer equipment and resources owned by the Michigan Court of Appeals.  It is subject to the terms and conditions of the Court's Computer Acceptable Use Policy.*

**From:** Tony Ur <tonyur@gmail.com>
**Sent:** Tuesday, September 13, 2022 11:22 AM
**To:** Gary Chambon <GCHAMBON@courts.mi.gov>
**Subject:** Fwd: case#'s 343695 & 343696, People V Tunc Uraz

Dear Mr. Chambon,

I am just trying to confirm if my appeal attorney Ms. Susan K. Walsh, timely filed my Standard 4 brief or not? it is not showing on register of actions

second please see the attach Lansing Police body cam footage video for the police report # 1751906153 about Jacob A. Perrone (my jury trial attorney and a Ginther hearing was granted to me based on his mental issues on 03/06/2020)which police report was filed on 11/20/2017 (Perrone second mental impairment with in the same month after my trial ended on 11/09/2017 and his first mental impairment was on 11/13/2017 )of my trial attorney's (Jacob A. Perrone P71915) mental impairment with my standard 4 briefs please,

I appreciate your understanding in this matter.
I have asked my appeal attorney to file this video with my briefs but I do not think she did.

please find below link camera record for his court appointed attorney  mr.Jacob Perrone,  received from  Nicholas Coscarelli from LANSING POLICE DEPT. (https://lansingmi.evidence.com) has sent you a link to download the case FOIA Request P009179- REDACTED on Evidence.com.

https://lansingmi.evidence.com/axon/download/28ae648b57714fcca3f531c4b7103d74/2
6063ef8c49c4883bd613b48184d72b2?token=dOZn%2BcWFU2vHwJRVXczsqm2du8Ji
DreCLmRmA0znC%2BSqh%2BvhMu4YMsiw%2FkFr6LPPotTw3k%2Fey6ZKOcLH5VC
qyuWO8Q0VbwyI8h5LUsDlmQ9fCNWk%2BXpD15AD%2Fy2gk3ib0M5k42yJxZgEKQ0
eHQeKbCu9%2BYKDbQfdODq4Ri4D5465cwdWeO7FTtNsngdys2keeCctxEr18h1mc5
YL5CLey%2Fai3xZrPmnqjMiflsgQllU%3D&version=1

respectfully submitted
Tunc Uraz 114653

**Gary Chambon**

---

| | |
|---|---|
| **From:** | Tony Ur <tonyur@gmail.com> |
| **Sent:** | Tuesday, September 13, 2022 11:18 AM |
| **To:** | Gary Chambon |
| **Subject:** | case#'s 343695 & 343696, People V Tunc Uraz |

Dear Mr. Chambon,

I am just trying to confirm if my appeal attorney Ms. Susan K. Walsh, timely filed my Standard 4 brief or not? it is not showing on register of actions

second please see the attach Lansing Police body cam footage video for the police report # 1751906153 about Jacob A. Perrone (my jury trial attorney and a Ginther hearing was granted to me based on his mental issues on 03/06/2020)which police report was filed on 11/20/2017 (Perrone second mental impairment with in the same month after my trial ended on 11/09/2017 and his first mental impairment was on 11/13/2017 )of my trial attorney's (Jacob A. Perrone P71915) mental impairment with my standard 4 briefs please,

I appreciate your understanding in this matter.
I have asked my appeal attorney to file this video with my briefs but I do not think she did.

respectfully submitted
Tunc Uraz 114653

1

STATE OF MICHIGAN
IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,          Court of Appeals Nos.
     Plaintiff-Appellee,          343695 & 343696

V          Circuit Court Nos.
          16-1065-FC & 16-1064-FH

TUNC URAZ,
     Defendant-Appellant.

_____/

**PEOPLE'S RESPONSE TO SUPPLEMENTAL
STANDARD-4 BRIEF (POST-REMAND)**

**ORAL ARGUMENT REQUESTED**

CAROL A. SIEMON (P32946)
     INGHAM COUNTY PROSECUTING ATTORNEY

KAHLA D. CRINO (P71012)
     APPELLATE DIVISION CHIEF

BUSINESS ADDRESS
     303 W. Kalamazoo Street, 4th Floor
     Lansing, MI 48933
     (517) 483-6228
     kcrino@ingham.org

RECEIVED by MCOA 11/28/2022 7:46:09 AM

The People of the State of Michigan, through Ingham County Prosecutor, Carol A. Siemon and Assistant Prosecuting Attorney, Kahla D. Crino, state as follows in response to Defendant's Supplemental Standard-4 Brief:

1. On November 9, 2022, Defendant's attorney, Susan Walsh, filed a motion for this Court to accept a supplemental Standard-4 brief prepared by Defendant Tunc Uraz.

2. On November 17, 2022, this Court granted the motion, but limited to the issue of ineffective assistance of counsel.

3. The People have filed three previous briefs in this Court: 1) a July 10, 2019 brief on appeal; 2) a February 19, 2020 response to Defendant's Standard-4 brief; and 3) a post-remand supplemental brief on appeal.

4. These briefs adequately address the ineffective assistance of counsel arguments that are contained throughout Defendant's supplemental Standard-4 brief and are incorporated in our answer to Defendant's supplemental Standard-4 brief. (Attachments 1, 2, and 3).

5. However, in reviewing these briefs, one factual correction is required based on Mr. Perrone's testimony at the *Ginther* hearing. Before having heard Mr. Perrone's testimony, the People believed, based on Mr. Perrone's statements to the trial court on December 12, 2017, that Mr. Perrone was diagnosed as bipolar before Mr. Uraz's trial, and thus framed our argument as though Mr. Perrone was a person *previously* diagnosed with bipolar disorder.[1] Mr. Perrone's testimony at the *Ginther* hearing corrected this misconception. At the *Ginther* hearing, Mr. Perrone testified that he did not have a mental health diagnosis before Defendant's trial and that from his perspective, he did not have symptoms during trial. (10/4/21, 14). Mr.

---

[1] On December 12, 2017, Perrone informed the trial court of several things: first, that he has bipolar disorder, which he takes medication for. (12/12/17, 6-7); second that he *did not* have an active episode during the trial (12/12/17, 7); third, that his diagnosis did not impact his representation of Defendant. (12/12/17, 5).

2

RECEIVED by MCOA 11/28/2022 7:46:09 AM

Perrone testified that he did not have any issues with his mental health on any day of Defendant's trial. (10/4/21, 22, 23, 24, 26, 29, 34-35). Mr. Perrone told the trial court that he had an issue with his mental health about a week after trial. (10/4/21, 35). This episode, approximately a week after trial, led to Mr. Perrone being diagnosed with bipolar disorder. (10/4/21, 35).

<div align="center">

**RELIEF REQUESTED**

</div>

WHEREFORE, the People respectfully request that this Court affirm Defendant's convictions.

Respectfully submitted,

*/S/ Kahla D. Crino*

_____

Dated: November 28, 2022

Kahla D. Crino (P71012)
Appellate Division Chief
303 W. Kalamazoo Street
Lansing, MI 48823
(517) 483-6228
kcrino@ingham.org

RECEIVED by MCOA 11/28/2022 7:46:09 AM

<div align="center">3</div>

Attachment 1

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

                                     Court of Appeals Nos. 343695
V                                           343696

                                     Circuit Court Nos. 16-1064-FH
                                           16-1065-FH

TUNC URAZ,

     Defendant-Appellant.

_____/

**PEOPLE'S BRIEF ON APPEAL**

**ORAL ARGUMENT NOT REQUESTED**

CAROL A. SIEMON
     INGHAM COUNTY PROSECUTING ATTORNEY

KAHLA D. CRINO
     APPELLATE DIVISION CHIEF

BUSINESS ADDRESS
     303 W. Kalamazoo Street, 4th Floor
     Lansing, Michigan 48933

RECEIVED by MCOA 11/28/2022 7:46:09 AM

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................iii

COUNTER STATEMENT OF QUESTIONS PRESENTED ........................... v

STATEMENT OF APPELLATE JURISDICTION......................................... vii

COUNTER STATEMENT OF FACTS ........................................................... 1

ARGUMENT

   I.  THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY ADMITTING DEFENDANT'S PREVIOUS ACTS OF STALKING PURSUANT TO MRE 404(B) TO SHOW INTENT, SCHEME, AND SYSTEM IN DOING AN ACT. ................... 12

   II.  THE TRIAL COURT DID NOT ERR BY DENYING DEFENDANT'S MOTION FOR SEVERANCE, BECAUSE THE CHARGES WERE A SERIES OF CONNECTED  ACTS OR A SERIES OF ACTS CONSTITUTING PARTS OF A SINGLE SCHEME OR PLAN .................................................................. 21

   III.  BECAUSE THE NOTES BETWEEN CLOSE AND PIERCE WERE DISCLOSED TO THE DEFENSE THE WEEK BEFORE TRIAL AND WERE UTILIZED BY DEFENDANT AT TRIAL, THERE WAS NO *BRADY* VIOLATION AND DEFENDANT WAS NOT DENIED A FAIR TRIAL. ...................................... 26

   IV.  BECAUSE DEFENDANT DID NOT MEET HIS BURDEN OF SHOWING THAT HE WAS ENTRAPPED, THE TRIAL COURT PROPERLY DENIED DEFENDANT'S MOTION TO DISMISS BASED ON ENTRAPMENT. .................. 29

   V.  DEFENDANT DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL MERELY BECAUSE TRIAL COUNSEL WAS A PERSON PREVIOUSLY DIAGNOSED WITH A MENTAL ILLNESS WHO RECEIVED TREATMENT FOR HIS MENTAL ILLNESS AFTER THE CONCLUSION OF DEFENDANT'S TRIAL. ........................................................... 33

   VI.  THE TRIAL PROSECUTOR DID NOT COMMIT PROSECUTORIAL MISCONDUCT AND DENY DEFENDANT A FAIR TRIAL BY STATING THAT THERE WAS A THREE-MINUTE DELAY BETWEEN QUESTIONS AND THAT DEFENSE COUNSEL RECEIVED A BREAK TO GATHER HIS THOUGHTS. .... 41

RELIEF REQUESTED ................................................................ 44

RECEIVED by MCOA 11/28/2022 7:46:09 AM

# TABLE OF AUTHORITIES

## Cases

*Harrington v Richter,* 562 US 86; 131 S Ct 770; 178 L Ed 2d 624 (2011) ..................... 35

*Huddleston* v *US*, 485 US 681 (1988) ................................................................. 15

*In re Ayres,* 239 Mich App 8 (1999) ................................................................. 36

*People v Ali Elatrache*, unpublished per curiam opinion of the Court of Appeals, issued
    April 19, 2016 (Docket No. 324918) .......................................................... 24, 25

*People v Babcock,* 469 Mich 247 (2003) ............................................................. 12

*People v Bynum,* 496 Mich 610 (2014) ............................................................... 12

*People v Carbin,* 463 Mich 590 (2001) ............................................................... 34

*People v Chenault*, 495 Mich 142 (2014) ........................................................ 26, 27

*People v Cooper*, 309 Mich App 74 (2015) ...................................................... 41, 42

*People v Dalessandro*, 165 Mich App 569 (1988) .................................................. 43

*People v Dendel,* 481 Mich 114 (2008) ............................................................... 34

*People v Fyda,* 288 Mich App 446 (2010) ........................................................... 29

*People v Gioglio*, 296 Mich App 12 (2012) .......................................................... 34

*People v Goree,* 132 Mich App 693 (1984) .......................................................... 18

*People v Hopson,* 178 Mich App 406 (1989) ........................................................ 36

*People v LeBlanc*, 465 Mich 575 (2002) ............................................................. 33

*People v Lockett,* 295 Mich App 165 (2012) ........................................................ 34

*People v Lukity,* 460 Mich 484 (1999) ............................................................... 12

*People v Mardlin,* 487 Mich 609 (2010) ............................................................. 14

*People v McLaughlin,* 258 Mich App 635 (2003) ................................................. 41

*People v Meadows,* 175 Mich App 355 (1989) ..................................................... 18

*People v Mills*, 450 Mich 61 (1995) .................................................................. 18

*People v Nix,* 301 Mich App 195 (2013) ............................................................. 33

*People v Ortiz,* 249 Mich App 297 (2001) ........................................................... 18

*People v Roscoe,* 303 Mich App 633 (2014) ........................................................ 13

*People v Sexton,* 250 Mich App 211 (2002) ........................................................ 30

*People v Stewart* (On Remand), 219 Mich App 38 (1996) ....................................... 35

*People v Stokes,* 312 Mich App 181 (2015) ......................................................... 26

*People v Unger,* 278 Mich App 210 (2008) .......................................................... 42

*People* v *Vandervliet*, 444 Mich 52 (1993) .......................................................... 15

*People v Williams*, 483 Mich 226 (2009) ........................................................ 21, 24

*Strickland v Washington,* 466 US 668 (1984) ...................................................... 35

*United States v Bagley,* 473 US 667; 105 S Ct  3375; 87 L Ed 2d 481 (1985) ............... 27

*Wiggins v Smith,* 539 US 510; 123 S Ct 2527; 156 L Ed 2d 471 (2003) ....................... 35

*Wilson v Taylor,* 457 Mich 232 (1998) .............................................................. 39

## Other Authorities

SJI 4.11 ........................................................................................................ 20

RECEIVED by MCOA 11/28/2022 7:46:09 AM

**Rules**

MCR 6.120(B)(1) ........................................................................................22, 25
MCR 6.120(C) ..................................................................................................21
MCR 7.215(C) ..................................................................................................24
MRE 104(b) ......................................................................................................15
MRE 401............................................................................................................16
MRE 402......................................................................................................15, 16
MRE 404(b) ................................................................12, 13, 14, 15, 23, 24, 38
MRE 404(b)(1) .................................................................................................14

RECEIVED by MCOA 11/28/2022 7:46:09 AM

**COUNTER STATEMENT OF QUESTIONS PRESENTED**

I.    DID THE TRIAL COURT ABUSE ITS DISCRETION BY ADMITTING DEFENDANT'S PREVIOUS ACTS OF STALKING PURSUANT TO MRE 404B TO SHOW INTENT, SCHEME, AND SYSTEM IN DOING AN ACT?

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

II.   DID THE TRIAL COURT ERR BY DENYING DEFENDANT'S MOTION FOR SEVERANCE, WHEN THE CHARGES WERE A SERIES OF CONNECTED  ACTS OR A SERIES OF ACTS CONSTITUTING PARTS OF A SINGLE SCHEME OR PLAN?

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

III.  WAS THERE A *BRADY* VIOLATION THAT DENIED DEFENDANT A FAIR TRIAL EVEN THOUGH THE NOTES BETWEEN CLOSE AND PIERCE WERE DISCLOSED TO THE DEFENSE THE WEEK BEFORE TRIAL AND WERE UTILIZED BY DEFENDANT AT TRIAL?

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

IV.   DID THE TRIAL COURT ERR BY DENYING DEFENDANT'S MOTION TO DISMISS BASED ON ENTRAPMENT WHEN DEFENDANT DID NOT MEET HIS BURDEN OF SHOWING THAT HE WAS ENTRAPPED?

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

V.    WAS DEFENDANT DENIED EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE TRIAL COUNSEL WAS A PERSON PREVIOUSLY DIAGNOSED WITH A MENTAL ILLNESS WHO RECEIVED TREATMENT FOR HIS MENTAL ILLNESS AFTER THE CONCLUSION OF DEFENDANT'S TRIAL?

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

RECEIVED by MCOA 11/28/2022 7:46:09 AM

VI. DID THE TRIAL PROSECUTOR COMMIT PROSECUTORIAL MISCONDUCT AND DENY DEFENDANT A FAIR TRIAL BY STATING THAT THERE WAS A THREE-MINUTE DELAY BETWEEN QUESTIONS AND THAT DEFENSE COUNSEL RECEIVED A BREAK TO GATHER HIS THOUGHTS?

Plaintiff-Appellee answers, "No."
Defendant-Appellant answers, "Yes."

RECEIVED by MCOA 11/28/2022 7:46:09 AM

## STATEMENT OF APPELLATE JURISDICTION

The People agree with Defendant's Statement of Jurisdiction.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

## COUNTER STATEMENT OF FACTS

Charges against Defendant Tunc Uraz arose because he stalked Erika Melke and solicited two jail inmates and an undercover officer to murder her after she ended a romantic relationship with him.

Defendant and Melke were in a dating relationship from the end of 2012 or beginning of 2013 until June 2015. (11/3/17, 10). They met when Defendant worked at the Michigan State University Cafeteria and Melke was a student. (11/3/17, 9). During the relationship, Defendant and Melke communicated in English, and Defendant taught a culinary arts management class in English. (11/3/17, 10-11).

When Melke ended the relationship, Defendant was not happy. (11/3/17, 11). After the relationship ended, Defendant still tried to communicate with Melke and work on their issues. (11/3/17, 11-12). Melke asked Defendant to leave her alone, but he refused. (11/3/17, 12). In July of 2015, Melke moved from one unit in her apartment complex to another unit, and Defendant helped her move. (11/3/17, 12-15). Defendant did not have a key to Melke's apartment. (11/3/17, 14-15).

During the evening on August 24, 2015, someone peeled Melke's registration tag off of her car, and damaged her car by keying it. (11/3/17, 15-17). On September 29, 2015, Defendant confronted Melke while she was grocery shopping at Kroger. Defendant asked Melke about a man that she was dating. Melke asked Defendant to leave her alone and left the store. Defendant also left without buying anything. (11/3/17, 18-19). During this time, Defendant was still trying to communicate with Melke by text message. (11/3/17, 20).

1

RECEIVED by MCOA 11/28/2022 7:46:09 AM

On December 31, 2015, Defendant confronted Melke while she was celebrating New Year's Eve at Dave and Busters with her then boyfriend, Stan White, and their friends Noelle VanSlembrouck and Zeb Baldwin. (11/3/17, 20). Defendant tried to make Melke come outside to talk to him. (11/3/17, 20). When she refused, he began slandering her, calling her a slut, and trying to talk to White. (11/3/17, 20). Melke felt scared and unsafe. (11/3/17, 21). Management had to escort Defendant out of the restaurant. (11/3/17, 22). That evening, when Melke and White left Dave and Busters, the tires on White's vehicle had been punctured on their side walls. (11/2/17, 178-179).

Melke obtained a Personal Protection Order and served Defendant on January 21, 2016. (11/3/17, 21). On February 13, 2016, Defendant texted Melke and called her a "Ho." (11/3/17, 24).  On March 26, 2016, Defendant confronted Melke in the parking lot of Bust Buy in Okemos. (11/3/17, 25). As Melke was pulling into the parking lot, she noticed Defendant's vehicle behind her. (11/3/17, 25). Defendant pulled up next to Melke, rolled down his window, and tried to talk to her. (11/3/17, 25). Melke took pictures of Defendant using her phone, stayed inside her car, and called the police. (11/3/17, 26-27). Defendant only left the parking lot when police arrived. (11/2/17, 131). Melke was upset, crying, and distraught. (11/3/17, 132).

On April 8, 2016, Melke was in Petoskey at her mother's home. (11/3/17, 27). Defendant called Melke from his mother's phone. His mother's name appeared on Melke's mother's caller ID, and Melke did not answer the call. (11/3/17, 28). Melke had not informed Defendant that she was going to Petoskey. (11/3/17, 28). On May 16, 2016, Melke stayed at White's house. During the night, Defendant egged Melke's vehicle and

2

punctured the tires on White's vehicle again. (11/3/17, 29; 11/2/17, 183). After this, Defendant also began texting White. Defendant did not identify himself in the text messages, but asked White to meet with him to work out their differences. White responded by calling the sender by Defendant's name, confronting him about damaging his vehicle and Melke's vehicle, and declining to meet with him. The sender did not express confusion and responded in a manner that made it clear he was Defendant. (11/2/17, 185-189). After this, Melke ended her relationship with White because she did not want to put him in continued danger. (11/3/17, 30-31).

Also in April 2016, Defendant attempted to obtain a gun and ammunition. Defendant stated that he could not do it the "legal way." (11/6/17, 96). Defendant asked Patrick Burnett, his co-worker at the Michigan State University, to get him a gun and bullets. Defendant asked Burnett, "Do you trust me?" (11/6/17, 92). Defendant stated that he really needed it, appeared to be serious, and stated that did not want to get a gun the legal way. (11/6/17, 94-96). The day after asking Burnett to get a gun and bullets for him, Defendant again approached Burnett, and made the same request again. (11/6/17, 97). Burnett knew it was not a joke, and reported the conversation to his supervisor. Defendant was terminated from his employment at Michigan State University for making this request. (11/6/17, 99).

In May 2016, Melke placed a security camera in her bedroom because she was concerned that Defendant had entered her apartment without her knowledge or consent. Melke was correct. On May 25, 2016, Defendant was caught on camera looking around inside Melke's room. Defendant appeared to be looking in an area where Melke had

RECEIVED by MCOA 11/28/2022 7:46:09 AM

placed tickets for an upcoming Drake concert. A bra, underwear, and a pair of shoes also went missing from Melke's bedroom. (11/3/17, 31-35).

On July 17, 2016, Carmen Elias, Melke's roommate and Melke saw Defendant parked outside of Melke's bedroom. (11/3/17, 35-36; 11/2/17, 146-148). Elias went to the parking lot, and Defendant drove away. Defendant then texted Elias and stated that he was in Turkey. (11/2/17, 147-148). A few weeks later, Elias found that the lug nuts on her tires had been loosened while it was parked outside her apartment. (11/2/17, 155).

On July 13, 2016, Melke obtained another Personal Protection Order. (11/3/17, 36). On August 15, 2016, Defendant began trying to access and change the password on Melke's Facebook account (11/3/17, 37). Defendant also created an Instagram account in Melke's name. He used pictures from Melke's actual Facebook account, and pictures of a dildo and posted them on the fake Instagram account. He also posted various pictures and messages that pertained to "cheating." (11/3/17, 37-42). This activity was linked to the apartment complex where Defendant and Defendant's associate Burak Atamar lived through search warrants for the IP addresses associated with the activity. (11/3/17, 83, 102-110). On August 16, 2016, Melke attended the Drake concert associated with the tickets Defendant appeared to look at when he broke into her bedroom in May of 2016. (11/3/17, 48). When she returned to her vehicle, her tires were again punctured by stabs to the side walls. (11/48-50).

Defendant was charged with Home Invasion Second Degree and Aggravated Stalking in file 16-534-FH and placed in the Ingham County Jail. (Information, *Attachment 1*). Defendant called Melke two times from the Ingham County jail.

4

RECEIVED by MCOA 11/28/2022 7:46:09 AM

Defendant had prerecorded a message that said, "I hope you're happy." (11/3/17, 46-48). Defendant wrote a letter for Melke and gave it to his former attorney Chris Bergstrom, to give to the prosecutor for Melke. The letter contained various demands, questions, and statements regarding their relationship. Defendant pleaded guilty to Aggravated Stalking on August 23, 2016, for his stalking conduct from before that date. Defendant admitted that his conduct was designed to scare or intimidate Melke. (11/3/17, 69).

On August 31, 2016 Defendant created a fake email account using Melke's name. He sent Melke a copy of the same letter he had provided to Bergstrom. This was a violation of the PPO and no contact order. (11/3/17, 44, 74-75). On August 27 and 31, 2016, Melke received notifications regarding changes to her Facebook password. This activity was linked to the apartment complex where Defendant lived through search warrants for the IP addresses associated with the activity. (11/3/17, 83, 102-110). Defendant's GPS tether also showed that he was present at the physical location associated with the IP address on August 27, 2017 and August 31, 2017 when the activity occurred. (11/2/17, 115-119). Before Defendant was sentenced on his first aggravated stalking case, he was charged with aggravated stalking in file 16-1064-FH for his stalking conduct between the dates of August 23, 2017 and September 26, 2017. (Information, *Attachment 2*). Defendant's sentencing in his first aggravated stalking file was on November 2, 2017. At that hearing, Defendant admitted to using alcohol since 1985, but denied ever abusing controlled substances. (11/3/17, 70-72).  Defendant was sentenced to six months in the Ingham County Jail in file 16-534-FH.

5

RECEIVED by MCOA 11/28/2022 7:46:09 AM

While serving his sentence, Defendant began soliciting other inmates to murder Melke. Defendant wanted Melke to die because he believed she had ruined his life, lied to him, and cheated on him. Because of this, Defendant wanted to "get rid of her" (11/3/17, 138) and stated "this bitch got to pay." (11/7/17, 13). Defendant was charged in file 16-1065-FC with three counts of solicitation to murder. (Information, *Attachment 3*).

The first person Defendant solicited to murder Melke was Charles Allen. Defendant and Allen were housed together for a period of time in a medical unit. They became friendly and Defendant began to talk to Allen about Melke. Defendant told Allen that he was in jail for stalking Melke. (11/7/17, 10-11). Defendant told Allen that he wanted to get back at Melke, and stated "this bitch got to pay." (11/7/17, 13). Defendant then made numerous, specific solicitations of Allen. Defendant asked Allen to beat Melke with a baseball bat. He stated that he wanted her "fucked up" and that he wanted pictures of it. (11/7/17, 14). Defendant then asked Allen to kill Ms. Melke. He specified that he wanted her beaten beyond recognition with a bat and that he wanted it to be recorded so that he could masturbate to it. Defendant also requested Melke's ID. (11/7/17, 20-21). Defendant specified that he wanted Melke's body to be dumped where no one would find her. (11/7/17, 16). Defendant agreed to pay Allen $2,500 in exchange for killing Melke. (11/7/17, 16-18). Defendant told Allen where Melke lived, what type of car she drove, and warned him that she has a camera in her house. Defendant also requested a gun so that he could go after the guy Melke "cheated" with. (11/7/17, 21-22). Allen went along with the conversations, but had no intentions of doing anything Defendant asked. (11/7/17, 22).

6

RECEIVED by MCOA 11/28/2022 7:46:09 AM

Allen notified a jail deputy about what Defendant had requested. (11/7/17, 24-25). Allen was interviewed by Detective Matt Krumbach, and during the interview, Allen asked if he could get out of jail. Detective Krumback told Defendant no, but that he could tell Mr. Allen's probation officer that Allen was helpful. (11/7/17, 27-28). Allen stated that no one took advantage of Defendant or hurt him while he was in jail. (11/7/17, 39, 68). Allen cooperated with law enforcement for the sake of Melke's life, and because it was the right thing to do. (11/7/17, 28, 69-70).

The second person Defendant solicited to murder Melke was Reginald Close. Close's nickname was "Rough." (11/3/17, 131). Defendant, Allen, and Close were assigned to the medical unit at the same time, and that is where Defendant and Close met. (11/3/17, 134-135). Defendant began talking to Close about Melke within 48 hours of meeting him. (11/3/17, 136-138). Defendant told Close that Melke ruined his life, lied to him, and cheated on him. Defendant told Close that he had stalked her, entered her house, and that it was her fault that he was in jail. (11/3/17, 138). Defendant stated that he was going to get rid of her. (11/3/17, 138). Defendant stated that he had lost his job at MSU because he tried to get a gun from a coworker in order to kill Melke. (11/3/17, 139). Defendant stated that he sliced Melke's tires while she was at a Drake concert and that he was able to access her phone through her iCloud. (11/3/17, 140-141).

Defendant asked Close if he knew anyone who could have Melke killed and make it look like a robbery. (11/3/17, 143). By the time this conversation took place, Allen had been moved to another location in the jail. (11/3/17, 143-144). Defendant asked Close if he could help by killing Melke. (11/3/17, 145). Close notified his lawyer after he realized

RECEIVED by MCOA 11/28/2022 7:46:09 AM

that Defendant was serious about killing Melke. (11/3/17, 145). Close agreed to help Defendant kill Melke. Defendant provided Melke's address, White's address, Melke's Facebook information, a map to Melke's apartment, Melke's car information, and Melke's job information. (11/3/17, 153-156). Defendant agreed to pay $1,000 for Melke's murder. (11/3/17, 147). Defendant made arrangements for his associate, to place some money in Close's jail account. (11/3/17, 157).

Detective Andrew Hogan, interviewed Close. (11/6/17, 106). Close did not receive anything in exchange for his statement or testimony. He was provided with immunity for agreeing to help Defendant kill Melke. (11/3/17, 146, 160-161). Detective Hogan checked Close's jail account, and verified that someone made a deposit $133.59 on October 13, 2016. (11/6/17, 108-109). Detective Hogan obtained a picture of the person who made the deposit. (11/6/17, 109-110). Detective Hogan verified that Defendant never complained of threats, assaults, or promises from other inmates. (11/6/17, 110-111).

The third person Defendant solicited to murder Melke was Officer Frank Mobley. Officer Mobley made contact with Defendant in an undercover capacity and pretended to be a "hit man." (11/6/17, 117). He was provided with basic information regarding Defendant's previous solicitations, and was pretending that he was Close's friend from Detroit. (11/6/17, 117-119). Officer Mobley called Defendant for the first time on October 18, 2016, using a video chat option for jail calls. The call was not successful. (11/6/17, 121). Officer Mobley called again on October 24, 2016. Defendant answered, and the entire call was recorded. (11/6/17, 121). Officer Mobley told Defendant that

8

RECEIVED by MCOA 11/28/2022 7:46:09 AM

"Rough" had told him that Defendant needed someone to "take out the trash." (11/6/17, 123). Throughout the call, Officer Mobley referred to Melke as the "trash," however, he made it clear that this was code for Melke, the person Defendant wanted to have killed. They discussed whether Defendant wanted Officer Mobley to "beat" the trash, whether he should "spill" the trash all over the house, whether he should beat the trash with a bat, whether he would want the scene to be cleaned up afterward, what color hair the trash had. Defendant stated that he wanted it done quickly, throw it out clean. (11/6/17, 123-127). They discussed the address where the trash would be, and Defendant stated that Rough would have that information because he had written it all down. (11/6/17, 126-127). Defendant stated that he was certain that he wanted it done. They discussed how completion would be verified, and that Defendant would pay Officer Mobley $2,000 for the first "bag" and $500 for any others. Defendant specified that he wanted the "trash" taken care of before November 2, which was his sentencing date.

Approximately a week before Defendant's trial began, the prosecutor provided Perrone with handwritten notes that were exchanged between Reginald Close and another inmate named John Pierce. (11/2/17, 6; *Attachment 4*). The notes did not pertain to Defendant's case. (11/6/17, 7). The notes were written before Close contacted his attorney about Defendant's case. (11/6/17, 23). Perrone utilized the notes as a part of his defense to show that Close had a habit of communicating with other inmates in an attempt to help his own case. One of the notes also stated that the author was a good liar, however, it was Pierce, not Close, who wrote that portion of the note. (11/9/17, 65-66).

9

RECEIVED by MCOA 11/28/2022 7:46:09 AM

One of the notes also stated that the author could pass a polygraph. Perrone at one point stated that he believed it was Close who had written that statement. (11/3/17, 6-7).

Perrone filed a motion to sever and an entrapment motion on Defendant's behalf. (2/28/17, 3-19; 10/20/17, 8-105). Both were denied before trial after extensive hearings. Perrone also responded and argued against the prosecutor's motion to admit evidence pursuant to MRE 404b. (10/11/17, 3-22). Perrone's defense included arguing that the jury should keep an open mind, that Defendant was presumed innocent, that the Defendant does not have to do anything, and that the prosecutor must prove beyond a reasonable doubt that Defendant is guilty. (11/2/17, 114-120; 11/9/17, 135). Perrone also argued that the evidence against Defendant was manufactured, and that Allen and Close took advantage of Defendant and provided testimony in an attempt to benefit their own situations. (11/2/17, 121-127; 11/9/17, 138-139). Perrone also argued that the evidence that was admitted pursuant to MRE 404b was not a part of the charged conduct in the case. (11/9/17, 137-138, 145). Throughout the trial, Perrone cross-examined witnesses and attempted to elicit testimony consistent with Defendant's theory of the case. Also throughout trial, Defendant was represented by two attorneys—Perrone, and Eric Schroeder.

Defendant was convicted of three counts of Solicitation to Commit Murder and one count of Aggravated Stalking. (11/9/17, 186). On December 12, 2017, Perrone informed the Court of several things: first, that he has bipolar disorder, which he takes medication for. (12/12/17, 6-7); second that he *did not* have an active episode during the trial (12/12/17, 7); third, that his diagnosis did not impact his representation of

10

Defendant. (12/12/17, 5). On December 13, 2017, a hearing was held regarding the information Perrone provided. The trial Court informed Defendant that Perrone had an illness "*after the completion of the trial*, but before the time of sentencing." (12/13/17, 3). The court appointed another attorney, Duane Silverthorn to represent Defendant, however, *Defendant requested that Perrone continue representing him* along with Mr. Silverthorn. (12/13/17, 4). Defendant agreed that this arrangement was fine with him and that it was what he wanted. (12/13/17, 4). Defendant's sentencing was adjourned from December 20, 2017 to January 24, 2018 so that Silverthorn could prepare. (12/13/17, 5-6). Defendant was sentenced to 200-360 months for each count of Solicitation of Murder, and 36-90 months for Aggravated Stalking, with credit for 443 days. (1/24/18, 37).

RECEIVED by MCOA 11/28/2022 7:46:09 AM

## ARGUMENT

## I.  THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY ADMITTING DEFENDANT'S PREVIOUS ACTS OF STALKING PURSUANT TO MRE 404(B) TO SHOW INTENT, SCHEME, AND SYSTEM IN DOING AN ACT.

### Defendant's Argument

Defendant argues the trial court abused its discretion by admitting Defendant's previous acts of stalking Melke pursuant to MRE 404(b). Defendant argues that the probative value of the other acts evidence was outweighed by the risk of unfair prejudice. Defendant argues that he was denied a fair trial based on the number of other acts that were admitted pursuant to MRE 404(b).

### Issue Preservation

Defendant objected to the admission of Defendant's previous acts of stalking the victim. This argument is preserved.

### Standard of Review

This Court reviews a trial court's decision regarding whether to admit evidence for an abuse of discretion.  *People v Lukity,* 460 Mich 484, 488 (1999).  An abuse of discretion occurs "when the trial court chooses an outcome falling outside [the] principled range of outcomes."  *People v Babcock,* 469 Mich 247, 269 (2003). When the decision whether to admit evidence involves a preliminary question of law, e.g. whether a rule of evidence or statute precludes admission of the evidence, this Court reviews the issue de novo.  *Lukity, supra* at 488.  "[I]t is an abuse of discretion to admit evidence that is inadmissible as a matter of law."  *People v Bynum,* 496 Mich 610, 623 (2014).

12

RECEIVED by MCOA 11/28/2022 7:46:09 AM

"A preserved error in the admission of evidence does not warrant reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *People v Roscoe,* 303 Mich App 633, 639 (2014).

### People's Argument

Files 16-1064-FH and 16-1065-FC were joined for trial. Defendant's three solicitations of murder were a culmination of Defendant's increasingly dangerous, two-year fixation on Melke. The prosecutor argued that Defendant's stalking behavior between August 2015 and July 2017 should be admitted to show motive, intent, and common plan or scheme. The prosecutor filed a timely motion to admit other acts pursuant to MRE 404(b), specifically:

1. Defendant's damage to Melke's vehicle, August 2015;
2. Defendant's messages to White asking to meet, and uninvited harassment at Dave and Busters on New Year's Eve, December 2015-January 2016;
3. Defendant's notice of Melke's January 20, 2016 Personal Protection Order;
4. Defendant's messages to White asking to meet, January 30, 2016;
5. Defendant's message to Melke calling her a "Ho," January 30, 2016;
6. Defendant's confrontation of Melke at Best Buy, March 26, 2016;
7. Defendant's two attempts illegally purchase a gun and ammunition from Burnett, April 5 and 7, 2016;
8. Defendant's phone calls to Melke at her mother's house, April 8, 2016;
9. Defendant's damage to Melke's vehicle at White's house, May 2016;
10. Defendant's damage to White's vehicle, May 2016;
11. Defendant's messages to White asking to meet, May 2016;
12. Defendant's messages to Melke asking to make amends, May 2016;
13. Defendant's home invasion at Melke's apartment, May 25, 2016;
14. Defendant appears in Melke's parking lot and texts Melke's roommate that he is in Turkey, July 17, 2016;
15. Defendant's notice that Melke's Personal Protection Order was extended another year, July 22, 2016;
16. Defendant slashes Melke's tires, August 15, 2016;

RECEIVED by MCOA 11/28/2022 7:46:09 AM

17. Defendant sends a letter to Melke's mother asking her to write him, September 2016;

18. Defendant's notice that Melke's Personal Protection order was extended five years, July 22, 2017.[Prosecutor's Motion to Admit Other Acts Evidence Pursuant to MRE 404b, *Attachment 5*]

The prosecutor argued that the proposed other acts evidence fit into three different categories: 1. Damage to property, 2. Appearance at location, and 3. Unwanted communications. In addition to these categories, was the Defendant's attempt to illegally buy a firearm and ammunition. (10/11/17, 3-4).[1]   The prosecutor argued that the other acts evidence was offered to show Defendant's common plan or system in stalking Melke, as well as his motive and intent in subsequently soliciting three people to kill Melke. The prosecutor argued that Defendant repeatedly contacted Melke after their breakup, and when this failed, he expanded the scope of his behavior to her friends and family. Once he was incarcerated and he could no longer see or contact her, he solicited three people to kill her because he believed she had ruined his life by breaking up with him and dating someone else or "cheating" as Defendant viewed it.

MRE 404(b) "is not exclusionary, but is inclusionary, because it provides a nonexhaustive list of reasons to properly admit evidence that may nonetheless also give rise to an inference about the defendant's character." *People v Mardlin,* 487 Mich. 609, 616 (2010).

MRE 404(b)(1) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It

---

[1] The trial court initially found that this would not be admitted pursuant to MRE 404(b), however after Defendant admitted to this conduct, the court reconsidered its ruling and allowed it to be admitted pursuant to MRE 404(b).

RECEIVED by MCOA 11/28/2022 7:46:09 AM

may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

According to *People* v *Vandervliet*, 444 Mich 52 (1993) and *Huddleston* v *US*, 485 US 681 (1988), other acts evidence is admissible if it satisfies the following four-pronged test:

1. The evidence must be offered for a proper purpose under 404(b);
2. The evidence must be relevant under MRE 402 as enforced through MRE 104(b);
3. The probative value of the evidence must not be substantially outweighed by unfair prejudice;
4. The trial court may, upon request, provide a limiting instruction.

**1.   The evidence was offered for a proper purpose under MRE 404(b).**

The prosecutor offered the other acts evidence to prove motive, intent and common system or plan in doing an act. Defendant's motive and intent was to stalk and kill Melke because she broke up with him and he believed that she was responsible for ruining his life. By stalking her, he intended to frighten and intimidate her, as he had previously admitted. By attempting to have her killed, he was motivated by a desire to get back at Melke for ruining his life. Motive and intent are proper purposes pursuant to MRE 404(b). Defendant's stalking charge in 16-1064-FH was merely a continuation and escalation of the previous two years that he stalked Melke. It was an ongoing course of conduct. In order for the jury to properly evaluate this conduct it was necessary for them to hear about the context in which it occurred, that it was a part of Defendant's ongoing behavior. Similarly, in order to understand Defendant's solicitation of Melke's murder, it

15

RECEIVED by MCOA 11/28/2022 7:46:09 AM

was also necessary for the jury to understand the reason, motivation, and intent behind it. The solicitations to murder Melke were the final culmination of Defendant's plan. System or plan in doing an act are also proper purposes pursuant to MRE 404(b).

### 2.  The evidence was relevant under MRE 402.

MRE 401 states: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

MRE 402 states: "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Michigan, these rules, or other rules adopted by the Supreme Court. Evidence which is not relevant is not admissible."

Defendant had been continually stalking Melke in various ways during the two years leading up to the charged stalking conduct in 16-1064-FH and 16-1065-FC. Defendant had also previously admitted that his intent in stalking Melke was to intimidate or frighten Melke. This is highly relevant to whether by continuing the same type of stalking conduct, Defendant's intent continued to be what he had previously admitted to. Defendant's previous acts of stalking Melke are certainly relevant to whether he factually continued to engage in the same type of conduct and whether it was his continued intent to frighten and intimidate her.

Similarly, Defendant's prolonged and escalated stalking of Melke, beginning with their breakup, is relevant to why Defendant would want to kill her. From Defendant's perspective based on his own admissions, Melke cheated on him and caused him to lose

RECEIVED by MCOA 11/28/2022 7:46:09 AM

his job. Defendant believed that Melke deserved to die a violent death simply because she ended their relationship and persisted in not wanting to have a relationship with him. As the prosecutor argued, Defendant believed that if he could not have Melke, then no one would. Defendant's own statements to Close and Allen give further insight into how Defendant's stalking behavior culminated with his attempts to have her killed. Defendant told Close that Melke ruined his life, lied to him, and cheated on him. Defendant told Close that he had stalked her, entered her house, and that it was her fault that he was in jail. (11/3/17, 138). Defendant told Allen that he was in jail for stalking Melke, that he wanted to get back at Melke, and stated "this bitch got to pay." (11/7/17, 10-11, 13). Defendants own statements explain the relevance of the other acts evidence. Defendant wanted to kill Melke as revenge for the fact that she left him and didn't want to be with him.

Defendant's attempts to obtain an illegal gun and ammunition are also relevant to his later attempts to have Melke killed. Defendant made it clear that he could not do it the "legal way." (11/6/17, 96). Defendant stated that he really needed it, appeared to be serious, and reiterated that did not want to get a gun the legal way. (11/6/17, 94-96). This all occurred in the spring of 2016, in the midst of a time when Defendant's instances of stalking Melke were especially repetitive. The other acts evidence was relevant to Defendant's stalking and solicitation of murder charges in files 16-1064-FH and 16-1065-FC.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

### 3. The probative value of the evidence was not substantially outweighed by unfair prejudice.

The probative value of the evidence was not substantially outweighed by unfair prejudice. "[U]nfair prejudice refers to the tendency of the proposed evidence to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *People v Goree,* 132 Mich App 693, 702–703 (1984). Evidence is unfairly prejudicial if there is a danger that marginally probative evidence will be given undue weight by the jury or cause the jury to decide the case on an improper basis such as emotion. *People v Ortiz,* 249 Mich App 297, 306 (2001), *People v Meadows,* 175 Mich App 355, 361 (1989). Unfair prejudice does not mean that the evidence will merely be damaging to the defendant's case.  *See People v Mills*, 450 Mich 61, 75 (1995).

It is highly unlikely that Defendant's previous stalking behavior would cause a jury to react with bias, sympathy, anger, shock, or a similar emotion. While Defendant's previous stalking behavior certainly tends to show that Defendant's stalking behavior continued and that Defendant's desire to kill Melke was motivated by revenge, the incidents themselves are not such that a jury would react with bias, sympathy, anger, or shock, and thus make a decision on an inappropriate basis. The conduct was not overtly violent or sexual. Rather, it consisted largely of attempts to contact Melke, either directly or through friends and family, damage to Melke or White's property, and appearing various time's at Melke's location.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

Defendant argues that the other acts evidence was unfairly prejudicial because it portrayed Defendant as an obsessed stalker. However, that was precisely the People's position at trial. Defendant argues that the large number of instances of stalking unfairly buttressed the charges for solicitation of murder. This is however incorrect. There was no room for confusion on this point. Instructions from the court, arguments by the prosecutor, and arguments by the defense made it clear that the prosecutor had to prove the elements of each offense beyond a reasonable doubt and that the other acts evidence could only be considered for a limited purpose. Defendant's argument that the large number of witnesses led to confusion is similarly incorrect. The jury did not express any confusion on this point.

Unfair prejudice does not mean the evidence will merely be damaging to Defendant's case. There is no question that the other acts evidence was damaging to Defendant's case. Without the other acts evidence, the jury would have heard, with no context whatsoever, about two instances of stalking conduct followed by three attempts to solicit Melke's murder. In the absence of the context provided by the other acts evidence, this simply would not have been a complete or accurate picture of what occurred, and the jury would have been left with no true way to determine Defendant's motive, intent, and plan. While this makes the other acts evidence highly relevant it, does not then also make the other acts evidence unfairly prejudicial, but instead merely a component of Defendant's case based exclusively on Defendant's own conduct.

Defendant argues that the other acts evidence was damaging to his case, and he is certainly correct, but it did not cause the jury to decide the case on an improper basis.

19

RECEIVED by MCOA 11/28/2022 7:46:09 AM

Instead, it showed the jury how after Melke ended the relationship, Defendant did become an obsessed and dangerous stalker. It showed how his conduct in stalking Melke continued and escalated, and ultimately how based on a desire for revenge for all of Melke's perceived slights, Defendant tried to have Melke murdered.

### 4.  The trial court provided a limiting instruction.

The trial court also provided a limiting instruction based on Michigan Standard Criminal Jury Instruction 4.11. The instruction was customized to only include the relevant purposes that the jury could consider the other acts evidence for. It stated:

> You have heard evidence that was introduced to show that the Defendant committed other acts for which he is not on trial. If you believe this evidence, you must be very careful and only to consider it for certain purposes. You may only think only about whether this evidence tends to show, one, that the defendant had a reason to commit the crimes. Two, that the defendant specifically meant to repeatedly contact Erika Melke against her wishes, and/or that the Defendant used a plan, system, or characteristic scheme that he had used before or since. You must not consider this evidence for any other purpose. For example, you must not decide that it shows that the Defendant is a bad person or that he is likely to commit crimes. You must not convict here because you think he is guilty of other bad conduct. All the evidence must convince you, beyond a reasonable doubt, that the Defendant committed the alleged crime, or you must find him not guilty. [(11/9/17, 175-176).]

Thus the jury was properly instructed to only consider the other acts evidence for proper and relevant purposes.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

**II.    THE TRIAL COURT DID NOT ERR BY DENYING DEFENDANT'S MOTION FOR SEVERANCE, BECAUSE THE CHARGES WERE A SERIES OF CONNECTED  ACTS OR A SERIES OF ACTS CONSTITUTING PARTS OF A SINGLE SCHEME OR PLAN**

### Defendant's Argument

Defendant argues that his multiple charges and the other acts evidence were too confusing for the jury and cast Defendant as an obsessed stalker. Defendant argues that severance of Defendant's files would have alleviated the jury's confusion and the perception that he was an obsessed stalker.

### Issue Preservation

Defendant filed a motion to sever trial for his files and the individual counts of Solicitation of Murder. This argument is preserved.

### Standard of Review

"To determine whether joinder is permissible, a trial court must first find the relevant facts and then must decide whether those facts constitute 'related' offenses for which joinder is appropriate. Because this case presents a mixed question of fact and law, it is subject to both a clear error and a de novo standard of review." *People v Williams*, 483 Mich 226, 231 (2009).

### People's Argument

Defendant's charges were properly joined because they were a series of connected acts or a series of acts constituting part of a single scheme or plan. MCR 6.120(C) states that the trial court "must sever for separate trials offenses that are not related as defined in

21

RECEIVED by MCOA 11/28/2022 7:46:09 AM

subrule (B)(1)." Offenses are related if they are based on "(a) the same conduct or transaction, or (b) a series of connected acts, or (c) a series of acts constituting parts of a single scheme or plan." MCR 6.120(B)(1).

Here, Defendant began stalking Melke after she ended their relationship. Defendant continued stalking Melke for approximately two years and culminated his stalking behavior with three attempts to have Melke killed. Defendant's own reasons for soliciting Melke's murder were that he wanted her to pay. This series of connected acts or series of acts constituting parts of a single scheme or plan consisted of numerous instances of unwanted contact. Defendant was charged with Home Invasion Second Degree and Aggravated Stalking in file 16-534-FH and placed in the Ingham County Jail. (Information, *Attachment 1*). Defendant called Melke two times from the Ingham County jail. Defendant had prerecorded a message that said, "I hope you're happy." (11/3/17, 46-48). Defendant wrote a letter for Melke and gave it to his former attorney Chris Bergstrom, to give to the prosecutor for Melke. The letter contained various demands, questions, and statements regarding their relationship. Defendant pleaded guilty to Aggravated Stalking on August 23, 2016 for his stalking conduct from before that date. Defendant admitted that his conduct was designed to scare or intimidate Melke. (11/3/17, 69).

On August 31, 2016 Defendant created a fake email account using Melke's name. He sent Melke a copy of the same letter he had provided to Bergstrom. This was a violation of the PPO and no contact order. (11/3/17, 44, 74-75). On August 27 and 31, 2016, Melke received notifications regarding changes to her Facebook password. This

activity was linked to the apartment complex where Defendant lived through search warrants for the IP addresses associated with the activity. (11/3/17, 83, 102-110). Defendant's GPS tether also showed that he was present at the physical location associated with the IP address on August 27, 2017 and August 31, 2017 when the activity occurred. (11/2/17, 115-119). Before Defendant was sentenced on his first aggravated stalking case, he was charged with aggravated stalking in file 16-1064-FH for his stalking conduct between the dates of August 23, 2017 and September 26, 2017. (Information, *Attachment 2*). Defendant's sentencing in his first aggravated stalking file was on November 2, 2017.  Defendant was sentenced to six months in the Ingham County Jail in file 16-534-FH.

While serving his sentence, Defendant began soliciting other inmates to murder Melke. Defendant wanted Melke to die because he believed she had ruined his life, lied to him, and cheated on him. Because of this, Defendant wanted to "get rid of her" (11/3/17, 138) and stated "this bitch got to pay." (11/7/17, 13). Defendant was charged in file 16-1065-FC with three counts of solicitation to murder. (Information, *Attachment 3*).

Before Defendant was even sentenced, he continued to persist in harassing Melke with continued stalking between the dates of August 23, 2017 and September 26, 2017, culminating with his three solicitations to murder Melke. Though Defendant pleaded guilty in file 16-534-FH, his plan of stalking and intimidating Melke not only continued, it escalated.

It is also appropriate to consider that evidence of Defendant stalking Melke would have been admitted at trial pursuant to MRE 404(b) even if severance of his stalking

RECEIVED by MCOA 11/28/2022 7:46:09 AM

23

charge and solicitation of murder charges were granted. Correspondingly, had each individual count of solicitation to murder been tried separately, evidence of the other two would have also been admitted pursuant to MRE 404(b).  Our Supreme Court reached a similar conclusion in *People v Williams*, 483 Mich 226, 237 (2009), where the Court stated, "[h]ere, even if the charges were tried separately, evidence from each crime would have been admissible in the trial of the other because of the common scheme or plan." *Id.* The admissibility of evidence in other trials is an important consideration because "[j]oinder of ... other crimes cannot prejudice the defendant more than he would have been by the admissibility of the other evidence in a separate trial."

This Court also reached a similar conclusion in *People v Ali Elatrache*, unpublished per curiam opinion of the Court of Appeals, issued April 19, 2016 (Docket No. 324918) (*Attachment 6*).[2] In *Elatrache*, the defendant relentlessly stalked and harassed the victim "S" after she ended a romantic relationship with him. His stalking and harassment ultimately culminated when he murdered S's father. The defendant argued that the stalking proofs were merely being used to bolster the murder proofs, that the crimes were unrelated, and that they should be severed. *Id*. at 15. The prosecutor argued that S's father's murder was the ultimate harassment that S suffered in that "defendant killed her father, he did what he knew would hurt her the most. The ultimate aggravated stalking…." *Id*. The trial court denied the defendant's motion to sever, and found that the crimes were "intertwined," and relevant to premeditation and deliberation.

[2] Pursuant to MCR 7.215(C), this unpublished case is not cited for a proposition of law, but rather to show how this Court has previously viewed a case where stalking served as motivation for another crime, and the trial court appropriately refused to sever charges.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

Defendant later pleaded guilty to aggravated stalking and proceeded to trial for murdering S's father. Notably, this Court also upheld the use of the defendant's stalking behavior toward S as MRE 404(b) evidence in the defendant's murder trial. *Id*. at 17-19.

Like the defendant in *Elatrache*, here, Defendant relentlessly stalked and harassed the victim after she ended their relationship. In both cases, the stalking escalated, until finally, the Defendant here attempted to have Melke murdered three times, and Elatrache successfully murdered S's father. In both cases, the end of the relationships, the anger and unwillingness to accept the end of the relationships, and a continued desire to control their victims ultimately led to the commission of other crimes. Just as the stalking in *Elatrache* was entwined with the defendant's murder of S's father, Defendant's stalking of Melke is entwined with Defendant's attempts to have Melke killed.  Defendant's actions in stalking and attempting to have Melke killed were a series of connected acts or a series of acts constituting parts of a single scheme or plan pursuant to MCR 6.120(B)(1), and joinder was appropriate.

25

**III. BECAUSE THE NOTES BETWEEN CLOSE AND PIERCE WERE DISCLOSED TO THE DEFENSE THE WEEK BEFORE TRIAL AND WERE UTILIZED BY DEFENDANT AT TRIAL, THERE WAS NO *BRADY* VIOLATION AND DEFENDANT WAS NOT DENIED A FAIR TRIAL.**

### Defendant's Argument

Defendant argues that the notes between Close and Pierce were disclosed the first day of trial, and thus defense counsel could not properly defend against the charges. Defendant argues that he could have used the notes as a part of his entrapment motion and that the late disclosure was a *Brady* violation.

### Issue Preservation

Defendant stated that he might move to dismiss based on the timing of when he was provided the notes. Ultimately, Defendant did not raise this argument.[3]

### Standard of Review

"This Court reviews due process claims, such as allegations of a *Brady* violation, de novo." *People v Stokes,* 312 Mich App 181, 189 (2015).

### People's Argument

"[T]he components of a '*true Brady* violation,' are that: (1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150 (2014)(emphasis added). To establish materiality, a defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A

---

[3] On November 6, 2017, the trial court referenced the notes, stated that he reviewed them, and found that they were not exculpatory. It is unclear as to whether this was associated with a motion. (11/6/17, 62-63).

26

RECEIVED by MCOA 11/28/2022 7:46:09 AM

'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id*.; *United States v Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). There is no *Brady* violation here because the evidence was provided to Defendant, and though only marginally favorable to Defendant, was admitted at trial, and used as a part of his defense.

### 1.  The prosecutor did not suppress the notes.

Defendant incorrectly asserts that the notes were not provided to Defendant. However, approximately a week before Defendant's trial began, the prosecutor provided Perrone with the handwritten notes that were exchanged between Reginald Close and another inmate named John Pierce. (11/2/17, 6; *Attachment 4*). Thus, this element is not met.

### 2.  The notes were not favorable to the defense.

First, the notes did not pertain to Defendant's case. (11/6/17, 7). The notes were written before Close contacted his attorney about Defendant's case. (11/6/17, 23). One of the notes also stated that the author was a good liar, however, it was Pierce, not Close, who wrote that portion of the note. (11/9/17, 65-66).  Perrone attempted to utilize the notes as a part of his defense to show that Close had a habit of communicating with other inmates in an attempt to help his own case, but he was not able to establish that it was Close who claimed to be a good liar. One of the notes also stated that the author could pass a polygraph. Perrone at one point stated that he believed it was Close who had written that statement. (11/3/17, 6-7). Thus, the notes were not favorable to the defense because Close did not write the statements that Defendant wished to attribute to him.

27

RECEIVED by MCOA 11/28/2022 7:46:09 AM

John Peirce testified as a witness for the defense and confirmed that he wrote the portion of the note where the author claimed to be a good liar.

### 3.  The notes were not material.

While materiality is typically established where there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different, this analysis is inapplicable here because the notes were both disclosed and utilized as a part of Defendant's strategy. Defendant attempts to meet this element by arguing that the outcome of his motion for severance would have been different if the notes had been disclosed earlier, but this is incorrect. As previously discussed, severance pertains to whether the offenses are related. The notes between Close and Peirce have absolutely nothing to do with whether Defendant was an obsessed stalker for a period of two years, culminating with attempts to have Melke killed and whether Defendant's act of stalking Melke was related to his attempts to have her killed for breaking up with him and rebuffing his advances.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

**IV. BECAUSE DEFENDANT DID NOT MEET HIS BURDEN OF SHOWING THAT HE WAS ENTRAPPED, THE TRIAL COURT PROPERLY DENIED DEFENDANT'S MOTION TO DISMISS BASED ON ENTRAPMENT.**

### Defendant's Argument

Defendant argues that the trial court erred by denying his entrapment motion because while he was in jail he was withdrawing from alcohol and drugs, he was vulnerable due to his placement in segregation, he had "mental health issues," and he was generally naive regarding jail. Defendant also argues that his motion should have been granted based on "the use of jailhouse snitches looking for favorable treatment."

### Issue Preservation

Defendant filed a motion alleging that Defendant was entrapped. This argument is preserved.

### Standard of Review

Whether entrapment occurred is determined by considering the facts of each case and is a question of law for this Court to decide de novo. The trial court must make specific findings regarding entrapment, and this Court reviews its findings under the clearly erroneous standard. The findings are clearly erroneous if this Court is left with a firm conviction that a mistake was made. [*People v Fyda,* 288 Mich App 446, 456 (2010) (citations omitted).]

### People's Argument

Entrapment occurs if (1) the police engage in impermissible conduct that would induce an otherwise law-abiding person to commit a crime in similar circumstances, or (2) the police engage in conduct so reprehensible that it cannot be tolerated by the court. The defendant bears the burden of proving entrapment by a preponderance of the evidence. The test for entrapment is objective and focuses on the propriety of the government's conduct that resulted in the charges against the defendant rather than on the defendant's predisposition to commit the crime. Entrapment will not be found where the

29

RECEIVED by MCOA 11/28/2022 7:46:09 AM

> police did nothing more than present the defendant with the opportunity to commit the crime of which he was convicted. [*People v Sexton*, 250 Mich App 211 (2002)(internal quotations and citations omitted).]

Here, Perrone filed a pretrial motion and brief alleging that Defendant was entrapped. The trial court held a hearing on Defendant's arguments. Defendant took the stand and testified that he has PTSD, substance abuse problems, and is manic depressive. (10/20/17, 11). Defendant testified that that he has abused alcohol and benzodiazepines for 30 years. (10/20/17, 12).[4] Defendant stated that while he was on the medical unit, he was inside 24 hours per day. (10/20/17, 10-11). Defendant stated that Allen offered to help with his case and that Allen did this with everyone. Defendant testified that he and Close wrote notes to one another about his case, but that it was Close's idea and that it was just talk. (10/20/17, 23). Defendant stated that Close offered to help Defendant beat his case. (10/20/17, 25). Defendant stated that he was being "extorted" by Close and Allen, but did not explain what this meant. (10/20/17, 32). Defendant testified that when he received Officer Mobley's call, he was not expecting a call about killing Melke. (10/20/17, 26-27). Defendant admitted to nearly every instance of stalking conduct, including his attempts to illegally obtain a handgun from a coworker at Michigan State University.

Also at the entrapment hearing, Detective Krumbach testified that Allen and Close were not working under police direction on anything and were never asked to gather information. (10/20/17, 94). Allen and Close did not have proffer agreements regarding their statements or testimony. (10/20/17, 93-94).

---

[4] Defendant did not report this at his previous sentencing.

30

RECEIVED by MCOA 11/28/2022 7:46:09 AM

The trial court denied Defendant's entrapment motion. The trial court stated that as to the first prong of the test, it found that Defendant had engaged in an escalation of activities that endangered Melke. The trial court found that "the police didn't really do anything. Close or Allen were not the agents. They were in the cell…And Close and Allen were not agents of the police. And they took the information about Mr. Uraz discussing solicitation of the victim in this matter to authorities. Authorities got it, they investigated it. And then they had the undercover agent make the call." (10/20/17, 109-110). The trial court also stated that in the video call with Officer Mobley, Defendant referenced "Rough" and told Officer Mobley that Rough would have all of the victim/intended target's information. The trial court found that as to Close and Allen, the police didn't do anything and that Close and Allen were not agents. As to Mobley, the trial court watched the video of the call, and found that Defendant did not express confusion, and participated in the conversation by talking about what he wanted to happen and explaining that "Rough" would have additional details. (10/20/17, 109-110).

Though it was not specifically discussed by the court, it is also significant that because Close and Allen were not agents of the police, and Defendant freely solicited each of them to murder Melke, he was not an otherwise law abiding citizen who was induced to commit a crime. Instead, when given a third opportunity to solicit an undercover officer to murder Melke, Defendant did so freely, as he had already done two times before with individuals who were not acting at the direction of law enforcement. Thus, the trial court properly denied Defendant's entrapment motion because the police did not engage in impermissible conduct that would induce an otherwise law abiding

RECEIVED by MCOA 11/28/2022 7:46:09 AM

citizen to commit a crime under similar circumstances. Defendant had been stalking Melke for two years—he was certainly not law abiding. Defendant solicited Melke's murder on multiple occasions with Close and Allen before officers were ever involved in his case. Once Officer Mobley called Defendant, Defendant merely continued to solicit Melke's murder as he had already done through several conversations with Close and Allen.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

**V. DEFENDANT DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL MERELY BECAUSE TRIAL COUNSEL WAS A PERSON PREVIOUSLY DIAGNOSED WITH A MENTAL ILLNESS WHO RECEIVED TREATMENT FOR HIS MENTAL ILLNESS AFTER THE CONCLUSION OF DEFENDANT'S TRIAL.**

### Defendant's Argument

Defendant argues that one of his attorneys, Perrone, had a mental breakdown during trial and provided ineffective assistance of counsel by: 1) failing to impeach witnesses with prior theft convictions, 2) giving an inadequate closing argument, 3) sending a particular email to Defendant's sister during the trial, and 4) an alleged delay between questions while cross examining a witness.

### Issue Preservation

Defendant did not move for a new trial in the trial court. In fact, after his conviction, he continued to request and receive Perrone's assistance. This argument is not preserved.

### Standard of Review

Whether a defendant has been denied effective assistance of counsel is a mixed question of law and fact.  *People v LeBlanc*, 465 Mich 575, 579 (2002).  "A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel."  *Id.*.  The trial court's findings of fact are reviewed for clear error.  *Id.*  Issues of law are reviewed de novo.  *Id.*

Defendant did not preserve this claim by moving for the new trial in the trial court. *People v Nix,* 301 Mich App 195, 207 (2013).  "Unpreserved issues concerning

33

<div style="writing-mode: vertical">RECEIVED by MCOA 11/28/2022 7:46:09 AM</div>

ineffective assistance of counsel are reviewed for errors apparent on the record." *People v Lockett,* 295 Mich App 165, 186 (2012).

## People's Argument

A defendant seeking a new trial on the ground that trial counsel was ineffective bears a heavy burden.  To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy the two-part test articulated by the United States Supreme Court in *Strickland v Washington,* 466 U S 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984).  See *People v Pickens,* 446 Mich 298, 302-303; 521 NW2d 797 (1994).  "First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment." *Strickland,* supra at 687.  In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy.  *Id.* at 690.[5]  "Second, the defendant must show that the deficient performance prejudiced the defense."  *Id.* at 687.  To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.  *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*  Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim.  [*People v Dendel,* 481 Mich 114, 124-125 (2008), quoting *People v Carbin,* 463 Mich 590, 599-600 (2001).]

---

[5] Reviewing courts are not only required to give counsel the benefit of the doubt with this presumption, they are required to "affirmatively entertain the range of possible reasons" that counsel may have had for proceeding as he or she did.  *Cullen v Pinholster*, 563 US [170]; 131 S Ct 1388, 1407; 179 L Ed 2d 557 (2011).  That inquiry is objective; although the reviewing court may not engage in a *post hoc* rationalization of the counsel's decision-making that contradicts the available evidence, neither may courts insist that counsel confirm every aspect of the strategic basis for his or her actions.  *Harrington v Richter*, 562 US [86]; 131 S Ct 770, 790; 178 L Ed 2d 624 (2011).  Accordingly, a reviewing court must conclude that the defendant's trial counsel's act or omission fell within the range of reasonable professional conduct if, after affirmatively entertaining the range of possible reasons for the act or omission under the facts known to the reviewing court, there might have been a legitimate strategic reason for the act or omission. *Pinholster*, 131 S Ct at 1407.  [*People v Gioglio*, 296 Mich App 12, 22-23; 815 NW2d 589, vacated in part on other grounds 493 Mich 864; 820 NW2d 922 (2012).]

RECEIVED by MCOA 11/28/2022 7:46:09 AM

"The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v Richter,* 562 US 86; 131 S Ct 770, 788; 178 L Ed 2d 624 (2011), quoting *Strickland v Washington,* 466 US 668, 690 (1984). "Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Harrington, supra* at 789, quoting *Strickland, supra* at 689. "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington, supra* at 789. "There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Harrington, supra* at 790, quoting *Wiggins v Smith,* 539 US 510, 525; 123 S Ct 2527; 156 L Ed 2d 471 (2003). Counsel's performance must be viewed from an objective standard, not from "counsel's subjective state of mind." *Harrington, supra* at 790. "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Id. at* 791. "The fact that defense counsel's strategy may not have worked does not constitute ineffective assistance of counsel." *People v Stewart* (On Remand), 219 Mich App 38, 42 (1996).

On December 12, 2017, Perrone informed the Court of several things: first, that he has bipolar disorder, which he takes medication for. (12/12/17, 6-7); second that he *did not* have an active episode during the trial (12/12/17, 7); third, that his diagnosis did not

RECEIVED by MCOA 11/28/2022 7:46:09 AM

impact his representation of Defendant. (12/12/17, 5). On December 13, 2017, a hearing was held regarding the information Perrone provided. The trial Court informed Defendant that Perrone had an illness "*after the completion of the trial*, but before the time of sentencing." (12/13/17, 3). The court appointed another attorney, Duane Silverthorn to represent Defendant, however, *Defendant requested that Perrone continue representing him* along with Silverthorn. (12/13/17, 4). Defendant agreed that this arrangement was fine with him and that it was what he wanted. (12/13/17, 4). Defendant's sentencing was adjourned from December 20, 2017 to January 24, 2018 so that Silverthorn could prepare. (12/13/17, 5-6). Nonetheless, Defendant argues that trial counsel's mental illness manifested as ineffective assistance in the following ways:

### 1. Failure to impeach Close and Allen with prior convictions

Defendant asserts that trial counsel should have impeached Close and Allen with their prior theft related convictions. The decisions whether and how to cross-examine witnesses are matters of trial strategy. *In re Ayres,* 239 Mich App 8, 23 (1999); *People v Hopson,* 178 Mich App 406, 412 (1989). Ineffective assistance of counsel can take the form of a failure to cross-examine witnesses only if the failure deprives the defendant of a substantial defense. *Hopson, supra.*

Here, Perrone did not impeach Allen or Close with previous theft related convictions, however, the jury would have known that they were each in jail because that is how they met Defendant. Thus the failure to cross-examine on this point did not deprive Defendant of a substantial defense. The jury knew that Close and Allen were Ingham County Jail inmates. The jury also knew that when he testified, Close was

36

RECEIVED by MCOA 11/28/2022 7:46:09 AM

incarcerated with the Michigan Department of Corrections (11/3/17, 131). Perrone also attacked Close's and Allen's credibility in numerous other ways. Perrone cross examined Close regarding the fact that he tried to help other inmates with their cases, and that he had tried to help John Pierce. (11/6/17, 6-7). Perrone elicited testimony that Close had proffered on other cases and that his original trial date for his own case was adjourned. (11/6/17, 9-13). Perrone also elicited testimony that Close was worried that Defendant was setting him up (11/6/17, 17). Perrone even elicited testimony from Close that Close and Allen had a conversation about Defendant's attempts to have Melke killed. (11/6/17, 49).

As to Allen, Perrone elicited testimony that Allen was placed on phone restrictions because he wasn't following instructions in the jail. (11/6/17, 31). Perrone elicited testimony from Allen that he tried to help Defendant be more comfortable in jail, and that Defendant seemed scared. (11/6/17, 39). Perrone elicited testimony from Allen that Allen believed it would be easy for someone to take advantage of Defendant. (11/6/17, 47). Perrone also elicited testimony that Allen initially came forward with information about Defendant to try to get out of jail early. (11/6/17, 51).

Thus the failure to impeach Close and Allen with prior theft related convictions did not deny Defendant a substantial defense, and in fact, Perrone elicited other information during cross examination that he was able to use to attack Close's and Allen's credibility, or lend support to his theory of the case. It is not reasonable to assert that had the jury been aware of their prior convictions, that they would have then disregarded their testimony.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

## 2) Perrone's closing argument

Defendant asserts that Perrone was ineffective because he gave an inadequate closing argument. This is simply incorrect. During pretrial motions, opening statements, cross-examination of witnesses, and closing arguments, Perrone presented Defendant's theory of the case.

Perrone filed a motion to sever and an entrapment motion on Defendant's behalf. (2/28/17, 3-19; 10/20/17, 8-105). Both were denied before trial after extensive hearings. Perrone also responded and argued against the prosecutor's motion to admit evidence pursuant to MRE 404b. (10/11/17, 3-22). Perrone's defense included arguing that the jury should keep an open mind, that Defendant was presumed innocent, that the Defendant does not have to do anything, and that the prosecutor must prove beyond a reasonable doubt that Defendant is guilty. (11/2/17, 114-120; 11/9/17, 135). Perrone also argued that the evidence against Defendant was manufactured, and that Allen and Close took advantage of Defendant and provided testimony in an attempt to benefit their own situations. (11/2/17, 121-127; 11/9/17, 138-139). Perrone also argued that the evidence that was admitted pursuant to MRE 404(b) was not a part of the charged conduct in the case. (11/9/17, 137-138, 145). Throughout the trial, Perrone cross-examined witnesses and attempted to elicit testimony consistent with Defendant's theory of the case. Also throughout trial, Defendant was represented by two attorneys—Perrone, and Eric Schroeder. Though Defendant asserts that Perrone's closing argument was an example of ineffective assistance of counsel, he fails to explain what was wrong with it, or what should have instead been presented. "It is not sufficient for a party simply to announce a

38

RECEIVED by MCOA 11/28/2022 7:46:09 AM

position ... and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Wilson v Taylor,* 457 Mich 232, 243 (1998) (quotations and citations omitted).

### 3) Email to Defendant's sister

Defendant has attached what purports to be an email that Perrone sent to Defendant's sister during the trial as evidence of ineffective assistance of counsel. Though some of the statements contained in the email are certainly odd, Defendant has not articulated how this email impacted Perrone's representation of Defendant. *See Id.*

### 4) Alleged delay between questions while cross examining Allen

Defendant argues that a statement by the prosecutor regarding Defendant's cross examination of Allen is an example of ineffective assistance of counsel.   Again, Defendant has not explained how any prolonged delay between questions, even if it did occur was ineffective assistance of counsel. While cross examining Allen, Perrone elicited testimony that Allen was placed on phone restrictions because he wasn't following instructions in the jail. (11/6/17, 31). Perrone elicited testimony from Allen that he tried to help Defendant be more comfortable in jail, and that Defendant seemed scared. (11/6/17, 39). Perrone elicited testimony from Allen that Allen believed it would be easy for someone to take advantage of Defendant. (11/6/17, 47).   Perrone also elicited testimony that Allen initially came forward with information about Defendant to try to get out of jail early. (11/6/17, 51).   Thus it is unclear why a delay in questions, if it occurred, was evidence of ineffective assistance of counsel. *See Id.*

RECEIVED by MCOA 11/28/2022 7:46:09 AM

Finally, even if these alleged errors were so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment," Defendant cannot establish prejudice. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. This is a burden Defendant cannot meet. The jury heard overwhelming evidence of Defendant's guilt from Melke, White, and other witnesses who experienced Defendant's stalking behavior first-hand. The jury heard from three witnesses, Close, Allen, and Officer Mobley, all of whom described how Defendant solicited them to murder Melke. The jury watched a video of Defendant soliciting Officer Mobley. Also of note is the fact that during his entrapment hearing and his previous stalking plea, Defendant admitted to nearly every component of the evidence against him. Therefore, Defendant cannot establish that but for counsel's errors, the result of the proceeding would have been different. Defendant did not receive ineffective assistance of counsel.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

## VI. THE TRIAL PROSECUTOR DID NOT COMMIT PROSECUTORIAL MISCONDUCT AND DENY DEFENDANT A FAIR TRIAL BY STATING THAT THERE WAS A THREE-MINUTE DELAY BETWEEN QUESTIONS AND THAT DEFENSE COUNSEL RECEIVED A BREAK TO GATHER HIS THOUGHTS.

### Defendant's Argument

Defendant argues that the trial prosecutor committed prosecutorial misconduct and denied Defendant a fair trial by stating that there was a three-minute break between defense counsel's questions and that defense counsel received a break to gather his thoughts. Defendant asserts that these comments were made "in the name of securing a conviction" and to "inflame prejudice."

### Issue Preservation

Defense counsel did not object to the trial prosecutor's comments. This argument is not preserved.

### Standard of Review

Where a defendant fails to object to an alleged prosecutorial impropriety, the issue is reviewed for plain error. A plain error is one that is "clear or obvious," and the error must affect the defendant's "substantial rights." That is, the defendant must have been prejudiced by the plain error. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of defendant's innocence." [*People v Cooper*, 309 Mich App 74, 88 (2015)(citations and quotation marks omitted).]

### People's Argument

It is well settled that a prosecutor may not personally attack defense counsel, *People v McLaughlin,* 258 Mich App 635, 646 (2003), or "suggest that defense counsel is intentionally attempting to mislead the jury," *People v Unger,* 278 Mich App 210, 236

41

RECEIVED by MCOA 11/28/2022 7:46:09 AM

(2008). This Court has distinguished between prosecutor "error" and prosecutor "misconduct" as follows:

> Although we recognize that the phrase "prosecutorial misconduct" has become a term of art in criminal appeals, we agree that the term "misconduct" is more appropriately applied to those extreme—and thankfully rare—instances where a prosecutor's *88 conduct violates the rules of professional conduct or constitutes illegal conduct. See, e.g., MRPC 8.4. In the vast majority of cases, the conduct about which a defendant complains is premised on the contention that the prosecutor made a technical or inadvertent error at trial—which is not the kind of conduct that would warrant discipline under our code of professional conduct. Therefore, we agree that these claims of error might be better and more fairly presented as claims of "prosecutorial error," with only the most extreme cases rising to the level of "prosecutorial misconduct." No matter what operative phrase is used, we must look to see whether the prosecutor committed errors during the course of trial that deprived defendant of a fair and impartial trial. [*Cooper*, 309 Mich App at 87-88.]

During Perrone's cross examination of Allen, the prosecutor stated, "Your honor, I am going to object. This is three minutes between questions. This cross-examination rambles on for hours." (11/7/17, 60). The court responded, "I can't help that." (11/7/17, 60). The prosecutor responded, "We took a break so he could gather his thoughts." (11/7/17, 60). The court responded, "This is a serious matter. So he can utilize whatever strategy he so desires." (11/7/17, 61). Defendant argues that the prosecutor made these comments to convince the jury of Defendant's guilt because he did not have sufficient evidence. (Defendant's Brief on Appeal, 31).

Though the prosecutor's comments were certainly not necessary, and may have been better addressed off the record, the comments regarding delay between questions and taking a break did not deny Defendant a fair trial. *See Id*. Defendant asserts that the prosecutor's comments regarding delay and taking a break are comparable to the

RECEIVED by MCOA 11/28/2022 7:46:09 AM

prosecutor's comments in *People v Dalessandro*, 165 Mich App 569 (1988), but does not provide a complete discussion of the comments at issue in *Dalessandro*. In *Dalessandro*, the prosecutor gave a closing argument rife with personal attacks on defense counsel, including arguments that he was intentionally misleading the jury, and that he fabricated evidence with the intention to mislead and presented perjured testimony. The prosecutor in *Dalessandor* also made extensive appeals for the jury to sympathize with the victim. This Court found that these comments collectively denied the defendant a fair trial.

Such comments are not present here. While the prosecutor's comments were unnecessary, they were also isolated, did not pertain to the evidence or directly denigrate defense counsel. Additionally, they were not incorporated into the prosecutor's closing arguments. The jury was also appropriately instructed that the lawyer's statements and arguments are not evidence, and juries are presumed to follow their instructions. (11/9/17, 166-167). The prosecutor's comments did not deny Defendant a fair trial.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

**RELIEF REQUESTED**

WHEREFORE, the People respectfully request that this court affirm Defendant's

convictions and sentence.

Respectfully submitted,
CAROL A. SIEMON
INGHAM COUNTY PROSECUTOR


/s/ Kahla D. Crino

_____
Kahla D. Crino (P71012)
Dated: July 10, 2019          Appellate Division Chief

RECEIVED by MCOA 11/28/2022 7:46:09 AM

44

Attachment 2

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

                              Court of Appeals Nos.  343695

V                                                  343696

                              Circuit Court Nos. 16-1064-FH

                                         16-1065-FH

TUNC URAZ,

      Defendant-Appellant.

_____/

**PEOPLE'S RESPONSE TO DEFENDANT'S
STANDARD-4 SUPPLEMENTAL BRIEF
ORAL ARGUMENT NOT REQUESTED**

CAROL A. SIEMON
     INGHAM COUNTY PROSECUTING ATTORNEY

KAHLA D. CRINO
     APPELLATE DIVISION CHIEF

PREPARED BY:
     JAMES HARRIES
     STUDENT INTERN

BUSINESS ADDRESS
     303 W. Kalamazoo Street, 4th Floor
     Lansing, Michigan 48933

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................iii

COUNTER STATEMENT OF QUESTIONS PRESENTED ................................ v

STATEMENT OF APPELLATE JURISDICTION ...............................................vi

INTRODUCTION ........................................................................................ 1

COUNTER STATEMENT OF FACTS .............................................................. 2

ARGUMENT .............................................................................................. 1

    I. BECAUSE DEFENDANT WAS CONVICTED AT TRIAL BASED ON SUFFICIENT EVIDENCE OF GUILT HE CANNOT RAISE THE ARGUMENT THAT THE DISTRICT COURT'S BIND OVER DECISION WAS ERRONIOUS. ... 1

    II. DEFENDANT DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL MERELY BECAUSE TRIAL COUNSEL WAS A PERSON PREVIOUSLY DIAGNOSED WITH A MENTAL ILLNESS WHO RECEIVED TREATMENT FOR HIS MENTAL ILLNESS AFTER THE CONCLUSION OF DEFENDANT'S TRIAL. ........................................................ 6

    III. TRIAL COUNSEL WAS NOT INEFECTIVE FOR FAILING TO OBJECT TO THE ADMISSION OF DEFENDANT'S STATEMENTS, FAILING TO PRESENT A DIMINISHED CAPACITY DEFENSE, AND FAILING TO CALL CERTAIN WITNESSES. ..................................................... 8

    IV. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S ENTRAPMENT MOTION, ADMITTING EVIDENCE OF DEFENDANT'S STATEMENTS, ADMITTING MRE 404(B) EVIDENCE, AND ALLOWING A JUROR WHO COMMENTED ON DEFENDANT'S RACE TO REMAIN ON THE JURY UNTIL THE CLOSE OF PROOFS. .......................................................................................... 24

    V. THE TRIAL COURT DID NOT ERR BY SCORING OV 4, 6, AND 10, AND BY ORDERING RESTITUTION, COSTS AND FINES IN BOTH OF DEFENDANT'S FILES. ........................................................................ 32

RELIEF REQUESTED ............................................................................... 39

RECEIVED by MCOA 11/28/2022 7:46:09 AM

# TABLE OF AUTHORITIES

**Cases**

*Brewer v Williams*, 430 US 387 (1977) ........................................................ 14

*Harrington v Richter,* 562 US 86; 131 S Ct 770; 178 L Ed 2d 624 (2011) .. 10, 11

*Montejo v Louisiana*, 556 US 778; 129 S Ct 2079; 173 LEd2d 955 (2009) ....... 12

*Moore v Illinois*, 434 US 220; 98 S Ct 458; 54 LEd2d 424 (1977) ..................... 12

*People v Babcock*, 469 Mich 247 (2003) ...................................................... 28

*People v Budzyn*, 456 Mich 77 (1997) .......................................................... 32

*People v Burhans*, 166 Mich App 758 (1988) .............................................. 11

*People v Bynum*, 496 Mich 610 (2014) ........................................................ 28

*People v Carbin,* 463 Mich 590 (2001) ........................................................ 10

*People v Carines*, 460 Mich 750 (1999) ........................................... 36, 37, 38

*People v Carpenter*, 464 Mich 223 (2001) ................................................... 17

*People v Cross,* 281 Mich App 737 (2008) ................................................... 37

*People v D'Angelo*, 401 Mich 167 (1977) ............................................... 33, 34

*People v Dendel,* 481 Mich 114 (2008) ........................................................ 10

*People v Fyda,* 288 Mich App 446 (2010) .................................................... 28

*People v Grant*, 455 Mich 221 (1997) .......................................................... 41

*People v Hall,* 435 Mich 599 (1990) .............................................................. 2

*People v Hardy*, 494 Mich 430 (2013) ......................................................... 37

*People v Harrington*, 258 Mich App 703 (2003) .................................... 12, 13

*People v Harris,* 185 Mich App 100 (1990) ............................................ 17, 18

*People v Johnson*, 315 Mich App 163 (2016) .............................................. 36

*People v Julian,* 171 Mich App 153 (1988) .................................................. 21

*People v Kammeraad*, 307 Mich App 98 (2014) .......................................... 18

*People v Kelly,* 186 Mich App 524 (1990) .............................................. 21, 42

*People v Kimble*, 470 Mich 305 (2004) ....................................................... 36

*People v Konopka*, 309 Mich App 354 (2015) ............................................. 42

*People v LeBlanc*, 465 Mich 575 (2002) ............................................... 6, 7, 8

*People v Lockett,* 295 Mich App 165 (2012) ............................................. 7, 9

*People v Loper*, 299 Mich App 451 (2013) .................................................. 37

*People v Lukity*, 460 Mich 484 (1999) ......................................................... 28

*People v McKinley,* 255 Mich App 20 (2003) ................................................ 1

*People v Nix,* 301 Mich App 195 (2013) ..................................................... 7, 9

*People v Perkins,* 468 Mich 448 (2003) ......................................................... 1

*People v Rockey,* 237 Mich App 74 (1999) .................................................. 21

*People v Stewart* (On Remand), 219 Mich App 38 (1996) ............................ 11

*People v Tate*, 244 Mich App 553 (2001) .................................................... 29

*People v Wilson*, 469 Mich 1018 (2004) ........................................................ 1

*People v Yost,* 468 Mich 122 (2003) .............................................................. 2

*Strickland v Washington,* 466 US 668 (1984) .............................................. 10

RECEIVED by MCOA 11/28/2022 7:46:09 AM

*United States v Wade*, 388 US 218, 228, 87 S Ct 1926, 18 LEd2d 1149 (1967) ........................................................................................................ 12

*Wiggins v Smith,* 539 US 510; 123 S Ct 2527; 156 L Ed 2d 471 (2003)............ 11

Statutes

MCL 330.2020(1) ................................................................................. 17
MCL 768.21a ....................................................................................... 19
MCL 769.1k(1)(b)(*iii*) ................................................................... 41, 42
MCL 777.22(1) .................................................................................... 39
MCL 777.34 ......................................................................................... 38
MCL 777.36 ......................................................................................... 40
MCL 777.40 ......................................................................................... 38

Rules

MCR 6.125(B) ...................................................................................... 17
MRE 404(b) .......................................................................... 23, 27, 33, 34

Constitutional Provisions

Const 1963, art 1, §17 .......................................................................... 11
Const 1963, art 1, §20 .......................................................................... 11
US Const, Am V .................................................................................... 11
US Const, Am VI ........................................................................... 11, 12

RECEIVED by MCOA 11/28/2022 7:46:09 AM

## COUNTER STATEMENT OF QUESTIONS PRESENTED

**I.  DEFENDANT WAS CONVICTED AT TRIAL BASED ON SUFFICIENT EVIDENCE OF GUILT. CAN THIS COURT ADDRESS DEFENDANT'S CLAIM THAT THE DISTRICT COURT'S BINDOVER DECISION WAS ERRONIOUS?**

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

**II.  DID DEFENDANT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL MERELY BECAUSE TRIAL COUNSEL WAS A PERSON PREVIOUSLY DIAGNOSED WITH A MENTAL ILLNESS WHO RECEIVED TREATMENT FOR HIS MENTAL ILLNESS AFTER THE CONCLUSION OF DEFENDANT'S TRIAL?**

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

**III.  WAS TRIAL COUNSEL INEFECTIVE FOR FAILING TO OBJECT TO THE ADMISSION OF DEFENDANT'S STATEMENTS, FAILING TO PRESENT A DIMINISHED CAPACITY DEFENSE, AND FAILING TO CALL CERTAIN WITNESSES?**

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

**IV.  DID THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S ENTRAPMENT MOTION, ADMITTING EVIDENCE OF DEFENDANT'S STATEMENTS, ADMITTING MRE 404(B) EVIDENCE, AND ALLOWING A JUROR WHO COMMENTED ON DEFENDANT'S RACE TO REMAIN ON THE JURY UNTIL THE CLOSE OF PROOFS?**

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

**V.  DID THE TRIAL COURT ERR BY SCORING OV 4, 6, AND 10, AND BY ORDERING RESTITUTION, COSTS AND FINES IN BOTH OF DEFENDANT'S FILES?**

> Plaintiff-Appellee answers, "No."
> Defendant-Appellant answers, "Yes."

RECEIVED by MCOA 11/28/2022 7:46:09 AM

**STATEMENT OF APPELLATE JURISDICTION**

Defendant may file a supplemental brief in propria persona pursuant to Administrative Order 2004-6, Standard 4. Because Defendant's propria persona brief was received within 84 days of February 22, 2019, this Court has jurisdiction.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

## INTRODUCTION

Defendant filed a Standard 4 Brief raising fourteen different arguments that do not appear to be in any particular order. The People have rearranged and organized these arguments to facilitate both responding and the appellate review of Defendant's arguments. The People's response will address Defendant's fourteen arguments in the following manner:

I. District court bind over decision (Defendant's Argument 10)
II. Trial counsel's mental illness (Defendant's Argument 3)
III. Ineffective assistance of counsel arguments
- Trial counsel should have objected to Defendant's statements on the basis of the Fifth Amendment and Sixth Amendment (Defendant's Argument 1 and 14)
- Trial counsel failed to investigate/present diminished capacity, criminal responsibility, competency (Defendant's Argument 2)
- Trial counsel failed to investigate and call witnesses (Defendant's Argument 4)
IV. Trial Court abuse of discretion arguments
- The trial court should have granted Defendant's entrapment motion (Defendant's Argument 5)
- The trial court shouldn't have admitted recordings of Defendant's statements because they were obtained in violation of his Fifth and Sixth Amendment right to counsel (Defendant's Argument 6)
- Juror with bias remained until close of proofs (Defendant's Argument 7)
- Admitting MRE 404(b) evidence (Defendant's Argument 11)
- Granting MRE 404(b) motion for reconsideration (Defendant's Argument 8)
V. Sentencing arguments
- Scoring OV 6 at 50 points was a cruel and unusual punishment and the jury was not instructed on degrees of solicitation (Defendant's Argument 9)
- OV 4 and OV 10 were improperly scored based on facts that were not proven beyond a reasonable doubt (Defendant's Argument 13)
- Restitution, fines, costs and assessments should not have been charged in both files (Defendant's Argument )

RECEIVED by MCOA 11/28/2022 7:46:09 AM

## COUNTER STATEMENT OF FACTS

The People incorporate the counterstatement of facts from their brief on appeal by reference.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

# ARGUMENT

## I. BECAUSE DEFENDANT WAS CONVICTED AT TRIAL BASED ON SUFFICIENT EVIDENCE OF GUILT HE CANNOT RAISE THE ARGUMENT THAT THE DISTRICT COURT'S BIND OVER DECISION WAS ERRONIOUS.

### Defendant's Argument

Defendant argues that the district court should not have bound him over for trial in on a third count of solicitation of murder. (Defendant's Argument 10)

### Issue Preservation

Defendant did not file a motion to quash bind over. This argument is not preserved.

### Standard of Review

The circuit court reviews the district court's decision regarding a motion to bind over for an abuse of discretion. *People v Perkins,* 468 Mich 448, 452 (2003). This Court reviews de novo the circuit court's decision regarding whether the district court abused its discretion. *People v McKinley,* 255 Mich App 20, 25 (2003).

### People's Argument

Because Defendant was convicted based on sufficient evidence of guilt, Defendant cannot challenge the district court's bind over decision. "If a defendant is fairly convicted at trial, no appeal lies regarding whether the evidence at the preliminary examination was sufficient to warrant a bindover." *People v Wilson*, 469 Mich 1018 (2004); *People v Hall,* 435 Mich 599, 601-603 (1990); *People v Yost,* 468 Mich 122, 124 n. 2 (2003).

RECEIVED by MCOA 11/28/2022 7:46:09 AM

Defendant has not raised the argument that he was convicted based on insufficient evidence. Still, the evidence of Defendant's guilt was overwhelming. Defendant persistently stalked Melke and broke into her home. While he was awaiting sentencing, he continued to engage in stalking behavior. While serving his sentence, Defendant began soliciting other inmates to murder Melke. Defendant wanted Melke to die because he believed she had ruined his life, lied to him, and cheated on him. Because of this, Defendant wanted to "get rid of her" (11/3/17, 138) and stated "this bitch got to pay." (11/7/17, 13). Defendant was charged in file 16-1065-FC with three counts of solicitation to murder.

The first person Defendant solicited to murder Melke was Charles Allen. Defendant and Allen were housed together for a period of time in a medical unit. They became friendly and Defendant began to talk to Allen about Melke. Defendant told Allen that he was in jail for stalking Melke. (11/7/17, 10-11). Defendant told Allen that he wanted to get back at Melke, and stated "this bitch got to pay." (11/7/17, 13). Defendant then made numerous, specific solicitations of Allen. Defendant asked Allen to beat Melke with a baseball bat. He stated that he wanted her "fucked up" and that he wanted pictures of it. (11/7/17, 14). Defendant then asked Allen to kill Melke. He specified that he wanted her beaten beyond recognition with a bat and that he wanted it to be recorded so that he could masturbate to it. Defendant also requested Melke's ID. (11/7/17, 20-21).  Defendant specified that he wanted Melke's body to be dumped where no one would find her. (11/7/17, 16). Defendant agreed to pay Allen $2,500 in exchange for killing Melke. (11/7/17, 16-18). Defendant told Allen

RECEIVED by MCOA 11/28/2022 7:46:09 AM

2

where Melke lived, what type of car she drove, and warned him that she has a camera in her house. Defendant also requested a gun so that he could go after the guy Melke "cheated" with. (11/7/17, 21-22). Allen went along with the conversations, but had no intentions of doing anything Defendant asked. (11/7/17, 22).

Allen notified a jail deputy about what Defendant had requested. (11/7/17, 24-25). Allen was interviewed by Detective Matt Krumbach, and during the interview, Allen asked if he could get out of jail. Detective Krumback told Defendant no, but that he could tell Allen's probation officer that Allen was helpful. (11/7/17, 27-28). Allen stated that no one took advantage of Defendant or hurt him while he was in jail. (11/7/17, 39, 68). Allen cooperated with law enforcement for the sake of Melke's life, and because it was the right thing to do. (11/7/17, 28, 69-70).

The second person Defendant solicited to murder Melke was Reginald Close. Close's nickname was "Rough." (11/3/17, 131). Defendant, Allen, and Close were assigned to the medical unit at the same time, and that is where Defendant and Close met. (11/3/17, 134-135). Defendant began talking to Close about Melke within 48 hours of meeting him. (11/3/17, 136-138). Defendant told Close that Melke ruined his life, lied to him, and cheated on him. Defendant told Close that he had stalked her, entered her house, and that it was her fault that he was in jail. (11/3/17, 138). Defendant stated that he was going to get rid of her. (11/3/17, 138). Defendant stated that he had lost his job at MSU because he tried to get a gun from a coworker in order to kill Melke. (11/3/17, 139). Defendant stated that he sliced Melke's tires while she

RECEIVED by MCOA 11/28/2022 7:46:09 AM

was at a Drake concert and that he was able to access her phone through her iCloud. (11/3/17, 140-141).

Defendant asked Close if he knew anyone who could have Melke killed and make it look like a robbery. (11/3/17, 143). By the time this conversation took place, Allen had been moved to another location in the jail. (11/3/17, 143-144). Defendant asked Close if he could help by killing Melke. (11/3/17, 145). Close notified his lawyer after he realized that Defendant was serious about killing Melke. (11/3/17, 145). Close agreed to help Defendant kill Melke. Defendant provided Melke's address, White's address, Melke's Facebook information, a map to Melke's apartment, Melke's car information, and Melke's job information. (11/3/17, 153-156). Defendant agreed to pay $1,000 for Melke's murder. (11/3/17, 147). Defendant made arrangements for his associate, to place some money in Close's jail account. (11/3/17, 157).

Detective Andrew Hogan, interviewed Close. (11/6/17, 106). Close did not receive anything in exchange for his statement or testimony. He was provided with immunity for agreeing to help Defendant kill Melke. (11/3/17, 146, 160-161). Detective Hogan checked Close's jail account, and verified that someone made a deposit $133.59 on October 13, 2016. (11/6/17, 108-109). Detective Hogan obtained a picture of the person who made the deposit. (11/6/17, 109-110). Detective Hogan verified that Defendant never complained of threats, assaults, or promises from other inmates. (11/6/17, 110-111).

The third person Defendant solicited to murder Melke was Officer Frank Mobley. Officer Mobley made contact with Defendant in an undercover capacity and

RECEIVED by MCOA 11/28/2022 7:46:09 AM

pretended to be a "hit man." (11/6/17, 117). He was provided with basic information regarding Defendant's previous solicitations, and was pretending that he was Close's friend from Detroit. (11/6/17, 117-119). Officer Mobley called Defendant for the first time on October 18, 2016, using a video chat option for jail calls. The call was not successful. (11/6/17, 121). Officer Mobley called again on October 24, 2016. Defendant answered, and the entire call was recorded. (11/6/17, 121). Officer Mobley told Defendant that "Rough" had told him that Defendant needed someone to "take out the trash." (11/6/17, 123). Throughout the call, Officer Mobley referred to Melke as the "trash," however, he made it clear that this was code for Melke, the person Defendant wanted to have killed. They discussed whether Defendant wanted Officer Mobley to "beat" the trash, whether he should "spill" the trash all over the house, whether he should beat the trash with a bat, whether he would want the scene to be cleaned up afterward, what color hair the trash had. Defendant stated that he wanted it done quickly, throw it out clean. (11/6/17, 123-127). They discussed the address where the trash would be, and Defendant stated that Rough would have that information because he had written it all down. (11/6/17, 126-127). Defendant stated that he was certain that he wanted it done. They discussed how completion would be verified, and that Defendant would pay Officer Mobley $2,000 for the first "bag" and $500 for any others. Defendant specified that he wanted the "trash" taken care of before November 2, which was his sentencing date.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

Based on all of this, there was sufficient evidence to convict Defendant of three counts of solicitation to commit murder, and Defendant cannot challenge the district court's bind over decision on appeal.

**II.   DEFENDANT DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL MERELY BECAUSE TRIAL COUNSEL WAS A PERSON PREVIOUSLY DIAGNOSED WITH A MENTAL ILLNESS WHO RECEIVED TREATMENT FOR HIS MENTAL ILLNESS AFTER THE CONCLUSION OF DEFENDANT'S TRIAL.**

### Defendant's Argument

Defendant argues that one of his attorneys, Perrone, had a mental breakdown during trial and provided ineffective assistance of counsel by: 1) failing to impeach witnesses with prior theft convictions, 2) giving an inadequate closing argument, 3) sending a particular email to Defendant's sister during the trial, and 4) an alleged delay between questions while cross examining a witness. (Defendant's Argument 3)

### Issue Preservation

Defendant did not move for a new trial in the trial court. In fact, after his conviction, he continued to request and receive Perrone's assistance. This argument is not preserved.

### Standard of Review

Whether a defendant has been denied effective assistance of counsel is a mixed question of law and fact. *People v LeBlanc*, 465 Mich 575, 579 (2002). "A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *Id.* The trial

RECEIVED by MCOA 11/28/2022 7:46:09 AM

court's findings of fact are reviewed for clear error. *Id.* Issues of law are reviewed de novo. *Id.*

Defendant did not preserve this claim by moving for the new trial in the trial court. *People v Nix,* 301 Mich App 195, 207 (2013). "Unpreserved issues concerning ineffective assistance of counsel are reviewed for errors apparent on the record." *People v Lockett,* 295 Mich App 165, 186 (2012).

## People's Argument

This argument was thoroughly addressed by the People in their Brief on Appeal. The People incorporate their Argument V from their Brief on Appeal by reference.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

### III. TRIAL COUNSEL WAS NOT INEFECTIVE FOR FAILING TO OBJECT TO THE ADMISSION OF DEFENDANT'S STATEMENTS, FAILING TO PRESENT A DIMINISHED CAPACITY DEFENSE, AND FAILING TO CALL CERTAIN WITNESSES.

#### Defendant's Argument

Defendant argues that trial counsel was ineffective for the following reasons:

1) trial counsel should have objected to the admission of Defendant's statements on the basis of the Fifth Amendment and Sixth Amendment (Defendant's Argument 1 and 14);

2) Trial counsel failed to investigate/present diminished capacity, criminal responsibility, competency (Defendant's Argument 2); and

3) Trial counsel failed to investigate and call witnesses. (Defendant's Argument 4)

#### Issue Preservation

Defendant did not move for a new trial in the trial court. After his conviction, he continued to request and receive Perrone's assistance. This argument is not preserved.

#### Standard of Review

Whether a defendant has been denied effective assistance of counsel is a mixed question of law and fact. *People v LeBlanc*, 465 Mich 575, 579 (2002). "A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *Id.*. The trial court's findings of fact are reviewed for clear error. *Id.* Issues of law are reviewed de novo. *Id.*

Defendant did not preserve this claim by moving for the new trial in the trial court. *People v Nix,* 301 Mich App 195, 207 (2013). "Unpreserved issues concerning

RECEIVED by MCOA 11/28/2022 7:46:09 AM

ineffective assistance of counsel are reviewed for errors apparent on the record."
*People v Lockett,* 295 Mich App 165, 186 (2012).

<div align="center">

**People's Argument**

</div>

Trial counsel was not ineffective for failing to object to the admission of Defendant's statements on the basis of the Fifth or Sixth Amendment because Defendant was not subjected to custodial interrogation and his jailhouse conversations were not critical stages of the proceedings. Trial counsel was not ineffective for failing to investigate and pursue a diminished capacity defense because that defense is not legally available. Trial counsel was not ineffective for failing to pursue competency and criminal responsibility because there is no credible evidence that Defendant was incompetent or not criminally responsible. Finally, trial counsel was not ineffective for failing to call the witnesses suggested by Defendant on appeal because their absence did not deny Defendant a substantial defense.

> A defendant seeking a new trial on the ground that trial counsel was ineffective bears a heavy burden. To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy the two-part test articulated by the United States Supreme Court in *Strickland v Washington,* 466 U S 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). See *People v Pickens,* 446 Mich 298, 302-303; 521 NW2d 797 (1994). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment." *Strickland,* supra at 687. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *Id.* at 690. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because the defendant bears the burden of demonstrating

RECEIVED by MCOA 11/28/2022 7:46:09 AM

both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. [*People v Dendel,* 481 Mich 114, 124-125 (2008), quoting *People v Carbin,* 463 Mich 590, 599-600 (2001).]

"The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v Richter,* 562 US 86; 131 S Ct 770, 788; 178 L Ed 2d 624 (2011), quoting *Strickland v Washington,* 466 US 668, 690 (1984). "Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Harrington, supra* at 789, quoting *Strickland, supra* at 689. "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington, supra* at 789. "There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Harrington, supra* at 790, quoting *Wiggins v Smith,* 539 US 510, 525; 123 S Ct 2527; 156 L Ed 2d 471 (2003). Counsel's performance must be viewed from an objective standard, not from "counsel's subjective state of mind." *Harrington, supra* at 790. "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Id. at* 791. "The fact that defense counsel's strategy may not have worked does not constitute ineffective assistance of counsel." *People v Stewart* (On Remand), 219 Mich App 38, 42 (1996).

RECEIVED by MCOA 11/28/2022 7:46:09 AM

10

**Trial counsel was not ineffective for failing to object to the admission of Defendant's statements on the basis of the Fifth and Sixth Amendment because Defendant was not subjected to custodial interrogation and his jailhouse conversations were not critical stages of the proceedings.**

The right to counsel is guaranteed under both the Fifth and Sixth Amendments of the United States Constitution and Michigan's Constitution. US Const, Am V, Am VI; Const 1963, art 1, §17, Const 1963, art 1, §20.  This right to counsel "extends to all 'critical' stages of the proceedings where counsel's absence might harm defendant's right to a fair trial." *People v Burhans*, 166 Mich App 758, 764 (1988), citing *United States v Wade*, 388 US 218, 228, 87 S Ct 1926, 18 LEd2d 1149 (1967).  The Sixth Amendment right to counsel attaches once criminal proceedings have been initiated. *Moore v Illinois*, 434 US 220, 231; 98 S Ct 458; 54 LEd2d 424 (1977).  "The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." *People v Harrington*, 258 Mich App 703, 706 (2003), quoting US Const, Am VI.  The Sixth Amendment affords an accused the right to rely on counsel as an intermediary between him and the state. *Harrington*, *supra* at 706.

Once the Sixth Amendment right to counsel has attached, it may still be waived.  *Montejo v Louisiana*, 556 US 778, 786–787; 129 S Ct 2079; 173 LEd2d 955 (2009).

Once the Sixth Amendment right to counsel has attached, it may still be waived.  *Montejo v Louisiana*, 556 US 778, 786–787; 129 S Ct 2079; 173 LEd2d 955 (2009). "When a defendant invokes the Sixth Amendment right to counsel, any subsequent waiver of this right in a *police-initiated custodial interview* is ineffective

RECEIVED by MCOA 11/28/2022 7:46:09 AM

with respect to the charges filed against the defendant. An exception to this rule exists where the defendant initiates the contact and makes a valid waiver of his rights." *People v Harrington*, 258 Mich App 703, 706 (2003).

Close and Allen are not police officers or agents of the police. The conversations Defendant chose to have with Close and Allen cannot be characterized as custodial interrogations, but rather, conversations Defendant wanted to have because he had decided to have Melke killed. Thus it was not necessary for the jail inmates or the officer posing as a hit man to advise Defendant of his Miranda rights. The Sixth Amendment right to counsel extends to "critical" stages of Defendant's proceedings. As such, Defendant was not entitled to have counsel present with him in custody for every voluntary conversation that he chose to have with another inmate. The time Defendant spent in custody cannot be characterized as a "critical" stage for purposes of the Sixth Amendment right to counsel. The same is true for Defendant's phone call with Officer Mobley while Officer Mobley pretended to be a hit man. Defendant sought a conversation with Officer Mobley because he believed that he was a hit man. During that conversation, he believed that Officer Mobley was a friend of Close's whom Close had put Defendant in contact with for the purpose of having Melke killed. This is a conversation Defendant voluntarily participated in, it cannot be characterized as custodial interrogation or a critical phase of proceedings. Voluntary conversations with inmates are not custodial interrogations for purposes of Miranda warnings and Defendant's Fifth Amendment rights and they are not critical phases of proceedings for purposes of the Sixth Amendment right to counsel.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

Defendant argues his rights were violated because the police officers and their "agents" made statements that were deliberately intended to elicit incriminating evidence from him in violation of his Sixth Amendment right to counsel. In support, Defendant points to *Brewer v Williams*, 430 US 387, 401 (1977). However, *Brewer* is distinguishable. The defendant in *Brewer* was transported by police to Des Moines and the police had agreed with the defendant's counsel not to interrogate the defendant during the trip. *Id.* at 387. One of the officers asked a question that seemed deliberately intended to elicit an incriminating statement from the defendant. The Supreme Court in *Brewer* held that the question and the answer that resulted were a violation of the defendant's rights. In the instant case however, Defendant's counsel had no such agreement with the police and Defendant was not subjected to custodial interrogation.

Defendant also argues that this "deliberate elicitation of incriminating statements" standard from *Brewer* should also apply to the statements he made to Close and Allen because they were part a plot to trick Defendant and because they acted as agents of the police when they discussed the murder plot with Defendant. Defendant claims these men were agents of the police because their motive for telling the police about Defendant was to lessen their own penalties. However, only one of the two men stated that his initial intent in coming forwards was to potentially receive a lower sentence. Additionally, neither Close nor Allen received any kind of benefit for giving the information to the police. (10/20/17, 93-94). Defendant also

RECEIVED by MCOA 11/28/2022 7:46:09 AM

claims that the two men were agents because they initiated contact with the Defendant and aided in planning and gathering more information about Defendant.

However, evidence on the record indicates that Defendant was the one who approached both men regarding the murder plot and, while Allen did approach Defendant first, it was only to ask why Defendant was in jail. Additionally, the police only became involved after they received reports from Close and Allen stating that Defendant had approached them and solicited them to murder Melke—meaning that Close and Allen could not have been acting as "agents of the police" as Defendant claims when he made these incriminating statements to Close and Allen. Defendant also argues that an agency relationship can be implied between the police and Close and Allen because the two men admitted to "deliberately eliciting incriminating information while acting as confidants of the Defendant. First, that would only be of concern if the two men were already agents, and second, Close and Allen testified they "played along" with Defendant when he was asking if they knew anyone who could murder Melke because they wanted to know how serious he was.[1] Trial counsel was not ineffective for failing to object on the basis of the Fifth or Sixth Amendment.

---

[1] (11/3/17, p 143-144; 11/7/17, p 17-24).

**Trial counsel was not ineffective for failing to investigate and pursue a diminished capacity defense because that defense is not legally available. Trial counsel was not ineffective for failing to pursue competency and criminal responsibility because there is no credible evidence that Defendant was incompetent or not criminally responsible.**

Defendant argues that his trial counsel was ineffective because he failed to present evidence or consult an expert regarding whether Defendant's diminished state of mind that undermined the specific intent required for his solicitation of intent to commit murder charges. Defendant argues that his counsel should have consulted an expert regarding Defendant's state of mind or requested a continuance to have a psychiatric evaluation done because it would allegedly show that Defendant had a diminished state of mind that would have undermined the specific intent requirement.

Defendant's own description of his "diminished state of mind" at a motion regarding the proposed defense of entrapment was:

> Being in jail for the first time in my life. Put into solitary confinement was a surprise the next day. I wasn't expecting that. And it's the loneliness. You start hallucinating. I had high blood pressure, hypertension, manic depressive situations. We got through every little thing that solitary confinement can do to you. Your focus changes. You start thinking over and over and over many times every little detail in your life, what happened then. You start getting frustrated most of the time. I also had experienced – like I would read a book and I would not remember what I read after a while. Then I would read over it again because – the scarcity of items, you beg for a book. I wasn't allowed to buy any commissary for the first month. Of course, no phone calls, whatsoever, you, taken away. (10/20/17, p 13).

Defendant also described being "held for 23 hours" and being in "withdrawal" due to benzoids and alcohol, as well as potentially suffering from depression. (*Id.* at 152-56). Regardless of how Defendant was feeling, trial counsel was not ineffective

RECEIVED by MCOA 11/28/2022 7:46:09 AM

for failing to pursue a diminished capacity defense because diminished capacity was abolished by *People v Carpenter*, 464 Mich 223 (2001).

Defendant asserts that trial counsel was not effective for failing to pursue a competency evaluation. Defendants facing criminal charges are presumed competent to stand trial. MCL 330.2020(1) states:

> A defendant to a criminal charge shall be presumed competent to stand trial. He shall be determined incompetent to stand trial only if he is incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner. The court shall determine the capacity of a defendant to assist in his defense by his ability to perform the tasks reasonably necessary for him to perform in the preparation of his defense and during his trial.

The issue of a defendant's competence to stand trial may be raised at any time during proceedings against the defendant by the court or the parties. MCR 6.125(B) states:

> The issue of the defendant's competence to stand trial or to participate in other criminal proceedings may be raised at any time during the proceedings against the defendant. The issue may be raised by the court before which such proceedings are pending or being held, or by motion of a party….

In *People v Harris,* 185 Mich App 100 (1990), the Court of Appeals stated: "Although the determination of a defendant's competence is within the trial court's discretion, a trial court has the duty of raising the issue of incompetence where facts are brought to its attention which raise a "bona fide doubt" as to the defendant's competence." *Harris*, 185 Mich App at 102.

> "[T]he test for such a bona fide doubt is whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Maxwell v Roe,* 606 F 3d 561, 568 (9th Cir 2010) (citation and quotation marks omitted). Evidence of

RECEIVED by MCOA 11/28/2022 7:46:09 AM

a defendant's irrational behavior, a defendant's demeanor, and a defendant's prior medical record relative to competence are all relevant in determining whether further inquiry in regard to competency is required. *Drope v Missouri,* 420 US 162, 180, 95 S Ct 896, 43 L Ed 2d 103 (1975). "There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Id.* [*People v Kammeraad*, 307 Mich App 98, 138-39 (2014) *app den* 497 Mich 1014 (2015).]

Here, Defendant displayed no irrational behaviors and there was no indication whatsoever that he may be incompetent. Defendant took the stand at his own entrapment hearing and testified as to why he believed he was entrapped. At Defendant's sentencing, Defendant requested that Perrone continue to assist in his representation. Defendant requested that OV 6 be challenged and provided information about this to his attorney. Defendant argued with the court regarding various facts from his case. On appeal, Defendant has continued to demonstrate his competence by learning that he could file a Standard 4 brief and addressing arguments to this Court.

On appeal, Defendant argues that because he was diagnosed with having depression, anxiety, suicidal thoughts, and chaotic emotions, that he was not competent. Even if we take this assertion as being true, it does not establish that Defendant did not understand the nature and object of the proceedings against him or that he was incapable of assisting in his defense in a rational manner. In fact, the record demonstrates that Defendant assisted with his defense in a rational manner by testifying at a pretrial motion and expressing his opinion at sentencing.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

Defendant asserts that trial counsel was ineffective for failing to pursue an evaluation for criminal responsibility. A Defendant is not criminally responsible if at the time of the offense he was legally insane. MCL 768.21a states:

> It is and affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense. An individual is legally insane if, as a result of mental illness as defined in section 400 of the mental health code, 1974 PA 258, MCL 330.1400, or as a result of having an intellectual disability as defined in section 100b of the mental health code, 1974 PA 258, MCL 330.1100b, that person lacks substantial capacity either to appreciate the nature and quality or wrongfulness of his or her conduct or to conform his or her conduct to the requirements of law. Mental illness or otherwise having an intellectual disability does not otherwise constitute a defense of legal insanity.

Again, even if we assume that Defendant was mentally ill, his mental illness, Defendant still had the substantial capacity to appreciate the nature and quality or wrongfulness of his actions and the ability to conform his conduct to the requirements of law. All of Defendant's actions in committing these offenses demonstrate that he understood what he was doing, and did it because he wanted to. Defendant was motivated by jealousy and rage that Melke had left him. When he solicited her murder, he stated that he wanted Melke to die because he believed she had ruined his life, lied to him, and cheated on him. Because of this, Defendant wanted to "get rid of her" (11/3/17, 138) and stated "this bitch got to pay." (11/7/17, 13). He stated that he wanted her "fucked up" and that he wanted pictures of it. (11/7/17, 14). Defendant then asked Allen to kill Melke. He specified that he wanted her beaten beyond recognition with a bat and that he wanted it to be recorded so that he could masturbate to it. Defendant also requested Melke's ID. (11/7/17, 20-21).  Defendant

18

RECEIVED by MCOA 11/28/2022 7:46:09 AM

specified that he wanted Melke's body to be dumped where no one would find her. (11/7/17, 16). Defendant told Close that Melke ruined his life, lied to him, and cheated on him. Defendant told Close that he had stalked her, entered her house, and that it was her fault that he was in jail. (11/3/17, 138). Defendant stated that he was going to get rid of her. (11/3/17, 138).

Defendant took further, intentional actions as a part of his plan. Defendant provided Melke's address, White's address, Melke's Facebook information, a map to Melke's apartment, Melke's car information, and Melke's job information to Close. (11/3/17, 153-156). Defendant agreed to pay $1,000 for Melke's murder. (11/3/17, 147). Defendant made arrangements for his associate, to place some money in Close's jail account. (11/3/17, 157).  When Defendant talked to Officer Mobley, he made the assumption that all of this information was already provided to Officer Mobley by Rough. Additionally, Defendant's evasiveness during his conversation with Officer Mobley further confirms that he understood the wrongfulness of his conduct and that he wanted to be careful of what he said. Defendant knew what he was doing was wrong, but he wanted to kill Melke so badly, that he ultimately did not care.  For all of these reasons, trial counsel was not incompetent for failing to pursue competency or criminal responsibility evaluations.

**Trial counsel was not ineffective for failing to call the witnesses suggested by Defendant on appeal because their absence did not deny Defendant a substantial defense.**

Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy. *People v Rockey,* 237 Mich

19

App 74, 76 (1999).  Ineffective assistance of counsel may be established by the failure to call witnesses only if the failure deprives defendant of a substantial defense.  *People v Julian,* 171 Mich App 153 (1988).  A substantial defense is one that might have made a difference in the outcome of the trial.  *People v Kelly,* 186 Mich App 524, 526 (1990).

Defendant argues that his trial counsel was ineffective because he failed to investigate or call any relevant witnesses that would have had a material impact on Defendant's case in chief. Defendant claims that his counsel was unprofessional when he provided a list of 30 witnesses that he failed to properly investigate and that Defendant's rights and ability to put on a defense were substantially affected when his counsel failed to call several witnesses during the trial that Defendant believes would have given materially relevant testimony. However, not a single one of these witnesses had any testimony that would have had any effect on Defendant's trial.

Defendant argues that, Kathy Edmonds should have testified and argues that Edmonds would have testified about an abundance of trash at Defendant's house to give credence to the argument that Defendant though Officer Mobley was contacting him to take out "literal" trash rather than a hit. However, given that Officer Mobley was asking Defendant "what color hair the 'trash' had" and "whether he wanted the trash beaten with a bat" or whether he "wanted the trash spread all over" it's unlikely this testimony from Edmonds would have been persuasive. (*Id.* at 70-75).

Defendant argues that two inmate workers from the Ingham County jail should have testified. According to Defendant, these two men would be able to testify

RECEIVED by MCOA 11/28/2022 7:46:09 AM

about the interactions, communications, and solicitations between Defendant, Close, and Allen. Such testimony would have been inadmissible as hearsay.

Defendant argues that four witnesses should have been called to testify about how Close and Allen became involved in their own cases. Such testimony would also be inadmissible as hearsay and would not be relevant to Defendant's case.

Defendant argues that two character witnesses should have been called, however, Defendant provides no information regarding what these witness would have said. Thus it is impossible to determine if their testimony would have been admissible and whether their absence denied Defendant a substantial defense.

Defendant argues that a man was with him when he stalked Melke at Dave and Busters in 2015 and that that person should have been called as a witness. The substance of this individual's proposed testimony is not specified. However, because Defendant was stalking Melke on this occasion, this individual may be an aider and abettor in Defendant's stalking behavior. It is also unclear as to whether it would be admissible. The incident in 2015 was part of the admitted MRE 404(b) evidence. Melke and Stan White testified about the Dave and Buster's incident. There was no mention of anyone being with Defendant when he started harassing Melke at the Dave and Buster's or when he was escorted out so it is unclear what this witness would testify to and whether it would be credible. Regardless, it is unclear how the absence of this witness denied Defendant a substantial defense.

Defendant argues that his friend Burak Atamer should have been called to testify regarding how he deposited money in Reginald Close's jail account. However,

RECEIVED by MCOA 11/28/2022 7:46:09 AM

Close himself testified about this and Defendant offers no argument how Atamer's testimony would be different. Defendant also argues that a private investigator who investigated Close's "shady background" should have been called. Defendant makes no argument about what this background is, why it would have been important at his trial, or how it would have been admissible.

Finally, Defendant argues that Dr. Sharon Hobbs should have been called to testify regarding her treatment of Defendant prior to the alleged offenses. It is unclear how this testimony would be admissible.

The absence of testimony from these witnesses did not deny Defendant a substantial defense. In fact, Perrone and Schroeder provided Defendant with effective representation and a substantial defense without all of the witnesses suggested by Defendant on appeal. Perrone engaged in pretrial motion practice on behalf of Defendant by filing a motion to sever and an entrapment motion. (2/28/17, 3-19; 10/20/17, 8-105). Both were denied before trial after extensive hearings. Perrone also responded and argued against the prosecutor's motion to admit evidence pursuant to MRE 404b. (10/11/17, 3-22). Perrone's defense included arguing that the jury should keep an open mind, that Defendant was presumed innocent, that the Defendant does not have to do anything, and that the prosecutor must prove beyond a reasonable doubt that Defendant is guilty. (11/2/17, 114-120; 11/9/17, 135). Perrone also argued that the evidence against Defendant was manufactured, and that Allen and Close took advantage of Defendant and provided testimony in an attempt to benefit their own situations. (11/2/17, 121-127; 11/9/17, 138-139). Perrone also argued that the evidence that was admitted pursuant to

RECEIVED by MCOA 11/28/2022 7:46:09 AM

MRE 404b was not a part of the charged conduct in the case. (11/9/17, 137-138, 145). Throughout the trial, Perrone cross-examined witnesses and attempted to elicit testimony consistent with Defendant's theory of the case. Throughout trial, Defendant was represented by both of his attorneys—Perrone, and Eric Schroeder.

Finally, even if these alleged errors were so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment," Defendant cannot establish prejudice. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. This is a burden Defendant cannot meet. The jury heard overwhelming evidence of Defendant's guilt from Melke, White, and other witnesses who experienced Defendant's stalking behavior first-hand. The jury heard from three witnesses, Close, Allen, and Officer Mobley, all of whom described how Defendant solicited them to murder Melke. The jury watched a video of Defendant soliciting Officer Mobley. Also of note is the fact that during his entrapment hearing and his previous stalking plea, Defendant admitted to nearly every component of the evidence against him. Therefore, Defendant cannot establish that but for counsel's errors, the result of the proceeding would have been different. Defendant did not receive ineffective assistance of counsel.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

**IV. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S ENTRAPMENT MOTION, ADMITTING EVIDENCE OF DEFENDANT'S STATEMENTS, ADMITTING MRE 404(B) EVIDENCE, AND ALLOWING A JUROR WHO COMMENTED ON DEFENDANT'S RACE TO REMAIN ON THE JURY UNTIL THE CLOSE OF PROOFS.**

<center>**Defendant's Arguments**</center>

**1. Entrapment**

Defendant argues the trial court erred by denying his entrapment motion (Defendant's Argument 5) because while he was in jail, he was withdrawing from alcohol and drugs, he was vulnerable due to his placement in segregation, he had "mental health issues," and he was generally naive regarding jail. Defendant also argues that his motion should have been granted based on "the use of jailhouse snitches looking for favorable treatment."

**2. Defendant's Statements**

Defendant argues the trial court erred by admitting recordings of Defendant's statements because they were obtained in violation of his Fifth Amendment rights and his Sixth Amendment right to counsel. (Defendant's Argument 6).

**3. Juror**

Defendant argues that the trial court erred because it did not immediately excuse one of the jury members who claimed he may potentially have a bias against Defendant if Defendant was of Turkish descent. Defendant argues that allowing the jury member to remain on the jury until the end of closing arguments allowed the juror's bias to taint the jury against him in violation of Defendant's rights. (Defendant's Argument 7).

<center>24</center>

RECEIVED by MCOA 11/28/2022 7:46:09 AM

### 4.  MRE 404(b)

Defendant argues that the trial court erred by admitting the proposed MRE 404(b) evidence. (Defendant's Argument 11). Defendant also argues that the trial court should not have granted the People's motion for reconsideration as to MRE 404(b) evidence of Defendant's attempts to buy a firearm. (Defendant's Argument 8).

## Issue Preservation

### 1.  Entrapment

Defendant filed a motion alleging that Defendant was entrapped. This argument is preserved for appellate review.

### 2.  Defendant's Statements

Defendant did not object to the admission of his statements on the basis of the Fifth or Sixth Amendment. This argument is not preserved.

### 3.  Juror

Though Defendant requested that the trial court voir dire the juror, Defendant did not object to the trial court's proposal to excuse the juror at the close of proofs. This argument is not preserved.

### 4.  MRE 404(b)

Defendant objected to the admission of the other acts evidence at both the hearing to admit the motion and his trial, therefore, this issue would be preserved for appellate review.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

## Standard of Review

### 1. Entrapment

Whether entrapment occurred is determined by considering the facts of each case and is a question of law for this Court to decide de novo. The trial court must make specific findings regarding entrapment, and this Court reviews its findings under the clearly erroneous standard. The findings are clearly erroneous if this Court is left with a firm conviction that a mistake was made. [*People v Fyda,* 288 Mich App 446, 456 (2010) (citations omitted).]

### 2. Defendant's Statements and MRE 404(b)

This Court reviews a trial court's decision regarding whether to admit evidence for an abuse of discretion. *People v Lukity*, 460 Mich 484, 488 (1999). An abuse of discretion occurs "when the trial court chooses an outcome falling outside [the] principled range of outcomes." *People v Babcock*, 469 Mich 247, 269 (2003). When the decision whether to admit evidence involves a preliminary question of law, e.g. whether a rule of evidence or statute precludes admission of the evidence, this Court reviews the issue de novo. *Lukity*, supra at 488. "[I]t is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *People v Bynum*, 496 Mich 610, 623 (2014).

### 3. Juror

"[A] trial court's decision to remove a juror will be reversed only when there has been a clear abuse of discretion. *People v Dry Land Marina, Inc.,* 175 Mich App 322, 325 (1989). An abuse of discretion will be found only when an unprejudiced person, considering the facts on which the trial court acted, would conclude that there was no justification or excuse for the ruling made. *People v Ullah,* 216 Mich App. 669, 673 (1996)." *People v Tate*, 244 Mich App 553, 559 (2001)(parallel citations removed).

RECEIVED by MCOA 11/28/2022 7:46:09 AM

**People's Argument**

## 1. Entrapment

This argument was thoroughly addressed by the People in their Brief on Appeal. The People incorporate their argument from Question Presented IV in the People's Brief on Appeal in response to this argument.

## 2. Defendant's Statements

Just as trial counsel was not ineffective for failing to object to the admission of Defendant's statements on the basis of the Fifth and Sixth Amendments, the trial court did not abuse its discretion by admitting these statements. Defendant was not subjected to custodial interrogation and his voluntary conversations with those he came into contact with in the Ingham County Jail are not "critical" proceedings for purposes of the Sixth Amendment.

Defendant argues that his Fifth Amendment rights were violated because he was tricked into making incriminating statements to inmates and an undercover police officer without being made aware of his *Miranda* rights first. Defendant argues that because of this alleged failure, any and all statements he made to Reginald Close, Charles Allen, and Officer Mobley, as well as all statements he made at the evidentiary hearing on October 20, 2017 must be suppressed because these statements were allegedly obtained in violation of his rights.

Defendant's claims that his statements should be suppressed because he was not advised of his *Miranda* rights are baseless and incorrect and there was no need to advise Defendant of his *Miranda* rights since he was never subjected to a custodial interrogation. Defendant could have ended his phone call with Officer Mobley at any

27

RECEIVED by MCOA 11/28/2022 7:46:09 AM

time, and Defendant was not being questioned or interrogated, he was voluntarily talking to someone he believed was a hit man to set up a murder for hire. Therefore, as Defendant was not the subject of a custodial interrogation when he spoke to Officer Mobley, there was no need to advise him of his *Miranda* rights.[2]

Defendant claims that his statements to Close and Allen should also be suppressed because they were in violation of his *Miranda* rights. Defendant claims that they were acting as "agents" of the police. However neither Close nor Allen were acting as agents of the police in this case as the majority of their discussions with Defendant regarding the solicitations took place before the police got involved, only one of the two men stated that he came forwards initially in hopes of getting a reduced sentence, and because neither of the men actually received any kind of special treatment in return for the information on Defendant. Since neither of the men were acting as agents of the police, they were not required to advise Defendant of his *Miranda* rights. Additionally, none of the statements that Defendant made to either Close or Allen were involuntary, and there is no indication that Defendant was unable to terminate his conversations with Close and Allen. Defendant was not subjected to a "custodial interrogation" by either of the men for the purposes of *Miranda*.

For all of these reasons, Defendant's Fifth and Sixth Amendment rights were not violated and the trial court did not abuse its discretion by admitting Defendant's statements.

---

[2] Furthermore, it would make no sense from a policy standpoint to require undercover officers to read suspects their *Miranda* rights anytime they spoke as it would completely defeat the purpose of being "undercover."

RECEIVED by MCOA 11/28/2022 7:46:09 AM

### 3. **Juror**

The trial court did not abuse its discretion by excusing the juror who expressed they may have a bias if Defendant is Turkish. The trial court excused this juror before deliberations began, so it is not possible that the juror's perspective or bias influenced the jury. Defendant argues speculatively that it did, but there is no evidence to support this.

> In order to establish that the extrinsic influence was error requiring reversal, the defendant must initially prove two points. First, the defendant must prove that the jury was exposed to extraneous influences. Second, the defendant must establish that these extraneous influences created a real and substantial possibility that they could have affected the jury's verdict. Generally, in proving this second point, the defendant will demonstrate that the extraneous influence is substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict. [*People v Budzyn*, 456 Mich 77, 88–89 (1997)(internal citations and footnotes removed).]

Here, Defendant's claim fails at each step. Defendant first cannot establish that the jury was exposed to the excused juror's bias. Second, even if they were, Defendant cannot establish a real and substantial possibility that it could have affected the jury's verdict. This is akin to claiming that if a person shares their opinion on something with another person, that person would then adopt the opinion as their own. This is not reasonable. Even if we were to assume that the juror told someone else on the jury about their bias, it would not be reasonable to claim the bias would be adopted by anyone who heard about it. Finally, the alleged bias is not related to a material aspect of the case, and there is no direct connection between the excused juror's bias and the verdict. This is because the juror who expressed a bias

RECEIVED by MCOA 11/28/2022 7:46:09 AM

did not even participate in deliberations. For all of these reasons, the trial court did not abuse its discretion by excusing the juror before deliberations began.

**4. Admission of MRE 404(B) Evidence and motion for reconsideration of MRE 404(b) evidence.**

Defendant's argument as to the initial MRE 404(b) decision was thoroughly addressed in the People's Brief on Appeal in Question Presented I and the associated argument. The People incorporate that component of their brief on appeal by reference.

Defendant raises a related argument in his assertion that the trial court abused its discretion by considering his testimony at his entrapment hearing to reconsider its ruling regarding Defendant's attempts to buy a gun. Defendant argues that this amounts to using his statements from his entrapment hearing substantively at his trial. However, Defendant's testimony at his entrapment hearing was not used substantively at his trial. His testimony merely caused the trial court to appropriately reconsider its MRE 404(b) ruling as to Defendant's attempts to buy a gun. Defendant points to *People v D'Angelo*, 401 Mich 167, 178 (1977) in support of his argument. In *D'Angelo*, the Supreme Court of Michigan stated that:

> When the defendant raises the issue of entrapment, whether before or during trial, the appropriate procedure will require the trial court to conduct an evidentiary hearing in the jury's absence . . . Any testimony the defendant gives at the entrapment hearing, including his possible admission of the crime charged or some aspect of it, will not be admissible against him in the case in chief for substantive purposes as an admission, but should the defendant give testimony before the jury in the case in chief on a material matter inconsistent with his entrapment hearing testimony, the prior inconsistent testimony may be admitted in the court's discretion to impeach his credibility. *D'Angelo*, 401 Mich at 177-78.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

*D'Angelo* does not address what happened at Defendant's trial because Defendant's statements were not used against him. In all other respects the trial court's ruling as to the admissibility of evidence pursuant to MRE 404(b) was appropriate. The People thoroughly addressed the trial court's ruling in Question Presented I of the People's Brief on Appeal. The People incorporate their argument from Question Presented I by reference.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

**V. THE TRIAL COURT DID NOT ERR BY SCORING OV 4, 6, AND 10, AND BY ORDERING RESTITUTION, COSTS AND FINES IN BOTH OF DEFENDANT'S FILES.**

### Defendant's Arguments

**1. OV 4 and OV 10**

Defendant argues that OV 4 and OV 10 were improperly scored in that the facts did not support scoring them and because the jury did not find Defendant guilty of causing psychological injury or predatory conduct. (Defendant's Argument 13)

**2. OV6**

Defendant argues that OV 6 was improperly scored because he did not intend to kill Melke and the jury was not instructed regarding the varying degrees of murder that one could solicit. (Defendant's Argument 9). Defendant argues that scoring OV 6 was a cruel and unusual punishment, but does not elaborate on this argument.

**3. Restitution**

Defendant argues that he was improperly ordered to pay restitution for uncharged conduct.

**4. Fines and Costs**

Defendant argues that he should not have been assessed fines and costs in each of his cases because16-1064-FH and 16-1065-FC were joined for trial.

### Issue Preservation

**1. OV 4 and OV 10**

The trial court heard from the prosecutor regarding OV 4 and OV 10, but Defendant did not object to the scoring of OV 4 or OV 10.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

### 2. OV 6

Defendant's counsel objected to the scoring of OV 6 at 50 points at Defendant's sentencing hearing. (1/24/18, 9). The argument that OV 6 should not have been scored is preserved. The argument that scoring OV 6 is a cruel and unusual punishment is not preserved.

### 3. Restitution, Fines, and Costs

Defendant did not object to restitution, court costs, or fees at sentencing. These arguments are not preserved. To preserve a challenge regarding a trial court's imposition of court costs, a defendant must object when the trial court orders him to pay the contested court costs. *People v Johnson*, 315 Mich App 163, 197(2016).

## Standard of Review

### 1. OV 4 OV 6, and OV 10

To preserve a challenge to the guidelines scoring, the defendant must raise the issue at sentencing, in a motion for resentencing, or in a proper motion to remand. *People v Kimble*, 470 Mich 305, 309 (2004). Unpreserved scoring errors are reviewable on appeal if the error has resulted in a sentence that is outside the appropriate guidelines range. *Id.* at 310-311. This Court reviews unpreserved scoring challenges for plain error that affected the defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764 (1999). However, if the Defendant advises the sentencing court that he or she agrees with the guidelines as scored, any claim of error is waived for appellate review. *People v Loper*, 299 Mich App 451, 472 (2013).

RECEIVED by MCOA 11/28/2022 7:46:09 AM

"Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *People v Hardy*, 494 Mich 430, 438 (2013).

### 2. Restitution

The trial court's decision regarding the amount of restitution ordered is reviewed for an abuse of discretion. *People v Cross,* 281 Mich App 737, 739 (2008).

### 3. Fines and Costs

This Court reviews unpreserved issues regarding the trial court's decision to order a defendant to pay court costs for plain error affecting substantial rights. *Id.*, citing *People v Carines*, 460 Mich 750, 763 (1999). To avoid forfeiture under the plain-error standard, the defendant must satisfy three elements: "1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Carines*, 460 Mich at 763. Generally, the third element requires the defendant to demonstrate prejudice, "i.e., that the error affected the outcome of the lower court proceedings." *Id.* Even if the defendant has demonstrated all three elements, reversal is appropriate "only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* at 763-764 (citation and quotation marks omitted).

RECEIVED by MCOA 11/28/2022 7:46:09 AM

<div align="center">**People's Argument**</div>

## 1. OV 4 and OV 10

Offense Variable 4 is scored at 10 points when "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.34. The trial court heard evidence that after Defendant and Melke broke up, Melke was "anxious, scared, and upset" any time she was asked about Defendant (11/2/17, p 161); Melke felt she needed to break up with Stan White because she did not want to "put him and his family in danger" due to Defendant's escalating harassments (11/3/17, p 30); Melke felt she was being watched and needed to seclude herself from others much more than she should. (1/24/18, p 15). Based on this, the trial court correctly concluded that Melke suffered serious psychological injury requiring medical treatment.

"Offense variable 10 is exploitation of a vulnerable victim." MCL 777.40. Offense Variable 10 is scored at 15 points when predatory conduct was involved. "Vulnerability" means the readily apparent susceptibility of a victim to injury, physical restraint, persuasion, or temptation. *Id*. "Predatory conduct" means pre offense conduct directed at a victim, or a law enforcement officer posing as a potential victim, for the primary purpose of victimization. *Id*. The trial court specifically addressed whether Defendant's conduct was predatory. In concluding that OV 10 was properly scored, Defendant considered the totality of Defendant's stalking behavior toward Melke. This included his prior convictions for home invasion and aggravated stalking. (1/24/18, 10). The trial court also addressed Defendant's action of drawing a

<div align="right" style="writing-mode: vertical-rl;">RECEIVED by MCOA 11/28/2022 7:46:09 AM</div>

<div align="center">35</div>

map with Melke's personal information on it and providing that map to inmates at the Ingham County Jail so that they could murder her. (1/24/18, 10-13). The testimony from Melke, White, Melke's friends, the police, Close, and Allen established Defendant's constant and escalating harassment and stalking of Melke. Defendant's prior domestic relationship and intimate knowledge of Melke made her vulnerable to injury and harassment by Defendant, and Defendant's action of persistently soliciting Melke's murder was predatory. OV 10 was appropriately scored at 15 points.

### 2. OV 6

Offense Variable 6 is scored when the sentencing offense is solicitation to commit homicide. MCL 777.22(1). OV 6 is scored at 50 points if:

The offender had premeditated intent to kill or the killing was committed while committing or attempting to commit arson, criminal sexual conduct in the first or third degree, child abuse in the first degree, a major controlled substance offense, robbery, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, or kidnapping or the killing was the murder of a peace officer or a corrections officer. MCL 777.36.

Here, Defendant solicited three different people to murder Melke. Defendant was specific regarding what he wanted to have happen, and made it clear that he wanted her to die a violent death. The trial court correctly found that Defendant had the premeditated intent to kill when he solicited Melke's murder on three occasions. (1/24/18, 12-14).

RECEIVED by MCOA 11/28/2022 7:46:09 AM

### 3.  Restitution

Defendant waived the right to challenge the amount of restitution ordered when he failed to object to the amount of restitution. *People v Grant*, 455 Mich 221, 224 (1997). If Defendant's waiver is overlooked, Defendant is not entitled to a reduction in the restitution he currently owes because he cannot establish plain error.

Defendant argues that his court order to pay $2273.00 in restitution was improper because it was based on "uncharged conduct" Defendant claims that the acts of property damage done to Melke and Stan White's vehicles should not be attributed to him and he should not be ordered to pay restitution because, though he was the primary suspect, he was never charged or convicted of these crimes. However, what Defendant fails to mention is that three separate witnesses testified at the trial that Defendant was the most likely person who could have perpetrated the acts of property damage. When asked about the property damage, Defendant did not deny it. Close testified that Defendant told him he was the one who damaged to Melke and Stan White's vehicles. (10/20/17, 43; 11/2/17, 183; 11/3/17, 51, 140). The trial court did not abuse its discretion by ordering restitution because these acts were part of Defendant's course of conduct in stalking Melke. As such, these acts of property damage are part of the "conduct which gives rise to the conviction."

### 4.  Fines and Costs

MCL 769.1k(1)(b)(*iii*) states:

Until October 17, 2020, any cost reasonably related to the actual costs incurred by the trial court without separately calculating those costs involved in the particular case, including, but not limited to, the following:

RECEIVED by MCOA 11/28/2022 7:46:09 AM

(A) Salaries and benefits for relevant court personnel.
(B) Goods and services necessary for the operation of the court.
(C) Necessary expenses for the operation and maintenance of court buildings and facilities.

Courts are not required to separately calculate the costs incurred for each trial, but a trial court must "establish a factual basis" for the costs imposed pursuant MCL 769.1k(1)(b)(*iii*) . *People v Konopka*, 309 Mich App 354, 359 (2015).

Defendant does not argue that the court was not authorized to impose costs or that the costs imposed were not authorized by statute. Instead, he argues that costs should not have been imposed in each of his files. Defendant has failed to present any statutes, case law, or other legal basis in support of this claim and only provides a definition of the legislative intent behind imposing costs on a defendant. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis of his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly,* 231 Mich App 627, 640-641 (1998).

It should however be noted that Defendant was not ordered to pay restitution twice. The judgment of sentence for file 16-1065-FC states that restitution is ordered in the amount of $2,273, and the judgment of sentence for file 16-1064-FH states that no restitution was ordered.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

38

**RELIEF REQUESTED**

WHEREFORE, the People respectfully request that this court affirm Defendant's convictions and sentence.

Respectfully submitted,

CAROL A. SIEMON
INGHAM COUNTY PROSECUTOR

Dated: February 19, 2020

/s/ Kahla D. Crino
Kahla D. Crino (P71012)
Appellate Division Chief

**CERTIFICATE OF SERVICE**

On February 19, 2020, I served a copy of the People's Response to Defendant's Standard 4 Brief on Defendant by first-class mail addressed to:

Tunc Uraz
MDOC #114653
Alger Correctional Facility
N6141 Industrial Park Drive
Munising, MI 49862

I declare that the statements above are true to the best of my knowledge, information, and belief.

/s/ Lisa Renee Davis
Lisa Renee Davis

RECEIVED by MCOA 11/28/2022 7:46:09 AM

STATE OF MICHIGAN
IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,
    Plaintiff-Appellee,

Court of Appeals Nos.
343695 & 343696

V

Circuit Court Nos.
16-1065-FC & 16-1064-FH

TUNC URAZ,
    Defendant-Appellant.

_____/

**PEOPLE'S SUPPLEMENTAL BRIEF ON APPEAL (POST-REMAND)**
**ORAL ARGUMENT REQUESTED**

CAROL A. SIEMON (P32946)
    INGHAM COUNTY PROSECUTING ATTORNEY

KAHLA D. CRINO (P71012)
    APPELLATE DIVISION CHIEF

BUSINESS ADDRESS
    303 W. Kalamazoo Street, 4th Floor
    Lansing, MI 48933
    (517) 483-6228
    kcrino@ingham.org

RECEIVED by MCOA 11/28/2022 7:46:09 AM

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................... iii

Statement of Appellate Jurisdiction and Judgment Subject to Appeal ................ iv

Counter-Statement of the Question Involved ........................................................ v

Counter-Statement of Facts ................................................................................... 1

Argument ................................................................................................................ 13

    I.    Defendant's *Ginther* hearing revealed that: 1) Defendant's attorney, Mr. Perrone was diagnosed with a mental illness *after* Defendant's trial; 2) Mr. Perrone did not exhibit symptoms of his mental illness *during* Defendant's trial, and 3) Mr. Perrone provided effective assistance of counsel. Defendant did not establish the factual predicate for his ineffective assistance claim or actual prejudice. The trial court did not abuse its discretion by finding that Mr. Perrone provided effective assistance of counsel and denying Defendant's motion for new trial. ................... 13

    Relief Requested ..................................................................................................... 25

RECEIVED by MCOA 11/28/2022 7:46:09 AM

# TABLE OF AUTHORITIES

## Cases

*Cullen v Pinholster*, 563 US 170; 131 S Ct 1388; 179 L Ed 2d 557 (2011) ................ 14

*Harrington v Richter,* 562 US 86; 131 S Ct 770; 178 L Ed 2d 624 (2011) ........... 14, 15

*In re Ayres,* 239 Mich App 8; 197 NW2d 106 (1999) .................................................... 18

*People v Carbin,* 463 Mich 590; 623 NW2d 884 (2001) ............................................. 14

*People v Dendel,* 481 Mich 114; 748 NW2d 859 (2008) ............................................. 14

*People v Hopson,* 178 Mich App 406; 444 NW2d 167 (1989) ..................................... 18

*People v LeBlanc*, 465 Mich 575; 640 NW2d 246 (2002) ..................................... 13, 14

*People v Orlewicz*, 293 Mich App 96; 809 NW2d 194 (2011) ..................................... 14

*People v Stewart* (On Remand), 219 Mich App 38; 555 NW2d 715 (1996) ............... 16

*Strickland v Washington,* 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984)... 15, 22

*Wiggins v Smith,* 539 US 510; 123 S Ct 2527; 156 L Ed 2d 471 (2003) ................... 15

## Rules

MRE 404(b) ............................................................................................................ 21

RECEIVED by MCOA 11/28/2022 7:46:09 AM

**STATEMENT OF APPELLATE JURISDICTION AND JUDGMENT
SUBJECT TO APPEAL**

On March 6, 2020, this Court remanded to the trial court for a *Ginther*.[1] In its order, this Court stated that it retained jurisdiction. On August 8, 2022, the trial court found that Defendant was not denied effective assistance of counsel.

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1993).

iv

RECEIVED by MCOA 11/28/2022 7:46:09 AM

**COUNTER-STATEMENT OF THE QUESTION INVOLVED**

**I. Defendant's *Ginther* hearing revealed that: 1) Defendant's attorney, Mr. Perrone was diagnosed with a mental illness *after* Defendant's trial; 2) Mr. Perrone did not exhibit symptoms of his mental illness *during* Defendant's trial, and 3) Mr. Perrone provided effective assistance of counsel. Defendant did not establish the factual predicate for his ineffective assistance claim or actual prejudice. Did the trial court abuse its discretion by finding that Mr. Perrone provided effective assistance of counsel and denying Defendant's motion for new trial?**

Plaintiff-Appellee answers: No.

Defendant-Appellant answers: Yes.

Trial Court answered: No.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

v

## COUNTER-STATEMENT OF FACTS

Defendant Tunc Uraz stalked his ex-girlfriend Erika Melke and solicited two jail inmates and an undercover officer to murder her after she ended a romantic relationship with him. As a result, a jury found him guilty of aggravated stalking and three counts of solicitation of murder.

Defendant and Ms. Melke were in a dating relationship from the end of 2012 or beginning of 2013 until June 2015. (11/3/17, 10). They met when Defendant worked at the Michigan State University Cafeteria and Ms. Melke was a student. (11/3/17, 9). During the relationship, Defendant and Ms. Melke communicated in English, and Defendant taught a culinary arts management class in English. (11/3/17, 10-11).

When Ms. Melke ended the relationship, Defendant was not happy. (11/3/17, 11). After the relationship ended, Defendant still tried to communicate with Ms. Melke and work on their issues. (11/3/17, 11-12). Ms. Melke asked Defendant to leave her alone, but he refused. (11/3/17, 12). In July of 2015, Ms. Melke moved from one unit in her apartment complex to another unit, and Defendant helped her move. (11/3/17, 12-15). Defendant did not have a key to Ms. Melke's apartment. (11/3/17, 14-15).

During the evening on August 24, 2015, someone peeled Ms. Melke's registration tag off of her car, and damaged her car by keying it. (11/3/17, 15-17). On September 29, 2015, Defendant confronted Ms. Melke while she was grocery shopping at Kroger. Defendant asked Ms. Melke about a man that she was dating. Ms. Melke asked Defendant to leave her alone and left the store. Defendant also left without

RECEIVED by MCOA 11/28/2022 7:46:09 AM

buying anything. (11/3/17, 18-19). During this time, Defendant was still trying to communicate with Ms. Melke by text message. (11/3/17, 20).

On December 31, 2015, Defendant confronted Ms. Melke while she was celebrating New Year's Eve at Dave and Busters with her then boyfriend, Stan White, and their friends Noelle VanSlembrouck and Zeb Baldwin. (11/3/17, 20). Defendant tried to make Ms. Melke come outside to talk to him. (11/3/17, 20). When she refused, he began slandering her, calling her a slut, and trying to talk to Mr. White. (11/3/17, 20). Ms. Melke felt scared and unsafe. (11/3/17, 21). Management had to escort Defendant out of the restaurant. (11/3/17, 22). That evening, when Ms. Melke and Mr. White left Dave and Busters, the tires on Mr. White's vehicle had been punctured on their side walls. (11/2/17, 178-179).

Ms. Melke obtained a Personal Protection Order and served Defendant on January 21, 2016. (11/3/17, 21). On February 13, 2016, Defendant texted Ms. Melke and called her a "Ho." (11/3/17, 24).  On March 26, 2016, Defendant confronted Ms. Melke in the parking lot of Best Buy in Okemos. (11/3/17, 25). As Ms. Melke was pulling into the parking lot, she noticed Defendant's vehicle behind her. (11/3/17, 25). Defendant pulled up next to Ms. Melke, rolled down his window, and tried to talk to her. (11/3/17, 25). Ms. Melke took pictures of Defendant using her phone, stayed inside her car, and called the police. (11/3/17, 26-27). Defendant only left the parking lot when police arrived. (11/2/17, 131). Ms. Melke was upset, crying, and distraught. (11/3/17, 132).

RECEIVED by MCOA 11/28/2022 7:46:09 AM

On April 8, 2016, Ms. Melke was in Petoskey at her mother's home. (11/3/17, 27). Defendant called Ms. Melke from his mother's phone. His mother's name appeared on Melke's mother's caller ID, and Ms. Melke did not answer the call. (11/3/17, 28). Ms. Melke did not inform Defendant that she was going to Petoskey. (11/3/17, 28). On May 16, 2016, Ms. Melke stayed at White's house. During the night, Defendant egged Ms. Melke's vehicle and punctured the tires on Mr. White's vehicle again. (11/3/17, 29; 11/2/17, 183). After this, Defendant also began texting Mr. White. Defendant did not identify himself in the text messages, but asked Mr. White to meet with him to work out their differences. Mr. White responded by calling the sender by Defendant's name, confronting him about damaging his vehicle and Ms. Melke's vehicle, and declining to meet with him. The sender did not express confusion and responded in a manner that made it clear he was Defendant. (11/2/17, 185-189). After this, Ms. Melke ended her relationship with Mr. White because she did not want to put him in continued danger. (11/3/17, 30-31).

Also in April 2016, Defendant attempted to obtain a gun and ammunition. Defendant stated that he could not do it the "legal way." (11/6/17, 96). Defendant asked Patrick Burnett, his co-worker at the Michigan State University, to get him a gun and bullets. Defendant asked Mr. Burnett, "Do you trust me?" (11/6/17, 92). Defendant stated that he really needed it, appeared to be serious, and stated that did not want to get a gun the legal way. (11/6/17, 94-96). The day after asking Mr. Burnett to get a gun and bullets for him, Defendant again approached Mr. Burnett, and made the same request again. (11/6/17, 97). Mr. Burnett knew it was not a joke, and

RECEIVED by MCOA 11/28/2022 7:46:09 AM

reported the conversation to his supervisor. Defendant was terminated from his employment at Michigan State University for making this request. (11/6/17, 99).

In May 2016, Ms. Melke placed a security camera in her bedroom because she was concerned that Defendant had entered her apartment without her knowledge or consent. Ms. Melke was correct. On May 25, 2016, Defendant was caught on camera looking around inside Ms. Melke's room. Defendant appeared to be looking in an area where Ms. Melke had placed tickets for an upcoming Drake concert. A bra, underwear, and a pair of shoes also went missing from Ms. Melke's bedroom. (11/3/17, 31-35).

On July 17, 2016, Carmen Elias, Ms. Melke's roommate and Ms. Melke saw Defendant parked outside of Ms. Melke's bedroom. (11/3/17, 35-36; 11/2/17, 146-148). Ms. Elias went to the parking lot, and Defendant drove away. Defendant then texted Ms. Elias and stated that he was in Turkey. (11/2/17, 147-148). A few weeks later, Ms. Elias found that the lug nuts on her tires had been loosened while it was parked outside her apartment. (11/2/17, 155).

On July 13, 2016, Ms. Melke obtained another Personal Protection Order. (11/3/17, 36). On August 15, 2016, Defendant began trying to access and change the password on Ms. Melke's Facebook account (11/3/17, 37). Defendant also created an Instagram account in Ms. Melke's name. He used pictures from Ms. Melke's actual Facebook account, and pictures of a dildo and posted them on the fake Instagram account. He also posted various pictures and messages that pertained to "cheating." (11/3/17, 37-42). This activity was linked to the apartment complex where Defendant

RECEIVED by MCOA 11/28/2022 7:46:09 AM

and Defendant's associate Burak Atamar lived through search warrants for the IP addresses associated with the activity. (11/3/17, 83, 102-110). On August 16, 2016, Ms. Melke attended the Drake concert associated with the tickets Defendant appeared to look at when he broke into her bedroom in May of 2016. (11/3/17, 48). When she returned to her vehicle, her tires were again punctured by stabs to the side walls. (11/48-50).

Defendant was charged with home invasion second degree and aggravated stalking in file 16-534-FH and placed in the Ingham County Jail. Defendant called Ms. Melke two times from the Ingham County jail. Defendant had prerecorded a message that said, "I hope you're happy." (11/3/17, 46-48). Defendant wrote a letter for Ms. Melke and gave it to his former attorney Chris Bergstrom, to give to the prosecutor for Ms. Melke. The letter contained various demands, questions, and statements regarding their relationship. Defendant pleaded guilty to Aggravated Stalking on August 23, 2016, for his stalking conduct from before that date. Defendant admitted that his conduct was designed to scare or intimidate Ms. Melke. (11/3/17, 69).

On August 31, 2016 Defendant created a fake email account using Ms. Melke's name. He sent Ms. Melke a copy of the same letter he had provided to Bergstrom. This was a violation of the PPO and no contact order. (11/3/17, 44, 74-75). On August 27 and 31, 2016, Melke received notifications regarding changes to her Facebook password. This activity was linked to the apartment complex where Defendant lived through search warrants for the IP addresses associated with the activity. (11/3/17,

RECEIVED by MCOA 11/28/2022 7:46:09 AM

83, 102-110). Defendant's GPS tether also showed that he was present at the physical location associated with the IP address on August 27, 2017 and August 31, 2017 when the activity occurred. (11/2/17, 115-119). Before Defendant was sentenced on his first aggravated stalking case, he was charged with aggravated stalking in file 16-1064-FH for his stalking conduct between the dates of August 23, 2017 and September 26, 2017. Defendant's sentencing in his first aggravated stalking file was on November 2, 2017. At that hearing, Defendant admitted to using alcohol since 1985, but denied ever abusing controlled substances. (11/3/17, 70-72). Defendant was sentenced to six months in the Ingham County Jail in file 16-534-FH.

While serving his sentence, Defendant began soliciting other inmates to murder Ms. Melke. Defendant wanted Ms. Melke to die because he believed she had ruined his life, lied to him, and cheated on him. Because of this, Defendant wanted to "get rid of her" (11/3/17, 138) and stated "this bitch got to pay." (11/7/17, 13). Defendant was charged in file 16-1065-FC with three counts of solicitation to murder.

The first person Defendant solicited to murder Ms. Melke was Charles Allen. Defendant and Mr. Allen were housed together for a period of time in a medical unit. They became friendly and Defendant began to talk to Allen about Melke. Defendant told Allen that he was in jail for stalking Ms. Melke. (11/7/17, 10-11). Defendant told Allen that he wanted to get back at Ms. Melke, and stated "this bitch got to pay." (11/7/17, 13). Defendant then made numerous, specific solicitations of Allen. Defendant asked Allen to beat Ms. Melke with a baseball bat. He stated that he wanted her "fucked up" and that he wanted pictures of it. (11/7/17, 14). Defendant

RECEIVED by MCOA 11/28/2022 7:46:09 AM

then asked Allen to kill Ms. Melke. He specified that he wanted her beaten beyond recognition with a bat and that he wanted it to be recorded so that he could masturbate to it. Defendant also requested Ms. Melke's ID. (11/7/17, 20-21). Defendant specified that he wanted Ms. Melke's body to be dumped where no one would find her. (11/7/17, 16). Defendant agreed to pay Allen $2,500 in exchange for killing Ms. Melke. (11/7/17, 16-18). Defendant told Mr. Allen where Ms. Melke lived, what type of car she drove, and warned him that she has a camera in her house. Defendant also requested a gun so that he could go after the guy Ms. Melke "cheated" with. (11/7/17, 21-22). Mr. Allen went along with the conversations, but had no intentions of doing anything Defendant asked. (11/7/17, 22).

Mr. Allen notified a jail deputy about what Defendant had requested. (11/7/17, 24-25). Mr. Allen was interviewed by Detective Matt Krumbach, and during the interview, Mr. Allen asked if he could get out of jail. Detective Krumback told Defendant no, but that he could tell Mr. Allen's probation officer that Mr. Allen was helpful. (11/7/17, 27-28). Mr. Allen stated that no one took advantage of Defendant or hurt him while he was in jail. (11/7/17, 39, 68). Mr. Allen cooperated with law enforcement for the sake of Ms. Melke's life, and because it was the right thing to do. (11/7/17, 28, 69-70).

The second person Defendant solicited to murder Ms. Melke was Reginald Close. Mr. Close's nickname was "Rough." (11/3/17, 131). Defendant, Mr. Allen, and Mr. Close were assigned to the medical unit at the same time, and that is where Defendant and Mr. Close met. (11/3/17, 134-135). Defendant began talking to Mr.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

Close about Ms. Melke within 48 hours of meeting him. (11/3/17, 136-138). Defendant told Mr. Close that Ms. Melke ruined his life, lied to him, and cheated on him. Defendant told Mr. Close that he had stalked her, entered her house, and that it was her fault that he was in jail. (11/3/17, 138). Defendant stated that he was going to get rid of her. (11/3/17, 138). Defendant stated that he had lost his job at MSU because he tried to get a gun from a coworker in order to kill Ms. Melke. (11/3/17, 139). Defendant stated that he sliced Ms. Melke's tires while she was at a Drake concert and that he was able to access her phone through her iCloud. (11/3/17, 140-141).

Defendant asked Mr. Close if he knew anyone who could have Ms. Melke killed and make it look like a robbery. (11/3/17, 143). By the time this conversation took place, Mr. Allen had been moved to another location in the jail. (11/3/17, 143-144). Defendant asked Mr. Close if he could help by killing Ms. Melke. (11/3/17, 145). Mr. Close notified his lawyer after he realized that Defendant was serious about killing Ms. Melke. (11/3/17, 145). Mr. Close agreed to help Defendant kill Ms. Melke. Defendant provided Ms. Melke's address, Mr. White's address, Ms. Melke's Facebook information, a map to Ms. Melke's apartment, Ms. Melke's car information, and Ms. Melke's job information. (11/3/17, 153-156). Defendant agreed to pay $1,000 for Ms. Melke's murder. (11/3/17, 147). Defendant made arrangements for his associate to place some money in Mr. Close's jail account. (11/3/17, 157).

Detective Andrew Hogan, interviewed Mr. Close. (11/6/17, 106). Mr. Close did not receive anything in exchange for his statement or testimony. He was provided with immunity for agreeing to help Defendant kill Ms. Melke. (11/3/17, 146, 160-161).

RECEIVED by MCOA 11/28/2022 7:46:09 AM

Detective Hogan checked Mr. Close's jail account, and verified that someone made a deposit $133.59 on October 13, 2016. (11/6/17, 108-109). Detective Hogan obtained a picture of the person who made the deposit. (11/6/17, 109-110). Detective Hogan verified that Defendant never complained of threats, assaults, or promises from other inmates. (11/6/17, 110-111).

The third person Defendant solicited to murder Ms. Melke was Officer Frank Mobley. Officer Mobley made contact with Defendant in an undercover capacity and pretended to be a "hit man." (11/6/17, 117). He was provided with basic information regarding Defendant's previous solicitations, and was pretending that he was Mr. Close's friend from Detroit. (11/6/17, 117-119). Officer Mobley called Defendant for the first time on October 18, 2016, using a video chat option for jail calls. The call was not successful. (11/6/17, 121). Officer Mobley called again on October 24, 2016. Defendant answered, and the entire call was recorded. (11/6/17, 121). Officer Mobley told Defendant that "Rough" had told him that Defendant needed someone to "take out the trash." (11/6/17, 123). Throughout the call, Officer Mobley referred to Ms. Melke as the "trash," however, he made it clear that this was code for Ms. Melke, the person Defendant wanted to have killed. They discussed whether Defendant wanted Officer Mobley to "beat" the trash, whether he should "spill" the trash all over the house, whether he should beat the trash with a bat, whether he would want the scene to be cleaned up afterward, what color hair the trash had. Defendant stated that he wanted it done quickly, throw it out clean. (11/6/17, 123-127). They discussed the address where the trash would be, and Defendant stated that Rough would have that

9

information because he had written it all down. (11/6/17, 126-127). Defendant stated that he was certain that he wanted it done. They discussed how completion would be verified, and that Defendant would pay Officer Mobley $2,000 for the first "bag" and $500 for any others. Defendant specified that he wanted the "trash" taken care of before November 2, which was his sentencing date.

Approximately a week before Defendant's trial began, the prosecutor provided Mr. Perrone with handwritten notes that were exchanged between Reginald Close and another inmate named John Pierce. (11/2/17, 6). The notes did not pertain to Defendant's case. (11/6/17, 7). The notes were written before Mr. Close contacted his attorney about Defendant's case. (11/6/17, 23). Mr. Perrone utilized the notes as a part of his defense to show that Mr. Close had a habit of communicating with other inmates in an attempt to help his own case. One of the notes also stated that the author was a good liar, however, it was Mr. Pierce, not Mr. Close, who wrote that portion of the note. (11/9/17, 65-66). One of the notes also stated that the author could pass a polygraph. Mr. Perrone at one point stated that he believed it was Mr. Close who had written that statement. (11/3/17, 6-7).

Mr. Perrone filed a motion to sever and an entrapment motion on Defendant's behalf. (2/28/17, 3-19; 10/20/17, 8-105). Both were denied before trial after extensive hearings. Mr. Perrone also responded and argued against the prosecutor's motion to admit evidence pursuant to MRE 404b. (10/11/17, 3-22). Mr. Perrone's defense included arguing that the jury should keep an open mind, that Defendant was presumed innocent, that the Defendant does not have to do anything, and that the

RECEIVED by MCOA 11/28/2022 7:46:09 AM

prosecutor must prove beyond a reasonable doubt that Defendant is guilty. (11/2/17, 114-120; 11/9/17, 135). Mr. Perrone also argued that the evidence against Defendant was manufactured, and that Mr. Allen and Mr. Close took advantage of Defendant and provided testimony in an attempt to benefit their own situations. (11/2/17, 121-127; 11/9/17, 138-139). Mr. Perrone also argued that the evidence that was admitted pursuant to MRE 404b was not a part of the charged conduct in the case. (11/9/17, 137-138, 145). Throughout the trial, Mr. Perrone cross-examined witnesses and attempted to elicit testimony consistent with Defendant's theory of the case. Also throughout trial, Defendant was represented by two attorneys: Mr. Perrone, and Eric Schroeder.

The jury convicted Defendant of three counts of solicitation to commit murder and one count of aggravated stalking. (11/9/17, 186). On December 12, 2017, Perrone informed the trial court of several things: first, that he has bipolar disorder, which he takes medication for. (12/12/17, 6-7); second that he *did not* have an active episode during the trial (12/12/17, 7); third, that his diagnosis did not impact his representation of Defendant. (12/12/17, 5). On December 13, 2017, a hearing was held regarding the information Mr. Perrone provided. The trial court informed Defendant that Mr. Perrone had an illness "*after the completion of the trial*, but before the time of sentencing." (12/13/17, 3, emphasis added). The trial court appointed another attorney, Duane Silverthorn to represent Defendant, however, Defendant requested that Perrone continue representing him along with Mr. Silverthorn. (12/13/17, 4). Defendant agreed that this arrangement was fine with him and that it was what he

RECEIVED by MCOA 11/28/2022 7:46:09 AM

wanted. (12/13/17, 4). Defendant's sentencing was adjourned from December 20, 2017 to January 24, 2018 so that Mr. Silverthorn could prepare. (12/13/17, 5-6). Defendant was sentenced to 200-360 months for each count of solicitation of murder, and 36-90 months for aggravated stalking, with credit for 443 days. (1/24/18, 37).

Defendant appealed his convictions. His appeal included a motion to remand for a *Ginther* hearing. On March 6, 2020, this Court remanded to the trial court to hold a *Ginther* hearing on Defendant's claims of ineffective assistance of counsel. Defendant's ineffective assistance related arguments on appeal were that one of his attorneys, Mr. Perrone, had a mental breakdown during trial and provided ineffective assistance of counsel by: 1) failing to impeach witnesses with prior theft convictions, 2) giving an inadequate closing argument, 3) sending a particular email to Defendant's sister during the trial, and 4) an alleged delay between questions while cross examining a witness. Defendant continued to pursue these claims at his *Ginther* hearing. The *Ginther* hearing was delayed due to the COVID-19 pandemic and the necessity of holding the *Ginther* hearing with Defendant's in-person presence.

At the *Ginther* hearing, Defendant testified on his own behalf and called seven witnesses: 1) his trial counsel Mr. Perrone; 2) his trial counsel Eric Schroeder; 3) Mr. Perrone's trial assistant Nicholas Fernandez, 4) the second chair trial prosecutor, Charles Koop; 5) his attorney at sentencing, Mr. Silverthorn, 6) an employee from Mr. Perrone's office, Andrew Vuckovich. The relevant facts from the *Ginther* hearing will be set forth in the argument section.

On August 8, 2022, the trial court denied Defendant's motion for new trial.

## ARGUMENT

I.   **Defendant's *Ginther* hearing revealed that: 1) Defendant's attorney, Mr. Perrone was diagnosed with a mental illness *after* Defendant's trial; 2) Mr. Perrone did not exhibit symptoms of his mental illness *during* Defendant's trial, and 3) Mr. Perrone provided effective assistance of counsel. Defendant did not establish the factual predicate for his ineffective assistance claim or actual prejudice. The trial court did not abuse its discretion by finding that Mr. Perrone provided effective assistance of counsel and denying Defendant's motion for new trial.**

### Defendant's Argument

Defendant argues that Mr. Perrone was nearing a mental breakdown during trial. Defendant also argues that Mr. Perrone provided ineffective assistance of counsel by: 1) failing to impeach witnesses with prior theft convictions, 2) giving an inadequate closing argument, 3) sending a particular email to Defendant's sister during the trial, and 4) alleged delays between questions while cross examining a witness.

### Issue Preservation

Defendant raised these arguments in his motion to remand, motion for new trial, and during his *Ginther* hearing. These arguments are preserved.

### Standard of Review

Whether a defendant has been denied effective assistance of counsel is a mixed question of law and fact. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). "A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel."

13

RECEIVED by MCOA 11/28/2022 7:46:09 AM

*Id.* A trial court's findings of fact are reviewed for clear error. *Id.* Issues of law are reviewed de novo. *Id.* "A trial court's decision on a motion for a new trial is reviewed for an abuse of discretion." *People v Orlewicz*, 293 Mich App 96, 100; 809 NW2d 194, 200 (2011), app den, cause remanded 493 Mich 916; 823 NW2d 428 (2012).

### Discussion

A defendant seeking a new trial on the ground that trial counsel was ineffective bears a heavy burden. To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy the two-part test articulated by the United States Supreme Court in *Strickland v Washington,* 466 U S 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). See *People v Pickens,* 446 Mich 298, 302-303; 521 NW2d 797 (1994). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment." *Strickland,* supra at 687. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *Id.* at 690. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. [*People v Dendel,* 481 Mich 114, 124-125; 748 NW2d 859 (2008), quoting *People v Carbin,* 463 Mich 590, 599-600; 623 NW2d 884 (2001).]

"The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v Richter,* 562 US 86; 131 S Ct 770, 788; 178 L Ed 2d 624 (2011), quoting *Strickland v Washington,* 466 US 668, 690

RECEIVED by MCOA 11/28/2022 7:46:09 AM

14

(1984). "Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Harrington, supra* at 789, quoting *Strickland, supra* at 689. "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington, supra* at 789. "There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Harrington, supra* at 790, quoting *Wiggins v Smith,* 539 US 510, 525; 123 S Ct 2527; 156 L Ed 2d 471 (2003). Counsel's performance must be viewed from an objective standard, not from "counsel's subjective state of mind." *Harrington, supra* at 790. "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Id. at* 791. "The fact that defense counsel's strategy may not have worked does not constitute ineffective assistance of counsel." *People v Stewart* (On Remand), 219 Mich App 38, 42; 555 NW2d 715 (1996).

**1.      Perrone did not have a mental breakdown during Defendant's trial.**

Defendant's argument that he received ineffective assistance of counsel comes broadly from his insistence that Mr. Perrone had a mental breakdown during trial. Defendant did not establish the factual predicate for this claim. In fact, the credible testimony from the *Ginther* hearing established that Mr. Perrone's mental breakdown occurred after the trial. First, Mr. Perrone informed the trial court that

15

RECEIVED by MCOA 11/28/2022 7:46:09 AM

he did not have a mental health diagnosis before Defendant's trial and that from his perspective, he did not have symptoms during trial. (10/4/21, 14). Mr. Perrone informed this the trial court that he did not have any issues with his mental health on any day of Defendant's trial. (10/4/21, 22, 23, 24, 26, 29, 34-35). Mr. Perrone told the trial court that he had an issue with his mental health about a week after trial. (10/4/21, 35). This episode, approximately a week after trial, led to Mr. Perrone being diagnosed with bipolar disorder. (10/4/21, 35). The next time Mr. Perrone saw Defendant, Mr. Perrone informed Defendant of his mental health diagnosis and Defendant asked Mr. Perrone to continue to represent him. (10/4/21, 36-37). Mr. Perrone informed the trial court that if he had had a mental breakdown or bipolar episode in court it would have been obvious everyone, he would have been unintelligible, and those present would have been calling for help for him. (10/4/21, 37-38). Additionally, Mr. Perrone explained that he did not have any general mental decline during the trial. (10/4/21, 38). [2]

Second, Eric Schroder, who was present during trial as second chair attorney for Mr. Perrone, testified that he did not observe Mr. Perrone have any issues with his mental health during trial. Mr. Schroeder explained to the trial court that he understood his ethical obligations under Michigan Rules of Professional Conduct 1.1, and 8.3 and that he did not see anything regarding Mr. Perrone's representation that gave him pause based on his ethical obligations. (10/4/21, 46-47). As to Defendant's

---

[2] Perrone should be commended for his candor and willingness to publicly testify about these private and difficult matters at Defendant's *Ginther* hearing.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

specific claims, Mr. Schroeder told the trial court that Mr. Perrone did not have a mental breakdown during trial. (10/4/21, 49). Mr. Schroeder told the trial court that "to his knowledge" Mr. Perrone did not have a mental decline during trial. (10/4/21, 50).

Third, Nick Fernandez testified that he did not see any "downturn" in Perrone's behavior during trial, however, Mr. Fernandez did recall an outburst that was directed at either the prosecutor or a detective. (10/4/21, 52).

Fourth, the second chair prosecutor, Mr. Koop, also agreed with the other witnesses that Mr. Perrone did not have a mental breakdown during trial (10/4/21, 55). Similarly, Andrew Vuckovich did not recall issues or changes in Perrone's behavior during the relevant timeframe. (10/4/21, 63-64).[3]

Last, the first chair trial prosecutor, Jonathan Roth, did not observe Mr. Perrone have a mental breakdown during the course of Defendant's trial. Mr. Roth's testimony was unique among the other witnesses in that he had known Mr. Perrone for 10-12 years before this trial. Mr. Roth and Mr. Perrone attended law school together. Mr. Roth did not notice anything different about Mr. Perrone during the trial than he had seen any other time before. (4/13/22, 6-7). Mr. Roth informed this Court that he did not observe Mr. Perrone have a mental breakdown or mental decline on any of Defendant's trial dates. (4/13/22, 11, 12, 14, 17, 20).

---

[3] Vuckovich characterized Perrone as a "jerk" and an "asshole," but not as related to Perrone's mental health. (10/4/21, 64).

17

Mr. Perrone simply did not experience mental decline or a mental breakdown during trial. With that understanding, we will move on to Defendant's more specific allegations of error.

### 2.   Perrone was not ineffective for failing to impeach two witnesses with prior convictions.

Defendant asserts that trial counsel should have impeached Mr. Close and Mr. Allen with their prior theft related convictions. The decisions whether and how to cross-examine witnesses are matters of trial strategy. *In re Ayres,* 239 Mich App 8, 23; 197 NW2d 106 (1999); *People v Hopson,* 178 Mich App 406, 412; 444 NW2d 167 (1989).

Here, Mr. Perrone did not impeach Mr. Allen or Mr. Close with previous theft related convictions, however, the jury knew they were both in jail because that is where they met Defendant. The jury knew that Mr. Close and Mr. Allen were Ingham County Jail inmates. The jury also knew that when he testified, Mr. Close was incarcerated with the Michigan Department of Corrections (11/3/17, 131). Mr. Perrone also attacked Mr. Close's and Mr. Allen's credibility in numerous other ways. Mr. Perrone cross examined Mr. Close regarding the fact that he tried to help other inmates with their cases, and that he had tried to help John Pierce. (11/6/17, 6-7). Perrone elicited testimony that Mr. Close had proffered on other cases and that his original trial date for his own case was adjourned. (11/6/17, 9-13). Mr. Perrone also elicited testimony that Mr. Close was worried that Defendant was setting him up (11/6/17, 17). Mr. Perrone even elicited testimony from Mr. Close that Mr. Close and

18

Mr. Allen had a conversation about Defendant's attempts to have Ms. Melke killed. (11/6/17, 49).

As to Mr. Allen, Mr. Perrone elicited testimony that Mr. Allen was placed on phone restrictions because he wasn't following instructions in the jail. (11/6/17, 31). Mr. Perrone elicited testimony from Mr. Allen that he tried to help Defendant be more comfortable in jail, and that Defendant seemed scared. (11/6/17, 39). Mr. Perrone elicited testimony from Mr. Allen that Mr. Allen believed it would be easy for someone to take advantage of Defendant. (11/6/17, 47).  Mr. Perrone also elicited testimony that Mr. Allen initially came forward with information about Defendant to try to get out of jail early. (11/6/17, 51).

At the *Ginther* hearing, Mr. Perrone explained that this was his first court appointed capital case, but that he felt that the other methods of impeachment that he utilized (as described above) were "very good" ways to impeach. (10/4/21, 11). Mr. Roth explained that nothing about his trial strategy (as the prosecutor) would have changed if Mr. Perrone had impeached Mr. Allen and Mr. Close with their misdemeanor convictions. (4/13/22, 19). Mr. Roth explained that Mr. Close and Mr. Allen's credibility was not dependent on convictions or misdemeanors because the jury was aware that they were in jail and had done bad things. He explained that their credibility came from the corroborating evidence of their claims. (4/13/22, 19, 22). Mr. Roth also explained that this type of impeachment would not have changed the substantial evidence of Defendant's guilt. (4/13/22, 20).

19

RECEIVED by MCOA 11/28/2022 7:46:09 AM

Thus, the failure to impeach Mr. Close and Mr. Allen with prior theft related convictions did not deny Defendant effective assistance of counsel, and in fact, Mr. Perrone elicited other information during cross examination that he was able to use to attack Mr. Close's and Mr. Allen's credibility, or lend support to his theory of the case. It is not reasonable to assert that had the jury been aware of their prior convictions, that they would have then disregarded their testimony and the other evidence of Defendant's guilt.

### 3.    Mr. Perrone's closing argument was appropriate and effective.

Defendant asserts that Mr. Perrone was ineffective because he gave an inadequate closing argument. This is simply incorrect. During pretrial motions, opening statements, cross-examination of witnesses, and closing arguments, Mr. Perrone presented Defendant's theory of the case.

Mr. Perrone's defense included arguing that the jury should keep an open mind, that Defendant was presumed innocent, that the Defendant does not have to do anything, and that the prosecutor must prove beyond a reasonable doubt that Defendant is guilty. (11/2/17, 114-120; 11/9/17, 135). Mr. Perrone also argued that the evidence against Defendant was manufactured, and that Mr. Allen and Mr. Close took advantage of Defendant and provided testimony in an attempt to benefit their own situations. (11/2/17, 121-127; 11/9/17, 138-139). Mr. Perrone also argued that the evidence that was admitted pursuant to MRE 404(b) was not a part of the charged conduct in the case. (11/9/17, 137-138, 145). Throughout the trial, Mr. Perrone cross-examined witnesses and attempted to elicit testimony consistent with Defendant's

RECEIVED by MCOA 11/28/2022 7:46:09 AM

theory of the case. Also throughout trial, Defendant was represented by two attorneys: Mr. Perrone and Mr. Schroeder.

At the *Ginther* hearing, Perrone testified that his closing argument was consistent with the trial strategy that he and Defendant agreed upon. (10/4/21, 33). Mr. Perrone agreed that he utilized the facts that he elicited during testimony as a part of his closing argument. (10/4/21, 33). Some of the facts and arguments from Mr. Perrone's closing argument were: 1) that Mr. Burnett thought Defendant looked scared during the conversation Mr. Burnett and Defendant had about the gun[4]; 2) that Defendant did not take any action toward committing the crimes; 3) that some conversations were initiated by other people; 4) that some of the language that Officer Mobley used was arguably ambiguous; 5) that certain witnesses were not credible; 6) that the police engaged in deliberate conduct, 7) and that there was reasonable doubt. (10/4/21, 33-34). Mr. Perrone also made arguments consistent with the jury instruction modification that he obtained. (10/4/21, 33).

Defendant points to two specific passages from Mr. Perrone's closing argument in support of his argument that Mr. Perrone provided ineffective assistance of counsel during his closing arguments. While these passages are odd, Mr. Schroeder testified that the only issue he observed during Mr. Perrone's closing argument was that he might have lost his train of thought on one occasion. (10/4/21, 48). It may be that

---

[4] The implication being that Defendant wanted the gun for his protection, not to scare, harm, or kill Ms. Melke.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

these passages are what Mr. Schroeder referenced.[5] Mr. Roth testified that he did not observe any glaring issues with Mr. Perrone's closing argument. (4/13/22, 20). In the context of the entire closing argument and the strategy that Defendant agreed to, these two passages alone do not establish that "counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment." *Strickland,* supra at 687.

4. **Perrone's email to Defendant's sister has nothing to do with his representation of Defendant.**

As a part of his *Ginther* hearing, Defendant submitted to the trial court what purported to be an email that Mr. Perrone sent to Defendant's sister during the trial. As to the content of the email, Mr. Perrone testified at the *Ginther* hearing that he thought they would receive a not guilty verdict and that ten million dollars would be a small award in an unlawful imprisonment case. He also testified that he may have been "a little bit expansive," but he "was trying to keep their moral up." (10/4/21, 40). Though some of the statements contained in the email are odd, Defendant has not articulated how this email impacted Mr. Perrone's representation of Defendant.

5. **Mr. Perrone's delay between questions while cross examining Mr. Allen was not ineffective assistance of counsel.**

Defendant argues that a statement made by Mr. Roth at trial regarding Defendant's cross examination of Mr. Allen is an example of ineffective assistance of

---

[5] Defendant cited specific passages for the first time in his supplemental brief on appeal in this Court. Because of this, these passages were not a topic of testimony at the *Ginther* hearing.

counsel. Again, Defendant has not explained how any prolonged delay between questions, even if it did occur, was ineffective assistance of counsel. At the *Ginther* hearing, Mr. Perrone, Mr. Schroeder, and Mr. Roth testified regarding this portion of the transcripts and this allegation. Mr. Perrone testified that he did not believe the delay between questions was actually three minutes long. (10/4/21, 28). Mr. Perrone testified that the cross examination was not as Mr. Roth stated, rambling on for hours. Further, Mr. Perrone testified that in his view, Mr. Roth was trying to undermine Mr. Perrone's cross examination. Mr. Perrone testified that Mr. Roth's objections contained exaggerations that were not consistent with what happened in court. (10/4/21, 28). Similarly, Mr. Schroeder testified that there was not three minutes between each question, and that Mr. Perrone's cross examination of Mr. Allen was lengthy because there was a lot of material to cover. (10/4/21, 50). In contrast, Mr. Roth had a different view. Mr. Roth testified that by his estimate, it *was* literally minutes between questions. (4/13/22, 16). Mr. Roth also testified that Mr. Perrone's cross examination of Mr. Allen was longer than it needed to be. (4/13/22, 16). Mr. Roth's perception was that the delay was intentional, and that it was a part of a trial strategy. (4/13/22, 16-17). Mr. Roth testified that in his view, it was an attempt to dilute the testimony of the most important witnesses. (4/13/22, 17).

And it is possible that the truth is somewhere in the middle. It may be that as Mr. Roth testified, the delay was a part of an intentional trial strategy to dilute certain testimony. Correspondingly, Mr. Perrone and Mr. Schroeder might also be correct that the delay was not actually three minutes between each question.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

Regardless, any delay, if it existed, does not establish ineffective assistance of counsel.

### 6. Defendant was not prejudiced.

Finally, even if these alleged errors were so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment," Defendant cannot establish prejudice. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. This is a burden Defendant cannot meet. The jury heard overwhelming evidence of Defendant's guilt from Ms. Melke, Mr. White, and other witnesses who experienced Defendant's stalking behavior first-hand. The jury heard from three witnesses, Mr. Close, Mr. Allen, and Officer Mobley, all of whom described how Defendant solicited them to murder Ms. Melke. The jury watched a video of Defendant soliciting Officer Mobley. Additionally, during Defendant's entrapment hearing and his previous stalking plea, Defendant admitted to nearly every component of the evidence against him. Therefore, Defendant cannot establish that but for counsel's errors, the result of the proceeding would have been different. Defendant did not receive ineffective assistance of counsel.

RECEIVED by MCOA 11/28/2022 7:46:09 AM

## RELIEF REQUESTED

WHEREFORE, the People respectfully request that this Court affirm Defendant's convictions.

Respectfully submitted,

*/S/ Kahla D. Crino*

Dated: September 12, 2022
Kahla D. Crino (P71012)
Appellate Division Chief
303 W. Kalamazoo Street
Lansing, MI 48823
(517) 483-6228
kcrino@ingham.org

## MCR 7.212(B)(3) STATEMENT

There are 6,526 countable words in this brief.

*/S/ Kahla D. Crino*

Dated: September 12, 2022
Kahla D. Crino (P71012)

25

RECEIVED by MCOA 11/28/2022 7:46:09 AM

ELIZABETH L. GLEICHER
CHIEF JUDGE
MICHAEL F. GADOLA
CHIEF JUDGE PRO TEM
MARK J. CAVANAGH
KATHLEEN JANSEN
JANE E. MARKEY
KIRSTEN FRANK KELLY
CHRISTOPHER M. MURRAY
STEPHEN L. BORRELLO
DEBORAH A. SERVITTO
MICHAEL J. KELLY
DOUGLAS B. SHAPIRO
MARK T. BOONSTRA
MICHAEL J. RIORDAN



State of Michigan
# Court of Appeals
**Lansing Office**

COLLEEN A. O'BRIEN
BROCK A. SWARTZLE
THOMAS C. CAMERON
ANICA LETICA
JAMES ROBERT REDFORD
MICHELLE M. RICK
SIMA G. PATEL
NOAH P. HOOD
KRISTINA ROBINSON GARRETT
CHRISTOPHER P. YATES
KATHLEEN A. FEENEY
ALLIE GREENLEAF MALDONADO
JUDGES

JEROME W. ZIMMER JR.
CHIEF CLERK

January 31, 2023

Tunc Uraz #114653
Muskegon Correctional Facility
2400 S. Sheridan Dr.
Muskegon MI 49442

    Re: **People of MI v Tunc Uraz**
    Court of Appeals Nos. **343695; 343696**
    Lower Court Nos. **16-001064-FH; 16-001065-FC**

Dear Mr. Uraz:

    Thank you for your letter dated January 23, 2023, which appears to give notice of your intent to file an *in propria persona* motion for reconsideration of this Court's January 19, 2023 opinion.

    As to your request for an extension of time to file such a motion MCR 7.215(I)(4) precludes this office from accepting for filing a late motion for reconsideration. Thus, the 21-day period for filing a motion for reconsideration under MCR 7.215(I)(1) cannot be extended. I do note that, under MCR 1.112, a filing submitted by a person incarcerated in a prison is deemed timely filed if deposited in the prison's outgoing mail on or before the filing deadline. Accordingly, for it to be considered timely filed, you must deposit any motion for reconsideration that you file as to this Court's January 19, 2023 opinion in the prison's outgoing mail within 21 days after the date of the opinion, i.e., by February 9, 2023.

        Sincerely,

        Gary L. Chambon Jr.
        District Clerk

cc:  Kahla D. Crino
     Susan K. Walsh

DETROIT OFFICE
CADILLAC PLACE
3020 W. GRAND BLVD. SUITE 14-300
DETROIT, MICHIGAN  48202-6020
(313) 972-5678

TROY OFFICE
COLUMBIA CENTER
201 W. BIG BEAVER RD. SUITE 800
TROY, MICHIGAN  48084-4127
(248) 524-8700

GRAND RAPIDS OFFICE
STATE OF MICHIGAN OFFICE BUILDING
350 OTTAWA, N.W.
GRAND RAPIDS, MICHIGAN  49503-2349
(616) 456-1167

LANSING OFFICE
925 W. OTTAWA ST.
P.O. BOX 30022
LANSING, MICHIGAN  48909-7522
(517) 373-0786

COURT OF APPEALS WEB SITE ~ https://www.courts.michigan.gov/courts/court-of-appeals/

**Gary Chambon**

---

| | |
|---|---|
| **From:** | Gary Chambon |
| **Sent:** | Tuesday, February 7, 2023 8:20 AM |
| **To:** | Tony Ur |
| **Cc:** | Judge Letica; Judge Shapiro; Judge Cameron; kcrino@ingham.org; skwalsh44@gmail.com |
| **Subject:** | RE: Motion for reconsideration per MCR 7.215(I) ORAL ARGUMENT REQUESTED |

Mr. Uraz,

It is inappropriate for you to directly email Judges of this Court *ex parte* correspondence regarding this matter.  Under the Code of Judicial Conduct it is not appropriate for the Judges to receive such *ex parte* correspondence.

Also, an email such as this to me or anyone in the Michigan Court of Appeals Clerk's Office is not an appropriate way to attempt to file a motion for reconsideration in this Court.  Accordingly, this office is not accepting for filing the motion for reconsideration that you attached to your email.

If you wish to submit a motion for reconsideration of this Court's January 19, 2023 opinion in Docket Numbers 343695 and 343696 to this Court you must do so through the ordinary processes for making a filing in this Court, which include mailing a copy to the Clerk's Office by U.S. mail.  As I advised you in my January 31, 2023 letter such a motion for reconsideration would be timely if deposited by you in your correctional facility's outgoing mail within the 21-day deadline under MCR 7.215(I)(1).

Please do not send further emails to my Court email address.  You should not expect a reply to any further such emails.

Gary L. Chambon, Jr.
*Gary L. Chambon, Jr.*
Lansing District Clerk
Michigan Court of Appeals
925 West Ottawa
P.O. Box 30022
Lansing, MI  48909

*This message has been prepared on computer equipment and resources owned by the Michigan Court of Appeals.  It is subject to the terms and conditions of the Court's Computer Acceptable Use Policy.*

**From:** Tony Ur <tonyur@gmail.com>
**Sent:** Tuesday, February 7, 2023 5:05 AM
**To:** Gary Chambon <GCHAMBON@courts.mi.gov>; Judge Letica <ALetica@courts.mi.gov>; Judge Shapiro <DShapiro@courts.mi.gov>; Judge Cameron <tcameron@courts.mi.gov>
**Subject:** Fwd: Motion for reconsideration per MCR 7.215(I) ORAL ARGUMENT REQUESTED

Motion for reconsideration per MCR 7.215(I)  ORAL ARGUMENT REQUESTED

1

RE: PEOPLE V URAZ, 2023 MICH APP LEXIS 487 (01/19/2023

Dear Honorable Judges,


please see the attached docs and evidences for the misapplication of the law, lack of reading of transcripts, (everything was put on the record), palpable errors. I pointed out what was said on the record page by page and show this court perjury committed by attorneys on record during Ginther Hearings and during trial


The hard copies were mailed on 02/02/2023 also you can download attachments from following link


https://drive.google.com/drive/folders/1Wc6iUeUQbmANRTjwF8mgxbuP6p93F70U?usp=sharing


I was told by my appeal lawyer SUSAN K. WALSH that I have to file this enclosed reconsideration briefs by myself.


I appreciate your understanding to this matter

Respectfully Submitted

Tunc Uraz 114653

Muskegon Correctional Facility
2400 S. Sheridan Dr.
Muskegon, MI 49442

STATE OF MICHIGAN
COURT OF APPEALS

PLAINTIFF:

PEOPLE OF THE STATE OF MICHIGAN

V. COA#'s343695, 343696
30th.Cir. Ct. LC#'s 16-00164-FH,16-001065-FC

DEFENDANT

TUNC URAZ
-----------------------------/

REJECTED

FEB - 7 2023

COURT OF APPEALS
FOURTH DISTRICT

***ORAL ARGUMENT REQUESTED***

MOTION FOR RECONSIDERATION BRIEF PER MCR 7.215 (I) FOR PEOPLE V. URAZ 2023 MICH APP 487, 01/19/2023 MOTION FOR REMAND GINTHER HEARING TO EXPAND THE RECORD ABOUT HIS ATTORNEY'S MENTAL ILLNESS GOING BACK TO 2015.

MR. JACOB A. PERRONE'S (P71915) HAD A MENTAL IMPAIRMENT HISTORY BEFORE TRIAL, DURING TRIAL AND AFTER TRIAL.

NOW COMES THE DEFENDANT MR. TUNC URAZ PER PER AND MOVES THIS HONORABLE COURT TO GRANT RECONSIDERATION AND HONOR THE NEWLY DISCOVERED/AVAILABLE EVIDENCE OBTAINED FROM OAKLAND COUNTY PROBATE COURT PER PROSECUTOR JONATHAN C. ROTH'S TESTIMONY DURING GINTHER HEARING ON 04/13/2022. (see pg.20 lines 20-25, pg.21 lines 1-3)

COURT OF APPEALS IGNORED/DID NOT PAY ATTENTION DEFENDANTS' ACTUAL/REAL EVIDENCES AND HIS BRIEF SUBMITTED ON 11/17/2022 DEFENDANTS' SUPPLEMENTAL STANDARD 4 AND ITS ATTACHMENTS BASED ON WHEN DEFENDANT MANAGED TO PUT 21 ISSUES ON RECORD DURING HIS TESTIMONY ON 04/13/22, PGS. 26-63)

DURING SENTENCING ON 01/24/2018 DEFENDANT MANAGED TO PUT 16 ISSUES AGAIN ON THE RECORD (see pgs 23-35) SINCE HIS SENTENCING ATTORNEY KEPT SAYING (D. SILVERTHORN) HE WAS NOT AT THE TRIAL AND HE DID NOT KNOW, WHAT IS BEING DISCUSSED.

THIS IS WHY DEFENDANT HAS A RIGHT TO "RECONSIDERATION APPEAL" TO CORRECT THE MISCONCEPTIONS AN DEFENDANT WISHES THAT JUDGES AND THEIR LAW CLERKS PAY ATTENTION TO DETAILS OF THE CASE AND TRANSCRIPTS.

MICHIGAN LAW IS CLEAR THAT REMAND/REVERSE/VACATE OF CONVICTION CAN ONLY BE GRANTED IF NEW EVIDENCE IS SHOWN TO THE COURT, EVIDENCE THAT COULD NOT HAVE BEEN OBTAINED BY DUE DILIGENCE ON THE IN THE ORIGINAL PROCEEDINGS. IT IS NOT SUFFICIENT TO MAKE AN ALLEGATION THAT THERE IS A NEW EVIDENCE, BUT IT MUST ALSO BE PROVEN THAT THE NEW EVIDENCE; DISCOVERY OF EXCULPATORY EVIDENCE.

HERE ARE THE FACTS OF THIS APPEAL BASED ON TRANSCRIPTS:

ELEMENTS OF THE SOLICITATION TO MURDER; (used in 12/01/2016 and 12/13/2016 prelim. exam)

IN PEOPLE V VANDERLINDER, 192 MICH APP 447 (1992); A SOLICITATION TO MURDER OCCURS WHEN THE SOLICITOR:

a) "PURPOSELY SEEKS" TO HAVE SOMEONE KILLED AND..
b) "TRIES TO ENGAGE" SOMEONE TO DO THE KILLING

JACOB A. PERRONE WAS MY COURT APPOINTED ATTORNEY UNTIL 12/14/2017 SEE ATTACHED E-MAIL MESSAGE FROM 30TH. CIRCUIT COURT CLERK LEIGH ANN WHIPPLE DATED 12/14/2017 APPOINTING DUANE SILVERTHORN AS A SENTENCING ATTORNEY ONLY PERRONE COULD NOT HAVE REPRESENTED DEFENDANT FOR 12/12/2017 AND 12/13/2017 HEARINGS, WHERE PERRONE REPRESENTED HIS OWN INTERESTS NOT DEFENDANTS/ DEFENDANT DID NOT HAVE A 'CONFLICT FREE ATTORNEY" DURING THOSE HEARINGS TO PROTECT HIS SIXTH AMEND. RIGHTS, DEFENDANT NEVER AGREED PERRONE TO REPRESENT HIM BECAUSE HE NEVER CAME TO JAIL TO ASK MY OPINION (see jail logs)

1

PERRONE COULD NOT HAVE "HELPED" SILVERTHORN BECAUSE HE WAS STILL GOING THROUGH COURT ORDERED MENTAL HEALTH TREATMENT FOR 80 DAYS PER OAKLAND COUNTY JUDGES ORDER ON 11/30/2017 (SEE ATTACHED)

I AM NOT SURE WHY COA WOULD NOT ACKNOWLEDGE PERRONE'S MENTAL ILLNESS GOING BACK TO 2015

1) BASIC FACT AND PROCEDURAL HISTORY

DEFENDANT WAS IN JAIL BETWEEN 08/23/2016-08/25/2016 AND REMANDED HIMSELF TO JAIL PERMANENTLY STARTING ON 08/31/2016 TO START HIS PRESUMED JAIL SENTENCE (width the recommendation of his attorney then Chris Bergstrom)

HE DID NOT COME TO JAIL "PURPOSEFULLY" TO SEEK/ENGAGE ANYONE TO HURT ERIKA MELKE (EM) . HE HAD PLEA DEAL FOR HIS FIRST STALKING CHARGE TO 0-3 MONTHS IN JAIL AND HE WAS SUPPOSE TO MOVE BACK TO TURKEY TO BE WITH HIS FAMILY

HE DIDN'T DO ANY TELEPHONE AND COMPUTER ACTIVITIES BEFORE OR AT JAIL. SEE ATTACHED JAIL PHONE LOGS. SECOND STALKING CHARGE WAS BASED ON PERJURY BY EM, BOTCHED LANSING POLICE, INGHAM COUNTY JAIL AND JAILHOUSE INFORMANTS' PROSECUTORS` FABRICATED STORIES. (EVIDENCE WAS SENT ON 01/17/2017 W/ SUPP STAND.4)

DEFENDANT WAS PUT IN SOLITARY CONFINEMENT FOR ALLEGED PHONE CALL TO MELKE ON 09/01/2016 FOR MONTH, WHEN JUDGE PUT HIM ON "PHONE RESTRICTIONS" INDEFINITELY FOR SOMETHING HE DID NOT DO (see jail phone logs)

FOR 1 MONTH HE WAS PUT IN A SOLITARY CONFINEMENT (ACCORDING TO U.N. MANDELLA PRISONERS' RIGHTS STANDARD ANYTHING MORE THAN 15 DAYS OF SOLITARY CONFINEMENT IS CONSIDERED A TORTURE) see:
https://silenced.in/michigan/voices/tunc-uraz
www.yahoo.com/entertainment/hung-myself-prisoner-share-tales-1740221194.html

DEFENDANT WAS TAKEN OUT OF SOLITARY CONFINEMENT AFTER A MONTH AND PUT IN THE SAME "CELL" WITH JAILHOUSE INFORMANTS ON PURPOSEFULLY. (C. ALLEN AND R. CLOSE) see Jail movement records

DEFENDANT WAS EXTORTED AND HIS JOURNAL INCLUDING A MAP THAT HE KEPT WAS STOLEN FROM HIM BY THESE JAILHOUSE INFORMANTS AND USED AGAINST HIM BY FABRICATING THEIR OWN STORIES TO BENEFIT THEMSELVES.(see jail "CATS" substance abuse Therapist TIM HELD report ABOUT DEFENDANT'S JOURNAL)

JACOB A. PERRONE WAS DEFENDANT'S COURT APPOINTED ATTORNEY FOR SOLICITATION CASE ON 11/16/2016 BUT WHEN DEFENDANT DECIDED TO HIRE ANOTHER ATTORNEY (MICHAEL NICHOLS), PERRONE WAS SWITCH TO SECOND STALKING CHARGE WITHOUT DEFENDANT'S CONSENT (Perrone forged def. initials on the sub form without defendants' consent)see attached.

MCR 9.121(C) INVESTIGATING MENTALLY IMPAIRED ATTORNEYS

THE MAJOR FLAW OF SUBSECTION (C) IS THAT SOLE PRACTITIONER ANSWERING THEIR OWN GRIEVANCES WHO MAY SUFFER FROM A MENTAL DISABILITY MAY NOT RECOGNIZE THAT HE OR SHE EVEN HAS A DISABILITY WHICH MAY MITIGATE THE ALLEGED MISCONDUCT. THE FRIGHTENING ASPECT OF CLINICAL DEPRESSION IS THAT; IT HAS USUALLY LASTED SUCH A LONG TIME THAT IT BECOMES THE NORM AND IS RECOGNIZED BY THE PERSON AND OTHERS AS "NORMAL" ALTHOUGH THIS IS NOT THE VENUE TO BRING UP (INEFFECTIVE ASSISTANT OF APPEAL COUNSEL) IAAC . MS SUSAN K. WALSH.DEFENDANT TRIED TO GET HELP HIS FOR APPEAL COUNSEL FROM THE POINT GINTHER HEARING GRANTED TO DEFENDANT ON 03/06/2020.

DEFENDANT WROTE TO SADO AND ASKED FOR ASSISTANCE FOR MS. WALSH TO HELP HER WITH GINTHER HEARING FOR A UNIQUE CASE LIKE THIS BUT HE WAS TOLD THAT, SHE IS AN EXPERIENCED ATTORNEY BY SADO.SHE FAILED TO BRING AN MENTAL HEALTH EXPERT TO TESTIFY ABOUT "UNTREATED, UNMEDICATED, UNDIAGNOSED BIPOLAR DISORDER". SHE ONLY HIRED A PRIVATE INVESTIGATOR WHOM ASKED ATTORNEY'S ABOUT THEIR PERCEPTION OF PERRONE'S MENTAL ILLNESS. SHE FAILED TO PUT MANY TRIAL ISSUES AS WELL FOR REMAND MOTIONS THAT SHE FILED.

Defendant choose "in person hearing" because," the kind of hearing (zoom-video) is "dehumanizing" and it would resemble the defendant as a "cartoon character" more than a real person provides implicit psychological platform

2

for the judge prosecutor and attorney to abandon any "empathy" he might have otherwise exhibit towards defendant regardless of evidence or lack thereof.

Defendant would be mere spectator to the process, one's representation may suffer by the wholesale deprivation of legal assistance at this (zoom-video) hearings. "Mute" button on the microphone is controlled by court where defendant could have put everything on record.

2) JOINDER AND OTHER ACTS

THERE WERE NO AREA OF OVERLAPPING PROOFS BETWEEN THE TWO CASES. THE OFFENSES DO NOT SHARE ELEMENTS OR THE OFFENSE DATE. THEY DO NOT SHARE WITNESSES. DEFENDANT IS THE ONLY COMMON THREAD BETWEEN THE TWO CASES.

STALKING IS NOT A ELEMENT OF SOLICITATION TO MURDER.
JOINING THE CASES WERE MORE PREJUDICIAL THAN PROBATIVE UNDER MRE 403, WHERE IT DISTRACTED, CONFUSED, INFLAMED THE PASSIONS OF THE JURORS DURING #"MEETOO" MOVEMENT IN 2017

THE PROSECUTOR'S THEORY OF THE CASE :
11/09/2017 CLOSING ARGUMENT Pg.160 "FALSITY OF INFERENCES"
"HE WANTS THE GUN BECAUSE HE IS DESPERATE BECAUSE IF HE CANT HAVE MELKE NOBODY CAN"

THE FALLACY OF STATE'S POSITION MAY MOST BE STATED AS A SIMPLE ALGEBRAIC EQUATION, ACCORDING TO PROSECUTION'S MATHEMATICS IF CRIMINAL INTENT:

A= MSU ATTEMPTED GUN INCIDENT
B= STALKING
C= SOLICITATION TO MURDER

SO THIS MEANT > A=B=C > THEREFORE A=C

THIS IS NOT A RIGHT LOGIC TO FOLLOW AND WRONG EQUATION.

DEFENDANT ACKNOWLEDGES THAT HE ATTEMPTED TO PURCHASE GUN AND ACTED IN A STALKING MANNER, ADMISSIBLE EVIDENCE OF HIS DESIRE TO PURCHASE A GUN TO COMMITT SUICIDE BUT IT WAS "NOT" CONCLUSIVE PRESUMPTION OR PROOF THAT HE SOLICITED MURDER.

THIS CRATED A COMPOUNDED CONFUSION ON JURY.

3) BRADY VIOLATION

MICHAEL NICHOLS AND JACOB PERRONE REQUESTED BRADY INFORMATION IN NOVEMBER 2016 AND FEBRUARY OF 2017.BASED ON LANSING POLICE REPORT #LLA161027011556 (10/27/2016) PG.4 POLICE AGENT R. CLOSE "AS RECENTLY HAD BEEN PROFFERED BY LANSING POLICE DETECTIVES LEWANDOSKI AND HOGAN REGARDING TO ANOTHER CASE BEFORE DEFENDANT'S (JOHN PIERCE AND CHRIS SHENBERGER CASE IN AUGUST 2016) PER BASED ON DETECTIVE HOGAN'S TESTIMONY ON 11/06/2017 PG.114-116 CONFIRMS THAT R. CLOSE HAS BEEN JAILHOUSE INFORMANT ON OTHER CASES.

FOOTNOTE #4 AS THE BRIEF TALKS ABOUT THAT BRADY MATERIAL GIVEN TO PERRONE "late last week" IS LIE BECAUSE 0N 10/26/2017 Thursday (trial start day was changed by Prosecution on 10/11/2017 to 10/30/2017 and again 10/31/2017)
PERRONE BY THE FORCE OF JUDGE (because Perrone has not contacted anyone until than on witness list) TO CONTACT JOHN PIERCE (MDOC INMATE) VIA ZOOM AT PROSECUTOR OFFICE WHERE PIERCE TOLD PERRONE THAT REGINALD CLOSE WAS PROFFERING ON HIS CASE AND ON OTHERS AS WELL.(see 10/20/2017 Evid. Hear. pgs 124-147)

ALTHOUGH DEFENDANTS' ATTORNEYS THEN NICHOLS AND PERRONE BOTH REQUESTED BRADY MATERIAL INFORMATION IN NOVEMBER OF 2016 AND AGAIN AFTER BIND OVER IN FEBRUARY OF 2017, BUT IT WAS IGNORED BY PROSECUTION AND PROS. ROTH'S RESPONSE WAS :I just came in contact with this "notes" Tuesday 10/31/2017" (see 11/02/2017 second day of T.T. pgs 4-11, and also where judge denied other proffers given to Reginald Close dating back to 2011 due to not being close proximity) so again this proves and R.CLOSE has been a police agent for a long time. (see attached proffer letter)

4)ENTRAPMENT
ELEMENTS OF THE SOLICITATION TO MURDER;
IN PEOPLE V VANDERLINDER, 192 MICH APP 447 (1992); A SOLICITATION TO MURDER OCCURS WHEN

3

THE SOLICITOR:
a) "PURPOSELY SEEKS" TO HAVE SOMEONE KILLED AND..
b) "TRIES TO ENGAGE" SOMEONE TO DO THE KILLING

DEFENDANT WAS PURPOSELY SOUGHT AND ENGAGED BY JAIL HOUSE INFORMANTS AND U/C POLICE
JUDGE CANADY "YOU CANT ARGUE SIMULTANEOUSLY, DENY THE COMMISSION OF THE CRIME AND
ASSERT THE DEFENSE OF ENTRAPMENT, (SEE PG.108 10/20/2017) JUDGE MADE A "SUBJECTIVE
DECISION", NOT "OBJECTIVE" BY USING A WRONG CASE AS AN EXAMPLE PEOPLE V JONES 48 MICH
APP 33 (1974) (in the middle of the trial defense attorney claimed entrapment in a drug case)

HOWEVER IN MATHEWS V. UNITED STATES 465 U.S. 88 (1988) (LE HN 4b) BY SCOTUS AGREED THAT
ACCUSED CAN DENY THE COMMISSION OF CRIME AND ENTRAPMENT SIMULTANEOUSLY (long standing
entrapment defense rule was ABROGATED) A CLAIM OF ENTRAPMENT IS DISTINCT FROM OTHER
DEFENSES SUCH AS INSANITY, SELF-DEFENSE, A LACK OF SPECIFIC INTENT WHICH INVOLVE AN
ASSESSMENT OF GUILT OR INNOCENCE

A CLAIM OF ENTRAPMENT DOS NOT INVOLVE AN ASSESSMENT OF GUILT OR INNOCENCE, BUT
RATHER EXPRESSES POLICY THAT THERE SHOULD BE NO PROSECUTION AT ALL. PEOPLE V. ALVIN
JOHNSON 396 MICH 424 (1976) SEE POLICE REPORT LLA #161027011556 pgs. 7-12 and the video transcript
that Det.Mobley used "ruff" name first at the video call and def. went along with it because Reginald Close's nick
name confirmed as is ROUGH see trial trans. 11/03/2017 pg. 131 lines 10-13 and on 12/1/2016 and 12/13/2016
prelim hearings no one confirmed, indicated R. Close's nick name being "Rough" or "Ruff" or who had that name?
So there was no proper identification done at all.

The Johnson standards (466 Mich 491) confirms reprehensible actions by Mobley, FACT he set up the account
contacted defendant first on 10/19/2016 when def. was still in the same pod with CLOSE and ALLEN, this is why
Mobley cancelled the video visit (see attached jailhouse movement for CLOSE) BOTH CONFIRMED POLICE
AGENTS.

HERE ARE THE REPREHENSIBLE Police actions

1)Mobley acted like friend to R. CLOSE and to def. and C. Allen was watching the video visit 6 feet behind the
defendant

2) unreliable jailhouse informants police interviews and their fabricated stories accused def. for the crime charged,
DEFENDANT WAS PUT IN THE SAME CELL WITH INFORMANTS the day that search warrant signed by
prosecution/magistrate 09/27/2016 based on false/missing information, defendant was housed with them for 4
weeks 09/27/16-10/28/2016 which paved the way for solicitation charges, since search warrant was an initiation
of a judicial act defedant's SIXTH AMED. right to counsel was violated

4) & 5)&7)&9) Mobley's police report; he says more than 25 time "I asked Mr. Uraz, he was rude and used a foul
language, THREATS AND PRESSING the def. (SEE ATTACHED POLICE REPORT AND MOBLEY VIDEO
VISIT TRANS).

10) MOBLEY SET UP THE ACCOUNT, CONTACTED DEF, DID ALL THE INDUCEMENTS, THREATS,
OFFERINGS, CODED LANGUAGE WHICH ESCALATED, THE CRIMINAL CULPABILITY OF THE DEFENDANT
(ENGLISH IS DEFENDANT'S SECOND LANGUAGE)

11) THERE WAS A POLICE CONTROL OVER INFORMANTS( R. CLOSE AND C. ALLEN)

12) INVESTIGATION WAS TARGETED "PURPOSEFULLY" TOWARDS THE DEFENDANT.

5) INEFFECTIVE ASSISTANCE OF COUNSEL

"INEXPLICABLY INCOMPETENT" STANDARD

WHICH IS A CRONIC STANDARD BEING ABSENT MENTALLY AND PHYSICALLY (3 TIMES JAIL VISIT
ONLY)

U.S V CRONIC 466 US 648 (1984)

the time afforded for investigation and preparation; PERRONE DID NOT DO ANY INVESTIGATION,
DEFENDANT SENT HIM MANY LETTERS SINCE HE WAS APPOINTED TWO CASES IN MARCH 2017, HE
DID NOTHING UNTIL LAST WEEK BEFORE TRIAL STARTED . the experience of counsel, IT WAS HIS FIRST
CAPITAL CASE (see Ginther hearing trans. 10/04/2017 pg. 11 lines 1-17  the gravity of charge DEFENDANT
WAS CHARGED WITH SOLICITATION WITH MURDER (3 COUNTS) AND (1 COUNT) OF AGGV. STALKING
ON A JOINED TRIAL

4

the complexity of possible defenses MANY COMPLEX ISSUES AND TECHNICAL ISSUES (IP ADDRESSES) THAT PERRONE DIDN'T INVESTIGATE the accessibility of witnesses to counsel DEFENDANT SENT HIM 30 NAMES IN APRIL 2017 AND HE DID NOT BOTHER TO INTERVIEW ANY OF THEM UNTIL LAST WEEK BEFORE TRIAL AND ONLY MDOC INMATES WITH THE HELP OF PROSECUTOR'S OFFICE (see 10/20/2017 Evidentiary hearing pg. 124-147) because he did not get paid last time from the county and expected prosecutor to subpoena them.

THE COA ERRED IN UTILIZING AND INFERENTIAL APPROACH IN DETERMINING WHETHER DEFENDANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL HAD BEEN VIOLATED

A) COUNSEL'S MENTAL ILLNESS

SEE ATTACHED OPEN LETTER TO COA JUDGES

DEFENDANT PROVED THAT PERRONE HAD MENTAL ILLNESS:

> BEFORE HIS TRIAL
> DURING HIS TRIAL
>AFTER HIS TRIAL

BASED ON ROTH'S TESTIMONY ON 04/13/2022 PG. (see pg.20 lines 20-25, pg.21 lines 1-3) AND BASED ON 12/18/2017 DOCS SENT TO SILVERTHORN

AND

PERRONE ADMITTED THAT HE WAS UNDIAGNOSED, UNTREATED, UNMEDICATED FOR BIPOLAR DURING TRIAL AND BEFORE DURING HIS TESTIMONY ON 12/12/2017 IN JUDGES' CHAMBERS see 12/12/2017 trans. pg 7 lines4-9  "I AM BIPOLAR AT THIS POINT IN TIME, I'M APPROPRIATELY MEDICATED" SO ACCORDING TO COA BRIEF SUBMITTED ON 01/19/2023, IT ONLY FOCUSES ON PERRONE'S MENTAL ILLNESS AFTER TRIAL AND HIS PERJURED TESTIMONY  PERRONE HAD MENTAL ISSUES GOING BACK TO 2015 SEE PRT FROM FILLED BY PERRONE'S FATHER DATED 11/14/2017 (see attached)

THE MENTAL ILLNESS RECORDS COULD NOT HAVE BEEN ADMITTED AT GINTHER HEARING BECAUSE NONE OF THE DOCS. WERE SHARED WITH DEFENDANT AND HIS APPEAL ATTORNEY.

DEFENDANTS' FIRST STANDARD 4 (APRIL 2019) BRIEF INCLUDED ;

>PERRONE'S FIRST MENTAL HOSPITAL STAY 11/14/2017 (HIS MEDICATION AND ADMISSION DOCUMENTS) it was given to defendant on 12/13/2017 by Perone.
>HIS CRAZY TEXT MESSAGES TO HIS SISTER BETWEEN 11/13/2017-12/06/2017, HIS CRAZY EMAIL MESSAGE TO HIS SISTER DURING TRIAL DATED 11/08/2017
>PERRONE WAS GRIEVED TO ATTORNEY GRIEVANCE COMMISSION (AGC # 18-956) APRIL 2018, BY DEFENDANT.

AS THE BRIEF SUGGESTS THAT, I AGREED TO CONTINUE WITH PERRONE WHEN I ACKNOWLEDGED JUDGE THAT I AM OK WITH THE SWITCH OF ATTORNEYS, PLEASE SEE THE TRANSCRIPT ON THE 12/13/2017, I ONLY AGREED WHAT I WAS TOLD BY JUDGE, REGARDLESS, PERRONE COULD NOT HAVE REPRESENTED ME BECAUSE ;


1) HE WAS ORDERED TO GO TO MENTAL HEALTH TREATMENT WITH COMMUNITY MENTAL HEALTH ON 11/30/2017 BY OKLND COUNTY JUDGE FOR 80 DAYS AND 10 DAYS IN A MENTAL HOSPITAL

2) SEE THE ATTACHMENT #8 SENT BY M. CRINO RESPONSE TO GRIEVANCE FILED IN OCTOBER 2022 (SEE ITEM d) PERRONE WAS ALSO GRIEVED BY AN UNKNOWN PROSECUTOR ON 12/11/2017 AND PERRON WAS AN APPOINTED ATTORNEY FOR THAT CASE ABOUT TO GO TO TRIAL IN DECEMBER 4th 2017, HOWEVER PLEASE SEE THE ATTACHED FILE LABELED 12/11/2017 AND PLEASE READ ENTIRE DOC. TO UNDERSTAND REALITY AND SERIOUSNESS OF THE SITUATION.

On 11/21/2017 this unknown Ingham county prosecutor met with an unknown judge in his chambers with Eric Schroeder (Perrone's "legal associate" and Tiffany DeBruin who was acting as Mr. Perrone's representative, they both told judge that Perrone had been "hospitalized" so therefore judge postponed the trial to April 23 2018 and REMOVED PERRONE ATTORNEY AND REQUESTED ANOTHER ATTORNEY TO BE APPOINTED

3) PER SILVERTHORN'S TESTIMONY ON 10/04/2021, PG 57, WHEN HE MET PERRONE AFTER THE HEARING " HE WAS AGITATED, RAMBLING, DIFFICULTY FOCUSING AND HIS RESPONSE TO PRIVATE

5

INVESTIGATOR IN SEPTEMBER 2021, PERRONE WAS ACTING LIKE A "AMPHETAMINE USER" NON-STOP TALKER ALMOST "PATHOLOGICALLY" SEEMED TO BE FLYING . FOR ALL THE REASONS ABOVE AND MORE PERRONE COULD NOT HAVE "HELP" SILVERTHORN DUE TO HIS MENTAL TREATMENT

C) INVESTIGATION AND CALLING OF WITNESSES D) OTHER ALLEGATIONS

HIS CROSS- EXAMINATION OF WITNESSES WAS FLAWED BECAUSE HE NEVER DID ANY INVESTIGATION NOR LOOKED AT THE HARD EVIDENCE I AND MY FAMILY PROVIDED HIM WITH.

HE DID NOT TALK TO 30 WITNESSES THIS IS PERJURY SEE :10/20/2017 EVIDENTIARY HEARING TRANS, PGS 124-147  SINCE HE DID NOT GET PAID LAST TIME FROM COUNTY TO PRIOR CASE PG. 129, EVEN JUDGE SAID "BECAUSE YOU WERE NOT ADEQUATELY COMPENSATED OR DID NOT GET PAID, SO YOU WAITED UNTIL ONE DAY BEFORE THIS HEARING?"PG. 130,131

HE WANTED PROSECUTION BRING IN DEFENSE WITNESSES 10 DAYS BEFORE TRIAL COMMENCED, HE DID NOT EVEN KNOW WHO IS WHO ON THE LIST. PROSECUTION HAD TO SENT 3 REQUESTS TO PERRONE TO GET A LIST, FORCED PERRONE TO AMEND WITNESS LIST SINCE HE WAS LATE TURNING IT IN. PERRONE NEVER ASKED ME WHO IS WHO ON THE LIST. SEE T.T. 10/31/2017 PG 32-37

MR. BURAK ATAMER, DEF. ROOMMATE WAS NOT BROUGHT IN TO TESTIFY BECAUSE PERRONE NEVER REACHED OUT TO HIM. This is the person deposited money to R.Close's jail account on 10/13/2016, because he was exorting def. for the contents of his journal that he stole from def. Mr. Uraz was trying to protect Melke not hurt her, he was scared of her and his life from these criminals.

PG 45 PERRONE READ NAMES TO POTENTIAL JURORS HE NEVER BOTHERED TO CONTACT( MR. CIHAT OZ, (he was with def. 10/31/2015 out of town restaurant incident, def. did not do any damages) Tim Horan (P/I hired by atty. Nichols where he discovered some dirt about R.Close's crime/trial where his victim did not show up to trial because she was scared of him), Ashley Close (R.Closes' wife she was beaten up by CLOSE), Cathy EDMOND (DEFENDANT'S NEIGHBOUR SHE WAS CONTACTED BY POLICE ONLY ON 10/24/2017 see attached entry report # 11556), ANDREW NITCHMEN,(Melke neighbour) JACKIE CLOSE (brother of CLOSE) 11/02/2017 VOIR DIRE ODD QUESTIONING BY PERRONE FOR JURY SELECTION SEE PGS 21-28, 32-33, 50-52, ALL THIS CONDESCENDING QUESTIONS UPSET TURNED THE JURY OFF
11/03/2017 pg. 163-165 prosecutor asking Perrone if he is going to call any of the witnesses above if so they all needed attorneys since Jackie Close is in Arkansas than Perrone asks for extra ordinary expenses to bring him up in the middle of the trial (Friday 4:00pm)

AND SEE TRIAL.TRANS. 11/06/2017 pg.170-172, no writs were sent to MDOC TO BRING IN INMATES TO TESTIFY, HE FORGOT TO SEND THEM AND HE WAS TALKING ABOUT CLOSING ARGUMENTS THEN BRING THE INMATES. 11/07/2017 PG 59-60 LINES 22-25, PERRONE WAS NOT CONFERING WITH ME HE WAS SUFFERING FROM HEIGHTENED MENTAL GRADATIONS DUE TO HIS UNTREATED BIPOLAR DISORDER AND AS IT READS IN THE 11/14/2017 PSYC. DR. GLICK REPORT ITEM #6 PERRONE HAD A AMPHETAMINE (ADDEROLL) INDUCED BIPOLAR DISORDER. THIS CANNOT BE A "TRIAL STRATEGY" 11/09/2016 PERRONE FAILED TO CALL KENNETH MCDANIELS TO TESTIFY WHEN HE WAS READY TO DOWNSTAIRS ( HE WAS IN THE SAME CLASSWITH R. CLOSE WHERE R.CLOSE TOLD HIM HOW HE FABRICATED THE WHOLE STORY TO GET BETTER DEAL IN WITH HIS CHARGES. pg.52-59 motions for a directed verdict LAST DAY OF TRIAL WITH NO NEW EVIDENCE. PG 135 Perrone ODD CLOSING ARGUMENTS, SEE pgs 135-142 (I DONT HAVE TO PRESENT ANY EVIDENCE IT'S STATE BURDEN....)

PLEASE STOP REFERRING JAILHOUSE INFORMANTS CRIMINAL BACKGROUND AS "MISDEMEANORS" I HAVE ATTACHED THEIR CRIMINAL BACKGROUNDS TO MY 11/17/2022 SUPP. STAND. 4 BRIEF AND I AM ATTACHING ANOTHER R.CLOSE'S COURT DOCS. TO THIS BRIEF AS WELL. PERRONE INCIDENTS/ DELUSIONS:

10/20/2017 PG 144 PERRONE AND ROTH STARTED YELLING AT EACH OTHER
11/07/2017 PG 170 LINE 6-8 ROTH TO PERRONE
11/09/2017
PG 123 VERBAL ARGUMENT WITH PERRONE AND ROTH
PG.131 ASKING JUDGE ABOUT DET. KRUMBACH
"IF HE IS GOING TO LAUGH AT ME AGAIN? ALL HE DOES IS LAUGH!"

YELP.COM REVIEW ABOUT PERRONE'S BEHAVIOUR DURING TRIAL BY AN SPECTATOR....ANGEL R. 11/10/2017

B) DEFENDANT'S MENTAL STATE
I PROVIDED ALL THE COPIES OF MY MENTAL STATE DOCS INCLUDING FMLA PAPERS WHICH WERE SIGNED BY DR. SHARON HOBBS OF EAST LANSING, I TOLD MY ATTORNEY THEN TO MICHAEL NICHOLS IN NOVEMBER 2016 AND PERRONE IN APRIL 2017 TO SEND ME TO FORENSICS CENTER AND I ALSO

6

TOLD MY APPEAL ATTORNEY WHEN I SUBMITTED MY STANDARD 4 IN APRIL, AS ALL COURT APPOINTED ATTORNEY TRIAL AND APPEAL "MINIMAL" APPROACH IS A STANDARD BECAUSE OF MONEY GET PAID IS DIRECTLY CORRELATED WITH THE AMOUNT OF WORK THEY DO. SO THEIR LAZINESS SHOULD NOT BECOME MY BURDEN BECAUSE I PROVIDED ALL THE DOCUMENTATION TO MS. WALSH FOR GINTHER HEARING SHE HAD ALMOST 2 YEARS TO PREPARE FOR IT AND PERRONE HAD 10 MONTHS TO PREPARE FOR A TRIAL, HIS MOTION FOR ENTRAPMENT WAS LAST MINUTE BRIEF PREPARED HAPHAZARDLY. NONE OF THEM INVESTIGATED, ANYTHING ABOUT DEFENDANT'S MENTAL ISSUES AND WHAT SOLITARY CONFINEMENT DOES TO ONE'S MENTAL HEALTH. SO AS A RESPONSE TO YOUR DIMINISHED CAPACITY DEFENSE NOT AVAILABLE AS A DEFENSE IN MICHIGAN. SEE ATTACHED AMICUS CURIAE SUBMITTED BY DEFENDANT TO MI SUPREME COURT FOR THE CASE TYSON 2022 MICH LEXIS 1142 (2022)

SINCE DIMINISHED CAPACITY DEFENSE IS NOT ALLOWED AS A DEFENSE THEREFORE; WHY MENTALLY IMPAIRED (DIMINISHED CAPACITY REPRESENTATION) COURT APPOINTED ATTORNEY IS ALLOWED TO REPRESENT INDIGENT DEFENDANTS?

THESE TWO STATEMENTS ARE INTERTWINED WITH EACH OTHER " IF ONE CANNOT FORM A SPECIFIC INTENT TO COMMIT A CRIME DUE TO MENTAL IMPAIRMENT, HOW CAN ATTORNEY WITH A MENTAL IMPAIRMENT CAN FORM A SPECIFIC INTENT TO DEFEND A DEFENDANT OR HAVE STRATEGY? AS PERRONE'S STRATEGY "THE DEFENSE OF POLICE OVERREACH BY PERRONE WAS NOT AFFIRMATIVE DEFENSE BECAUSE DEFENDANT DID NOT BEAR THE BURDEN OF NEGATING INTENT" 11/09/2017 PG 3 JURY INSTRUCTIONS BY PERRONE WHICH HE DIDNT FILE LAST DAY BUT FILED ON THE FIRST DAY OF TRIAL BEFORE JURY SELECTION STARTED 10/31/2017 PGS 37-38  BRIEF KEPT SAYING WHY DIDN'T I ASK FOR A CHANGE OF ATTORNEY BEFORE TRIAL BECAUSE I DIDN'T KNOW MY RIGHTS BACK THEN. AND EVERYONE KEPT TELLING ME DON'T EXPECT FROM INDIGENT ATTORNEYS

6)PROSECUTORIAL ERROR
CLOSING ARGUMENT BY ROTH WAS PURPOSEFULLY ALTERED ON 11/09/207 JUDGE AND PERRONE AGREED ON PG. 8 LINE 1-25 -ROTH ; PURPOSEFULLY SEEKING TO HAVE SOMEONE KILLED THAT IS THE INTENT
JUDGE: I' M GOING TO GO WITH THAT

ROTH'S FIRST CLOSING ARGUMENT ON PGS. 114, 115,116 HE CHANGED THE WORDING TO "INTENDED" FROM "PURPOSEFULLY"  TO CONFUSE THE JURY TO BENEFIT POSECUTION
PERRON OBJECTED ON PGS 120-123 WHY ROTH CHANGED THE WORDING TO "INTENDED"? THEY HAD A VERBAL ARGUMENT.
PGS 124-127 JUDGE AGAIN CHANGES IT TO "PURPOSEFULLY SOUGHT" WHICH CREATED A PRESUMPTIVE GUILT ON DEFENDANT.
PG 127 LINE 19-25 JUDGE REFUSES TO GIVE CURATIVE INSTRUCTION ABOUT ALTERED JURY INSTRUCTION
PG 131 LINE 5-3
PERRONE PRESERVE THE OBJECTION THAT JURY INSTRUCTION FOR SOLICITATION TO MURDER INSTRUCTION IS MISSING AN INTENT ELEMENT FOR COURT OF APPEALS
PG 133 HERE IS THE SECOND ELEMENT READS "THAT THE DEFENDANT PURPOSEFULLY SOUGHT BY HIS WORDS OR ACTIONS THAT WHAT HE SAID OR DID WOULD CAUSE REGINALD CLOSE, OR CHARLES ALLEN, AND FRANK MOBLEY OR ANYONE ON HIS BEHALF KILL MELKE."

THESE ELEMENTS AND THE SUFFICIENCY OF EVIDENCES DID NOT MATCH, BECAUSE IF YOU LOOK THE CROSS EXAMINATION OF ALLEN, CLOSE AND MOBLEY THEY ALL SAID THEY INITIATED THE CONVERSATIONS DELIBERATELY TO GET THE DEFENDANT MAKE INCRIMINATING STATEMENTS.

ROTH MADE JAILHOUSE INFORMANTS LOOK LIKE AN ANGELS TO JURY INCLUDED LIES SUCH AS THEY NEVER RECEIVED ANY DEALS  (CLOSE AND ALLEN WERE NEVER CHARGED WITH ANY HABITUAL ENHANCEMENT AND CLOSE'S VICTIM DID NOT SHOW UP TO TESTIFY AT TRIAL YET HER PRELIMINARY EXAM TESTIMONY WAS NOT USED, R.CLOSE WAS GIVEN PAROLE BECAUSE HE "COOPERATED" WITH LAW ENFORCEMENT. PERRONE FAILED TO BRING IN AN EXPERT WITNESS TO EDUCATE JURY ABOUT JAILHOUSE INFORMANTS UNRELIABLE FABRICATED TESTIMONY TO FIT THE NARRATIVE OF CRIME AND ALWAYS GET FUTURE DEALS WHICH IS A VERY UNREGULATED AREA WITH PROSECUTORS, AND COURTS. "IF A PROSECUTOR AND POLICE ARE WILLING TO LIE ABOUT INFORMANTS HOW CAN THEIR INFORMANTS BE BELIEVED."
7) VIOLATION OF RIGHT TO COUNSEL
THE SEARCH WARRANT FOR "EXPIRED IP ADDRESSES" ISSUED BY MAGISTRATE ON 09/27/2016, WITH POLICE AND PROSECUTOR TRIGGERED THE INITIATION OF JUDICIAL PROCEDURE AGAINST DEFENDANT IN LIEU OF SIXTH AMEND. PROTECTION OF "PROPHYLACTIC" RIGHT TO HAVE A COUNSEL, THEREFORE ANY INCRIMINATING STATEMENTS DEFENDANT MADE TO JAILHOUSE INFORMANTS SHOULD BE SUPPRESSED.

THE ISSUANCE OF A SEARCH WARRANT IS "UNQUESTIONABLY" A JUDICIAL ACT.
BURNS V REED 500 US 478(1991)
LOMAZ V HENNOSY 151F3 (6TH CIR, 1998)
IRELAND V TUNIS 113F3D1433 (6TH. CIR 1997)
PEOPLE V MARSACK 231 MICH PP 364 (1998)
THIS WAS A "INFERENCE OF FALSITY" SEARCH WARRANT BASED ON EXPIRED AND WRONG IP
NUMBERS, WRONG EQUIPMENT,
see 11/03/2017 RICHARD LAING TESTIMONY PG 92-93

THE IP ADDRESSES TRACED TO AN ACTUAL APPLE/MAC ADDRESS MELKE OWNED AN IPHONE(BUT
THE SEARCH WARRANT SAID GALAXY PHONE FOR CHANGE FOR INSTAGRAM)
THE PASSWORD CHANGE WAS DONE WITH AN EMAIL BELONG TO MELKE NOT DEFENDANT
(RIKA_THINKGREN@HOTMAIL.COM)

3 IP ADDRESSES ALL EXPIRED AND NONE OF THEM MATCHES THE ONES ON SEARCH WARRANT
PERRONE NEVER INVESTIGATED ANY OF THIS, PERRONE SHOWED TO JAIL ON 12/13/2014 AFTER
9:00PM (AFTER ATTY. VISIT HOURS ,HE WILL BE MY SECOND STALKING CHARGE ATTY.) ON 12/14/2017
HE SHOWED UP LATE TO PRELIM HEARING LATE AND BOUND IT OVER BECAUSE HE WAS NOT READY
FOR ANY OF THIS EVIDENCE AND HE WAS HIGH ON DRUGS, HE DID NOT HAVE HIS STATE BAR ID WITH
HIM, SEE JAIL LOGS.
DELIBERATELY CREATED STANDARD
DEFENDANT WAS PLACED IN THE SAME CELL WITH ALLEN AND CLOSE ON 09/27/2016 - 10/28/2016,
ON SEPARATE OCCASIONS ALLEN AND CLOSE ASKED TO SPEAK TO THE POLICE
09/27/2016 R.CLOSE SENT A LETTER TO HIS ATTORNEY ABOUT DEF. INCRIMINATING STATEMENTS
WHICH HE HAS DONE ON TWO OTHER INMATES S WELL, THE GOVERNMENT VIOLATED THE DEF'S
RIGHTS BY "INTENTIONALLY CREATING A SITUATION TO INDUCE, ELICIT
(THE DEFENDANT) TO INCRIMINATING STATEMENTS WITHOUT THE ASSISTANCE OF COUNSEL (US. V
HENRY 477 US 264 (1980)

8) EXTRANEOUS INFLUENCE ON JURY

SEE 11/02/217 PG.12-16 BIAS JURY LARRY R. NISHON EXTENSIVELY QUESTIONED BY JUDGE, PROS.
ROTH AND PERRONE (pgs 21-23) BECAUSE HE WAS FIRST ONE CALLED FOR VOIR DIRE

pg. 98 line 2-5 after jury sworn in JUDGE TELLS JUROR THAT ALTERNATES WOULD BE CHOSEN BY
"DRAW LOTS"

MANIFEST NECESSITY : AFTER JURY SWORN IN ON 11/03/2017 pg.4 BIAS JUROR #1 TELLS COURT
THAT HE IS BIASED AGAINST TURKISH PEOPLE UNTIL THAT POINT NO ONE TOLD TO ANY POTENTIAL
JURORS THAT DEF. HAS TURKISH DESCENT, AGAINST THE JUDGES INSTRUCTIONS JURY, BIAS JUROR
MUST HAVE GOOGLED DEF. NAME "TUNC URAZ" TO LEARN THAT HE IS FROM TURKEY.

11/03/2017 PGS 4,5

BOTH PERRONE AND ROTH TOLD JUDGE THAT JURY NEEDS TO BE REPLACED ASAP

PG.6
INSTEAD OF HOLDING A REMMER HEARING ", JUDGE'S "THEORY"WAS STRIKE HIM AFTER THE
PROOFS, BECAUSE IF HE DOES "THE OTHER WAY" IT STARTS STAMPEDE WITH OTHER JURORS WHO
DOESN'T WANT TO BE IN A JURY POOL.

PER MCR 6.411 AND MCL 768.18 THE ALTERNATE JURORS MUST BE REPLACED BY RANDOW DRAW
NOT KNOWINGLY AND THIS WAS "JUDICIAL LAW MAKING" "ABSURD RESULTS" JAVENS 469 MICH1032
(2004)
AND JI 3.11A REPLACEMENTS JUROR INSTRUCTIONS AND JI 3.3 DEFENDANT NOT TESTIFYING
INSTRUCTION WERE NOT GIVEN TO THE JURY, SEE 11/09/2017 PG.164

JI 5.6 CAUTIONARY INSTRUCTION REGARDING ACCOMPLICE TESTIMONY WAS NOT GIVEN SINCE
IMMUNITY WAS GRANTED BASED ON INFORMANTS WOULD NOT BE CHARGED WITH AIDING AND
ABETTING/ACCOMPLICE, ALSO THEIR IMMUNITY GRANTED
ON 12/01/2016, WAS NOT GRANTED DURING TRIAL SEE T.T. 10/31/2017 PG 30,31, SO INFORMANT'S
PERJURED TESTIMONY WAS NOT IMMUNIZED

9) BINDOVER
SEE 12/13/2016 JUDGE THOMAS PRELIM TT PGS 207LINE 10-13 JUDGE FOUND IT 100%
CIRCUMSTANTIAL PG 208 ,209

8

THERE WAS NEVER ANY MONEY AMOUNT OFFERED BY DEFENDANT
THE AMOUNTS WERE ALL OFFERED BY R.CLOSE AND MOBLEY.
SEE PRELIM EX. 12/13/16, PG 155 R. CLOSE TESTIMONY, VIDEO CALL 10/24/2016,

SEE NOTES EXCHANGED BETWEEN DEF. AND R.CLOSE INITIATED OFFERINGS

MOBLEY'S AND ALLEN'S WERE ALL ABOUT OUT BEATING MELKE

SEE 11/06/2017 T.T. PG 122-145 MOBLEY TESTIMONY HE INITIATED
THE CONVO.

R.CLOSE TT 11/06/2017 PG 5-40 HE INITIATED THE CONVERSATION AND PERRONE DID NOT CONFIRM
WHO IS HAND WRITING ON THE NOTES EXCHANGED BETWEEN PIERCE AND R.CLOSE (NO HAND
WRITING EXPERT WERE CALLED)

see 11/07/2017 TT PG 50-77, ALLEN INITIATED THE CONVERSATION
def. did not give any address, hair color, description to Mobley
THE FACT PRESENTED AT THE PRELIM. DO NOT SUPPORT THAT A SEPARATE AND INDEPENDENT
CRIME WAS COMMITTED (3rd. Solicitation charge)

see People v Salazar 140 Mich App 137 (1985)

10) MIRANDA VIOLATION

DEFENDANT WAS NEVER INTERVIEWED BY ANY POLICE WHILE IN JAIL OTHER THAN POLICE AGENTS
R. CLOSE AND ALLEN WHICH WAS A "CUSTODIAL INTERROGATION"/PROPHYLACTIC RIGHT TO
COUNSEL ARISING FROM FIFTH AMD. SELF INCRIMINATION EDWARDS V ARIZONA 451 US 477 (1981),
MCNEIL V WISCONSIN 501 US 171 (1991)

12)

OV 10 FOR SOLICITATION TO MURDER SCORED 15 POINTS IS WRONG BECAUSE SOLICITATION IS NO
AN OVERT ACT,

COA BRIEF 01/19/20123
"DEFENDANT'S MOTIVATION WITH REGARD TO SCORING OF OV 0 FOR THE PRE- SOLICITATION
STALKING WAS VICTIMIZATION" IS A WRONG ANALOGY BECAUSE:

1) DEF. PROVED THIS COURT THAT SECOND STALKING CHARGE WS BASED ON FALSE EVIDENCE,
INFERENCES AND PERJURED TESTIMONY BY MELKE

2) HIS SENTENCING ATTORNEYS' INEFFECTIVENESS IS OBVIOUS BECAUSE HE WAS HIDING
PERRONE'S MENTAL PRT, POLICE AND PROBATE COURTS DOCS FROM DEFENDANT AND PER
JUDGES REQUEST ONLY PERRONE'S CRAZY EMAIL TO HIS SISTER WS ADMITTED TO RECORD,
DEFENDANT ALSO GAVE SILVERTHORN PERRONE'S FIRST HOSPITAL STAY DRUG INFORMATION
SHEET 11/14/2017 BUT HE CHOOSE NOT TO PUT ON RECORD BECAUSE JUDGE TOLD HIM NOT TO SEE
01/24/2018 PG 3 (JUDGE HAD A PRIOR DISCUSSION WITH SILVERTHRN ABOUT WHAT TO PUT ON
RECORD FOR PERRONE'S MENTAL ILLNESS)WHICH MAKES SILVERTHORN AN ACCOMPLICE TO THIS
COVER UP (WHICH HE IS GRIEVED FOR CURRENTLY AT AGC)

3) 15 POINTS ASSESSED TO OV 10 BASED ON A ALLEGED MAP DRAWN (SEE 01/24/2018 PG 14) BY
DEFENDANT WHICH WAS STOLEN FROM HIM BY R.CLOSE
BUT JUDGE ABUSED HIS DISCRETION AND ALLOWED IN THE EVIDENCE ALTHOUGH IT WAS A
HEARSAY MRE 801 SEE
10/20/2017 PG 20 LINE 6-25 ABOUT MAP TESTIMONY BY DEFENDANT , AGAIN HIS TESTIMONY WAS
USED AGAINST HIM AT TRIAL, WHICH SHOULD HAVE BEEN INADMISSIBLE

FOR OV 9 THERE WAS ONLY ONE VICTIM FOR BOTH CRIME JUDGE JOINED THE CHARGES BASED ON
THAT ON 02/28/17 JOINDER HEARING SAYING "IT IS THE SAME VICTIM FOR BOTH CRIMES.
SILVERTHORN NOT BEING READY FOR SENTENCING CREATES IS "NOT PRESERVED FOR THE
RECORD"

SEE 10/19/2016 AND 11/02/2016 (CASE #16-534-PP) SENTENCING TRANSCRIPTS FOR FIRST STALKING
SINCE MR. BERGSTROM BY RETAINED ATTORNEY SHARED A LETTER WITH PROS MR. KOOP ON
08/23/2016 WHEN DEF, ACCEPTED A PLEA DEAL FOR HIS FIRST STALKING CHARGE, THAT LETTER
WAS USED AGAINST DEFENDANT AT TRAIL BASED ON DEF. EVIDENTIARY HEARING ON 10/20/2017

9

CHRIS BERGSTROM VIOLATED ATTORNEY CLIENT PRIVILAGE BY TESTIFYING AGAINST DEFENDANT ON 11/03/2017 PG 61-62
MR. KOOP ALSO BECAME A WITNESS AT DEFENDANT'S TRIAL BY ACKNOWLEDIGING THE LETTER SHOWN AND LATER THE SAME LETER WAS ALLEGELY EMAILED TO MELKE FROM AN ACCOUNT EMELKE20@GMAIL.COM WHICH BELONGED TO MELKE SINCE 2009
THIS ALLEGED LETTER WAS SHOWN TO PROSECUTOR KOOP BEFORE THE FIRST STALKING PLEASE DEAL
AND ACCORDING TO U.S. V ZOLIN 491 U.S. 554 (1989) SCOTUS
..protect the "wrong doers" not to "PRIOR" WRONG DOING BUT TO "FUTURE" wrong doing

DEFENDANT WAS IN JAIL WHEN THIS ALLEGED EMAIL SENT TO MELKE T 3:32 PM SEE GPS RECORDS 08/31/2016

PERRONE DID NOT OBJECT TO THIS AS WELL.

13) RESTITUTION, FEES AND COSTS

11/03/2017 PG 18 LINE 10-16 MELKE DID NOT HAVE THE CAR BY SUMMER OF 2017 BEFORE TRIAL AND THE RECEIPTS SUBMITTED
TO COURT WERE ONLY TIRE DAMAGE RECEIPTS OF $273.00 SO

01/24/2018
THIS ARBITRARY AMOUNT OF $ 2000.00 (DOOR SCRATCHES) WAS FOR A CAR DOES NOT EXIST ANYMORE. THERE WERE NO REPAIR RECEIPTS SUBMITTED AS WELL, IT WAS JUST ROTH "COMMUNICATED" TO SILVERTHORN IS A PERJURY BECAUSE

SEE
PG. 9 LINE 19-25 "I DID NOT CONDUCT THE TRIAL SO I DON'T KNOW HOW EVIDENCE FELL (ALL THAT EXTRA TIME 35 DAYS JUDGE GAVE TO SILVERTHORN STILL NOT READY)

PG13 LINES 13-25
SILVERTHORN : AGAIN NOT BEING PRESENT, NOT BEING THE PERSON THAT DEFENDED THE CASE, AND TRIED IT....

SEE ATTACHED LIST FROM DEF. SISTER ABOUT HIS SON'S EXPENSES IN TURKEYS AND STATE IS TAKING HIS PENSION FROM DEF. UNDER SCFRA SINCE 2019 AND DEFENDANT HAS BEEN WORKING IN PRISON AND GETTING PAID ONLY $11.00 PER MONTH THEREFORE ONLY INCOME HE IS DEPENDING ON TO SURVIVE IN PRISON . EVERY AMOUNT GETS DEPOSITED FROM 10% OF SCFRA TO DEF. ACCOUNT IS TAKEN RIGHT AWAY, BECAUSE OF TWO SPERATE CHARGES .

DNA

PEOPLE V ORT 2020 MICH APP LEXIS 4049 (2020) DNA WAS ALREADY ON FILE WHEN DEF. WAS CONVICTED FROM PRIOR CASE

DEFENDANT ACCEPTED A PLEA DEAL FOR HIS FIRST STALKING ON 08/23/2016 AND HIS DNA WAS COLLECTED FROM HIM FOR THAT CASE ON 03/26/2016 SEE MERIDIAN TOWNSHIP POLICE REPORT PLEASE CANCEL THE OTHER DNA FEE

BASED ON COA BRIEF BASED ON TWO SPERATE ATTORNEY WORK WHICH IS NOT TRUE BECAUSE PERRON DID NOT DO HIS INVESTIGATION DEFENDANT TRIED TO POINT OUT "PERRONE'S MISHAPS" PER TRIAL TRANS.


PROOF OF SERVICE
DEFENDANT URAZ SERVED THE COPIES OF THIS BRIEF TO INGHAM COUNTY PROSECUTORS OFFICE ON VIA MDOC EXPEDITED MAIL PROCEDURE.

**TUNC URAZ #114653**
**MUSKEGON CORRECTIONAL FACILITY**
**2400 S. SHERIDAN DR.**
**MUSKEGON, MI 49442**

10